# Exhibit 116

```
          SUBSEQUENT PAROLE CONSIDERATION HEARING

                    STATE OF CALIFORNIA

                 BOARD OF PAROLE HEARINGS



In the matter of the Life   )  CDC Number:  H-42130
Term Parole Consideration   )
Hearing of:                 )
                            )
AARON MICHAEL SIDNEY SPRAGUE)
_____ )



       CALIFORNIA SUBSTANCE ABUSE TREATMENT FACILITY

                  CORCORAN, CALIFORNIA

                    JULY 9, 2019

                    08:32 A.M.

PANEL PRESENT:

MICHELE MINOR, Presiding Commissioner
GARY SHINAVER, Deputy Commissioner


OTHERS PRESENT:

AARON MICHAEL SIDNEY SPRAGUE, Inmate
ALISON HARDY, Attorney for Inmate
DENISE HARLAN, Realtime Captioner
DANIELLE DZIOBA, Realtime Captioner
ATIEN HARVEY, Sign Language Interpreter
LISA ESPINOZA, Sign Language Interpreter
ROY HENSLEY, Sign Language Interpreter
CORRECTIONAL OFFICER(S), Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

          _____No    See Review of Hearing
          _____Yes   Transcript Memorandum


HANNAH AVERETTE, Transcriber, DE
```

# **I N D E X**

Page

Proceedings.......................................  3

Case Factors.....................................  26

Pre-Commitment Factors...........................  17

Post-Commitment Factors..........................  36

Parole Plans.....................................  64

Closing Statements...............................  79

Recess...........................................  84

Decision.........................................  85

Adjournment......................................  93

Transcript Certification.........................  95

3

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **DEPUTY COMMISSIONER SHINAVER:**  Okay.  We're on |
| 3 | the record. |
| 4 | **PRESIDING COMMISSIONER MINOR:**  Thank you. |
| 5 | Today's date is July 9th, 2019.  The time is |
| 6 | approximately 8:32 AM.  This is the fourth subsequent |
| 7 | parole suitability hearing for Mr. Sprague who is |
| 8 | present in the BPH hearing room at this Substance Abuse |
| 9 | Treatment Facility.  This hearing is being -- let me go |
| 10 | back.  Mr. Sprague committed his offense while he was |
| 11 | under the age of 26 so the panel will give great weight |
| 12 | to the youth offender factors in deciding suitability |
| 13 | today.  This hearing is being audio recorded.  So for |
| 14 | the purpose of voice identification, everyone present is |
| 15 | asked to state your full name and spell their last name. |
| 16 | Mr. Sprague is also going to give us his CDC number. |
| 17 | I'll go first and continue to my right.  Michele Minor, |
| 18 | M-I-N-O-R, Commissioner. |
| 19 | **DEPUTY COMMISSIONER SHINAVER:**  Gary Shinaver, S- |
| 20 | H-I-N-A-V-E-R, Deputy Commissioner. |
| 21 | **REALTIME CAPTIONER HARLAN:**  Denise Harlan, |
| 22 | realtime captioner, H-A-R-L-A-N. |
| 23 | **REALTIME CAPTIONER DZIOBA:**  Danielle Dzioba, |
| 24 | realtime captioner, D-Z-I-O-B-A. |
| 25 | **DEPUTY COMMISSIONER SHINAVER:**  Mr. Sprague. |

1     **PRESIDING COMMISSIONER MINOR:** State your name.

2     **INMATE SPRAGUE:** Uh, Aaron Sprague, H42130.

3     **PRESIDING COMMISSIONER MINOR:** Spell your last

4  name for us.

5     **INMATE SPRAGUE:** Uh, Sprague, S-P-R-A-G-U-E.

6     **ATTORNEY HARDY:** Alison Hardy. Attorney for Mr.

7  Sprague. A-L-I-S-O-N H-A-R-D-Y.

8     **SIGN LANGUAGE INTERPRETER HARVEY:** Atien Harvey,

9  H-A-R-V-E-Y, sign language interpreter for the

10  defendant.

11     **SIGN LANGUAGE INTERPRETER ESPINOZA:** Lisa

12  Espinoza, sign language interpreter, E-S-P-I-N-O-Z-A.

13     **SIGN LANGUAGE INTERPRETER HENSLEY:** Roy, last

14  name Hensley, H-E-N-S-L-E-Y, also an interpreter.

15     **PRESIDING COMMISSIONER MINOR:** Thank you. We

16  also have a correctional officer in the room. The

17  correctional officer is here for security purposes. So

18  the first thing we're going to do today is we're going

19  to conduct your ADA review. That's to see if there's

20  any assistance you needed this hearing today. And so I

21  want to make sure that, um, as we have the interpreters

22  set up that you, um, are able to see the interpreter

23  that -- that's right in front of you and that the

24  captioning, um, is -- is working.

25     **INMATE SPRAGUE:** Yes.

1          **PRESIDING COMMISSIONER MINOR:**  Okay.

2          **ATTORNEY HARDY:**  May I interrupt for a minute?

3          **PRESIDING COMMISSIONER MINOR:**  Okay.  Uh, Aaron,

4    would -- Mr. Sprague, would it help if we moved the

5    screen so that it's more in line with the interpreter?

6          **INMATE SPRAGUE:**  That'd be better for me because

7    I keep going back and forth.

8          **ATTORNEY HARDY:**  If you stand up --

9          **PRESIDING COMMISSIONER MINOR:**  How does that

10   work?  Do you want him to stand?  Do you want him to

11   sit?

12         **SIGN LANGUAGE INTERPRETER HARVEY:**  Perfect.

13         **PRESIDING COMMISSIONER MINOR:**  Did -- do we want

14   him to stand or sit?

15         **SIGN LANGUAGE INTERPRETER HARVEY:**  He said sit.

16         **PRESIDING COMMISSIONER MINOR:**  Sit.  Okay.  Okay.

17   All right.  So we, um, as we go through, we have a sign

18   language interpreter.  We also have the closed

19   captioning and I do want to note that, um, Ms. Hardy did

20   provide a list of common words.  Um, we have that list

21   and I believe that the interpreters also have that list

22   and that's to the, um, caption.  It's for captioning and

23   you can -- Ms. Hardy, you can go on and speak.

24         **ATTORNEY HARDY:**  Thank you.  Um, yes, I did give

25   that a list this morning to the transcriptionist.  Thank

6

1    you.  Um, I don't know if it would be helpful for the

2    interpreters to also see the list.  I have another copy

3    and I can give it to them if that would be helpful.

4         **PRESIDING COMMISSIONER MINOR:**  And this list, it

5    appears that when the -- I believe and Ms. Hardy, you

6    can certainly correct me if I'm wrong.  I believe that,

7    um, some of the words as they were interpreting didn't

8    come out quite right as they were being typed.  And so

9    we just want to make sure that there's clarification on

10   those words.

11        **ATTORNEY HARDY:**  Thank you.

12        **PRESIDING COMMISSIONER MINOR:**  So if we have any

13   of those issues today, if we have these words that are -

14   - we -- we have a clarification.  Okay.  So we have, um,

15   our sign language interpreter, we have two, um, close

16   caption -- is that -- give me the proper, um --

17        **REALTIME CAPTIONER HARLAN:**  Captioning.

18        **PRESIDING COMMISSIONER MINOR:**  Captioning.  Okay.

19   And you will switch off every --

20        **REALTIME CAPTIONER HARLAN:**  30 minutes.

21        **PRESIDING COMMISSIONER MINOR:**  30 minutes.  And I

22   understand that the sign language interpreters will

23   switch off every about 20 minutes.  Okay.  All right.

24   And so you just switch off as you need.

25        **REALTIME CAPTIONER HARLAN:**  She'll have to reach

1  out and pull her out and I'll slide mine over.

2          **PRESIDING COMMISSIONER MINOR:**  Okay.  Do you need

3  a break during that time?  Just a quick --

4          **REALTIME CAPTIONER HARLAN:**  Just a quick --

5          **PRESIDING COMMISSIONER MINOR:**  Just let us know.

6  Okay.  All right.  So I reviewed the DECS database and

7  I've also reviewed the notice and request for assistance

8  at parole proceedings form.  So as we go through the

9  form, it does indicate that you also are visually

10 impaired, right?

11         **INMATE SPRAGUE:**  Yes.

12         **PRESIDING COMMISSIONER MINOR:**  And so what -- and

13 so as you are -- do you have anything that assists you

14 with your vision like glasses or anything like that?

15         **INMATE SPRAGUE:**  I have glasses for reading.

16         **PRESIDING COMMISSIONER MINOR:**  Okay.  But they

17 don't help you with your ability to see your

18 interpreter?

19         **INMATE SPRAGUE:**  No, I have a (inaudible).  It's

20 like a tunnel vision.  So I don't really see anything to

21 the side and I can't really see that far.  This is

22 perfect right here.

23         **PRESIDING COMMISSIONER MINOR:**  So that's perfect.

24 Okay.

25         **ATTORNEY HARDY:**  Commissioner, for record, um,

8

the eye disease is called retinitis pigmentosa.

    **PRESIDING COMMISSIONER MINOR:**  Okay, thank you.

    **DEPUTY COMMISSIONER SHINAVER:**  Okay, so on -- on just what clarification on the issue with visions and he -- there is a magnifying device present for him also for reading and then the glasses are reading glasses, correct?

    **ATTORNEY HARDY:**  They are, yes.

    **DEPUTY COMMISSIONER SHINAVER:**  Thank you.

    **PRESIDING COMMISSIONER MINOR:**  All right.

    **UNIDENTIFIED SPEARKER:**  Oh, good.  Thank you.  I like that.

    **PRESIDING COMMISSIONER MINOR:**  Okay, so you have on your vest, it also indicates you have on compression stockings or anything like that?  Do you have the compressions?  You don't have to take it off.  You have your vest on.  Okay.  He's showing us his vest.

    **INMATE SPRAGUE:**  Trust me, I don't mind taking it off.

    **PRESIDING COMMISSIONER MINOR:**  Do you have on compression stockings?

    **INMATE SPRAGUE:**  Yeah, when my leg swells up, I have to put them on at night.

    **PRESIDING COMMISSIONER MINOR:**  Oh, just at night.  Okay.  All right.

1      **INMATE SPRAGUE:**  Yeah, for my heart.

2      **PRESIDING COMMISSIONER MINOR:**  Okay.  So we have

3  your reading level at 11.3.  I also note you have a GED,

4  is that correct?

5      **INMATE SPRAGUE:**  Yes.

6      **PRESIDING COMMISSIONER MINOR:**  And you have your

7  hearing aids on, you have glasses.  Like I mentioned,

8  you have your vest, you have the closed captioning.  The

9  accommodation also includes your attorney.  Okay.  All

10  right.  Ms. Hardy, I've gone through the documents that

11  we have and also the DECS database.  Is there any --

12  anything else in the area of ADA?

13      **ATTORNEY HARDY:**  It takes an enormous amount of

14  concentration for Mr. Sprague to deal with the hearing

15  world.  He's looking both at the reading and at the

16  interpreter.  Um, this is exhausting for him.  So, um,

17  in addition to taking breaks for the interpreters, I

18  would like, uh, us all to be mindful that Mr. Sprague

19  may need to take breaks along the way.

20      **PRESIDING COMMISSIONER MINOR:**  Okay.

21      **DEPUTY COMMISSIONER SHINAVER:**  And I'm sorry, did

22  we mention the hearing aids?

23      **PRESIDING COMMISSIONER MINOR:**  Yes.

24      **DEPUTY COMMISSIONER SHINAVER:**  Okay.  And also, I

25  don't know if this is needed, but there's a pocket

1  talker available.  I suppose that's not really needed if

2  there's hearing aids.

3         **ATTORNEY HARDY:**  Not for this hearing.  Thank

4  you.

5         **PRESIDING COMMISSIONER MINOR:**  So we'll take

6  breaks as needed and we'll go slow.

7         **ATTORNEY HARDY:**  One other thing is that, um, ASL

8  is a language that has some much smaller vocabulary than

9  English.  So I just ask that people use simple words.

10         **PRESIDING COMMISSIONER MINOR:**  Okay.  We'll do

11  that.  All right.

12         **ATTORNEY HARDY:**  Commissioners, uh, is this the

13  time when I give you, um, extra documents that are not

14  yet in the record?

15         **PRESIDING COMMISSIONER MINOR:**  Not quite yet.

16  We'll get there.

17         **ATTORNEY HARDY:**  Okay.  Thank you.

18         **PRESIDING COMMISSIONER MINOR:**  Okay.  All right.

19  So, um, as we -- as we go through, um, the hearing

20  today, we certainly want to make sure that you have --

21  understand what we're asking.  If you need any

22  clarification, make sure you ask us for clarification.

23         **INMATE SPRAGUE:**  Okay.

24         **PRESIDING COMMISSIONER MINOR:**  All right.  So

25  today I want to make sure you understand that we're not

# Exhibit 117

## Declaration of Ms. Tammatha Foss

I declare, under penalty of perjury and pursuant to 28 U.S.C. § 1746, as follows:

### I.     Background and Qualifications

1.     My name is Tammatha Foss, Director, Corrections Services at California Correctional Health Care Services (CCHCS).  In that role, I coordinate activities between the Receivership and CDCR.  I was appointed to serve in my current role in November 2020.

2.     I have worked at the California Department of Corrections and Rehabilitation (CDCR) for twenty-five years in a variety of roles.  From 1996 to 2009, I was a corrections officer at Pelican Bay State Prison.  After serving in administrative roles at San Quentin State Prison and CDCR Headquarters from 2009 to 2016, I was appointed chief deputy warden at High Desert State Prison, where I served from 2016 to 2018.  From 2018 to 2019, I was acting warden at Salinas Valley State Prison.  In 2019, I was appointed as Associate Director of Female Offenders Programs and Services.

### II.     Introduction of COIVD-19 to CDCR Institutions

3.     From my duties in my current and prior roles within the CCHCS and CDCR, I am familiar with how corrections officers and incarcerated persons interact on a daily basis.  Corrections officers have frequent, daily, close contact with incarcerated persons.  Corrections officers work in the housing units in which incarcerated persons live and provide them with services throughout the day.  In many cases, corrections officers provide incarcerated persons their meals, distribute their mail, and perform daily safety checks.  When incarcerated persons go out to the yard— an outdoor space within the grounds of a facility—which they generally do twice each day, corrections officers pat them down to ensure they do not have contraband both on their way to and from the yard.  Incarcerated persons are also handcuffed and escorted by a corrections officer, with the officer maintaining physical contact to guide the incarcerated person, when not in a secure environment, such as moving to another part of the institution or to an outside medical appointment.  Those in administrative segregation are typically handcuffed when out of their cells.  When performing their jobs, corrections officers are within six feet of incarcerated people frequently throughout their shifts; it is not possible for corrections officers to perform their job with social distancing precautions.

4.     Corrections officers perform their work throughout the institution and cannot typically remain at one duty station because the allocation of staff resources is adjusted to meet the needs of the institution.  Officers working their ordinary shifts are often reassigned to cover higher-need vacant positions.  For example, a gym officer may be reassigned for the day to guard a clinic in order to keep the clinic operating.  There are often insufficient staff resources within one housing

unit or one yard to accommodate these institutional needs without moving staff throughout the institution.  Emergency transports are also a near daily occurrence at each institution, and any available officer may be assigned to assist in that transport.  Corrections officers also frequently work overtime in housing units and yards to which they are not ordinarily assigned, based on availability and need of the institution.

### III.    CDCR Facilities

5.      A majority of incarcerated persons in CDCR custody are housed in dormitories that are too crowded to allow for social distancing.  These accommodations typically have one hundred to two hundred bunk beds per room in close proximity to one another.  To provide more distance during the COVID-19 pandemic, bunk beds have been grouped together into cohorts of eight beds.  Within a cohort, the beds are within six feet of each other, but the cohorts are spaced six feet apart from other cohorts.

6.      Some incarcerated persons are housed in cells, typically two-person cells.  Most cells have perforated doors or bars rather than solid doors.

7.      If there is no current COVID-19 outbreak, incarcerated persons spend their days in a variety of environments, none of which is conducive to social distancing.  Typically, incarcerated people spend the day at job assignments in the institution, in classrooms, in the yard, or in the dayroom.  In most of these environments, incarcerated people are with only those people who are in the same housing unit.  However, in the yard and in jobs, incarcerated people will come into close contact with people from other housing units.  The institutions do not contain sufficient yard or work spaces or sufficient staff to provide each housing unit separate yard and work space.

8.      In some institutions incarcerated people are served meals in their cells.  Generally, however, incarcerated people eat in a dining hall.  Generally, those dining halls have tables of four, at which incarcerated persons sit close together with others from the same housing unit.  During the COVID-19 pandemic, the tables have been spaced at least six feet apart from one another.

9.      Bathroom facilities vary by housing type.  Every cell has its own toilet and sink and several cells share a single shower.  Dormitory housing has group bathrooms, generally with a shower area with six shower heads, a large sink area, and a common bathroom.  It is common for several residents to be in these common bathrooms at a time.

10.     Incarcerated people will often be in close contact with residents of their own and other housing units and yards while waiting for services such as laundry, pill distribution, telephones, and classrooms.  Medical programs also often bring incarcerated people from different housing units into close contact, such as Enhanced Outpatient Program ("EOP") groups for mental health, or instances

where ten to twenty incarcerated people wait together in a holding area to be called in for medical appointments. When visitation is available, incarcerated people are held in a holding area after completing visitation and are often in close contact there with people from other housing units. Although visitation was suspended from March 2020 through April 2021, since April, limited visitation has been available in institutions without a recent outbreak consistent with the Roadmap to Reopening plan.

11.     Incarcerated people also share a large number of high-touch objects and surfaces such as telephones, showers, tables and chairs, door handles, and water fountains. While some of these surfaces, such as showers and telephones, are now cleaned between each use, many are not.

I declare that the foregoing is true and correct.

Executed on this 4th day of August, 2021, at Sacramento, California.

DocuSigned by:

*Tammy Foss*

CA838E6E43384A2...

Tammatha Foss

# Exhibit 118

## Reply Declaration of Tammatha Foss

I declare, under penalty of perjury and pursuant to 28 U.S.C. § 1746, as follows:

1.  I am Tammatha Foss, Director, Corrections Services at California Correctional Health Care Services (CCHCS). I was appointed to that role, which involves coordinating between the Receivership and CDCR, in November 2020. Prior to November 2020, I worked at CDCR for twenty-four years in a variety of roles from corrections officer to acting warden.

2.  Every day, across all CDCR institutions, there are hundreds of employees working in areas to which they are not regularly assigned. Each institution has relief officers with no permanent post who fill different vacancies from day to day, including substituting for other officers who are not working due to vacation, training, and sick leave. Some are scheduled in advance and others are held in reserve for unanticipated vacancies. For example, California State Prison, Solano has 102 such relief officers and Ironwood State Prison has 92 relief officers. When the number of an institution's relief officers is insufficient to meet the vacancies, or when officers have traded shifts, the need is met through having additional, non-relief officers work overtime. Corrections officers working overtime typically do so in posts to which they are not permanently assigned.

3.  Staff are often temporarily assigned to medical facilities. For example, not including Health Care Access escorts, at Ironwood State Prison, there were 193 shifts in clinics covered by correctional officers not regularly assigned to them in August 2021. At California State Prison, Solano, in August 2021, there were 116 shifts in clinics covered by correctional officers not regularly assigned to them.

4.  Incarcerated persons who are housed in, and spend almost all their time in, areas not covered by the CDPH August 19 order mandating vaccination of staff in healthcare facilities integrated into correctional institutions, regularly come to clinics and have close contact there with staff and other incarcerated persons.

5.  Medical facilities and yards often share facilities with the entire institution, such as cafeterias, yards, and programming spaces. Incarcerated persons residing in a medically focused area of an institution, when healthy enough to participate in activities, have contact with staff and incarcerated persons from other yards when in the yard, in classrooms, in transportation to off-site medical appointments, or in group health appointments such as Enhanced Outpatient Program ("EOP") groups for mental health.

6.  Program modifications have been very disruptive from the beginning of the pandemic and remain so today. For example, in August 2021 at Pelican Bay State Prison, due to COVID-19 outbreaks among incarcerated persons and staff shortages due to isolations and quarantines, Facility A and Facility B both had modified programming for all 31 days, Facility D had modified programming for 17 days (Facility C and the Minimum Support Facility each did not have modified programming).

7.  If required to implement a mandatory vaccination policy for incarcerated persons, CDCR staff would begin with discussion of the mandate and further education about vaccination

1

beyond what has already been provided, followed by medical and mental health evaluations of incarcerated persons who refused vaccination. Ultimately, enforcement of a vaccination mandate for those who continued to refuse vaccination would require corrections officers to extract unwilling incarcerated persons from their cells, presenting a significant security risk to both corrections officers and incarcerated persons. Cell extractions are conducted by five custody officers in protective equipment who simultaneously rush into the cell to restrain and remove the incarcerated person from the cell. Custodial officers and incarcerated persons have been injured in these extractions, which are performed only where absolutely necessary due to the risks involved.

8. A constructive relationship between incarcerated persons and prison administrators and staff is critical to maintaining a safe prison environment. Poor relations raise tensions and risk outbreaks of violence that threaten the safety of incarcerated persons and staff. Constructive relations, on the other hand, lower tensions and improve inmate compliance with staff instructions and institution policies, making prisons safer and enabling recreational, medical, and educational programming. A mandatory vaccination order applying to all incarcerated persons would risk profoundly disrupting this relationship of trust between CDCR staff and incarcerated persons.

Executed on this 10th day of September, 2021, at Sacramento, California.

Tammatha Foss

48177225.3                                    2

# Exhibit 119

# Memorandum                                    **Policy 23/028**

**Operational Procedure 403, Disability Placement Program**

Date:    November 17, 2023

To:      All Staff

Subject: **OPERATIONAL PROCEDURE 403, DISABILITY PLACEMENT PROGRAM**

The purpose of this memorandum is to announce the amendment of Operational Procedure 403, Disability Placement Program. This policy shall remain in effect until incorporated into the next annual revision.

<p align="center">~~Deletions~~/<u>Additions</u></p>

### VI. METHODS

#### C. FIELD OPERATIONS

##### 7. INSTITUTION PROCEDURES

###### I. CAPTION PHONES AND TDD/TTY PHONES

Each facility has a TDD/TTY device. Use of a TDD/TTY and telephones for inmates with disabilities shall be consistent with CCR, Title 15, Section 3282(h). Verification of an inmate's need for TDD/TTY may be confirmed with local health care staff, the assigned CCI, or by reviewing a copy of the electronic CDCR 1845. An inmate who has been approved by the institution to use the TDD/TTY and who wishes to call a party who does not have use of a TDD/TTY shall be permitted to use the California Relay Service. If the inmate does not have severe hearing/speech impairment, but desires to call a party who requires the use of a TDD/TTY, the outside party shall forward a physician's statement of TDD/TTY verification to the inmate's CCI. Upon meeting verification requirements, the inmate may sign up for telephone calls according to his privilege group designation.

There is a TDD/TTY Sign Up Log (Attachment N) and TDD/TTY Tracking Log (Attachment O) available on each facility. Each log shall include the name of the inmate signing up for the phone call. If access to the scheduled call is denied for any reason, or if the inmate cancels or fails to report for the call, the reason shall be noted next to the inmate's signature in the "reason if no call" column. TDD/TTY calls shall have extended time increments due to the time delay associated with the TDD/TTY relay process.

Sign-ups are divided into 40-minute increments. TDD/TTY access for the hearing impaired shall be consistent and similar to telephone access provided for nondisabled inmates (e.g., work group A1/A TDD/TTY users shall receive one 40 minutes call per

day), **including the expanded ability to make phone calls within the confines of their cell via tablet technology**. Inmate shall be supervised by custody staff at all times when utilizing the TDD/TTY machine. It is the responsibility of the supervising officer to ensure a sufficient amount of tape is available in the machine to record the entire call. At no time shall an inmate utilize a TDD/TTY machine if tape is not available to record the phone call. In cases where TDD/TTY machine tape is not available, a supervisor shall be notified immediately and all efforts shall be made to obtain tape from an alternate facility. The facility Office Assistant/Office Technician is responsible for the ordering of the TDD/TTY machine tape, as needed, each month.

At the completion of the phone call, the supervising officer shall remove the tape from the TDD/TTY machine and review it for safety/security concerns. The inmate's name, CDCR number, housing assignment, and the date and time shall be written on the backside of the tape, and placed in a manila envelope labeled "TDD/TTY Machine Tape". The manila envelope shall be stored in a secure area at all times. The envelope containing an entire month's tape, along with all logs, which must be reviewed and signed by the Facility Captain, will be forwarded to the ADA Coordinator by the fifth day of the following month.

An inmate's request for use of a TDD/TTY for confidential purposes, (e.g., attorney/client privilege) shall be in accordance with CCR, Title 15, Section 3282(g)(1) and (h). All requests for a confidential telephone call will be processed by the Litigation Coordinator. Any printer paper containing the text of the verbal exchange shall be relinquished to the inmate, if requested. Should the inmate not wish to retain the written text, staff shall dispose of the unread text in accordance with institutional policy and procedure regarding the disposal of confidential documents.

Each TTY System shall be tested on a quarterly basis. The ADA Coordinator shall be responsible to ensure the testing is completed by ADA Staff during the months of March, June, September, and December. Staff conducting the testing shall document the results of the test on each facility TTY Tracking Log. If at any time the TTY System is found to be inoperable, the ADA Coordinator shall be notified immediately. Staff will utilize two sets of instructions (Attachment Q) when testing the TTY System.

In addition to TTY phones, SATF has purchased caption phones for use by the deaf or hard of hearing inmate population or any other inmate who demonstrates a need. The caption phones are available on each facility. The new caption phones do not replace the TTY/TDD hearing impaired telephone, but provide another available accommodation to the inmate population and the

DocuSign Envelope ID: 85132B950-E6DD-4500-923F-31F36C4AD905    Case 4:94-cv-02307-CW    Document 3630-13    Filed 10/16/24    Page 22 of 426

Page 3 of 3
Policy 23/028 OP 403 – Disability Placement Program

TTY/TDD shall remain accessible for inmate use, if requested. The request process for using the caption phones will be the same as the request process for the TTY/TDD. SATF's Sign Language Interpreters and/or ADAC designee will train the deaf and hearing impaired population on the usage of the caption phones. Inmates will continue to be allowed 40 minutes per phone call. This time frame can be extended for legal calls or at the direction of a staff member. **Additionally, based on expanded access to phone calls via tablet technology available to the inmate population, DNH and DPH class members may request/sign-up during normal programming hours. Housing unit staff shall allow access as a means of reasonable accommodation when security concerns would not otherwise prohibit access. DNH and DPH class members will be allowed to sign up for additional time slots for both the TTY/TDD and caption phones. If a DNH or DPH class members use of the TTY/TDD or Caption Phone is cancelled for any reason outside their control, the DNH or DPH class member will be allowed to sign-up for a vacant slot during the same day as the cancellations, if available.**

Ensure this information is disseminated to all institutional staff. Should you have any questions regarding this matter, please contact the ADA Coordinator at extension 7516.

*Bryan Phillips*
—92548B2349FE4E7...
BRYAN D. PHILLIPS
Warden (A)
California Substance Abuse Treatment
Facility and State Prison at Corcoran

*Anu Banerjee*
—22A0E0021FCB4AB...
ANU BANERJEE
Chief Executive Officer
California Substance Abuse Treatment
Facility and State Prison at Corcoran

# Exhibit 120

| Addendum<br>Operational Procedure 0-0901<br>Disability Placement Program-<br>Telecommunication Devices<br>October 6, 2023 |
| --- |

**10. TELECOMMUNICATION DEVICES FOR THE DEAF (TDD), CAPTION PHONES AND VIDEO PHONES (VP)**

The following information shall be incorporated into the next revision of California State Prison - San Quentin's (CSP-SQ) Operational Procedure 0-0901 Disability Placement Program, at its next scheduled revision.

During Modified Program, inmate's access to VP/VRS and caption phones will be adjusted to the same degree as the general population's access to any telephone calls via traditional telephone or tablet. During instances where the general population's movement is restricted to cells, VP/VRS and caption phone users will continue to have access to the VP/VRS and caption phone program to account for the lack of VRS access within the inmate tablet program.


DocuSigned by:

*Nicole Avila*

438DE5DF3EEF4ED...

for **OAK SMITH**
Warden (A)

10/6/2023

Date Signed

# Exhibit 121

State of California                                                      Department of Corrections and Rehabilitation

# **M**emorandum                                    **Policy Memo 24/022**

**Operational Procedure 112, Daily Activity Schedule**

Date   :   July 2, 2024

To     :   All Staff

Subject:   **OPERATIONAL PROCEDURE 112, DAILY ACTIVITY SCHEDULE**

Effective immediately the following addition to OP 112 shall be implemented to Facilities F&G, Daily Activity Schedule as noted. Additions are noted in **red bold font.**

### **Second Watch:**

**1400**      **Yard Recall**

### **Third Watch:**

1430      Third Watch staff arrives: Conduct security & equipment check.
**1445      Yard Release**

Staff Training Days
**The first Wednesday and second Friday, are designated staff training days. Supervisors will meet with staff on Second and Third Watch to provide 6 hours of meaningful training. There will be no yard or dayroom on training days. Showers, phones, and kiosks will run, following signup lists, when staff are in the housing units.**

This information shall be incorporated into the next scheduled revision of Operational Procedure 112, Daily Activity Schedule.

If you have any questions or require additional information contact Associate Warden IV at extension 7213.

**PEGGY LLAMAS**
Warden (A)
California Substance Abuse Treatment Facility and State Prison at Corcoran

FACILITY "G" DAILY ACTIVITY SCHEDULE (DAS) 2024

### First Watch:
| | |
|---|---|
| 2230 | First Watch staff arrives: Conduct security & equipment check. |
| 0030 | Institutional Count |
| 0100 | Personal Alarm Device (PAD) Testing (Support Buildings & Neutral Zone). |
| 0300 | Institutional Count: Positive and Negative. |
| 0330 | Wake-up call for early Dining Workers. |
| 0400 | Release early Dining Workers. |
| 0500 | Institutional Count. |

### Second Watch:
| | |
|---|---|
| 0630 | Second Watch staff arrives: Conduct security & equipment check. Morning Wake Up, showers and TVs on, EOP unit remains secured pending medical/mental health unlock request. |
| 0645 | Early breakfast release for diabetics, inmates with special diets, Education/DRP/ISUDT. |
| 0700 | Breakfast release (EOP first) / non-EOP Medication release. |
| 0730 | Telephones on/able to use. |
| 0815 | Education/DRP/ISUDT (1st class) begins. |
| 0830 | AM Worker Release. Yard release and Dayrooms open (upon Dining tool count clearing). 10-minute unlock (one-way out). Facility gym available 2-3 days per week, Tuesday through Friday to follow Neutral Zone schedule from 0900-1130 hours. |
| 1030 | 5-minute Inline, followed by a 5-minute Outline; no two-way traffic. Education/DRP/ISUDT (2nd class) release. |
| 1045 | Education/DRP/ISUDT (2nd class) begins. |
| 1155 | Medication release. PM worker release. |
| 1200 | Yard and Dayroom recall. |
| 1230 | Yard and Dayroom release. The gym is open from 1230-1400 hours according to the Neutral Zone Schedule. |
| 1300 | 5-minute Inline, followed by a 5-minute Outline; no two way traffic. Education/DRP/ISUDT (3rd class) release. |
| 1315 | Education/DRP/ISUDT (3rd class) begins. |
| 1330 | C/C Yard Release (Monday through Friday only) |
| **1400** | **Yard Recall** |

### Third Watch:
| | |
|---|---|
| 1430 | Third Watch staff arrives: Conduct security & equipment check. |
| **1445** | **Yard Release** |
| 1530 | 5-minute Inline, followed by a 5-minute Outline; no two way traffic. |
| 1600 | Yard recall for all inmates. |
| 1630 | Dayroom recall for all inmates. |
| 1700 | Institutional standing count: Upon completion of the Institutional Count, conduct Evening Meal release. |
| 1900 | Telephones on/able to use. Yard and Dayroom release upon completion of the evening meal and Dining Tool Inventory clearing. |
| 2000 | 5-minute Inline, followed by a 5-minute Outline; no two way traffic. |
| 2100 | Yard recall for all inmates. |
| 2115 | Dayroom recall. Pod doors closed. |
| 2120 | PAD Testing. |
| 2200 | Institutional Count. |
| 2215 | Security checks of unit. |

Staff Training Days
**The first Wednesday and second Friday, are designated staff training days. Supervisors will meet with staff on Second and Third Watch to provide 6 hours of meaningful training. There will be no yard or dayroom on training days. Showers, phones and kiosks will run, following signup lists, when staff are in the housing units.**

Evening feeding shall be conducted utilizing one side of the chow hall at a time only.

---

### DAILY RECREATION YARD / DAYROOM ACTIVITIES
Refer to the attached 'Yard Recreation / Dayroom Daily Activity Schedule'. This will be accomplished on a rotational basis so all housing units have equal access to the Recreational Yard and Dayrooms.

### INCLEMENT WEATHER AND FOG CONDITIONS
1. No yard activities.
2. Dayroom activities only.
3. All inmates will be escorted when outside of the housing unit (example; dining release, visiting, etc.}

---

NOTE: The Recreation equipment box will be unlocked and opened for (10) minutes at the top of the hour. At the conclusion of the (10) minute unlock the Recreation box will be re-secured. Staff will log all yard releases, Inline / Outline, dayroom activities, and mandatory showers (during modified program) in the Housing Unit Logbook. Schedule deviations will only be approved by the Program Lieutenant or above, then log in the Housing Unit Logbook.

---

NOTE: On Facility "G", heat-risk inmates will be allowed dayroom in the building section which is conducting dayroom activities. Heat-risk inmates who assume dayroom activities in a section where there are not housed will not be able to return their section until dayroom recall. After evening meal has ended, dayroom activities will resume

---

The Pod doors will be open during Dayrooms, times of mass movement (including group releases across sections, meals, and in/out lines. They will be closed for counts, and during times of reduced staff in the units, to be considered 1 custody staff in the unit for an extended time. This may be modified as needed for unusual circumstances or emergencies, with approval of the Facility Lieutenant, if time is available to seek it.. During the times the Pod Doors are locked, staff will make every effort to run phones, and workers showers, unless otherwise instructed.

**Facility G Captain**

**C. CRITCHLOW**
**Complex IV Associate Warden**

Changes / revisions to the DAS require the AW's approval prior to implementation via policy memorandum to the Warden.

**FACILITY "F" DAILY ACTIVITY SCHEDULE (DAS) 2024**

### First Watch:

| | |
|---|---|
| 2230 | First Watch staff arrives: Conduct security & equipment check. |
| 0030 | Institutional Count |
| 0100 | Personal Alarm Device (PAD) Testing (Support Buildings & Neutral Zone). |
| 0300 | Institutional Count: Positive and Negative. |
| 0330 | Wake-up call for early Dining Workers. |
| 0400 | Release early Dining Workers. |
| 0500 | Institutional Count. |

### Second Watch:

| | |
|---|---|
| 0630 | Second Watch staff arrives: Conduct security & equipment check. Morning Wake Up, showers and TVs on. EOP unit remains secured pending medical/mental health unlock request. |
| 0645 | Early breakfast release for diabetics, inmates with special diets, Education/DRP/ISUDT. |
| 0700 | Breakfast release (EOP first) / non-EOP Medication release. |
| 0730 | Telephones on/able to use. |
| 0815 | Education/DRP/ISUDT (1st class) begins. |
| 0830 | AM Worker Release. Yard release and Dayrooms open (upon Dining tool count clearing). 10-minute unlock (one-way out). Facility gym available 2-3 days per week, Tuesday through Friday to follow Neutral Zone schedule from 0900-1130 hours. |
| 1030 | 5-minute Inline, followed by a 5-minute Outline; no two-way traffic. Education/DRP/ISUDT (2nd class) release. |
| 1045 | Education/DRP/ISUDT (2nd class) begins. |
| 1155 | Medication release. PM worker release. |
| 1200 | Yard and Dayroom recall. |
| 1230 | Yard and Dayroom release. The gym is open from 1230-1400 hours according to the Neutral Zone Schedule. |
| 1300 | 5-minute Inline, followed by a 5-minute Outline; no two way traffic. Education/DRP/ISUDT (3rd class) release. |
| 1315 | Education/DRP/ISUDT (3rd class) begins. |
| 1330 | C/C Yard Release. (Monday through Friday only) |
| **1400** | **Yard Recall.** |

### Third Watch:

| | |
|---|---|
| 1430 | Third Watch staff arrives: Conduct security & equipment check. |
| **1445** | **Yard Release.** |
| 1530 | 5-minute Inline, followed by a 5-minute Outline; no two way traffic. |
| 1600 | Yard recall for all inmates. |
| 1630 | Dayroom recall for all inmates. |
| 1700 | Institutional standing count: Upon completion of the Institutional Count, conduct Evening Meal release. |
| 1900 | Telephones on/able to use. Yard and Dayroom release upon completion of the evening meal and Dining Tool Inventory clearing. |
| 2000 | 5-minute Inline, followed by a 5-minute Outline; no two way traffic. |
| 2100 | Yard recall for all inmates. |
| 2115 | Dayroom recall. Pod doors closed. |
| 2120 | PAD Testing. |
| 2200 | Institutional Count. |
| 2215 | Security checks of unit. |

<u>Staff Training Days</u>
**The first Wednesday and second Friday, are designated staff training days. Supervisors will meet with staff on Second and Third Watch to provide 6 hours of meaningful training. There will be no yard or dayroom on training days. Showers, phones and kiosks will run, following signup lists, when staff are in the housing units.**

<u>Evening feeding shall be conducted utilizing one side of the chow hall at a time only.</u>

---

### DAILY RECREATION YARD / DAYROOM ACTIVITIES

Refer to the attached 'Yard Recreation / Dayroom Daily Activity Schedule'. This will be accomplished on a rotational basis so all housing units have equal access to the Recreational Yard and Dayrooms.

### INCLEMENT WEATHER AND FOG CONDITIONS

1. No yard activities.
2. Dayroom activities only.
3. All inmates will be escorted when outside of the housing unit (example; dining release, visiting, etc.}

---

NOTE: The Recreation equipment box will be unlocked and opened for (10) minutes at the top of the hour. At the conclusion of the (10) minute unlock the Recreation box will be re-secured. Staff will log all yard releases, Inline / Outline, dayroom activities, and mandatory showers (during modified program) in the Housing Unit Logbook. Schedule deviations will only be approved by the Program Lieutenant or above, then log in the Housing Unit Logbook.

---

NOTE: On Facility "F", heat-risk inmates will be allowed dayroom in the building section which is conducting dayroom activities. Heat-risk inmates who assume dayroom activities in a section where they are not housed will not be able to return their section until dayroom recall. After evening meal has ended, dayroom activities will resume

---

The Pod doors will be open during Dayrooms, times of mass movement (including group releases across sections, meals), and in/out lines. They will be closed for counts, and during times of reduced staff in the units, to be considered 1 custody staff in the unit for an extended time. This may be modified as needed for unusual circumstances or emergencies, with approval of the Facility Lieutenant, if time is available to seek it.. During the times the Pod Doors are locked, staff will make every effort to run phones, and workers showers, unless otherwise instructed.

**Facility F Captain**

**C. CRITCHLOW**
**Complex IV Associate Warden**

Changes / revisions to the DAS require the AW's approval prior to implementation via policy memorandum to the Warden.

State of California                                    Department of Corrections and Rehabilitation

# Memorandum                                    **Policy 24/009**

                                                **Operational Procedure 112,**
Date:     February 27, 2024                      **Daily Activity Schedule**

To:       All Staff

Subject:  **OPERATIONAL PROCEDURE 112, DAILY ACTIVITY SCHEDULE**

The purpose of this memorandum is to announce Operational Procedure 112, Daily
Activity Schedule (DAS) Attachment E has been amended. This change reflects the
conversion of Facility E from a Level-III Sensitive Needs Yard (SNY) to a Level-II
Non-Designated Programing Facility (NDPF). Due to the changes, the Facility E DAS
should be read in its entirety. This policy shall remain in effect until incorporated into
the next annual revision of Operational Procedure 112, Daily Activity Schedule.

If you have any questions or concerns, please contact the Facility E Captain at
extension 7116.

BRYAN D. PHILLIPS
Warden
California Substance Abuse Treatment Facility and State Prison at Corcoran

State of California                                    Department of Corrections and Rehabilitation

# Memorandum                         Policy Memo 24/007

Operational Procedure 112, Daily Activity Schedule

Date  :   February 16, 2024

To    :   All Staff

Subject:  **OPERATIONAL PROCEDURE 112, DAILY ACTIVITY SCHEDULE**

Effective immediately the following addition to OP 112 shall be implemented to Facility C, Daily Activity Schedule as noted.

**NOTE:**

- During normal program, 2/W will shower all Incarcerated persons with LOP dayroom Incarcerated persons on Monday, Wednesday, Friday, and Sunday. These Incarcerated persons will be secured in the showers while showering. Workers will be showered upon completion of their shift. The remainder of the Incarcerated persons will shower during their dayroom activities, in accordance with the C Facility Dayroom schedule.

This information shall be incorporated into the next scheduled revision of Operational Procedure 112, Daily Activity Schedule.

If you have any questions or require additional information contact the Custody Captain at extension 7143.

BRYAN D. PHILLIPS
Warden (A)
California Substance Abuse Treatment Facility and State Prison at Corcoran

State of California                                      Department of Corrections and Rehabilitation

# Memorandum

Date   :   August 11, 2023

To     :   All Staff

Subject :   **OPERATIONAL PROCEDURE 112, DAILY ACTIVITY SCHEDULE**

The purpose of this memorandum is to announce the following amendments to
Operational Procedure 112, Daily Activity Schedule, during this annual review period.
Any additions are in **red bold font** within the procedure.

Ensure this information is disseminated to all institution staff.  Should you have any
questions regarding this matter, please contact the Complex IV Associate Warden at
extension 7213.

BRYAN D. PHILLIPS
Warden (A)
California Substance Abuse Treatment Facility and State Prison at Corcoran

| New: | |
|------|------|
| Reviewed: | July 2023 |
| Annual Revision Month: | August |

# PPIM

## CALIFORNIA SUBSTANCE ABUSE TREATMENT FACILITY AND STATE PRISON
Corcoran, California

Operational Procedure (OP)

**I.     PLAN TITLE AND NUMBER**

    A.     Daily Activity Schedule

    B.     OP-112

**II.     PURPOSE AND OBJECTIVES**

The purpose of the procedure is to establish guidelines for implementation of the Daily Activity Schedules (DAS) for all facilities at the California Substance Abuse Treatment Facility and State Prison at Corcoran (CSATF/SP), and to ensure that all Departments/Divisions within CSATF/SP comply with this procedure.

**III.     REFERENCES**

    A.     California Code of Regulations (CCR), Title 15, Section 3220(b), Recreational Programs

    B.     Department Operations Manual (DOM), Chapter 5, Article 16, Section 52020, Inmate Count and Movement.

**IV.     APPROVALS AND REVIEW**

This OP will be reviewed/revised annually by the Associate Warden (AW) Complex IV (AW-IV) during the month of August and submitted to the Warden for final approval.   Each DAS will be reviewed annually for revision by each respective Facility Captain and the Associate Wardens of each housing complex.  The revised DAS will be forwarded to the AW-IV for attachment to the revised OP.

**V.     RESPONSIBILITY**

    A.     Facility Lieutenants and Sergeants are responsible for implementing the DAS for their respective facilities included herein (Attachments A through G).

    B.     Each Facility Captain is responsible for ensuring compliance with this procedure.

Daily Activity Schedule, OP 112
Page 2

### VI.    METHODS

Approved DAS forms shall contain signatures from the Facility Captain and the respective AW.

A.    All staff are responsible for utilizing the DAS to control daily operations on each facility.

B.    All facilities will post the DAS in a central area accessible to the inmate population, such as, yard/housing unit bulletin boards.

C.    A copy of the DAS will be provided to the respective facility's Inmate Advisory Council (IAC).

D.    The DAS may be modified as a result of serious incidents or disturbances.

### VII.    ATTACHMENTS

**Attachment A: Facility A DAS**
**Attachment B: Facility B DAS**
**Attachment C: Facility C DAS**
**Attachment D: Facility D DAS**
**Attachment E: Facility E DAS**
**Attachment F: Facility F DAS**
**Attachment G: Facility G DAS**

_8-14-2023_
Date

BRYAN D. PHILLIPS
Warden (A)

## FACILITY "A" DAILY ACTIVITY SCHEDULE
### REVISED JULY 2023

| | |
|---|---|
| 0030 | Institutional Count |
| 0100 | Personal Alarm Testing (Program/Vocations/Visiting) |
| 0300 | Institutional Count |
| 0330 | Wake-Up for early Culinary Workers |
| 0415 | Release early Culinary Workers. |
| 0500 | Institutional Count; Showers available to early workers upon count clearing. |
| 0615 | Wake-up for General Population, All Pod lights on. |
| 0630 | Shift change / Security Check |
| 0650 | Facility Breakfast release (earlier if possible), Early Worker release, Dayroom lighting section in effect after release. |
| 0700 | Phones Turned On. |
| 0800 | Breakfast concludes; clear culinary tool count. Vocation/Education/DRP Programs begin. Upon return of staff assisting at dining, crash gates open. |
| 0900 | Yard Release/Dayrooms Open (contingent on culinary tool count). May be delayed due to yard maintenance. |
| 1000 | 5 minute inline followed by 5 minute outline, no two way traffic. |
| 1100 | 5 minute inline followed by 5 minute outline, no two way traffic, Education Inline, lunch break. |
| 1200 | 5 minute inline followed by 5 minute outline, no two way traffic, education inline. (1200-1400, Monday-Friday C status yard release). |
| 1300 | 5 minute inline followed by 5 minute outline, no two way traffic. |
| 1400 | Yard Recall |
| 1430 | Shift change/Security Check |
| 1500 | Education Release. Vocations Release complete. 5 minute inline followed by 5 minute outline, no two way traffic. |
| 1530 | Yard Release |
| 1615 | Yard Recall |
| 1630 | Dayroom Recall Close Crash gates |
| 1700 | Institutional Count; Pod day lights on during count. Upon completion of the Institutional count, the evening meal releases will be conducted. Return to dayroom lighting policy. |
| 1900 | Evening Yard (Assigned inmates only) Release, contingent upon culinary tool count clearing. |
| 2000 | 5 minute inline followed by 5 minute outline, no two way traffic |
| 2100 | Yard Recall/Personal alarm testing (Housing Units). |
| 2130 | Dayroom Recall, Pod day lights on. Close crash gates. |
| 2200 | Institutional count, night lights turned on after count clears. |
| 2230 | Shift change / security check. |
| 2330 | Phones Turned Off. |
| 2345 | Dayroom recall. |

### Weekends and Holidays

The activity schedule for weekends and holidays will be the same as the weekday schedule with the following changes: yard for workers only. No C status yard. UHT inmates will return to their housing units immediately upon the announcement of UHT, unless they are in a climate controlled area, such as Medical, Chapel, or Education. Upon release from these areas, they will immediately return to their housing units. On holidays, no wakeup calls for vocation / education or meal releases.

### Dayroom Lighting

Between the hours of 0630-2345 the following standard of lighting will be used; all pod day lights will be off, all pod night lights will be on, no more than four (4) dayroom lights will be on per section. This lighting may be increased or decreased at the discretion of the Housing Unit Officers with Supervisor's approval, based on the ambient lighting conditions in the unit, or operational necessity. In compliance with the Armstrong Remedial Plan (ARP) full lighting will be on in any pod, if requested by any visually impaired inmate living in that pod, during the above hours.

### Inclement Weather and Fog Conditions

1. No yard activities.
2. Dayroom activities only with crash gates closed.
3. All inmates are escorted when outside of the housing units.

*Staff will log all yard releases, inline / outlines, dayroom activities, and security checks in the Housing Unit Logbooks. Any deviation from this schedule will be approved by the Program Lieutenant or above and be logged in the Housing Unit Logbook.

~~*Training days for Custody Staff shall be the first Wednesday and the second Friday of each month. (2W 0900-1100 hours) (3W 1445-1645 hours)~~

*The first Wednesday and second Friday, are designated staff training days. Supervisors will meet with staff on Second and Third Watch to provide 6 hours of meaningful training. There will be no yard or dayroom on training days. Showers, phones and kiosks will run, following signup lists, when staff are in the housing units.

### Crash Gates

Crash gates will be closed when there is only one officer in the unit for more than about 15 minutes, during inclement weather, and as required by the Facility Supervisors. All other openings and closing of crash gates follow the DAS.

**Facility Captain (A)**



**M. JONES**
**Associate Warden, Complex I**

## FACILITY "B" DAILY ACTIVITY SCHEDULE
### REVISED JULY 2023

| | |
|---|---|
| 0030 | Institutional Count |
| 0100 | Personal Alarm Testing (Program/Vocations/Visiting) |
| 0300 | Institutional Count |
| 0330 | Wake-Up for early Culinary Workers |
| 0415 | Release early Culinary Workers. |
| 0500 | Institutional Count; Showers available to early workers upon count clearing. |
| 0615 | Wake-up for General Population, All Pod lights on. |
| 0630 | Shift change / Security Check |
| 0650 | Facility Breakfast release (earlier if possible), Early Worker release, Dayroom lighting section in effect after release. |
| 0700 | Phones Turned On. |
| 0800 | Breakfast concludes; clear culinary tool count. Vocation/Education/DRP Programs begin. Upon return of staff assisting at dining, crash gates open. |
| 0900 | Yard Release/Dayrooms Open (contingent on culinary tool count). May be delayed due to yard maintenance. |
| 1000 | 5 minute inline followed by 5 minute outline, no two way traffic. |
| 1100 | 5 minute inline followed by 5 minute outline, no two way traffic, Education Inline, lunch break. |
| 1200 | 5 minute inline followed by 5 minute outline, no two way traffic, education inline. (1200-1400, Monday-Friday C status yard release). |
| 1300 | 5 minute inline followed by 5 minute outline, no two way traffic. |
| 1400 | Yard Recall |
| 1430 | Shift change/Security Check |
| 1500 | Education Release. Vocations Release complete. 5 minute inline followed by 5 minute outline, no two way traffic. |
| 1530 | Yard Release |
| 1615 | Yard Recall |
| 1630 | Dayroom Recall Close Crash gates |
| 1700 | Institutional Count; Pod day lights on during count. Upon completion of the Institutional count, the evening meal releases will be conducted. Return to dayroom lighting policy. |
| 1900 | Evening Yard (Assigned inmates only) Release, contingent upon culinary tool count clearing. |
| 2000 | 5 minute inline followed by 5 minute outline, no two way traffic |
| 2100 | Yard Recall/Personal alarm testing (Housing Units). |
| 2130 | Dayroom Recall, Pod day lights on. Close crash gates. |
| 2200 | Institutional count, night lights turned on after count clears. |
| 2230 | Shift change / security check. |
| 2330 | Phones Turned Off. |
| 2345 | Dayroom recall. |

### Weekends and Holidays

The activity schedule for weekends and holidays will be the same as the weekday schedule with the following changes: yard for workers only. No C status yard. UHT inmates will return to their housing units immediately upon the announcement of UHT, unless they are in a climate controlled area, such as Medical, Chapel, or Education. Upon release from these areas, they will immediately return to their housing units. On holidays, no wakeup calls for vocation / education or meal releases.

### Dayroom Lighting

Between the hours of 0630-2345 the following standard of lighting will be used; all pod day lights will be off, all pod night lights will be on, no more than four (4) dayroom lights will be on per section. This lighting may be increased or decreased at the discretion of the Housing Unit Officers with Supervisor's approval, based on the ambient lighting conditions in the unit, or operational necessity. In compliance with the Armstrong Remedial Plan (ARP) full lighting will be on in any pod, if requested by any visually impaired inmate living in that pod, during the above hours.

### Inclement Weather and Fog Conditions

1. No yard activities.
2. Dayroom activities only with crash gates closed.
3. All inmates are escorted when outside of the housing units.

*Staff will log all yard releases, inline / outlines, dayroom activities, and security checks in the Housing Unit Logbooks. Any deviation from this schedule will be approved by the Program Lieutenant or above and be logged in the Housing Unit Logbook.

*Training days for Custody Staff shall be the first Wednesday and the second Friday of each month. (2/W 0900-1100 hours) (3/W 1445-1645 hours)

*The first Wednesday and second Friday, are designated staff training days. Supervisors will meet with staff on Second and Third Watch to provide 6 hours of meaningful training. There will be no yard or dayroom on training days. Showers, phones and kiosks will run, following signup lists, when staff are in the housing units.

### Crash Gates

Crash gates will be closed when there is only one officer in the unit for more than about 15 minutes, during inclement weather, and as required by the Facility Supervisors. All other openings and closing of crash gates follow the DAS.

Facility Captain (A)

M. JONES
Associate Warden, Complex I

## Facility C Daily Activity Schedule (revised February 2024)

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| -Week 1- | -Week 1- | -Week 1- | -Week 1- | -Week 1- | -Week 1- | -Week 1- |
| AM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>PM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'A' sec<br>1445-1545<br>Dayroom 'B' sec<br>1745-1845<br>Dayroom 'C' sec<br>1855-1955 | AM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>PM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'B' sec<br>1445-1545<br>Dayroom 'C' sec<br>1745-1845<br>Dayroom 'A' sec<br>1855-1955 | AM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>PM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'C' sec<br>1445-1545<br>Dayroom 'A' sec<br>1745-1845<br>Dayroom 'B' sec<br>1855-1955 | Staff Training 2W 0700-1200<br>PM Yard-buildings 1-2/5-6<br>1200-1400<br>Gym Activities<br>(Even Upper Yd)<br>Staff Training 3W<br>1500-2000 | AM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>PM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'A' sec<br>1445-1545<br>Dayroom 'B' sec<br>1745-1845<br>Dayroom 'C' sec<br>1855-1955 | AM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>PM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'C' sec<br>1445-1545<br>Dayroom 'C' sec<br>1745-1845<br>Dayroom 'A' sec<br>1855-1955 | AM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>PM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'C' sec<br>1445-1545<br>Dayroom 'A' sec<br>1745-1845<br>Dayroom 'B' sec<br>1855-1955 |
| -Week 2- | -Week 2- | -Week 2- | -Week 2- | -Week 2- | -Week 2- | -Week 2- |
| AM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>PM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'A' sec<br>1445-1545<br>Dayroom 'B' sec<br>1745-1845<br>Dayroom 'C' sec<br>1855-1955 | AM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>PM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'B' sec<br>1445-1545<br>Dayroom 'C' sec<br>1745-1845<br>Dayroom 'A' sec<br>1855-1955 | AM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>PM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'C' sec<br>1445-1545<br>Dayroom 'A' sec<br>1745-1845<br>Dayroom 'B' sec<br>1855-1955 | AM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>PM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'A' sec<br>1445-1545<br>Dayroom 'B' sec<br>1745-1845<br>Dayroom 'C' sec<br>1855-1955 | AM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>PM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'B' sec<br>1445-1545<br>Dayroom 'C' sec<br>1745-1845<br>Dayroom 'A' sec<br>1855-1955 | Staff Training 2W 0700-1200<br>PM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1200-1400<br>Staff Training 3W<br>1500-2000 | AM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>PM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'A' sec<br>1445-1545<br>Dayroom 'B' sec<br>1745-1845<br>Dayroom 'C' sec<br>1855-1955 |
| -Week 3- | -Week 3- | -Week 3- | -Week 3- | -Week 3- | -Week 3- | -Week 3- |
| AM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>PM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'B' sec<br>1445-1545<br>Dayroom 'C' sec<br>1745-1845<br>Dayroom 'A' sec<br>1855-1955 | AM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>2W IST Make-up Training<br>0700-1200<br>PM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'C' sec<br>1445-1545<br>Dayroom 'A' sec<br>1745-1845<br>Dayroom 'B' sec<br>1855-1955 | AM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>PM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'A' sec<br>1445-1545<br>Dayroom 'B' sec<br>1745-1845<br>Dayroom 'C' sec<br>1855-1955 | AM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>PM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'B' sec<br>1445-1545<br>Dayroom 'C' sec<br>1745-1845<br>Dayroom 'A' sec<br>1855-1955 | AM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>PM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>3W IST Make-up Training<br>1500-2000<br>Dayroom 'C' sec<br>1445-1545<br>Dayroom 'A' sec<br>1745-1845<br>Dayroom 'B' sec<br>1855-1955 | AM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>PM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'A' sec<br>1445-1545<br>Dayroom 'B' sec<br>1745-1845<br>Dayroom 'C' sec<br>1855-1955 | AM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>08301100<br>PM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'B' sec<br>1445-1545<br>Dayroom 'C' sec<br>1745-1845<br>Dayroom 'A' sec<br>1855-1955 |
| -Week 4- | -Week 4- | -Week 4- | -Week 4- | -Week 4- | -Week 4- | -Week 4- |
| AM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>PM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'C' sec<br>1445-1545<br>Dayroom 'A' sec<br>1745-1845<br>Dayroom 'B' sec<br>1855-1955 | AM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>PM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'A' sec<br>1445-1545<br>Dayroom 'B' sec<br>1745-1845<br>Dayroom 'C' sec<br>1855-1955 | AM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>PM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'B' sec<br>1445-1545<br>Dayroom 'C' sec<br>1745-1845<br>Dayroom 'A' sec<br>1855-1955 | AM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>PM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'C' sec<br>1445-1545<br>Dayroom 'A' sec<br>1745-1845<br>Dayroom 'B' sec<br>1855-1955 | AM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>PM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'A' sec<br>1445-1545<br>Dayroom 'B' sec<br>1745-1845<br>Dayroom 'C' sec<br>1855-1955 | AM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>PM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'B' sec<br>1445-1545<br>Dayroom 'C' sec<br>1745-1845<br>Dayroom 'A' sec<br>1855-1955 | AM Yard-buildings 1-2/5-6<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>0830-1100<br>PM Yard-buildings 3-4/7-8<br>Gym Activities<br>(Odd-Lower Yd/Even Upper Yd)<br>1130-1400<br>Dayroom 'C' sec<br>1445-1545<br>Dayroom 'A' sec<br>1745-1845<br>Dayroom 'B' sec<br>1855-1955 |

## Facility C Daily Activity Schedule (revised February 2024)

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|--------|--------|---------|-----------|----------|--------|----------|
| Religious Services<br><br>Packages | 3rd Monday<br>Staff Training 2W-0700-1200<br><br>Laundry – process new arrivals and shortage slips. | Laundry – Bag Pickup | 1st Wednesday<br>Staff Training<br>2W-0700-1200<br>3W-1500-2000<br><br>Laundry – Sheet Exchange | Unit Classification Committee<br><br>3rd Thursday<br>Staff Training 3W- 1500-2000<br><br>Laundry – Bag Returns | 2nd Friday<br>Staff Training<br>2W-0700-1200<br>3W-1500-2000<br><br>Laundry – one for one clothing exchanges. | Religious Services<br><br>AMI Sweat Lodge<br>Ducated Incarcerated persons s Only<br><br>Packages |

## FACILITY C DAILY ACTIVITY SCHEDULE

| | |
|---|---|
| 0030 | Institutional Count, Personal Alarm Testing |
| 0100 | Conduct outside Window Checks of the Facility Perimeter |
| 0200 | Security Check |
| 0300 | Institutional Count Positive/Negative |
| 0400 | Security Check |
| 0500 | Count / Un-Barbox the Housing Units |
| 0600 | Security Check |
| **0630** | **SECOND WATCH:** Staff arrives, sign in on the Sign-in Sheet and complete all tool/equipment inventories and conduct security checks |
| 0640 | Diabetic Release (upon receipt of food carts), Breakfast, Cell Feed/AM Pill Line |
| 0645 | AM Medication Release (Pill Line) Staff training First Wednesday, Second Friday and Third Monday. See schedule chart for program. |
| 0745 | Session 1 Education and Integrated Substance Use Disorder Treatment (ISUDT) Release |
| 0815 | Session 1 Education/ISUDT Start |
| 0830 | AM Yard Release and Gym Recreational Activities (Even Days Upper Yard AM/PM; Odd Days Lower Yard AM/PM) |
| 1015 | Session 1 Education/ISUDT End |
| 1030 | Session 2 Education/ISUDT Release |
| 1045 | Session 2 Education/ISUDT Start |
| 1100 | AM Yard Recall |
| 1105 | Afternoon Medication Release (Pill Line) |
| 1130 | Afternoon Yard Release and Gym Recreational Activities |
| 1200 | Close Custody Count |
| 1245 | Session 2 Education/ISUDT End |
| 1300 | Session 3 Education/ISUDT Release |
| 1315 | Session 3 Education/ISUDT Start |
| 1400 | Afternoon Yard Recall |
| **1430** | **THIRD WATCH:** Staff arrives, sign in on the Sign-in Sheet and complete all tool/equipment inventories and conduct security checks |
| 1445 | Dayroom Release. Staff training First Wednesday, Second Friday and Third Thursday. See schedule chart for program. |
| 1515 | Session 3 Education/ISUDT Release |
| 1545 | Dayroom Recall |
| 1600 | Evening Medication release/7362 drop off |
| 1700 | Institutional Standing Count: Upon count clearing, Diabetic release (upon receipt of food carts) begin in-cell feeding (Dinner) |
| 1745 | Dayroom Release. |
| 1845 | Dayroom Recall |
| 1855 | Dayroom Release |
| 1955 | Dayroom Recall |
| 2000 | Close Custody Count |
| 2005 | Hour of Sleep Medication release (Pill Line)(Close Custody Incarcerated persons s after count clears) |
| 2110 | Security checks / phone list sign up |
| 2130 | Institutional Alarm Testing (Time may vary) |
| 2200 | Institutional Count / Barbox the Housing Units |
| 2215 | Security Check |
| **2230** | **FIRST WATCH:** Staff arrives, sign in on the Sign-in Sheet and complete all tool/equipment inventories and conduct security checks |
| 2300 | Security Check |

## Facility C Daily Activity Schedule (revised February 2024)

### Weekend and Holiday Schedule

WG/PG C/C Incarcerated persons s shall have no access to yard on Saturdays, Sundays, and Holidays with the exception of training weeks. On Training <u>Weeks only</u>, WG/PG 'C' Status Incarcerated persons s will have access to Yard on Saturdays in accordance with the DAS yard schedule.

A2B Incarcerated persons s shall have access to yard on Saturdays and Sundays in accordance to their housing unit schedule/rotation.

### Inclement Weather and Fog Conditions

- No recreational yard activities
- Dayrooms shall be normal program in accordance with the scheduled rotation, as per the DAS.
- No activities for Close Custody Incarcerated persons outside of their assigned Housing Units during Fog Conditions. Close Custody Incarcerated persons shall be allowed activities within assigned their assigned Housing Units.
- All Incarcerated persons shall be under <u>direct escort</u> when movement is outside of the Housing Unit (example: Visits, Medical, BPH, etc.)
- Pill Pass will be in accordance with DOM Supplement 52020.8.9 (Incarcerated persons Count and Movement) Facility Lieutenant will assess visibility and notify the watch commander of the program.

### NOTE:

- When **all** Facility C Incarcerated persons are on Modified Program, 2/W shall shower one half and 3/W shall shower the other half on a rotation. However, if only specific group/groups of Incarcerated persons are on a Modified Program, those modified Incarcerated persons shall be showered on 3/W, and the PM Dayroom shall be modified to accommodate these showers, unless otherwise dictated by a Search Plan or PSR. Evening Phones and Kiosk ran in accordance with Dayroom Schedule.
- During normal program, 2/W will shower all Incarcerated persons with LOP dayroom Incarcerated persons on Monday, Wednesday, Friday, and Sunday. These Incarcerated persons will be secured in the showers while showering. Workers will be showered upon completion of their shift. The remainder of the Incarcerated persons will shower during their dayroom activities, in accordance with the C Facility Dayroom schedule.
- The 1st Wednesday and 2nd Friday are Staff Training Days. The 3rd Monday and 3rd Thursday are IST training make-up days. Program shall not be modified, on IST make-up days, unless multiple custody staff are required to attend the make-up training. All Staff shall attend/participate in training and sign the CDC-844 (On the Job Training Sign-in Sheet).
- IAC Executive Body shall be allowed movement to either yard, during exercise yard periods, unless they are precluded from yard due to disciplinary action. Should they need to access housing units, arrangements will be made with the Facility Sergeants. They must be in State Blues to exercise this privilege.
- IAC Housing Unit Representatives will be allowed to walk tiers to confer with the Incarcerated person Population on 2W MON-FRI AS NEEDED PER SUPERVISOR DECISION/APPROVAL ONLY. Food ports will be locked. IAC Housing Unit Representative will be allowed to walk tiers to confer with the Incarcerated person Population on 3W MON-FRI during the 2nd Dayroom from 1745-1845 hours. Food ports will be locked. They must be in State Blues to exercise this privilege. Incarcerated persons will not pass during this time, or engage in any recreational activities. Incarcerated persons caught engaging in anything other than IAC Housing Unit Representation business, will immediately be returned to their cell.
- All A1A and A2B Incarcerated persons shall be allowed Dayroom access during their scheduled Dayrooms.
- Gym recreational activities shall be allowed for Incarcerated persons during recreational yard. (Even Days Upper Yard AM/PM; Odd Days Lower Yard AM/PM). Facility C will offer recreational yard activities consistent with the monthly yard schedule. When the Uniform Heat Trigger (UHT) is activated, Gym recreational activities will cease. When UHT is activated, only heat-risk Incarcerated persons Patient (I/P) that miss yard based on the schedule, will be allowed recreation time in the Facility C Gymnasium.
- Close Custody Incarcerated persons assigned to a job assignment may stay on their assignment until 2200 hours, or until required to return to their cells by their supervisor. Close Custody Incarcerated persons not on a work assignment may remain in the dayroom until the general evening recall.
- During 3/W dayrooms, Incarcerated person workers shall clean/work in the dayroom section that is open in accordance with the DAS. If workers are needed in other sections, not running dayroom, staff shall supervise as needed.

**ANY DEVIATION FROM THIS SCHEDULE MUST BE APPROVED BY THE FACILITY LIEUTENANT AND DOCUMENTED ON THE DAILY ACTIVITY REPORT.**

DocuSigned by:

_____
Facility C Captain
CSATF/SP

DocuSigned by:
*Steven Marsh*
61EAA1D2D64F4C4...
S. Marsh
Associate Warden / Central Services
CSATF/SP

**FACILITY D LEVEL-IV (270/SNY) DAILY ACTIVITY SCHEDULE TRIAL**

**ATTACHMENT D**

### FIRST WATCH

| | |
|---|---|
| 2230 | STAFF ARRIVE - SECURITY CHECKS/INVENTORIES |
| 2235 | PERSONAL ALARM DEVICE TESTING -- VOCATIONS & ALL REMAINING AREAS. |
| 0030 | INSTITUTIONAL COUNT. |
| 0100 | PERSONAL ALARM DEVICE TESTING- NON-HOUSING UNITS. |
| 0300 | INSTITUTIONAL COUNT: POSITIVE AND NEGATIVE. |
| 0500 | INSTITUTIONAL COUNT. |
| 0600 | UNLOCK BAR BOXES. |

### SECOND WATCH

| | |
|---|---|
| 0630 | STAFF ARRIVE-SECURITY CHECKS/INVENTORIES. |
| 0645 | MEDICATION DISTRIBUTION ONE BUILDING AT A TIME. CELL FEEDING BEGINS. BOX LUNCHES ISSUED. |
| 0800 | CELL FEEDING COMPLETED-RELEASE FOR PIA, CENTRAL KITCHEN, EDUCATION, DRP, AND ISUDT (FIRST CLASS). |
| 0900 | AM YARD & DAYROOM RELEASE - ODD DAYS LOWER TIER/EVEN DAYS UPPER TIER. SHOWERING, TELEPHONE CALLS AND KIOSKS WILL BE CONDUCTED DURING SCHEDULED DAYROOM (EXCEPTION PRIORITY SHOWERS). |
| 0910 | GYM ACTIVITIES BEGIN. |
| 0930 | C/C YARD RELEASE. |
| 1030 | YARD IN-LINE/OUT-LINE, EDUCATION, DRP, ISUDT RELEASE (SECOND CLASS). |
| 1130 | YARD AND DAYROOM RECALL – ALL INMATES. |
| 1135 | MEDICATION DISTRIBUTION. ONE BUILDING AT A TIME STARTING WITH THE TIER THAT DOES NOT RECEIVE PM YARD. |
| 1200 | CLOSE CUSTODY COUNT. |
| 1230 | PM YARD & DAYROOM RELEASE - ODD DAYS UPPER TIER/EVEN DAYS LOWER TIER UPON COMPLETION OF THE TIER NOT RECEIVING PM YARD. SHOWERING, TELEPHONE CALLS AND KIOSKS WILL BE CONDUCTED DURING SCHEDULED DAYROOM (EXCEPTION PRIORITY SHOWERS). |
| 1240 | GYM ACTIVITIES BEGIN. |
| 1300 | YARD IN-LINE/OUT-LINE. LAST CALL MEDICATION. EDUCATION, DRP, ISUDT RELEASE (THIRD CLASS). |
| 1400 | YARD RECALL/DAYROOM RECALL. |

### THIRD WATCH

| | |
|---|---|
| 1430 | STAFF ARRIVE-SECURITY CHECKS/INVENTORIES. |
| 1445 | PM YARD & DAYROOM RELEASE. SAME TIER AS PM YARD - ODD DAYS UPPER TIER/EVEN DAYS LOWER TIER. SHOWERING AND PHONE CALLS WILL BE CONDUCTED DURING SCHEDULED DAYROOM (EXCEPTION PRIORITY SHOWERS). |
| 1545 | YARD AND DAYROOM RECALL ALL INMATES RETURN TO THEIR ASSIGNED CELLS. |
| 1600 | MEDICATION DISTRIBUTION ONE BUILDING AT A TIME. |
| 1700 | INSTITUTIONAL STANDING COUNT: ONCE CLEARED, START EVENING MEAL. |
| 1750 | EVENING YARD (A1A ONLY) AND DAYROOM RELEASE (A1A/A2B). ODD DAYS LOWER TIER/EVEN DAYS UPPER TIER. SHOWERS, TELEPHONE CALLS AND KIOSKS WILL BE CONDUCTED DURING SCHEDULED DAYROOM (EXCEPTION PRIORITY SHOWERS). |
| 1950 | EVENING YARD AND DAYROOM RECALL. |
| 2000 | CLOSE CUSTODY COUNT. MEDICATION DISTRIBUTION ONE BUILDING AT A TIME. CLOSE CUSTODY INMATES SHALL BE RELEASED FOR MEDICATION UPON THE COMPLETION OF CLOSE CUSTODY COUNT. |
| 2030 | PHONE/KIOSK SIGN-UPS (A2B I/M'S ONE PHONE CALL PER MONTH). |
| 2115 | PERSONAL ALARM DEVICE TESTING – HOUSING UNITS AND PROGRAM. |
| 2200 | INSTITUTIONAL COUNT (LOCK BAR BOXES). |
| 2215 | SECURITY CHECK OF HOUSING UNIT/PROGRAM AREAS. |

### MON-SUN DAILY PROGRAM (INCLUDING HOLIDAYS)

**Privilege Group A and B**
AM Yard Odd days Lower Tier/Even Days upper tier 0900 – 1130 (2.5 hours daily).
PM Yard Odd days Upper Tier/Even Days Lower tier 1230 – 1400; 1445 – 1545 (2.5 hours daily).
**Work Group C/Privilege Group C (C/C)**
Monday thru Friday (Including Holidays/no weekends) 0930-1130 (2 hours daily/10 hours weekly).

### PM YARD AND MED-LINE

Med-line begins at 1135 with the tier not schedule for PM Yard. Upon completion of the tier's med-line yard will be released. The tier schedule for PM Yard will attend med-line during their schedule yard. Last call to receive medication and yard in/out-line will be announced at 1300. **In the event of staff shortages (Less than 2 Officers observing med-line and 2 Officers observing yard release) med-line will be released one building at a time.** Inmates will proceed straight to med-line from the housing unit and back. ADA inmates will use the track and take the shortest route to medical and back to their housing unit. LOP and C/C inmates will be released with the tier not receiving yard.

### RECREATION GYM ACTIVITES

Privilege Group A ONLY and serious disciplinary free for 180 days.

### MON-SUN EVENING YARD/DAYROOM PROGRAM

Evening Yard from 1750-1950 will be for Work Group A1/Privilege Group A (A1A) assigned inmates ONLY. Privilege Group A and B will have access to evening dayroom program based on yard/dayroom Schedule. Privilege Group C inmates will have no access to evening program.

### SHOWER PROGRAM

A1A inmate worker showers shall be conducted on 2/W and 3/W. A1A/A2B inmate showers shall be conducted on 2/W and 3/W on designated shower days during afforded dayroom times per the dayroom schedule. C/C inmate showers shall be conducted on designated shower days between the hours of 1600-1800 (excluding count time).

### INCLEMENT WEATHER AND FOG CONDITIONS

No yard. Normal Dayroom based on scheduled tier rotation. All inmates will be under direct escort when outside of the housing unit (i.e., visits, canteen, etc.)

### TRAINING DAYS

The first Wednesday and second Friday, are designated staff training days. Staff shall be afforded six (6) hours of training on scheduled training days. Supervisors will meet with staff on Second and Third Watch to provide 6 hours of meaningful training and direction relative to LMS training. There will be no yard or dayroom activities on scheduled training days. Showers, phones and kiosks will continue provided at least one floor officer is present in the housing unit to monitor the opening and closing of cell doors.

### CLOSE CUSTODY INMATES

With the exception of Medication distribution and other emergency situations, A1A and A2B Close Custody inmates will be provided evening yard and dayroom 1750-1950.

NOTE: Staff shall log all yard releases, dayroom activities, and mandatory showers in the Housing Unit Log. Any deviation from this schedule must be approved by the Facility Captain or Administrative Officer of the Day (AOD) and documented on a Notice of Unusual Occurrence (NOU).

During mass movement, inmates shall walk between the white line and the grass. (One Way Traffic) (ADA inmates may walk just right of the line) inmates receiving medication are instructed to stand in the pill line with their shirts tucked in and wearing state issued clothing, however, during PM Yard inmates are allowed to wear recreational clothing. Movement on the track shall be counter clockwise.

Captain – Facility D

P. Llamas
Associate Warden – Complex III

# FACILITY 'E' LEVEL-II NDPF DAILY ACTIVITY SCHEDULE
Revised: July 2024

### First Watch Begins

| | |
|---|---|
| 2230 | First Watch staff arrives: Conduct security & equipment check. |
| 0030 | Institutional Count |
| 0045 | Backside Window Checks |
| 0300 | Institutional Count; Positive and Negative |
| 0330 | Wake-Up Call for Early Dining Workers |
| 0415 | Release Early Dining Workers |
| 0500 | Institutional Count |
| 0600 | Unlock Bar Boxes |

### Second Watch Begins

| | |
|---|---|
| 0630 | Second Watch staff arrives: Conduct security & equipment check. |
| 0635 | Cell Doors open / Breakfast Release and Pill Line. |
| 0730 | Vocation/Education Group/DRP Early Release. Announce Any Program Deviations in All Housing Units Over the P.A. |
| 0830 | Pending Tool Count Clearance. Yard & Dayroom Release for A1/A & A2/B Inmates. Gym activities designated during yard times. |
| 1000 | 5-minute Inline, followed by a 5-minute Outline, no two-way traffic. |
| 1030 | Education Group Release |
| 1100 | 5-minute Inline, followed by a 5-minute Outline, no two-way traffic. |
| 1130 | Medication release including close custody. P.M worker release C/C Dayroom/Yard Release. (Monday through Friday only) |
| 1200 | 5-minute Inline, followed by a 5-minute Outline, no two-way traffic. Close Custody Count |
| 1245 | Final Medication Call (exception will be made on case-by-case basis on medical discretion) |
| 1300 | 5-minute Inline, followed by a 5-minute Outline, no two-way traffic. Education Group Release |
| 1400 | Yard/Dayroom recall for all inmates. |

### Third Watch Begins

| | |
|---|---|
| 1430 | Third Watch staff arrives: Conduct security & equipment/inventory check. |
| 1445 | Yard & Dayroom Release for A1/A & A2/B Inmates. C/C Yard Release (Monday through Friday only) |
| 1600 | Yard recall for all inmates, Medication Distribution one building at a time. |
| 1630 | Dayroom recall for all inmates. |
| 1700 | Institutional Standing Count; Once Count is Cleared, Start Evening Meal/Diabetics Medication |
| 1900 | Telephones on/able to use. Yard and Dayroom release upon completion of the evening meal and Dining Tool Inventory clearing. |
| 2000 | Close Custody Count. Medication Distribution one building at a time. 5-minute Inline, followed by a 5-minute Outline, no two-way traffic. |
| 2100 | Yard/Dayroom recall for all inmates. |
| 2115 | Personal Alarm Device Testing-All Housing Units |
| 2200 | Institutional Count / Lock Bar-Boxes |
| 2215 | Security Check of Housing Unit /Program Areas |

**NOTE: Any Deviation From This Schedule Shall Be Approved by the Program Lieutenant or Above and Be Logged in the Housing Unit Logs.**

### Staff Training Days
The first Wednesday and second Friday, are designated staff training days. Supervisors will ensure staff complete their training assigned. There will be no yard or dayroom on training days.

### DAILY RECREATION YARD / DAYROOM ACTIVITIES
Refer to the attached 'Yard Recreation / Dayroom Daily Activity Schedule'. This will be accomplished, so all housing units have equal access to the Recreational Yard and Dayrooms.

### INCLEMENT WEATHER AND FOG CONDITIONS
1. No yard activities.
2. Dayroom activities only

All inmates will be escorted when outside of the housing unit (example, dining release, visiting, vocational, education, DRP, etc.)

### GYM ACTIVITIES
**Gym Activities Shall Run Monday through Sunday. The Maximum Number of Inmates Allowed in the Gym is 30; unless special activities are scheduled. NOTE: The Recreation equipment box will be unlocked and opened for (10) minutes at the top of the hour. At the conclusion of the (10) minute unlock the Recreation box will be re-secured. Staff will log all yard releases, Inline / Outline, dayroom activities, and mandatory showers (during modified program) in the Housing Unit Logbook. Schedule deviations will only be approved by the Program Lieutenant or above, then log in the Housing Unit Logbook.**

Staff Shall Log All Yard Releases, Dayroom Releases, and/or any building activities that occur in the unit. Gym Activities Shall Also Be Logged in the Gym Logbook. It should be noted that if inmates elect to secure/close their assigned cell door, they will be afforded the opportunity to access their cell during the Inline/Outline.

During Mass Movement, Inmates Shall Walk Along The White Line: Movement On The Track Shall Be Counter Clockwise.

Facility E Captain

M. JONES
Complex I, Associate Warden

Changes / revisions to the DAS require the AW's approval prior to implementation via policy memorandum to the Warden.

### First Watch:

| | |
|---|---|
| 2230 | First Watch staff arrives: Conduct security & equipment check. |
| 0030 | Institutional Count |
| 0100 | Personal Alarm Device (PAD) Testing (Support Buildings & Neutral Zone). |
| 0300 | Institutional Count: Positive and Negative. |
| 0330 | Wake-up call for early Dining Workers. |
| 0400 | Release early Dining Workers. |
| 0500 | Institutional Count. |

### Second Watch:

| | |
|---|---|
| 0630 | Second Watch staff arrives: Conduct security & equipment check. Morning Wake Up, showers and TVs on. EOP unit remains secured pending medical/mental health unlock request. |
| 0645 | Early breakfast release for diabetics, inmates with special diets, Education/DRP/ISUDT. |
| 0700 | Breakfast release (EOP first) / non-EOP Medication release. |
| 0730 | Telephones on/able to use. |
| 0815 | Education/DRP/ISUDT (1st class) begins. |
| 0830 | AM Worker Release. Yard release and Dayrooms open (upon Dining tool count clearing). 10-minute unlock (one-way out). Facility gym available 2-3 days per week, Tuesday through Friday to follow Neutral Zone schedule from 0900-1130 hours. |
| 1030 | 5-minute Inline, followed by a 5-minute Outline; no two-way traffic. Education/DRP/ISUDT (2nd class) release. |
| 1045 | Education/DRP/ISUDT (2nd class) begins. |
| 1155 | Medication release. PM worker release. |
| 1200 | Yard and Dayroom recall. |
| 1230 | Yard and Dayroom release. The gym is open from 1230-1400 hours according to the Neutral Zone Schedule. |
| 1300 | 5-minute Inline, followed by a 5-minute Outline; no two way traffic. Education/DRP/ISUDT (3rd class) release. |
| 1315 | Education/DRP/ISUDT (3rd class) begins. |
| 1330 | C/C Yard Release. (Monday through Friday only) |
| 1400 | 5-minute Inline, followed by a 5-minute Outline; no two way traffic. |

### Third Watch:

| | |
|---|---|
| 1430 | Third Watch staff arrives: Conduct security & equipment check. |
| 1530 | 5-minute Inline, followed by a 5-minute Outline; no two way traffic. |
| 1600 | Yard recall for all inmates. |
| 1630 | Dayroom recall for all inmates. |
| 1700 | Institutional standing count: Upon completion of the Institutional Count, conduct Evening Meal release. |
| 1900 | Telephones on/able to use. Yard and Dayroom release upon completion of the evening meal and Dining Tool Inventory clearing. |
| 2000 | 5-minute Inline, followed by a 5-minute Outline; no two way traffic. |
| 2100 | Yard recall for all inmates. |
| 2115 | Dayroom recall. Pod doors closed. |
| 2120 | PAD Testing. |
| 2200 | Institutional Count. |
| 2215 | Security checks of unit. |

<u>Staff Training Days</u>

**The first Wednesday and second Friday, are designated staff training days. Supervisors will meet with staff on Second and Third Watch to provide 6 hours of meaningful training. There will be no yard or dayroom on training days. Showers, phones and kiosks will run, following signup lists, when staff are in the housing units.**

<u>Evening feeding shall be conducted utilizing one side of the chow hall at a time only.</u>

### DAILY RECREATION YARD / DAYROOM ACTIVITIES

Refer to the attached 'Yard Recreation / Dayroom Daily Activity Schedule'. This will be accomplished on a rotational basis so all housing units have equal access to the Recreational Yard and Dayrooms.

### INCLEMENT WEATHER AND FOG CONDITIONS

| | |
|---|---|
| 1. | No yard activities. |
| 2. | Dayroom activities only. |
| 3. | All inmates will be escorted when outside of the housing unit (example; dining release, visiting, etc.} |

NOTE: The Recreation equipment box will be unlocked and opened for (10) minutes at the top of the hour. At the conclusion of the (10) minute unlock the Recreation box will be re-secured. Staff will log all yard releases, Inline / Outline, dayroom activities, and mandatory showers (during modified program) in the Housing Unit Logbook. Schedule deviations will only be approved by the Program Lieutenant or above, then log in the Housing Unit Logbook.

NOTE: On Facility "F", heat-risk inmates will be allowed dayroom in the building section which is conducting dayroom activities. Heat-risk inmates who assume dayroom activities in a section where there are not housed will not be able to return their section until dayroom recall. After evening meal has ended, dayroom activities will resume.

The Pod doors will be open during Dayrooms, times of mass movement (including group releases across sections, meals), and in/out lines. They will be closed for counts, and during times of reduced staff in the units, to be considered 1 custody staff in the unit for an extended time. This may be modified as needed for unusual circumstances or emergencies, with approval of the Facility Lieutenant, if time is available to seek it.. During the times the Pod Doors are locked, staff will make every effort to run phones, and workers showers, unless otherwise instructed.

**Complex IV Captain**

A. IVERSEN
**Complex IV Associate Warden (A)**

Changes / revisions to the DAS require the AW's approval prior to implementation via policy memorandum to the Warden.

**First Watch:**

| | |
|---|---|
| 2230 | First Watch staff arrives: Conduct security & equipment check. |
| 0030 | Institutional Count |
| 0100 | Personal Alarm Device (PAD) Testing (Support Buildings & Neutral Zone). |
| 0300 | Institutional Count: Positive and Negative. |
| 0330 | Wake-up call for early Dining Workers. |
| 0400 | Release early Dining Workers. |
| 0500 | Institutional Count. |

**Second Watch:**

| | |
|---|---|
| 0630 | Second Watch staff arrives: Conduct security & equipment check. Morning Wake Up, showers and TVs on, EOP unit remains secured pending medical/mental health unlock request. |
| 0645 | Early breakfast release for diabetics, inmates with special diets, Education/DRP/ISUDT. |
| 0700 | Breakfast release (EOP first) / non-EOP Medication release. |
| 0730 | Telephones on/able to use. |
| 0815 | Education/DRP/ISUDT (1st class) begins. |
| 0830 | AM Worker Release. Yard release and Dayrooms open (upon Dining tool count clearing). 10-minute unlock (one-way out). Facility gym available 2-3 days per week, Tuesday through Friday to follow Neutral Zone schedule from 0900-1130 hours. |
| 1030 | 5-minute Inline, followed by a 5-minute Outline; no two-way traffic. Education/DRP/ISUDT (2nd class) release. |
| 1045 | Education/DRP/ISUDT (2nd class) begins. |
| 1155 | Medication release. PM worker release. |
| 1200 | Yard and Dayroom recall. |
| 1230 | Yard and Dayroom release. The gym is open from 1230-1400 hours according to the Neutral Zone Schedule. |
| 1300 | 5-minute Inline, followed by a 5-minute Outline; no two way traffic. Education/DRP/ISUDT (3rd class) release. |
| 1315 | Education/DRP/ISUDT (3rd class) begins. |
| 1330 | C/C Yard Release. (Monday through Friday only) |
| 1400 | 5-minute Inline, followed by a 5-minute Outline; no two way traffic. |

**Third Watch:**

| | |
|---|---|
| 1430 | Third Watch staff arrives: Conduct security & equipment check. |
| 1530 | 5-minute Inline, followed by a 5-minute Outline; no two way traffic. |
| 1600 | Yard recall for all inmates. |
| 1630 | Dayroom recall for all inmates. |
| 1700 | Institutional standing count: Upon completion of the Institutional Count, conduct Evening Meal release. |
| 1900 | Telephones on/able to use. Yard and Dayroom release upon completion of the evening meal and Dining Tool Inventory clearing. |
| 2000 | 5-minute Inline, followed by a 5-minute Outline; no two way traffic. |
| 2100 | Yard recall for all inmates. |
| 2115 | Dayroom recall. Pod doors closed. |
| 2120 | PAD Testing. |
| 2200 | Institutional Count. |
| 2215 | Security checks of unit. |

<u>Staff Training Days</u>

**The first Wednesday and second Friday, are designated staff training days. Supervisors will meet with staff on Second and Third Watch to provide 6 hours of meaningful training. There will be no yard or dayroom on training days. Showers, phones and kiosks will run, following signup lists, when staff are in the housing units.**

<u>Evening feeding shall be conducted utilizing one side of the chow hall at a time only.</u>

---

### DAILY RECREATION YARD / DAYROOM ACTIVITIES

Refer to the attached 'Yard Recreation / Dayroom Daily Activity Schedule'. This will be accomplished on a rotational basis so all housing units have equal access to the Recreational Yard and Dayrooms.

### INCLEMENT WEATHER AND FOG CONDITIONS

1. No yard activities.
2. Dayroom activities only.
3. All inmates will be escorted when outside of the housing unit (example; dining release, visiting, etc.}

---

NOTE: The Recreation equipment box will be unlocked and opened for (10) minutes at the top of the hour. At the conclusion of the (10) minute unlock the Recreation box will be re-secured. Staff will log all yard releases, Inline / Outline, dayroom activities, and mandatory showers (during modified program) in the Housing Unit Logbook. Schedule deviations will only be approved by the Program Lieutenant or above, then log in the Housing Unit Logbook.

---

NOTE: On Facility "G", heat-risk inmates will be allowed dayroom in the building section which is conducting dayroom activities. Heat-risk inmates who assume dayroom activities in a section where they are not housed will not be able to return their section until dayroom recall. After evening meal has ended, dayroom activities will resume

---

The Pod doors will be open during Dayrooms, times of mass movement (including group releases across sections, meals), and in/out lines. They will be closed for counts, and during times of reduced staff in the units, to be considered 1 custody staff in the unit for an extended time. This may be modified as needed for unusual circumstances or emergencies, with approval of the Facility Lieutenant, if time is available to seek it.. During the times the Pod Doors are locked, staff will make every effort to run phones, and workers showers, unless otherwise instructed.



**Complex IV Captain**

**A. IVERSEN**
**Complex IV Associate Warden (A)**

Changes / revisions to the DAS require the AW's approval prior to implementation via policy memorandum to the Warden.

# Exhibit 122

| CAMU Compliance Review Summary (CSATF November 2023) | | |
|---|---|---|
| **Issue** | **Completed** | **Comments/Efforts to Correct** |
| **Effective Communication (EC) (DPP)**: Is it documented that EC was provided throughout the Rules Violation Report (RVR) Process? Please complete the monthly RVR template attachment. (This report you can generate in Oracle and then filter down to inmates who require EC). (if applicable)Please review a minimum of Ten (10) RVR's. | Compliant | CAMU HQ has requested internal audits between CSATF & HDSP to ensure DPP RVR's are in compliance. I utilized a date range of 10-18-23 to 11-30-23 (Day of audit) as previous months have already been reviewed by HDSP. Only 8 fully adjudicated RVR's were available for review with LOW TABE concerns. 100% in compliance. At every due process event (Initial copy, hearing and Final copy), EC was achieved and documented. Good job by HDSP. ████████-log#4929, ████og#6793, █████ log#6796, log#3267, █████ log#6803,███████-log#4218, ████-log#7881, ████████og#4223 |
| **ADA**: Is it documented that the institution tracks inmates in the Disability Placement Program (DPP) on Out-to Court (OTC) status? | Compliant | Yes. I interviewed both staff in records regarding there role in advising stakeholders of OTC transfers. They stated once they are aware of a court hearing, they utilize SOMS to identify disabilities, and DME. They then email ADA office. After completing this interview, I spoke with the ADA office technician in charge of maintaining tracking log for disabled inmates OTC. The report was accurate after reviewing OTC report in SOMS oracle. |
| **ADA**: Per HQ CAMU directives, has the institution ordered the Captel captioning 1MB analog lines? Also, has the institution submitted a remedy ticket to install the new phone lines for the Captel phones (please provide the expected date for when the phone lines would be installed). | Approaching Compliance | **Below is information received from the ADAC, Plant Operations Manager, and HQ EIS IT Specialist:** The AT&T analog lines will not be ordered until IT Acquisitions has worked with each individual institution business services/acquisitions department to either use an existing business account, creating a new business account or using a different business account to purchase and pay for the monthly costs of the AT&T analog lines. ALL institutions have already submitted Remedy tickets to IT Acquisitions who is in the process of working on them. There is no ETA currently as the billing/purchasing will need to be finalized and once this is completed the AT&T analog lines can be purchased. From the time of purchase date it can take up to 90 days for AT&T to process, configure and bring the analog lines to the institution for installation and use.                           I will follow up next month for status update. |
| **ADA/RAP**: Is the Disability Verification Process (DVP) being followed appropriately in the responses? | Compliant | I audited 10 completed 1824 for the month of November. The following 1824's were in full compliance regarding the DVP process. Many of the audited 1824's did not require a DVP as it had no nexus to medical and only custody. Log #-4361 ████ 4365 ████████ 4370 █████ 4379 ████ ████ 4383 █████ ████ 4467 ████ 4476 ████████ 4496 █████ |
| **ADA**: Are DPP incarcerated persons assigned to a job/education or placed on a waiting list, and are they being accommodated in their assignment? | Compliant | Every inmate is seen by classification committee and placed on appropriate waiting list regardless of disability, unless the inmate does not meet the essential functions of the position per Armstrong Remedial Plan. When assigned to a position, staff will accommodate by allowing for extra time to complete the assignment. I interviewed staff in G1 (Specifically C/O ████ who stated such. I also interviewed an inmate on Facility G who is DPO/DNH (Inmate ████ ████-Yard Worker). He stated that staff do a good job in allowing him to work at his pace. He stated he is able to pick up trash and then rest when needed. |

| | | |
|---|---|---|
| **ADA workers:** ADA workers training records completed per policy? | Not in Compliance | CSATF continues to have overdue ADA Worker Evaluation's on every facility. In order to maintain compliance, staff must review this report in SOMS daily. Historically, this process was completed via a 'paper' CDC-101 form. Since merging to SOMS, this has become a difficult task for staff to maintain compliance during there shift. This deficiency was reported to ADAC and FT Lt. FTS have been tasked to report to buildings and train staff on compliance. I will follow up next month on this process. |
| **DDP RVR Policy Question:** (Staff interview) Can staff articulate there responsibilities when determining if a DDP inmate requires discipline? What is mandated prior to issuing an RVR and what is required to be documented in the RVR? | Approaching Compliance | I interviewed 16 staff on Facility F & G on 3/W. All staff did well with the exception of one officer working in G1 & G2. (Both designated DDP buildings). I reported my findings to the ADAC and recommended additional training for those staff. I also showed staff how to navigate to the CSATF share drive, ADA tab, to review a DDP RVR and what is mandated. I also advised the staff members of their resources in the ADA Binder located in every office, specifically OP 178. It gives the requirements on how to discipline or not discipline a DDP inmate. I will continue to follow up on this question until I see sustained compliance. |
| **Accommodations:** Is it documented that custody staff perform monthly wheelchair inspections and notify healthcare staff of needed repairs? | Compliant | Logs reviewed for all facilities. 100 percent compliance. This has been sustained for several months. |
| **Staff Interview:** Do you know what CART is? Who qualifies for CART?  CART is "Real-time Captioning" currently approved for due process events (RVR Hearings, Classification, ASUPN Notices). Captioning is placed on a computer screen (Similar to Close Caption on a TV) so a deaf inmate can 'read along' during the encounter. This method is popular amongst the deaf community who lost hearing later in life and can read, but do not know how to use sign language. Inmates with a primary & secondary method of "Written Notes" qualify for CART. | Not in Compliance | In interviewed 16 staff on Facility F & G. Though its not mandated for officers to use CART, minimal staff were aware of this aid for our deaf inmates who require Written Notes. One officer in F3 was knowledgeable and he was recognized to management staff. As the CAMU CCII, I train all staff in Block Training weekly. I speak of CART, Caption phone, TTY, and other auxilary aids at CSATF. I also show videos of said aids. My hope is that staff will become knowledgeable with this process. The ADAC has also ordered FTS staff to conduct more training on these topics. Town Hall training for staff and inmates will be started December 2023. I will follow up on this question next month. |
| **Staff Interview:** Do you know what the CAP-TEL phone is? | Not in Compliance | In interviewed 16 staff on Facility F & G. Minimal staff on both facilities were knowledgeable on the exact location of the Caption Phone (FTS Office). Minimal staff could articulate what the phone does, and some confused the location with the TTY phone and stated it was in G3 and F1 which is incorrect. As the CAMU CCII, I train all staff in Block Training weekly in ADA & DDP. I recently started to speak of CART, Caption phone, TTY, and other auxiliary aids at CSATF since these are new items at CSATF (With exception of TTY). I also show videos of said aids. My hope is that staff will become knowledgeable with this process. The ADAC has also ordered FTS staff to conduct more training on these topics. Town Hall training for staff and inmates will be started December 2023. I will follow up on this question next month. |

Exhibit 123

| CAMU Compliance Review Summary (CSATF December 2023) | | |
|---|---|---|
| **Issue** | **Completed** | **Comments/Efforts to Correct** |
| **Effective Communication (EC) (DPP)**: Is it documented that EC was provided throughout the Rules Violation Report (RVR) Process? Please complete the monthly RVR template attachment. (This report you can generate in Oracle and then filter down to inmates who require EC). (if applicable)Please review a minimum of Ten (10) RVR's. | Compliant | CAMU HQ has requested internal audits between CSATF & SCC to ensure DPP RVR's are in compliance. I utilized a date range of 10-31-23 to 12-13-23 (Day of audit) as previous months have already been reviewed by SCC. Only 1 fully adjudicated RVR was available for review noting a verified LD and 9 with a low TABE score. RVR log numbers: 71630, 67211, 68302, 67093, 67489, 67413, 67501, 67115, 66593, & 67083. 100% in compliance. Great job at SCC! |
| **ADA:  CAPTION PHONES-Please provide a status update  from last review of this item.** Per HQ CAMU directives, has the institution ordered the Captel captioning 1MB analog lines? Also, has the institution submitted a remedy ticket to install the new phone lines for the Captel phones?-**Specifically, has your local plant ops team submitted a remedy ticket (include remedy ticket number) to EIS Enterprise Service Desk at EIS Service Desk (EISServiceDesk@cdcr.ca.gov) EIS/IT Acquisitions Unit Chris Pierce-Smith. If the answer is no, this would be considered NON-COMPLIANCE.** | Compliant | Remedy ticket placed on 11-3-23 per Plant Manager. Ticket number REQ000002891993. CSATF is waiting for installation by AT&T. CSATF is compliant and is awaiting AT&T, therefore, for the purposes of this audit, I will not place CSATF as Non Compliant or Approaching Compliance. |
| **DME:** Are staff aware of how to search an incarcerated person with a prosthetic device (interview Correctional officers and Sergeants)? **Routine clothed, unclothed to include the process for refusals to be searched.** | Compliant | I toured Facility E and interviewed 15 staff. All staff noted they would treat the search the same during a routine clothed pat down. When asked about the policy of asking the inmate to remove the prosthesis or for a refusal, they all noted the search and removal would need to be conducted in a private setting which was appropriate. Good job by Facility E staff on this audit question. I will continue to utilize this question and tour other facilities in the future. |
| **ADA:** Is it documented that staff interviewed speech and hearing impaired incarcerated persons within 14 days of arrival to the institution, or within 14 days of being placed in the Disability Placement Program (DPP), to determine the incarcerated persons primary and secondary methods of communication? | Compliant | As of 12-26-23, CSATF has 281 inmates who are hearing impaired. We have a system in place in where the SLI staff review the Effective Communication Preview Report for any new DNH or DPH inmates. They then report to the facility to complete the EEC 128B chrono. As the CAMU CCII, I have provisions to enter the Primary and Secondary method of communication into SOMS. A review of report shows full compliance.  Great job by SLI staff on keeping a current tracking method! |
| **ADA workers:** Check response times are reasonable and if they are wearing their gold shirts during their work hours. Are ADA workers being paid in a timely manner? | Compliant | I toured all buildings on Facility E and asked the control booth officer to contact an ADA Worker. In very case, the ADA worker responded immediately and was wearing the appropriate ADA worker vest. I spoke to all ADA workers about the importance of providing services in a timely manner and they were all very eager to help. No issues on Facility E. I will continue this audit question in the near future for other facilities, as we have over 500 ADA workers spread out on 7 facilities. |
| **ADA workers:** ADA workers training records completed per policy? | Compliant | An audit of the last 22 new hires was conducted to ensure compliance with ADA Worker training. I reviewed all 7 ADA Training record binders kept in the FT office. All 22 new hires had received training and signed documents. Good job by FT staff. I will continue to monitor for compliance as we have over 500 ADA Workers at CSATF throughout 7 facilities. |

| | | |
|---|---|---|
| **DDP RVR Policy Question: (Staff interview)** Can staff articulate there responsibilities when determining if a DDP inmate requires discipline? What is mandated prior to issuing an RVR and what is required to be documented in the RVR? | Approaching Compliance | I toured Facility E and spoke to 15 staff. Many of the staff were able to articulate the policy and mandates prior to authorizing an RVR and the policy and mandates when documenting an RVR. For those staff who had difficulty with this policy, they were educated and instructed to review OP 178, Disciplinary Section. I advised them that during a tour, they can always utilize there resources (OP 178) when being interviewed by outside stakeholders. All staff were eager to learn. My findings were forwarded to ADAC, FT. Lieutenant, and FTS on facility E. I will continue to ask this question during my monthly tours. I also speak of this policy every week during block training when I teach. |
| **Staff Interview:** Do you know what CART is? Who qualifies for CART? CART is "Real-time Captioning" currently approved for due process events (RVR Hearings, Classification, ASUPN Notices). Captioning is placed on a computer screen (Similar to Close Caption on a TV) so a deaf inmate can 'read along' during the encounter. This method is popular amongst the deaf community who lost hearing later in life and can read, but do not know how to use sign language. Inmates with a primary & secondary method of "Written Notes" qualify for CART. | Approaching Compliance | I toured Facility E and spoke to 15 staff. Minimal staff were aware of this new process. I educated them that CART is realtime captioning currently being used for Due Process and Classification encounters for inmates who are deaf and have "Written Notes" listed as a Primary or Secondary method of communication. Building staff are not required to utilize this process at this time, but I advised they should be knowledgeable and understand the process and reason for CART. I advised them that during a tour, they can always utilize there resources (OP 403) to find information regarding CART when being interviewed by outside stakeholders. All staff were eager to learn. My findings were forwarded to ADAC, FT. Lieutenant, and FTS on facility E. I will continue to ask this question during my monthly tours. I also speak of this policy and show a CART video every week during block training when I teach. |
| **Staff Interview:** Do you know what the CAP-TEL phone is? | Approaching Compliance | I toured Facility E and spoke to 15 staff. Approximately 75% of staff were aware of this new process. I educated them the Cap Tel phone is currently being offered by the FTS in the chapel, however, in the near future and after Bargaining Union 6 Workload Impact process, staff in the designated buildings will be required to offer this phone similar to offering the TTY machine. I educated staff on what the phone provides (Captioning) and who is eligible (Inmate with "Written Notes" listed as a Primary or Secondary method of communication.) Building staff are not required to utilize this process at this time, but I advised they should be knowledgeable and understand the process and reason for the Cap Tel phone. I advised them that during a tour, they can always utilize there resources (OP 403) to find information regarding Cap Tel when being interviewed by outside stakeholders. All staff were eager to learn. My findings were forwarded to ADAC, FT. Lieutenant, and FTS on facility E. I will continue to ask this question during my monthly tours. I also speak of this policy and show a Cap Tel video every week during block training when I teach. |

| | | |
|---|---|---|
| **TTY Phones:** Conduct random inspection of TTY phones to ensure the TTY phones are properly working ? Is the institution completing the TTY phone quarterly inspection in accordance to Statewide policy (where is the completed inspections stored?). | Approaching Compliance | I personally conducted testing of TTY on Facility A, B, & CTC. FTS staff completed the testing on the rest of the facilities for December. I reported to Via Path that Facility A & B messages were garbled between me and the CA Relay Service Operator. I did confirm that the other party was able to read my messages with no garbling and could also hear my voice when activating Voice Carry Over (VCO). So in these two cases, the issue is not at CSATF. The CTC Via Path phone did not allow the call to be processed and this was also reported and requested to be fixed by Via Path. I have been reporting these types of findings for several years at CSATF via Via Path work orders and the technology is simply too old and isn't reliable...... There are current meetings being held by CAMU HQ & Via path to determine if the TTY will be discontinued or upgraded to provide sustainability. Statewide, we are now mandated to test monthly, so I will continue to add results in the following months. |

# Exhibit 124

| CAMU Compliance Review Summary | | |
|---|---|---|
| **Issue** | **Completed** | **Comments/Efforts to Correct** |
| **Effective Communication (EC) (DPP)**: Is it documented that EC was provided throughout the Rules Violation Report (RVR) Process? Please complete the monthly RVR template attachment.  (This report you can generate in Oracle and then filter down to inmates who require EC). (if applicable)Please review a minimum of Ten (10) RVR's. | Compliant | CAMU HQ has requested internal audits between CSATF & CEN to ensure DPP RVR's are in compliance. I utilized a date range of 10-1-23 to 10-31-23 as previous months have already been reviewed by staff. For this review period, only 6 ADA inmates had fully adjudicated RVR's for review. Of those 6, 2 were only DLT and had a TABE score of over 4.0, therefore, these RVR's did not require an audit. The following RVR's were audit for compliance: RVR log numbers: 63513, 62365, 61252, & 64532. 100% in compliance for all three stages of EC (Initial Copy, Hearing, & Final Copy). Great job at CEN! |
| **ADA:  CAP TEL PHONES-**Please provide a status update  from last review of this item:: Has the institution install the new phone lines for the Captel phones?- **If the answer is no, please provide an expected date on when the institution would have the lines installed(local plant ops team should provide an update)** | Compliant | Remedy ticket placed on 11-3-23 per Plant Manager. Ticket number REQ000002891993. CSATF is waiting for installation by AT&T. CSATF is compliant and is awaiting AT&T, therefore, for the purposes of this audit, I will not place CSATF as Non Compliant or Approaching Compliance. EIS IT HQ staff, Via Path, and CSATF Plant Op's conducted a tour of all designated units to develop a plan of action for not only AT&T, but also our local IT and Plant Op staff who will adding conduit and phone lines while waiting for AT&T to arrive and complete the work order. Progress is being made and CSATF staff are making every effort to get this completed. |
| **ADA: Housing Unit:**                              1) ADA Binder-Disability Rosters and ADA pictures in the ADA binder up to date?                                2) Posters-LEP (ispeak) posters-contact business services manager information updated. ADA Posters (English and Spanish) posted in HU's. 3) Are the 1824's readily accessible to the incarcerated population. | Not in Compliance | The following are results from touring Facility A & G:          **1.** All of facility A had updated rosters in binders. Facility A1 picture board was not up to date. A2 & A3 were up to date. All staff were educated on the importance of having an accurate picture board and weekly roster and stated they would fix the deficiencies immediately. All findings were reported to the ADAC. All of Facility G had outdated DPP & DDP rosters. In some cases an entire months worth. I also could not validate the picture book without the updated roster, therefore they all failed. All findings were reported to the ADAC and the updated reports were immediately placed in the ADA Binders. Staff were advised to now update picture binder with disabilities.   **2.** Only Facility G, building 1 had the appropriate identification for LEP (ISpeak Posters should identify AW of BS not ADAC). All of Facility A and the remaining buildings on Facility G still identified the ADAC as the LEP coordinator. All findings were reported to the ADAC with a recommendation to immediately fix.<br>**3.** All housing units had 1824's avaible. |
| **ADA:** ADA worker packets and training being completed by a supervisor? | Compliant | An audit of all hires in January 2024 was conducted. As of 1-31-24, CSATF hired 9 ADA workers on Facility D, E, F & G. Training packets were completed by staff. Great job. Sustained compliance as December 2023 was also accurate. |
| **ADA:** Is it documented that incarcerated persons who meets the criteria for CART services are being accommodated in due process events (e.g. classification committee, RVR hearings). | Compliant | I audited 10 inmates who have a Primary or Secondary of Written Notes. 4 DPH and 6 DNH inmates. In all cases, SOMS was updated by the ADAC per policy to document the need for CART when requested. During a review of UCC's and RVR hearing after CART policy was established, all DPH inmates elected to use SLI during committee. All DNH inmates utilized primary of hearing aids or loud voice or elected to have UCC conducted in absentia. 1 chrono for ▓▓▓▓ had amazing verbiage noting CART was offered and inmate declined. Great job so far! |

| | | |
|---|---|---|
| **ADA:** Is it documented that the C&PR, or designee, followed the expedited transfer process once the Disability Placement Program expedited transfer incarcerated person is endorsed? | Compliant | As previously reported, CSATF houses all inmates with various disabilities. At no time will a class member be housed inappropriately due to his disability, nor will his WG/PG or credit earning status change. CSATF should not be listed on any Expedited Transfer reports as we can and have been accommodating inmates disabilities. As previously reported, when all inmates are endorsed, they go on the transfer report by seniority (Date of Endorsement). While endorsed, the ADA inmate continues to work, attend services, maintain WG/PG and credit earning status and appropriate Canteen withdrawals. So there is never a reason to place any of our inmates on a Expedited Transfer report. On a rare occasion when a disabled inmate is delayed for transfer due to a lack of lower bunk and lower tier housing, the C&PR office contacts PMU to ensure the inmate receives transfer as soon as a Lower Lower is vacant. This process is completed by both assistant C&PR's at CSATF. CSATF is in compliance. |
| **ADA: Is** it documented that class members have been informed of the reasonable accommodation assistive devices made available to them  (e.g. CART services, PSAP's, Cap tel phones, Zoomax etc.) | Compliant | Yes, the ADAC and Ft Lieutenant have done an extremely good job to provide information to all class members regarding the new assistive devices. They conducted Town Hall meetings, visits to buildings to provide training to inmates and staff, placed informative information on the Via Path Tablets and TV channel. They are also developing additional posters to place inside housing units. Previously, the Ft. Lieutenant created a poster to list all new technology and placed them in every building. Great job by the ADAC and FT staff. |
| Is medical staff (To include nursing and Medical OT Scheduling) knowledgeable on the SLI mandate and policy? | Compliant | On 1-17-24, I toured Facility A, B, D, E, G, R&R and CTC. With the assistance of the CCHCS HQ Captain and Assistant Deputy Director. We asked medical, dental and OT staff of the SLI requirements and polices. All staff stated they would utilize SLI in person first, followed by VRI. Staff were able to log on and show us the VRI process and make contact with an SLI. Only one interview with B dental stated they would 'postpone' the occurrence, fearing a medical NC for lack of SLI. They were educated to never postpone, but simply switch from in person to VRI SLI. Great job overall by CCHCS staff at CSATF. |
| **Staff Interview:** Do you know what CART is? Who qualifies for CART?  CART is "Real-time Captioning" currently approved for due process events (RVR Hearings, Classification, ASUPN Notices). Captioning is placed on a computer screen (Similar to Close Caption on a TV) so a deaf inmate can 'read along' during the encounter. This method is popular amongst the deaf community who lost hearing later in life and can read, but do not know how to use sign language. Inmates with a primary & secondary method of "Written Notes" qualify for CART. | Approaching Compliance | I interviewed 16 staff on Facility A & G. Many were not aware of CART due to never using the technology. After advising them of the process and why its used, I educated them on using OP 403 to educate themselves on CART. I advised them in the near future, all staff may be obligated to use it. Staff were eager to learn and they were advised when unable to answer ADA related questions during tours, to always rely on the ADA binder and OP 403. Good job by staff. |
| Staff Interview: Do you know what the CAP-TEL phone is? | Approaching Compliance | I interviewed 16 staff on Facility A & G. Many were aware of The CAP Tel phone and current location (FTS Office). I educated them on using OP 403 to educate themselves on CAP Tel phone policy. I advised them in the near future, the CAP Tel phones will be moved next to the TTY phone for quicker access. Staff were eager to learn and they were advised when unable to answer ADA related questions during tours, to always rely on the ADA binder and OP 403. Good job by staff. |

# Exhibit 125

# (Intentionally left blank)

# Exhibit 126

# (Intentionally left blank)

# Exhibit 127

# (Intentionally left blank)

# Exhibit 128

# (Intentionally left blank)

Exhibit 129

Generated by :
dave.leclerc

**Institution Bed Audit**
Time run: 5/29/2024 4:00:03 AM

**ASP**  Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASP-Central Service | FIR | S FIR 1 | Dorm | 10 | 0 | 0 | 10 | I | FH | 10 | 6 | 4 | 0 | 60% |
| | INF | S INF 1 | Cell | 0 | 0 | 13 | 13 | NA | OHU | 0 | 5 | 8 | 0 | |
| | | | Dorm | 0 | 0 | 15 | 15 | NA | OHU | 0 | 3 | 12 | 0 | |
| **ASP-Central Service Total** | | | | **10** | **0** | **28** | **38** | | | **10** | **14** | **24** | **0** | **140%** |
| ASP-Facility A | 110 | A 110 1 | 270 Dorm | 68 | 68 | 0 | 136 | II | PF | 102 | 117 | 19 | 0 | 172% |
| | | A 110 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | PF | 93 | 100 | 24 | 0 | 161% |
| | 120 | A 120 1 | 270 Dorm | 68 | 68 | 0 | 136 | II | PF | 102 | 117 | 19 | 0 | 172% |
| | | A 120 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | PF | 93 | 99 | 25 | 0 | 160% |
| | 130 | A 130 1 | Dorm | 100 | 100 | 0 | 200 | II | PF | 150 | 136 | 64 | 0 | 136% |
| | 140 | A 140 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 15 | 83 | 2 | 30% |
| | | A 140 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 17 | 83 | 0 | 34% |
| **ASP-Facility A Total** | | | | **460** | **460** | **0** | **920** | | | **690** | **601** | **317** | **2** | **131%** |
| ASP-Facility B | 210 | B 210 1 | 270 Dorm | 68 | 68 | 0 | 136 | II | PF | 102 | 122 | 13 | 0 | 179% |
| | | B 210 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | PF | 93 | 111 | 13 | 0 | 179% |
| | 220 | B 220 1 | Dorm | 100 | 100 | 0 | 200 | II | PF | 150 | 158 | 41 | 0 | 158% |
| | 230 | B 230 1 | 270 Dorm | 68 | 68 | 0 | 136 | II | PF | 102 | 119 | 17 | 0 | 175% |
| | | B 230 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | PF | 93 | 109 | 14 | 0 | 176% |
| | 250 | B 250 1 | 270 Dorm | 68 | 68 | 0 | 136 | II | PF | 102 | 122 | 14 | 0 | 179% |
| | | B 250 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | PF | 93 | 111 | 13 | 0 | 179% |
| **ASP-Facility B Total** | | | | **490** | **490** | **0** | **980** | | | **735** | **852** | **125** | **0** | **174%** |
| ASP-Facility C | 310 | C 310 1 | 270 Dorm | 68 | 68 | 0 | 136 | II | PF | 102 | 105 | 31 | 0 | 154% |
| | | C 310 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | PF | 93 | 96 | 28 | 0 | 155% |
| | 320 | C 320 1 | Dorm | 100 | 100 | 0 | 200 | II | PF | 150 | 98 | 101 | 0 | 98% |
| | 330 | C 330 1 | 270 Dorm | 68 | 68 | 0 | 136 | II | PF | 102 | 86 | 50 | 0 | 126% |
| | | C 330 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | PF | 93 | 79 | 45 | 0 | 127% |
| | 350 | C 350 1 | 270 Dorm | 68 | 68 | 0 | 136 | II | PF | 102 | 118 | 18 | 0 | 174% |
| | | C 350 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | PF | 93 | 101 | 23 | 0 | 163% |
| **ASP-Facility C Total** | | | | **490** | **490** | **0** | **980** | | | **735** | **683** | **296** | **0** | **139%** |
| ASP-Facility D | 410 | D 410 1 | 270 Dorm | 68 | 68 | 0 | 136 | II | PF | 102 | 121 | 14 | 0 | 178% |
| | | D 410 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | PF | 93 | 108 | 15 | 0 | 174% |
| | 420 | D 420 1 | Dorm | 100 | 100 | 0 | 200 | II | PF | 150 | 170 | 30 | 0 | 170% |
| | 430 | D 430 1 | 270 Dorm | 68 | 68 | 0 | 136 | II | PF | 102 | 127 | 9 | 0 | 187% |
| | | D 430 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | PF | 93 | 102 | 22 | 0 | 165% |
| | 450 | D 450 1 | 270 Dorm | 68 | 68 | 0 | 136 | II | PF | 102 | 118 | 18 | 0 | 174% |
| | | D 450 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | PF | 93 | 103 | 21 | 0 | 166% |
| **ASP-Facility D Total** | | | | **490** | **490** | **0** | **980** | | | **735** | **849** | **129** | **0** | **173%** |
| ASP-Facility E | 510 | E 510 1 | 270 Dorm | 68 | 68 | 0 | 136 | II | PF | 102 | 129 | 7 | 0 | 190% |
| | | E 510 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | PF | 93 | 101 | 22 | 0 | 163% |
| | 520 | E 520 1 | Dorm | 100 | 100 | 0 | 200 | II | PF | 150 | 166 | 34 | 0 | 166% |
| | 530 | E 530 1 | 270 Dorm | 68 | 68 | 0 | 136 | II | PF | 102 | 123 | 13 | 0 | 181% |
| | | E 530 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | PF | 93 | 110 | 14 | 0 | 177% |
| | 550 | E 550 1 | 270 Dorm | 62 | 62 | 0 | 124 | II | PF | 93 | 116 | 8 | 0 | 187% |
| | | E 550 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | PF | 93 | 106 | 18 | 0 | 171% |
| **ASP-Facility E Total** | | | | **484** | **484** | **0** | **968** | | | **726** | **851** | **116** | **0** | **176%** |
| ASP-Facility F | 610 | F 610 1 | 270 Dorm | 64 | 64 | 0 | 128 | II | PF | 96 | 119 | 9 | 0 | 186% |
| | | F 610 2 | 270 Dorm | 61 | 61 | 0 | 122 | II | PF | 92 | 102 | 20 | 0 | 167% |
| | 630 | F 630 1 | 270 Dorm | 68 | 68 | 0 | 136 | II | PF | 102 | 123 | 13 | 0 | 181% |
| | | F 630 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | PF | 93 | 105 | 19 | 0 | 169% |
| | 640 | F 640 1 | Dorm | 100 | 100 | 0 | 200 | II | PF | 150 | 163 | 37 | 0 | 163% |
| | 650 | F 650 1 | 270 Dorm | 68 | 68 | 0 | 136 | II | PF | 102 | 115 | 20 | 0 | 169% |
| | | F 650 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | PF | 93 | 124 | 0 | 0 | 200% |
| **ASP-Facility F Total** | | | | **485** | **485** | **0** | **970** | | | **728** | **851** | **118** | **0** | **175%** |
| **Grand Total** | | | | **2909** | **2899** | **28** | **5836** | | | **4359** | **4701** | **1125** | **2** | **162%** |

**CAL** Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CAL-Central Service | INF | S INF 1 | Cell | 0 | 0 | 18 | 18 | NA | OHU | 0 | 10 | 7 | 0 | |
| **CAL-Central Service Total** | | | | **0** | **0** | **18** | **18** | | | **0** | **10** | **7** | **0** | |
| CAL-Facility A | 001 | A 001 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 80 | 14 | 5 | 160% |
| | | A 001 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 87 | 13 | 0 | 174% |
| | 002 | A 002 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 81 | 19 | 0 | 162% |
| | | A 002 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 78 | 19 | 1 | 156% |
| | 003 | A 003 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 84 | 15 | 1 | 168% |
| | | A 003 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 82 | 16 | 0 | 164% |
| | 004 | A 004 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 86 | 13 | 1 | 172% |
| | | A 004 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 85 | 13 | 0 | 170% |
| | 005 | A 005 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 22 | 71 | 5 | 44% |
| | | A 005 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 21 | 75 | 2 | 42% |
| **CAL-Facility A Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **706** | **268** | **15** | **141%** |
| CAL-Facility B | 001 | B 001 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 76 | 22 | 0 | 152% |
| | | B 001 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 68 | 28 | 1 | 136% |
| | 002 | B 002 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 71 | 27 | 0 | 142% |
| | | B 002 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 73 | 24 | 1 | 146% |
| | 003 | B 003 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 71 | 27 | 0 | 142% |
| | | B 003 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 71 | 22 | 1 | 142% |
| | 004 | B 004 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 67 | 32 | 0 | 134% |
| | | B 004 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 75 | 24 | 1 | 150% |
| | 005 | B 005 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 74 | 19 | 1 | 148% |
| | | B 005 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 65 | 28 | 0 | 130% |
| **CAL-Facility B Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **711** | **253** | **5** | **142%** |
| CAL-Facility C | 001 | C 001 1 | 270 Cell | 50 | 50 | 0 | 100 | II | GP | 75 | 61 | 35 | 0 | 122% |
| | | C 001 2 | 270 Cell | 50 | 50 | 0 | 100 | II | GP | 75 | 67 | 32 | 1 | 134% |
| | 002 | C 002 1 | 270 Cell | 50 | 50 | 0 | 100 | II | GP | 75 | 72 | 27 | 1 | 144% |
| | | C 002 2 | 270 Cell | 50 | 50 | 0 | 100 | II | GP | 75 | 53 | 43 | 0 | 106% |
| | 003 | C 003 1 | 270 Cell | 50 | 50 | 0 | 100 | II | GP | 75 | 65 | 33 | 0 | 130% |
| | | C 003 2 | 270 Cell | 50 | 50 | 0 | 100 | II | GP | 75 | 71 | 29 | 0 | 142% |
| | 004 | C 004 1 | 270 Cell | 50 | 50 | 0 | 100 | II | GP | 75 | 58 | 42 | 0 | 116% |
| | | C 004 2 | 270 Cell | 50 | 50 | 0 | 100 | II | GP | 75 | 53 | 46 | 1 | 106% |
| | 005 | C 005 1 | 270 Cell | 50 | 50 | 0 | 100 | II | GP | 75 | 61 | 37 | 0 | 122% |
| | | C 005 2 | 270 Cell | 50 | 50 | 0 | 100 | II | GP | 75 | 63 | 37 | 0 | 126% |
| **CAL-Facility C Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **624** | **361** | **3** | **125%** |
| CAL-Facility D | 001 | D 001 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 70 | 26 | 0 | 140% |
| | | D 001 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 57 | 39 | 4 | 114% |
| | 002 | D 002 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 66 | 34 | 0 | 132% |
| | | D 002 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 62 | 35 | 3 | 124% |
| | 003 | D 003 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 69 | 27 | 4 | 138% |
| | | D 003 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 67 | 31 | 2 | 134% |
| | 004 | D 004 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 65 | 31 | 2 | 130% |
| | | D 004 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 60 | 38 | 2 | 120% |
| | 005 | D 005 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 50 | 46 | 0 | 100% |
| | | D 005 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 53 | 34 | 1 | 106% |
| **CAL-Facility D Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **619** | **341** | **19** | **124%** |
| CAL-MSF | 001 | M 001 1 | Dorm | 100 | 50 | 0 | 150 | I | WC | 150 | 53 | 97 | 0 | 53% |
| | 002 | M 002 1 | Dorm | 100 | 100 | 0 | 200 | I | WC | 150 | 51 | 149 | 0 | 51% |
| | FIR | M FIR 1 | Dorm | 8 | 0 | 0 | 8 | I | FH | 8 | 6 | 2 | 0 | 75% |
| **CAL-MSF Total** | | | | **208** | **150** | **0** | **358** | | | **308** | **110** | **248** | **0** | **53%** |
| CAL-RHU-GP | 001 | Z 001 1 | Cell | 100 | 100 | 0 | 200 | NA | RHG | 150 | 53 | 128 | 17 | 53% |
| **CAL-RHU-GP Total** | | | | **100** | **100** | **0** | **200** | | | **150** | **53** | **128** | **17** | **53%** |
| **Grand Total** | | | | **2308** | **2250** | **18** | **4576** | | | **3458** | **2833** | **1606** | **59** | **123%** |

**CCI** Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CCI-Central Service | FIR | S FIR 1 | Dorm | 8 | 0 | 0 | 8 | I | FH | 8 | 5 | 1 | 0 | 63% |
| **CCI-Central Service Total** | | | | **8** | **0** | **0** | **8** | | | **8** | **5** | **1** | **0** | **63%** |
| CCI-Facility A | 001 | A 001A1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 9 | 8 | 1 | 90% |
| | | A 001A2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 11 | 9 | 0 | 110% |
| | | A 001B1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 7 | 12 | 1 | 70% |
| | | A 001B2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 7 | 11 | 2 | 70% |
| | | A 001C1 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 10 | 9 | 3 | 91% |
| | | A 001C2 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 12 | 8 | 0 | 109% |
| | 002 | A 002A1 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 0 | 22 | 0 | 0% |
| | | A 002A2 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 0 | 22 | 0 | 0% |
| | | A 002B1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 0 | 20 | 0 | 0% |
| | | A 002B2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 0 | 20 | 0 | 0% |
| | | A 002C1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 0 | 20 | 0 | 0% |
| | | A 002C2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 0 | 20 | 0 | 0% |
| | 003 | A 003A1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 12 | 8 | 0 | 120% |
| | | A 003A2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 7 | 9 | 2 | 70% |
| | | A 003B1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 8 | 11 | 1 | 80% |
| | | A 003B2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 11 | 6 | 1 | 110% |
| | | A 003C1 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 9 | 11 | 2 | 82% |
| | | A 003C2 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 8 | 12 | 2 | 73% |
| | 004 | A 004A1 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 10 | 9 | 3 | 91% |
| | | A 004A2 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 12 | 8 | 2 | 109% |
| | | A 004B1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 9 | 9 | 0 | 90% |
| | | A 004B2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 12 | 5 | 1 | 120% |
| | | A 004C1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 10 | 7 | 3 | 100% |
| | | A 004C2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 11 | 9 | 0 | 110% |
| | 005 | A 005A1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 9 | 10 | 1 | 90% |
| | | A 005A2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 7 | 12 | 1 | 70% |
| | | A 005B1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 10 | 9 | 1 | 100% |
| | | A 005B2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 10 | 6 | 4 | 100% |
| | | A 005C1 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 3 | 19 | 0 | 27% |
| | | A 005C2 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 11 | 11 | 0 | 100% |
| | 006 | A 006A1 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 10 | 10 | 2 | 91% |
| | | A 006A2 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 9 | 11 | 2 | 82% |
| | | A 006B1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 4 | 15 | 1 | 40% |
| | | A 006B2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 10 | 8 | 2 | 100% |
| | | A 006C1 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 10 | 9 | 3 | 91% |
| | | A 006C2 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 10 | 10 | 2 | 91% |
| | 007 | A 007A1 | 180 Cell | 11 | 11 | 0 | 22 | IV | EOP | 17 | 11 | 8 | 3 | 100% |
| | | A 007A2 | 180 Cell | 11 | 11 | 0 | 22 | IV | EOP | 17 | 12 | 6 | 4 | 109% |
| | | A 007B1 | 180 Cell | 10 | 10 | 0 | 20 | IV | EOP | 15 | 9 | 9 | 2 | 90% |
| | | A 007B2 | 180 Cell | 10 | 10 | 0 | 20 | IV | EOP | 15 | 13 | 6 | 1 | 130% |
| | | A 007C1 | 180 Cell | 12 | 10 | 0 | 22 | IV | EOP | 18 | 11 | 6 | 3 | 92% |
| | | A 007C2 | 180 Cell | 11 | 11 | 0 | 22 | IV | EOP | 17 | 15 | 5 | 2 | 136% |
| | 008 | A 008A1 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 0 | 22 | 0 | 0% |
| | | A 008A2 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 0 | 22 | 0 | 0% |
| | | A 008B1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 0 | 20 | 0 | 0% |
| | | A 008B2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 0 | 20 | 0 | 0% |
| | | A 008C1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 0 | 20 | 0 | 0% |
| | | A 008C2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 0 | 20 | 0 | 0% |
| **CCI-Facility A Total** | | | | **501** | **499** | **0** | **1000** | | | **752** | **349** | **579** | **58** | **70%** |
| CCI-Facility B | 001 | B 001A1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 9 | 8 | 3 | 90% |
| | | B 001A2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 9 | 11 | 0 | 90% |
| | | B 001B1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 13 | 6 | 1 | 130% |
| | | B 001B2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 10 | 5 | 3 | 100% |
| | | B 001C1 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 13 | 6 | 3 | 118% |
| | | B 001C2 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 14 | 7 | 1 | 127% |
| | 002 | B 002A1 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 10 | 7 | 4 | 91% |
| | | B 002A2 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 12 | 9 | 1 | 109% |
| | | B 002B1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 12 | 6 | 1 | 120% |
| | | B 002B2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 11 | 7 | 2 | 110% |
| | | B 002C1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 12 | 6 | 0 | 120% |
| | | B 002C2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 13 | 6 | 1 | 130% |
| | 003 | B 003A1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 11 | 8 | 1 | 110% |
| | | B 003A2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 11 | 8 | 1 | 110% |
| | | B 003B1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 13 | 4 | 3 | 130% |
| | | B 003B2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 12 | 5 | 3 | 120% |
| | | B 003C1 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 11 | 10 | 1 | 100% |
| | | B 003C2 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 13 | 6 | 1 | 118% |
| | 004 | B 004A1 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 12 | 7 | 3 | 109% |
| | | B 004A2 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 12 | 6 | 2 | 109% |

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CCI-Facility B | 004 | B 004B1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 11 | 9 | 0 | 110% |
| | | B 004B2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 5 | 14 | 1 | 50% |
| | | B 004C1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 0 | 20 | 0 | 0% |
| | | B 004C2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 0 | 18 | 0 | 0% |
| | 005 | B 005A1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 12 | 6 | 2 | 120% |
| | | B 005A2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 13 | 6 | 1 | 130% |
| | | B 005B1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 13 | 7 | 0 | 130% |
| | | B 005B2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 14 | 4 | 2 | 140% |
| | | B 005C1 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 12 | 9 | 1 | 109% |
| | | B 005C2 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 10 | 12 | 0 | 91% |
| | 006 | B 006A1 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 0 | 22 | 0 | 0% |
| | | B 006A2 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 0 | 20 | 0 | 0% |
| | | B 006B1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 0 | 18 | 0 | 0% |
| | | B 006B2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 0 | 18 | 0 | 0% |
| | | B 006C1 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 0 | 20 | 0 | 0% |
| | | B 006C2 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 0 | 22 | 0 | 0% |
| | 007 | B 007A1 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 0 | 22 | 0 | 0% |
| | | B 007A2 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 0 | 22 | 0 | 0% |
| | | B 007B1 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 0 | 20 | 0 | 0% |
| | | B 007B2 | 180 Cell | 10 | 10 | 0 | 20 | IV | SNY | 15 | 0 | 20 | 0 | 0% |
| | | B 007C1 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 0 | 20 | 0 | 0% |
| | | B 007C2 | 180 Cell | 11 | 11 | 0 | 22 | IV | SNY | 17 | 0 | 22 | 0 | 0% |
| | 008 | B 008A1 | 180 Cell | 11 | 11 | 0 | 22 | NA | RHG | 17 | 14 | 6 | 2 | 127% |
| | | B 008A2 | 180 Cell | 11 | 11 | 0 | 22 | NA | RHG | 17 | 20 | 1 | 1 | 182% |
| | | B 008B1 | 180 Cell | 10 | 10 | 0 | 20 | NA | RHG | 15 | 12 | 7 | 1 | 120% |
| | | B 008B2 | 180 Cell | 10 | 10 | 0 | 20 | NA | RHG | 15 | 16 | 4 | 0 | 160% |
| | | B 008C1 | 180 Cell | 10 | 10 | 0 | 20 | NA | RHG | 15 | 15 | 4 | 1 | 150% |
| | | B 008C2 | 180 Cell | 10 | 10 | 0 | 20 | NA | RHG | 15 | 17 | 1 | 2 | 170% |
| | INF | B INF 1 | Cell | 0 | 0 | 16 | 16 | NA | OHU | 0 | 13 | 2 | 0 | |
| **CCI-Facility B Total** | | | | **500** | **500** | **16** | **1016** | | | **750** | **430** | **514** | **49** | **86%** |
| CCI-Facility C | 001 | C 001 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 69 | 30 | 1 | 138% |
| | | C 001 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 76 | 23 | 1 | 152% |
| | 002 | C 002 1 | 270 Cell | 50 | 50 | 0 | 100 | III | PF | 75 | 94 | 2 | 2 | 188% |
| | | C 002 2 | 270 Cell | 50 | 50 | 0 | 100 | III | PF | 75 | 89 | 7 | 4 | 178% |
| | 003 | C 003 1 | 270 Cell | 50 | 50 | 0 | 100 | III | PF | 75 | 96 | 3 | 1 | 192% |
| | | C 003 2 | 270 Cell | 50 | 50 | 0 | 100 | III | PF | 75 | 91 | 6 | 3 | 182% |
| | 004 | C 004 1 | 270 Cell | 50 | 50 | 0 | 100 | III | PF | 75 | 94 | 3 | 3 | 188% |
| | | C 004 2 | 270 Cell | 50 | 50 | 0 | 100 | III | PF | 75 | 97 | 3 | 0 | 194% |
| | 005 | C 005 1 | 270 Cell | 50 | 50 | 0 | 100 | III | PF | 75 | 94 | 1 | 3 | 188% |
| | | C 005 2 | 270 Cell | 50 | 50 | 0 | 100 | III | PF | 75 | 97 | 0 | 3 | 194% |
| **CCI-Facility C Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **897** | **78** | **21** | **179%** |
| **Grand Total** | | | | **1509** | **1499** | **16** | **3024** | | | **2260** | **1681** | **1172** | **128** | **111%** |

Generated by :
dave.leclerc

**CCWF**  Female Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FIR | S FIR 1 | Dorm | 10 | 0 | 0 | 10 | I | FH | 10 | 5 | 5 | 0 | 50% |
| CCWF-Central Service | INF | S INF 1 | Cell | 0 | 0 | 12 | 12 | NA | MCB | 0 | 6 | 6 | 0 | |
| | | | | 0 | 0 | 26 | 26 | | SNF | 0 | 17 | 9 | 0 | |
| **CCWF-Central Service Total** | | | | **10** | **0** | **38** | **48** | | | **10** | **28** | **20** | **0** | **280%** |
| | 501 | A 501 1 | Dorm | 127 | 127 | 0 | 254 | NA | RC | 191 | 195 | 59 | 0 | 154% |
| | 502 | A 502 1 | Dorm | 128 | 128 | 0 | 256 | NA | RC | 192 | 179 | 77 | 0 | 140% |
| | 503 | A 503 1 | 270 Cell | 50 | 50 | 0 | 100 | NA | RC | 75 | 42 | 58 | 0 | 84% |
| CCWF-Facility A | | A 503 2 | 270 Cell | 50 | 50 | 0 | 100 | NA | RC | 75 | 40 | 59 | 0 | 80% |
| | 504 | A 504 1 | 270 Cell | 33 | 33 | 0 | 66 | NA | ASU | 41 | 15 | 45 | 6 | 45% |
| | | | | 17 | 17 | 0 | 34 | | DR | 17 | 0 | 34 | 0 | 0% |
| | | A 504 2 | 270 Cell | 50 | 50 | 0 | 100 | NA | ASU | 63 | 19 | 73 | 8 | 38% |
| **CCWF-Facility A Total** | | | | **455** | **455** | **0** | **910** | | | **653** | **490** | **405** | **14** | **108%** |
| | 505 | B 505 1 | Dorm | 119 | 119 | 0 | 238 | NA | GP | 179 | 57 | 181 | 0 | 48% |
| | 506 | B 506 1 | Dorm | 124 | 124 | 0 | 248 | NA | GP | 186 | 134 | 114 | 0 | 108% |
| CCWF-Facility B | 507 | B 507 1 | Dorm | 128 | 128 | 0 | 256 | NA | GP | 192 | 169 | 87 | 0 | 132% |
| | 508 | B 508 1 | Dorm | 78 | 42 | 0 | 120 | NA | EOP | 117 | 60 | 60 | 0 | 77% |
| | | | | 48 | 48 | 0 | 96 | | GP | 72 | 28 | 67 | 0 | 58% |
| **CCWF-Facility B Total** | | | | **497** | **461** | **0** | **958** | | | **746** | **448** | **509** | **0** | **90%** |
| | 509 | C 509 1 | Dorm | 128 | 128 | 0 | 256 | NA | GP | 192 | 162 | 94 | 0 | 127% |
| CCWF-Facility C | 510 | C 510 1 | Dorm | 128 | 128 | 0 | 256 | NA | GP | 192 | 164 | 92 | 0 | 128% |
| | 511 | C 511 1 | Dorm | 128 | 128 | 0 | 256 | NA | GP | 192 | 164 | 92 | 0 | 128% |
| | 512 | C 512 1 | Dorm | 128 | 128 | 0 | 256 | NA | GP | 192 | 148 | 108 | 0 | 116% |
| **CCWF-Facility C Total** | | | | **512** | **512** | **0** | **1024** | | | **768** | **638** | **386** | **0** | **125%** |
| | 513 | D 513 1 | Dorm | 128 | 128 | 0 | 256 | NA | GP | 192 | 164 | 92 | 0 | 128% |
| CCWF-Facility D | 514 | D 514 1 | Dorm | 128 | 128 | 0 | 256 | NA | GP | 192 | 171 | 85 | 0 | 134% |
| | 515 | D 515 1 | Dorm | 128 | 128 | 0 | 256 | NA | GP | 192 | 170 | 85 | 0 | 133% |
| | 516 | D 516 1 | Dorm | 128 | 128 | 0 | 256 | NA | GP | 192 | 122 | 134 | 0 | 95% |
| **CCWF-Facility D Total** | | | | **512** | **512** | **0** | **1024** | | | **768** | **627** | **396** | **0** | **122%** |
| **Grand Total** | | | | **1986** | **1940** | **38** | **3964** | | | **2945** | **2231** | **1716** | **14** | **112%** |

**CEN** Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CEN-Central Service | INF | S INF 1 | Cell | 0 | 0 | 13 | 13 | NA | CTC | 0 | 11 | 0 | 0 | |
| **CEN-Central Service Total** | | | | **0** | **0** | **13** | **13** | | | **0** | **11** | **0** | **0** | |
| CEN-Facility A | 001 | A 001 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 80 | 19 | 1 | 160% |
| | | A 001 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 85 | 13 | 1 | 170% |
| | 002 | A 002 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 89 | 9 | 0 | 178% |
| | | A 002 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 92 | 8 | 0 | 184% |
| | 003 | A 003 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 87 | 9 | 3 | 174% |
| | | A 003 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 84 | 13 | 2 | 168% |
| | 004 | A 004 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 89 | 10 | 1 | 178% |
| | | A 004 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 86 | 13 | 1 | 172% |
| | 005 | A 005 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 55 | 44 | 0 | 110% |
| | | A 005 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 55 | 44 | 1 | 110% |
| **CEN-Facility A Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **802** | **182** | **10** | **160%** |
| CEN-Facility B | 001 | B 001 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 88 | 10 | 0 | 176% |
| | | B 001 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 94 | 6 | 0 | 188% |
| | 002 | B 002 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 80 | 17 | 1 | 160% |
| | | B 002 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 88 | 11 | 1 | 176% |
| | 003 | B 003 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 82 | 17 | 1 | 164% |
| | | B 003 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 91 | 7 | 0 | 182% |
| | 004 | B 004 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 41 | 59 | 0 | 82% |
| | | B 004 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 50 | 50 | 0 | 100% |
| | 005 | B 005 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 85 | 14 | 1 | 170% |
| | | B 005 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 89 | 11 | 0 | 178% |
| **CEN-Facility B Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **788** | **202** | **4** | **158%** |
| CEN-Facility C | 001 | C 001 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 82 | 15 | 1 | 164% |
| | | C 001 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 78 | 19 | 3 | 156% |
| | 002 | C 002 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 77 | 20 | 2 | 154% |
| | | C 002 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 86 | 13 | 0 | 172% |
| | 003 | C 003 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 81 | 17 | 0 | 162% |
| | | C 003 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 80 | 18 | 2 | 160% |
| | 004 | C 004 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 67 | 30 | 2 | 134% |
| | | C 004 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 73 | 27 | 0 | 146% |
| | 005 | C 005 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 85 | 14 | 1 | 170% |
| | | C 005 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 72 | 27 | 0 | 144% |
| **CEN-Facility C Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **781** | **200** | **11** | **156%** |
| CEN-Facility D | 001 | D 001 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 58 | 37 | 5 | 116% |
| | | D 001 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 54 | 42 | 4 | 108% |
| | 002 | D 002 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 59 | 36 | 5 | 118% |
| | | D 002 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 55 | 44 | 1 | 110% |
| | 003 | D 003 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 53 | 45 | 2 | 106% |
| | | D 003 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 60 | 36 | 4 | 120% |
| | 004 | D 004 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 39 | 61 | 0 | 78% |
| | | D 004 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 34 | 65 | 1 | 68% |
| | 005 | D 005 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 38 | 61 | 1 | 76% |
| | | D 005 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 33 | 67 | 0 | 66% |
| **CEN-Facility D Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **483** | **494** | **23** | **97%** |
| CEN-MSF | 001 | M 001 1 | Dorm | 100 | 100 | 0 | 200 | I | WC | 150 | 81 | 119 | 0 | 81% |
| | 002 | M 002 1 | Dorm | 100 | 100 | 0 | 200 | I | WC | 150 | 80 | 120 | 0 | 80% |
| | FIR | M FIR 1 | Dorm | 8 | 0 | 0 | 8 | I | FH | 8 | 7 | 1 | 0 | 88% |
| **CEN-MSF Total** | | | | **208** | **200** | **0** | **408** | | | **308** | **168** | **240** | **0** | **81%** |
| CEN-RHU-GP | 001 | Z 001 1 | Cell | 100 | 100 | 0 | 200 | NA | RHG | 150 | 39 | 152 | 9 | 39% |
| **CEN-RHU-GP Total** | | | | **100** | **100** | **0** | **200** | | | **150** | **39** | **152** | **9** | **39%** |
| **Grand Total** | | | | **2308** | **2300** | **13** | **4621** | | | **3458** | **3072** | **1470** | **57** | **133%** |

**CHCF**  Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CHCF-Facility A | Building 301 | A 301A1 | Cell | 30 | 0 | 0 | 30 | NA | FLX | 30 | 24 | 6 | 0 | 80% |
| | | A 301B1 | Cell | 30 | 0 | 0 | 30 | NA | FLX | 30 | 0 | 30 | 0 | 0% |
| | Building 302 | A 302A1 | Cell | 39 | 0 | 0 | 39 | NA | PIP | 39 | 0 | 39 | 0 | 0% |
| | | A 302B1 | Cell | 20 | 0 | 0 | 20 | NA | FLX | 20 | 0 | 20 | 0 | 0% |
| | | | Cell | 18 | 0 | 0 | 18 | | PIP | 18 | 0 | 18 | 0 | 0% |
| | Building 304 | A 304 1 | Cell | 94 | 0 | 0 | 94 | II | PF | 94 | 72 | 10 | 3 | 77% |
| | | A 304 2 | Cell | 102 | 0 | 0 | 102 | II | PF | 102 | 95 | 1 | 2 | 93% |
| **CHCF-Facility A Total** | | | | **333** | **0** | **0** | **333** | | | **333** | **191** | **124** | **5** | **57%** |
| CHCF-Facility B | Building 301 | B 301A1 | Cell | 30 | 0 | 0 | 30 | NA | PIP | 30 | 21 | 9 | 0 | 70% |
| | | B 301B1 | Cell | 25 | 0 | 0 | 25 | NA | PIP | 25 | 15 | 10 | 0 | 60% |
| | Building 302 | B 302A1 | Cell | 30 | 0 | 0 | 30 | NA | PIP | 30 | 14 | 16 | 0 | 47% |
| | | B 302B1 | Cell | 30 | 0 | 0 | 30 | NA | PIP | 30 | 22 | 8 | 0 | 73% |
| | Building 303 | B 303A1 | Cell | 30 | 0 | 0 | 30 | NA | ICF | 30 | 0 | 30 | 0 | 0% |
| | | B 303B1 | Cell | 30 | 0 | 0 | 30 | NA | ICF | 30 | 27 | 3 | 0 | 90% |
| | Building 304 | B 304A1 | Cell | 30 | 0 | 0 | 30 | NA | PIP | 30 | 14 | 16 | 0 | 47% |
| | | B 304B1 | Cell | 30 | 0 | 0 | 30 | NA | ICF | 30 | 26 | 4 | 0 | 87% |
| | Building 305 | B 305A1 | Cell | 30 | 0 | 0 | 30 | NA | ICF | 30 | 24 | 5 | 0 | 80% |
| | | B 305B1 | Cell | 30 | 0 | 0 | 30 | NA | ICF | 30 | 0 | 30 | 0 | 0% |
| | Building 306 | B 306A1 | Cell | 30 | 0 | 0 | 30 | NA | ICF | 30 | 23 | 7 | 0 | 77% |
| | | B 306B1 | Cell | 30 | 0 | 0 | 30 | NA | ICF | 30 | 26 | 3 | 0 | 87% |
| | Building 307 | B 307A1 | Cell | 30 | 0 | 0 | 30 | NA | ICF | 30 | 25 | 5 | 0 | 83% |
| | | B 307B1 | Cell | 30 | 0 | 0 | 30 | NA | ICF | 30 | 24 | 6 | 0 | 80% |
| | Building 308 | B 308A1 | Cell | 30 | 0 | 0 | 30 | NA | ICF | 30 | 22 | 7 | 0 | 73% |
| | | B 308B1 | Cell | 30 | 0 | 0 | 30 | NA | ICF | 30 | 22 | 8 | 0 | 73% |
| **CHCF-Facility B Total** | | | | **475** | **0** | **0** | **475** | | | **475** | **305** | **167** | **0** | **64%** |
| CHCF-Facility C | Building 301 | C 301A1 | Cell | 2 | 0 | 0 | 2 | NA | OHU | 2 | 1 | 0 | 0 | 50% |
| | | | Dorm | 48 | 0 | 0 | 48 | NA | OHU | 48 | 32 | 15 | 0 | 67% |
| | | C 301B1 | Cell | 2 | 0 | 0 | 2 | NA | OHU | 2 | 0 | 2 | 0 | 0% |
| | | | Dorm | 48 | 0 | 0 | 48 | NA | OHU | 48 | 36 | 11 | 0 | 75% |
| | Building 302 | C 302A1 | Cell | 48 | 0 | 0 | 48 | NA | OHU | 48 | 44 | 3 | 0 | 92% |
| | | C 302B1 | Cell | 48 | 0 | 0 | 48 | NA | OHU | 48 | 47 | 1 | 0 | 98% |
| | Building 303 | C 303A1 | Cell | 48 | 0 | 0 | 48 | NA | OHU | 48 | 43 | 2 | 0 | 90% |
| | | C 303B1 | Cell | 48 | 0 | 0 | 48 | NA | OHU | 48 | 45 | 3 | 0 | 94% |
| | Building 304 | C 304A1 | Cell | 2 | 0 | 0 | 2 | NA | OHU | 2 | 0 | 2 | 0 | 0% |
| | | | Dorm | 48 | 0 | 0 | 48 | NA | OHU | 48 | 32 | 16 | 0 | 67% |
| | | C 304B1 | Cell | 2 | 0 | 0 | 2 | NA | OHU | 2 | 0 | 2 | 0 | 0% |
| | | | Dorm | 48 | 0 | 0 | 48 | NA | OHU | 48 | 25 | 23 | 0 | 52% |
| | Building 305 | C 305A1 | Cell | 2 | 0 | 0 | 2 | NA | OHU | 2 | 0 | 2 | 0 | 0% |
| | | | Dorm | 48 | 0 | 0 | 48 | NA | OHU | 48 | 29 | 19 | 0 | 60% |
| | | C 305B1 | Cell | 2 | 0 | 0 | 2 | NA | OHU | 2 | 0 | 2 | 0 | 0% |
| | | | Dorm | 48 | 0 | 0 | 48 | NA | OHU | 48 | 25 | 15 | 0 | 52% |
| | Building 306 | C 306A1 | Cell | 2 | 0 | 0 | 2 | NA | OHU | 2 | 2 | 0 | 0 | 100% |
| | | | Dorm | 48 | 0 | 0 | 48 | NA | OHU | 48 | 29 | 18 | 0 | 60% |
| | | C 306B1 | Cell | 2 | 0 | 0 | 2 | NA | OHU | 2 | 1 | 0 | 0 | 50% |
| | | | Dorm | 48 | 0 | 0 | 48 | NA | OHU | 48 | 28 | 20 | 0 | 58% |
| **CHCF-Facility C Total** | | | | **592** | **0** | **0** | **592** | | | **592** | **419** | **156** | **0** | **71%** |
| CHCF-Facility D | Building 301 | D 301A1 | Cell | 30 | 0 | 0 | 30 | NA | CTC | 30 | 29 | 0 | 0 | 97% |
| | | D 301B1 | Cell | 30 | 0 | 0 | 30 | NA | CTC | 30 | 27 | 2 | 0 | 90% |
| | Building 302 | D 302A1 | Cell | 30 | 0 | 0 | 30 | NA | CTC | 30 | 25 | 1 | 0 | 83% |
| | | D 302B1 | Cell | 30 | 0 | 0 | 30 | NA | CTC | 30 | 24 | 5 | 0 | 80% |
| | Building 303 | D 303A1 | Cell | 30 | 0 | 0 | 30 | NA | CTC | 30 | 26 | 4 | 0 | 87% |
| | | D 303B1 | Cell | 30 | 0 | 0 | 30 | NA | CTC | 30 | 21 | 6 | 0 | 70% |
| | Building 304 | D 304A1 | Cell | 30 | 0 | 0 | 30 | NA | CTC | 30 | 25 | 5 | 0 | 83% |
| | | D 304B1 | Cell | 30 | 0 | 0 | 30 | NA | CTC | 30 | 25 | 3 | 0 | 83% |
| | Building 305 | D 305A1 | Cell | 30 | 0 | 0 | 30 | NA | CTC | 30 | 22 | 6 | 0 | 73% |
| | | D 305B1 | Cell | 30 | 0 | 0 | 30 | NA | CTC | 30 | 25 | 2 | 0 | 83% |
| | Building 306 | D 306A1 | Cell | 30 | 0 | 0 | 30 | NA | CTC | 30 | 29 | 1 | 0 | 97% |
| | | D 306B1 | Cell | 30 | 0 | 0 | 30 | NA | CTC | 30 | 26 | 4 | 0 | 87% |
| | Building 307 | D 307A1 | Cell | 30 | 0 | 0 | 30 | NA | OHU | 30 | 26 | 3 | 0 | 87% |
| | | D 307B1 | Cell | 30 | 0 | 0 | 30 | NA | OHU | 30 | 22 | 8 | 0 | 73% |
| **CHCF-Facility D Total** | | | | **420** | **0** | **0** | **420** | | | **420** | **352** | **50** | **0** | **84%** |
| CHCF-Facility E | 301 | E 301B1 | Cell | 40 | 10 | 0 | 50 | II | PF | 40 | 28 | 14 | 6 | 70% |
| | | E 301B2 | Cell | 35 | 15 | 0 | 50 | II | PF | 35 | 37 | 10 | 3 | 106% |
| | | E 301C1 | Cell | 42 | 0 | 0 | 42 | II | PF | 42 | 29 | 7 | 5 | 69% |
| | | E 301C2 | Cell | 35 | 15 | 0 | 50 | II | PF | 35 | 34 | 10 | 6 | 97% |
| | | E 301D1 | Cell | 40 | 2 | 0 | 42 | II | EOP | 40 | 36 | 2 | 1 | 90% |
| | | E 301D2 | Cell | 35 | 15 | 0 | 50 | II | EOP | 35 | 35 | 9 | 5 | 100% |
| | | E 301E1 | Cell | 40 | 10 | 0 | 50 | II | EOP | 40 | 37 | 7 | 4 | 93% |
| | | E 301E2 | Cell | 35 | 15 | 0 | 50 | II | EOP | 35 | 37 | 10 | 3 | 106% |
| | | E 301F1 | Cell | 39 | 9 | 0 | 48 | II | EOP | 39 | 31 | 12 | 3 | 79% |
| | | E 301F2 | Cell | 33 | 17 | 0 | 50 | II | EOP | 33 | 35 | 9 | 6 | 106% |

Page 8

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CHCF-Facility E | 302 | E 302A1 | Dorm | 88 | 0 | 0 | 88 | II | PF | 88 | 75 | 13 | 0 | 85% |
| | | E 302B1 | Dorm | 89 | 0 | 0 | 89 | II | PF | 89 | 75 | 14 | 0 | 84% |
| | 303 | E 303A1 | Dorm | 88 | 0 | 0 | 88 | II | PF | 88 | 72 | 15 | 0 | 82% |
| | | E 303B1 | Dorm | 89 | 0 | 0 | 89 | II | PF | 89 | 68 | 7 | 0 | 76% |
| | 304 | E 304A1 | Dorm | 88 | 0 | 0 | 88 | II | PF | 88 | 68 | 20 | 0 | 77% |
| | | E 304B1 | Dorm | 89 | 0 | 0 | 89 | II | PF | 89 | 71 | 18 | 0 | 80% |
| | 305 | E 305A1 | Dorm | 88 | 0 | 0 | 88 | II | PF | 88 | 65 | 23 | 0 | 74% |
| | | E 305B1 | Dorm | 89 | 0 | 0 | 89 | II | PF | 89 | 65 | 24 | 0 | 73% |
| **CHCF-Facility E Total** | | | | **1082** | **108** | **0** | **1190** | | | **1082** | **898** | **224** | **42** | **83%** |
| **Grand Total** | | | | **2902** | **108** | **0** | **3010** | | | **2902** | **2165** | **721** | **47** | **75%** |

Generated by :
dave.leclerc

**CIM**  Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CIM-Facility A | Angeles | A AH 1 | Dorm | 80 | 80 | 0 | 160 | II | PF | 120 | 111 | 48 | 0 | 139% |
| | Borrego | A BH 1 | Dorm | 80 | 80 | 0 | 160 | II | PF | 120 | 142 | 18 | 0 | 178% |
| | Cleveland | A CH 1 | Dorm | 80 | 80 | 0 | 160 | II | PF | 120 | 141 | 17 | 0 | 176% |
| | Joshua | A JH 1 | Dorm | 80 | 80 | 0 | 160 | II | PF | 120 | 129 | 30 | 0 | 161% |
| | Laguna | A LH 1 | Dorm | 80 | 80 | 0 | 160 | II | PF | 120 | 135 | 25 | 0 | 169% |
| | Mariposa | A MH 1 | Dorm | 80 | 80 | 0 | 160 | II | PF | 120 | 133 | 27 | 0 | 166% |
| | Otay | A OH 1 | Dorm | 80 | 80 | 0 | 160 | II | PF | 120 | 135 | 24 | 0 | 169% |
| **CIM-Facility A Total** | | | | **560** | **560** | **0** | **1120** | | | **840** | **926** | **189** | **0** | **165%** |
| CIM-Facility B | Birch Hall | B BH 1 | Cell | 47 | 0 | 0 | 47 | II | PF | 47 | 47 | 0 | 0 | 100% |
| | | B BH 2 | Cell | 52 | 0 | 0 | 52 | II | PF | 52 | 51 | 0 | 0 | 98% |
| | | B BH 3 | Cell | 52 | 0 | 0 | 52 | II | PF | 52 | 51 | 0 | 0 | 98% |
| | Cypress Hall | B CH 1 | Cell | 34 | 17 | 0 | 51 | II | PF | 51 | 15 | 32 | 0 | 44% |
| | | B CH 2 | Cell | 34 | 34 | 0 | 68 | II | PF | 51 | 27 | 34 | 0 | 79% |
| | | B CH 3 | Cell | 34 | 34 | 0 | 68 | II | PF | 51 | 38 | 29 | 0 | 112% |
| | Madrone Hall | B MH 1 | Cell | 34 | 2 | 0 | 36 | II | PF | 34 | 34 | 0 | 0 | 100% |
| | | B MH 2 | Cell | 34 | 0 | 0 | 34 | II | PF | 34 | 34 | 0 | 0 | 100% |
| | | B MH 3 | Cell | 34 | 0 | 0 | 34 | II | PF | 34 | 34 | 0 | 0 | 100% |
| | Palm Hall | B PH 1 | Cell | 32 | 17 | 0 | 49 | NA | RHG | 48 | 15 | 33 | 0 | 47% |
| | | B PH 2 | Cell | 34 | 34 | 0 | 68 | NA | RHG | 51 | 23 | 38 | 1 | 68% |
| | | B PH 3 | Cell | 34 | 34 | 0 | 68 | NA | RHG | 51 | 32 | 33 | 3 | 94% |
| | Sycamore Hall | B SH 1 | Cell | 31 | 31 | 0 | 62 | II | PF | 47 | 47 | 12 | 1 | 152% |
| | | B SH 2 | Cell | 34 | 34 | 0 | 68 | II | PF | 51 | 53 | 14 | 0 | 156% |
| | | B SH 3 | Cell | 34 | 34 | 0 | 68 | II | PF | 51 | 52 | 13 | 0 | 153% |
| **CIM-Facility B Total** | | | | **554** | **271** | **0** | **825** | | | **705** | **553** | **238** | **5** | **100%** |
| CIM-Facility C | Alpine | C A 1 | Cell | 50 | 50 | 0 | 100 | II | EOP | 75 | 72 | 19 | 7 | 144% |
| | | C A 2 | Cell | 50 | 50 | 0 | 100 | II | EOP | 75 | 80 | 12 | 4 | 160% |
| | Butte | C B 1 | Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 91 | 1 | 1 | 182% |
| | | C B 2 | Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 89 | 2 | 1 | 178% |
| | Colusa | C C 1 | Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 91 | 0 | 2 | 182% |
| | | C C 2 | Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 96 | 2 | 0 | 192% |
| | Del Norte | C DEL 1 | Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 81 | 13 | 1 | 162% |
| | | C DEL 2 | Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 91 | 3 | 1 | 182% |
| **CIM-Facility C Total** | | | | **400** | **400** | **0** | **800** | | | **600** | **691** | **52** | **17** | **173%** |
| CIM-Facility D | FIR | D FIR 1 | Dorm | 10 | 0 | 0 | 10 | I | FH | 10 | 5 | 5 | 0 | 50% |
| | Infirmary | D OHU 1 | Cell | 0 | 0 | 34 | 34 | NA | MCB | 0 | 30 | 3 | 0 | |
| | | | | 0 | 0 | 39 | 39 | | OHU | 0 | 38 | 0 | 0 | |
| | | | Dorm | 0 | 0 | 5 | 5 | NA | OHU | 0 | 5 | 0 | 0 | |
| **CIM-Facility D Total** | | | | **10** | **0** | **78** | **88** | | | **10** | **78** | **8** | **0** | **780%** |
| **Grand Total** | | | | **1524** | **1231** | **78** | **2833** | | | **2155** | **2248** | **487** | **22** | **148%** |

Generated by :
dave.leclerc

**CIW** Female Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CIW-CAMPS | Malibu | X13001 1 | Dorm | 100 | 0 | 0 | 100 | I | CMP | 100 | 26 | 74 | 0 | 26% |
| | Puerta La Cruz Camp | X14001 1 | Dorm | 120 | 0 | 0 | 120 | I | CMP | 120 | 21 | 99 | 0 | 18% |
| **CIW-CAMPS Total** | | | | **220** | **0** | **0** | **220** | | | **220** | **47** | **173** | **0** | **21%** |
| CIW-Central Service | INF | S INF 1 | Cell | 0 | 0 | 8 | 8 | NA | CTC | 0 | 4 | 4 | 0 | |
| | | | | 0 | 0 | 10 | 10 | | MCB | 0 | 6 | 4 | 0 | |
| | Psychiatric Inpatient Program | S PIPA1 | Cell | 21 | 0 | 0 | 21 | NA | PIP | 21 | 18 | 3 | 0 | 86% |
| | | S PIPB1 | Cell | 24 | 0 | 0 | 24 | NA | PIP | 24 | 17 | 7 | 0 | 71% |
| **CIW-Central Service Total** | | | | **45** | **0** | **18** | **63** | | | **45** | **45** | **18** | **0** | **100%** |
| CIW-Facility A | Barneberg | A BAUA1 | Cell | 60 | 60 | 0 | 120 | NA | GP | 90 | 92 | 26 | 0 | 153% |
| | | A BAUB1 | Cell | 60 | 60 | 0 | 120 | NA | GP | 90 | 95 | 18 | 5 | 158% |
| | Emmons | A EMUA1 | Cell | 60 | 60 | 0 | 120 | NA | GP | 90 | 0 | 116 | 0 | 0% |
| | | A EMUB1 | Cell | 60 | 60 | 0 | 120 | NA | GP | 90 | 92 | 26 | 0 | 153% |
| | GP Hall | A RCU 1 | Cell | 111 | 109 | 0 | 220 | NA | GP | 167 | 67 | 152 | 1 | 60% |
| | Harrison | A HAUA1 | Cell | 60 | 60 | 0 | 120 | NA | GP | 90 | 0 | 108 | 0 | 0% |
| | | A HAUB1 | Cell | 60 | 60 | 0 | 120 | NA | GP | 90 | 85 | 29 | 1 | 142% |
| | Latham | A LAUA1 | Cell | 60 | 60 | 0 | 120 | NA | GP | 90 | 101 | 19 | 0 | 168% |
| | | A LAUB1 | Cell | 60 | 60 | 0 | 120 | NA | GP | 90 | 95 | 13 | 0 | 158% |
| | Miller | A MIUA1 | Cell | 60 | 60 | 0 | 120 | NA | GP | 90 | 95 | 14 | 6 | 158% |
| | | A MIUB1 | Cell | 60 | 60 | 0 | 120 | NA | GP | 90 | 89 | 16 | 7 | 148% |
| | OPU | A OPU 1 | Cell | 0 | 0 | 14 | 14 | NA | OHU | 0 | 13 | 1 | 0 | |
| | | | Cell | 0 | 0 | 2 | 2 | NA | OHU | 0 | 0 | 2 | 0 | |
| | SHU | A SHU 1 | 270 Cell | 50 | 50 | 0 | 100 | NA | RHG | 75 | 4 | 88 | 0 | 8% |
| | | A SHU 2 | 270 Cell | 50 | 50 | 0 | 100 | NA | RHG | 75 | 0 | 96 | 0 | 0% |
| | Support Care | A SCU 1 | Cell | 47 | 47 | 0 | 94 | NA | EOP | 71 | 52 | 40 | 2 | 111% |
| | | A SCUB1 | Cell | 10 | 0 | 0 | 10 | NA | ASU | 10 | 1 | 7 | 0 | 10% |
| | | | | 10 | 0 | 0 | 10 | | PSU | 10 | 0 | 10 | 0 | 0% |
| | Walker Unit | A WAU 1 | Cell | 19 | 0 | 0 | 19 | NA | MCB | 19 | 0 | 19 | 0 | 0% |
| | WIU | A WIUA1 | Cell | 60 | 60 | 0 | 120 | NA | GP | 90 | 84 | 22 | 0 | 140% |
| | | A WIUB1 | Cell | 60 | 60 | 0 | 120 | NA | GP | 90 | 94 | 21 | 0 | 157% |
| **CIW-Facility A Total** | | | | **1017** | **976** | **16** | **2009** | | | **1506** | **1059** | **843** | **22** | **104%** |
| **Grand Total** | | | | **1282** | **976** | **34** | **2292** | | | **1771** | **1151** | **1034** | **22** | **90%** |

**CMC**  Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CMC-Central Service | HOS | S HOS 1 | Cell | 0 | 0 | 15 | 15 | NA | CTC | 0 | 13 | 2 | 0 | |
| | | | Dorm | 0 | 0 | 22 | 22 | NA | CTC | 0 | 4 | 18 | 0 | |
| **CMC-Central Service Total** | | | | **0** | **0** | **37** | **37** | | | **0** | **17** | **20** | **0** | |
| CMC-Facility A | 001 | A 001 1 | Cell | 100 | 0 | 0 | 100 | III | PF | 100 | 95 | 3 | 0 | 95% |
| | | A 001 2 | Cell | 100 | 0 | 0 | 100 | III | PF | 100 | 98 | 2 | 0 | 98% |
| | | A 001 3 | Cell | 100 | 0 | 0 | 100 | III | PF | 100 | 92 | 5 | 0 | 92% |
| | 002 | A 002 1 | Cell | 100 | 0 | 0 | 100 | III | PF | 100 | 89 | 11 | 0 | 89% |
| | | A 002 2 | Cell | 100 | 0 | 0 | 100 | III | PF | 100 | 89 | 4 | 0 | 89% |
| | | A 002 3 | Cell | 100 | 0 | 0 | 100 | III | PF | 100 | 95 | 2 | 0 | 95% |
| **CMC-Facility A Total** | | | | **600** | **0** | **0** | **600** | | | **600** | **558** | **27** | **0** | **93%** |
| CMC-Facility B | 003 | B 003 1 | Cell | 100 | 0 | 0 | 100 | III | PF | 100 | 85 | 13 | 0 | 85% |
| | | B 003 2 | Cell | 100 | 0 | 0 | 100 | III | PF | 100 | 85 | 13 | 0 | 85% |
| | | B 003 3 | Cell | 100 | 0 | 0 | 100 | III | PF | 100 | 92 | 8 | 0 | 92% |
| | 004 | B 004 1 | Cell | 97 | 0 | 0 | 97 | NA | ASU | 97 | 50 | 42 | 0 | 52% |
| | | B 004 2 | Cell | 90 | 0 | 0 | 90 | NA | ASU | 90 | 41 | 45 | 0 | 46% |
| | | B 004 3 | Cell | 94 | 0 | 0 | 94 | NA | ASU | 94 | 27 | 64 | 0 | 29% |
| **CMC-Facility B Total** | | | | **581** | **0** | **0** | **581** | | | **581** | **380** | **185** | **0** | **65%** |
| CMC-Facility C | 005 | C 005 1 | Cell | 100 | 0 | 0 | 100 | III | PF | 100 | 89 | 8 | 0 | 89% |
| | | C 005 2 | Cell | 100 | 0 | 0 | 100 | III | PF | 100 | 94 | 2 | 0 | 94% |
| | | C 005 3 | Cell | 100 | 0 | 0 | 100 | III | PF | 100 | 95 | 0 | 0 | 95% |
| | 006 | C 006 1 | Cell | 100 | 0 | 0 | 100 | III | PF | 100 | 96 | 2 | 0 | 96% |
| | | C 006 2 | Cell | 100 | 0 | 0 | 100 | III | PF | 100 | 94 | 3 | 0 | 94% |
| | | C 006 3 | Cell | 100 | 0 | 0 | 100 | III | PF | 100 | 98 | 1 | 0 | 98% |
| **CMC-Facility C Total** | | | | **600** | **0** | **0** | **600** | | | **600** | **566** | **16** | **0** | **94%** |
| CMC-Facility D | 007 | D 007 1 | Cell | 50 | 0 | 0 | 50 | II | EOP | 50 | 50 | 0 | 0 | 100% |
| | | | | 42 | 0 | 0 | 42 | III | PF | 42 | 1 | 2 | 0 | 2% |
| | | D 007 2 | Cell | 100 | 0 | 0 | 100 | II | EOP | 100 | 100 | 0 | 0 | 100% |
| | | D 007 3 | Cell | 100 | 0 | 0 | 100 | II | EOP | 100 | 99 | 0 | 0 | 99% |
| | 008 | D 008 1 | Cell | 100 | 0 | 0 | 100 | III | EOP | 100 | 95 | 4 | 0 | 95% |
| | | D 008 2 | Cell | 100 | 0 | 0 | 100 | III | EOP | 100 | 99 | 1 | 0 | 99% |
| | | D 008 3 | Cell | 100 | 0 | 0 | 100 | III | EOP | 100 | 100 | 0 | 0 | 100% |
| **CMC-Facility D Total** | | | | **592** | **0** | **0** | **592** | | | **592** | **544** | **7** | **0** | **92%** |
| CMC-Facility H | Building 001 | H 001A1 | Cell | 0 | 0 | 25 | 25 | NA | MCB | 0 | 20 | 5 | 0 | |
| | | H 001B1 | Cell | 0 | 0 | 12 | 12 | NA | FLX | 0 | 9 | 3 | 0 | |
| | | | | 0 | 0 | 13 | 13 | | MCB | 0 | 10 | 3 | 0 | |
| **CMC-Facility H Total** | | | | **0** | **0** | **50** | **50** | | | **0** | **39** | **11** | **0** | |
| CMC-MSF | 030 - CAMP CUESTA | M 030 1 | Dorm | 44 | 0 | 0 | 44 | I | WC | 66 | 33 | 11 | 0 | 75% |
| | 031 | M 031 1 | Dorm | 44 | 11 | 0 | 55 | I | WC | 66 | 31 | 24 | 0 | 70% |
| | 032 - CAMP CUESTA | M 032 1 | Dorm | 44 | 11 | 0 | 55 | I | WC | 66 | 33 | 22 | 0 | 75% |
| | 033 | M 033 1 | Dorm | 33 | 9 | 0 | 42 | I | WC | 50 | 30 | 12 | 0 | 91% |
| | 034 - CAMP CUESTA | M 034 1 | Dorm | 33 | 0 | 0 | 33 | I | WC | 50 | 33 | 0 | 0 | 100% |
| | FIR | M FIR 1 | Dorm | 12 | 0 | 0 | 12 | I | FH | 12 | 5 | 7 | 0 | 42% |
| **CMC-MSF Total** | | | | **210** | **31** | **0** | **241** | | | **309** | **165** | **76** | **0** | **79%** |
| **Grand Total** | | | | **2583** | **31** | **87** | **2701** | | | **2682** | **2269** | **342** | **0** | **88%** |

**CMF**  Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CMF-Central Service | CTC | S CTCA1 | Cell | 0 | 0 | 25 | 25 | NA | MCB | 0 | 23 | 2 | 0 | |
| | | S CTCB1 | Cell | 0 | 0 | 25 | 25 | NA | MCB | 0 | 24 | 1 | 0 | |
| **CMF-Central Service Total** | | | | **0** | **0** | **50** | **50** | | | **0** | **47** | **3** | **0** | |
| CMF-Facility A | A | A A 2 | Cell | 12 | 0 | 0 | 12 | NA | ICF | 12 | 9 | 3 | 0 | 75% |
| | | | Dorm | 32 | 0 | 0 | 32 | NA | ICF | 32 | 15 | 17 | 0 | 47% |
| | | A A 3 | Cell | 8 | 0 | 0 | 8 | NA | ICF | 8 | 6 | 2 | 0 | 75% |
| | | | Dorm | 32 | 0 | 0 | 32 | NA | ICF | 32 | 18 | 14 | 0 | 56% |
| | G | A G 1 | Cell | 16 | 0 | 0 | 16 | NA | CTC | 16 | 16 | 0 | 0 | 100% |
| | | | Dorm | 11 | 0 | 0 | 11 | NA | CTC | 11 | 11 | 0 | 0 | 100% |
| | | A G 2 | Cell | 16 | 0 | 0 | 16 | NA | CTC | 16 | 16 | 0 | 0 | 100% |
| | | | Dorm | 12 | 0 | 0 | 12 | NA | CTC | 12 | 12 | 0 | 0 | 100% |
| | | A G 3 | Cell | 17 | 0 | 0 | 17 | NA | OHU | 17 | 15 | 0 | 0 | 88% |
| | | | Dorm | 30 | 0 | 0 | 30 | NA | OHU | 30 | 24 | 6 | 0 | 80% |
| | H | A H 1 | Cell | 21 | 0 | 0 | 21 | III | PF | 23 | 0 | 21 | 0 | 0% |
| | | | Dorm | 22 | 14 | 0 | 36 | III | PF | 33 | 0 | 36 | 0 | 0% |
| | | A H 2 | Cell | 21 | 15 | 0 | 36 | III | PF | 23 | 32 | 3 | 1 | 152% |
| | | | Dorm | 31 | 20 | 0 | 51 | III | PF | 46 | 30 | 20 | 0 | 97% |
| | | A H 3 | Cell | 21 | 21 | 0 | 42 | III | PF | 23 | 0 | 0 | 0 | 0% |
| | | | Dorm | 30 | 20 | 0 | 50 | III | PF | 45 | 0 | 0 | 0 | 0% |
| | I | A I 1 | Cell | 37 | 38 | 0 | 75 | III | PF | 41 | 55 | 17 | 3 | 149% |
| | | | Cell | 10 | 3 | 0 | 13 | III | PF | 15 | 11 | 1 | 0 | 110% |
| | | A I 2 | Cell | 38 | 38 | 0 | 76 | III | PF | 42 | 32 | 38 | 3 | 84% |
| | | | Dorm | 6 | 0 | 0 | 6 | III | PF | 9 | 2 | 4 | 0 | 33% |
| | | A I 3 | Cell | 38 | 0 | 0 | 38 | NA | ASU | 38 | 26 | 12 | 0 | 68% |
| | J | A J 1 | Cell | 92 | 46 | 0 | 138 | II | PF | 138 | 121 | 16 | 0 | 132% |
| | | A J 2 | Dorm | 76 | 38 | 0 | 114 | II | PF | 114 | 90 | 24 | 0 | 118% |
| | | A J 3 | Dorm | 76 | 38 | 0 | 114 | II | PF | 114 | 105 | 9 | 0 | 138% |
| | L | A L 1 | Cell | 35 | 0 | 0 | 35 | NA | PF | 53 | 27 | 8 | 0 | 77% |
| | | A L 2 | Cell | 38 | 38 | 0 | 76 | II | EOP | 57 | 71 | 1 | 4 | 187% |
| | | A L 3 | Cell | 37 | 0 | 0 | 37 | II | EOP | 56 | 37 | 0 | 0 | 100% |
| | M | A M 1 | Cell | 37 | 37 | 0 | 74 | II | EOP | 56 | 66 | 2 | 5 | 178% |
| | | A M 2 | Cell | 38 | 38 | 0 | 76 | II | EOP | 57 | 67 | 6 | 3 | 176% |
| | | A M 3 | Cell | 38 | 0 | 0 | 38 | NA | ASU | 38 | 29 | 9 | 0 | 76% |
| | N | A N 1 | Cell | 37 | 36 | 0 | 73 | II | EOP | 56 | 54 | 9 | 10 | 146% |
| | | A N 2 | Cell | 38 | 38 | 0 | 76 | II | EOP | 57 | 66 | 4 | 4 | 174% |
| | | A N 3 | Cell | 38 | 37 | 0 | 75 | II | EOP | 57 | 64 | 3 | 7 | 168% |
| | P | A P 1 | Cell | 32 | 0 | 0 | 32 | NA | PIP | 32 | 17 | 15 | 0 | 53% |
| | | A P 2 | Cell | 36 | 0 | 0 | 36 | NA | PIP | 36 | 9 | 27 | 0 | 25% |
| | | A P 3 | Cell | 30 | 0 | 0 | 30 | NA | ICF | 30 | 19 | 11 | 0 | 63% |
| | Q | A Q 1 | Cell | 29 | 0 | 0 | 29 | NA | PIP | 29 | 17 | 12 | 0 | 59% |
| | | A Q 2 | Cell | 31 | 0 | 0 | 31 | NA | PIP | 31 | 14 | 17 | 0 | 45% |
| | | A Q 3 | Cell | 30 | 0 | 0 | 30 | NA | PIP | 30 | 11 | 19 | 0 | 37% |
| | R | A R 1 | Dorm | 26 | 16 | 0 | 42 | II | PF | 39 | 37 | 5 | 0 | 142% |
| | S | A S 1 | Cell | 30 | 0 | 0 | 30 | NA | PIP | 30 | 19 | 11 | 0 | 63% |
| | | A S 2 | Cell | 30 | 0 | 0 | 30 | NA | PIP | 30 | 16 | 14 | 0 | 53% |
| | | A S 3 | Cell | 18 | 0 | 0 | 18 | NA | RHG | 27 | 0 | 18 | 0 | 0% |
| | T | A T 1 | Cell | 42 | 0 | 0 | 42 | III | PF | 46 | 37 | 5 | 0 | 88% |
| | | A T 2 | Cell | 58 | 0 | 0 | 58 | III | PF | 64 | 48 | 10 | 0 | 83% |
| | | A T 3 | Cell | 58 | 0 | 0 | 58 | III | PF | 64 | 45 | 13 | 0 | 78% |
| | U | A U 1 | Cell | 40 | 0 | 0 | 40 | III | PF | 44 | 39 | 1 | 0 | 98% |
| | | A U 2 | Cell | 58 | 0 | 0 | 58 | III | PF | 64 | 52 | 6 | 0 | 90% |
| | | A U 3 | Cell | 58 | 0 | 0 | 58 | III | PF | 64 | 50 | 6 | 0 | 86% |
| | V | A V 1 | Cell | 42 | 0 | 0 | 42 | III | PF | 46 | 40 | 2 | 0 | 95% |
| | | A V 2 | Cell | 58 | 0 | 0 | 58 | III | PF | 64 | 51 | 7 | 0 | 88% |
| | | A V 3 | Cell | 58 | 0 | 0 | 58 | III | PF | 64 | 43 | 14 | 0 | 74% |
| | X | A X 1 | Cell | 4 | 0 | 0 | 4 | NA | HSP | 4 | 3 | 1 | 0 | 75% |
| | Y | A Y 1 | Cell | 13 | 0 | 0 | 13 | NA | HSP | 13 | 10 | 3 | 0 | 77% |
| | | | Dorm | 21 | 21 | 0 | 42 | III | PF | 31 | 31 | 11 | 0 | 148% |
| **CMF-Facility A Total** | | | | **1843** | **552** | **0** | **2395** | | | **2255** | **1735** | **513** | **40** | **94%** |
| CMF-Facility B | DC | B DC 1 | Dorm | 100 | 50 | 0 | 150 | II | PF | 150 | 131 | 18 | 0 | 131% |
| | DD | B DD 1 | Dorm | 88 | 62 | 0 | 150 | II | PF | 132 | 140 | 10 | 0 | 159% |
| **CMF-Facility B Total** | | | | **188** | **112** | **0** | **300** | | | **282** | **271** | **28** | **0** | **144%** |
| CMF-Facility C | HTC | C HTCA1 | Cell | 16 | 0 | 0 | 16 | NA | FLX | 24 | 8 | 8 | 0 | 50% |
| | | C HTCB1 | Cell | 16 | 0 | 0 | 16 | NA | FLX | 24 | 6 | 10 | 0 | 38% |
| | | C HTCC1 | Cell | 16 | 0 | 0 | 16 | NA | ICF | 16 | 0 | 16 | 0 | 0% |
| | | C HTCD1 | Cell | 16 | 0 | 0 | 16 | NA | ICF | 16 | 0 | 16 | 0 | 0% |
| **CMF-Facility C Total** | | | | **64** | **0** | **0** | **64** | | | **80** | **14** | **50** | **0** | **22%** |
| CMF-MSF | FIR | M FIR 1 | Dorm | 9 | 7 | 0 | 16 | I | FH | 9 | 7 | 9 | 0 | 78% |
| **CMF-MSF Total** | | | | **9** | **7** | **0** | **16** | | | **9** | **7** | **9** | **0** | **78%** |
| **Grand Total** | | | | **2104** | **671** | **50** | **2825** | | | **2626** | **2074** | **603** | **40** | **99%** |

Generated by :
dave.leclerc

**COR**  Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| COR-Central Service | INF | S INFA1 | Cell | 0 | 0 | 24 | 24 | NA | CTC | 0 | 23 | 0 | 0 | |
| | | S INFB1 | Cell | 0 | 0 | 26 | 26 | NA | CTC | 0 | 24 | 2 | 0 | |
| | | S INFC1 | Cell | 0 | 0 | 24 | 24 | NA | MCB | 0 | 21 | 2 | 0 | |
| | | S INFD1 | Cell | 0 | 0 | 18 | 18 | NA | OHU | 0 | 17 | 0 | 0 | |
| **COR-Central Service Total** | | | | **0** | **0** | **92** | **92** | | | **0** | **85** | **4** | **0** | |
| COR-Facility 03A | 001 | 03A001 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 58 | 39 | 3 | 116% |
| | | 03A001 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 59 | 36 | 3 | 118% |
| | 002 | 03A002 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 72 | 19 | 9 | 144% |
| | | 03A002 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 74 | 22 | 4 | 148% |
| | 003 | 03A003 1 | 270 Cell | 50 | 50 | 0 | 100 | NA | ASU | 63 | 23 | 66 | 8 | 46% |
| | | 03A003 2 | 270 Cell | 50 | 50 | 0 | 100 | NA | ASU | 63 | 22 | 67 | 3 | 44% |
| | 004 | 03A004 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 56 | 32 | 6 | 112% |
| | | 03A004 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 60 | 28 | 2 | 120% |
| | 005 | 03A005 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 58 | 38 | 4 | 116% |
| | | 03A005 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 57 | 41 | 0 | 114% |
| **COR-Facility 03A Total** | | | | **500** | **500** | **0** | **1000** | | | **725** | **539** | **388** | **42** | **108%** |
| COR-Facility 03B | 001 | 03B001 1 | 270 Cell | 50 | 50 | 0 | 100 | II | EOP | 75 | 74 | 16 | 10 | 148% |
| | | 03B001 2 | 270 Cell | 50 | 50 | 0 | 100 | II | EOP | 75 | 72 | 8 | 20 | 144% |
| | 002 | 03B002 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 65 | 33 | 2 | 130% |
| | | 03B002 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 63 | 25 | 10 | 126% |
| | 003 | 03B003 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 72 | 26 | 2 | 144% |
| | | 03B003 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 82 | 17 | 1 | 164% |
| | 004 | 03B004 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 85 | 11 | 4 | 170% |
| | | 03B004 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 90 | 6 | 4 | 180% |
| | 005 | 03B005 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 85 | 11 | 4 | 170% |
| | | 03B005 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 85 | 11 | 4 | 170% |
| **COR-Facility 03B Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **773** | **164** | **61** | **155%** |
| COR-Facility 04A | A1L | 04AA1LA1 | Cell | 10 | 10 | 0 | 20 | NA | RHC | 15 | 11 | 7 | 2 | 110% |
| | | 04AA1LA2 | Cell | 10 | 10 | 0 | 20 | NA | RHC | 15 | 7 | 6 | 3 | 70% |
| | | 04AA1LB1 | 180 Cell | 10 | 0 | 0 | 10 | IV | GP | 10 | 10 | 0 | 0 | 100% |
| | | 04AA1LB2 | 180 Cell | 10 | 10 | 0 | 20 | IV | GP | 15 | 0 | 16 | 0 | 0% |
| | | 04AA1LC1 | Cell | 12 | 12 | 0 | 24 | NA | RHC | 18 | 9 | 12 | 3 | 75% |
| | | 04AA1LC2 | Cell | 11 | 11 | 0 | 22 | NA | RHC | 17 | 4 | 17 | 1 | 36% |
| | A1R | 04AA1RA1 | Cell | 10 | 10 | 0 | 20 | NA | RHC | 15 | 9 | 9 | 0 | 90% |
| | | 04AA1RA2 | Cell | 10 | 10 | 0 | 20 | NA | RHC | 15 | 7 | 10 | 3 | 70% |
| | | 04AA1RB1 | Cell | 10 | 10 | 0 | 20 | NA | RHC | 15 | 9 | 8 | 3 | 90% |
| | | 04AA1RB2 | Cell | 10 | 10 | 0 | 20 | NA | RHC | 15 | 5 | 14 | 1 | 50% |
| | | 04AA1RC1 | Cell | 12 | 12 | 0 | 24 | NA | RHC | 18 | 11 | 10 | 3 | 92% |
| | | 04AA1RC2 | Cell | 12 | 12 | 0 | 24 | NA | RHC | 18 | 2 | 22 | 0 | 17% |
| | A2R | 04AA2RA1 | Cell | 10 | 10 | 0 | 20 | NA | RHG | 15 | 0 | 20 | 0 | 0% |
| | | 04AA2RA2 | Cell | 10 | 10 | 0 | 20 | NA | RHG | 15 | 0 | 20 | 0 | 0% |
| | | 04AA2RB1 | Cell | 10 | 10 | 0 | 20 | NA | RHG | 15 | 0 | 20 | 0 | 0% |
| | | 04AA2RB2 | Cell | 10 | 10 | 0 | 20 | NA | RHG | 15 | 0 | 20 | 0 | 0% |
| | | 04AA2RC1 | Cell | 12 | 12 | 0 | 24 | NA | THU | 18 | 0 | 24 | 0 | 0% |
| | | 04AA2RC2 | Cell | 12 | 12 | 0 | 24 | NA | THU | 18 | 0 | 24 | 0 | 0% |
| | A3L | 04AA3LA1 | Cell | 10 | 10 | 0 | 20 | NA | THU | 15 | 8 | 11 | 1 | 80% |
| | | 04AA3LA2 | Cell | 10 | 10 | 0 | 20 | NA | THU | 15 | 9 | 10 | 1 | 90% |
| | | 04AA3LB1 | Cell | 10 | 10 | 0 | 20 | NA | THU | 15 | 7 | 13 | 0 | 70% |
| | | 04AA3LB2 | Cell | 10 | 10 | 0 | 20 | NA | THU | 15 | 8 | 12 | 0 | 80% |
| | | 04AA3LC1 | Cell | 12 | 12 | 0 | 24 | NA | THU | 18 | 0 | 22 | 0 | 0% |
| | | 04AA3LC2 | Cell | 12 | 12 | 0 | 24 | NA | THU | 18 | 0 | 24 | 0 | 0% |
| | A4L | 04AA4LA1 | Cell | 10 | 10 | 0 | 20 | NA | RHG | 15 | 9 | 10 | 1 | 90% |
| | | 04AA4LA2 | Cell | 10 | 10 | 0 | 20 | NA | RHG | 15 | 5 | 14 | 1 | 50% |
| | | 04AA4LB1 | Cell | 10 | 10 | 0 | 20 | NA | RHG | 15 | 7 | 13 | 0 | 70% |
| | | 04AA4LB2 | Cell | 10 | 10 | 0 | 20 | NA | RHG | 15 | 7 | 10 | 3 | 70% |
| | | 04AA4LC1 | Cell | 12 | 12 | 0 | 24 | NA | RHG | 18 | 7 | 16 | 1 | 58% |
| | | 04AA4LC2 | Cell | 12 | 12 | 0 | 24 | NA | RHG | 18 | 9 | 15 | 0 | 75% |
| | A4R | 04AA4RA1 | Cell | 9 | 9 | 0 | 18 | NA | PHU | 9 | 3 | 12 | 3 | 33% |
| | | 04AA4RA2 | Cell | 8 | 8 | 0 | 18 | NA | PHU | 8 | 3 | 14 | 1 | 38% |
| | | 04AA4RB1 | Cell | 10 | 10 | 0 | 20 | NA | RHG | 15 | 10 | 10 | 0 | 100% |
| | | 04AA4RB2 | Cell | 10 | 10 | 0 | 20 | NA | RHG | 15 | 6 | 12 | 2 | 60% |
| | | 04AA4RC1 | Cell | 12 | 11 | 0 | 23 | NA | RHG | 18 | 7 | 11 | 5 | 58% |
| | | 04AA4RC2 | Cell | 12 | 12 | 0 | 24 | NA | RHG | 18 | 10 | 11 | 3 | 83% |
| **COR-Facility 04A Total** | | | | **380** | **371** | **0** | **751** | | | **557** | **199** | **499** | **41** | **52%** |
| COR-Facility 04B | B1L | 04BB1LA1 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 20 | 0 | 0 | 200% |
| | | 04BB1LA2 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 18 | 1 | 1 | 180% |
| | | 04BB1LB1 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 16 | 3 | 1 | 160% |
| | | 04BB1LB2 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 18 | 2 | 0 | 180% |
| | | 04BB1LC1 | Cell | 12 | 12 | 0 | 24 | II | PF | 18 | 19 | 4 | 1 | 158% |
| | | 04BB1LC2 | Cell | 12 | 12 | 0 | 24 | II | PF | 18 | 20 | 4 | 0 | 167% |
| | B1R | 04BB1RA1 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 16 | 4 | 0 | 160% |

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| COR-Facility 04B | B1R | 04BB1RA2 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 16 | 4 | 0 | 160% |
| | | 04BB1RB1 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 18 | 2 | 0 | 180% |
| | | 04BB1RB2 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 16 | 4 | 0 | 160% |
| | | 04BB1RC1 | Cell | 12 | 12 | 0 | 24 | II | PF | 18 | 23 | 0 | 1 | 192% |
| | | 04BB1RC2 | Cell | 12 | 12 | 0 | 24 | II | PF | 18 | 21 | 3 | 0 | 175% |
| | B2L | 04BB2LA1 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 16 | 3 | 1 | 160% |
| | | 04BB2LA2 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 17 | 3 | 0 | 170% |
| | | 04BB2LB1 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 18 | 1 | 1 | 180% |
| | | 04BB2LB2 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 19 | 1 | 0 | 190% |
| | | 04BB2LC1 | Cell | 12 | 12 | 0 | 24 | II | PF | 18 | 23 | 1 | 0 | 192% |
| | | 04BB2LC2 | Cell | 12 | 12 | 0 | 24 | II | PF | 18 | 21 | 3 | 0 | 175% |
| | B2R | 04BB2RA1 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 18 | 2 | 0 | 180% |
| | | 04BB2RA2 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 17 | 0 | 3 | 170% |
| | | 04BB2RB1 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 17 | 3 | 0 | 170% |
| | | 04BB2RB2 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 16 | 4 | 0 | 160% |
| | | 04BB2RC1 | Cell | 12 | 12 | 0 | 24 | II | PF | 18 | 21 | 3 | 0 | 175% |
| | | 04BB2RC2 | Cell | 12 | 12 | 0 | 24 | II | PF | 18 | 20 | 4 | 0 | 167% |
| | B3L | 04BB3LA1 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 20 | 0 | 0 | 200% |
| | | 04BB3LA2 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 20 | 0 | 0 | 200% |
| | | 04BB3LB1 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 19 | 1 | 0 | 190% |
| | | 04BB3LB2 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 20 | 0 | 0 | 200% |
| | | 04BB3LC1 | Cell | 12 | 12 | 0 | 24 | II | PF | 18 | 23 | 1 | 0 | 192% |
| | | 04BB3LC2 | Cell | 12 | 12 | 0 | 24 | II | PF | 18 | 23 | 1 | 0 | 192% |
| | B3R | 04BB3RA1 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 17 | 3 | 0 | 170% |
| | | 04BB3RA2 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 17 | 3 | 0 | 170% |
| | | 04BB3RB1 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 19 | 1 | 0 | 190% |
| | | 04BB3RB2 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 17 | 2 | 1 | 170% |
| | | 04BB3RC1 | Cell | 12 | 12 | 0 | 24 | II | PF | 18 | 23 | 0 | 1 | 192% |
| | | 04BB3RC2 | Cell | 12 | 12 | 0 | 24 | II | PF | 18 | 18 | 5 | 1 | 150% |
| | B4L | 04BB4LA1 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 17 | 2 | 1 | 170% |
| | | 04BB4LA2 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 15 | 5 | 0 | 150% |
| | | 04BB4LB1 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 20 | 0 | 0 | 200% |
| | | 04BB4LB2 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 15 | 4 | 1 | 150% |
| | | 04BB4LC1 | Cell | 12 | 12 | 0 | 24 | II | PF | 18 | 20 | 2 | 2 | 167% |
| | | 04BB4LC2 | Cell | 12 | 12 | 0 | 24 | II | PF | 18 | 20 | 3 | 1 | 167% |
| | B4R | 04BB4RA1 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 19 | 0 | 1 | 190% |
| | | 04BB4RA2 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 18 | 2 | 0 | 180% |
| | | 04BB4RB1 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 18 | 1 | 1 | 180% |
| | | 04BB4RB2 | Cell | 10 | 10 | 0 | 20 | II | PF | 15 | 18 | 1 | 1 | 180% |
| | | 04BB4RC1 | Cell | 12 | 12 | 0 | 24 | II | PF | 18 | 21 | 2 | 1 | 175% |
| | | 04BB4RC2 | Cell | 12 | 12 | 0 | 24 | II | PF | 18 | 22 | 2 | 0 | 183% |
| **COR-Facility 04B Total** | | | | **512** | **512** | **0** | **1024** | | | **768** | **903** | **100** | **21** | **176%** |
| COR-MSF | FIR | M FIR 1 | Dorm | 8 | 0 | 0 | 8 | I | FH | 8 | 4 | 4 | 0 | 50% |
| **COR-MSF Total** | | | | **8** | **0** | **0** | **8** | | | **8** | **4** | **4** | **0** | **50%** |
| COR-RHU-CCCMS | 001 | Z 001A1 | Cell | 12 | 12 | 0 | 24 | NA | RHC | 18 | 6 | 17 | 1 | 50% |
| | | Z 001B1 | Cell | 12 | 12 | 0 | 24 | NA | RHC | 18 | 7 | 13 | 2 | 58% |
| | | Z 001C1 | Cell | 12 | 12 | 0 | 24 | NA | RHC | 18 | 8 | 13 | 3 | 67% |
| | | Z 001D1 | Cell | 12 | 12 | 0 | 24 | NA | RHC | 18 | 0 | 24 | 0 | 0% |
| | | Z 001E1 | Cell | 12 | 12 | 0 | 24 | NA | RHC | 18 | 7 | 15 | 2 | 58% |
| | | Z 001F1 | Cell | 14 | 14 | 0 | 28 | NA | RHC | 21 | 11 | 16 | 1 | 79% |
| | | Z 001G1 | Cell | 14 | 14 | 0 | 28 | NA | RHC | 21 | 9 | 17 | 2 | 64% |
| | | Z 001H1 | Cell | 12 | 12 | 0 | 24 | NA | RHC | 18 | 0 | 24 | 0 | 0% |
| **COR-RHU-CCCMS Total** | | | | **100** | **100** | **0** | **200** | | | **150** | **48** | **139** | **11** | **48%** |
| **Grand Total** | | | | **2000** | **1983** | **92** | **4075** | | | **2958** | **2551** | **1298** | **176** | **128%** |

**CRC**  Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CRC-Central Service | INF | S INF 1 | Dorm | 0 | 0 | 4 | 4 | NA | OHU | 0 | 3 | 0 | 0 | |
| | | | Room | 0 | 0 | 6 | 6 | NA | OHU | 0 | 3 | 3 | 0 | |
| **CRC-Central Service Total** | | | | **0** | **0** | **10** | **10** | | | **0** | **6** | **3** | **0** | |
| | 201 | B 201 1 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 91 | 9 | 0 | 182% |
| | 202 | B 202 1 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 87 | 13 | 0 | 174% |
| | 203 | B 203 1 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 88 | 12 | 0 | 176% |
| | 205 | B 205 1 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 85 | 15 | 0 | 170% |
| | 206 | B 206 1 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 87 | 13 | 0 | 174% |
| CRC-Facility B | 207 | B 207 1 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 84 | 16 | 0 | 168% |
| | 208 | B 208 1 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 85 | 15 | 0 | 170% |
| | 209 | B 209 1 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 85 | 15 | 0 | 170% |
| | 210 | B 210 1 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 63 | 37 | 0 | 126% |
| | 211 | B 211 1 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 95 | 5 | 0 | 190% |
| | 212 | B 212 1 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 83 | 17 | 0 | 166% |
| | 214 | B 214 1 | Dorm | 100 | 100 | 0 | 200 | II | PF | 150 | 169 | 31 | 0 | 169% |
| **CRC-Facility B Total** | | | | **650** | **650** | **0** | **1300** | | | **975** | **1102** | **198** | **0** | **170%** |
| | 302 | C 302 1 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 92 | 8 | 0 | 184% |
| | 303 | C 303 1 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 52 | 48 | 0 | 104% |
| | 304 | C 304 1 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 84 | 16 | 0 | 168% |
| | 305 | C 305 1 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 85 | 15 | 0 | 170% |
| | 306 | C 306 1 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 88 | 12 | 0 | 176% |
| | 307 | C 307 1 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 90 | 10 | 0 | 180% |
| | 308 | C 308 1 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 73 | 27 | 0 | 146% |
| CRC-Facility C | 309 | C 309 1 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 82 | 18 | 0 | 164% |
| | 310 | C 310 1 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 90 | 10 | 0 | 180% |
| | 311 | C 311 1 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 88 | 12 | 0 | 176% |
| | 312 | C 312 1 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 100 | 0 | 0 | 200% |
| | 313 | C 313 1 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 82 | 18 | 0 | 164% |
| | 314 | C 314 1 | Dorm | 32 | 32 | 0 | 64 | II | PF | 48 | 41 | 22 | 0 | 128% |
| | 315 | C 315 1 | Dorm | 31 | 31 | 0 | 62 | II | PF | 47 | 45 | 17 | 0 | 145% |
| | FIR | C FIR 2 | Dorm | 9 | 0 | 0 | 9 | I | FH | 9 | 6 | 3 | 0 | 67% |
| **CRC-Facility C Total** | | | | **672** | **663** | **0** | **1335** | | | **1004** | **1098** | **236** | **0** | **163%** |
| | 401 | D 401 3 | Dorm | 43 | 43 | 0 | 86 | II | PF | 65 | 86 | 0 | 0 | 200% |
| | 402 | D 402 3 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 100 | 0 | 0 | 200% |
| | 403 | D 403 2 | Dorm | 47 | 47 | 0 | 94 | II | PF | 71 | 94 | 0 | 0 | 200% |
| | 404 | D 404 2 | Dorm | 50 | 50 | 0 | 100 | II | PF | 75 | 99 | 1 | 0 | 198% |
| CRC-Facility D | 405 | D 405 3 | Dorm | 48 | 48 | 0 | 96 | II | PF | 72 | 95 | 0 | 0 | 198% |
| | 406 | D 406 3 | Dorm | 42 | 42 | 0 | 84 | II | PF | 63 | 84 | 0 | 0 | 200% |
| | 407 | D 407 1 | Dorm | 40 | 40 | 0 | 80 | II | PF | 60 | 0 | 80 | 0 | 0% |
| | 408 | D 408 1 | Dorm | 40 | 40 | 0 | 80 | II | PF | 60 | 44 | 36 | 0 | 110% |
| | 409 | D 409 1 | Dorm | 40 | 40 | 0 | 80 | II | PF | 60 | 80 | 0 | 0 | 200% |
| | 410 | D 410 D | Dorm | 0 | 78 | 0 | 78 | II | PF | 0 | 0 | 78 | 0 | |
| **CRC-Facility D Total** | | | | **400** | **478** | **0** | **878** | | | **600** | **682** | **195** | **0** | **171%** |
| **Grand Total** | | | | **1722** | **1791** | **10** | **3523** | | | **2579** | **2888** | **632** | **0** | **168%** |

**CTF**  Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CTF-Facility A | Firehouse | A FIR 1 | Dorm | 6 | 6 | 0 | 12 | I | FH | 6 | 7 | 5 | 0 | 117% |
| | Fremont | A FD 1 | Dorm | 100 | 100 | 0 | 200 | II | PF | 150 | 104 | 96 | 0 | 104% |
| | Lassen | A LA A1 | Cell | 44 | 44 | 0 | 88 | II | PF | 66 | 79 | 7 | 1 | 180% |
| | | A LA A2 | Cell | 56 | 56 | 0 | 112 | II | PF | 84 | 102 | 10 | 0 | 182% |
| | | A LA A3 | Cell | 56 | 56 | 0 | 112 | II | PF | 84 | 103 | 9 | 0 | 184% |
| | | A LA B1 | Cell | 43 | 43 | 0 | 86 | II | PF | 65 | 68 | 18 | 0 | 158% |
| | | A LA B2 | Cell | 52 | 52 | 0 | 104 | II | PF | 78 | 79 | 24 | 1 | 152% |
| | | A LA B3 | Cell | 52 | 52 | 0 | 104 | II | PF | 78 | 92 | 12 | 0 | 177% |
| | Ranier | A RA A1 | Cell | 44 | 44 | 0 | 88 | II | PF | 66 | 61 | 26 | 0 | 139% |
| | | A RA A2 | Cell | 56 | 56 | 0 | 112 | II | PF | 84 | 86 | 25 | 1 | 154% |
| | | A RA A3 | Cell | 56 | 56 | 0 | 112 | II | PF | 84 | 93 | 18 | 1 | 166% |
| | | A RA B1 | Cell | 43 | 43 | 0 | 86 | II | PF | 65 | 62 | 21 | 3 | 144% |
| | | A RA B2 | Cell | 52 | 52 | 0 | 104 | II | PF | 78 | 74 | 28 | 2 | 142% |
| | | A RA B3 | Cell | 52 | 52 | 0 | 104 | II | PF | 78 | 87 | 16 | 1 | 167% |
| **CTF-Facility A Total** | | | | **712** | **712** | **0** | **1424** | | | **1065** | **1097** | **315** | **10** | **154%** |
| CTF-Facility B | Shasta | B SH A1 | Cell | 43 | 43 | 0 | 86 | II | PF | 65 | 76 | 6 | 4 | 177% |
| | | B SH A2 | Cell | 55 | 55 | 0 | 110 | II | PF | 83 | 98 | 5 | 7 | 178% |
| | | B SH A3 | Cell | 55 | 55 | 0 | 110 | II | PF | 83 | 100 | 10 | 0 | 182% |
| | | B SH B1 | Cell | 42 | 42 | 0 | 84 | II | PF | 63 | 68 | 14 | 2 | 162% |
| | | B SH B2 | Cell | 51 | 51 | 0 | 102 | II | PF | 77 | 85 | 13 | 4 | 167% |
| | | B SH B3 | Cell | 51 | 51 | 0 | 102 | II | PF | 77 | 95 | 4 | 3 | 186% |
| | Toro | B TD 1 | Dorm | 100 | 100 | 0 | 200 | II | PF | 150 | 119 | 81 | 0 | 119% |
| | Whitney | B WH A1 | Cell | 43 | 43 | 0 | 86 | II | PF | 65 | 72 | 13 | 1 | 167% |
| | | B WH A2 | Cell | 55 | 55 | 0 | 110 | II | PF | 83 | 98 | 10 | 2 | 178% |
| | | B WH A3 | Cell | 55 | 55 | 0 | 110 | II | PF | 83 | 96 | 10 | 3 | 175% |
| | | B WH B1 | Cell | 42 | 42 | 0 | 84 | II | PF | 63 | 71 | 13 | 0 | 169% |
| | | B WH B2 | Cell | 51 | 51 | 0 | 102 | II | PF | 77 | 78 | 20 | 4 | 153% |
| | | B WH B3 | Cell | 51 | 51 | 0 | 102 | II | PF | 77 | 85 | 17 | 0 | 167% |
| **CTF-Facility B Total** | | | | **694** | **694** | **0** | **1388** | | | **1041** | **1141** | **216** | **30** | **164%** |
| CTF-Facility C | B Wing | C BW 1 | Cell | 37 | 37 | 0 | 74 | II | GP | 56 | 45 | 29 | 0 | 122% |
| | | C BW 2 | Cell | 45 | 45 | 0 | 90 | II | GP | 68 | 65 | 24 | 1 | 144% |
| | | C BW 3 | Cell | 45 | 45 | 0 | 90 | II | GP | 68 | 66 | 24 | 0 | 147% |
| | C Wing | C CW 1 | Cell | 37 | 37 | 0 | 74 | II | GP | 56 | 56 | 16 | 2 | 151% |
| | | C CW 2 | Cell | 45 | 45 | 0 | 90 | II | GP | 68 | 78 | 12 | 0 | 173% |
| | | C CW 3 | Cell | 45 | 45 | 0 | 90 | II | GP | 68 | 67 | 22 | 1 | 149% |
| | D Wing | C DW 1 | Cell | 37 | 37 | 0 | 74 | II | GP | 56 | 52 | 22 | 0 | 141% |
| | | C DW 2 | Cell | 45 | 45 | 0 | 90 | II | GP | 68 | 75 | 14 | 1 | 167% |
| | | C DW 3 | Cell | 45 | 45 | 0 | 90 | II | GP | 68 | 79 | 10 | 1 | 176% |
| | E Wing | C EW 1 | Cell | 37 | 37 | 0 | 74 | II | GP | 56 | 32 | 42 | 0 | 86% |
| | | C EW 2 | Cell | 45 | 45 | 0 | 90 | II | GP | 68 | 76 | 14 | 0 | 169% |
| | | C EW 3 | Cell | 45 | 45 | 0 | 90 | II | GP | 68 | 75 | 15 | 0 | 167% |
| | F Wing | C FW 1 | Cell | 53 | 53 | 0 | 106 | II | GP | 80 | 76 | 28 | 2 | 143% |
| | | C FW 2 | Cell | 61 | 61 | 0 | 122 | II | GP | 92 | 96 | 22 | 4 | 157% |
| | | C FW 3 | Cell | 61 | 61 | 0 | 122 | II | GP | 92 | 101 | 21 | 0 | 166% |
| | G Wing | C GW 1 | Cell | 53 | 53 | 0 | 106 | II | GP | 80 | 67 | 38 | 1 | 126% |
| | | C GW 2 | Cell | 61 | 61 | 0 | 122 | II | GP | 92 | 81 | 39 | 1 | 133% |
| | | C GW 3 | Cell | 61 | 61 | 0 | 122 | II | GP | 92 | 93 | 27 | 2 | 152% |
| | INF | C INF 2 | Cell | 0 | 0 | 4 | 4 | NA | OHU | 0 | 3 | 1 | 0 | |
| | | | Dorm | 0 | 0 | 13 | 13 | NA | OHU | 0 | 9 | 4 | 0 | |
| | O Wing | C OW 1 | Cell | 48 | 0 | 0 | 48 | NA | RHG | 72 | 27 | 21 | 0 | 56% |
| | | C OW 2 | Cell | 48 | 0 | 0 | 48 | NA | RHG | 72 | 38 | 9 | 0 | 79% |
| | | C OW 3 | Cell | 48 | 0 | 0 | 48 | NA | RHG | 72 | 36 | 12 | 0 | 75% |
| | X Wing | C XW 1 | Cell | 39 | 37 | 0 | 76 | II | GP | 59 | 43 | 31 | 2 | 110% |
| | | C XW 2 | Cell | 46 | 46 | 0 | 92 | II | GP | 69 | 62 | 30 | 0 | 135% |
| | | C XW 3 | Cell | 46 | 46 | 0 | 92 | II | GP | 69 | 68 | 23 | 1 | 148% |
| | Y Wing | C YW 1 | Cell | 37 | 37 | 0 | 74 | II | GP | 56 | 1 | 73 | 0 | 3% |
| | | C YW 2 | Cell | 46 | 46 | 0 | 92 | II | GP | 69 | 0 | 92 | 0 | 0% |
| | | C YW 3 | Cell | 46 | 46 | 0 | 92 | II | GP | 69 | 0 | 92 | 0 | 0% |
| | Z Wing | C ZW 1 | Cell | 40 | 40 | 0 | 80 | II | GP | 60 | 54 | 25 | 1 | 135% |
| | | C ZW 2 | Cell | 46 | 46 | 0 | 92 | II | GP | 69 | 65 | 24 | 3 | 141% |
| | | C ZW 3 | Cell | 46 | 46 | 0 | 92 | II | GP | 69 | 69 | 23 | 0 | 150% |
| **CTF-Facility C Total** | | | | **1394** | **1248** | **17** | **2659** | | | **2091** | **1755** | **879** | **23** | **126%** |
| **Grand Total** | | | | **2800** | **2654** | **17** | **5471** | | | **4197** | **3993** | **1410** | **63** | **143%** |

**CVSP**  Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CVSP-Central Service | OHU | S CH 1 | Cell | 0 | 0 | 7 | 7 | NA | OHU | 0 | 0 | 7 | 0 | |
| | | | | 0 | 0 | 7 | 7 | | VAR | 0 | 0 | 7 | 0 | |
| **CVSP-Central Service Total** | | | | **0** | **0** | **14** | **14** | | | **0** | **0** | **14** | **0** | |
| CVSP-Facility A | 001 | A 001 1 | 270 Dorm | 68 | 68 | 0 | 136 | II | PF | 102 | 101 | 35 | 0 | 149% |
| | | A 001 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | PF | 93 | 93 | 31 | 0 | 150% |
| | 002 | A 002 1 | 270 Dorm | 68 | 68 | 0 | 136 | II | PF | 102 | 93 | 43 | 0 | 137% |
| | | A 002 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | PF | 93 | 89 | 35 | 0 | 144% |
| | 003 | A 003 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 48 | 52 | 0 | 96% |
| | | A 003 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 70 | 30 | 0 | 140% |
| **CVSP-Facility A Total** | | | | **360** | **360** | **0** | **720** | | | **540** | **494** | **226** | **0** | **137%** |
| CVSP-MSF | FIR | M FIR 1 | Dorm | 8 | 2 | 0 | 10 | I | FH | 8 | 6 | 4 | 0 | 75% |
| **CVSP-MSF Total** | | | | **8** | **2** | **0** | **10** | | | **8** | **6** | **4** | **0** | **75%** |
| **Grand Total** | | | | **368** | **362** | **14** | **744** | | | **548** | **500** | **244** | **0** | **136%** |

**FOL**  Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FOL-Facility A | 001 | A 001A1 | Cell | 32 | 32 | 0 | 64 | II | GP | 48 | 43 | 18 | 3 | 134% |
| | | A 001A2 | Cell | 32 | 32 | 0 | 64 | II | GP | 48 | 46 | 18 | 0 | 144% |
| | | A 001A3 | Cell | 32 | 32 | 0 | 64 | II | GP | 48 | 43 | 19 | 2 | 134% |
| | | A 001A4 | Cell | 32 | 32 | 0 | 64 | II | GP | 48 | 49 | 15 | 0 | 153% |
| | | A 001A5 | Cell | 32 | 32 | 0 | 64 | II | GP | 48 | 40 | 23 | 1 | 125% |
| | | A 001B1 | Cell | 31 | 31 | 0 | 62 | II | GP | 47 | 45 | 16 | 1 | 145% |
| | | A 001B2 | Cell | 32 | 32 | 0 | 64 | II | GP | 48 | 54 | 9 | 1 | 169% |
| | | A 001B3 | Cell | 32 | 32 | 0 | 64 | II | GP | 48 | 47 | 16 | 1 | 147% |
| | | A 001B4 | Cell | 31 | 31 | 0 | 62 | II | GP | 47 | 42 | 20 | 0 | 135% |
| | | A 001B5 | Cell | 31 | 31 | 0 | 62 | II | GP | 47 | 37 | 24 | 1 | 119% |
| | | A 001C1 | Cell | 32 | 32 | 0 | 64 | II | GP | 48 | 38 | 26 | 0 | 119% |
| | | A 001C2 | Cell | 31 | 31 | 0 | 62 | II | GP | 47 | 49 | 13 | 0 | 158% |
| | | A 001C3 | Cell | 31 | 31 | 0 | 62 | II | GP | 47 | 48 | 14 | 0 | 155% |
| | | A 001C4 | Cell | 32 | 32 | 0 | 64 | II | GP | 48 | 46 | 17 | 0 | 144% |
| | | A 001C5 | Cell | 32 | 32 | 0 | 64 | II | GP | 48 | 39 | 25 | 0 | 122% |
| | | A 001D1 | Cell | 30 | 30 | 0 | 60 | II | GP | 45 | 36 | 23 | 0 | 120% |
| | | A 001D2 | Cell | 32 | 32 | 0 | 64 | II | GP | 48 | 47 | 17 | 0 | 147% |
| | | A 001D3 | Cell | 32 | 32 | 0 | 64 | II | GP | 48 | 47 | 16 | 1 | 147% |
| | | A 001D4 | Cell | 32 | 32 | 0 | 64 | II | GP | 48 | 42 | 21 | 1 | 131% |
| | | A 001D5 | Cell | 32 | 32 | 0 | 64 | II | GP | 48 | 36 | 27 | 1 | 113% |
| | 002 | A 002A1 | Cell | 31 | 31 | 0 | 62 | III | GP | 47 | 37 | 24 | 1 | 119% |
| | | A 002A2 | Cell | 30 | 30 | 0 | 60 | III | GP | 45 | 35 | 24 | 1 | 117% |
| | | A 002A3 | Cell | 31 | 31 | 0 | 62 | III | GP | 47 | 40 | 19 | 3 | 129% |
| | | A 002A4 | Cell | 31 | 31 | 0 | 62 | III | GP | 47 | 38 | 24 | 0 | 123% |
| | | A 002A5 | Cell | 31 | 31 | 0 | 62 | III | GP | 47 | 37 | 23 | 1 | 119% |
| | | A 002B1 | Cell | 31 | 31 | 0 | 62 | III | GP | 47 | 39 | 23 | 0 | 126% |
| | | A 002B2 | Cell | 31 | 31 | 0 | 62 | III | GP | 47 | 27 | 34 | 1 | 87% |
| | | A 002B3 | Cell | 31 | 31 | 0 | 62 | III | GP | 47 | 44 | 18 | 0 | 142% |
| | | A 002B4 | Cell | 31 | 31 | 0 | 62 | III | GP | 47 | 39 | 22 | 1 | 126% |
| | | A 002B5 | Cell | 31 | 31 | 0 | 62 | III | GP | 47 | 40 | 22 | 0 | 129% |
| | 003 | A 003A1 | Cell | 39 | 39 | 0 | 78 | II | GP | 59 | 59 | 19 | 0 | 151% |
| | | A 003A2 | Cell | 40 | 40 | 0 | 80 | II | GP | 60 | 69 | 11 | 0 | 173% |
| | | A 003A3 | Cell | 40 | 40 | 0 | 80 | II | GP | 60 | 56 | 23 | 1 | 140% |
| | | A 003A4 | Cell | 40 | 40 | 0 | 80 | II | GP | 60 | 64 | 16 | 0 | 160% |
| | | A 003A5 | Cell | 40 | 40 | 0 | 80 | II | GP | 60 | 64 | 16 | 0 | 160% |
| | | A 003B1 | Cell | 40 | 40 | 0 | 80 | II | GP | 60 | 61 | 18 | 1 | 153% |
| | | A 003B2 | Cell | 40 | 40 | 0 | 80 | II | GP | 60 | 23 | 55 | 2 | 58% |
| | | A 003B3 | Cell | 40 | 40 | 0 | 80 | II | GP | 60 | 66 | 14 | 0 | 165% |
| | | A 003B4 | Cell | 40 | 40 | 0 | 80 | II | GP | 60 | 61 | 19 | 0 | 153% |
| | | A 003B5 | Cell | 40 | 40 | 0 | 80 | II | GP | 60 | 62 | 18 | 0 | 155% |
| | 004 | A 004A1 | Cell | 23 | 23 | 0 | 46 | NA | RHG | 35 | 12 | 34 | 0 | 52% |
| | | A 004A2 | Cell | 23 | 23 | 0 | 46 | NA | RHG | 35 | 13 | 31 | 2 | 57% |
| | | A 004A3 | Cell | 23 | 0 | 0 | 23 | NA | RHG | 35 | 17 | 6 | 0 | 74% |
| | | A 004B1 | Cell | 23 | 0 | 0 | 23 | NA | RHG | 35 | 9 | 14 | 0 | 39% |
| | | A 004B2 | Cell | 23 | 0 | 0 | 23 | NA | RHG | 35 | 12 | 11 | 0 | 52% |
| | | A 004B3 | Cell | 23 | 0 | 0 | 23 | NA | RHG | 35 | 16 | 7 | 0 | 70% |
| | 005 | A 005A1 | Cell | 39 | 39 | 0 | 78 | II | GP | 59 | 59 | 17 | 1 | 151% |
| | | A 005A2 | Cell | 41 | 41 | 0 | 82 | II | GP | 62 | 58 | 24 | 0 | 141% |
| | | A 005B1 | Cell | 39 | 39 | 0 | 78 | II | GP | 59 | 65 | 11 | 2 | 167% |
| | | A 005B2 | Cell | 41 | 41 | 0 | 82 | II | GP | 62 | 68 | 14 | 0 | 166% |
| | | A 005C1 | Cell | 39 | 39 | 0 | 78 | II | GP | 59 | 57 | 20 | 1 | 146% |
| | | A 005C2 | Cell | 41 | 41 | 0 | 82 | II | GP | 62 | 69 | 12 | 1 | 168% |
| | | A 005D1 | Cell | 40 | 40 | 0 | 80 | II | GP | 60 | 3 | 77 | 0 | 8% |
| | | A 005D2 | Cell | 41 | 41 | 0 | 82 | II | GP | 62 | 68 | 13 | 1 | 166% |
| **FOL-Facility A Total** | | | | **1800** | **1708** | **0** | **3508** | | | **2700** | **2361** | **1110** | **33** | **131%** |
| FOL-MSF | 001 | M 001 1 | Dorm | 18 | 3 | 0 | 21 | I | WC | 27 | 18 | 3 | 0 | 100% |
| | 002 | M 002 1 | Dorm | 18 | 3 | 0 | 21 | I | WC | 27 | 18 | 3 | 0 | 100% |
| | 003 | M 003 1 | Dorm | 18 | 3 | 0 | 21 | I | WC | 27 | 13 | 8 | 0 | 72% |
| | 004 | M 004 1 | Dorm | 18 | 3 | 0 | 21 | I | WC | 27 | 15 | 6 | 0 | 83% |
| | 005 | M 005 1 | Dorm | 18 | 3 | 0 | 21 | I | WC | 27 | 13 | 8 | 0 | 72% |
| | 006 | M 006 1 | Dorm | 18 | 3 | 0 | 21 | I | WC | 27 | 0 | 21 | 0 | 0% |
| | 007 | M 007 1 | Dorm | 27 | 27 | 0 | 54 | I | WC | 41 | 12 | 42 | 0 | 44% |
| | 008 | M 008 1 | Dorm | 27 | 27 | 0 | 54 | I | WC | 41 | 27 | 27 | 0 | 100% |
| | 009 | M 009 1 | Dorm | 34 | 34 | 0 | 68 | I | WC | 51 | 30 | 38 | 0 | 88% |
| | 010 | M 010 1 | Dorm | 27 | 27 | 0 | 54 | I | WC | 41 | 26 | 28 | 0 | 96% |
| | 011 | M 011 1 | Dorm | 27 | 27 | 0 | 54 | I | WC | 41 | 0 | 54 | 0 | 0% |
| | FIR | M FIR 1 | Dorm | 15 | 0 | 0 | 15 | I | FH | 15 | 8 | 7 | 0 | 53% |
| **FOL-MSF Total** | | | | **265** | **160** | **0** | **425** | | | **390** | **180** | **245** | **0** | **68%** |
| **Grand Total** | | | | **2065** | **1868** | **0** | **3933** | | | **3090** | **2541** | **1355** | **33** | **123%** |

**HDSP**  Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HDSP-Central Service | INF | S INF 1 | Cell | 0 | 0 | 21 | 21 | NA | CTC | 0 | 11 | 10 | 0 | |
| | | | | 0 | 0 | 10 | 10 | | MCB | 0 | 8 | 2 | 0 | |
| **HDSP-Central Service Total** | | | | **0** | **0** | **31** | **31** | | | **0** | **19** | **12** | **0** | |
| HDSP-Facility A | 001 | A 001 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 45 | 50 | 5 | 90% |
| | | A 001 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 50 | 49 | 1 | 100% |
| | 002 | A 002 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 42 | 55 | 1 | 84% |
| | | A 002 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 41 | 58 | 1 | 82% |
| | 003 | A 003 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 43 | 50 | 5 | 86% |
| | | A 003 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 44 | 54 | 0 | 88% |
| | 004 | A 004 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 47 | 47 | 5 | 94% |
| | | A 004 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 57 | 41 | 2 | 114% |
| | 005 | A 005 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 0 | 78 | 0 | 0% |
| | | A 005 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 0 | 98 | 0 | 0% |
| **HDSP-Facility A Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **369** | **580** | **20** | **74%** |
| HDSP-Facility B | 001 | B 001 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 76 | 17 | 7 | 152% |
| | | B 001 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 84 | 15 | 1 | 168% |
| | 002 | B 002 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 70 | 27 | 3 | 140% |
| | | B 002 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 80 | 17 | 3 | 160% |
| | 003 | B 003 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 66 | 28 | 6 | 132% |
| | | B 003 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 84 | 15 | 1 | 168% |
| | 004 | B 004 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 70 | 25 | 5 | 140% |
| | | B 004 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 84 | 14 | 2 | 168% |
| | 005 | B 005 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 69 | 27 | 4 | 138% |
| | | B 005 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 74 | 26 | 0 | 148% |
| **HDSP-Facility B Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **757** | **211** | **32** | **151%** |
| HDSP-Facility C | 001 | C 001 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 21 | 43 | 0 | 66% |
| | | C 001 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 19 | 44 | 1 | 59% |
| | 002 | C 002 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 0 | 62 | 0 | 0% |
| | | C 002 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 0 | 60 | 0 | 0% |
| | 003 | C 003 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 53 | 7 | 2 | 166% |
| | | C 003 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 51 | 13 | 0 | 159% |
| | 004 | C 004 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 45 | 18 | 1 | 141% |
| | | C 004 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 42 | 20 | 2 | 131% |
| | 005 | C 005 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 50 | 12 | 2 | 156% |
| | | C 005 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 47 | 17 | 0 | 147% |
| | 006 | C 006 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 45 | 17 | 2 | 141% |
| | | C 006 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 43 | 20 | 1 | 134% |
| | 007 | C 007 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 41 | 14 | 2 | 128% |
| | | C 007 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 42 | 18 | 2 | 131% |
| | 008 | C 008 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 41 | 19 | 4 | 128% |
| | | C 008 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 41 | 23 | 0 | 128% |
| **HDSP-Facility C Total** | | | | **512** | **512** | **0** | **1024** | | | **768** | **581** | **407** | **19** | **113%** |
| HDSP-Facility D | 001 | D 001 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | EOP | 48 | 37 | 19 | 8 | 116% |
| | | D 001 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | EOP | 48 | 34 | 16 | 14 | 106% |
| | 002 | D 002 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | EOP | 48 | 38 | 13 | 13 | 119% |
| | | D 002 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | EOP | 48 | 37 | 17 | 10 | 116% |
| | 003 | D 003 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 0 | 64 | 0 | 0% |
| | | D 003 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 0 | 64 | 0 | 0% |
| | 004 | D 004 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 0 | 63 | 0 | 0% |
| | | D 004 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 0 | 60 | 0 | 0% |
| | 005 | D 005 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 51 | 11 | 2 | 159% |
| | | D 005 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 49 | 14 | 1 | 153% |
| | 006 | D 006 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 43 | 15 | 2 | 134% |
| | | D 006 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 40 | 18 | 5 | 125% |
| | 007 | D 007 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 49 | 14 | 1 | 153% |
| | | D 007 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 50 | 13 | 0 | 156% |
| | 008 | D 008 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 30 | 31 | 3 | 94% |
| | | D 008 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 35 | 26 | 0 | 109% |
| **HDSP-Facility D Total** | | | | **512** | **512** | **0** | **1024** | | | **768** | **493** | **458** | **59** | **96%** |
| HDSP-MSF | 001 | M 001 1 | Dorm | 100 | 100 | 0 | 200 | I | WC | 150 | 112 | 88 | 0 | 112% |
| | 002 | M 002 1 | Dorm | 100 | 100 | 0 | 200 | I | WC | 150 | 116 | 84 | 0 | 116% |
| | FIRE HOUSE | M FIR 1 | Dorm | 13 | 4 | 0 | 17 | I | FH | 13 | 12 | 5 | 0 | 92% |
| **HDSP-MSF Total** | | | | **213** | **204** | **0** | **417** | | | **313** | **240** | **177** | **0** | **113%** |
| HDSP-RHU-CCCMS | 001 | Z 001 1 | Cell | 100 | 100 | 0 | 200 | NA | RHC | 150 | 101 | 37 | 62 | 101% |
| **HDSP-RHU-CCCMS Total** | | | | **100** | **100** | **0** | **200** | | | **150** | **101** | **37** | **62** | **101%** |
| **Grand Total** | | | | **2337** | **2328** | **31** | **4696** | | | **3499** | **2560** | **1882** | **192** | **110%** |

**ISP** Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ISP-Central Service | INF | S INF 1 | Cell | 0 | 0 | 14 | 14 | NA | OHU | 0 | 11 | 3 | 0 | |
| **ISP-Central Service Total** | | | | **0** | **0** | **14** | **14** | | | **0** | **11** | **3** | **0** | |
| ISP-Facility A | 001 | A 001 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 75 | 24 | 1 | 150% |
| | | A 001 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 92 | 8 | 0 | 184% |
| | 002 | A 002 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 84 | 16 | 0 | 168% |
| | | A 002 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 90 | 10 | 0 | 180% |
| | 003 | A 003 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 88 | 10 | 2 | 176% |
| | | A 003 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 94 | 6 | 0 | 188% |
| | 004 | A 004 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 76 | 24 | 0 | 152% |
| | | A 004 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 95 | 5 | 0 | 190% |
| | 005 | A 005 1 | 270 Cell | 50 | 50 | 0 | 100 | NA | RHG | 75 | 29 | 64 | 7 | 58% |
| | | A 005 2 | 270 Cell | 50 | 50 | 0 | 100 | NA | RHG | 75 | 32 | 65 | 3 | 64% |
| **ISP-Facility A Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **755** | **232** | **13** | **151%** |
| ISP-Facility B | 001 | B 001 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 95 | 3 | 1 | 190% |
| | | B 001 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 88 | 12 | 0 | 176% |
| | 002 | B 002 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 91 | 5 | 3 | 182% |
| | | B 002 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 90 | 9 | 1 | 180% |
| | 003 | B 003 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 85 | 15 | 0 | 170% |
| | | B 003 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 97 | 3 | 0 | 194% |
| | 004 | B 004 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 79 | 17 | 3 | 158% |
| | | B 004 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 95 | 4 | 0 | 190% |
| | 005 | B 005 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 72 | 28 | 0 | 144% |
| | | B 005 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 67 | 29 | 4 | 134% |
| **ISP-Facility B Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **859** | **125** | **12** | **172%** |
| ISP-Facility C | 001 | C 001 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 88 | 6 | 6 | 176% |
| | | C 001 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 84 | 10 | 6 | 168% |
| | 002 | C 002 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 93 | 7 | 0 | 186% |
| | | C 002 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 95 | 5 | 0 | 190% |
| | 003 | C 003 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 98 | 2 | 0 | 196% |
| | | C 003 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 90 | 10 | 0 | 180% |
| | 004 | C 004 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 96 | 4 | 0 | 192% |
| | | C 004 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 91 | 7 | 1 | 182% |
| | 005 | C 005 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 93 | 6 | 1 | 186% |
| | | C 005 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 70 | 30 | 0 | 140% |
| **ISP-Facility C Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **898** | **87** | **14** | **180%** |
| ISP-Facility D | 001 | D 001 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 70 | 30 | 0 | 140% |
| | | D 001 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 78 | 22 | 0 | 156% |
| | 002 | D 002 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 71 | 28 | 1 | 142% |
| | | D 002 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 75 | 25 | 0 | 150% |
| | 003 | D 003 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 73 | 26 | 1 | 146% |
| | | D 003 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 71 | 28 | 1 | 142% |
| | 004 | D 004 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 50 | 48 | 2 | 100% |
| | | D 004 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 68 | 32 | 0 | 136% |
| | 005 | D 005 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 0 | 100 | 0 | 0% |
| | | D 005 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 0 | 100 | 0 | 0% |
| **ISP-Facility D Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **556** | **439** | **5** | **111%** |
| ISP-MSF | 001 | M 001 1 | Dorm | 100 | 100 | 0 | 200 | I | WC | 150 | 46 | 153 | 0 | 46% |
| | 002 | M 002 1 | Dorm | 100 | 100 | 0 | 200 | I | WC | 150 | 46 | 154 | 0 | 46% |
| **ISP-MSF Total** | | | | **200** | **200** | **0** | **400** | | | **300** | **92** | **307** | **0** | **46%** |
| Grand Total | | | | **2200** | **2200** | **14** | **4414** | | | **3300** | **3171** | **1193** | **44** | **144%** |

**KVSP** Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| KVSP-Central Service | INF | S INF 1 | Cell | 0 | 0 | 10 | 10 | NA | CTC | 0 | 10 | 0 | 0 | |
| | | | | 0 | 0 | 12 | 12 | | MCB | 0 | 10 | 2 | 0 | |
| **KVSP-Central Service Total** | | | | **0** | **0** | **22** | **22** | | | **0** | **20** | **2** | **0** | |
| KVSP-Facility A | 001 | A 001 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 50 | 9 | 5 | 156% |
| | | A 001 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 55 | 7 | 2 | 172% |
| | 002 | A 002 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 60 | 3 | 1 | 188% |
| | | A 002 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 55 | 8 | 1 | 172% |
| | 003 | A 003 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 58 | 5 | 1 | 181% |
| | | A 003 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 61 | 3 | 0 | 191% |
| | 004 | A 004 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 52 | 10 | 2 | 163% |
| | | A 004 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 51 | 8 | 5 | 159% |
| | 005 | A 005 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 48 | 11 | 5 | 150% |
| | | A 005 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 54 | 8 | 2 | 169% |
| | 006 | A 006 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 56 | 4 | 4 | 175% |
| | | A 006 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 57 | 2 | 5 | 178% |
| | 007 | A 007 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 57 | 5 | 2 | 178% |
| | | A 007 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 55 | 8 | 1 | 172% |
| **KVSP-Facility A Total** | | | | **448** | **448** | **0** | **896** | | | **672** | **769** | **91** | **36** | **172%** |
| KVSP-Facility B | 001 | B 001 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 42 | 17 | 5 | 131% |
| | | B 001 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 44 | 14 | 6 | 138% |
| | 002 | B 002 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 56 | 5 | 3 | 175% |
| | | B 002 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 51 | 10 | 3 | 159% |
| | 003 | B 003 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 51 | 11 | 2 | 159% |
| | | B 003 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 47 | 17 | 0 | 147% |
| | 004 | B 004 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 57 | 4 | 3 | 178% |
| | | B 004 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 61 | 1 | 2 | 191% |
| | 005 | B 005 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 52 | 9 | 3 | 163% |
| | | B 005 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 53 | 11 | 0 | 166% |
| | 006 | B 006 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 54 | 9 | 1 | 169% |
| | | B 006 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 54 | 10 | 0 | 169% |
| | 007 | B 007 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 53 | 8 | 2 | 166% |
| | | B 007 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 48 | 10 | 6 | 150% |
| | 008 | B 008 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 56 | 6 | 2 | 175% |
| | | B 008 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 57 | 5 | 2 | 178% |
| **KVSP-Facility B Total** | | | | **512** | **512** | **0** | **1024** | | | **768** | **836** | **147** | **40** | **163%** |
| KVSP-Facility C | 001 | C 001 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 52 | 7 | 5 | 163% |
| | | C 001 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 50 | 6 | 8 | 156% |
| | 002 | C 002 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 48 | 11 | 4 | 150% |
| | | C 002 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 50 | 7 | 7 | 156% |
| | 003 | C 003 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 44 | 14 | 6 | 138% |
| | | C 003 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 45 | 13 | 6 | 141% |
| | 004 | C 004 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 41 | 15 | 7 | 128% |
| | | C 004 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 47 | 9 | 8 | 147% |
| | 005 | C 005 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 44 | 11 | 9 | 138% |
| | | C 005 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 47 | 14 | 3 | 147% |
| | 006 | C 006 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | EOP | 48 | 37 | 23 | 4 | 116% |
| | | C 006 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | EOP | 48 | 36 | 16 | 12 | 113% |
| | 007 | C 007 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | EOP | 48 | 37 | 17 | 10 | 116% |
| | | C 007 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | EOP | 48 | 36 | 19 | 9 | 113% |
| | 008 | C 008 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | EOP | 48 | 39 | 17 | 8 | 122% |
| | | C 008 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | EOP | 48 | 37 | 16 | 10 | 116% |
| **KVSP-Facility C Total** | | | | **512** | **512** | **0** | **1024** | | | **768** | **690** | **215** | **116** | **135%** |
| KVSP-Facility D | 001 | D 001 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 18 | 44 | 0 | 56% |
| | | D 001 2 | 180 Cell | 33 | 31 | 0 | 64 | IV | SNY | 50 | 30 | 32 | 0 | 91% |
| | 002 | D 002 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 54 | 4 | 6 | 169% |
| | | D 002 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 53 | 6 | 5 | 166% |
| | 003 | D 003 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 48 | 9 | 6 | 150% |
| | | D 003 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 51 | 9 | 4 | 159% |
| | 004 | D 004 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 46 | 6 | 12 | 144% |
| | | D 004 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 49 | 9 | 5 | 153% |
| | 005 | D 005 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 47 | 13 | 4 | 147% |
| | | D 005 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 49 | 8 | 7 | 153% |
| | 006 | D 006 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 38 | 19 | 7 | 119% |
| | | D 006 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 40 | 16 | 8 | 125% |
| | 007 | D 007 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 51 | 8 | 5 | 159% |
| | | D 007 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 52 | 9 | 3 | 163% |
| | 008 | D 008 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 42 | 13 | 9 | 131% |
| | | D 008 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 44 | 15 | 5 | 138% |
| **KVSP-Facility D Total** | | | | **513** | **511** | **0** | **1024** | | | **770** | **712** | **220** | **86** | **139%** |
| KVSP-Facility Z01 - RHU-CCCMS | 001 | Z01001A1 | Cell | 12 | 12 | 0 | 24 | NA | RHC | 18 | 11 | 11 | 2 | 92% |
| | | Z01001B1 | Cell | 12 | 12 | 0 | 24 | NA | RHC | 18 | 11 | 11 | 2 | 92% |

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| KVSP-Facility Z01 - RHU-CCCMS | 001 | Z01001C1 | Cell | 12 | 12 | 0 | 24 | NA | RHC | 18 | 13 | 7 | 3 | 108% |
| | | Z01001D1 | Cell | 12 | 12 | 0 | 24 | NA | RHC | 18 | 12 | 6 | 6 | 100% |
| | | Z01001E1 | Cell | 12 | 12 | 0 | 24 | NA | RHC | 18 | 10 | 11 | 3 | 83% |
| | | Z01001F1 | Cell | 14 | 14 | 0 | 28 | NA | RHC | 21 | 14 | 9 | 5 | 100% |
| | | Z01001G1 | Cell | 14 | 14 | 0 | 28 | NA | RHC | 21 | 13 | 10 | 5 | 93% |
| | | Z01001H1 | Cell | 12 | 12 | 0 | 24 | NA | RHC | 18 | 9 | 14 | 1 | 75% |
| **KVSP-Facility Z01 - RHU-CCCMS Total** | | | | **100** | **100** | **0** | **200** | | | **150** | **93** | **79** | **27** | **93%** |
| KVSP-Facility Z02 RHU-GP | 001 | Z02001A1 | Cell | 12 | 12 | 0 | 24 | NA | RHG | 18 | 12 | 10 | 2 | 100% |
| | | Z02001B1 | Cell | 12 | 12 | 0 | 24 | NA | RHG | 18 | 12 | 9 | 3 | 100% |
| | | Z02001C1 | Cell | 12 | 12 | 0 | 24 | NA | RHG | 18 | 8 | 13 | 3 | 67% |
| | | Z02001D1 | Cell | 12 | 12 | 0 | 24 | NA | RHG | 18 | 7 | 12 | 2 | 58% |
| | | Z02001E1 | Cell | 12 | 12 | 0 | 24 | NA | RHG | 18 | 8 | 12 | 4 | 67% |
| | | Z02001F1 | Cell | 14 | 14 | 0 | 28 | NA | RHG | 21 | 10 | 14 | 4 | 71% |
| | | Z02001G1 | Cell | 14 | 14 | 0 | 28 | NA | RHG | 21 | 13 | 9 | 6 | 93% |
| | | Z02001H1 | Cell | 12 | 12 | 0 | 24 | NA | RHG | 18 | 5 | 16 | 3 | 42% |
| **KVSP-Facility Z02 RHU-GP Total** | | | | **100** | **100** | **0** | **200** | | | **150** | **75** | **95** | **27** | **75%** |
| KVSP-MSF | 001 | M 001 1 | Dorm | 100 | 100 | 0 | 200 | I | WC | 150 | 127 | 73 | 0 | 127% |
| **KVSP-MSF Total** | | | | **100** | **100** | **0** | **200** | | | **150** | **127** | **73** | **0** | **127%** |
| **Grand Total** | | | | **2285** | **2283** | **22** | **4590** | | | **3428** | **3322** | **922** | **332** | **145%** |

**LAC**  Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LAC-Central Service | INF | S INF 1 | Cell | 0 | 0 | 4 | 4 | NA | CTC | 0 | 4 | 0 | 0 | |
| | | | | 0 | 0 | 12 | 12 | | MCB | 0 | 10 | 1 | 0 | |
| **LAC-Central Service Total** | | | | **0** | **0** | **16** | **16** | | | **0** | **14** | **1** | **0** | |
| LAC-Facility A | 001 | A 001 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 66 | 25 | 9 | 132% |
| | | A 001 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 82 | 16 | 2 | 164% |
| | 002 | A 002 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 71 | 25 | 4 | 142% |
| | | A 002 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 74 | 26 | 0 | 148% |
| | 003 | A 003 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 66 | 32 | 2 | 132% |
| | | A 003 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 72 | 27 | 1 | 144% |
| | 004 | A 004 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 57 | 40 | 3 | 114% |
| | | A 004 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 71 | 25 | 1 | 142% |
| | 005 | A 005 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 71 | 26 | 3 | 142% |
| | | A 005 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 75 | 25 | 0 | 150% |
| **LAC-Facility A Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **705** | **267** | **25** | **141%** |
| LAC-Facility B | 001 | B 001 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 81 | 13 | 6 | 162% |
| | | B 001 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 86 | 12 | 2 | 172% |
| | 002 | B 002 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 81 | 8 | 11 | 162% |
| | | B 002 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 91 | 5 | 4 | 182% |
| | 003 | B 003 1 | 270 Cell | 51 | 49 | 0 | 100 | IV | GP | 77 | 84 | 9 | 6 | 165% |
| | | B 003 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 94 | 4 | 2 | 188% |
| | 004 | B 004 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 84 | 8 | 8 | 168% |
| | | B 004 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 90 | 8 | 2 | 180% |
| | 005 | B 005 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 91 | 6 | 3 | 182% |
| | | B 005 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 93 | 5 | 1 | 186% |
| **LAC-Facility B Total** | | | | **501** | **499** | **0** | **1000** | | | **752** | **875** | **78** | **45** | **175%** |
| LAC-Facility C | 001 | C 001 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 66 | 18 | 15 | 132% |
| | | C 001 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 83 | 8 | 9 | 166% |
| | 002 | C 002 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 78 | 10 | 12 | 156% |
| | | C 002 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 78 | 15 | 5 | 156% |
| | 003 | C 003 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 82 | 11 | 7 | 164% |
| | | C 003 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 84 | 6 | 9 | 168% |
| | 004 | C 004 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 70 | 22 | 8 | 140% |
| | | C 004 2 | 270 Cell | 51 | 49 | 0 | 100 | IV | SNY | 77 | 73 | 19 | 7 | 143% |
| | 005 | C 005 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 41 | 42 | 11 | 82% |
| | | C 005 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 34 | 55 | 9 | 68% |
| **LAC-Facility C Total** | | | | **501** | **499** | **0** | **1000** | | | **752** | **689** | **206** | **92** | **138%** |
| LAC-Facility D | 001 | D 001 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | EOP | 75 | 73 | 12 | 12 | 146% |
| | | D 001 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | EOP | 75 | 68 | 6 | 24 | 136% |
| | 002 | D 002 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | EOP | 75 | 76 | 10 | 12 | 152% |
| | | D 002 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | EOP | 75 | 78 | 6 | 16 | 156% |
| | 003 | D 003 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | EOP | 75 | 75 | 8 | 11 | 150% |
| | | D 003 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | EOP | 75 | 78 | 7 | 9 | 156% |
| | 004 | D 004 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | EOP | 75 | 72 | 11 | 11 | 144% |
| | | D 004 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | EOP | 75 | 71 | 9 | 12 | 142% |
| | 005 | D 005 1 | 270 Cell | 50 | 50 | 0 | 100 | NA | ASU | 63 | 50 | 39 | 11 | 100% |
| | | D 005 2 | 270 Cell | 50 | 50 | 0 | 100 | NA | ASU | 63 | 53 | 41 | 5 | 106% |
| **LAC-Facility D Total** | | | | **500** | **500** | **0** | **1000** | | | **725** | **694** | **149** | **123** | **139%** |
| LAC-MSF | 001 | M 001 1 | Dorm | 100 | 100 | 0 | 200 | I | WC | 150 | 114 | 86 | 0 | 114% |
| **LAC-MSF Total** | | | | **100** | **100** | **0** | **200** | | | **150** | **114** | **86** | **0** | **114%** |
| LAC-RHU-CCCMS | 001 | Z 001 1 | Cell | 100 | 100 | 0 | 200 | NA | RHC | 150 | 117 | 69 | 13 | 117% |
| **LAC-RHU-CCCMS Total** | | | | **100** | **100** | **0** | **200** | | | **150** | **117** | **69** | **13** | **117%** |
| **Grand Total** | | | | **2202** | **2198** | **16** | **4416** | | | **3278** | **3208** | **856** | **298** | **146%** |

**MCSP** Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MCSP-Central Service | INF | S INF 1 | Cell | 0 | 0 | 2 | 2 | NA | CTC | 0 | 2 | 0 | 0 | |
| | | | | 0 | 0 | 8 | 8 | | MCB | 0 | 8 | 0 | 0 | |
| **MCSP-Central Service Total** | | | | **0** | **0** | **10** | **10** | | | **0** | **10** | **0** | **0** | |
| MCSP-Facility A | 001 | A 001 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 84 | 6 | 10 | 168% |
| | | A 001 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 87 | 2 | 11 | 174% |
| | 002 | A 002 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 48 | 42 | 7 | 96% |
| | | A 002 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 33 | 66 | 1 | 66% |
| | 003 | A 003 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 89 | 6 | 4 | 178% |
| | | A 003 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 85 | 4 | 11 | 170% |
| | 004 | A 004 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 87 | 6 | 7 | 174% |
| | | A 004 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 88 | 3 | 9 | 176% |
| | 005 | A 005 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | EOP | 75 | 71 | 7 | 22 | 142% |
| | | A 005 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | EOP | 75 | 80 | 5 | 15 | 160% |
| **MCSP-Facility A Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **752** | **147** | **97** | **150%** |
| MCSP-Facility B | 006 | B 006 1 | 270 Cell | 50 | 50 | 0 | 100 | III | EOP | 75 | 89 | 5 | 6 | 178% |
| | | B 006 2 | 270 Cell | 50 | 50 | 0 | 100 | III | EOP | 75 | 90 | 2 | 8 | 180% |
| | 007 | B 007 1 | 270 Cell | 50 | 50 | 0 | 100 | III | EOP | 75 | 83 | 12 | 5 | 166% |
| | | B 007 2 | 270 Cell | 50 | 50 | 0 | 100 | III | EOP | 75 | 75 | 16 | 9 | 150% |
| | 008 | B 008 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 59 | 39 | 1 | 118% |
| | | B 008 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 61 | 35 | 3 | 122% |
| | 009 | B 009 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 78 | 18 | 4 | 156% |
| | | B 009 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 79 | 17 | 4 | 158% |
| | 010 | B 010 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 68 | 28 | 4 | 136% |
| | | B 010 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 66 | 28 | 6 | 132% |
| **MCSP-Facility B Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **748** | **200** | **50** | **150%** |
| MCSP-Facility C | 011 | C 011 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 89 | 6 | 5 | 178% |
| | | C 011 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 79 | 8 | 13 | 158% |
| | 012 | C 012 1 | 270 Cell | 50 | 50 | 0 | 100 | NA | ASU | 63 | 52 | 35 | 13 | 104% |
| | | C 012 2 | 270 Cell | 50 | 50 | 0 | 100 | NA | ASU | 63 | 55 | 37 | 8 | 110% |
| | 013 | C 013 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 72 | 22 | 6 | 144% |
| | | C 013 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 86 | 9 | 5 | 172% |
| | 014 | C 014 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 85 | 9 | 6 | 170% |
| | | C 014 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 87 | 9 | 4 | 174% |
| | 015 | C 015 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 84 | 13 | 3 | 168% |
| | | C 015 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 88 | 9 | 3 | 176% |
| **MCSP-Facility C Total** | | | | **500** | **500** | **0** | **1000** | | | **725** | **777** | **157** | **66** | **155%** |
| MCSP-Facility D | 016A | D 016A1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 28 | 1 | 0 | 93% |
| | | D 016A2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 35 | 1 | 0 | 97% |
| | 016B | D 016B1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 29 | 1 | 0 | 97% |
| | | D 016B2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 34 | 2 | 0 | 94% |
| | 016C | D 016C1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 30 | 0 | 0 | 100% |
| | | D 016C2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 36 | 0 | 0 | 100% |
| | 016D | D 016D1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 30 | 0 | 0 | 100% |
| | | D 016D2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 34 | 2 | 0 | 94% |
| | 017A | D 017A1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 29 | 1 | 0 | 97% |
| | | D 017A2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 36 | 0 | 0 | 100% |
| | 017B | D 017B1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 30 | 0 | 0 | 100% |
| | | D 017B2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 34 | 2 | 0 | 94% |
| | 017C | D 017C1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 29 | 1 | 0 | 97% |
| | | D 017C2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 35 | 1 | 0 | 97% |
| | 017D | D 017D1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 28 | 2 | 0 | 93% |
| | | D 017D2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 34 | 2 | 0 | 94% |
| | 018A | D 018A1 | Dorm | 30 | 0 | 0 | 30 | II | EOP | 30 | 30 | 0 | 0 | 100% |
| | | D 018A2 | Dorm | 36 | 0 | 0 | 36 | II | EOP | 36 | 36 | 0 | 0 | 100% |
| | 018B | D 018B1 | Dorm | 30 | 0 | 0 | 30 | II | EOP | 30 | 30 | 0 | 0 | 100% |
| | | D 018B2 | Dorm | 36 | 0 | 0 | 36 | II | EOP | 36 | 36 | 0 | 0 | 100% |
| | 018C | D 018C1 | Dorm | 30 | 0 | 0 | 30 | II | EOP | 30 | 30 | 0 | 0 | 100% |
| | | D 018C2 | Dorm | 36 | 0 | 0 | 36 | II | EOP | 36 | 36 | 0 | 0 | 100% |
| | 018D | D 018D1 | Dorm | 30 | 0 | 0 | 30 | II | EOP | 30 | 30 | 0 | 0 | 100% |
| | | D 018D2 | Dorm | 36 | 0 | 0 | 36 | II | EOP | 36 | 36 | 0 | 0 | 100% |
| **MCSP-Facility D Total** | | | | **792** | **0** | **0** | **792** | | | **792** | **775** | **16** | **0** | **98%** |
| MCSP-Facility E | 019A | E 019A1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 29 | 1 | 0 | 97% |
| | | E 019A2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 36 | 0 | 0 | 100% |
| | 019B | E 019B1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 30 | 0 | 0 | 100% |
| | | E 019B2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 36 | 0 | 0 | 100% |
| | 019C | E 019C1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 30 | 0 | 0 | 100% |
| | | E 019C2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 36 | 0 | 0 | 100% |
| | 019D | E 019D1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 30 | 0 | 0 | 100% |
| | | E 019D2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 35 | 1 | 0 | 97% |
| | 020A | E 020A1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 30 | 0 | 0 | 100% |
| | | E 020A2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 36 | 0 | 0 | 100% |

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MCSP-Facility E | 020B | E 020B1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 29 | 1 | 0 | 97% |
| | | E 020B2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 35 | 1 | 0 | 97% |
| | 020C | E 020C1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 30 | 0 | 0 | 100% |
| | | E 020C2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 36 | 0 | 0 | 100% |
| | 020D | E 020D1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 30 | 0 | 0 | 100% |
| | | E 020D2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 35 | 0 | 0 | 97% |
| | 021A | E 021A1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 28 | 2 | 0 | 93% |
| | | E 021A2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 36 | 0 | 0 | 100% |
| | 021B | E 021B1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 29 | 0 | 0 | 97% |
| | | E 021B2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 36 | 0 | 0 | 100% |
| | 021C | E 021C1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 29 | 0 | 0 | 97% |
| | | E 021C2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 34 | 1 | 0 | 94% |
| | 021D | E 021D1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 29 | 1 | 0 | 97% |
| | | E 021D2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 32 | 3 | 0 | 89% |
| **MCSP-Facility E Total** | | | | **792** | **0** | **0** | **792** | | | **792** | **776** | **11** | **0** | **98%** |
| MCSP-MSF | 001 | M 001A1 | Dorm | 12 | 12 | 0 | 24 | I | WC | 18 | 4 | 20 | 0 | 33% |
| | | M 001B1 | Dorm | 12 | 12 | 0 | 24 | I | WC | 18 | 10 | 14 | 0 | 83% |
| | | M 001C1 | Dorm | 12 | 12 | 0 | 24 | I | WC | 18 | 8 | 16 | 0 | 67% |
| | | M 001D1 | Dorm | 12 | 12 | 0 | 24 | I | WC | 18 | 4 | 20 | 0 | 33% |
| | | M 001E1 | Dorm | 12 | 12 | 0 | 24 | I | WC | 18 | 6 | 18 | 0 | 50% |
| | | M 001F1 | Dorm | 12 | 12 | 0 | 24 | I | WC | 18 | 8 | 16 | 0 | 67% |
| | | M 001G1 | Dorm | 12 | 12 | 0 | 24 | I | WC | 18 | 8 | 16 | 0 | 67% |
| | | M 001H1 | Dorm | 12 | 12 | 0 | 24 | I | WC | 18 | 5 | 19 | 0 | 42% |
| | 002 | M 002A1 | Dorm | 12 | 12 | 0 | 24 | I | WC | 18 | 11 | 13 | 0 | 92% |
| | | M 002B1 | Dorm | 12 | 12 | 0 | 24 | I | WC | 18 | 0 | 24 | 0 | 0% |
| | | M 002C1 | Dorm | 12 | 12 | 0 | 24 | I | WC | 18 | 0 | 24 | 0 | 0% |
| | | M 002D1 | Dorm | 12 | 12 | 0 | 24 | I | WC | 18 | 11 | 13 | 0 | 92% |
| | | M 002E1 | Dorm | 12 | 12 | 0 | 24 | I | WC | 18 | 11 | 13 | 0 | 92% |
| | | M 002F1 | Dorm | 12 | 12 | 0 | 24 | I | WC | 18 | 12 | 12 | 0 | 100% |
| | | M 002G1 | Dorm | 12 | 12 | 0 | 24 | I | WC | 18 | 11 | 13 | 0 | 92% |
| | | M 002H1 | Dorm | 12 | 12 | 0 | 24 | I | WC | 18 | 11 | 13 | 0 | 92% |
| | FIR | M FIR 1 | Dorm | 8 | 0 | 0 | 8 | I | FH | 8 | 7 | 1 | 0 | 88% |
| **MCSP-MSF Total** | | | | **200** | **192** | **0** | **392** | | | **296** | **127** | **265** | **0** | **64%** |
| **Grand Total** | | | | **3284** | **1692** | **10** | **4986** | | | **4105** | **3965** | **796** | **213** | **121%** |

**NKSP**  Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NKSP-Central Service | INF | S INF 1 | Cell | 0 | 0 | 6 | 6 | NA | CTC | 0 | 6 | 0 | 0 | |
| | | | | 0 | 0 | 10 | 10 | | MCB | 0 | 7 | 1 | 0 | |
| **NKSP-Central Service Total** | | | | **0** | **0** | **16** | **16** | | | **0** | **13** | **1** | **0** | |
| NKSP-Facility A | 001 | A 001 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 85 | 10 | 4 | 170% |
| | | A 001 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 93 | 7 | 0 | 186% |
| | 002 | A 002 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 92 | 8 | 0 | 184% |
| | | A 002 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 89 | 10 | 1 | 178% |
| | 003 | A 003 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 91 | 8 | 1 | 182% |
| | | A 003 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 87 | 13 | 0 | 174% |
| | 004 | A 004 1 | 270 Cell | 50 | 45 | 0 | 95 | III | GP | 75 | 32 | 61 | 2 | 64% |
| | | A 004 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 27 | 72 | 1 | 54% |
| | 005 | A 005 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 88 | 10 | 2 | 176% |
| | | A 005 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 89 | 9 | 1 | 178% |
| **NKSP-Facility A Total** | | | | **500** | **495** | **0** | **995** | | | **750** | **773** | **208** | **12** | **155%** |
| NKSP-Facility B | 001 | B 001 1 | Cell | 47 | 45 | 0 | 92 | NA | RC | 71 | 54 | 35 | 1 | 115% |
| | | B 001 2 | Cell | 54 | 54 | 0 | 108 | NA | RC | 81 | 59 | 47 | 2 | 109% |
| | 002 | B 002 1 | Cell | 46 | 46 | 0 | 92 | NA | RC | 69 | 56 | 33 | 1 | 122% |
| | | B 002 2 | Cell | 54 | 54 | 0 | 108 | NA | RC | 81 | 58 | 50 | 0 | 107% |
| | 003 | B 003 1 | Cell | 48 | 44 | 0 | 92 | NA | RC | 72 | 54 | 33 | 3 | 113% |
| | | B 003 2 | Cell | 56 | 52 | 0 | 108 | NA | RC | 84 | 58 | 46 | 0 | 104% |
| | 004 | B 004 1 | Cell | 46 | 48 | 0 | 94 | NA | RC | 69 | 14 | 80 | 0 | 30% |
| | | B 004 2 | Cell | 54 | 54 | 0 | 108 | NA | RC | 81 | 52 | 56 | 0 | 96% |
| | 005 | B 005 1 | Cell | 47 | 45 | 0 | 92 | NA | RC | 71 | 22 | 70 | 0 | 47% |
| | | B 005 2 | Cell | 56 | 52 | 0 | 108 | NA | RC | 84 | 38 | 68 | 0 | 68% |
| | 006 | B 006 1 | Cell | 46 | 46 | 0 | 92 | NA | RC | 69 | 0 | 92 | 0 | 0% |
| | | B 006 2 | Cell | 54 | 54 | 0 | 108 | NA | RC | 81 | 0 | 108 | 0 | 0% |
| **NKSP-Facility B Total** | | | | **608** | **594** | **0** | **1202** | | | **912** | **465** | **718** | **7** | **76%** |
| NKSP-Facility C | 001 | C 001 1 | Dorm | 80 | 79 | 0 | 159 | NA | RC | 120 | 144 | 14 | 0 | 180% |
| | | C 001 2 | Dorm | 66 | 66 | 0 | 132 | NA | RC | 99 | 128 | 4 | 0 | 194% |
| | 002 | C 002 1 | Dorm | 80 | 79 | 0 | 159 | NA | RC | 120 | 152 | 6 | 0 | 190% |
| | | C 002 2 | Dorm | 66 | 66 | 0 | 132 | NA | RC | 99 | 123 | 9 | 0 | 186% |
| | 003 | C 003 1 | Dorm | 80 | 79 | 0 | 159 | NA | RC | 120 | 125 | 34 | 0 | 156% |
| | | C 003 2 | Dorm | 66 | 66 | 0 | 132 | NA | RC | 99 | 114 | 18 | 0 | 173% |
| | 004 | C 004 1 | Dorm | 80 | 79 | 0 | 159 | NA | RC | 120 | 134 | 25 | 0 | 168% |
| | | C 004 2 | Dorm | 66 | 66 | 0 | 132 | NA | RC | 99 | 115 | 17 | 0 | 174% |
| | East | C E 1 | Dorm | 100 | 100 | 0 | 200 | NA | RC | 150 | 0 | 200 | 0 | 0% |
| | West | C W 1 | Dorm | 100 | 100 | 0 | 200 | NA | RC | 150 | 178 | 21 | 0 | 178% |
| **NKSP-Facility C Total** | | | | **784** | **780** | **0** | **1564** | | | **1176** | **1213** | **348** | **0** | **155%** |
| NKSP-Facility D | 001 | D 001 1 | Cell | 46 | 46 | 0 | 92 | NA | RC | 69 | 49 | 43 | 0 | 107% |
| | | D 001 2 | Cell | 54 | 54 | 0 | 108 | NA | RC | 81 | 57 | 49 | 0 | 106% |
| | 002 | D 002 1 | Cell | 47 | 45 | 0 | 92 | NA | RC | 71 | 65 | 25 | 2 | 138% |
| | | D 002 2 | Cell | 58 | 50 | 0 | 108 | NA | RC | 87 | 79 | 24 | 5 | 136% |
| | 003 | D 003 1 | Cell | 46 | 48 | 0 | 94 | NA | RC | 69 | 20 | 74 | 0 | 43% |
| | | D 003 2 | Cell | 54 | 54 | 0 | 108 | NA | RC | 81 | 24 | 82 | 0 | 44% |
| | 004 | D 004 1 | Cell | 46 | 46 | 0 | 92 | NA | RC | 69 | 61 | 29 | 2 | 133% |
| | | D 004 2 | Cell | 54 | 54 | 0 | 108 | NA | RC | 81 | 74 | 31 | 3 | 137% |
| | 005 | D 005 1 | Cell | 46 | 46 | 0 | 92 | NA | RC | 69 | 59 | 32 | 1 | 128% |
| | | D 005 2 | Cell | 54 | 54 | 0 | 108 | NA | RC | 81 | 77 | 28 | 3 | 143% |
| | 006 | D 006 1 | Cell | 46 | 46 | 0 | 92 | NA | RHG | 69 | 26 | 61 | 5 | 57% |
| | | D 006 2 | Cell | 54 | 54 | 0 | 108 | NA | RHG | 81 | 57 | 38 | 13 | 106% |
| **NKSP-Facility D Total** | | | | **605** | **597** | **0** | **1202** | | | **908** | **648** | **516** | **34** | **107%** |
| NKSP-MSF | 001 | M 001 1 | Dorm | 100 | 100 | 0 | 200 | I | WC | 150 | 59 | 141 | 0 | 59% |
| | 002 | M 002 1 | Dorm | 100 | 100 | 0 | 200 | I | WC | 150 | 65 | 135 | 0 | 65% |
| | FIR | M FIR 1 | Dorm | 10 | 0 | 0 | 10 | I | FH | 10 | 5 | 5 | 0 | 50% |
| **NKSP-MSF Total** | | | | **210** | **200** | **0** | **410** | | | **310** | **129** | **281** | **0** | **61%** |
| **Grand Total** | | | | **2707** | **2666** | **16** | **5389** | | | **4056** | **3241** | **2072** | **53** | **120%** |

**PBSP** Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PBSP-Central Service | INF | S INF 1 | Cell | 0 | 0 | 10 | 10 | NA | CTC | 0 | 2 | 7 | 0 | |
| | | | | 0 | 0 | 10 | 10 | | MCB | 0 | 9 | 0 | 0 | |
| **PBSP-Central Service Total** | | | | **0** | **0** | **20** | **20** | | | **0** | **11** | **7** | **0** | |
| PBSP-Facility A | 001 | A 001 1 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 0 | 64 | 0 | 0% |
| | | A 001 2 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 0 | 64 | 0 | 0% |
| | 002 | A 002 1 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 31 | 33 | 0 | 97% |
| | | A 002 2 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 27 | 37 | 0 | 84% |
| | 003 | A 003 1 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 48 | 16 | 0 | 150% |
| | | A 003 2 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 43 | 21 | 0 | 134% |
| | 004 | A 004 1 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 47 | 17 | 0 | 147% |
| | | A 004 2 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 47 | 17 | 0 | 147% |
| | 005 | A 005 1 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 45 | 19 | 0 | 141% |
| | | A 005 2 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 42 | 20 | 0 | 131% |
| | 006 | A 006 1 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 40 | 24 | 0 | 125% |
| | | A 006 2 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 36 | 28 | 0 | 113% |
| | 007 | A 007 1 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 49 | 15 | 0 | 153% |
| | | A 007 2 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 41 | 23 | 0 | 128% |
| | 008 | A 008 1 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 48 | 15 | 0 | 150% |
| | | A 008 2 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 39 | 25 | 0 | 122% |
| **PBSP-Facility A Total** | | | | **512** | **512** | **0** | **1024** | | | **768** | **583** | **438** | **0** | **114%** |
| PBSP-Facility B | 001 | B 001 1 | 180 Cell | 32 | 32 | 0 | 64 | NA | RGP | 48 | 28 | 31 | 5 | 88% |
| | | B 001 2 | 180 Cell | 32 | 32 | 0 | 64 | NA | RGP | 48 | 20 | 42 | 2 | 63% |
| | 002 | B 002 1 | 180 Cell | 32 | 10 | 0 | 42 | NA | RGP | 32 | 0 | 42 | 0 | 0% |
| | | B 002 2 | 180 Cell | 32 | 10 | 0 | 42 | NA | RGP | 32 | 0 | 42 | 0 | 0% |
| | 003 | B 003 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | EOP | 48 | 32 | 24 | 8 | 100% |
| | | B 003 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | EOP | 48 | 32 | 20 | 12 | 100% |
| | 004 | B 004 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 52 | 11 | 0 | 163% |
| | | B 004 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 59 | 4 | 1 | 184% |
| | 005 | B 005 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 51 | 7 | 4 | 159% |
| | | B 005 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 56 | 6 | 2 | 175% |
| | 006 | B 006 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 53 | 9 | 2 | 166% |
| | | B 006 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 54 | 6 | 4 | 169% |
| | 007 | B 007 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 57 | 6 | 1 | 178% |
| | | B 007 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 56 | 8 | 0 | 175% |
| | 008 | B 008 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 50 | 14 | 0 | 156% |
| | | B 008 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 48 | 11 | 4 | 150% |
| **PBSP-Facility B Total** | | | | **512** | **468** | **0** | **980** | | | **736** | **648** | **283** | **45** | **127%** |
| PBSP-Facility D | 001 | D 001 1 | Cell | 24 | 24 | 0 | 48 | II | PF | 36 | 23 | 24 | 1 | 96% |
| | | D 001 2 | Cell | 24 | 24 | 0 | 48 | II | PF | 36 | 23 | 25 | 0 | 96% |
| | 002 | D 002 1 | Cell | 24 | 24 | 0 | 48 | II | PF | 36 | 23 | 25 | 0 | 96% |
| | | D 002 2 | Cell | 24 | 24 | 0 | 48 | II | PF | 36 | 22 | 26 | 0 | 92% |
| | 003 | D 003 1 | Cell | 24 | 24 | 0 | 48 | II | PF | 36 | 17 | 31 | 0 | 71% |
| | | D 003 2 | Cell | 24 | 24 | 0 | 48 | II | PF | 36 | 16 | 32 | 0 | 67% |
| | 004 | D 004 1 | Cell | 24 | 0 | 0 | 24 | II | PF | 36 | 24 | 0 | 0 | 100% |
| | | D 004 2 | Cell | 24 | 0 | 0 | 24 | II | PF | 36 | 22 | 2 | 0 | 92% |
| | 005 | D 005 1 | Cell | 24 | 24 | 0 | 48 | II | PF | 36 | 24 | 24 | 0 | 100% |
| | | D 005 2 | Cell | 24 | 24 | 0 | 48 | II | PF | 36 | 22 | 26 | 0 | 92% |
| | 006 | D 006 1 | Cell | 24 | 0 | 0 | 24 | II | PF | 36 | 22 | 2 | 0 | 92% |
| | | D 006 2 | Cell | 24 | 0 | 0 | 24 | II | PF | 36 | 24 | 0 | 0 | 100% |
| | 007 | D 007 1 | Cell | 24 | 0 | 0 | 24 | II | PF | 36 | 24 | 0 | 0 | 100% |
| | | D 007 2 | Cell | 24 | 0 | 0 | 24 | II | PF | 36 | 24 | 0 | 0 | 100% |
| | 008 | D 008 1 | Cell | 24 | 24 | 0 | 48 | II | PF | 36 | 23 | 25 | 0 | 96% |
| | | D 008 2 | Cell | 24 | 24 | 0 | 48 | II | PF | 36 | 20 | 28 | 0 | 83% |
| | 009 | D 009 1 | Cell | 24 | 0 | 0 | 24 | II | PF | 36 | 23 | 1 | 0 | 96% |
| | | D 009 2 | Cell | 24 | 0 | 0 | 24 | II | PF | 36 | 24 | 0 | 0 | 100% |
| | 010 | D 010 1 | Cell | 24 | 0 | 0 | 24 | II | PF | 36 | 23 | 1 | 0 | 96% |
| | | D 010 2 | Cell | 24 | 0 | 0 | 24 | II | PF | 36 | 23 | 1 | 0 | 96% |
| **PBSP-Facility D Total** | | | | **480** | **240** | **0** | **720** | | | **720** | **446** | **273** | **1** | **93%** |
| PBSP-MSF | 001 | M 001 1 | Dorm | 48 | 48 | 0 | 96 | I | WC | 72 | 35 | 61 | 0 | 73% |
| | | M 001 2 | Dorm | 48 | 48 | 0 | 96 | I | WC | 72 | 32 | 64 | 0 | 67% |
| | 002 | M 002 1 | Dorm | 48 | 48 | 0 | 96 | I | WC | 72 | 33 | 63 | 0 | 69% |
| | | M 002 2 | Dorm | 48 | 48 | 0 | 96 | I | WC | 72 | 33 | 63 | 0 | 69% |
| | FIR | M FIR 1 | Dorm | 8 | 8 | 0 | 16 | I | FH | 8 | 5 | 11 | 0 | 63% |
| **PBSP-MSF Total** | | | | **200** | **200** | **0** | **400** | | | **296** | **138** | **262** | **0** | **69%** |
| PBSP-RHU-CCCMS | 001 | Z 001 1 | Cell | 100 | 100 | 0 | 200 | NA | RHC | 150 | 99 | 86 | 15 | 99% |
| **PBSP-RHU-CCCMS Total** | | | | **100** | **100** | **0** | **200** | | | **150** | **99** | **86** | **15** | **99%** |
| **Grand Total** | | | | **1804** | **1520** | **20** | **3344** | | | **2670** | **1925** | **1349** | **61** | **107%** |

**PVSP**  Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PVSP-Central Service | INF | S INF 1 | Cell | 0 | 0 | 9 | 9 | NA | CTC | 0 | 0 | 0 | 0 | |
| | | | | 0 | 0 | 6 | 6 | | MCB | 0 | 0 | 0 | 0 | |
| **PVSP-Central Service Total** | | | | **0** | **0** | **15** | **15** | | | **0** | **0** | **0** | **0** | |
| PVSP-Facility A | 001 | A 001 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 29 | 70 | 1 | 58% |
| | | A 001 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 41 | 59 | 0 | 82% |
| | 002 | A 002 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 59 | 41 | 0 | 118% |
| | | A 002 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 61 | 37 | 1 | 122% |
| | 003 | A 003 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 55 | 43 | 2 | 110% |
| | | A 003 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 61 | 39 | 0 | 122% |
| | 004 | A 004 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 50 | 50 | 0 | 100% |
| | | A 004 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 54 | 45 | 1 | 108% |
| | 005 | A 005 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 45 | 54 | 1 | 90% |
| | | A 005 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 57 | 43 | 0 | 114% |
| **PVSP-Facility A Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **512** | **481** | **6** | **102%** |
| PVSP-Facility B | 001 | B 001 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 81 | 19 | 0 | 162% |
| | | B 001 2 | 270 Cell | 51 | 49 | 0 | 100 | III | GP | 77 | 70 | 28 | 0 | 137% |
| | 002 | B 002 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 76 | 24 | 0 | 152% |
| | | B 002 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 71 | 28 | 1 | 142% |
| | 003 | B 003 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 76 | 22 | 0 | 152% |
| | | B 003 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 78 | 22 | 0 | 156% |
| | 004 | B 004 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 75 | 25 | 0 | 150% |
| | | B 004 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 69 | 27 | 0 | 138% |
| | 005 | B 005 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 60 | 38 | 0 | 120% |
| | | B 005 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 66 | 33 | 1 | 132% |
| **PVSP-Facility B Total** | | | | **501** | **499** | **0** | **1000** | | | **752** | **722** | **266** | **2** | **144%** |
| PVSP-Facility C | 001 | C 001 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 56 | 44 | 0 | 112% |
| | | C 001 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 78 | 22 | 0 | 156% |
| | 002 | C 002 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 80 | 20 | 0 | 160% |
| | | C 002 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 78 | 22 | 0 | 156% |
| | 003 | C 003 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 90 | 9 | 1 | 180% |
| | | C 003 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 77 | 23 | 0 | 154% |
| | 004 | C 004 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 72 | 28 | 0 | 144% |
| | | C 004 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 80 | 20 | 0 | 160% |
| | 005 | C 005 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 49 | 50 | 1 | 98% |
| | | C 005 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 52 | 47 | 0 | 104% |
| **PVSP-Facility C Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **712** | **285** | **2** | **142%** |
| PVSP-Facility D | 001 | D 001 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 0 | 100 | 0 | 0% |
| | | D 001 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 0 | 100 | 0 | 0% |
| | 002 | D 002 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 60 | 39 | 1 | 120% |
| | | D 002 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 64 | 33 | 3 | 128% |
| | 003 | D 003 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 0 | 98 | 0 | 0% |
| | | D 003 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 0 | 98 | 0 | 0% |
| | 004 | D 004 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 28 | 72 | 0 | 56% |
| | | D 004 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 32 | 68 | 0 | 64% |
| | 005 | D 005 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 62 | 36 | 2 | 124% |
| | | D 005 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 50 | 50 | 0 | 100% |
| **PVSP-Facility D Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **296** | **694** | **6** | **59%** |
| PVSP-MSF | 001 | M 001 1 | Dorm | 100 | 100 | 0 | 200 | I | WC | 150 | 70 | 130 | 0 | 70% |
| | 002 | M 002 1 | Dorm | 100 | 100 | 0 | 200 | I | WC | 150 | 68 | 132 | 0 | 68% |
| | FIR | M FIR 1 | Dorm | 8 | 0 | 0 | 8 | I | FH | 8 | 8 | 0 | 0 | 100% |
| **PVSP-MSF Total** | | | | **208** | **200** | **0** | **408** | | | **308** | **146** | **262** | **0** | **70%** |
| PVSP-RHU-CCCMS | 001 | Z 001 1 | Cell | 100 | 100 | 0 | 200 | NA | RHC | 150 | 78 | 109 | 11 | 78% |
| **PVSP-RHU-CCCMS Total** | | | | **100** | **100** | **0** | **200** | | | **150** | **78** | **109** | **11** | **78%** |
| **Grand Total** | | | | **2309** | **2299** | **15** | **4623** | | | **3460** | **2466** | **2097** | **27** | **107%** |

**RJD**  Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RJD-Central Service | INF | S INF 1 | Cell | 0 | 0 | 14 | 14 | NA | CTC | 0 | 13 | 1 | 0 | |
| | | | | 0 | 0 | 14 | 14 | | MCB | 0 | 13 | 1 | 0 | |
| **RJD-Central Service Total** | | | | **0** | **0** | **28** | **28** | | | **0** | **26** | **2** | **0** | |
| RJD-Facility A | 001 | A 001 1 | 270 Cell | 50 | 50 | 0 | 100 | III | EOP | 75 | 82 | 2 | 15 | 164% |
| | | A 001 2 | 270 Cell | 50 | 50 | 0 | 100 | III | EOP | 75 | 78 | 4 | 18 | 156% |
| | 002 | A 002 1 | 270 Cell | 50 | 50 | 0 | 100 | III | EOP | 75 | 81 | 3 | 15 | 162% |
| | | A 002 2 | 270 Cell | 50 | 50 | 0 | 100 | III | EOP | 75 | 85 | 2 | 13 | 170% |
| | 003 | A 003 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 59 | 31 | 7 | 118% |
| | | A 003 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 75 | 18 | 3 | 150% |
| | 004 | A 004 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 58 | 34 | 8 | 116% |
| | | A 004 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 73 | 21 | 6 | 146% |
| | 005 | A 005 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 55 | 31 | 10 | 110% |
| | | A 005 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 64 | 26 | 10 | 128% |
| **RJD-Facility A Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **710** | **172** | **105** | **142%** |
| RJD-Facility B | 006 | B 006 1 | 270 Cell | 50 | 50 | 0 | 100 | NA | ASU | 63 | 40 | 44 | 14 | 80% |
| | | B 006 2 | 270 Cell | 50 | 50 | 0 | 100 | NA | ASU | 63 | 39 | 46 | 13 | 78% |
| | 008 | B 008 1 | 270 Cell | 50 | 50 | 0 | 100 | NA | RHG | 75 | 26 | 63 | 11 | 52% |
| | | B 008 2 | 270 Cell | 50 | 50 | 0 | 100 | NA | RHG | 75 | 27 | 61 | 12 | 54% |
| | 009 | B 009 1 | 270 Cell | 50 | 0 | 0 | 50 | III | GP | 75 | 0 | 50 | 0 | 0% |
| | | B 009 2 | 270 Cell | 50 | 6 | 0 | 56 | III | GP | 75 | 0 | 44 | 0 | 0% |
| | 010 | B 010 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 68 | 25 | 6 | 136% |
| | | B 010 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 84 | 15 | 1 | 168% |
| **RJD-Facility B Total** | | | | **400** | **306** | **0** | **706** | | | **575** | **284** | **348** | **57** | **71%** |
| RJD-Facility C | 011 | C 011 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 62 | 29 | 9 | 124% |
| | | C 011 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 70 | 27 | 0 | 140% |
| | 012 | C 012 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 64 | 22 | 12 | 128% |
| | | C 012 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 75 | 17 | 7 | 150% |
| | 013 | C 013 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 68 | 20 | 12 | 136% |
| | | C 013 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 78 | 17 | 5 | 156% |
| | 014 | C 014 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | EOP | 75 | 78 | 8 | 14 | 156% |
| | | C 014 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | EOP | 75 | 76 | 13 | 10 | 152% |
| | 015 | C 015 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | EOP | 75 | 76 | 7 | 16 | 152% |
| | | C 015 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | EOP | 75 | 68 | 12 | 19 | 136% |
| **RJD-Facility C Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **715** | **172** | **104** | **143%** |
| RJD-Facility D | 016 | D 016 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 70 | 26 | 3 | 140% |
| | | D 016 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 91 | 4 | 4 | 182% |
| | 017 | D 017 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 77 | 23 | 0 | 154% |
| | | D 017 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 91 | 8 | 0 | 182% |
| | 018 | D 018 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 75 | 24 | 1 | 150% |
| | | D 018 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 88 | 9 | 3 | 176% |
| | 019 | D 019 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 70 | 29 | 0 | 140% |
| | | D 019 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 93 | 6 | 1 | 186% |
| | 020 | D 020 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 70 | 30 | 0 | 140% |
| | | D 020 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 93 | 4 | 2 | 186% |
| **RJD-Facility D Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **818** | **163** | **14** | **164%** |
| RJD-Facility E | 023A | E 023A1 | Dorm | 30 | 0 | 0 | 30 | II | EOP | 30 | 29 | 1 | 0 | 97% |
| | | E 023A2 | Dorm | 36 | 0 | 0 | 36 | II | EOP | 36 | 35 | 1 | 0 | 97% |
| | 023B | E 023B1 | Dorm | 30 | 0 | 0 | 30 | II | EOP | 30 | 29 | 0 | 0 | 97% |
| | | E 023B2 | Dorm | 36 | 0 | 0 | 36 | II | EOP | 36 | 36 | 0 | 0 | 100% |
| | 023C | E 023C1 | Dorm | 30 | 0 | 0 | 30 | II | EOP | 30 | 30 | 0 | 0 | 100% |
| | | E 023C2 | Dorm | 36 | 0 | 0 | 36 | II | EOP | 36 | 36 | 0 | 0 | 100% |
| | 023D | E 023D1 | Dorm | 30 | 0 | 0 | 30 | II | EOP | 30 | 30 | 0 | 0 | 100% |
| | | E 023D2 | Dorm | 36 | 0 | 0 | 36 | II | EOP | 36 | 36 | 0 | 0 | 100% |
| | 024A | E 024A1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 30 | 0 | 0 | 100% |
| | | E 024A2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 36 | 0 | 0 | 100% |
| | 024B | E 024B1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 29 | 0 | 0 | 97% |
| | | E 024B2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 36 | 0 | 0 | 100% |
| | 024C | E 024C1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 30 | 0 | 0 | 100% |
| | | E 024C2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 35 | 1 | 0 | 97% |
| | 024D | E 024D1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 30 | 0 | 0 | 100% |
| | | E 024D2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 36 | 0 | 0 | 100% |
| | 025A | E 025A1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 30 | 0 | 0 | 100% |
| | | E 025A2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 36 | 0 | 0 | 100% |
| | 025B | E 025B1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 30 | 0 | 0 | 100% |
| | | E 025B2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 36 | 0 | 0 | 100% |
| | 025C | E 025C1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 29 | 0 | 0 | 97% |
| | | E 025C2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 36 | 0 | 0 | 100% |
| | 025D | E 025D1 | Dorm | 30 | 0 | 0 | 30 | II | PF | 30 | 30 | 0 | 0 | 100% |
| | | E 025D2 | Dorm | 36 | 0 | 0 | 36 | II | PF | 36 | 36 | 0 | 0 | 100% |
| **RJD-Facility E Total** | | | | **792** | **0** | **0** | **792** | | | **792** | **786** | **3** | **0** | **99%** |
| RJD-MSF | FIR | M FIR 1 | Dorm | 8 | 0 | 0 | 8 | I | FH | 8 | 4 | 4 | 0 | 50% |

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **RJD-MSF Total** | | | | **8** | **0** | **0** | **8** | | | **8** | **4** | **4** | **0** | **50%** |
| Grand Total | | | | 2700 | 1806 | 28 | 4534 | | | 3625 | 3343 | 864 | 280 | 124% |

**SAC** Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SAC-Central Service | CTC 1 | S CT1 1 | Cell | 0 | 0 | 2 | 2 | NA | CTC | 0 | 0 | 1 | 0 | |
| | CTC 1 | | | 0 | 0 | 13 | 13 | | MCB | 0 | 7 | 5 | 0 | |
| | CTC 2 | S CT2 1 | Cell | 0 | 0 | 11 | 11 | NA | MCB | 0 | 6 | 3 | 0 | |
| **SAC-Central Service Total** | | | | **0** | **0** | **26** | **26** | | | **0** | **13** | **9** | **0** | |
| SAC-Facility A | 001 | A 001 1 | 180 Cell | 32 | 0 | 0 | 32 | NA | PSU | 32 | 27 | 5 | 0 | 84% |
| | | A 001 2 | 180 Cell | 32 | 0 | 0 | 32 | NA | PSU | 32 | 24 | 7 | 0 | 75% |
| | 002 | A 002 1 | 180 Cell | 10 | 0 | 0 | 10 | NA | NDS | 10 | 8 | 2 | 0 | 80% |
| | | | | 22 | 0 | 0 | 22 | | PSU | 22 | 16 | 3 | 0 | 73% |
| | | A 002 2 | 180 Cell | 10 | 0 | 0 | 10 | NA | NDS | 10 | 4 | 2 | 0 | 40% |
| | | | | 22 | 0 | 0 | 22 | | PSU | 22 | 19 | 2 | 0 | 86% |
| | 003 | A 003 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | EOP | 48 | 45 | 6 | 12 | 141% |
| | | A 003 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | EOP | 48 | 46 | 10 | 8 | 144% |
| | 004 | A 004 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | EOP | 48 | 47 | 11 | 6 | 147% |
| | | A 004 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | EOP | 48 | 44 | 7 | 13 | 138% |
| | 005 | A 005 1 | 180 Cell | 32 | 11 | 0 | 43 | NA | ASU | 40 | 29 | 9 | 3 | 91% |
| | | A 005 2 | 180 Cell | 32 | 0 | 0 | 32 | NA | ASU | 32 | 30 | 2 | 0 | 94% |
| | 006 | A 006 1 | 180 Cell | 33 | 31 | 0 | 64 | IV | EOP | 50 | 45 | 13 | 4 | 136% |
| | | A 006 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | EOP | 48 | 47 | 12 | 5 | 147% |
| | 007 | A 007 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | EOP | 48 | 42 | 12 | 10 | 131% |
| | | A 007 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | EOP | 48 | 42 | 13 | 9 | 131% |
| | 008 | A 008 1 | 180 Cell | 33 | 31 | 0 | 64 | IV | GP | 50 | 22 | 32 | 10 | 67% |
| | | A 008 2 | 180 Cell | 36 | 28 | 0 | 64 | IV | GP | 54 | 23 | 33 | 8 | 64% |
| **SAC-Facility A Total** | | | | **518** | **325** | **0** | **843** | | | **689** | **560** | **181** | **88** | **108%** |
| SAC-Facility B | 001 | B 001 1 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 54 | 9 | 1 | 169% |
| | | B 001 2 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 50 | 14 | 0 | 156% |
| | 002 | B 002 1 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 43 | 20 | 1 | 134% |
| | | B 002 2 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 44 | 18 | 2 | 138% |
| | 003 | B 003 1 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 47 | 17 | 0 | 147% |
| | | B 003 2 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 52 | 11 | 1 | 163% |
| | 004 | B 004 1 | 180 Cell | 32 | 24 | 0 | 56 | II | PF | 48 | 44 | 12 | 0 | 138% |
| | | B 004 2 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 48 | 15 | 1 | 150% |
| | 005 | B 005 1 | 180 Cell | 33 | 31 | 0 | 64 | IV | EOP | 50 | 47 | 10 | 7 | 142% |
| | | B 005 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | EOP | 48 | 45 | 10 | 9 | 141% |
| | 006 | B 006 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | EOP | 48 | 33 | 7 | 24 | 103% |
| | | B 006 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | EOP | 48 | 31 | 7 | 26 | 97% |
| | 007 | B 007 1 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 28 | 35 | 1 | 88% |
| | | B 007 2 | 180 Cell | 32 | 32 | 0 | 64 | II | PF | 48 | 27 | 32 | 5 | 84% |
| **SAC-Facility B Total** | | | | **449** | **439** | **0** | **888** | | | **674** | **593** | **217** | **78** | **132%** |
| SAC-Facility C | 001 | C 001 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 36 | 26 | 2 | 113% |
| | | C 001 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 39 | 22 | 3 | 122% |
| | 002 | C 002 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 0 | 64 | 0 | 0% |
| | | C 002 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 0 | 64 | 0 | 0% |
| | 003 | C 003 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 51 | 12 | 1 | 159% |
| | | C 003 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 56 | 6 | 2 | 175% |
| | 004 | C 004 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 54 | 8 | 2 | 169% |
| | | C 004 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 51 | 9 | 4 | 159% |
| | 005 | C 005 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 54 | 10 | 0 | 169% |
| | | C 005 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 52 | 8 | 4 | 163% |
| | 006 | C 006 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 37 | 25 | 2 | 116% |
| | | C 006 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 37 | 23 | 0 | 116% |
| | 007 | C 007 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 53 | 7 | 3 | 166% |
| | | C 007 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 56 | 7 | 1 | 175% |
| | 008 | C 008 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 5 | 59 | 0 | 16% |
| | | C 008 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 6 | 58 | 0 | 19% |
| **SAC-Facility C Total** | | | | **512** | **512** | **0** | **1024** | | | **768** | **587** | **408** | **24** | **115%** |
| SAC-RHU-CCCMS | 001 | Z 001A1 | Cell | 12 | 12 | 0 | 24 | NA | RHC | 18 | 13 | 5 | 6 | 108% |
| | | Z 001B1 | Cell | 12 | 12 | 0 | 24 | NA | RHC | 18 | 12 | 5 | 7 | 100% |
| | | Z 001C1 | Cell | 12 | 12 | 0 | 24 | NA | RHC | 18 | 13 | 7 | 4 | 108% |
| | | Z 001D1 | Cell | 12 | 12 | 0 | 24 | NA | RHC | 18 | 15 | 2 | 7 | 125% |
| | | Z 001E1 | Cell | 12 | 12 | 0 | 24 | NA | RHC | 18 | 12 | 4 | 8 | 100% |
| | | Z 001F1 | Cell | 14 | 14 | 0 | 28 | NA | RHC | 21 | 14 | 6 | 8 | 100% |
| | | Z 001G1 | Cell | 14 | 14 | 0 | 28 | NA | RHC | 21 | 16 | 2 | 10 | 114% |
| | | Z 001H1 | Cell | 12 | 12 | 0 | 24 | NA | RHC | 18 | 12 | 3 | 9 | 100% |
| **SAC-RHU-CCCMS Total** | | | | **100** | **100** | **0** | **200** | | | **150** | **107** | **34** | **59** | **107%** |
| **Grand Total** | | | | **1579** | **1376** | **26** | **2981** | | | **2281** | **1860** | **849** | **249** | **118%** |

**SATF**  Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SATF-Central Service | CTC | S INF 1 | Cell | 0 | 0 | 18 | 18 | NA | CTC | 0 | 17 | 0 | 0 | |
| | | | | 0 | 0 | 20 | 20 | | MCB | 0 | 20 | 0 | 0 | |
| **SATF-Central Service Total** | | | | **0** | **0** | **38** | **38** | | | **0** | **37** | **0** | **0** | |
| SATF-Facility A | 001 | A 001 1 | Dorm | 63 | 63 | 0 | 126 | II | PF | 95 | 111 | 15 | 0 | 176% |
| | | A 001 2 | Dorm | 63 | 63 | 0 | 126 | II | PF | 95 | 112 | 12 | 0 | 178% |
| | 002 | A 002 1 | Dorm | 63 | 63 | 0 | 126 | II | PF | 95 | 95 | 30 | 0 | 151% |
| | | A 002 2 | Dorm | 63 | 63 | 0 | 126 | II | PF | 95 | 111 | 15 | 0 | 176% |
| | 003 | A 003 1 | Dorm | 63 | 63 | 0 | 126 | II | PF | 95 | 92 | 34 | 0 | 146% |
| | | A 003 2 | Dorm | 63 | 63 | 0 | 126 | II | PF | 95 | 104 | 22 | 0 | 165% |
| **SATF-Facility A Total** | | | | **378** | **378** | **0** | **756** | | | **567** | **625** | **128** | **0** | **165%** |
| SATF-Facility B | 001 | B 001 1 | Dorm | 63 | 63 | 0 | 126 | II | GP | 95 | 91 | 33 | 0 | 144% |
| | | B 001 2 | Dorm | 63 | 63 | 0 | 126 | II | GP | 95 | 94 | 32 | 0 | 149% |
| | 002 | B 002 1 | Dorm | 63 | 63 | 0 | 126 | II | GP | 95 | 90 | 36 | 0 | 143% |
| | | B 002 2 | Dorm | 63 | 63 | 0 | 126 | II | GP | 95 | 103 | 23 | 0 | 163% |
| | 003 | B 003 1 | Dorm | 63 | 63 | 0 | 126 | II | GP | 95 | 77 | 49 | 0 | 122% |
| | | B 003 2 | Dorm | 63 | 63 | 0 | 126 | II | GP | 95 | 79 | 46 | 0 | 125% |
| **SATF-Facility B Total** | | | | **378** | **378** | **0** | **756** | | | **567** | **534** | **219** | **0** | **141%** |
| SATF-Facility C | 001 | C 001 1 | 180 Cell | 32 | 32 | 0 | 64 | III | PF | 48 | 19 | 44 | 1 | 59% |
| | | C 001 2 | 180 Cell | 32 | 32 | 0 | 64 | III | PF | 48 | 43 | 20 | 1 | 134% |
| | 002 | C 002 1 | 180 Cell | 34 | 30 | 0 | 64 | III | PF | 51 | 16 | 48 | 0 | 47% |
| | | C 002 2 | 180 Cell | 30 | 34 | 0 | 64 | III | PF | 45 | 26 | 37 | 1 | 87% |
| | 003 | C 003 1 | 180 Cell | 32 | 32 | 0 | 64 | III | PF | 48 | 56 | 4 | 4 | 175% |
| | | C 003 2 | 180 Cell | 32 | 32 | 0 | 64 | III | PF | 48 | 59 | 4 | 1 | 184% |
| | 004 | C 004 1 | 180 Cell | 32 | 32 | 0 | 64 | III | PF | 48 | 8 | 35 | 1 | 25% |
| | | C 004 2 | 180 Cell | 39 | 25 | 0 | 64 | III | PF | 59 | 15 | 27 | 2 | 38% |
| | 005 | C 005 1 | 180 Cell | 32 | 32 | 0 | 64 | III | PF | 48 | 31 | 11 | 0 | 97% |
| | | C 005 2 | 180 Cell | 32 | 32 | 0 | 64 | III | PF | 48 | 26 | 17 | 1 | 81% |
| | 006 | C 006 1 | 180 Cell | 32 | 32 | 0 | 64 | III | PF | 48 | 23 | 31 | 0 | 72% |
| | | C 006 2 | 180 Cell | 32 | 32 | 0 | 64 | III | PF | 48 | 34 | 19 | 1 | 106% |
| | 007 | C 007 1 | 180 Cell | 32 | 32 | 0 | 64 | III | PF | 48 | 32 | 29 | 3 | 100% |
| | | C 007 2 | 180 Cell | 32 | 32 | 0 | 64 | III | PF | 48 | 48 | 16 | 0 | 150% |
| | 008 | C 008 1 | 180 Cell | 32 | 32 | 0 | 64 | III | PF | 48 | 36 | 23 | 5 | 113% |
| | | C 008 2 | 180 Cell | 32 | 32 | 0 | 64 | III | PF | 48 | 39 | 24 | 1 | 122% |
| **SATF-Facility C Total** | | | | **519** | **505** | **0** | **1024** | | | **779** | **511** | **389** | **22** | **98%** |
| SATF-Facility D | 001 | D 001 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 63 | 26 | 11 | 126% |
| | | D 001 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 67 | 28 | 5 | 134% |
| | 002 | D 002 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 78 | 12 | 10 | 156% |
| | | D 002 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 80 | 18 | 2 | 160% |
| | 003 | D 003 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 70 | 21 | 6 | 140% |
| | | D 003 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 78 | 16 | 6 | 156% |
| | 004 | D 004 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 60 | 33 | 7 | 120% |
| | | D 004 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 77 | 19 | 4 | 154% |
| | 005 | D 005 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 63 | 24 | 13 | 126% |
| | | D 005 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | SNY | 75 | 84 | 15 | 1 | 168% |
| **SATF-Facility D Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **720** | **212** | **65** | **144%** |
| SATF-Facility E | 001 | E 001 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 17 | 79 | 2 | 34% |
| | | E 001 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 26 | 74 | 0 | 52% |
| | 002 | E 002 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 52 | 44 | 4 | 104% |
| | | E 002 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 67 | 29 | 2 | 134% |
| | 003 | E 003 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 55 | 35 | 10 | 110% |
| | | E 003 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 63 | 35 | 2 | 126% |
| | 004 | E 004 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 61 | 29 | 10 | 122% |
| | | E 004 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 68 | 30 | 2 | 136% |
| | 005 | E 005 1 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 54 | 38 | 6 | 108% |
| | | E 005 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 62 | 38 | 0 | 124% |
| **SATF-Facility E Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **525** | **431** | **38** | **105%** |
| SATF-Facility F | 001 | F 001 1 | Dorm | 80 | 80 | 0 | 160 | II | PF | 120 | 138 | 22 | 0 | 173% |
| | | F 001 2 | Dorm | 96 | 96 | 0 | 192 | II | PF | 144 | 154 | 29 | 0 | 160% |
| | 002 | F 002 1 | Dorm | 80 | 80 | 0 | 160 | II | PF | 120 | 131 | 29 | 0 | 164% |
| | | F 002 2 | Dorm | 96 | 96 | 0 | 192 | II | PF | 144 | 162 | 30 | 0 | 169% |
| | 003 | F 003 1 | Dorm | 80 | 40 | 0 | 120 | II | EOP | 120 | 109 | 11 | 0 | 136% |
| | | F 003 2 | Dorm | 96 | 48 | 0 | 144 | II | EOP | 144 | 126 | 18 | 0 | 131% |
| **SATF-Facility F Total** | | | | **528** | **440** | **0** | **968** | | | **792** | **820** | **139** | **0** | **155%** |
| SATF-Facility G | 001 | G 001 1 | Dorm | 80 | 40 | 0 | 120 | II | EOP | 120 | 112 | 8 | 0 | 140% |
| | | G 001 2 | Dorm | 96 | 48 | 0 | 144 | II | EOP | 144 | 138 | 6 | 0 | 144% |
| | 002 | G 002 1 | Dorm | 80 | 80 | 0 | 160 | II | PF | 120 | 154 | 6 | 0 | 193% |
| | | G 002 2 | Dorm | 96 | 96 | 0 | 192 | II | PF | 144 | 186 | 6 | 0 | 194% |
| | 003 | G 003 1 | Dorm | 40 | 20 | 0 | 60 | II | EOP | 60 | 54 | 5 | 0 | 135% |
| | | | | 40 | 40 | 0 | 80 | | PF | 60 | 74 | 6 | 0 | 185% |
| | | G 003 2 | Dorm | 48 | 24 | 0 | 72 | II | EOP | 72 | 67 | 4 | 0 | 140% |
| | | | | 48 | 48 | 0 | 96 | | PF | 72 | 89 | 7 | 0 | 185% |

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SATF-Facility G Total** | | | | **528** | **396** | **0** | **924** | | | **792** | **874** | **48** | **0** | **166%** |
| SATF-RHU-CCCMS | 001 | Z 001 1 | Cell | 100 | 100 | 0 | 200 | NA | RHC | 150 | 74 | 111 | 15 | 74% |
| **SATF-RHU-CCCMS Total** | | | | **100** | **100** | **0** | **200** | | | **150** | **74** | **111** | **15** | **74%** |
| Grand Total | | | | 3431 | 3197 | 38 | 6666 | | | 5147 | 4720 | 1677 | 140 | 138% |

**SCC**  Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SCC-Alder Camp | Alder | X20001 1 | Dorm | 100 | 0 | 0 | 100 | I | CMP | 100 | 40 | 60 | 0 | 40% |
| **SCC-Alder Camp Total** | | | | **100** | **0** | **0** | **100** | | | **100** | **40** | **60** | **0** | **40%** |
| SCC-Antelope Camp | Antelope | X25001 1 | Dorm | 108 | 32 | 0 | 140 | I | CMP | 108 | 60 | 80 | 0 | 56% |
| **SCC-Antelope Camp Total** | | | | **108** | **32** | **0** | **140** | | | **108** | **60** | **80** | **0** | **56%** |
| SCC-Ben Lomond Camp | Ben Lomond | X45001 1 | Dorm | 100 | 10 | 0 | 110 | I | CMP | 100 | 51 | 59 | 0 | 51% |
| **SCC-Ben Lomond Camp Total** | | | | **100** | **10** | **0** | **110** | | | **100** | **51** | **59** | **0** | **51%** |
| SCC-CAMPS | Acton | X11001 1 | Dorm | 80 | 8 | 0 | 88 | I | CMP | 80 | 46 | 42 | 0 | 58% |
| | Bautista | X36001 1 | Dorm | 120 | 12 | 0 | 132 | I | CMP | 120 | 48 | 84 | 0 | 40% |
| | Fenner Canyon | X41001 1 | Dorm | 120 | 12 | 0 | 132 | I | CMP | 120 | 46 | 86 | 0 | 38% |
| | Francisquito | X04001 1 | Dorm | 80 | 8 | 0 | 88 | I | CMP | 80 | 48 | 40 | 0 | 60% |
| | Gabilan | X38001 1 | Dorm | 120 | 12 | 0 | 132 | I | CMP | 120 | 63 | 69 | 0 | 53% |
| | Growlersburg | X33001 1 | Dorm | 120 | 12 | 0 | 132 | I | CMP | 120 | 110 | 22 | 0 | 92% |
| | Holton | X16001 1 | Dorm | 100 | 10 | 0 | 110 | I | CMP | 100 | 48 | 62 | 0 | 48% |
| | Julius Klein | X19001 1 | Dorm | 120 | 12 | 0 | 132 | I | CMP | 120 | 43 | 89 | 0 | 36% |
| | La Cima | X42001 1 | Dorm | 80 | 8 | 0 | 88 | I | CMP | 80 | 56 | 32 | 0 | 70% |
| | Miramonte | X05001 1 | Dorm | 80 | 8 | 0 | 88 | I | CMP | 80 | 41 | 47 | 0 | 51% |
| | Mountain Home | X10001 1 | Dorm | 100 | 10 | 0 | 110 | I | CMP | 100 | 42 | 68 | 0 | 42% |
| | Mt. Bullion | X39001 1 | Dorm | 100 | 10 | 0 | 110 | I | CMP | 100 | 56 | 54 | 0 | 56% |
| | Oak Glen | X35001 1 | Dorm | 160 | 0 | 0 | 160 | I | CMP | 160 | 79 | 81 | 0 | 49% |
| | Owens Valley | X26001 1 | Dorm | 120 | 12 | 0 | 132 | I | CMP | 120 | 47 | 85 | 0 | 39% |
| | Prado | X28001 1 | Dorm | 80 | 11 | 0 | 91 | I | CMP | 80 | 51 | 40 | 0 | 64% |
| | Vallecito | X01001 1 | Dorm | 100 | 0 | 0 | 100 | I | CMP | 100 | 55 | 45 | 0 | 55% |
| **SCC-CAMPS Total** | | | | **1680** | **145** | **0** | **1825** | | | **1680** | **879** | **946** | **0** | **52%** |
| SCC-Central Service | FIR | S FIR 1 | Dorm | 10 | 0 | 0 | 10 | I | FH | 10 | 8 | 2 | 0 | 80% |
| **SCC-Central Service Total** | | | | **10** | **0** | **0** | **10** | | | **10** | **8** | **2** | **0** | **80%** |
| SCC-Deadwood Camp | Deadwood | X23001 1 | Dorm | 80 | 8 | 0 | 88 | I | CMP | 80 | 42 | 46 | 0 | 53% |
| **SCC-Deadwood Camp Total** | | | | **80** | **8** | **0** | **88** | | | **80** | **42** | **46** | **0** | **53%** |
| SCC-Delta Camp | Delta | X08001 1 | Dorm | 120 | 0 | 0 | 120 | I | CMP | 120 | 56 | 64 | 0 | 47% |
| **SCC-Delta Camp Total** | | | | **120** | **0** | **0** | **120** | | | **120** | **56** | **64** | **0** | **47%** |
| SCC-Eel River Camp | Eel River | X31001 1 | Dorm | 120 | 0 | 0 | 120 | I | CMP | 120 | 52 | 68 | 0 | 43% |
| **SCC-Eel River Camp Total** | | | | **120** | **0** | **0** | **120** | | | **120** | **52** | **68** | **0** | **43%** |
| SCC-Facility A | Calaveras | A 001A1 | Dorm | 96 | 96 | 0 | 192 | I | PF | 144 | 126 | 65 | 0 | 131% |
| | | A 001A2 | Dorm | 96 | 96 | 0 | 192 | I | PF | 144 | 107 | 85 | 0 | 111% |
| | | A 001B1 | Dorm | 112 | 112 | 0 | 224 | I | PF | 168 | 140 | 84 | 0 | 125% |
| | | A 001B2 | Dorm | 112 | 112 | 0 | 224 | I | PF | 168 | 156 | 68 | 0 | 139% |
| | | A 001C1 | Dorm | 96 | 96 | 0 | 192 | I | PF | 144 | 89 | 103 | 0 | 93% |
| | | A 001C2 | Dorm | 96 | 96 | 0 | 192 | I | PF | 144 | 109 | 83 | 0 | 114% |
| **SCC-Facility A Total** | | | | **608** | **608** | **0** | **1216** | | | **912** | **727** | **488** | **0** | **120%** |
| SCC-Facility B | Mariposa | B 001D1 | Dorm | 96 | 96 | 0 | 192 | II | PF | 144 | 74 | 117 | 0 | 77% |
| | | B 001D2 | Dorm | 96 | 96 | 0 | 192 | II | PF | 144 | 154 | 38 | 0 | 160% |
| | | B 001E1 | Dorm | 112 | 112 | 0 | 224 | II | PF | 168 | 145 | 79 | 0 | 129% |
| | | B 001E2 | Dorm | 112 | 112 | 0 | 224 | II | PF | 168 | 144 | 80 | 0 | 129% |
| | | B 001F1 | Dorm | 94 | 94 | 0 | 188 | II | PF | 141 | 83 | 93 | 0 | 88% |
| | | B 001F2 | Dorm | 96 | 96 | 0 | 192 | II | PF | 144 | 151 | 41 | 0 | 157% |
| **SCC-Facility B Total** | | | | **606** | **606** | **0** | **1212** | | | **909** | **751** | **448** | **0** | **124%** |
| SCC-Facility C | Tuolumne | C 001 1 | 270 Cell | 50 | 50 | 0 | 100 | III | PF | 75 | 96 | 1 | 3 | 192% |
| | | C 001 2 | 270 Cell | 50 | 50 | 0 | 100 | III | PF | 75 | 94 | 3 | 2 | 188% |
| | | C 002 1 | 270 Cell | 50 | 50 | 0 | 100 | NA | RHG | 75 | 48 | 52 | 0 | 96% |
| | | C 002 2 | 270 Cell | 50 | 50 | 0 | 100 | NA | RHG | 75 | 50 | 49 | 1 | 100% |
| | | C 003 1 | 270 Cell | 50 | 50 | 0 | 100 | III | PF | 75 | 90 | 5 | 5 | 180% |
| | | C 003 2 | 270 Cell | 50 | 50 | 0 | 100 | III | PF | 75 | 86 | 12 | 2 | 172% |
| | | C 004 1 | 270 Cell | 50 | 50 | 0 | 100 | III | PF | 75 | 95 | 1 | 4 | 190% |
| | | C 004 2 | 270 Cell | 50 | 50 | 0 | 100 | III | PF | 75 | 89 | 10 | 1 | 178% |
| | | C 005 1 | 270 Cell | 50 | 50 | 0 | 100 | III | PF | 75 | 95 | 4 | 1 | 190% |
| | | C 005 2 | 270 Cell | 50 | 50 | 0 | 100 | III | PF | 75 | 95 | 5 | 0 | 190% |
| **SCC-Facility C Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **838** | **142** | **19** | **168%** |
| SCC-Intermountain | Intermountain Camp | X22001 1 | Dorm | 80 | 8 | 0 | 88 | I | CMP | 80 | 40 | 48 | 0 | 50% |
| **SCC-Intermountain Total** | | | | **80** | **8** | **0** | **88** | | | **80** | **40** | **48** | **0** | **50%** |
| SCC-Ishi Camp | Ishi | X18001 1 | Dorm | 100 | 0 | 0 | 100 | I | CMP | 100 | 61 | 39 | 0 | 61% |
| **SCC-Ishi Camp Total** | | | | **100** | **0** | **0** | **100** | | | **100** | **61** | **39** | **0** | **61%** |
| SCC-Konocti Camp | Konocti | X27001 1 | Dorm | 100 | 0 | 0 | 100 | I | CMP | 100 | 64 | 36 | 0 | 64% |
| **SCC-Konocti Camp Total** | | | | **100** | **0** | **0** | **100** | | | **100** | **64** | **36** | **0** | **64%** |
| SCC-Parlin Fork Camp | Parlin Fork | X06001 1 | Dorm | 100 | 0 | 0 | 100 | I | CMP | 100 | 47 | 53 | 0 | 47% |
| **SCC-Parlin Fork Camp Total** | | | | **100** | **0** | **0** | **100** | | | **100** | **47** | **53** | **0** | **47%** |
| SCC-Pine Grove Youth Camp | Pine Grove Youth Camp | PGC001 1 | Dorm | 100 | 0 | 0 | 100 | I | CMP | 100 | 23 | 77 | 0 | 23% |
| **SCC-Pine Grove Youth Camp Total** | | | | **100** | **0** | **0** | **100** | | | **100** | **23** | **77** | **0** | **23%** |
| SCC-Salt Creek Camp | Salt Creek | X07001 1 | Dorm | 120 | 0 | 0 | 120 | I | CMP | 120 | 66 | 54 | 0 | 55% |

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SCC-Salt Creek Camp Total** | | | | **120** | **0** | **0** | **120** | | | **120** | **66** | **54** | **0** | **55%** |
| SCC-Sugar Pine Camp | Sugar Pine | X09001 1 | Dorm | 120 | 0 | 0 | 120 | I | CMP | 120 | 56 | 64 | 0 | 47% |
| **SCC-Sugar Pine Camp Total** | | | | **120** | **0** | **0** | **120** | | | **120** | **56** | **64** | **0** | **47%** |
| SCC-Trinity Camp | Trinity | X03001 1 | Dorm | 120 | 0 | 0 | 120 | I | CMP | 120 | 63 | 57 | 0 | 53% |
| **SCC-Trinity Camp Total** | | | | **120** | **0** | **0** | **120** | | | **120** | **63** | **57** | **0** | **53%** |
| SCC-Washington Ridge Camp | Washington Ridge | X44001 1 | Dorm | 100 | 0 | 0 | 100 | I | CMP | 100 | 53 | 47 | 0 | 53% |
| **SCC-Washington Ridge Camp Total** | | | | **100** | **0** | **0** | **100** | | | **100** | **53** | **47** | **0** | **53%** |
| **Grand Total** | | | | **4972** | **1917** | **0** | **6889** | | | **5829** | **3977** | **2878** | **19** | **80%** |

**SOL**  Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SOL-Central Service | INF | S INF 1 | Cell | 0 | 0 | 3 | 3 | NA | CTC | 0 | 3 | 0 | 0 | |
| | | | | 0 | 0 | 9 | 9 | | MCB | 0 | 9 | 0 | 0 | |
| | | | Dorm | 0 | 0 | 3 | 3 | NA | CTC | 0 | 3 | 0 | 0 | |
| **SOL-Central Service Total** | | | | **0** | **0** | **15** | **15** | | | **0** | **15** | **0** | **0** | |
| SOL-Facility A | 001 | A 001 1 | 270 Cell | 34 | 34 | 0 | 68 | III | GP | 51 | 30 | 38 | 0 | 88% |
| | | A 001 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 46 | 53 | 1 | 92% |
| | 002 | A 002 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 53 | 45 | 2 | 106% |
| | | A 002 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 54 | 45 | 1 | 108% |
| | 003 | A 003 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 43 | 54 | 1 | 86% |
| | | A 003 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 54 | 43 | 1 | 108% |
| | 004 | A 004 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 39 | 57 | 4 | 78% |
| | | A 004 2 | 270 Cell | 51 | 49 | 0 | 100 | III | GP | 77 | 58 | 40 | 0 | 114% |
| | 005 | A 005 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 49 | 49 | 2 | 98% |
| | | A 005 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 56 | 43 | 1 | 112% |
| | 006 | A 006 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 52 | 47 | 1 | 104% |
| | | A 006 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 52 | 47 | 1 | 104% |
| **SOL-Facility A Total** | | | | **585** | **583** | **0** | **1168** | | | **878** | **586** | **561** | **15** | **100%** |
| SOL-Facility B | 007 | B 007 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 84 | 13 | 3 | 168% |
| | | B 007 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 90 | 10 | 0 | 180% |
| | 008 | B 008 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 88 | 9 | 1 | 176% |
| | | B 008 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 93 | 6 | 1 | 186% |
| | 009 | B 009 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 51 | 38 | 3 | 102% |
| | | B 009 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 66 | 22 | 2 | 132% |
| | 010 | B 010 1 | 270 Cell | 50 | 50 | 0 | 100 | NA | RHG | 75 | 36 | 52 | 11 | 72% |
| | | B 010 2 | 270 Cell | 50 | 50 | 0 | 100 | NA | RHG | 75 | 47 | 46 | 7 | 94% |
| | 011 | B 011 1 | 270 Cell | 51 | 49 | 0 | 100 | III | GP | 77 | 91 | 9 | 0 | 178% |
| | | B 011 2 | 270 Cell | 51 | 49 | 0 | 100 | III | GP | 77 | 97 | 2 | 1 | 190% |
| | 012 | B 012 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 94 | 6 | 0 | 188% |
| | | B 012 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 93 | 6 | 1 | 186% |
| **SOL-Facility B Total** | | | | **602** | **598** | **0** | **1200** | | | **903** | **930** | **219** | **30** | **154%** |
| SOL-Facility C | 013 | C 013 1 | 270 Dorm | 68 | 68 | 0 | 136 | II | GP | 102 | 117 | 18 | 0 | 172% |
| | | C 013 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | GP | 93 | 117 | 7 | 0 | 189% |
| | 014 | C 014 1 | 270 Dorm | 68 | 68 | 0 | 136 | II | GP | 102 | 117 | 19 | 0 | 172% |
| | | C 014 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | GP | 93 | 117 | 7 | 0 | 189% |
| | 015 | C 015 1 | 270 Dorm | 68 | 68 | 0 | 136 | II | GP | 102 | 118 | 18 | 0 | 174% |
| | | C 015 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | GP | 93 | 105 | 19 | 0 | 169% |
| | 016 | C 016 1 | Dorm | 100 | 100 | 0 | 200 | II | GP | 150 | 176 | 24 | 0 | 176% |
| | 017 | C 017 1 | Dorm | 100 | 100 | 0 | 200 | II | GP | 150 | 177 | 22 | 0 | 177% |
| | 018 | C 018 1 | Dorm | 100 | 100 | 0 | 200 | II | GP | 150 | 159 | 35 | 0 | 159% |
| **SOL-Facility C Total** | | | | **690** | **690** | **0** | **1380** | | | **1035** | **1203** | **169** | **0** | **174%** |
| SOL-Facility D | 019 | D 019 1 | 270 Dorm | 100 | 100 | 0 | 200 | II | GP | 150 | 179 | 20 | 0 | 179% |
| | 020 | D 020 1 | 270 Dorm | 68 | 68 | 0 | 136 | II | GP | 102 | 114 | 22 | 0 | 168% |
| | | D 020 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | GP | 93 | 106 | 17 | 0 | 171% |
| | 021 | D 021 1 | 270 Dorm | 68 | 68 | 0 | 136 | II | GP | 102 | 119 | 16 | 0 | 175% |
| | | D 021 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | GP | 93 | 111 | 13 | 0 | 179% |
| | 022 | D 022 1 | 270 Dorm | 68 | 68 | 0 | 136 | II | GP | 102 | 112 | 24 | 0 | 165% |
| | | D 022 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | GP | 93 | 109 | 15 | 0 | 176% |
| | 023 | D 023 1 | 270 Dorm | 68 | 68 | 0 | 136 | II | GP | 102 | 119 | 17 | 0 | 175% |
| | | D 023 2 | 270 Dorm | 62 | 62 | 0 | 124 | II | GP | 93 | 108 | 16 | 0 | 174% |
| | 024 | D 024 1 | Dorm | 100 | 100 | 0 | 200 | II | GP | 150 | 167 | 33 | 0 | 167% |
| **SOL-Facility D Total** | | | | **720** | **720** | **0** | **1440** | | | **1080** | **1244** | **193** | **0** | **173%** |
| **Grand Total** | | | | **2597** | **2591** | **15** | **5203** | | | **3896** | **3978** | **1142** | **45** | **153%** |

**SQ**  Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SQ-Central Service | FIR | S FIR 1 | Dorm | 15 | 0 | 0 | 15 | I | FH | 15 | 5 | 10 | 0 | 33% |
| | INF | S INF 1 | Cell | 0 | 0 | 10 | 10 | NA | CTC | 0 | 10 | 0 | 0 | |
| | | | | 40 | 0 | 0 | 40 | | FLX | 60 | 35 | 4 | 0 | 88% |
| **SQ-Central Service Total** | | | | **55** | **0** | **10** | **65** | | | **75** | **50** | **14** | **0** | **91%** |
| SQ-Facility A | Adjustment Center | A AC 1 | Cell | 34 | 0 | 0 | 34 | NA | RHG | 51 | 13 | 21 | 0 | 38% |
| | | A AC 2 | Cell | 34 | 0 | 0 | 34 | NA | RHG | 51 | 28 | 6 | 0 | 82% |
| | | A AC 3 | Cell | 34 | 0 | 0 | 34 | NA | RHG | 51 | 28 | 6 | 0 | 82% |
| | Alpine Unit | A SB A1 | Cell | 47 | 47 | 0 | 94 | II | PF | 71 | 66 | 26 | 2 | 140% |
| | | A SB A2 | Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 85 | 14 | 1 | 170% |
| | | A SB A3 | Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 79 | 18 | 3 | 158% |
| | | A SB A4 | Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 88 | 11 | 1 | 176% |
| | | A SB A5 | Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 69 | 30 | 1 | 138% |
| | Badger Unit | A SB B1 | Cell | 47 | 47 | 0 | 94 | II | PF | 71 | 83 | 8 | 3 | 177% |
| | | A SB B2 | Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 97 | 2 | 1 | 194% |
| | | A SB B3 | Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 99 | 0 | 1 | 198% |
| | | A SB B4 | Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 93 | 3 | 4 | 186% |
| | | A SB B5 | Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 48 | 52 | 0 | 96% |
| | Carson Unit | A SB C1 | Cell | 41 | 0 | 0 | 41 | NA | RHG | 62 | 0 | 41 | 0 | 0% |
| | | A SB C2 | Cell | 48 | 0 | 0 | 48 | NA | RHG | 72 | 0 | 48 | 0 | 0% |
| | | A SB C3 | Cell | 48 | 0 | 0 | 48 | NA | RHG | 72 | 0 | 48 | 0 | 0% |
| | | A SB C4 | Cell | 48 | 0 | 0 | 48 | NA | RHG | 72 | 0 | 48 | 0 | 0% |
| | | A SB C5 | Cell | 48 | 0 | 0 | 48 | II | PF | 48 | 0 | 48 | 0 | 0% |
| | Donner Unit | A SB D1 | Cell | 47 | 0 | 0 | 47 | II | PF | 71 | 43 | 4 | 0 | 91% |
| | | A SB D2 | Cell | 50 | 0 | 0 | 50 | II | PF | 75 | 50 | 0 | 0 | 100% |
| | | A SB D3 | Cell | 48 | 0 | 0 | 48 | II | PF | 72 | 48 | 0 | 0 | 100% |
| | | A SB D4 | Cell | 48 | 0 | 0 | 48 | II | PF | 72 | 47 | 1 | 0 | 98% |
| | | A SB D5 | Cell | 48 | 48 | 0 | 96 | II | PF | 72 | 48 | 48 | 0 | 100% |
| | East Block | A EB 1 | Cell | 96 | 0 | 0 | 96 | NA | DR | 96 | 2 | 94 | 0 | 2% |
| | | A EB 2 | Cell | 108 | 0 | 0 | 108 | NA | DR | 108 | 6 | 102 | 0 | 6% |
| | | A EB 3 | Cell | 108 | 0 | 0 | 108 | NA | DR | 108 | 5 | 103 | 0 | 5% |
| | | A EB 4 | Cell | 108 | 0 | 0 | 108 | NA | DR | 108 | 3 | 105 | 0 | 3% |
| | | A EB 5 | Cell | 108 | 0 | 0 | 108 | NA | DR | 108 | 0 | 108 | 0 | 0% |
| | North Block | A NB 1 | Cell | 82 | 82 | 0 | 164 | II | PF | 123 | 146 | 17 | 1 | 178% |
| | | A NB 2 | Cell | 83 | 83 | 0 | 166 | II | PF | 125 | 156 | 7 | 1 | 188% |
| | | A NB 3 | Cell | 83 | 83 | 0 | 166 | II | PF | 125 | 150 | 14 | 1 | 181% |
| | | A NB 4 | Cell | 83 | 83 | 0 | 166 | II | PF | 125 | 155 | 10 | 1 | 187% |
| | | A NB 5 | Cell | 83 | 83 | 0 | 166 | II | PF | 125 | 135 | 7 | 2 | 163% |
| | NORTH SEG | A NB N6 | Cell | 34 | 0 | 0 | 34 | NA | DR | 34 | 0 | 34 | 0 | 0% |
| | | A NB S6 | Cell | 34 | 0 | 0 | 34 | NA | DR | 34 | 0 | 34 | 0 | 0% |
| | West Block | A WB 1 | Cell | 89 | 89 | 0 | 178 | II | PF | 134 | 166 | 12 | 0 | 187% |
| | | A WB 2 | Cell | 90 | 90 | 0 | 180 | II | PF | 135 | 164 | 14 | 2 | 182% |
| | | A WB 3 | Cell | 90 | 90 | 0 | 180 | II | PF | 135 | 161 | 19 | 0 | 179% |
| | | A WB 4 | Cell | 90 | 90 | 0 | 180 | II | PF | 135 | 153 | 26 | 1 | 170% |
| | | A WB 5 | Cell | 90 | 90 | 0 | 180 | II | PF | 135 | 150 | 30 | 0 | 167% |
| **SQ-Facility A Total** | | | | **2529** | **1405** | **0** | **3934** | | | **3472** | **2664** | **1219** | **26** | **105%** |
| SQ-Facility B | H Unit 1 | B 001 1 | Dorm | 100 | 0 | 0 | 100 | II | EOP | 100 | 84 | 15 | 0 | 84% |
| | H Unit 2 | B 002 1 | Dorm | 100 | 0 | 0 | 100 | II | EOP | 100 | 81 | 19 | 0 | 81% |
| | H Unit 3 | B 003 1 | Dorm | 100 | 0 | 0 | 100 | II | EOP | 150 | 81 | 19 | 0 | 81% |
| | H Unit 4 | B 004 1 | Dorm | 100 | 100 | 0 | 200 | II | PF | 150 | 180 | 20 | 0 | 180% |
| | H Unit 5 | B 005 1 | Dorm | 100 | 100 | 0 | 200 | II | PF | 150 | 188 | 12 | 0 | 188% |
| **SQ-Facility B Total** | | | | **500** | **200** | **0** | **700** | | | **650** | **614** | **85** | **0** | **123%** |
| **Grand Total** | | | | **3084** | **1605** | **10** | **4699** | | | **4197** | **3328** | **1318** | **26** | **108%** |

**SVSP** Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SVSP-Central Service | CTC | S CTC 1 | Cell | 0 | 0 | 12 | 12 | NA | CTC | 0 | 11 | 0 | 0 | |
| | | | | 0 | 0 | 10 | 10 | | MCB | 0 | 9 | 0 | 0 | |
| **SVSP-Central Service Total** | | | | **0** | **0** | **22** | **22** | | | **0** | **20** | **0** | **0** | |
| SVSP-Facility A | 001 | A 001 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 63 | 30 | 7 | 126% |
| | | A 001 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 67 | 33 | 0 | 134% |
| | 002 | A 002 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 70 | 23 | 7 | 140% |
| | | A 002 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 69 | 27 | 4 | 138% |
| | 003 | A 003 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 66 | 22 | 11 | 132% |
| | | A 003 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 72 | 28 | 0 | 144% |
| | 004 | A 004 1 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 61 | 31 | 8 | 122% |
| | | A 004 2 | 270 Cell | 50 | 50 | 0 | 100 | III | SNY | 75 | 69 | 26 | 5 | 138% |
| | 005 | A 005 1 | 270 Cell | 50 | 50 | 0 | 100 | III | EOP | 75 | 72 | 16 | 11 | 144% |
| | | A 005 2 | 270 Cell | 50 | 50 | 0 | 100 | III | EOP | 75 | 77 | 10 | 12 | 154% |
| **SVSP-Facility A Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **686** | **246** | **65** | **137%** |
| SVSP-Facility B | 001 | B 001 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 75 | 13 | 11 | 150% |
| | | B 001 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 79 | 20 | 1 | 158% |
| | 002 | B 002 1 | 270 Cell | 14 | 13 | 0 | 27 | IV | GP | 21 | 0 | 0 | 0 | 0% |
| | | B 002 2 | 270 Cell | 1 | 1 | 0 | 2 | IV | GP | 2 | 0 | 0 | 0 | 0% |
| | 003 | B 003 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 68 | 28 | 4 | 136% |
| | | B 003 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 67 | 30 | 1 | 134% |
| | 004 | B 004 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 0 | 0 | 0 | 0% |
| | | B 004 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 0 | 0 | 0 | 0% |
| | 005 | B 005 1 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 75 | 22 | 1 | 150% |
| | | B 005 2 | 270 Cell | 50 | 50 | 0 | 100 | IV | GP | 75 | 69 | 26 | 3 | 138% |
| **SVSP-Facility B Total** | | | | **415** | **414** | **0** | **829** | | | **623** | **433** | **139** | **21** | **104%** |
| SVSP-Facility C | 001 | C 001 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 46 | 17 | 1 | 144% |
| | | C 001 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 47 | 13 | 4 | 147% |
| | 002 | C 002 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 49 | 13 | 2 | 153% |
| | | C 002 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 53 | 11 | 0 | 166% |
| | 003 | C 003 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 44 | 18 | 2 | 138% |
| | | C 003 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 43 | 18 | 3 | 134% |
| | 004 | C 004 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 52 | 8 | 3 | 163% |
| | | C 004 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 39 | 18 | 4 | 122% |
| | 005 | C 005 1 | 180 Cell | 32 | 0 | 0 | 32 | NA | ICF | 32 | 18 | 8 | 0 | 56% |
| | | C 005 2 | 180 Cell | 32 | 0 | 0 | 32 | NA | ICF | 32 | 25 | 7 | 0 | 78% |
| | 006 | C 006 1 | 180 Cell | 32 | 0 | 0 | 32 | NA | ICF | 32 | 13 | 13 | 0 | 41% |
| | | C 006 2 | 180 Cell | 32 | 0 | 0 | 32 | NA | ICF | 32 | 22 | 10 | 0 | 69% |
| | 007 | C 007 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 52 | 11 | 1 | 163% |
| | | C 007 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 57 | 7 | 0 | 178% |
| | 008 | C 008 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 56 | 6 | 2 | 175% |
| | | C 008 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | GP | 48 | 50 | 11 | 3 | 156% |
| **SVSP-Facility C Total** | | | | **512** | **384** | **0** | **896** | | | **704** | **666** | **189** | **25** | **130%** |
| SVSP-Facility D | 002 | D 002 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 30 | 29 | 4 | 94% |
| | | D 002 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 33 | 24 | 4 | 103% |
| | 003 | D 003 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | EOP | 48 | 39 | 17 | 8 | 122% |
| | | D 003 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | EOP | 48 | 44 | 11 | 9 | 138% |
| | 004 | D 004 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 35 | 21 | 6 | 109% |
| | | D 004 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 40 | 17 | 7 | 125% |
| | 005 | D 005 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 34 | 23 | 7 | 106% |
| | | D 005 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 38 | 18 | 8 | 119% |
| | 006 | D 006 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 42 | 16 | 6 | 131% |
| | | D 006 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 37 | 21 | 6 | 116% |
| | 007 | D 007 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 41 | 16 | 7 | 128% |
| | | D 007 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 43 | 16 | 5 | 134% |
| | 008 | D 008 1 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 40 | 18 | 6 | 125% |
| | | D 008 2 | 180 Cell | 32 | 32 | 0 | 64 | IV | SNY | 48 | 39 | 20 | 5 | 122% |
| **SVSP-Facility D Total** | | | | **448** | **448** | **0** | **896** | | | **672** | **535** | **267** | **90** | **119%** |
| SVSP-Facility I | 001 | I 001A1 | Cell | 12 | 0 | 0 | 12 | NA | ICF | 12 | 11 | 0 | 0 | 92% |
| | | I 001B1 | Cell | 10 | 0 | 0 | 10 | NA | ICF | 10 | 9 | 1 | 0 | 90% |
| | | I 001C1 | Cell | 10 | 0 | 0 | 10 | NA | ICF | 10 | 8 | 0 | 0 | 80% |
| | | I 001D1 | Cell | 32 | 0 | 0 | 32 | NA | ICF | 32 | 22 | 2 | 0 | 69% |
| | 002 | I 002A1 | Cell | 16 | 10 | 0 | 26 | NA | ICF | 16 | 22 | 4 | 0 | 138% |
| | | I 002B1 | Cell | 16 | 0 | 0 | 16 | NA | ICF | 16 | 13 | 1 | 0 | 81% |
| | | I 002C1 | Cell | 16 | 0 | 0 | 16 | NA | ICF | 16 | 14 | 1 | 0 | 88% |
| | | I 002D1 | Cell | 16 | 0 | 0 | 16 | NA | ICF | 16 | 15 | 1 | 0 | 94% |
| **SVSP-Facility I Total** | | | | **128** | **10** | **0** | **138** | | | **128** | **114** | **10** | **0** | **89%** |
| SVSP-RHU-CCCMS | 009 | Z 009 1 | Cell | 100 | 100 | 0 | 200 | NA | RHC | 150 | 99 | 68 | 27 | 99% |
| **SVSP-RHU-CCCMS Total** | | | | **100** | **100** | **0** | **200** | | | **150** | **99** | **68** | **27** | **99%** |
| **Grand Total** | | | | **2103** | **1856** | **22** | **3981** | | | **3027** | **2553** | **919** | **228** | **121%** |

**VSP**  Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VSP-Central Service | INF | S INF 1 | Cell | 0 | 0 | 20 | 20 | NA | OHU | 0 | 12 | 0 | 0 | |
| **VSP-Central Service Total** | | | | **0** | **0** | **20** | **20** | | | **0** | **12** | **0** | **0** | |
| VSP-Facility A | 001 | A 001 1 | Dorm | 128 | 64 | 0 | 192 | II | EOP | 192 | 176 | 16 | 0 | 138% |
| | 002 | A 002 1 | Dorm | 119 | 63 | 0 | 182 | II | EOP | 179 | 148 | 31 | 0 | 124% |
| | 003 | A 003 1 | 270 Cell | 50 | 49 | 0 | 99 | II | PF | 75 | 2 | 97 | 0 | 4% |
| | | A 003 2 | 270 Cell | 50 | 50 | 0 | 100 | II | PF | 75 | 0 | 100 | 0 | 0% |
| | 004 | A 004 1 | 270 Cell | 22 | 22 | 0 | 44 | II | PF | 33 | 1 | 43 | 0 | 5% |
| | | | | 22 | 22 | 0 | 44 | NA | RHG | 33 | 12 | 31 | 1 | 55% |
| | | A 004 2 | 270 Cell | 22 | 22 | 0 | 44 | II | PF | 33 | 0 | 44 | 0 | 0% |
| | | | | 22 | 22 | 0 | 44 | NA | RHG | 33 | 10 | 34 | 0 | 45% |
| **VSP-Facility A Total** | | | | **435** | **314** | **0** | **749** | | | **653** | **349** | **396** | **1** | **80%** |
| VSP-Facility B | 001 | B 001 1 | Dorm | 118 | 118 | 0 | 236 | II | PF | 177 | 216 | 20 | 0 | 183% |
| | 002 | B 002 1 | Dorm | 128 | 128 | 0 | 256 | II | PF | 192 | 245 | 11 | 0 | 191% |
| | 003 | B 003 1 | Dorm | 128 | 128 | 0 | 256 | II | PF | 192 | 239 | 17 | 0 | 187% |
| | 004 | B 004 1 | Dorm | 128 | 128 | 0 | 256 | II | PF | 192 | 184 | 72 | 0 | 144% |
| **VSP-Facility B Total** | | | | **502** | **502** | **0** | **1004** | | | **753** | **884** | **120** | **0** | **176%** |
| VSP-Facility C | 001 | C 001 1 | Dorm | 128 | 128 | 0 | 256 | II | PF | 192 | 194 | 62 | 0 | 152% |
| | 002 | C 002 1 | Dorm | 128 | 128 | 0 | 256 | II | PF | 192 | 214 | 42 | 0 | 167% |
| | 003 | C 003 1 | Dorm | 128 | 128 | 0 | 256 | II | PF | 192 | 223 | 33 | 0 | 174% |
| | 004 | C 004 1 | Dorm | 128 | 128 | 0 | 256 | II | PF | 192 | 225 | 31 | 0 | 176% |
| **VSP-Facility C Total** | | | | **512** | **512** | **0** | **1024** | | | **768** | **856** | **168** | **0** | **167%** |
| VSP-Facility D | 001 | D 001 1 | Dorm | 128 | 128 | 0 | 256 | II | PF | 192 | 220 | 36 | 0 | 172% |
| | 002 | D 002 1 | Dorm | 128 | 128 | 0 | 256 | II | PF | 192 | 239 | 17 | 0 | 187% |
| | 003 | D 003 1 | Dorm | 128 | 128 | 0 | 256 | II | PF | 192 | 230 | 26 | 0 | 180% |
| | 004 | D 004 1 | Dorm | 128 | 128 | 0 | 256 | II | PF | 192 | 233 | 23 | 0 | 182% |
| **VSP-Facility D Total** | | | | **512** | **512** | **0** | **1024** | | | **768** | **922** | **102** | **0** | **180%** |
| **Grand Total** | | | | **1961** | **1840** | **20** | **3821** | | | **2942** | **3023** | **786** | **1** | **154%** |

**WSP**  Male Only

| Facility Name | Housing Area Name | Facility Building ID | Type of Bed | Design Bed Count | Overcrowd Bed Count | Medical Bed Count | Total Capacity | Security Level | Program | BP Crowding | Occupied Count | Empty Bed Count | Single Cell | O/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WSP-Central Service | INF | S INF 1 | Cell | 0 | 0 | 10 | 10 | NA | CTC | 0 | 0 | 0 | 0 | |
| | | | | 0 | 0 | 6 | 6 | | MCB | 0 | 0 | 0 | 0 | |
| **WSP-Central Service Total** | | | | **0** | **0** | **16** | **16** | | | **0** | **0** | **0** | **0** | |
| WSP-Facility A | 001 | A 001 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 73 | 27 | 0 | 146% |
| | | A 001 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 69 | 30 | 0 | 138% |
| | 002 | A 002 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 75 | 22 | 3 | 150% |
| | | A 002 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 77 | 23 | 0 | 154% |
| | 003 | A 003 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 82 | 18 | 0 | 164% |
| | | A 003 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 80 | 20 | 0 | 160% |
| | 004 | A 004 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 36 | 62 | 0 | 72% |
| | | A 004 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 43 | 55 | 0 | 86% |
| | 005 | A 005 1 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 69 | 31 | 0 | 138% |
| | | A 005 2 | 270 Cell | 50 | 50 | 0 | 100 | III | GP | 75 | 71 | 28 | 1 | 142% |
| **WSP-Facility A Total** | | | | **500** | **500** | **0** | **1000** | | | **750** | **675** | **316** | **4** | **135%** |
| WSP-Facility B | 001 | B 001 1 | Cell | 46 | 46 | 0 | 92 | NA | RC | 69 | 56 | 13 | 1 | 122% |
| | | B 001 2 | Cell | 55 | 53 | 0 | 108 | NA | RC | 83 | 75 | 14 | 1 | 136% |
| | 002 | B 002 1 | Cell | 53 | 39 | 0 | 92 | NA | RC | 80 | 4 | 78 | 0 | 8% |
| | | B 002 2 | Cell | 57 | 51 | 0 | 108 | NA | RC | 86 | 5 | 97 | 0 | 9% |
| | 003 | B 003 1 | Cell | 47 | 45 | 0 | 92 | NA | RC | 71 | 57 | 27 | 2 | 121% |
| | | B 003 2 | Cell | 57 | 51 | 0 | 108 | NA | RC | 86 | 50 | 46 | 2 | 88% |
| | 004 | B 004 1 | Cell | 49 | 43 | 0 | 92 | NA | RC | 74 | 36 | 52 | 0 | 73% |
| | | B 004 2 | Cell | 59 | 49 | 0 | 108 | NA | RC | 89 | 52 | 48 | 0 | 88% |
| | 005 | B 005 1 | Cell | 46 | 46 | 0 | 92 | NA | RC | 69 | 56 | 35 | 0 | 122% |
| | | B 005 2 | Cell | 54 | 54 | 0 | 108 | NA | RC | 81 | 59 | 47 | 2 | 109% |
| | 006 | B 006 1 | Cell | 47 | 45 | 0 | 92 | NA | RC | 71 | 15 | 74 | 1 | 32% |
| | | B 006 2 | Cell | 55 | 53 | 0 | 108 | NA | RC | 83 | 18 | 83 | 1 | 33% |
| **WSP-Facility B Total** | | | | **625** | **575** | **0** | **1200** | | | **938** | **483** | **614** | **10** | **77%** |
| WSP-Facility C | 001 | C 001 1 | Dorm | 80 | 80 | 0 | 160 | NA | RC | 120 | 124 | 36 | 0 | 155% |
| | | C 001 2 | Dorm | 66 | 66 | 0 | 132 | NA | RC | 99 | 114 | 18 | 0 | 173% |
| | 002 | C 002 1 | Dorm | 80 | 80 | 0 | 160 | NA | RC | 120 | 132 | 28 | 0 | 165% |
| | | C 002 2 | Dorm | 66 | 66 | 0 | 132 | NA | RC | 99 | 98 | 34 | 0 | 148% |
| | 003 | C 003 1 | Dorm | 80 | 80 | 0 | 160 | NA | RC | 120 | 114 | 46 | 0 | 143% |
| | | C 003 2 | Dorm | 66 | 66 | 0 | 132 | NA | RC | 99 | 112 | 20 | 0 | 170% |
| | 004 | C 004 1 | Dorm | 80 | 80 | 0 | 160 | NA | RC | 120 | 129 | 31 | 0 | 161% |
| | | C 004 2 | Dorm | 66 | 66 | 0 | 132 | NA | RC | 99 | 105 | 27 | 0 | 159% |
| **WSP-Facility C Total** | | | | **584** | **584** | **0** | **1168** | | | **876** | **928** | **240** | **0** | **159%** |
| WSP-Facility D | 001 | D 001 1 | Cell | 46 | 46 | 0 | 92 | NA | RC | 69 | 36 | 54 | 0 | 78% |
| | | D 001 2 | Cell | 54 | 54 | 0 | 108 | NA | RC | 81 | 25 | 81 | 0 | 46% |
| | 002 | D 002 1 | Cell | 46 | 46 | 0 | 92 | NA | RC | 69 | 25 | 55 | 0 | 54% |
| | | D 002 2 | Cell | 54 | 54 | 0 | 108 | NA | RC | 81 | 40 | 53 | 1 | 74% |
| | 003 | D 003 1 | Cell | 46 | 46 | 0 | 92 | NA | RC | 69 | 26 | 62 | 0 | 57% |
| | | D 003 2 | Cell | 54 | 54 | 0 | 108 | NA | RC | 81 | 61 | 45 | 0 | 113% |
| | 004 | D 004 1 | Cell | 47 | 45 | 0 | 92 | NA | RC | 71 | 64 | 24 | 0 | 136% |
| | | D 004 2 | Cell | 55 | 53 | 0 | 108 | NA | RC | 83 | 67 | 29 | 0 | 122% |
| | 005 | D 005 1 | Cell | 46 | 46 | 0 | 92 | NA | RC | 69 | 72 | 13 | 0 | 157% |
| | | D 005 2 | Cell | 54 | 54 | 0 | 108 | NA | RC | 81 | 68 | 22 | 0 | 126% |
| | 006 | D 006 1 | Cell | 46 | 45 | 0 | 91 | NA | RHG | 69 | 25 | 63 | 1 | 54% |
| | | D 006 2 | Cell | 54 | 54 | 0 | 108 | NA | RHG | 81 | 32 | 69 | 3 | 59% |
| | 007 | D 007 1 | Dorm | 100 | 100 | 0 | 200 | NA | RC | 150 | 177 | 21 | 0 | 177% |
| **WSP-Facility D Total** | | | | **702** | **697** | **0** | **1399** | | | **1053** | **718** | **591** | **5** | **102%** |
| WSP-Facility H | 001 | H 001 1 | Dorm | 100 | 100 | 0 | 200 | NA | RC | 150 | 179 | 21 | 0 | 179% |
| | 002 | H 002 1 | Dorm | 100 | 100 | 0 | 200 | NA | RC | 150 | 181 | 19 | 0 | 181% |
| | 003 | H 003 1 | Dorm | 100 | 100 | 0 | 200 | NA | RC | 150 | 155 | 43 | 0 | 155% |
| | 004 | H 004 1 | Dorm | 100 | 100 | 0 | 200 | NA | RC | 150 | 179 | 21 | 0 | 179% |
| **WSP-Facility H Total** | | | | **400** | **400** | **0** | **800** | | | **600** | **694** | **104** | **0** | **174%** |
| WSP-MSF | 001 | M 001 1 | Dorm | 48 | 48 | 0 | 96 | I | WC | 72 | 53 | 43 | 0 | 110% |
| | | M 001 2 | Dorm | 48 | 38 | 0 | 86 | I | WC | 72 | 43 | 43 | 0 | 90% |
| | 002 | M 002 1 | Dorm | 48 | 57 | 0 | 105 | I | WC | 72 | 65 | 40 | 0 | 135% |
| | | M 002 2 | Dorm | 48 | 45 | 0 | 93 | I | WC | 72 | 57 | 36 | 0 | 119% |
| | FIR | M FIR 1 | Dorm | 8 | 0 | 0 | 8 | I | FH | 8 | 4 | 4 | 0 | 50% |
| **WSP-MSF Total** | | | | **200** | **188** | **0** | **388** | | | **296** | **222** | **166** | **0** | **111%** |
| **Grand Total** | | | | **3011** | **2944** | **16** | **5971** | | | **4513** | **3720** | **2031** | **19** | **124%** |

Generated by :
dave.leclerc

This report is based on SOMS Bed Data, utilizing the bed status and bed program use. "Empty beds" takes into consideration Single-Celled inmates, and therefore only reflects "vacant" status beds.

# Exhibit 130

# (Intentionally left blank)

# Exhibit 131

**Plaintiffs' Statement Regarding CART and ViewSonic**

**July 22, 2024**

| I.       Introduction |
|---|

On February 24, 2023, following years of advocacy by Plaintiffs' counsel and a report from the Court Expert, the Court ordered Defendants to make CART or an equally effective alternative available at SATF "for due process events, programming, and education . . . as soon as possible." ECF 3467 at 3. After months of representations that they would implement CART for programming and education, Defendants reversed course and identified the "ViewSonic MyViewBoard" technology (hereinafter "ViewSonic") instead of CART—not because it was better, or even equal, but because it was already in the classrooms at SATF (and apparently had been for some time). On December 7, 2023, with no captioning technology yet available at SATF, the Court ordered additional relief:  for Defendants to "provide Plaintiffs with a demonstration of the whiteboard captioning technology in various institutional settings." ECF No. 3538 at 8. The demonstration occurred on March 27, 2024, at San Quentin, and, because Defendants did not have the equipment to allow a successful demonstration, again by audio/video only on June 5, 2024, a demonstration that suffered similar problems due to Defendants' failure to acquire the proper equipment.[1]

Under the ADA, Defendants bear the burden of establishing that any alternative they provide is "equally effective." *See Lavandeira v. City of Tampa*, 2024 WL 1328420, at *4 (M.D. Fla. Mar. 28, 2024) (citing 28 C.F.R. § 35.160(b)(2)); *see also* U.S. Dep't of Justice, Civil Rights Div., Disability Rights Section, ADA Requirements, Effective Communication[2]  (Jan. 2014), at 6 (advising that Title II entities are required to give primary consideration to the choice of aid of a person with a communicative disability, and that "the state or local government must honor the person's choice, unless it can demonstrate that another equally effective means of communication is available.").

---

[1] The limitations of these demonstrations are discussed below in Section (III), and also in Plaintiffs' experts' declarations. *See* Harvey Decl. at ¶ 15–16, McDonald-Peltier Decl. at pp. 4–5, and Watson Decl. at ¶ 28.

[2] https://www.ada.gov/effective-comm.pdf

To evaluate CART and ViewSonic, Plaintiffs retained three consultants with experience relevant to hearing disabilities, CDCR operations, and assistive technology.

- **Etienne Harvey.** Mr. Harvey is a former professor and sign language interpreter with over forty years' experience working in the D/deaf community, and who himself is an adventitiously deaf adult.

- **Jen McDonald-Peltier.** Ms. McDonald-Peltier holds an Assistive Technology Professional (ATP) certification as well as a graduate certification in Augmentative and Alternative Communication (AAP), and has worked with individuals with hearing-related and other disabilities for over two decades.

- **Tremmel Watson.** Mr. Watson is a sign language instructor for non-verbal children and children with autism. Mr. Watson became profoundly deaf in 2020 while in CDCR, and before he was proficient in sign language, used written notes as his primary form of communication. Therefore, Mr. Watson represents the exact type of person that speech-to-text technology is meant to assist within CDCR.

The demonstrations of CART and ViewSonic do not show either technology at its full potential because Defendants did not supply adequate microphones and ensure appropriate connectivity to demonstrate accuracy. Nonetheless, the consultants were able to evaluate the two technologies based on the transcription features and display. Because the built-in features of each technology remain the same, regardless of the quality of microphones or Wi-Fi connectivity, Plaintiffs' experts were able to reliably assess whether CART and ViewSonic had the potential to be effective.

As explained in more detail below, **all three experts agree: ViewSonic is not an effective alternative to CART due to its display features, which cannot be improved with better microphones or connectivity.** *See* Harvey Decl. at p. 13, McDonald-Peltier Decl. at p. 9, and Watson Decl. at pp. 16–17.

## II.    ViewSonic Is Not an Effective Assistive Technology.

The effectiveness of captioning technology depends on how well it allows individuals to **decode** written language. "Decoding" refers to the ability of a reader "to process and make sense of the text they are reading."  McDonald-Peltier Decl. at p. 5.  Put differently, "decoding is the foundation on which a reader builds language understanding and message comprehension." *Id.*  In the captioning context, "decoding is most determined by the display including how fast or how often it refreshes or changes its visual composition, and the font size, font and background colors, and display contrast, among other display characteristics." *Id.*

ViewSonic is not effective because it (A) impedes reading comprehension with an erratic display that deletes, overwrites, and physically moves words around the screen, (B) shows only two lines of text that are stretched horizontally across the entire top of the screen, which rapidly disappear before they can be decoded, (C) lacks indicators of error, forcing deaf people to try to make sense out of captions that are inaccurate or nonsensical, (D) does not indicate a change in speaker, instead treating hours-long, multi-person conversations as a single run-on sentence with inaccurate punctuation, and (E) lacks accessible display customization features, and (F) lacks the ability to generate a corrected transcript, depriving individuals of an opportunity to correct misunderstandings caused by inaccuracies in the original transcription.

### A. ViewSonic's Transcription Is Muddled by "False Starts," Word Changes, and Error Overwriting that Creates Random Word Movements and Nonsensical Captions.

ViewSonic's display pattern is erratic and difficult to read, and "the display rate change of the ViewBoard is an impediment to reading comprehension." McDonald-Peltier Decl. at p. 7. Rather than produce accurate text the first time, "ViewSonic ... display[s] incorrect words as fast as possible, and then [] retroactively fix[es] them, changing the meaning of the sentence and causing the reader to start over." Harvey Decl. at ¶ 44.  As the AI works, ViewSonic's display automatically deletes and re-writes words, meaning entire sentences occasionally disappear, and words jump around the screen. "Visually, this is represented as text appearing and then disappearing and being replaced at a fast rate. The 'display change' on the ViewBoard occurs not only by words being rapidly withdrawn and overwritten, but also because with each word change, the word moves to a different location of the display; for instance, from the bottom to the top line,

3

or from the left to the right side of the screen." McDonald-Peltier Decl. at p. 7. Mr. Watson explained that with ViewSonic, "[t]he length of lines changes rapidly, which can shorten or elongate sentences suddenly. The words of sentences sometimes disappear and are replaced suddenly, forcing the reader to go back and determine what part of the sentence was incorrect the first time and what it has been replaced with, to create a new meaning." Watson Decl. at ¶ 53.

Mr. Harvey explained that ViewSonic had multiple "false starts," in other words, speech correction after an unsuccessful start, "causing the captioning to overwrite text that had already appeared, which created visual distraction." Harvey Decl. at ¶ 29.  Mr. Harvey found "the transcription of ViewSonic to be, simply put, overwhelming." Harvey Decl. at ¶ 28. He further observed that "[t]he sheer number of 'false starts' and movement of words in ViewSonic's transcription is mind-boggling for a deaf person to try to follow along with." *Id.* at ¶ 29.

By contrast, CART had a more consistent reading pattern, "making it more predictable and easier to decode." *See* McDonald-Peltier Decl. at p. 9. It displayed new words in a predictable place (the bottom left, where a new line was being transcribed), scrolled slowly, and did not erase and replace words. Ms. McDonald-Peltier noted that "[t]here is incredibly high comprehension value to a reader knowing that a displayed word is reliable, in other words, that when they see a word, they can be confident that it will stay that word and not change." *Id.*

Even when CART transcriptionists make errors, the captions usually stay on the screen for several minutes and are surrounded by several lines of context, meaning that when a phrase is updated to a more accurate version, the reader can more easily identify the error and re-read the whole sentence to understand the updated version of the transcription. Identification and re-reading of inaccurate sentences is often not possible with ViewSonic, because the lines and words change quickly and remain on the screen for a few seconds, and sometimes less.

For example, in a self-help group, CART showed a single screen with scrolling text (shown below) during an exchange between a facilitator and participant, where the group member shared a Bob Marley quote that he had tattooed on him ("love the life you live, live the life you love"), and was then praised for his insightfulness by the instructor. While neither captioning technology was connected to sufficient microphone technology to make it accurate, the CART display is consistent and presented in a way that readers can intake and comprehend.



By contrast, within the same time (approximately 35 seconds), the ViewSonic displayed the exchange as follows, which did not scroll, but rather flashed eleven different two-line sets of text to get the same point across. ViewSonic also added words that were not spoken by anyone, like "Hey Cortana." Often the words were deleted and overwritten, resulting in multiple displays of changing words within milliseconds.

Picture 1, March 27, 2024, San Quentin at 1:16:11:



Picture 2, March 27, 2024, San Quentin at 1:16:16:



Picture 3, March 27, 2024, San Quentin at 1:16:21:



Picture 4, March 27, 2024, San Quentin at 1:16:28:



Picture 5, March 27, 2024, San Quentin at 1:16:34:



Picture 6, March 27, 2024, San Quentin at 1:16:39:



Picture 7, March 27, 2024, San Quentin at 1:16:46:



Picture 8, March 27, 2024, San Quentin at 1:16:51:



Picture 9, March 27, 2024, San Quentin at 1:16:59:



Picture 10, March 27, 2024, San Quentin at 1:17:02:



Picture 11, March 27, 2024, San Quentin at 1:17:02:



Because ViewSonic does not scroll, but rather flashes two lines of text at a time, the placement of words on the screen does not move up at a consistent rate, and words do not stay in the same place within a given line of text.

ViewSonic can be seen to be moving phrases around, for example: "Bob marking" in Picture 1 is corrected to "Bob Marley" in Picture 2, but the *location* of the word changes, and by the time the accurate words are displayed, they are almost gone, meaning the reader likely would not have time to re-read, understand what to disregard, and understand the new (correct) sentiment. In Picture 3, the phrase "scream stack" appears on the lower line to the right. The next time the captions flash on the screen in Picture 4, "scream stack" has moved to the top left of the screen.

As Ms. McDonald-Peltier observed that "the words often move to a different location on the display; for instance, from the bottom to the top line, or from the left to the right side of the screen. With ViewBoard transcription, a particular word might be in a particular location for only a fraction of a second before it moves somewhere else on the screen." McDonald-Peltier Decl. at p. 7–8. This makes ViewSonic ineffective because "[r]eading fluency is a function of both scanning (reading ahead and coming back) and also reading the sequential words to understand them. The ViewBoard's transcription requires both horizontal and vertical saccades [rapid eye movements] as words move and change along the long lines of text from one line to another. Not only is this hard to accomplish quickly enough to decode text, it is incredibly tiring for readers, which will impact their reading comprehension, and ultimately, their ability to participate in the environment as hearing people do." *Id.* at p. 8.

Importantly, CART transcription contains an approximately five-second lag, which minimizes the number of errors that are displayed on the screen in the first place. CART transcriptionists pause before transcribing, which makes it more likely that they understand the context of what was said and are conveying a coherent phrase. Ms. McDonald-Peltier observed that "CART transcriptionists appear to address errors on the front end of transcription . . . This front-end avoidance of errors is likely part of the reason CART experiences a lag." McDonald-Peltier Decl. at ¶ 14.

Because the CART transcriptionist waits a few seconds to process the audio, once a word or phrase appears in the captioning, it stays in place long enough to be decoded. The longer a word or phrase stays on the screen, the easier it is for individuals to understand the message being conveyed. The same goes for errors: if a word is erased and corrected, it should then stay on the screen long enough to allow readers to read, re-read, identify what the error was, and understand what the correct statement is. Take for instance a teacher's announcement to her class, below, informing them that "we compare our tracking system with yours," which stayed on the screen for over two minutes—long enough for students to see, comprehend, take notes on, and re-reference as the words around it changed.

Picture 1, June 5, 2024, CIM beginning at 00:01:35:



On the other hand, ViewSonic transcribes *before* it understands what the correct word or phrase is. Words will be shown but then deleted, overwritten, and moved as the AI adjusts, causing visual confusion. A line overwriting can be seen on ViewSonic below in Picture 2, below. The overwriting causes the wording to be blurry as the line of text changes from one sentence to another:

Picture 2, June 5, 2024, CIM at 00:02:22:



8

A reader in this classroom would be watching in real time and would not have the benefit of screenshots—they would not have the time to process the visual blurring, try to remember what the line originally said, and comprehend what the line has been "replaced" with, all before the text flashes off the screen again.

**B.    ViewSonic Uses Only Two Rapidly Disappearing Lines of Text Across the Entire Horizontal Length of the Screen, While CART Shows More Context and Is Vertically Stacked.**

ViewSonic's "false starts," overwriting of errors and shifting of words across the screen is compounded by the fact that (1) ViewSonic displays just two lines of text that stretch horizontally across the entire screen, and (2) the two lines of text rapidly disappear before readers can grasp what was on the screen. Mr. Watson explained that "having only two lines of text does not provide enough context for readers to figure out what has happened when errors are made. On top of that, ViewSonic transcribes so quickly that the top line is often gone by the time a change is made to the sentence, making it impossible for a reader to keep up with the changes and to understand what is being said." Watson Decl. at ¶54.

First, ViewSonic is ineffective because its captions are composed of only two lines of text, stretched horizontally across the screen. Ms. McDonald-Peltier explained the ineffectiveness of this display, noting that the horizontal arrangement "negatively impact[s] decoding. With such long lines of text, a reader has visual access to fewer words at a time, because they have to move their eyes much more to visually recognize and decode all the words." McDonald-Peltier Decl. at p. 6. She noted that instead of scrolling its text (like CART does), the ViewBoard flashes one-to-two lines of text at a time, and therefore "[t]he length of the lines affects visual access, impacting both the ability to decode sentences (because it is difficult to see all parts of the sentence at the same time) as well as decoding of individual words which might be missed by the reader due to text line length." *Id.* at p. 6. She noted that "[b]ecause the horizontal length of a line of text has a direct impact on decoding, captioning is generally thought to be more effective where it is visually grouped together in a way that is not too elongated in either a vertical or a horizontal direction." *Id.* at p. 6.

Similarly, Mr. Harvey observed: "Because CART shows multiple lines of transcription at a time and it is vertically organized, it is much easier to focus my eyes to a designated place on the screen where new words should be appearing, and I can easily see multiple lines of context if I

need to reference something above or if I am reading slowly. By contrast, ViewSonic only showed two lines of text across the entire length of the top of the screen, meaning that there was limited context in the transcription to begin with, and related contextual concepts may be visually far away from each other." Harvey Decl. at ¶ 18. He explained why CART's presentation would be more effective for deaf students and participants: "When it comes to students' reading comprehension, the vertical, multi-line presentation of CART's transcript is far superior to the two-line, horizontal organization of ViewSonic's transcript. Reading is easier when it is multi-line and vertically organized; this is why books are printed in "portrait" orientation with multiple lines, and not printed in "landscape" orientation with only two lines across the width of the whole book." *See id.* at ¶ 19.

CART's display, with stacked text that keeps multiple lines on the screen at a time, is more effective for reading comprehension and access, and the multiple lines on the screen at a time contain more available context for the reader:



Second, ViewSonic compounds the challenges posed by the horizontal organization of text by having text disappear too rapidly for readers to keep up. Mr. Harvey explained "[i]n my opinion, the ViewSonic transcription is too fast to be effective for anyone, including myself, and it will be even harder for people with low literacy or other language barriers to be able to read and comprehend." Harvey Decl. at ¶ 32.

ViewSonic's transcription exceeds recommended speeds for transcription in the deaf community. Ms. McDonald-Peltier analyzed the word-per-minute (wpm) rate of transcription for ViewSonic, and found it to be 142 wpm on average, and as high at 170 wpm. McDonald-Peltier Decl. at p. 10. She noted that the Described & Captioned Media Program, a venture funded by the U.S. Department of Education and administered by the National Association of the Deaf, recommends that "[a]ll lower- to middle-level educational media should be captioned at a presentation rate range not to exceed 120–130 words per minute (wpm)." *Id.* at p. 11.

While captions must appear quickly enough to keep pace with the people speaking, the format of ViewSonic causes the text to disappear before readers have the opportunity to fully understand what is written—even very strong readers, such as Mr. Harvey. *See* Harvey Decl. at ¶ 32 ("The transcription speed of ViewSonic was a major detriment to reading comprehension."). This effect will be even worse for the "[m]any people in CDCR [who] are slow readers or have below-average literacy. For these people, ViewSonic will not be effective at all." Watson Decl. at ¶¶ 57. According to the July 1, 2024 DPP roster, the average TABE score for DPH individuals is 6.6. Additionally, thirty-three DPH individuals—or nearly half of the population—had below a fifth-grade reading level. According to Mr. Watson, "[f]or readers who read slowly or have low literacy, ViewSonic's rapid changes to words and line length will be hard to keep up with. When considering that ViewSonic only shows two lines of context for these changes and transcribes very quickly, it will be nearly impossible for slow readers and people with low literacy to keep up." 55.

Finally, the fact that ViewSonic uses only two lines of text that disappear too quickly is exacerbated by the realities of providing captioning of a live, in-person event: the deaf participant needs look about the room, and will miss important information if there are too few lines of text that disappear quickly. Mr. Watson explained that "D/deaf people in prison frequently have to take their eyes off the screen to ensure their safety by observing their surroundings. This would make ViewSonic's speed even more challenging to keep up with, and a reader can easily miss important context if they have only two lines of quickly-disappearing text provided at a time." Watson Decl.

at ¶ 56. There are many other reasons why a deaf person might take their eyes away from a screen—for example, to look at the teacher or other students, to look at their textbook, or to read the expressions and body language of a speaker. While individuals could look around and not miss out on CART's captions—which stay on screen for a sustained period of time—they would miss important information on the ViewSonic display by looking away, even for a few seconds.

### C. ViewSonic Lacks Indicators of Error, Forcing Deaf People to Try to Make Sense Out of Nonsense.

Not only did ViewSonic spit out words as fast as possible, it would continue to do so even when it appeared to have an unreliable audio input, and it would not alert viewers to the fact that there may be an issue with the reliability of the transcription. By contrast, the CART transcriptionist was able to indicate things going on in the room that prevented immediate transcription, such as "[multiple speakers]" or "[away from mic]."

Mr. Watson explained CART's ability to indicate audio problems as "hazard lights." He opined that "'[h]azard lights,' or a technology's ability to indicate problems with the audio, is crucial. When captions specify audio problems such as 'no sound,' 'audio unclear,' or 'audio distorted,' it helps D/deaf viewers understand why they might not be hearing any dialogue. This prevents confusion and frustration." Watson Decl. at ¶ 36. Because ViewSonic continuously transcribes and does not visually indicate problems to viewers, Mr. Watson opined that it can leave deaf people "missing out on important information or context, or trying to make sense out of captions that are incorrect and based on faulty audio." *Id.* at ¶ 37.

Importantly, "'[h]azard lights' are not just about conveying information; they are about ensuring inclusivity, providing clarity, and enhancing the overall accessibility of content for all viewers. CART has the ability to indicate audio issues, which provide equal access to information about pauses and silences in the room, and also can avoid incorrect transcriptions and miscommunications." *Id.* at ¶ 41. According to Mr. Watson, "[i]t is important to note that not only does ViewSonic lack the capacity to visually indicate audio problems the way that CART can, but that when ViewSonic encounters audio issues, it *makes up* inaccurate and false captions instead of going silent." Watson Decl. at ¶ 42. An example of this can be found in the March 27, 2024 San Quentin videos beginning at 1:16:46, where a group participant shared his story in Spanish. Instead of indicating a different language was being spoken, ViewSonic transcribes the entire portion *in English*, using made-up words that sound similar to the Spanish words being spoken. For instance,

as the Spanish speaker began to share his experience in group, the sentence "¿Como saves que tu eres amado?" was displayed by ViewSonic as:



March 27, 2024, San Quentin at 1:17:53.

### D. ViewSonic Does Not Distinguish Between Speakers, a Bare Minimum Requirement for Effective Transcription.

As Mr. Harvey explained, "transcription must include bare-minimum visual cues to indicate a change in speaker to be effective. ViewSonic lacks even the most rudimentary form of visual cuing to indicate different speakers." Harvey Decl. at ¶ 40. ViewSonic does not visually distinguish between speakers, meaning deaf users have no information whether the transcription they are seeing is a back-and-forth conversation, or one long, unbroken monologue. Indeed, ViewSonic often did not correctly indicate where one sentence ended and another began, much less distinguish between different speakers. "Without knowing which words form a question, the answer, or a different person starting a new thought, captioning is ineffective." *Id.* at ¶ 40. Mr. Harvey described the difficulty this creates for the reader, saying:

> ViewSonic presented multi-person conversation as one long continuous conversation without breaks. . . I couldn't tell if one person was speaking, if multiple people were speaking at the same time, or if what was being said was a question, an answer, or just a thought. ViewSonic erratically self-corrected its one long run-on sentence, and because all that was happening simultaneously, I couldn't process the words or context of a conversation. ViewSonic will not provide D/deaf people an effective understanding of a conversation, unless it deploys different features with line breaks and speech identifiers. ViewSonic will be inadequate as long as it lacks visual cues for changes in speakers.

Harvey Decl. at ¶ 42.

Mr. Watson explained the profound consequences of ViewSonic's lack of speaker identification:

> This means that entire conversations and self-help groups, which include multiple people sharing their experiences and thoughts, giving feedback to each other, or answering prompts from the facilitator get reduced down to a single run-on sentence by ViewSonic. From a D/deaf person's point of view, these heartfelt,

13

> sensitive, and collaborative conversations appear to be one single person giving a long and incoherent speech. ViewSonic's inability to correctly punctuate or indicate a change in speaker is a massive disadvantage compared to CART. Even if ViewSonic's captions were 100% accurate, when they take a collaborative conversation and change it into one long run-on sentence with poor punctuation, the captions are virtually useless to a D/deaf person.

Watson Decl. at ¶ 48.

By contrast, CART indicated a change in speaker with ">>." Mr. Watson observed: "CART's presentation indicates a change in speaker, which is critical context for a D/deaf person in a self-help group, classroom, or any other setting. For instance, visual cuing for different speakers lets a D/deaf person know that someone is changing the subject, offering a new opinion on something, or answering a question." Watson Decl. at ¶ 48. For deaf persons who want to see who is talking, it also provides an important cue for deaf persons to go look for a new speaker.

### E.  ViewSonic Lacks Accessible Display Customization Features.

CART's display can be customized, while ViewSonic lacks of display customization features that allow for font size and contrast changes—particularly important accessibility features for individuals with vision issues. Mr. Harvey noted that "the pace, font size, line text length, vertical organization, and black/white contrast of CART seemed to be adequate for classroom involvement, and these features were missing with ViewSonic." Harvey Decl. at ¶ 25. Not only were those features missing from ViewSonic during the demonstrations, but the ViewSonic board does not have the ability to adopt any of those features, such as higher black/white contrast or bigger font size. Ms. McDonald-Peltier noted that "the only way to make the ViewBoard bigger is to have a bigger screen—there is no software setting available to adjust the ViewBoard's display to meet the needs of a given environment, or with a given reader." McDonald-Peltier Decl. at p. 14. She noted that "[v]isual presentation, such as font size, color, and contrast, can be important for decoding and recognition . . . for the most part there will not be one-size-fits all display characteristics that are relevant to group situations. This is why the availability of display customization options is an important metric for effective assistive technologies." *Id.* at p. 12.

### F.  ViewSonic Has No Ability to Generate a Transcript.

ViewSonic has no ability to generate a transcript, which creates inequality in settings where hearing students can take their own notes. Mr. Harvey explained that a transcript "is a massive advantage for D/deaf students in any context where hearing students would be allowed to take notes . . . because if a student relies on visually intaking information instead of hearing it, it is impossible for them to both read captions and look at a keyboard or screen to take notes. [It is] an impossible task for a D/deaf person to simultaneously watch captions or learn through visual cues while *also* taking their own notes . . . If ViewSonic does not provide a written transcript of a lesson and it is used in situations where hearing people can take notes, then it is categorically ineffective and discriminatory towards D/deaf students." Harvey Decl. at ¶ 24. Mr. Watson also underscored that "[i]f hearing students can take notes during a lesson, fairness dictates that D/deaf students should have access to a complete transcript." Watson Decl. at ¶ 57. He explained that "a CART transcriptionist can provide a corrected transcript of a conversation or group session after it happens in real time. This capability is incredibly helpful to D/deaf participants and is essential for ensuring equal access in settings where written notes are allowed." *Id.*

CART's ability to provide a corrected transcript also helps with any inaccuracies that might happen during transcription. Mr. Watson explained that "[h]aving access to a full and corrected transcript allows D/deaf individuals to revisit lessons, complete assignments accurately, and fully understand complex topics. In educational and group settings, this is crucial for retaining and advancing through the information required to obtain milestone credits." Watson Decl. at ¶ 58. ViewSonic cannot provide corrected transcripts, meaning deaf students will not have notes of what happened (like everyone else), and will not have misunderstandings cleared up in the event they do not see or comprehend an error during the live transcription.

### III.    CDCR Must Implement CART for Programs and Activities Without Delay.

It is unfortunate that Defendants provided only a single alternative to CART, and after nearly seventeen months since the Court's order requiring CART or an effective alternative, they have not shown their chosen alternative to be effective. It is entirely possible that there are available, effective captioning technologies that rival or surpass CART, particularly with modern advances in artificial intelligence. However, Defendants have not offered an AI-based alternative that has accessible features or that displays words so that they can be decoded and understood by deaf users. The Plaintiff class can no longer wait for enforcement of the Court order, and CART

should be implemented immediately at SATF and any institution where deaf non-signers may live, with high-quality microphones suited for group environments, so that these vulnerable class members may finally participate in activities and programs.

All three of Plaintiffs' experts have opined on how ViewSonic's inherent technical features—which will not be changed by improved microphones—are ineffective. Technical characteristics can set different types of accessible technology apart; therefore, an expert's testimony on the technical, built-in functionality of an auxiliary device is relevant to the "effectiveness" inquiry. *See, e.g.*, *Meyer v. Walthall*, 528 F. Supp. 3d 928, 942 (S.D. Ind. 2021) (finding fact issues precluded summary judgment in a Title II case involving the effectiveness of Braille documents, where the Plaintiffs' expert was able to read the documents but nonetheless found deficiencies in the documents such as "incorrect formatting, numbering, capitalization, and punctuation . . . lack of margins, tables not presented with proper formatting, extra symbols and characters, improper spacing, and improper paragraph formatting"). Based on the readily-observable technical features of each captioning technology, all three of Plaintiffs' experts have found that ViewSonic is not an effective alternative to CART, and that it does not have the potential to equal CART in its effectiveness.

Plaintiffs' expert Jen McDonald-Peltier defined the metric for "effectiveness" in an assistive technology based on her decades of experience advising schools and other entities on the effective assistive technologies: she opines that effectiveness is not determined by the sophistication, speediness, or cost of the technology, but rather "the effectiveness of an assistive technology is determined by how helpful the technology is in light of its task, environment, and user." McDonald-Peltier Decl. at p. 4. Speech-to-text transcription is meant to be used in due process events, programming, and education, all of which are long and complex encounters depending on interpersonal understanding and conversation. For most CDCR programs—such as self-help programs and group classes that help individuals earn milestones and prepare to seek parole—the rehabilitative value of the group lies in differentiating between facilitators' questions and participants' answers, understanding who is speaking, identifying differing perspectives, relating it to personal experiences, and gaining insight from multiple people sharing their opinions. *See* Watson Decl. at ¶¶ 12–16.

Ms. McDonald-Peltier's metrics for effectiveness mirror the standards of the ADA. The regulations implementing Title II of the ADA explain:

> The type of auxiliary aid or service necessary to ensure **effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place.** In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities. **In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.**

28 C.F.R. § 35.160(b)(2) (emphasis added).

For the reasons above, ViewSonic's display prevents decoding, and therefore it cannot transcribe the nature, length, or complexity of groups and programs within CDCR—even if the microphones were to improve. Accordingly, it is not an effective alternative to CART.

Finally, it's worth noting that Defendants carried the burden of proving that ViewSonic is an effective alternative to CART , and were required to meet this burden by preponderance of the evidence. *See Lavandeira v. City of Tampa*, 2024 WL 1328420, at *4 (M.D. Fla. Mar. 28, 2024) (citing 28 C.F.R. § 35.160(b)(2)); *see also* U.S. Dep't of Justice, Civil Rights Div., Disability Rights Section, ADA Requirements, Effective Communication[3] (Jan. 2014), at 6. Defendants did not meet their burden[4] to show that their chosen alternative is effective, and failed to produce even reliable demonstrations[5] of the relevant technologies. Therefore, CART must be implemented immediately and without further delay.

---

[3] https://www.ada.gov/effective-comm.pdf

[4] Defendants cannot meet their evidentiary burden, because they have not produced reliable evidence in the first place. Despite acknowledgment that microphone quality impeded the first demonstration, Defendants have failed to use suitable microphones subsequently in the demonstration process. They also have failed to demonstrate CART and ViewSonic at SATF, despite Plaintiffs' requests, and despite SATF being the institution where Defendants have been ordered to provide the captioning services. Defendants' failure to provide evidence using workable technology, or to test the technology in the setting where they have been court-ordered to provide it, has made it difficult (if not impossible) to meet their burden. In particular, that Defendants cannot (or will not) show CART operating within its normal, expected functionality brings into question their ability to demonstrate captioning technology to any reliable degree for the purposes of this dispute.

[5] Defendants provided a second set of videos to Plaintiffs' counsel on June 21, 2024. One video was from San Quentin, showing two locations. In the first location (in ISUDT), the audio is such poor quality that it is hard for to hear what is going on, making it difficult to assess the transcription. In the second location (Education), both screens initially show ViewSonic, and neither show CART. A few minutes in, the error is noticed, and only then to the demonstrators try

CART continues to be a reliable, effective choice despite Defendants' failure to effectively demonstrate it. By virtue of its regular use by Title II entities, CART is a reliable option that a court can (and has) adopted for suggested use. CART is used routinely used and recommended by state and local governments,[6] and is recognized by the federal government as a reliable service "that can be provided on-site or remotely, [and] is particularly useful for people who are deaf or have hearing loss but do not use sign language."[7] Indeed, the fact that it "is a common auxiliary aid provided by Title II entities" is relevant to how it compares against competing auxiliary aids. *See Martinez v. Cnty. of Alameda*, No. 20-CV-06570-TSH, 2024 WL 871408, at *5 (N.D. Cal. Feb. 29, 2024). CART technology has already proven effective by virtue of its ubiquitous use. *See, e.g.*, Harvey Decl. at ¶ 13; Watson Decl. at ¶¶ 7, 21. Defendants have failed to show that ViewSonic can effectively replace CART.

Importantly, identification and vetting of an alternative technology must be done through consultation with expert(s) with experience in the relevant field of disability (here, hearing-related disabilities). In an opinion issued earlier this month, the United States District Court for the Middle District of Tennessee determined that the Tennessee Department of Corrections' proffered expert was not qualified to opine on whether the Department had provided "effective" accommodations through VRS (video relay services) and VRI (video remote interpreters) because he did not have experience working with hearing-related disabilities. The court explained: "Nothing about [the proposed expert's] experience, however, suggests he is qualified to testify as an expert on the topic

---

to get CART online, taking the majority of the rest of the video. There are less than 4 minutes of usable video showing both CART and ViewSonic, and the CART transcriptionist indicates "[away from mic]" for the majority of that. The second video is from California Institute for Men (CIM), and was obviously edited by CDCR, with at least one segment missing and replaced by an inserted slide with text. The microphones during the CIM demonstration are an impediment again, evidenced by the CART transcriptionist indicating "inaudible" or "away from microphone" numerous times. The audio quality of the video garbles and makes it difficult to assess the accuracy of both CART and ViewSonic's transcription.

[6] *See, e.g.*, Illinois Deaf & Hard of Hearing Commission: https://idhhc.illinois.gov/content/dam/soi/en/web/idhhc/community/documents/cart/cart-provider-brochure-2.pdf; *see also* Denver Office of Sign Language Services, https://denver.prelive.opencities.com/files/assets/public/v/1/human-rights-amp-community-partnerships/offices/deaf-and-hard-of-hearing-services/documents/cart-remote-cart-info-sheet-002-002.pdf.

[7] https://www.ada.gov/resources/effective-communication/

of whether any particular communication option is 'effective' for individuals with hearing-related disabilities . . . [b]ecause [the expert] cannot testify regarding the effectiveness of any accommodation, he cannot testify on any question that would hinge, in any part, on that issue, such as whether DOC's efforts have been reasonable." *See Trivette v. Tenn. Dept. of Corr.*, 3:30-cv-00276, ____ WL _____ at \*69 (M.D. Tenn. July 9, 2024). Whether an auxiliary aid is effective for a given disability is a technical question that cannot be answered by lawyers' argumentation alone, and if Defendants do not provide insights from an expert with experience working with hearing disabilities, it is unlikely they can meet their burden. Testimony from an expert who does not work with hearing-related disabilities sheds no light on whether an assistive technology is effective for people with hearing disabilities, and it cannot meaningfully challenge the testimony of an expert with experience working with hearing disabilities. Plaintiffs sincerely hope that Defendants consult with relevant experts next time they seek to implement an alternative technology to the one that the Court has ordered—but now, Defendants have failed to show that ViewSonic is effective, and must comply with the Court's order by implementing CART immediately to avoid continued discrimination against deaf and hard-of-hearing people.

Exhibit 132

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94-2307-CW |
| Plaintiffs, | |
| v. | **DECLARATION OF ETIENNE HARVEY, MA** |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

I, ETIENNE HARVEY, declare as follows:

1.  I am a retired college professor of American Sign Language (ASL) with over four decades of experience working in the D/deaf community. In particular, I specialize in the instruction of foreign-born deafened individuals with no language base and who are limited in expressing themselves in any language, including ASL. These individuals are often referred to as having minimal language skills.

2.  I am an adventitiously deaf adult, meaning I became deaf after acquiring language. I grew up speaking both English and ASL. I use captioning in my day-to-day activities, as well as in my professional life.

3.  I am a former full-time professor for the State Center Community College District at Fresno City College, where I taught courses from 2010 to 2023. I taught American Sign Language, basic vocabulary, grammar, and culture of the Deaf community. I introduced students to the literary and artistic contributions of the Deaf. I also served as the Lead Trainer for the Men of

Color Mentoring Project, "The Brotherhood: Empowering African American Males Towards Excellence" at Fresno City College.

4.    I have over forty years' experience working in the D/deaf and hard of hearing community. In 1989, I became the Assistant Director of the Center for Communicative Development, after working there for a decade. Over that decade, I held various roles at the Center, including administrative assistant and evening school instructor. I worked with deaf adults with minimal language skills and I taught language development, including instruction in sign language. I taught language development and sign language to students who came from other countries with no language whatsoever, including rudimentary signing abilities.

5.    In 1999, I founded ET INTERPRETING, a sign language agency that provides American Sign Language interpreting/transliterating services to D/deaf, hard of hearing, Deafblind and hearing consumers in a variety of community settings.

6.    I hold certifications in ASL translation from the State of California Department of Rehabilitation, the Registry of Interpreters for the Deaf, and the National Association of the Deaf.

7.    I have received multiple recognition awards presented by the Center for Communicative Development, and the Medallion Award presented by the Los Angeles Unified School District for my work with the D/deaf community, particularly in the area of enhancing communication. I am the author of a chapter on the topic of Hearing Loss in the 2002 textbook entitled "Medical, psychosocial, and vocational aspects of disability." Brodwin, M.G., Tellez, F., & Brodwin, S. K.  (Eds.). (2002). (2nd ed.).

## Experience with Captioning Technology

8.    I used captioning in my classrooms at the Center for Communicative Development under certain circumstances, such as when I showed students information about current events and when I taught reading and writing.

2

9.    In my professional life as a sign language interpreter, I evaluated live captioning on behalf of clients. One experience that sticks out to me is a deaf client who was a member of a city-planning commission. There, a live captioner was used for commission meetings, and it was my responsibility to watch and assess the captions to ensure that the deaf member was receiving accurate information with enough context so that they could equally participate in their duties. In other words, I was hired to watch and assess the CART accuracy against the spoken word.

10.   In my personal life, I use captioning technology for day-today activities, including when interacting with merchants, communicating with law enforcement, and when I communicate with non-signers. I use captions to interact with students, to hold meetings with other professionals, and when involved in on-campus activities.

11.   I regularly consult others within the deaf community regarding captioning technology, and in particular, AI-generated captions. I regularly attend groups and community events for D/deaf individuals, including the Valley Deaf Festival and "What Did You Say?", a local support group for individuals who are deaf and hard of hearing to share tips and strategies for effective communication. These groups and communities are always seeking out the best AI, since it is important for effective communication. Individuals in these groups share information about the best and most useful AI they have discovered or are using. Overwhelmingly, people in the D/deaf and hard of hearing community report that the AI that they find useful for transcription is Otter AI and AVA AI.

12.   I understand that CDCR has represented that the ViewSonic whiteboard relies on "Microsoft AI." I have not previously heard of "Microsoft AI," and I have not heard of it being used by anyone else that I consult with.

13.   On the other hand, Communication Access Realtime Translation, or CART, is used regularly in the D/deaf community. I have seen the effectiveness of CART during teaching and professional conferences, where CART captioning

3

is provided alongside an ASL interpreter. I have seen the effectiveness of CART in meetings with rehabilitation counselors when working as an interpreter during meetings held in the State of California Department of Rehabilitation. When a non-signer with hearing loss is impaneled for a jury, CART services have been offered to allow equal access. CART services have also been offered to class members going before board panels. In both these instances, I have observed the effectiveness of CART as both an interpreter and a consultant. CART relies on a human transcriptionist as opposed to artificial intelligence.

## Review of Demonstration Materials

14.    I have been asked to render an opinion about the relative effectiveness between two captioning technologies: CART and the "ViewSonic Whiteboard." I reviewed two sets of video materials to render this opinion: first, I viewed videos from a March 27, 2024 demonstration at San Quentin showing ViewSonic and CART technologies in four separate environments. I also reviewed videos produced to Plaintiffs' counsel on June 21, 2024.

15.    When I first reviewed the videos, I did it alone, without a hearing person to describe the audio to me. The ViewSonic transcription was inadequate because it lacked delineation of speakers, and it caused confusion by rapidly and repeatedly overwriting information. On the CART side of the screen, it did appear that a transcriptionist was present, but due to their inability to hear well enough to transcribe, often no captions appeared. On the ViewSonic side of the screen, information was being transcribed, but it rarely displayed intelligible sentences.

16.    Therefore, instead of assessing accuracy, I focused instead on the visual presentation of the captions on both technologies.

17.    My opinion focuses on the technological features of the ViewSonic and CART displays, including the rate of transcription, visual presentation, and display-related factors affecting reading comprehension. These features relate to *how* the two different technologies present information, and not necessarily the substance of the information itself. Technological features are inherent to

4

the two technologies, and my assessment of them would likely be unaffected by the substance of the transcription. I render my opinions under the assumption that the substantive accuracy could be improved in the two technologies with better connectivity and microphones (for CART) or better artificial intelligence and microphones (for ViewSonic).

**Assessment of CART and ViewSonic**

18.    When assessing the captioning technologies' effectiveness in a group setting, I thought the visual presentation of the information was more effective using CART than ViewSonic.

**CART**

19.    First of all, the transcription in CART is vertically organized, meaning that I do not have to scan my eyes across the entire left-to-right length of the top of the screen, like I do with ViewSonic, to understand the sentences. Because CART shows multiple lines of transcription at a time and it is vertically organized, it is much easier to focus my eyes to a designated place on the screen where new words should be appearing, and I can easily see multiple lines of context if I need to reference something above or if I am reading slowly.   By contrast, ViewSonic only showed two lines of text across the entire length of the top of the screen, meaning that there was limited context in the transcription to begin with, and related contextual concepts may be visually far away from each other (for instance, at the top left and bottom right of the screen). ViewSonic also had multiple "false starts" – it's not normal for a reader to have to read the entire length of a screen, and then have it disappear and have to start over. This makes reading the captions incredibly difficult.

20.    When it comes to students' reading comprehension, the vertical, multi-line presentation of CART's transcript is far superior to the two-line, horizontal organization of ViewSonic's transcript. Reading is easier when it is multi-line and vertically organized; this is why books are printed in "portrait" orientation with multiple lines, and not printed in "landscape" orientation with only two lines across the width of the whole book.

5

21.    Even though the font size on CART was not particularly large on the videos I reviewed, the display format and visualization made it a lot easier on my eyes to read. For instance, there was white space around words, and the words were presented as black letters on a white background. CART had a white background with black lettering, which was easier on my eyes. The contrast of the words against the background stood out to me as superior and easy to read. However, it is important for a captioning technology to have adjustable backgrounds to accommodate individuals' vision needs.

22.    In particular, the pace of transcription was easier to follow, contextualize, and comprehend. Unlike in ViewSonic, a CART transcriptionist puts spaces between each word and spaces the sentences to make clear where one sentence starts and another begins.  Spacing between separate words and distinct sentences is a fundamental feature of effective communication, and the fact that ViewSonic does not have spaces between words or identifiable spacing between sentences makes it difficult to read and comprehend, and in that way, it is inferior to CART.

23.    ViewSonic did not appear to be able to identify when there was a mistake; it just kept transcribing new information. By contrast, the CART transcriptionist could indicate errors and alert the reader to changes by indicating "inaudible." The CART captionist can inform the reader of environmental noises, whereas ViewSonic is unable to explain distortion. The difference between CART and ViewSonic is akin to the difference between autocorrect and a live human editor: the human intelligence has awareness and can better indicate errors and problems.

24.    It is my understanding that CART provides the opportunity for a transcript to be generated after a class or lesson. While some situations may involve sensitive information and would not be appropriate for people to take notes or for there to be a permanent transcript, a transcript is a massive advantage for D/deaf students in any context where hearing students would be allowed to take their own notes. Indeed, transcripts and written supplements produced by teachers are the norm in the D/deaf community, because if a student relies on visually intaking information instead of hearing it, it is impossible for them to

6

both read captions and look at a keyboard or screen to take notes. An impossible task for a D/deaf person is to simultaneously watch captions or learn through visual cues while *also* taking their own notes. This is why professional note-takers are commonly offered as a reasonable accommodation. In any situation where hearing students would be allowed to be able to take their own notes and review them later, a D/deaf student should be provided access to a transcript to review later. If ViewSonic does not provide a written transcript of a lesson and it is used in situations where hearing people can take notes, then it is categorically ineffective and discriminatory towards D/deaf students. My understanding is that CART transcriptionists can provide "notes" in the form of a transcript, and therefore CART technology does not present the same issue of unequal access as ViewSonic does.

25.   Overall, the pace, font size, text line length, vertical organization, and black/white contrast of CART seemed to be adequate for classroom involvement, and these features were missing with ViewSonic. These features will make reading the transcription much more comfortable for a reader's eyes and neck, and easier to comprehend. The features of CART's transcription make it easier for a reader to be engaged. By contrast, when watching the two-line ViewSonic transcription, the reader may feel rushed and unable to catch the changing words and context quickly enough. CART also had an advantage over ViewSonic during pauses in the lesson, because it kept the transcript on the screen for as long as possible, allowing the reader to review what had been said.

26.   ViewSonic not only has rapidly-changing words with not enough lines of text, but those lines of text would then disappear quickly, even during pauses. The lack of a permanent, steady transcript can make a reader feel disengaged and isolated when the words disappeared.

27.   The fundamental difference between ViewSonic and CART is that CART uses human intelligence. A human being has awareness, and can provide accuracy not only in terms of grammar and words, but can provide an accurate description of who is speaking, what the distractions are, and what the feelings

7

in the room are. A human person hears and experiences what happens in the room, and is captioning that information to the reader, human-to-human. The captioner can convey emotion in voice, intonation, and context. A human transcriptionist can capture audible information that is accessible to others, and can provide it to the reader. This creates an overall more accurate experience for the viewer, and cannot be accomplished by artificial intelligence.

## Assessment of ViewSonic Performance

### *ViewSonic Has an Overwhelming and Erratic Word Display*

28.    I found the transcription of ViewSonic to be, simply put, overwhelming. This is primarily due to the fact that the computer would adjust individual words and phrases multiple times, meaning that words might appear, disappear, and be replaced rapidly, sometimes mid-word.

29.    In the field of interpreting, correcting one's speech after an unsuccessful start is considered a "false start." ViewSonic had multiple "false starts," causing the captioning to overwrite text that had already appeared, which created visual distraction. The sheer number of "false starts" and movement of words in ViewSonic's transcription is mind-boggling for a deaf person to try to follow along with.

30.    In addition to the difficulty presented by how often and how fast individual words changed, the *location* of the changing words posed a problem. ViewSonic appeared not only to rapidly delete and replace words as they were being newly transcribed on the bottom line of text, but would also change and replace words on the top line of text right before it scrolled out of sight. The presentation of words was erratic, and changes were occurring in the words on both lines of text, sometimes in different places on the screen, simultaneously. For instance, ViewSonic would produce a new word in transcription that appeared on the bottom line of text, while simultaneously deleting and replacing a word farther back in the sentence, on the top line of text on the left side of the screen. Because multiple parts of the two lines of

8

text would change throughout transcription, it was difficult to know where to look when trying to read the transcription.

31.    View Sonic only showed two lines of text across the entire length of the top of the screen, and as mentioned previously, the visual spread of the information makes it difficult to see important context from the same sentence in the same place. The horizontal length of ViewSonic's captioning lines would also present a problem in environments where the transcription must be read for more than a few minutes, as it requires side-to-side head movement that can become uncomfortable.

32.    The erratic word changes in ViewSonic was compounded by the speed of ViewSonic's transcription. In my opinion, the ViewSonic transcription is too fast to be effective for anyone, including myself, and it will be even harder for people with low literacy or other language barriers to be able to read and comprehend. When words in a sentence would change retroactively, for instance, on the top line of text near the left side of the screen, a reader who is paying attention to the bottom line of text (where new words are being transcribed) would likely not have time to look back at the changed word, read it, and understand it in context before it scrolled away. The transcription speed of ViewSonic was a major detriment to reading comprehension.

33.    At the sentence level, ViewSonic's AI was too unsophisticated to use proper grammar, and often it did not even put spaces between words. Sentences would be punctuated by random periods, making it difficult to know which words belonged together in a sentence, or where one sentence ended and another began. This is a threshold impediment to reading comprehension.

34.    When reviewing videos of ViewSonic, I had my foreign-born students in mind and did not think it would be useful to them at all, particularly due to ViewSonic's speed and incorrect grammar. As I continued to watch, I realized that ViewSonic would be ineffective for any reader at any level of education; its two lines of frequently-changing text do not provide enough context, and it is difficult to follow due to visual presentation and incorrect grammar and spacing.

9

35.  ViewSonic did not appear to be transcribing accurate, comprehensible sentences, and even if it was, the *display* itself is ineffective for reading comprehension. Altogether, ViewSonic has too much visual distraction, and not enough context when transcribing. ViewSonic lacks the ability to capture the affect of the speakers, whereas CART is able. This invaluable information is essential because research shows deaf persons of hearing families are often times excluded from the collection of knowledge based on cultural practices commonly referred to as **"FUND OF KNOWLEDGE,"** which is part of one's family's inner culture. By not being part of this learning experience, a deaf person suffers severe language deprivation. Therefore, CART's ability to capture the affect of the speakers contributes to the cognitive and conceptual skills for a deaf person.

### *ViewSonic Lacks Bare-Minimum Speaker Identification or Differentiation*

36.  Speaker identification and speaker differentiation are both useful techniques in captioning. Speaker identification matches speech input to a specific speaker or type of speaker. For instance, a technology that can indicate "Tom speaking," or "Speaker B" would be providing speaker identification. Speaker differentiation does not provide specific information about the speaker's identity, but it does indicate a change in speaker. For instance, a transcriptionist may be able to indicate ">>>" or "Q:" and "A:" to indicate a change in speech between a person asking a question and a person answering a question. Speaker differentiation indicates in some visual way that the speaker has changed, by using an arrow, line break, or some other visual cue.

37.  When D/deaf people are in situations designed for hearing people, they operate with incredibly limited information about what is going on around them. They do not have audible cues to know who is speaking, or where they are in the room. They cannot hear intonation to know whether something is a question or a statement. And they will not have information about anything happening in the room without some cue that comes from their other senses. Usually this is a visual cue.

10

38.   To be effective, captioning needs a visual indicator for new subject matter. A new line, indentation, or other visual cue must be incorporated into captioning to indicate change. Otherwise, the meaning of many conversations is lost.

39.   The ideal visual cue for a change in sound input is an audio description. These cues are those that are used for sound effects on captioned movies (such as "dog barking," or "loud explosion"). Nuances in the audio in a room allow a D/deaf person to know what others are hearing and reacting to, and provides important context. Audio descriptions can help a D/deaf person to feel totally involved in what's happening around them.

40.   At minimum, transcription must include bare-minimum visual cues to indicate a change in speaker to be effective. ViewSonic lacks even the most rudimentary form of visual cuing to indicate different speakers. Without knowing which words form a question, the answer, or a different person starting a new thought, captioning is ineffective.

41.   CART's live captioning included visual cues in the form of arrows. This is the minimum needed to achieve effective transcription. CART's text was presented in block style, and because it used visual cues to indicate a change in speaker, I was able to determine that all of the information between a set of arrows was one thought, or one speaker.

42.   By contrast, ViewSonic does not have arrows or any other visual cues that would allow it to provide the minimum context necessary to be effective. ViewSonic turns a thirty-minute conversation with multiple speakers, questions, answers, and viewpoints from different people into one long continuous sentence. ViewSonic presented multi-person conversation as one long continuous sentence without breaks. When watching the ViewSonic transcription, I couldn't tell if one person was speaking, if multiple were speaking at the same time, or if what was being said was a question, an answer, or just a thought. ViewSonic erratically self-corrected its one long run-on sentence, and because all of that was happening simultaneously, I couldn't process the words or context of the conversation. ViewSonic will not provide D/deaf people an effective understanding of a conversation, unless it deploys

11

different features with line breaks and speech identifiers. ViewSonic will be inadequate as long as it lacks visual cues for changes in speakers.

***ViewSonic's Speed of Transcription Hinders Comprehension***

***Consecutive Versus Simultaneous Transcription***

43.    In my opinion, ViewSonic was not equally effective to CART due to its fast rate and simultaneous transcription. Simultaneous transcription involves transcribing speech into written text in real-time as the speaker is speaking.

44.    ViewSonic was not able to process pauses, and instead would display incorrect words as fast as possible, and then would retroactively fix them, changing the meaning of the sentence and causing the reader to start over.

45.    In contrast to simultaneous transcription, consecutive transcription involves listening to a segment of speech and then transcribing it into written text after the speaker has finished speaking. Sign Language Interpreters, and all language interpreters, use consecutive interpretation. We wait for all the information, and then interpret it once we are sure of the correct meaning, taken in context.

46.    Consecutive interpretation/transcription is better for the recipient of information and a much more effective means of communicating. Consecutive interpretation provides a more accurate and effective form of communication with D/deaf populations.

47.    CART's transcription appears to be a consecutive form, which is more accurate and effective. ViewSonic, which transcribes words as fast as possible without consideration of context, does not meet this principle and is less accurate and effective.

48.    My review of the videos indicated that the CART transcriber was able to pause and listen for accuracy. The CART captioner could then transcribe information in coherent, complete sentences or phrases. On the other hand, ViewSonic had multiple "false starts" and still would not convey the correct information. This means a D/deaf reader must not only process quickly, but

12

may need to go back and start over if it turns out ViewSonic's immediate transcription was incorrect or incomplete. Because ViewSonic did not pause to gather context and ensure accuracy before transcribing, it was less effective than CART.

**Conclusion**

It is my professional opinion that ViewSonic is not equal to CART because it uses simultaneous transcription without waiting to ensure that the captions are coherent, it does not indicate a change in speaker, it does not use correct punctuation, the AI appears to lacks the ability to pick up important context and nuance that is apparent to hearing individuals, and perhaps most importantly, the display rapidly erases and overwrites words, changing the meaning of the captions and the placement of the words, making it mind-boggling to try to read. Based on its inherent features alone, ViewSonic was not an effective auxiliary aid from my perspective.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed this __17__ day of July, 2024.

_Etienne Harvey_

Etienne Harvey

13

Exhibit 133

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

JOHN ARMSTRONG, et al.,

Plaintiffs,

v.

GAVIN NEWSOM, et al.,

Defendants.

Case No. C94-2307-CW

**DECLARATION OF JEN MCDONALD-PELTIER, MS, ATP**

I, JEN MCDONALD-PELTIER, declare as follows:

I am an Assistive Technology (AT) and Augmentative and Alternative Communication (AAC) Specialist, with over two decades of experience in access technologies, and over three decades of experience working with people with disabilities.

I obtained my Bachelor's Degree from the University of California, Berkeley, in 1992, and my Master's Degree in Special Education from Southern Connecticut State University (SCSU) in 2005. I was a lab assistant in SCSU's Adaptive Technology Lab, where I wrote training modules for adaptive software tools, and assessed students with disabilities to determine the appropriate assistive technologies to meet their individual needs.

Since 2008, I have been certified as an Assistive Technology Professional (ATP) by the Rehabilitation Engineering and Assistive Technology Society of North America (RESNA). That certification has been renewed every two years since, and in 2023, I earned a graduate certification in Augmentative and Alternative Communication from San Francisco State University.

Since 2000, I have worked at the Center for Accessible Technology in Berkeley, California, a nonprofit organization that works to provide technology-based solutions to overcome barriers for people with disabilities. As part of my work, I routinely conduct AT and AAC assessments for individuals across the need spectrum to determine the most suitable access tools based on their individual needs and disabilities. For over twenty years I have served and worked with individuals with a variety of disabling conditions including

1

hearing loss and deafness (both from birth and late-onset); I have also studied American Sign Language (ASL).

I have been asked by Plaintiff's counsel, the Prison Law Office, to review and compare two assistive technologies as used in the California Prison System: the ViewBoard MyViewBoard (or "ViewBoard") and Computer-Assisted Real-Time Transcription (CART). I have been asked to render an opinion as to whether the ViewBoard Whiteboard is equally effective to CART. Prior to my work on this case, I was familiar with CART as a form of assistive technology regularly used in deaf communities. I am also familiar with smart boards, although I do not see smart boards being used with their built-in captioning in schools or other places where I work. However, real-time automated captioning (like that used on the ViewBoard) is becoming increasingly common as an assistive technology.

To render an opinion in this case, in addition to relying on my training and experience with assistive technologies, I attended an in-person demonstration of CART and the ViewBoard Whiteboard on March 27, 2024 at San Quentin Rehabilitation Center. I reviewed the videos produced from that demonstration. I also reviewed a second set of videos demonstrating CART and the ViewBoard Whiteboard that were provided to me by Plaintiff's counsel on June 24, 2024. In addition, my methodology for assessing the ViewBoard against CART involved consulting an end-user—in other words, a deaf person for whom the technology is made—to fill gaps in my perception of the technology. For instance, features that may seem preferable to a hearing person (such as transcription speed that is almost simultaneous with extempore speech) may actually be seen as a detriment by an end user (as is the case with the ViewBoard, which was considered too fast for the end user). The preferences and experiences of end users are vital for assessing assistive technology, and consultation with an end user is essential for forming a reliable opinion on assistive technology.

It is important to see that captioning technology is effective in three contexts: **lecture** (one person speaking), **discussion** (solicited back-and-forth where the speakers take turns), and **conversation** (multi-speaker, free-flowing conversation where speech may overlap). I understand some of the environments where captioning technology will be used include mental health groups, educational classes, and self-help groups and interactive programs. Therefore, the focus of my assessment in the videos from San Quentin and California Institute for Men (CIM) was primarily in the educational and self-help group settings, where both "discussion" and "conversation" were present. This is because most of the contemplated uses of captioning within CDCR will involve discussion and conversation, and importantly, conversational contexts are the hardest to transcribe,

making them the most illustrative when gathering information about a technology's capability and effectiveness.

## I.    Accessible Technology Vs. Assistive Technology

"Assistive technology" and "accessible technology" are related concepts but serve distinct purposes in enhancing accessibility for individuals with disabilities. **"Accessible technology"** refers to devices, tools, software, or equipment that is designed with built-in accessibility functions to eliminate barriers to use from the outset. Accessible technology involves inclusive design principles that are integrated into the original design and development process from the outset. An example of accessible technology is a mobile phone operating system programmed with a built-in screen reader that translates visual and textual elements on the screen into spoken text, making the device inherently accessible for people with vision disabilities.

**"Assistive technology,"** on the other hand, functions as a *supplement* to technologies that are already in use, but are inaccessible in their original form. Assistive technology refers to devices, tools, software, or equipment specifically designed to help people with disabilities perform tasks that might otherwise be difficult or impossible. These technologies aim to compensate for disabilities, such as impediments to communication, and enable individuals to function more independently. Assistive technology is typically implemented after a disability has been identified to address specific needs. Examples of assistive technology include refreshable braille displays for blind users, adaptive keyboards for those with limited dexterity, and hearing aids for hard-of-hearing individuals.

Captioning is an **assistive technology**; it is a technological solution used to supplement or compensate for the inability to hear in an environment that is otherwise inaccessible to deaf individuals. Because captioning aims to make spoken language-based services in California prisons usable by a broader range of people, it is critically important that the technological solution implemented by CDCR have strong audio capture capabilities.

The "effectiveness" of any assistive technology is not determined by universal factors that might be used by the general, non-disabled population to assess technology; faster speed, higher-quality components, modern advancement, or a higher price do not automatically make assistive technology more effective for any given population with specific needs.

Instead, **the effectiveness of an assistive technology is determined by how helpful the technology is in light of its task, environment, and user.**

- ***Task:*** This is the task that the user needs to accomplish with the technology, including the underlying purpose of the task. For instance, in a college classroom, the task and purpose of the lessons are not only attendance, but participation and learning. Users with hearing disabilities need assistive technology that not only allows them to visually access the lesson, but that does so in a way that they can process, understand, and comprehend. Where the course requires discussion, the technology must allow the user to see questions and answers, and to differentiate between them (e.g., where the question originated from the professor to the class, with multiple students attempting to answer until the professor is satisfied). Where the course requires reference back to materials (e.g., to study to pass an end-of semester test), a technology will be effective if it has features that allow for storage and audio-based retrieval.

- ***Environment:*** This includes both the physical and social environment of the task, as well the user's access needs within the environment. For instance, a technology will only be effective if it can account for the acoustics of the room, the amount of ambient noise, and the space between the source(s) of audio and the user. How well the assistive technology accounts for the user's position in the environment (e.g., how close they are to the source(s) of audio) also factors into the technology's effectiveness.

- ***User:*** This refers to the capabilities and individualized needs of the user. The effectiveness of a technology will depend on how useful and supportive it is for users when factoring in their reading ability, cognitive ability, eyesight, physical limitations, or any other individualized factors.

## III.  Measuring the Effectiveness of CART and ViewBoard Captioning Technology in CDCR Programs and Activities

I first note that based on my observations of CART and the ViewBoard at San Quentin and my subsequent review of videos, neither tool met the effectiveness standard (task, environment, user)—but each for different reasons. CART was ineffective during the visit due to what seemed to be connectivity issues and microphone issues. At one point during the demonstration, we were told that the receiver for the CART microphone had been lost. The ViewBoard, on the other hand, seemed to be transcribing most of the time.

4

The issue was that the *substance* of the transcription was incorrect, and its visual presentation was difficult to decipher.

A factor common to both CART and the ViewBoard was substandard microphones and audio feed. It was apparent that neither technology could pick up all words spoken in any environment, particularly the larger chapel where a self-help group was being held.

In summary: the demonstration set up for us by CDCR was negatively impacted by poor microphone quality. On top of the audio feed issues, CART appeared to have connectivity issues, and the ViewBoard had accuracy and display issues. It is possible that the ViewBoard's accuracy issues were also due to connectivity problems if the artificial intelligence uses web-based programming to assist with vocabulary and processing. However, if connectivity does not explain the ViewBoard's inaccuracy, the only other explanation that I can think of for the inaccuracy would be low recognition accuracy of the AI used for the ViewBoard.

While both technologies suffered from microphone problems and potentially from connectivity problems, the one thing we were able to comprehensively and conclusively assess during the demonstration was each technology's **display** and visual presentation. Display and visual presentation are inherent features in a technology's design, and therefore I would not expect the display characteristics of either CART or ViewSonic to change once connectivity and microphone issues are improved.

1.    **Decoding**

Technology can impact how easily a message is decoded. **"Decoding"** refers to the ability of a reader to convert written or printed text into meaningful language. It involves using knowledge of letter-sound correspondence, phonics, word recognition, and other language structures to understand written words and sentences. Decoding enables individuals to process and make sense of the text they are reading in order to understand the words and sentences built with them. In the context of assistive technology and captioning, decoding is most determined by the display including how fast or how often it refreshes or changes its visual composition, and the font size, font and background colors, and display contrast, among other display characteristics.

Decoding is the foundation on which a reader builds language understanding and message comprehension. While technology cannot ensure that a reader fully comprehends the underlying *message* being displayed, comprehension can only arise after the reader is able to decode the words and sentences being shown. Understanding and comprehension

are a function of literacy, experience, vocabulary, and language, and not necessarily provided by assistive technology. What assistive technology does provide, however, is an opportunity for a reader to decode a message, and they cannot comprehend a message without decoding it first. Because the function of assistive technology is to assist a reader to decode, I focus on the decoding capacity of CART and ViewBoard.

ViewBoard has several features that prevent effective decoding. The number of words that a person has visual access to directly impacts the person's ability to decode what is being transcribed. ViewBoard provides words across nearly the entire visual horizon (horizontal, at the top of the screen), negatively impacting decoding. With such long lines of text, a reader has visual access to fewer words at a time, because they have to move their eyes much more to visually recognize and decode all the words. With fewer lines of text and less visual access to the words at any given time, a reader has less context to help them understand as they decode. This challenge is exacerbated by the short duration that the words are displayed; instead of scrolling its text, the ViewBoard flashes one-to-two lines of text at a time. The length of the lines affects visual access, impacting both the ability to decode sentences (because it is difficult to see all parts of the sentence at the same time) as well as decoding of individual words which might be missed by the reader due to text line length.

Because the horizontal length of a line of text has a direct impact on decoding, captioning is generally thought to be more effective where it is visually grouped together in a way that is not too elongated in either a vertical or a horizontal direction. Words that are "clumped" allow for less visual scanning and more simultaneous visual access of words. Fewer eye movements across long lines of text allows for easier decoding. For example, the concepts transcribed in green are easier to quickly decode than their counterparts in red:

| Original Narration |
| --- |
| I found that it was a lot easier to keep track of the words and the lines. |

| Edited |
| --- |
| I found it much easier to keep track of words and lines. |

| Original Narration |
| --- |
| And even though they're looking at the word, their focus is going elsewhere. |

| Edited |
| --- |
| They're looking at the word, but their focus is elsewhere. |

| Original Narration |
| --- |
| And what we're saying is that people with dyslexia tend to get distracted by the words on either side. |

| Edited |
| --- |
| Words on either side tend to distract people with dyslexia. |

National Association for the Deaf, Described and Captioned Media Program (DCMP), Captioning Key.[1]

### 2. Rate of Display Change Impacts Decoding

Next, the **<u>rate of display change</u>** on the ViewBoard is too high, which negatively impacts decoding. The ViewBoard makes real-time edits to the words and phrases resulting in words and entire portions of sentences being overwritten, sometimes multiple times. Visually, this is represented as text appearing and then disappearing and being replaced at a fast rate. The "display change" on the ViewBoard occurs not only by words being rapidly withdrawn and overwritten, but also because words often move to a different location of the display; for instance, from the bottom to the top line, or from the left to the right side of the screen. With ViewBoard transcription, a particular word might be in a single location for only a fraction of a second before it moves somewhere else on the screen. Altogether,

---

[1] https://dcmp.org/learn/601-captioning-key---presentation-rate

the display rate change of the ViewBoard is an impediment to reading comprehension. The rate at which words are transcribed, then deleted, then replaced, all affect readability. The rate of display change includes not only the number of words that change and how often those changes occur, but how much the resultant meaning of the transcription changes when words change. Therefore, the ViewBoard presents not just word changes, but **word/meaning changes**.

In addition to word/meaning changes, the ViewBoard transcription is fast and only displays two lines of text that change frequently, move around the display, and disappear quickly. The entire visual transcription is made up of very few rows of lines, which are rapidly changing in horizontal length, are rapidly changing in substance, and that disappear off the screen quickly. This creates an **inconsistent reading pattern** that impedes decoding. The fewer retroactive word/meaning changes in the transcription, the easier it is for readers to decode and comprehend. More retroactive word/meaning changes in the transcription makes it harder for readers to decode and comprehend.

The rate of display change affects the number of **saccades** required from a reader. Saccades are rapid movements of the eyes that occur when we shift our gaze from one point to another. During a saccade, the eye moves quickly and abruptly in a specific direction, and these movements are essential for scanning the visual environment and directing the fovea (the central part of the retina responsible for detailed vision) towards objects of interest and, when reading, towards words that must be decoded. While saccades can be consciously controlled to some extent, they also occur involuntarily as part of our natural visual processing. Saccades play a crucial role in visual perception by constantly shifting the gaze so that the fovea can gather detailed information about objects or scenes. The more saccades required, the harder the text is to decode.

The numerous word/meaning updates in the ViewBoard's transcription require rapid and numerous saccades while reading, impacting reading comprehension. Reading fluency is a function of both scanning (reading ahead and coming back) and also reading the sequential words to understand them. The ViewBoard's transcription requires both horizontal and vertical saccades as words move and change along the long lines of text and from one line to another. Not only is this hard to accomplish quickly enough to decode text, it is incredibly tiring for readers, which will impact their reading comprehension, and ultimately, their ability to participate in the environment as hearing people do.

To analogize the visual decoding difficulties posed by the ViewBoard's fast rate of transcription, two-line display, and frequently-changing words, imagine this listening analogy: you are listening to a person speak, but whenever they misspeak, they have the

ability to instantaneously overlap their incorrect statement with a new statement. This means you hear both their original words and their new words almost simultaneously; the speaker is using an average rate of speech, but has effectively fit two statements into the time that it would usually take to say one statement. You hear both at the same time at the same rate, but have to decipher which is the correct statement. Moreover, as new words come out, you cannot be sure they will remain, because they may be overlapped with new words at any time, at which point you as the listener will be responsible for recalling words you heard (but are now gone) and reconciling them with the new words (which you hear in an almost-overlapping manner). Now, picture that on top of the words themselves changing, the *place* where the speaking is coming from is too spread out for you to focus your hearing. Just as the ViewBoard presents words in a long visual line of text, picture the beginning of the spoken sentence and the end of their sentence originate from two different audio speakers, set up across from each other in a room. Like visual saccades, you will need to make rapid auditory adjustments to focus your hearing between the audio speaker on one side of the room the the audio speaker on the other. These circumstances significantly restrict the listener's ability to decode and retain what is being said, particularly over a sustained period of time.

CART's transcription has a more consistent reading pattern and slower rate of display change, making it more predictable and easier to decode. For the most part, words do not change once they have been transcribed on the CART display. There is incredibly high comprehension value to a reader knowing that a displayed word is reliable, in other words, that when they see a word, they can be confident that it will stay as that word and not change.  ViewBoard is less predictable; there, the words, meanings, and display each change as words on the screen are retroactively revised and as words move around the two lines of text. Coupled with the fast rate of transcription and the fact that the visual area is spread out horizontally, ViewBoard's visual transcription was less accessible than CART's.

Overall, the style and rate of display change for the ViewBoard is an impediment to reading comprehension of the conversations going on in the room. The CART display changes as well, but in more consistently predictable ways. Because the **task** that must be performed using captioning technology within CDCR—whether it is in self-help programs, study groups, or classes—is to understand and comprehend conversations, I am not convinced of the ViewBoard's effectiveness as a captioning technology in CDCR environments.

### 3.    Speed of Transcription Has Been Found to Negatively Affect Decoding, and Too-Fast Transcription Is Counterproductive to Captioning

While speech-to-text transcription that is simultaneous with spoken words might seem to be desirable, in reality, captions that move at the rate of speech can be counterproductive. The National Association for the Deaf, in setting forth a policy and philosophy on transcription speeds, summarized in a report for the federally funded research entitled "Caption Speed and Viewer Comprehension of Television Programs" (1999) that noted:

> At first glance, the idea of verbatim captioning is very appealing. Allowing a deaf or hard of hearing person to read every word that is spoken on television means that the person has full access. However, it may be possible for spoken television dialogue to go so fast that most people cannot read its verbatim captioning. Creating captions which are delivered too fast to read is counter-productive to the entire purpose of captioning.[2]

As part of my review of the CDCR videos, I analyzed the **rate of transcription** or in other words, the transcription's words per minute (wpm), from the ViewBoard from three clips of video taken during participatory groups at two different prisons. The first segments of video I analyzed were from videos taken on March 27, 2024 at San Quentin, at four-minute intervals from the 1:07:39 mark, when the group started. Then by using two sets of four-minute intervals followed by a one-minute rate measurement after each internal measurement covered a total of 10 minutes of video. Similarly, I analyzed a segment of video taken on June 5, 2024, from a participatory group at CIM at a four-minute interval from when the video group started, which was at the 0:03:49 minute mark. I chose set intervals of four minutes within each video to ensure that I was capturing as close to "random" portions of video as possible, without actively seeking portions of video that were biased toward either technology. That being said, I avoided portions of the videos where the ViewBoard was not transcribing anything, as those portions would not accurately reflect rate of transcription.

The transcription rate for the ViewBoard was, on average, **142 wpm**, and at times was at high as **170 wpm**. This is an approximation and may be an undercount, because I

---

[2] DCMP, *Notes on Research Concerning Captioning Presentation Rate*,
https://dcmp.org/images/learning_center/captioning-key/documents/captioning_presentation_research.pdf

was not always able to keep track of the number of words that that were displayed, but then deleted and overwritten, by the ViewBoard.

The ViewBoard's rate of transcription is far too fast, according to prevailing standards in the deaf community. The Described & Captioned Media Program, a venture funded by the Department of Education and administered by the National Association of the Deaf, recommends that "[a]ll lower- to middle-level educational media should be captioned at a presentation rate range **not to exceed 120–130 words per minute (wpm).** Upper-level educational media may be captioned slightly above the 120–130 wpm range. No caption should remain on-screen less than two seconds."[3]

While CART may have lag time in its captions, that lag is likely to be more effective for group participants in CDCR, especially those with lower reading levels. Lag time in captioning is normal and does not necessarily diminish the effectiveness of captioning. By contrast, captions that appear at a rate similar to spoken words, like on the ViewBoard, have been shown to be *ineffective*. In a 1980 study entitled "Captions and Reading Rates of Hearing-Impaired Students," students watched captions at the same rate of normal extempore speech, which was determined to be 159 wpm. According to DCMP, the study "found that if speech on television/films was synchronized in content and speed with captions, approximately 84% of hard of hearing students were not able to read it. (That is, 84% of the students in the study possessed reading rates below the 159 wpm of extempore speech.)."[4]

Similarly, in a 1998 study of closed captions involving elementary school deaf students, researchers "found that the time constraint of captions further compounded the literacy problem for deaf readers as captions move quickly off the screen. Deaf readers also exhibited a lack of fluent word reading, which adversely affects comprehension; word-reading fluency depended on the ability to recognize (effortlessly and automatically) letters, spelling patterns, and whole words. In addition, students who viewed captions at a slower pace of 78 wpm retained significantly more information than students who viewed captions at an average rate of 116 wpm."[5]

---

[3] DCMP, Captioning Key for Educational Media: Guidelines and Preferred Techniques," 0. 12 (2010), Described & Captioned Media Program (Funded by the Dept. of Education) https://access-ed.r2d2.uwm.edu/resources/captioning-key.pdf

[4] DCMP, *Notes on Research Concerning Captioning Presentation Rate*, https://dcmp.org/images/learning_center/captioning-key/documents/captioning_presentation_research.pdf

[5] *Id.*

The ViewBoard transcribes almost simultaneously with speech—a feature that has been found to be "counter-productive to the entire purpose of captioning." J. Jensema, "Caption Speed and Viewer Comprehension of Television Programs" (1999). The ViewBoard's rate of transcription exceeds recommended levels for transcription in educational settings and in settings where users have lower- to middle- level reading rates. This problem is compounded by ViewBoard's high rate of display change, making it even harder to decode.

It should be noted: not all environments will benefit from slower rates of transcription, and there may be times where faster transcription is more effective, based on the task, environment, and user of the technology. However, speed will always be secondary to effective decoding of the message; if the transcription is moving too fast for someone to be able to process in the first place, they will not be able to keep up with the conversation at all. Accuracy and the opportunity to process (i.e., decode, understand, and comprehend) make a technology more effective than having no lag time does.

Overall, the ViewBoard's transcription was ineffective because it transcribed at a rate that is far above the recommended wpm rate for educational transcription, at *all* levels of education. Moreover, the ViewBoard transcribed at almost the same rate of normal extempore speech, which is considered to be counterproductive to the fundamental purpose of captioning, and will be ineffective for all but the highest level of readers. CART had short delays in transcription and a slower rate of transcription, making it more effective than the ViewBoard for decoding and comprehension.

### 4.      Visual Presentation Can Affect Decoding and Reading Comprehension

Visual presentation, such as font size, color, and contrast, can be important for decoding and recognition—however, many of these metrics can and should be individuated, or tailored to specific needs. While there are some visual presentation characteristics that can be universally said to be ineffective, such as a lack of contrast between background and text, for the most part there will not be one-size-fits-all display characteristics that are relevant to group situations. This is why the availability of **<u>display customization options</u>** is an important metric for effective assistive technologies.

In group settings or settings with multiple users of captions, the best we can get is display options "approaching universal access"—in other words, guidelines that are close to universal for display boards. Options that approach universal access on a captioning screen would include:

(1) the length of text lines, which determine the distance that eyes have to travel to read the text. This metric is also impacted by the reader's distance from the screen, as the proportional length of the lines to the reader's visual field will change as the reader gets farther from the screen.

(2) The amount of text on the screen at a given time. The amount of text needs to be appropriate to allow decoding, with enough text to give context.

(3) Time that captions appear on screen. Captions must appear with enough time to view and decode them before they disappear.

(4) Devoted versus overlapping display, i.e., whether captions are displayed on a dedicated screen, or overlapping on the same screen as other information.

For decoding purposes, the most important of these display features is the length of text lines and the amount of text on the screen. **Customization of display is** important for correct font size for viewing distance, as the exact display features necessary in any environment will depend on the environmental purpose, subject matter, and reader's needs.

Some display features have guidelines for approaching universal access; for instance, there are general guidelines for the size of text relative to distance from screen:

**Reading Distance and Font Size**

| Reading Distance | | Minimum Comfortable Font Size | Comments |
|---|---|---|---|
| 1.2 feet | 0.35 m | 8 points | This is the typical reading distance for a book. Most people prefer text to be 10, 11, or 12 points at this distance. |
| 2.4 feet | 0.7 m | 16 points | This is the closest comfortable distance for reading a large poster. |
| 5.0 feet | 1.5 m | 32 points | In many settings this is as close as one can get to a poster. Sometimes this is because the poster is roped off, or in other cases, large crowds simply make close approach difficult. |
| 25.0 feet | 7.5 m | 160 points | For almost any setting, you want a title that can be read from at least this far away. |

*See* Science Buddies, "Everything you need to know about fonts for display boards," https://www.sciencebuddies.org/science-fair-projects/science-fair/display-board-fonts (last accessed July 2, 2024).

Again, for multi-purpose captions in a variety of settings, **customization options** are paramount; the text size has to be able to change based on a reader's distance from the screen, as well as their eyesight capabilities. It is my understanding that CART has customization options, but ViewBoard does not. Therefore, the only way to make ViewBoard bigger is to have a bigger screen—there is no software setting available to adjust the ViewBoard's display to meet the needs of a given environment, or with a given reader.

In the context of captioning, punctuation is part of presentation. Accurate punctuation provides more effective comprehension because it aids the reader in *extracting* meaning from words.  In groups and classes based on conversation, there is no punctuation in the "source," because the source is spoken words. Hearing people do not need punctuation in the source, because they use other "interpretive" cues—pauses in speech, inflections, intonation, and changes in volume. When a person does not have auditory access to a conversation, but rather only visual access to a conversation, punctuation provides *interpretive cues.* In other words, punctuation is to D/deaf people what inflection and intonation is to hearing people; it is the part of speech that involves some amount of subjective interpretation.

Whether punctuation is done by a human intelligence (i.e., captioner) or an artificial intelligence, it is interpretive. The effectiveness of the interpretation is directly dependent on the effectiveness of the intelligence's ability to interpret human emotion and meaning when speaking.

### 5.    Identification of Errors and Treatment of Errors

It is important that any assistive technology be able to identify, acknowledge, and address errors. With fewer transcription errors, it is easier to comprehend transcription messages. CART transcriptionists appear to address errors on the front end of transcription—they do not put any captions up until they are confident in what the words are. This front-end avoidance of errors is likely part of the reason CART experiences a lag. On the other hand, ViewBoard's AI corrects errors in real time, meaning the display shifts as recognition corrects. A shifting display, if too rapid, can impede reading comprehension.

Moreover, if an error occurs during transcription, such as audio or connectivity problems, CART gives a visual indication something is wrong (for instance, by showing "away from microphone"). ViewBoard's AI on the other hand will make a best guess; it will fill something in, rather than wait to avoid error. When ViewBoard transcribes words irrespective of whether a tech problem has occurred a non-hearing person will not be able

14

to identify the erroneous words as distinguished from accurate words. They will therefore understand nonsensical and/or nonsequitur words to be an accurate reflection of what is being said, likely causing confusion.

Finally, to be effective, protocols must be in place to minimize user-based errors in the technology. Individuals who interact with a technology must not only know how to use it, but how to maximize its use. For instance, instructors who teach captioned classes must not only know how to set up the captioning equipment, where it belongs in the room, and how to troubleshoot technical problems, but they must also be instructed on *behavioral* techniques they can employ to maximize use of the technology, such as speaking slowly or adopting a practice of asking speakers to identify themselves whenever they speak.

During the demonstration at San Quentin, the teacher who demonstrated CART and the ViewBoard in a classroom setting told us that she spent time before the demonstration to prepare the ViewBoard slides to be compatible with the captioning display. Because the ViewBoard captions overlap with whatever else is on the screen, she explained that when she first tried to use ViewBoard captions with her PowerPoint presentation, the captioning overlapped with wording at the top of the slides, making it hard to read. She said she had to go back and compact her PowerPoint slides to leave enough blank space at the top of the screen for the ViewBoard captions to be seen. If the ViewBoard is used in CDCR, teachers and other presenters need to be instructed on how to change the aspect ratio of PowerPoint slides and other visuals *for every single class, program, and presentation* given, so as not to conflict with ViewBoard captions. In addition, because the ViewBoard technology does not have customizable display, teachers and presenters will have to consistently adapt the background of their presentation so that is has an appropriate contrast that can make the ViewBoard's white text visible.

Teachers and facilitators who use an AI-based system of captioning will need more thorough training than teachers who interface with a human transcriptionist. A human transcriptionist provides a second layer of human awareness to identify and trouble shoot problems, and they can communicate directly with the teacher or facilitator about issues. AI, on the other hand, cannot work collaboratively with teachers and group facilitators. Teachers and group facilitators utilizing AI will need to be able to identify and solve issues on their own, and they will need to be trained to maximize use of the technology without assistance or help.

**Conclusion**

While I applaud CDCR's commitment to increasing programmatic access for all participants, I see many shortcomings in the ViewSonic ViewBoard technology that inhibit reading access to spoken content.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge

Signed this 21st day of July, 2024.

Jen McDonald-Peltier, MS, ATP

16

Exhibit 134

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94-2307-CW |
| Plaintiffs, | **DECLARATION OF TREMMEL WATSON** |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

I, TREMMEL WATSON, declare as follows:

1.     I am a special-needs and American Sign Language (ASL) instructor working for the City and County of San Francisco Recreation and Parks Department, where I instruct children with autism and non-verbal children in sign language. I regularly collaborate with nonprofit organizations such as the San Francisco Bay Area ASL Space and ASL Love, a San Francisco-based organization dedicated to showcasing Deaf artists' work. I do freelance graphics design, and design graphics for the San Francisco Recreation and Parks Department that are meant to provide information to deaf and hard of hearing communities.

2.     I am also a technology entrepreneur with a background in accessible programming for D/deaf individuals. I developed a mobile app (that has not yet launched) for teaching sign language, ensuring its accessibility, and have worked with developers to ensure that it meets the needs of its target audience. Additionally, I have experience managing a web hosting company and overseeing website hosting and forums.

3.     I became profoundly deaf in 2020 while incarcerated. As someone who is late-deafened, my primary language was English, and I did not initially speak ASL. I have relied on captions and written notes as a primary means of communication since losing my hearing.

1

4.    I rely use captions every day to communicate with coworkers and loved ones. I am familiar with the breadth of captioning technologies available and the developments in AI that are being integrated into captioning technologies. Numerous different types of AI are used for captioning technology, and not all of them are equal.

5.    Accurate captioning technology is vital for D/deaf individuals in prison to comprehend what is being transcribed and understand the context of discussions. In the prison environment, where safety and awareness of surroundings are paramount, captioning technology must allow D/deaf people to scan their environment while reading captions. ViewSonic's rapid and often inaccurate transcription fails to meet these needs, making it inferior to CART. For instance, I use Sorenson CaptionCall to make phone calls and save transcripts of calls, Apple's FaceTime captioning, and Zoom's integrated captioning. I have also used TTY phones in CDCR programs and Purple in Sacramento County Jail for ASL video chat with interpreters.

6.    Additionally, I have participated in special events such as the Juneteenth celebration organized by STEP (Strategies to Empower People). STEP is a leading agency in California providing services to Deaf individuals in ASL, and it is one of the largest employers of Deaf people in Northern California. At the Juneteenth event, I helped pass out beverages, and we used built-in captioning on Apple iPhones and ASL to communicate effectively within the community. This event brought together a notable Deaf community, including retired individuals like my aunt, Desiree Pollard. At the recent ASL celebration event in San Francisco, where I helped sign people in, I witnessed firsthand how effective communication methods can foster a sense of community and inclusion. Despite the bustling environment, the use of live interpreters ensured everyone, regardless of hearing ability, could participate fully and enjoy the event.

7.    Many people I know through STEP are familiar with and regularly use CART (Computer-Assisted Real-Time Translation) for accurate and real-time transcription, including in their college classes, which underscores the importance and effectiveness of captioning technologies in ensuring communication accessibility for Deaf individuals.

2

8.      I am also formerly incarcerated, and I have firsthand experience understanding the needs of D/deaf people in a prison environment. In many ways, the captioning needs of D/deaf people in prison are the same as in the D/deaf community: they need to be able to read and comprehend what is being transcribed, and they need context to understand how that transcription relates to what is going on around them (whether it is a classroom lesson, a group meeting, or a presentation at a conference).

9.      On the other hand, D/deaf people in prison have unique needs that are crucial to their success and safety in their particular environment. D/deaf people in prison are hypervigilant about their surroundings, and need assistive technology that allows them to use their eyes for reading captions *and* that gives them the flexibility and freedom to check their surroundings for safety. Since D/deaf individuals cannot hear alarms, yelling, officers' directions, people approaching behind them, or other auditory cues that signal danger, they develop a heightened sense of visual awareness to compensate. This can manifest as being extremely attentive to their surroundings, constantly scanning for potential hazards or changes in their environment. Technology that does not allow D/deaf people to visually scan their environment, such as captions that are too fast and disappear off the screen, will always leave D/deaf people in prison at a disadvantage.

**<u>The Need for Accurate, Easy-to-Read Captions in CDCR</u>**

10.     I became completely deaf while I was incarcerated in 2020. At the time, I did not speak ASL. The California Department of Corrections and Rehabilitation (CDCR) did not provide the necessary accommodations for me to participate fully in programs or classes. CDCR only provides assistance if ASL is your primary method of communication. Since I did not have ASL as my primary communication method, I primarily relied on written notes. Therefore, captioning technology like CART or ViewSonic would have been particularly beneficial for me. People like me, who are deaf but do not have ASL as a first language, are the target population for technologies like CART.

11.     During my time in CDCR, I struggled significantly to follow along in various groups and educational settings due to the lack of accessible communication tools. Many of these programs, which are crucial for earning

3

milestone credits, are heavily reliant on group discussions. Homework assignments often required us to reference something discussed in the group and relate it to our personal experiences.

12.    Without accurate captioning technology that could tell me who was speaking, I was unable to participate fully in discussions in group settings where dynamic interactions and multiple speakers were involved. If I couldn't grasp who was speaking and whether different insights were being offered, then I couldn't grasp the meaning of the group. That meant I could not learn from the group.

13.    I received fewer milestones than my hearing peers because I had trouble completing assignments and understanding what was going on in class. While other students could clearly hear the group facilitator ask questions, and then gain insight from multiple people sharing their opinions, I did not have access to that information.

14.    I knew another deaf non-signer while I was in prison. His ASL skills were very limited—in fact, he only knew the basic alphabet. He also did not receive accommodations from CDCR to help him participate in classes and programs. He was serving a life sentence, and his chances of parole were negatively impacted because he was not able to participate in classes or groups without captions being provided. He was not able to pursue his GED, because it was not realistic to ask the teacher to use written notes for everything that was being conveyed during the lesson from both the teacher themselves and the other students. Something like CART would be incredibly beneficial to him, and even help him get paroled and reenter the community, if the captions were effective in the classroom.

15.    I think it's important to highlight that without captioning, people like me face significant barriers in prison. For example, in educational classes, the lack of proper captioning meant I missed out on the valuable exchanges between the teacher and other students. These interactions often contain insights and information that are critical for understanding the lessons. With accurate captioning, I could have followed along with the lesson in real-time, just as my peers did. This inclusion would have allowed me to engage with the material, understand the questions being asked, and participate actively in the discussions.

4

16.     In school, effective captioning was important for doing homework, understanding and completing assignments, reaching milestones, understanding when a question has been asked and what the right answer is, and ultimately, for passing the class. Without effective captions in classrooms, I was left behind and unable to complete my GED.

17.     Participation in educational programs and self-help groups is essential for rehabilitation and earning milestone credits. For instance, in one particular group session, the homework required us to reference a discussion we had in the group and explain its relevance to our personal situations. Without CART, I couldn't keep up with what was being said. The inmates who were supposed to take notes for me often didn't capture the entire conversation, leading to incomplete information and leaving me out of the loop. This not only affected my ability to complete the assignments but also made me feel isolated and disengaged from the group.

18.     In self-help groups and educational classes, the lack of proper captioning isolated me from discussions, making it challenging to engage and benefit from the programs.  I could not participate in groups or follow group discussions, which left me feeling isolated and disengaged from the community. These technologies provide real-time, accurate transcription of spoken words, and indicate when different people are speaking, which would have allowed me to keep up with group discussions, understand the context of the lessons, and engage fully with the educational material.

19.     The use of CART or similar captioning technology would have significantly enhanced my ability to participate and rehabilitate. In essence, having access to CART would have enabled me to be an active participant rather than a passive observer, ultimately impacting my learning and personal development positively.

## Review of Demonstration Materials

20.     I was asked by Plaintiffs' counsel to compare Computer-Assisted Realtime Transcription (CART) technology with the ViewSonic Whiteboard technology, and to render an opinion about whether ViewSonic is equally as effective as CART.

5

21.    To render my opinion, I have relied on my experiences with CART and ViewSonic technology in a wide variety of personal and professional contexts. I have seen CART used effectively in numerous settings, including legal proceedings, educational environments, and community events. For instance, CART is commonly used in courtrooms to provide accurate, real-time transcription of proceedings, ensuring that all participants, including those who are D/deaf or hard of hearing, can follow the dialogue. Many college students also rely on CART for lectures and seminars, where it helps them keep up with fast-paced academic discussions. Additionally, CART is trusted by community organizations that host events requiring precise communication, such as public forums and workshops.

22. During my criminal court proceedings, I relied heavily on CART. In one particular case, I was able to follow the fast-paced dialogue of multiple attorneys because the CART transcriptionist accurately indicated who was speaking and provided essential context cues. This made a significant difference in my understanding and ability to participate.

23.    In contrast, I have experience using ViewSonic in an attempt to facilitate my communication with other professionals in my work at the San Francisco Recreation and Parks Department. Despite these efforts, ViewSonic frequently failed to provide accurate and reliable captions, which hindered effective communication. ViewSonic's text display was often too fast, displaying only two lines at a time, which would disappear quickly. This was particularly problematic during my work with the San Francisco Park and Recreation Department, where I relied on captioning to follow along in meetings and training sessions. The rapid disappearance of text made it difficult to keep up with discussions, especially when multiple people were speaking. If there had been a setting to slow down the text display, it would have significantly improved my ability to stay engaged and comprehend the information being shared. Without this, I frequently missed important details and had to rely on colleagues to fill in the gaps, which was inconsistent and often left me at a disadvantage.

24.    After trying to use ViewSonic approximately three times at work, I had to stop using it due to its ineffectiveness, and I switched to a different technology. The transition from ViewSonic to Zoom's captioning at work was a game-changer. For instance, during a critical training session, Zoom's accurate captions allowed me to

follow complex instructions on safety protocols, something ViewSonic failed to do repeatedly due to its errors and omissions.

25.    I have not seen or heard of ViewSonic being used or trusted within the D/deaf community, further underscoring its limitations compared to CART.

26.    In rendering my opinion, I met in-person with Norma Rease, a CART transcriptionist and court reporter who provides services all over the Bay Area and the Sacramento area. She has been working with CART for twenty years. From her, I learned that CART transcription services are considered "ADA Compliant," which is crucial for ensuring accessibility and equal opportunity for individuals who are deaf or hard of hearing. This compliance is vital for educational and legal settings to meet ADA requirements.

27.    In addition to my own personal experiences with CART and ViewSonic, I also reviewed two sets of video materials to render this opinion: I viewed videos from a March 27, 2024 demonstration at San Quentin showing ViewSonic and CART technologies in four separate environments. I also reviewed videos produced to Plaintiffs' counsel on June 21, 2024 showing ViewSonic and CART technologies in two additional environments at San Quentin, and two environments at California Institute for Men (CIM).

28.    When I reviewed the videos, I was not able to understand what was going on in the room by looking at either technology. The CART screen did not provide enough context due to poor audio quality, and the ViewSonic display was often too fast, showing only two lines at a time which would disappear quickly. This was the same problem I encountered with ViewSonic during my work with the San Francisco Park and Recreation Department, where I relied on ViewSonic captioning to follow along in meetings and training sessions. The rapid disappearance of text made it difficult to keep up with discussions, especially when multiple people were speaking.

29.    Even without substantive information provided by either set of captions, from a purely visual perspective, CART includes features that will help D/deaf individuals better read and comprehend the information being presented.

**Background with CART/ViewSonic**

7

30.     Prior to accepting this assignment, I was familiar with both CART and ViewSonic as captioning technologies.

31.     In contrast to what I saw on the videos provided, I have seen CART work effectively in judicial settings and the community. I have relied on CART over a dozen times in legal litigation and meetings, particularly in courtrooms with a diversity of speakers, some of whom speak very quickly or mumble. While CART isn't always perfectly effective in these situations, court reporters correct the transcriptions after the proceedings and provide a full transcript for the record. This helps ensure that the information is accurate and comprehensive. CART allowed me to gather a lot of information about what was going on, and the information I gathered made sense independently (in other words, it was not nonsense). The information provided to me via CART was useful, meaningful, seemingly complete, and matched the environment around me. Up until I watched the videos provided by CDCR, every experience I had with CART showed it to be an accurate, complete, and effective way of captioning.

32.     I have also used ViewSonic in my professional life. As part of our work at the San Francisco Recreation and Parks Department, we attempted to use the ViewSonic Whiteboard to facilitate communication between myself and other employees. My colleagues and I quickly became uncomfortable with the software, because it made numerous errors that caused miscommunication. In some cases. ViewSonic did not pick up all the words that were being said, but the biggest problem with ViewSonic was that it would incorrectly add in words that had *not* been said. In particular, because the ViewSonic Whiteboard tries to transcribe as quickly as possible, even when the information doesn't make sense, the transcription added words and phrases into conversation that no one had said. There was no human intelligence involved in the transcription to prevent incorrect words and phrases being added into the transcription, even when they did not match the speaker's intent. This became an issue in a professional environment, and we stopped using ViewSonic's captions. We switched over to Zoom's captioning technology, which worked better.

33.     I think it is important to note that no captioning technology will ever be flawless or be able to make up for a lack of hearing. Whether captioning is done by a human transcriptionist or AI, it will include inaccuracies to some degree. Nothing

is as effective as being able to hear people, in their own voice, engage in a conversation. However, when it comes to compensating for a lack of hearing in group settings, ViewSonic lacks key features that CART has. CART's features make it easier for D/deaf people to understand what is going on in the room, and the ViewSonic board does not provide an equally effective transcription of groups and classes.

34.    D/deaf people in CDCR rely on transcription to give them a bare-minimum understanding of that is happening around them in a classroom, group, or conversation. In self-help groups, D/deaf people need to be able to follow along and be actively involved in discussions to be able to benefit from the group. To draw meaning from a group, every participant needs to be able to follow what different people are saying, and to learn from what is applicable in their own situation. In groups and programs, everyone is telling their own story and their own situations for others to learn from. The value of these rehabilitative groups is not in being physically present in the group, but rather in understanding what is being said and who is saying it.

## Important Aspects of CART Captioning that Are Missing from ViewSonic

### Accuracy and "Hazard Lights"

35.    The most important aspect of any captioning technology is accuracy. If a captioning technology cannot accurately display what is being said in the room, then it is of little use to D/deaf individuals. As described above, I have seen CART used in multiple settings with what appeared to be a very high degree of accuracy. On the other hand, I have used the ViewSonic Whiteboard in professional environments and have also assessed it in the videos provided by CDCR, and it has not been accurate in either context.

36.    In terms of captioning accuracy, the concept of "hazard lights," or a technology's ability to indicate problems with the audio, is crucial. When captions specify audio problems such as "no sound," "audio unclear," or "audio distorted," it helps D/deaf viewers understand why they might not be hearing any dialogue. This prevents confusion and frustration.

9

37.    Captions should alert viewers to the fact that there is an audio problem. Without these alerts, deaf viewers might not immediately realize there is an issue, potentially missing out on important information or context, or trying to make sense out of captions that are incorrect and based on faulty audio.

38.    In the CDCR videos I observed, CART transcriptionists frequently indicate "inaudible" or "away from microphone" multiple times. This was far more effective that ViewSonic, which kept transcribing nonsensical information. As a matter of basic respect, it is better to tell a deaf person that audio is not reliable, rather than have them try to decipher and understand nonsensical information.

39.    Because CART's "hazard lights" indicate an audio problem, D/deaf people using CART will be able to tell when a lack of transcription is due to the room being silent, or instead is due to an audio issue. With ViewSonic, D/deaf users have no information about what a blank screen or a significant pause means.

40.    Human captioners provide invaluable context that AI cannot. For example, I have seen a TTY transcriptionist note when a speaker was whispering, which was crucial for understanding the confidential nature of the conversation. A CART transcriptionist can indicate this type of context as well. In contrast, AI would either miss this entirely, or, because the AI does not have awareness of the surroundings and context of a conversation, it could provide an inaccurate transcription such as interpreting "confidential" as "continental," which could lead to serious misunderstandings.

41.    "Hazard lights" are not just about conveying information; they are about ensuring inclusivity, providing clarity, and enhancing the overall accessibility of content for all viewers. CART has the ability to indicate audio issues, which provide equal access to information about pauses and silences in the room, and also can avoid incorrect transcriptions and miscommunications. ViewSonic does not have these capabilities, and therefore does not equally accommodate or respect D/deaf experiences and needs.

42.    It is important to note that not only does ViewSonic lack the capacity to visually indicate audio problems the way that CART can, but that when ViewSonic encounters audio issues, it *makes up* inaccurate and false captions instead of going

silent. ViewSonic engages in a continuous, unbroken set of captions seemingly based on any audio that it can pick up, even if that audio is poor quality, and even when the words being transcribed make no sense. In self-help groups where people share sensitive information, it is better for a deaf user to see a caption indicating an audio problem such as "away from microphone," rather than to receive a completely made-up caption, falsely attributed to someone, with no indication that there was a problem. Made-up captions can lead to misunderstandings, which hinder a deaf person's rehabilitation at best, and can lead to safety and security problems at worst.

43.   For instance, the following list shows some instances where I observed ViewSonic provide captions that were made up, and were provided to the D/deaf viewers even though they were not spoken.

| Timestamp | What was said[1] | CART | ViewSonic |
|---|---|---|---|
| SQ Demo, March 27, 2024 at 1:08:43 | Instructor: "How do you know they [your family] are still there for you?"<br><br>Group participant: "Because every time I ask them for something, she says okay no problem" | "Testing testing" | "Can you sing me turn off Using internal. my alarm for dinner for the weekend or something she feels OK" |
| SQ Demo, March 27, 2024 1:09:38 | "God bless you" | "Testing testing" | "Hey, Cortana, my shoe." |

---

[1] I was assisted by Plaintiffs' counsel to translate the audible portions of the video for the column of the graph that indicates "What was said."

| SQ Demo, March 27, 2024 1:10:57 | "My name's Andrew" | "Testing testing" | "Gonna do an alarm." |
|---|---|---|---|

44.    In each of these instances, ViewSonic made up captions even though it was not receiving trustworthy audio output. The information made up by ViewSonic was never corrected, and it could potentially cause confusion, distrust, or miscommunication. On the other hand, when the CART transcriptionist could not hear, they provided a visual cue rather than convey incorrect information.

45.    ViewSonic's lack of visual cues as "hazard lights" not only makes it less effective than CART, it makes ViewSonic confusing, alienating, and potentially dangerous in sensitive self-help groups and in the correctional setting.

***Context***

46.    CART is able to provide information about when a speaker has changed, whereas ViewSonic does not provide this information. Understanding that there are multiple speakers, or understanding when a speaker has changed, is crucial to a D/deaf person's understanding of a situation. CART can provide this important context, whereas ViewSonic does not.

47.    ViewSonic always presents captions as one long run-on sentence with incorrect punctuation. Sometimes periods are inserted in what appears to be the middle of a sentence, meaning that ViewSonic cannot indicate where a sentence stops and starts. On top of not being able to indicate whole sentences, ViewSonic does not indicate whether the speaker has changed. This means that entire conversations and self-help groups, which include multiple people sharing their experiences and thoughts, giving feedback to each other, or answering prompts from the facilitator get reduced down to a single run-on sentence by ViewSonic. From a D/deaf person's point of view, these heartfelt, sensitive, and collaborative conversations appear to be one single person giving a long and incoherent speech. ViewSonic's inability to correctly punctuate or indicate a change in speaker is a

12

massive disadvantage compared to CART. Even if ViewSonic's captions were 100% accurate, when they take a collaborative conversation and change it into one long run-on sentence with poor punctuation, the captions are virtually useless to a D/deaf person.

48.    CART's presentation indicates a change in speaker, which is critical context for a D/deaf person in a self-help group, classroom, or any other setting. For instance, visual cuing for different speakers lets a D/deaf person know that someone is changing the subject, offering a new opinion on something, or answering a question. ViewSonic cannot provide this crucial and bare-minimum context about a conversation, and is not equal to CART. By presenting a D/deaf person's entire environment as one long run-on sentence with no coherent punctuation, ViewSonic is ineffective at conveying information through captions.

49.    One advantage that CART has over any AI-based technology currently on the market is that it uses a human captioner. A human captioner is far more descriptive than AI, and the human captioner is able to differentiate between what things are important to describe (for instance, someone laughing after giving an answer), and less important to describe.

50.    When I spoke with Ms. Rease, she emphasized the importance of indicating non-verbal occurrences in the room. For instance, she notes (siren) or (loud noise). She highlighted that the most crucial indication is (laughing), to show that something spoken was a joke. Without this, deaf students might see others laughing without understanding if it's related to the spoken words or something else. She also mentioned that using chevron signs (">>") to indicate new speakers is a standard practice for CART transcriptionists.

51.    From my perspective, it is important for captions to indicate when a joke was made because it is inclusive. Otherwise, I would just see others laughing and not know why, or if it was related to the conversation. In prison, it's particularly important to indicate where people are laughing due to a shared conversation, as opposed to something else, so that the deaf person can feel safe and included.

52.    CART can also provide punctuation, which can provide information about emotion. Usually, when people speak, there are other factors that help us understand

13

what they're saying that won't come through transcription of the words alone. For example, body language and voice inflection provide context. CART indicates a change in speaker, which can help a deaf person know to look around the room for a new speaker; ViewSonic does not provide this. CART indicates the correct start and end point of a sentence and can add interpretative punctuation; ViewSonic does not provide this. ViewSonic is far behind CART when it comes to accurately transcribing the nature of conversations, including how many people are speaking, and whether they are responding to each other.

### Visual Capabilities of ViewSonic as Compared to CART

53.    The presentation of words and phrases on the ViewSonic whiteboard is distracting and hard to follow. The length of lines changes rapidly, which can shorten or elongate sentences suddenly. The words of sentences sometimes disappear and are replaced suddenly, forcing the reader to go back and determine what part of the sentence was incorrect the first time and what it has been replaced with, to create a new meaning.

54.    Because the speed of transcription for ViewSonic is so fast, it is very difficult to effectively read what is being transcribed. There are only two lines of text, which provide far less context than CART's transcription to begin with. Considering that ViewSonic erases and changes words rapidly, having only two lines of text does not provide enough context for readers to figure out what has happened when errors are made. On top of that, ViewSonic transcribes so quickly that the top line is often gone by the time a change is made to the sentence, making it impossible for a reader to keep up with the changes and to understand what is being said.

55.    For readers who read slowly or have low literacy, ViewSonic's rapid changes to words and line length will be hard to keep up with. When considering that ViewSonic only shows two lines of context for these changes and transcribes very quickly, it will be nearly impossible for slow readers and people with low literacy to keep up.

56.    Additionally, D/deaf people in prison frequently have to take their eyes off the screen to ensure their safety by observing their surroundings. This would make ViewSonic's speed even more challenging to keep up with, and a

14

reader can easily miss important context if they have only two lines of quickly-disappearing text provided at a time. CART's display, which has multiple lines that stay on the screen and slowly scroll, is much more effective for people in prison.

57.    Because ViewSonic's display is constantly changing and moving too quickly, it is difficult to comprehend. In terms of display, ViewSonic is not equally effective to CART, which displays several lines of text that do not move or change places, and are kept up on the screen for as long as possible. Many people in CDCR are slow readers or have below-average literacy. For these people, ViewSonic will not be effective at all.

58.    I learned from Ms. Rease that it is standard practice for a CART writer to produce a corrected transcript when they are working with students, and to provide a corrected copy within 24 hours of class.  This practice underscores a commitment to accuracy and timely access to information. This capability is incredibly helpful to D/deaf participants and is essential for ensuring equal access in settings where written notes are allowed. D/deaf students cannot take notes while simultaneously reading captions. If hearing students can take notes during a lesson, fairness dictates that D/deaf students should have access to a complete transcript.

59.    Having access to a full and corrected transcript allows D/deaf individuals to revisit lessons, complete assignments accurately, and fully understand complex topics. In educational and group settings, this is crucial for retaining and advancing through the information required to obtain milestone credits. In contrast, ViewSonic does not offer this capability, limiting its usefulness for long-term reference and review. This lack of transcript retention can lead to misunderstandings and hinder a Deaf person's ability to follow along, pass education classes, and advance in milestone-based programs. Without this feature, it's nearly impossible for us to keep up with the information presented and achieve the same milestones as our hearing peers.

60.    I understand that a CART transcriptionist can provide a corrected transcript of a conversation or group after it happens in real time. This would be incredibly helpful to D/deaf group participants, and is the only way to ensure equal access in groups where written notes are allowed.

15

*Conclusion*

It is my professional opinion that ViewSonic is not an equally effective alternative to CART because of several key reasons:

1.     Superior Accuracy:

CART delivers spot-on real-time transcription, which is crucial for understanding and participating in both legal and educational settings. On the other hand, ViewSonic often messes up captions, causing confusion. I've seen this firsthand in my meetings at the San Francisco Recreation and Parks Department.

2.     Comprehensive Contextual Information:

CART provides important context, like indicating speaker changes and audio issues (think of these as "hazard lights"). These cues are essential for following conversations, especially in complex situations. For example, CART transcriptionists note when audio is inaudible or when a speaker is whispering, helping to keep the flow of understanding. ViewSonic just doesn't have these features, making it hard to follow who is speaking and the overall context.

3.     Established Reliability:

CART is a trusted tool in courtrooms and educational settings because it consistently performs well. My experiences show that ViewSonic frequently has inaccuracies and lacks context, making it unreliable and frustrating for users.

4.     User-Friendly Visual Format:

CART's multi-line text display is stable and easy to follow, which is crucial for people who read slowly or have lower literacy levels. ViewSonic's rapidly changing captions, however, are distracting and hard to track.

5.     Human Insight and Nuance:

Human transcriptionists with CART provide accurate punctuation, speaker identification, and interpretative cues. This human element captures nuances like emotional inflection and speaker changes, which AI-based systems like ViewSonic miss.

16

6.    Enhanced Safety in Correctional Environments:

Accurate captioning is critical for safety in prisons. CART's clear and context-aware captions help D/deaf individuals stay aware of their surroundings. ViewSonic's inaccuracies and lack of context can pose serious risks.

7.    Retention of Full Transcripts:

CART retains a full transcript of proceedings, allowing for later review. This is invaluable for understanding complex information and ensuring no details are missed. ViewSonic doesn't offer this feature, which limits its usefulness.

**Summary:**

In short, CART beats ViewSonic hands down in accuracy, context, reliability, visual format, human touch, safety, and transcript retention. These advantages make CART the best choice for supporting D/deaf individuals in important settings.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge

Signed this _22_ day of July, 2024.

Tremmel Watson

17

# Exhibit 135

C A L I F O R N I A
**DEPARTMENT** OF **JUSTICE**

*Rob Bonta*
**Attorney General**

600 WEST BROADWAY, SUITE 1800
SAN DIEGO, CA 92101
P.O. BOX 85266
SAN DIEGO, CA 92186-5266

Public: (619) 738-9000
Telephone: (619) 321-5781
Facsimile: (619) 645-2581
E-Mail: Anne.Kammer@doj.ca.gov

July 29, 2024

*Via Email*

Ed Swanson
*Armstrong* Court Expert

Marissa Hatton
Prison Law Office

RE:     *John Armstrong, et al. v. Newsom, et al.*
        United States District Court, Northern District of Ca., Case No. 4:94-cv-02307-CW
        Defendants' Position Regarding Whiteboard Captioning Technology (SATF Stipulation
        Item No. 13)

Dear Ed and Marissa,

        We write to provide further support for Defendants' position regarding the use of
Artificial Intelligence (AI) generated captioning technology, such as the Live Captions feature of
the ViewSonic myViewBoard, as an adequate alternative to Communication Access Realtime
Translation (CART), to accommodate non-signer deaf class members at California Substance
Abuse Treatment Facility (SATF) in programs, services, and activities.[1]

## INTRODUCTION

        As part of their core mission, Defendants are committed to providing rehabilitative
programming to all incarcerated individuals.  In compliance with Title II of the Americans with
Disabilities Act, 42 U.S.C. § 12101, *et seq.*, and despite the inherent challenges in a carceral
setting, Defendants are constantly working to ensure that programming is equally accessible to
individuals with disabilities.  *See Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1215-16 (9th Cir.
2008).  This includes identifying and implementing a reliable, readily-available solution for
accommodating non-signer deaf class members at SATF when participating in group programs.
Consistent with the Court's February 24, 2023, order, and based on the expert opinion of a

---

[1] The programs, services, and activities referred to herein are those that do not implicate an
incarcerated person's constitutional right to due process.  For more than a year now, Defendants
have been providing CART services as needed for due process events.  Defendants are proposing
the use of AI-generated captioning technology in staff or volunteer-led educational, vocational,
rehabilitative, mental health, religious, and substance use disorder groups.

certified Assistive Technology Professional,[2] Defendants have identified AI-generated captioning technology as a reasonable accommodation for non-signer deaf class members that, unlike CART, is available any time, on demand, in programming venues at SATF.[3]  (*See* ECF No. 3467 at 3.)  The Live Captions feature of the myViewBoard utilizes the power of AI-generated captioning technology to provide real-time access to programs through the immediate text representation of spoken words and has significant advantages over CART services.  While CART is an effective tool, AI-generated captioning technology offers scalability, flexibility, and improved availability.  The Live Captions feature of myViewBoard has proven successful in educational programming, and, when used with microphones appropriately matched to the specific venue, will provide non-deaf signers with equal access to programs and activities while eliminating the persistent logistical challenges associated with scheduling live CART services.

## I.    AI-GENERATED CAPTIONING TECHNOLOGY IS AN EQUALLY EFFECTIVE ASSISTIVE TECHNOLOGY.

The Live Captions feature of the myViewBoard uses Microsoft Azure Speech-to-Text, an AI-generated captioning technology, to display speech-to-text captions in real time.  AI-generated captioning technology provides real-time transcription by converting spoken language into text using AI algorithms.  AI-powered captioning has already transformed communication and education for deaf individuals who are not incarcerated, and it is an assistive solution that is autonomous, continuously improving in accuracy, and can be integrated into various platforms to provide real-time captioning.  An integrated solution allows users to enable real-time captions during meetings and courses, enhancing accessibility without the need for external transcription services.

While CART is an effective form of captioning live presentations, the Live Captions feature of the myViewBoard is equally effective, as reflected in a comparison of the two technologies' key features:

---

[2] As the parties are aware, Defendants have retained Dr. Nathan Swett, a RESNA-certified ATP, to provide expert consultation services and conduct individual assessments of each class member at SATF with a permanent hearing impairment impacting placement (DPH).  Dr. Swett has substantial experience working with deaf individuals, as well as individuals with other disabilities, in educational and other settings, and is uniquely qualified to advise Defendants on the appropriate assistive technologies to accommodate deaf and hard-of-hearing class members.

[3] The National Association of the Deaf defines captioning as "the process of converting the audio content of a television broadcast, webcast, film, video, CD-ROM, DVD, live event, or other productions into text and displaying the text on the screen, monitor, or other visual display system."  (*See* https://www.nad.org/resources/technology/captioning-for-access/what-is-captioning/.)  Deaf and hard-of-hearing individuals "rely on captions to access educational content, real-time information in television programs, digital content on YouTube and social media videos, and communications in public spaces."  (Butler, J. (2019) "Perspectives of deaf and hard of hearing viewers of captions," AMERICAN ANNALS OF THE DEAF, 163(5), 534.)

| Feature | CART | myViewBoard |
|---|---|---|
| Text Display | Text display covers full screen. | Two lines of text appear at a time.[4] |
| Font Size | Font size is fully adjustable. | Font size is adjustable with larger monitors. |
| Punctuation | Punctuation is highly accurate. | Punctuation is highly accurate. |
| Speaker Names | The human transcriptionist must request participants' names in advance and can identify unknown speakers and when the speaker changes. | Staff who facilitate the program and participants of the program can be trained to self-identify before speaking, and Live Captions will reflect that information on the screen. |
| Accuracy | The human transcriptionists are expected to achieve 98% accuracy or higher.[5] | Live Captions are 95% accurate. |
| Technical Terms | Technical terms can be preloaded for increased accuracy. | Live Captions can learn acronyms and will caption the acronyms correctly if they are spelled out. |
| Real-Time | There is a significant delay in the display of captions. | Live Captions appear within 2-3 seconds. |
| Speaker Identification | A human transcriptionist can identify which speakers to caption and which to omit. | Live Captions generally captions the loudest voice in the room and omits side conversations. |

---

[4] This is consistent with Federal Communication Commission guidelines and similar to the way in which captioning is presented on television, where "two to three lines of text appear at one time, and as a new bottom line appears, it pushes up the previously appearing lines until they roll off the screen." (Report and Order, Declaratory Ruling, and Further Notice of Proposed Rulemaking (Adopted: February 20, 2014), *In the Matter of Closed Captioning of Video Programming Telecommunications for the Deaf and Hard of Hearing, Inc. Petition for Rulemaking*, Docket No. 05-231 (FCC Order) ¶ 39.)

[5] In 2014, the Federal Communications Commission defined several "non-technical quality standards as the components necessary to ensure that closed captions . . . fully and effectively convey [] content," including accuracy. (FCC Order ¶ 3.) The FCC Order applies to television programming, but it provides important guidelines regarding captioning quality standards. These quality standards take into consideration that errors are unavoidable with real-time captioning and an accuracy rate of 100% is not achievable. (*Id.*, ¶ 40; ¶ 38, n. 161 ["a 'perfect' verbatim transcription of any live program or event is nearly impossible to create, even using professional transcriptionists with plenty of turnaround time; real-time television captioners are often unable to keep pace with broadcasters when the broadcasters speak faster than even the best and most experienced captioner in the industry; inherent in the process of providing live captioning is an unavoidable truth that both human error and transmission delays will preclude perfect captions."].)

Meanwhile, the side-by-side demonstrations of the Live Captions feature of myViewBoard and CART made clear that each technology has advantages and drawbacks:

| Live Captions with myViewBoard | |
| --- | --- |
| **Advantages** | **Drawbacks** |
| <ul><li>Easy and fast set-up.</li><li>No need for prior scheduling of service.</li><li>Displayed text on the screen almost simultaneously with speech.</li><li>Captured vast majority of speech.</li><li>Able to transcribe speech in multiple languages.</li></ul> | <ul><li>Failed to capture some words and names.</li><li>Did not automatically distinguish between speakers.</li><li>Only two color-change modes.</li><li>Could not produce a transcript.[6]</li></ul> |
| **CART** | |
| **Advantages** | **Drawbacks** |
| <ul><li>Distinguished between different speakers by starting text on a new line and including <<< at the beginning of the new speaker line.</li><li>Had multiple color change modes.</li><li>Could enlarge text.</li><li>Could produce a transcript.</li></ul> | <ul><li>Lengthy and involved set-up.</li><li>Required 72 hours advanced notice to set up and service cancelled if there is no log-on within 20 minutes of start time.</li><li>Approximate 5-second delay between speech and text on the screen.</li><li>Sometimes failed to capture large portions of a discussion or transcribe speech verbatim.</li><li>English only.</li></ul> |

Both AI-generated captioning technology and human transcription have a role to play in accommodating deaf and hard-of-hearing class members at SATF. As noted above, Defendants have made CART available for events that are scheduled and noticed in advance and implicate a class member's right to procedural due process. For routine or informal meetings, everyday group programming and in classroom settings, AI-generated captioning, such as the Live Captions feature of myViewBoard, can serve as an effective accommodation, and ensure that transcription services are always available on demand and in a variety of venues. There is no such guarantee with CART because it lacks the maneuverability and flexibility. Regular updates and advancements in AI algorithms will enhance the accuracy and effectiveness of these solutions over time, providing a long-term, sustainable, cost-effective accommodation that, with the assistance of additional technologies identified by Defendants' Assistive Technology Professional, will make programming fully accessible for deaf and hard-of-hearing individuals at SATF.

---

[6] During the individual assessments of DPH class members at SATF, Defendants' Assistive Technology Professional will conduct a thorough review of each class member's assistive technology needs considering their current and anticipated programming needs. If this includes the need for a written transcript or notes, the Assistive Technology Professional will identify an appropriate AI-generated transcription service for use in conjunction with AI-generated captioning technology.

## II.    AI-GENERATED CAPTIONING TECHNOLOGY PROVIDES KEY ADVANTAGES IN A CARCERAL SETTING.

Accommodating deaf and hard-of-hearing individuals during live presentations in group programming in a carceral setting poses unique challenges that must be taken into consideration when determining which assistive technologies to employ.  AI-generated captioning technology, such as the Live Captions feature of mvViewBoard, strikes the best balance of providing both an effective and reliably available accommodation.

*Scalability and Availability*

AI-generated captioning technology is highly scalable and can be deployed across various settings without the need for individual scheduling.  Unlike CART, which requires the availability of a trained human transcriptionist, AI solutions can operate 24/7 and handle multiple requests simultaneously.  This scalability ensures that transcription services are available whenever and wherever they are needed, providing continuous support without the constraints of human scheduling.

*Flexibility*

AI-generated captioning technology offers greater flexibility compared to CART.  It can be easily integrated simultaneously into various platforms, including virtual meetings, educational software, and public announcement systems.  This flexibility allows for seamless adaptation to different environments and use cases, making AI a versatile tool for providing real-time transcription and captioning.

*Barriers with Scheduling Live CART Services*

One of the primary barriers to using CART is the limited availability of qualified transcriptionists.  Scheduling a live CART service requires advance notice, and there may be a shortage of professionals based on this request.  Specifically, Defendants' contracted provider for CART services, California Interpreting Translation Services, has limited staff available, and therefore requires 72-hour advance notice for providing CART services.  Also, the numerous requests for CART services can lead to delays or an inability to provide transcription services when needed, as CART is unavailable to provide a high volume of service all day long and simultaneously in multiple locations.

Coordinating the schedules of CART transcriptionists with the needs of deaf and hard-of-hearing individuals can be challenging.  Events or meetings that are scheduled on short notice may not be able to secure a CART transcriptionist in time, leading to gaps in accessibility.  This issue is compounded in settings with frequent, unpredictable events that require real-time transcription.

Finally, the virtual presence of a human transcriptionist has raised concerns among both the incarcerated population and staff who lead group programs regarding incarcerated persons' privacy when attending sensitive group programming.  AI-generated captioning technology, such as the Live Captions feature of the myViewBoard, eliminates this concern completely, ensuring that private group discussions regarding difficult, personal issues remain private.

Simply put, CART involves significant logistical challenges that are eliminated with the Live Captions feature of the myViewBoard.

## CONCLUSION

AI-generated captioning technology is equally effective and offers advantages over traditional CART services, including scalability and flexibility.  Defendants are confident that with the guidance and expertise of a certified professional, AI solutions such as the Live Captions feature of the myViewBoard will provide continuous, reliable support for deaf and hard-of-hearing individuals at SATF.

Sincerely,

ANNE M. KAMMER
Deputy Attorney General

For ROB BONTA
   Attorney General

cc: Audrey Barron (Court Expert)
  Patricia Ferguson, Tamiya Davis, Ramon Ruiz, Ava Lau-Silveira, Ursula Stuter (CDCR
  OLA)
  Dawn Lorey, Lourdes White, Darnell Mebane, Kristina Davis, Megan Roberts (CAMU)

CF1997CS0005
38295541

Exhibit 136

Cal Interpreting & Translations                                    Agreement #C5611526
California Department of Corrections and Rehabilitation (CDCR)                  Exhibit A

## STATEMENT OF WORK
### Communication Access Real-time Translation Services (CART)

### A. PURPOSE

The Contractor shall provide the California Department of Corrections and Rehabilitation's (CDCR) Division of Adult Institutions (DAI) and Division of Rehabilitative Programs (DRP) with remote Communication Access Real-time Translation (CART) services for the incarcerated population at CDCR institutions state-wide.

The terms "shall" and "must" are considered by the CDCR to mean mandatory or required. The terms "may" or "can" are considered to be optional, and are at the discretion of the CDCR.

### B. BACKGROUND

CART is a professional service that can be delivered remotely. CART services are the instant translation of the spoken word into English text using a stenotype machine or voice, notebook computer, and real-time software. The text produced by the CART service can be displayed on an individual's computer monitor, projected onto a screen, combined with a video presentation to appear as captions, or otherwise made available using other transmission and display systems.

### C. OBJECTIVES

In order to ensure effective communication and equal access to programs for CDCR's deaf or hard of hearing incarcerated population, CART services are required on an as-needed basis for due process events, rehabilitative programs, and religious services.

### D. PERIOD OF PERFORMANCE

The period of performance for this Agreement shall be from July 1, 2023, or upon final execution of this Agreement by the CDCR, whichever is later, through June 30, 2024, with one (1) optional one (1) year extension, consistent with the original Scope of Services and at the contracted hourly rate as referenced in Exhibit B-1, Rate Sheet, and the dollar amount of the first year amendment shall not exceed the first full fiscal year funds encumbered.

### E. EVALUATION TYPE AND METHOD OF AWARD

This evaluation will be based on a Request for Quote (RFQ). The CDCR will compare Offers submitted in response to this RFQ based on Lowest Cost to the CDCR, which means the quote that best meets, and potentially exceeds, CDCR's requirements at the lowest overall cost. If award of an Agreement is made, it will be made on an "All or None" basis in accordance with the RFQ assessment requirements to a responsible

Cal Interpreting & Translations                                    Agreement #C5611526
California Department of Corrections and Rehabilitation (CDCR)                Exhibit A

Contractor whose Offer complies with all the requirements (administrative and technical), terms and conditions of the RFQ, and any Addenda thereto, except for such immaterial defects as may be waived by the State. The Contractor, including all proposed candidates and/or subcontractors, shall be headquartered and doing business within the United States only. No foreign or international firms, including all proposed candidates and/or subcontractors, shall be allowed to respond to this RFQ.

## F.  SUBCONTRACTING

For any services, including Consulting services awarded by the CDCR, the maximum amount of Subcontracting shall not exceed 40%. If the amount of Subcontracting exceeds 40%, the responding Contractor must include a letter of explanation which clearly defines the need for further Subcontracting. Any offer or quote submission that is received by the CDCR that indicates more than 40% Subcontracting, as noted on the Bidder Declaration GSPD-05-105, and does not include a letter of explanation, will be deemed non-responsive by the CDCR Administrative Evaluation Team, and subsequently disqualified from further evaluation of this offer or quote. In addition, the CDCR Evaluation Team will be the final determining body that approves any Subcontracting of more than 40% as indicated on the Bidder Declaration form GSPD-05-105, and that is also accompanied by the Contractor's letter of explanation.

## G.  TIME AND MATERIALS

This agreement shall be based on Time and Materials and shall be task oriented. Tasks shall be Cleary defined in the Scope of Work Section I. Time and Material is defined as an hourly staff augmentation that supports the overall effort of this agreement, and where the staff member provides labor at an hourly rate as noted in Exhibit B-1, in exchange for payment, billed monthly in arrears. Time and Materials/Services are billed in the Fiscal Year the Services are rendered and cannot cross Fiscal Years.

## H.  SCOPE OF WORK/TASKS

1.  The Contractor shall provide remote Communication Access Real-time Translation (CART) Services for CDCR's incarcerated population. CART services are required on an as-needed basis for CDCR's deaf or hard of hearing incarcerated population to participate in due process events, rehabilitative programs, and religious services as such individuals shall be provided with word-for-word, near-verbatim, speech-to-text interpreting services.

2.  The Contractor shall provide remote CART services at the following CDCR locations, and CDCR reserves the right to add additional covered institutions to this Agreement at the same hourly rates evaluated and considered:

    a.  California Health Care Facility (CHCF)

    b.  California Institution for Men (CIM)

    c.  California Medical Facility (CMF)

Cal Interpreting & Translations                                                                           Agreement #C5611526
California Department of Corrections and Rehabilitation (CDCR)                          Exhibit A

    d.  California State Prison (COR)

    e.  Richard J. Donovan Correctional Facility (RJD)

    f.  California Correctional Women's Facility (CCWF)

    g.  Substance Abuse Treatment Facility (SATF)

    h.  California State Prison San Quentin (SQ)

    i.  Salinas Valley State Prison (SVSP)

    j.  Wasco State Prison (WSP)

3.  The Contractor shall provide a complete translation of all spoken words and environmental sounds, displayable on CDCR-provided projectors, computers, laptops, and mobile devices designated by CDCR DAI and DRP and approved by CDCR Enterprise Information Services (EIS).

4.  CART services will be requested by designated CDCR staff via email or other written means at least forty-eight (48) hours in advance of the required service. The request will include:

    a.  Date(s) service(s) are required

    b.  Start and estimated end times for required service(s)

    c.  Name and CDCR number for the inmate(s) CART service(s) are to be provided

    d.  Name and contact information for the CDCR staff making the request

    e.  Additional scheduling information can be provided if required by the Contractor and agreed to by CDCR.

    The CDCR will make every attempt to notify the Contractor no less than twenty-four (24) hours in advance if the requested duration of services is extended.

5.  Task Expectation Documents, TED (Attachment 8) and Task Acceptance Documents, TAD (Attachment 9) will be the basis by which a task is accepted by CDCR.

## I.  KEY ACTION DATES

Contractors are advised of the dates and times shown below and are expected to adhere to them. The CDCR may modify any part of the RFQ, prior to the date quotes are due, by issuance of one (1) or more Addendum.  Addendums will be numbered consecutively and sent to all companies who received the original RFQ. Interested Contractors may submit questions and/or requests for clarification, via e-mail on or before the date and time listed in the table below, to: Nicole.Finch@cdcr.ca.gov. The CDCR's responses to Contractor's questions that provide new or additional information will be provided to all Contractors via an Addendum and sent to all potential bidders.

Cal Interpreting & Translations                                             Agreement #C5611526
California Department of Corrections and Rehabilitation (CDCR)                          Exhibit A

| Event | Date | Time |
|---|---|---|
| RFQ Release date | 5/01/2023 | 4:00 PM |
| RFQ Questions Due | 5/08/2023 | 2:00 PM |
| RFQ Response to Questions | 5/11/2023 | 4:00 PM |
| RFQ Solicitation Due Date | 5/16/2023 | 2:00 PM |
| RFQ Evaluations* | 5/17/2023-5/19/2023 | |
| Interviews (if requested, will be used as a tiebreaker) | 5/22/2023 | |
| Intent to award (5-day notice) | 5/23/2023 | |
| Award of Agreement (Proposed)* | 5/31/2023 | |
| Proposed Agreement Start Date* | 7/1/2023 | |

## J. MANDATORY MINIMUM CONTRACTOR STAFF QUALIFICATIONS

| Requests | Type of Personnel | CDCR Working Title | Classification |
|---|---|---|---|
| 1-5 | Contractor Staff | CART Provider | CART Provider |

The Contractor staff will work under the direction of the Correctional Business Manager I or designee.

The Contractor staff performs duties and tasks and applies common competencies as follows:

The Contractor's staff must meet all of the MQ's listed below (Section L (1) below) in order for the Contractor to be considered for Agreement award. Not meeting any one (1) MQ in this area will result in disqualification.

1. Contractor staff must currently possess at least one of the following certifications:

   a. Certified Real-time Captioner (CRC)

   b. California CART Generalist (CCG)

   c. Registered CART Provider – Master, RCP-M

## K. TASK ACCEPTANCE CRITERIA

All concluded work shall be submitted to the CDCR Program Manager, or a selected representative, for review, approval, or rejection.  Payment for all tasks performed under this agreement shall be by time and materials. It will be the sole determination of the CDCR as to whether the Contractor staff work has been successfully completed and is acceptable to the CDCR.  Signed acceptance is required from the CDCR Program Manager, or a selected representative, before approving an invoice for payment, and a TAD shall accompany the invoice for any progress payment if allowed in the SOW.

Cal Interpreting & Translations                                    Agreement #C5611526
California Department of Corrections and Rehabilitation (CDCR)                Exhibit A

1. Task Expectation Document

   The purpose of the Task Expectation Document (TED), Attachment 8 is to ensure the CDCR Program Manager or selected representative and Contractor share a common understanding of the task prior to commencing work.

   The CDCR shall create the TEDs and submit to the Contractor within 30 day of contract initiation. The Contractor shall review the TEDs, meet with the CDCR to approve the TEDs. Any TED content that cannot be agreed upon at the end of the TED creation cycle will be negotiated with the CDCR Program Manager and the Contractor staff representatives. The Contractor staff will resubmit a final copy for review within five (5) State working days following receipt of the written requested changes.

   After the TED is accepted, it will be signed by the CDCR Program Manager or selected representative and Contractor, upon which the Contractor staff can commence work against said task.

   After the task is completed and accepted, the Contractor staff will submit a Task Acceptance Document (Attachment 9) for CDCR Program Manager review and approval. The Contractor staff may submit invoices for individual task withhold amounts after all tasks are signed off as accepted.

   The Contractor shall submit a Task Acceptance Document (TAD) as noted in the original solicitation and award documents, with each monthly invoice. Each invoice shall clearly identify the billed hours from each task, as noted on Exhibit B-1, Rate Sheet, and to which fiscal year (FY) and Purchase Order (PO) the Contractor's invoice is in reference to. The Program Manager must approve and sign the Contractor's submitted TAD. Failure to submit a TAD for signature, or if the Contractor's invoice does not clearly separate billed hours from each task, may result in a delay in invoice and payment processing.

2. Task Acceptance Document (TAD)

   The CDCR shall be the sole judge of the acceptability of all work performed and all work products produced by the Contractor staff as a result of this Agreement. The Contractor staff shall complete the Task Acceptance Document (TAD), Attachment 9 for all completed work.

   All concluded work shall be submitted to the CDCR Program Manager, or a selected representative, for review, approval and/or rejection. Payment for all tasks performed under this Agreement shall be by time and materials. Throughout this Agreement, the CDCR will review and validate tasks prior to final acceptance. It shall be CDCR's sole determination as to whether a task has been successfully completed and is acceptable to the CDCR. Signed acceptance is required from the CDCR Program Manager, or a selected representative, before approving an invoice for payment.

Cal Interpreting & Translations                                          Agreement #C5611526
California Department of Corrections and Rehabilitation (CDCR)                          Exhibit A

CDCR may approve progress payments against a task based on work completed against said task and as spelled out in the TED.

**Invoice approval criteria shall consist of the following:**

1. Assigned tasks were completed as specified and the product/service is deemed by the CDCR to be making satisfactory progress and or a final product was rendered.

2. Plans, schedules, designs, documentation, and reports are completed as specified and approved.

3. All documentation and artifact gathering has been completed.

4. The invoice submittal reflects the following information:

    a. A description of the services provided

    b. The CDCR number of the inmate that received CART services

    c. The dates and times the CART services were provided

    d. Name of the staff members requesting the CART services

    e. The number of hours the Contractor was providing CART services

    f. The billing rate and the total amount due

    g. A completed TAD for all completed work

5. All products/services provided must be in a form useful to the CDCR.

6. If a product/service is not accepted, the CDCR shall provide the reason, in writing, within ten (10) business days of receipt of the product/service.

## L. AGREEMENT COMPLETION CRITERIA

The CDCR Program Manager, or selected representative, will perform status monitoring and acceptance of detailed activities and tasks as outlined in Section I, Scope of Work. Following an assessment of the various tasks and/or confirming tasks has been completed to the CDCR satisfaction, the CDCR Program Manager, or a selected representative, will inform the selected Contractor by e-mail when the Contractor's services are completed. Following this notification, the Contractor staff shall complete and submit a handover report to the CDCR Program Manager, or a selected representative, confirming completion of the tasks and the status of related work at the time the services were rendered complete.

## M. CONTRACTOR ROLES AND RESPONSIBLITIES

The Contractor shall perform and/or provide the following:

Cal Interpreting & Translations                                                        Agreement #C5611526
California Department of Corrections and Rehabilitation (CDCR)                              Exhibit A

1. Provide CART services at the times agreed upon, within seventy-two (72) hours notification by the CDCR Correctional Business Manager, or designee.

2. Provide experienced contract staff with the skill and knowledge appropriate to carry out the services.

3. Ensure Contractor Staff possess the following to ensure the ability to provide consistent remote CART services:

   a. Telephone connectivity

   b. Emergency contact capability (cell phone, instant messaging, etc.)

   c. High-speed internet connection

   d. Voice/data modem (for use with single phone line)

   e. Special microphone (for speaker)

   f. Computer-assisted Translation (CAT) software that supports remote CART

   g. Communication software (computer to computer)

4. Provide any applicable software compatible with CDCR-provided equipment to support CART services.

5. Ensure confidential, sensitive or personal information that is transmitted for translation is encrypted in accordance with State Administrative Manual 5350.1 and Statewide Information Management Manual 5305-A.

6. Contractor staff engaging in services to CDCR as related to this SOW and the resulting contract are required to exercise security precautions for any confidential CDCR information with which they may come in contact.

7. Support the DAI Class Action Management Unit (CAMU) and DRP team with such advice and assistance as may be reasonably requested from the assigned CDCR Program Manager.

8. Assist the Correctional Business Manager, or a selected representative, in planning, monitoring, and controlling the activities and tasks to be carried out by the Contractors' staff.

9. Monitor the performance of the Contractor's staff and adjust staffing levels appropriately to ensure completion of tasks listed in Section I, Scope of Work, within the stated Period of Performance.

10. Comply with all applicable CDCR policies.

11. Immediately communicate all issues affecting work, schedule, resources, scope, or cost to the CDCR CM.

Cal Interpreting & Translations                                    Agreement #C5611526
California Department of Corrections and Rehabilitation (CDCR)                   Exhibit A

12. Meet accuracy guidelines if, after review, it is determined that the text meets a minimum accuracy level of 98%.

13. Identify speakers whenever possible.

14. Contractors with CCG and CRG certifications must demonstrate the capability to perform the required work of a CART Provider. CDCR may require proof of current certificate at any time.

15. Indicate the following during translation sessions:

    a. Bells or beeps when others join a call

    b. All environmental sounds, including "silence" or "papers shuffling."

    c. Write a parenthetical such as "(inaudible)" to let the staff know there are audio difficulties when audio is not discernible.

16. With CDCR staff's permission, interrupt the session and ask for a repeat or for a microphone to be readjusted.

## N. CDCR ROLES AND RESPONSIBILITIES

The CDCR shall perform and/or provide the following:

1. The CDCR will provide the Department's mission, strategies, and programs.

2. The CDCR will help resolve and escalate contract/project issues within the CDCR organization, as necessary.

3. The CDCR Program Manager, or a selected representative, will review and approve the work plan for each task before the Contractor staff can commence work.

4. The CDCR Program Manager, or a selected representative, will review and approved all work products.

5. The CDCR Program Manager will provide Contractor staff access to applicable files, reports, contracts, documents, and other relevant information as needed by this contract.

6. The CDCR will provide staff availability for all meetings.

7. The CDCR will provide secure access to the IT Headquarter facility as needed.

8. The CDCR will provide a laptop to the Contractor staff, if applicable, or as needed.

9. The CDCR will not provide any assistance of a clerical nature for documents or telephone support.

Cal Interpreting & Translations                                Agreement #C5611526
California Department of Corrections and Rehabilitation (CDCR)              Exhibit A

## O. PROJECT ASSUMPTIONS AND CONSTRAINTS

1. Any Contractor staff or sub-contractor working remotely must work from a remote location <u>within</u> the United States. Remote work locations outside of the United States are prohibited.

2. CART services shall be available from 7:00 a.m. to 8:00 p.m., seven (7) days a week. The CDCR can request services any time, including weekends and holidays, as necessary.

3. No overtime pay will be authorized for non-standard work hours. The CDCR shall not be responsible for overtime, holiday, shift differential payments, or other special compensation that may have been agreed upon between the Contractor and its CART providers.

4. Time off for the Contractor staff will be authorized, if there is no foreseeable impact to the expected tasks or work schedule, as determined by the CDCR Program Manager, or a selected representative. The CDCR shall not be charged for vacation time used by the Contractor(s).

5. The CDCR and the Contractor staff are mutually obligated to keep open and regular channels of communication to ensure the successful execution of this contract. Both parties are responsible for communicating any potential problem or issue to the CDCR Program Manager and the Contractor staff, respectively, within forty-eight (48) hours of becoming aware of said problem.

6. The Contractor certifies appropriate systems and controls shall be in place to ensure State funds will not be used in the performance of this Agreement for the acquisition, operation, or maintenance of computer software in violation of copyright laws.

7. All application enhancements and new applications developed under this contract are the sole property of the CDCR. The Contractor does not retain rights to work completed under this contract.

8. The CDCR reserves the right to cancel, change, increase, or reschedule requested CART service needs at least thirty-six (36) hours prior to the beginning of the CART session. In these situations, there will be no additional charge to the State. If CDCR cancels or changes a requested CART session for any reason, including emergency security situations such as an institutional lock down less than thirty-six (36) hours before or during a scheduled CART session, CDCR will pay a fee at the Contractor's hourly rate for one-half of the provider's scheduled service hours for the first day of the requested CART session only.

9. The awarded Contractor will be required to comply with the provisions of the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191 (HIPAA) and the regulations promulgated thereunder as outlined in Exhibit A-2 – Business

Cal Interpreting & Translations                                    Agreement #C5611526
California Department of Corrections and Rehabilitation (CDCR)                Exhibit A

Associate Agreement (BAA).

## P. TRAVEL

The CDCR will not compensate for travel against this Agreement.

## Q. TERMINATION OR CONTRACT MODIFICATION

The CDCR will have the right to terminate this Agreement upon thirty (30) business days advance written notice issued to the Contractor.

## R. UNANTICIPATED TASKS

The CDCR is expecting during the Agreement term, legislative and/or program changes may necessitate modifications to this Agreement. Unanticipated Tasks may result in an Amendment, and the Amendment rates are based on the Contractor staff hourly labor rates as identified on Exhibit B-1 Rate Sheet. The agreed-upon rates shall be to support Amendments (change requests) to this Agreement.

Unanticipated Tasks are defined as additional work which must be performed, and are generally within Exhibit A SOW, but were unforeseen and not identified at the time of offer. Both parties shall agree upon the work needing to be performed, which shall result in Unanticipated Costs and Tasks as identified on the Work Authorization (WA) form, Exhibit A-1. No work shall be performed in advance of the Contractor's written proposal and the CDCR approved Amendment of Unanticipated Tasks.

The CDCR limits the budget for unanticipated tasks to not exceed 10% of the sum of the original Contract as is in accordance with rates as listed in Exhibit B-1.

1. A WA shall be performed for each item of unanticipated work not specified in Exhibit A, SOW. All unanticipated work shall be clearly defined on Exhibit A-1, Work Authorization.

2. Before work can begin, a WA shall be completed by the CDCR Contract Manager (CM) and signed by both the CDCR and the Contractor.

3. Each WA shall outline in detail the purpose, objective, goals, and costs.

4. The CDCR may, at any time, order the Contractor staff to stop work on any WA. The Contractor shall be compensated for all work performed before any work stoppage.

5. The Contractor shall inform the CDCR CM if a WA needs to be revised for additional work hours. It is at the discretion of the CDCR CM to accept or reject the request, and the revised WA must be signed by both the CDCR CM and the Contractor staff.

6. The WA shall not supersede the terms of this Agreement; all terms within this Agreement shall remain in full force.

Page 10 of 12

Cal Interpreting & Translations
California Department of Corrections and Rehabilitation (CDCR)

Agreement #C5611526
Exhibit A

7. The Contractor shall be compensated under the WA by the rates and provided on Exhibit B-1, Rate Sheet.

## S. WORK AUTHORIZATION AND AMENDMENT LIMITS

1. Work Authorizations (WA's) shall not exceed 10% of the original Agreement, not including or related to any time and/or money Amendments.  WA's must be justified, and be completely separate from any time and/or money Amendment. Once a WA has been approved, it will be added and considered as an Amendment, separate from any time and/or money Amendment.

2. Period of Performance language may indicate that amendment for optional years may be executed. Upon the execution of these optional years, any further Amendments that add either time and/or money shall not exceed 1-year, and with a maximum dollar increase of no more than 20% of the original Agreement

3. Under Emergency justification, special circumstances, or Legislatively mandated conditions, some agreements may be Amended beyond 1-year and/or 20% of the original Agreement amount, and will be solely at the discretion of the CDCR and/or the Program Director. Any Amendment that adds funding will be subject to the CDCR's Delegated Purchasing Authority thresholds.

## T. CONTACT LIST

**CDCR PROGRAM MANAGER**
Lourdes White
California Department of Corrections and Rehabilitation
DAI CAMU
1515 S Street, North Building 322 N, Sacramento CA, 95811
Lourdes.White@cdcr.ca.gov

**CDCR PROGRAM DIRECTOR**
Mona Houston
DAI CAMU
California Department of Corrections and Rehabilitation
1515 S Street, North Building 351, Sacramento CA, 95811
Mona.Houston@cdcr.ca.gov

**CDCR CONTRACT MANAGER**
Heidi Lozano
California Department of Corrections and Rehabilitation
Information Technology Contract Management Unit (ITCMU)
1940 Birkmont Drive, Rancho Cordova, CA 95742
Heidi.Lozano2@cdcr.ca.gov

Cal Interpreting & Translations
California Department of Corrections and Rehabilitation (CDCR)

Agreement #C5611526
Exhibit A

**CDCR CONTRACT ANALYST**
Nicole Finch
California Department of Corrections and Rehabilitation
Information Technology Contract Procurement Unit (ITCPU)
1940 Birkmont Drive, Rancho Cordova, CA 95742
Nicole.Finch@cdcr.ca.gov

**CONTRACTOR**
Cal Interpreting & Translations

**CONTRACTS AND SALES CONTACT –** Giuliano Scocozza
**EMAIL ADDRESS:** pm@calinterpreting.com
**PHONE NUMBER:** (888) 737-9009

**BILLING AND ACCOUNTING CONTACT–** Giuliano Scocozza
**EMAIL ADDRESS:** pm@calinterpreting.com
**PHONE NUMBER:** (888) 737-9009

**SCHEDULING –** Julia Gallegos
**EMAIL ADDRESS:** info@calinterpreting.com

Cal Interpreting & Translations                                  Agreement #C5611526
Department of Corrections and Rehabilitation                            Exhibit B-1

## EXHIBIT B-1 - RATE SHEET

As noted on this Exhibit B-1, the Contractor shall bill only for actual services provided at the per hour rate as noted on this Time and Materials Based agreement. **If** the total number of hours per classification are listed below, those hours cannot exceed the Contractors total invoiced hours per classification. Any loss of time in and out of the institution gates and sally ports shall be borne by the Contractor.

| Company Name |  |
|---|---|
| Cal Interpreting & Translations |  |
| **Street Address** |  |
| 2501 W. Burbank Blvd. Ste. 311 |  |
| **City, State, Zip Code** |  |
| Burbank CA 91505-2347 |  |
| **Print Name and Title of Authorized Representative** |  |
| Igal Saidian - President |  |
| **Signature and Title of Authorized Representative** | **Date** |
|  | 05/15/2023 |

| Classification | Proposed Hourly Rate |
|---|---|
| **CART Provider (Legal)**<br><br>(estimated *Cart Provider (Legal)* hours to be 5% of total Agreement amount) | $ 150.00 |
| **CART Provider (Non-Legal)**<br><br>(estimated *CART Provider (Non-Legal)* hours to be 95% of total Agreement amount) | $ 110.00 |

Exhibit 137

# STATEWIDE AGREEMENT BETWEEN CDCR/BPH AND NATURAL LANGUAGE LCC (AGREEMENT NUMBER C5611397)

STATE OF CALIFORNIA - DEPARTMENT OF GENERAL SERVICES

**STANDARD AGREEMENT**
STD 213 (Rev. 04/2020)

| | |
|---|---|
| AGREEMENT NUMBER | PURCHASING AUTHORITY NUMBER (If Applicable) |
| C5611397 | |

**1. This Agreement is entered into between the Contracting Agency and the Contractor named below:**

CONTRACTING AGENCY NAME

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION (CDCR)

CONTRACTOR NAME

NATURAL LANGUAGES LLC

**2. The term of this Agreement is:**

START DATE

July 1, 2023 or upon approval whichever occurs later

THROUGH END DATE

June 30, 2026

**3. The maximum amount of this Agreement is:**

$113,209.48 (One Hundred Thirteen Thousand Two Hundred Nine Dollars and Forty Eight cents)

**4. The parties agree to comply with the terms and conditions of the following exhibits, which are by this reference made a part of the Agreement.**

| Exhibits | | Title | Pages |
|---|---|---|---|
| | Exhibit A | Scope of Work | 8 |
| | Exhibit A-1 | Professional Conduct and Attire | 2 |
| | Exhibit A-2 | List of Participating Institutions | 1 |
| +/− | Exhibit B | Budget Details and Payment Provisions | 2 |
| +/− | Exhibit B-1 | Rate Sheet | 2 |
| +/− | Exhibit C * | General Terms and Conditions                                              GTC | 04/2017 |
| +/− | Exhibit D | Special Terms and Conditions | 19 |
| +/− | Exhibit E | HIPAA-BAA | 12 |
| +/− | Exhibit F | PREA – CDCR 2301 PREA Policy Information for Volunteers and Contractors | 3 |

*Items shown with an asterisk (\*), are hereby incorporated by reference and made part of this agreement as if attached hereto.*
*These documents can be viewed at https://www.dgs.ca.gov/OLS/Resources*
*IN WITNESS WHEREOF, THIS AGREEMENT HAS BEEN EXECUTED BY THE PARTIES HERETO.*

| **CONTRACTOR** |
|---|

CONTRACTOR NAME (if other than an individual, state whether a corporation, partnership, etc.)

Natural Languages LLC

| CONTRACTOR BUSINESS ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| 13536 Lakewood Blvd. #103 | Bellflower | CA | 90706 |

| PRINTED NAME OF PERSON SIGNING | TITLE |
|---|---|
| Lily Pacheco | NIC and Contract Administrator |

| CONTRACTOR AUTHORIZED SIGNATURE | DATE SIGNED |
|---|---|
| *[signature]* 7F9D8FA33FDF44C... | 6/16/2023 |

STATE OF CALIFORNIA – DEPARTMENT OF GENERAL SERVICES

# STANDARD AGREEMENT
STD 213 (Rev. 04/2020)

| | AGREEMENT NUMBER | PURCHASING AUTHORITY NUMBER (If Applicable) |
|---|---|---|
| | C5611397 | |

## STATE OF CALIFORNIA

CONTRACTING AGENCY NAME

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION (CDCR)

| CONTRACTING AGENCY ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| 9838 Old Placerville Road, Suite B-2 | Sacramento | CA | 95827 |

| PRINTED NAME OF PERSON SIGNING | TITLE |
|---|---|
| Samantha Bruton | Section Chief, Institutions Contract Section |

| CONTRACTING AGENCY AUTHORIZED SIGNATURE | DATE SIGNED |
|---|---|
| *Samantha Bruton* | 6/20/2023 |

CALIFORNIA DEPARTMENT OF GENERAL SERVICES APPROVAL

EXEMPTION (If Applicable)
I hereby certify that all conditions for exemption Have been complied with and this contract is exempt from the Department of General Services Approval, per DGS Exemption Letter #CDCR5.1

By *Samantha Bruton*    Date 6/20/2023

Natural Languages LLC
Department of Corrections and Rehabilitation (CDCR)
Scope of Work

Agreement Number C5611397
Exhibit A

**AMERICAN SIGN LANGUAGE INTERPRETER SERVICES (ASL)
IN-PERSON/VIDEO CONFERENCE**

## 1. INTRODUCTION

This is a statewide Agreement in which the Contractor shall perform, sign language interpretation, including the use of American Sign Language (ASL) services, Certified Deaf Interpreter (CDI) team services, and other sign language interpretation (SLI) services as needed, for deaf or hearing-impaired incarcerated persons (IPs) subject to a proceeding under the jurisdiction of the California Department of Corrections and Rehabilitation (CDCR), Board of Parole Hearings (BPH), hereafter referred to as BPH.

The Contractor will be compensated monthly in arrears for the services in accordance with the rate(s) specified on the Exhibit B-1, Rate Sheet, which shall include all labor, travel time, per diem, materials, non-consumable supplies, transportation, tools, equipment, permits, licenses at no additional cost to the state and every other item of expense necessary.

The Contractor shall provide services for the California Department of Corrections and Rehabilitation (CDCR) Institutions listed in the Exhibit A-2, List of Participating Institutions.

Quantities of services identified herein and on the Exhibit B-1, Rate Sheet are CDCR's estimates only. The State does not expressly or by implication agree that the actual amounts will correspond therewith and reserves the right to increase/omit portions of the service as may be deemed necessary or advisable by the State. This shall remain in force for the entire term of this Agreement.

The Contract shall be awarded as a (Primary) provider.

**The State assumes no responsibility for any work commenced by the Contractor and will not reimburse the Contractor for any work performed prior to approval and scheduling by the Institution Contract Liaison.**

## 2. CONTRACTOR RESPONSIBILITIES

The Contractor shall provide these services on an as-needed basis at the pre-hearing proceedings including, but not limited to, consultations, Forensic Assessment Division (FAD) interviews and attorney-client interviews, as well as at hearings including, but not limited to, Parole Consideration Hearings, Parole Reconsideration Hearings, Rescission Hearings, and Offender with Mental Health Disorder Hearings. At all pre-hearing proceedings and hearings, these services shall include either (1) video conference ASL, ASL/CDI team, or other SLI services or (2) in-person ASL, ASL/CDI team, or other SLI services. Pre-hearing proceedings and hearing are generally conducted by video conference; however, the board holds approximately 5% of proceedings and hearings in person at the IP's institution when deemed necessary to achieve effective communication. All services, whether for pre-hearing proceedings or hearings, may be conducted at any of the CDCR institutions listed in the Exhibit E, List of Participating Institutions.

Natural Languages LLC                                                    Agreement Number C5611397
Department of Corrections and Rehabilitation (CDCR)                                    Exhibit A
Scope of Work

The Contractor shall interpret from a spoken English to sign and from sign to spoken English by a certified ASL, ASL/CDI team, or other SLI interpreter, as determined for the IP's individual need.

The Contractor shall certify, in the bid, the ability to provide video conference and in-person ASL, ASL/CDI team, or other SLI interpretation services at the times and locations required by BPH.

The Contractor shall ensure all interpreters assigned to proceedings have proper identification and proof of RID, NAD, or DOR certification. Assigned interpreters shall be prepared to provide a copy of their credentials to BPH hearing panel upon request.

Due to the confidentiality of an IP's information that may be discussed at any pre-hearing proceeding or hearing, all interpreters shall record a declaration stating that each session is privileged information and shall not be divulged unless by special permission from the IP. For hearings, the hearing transcription is the official record of this declaration. For pre-hearing proceedings, which are not recorded or transcribed, all shall provide their declaration in writing electronically to BPHAccountingLiaison@cdcr.ca.gov.

Upon an interpreter being assigned to a pre-hearing proceeding or hearing, the Contractor shall provide the name and cell phone number of all scheduled interpreters to BPH. This helps to alleviate cancellations in the event an interpreter is late or relocated/rescheduled to another hearing.

An interpreter shall wear appropriate business casual attire and professionally represent themselves in accordance with Exhibit A-1, Professional Conduct and Attire for Interpreters, regardless of whether the pre-hearing proceeding or hearing is conducted by video conference or in person.

The Contractor shall provide interpreters a copy of Exhibit A-1, Professional Conduct and Attire for Interpreters to ensure interpreters understand BPH's expectations and industrial standards regarding professionalism and attire.

The Contractor shall ensure their camera/equipment, software and/or data support utilized for conducting ASL, ASL/CDI team, or other SLI Video Conferencing interpreting service is compatible and permissible to operate on CDCR CISCO Video Conferencing equipment.

All invoices shall be submitted within thirty (30) calendar days from the date of the pre-hearing proceeding or hearing to ensure expediency of processing.  Any invoice(s) submitted after thirty (30) calendar days may cause delay in payment to the Contractor.  All required documents, as stated in Section 4 – Documentation Requirements, shall be included with an invoice to ensure timely payment.

The Contractor shall maintain a roster of interpreters and provide facility gate clearance information (name, driver's license number or identification card number, date of birth, and Social Security Number) to BPH, upon assignment of an interpreter. This information allows

Natural Languages LLC                                    Agreement Number C5611397
Department of Corrections and Rehabilitation (CDCR)                    Exhibit A
Scope of Work

BPH to complete a request for gate clearance for all interpreters entering a facility, prior to commencement of services.

3.  **REQUEST FOR SERVICE**

When services are requested, the BPH will provide the Contractor a confirmation letter via email, advising the Contractor of the type of assignment (pre-hearing proceeding or hearing type); the method by which the hearing is expected to be conducted (video or in-person); the IP's last name and CDCR number; the date and time when services are needed; the location of services if in-person; and the institution contact person's name and contact information. Contractor is responsible for advising interpreters that hearing start times are approximate and may be delayed for a variety of reasons including, but not limited to, an earlier hearing running late, a current hearing running late, or technical issues during a video conference proceeding or hearing.

The interpreter shall bring the confirmation letter to in-person scheduled proceedings. When services are complete, the interpreter shall present this letter to the assigned Commissioner or Deputy Commissioner / Administrative Law Judge for signature, per Section 4 - Documentation Requirements.

A.  The Contractor shall provide one (1) ASL interpreter, one (1) ASL/CDI team when an intermediary is necessary, or one (1) other SLI interpreter for each pre-hearing proceeding or hearing, when the estimated duration is less than or equal to four (4) hours.

B.  The Contractor shall provide two (2) ASL interpreters, two (2) ASL/CDI teams when an intermediary is necessary, or two (2) other SLI interpreters for each pre-hearing proceeding and each hearing, when the estimated duration will be in excess of four (4) hours.

   1.  Parole Consideration Hearings and Parole Reconsideration Hearings shall be presumed to exceed four (4) hours and to require the two (2) interpreters or interpreter teams.

   2.  When two (2) ASL interpreters or two (2) ASL/CDI team interpreters are working, the interpreters or teams shall switch every thirty minutes or when an interpreter reports a need to switch (whichever event occurs first).

C.  Generally, pre-hearing proceedings are scheduled, and normally take place, between 8:00 a.m. through 5:00 p.m., Monday through Friday. Pre-hearing proceedings normally take no longer than one to two hours to complete attorney-client meetings and two to four hours to complete FAD interviews. However, services may be required, on a case-by-case basis, prior to 8:00 a.m. or after 5:00 p.m.

D.  Generally, hearings are scheduled, and normally take place, from 8:00 a.m. to 5:00 p.m., Monday through Friday, and normally take between two to six hours for completion. However, services may be required, on a case-by-case basis, prior to 8:00

Natural Languages LLC                                    Agreement Number C5611397
Department of Corrections and Rehabilitation (CDCR)                     Exhibit A
Scope of Work

a.m., or after 5:00 p.m., depending upon the hearing calendar and institutional scheduling needs.

E.  Due to the nature of BPH pre-hearing proceedings and hearings, BPH has no control over the length of proceedings or hearings. The Contractor shall ensure all interpreters are aware that assignments may exceed the generally expected range of time for proceedings and hearings listed above. To fulfill their obligation to BPH under this Agreement, the interpreter or interpreter team shall be available for the entire proceeding or hearing to continue their interpreter services until the proceeding or hearing has been completed. Interpreters who are required to stay for extended hours shall be compensated in accordance with the Exhibit B-1, Rate Sheet.

F.  If services are required for an eight (8) hour period, a thirty (30) minute unpaid lunch shall be allowed.

G.  The Contractor shall provide a normal hourly rate for interpreters and interpreter teams for interpretation assignments on the Exhibit B-1, Rate Sheet, that last up to 8 hours, not including any lunch period. The Contractor will be compensated for each assignment in quarter-hour (¼) increments, not to exceed 8 hours at this normal hourly rate, for each quarter-hour to complete the assignment in accordance with the Exhibit B-1, Rate Sheet. (Compensation will be computed by taking the normal rate, divided by four (4), times the number of quarter-hours to complete the assignment).

H.  The Contractor shall provide an overtime hourly rate for interpreters and interpreter teams for interpretation assignments on the Exhibit B-1, Rate Sheet that exceed 8 hours, not including any lunch period. The Contractor will be compensated for each assignment in quarter-hour (¼) increments at this overtime hourly rate for each quarter hour in excess of 8 hours to complete the assignment in accordance with the Exhibit B-1, Rate Sheet. (Compensation will be computed by taking the overtime rate, divided by four (4), times the number of quarter-hours in excess of 8 hours).

I.  For hearing assignments, the interpreters or interpreter teams may be asked to assist attorneys with interpretation when the attorneys meet with the IP during breaks from the hearings, or immediately prior to or after the hearing.

J.  At all video conference proceedings or hearings, the interpreter shall be available by video thirty (30) minutes prior to the start time of the proceeding or hearing as identified in the confirmation letter or any subsequent notification sent via e-mail, in case interpretation is needed for a pre-hearing attorney-client interview. The interpreters shall be punctual and take into consideration the approximate time needed to log in to video conferencing.

K.  At all in-person proceedings, the interpreter shall arrive thirty (30) minutes prior to the start time of the proceeding and location as identified in the confirmation letter or any subsequent notification sent via e-mail.  The interpreters shall be punctual and take into consideration the approximate time required for parking, security screening and escort to the hearing room at State prison facilities. At all in-person proceedings, the interpreter shall be present with the incarcerated person during the hearing.

Natural Languages LLC                                    Agreement Number C5611397
Department of Corrections and Rehabilitation (CDCR)                       Exhibit A
Scope of Work

   L. If the interpreter is not available or becomes unavailable at the scheduled time of a pre-hearing proceeding or hearing, the Contractor shall not be compensated unless the Contractor is able to provide another interpreter within 30 minutes of the proceeding or hearing start time.

   M. Upon request by BPH, the "primary" Contractor, defined as the <u>lowest</u> responsible bidder, shall be contacted by BPH-Scheduling first.  IF and ONLY IF, the primary Contractor is <u>unable to provide services</u>, the "secondary" Contractor, defined as the <u>second lowest</u> responsible bidder, shall be contacted.  This process shall be repeated based on the number of agreements awarded and shall take place each time BPH-Scheduling notifies the Contractor to provide services and the Contractor is unable to do so.

   N. The Contractor shall respond to BPH's request for an interpreter as follows:

      1. The Contractor shall confirm assignment of an interpreter and to notify BPH-Scheduling with the interpreter's name and telephone number, in writing, within five (5) business days of contact, when a hearing has a scheduled date of over thirty (30) calendar days from BPH's request.

      2. The Contractor shall confirm assignment of an interpreter and notify BPH-Scheduling of the interpreter's name and telephone number, in writing, within three (3) business days of contact, when a hearing has a scheduled date that is less than thirty (30) calendar days from BPH's request.

      3. The Contractor shall confirm assignment of an interpreter and notify BPH of the interpreter's name and telephone number, in writing, within two hours of contact, when an expedited hearing is scheduled within three (3) business days or less from BPH's request.

**4.**    **<u>DOCUMENTATION REQUIREMENTS</u>**

When submitting an invoice for video conferencing ASL, ASL/CDI team, or other SLI interpreter services, signatures of the confirmation letter by the panel is not required.  For hearings, auditing staff shall audit the hearing transcript to verify attendance. For pre-hearing proceedings, auditing staff shall verify attendance with the IP's attorney, FAD clinician, or hearing officer presiding over the consultation. Electronic submissions shall be sent to both:

institutionnonmedcontractinvoices@cdcr.ca.gov and

BPHAccountingLiaison@cdcr.ca.gov

When submitting an invoice for in-person ASL, ASL/CDI team, or other SLI interpreter services, the Contractor shall submit the confirmation letter signed by the Commissioner or

DocuSign Envelope ID: 680D18GA-5B48-448C-8F48-FB080A7423D1

Natural Languages LLC                                                Agreement Number C5611397
Department of Corrections and Rehabilitation (CDCR)                                     Exhibit A
Scope of Work

Deputy Commissioner / Administrative Law Judge that includes the date, start and end time of the proceedings.  Electronic submissions shall be sent to both:

institutionnonmedcontractinvoices@cdcr.ca.gov and

BPHAccountingLiaison@cdcr.ca.gov

When submitting for cancellation, the Contractor shall submit the email notice of cancellation along with the invoice.  Electronic submission shall be sent to:

BPHAccountingLiaison@cdcr.ca.gov

5.    **QUALIFICATIONS**

**Required**: All ASL, CDI, or other SLI interpreters provided by the Contractor during the term of this Agreement shall be certified by the Registry of Interpreters for the Deaf (RID), the National Association for the Deaf (NAD); or Certified only California Department of Rehabilitation (DOR) Support Services Assistant Interpreters.

**Desired**: Having general knowledge of the criminal justice system or court interpretation would aid any sign language interpreters to communicate the discussions more accurately and effectively during any pre-hearing proceedings or hearings.

6.    **CANCELLATION**

ASL, ASL/CDI team, and other SLI interpreter services are mission critical to BPH. The Contractor shall notify BPH within twenty-four (24) hours of receiving notification that an interpreter scheduled for a BPH proceeding is unable to provide services. Within three (3) business days or sooner as BPH requires, the Contractor shall also provide replacement interpreter to avoid disruption of services.

The BPH shall notify the Contractor at least twenty-four (24) hours in advance of cancelled proceeding. In instances where the proceeding is cancelled by BPH without a twenty-four (24) hour notice, a cancellation fee may be paid to the Contractor by BPH of up to two (2) hours of the normal hourly rate for pre-hearing proceedings and up to four (4) hours of the normal hourly rate for hearings.

7.    **LICENSE / PERMITS / CERTIFICATIONS / EXPERIENCE**

The Contractor shall keep current all permits, certificates, and licenses required by Federal, State, County, and local regulations, as applicable.

The Contractors located within the State of California are required to have and submit a current business license from the city and/or county in which the Contractor is headquartered.  Corporations are required to have and submit a copy of incorporation documents and/or a letter from the office of the Secretary of State.

DocuSign Envelope ID: 680D18CA-5B48-448C-8F48-FB080A7423D1

Natural Languages LLC                                      Agreement Number C5611397
Department of Corrections and Rehabilitation (CDCR)                          Exhibit A
Scope of Work

The Contractors located outside the State of California are required to have and submit a copy of the business license or incorporation papers from the respective state showing that the company is in good standing in that state.

The Contractor shall ensure RID, NAD, or DOR certified interpreters are provided. The Contractor shall maintain all ASL, CDI, or other SLI licenses and certifications required by law. The Contractor shall provide proof of certifications/qualifications to BPH, if requested. The Contractor shall ensure interpreters are prepared to show or provide copies of any licenses or certifications to BPH hearing panel.

If at any time during the period of this Agreement, the Contractor receives notification that an interpreter assigned to a proceeding had their license or certification suspended, or will be suspended, the Contractor shall notify BPH in writing within 24 hours of receiving the notification.

The Contractor shall maintain proof of experience in ASL, CDI, or other SLI interpreting services and provide upon BPH request. Acceptable proof is a completed Contractor References (Attachment 1). A minimum of three (3) references are required, specifying the dates services were performed. Each reference shall include the company name, address, contact information and telephone number(s) of the evaluator enabling verification the services performed were satisfactory for each reference given. The three (3) references shall be for services identified as video conference ASL, ASL/CDI team, or other SLI interpreting, or as in-person ASL, ASL/CDI team, or other SLI interpreting, provided within five (5) years prior to the commencement date of the Agreement.

8.  **CDCR RESPONSIBILITES**

    The BPH reserves the right not to use any of Contractor's assigned interpreters, based on prior failure to perform interpretation services up to BPH standards, and to instead request the Contractor to provide a different interpreter.

9.  **CDCR CONTACT INFORMATION**

    Should questions or problems arise during the term of this Agreement, the Contractor shall contact the following offices:

    **Scope of Service/Performance Issues:**
    Board of Parole Hearings
    Contract Liaison Unit Phone
    Number: (279) 300-5717
    Fax Number: (916) 445-5242

    **Scheduling Issues:**
    Board of Parole Hearings
    Chief of Scheduling
    Phone Number: (916) 224-4615

Natural Languages LLC                                          Agreement Number C5611397
Department of Corrections and Rehabilitation (CDCR)                              Exhibit A
Scope of Work

**Billing/Payment  Issues:**
Board  of  Parole  Hearings
Accounting Liaison Unit
Phone Number: (279) 300-5833
Fax Number: (916) 445-5242

**General Contract Issues:**
Office of Business Services
Contract Management Unit
Phone Number: (916) 255-5624
Fax Number: (916) 255-6187

Natural Languages LLC                                       Agreement Number C5611397
Department of Corrections and Rehabilitation (CDCR)                        Exhibit A-1
Professional Conduct and Attire for Interpreters

## AMERICAN SIGN LANGUAGE INTERPRETER SERVICES (ASL)
## IN-PERSON/VIDEO CONFERENCE

## Professional Conduct

### a) Representation of qualifications

An interpreter shall accurately and completely represent his or her certifications, training, and relevant experience.

### b) Complete and accurate interpretation

An interpreter shall use his or her best skills and judgment to interpret accurately without embellishing, omitting, or editing. When interpreting for a party, the interpreter shall interpret everything that is said during the entire proceedings.

### c) Impartiality and avoidance of conflicts of interest

1) *Impartiality:* An interpreter shall be impartial and unbiased and shall refrain from conduct that may give an appearance of bias.

2) *Disclosure of conflicts:* An interpreter shall disclose to the commissioner and to all parties any actual or apparent conflict of interest. Any condition that interferes with the objectivity of an interpreter is a conflict of interest. A conflict may exist if the interpreter is acquainted with or related to any inmate or party to the action or if the interpreter has an interest in the outcome of the proceedings.

3) *Conduct:* An interpreter shall not engage in conduct creating the appearance of bias, prejudice, or partiality.

### d) Confidentiality of privileged communications

An interpreter shall not disclose privileged communications between counsel and client to any person.

### e) Giving legal advice

An interpreter shall not give legal advice to inmate and other parties, nor recommend specific attorneys or law firms.

### f) Impartial professional relationships

An interpreter shall maintain an impartial, professional relationship with all hearing officers, commissioner, attorneys, and other parties.

## Attire Restrictions

There are restrictions on what you may wear to a prison. In general, there are four rules to remember:

1. Do not wear clothing that resembles the clothing prisoners wear, which includes:

   a) Blue denim pants,

Natural Languages LLC                                          Agreement Number C5611397
Department of Corrections and Rehabilitation (CDCR)                            Exhibit A-1
Professional Conduct and Attire for Interpreters

      b)  blue chambray shirts,

      c)  orange jumpsuits or orange tops with orange bottoms,

      d)  red tops (Pleasant Valley State Prison only), or

      e)  dresses that resemble prisoner muumuu (female institutions only).

2. Do not wear clothing resembling what custodial staff wears. This includes:

      a)  Forest green pants,

      b)  tan shirts or

      c)  camouflage (unless identification shows an active or reserve member of the military).

3. Dress conservatively and modestly. No skirts, dresses or shorts that expose more than two inches above the knee. This includes no strapless, halter, bare midriff, sheer, or transparent clothing.

4. Do not wear any item that cannot be taken off and will not clear a metal detector (such as an underwire bra or clothing with metal buttons).

      a)  No wigs, hairpieces, extensions, or other headpieces except for medical reasons and with prior approval,

      b)  no hats or gloves, except with prior approval or in inclement weather, and

      c)  no shower shoes.

Natural Languages LLC                                                    Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)                          Exhibit A-2
List of Participating Institutions

## AMERICAN SIGN LANGUAGE INTERPRETER SERVICES (ASL)
## IN-PERSON/VIDEO CONFERENCE

| Institutions | Address | City/State |
|---|---|---|
| **Northern Regional Office** | | |
| California Correctional Center (CCC) | 711-045 Center Road | Susanville, CA  96127 |
| California Medical Facility (CMF) | 1600 California Drive, P O BOX 2237 | Vacaville, CA  95697, 95696 |
| California State Prison, Sacramento (SAC) | 100 Prison Road | Represa, CA  95671-0002 |
| California State Prison, Solano (SOL) | 2100 Peabody Road | Vacaville, CA  95696-4000 |
| California Health Care Facility (CHCF) | 7707 South Austin Road | Stockton, CA  95215 |
| Folsom State Prison (FOL) | 300 Prison Road | Represa, CA  95671 |
| High Desert State Prison (HDSP) | 475-750 Rice Canyon Road | Susanville, CA  96127 |
| Mule Creek State Prison (MCSP) | 4001 Ione Michigan Bar Rd., PO Box. Box 409099 | Ione, CA  95640 |
| Pelican Bay State Prison (PBSP) | 5905 Lake Earl Drive | Crescent City, CA  95531 |
| Sacramento Central Office (SACCO) | 1515 S Street, Rm 516-S | Sacramento 95811 |
| San Quentin State Prison (SQ) | 1 Main Street | San Quentin, CA  94964 |
| Sierra Conservation Center (SCC) | 5100 O'Byrnes Ferry Road | Jamestown, CA  95327 |
| **Central Regional Office** | | |
| Avenal State Prison (ASP) | #1 Kings Way | Avenal, CA  93204 |
| CA Substance Abuse Treatment Facility (SATF) | 900 Quebec Avenue | Corcoran, CA  93212-7100 |
| California Correctional Institution (CCI) | 24900 Highway 202 | Tehachapi, CA  93561 |
| California State Prison, Corcoran (COR) | 4001 King Avenue | Corcoran, CA  93212-8309 |
| Central California Women's Facility (CCWF) | 23370 Road 22 | Chowchilla, CA  93610-1501 |
| Correctional Training Facility (CTF) | Highway 101 North - PO Box 686 | Soledad, CA  93960-0686 |
| Kern Valley State Prison (KVSP) | 3000 West Cecil Avenue | Delano, CA  93216 |
| North Kern State Prison (NKSP) | 2737 West Cecil Avenue | Delano, CA  93215-0567 |
| Pleasant Valley State Prison (PVSP) | 24863 W Jayne Ave | Coalinga, CA  93210 |
| Salinas Valley State Prison (SVSP) | 31625 Highway 101 | Soledad, CA  93960-1020 |
| Valley State Prison (VSP) | 216233 Avenue 24 | Chowchilla, CA  93610-0099 |
| Wasco State Prison (WSP) | 701 Scofield Avenue | Wasco, CA  93280-8800 |
| **Southern Regional Office** | | |
| Atascadero State Hospital | (10333 El Camino Real) 3232 S. Higuera St, Ste. 102 | (Atascadero, CA  93422) San Luis Obispo, CA 93401 |
| CA State Prison, Los Angeles County (LAC) | 44750 60th Street West | Lancaster, CA  93536-7620 |
| California City Correctional Facility (CAC) | 22844 Virginia Blvd. - PO Box 2646 | California City, CA  93505, 93504 |
| California Institution for Men (CIM) | 14901 Central Avenue | Chino, CA  91710 |
| California Institution for Women (CIW) | 16756 Chino-Corona Road | Corona, CA  92880 |
| California Men's Colony (CMC) | Highway 1 | San Luis Obispo, CA  93409 |
| California Rehabilitation Center (CRC) | 5th Street and Western - PO Box 1841 | Norco, CA  92860-0991 |
| Calipatria State Prison (CAL) | 7018 Blair Road | Calipatria, CA  92233-5001 |
| Centinela State Prison (CEN) | 2302 Brown Road - PO Box 731 | Imperial, CA  92251-0731 |
| Chuckawalla Valley State Prison (CVSP) | 19025 Wiley's Well Road | Blythe, CA  92225 |
| Ironwood State Prison (ISP) | 19005 Wiley's Well Road | Blythe, CA  92225 |
| Patton State Hospital | 303 W 5th Street | San Bernardino, CA  72401 |
| R.J. Donovan Correctional Facility (RJD) | 480 Alta Road | San Diego, CA  92179 |

Natural Languages LLC                                           Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)                    Exhibit B
Budget Detail and Payment Provisions

### AMERICAN SIGN LANGUAGE INTERPRETER SERVICES (ASL)
### IN-PERSON/VIDEO CONFERENCE

**1.     Invoicing and Payment**

**a.**     For services satisfactorily rendered, and upon receipt and approval of Contractor's invoices, the State agrees to compensate the Contractor in accordance with the rates specified herein on Exhibit B-1 Rate Sheet and made a part of this Agreement.  Exhibit B-1 Rate Sheet shall remain in force for the stated term of this Agreement and shall include every item of expense, direct and indirect, including taxes incidental to the specified rates.

**b.**     Invoices shall include the Agreement Number, Purchase Order Number and shall be submitted in triplicate not more frequently than monthly in arrears to the address provided below.

**c.**     The Contractor also has the option to submit their invoices electronically to the appropriate email address listed below.  The Contractor must use the name on the Agreement and the Agreement Number on the subject line of the email.  The email must include an attached PDF file of the invoice, in accordance with the information above, and must reference the institution acronym and invoice number. Separate emails shall be sent for contracts with more than one participating institution, facility, office and/or site with the invoice information as stated above.

California Department of Corrections and Rehabilitation (CDCR)
ASB - Sacramento
Attention:  **Accounts Payable B**
P.O. Box 187016
Sacramento, CA  95818-7016

**For electronic submission, send invoices to:**
**Institutionnonmedcontractinvoices@cdcr.ca.gov**

Please also submit a copy of invoice to:

California Department of Corrections and Rehabilitation
Board of Parole Hearings
Attention:  **Accounting Liaison Unit**
P.O. Box 4036
Sacramento, CA  95812-4036

**For electronic submission, send invoices to:**
**BPHAccountingLiaison@cdcr.ca.gov**

**2.     Budget Contingency Clause**

**a.**     It is mutually agreed that if the California State Budget Act for the current fiscal year and/or any subsequent fiscal years covered under this Agreement does not appropriate sufficient funds for the program, this Agreement shall be of no further force and effect.  In this event, the State shall have no liability to pay any funds whatsoever to Contractor, or to furnish any other considerations under this Agreement, and Contractor shall not be obligated to perform any provisions of this

Agreement.

**b.**     If funding for the purposes of this program is reduced or deleted for any fiscal year by the California State Budget Act, the State shall have the option to either cancel this Agreement with no liability occurring to the State, or offer an Agreement amendment to Contractor to reflect the reduced amount.

**3.**     <u>**Prompt Payment Clause**</u>

Payment will be made in accordance with, and within the time specified in, Government Code Chapter 4.5, commencing with Section 927.  Payment to small/micro businesses shall be made in accordance with and within the time specified in Chapter 4.5, Government Code 927 et seq.

**4.**     <u>**Subcontractors**</u>

Nothing contained in this Agreement, or otherwise, shall create any contractual relation between the State and any subcontractors, and no subcontract shall relieve the Contractor of Contractor's responsibilities and obligations hereunder.  The Contractor agrees to be as fully responsible to the State for the acts and omissions of its subcontractors and of persons either directly or indirectly employed by any of them as it is for the acts and omissions of persons directly employed by the Contractor.  The Contractor's obligation to pay its subcontractors is an independent obligation from the State's obligation to make payments to the Contractor.  As a result, the State shall have no obligation to pay or to enforce the payment of any moneys to any subcontractor.

**5.**     <u>**Advanced Payment for Non-Profit Organizations**</u>

Pursuant to Government Code Section (GC) 11019, upon review and approval of CDCR, the Contractor may request an advance payment for the fiscal year(s) covered by this agreement, which shall not exceed twenty five percent (25%) of the annual budget for each fiscal year.  The CDCR will review and determine the need for an advance payment using the criteria contained in the department's procedures for advance payments to Community-Based, Private, Non-Profit Organizations, CDCR shall recover one-twelfth (1/12) of the advance payment each month by the reduction of monthly invoices submitted for payment by the Contractor in accordance with the project budget amount for each fiscal year of the agreement.

**6.**     <u>**Bidder Acknowledgement/Certification (OBS 300)**</u>

The Contractor hereby agrees to provide all labor, materials, supplies, licenses, permits, equipment and transportation necessary to perform all services required for the foregoing titled work in accordance with the Scope of Work and all Terms and Conditions.

Any and all services performed outside the scope of this Agreement will be at the sole risk and expense of the Contractor.

DocuSign Envelope ID: 680D18GA-5B48-448C-8F48-EB080A7423D1
California Department of Corrections and Rehabilitation (CDCR)
Rate Sheet

Case 2:90-cv-00520-KJM-SCR   Document 3630-13   Filed 10/16/24   Page 208 of 426

Agreement Number C5611397
Exhibit B-1

## AMERICAN SIGN LANGUAGE INTERPRETER SERVICES (ASL)
## IN-PERSON/VIDEO CONFERENCE

Electronic bid packages include an Excel version of this Rate Sheet (Exhibit B-1) in addition to the PDF file in order to assist bidders in computing accurate totals. Bidders should download the Excel version and complete all highlighted yellow cells. Bidders are required to bid on each item. Failure to indicate a dollar amount (BLANK CELL) in any item will be grounds to reject the entire bid. A zero dollar amount ($0.00 or $-) listed for any and all items will be interpreted and understood by the State to mean that the bidder who indicated a zero dollar amount shall perform any such services at **NO COST** to the State.

**Any and all services performed outside the scope of this contract shall be at the sole risk and expense of the contractor.**

Quantities listed on the Exhibit B-1, Rate Sheet are the State's estimates only and are offered as a basis for comparison of bids. The State does not expressly or by implication agree that the actual amount of work will correspond therewith and reserves the right to increase/omit portions of the work as may be deemed necessary or advisable by the State.

All prices must be printed in ink or typewritten. All prices must be bid in U.S. currency and shall encompass every item of expense necessary to perform the services.

NOTE: The Bidder shall provide services for the California Department of Corrections and Rehabilitation (CDCR) Institutions listed in the Exhibit A-2, List of Participating Institutions.

---

The Contractor may offer a discount on invoices in order for the invoices to be paid within thirty (30) days of receipt. Discount offered must be at least one-half of one percent and a minimum of fifty dollars ($50.00).

**Discount offered on invoices to be paid within thirty (30) days of receipt =** | 0 | %

The percent discount (highest discount prevails) may be used in the event of tied bids. Refer to the Notice to Prospective    Bidders, Bid Submission Requirements.

---

### A.  NORMAL RATE (Video Conferencing)

| LANGUAGES | ESTIMATED NUMBER OF HOURS | x | HOURLY RATE | = | TOTAL |
|---|---|---|---|---|---|
| American Sign Language | 800 | x | $ 84.74 | = | $ 67,792.00 |
| Certified Deaf Interpreter | 200 | x | $ 74.74 | = | $ 14,948.00 |
| Other Sign Language Interpretation | 200 | x | $ 64.74 | = | $ 12,948.00 |
| | | | | TOTAL FOR A | $ 95,688.00 ✓ |

### B.  NORMAL RATE (In-Person)

| LANGUAGES | ESTIMATED NUMBER OF HOURS | x | HOURLY RATE | = | TOTAL |
|---|---|---|---|---|---|
| American Sign Language | 50 | x | $ 98.74 | = | $ 4,937.00 |
| Certified Deaf Interpreter | 20 | x | $ 84.74 | = | $ 1,694.80 |
| Other Sign Language Interpretation | 20 | x | $ 64.74 | = | $ 1,294.80 |
| | | | | TOTAL FOR B | $ 7,926.60 ✓ |

DocuSign Envelope ID: 680D18GA-5B48-448C-8F48-EB080A7423D1
California Department of Corrections and Rehabilitation (CDCR)
Rate Sheet

Agreement Number C5611397
Exhibit B-1

Case 2:90-cv-00520-KJM-SCR   Document 3630-13   Filed 10/16/24   Page 209 of 426

**C. OVERTIME RATE (Video Conferencing)**

| LANGUAGES | ESTIMATED NUMBER OF HOURS | x | HOURLY RATE | = | TOTAL |
|---|---|---|---|---|---|
| American Sign Language | 36 | x | $ 84.74 | = | $ 3,050.64 |
| Certified Deaf Interpreter | 20 | x | | = | $ - |
| Other Sign Language Interpretation | 20 | x | | = | $ - |
| | | | TOTAL FOR C | | $ 3,050.64 |

**D. OVERTIME RATE (In-Person)**

| LANGUAGES | ESTIMATED NUMBER OF HOURS | x | HOURLY RATE | = | TOTAL |
|---|---|---|---|---|---|
| American Sign Language | 36 | x | $ 98.74 | = | $ 3,554.64 |
| Certified Deaf Interpreter | 20 | x | $ 84.74 | = | $ 1,694.80 |
| Other Sign Language Interpretation | 20 | x | $ 64.74 | = | $ 1,294.80 |
| | | | TOTAL FOR D | | $ 6,544.24 |

| TOTAL AMOUNT (A + B + C + D) | $ 113,209.48 |
|---|---|
| | BASIS OF AWARD |

DocuSign Envelope ID: 680D18GA-5B48-448G-8F48-EB080A7423D1

Natural Languages LLC                                                   Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)                          Exhibit D
Special Terms and Conditions

## AMERICAN SIGN LANGUAGE INTERPRETER SERVICES (ASL)
## IN-PERSON/VIDEO CONFERENCE

1. **Contract Disputes** (Supersedes provision number 6, Disputes, of Exhibit C)

   As a condition precedent to Contractor's right to institute and pursue litigation or other legally available dispute resolution process, if any, Contractor agrees that all disputes and/or claims of Contractor arising under or related to the Agreement shall be resolved pursuant to the following processes. Contractor's failure to comply with said dispute resolution procedures shall constitute a failure to exhaust administrative remedies.

   Pending the final resolution of any such disputes and/or claims, Contractor agrees to diligently proceed with the performance of the Agreement, including the delivering of goods or providing of services. Contractor's failure to diligently proceed shall constitute a material breach of the Agreement.

   The Agreement shall be interpreted, administered, and enforced according to the laws of the State of California. The parties agree that any suit brought hereunder shall have venue in Sacramento, California, the parties hereby waiving any claim or defense that such venue is not convenient or proper.

   a. **Final Payment**
      The acceptance by Contractor of final payment shall release the California Department of Corrections and Rehabilitation (CDCR) from all claims, demands and liability to Contractor for everything done or furnished in connection with this work and from every act and neglect of CDCR and others relating to or arising out of this work except for any claim previously accepted and/or in process of resolution.

   b. **Informal Appeal**
      Contractor and the program or institution contract liaison, or other designated CDCR employee of the unit for which the goods are being delivered or the service is being performed, shall first attempt in good faith to resolve the dispute or claim by informal discussion(s). Contractor shall identify the issues and the relief sought. Informal discussion(s) between Contractor and contract liaison, or the designated CDCR employee, shall be written, dated, and signed by the authors.

      The program or institution contract liaison shall issue an informal written statement to Contractor regarding the dispute within fifteen (15) calendar days following settlement or an impasse in the informal discussion(s) process. The written statement shall either: (1) document the dispute settlement and what, if any, conditions were reached; or, (2) document the reason(s) the dispute could not be resolved informally and provide notification to Contractor of its option to file a formal appeal within thirty (30) days of the informal statement. One (1) copy of the informal statement and the discussion(s) on which it is based shall be forwarded immediately to the Office of Business Services (OBS) for inclusion in the Agreement file.

   c. **Formal Appeal**
      If the dispute or claim is not resolved to Contractor's satisfaction by the informal appeal process, Contractor may file with the Associate Director, OBS, and a formal written

appeal within thirty (30) calendar days of the date of CDCR's informal written decision. The formal written appeal shall be addressed as follows:

  (SUBJECT)_____
Associate Director
Office of Business Services
California Department of Corrections and Rehabilitation
9838 Old Placerville Road, Suite B-2
Sacramento, CA 95827

Contractor shall specify in the formal written appeal the issue(s) in dispute, the particular relief or remedy sought, the factual basis for Contractor's claim or dispute, and Contractor's legal, technical and/or other authority upon which Contractor bases its claim or dispute.

The formal written appeal shall include a written certification signed by a knowledgeable company official under the penalty of perjury according to the laws of the State of California pursuant to California Code of Civil Procedure Section 2015.5 that the dispute, claim, or demand is made in good faith, and that the supporting data are accurate and complete. If an Agreement adjustment is requested, the written certification shall further state under penalty of perjury that the relief requested accurately reflects the Agreement adjustment for which the CDCR is responsible.

If Contractor is a corporation, the written certification shall be signed by an officer thereof. If Contractor is a sole proprietorship or partnership, it shall be signed by an owner or full partner. If Contractor is other than a corporation, sole proprietorship or partnership, it shall be signed by a principal of the company with authority to bind the company.

The Associate Director, OBS, shall issue a formal written decision on behalf of CDCR within thirty (30) calendar days of receipt of the properly addressed formal written appeal. If mutually agreed by the parties, the date for the issuance of CDCR's final written decision may be extended.

**d.   Further Resolution**
If the dispute is not resolved by the formal appeal process to Contractor's satisfaction, or Contractor has not received a written decision from the Associate Director, OBS, after thirty (30) calendar days, or other mutually agreed extension, Contractor may thereafter pursue its right to institute other dispute resolution process, if any, available under the laws of the State of California.

**e.   Contract Disputes with Public Entities**
A county, city, district or other local public body, state board or state commission, another state or federal agency, or joint-powers authority shall resolve a dispute with CDCR, if any, through a meeting of representatives from the entities affected. If the dispute cannot be resolved to the satisfaction of the parties, each entity may thereafter pursue its right to institute litigation or other dispute resolution process, if any, available under the laws of the State of California.

Natural Languages LLC                                              Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)                          Exhibit D
Special Terms and Conditions

**Right to Terminate** (Supersedes provision number 7, Termination for Cause, of Exhibit C)

     The State reserves the right to terminate this Agreement subject to thirty (30) calendar days written notice to the Contractor.  Contractor may submit a written request to terminate this Agreement only if the State should substantially fail to perform its responsibilities as provided herein.

     Additionally, the State reserves the right to terminate this Agreement subject to thirty (30) calendar days written notice to the Contractor should it be later identified as a service which can be consolidated into a statewide/regionalized Agreement.  The State may exercise its option to cancel the remaining years of this Agreement, should it be decided that with additional institutions and/or sites, the State would receive a better rate for the same service.

     However, the State can immediately terminate this Agreement for cause.  The term "for cause" shall mean that the Contractor fails to meet the terms, conditions, and/or responsibilities of the Agreement.  In this instance, the Agreement termination shall be effective as of the date indicated on the State's notification to the Contractor.

     This Agreement may be suspended or cancelled without notice, at the option of the Contractor, if the Contractor or State's premises or equipment are destroyed by fire or other catastrophe, or so substantially damaged that it is impractical to continue service, or in the event the Contractor is unable to render service as a result of any action by any governmental authority.

2.   **Contract Suspension**

     Notwithstanding any other provisions of this Agreement, pursuant to a Governor's Executive Order or equivalent directive, such as a court order or an order from a federal or state regulatory agency, mandating the suspension of state contracts, the State may issue a Suspension of Work Notice.  The Notice shall identify the specific Executive Order or directive and the Agreement number(s) subject to suspension.  Unless specifically stated otherwise, all performance under the Agreement(s) must stop immediately upon receipt of the Notice.  During the period of contract suspension, Contractor is not entitled to any payment for the suspended work.  Once the order suspending state contracts has been lifted, a formal letter from the Department will be issued to the Contractor to resume work.

3.   **Responsibility Hearing**

     If this Agreement is terminated for cause, CDCR reserves the right to conduct a responsibility hearing to determine if the Contractor is a responsible bidder before an award of future Agreements can be made.

4.   **Confidentiality of Data**

     All financial, statistical, personal, technical and other data and information relating to State's operation, which are designated confidential by the State and made available to carry out this Agreement, or which become available to the Contractor in order to carry out this Agreement, shall be protected by the Contractor from unauthorized use and disclosure.

     If the methods and procedures employed by the Contractor for the protection of the Contractor's data and information are deemed by the State to be adequate for the protection

Natural Languages LLC        Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)       Exhibit D
Special Terms and Conditions

of the State's confidential information, such methods and procedures may be used with the written consent of the State. The Contractor shall not be required under the provisions of this paragraph to keep confidential any data already rightfully in the Contractor's possession that is independently developed by the Contractor outside the scope of the Agreement or is rightfully obtained from third parties.

No reports, information, inventions, improvements, discoveries, or data obtained, repaired, assembled, or developed by the Contractor pursuant to this Agreement shall be released, published, or made available to any person (except to the State) in violation of any state or federal law.

Contractor by acceptance of this Agreement is subject to all of the requirements of California Government Code Section 11019.9 and California Civil Code Sections 1798, et seq., regarding the collection, maintenance, and disclosure of personal and confidential information about individuals.

5. <u>**Compliance with Legal Requirements**</u>

The Contractor shall be aware of and comply with all Federal and State statutes, rules, regulations, and CDCR policies and directives ("CDCR Policies") applicable to the Contract. CDCR policies shall include, but are not limited to the Department Operations Manual (DOM), California Code of Regulations Title 15, any policy memoranda issued by the CDCR Secretary or jointly with the Receiver, California Correctional Health Care Services (CCHCS), and any similar department-wide guidance that may be issued by proper authority, of which the Contractor has been informed by CDCR or has been published on the CDCR public internet web site, CDCR.ca.gov.

6. <u>**Executive Order N-6-22 – Russia Sanctions**</u>

On March 4, 2022, Governor Gavin Newsom issued Executive Order N-6-22 (the EO) regarding Economic Sanctions against Russia and Russian entities and individuals. "Economic Sanctions" refers to sanctions imposed by the U.S. government in response to Russia's actions in Ukraine, as well as any sanctions imposed under state law. The EO directs state agencies to terminate contracts with, and to refrain from entering any new contracts with, individuals or entities that are determined to be a target of Economic Sanctions. Accordingly, should the State determine Contractor is a target of Economic Sanctions or is conducting prohibited transactions with sanctioned individuals or entities, that shall be grounds for termination of this agreement. The State shall provide Contractor advance written notice of such termination, allowing Contractor at least 30 calendar days to provide a written response. Termination shall be at the sole discretion of the State.

7. <u>**Liability for Loss and Damages**</u>

Any damages by the Contractor to the State's facility including equipment, furniture, materials or other State property, will be repaired or replaced by the Contractor to the satisfaction of the State at no cost to the State. The State may, at its option, repair any such damage and deduct the cost thereof from any sum due Contractor under this Agreement.

<u>**Computer Software Management Memo**</u>

Contractor certifies that it has appropriate systems and controls in place to ensure that state

Natural Languages LLC                                    Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)                    Exhibit D
Special Terms and Conditions

funds will not be used in the performance of this Agreement for the acquisition, operation or maintenance of computer software in violation of copyright laws.

8.   **Accounting Principles**

The Contractor will adhere to generally accepted accounting principles as outlined by the American Institute of Certified Public Accountants.  Dual compensation is not allowed; a Contractor cannot receive simultaneous compensation from two or more funding sources for the same services performed even though both funding sources could benefit.

9.   **Liability for Nonconforming Work**

All work provided by the Contractor shall conform to the latest requirement of federal, state, city and county regulations.  Contractor is responsible for compliance with all applicable laws, codes, rules and regulations in connection with work performed under this Agreement.

The Contractor will be fully responsible for ensuring that the completed work conforms to the agreed upon terms.  If nonconformity is discovered prior to the Contractor's deadline, the Contractor will be given a reasonable opportunity to cure the nonconformity.  If the nonconformity is discovered after the deadline for the completion of the project, CDCR, in its sole discretion, may use any reasonable means to cure the nonconformity.  The Contractor shall be responsible for reimbursing CDCR for any additional expenses incurred to cure such defects.

10.   **Subcontractor/Consultant Information**

Contractor is required to identify all subcontractors and consultants who will perform labor or render services in the performance of this Agreement.  Additionally, the Contractor shall notify CDCR, OBS in writing within ten (10) working days of any changes to the subcontractor and/or consultant information.

11.   **Contract Violations**

The Contractor acknowledges that any violation of Chapter 2 or any other chaptered provision of the Public Contract Code (PCC) is subject to the remedies and penalties contained in PCC Sections 10420 through 10425.

12.   **Temporary Nonperformance**

If, because of mechanical failure or for any other reason, the Contractor shall be temporarily unable to perform the work as required, the State, during the period of the Contractor's inability to perform, reserves the right to accomplish the work by other means and shall be reimbursed by the Contractor for any additional costs above the Agreement price.

13. **Extension of Term**

This Agreement may not be amended to extend the term except where necessary to complete performance of the original agreement and not to provide for additional services.

Natural Languages LLC                                    Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)              Exhibit D
Special Terms and Conditions

**14.** **Employment of Ex-Offenders**

Contractor cannot and will not either directly, or on a subcontract basis, employ in connection with this Agreement:

a.   Ex-Offenders on active parole or probation, who have been on active parole or probation during the last three years preceding their employment;

b.   Ex-offenders convicted of drug trafficking in a prison/jail; escape or aiding/abetting escape; battery on a Peace Officer or Public Official; arson offenses; or, any violations of Penal Code Sections 4570-4574 (Unauthorized Communications with Prisons and Prisoners Offenses);

c.   Ex-Offenders required to register as a sex offender pursuant to Penal Code Section 290 or if such ex-offender has an offense history involving a "violent felony" as defined in subparagraph (c) of Penal Code Section 667.5; or

d.   Any ex-offender in a position which provides direct supervision of parolees, except in the following instances:

    1.   Contractor shall only employ ex-offenders who can provide written evidence of having satisfactorily completed parole or probation, and who have remained off parole or probation, and have had no arrests or convictions within the past three years.

An ex-offender whose assigned duties involve administrative or policy decision-making, accounting, procurement, cashiering, auditing, or any other business-related administrative function shall be fully bonded to cover any potential loss to the State or Contractor.  Evidence of such bond shall be supplied to CDCR prior to employment of the ex-offender.

**15.** **Electronic Waste Recycling**

The Contractor certifies that it complies with the requirements of the Electronic Waste Recycling Act of 2003, Chapter 8.5, Part 3 of Division 30, commencing with Section 42460 of the Public Resources Code, relating to hazardous and solid waste.  Contractor shall maintain documentation and provide reasonable access to its records and documents that evidence compliance.

**16.** **Tax**

The State of California and Contractor will each bear their own respective federal, state and local tax liabilities arising from this Agreement.  It is expressly understood that neither the State nor the Contractor will assign, shift, pass on or otherwise assume the tax liabilities of the other party.

**17.** **Licenses and Permits**

The Contractor shall be an individual or firm licensed to do business in California and shall obtain at Contractor's expense all license(s) and permit(s) required by law for accomplishing any work required in connection with this Agreement.

DocuSign Envelope ID: 680D18GA-5B40-448G-8F48-FB080A7423D1

Natural Languages LLC                                                    Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)                          Exhibit D
Special Terms and Conditions

In the event any license(s) and/or permit(s) expire at any time during the term of this Agreement, Contractor agrees to provide CDCR with a copy of the renewed license(s) and/or permit(s) within thirty (30) days following the expiration date.  In the event the Contractor fails to keep in effect at all times all required license(s) and permit(s), the State may, in addition to any other remedies it may have, terminate this Agreement upon occurrence of such event.

18. **Permits and Certifications from State Board of Equalization**

This solicitation and any resulting Agreement shall be subject to all requirements as set forth in Sections 6487, 7101 and Sections 6452.1, 6487.3, 18510 of the Revenue and Taxation Code, and Section 10295.1 of the Public Contract Code requiring suppliers to provide a copy of their reseller's permit or certification of registration and, if applicable, the permit or certification of all participating affiliates, issued by California's State Board of Equalization. Failure of the supplier to comply by supplying the required permit or certification will cause the supplier's bid response to be considered non-responsive and their bid rejected.  Unless otherwise specified in this solicitation, a copy of the reseller's permit or certification of registration must be supplied within five (5) State business days of the request made by the State.

19. **Darfur Contracting Act**

Effective January 1, 2009, CDCR generally cannot contract with "scrutinized" companies that do business in the African nation of Sudan, as described in Public Contract Code Sections 10475-10478.  A company that currently has (or within the previous three years has had) business activities or other operations outside of the United States must certify that it is not a "scrutinized" company when it submits a bid or proposal to CDCR.  A scrutinized company may still submit a bid or proposal for a contract with CDCR if the company first obtains permission from the Department of General Services (DGS).

All bidders must submit a completed OBS 1500 verifying status, with their bid proposal.

20. **Iran Contracting Act**

Pursuant to the Iran Contracting Act of 2010 (Public Contract Code Sections 2200 through 2208 are "the Act"), vendors are ineligible to bid on, submit a proposal for, enter into, or renew any contract with the state for goods or services of one million dollars ($1,000,000) or more if the vendor engages in investment activities in Iran, as defined in the Act. The Act requires that DGS establish and periodically update a list of ineligible vendors.

Also, pursuant to the Act, financial institutions are ineligible to bid on, submit a proposal for, enter into, or renew any contract with the state for goods or services of one million dollars ($1,000,000) or more if the financial institution extends credit, as defined in the Act, to a business identified on the DGS list of ineligible vendors that will use the credit to provide goods or services in the energy sector in Iran.

Prior to submitting a bid or proposal and prior to executing any state contract or renewal for goods or services of one million dollars ($1,000,000) or more, a vendor must certify that it is not on the list of ineligible vendors prohibited from doing business with the State of California. Also financial institutions must certify that they are not extending credit to an ineligible vendor as described in the Act.  The Act provides exceptions to the certification

DocuSign Envelope ID: 680D18GA-5B40-448G-8F48-FB080A7423D1

Natural Languages LLC                                             Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)                  Exhibit D
Special Terms and Conditions

requirement, see PCC sections 2203(c) and (d) for additional information regarding the exceptions.

All bidders must submit a completed OBS 1502 verifying status, with their bid proposal.

**21.** **Conflict of Interest**

The Contractor and their employees shall abide by the provisions of Government Code (GC) Sections 1090, 81000 et seq., 82000 et seq., 87100 et seq., and 87300 et seq., Public Contract Code (PCC) Sections 10335 et seq. and 10410 et seq., California Code of Regulations (CCR), Title 2, Section 18700 et seq. and Title 15, Section 3409, and the Department Operations Manual (DOM) Section 31100 et seq. regarding conflicts of interest.

**a.** **Contractors and Their Employees**
Consultant Contractors shall file a Statement of Economic Interests, Fair Political Practices Commission (FPPC) Form 700 prior to commencing services under the Agreement, annually during the life of the Agreement, and within thirty (30) days after the expiration of the Agreement. Other service Contractors and/or certain of their employees may be required to file a Form 700 if so requested by CDCR or whenever it appears that a conflict of interest may be at issue. Generally, service Contractors (other than consultant Contractors required to file as above) and their employees shall be required to file an FPPC Form 700 if one of the following exists:

1.  The Agreement service has been identified by CDCR as one where there is a greater likelihood that a conflict of interest may occur;

2.  The Contractor and/or Contractor's employee(s), pursuant to the Agreement, makes or influences a governmental decision; or

3.  The Contractor and/or Contractor's employee(s) serves in a staff capacity with CDCR and in that capacity participates in making a governmental decision or performs the same or substantially all the same duties for CDCR that would otherwise be performed by an individual holding a position specified in CDCR's Conflict of Interest Code.

**b.** **Current State Employees**
1.  No officer or employee shall engage in any employment, activity or enterprise from which the officer or employee receives compensation or has a financial interest and which is sponsored or funded by any state agency, unless the employment, activity or enterprise is required as a condition of regular state employment.

2.  No officer or employee shall contract on his or her own behalf as an independent Contractor with any state agency to provide goods or services.

3.  In addition to the above, CDCR officials and employees shall also avoid actions resulting in or creating an appearance of:

    a.  Using an official position for private gain;
    b.  Giving preferential treatment to any particular person;
    c.  Losing independence or impartiality;

DocuSign Envelope ID: 680D18GA-5B48-448C-8F48-EB080A7423D1

       d.     Making a decision outside of official channels; and

       e.     Affecting adversely the confidence of the public or local officials in the integrity of the program.

4.     Officers and employees of the Department must not solicit, accept or receive, directly or indirectly, any fee, commission, gratuity or gift from any person or business organization doing or seeking to do business with the State.

## c. Former State Employees

1.     For the two year (2-year) period from the date he or she left state employment, no former state officer or employee may enter into an Agreement in which he or she engaged in any of the negotiations, transactions, planning, arrangements or any part of the decision-making process relevant to the Agreement while employed in any capacity by any state agency.

2.     For the twelve-month (12-month) period from the date he or she left state employment, no former state officer or employee may enter into an Agreement with any state agency if he or she was employed by that state agency in a policy-making position in the same general subject area as the proposed Agreement within the 12-month period prior to his or her leaving state service.

In addition to the above, the Contractor shall avoid any conflict of interest whatsoever with respect to any financial dealings, employment services, or opportunities offered to inmates or parolees. The Contractor shall not itself employ or offer to employ inmates or parolees either directly or indirectly through an affiliated company, person or business unless specifically authorized in writing by the CDCR. In addition, the Contractor shall not (either directly, or indirectly through an affiliated company, person or business) engage in financial dealings with inmates or parolees, except to the extent that such financial dealings create no actual or potential conflict of interest, are available on the same terms to the general public, and have been approved in advance in writing by CDCR. For the purposes of this paragraph, "affiliated company, person or business" means any company, business, corporation, nonprofit corporation, partnership, limited partnership, sole proprietorship, or other person or business entity of any kind which has any ownership or control interest whatsoever in the Contractor, or which is wholly or partially owned (more than 5% ownership) or controlled (any percentage) by the Contractor or by the Contractor's owners, officers, principals, directors and/or shareholders, either directly or indirectly. "Affiliated companies, persons or businesses" include, but are not limited to, subsidiary, parent, or sister companies or corporations, and any company, corporation, nonprofit corporation, partnership, limited partnership, sole proprietorship, or other person or business entity of any kind that is wholly or partially owned or controlled, either directly or indirectly, by the Contractor or by the Contractor's owners, officers, principals, directors and/or shareholders.

The Contractor shall have a continuing duty to disclose to the State, in writing, all interests and activities that create an actual or potential conflict of interest in performance of the Agreement.

The Contractor shall have a continuing duty to keep the State timely and fully apprised in writing of any material changes in the Contractor's business structure and/or status. This includes any changes in business form, such as a change from sole proprietorship or partnership into a corporation or vice-versa; any changes in company ownership; any dissolution of the business; any change of the name of the business; any filing in bankruptcy;

DocuSign Envelope ID: 680D18GA-5B48-448C-8F48-EB080A7423D1

Natural Languages LLC                                                    Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)                          Exhibit D
Special Terms and Conditions

any revocation of corporate status by the Secretary of State; and any other material changes in the Contractor's business status or structure that could affect the performance of the Contractor's duties under the Agreement.

If the Contractor violates any provision of the above paragraphs, such action by the Contractor shall render this Agreement void.

Members of boards and commissions are exempt from this section if they do not receive payment other than payment for each meeting of the board or commission, payment for preparatory time and payment for per diem.

22. **Disclosure**

Neither the State nor any State employee will be liable to the Contractor or its staff for injuries inflicted by inmates or parolees of the State. The State agrees to disclose to the Contractor any statement(s) known to State staff, made by any inmate or parolee, which indicate violence may result in any specific situation, and the same responsibility will be shared by the Contractor in disclosing such statement(s) to the State.

23. **Additional Disclosure**

Neither the State nor any State employee will be liable to the Contractor or its staff for any injuries caused by exposure to any blood borne pathogens, aerosol transmissible diseases, or communicable diseases. Contractor agrees that it shall comply fully with all applicable Cal/OSHA regulations concerning protection of the Contractor's employees from diseases; including Title 8, California Code of Regulations section 5193 (Blood Borne Pathogens), and Title 8, section 5199 (Aerosol Transmissible Diseases). Contractor agrees to indemnify, defend, and save harmless the State, its officers, agents and employees from any and all claims and losses accruing or resulting to any of the Contractor's employees arising out of exposure to any blood borne pathogen, aerosol transmissible disease, or communicable disease during the Contractor's performance of the Agreement.

24. **Security Clearance/Fingerprinting**

The State reserves the right to conduct fingerprinting and/or security clearance through the Department of Justice, Bureau of Criminal Identification and Information (BCII), prior to award and at any time during the term of the Agreement, in order to permit Contractor and/or Contractor's employee access to State premises. The State further reserves the right to terminate the Agreement should a threat to security be determined.

25. **Notification of Personnel Changes**

Contractor must notify the State, in writing, of any changes of those personnel allowed access to State premises for the purpose of providing services under this Agreement. In addition, Contractor must recover and return any State-issued identification card provided to Contractor's employee(s) upon their departure or termination.

26. **Contractor Employee Misconduct**

During the performance of this Agreement, it shall be the responsibility of the Contractor whenever there is an incident of use of force or allegation(s) of employee misconduct

DocuSign Envelope ID: 680D18GA-5B40-448G-8F48-FB080A7423D1
Case 4:94-cv-02307-CW    Document 3630-13    Filed 10/16/24    Page 220 of 426
Natural Languages LLC                                    Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)                    Exhibit D
Special Terms and Conditions

associated with and directly impacting inmate and/or parolee rights, to immediately notify CDCR of the incident(s), to cause an investigation to be conducted, and to provide CDCR with all relevant information pertaining to the incident(s).  All relevant information includes, but is not limited to:   a) investigative reports; b) access to inmates/parolees and the associated staff; c) access to employee personnel records; d) that information reasonably necessary to assure CDCR that inmates and/or parolees are not or have not been deprived of any legal rights as required by law, regulation, policy and procedures; and e) written evidence that the Contractor has taken such remedial action, in the event of unnecessary or excessive force, or employee misconduct with inmates and/or parolees, as will assure against a repetition of incident(s) or retaliation.  To the extent that the information provided by the Contractor fails to so assure CDCR, CDCR may require that any implicated Contractor staff be denied access to and the supervision of CDCR inmates and/or parolees at the facility and access to inmate and/or parolee records.  Notwithstanding the foregoing, and without waiving any obligation of the Contractor, CDCR retains the power to conduct an independent investigation of any incident(s).  Furthermore, it is the responsibility of the Contractor to include the foregoing terms within any and all subcontracts, requiring that subcontractor(s) agree to the jurisdiction of CDCR to conduct an investigation of their facility and staff, including review of subcontractor employee personnel records, as a condition of the Agreement.

## 27. Workers' Compensation

Contractor hereby represents and warrants that Contractor is currently and shall, for the duration of this Agreement, carry workers' compensation insurance, at Contractor's expenses, or that it is self-insured through a policy acceptable to CDCR, for all of its employees who will be engaged in the performance of this Agreement.  Such coverage will be a condition of CDCR's obligation to pay for services provided under this Agreement.

Prior to approval of this Agreement and before performing any work, Contractor shall furnish to the State evidence of valid workers' compensation coverage.  Contractor agrees that the workers' compensation insurance shall be in effect at all times during the term of this Agreement.  In the event said insurance coverage expires or is canceled at any time during the term of this Agreement, Contractor agrees to give at least thirty (30) days prior notice to CDCR before said expiration date or immediate notice of cancellation.  Evidence of coverage shall not be for less than the remainder of the term of the Agreement or for a period of not less than one year.  The State reserves the right to verify the Contractor's evidence of coverage.  In the event the Contractor fails to keep workers' compensation insurance coverage in effect at all times, the State reserves the right to terminate this Agreement and seek any other remedies afforded by the laws of this State.

Contractor also agrees to indemnify, defend and save harmless the State, its officers, agents and employees from any and all of Contractor's workers' compensation claims and losses by Contractor's officers, agents and employees related to the performance of this Agreement.

## 28. Insurance Requirements

Insurance as required herein shall be a condition of the State's obligation to pay for services provided under this Agreement.  Prior to approval of this Agreement and before performing any work, Contractor and any subcontractor shall furnish to the State evidence of valid coverage.   The following shall be considered evidence of coverage:   A certificate of

Natural Languages LLC                                                           Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)                               Exhibit D
Special Terms and Conditions

insurance, a "true and certified" copy of the policy, or any other proof of coverage issued by Contractor's insurance carrier. Binders are not acceptable as evidence of coverage. Providing evidence of coverage to the State conveys no rights or privileges to the State, nor does it insure any State employee or insure any premises owned, leased, used by or otherwise or under the control of the State. It does, however, serve to provide the State with proof that the Contractor and any subcontractor are insured at the minimum levels required by the State of California.

Contractor agrees that any liability insurance required in the performance of this Agreement shall be in effect at all times during the term of this Agreement. In the event said insurance coverage expires or is canceled during the term of this Agreement, Contractor shall provide the State within five (5) business days of receipt by contractor a copy of any notice of cancellation or non-renewal of insurance required by the contract. Evidence of coverage required in the performance of this Agreement shall not be for less than the remainder of the term of this Agreement or for a period of not less than one year. The State and the Department of General Services (DGS) reserve the right to verify the Contractor's evidence of coverage; evidence of coverage is subject to the approval of the DGS. In the event the Contractor fails to keep insurance coverage at all times as required, the State reserves the right to terminate this Agreement and to seek any other remedies afforded by the laws of the State of California.

For all companies and/or businesses and individual providers, the Contractor hereby represents and warrants that the Contractor is currently and shall be, for the duration of this Agreement, at Contractor's expense insured against:

<u>Commercial General Liability</u> - Provider agrees to carry a minimum of $1,000,000 per occurrence for bodily injury and property damage liability combined (not required if medical services are provided at the institution).

The certificate of insurance must include the following provisions:

•   The California Department of Corrections and Rehabilitation must be named as the "Certificate Holder" and list the following:

    State of California
    California Department of Corrections and Rehabilitation
    Office of Business Services
    9838 Old Placerville Road, Suite B-2
    Sacramento, CA 95827

•   The State of California, its officers, agents, employees, and servants are hereby named as additional insured but only with respect to work performed for the State of California, under the contract (SCM 7.40).

<u>Auto Liability</u> – By signing this Agreement, the Contractor certifies that the Contractor and any employees, subcontractors or servants possess valid automobile coverage in accordance with California Vehicle Code Sections 16450 to 16457, inclusive. The State reserves the right to request proof at any time.

DocuSign Envelope ID: 680D18GA-5B48-448G-8F48-FB080A7423D1
Case 4:94-cv-02307-CW   Document 3630-13   Filed 10/16/24   Page 222 of 426

Natural Languages LLC                                    Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)                Exhibit D
Special Terms and Conditions

29. **Disabled Veteran Business Enterprise (DVBE)**

If this Agreement is exempt from DVBE requirements, CDCR requests your assistance in achieving legislatively established goals for the participation of DVBEs by reporting any certified DVBEs that will be used in the performance of this Agreement.

30. **Small Business and DVBE Participation – Commercially Useful Functions**

This solicitation and any resulting Agreement shall be subject to all requirements as set forth in the following code:

> Government Code Sections 14837, 14839, 14842, 14842.5
> Military and Veterans Code (MVC) Sections 999, 999.6, 999.9

In part, these codes involve requirements for businesses to qualify as a California certified Small Business, Micro business and/or DVBE.  The aforementioned companies must perform a **commercially useful function** to be eligible for award and be "domiciled" in California.  A supplier's bid will be considered non-responsive and rejected for failure to comply with the definition and requirements set forth in the statutes Contractors found to be in violation of certain provisions within these code sections may be subject to loss of certification, penalties and Agreement cancellation.

31. **DVBE Replacement Request**

Contractor understands and agrees that should award of this contract be based in part on their commitment to use the Disabled Veteran Business Enterprise (DVBE) subcontractor(s) identified in their bid or offer, per Military and Veteran's Code (MVC) § 999.5 (e), a DVBE subcontractor may only be replaced by another DVBE subcontractor and must be approved by the Department of General Services (DGS).  The Contractor shall submit requests for DVBE substitutions electronically on the DVBE Substitution form with justification for the substitution to the Office of Business Services; icshelpdesk.icshelpdesk@cdcr.ca.gov (for institution-related contracts) or to scshelpdesk.scshelpdesk@cdcr.ca.gov (for all other requests).  For assistance with access to the "DVBE Substitution" form and instructions, contact the Department of Corrections and Rehabilitation Office of Business Services SB/DVBE Advocate at sbdvbeadvocate@cdcr.ca.gov.  Requests to replace a DVBE subcontractor must be amply documented to show that the replacement meets the criteria as specified in the California Code of Regulations (CCR), Title II, Section 1896.64(c) or the Public Contract Code (PCC) § 4107 (for public works).  Failure of Contractor to seek substitution and adhere to the DVBE participation level identified in the bid or offer may be cause for contract termination, recovery of damages under rights and remedies due to the State, and penalties as outlined in MVC § 999.9; PCC § 10115.10, or PCC § 4110 (for public works contracts).

32. **DVBE Payment Certification**

Military and Veterans Code (MVC) 999.5(d) requires prime contractors to certify that payments to DVBE subcontractors were made upon completion of the contract and allows the awarding department to requests proof of payment.  Senate Bill 588 requires prime contractors to certify that payments to DVBE subcontractors were made upon final invoice submittal.  MVC 999.7 states that the department shall withhold up to $10,000 from the final payment until the prime contractor complies with the certification requirements in MVC

DocuSign Envelope ID: 680D18GA-5B48-448C-8F48-FB080A7423D1

Case 4:94-cv-02307-CW    Document 3630-13    Filed 10/16/24    Page 223 of 426

Natural Languages LLC                                    Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)              Exhibit D
Special Terms and Conditions

999.5(d).

Prime contractors shall return the completed Prime Contractor's Certification – DVBE Subcontractor Report (STD 817) with proof of payment to the DVBE subcontractor via email to "DVBESubcontractorReport@cdcr.ca.gov" for processing and inclusion in the contract file with the final invoice.  If the STD 817 is not submitted with the final invoice or submitted incomplete, up to $10,000 will be withheld from the prime contractor's final payment pending receipt of a complete and accurate STD 817.

## 33.   Confidentiality of Information

CDCR and Contractor agree that all inmate/patient medical record information is identified as confidential and shall be held in trust and confidence and shall be used only for the purposes contemplated under this Agreement.

Contractor by acceptance of this Agreement is subject to all of the requirements of the federal regulations implementing the Health Insurance Portability and Accountability Act of 1996 (Code of Federal Regulations (CFR), Title 45, Sections 164.501 et seq.); the California Government Code Section 11019.9; California Civil Code Sections 56 et seq.; and California Civil Code Sections 1798, et seq.; regarding the collections, maintenance, and disclosure of personal and confidential information about individuals.  Attached as an Exhibit and incorporated herein is a Business Associate Agreement, which memorializes the parties' duties and obligations with respect to the protection, use, and disclosure of protected health information.

## 34.   Travel

Contractor's rates shall include all travel expenses required to perform services in accordance with this Agreement.

## 35.   Tuberculosis (TB) Testing

In the event that the services required under this Agreement will be performed within a CDCR institution/parole office/community-based program, Contractors and their employees who are assigned to work with, near, or around inmates/parolees shall be required to be examined and tested or medically evaluated by a licensed healthcare provider for TB in an infectious or contagious stage prior to the performance of contracted duties, and at least once a year thereafter (within 12 months of their initial or previous TB test under this contract), or more often as directed by CDCR.

Contractors and their employees who have any contact (physical or nonphysical) with inmates/parolees, shall be required to furnish to the CDCR Program/Institution Contract Manager, at no cost to CDCR, a documented Tuberculosis (TB) evaluation/test for TB infection (Tuberculin Skin Test (TST) or a blood test Interferon Gamma Release Assay (IGRA) completed within (30) thirty days of the start date of the services and be certified to be free of TB in an infectious or contagious stage by a licensed healthcare provider prior to assuming their contracted duties and annually thereafter.

*The following provisions apply to services provided on departmental and/or institution grounds:*

Natural Languages LLC                                    Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)              Exhibit D
Special Terms and Conditions

**36.** **Bloodborne Pathogens**

Contractor shall adhere to California Division of Occupational Safety and Health (CAL-OSHA) regulations and guidelines pertaining to bloodborne pathogens.

**37.** **Primary Laws, Rules, and Regulations Regarding Conduct and Association with State Prison Inmates and Division of Juvenile Justice Wards**

Individuals who are not employees of the California Department of Corrections and Rehabilitation (CDCR), but who are working in and around inmates who are incarcerated, or wards who are housed within California's institutions/facilities or camps, are to be apprised of the laws, rules and regulations governing conduct in associating with prison inmates or wards. The following is a summation of pertinent information when non-departmental employees come in contact with prison inmates or wards.

By signing this contract, the Contractor agrees that if the provisions of the contract require the Contractor to enter an institution/facility or camp, the Contractor and any employee(s) and/or subcontractor(s) shall be made aware of and shall abide by the following laws, rules and regulations governing conduct in associating with prison inmates or wards:

a. Persons who are not employed by CDCR, but are engaged in work at any institution/facility or camp must observe and abide by all laws, rules and regulations governing the conduct of their behavior in associating with prison inmates or wards. Failure to comply with these guidelines may lead to expulsion from CDCR institutions/facilities or camps.

SOURCE: California Penal Code (PC) Sections 5054 and 5058; California Code of Regulations (CCR), Title 15, Sections 3285 and 3415, and California Welfare and Institutions Code (WIC) Section 1712.

b. CDCR does not recognize hostages for bargaining purposes. CDCR has a "NO HOSTAGE" policy and all prison inmates, wards, visitors, and employees shall be made aware of this.

SOURCE: PC Sections 5054 and 5058; CCR, Title 15, Section 3304 and 4603; WIC Section 1712.

c. All persons entering onto institution/facility or camp grounds consent to search of their person, property or vehicle at any time. Refusal by individuals to submit to a search of their person, property, or vehicle may be cause for denial of access to the premises.

SOURCE: PC Sections 2601, 5054 and 5058; CCR, Title 15, Sections 3173, 3177, 3288, 4696, and 4697; WIC 1712.

d. Persons normally permitted to enter an institution/facility or camp may be barred, for cause, by the CDCR Director, Warden, and/or Regional Parole Administrator.

SOURCE: PC Sections 5054 and 5058; CCR, Title 15, Section 3176(a) and 4696; WIC Section 1712.

e. It is illegal for an individual who has been previously convicted of a felony offense to enter into CDCR adult institutions/facilities or camps, or youth institutions/facilities or

Natural Languages LLC                                            Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)              Exhibit D
Special Terms and Conditions

camps in the nighttime, without the prior approval of the Warden or officer in charge. It is also illegal for an individual to enter onto these premises for unauthorized purposes or to refuse to leave said premises when requested to do so. Failure to comply with this provision could lead to prosecution.

SOURCE: PC Sections 602, 4570.5 and 4571; CCR, Title 15, Sections 3173 and 3289; WIC Section 1001.7.

f.   Encouraging and/or assisting prison inmates to escape, is a crime. It is illegal to bring firearms, deadly weapons, explosives, tear gas, drugs or drug paraphernalia on CDCR institutions/facilities or camp premises. It is illegal to give prison inmates or wards firearms, explosives, alcoholic beverages, narcotics, or any drug or drug paraphernalia, including cocaine or marijuana. It is illegal to give wards sex oriented objects or devices, and written materials and pictures whose sale is prohibited to minors.

SOURCE: PC Sections 2772, 2790, 4533, 4535, 4550, 4573, 4573.5, 4573.6 and 4574; Title 15, Sections 4681 and 4710; WIC Sections 1001.5 and 1152.

g.   It is illegal to give or take letters from inmates or wards without the authorization of the Warden or officer in charge. It is also illegal to give or receive any type of gift and/or gratuities from prison inmates or wards.

SOURCE: PC Sections 2540, 2541 and 4570; CCR, Title 15, Sections 3010, 3399, 3401, 3424, 3425 and 4045; WIC Section 1712.

h.   In an emergency situation, the visiting program and other program activities may be suspended.

SOURCE: PC Section 2601; CCR, Title 15, Sections 3383, 4002.5 and 4696.

i.   For security reasons, visitors must not wear clothing that in any way resembles state issued prison inmate or ward clothing (blue denim shirts, blue denim pants).

SOURCE: CCR, Title 15, Section 3174(b)(1) and 4696.

j.   Interviews with SPECIFIC INMATES are not permitted. Conspiring with an inmate to circumvent policy and/or regulations constitutes a rule violation that may result in appropriate legal action. Interviews with individual wards are permitted with written consent of each ward if he is 18 years of age or older, or with written consent of a parent, legal guardian, or committing court, if 17 years of age or younger.

SOURCE: CCR, Title 15, Sections 3261.5, 3315(a)(3)(X), and 3177 and 4700(a)(1).

38.  **Clothing Restrictions**

While on institution grounds, Contractor and all its agents, employees, and/or representatives shall be professionally and appropriately dressed in clothing distinct from that worn by inmates at the institution. Specifically, blue denim pants and blue chambray shirts, orange/red/yellow/white/chartreuse jumpsuits and/or yellow rainwear shall not be worn onto institution grounds, as this is inmate attire. The Contractor should contact the

DocuSign Envelope ID: 680D18GA-5B40-448G-8F48-EB080A7423D1
Case 4:94-cv-02307-CW   Document 3630-13   Filed 10/16/24   Page 226 of 426
Natural Languages LLC                                          Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)                    Exhibit D
Special Terms and Conditions

institution regarding clothing restrictions prior to requiring access to the institution to assure the Contractor and their employees are in compliance.

### 39. Tobacco-Free Environment

Pursuant to Penal Code Section 5030.1, the use of tobacco products by any person on the grounds of any institution or facility under the jurisdiction of CDCR is prohibited.

### 40. Prison Rape Elimination Policy

CDCR maintains a zero tolerance for sexual misconduct in its institutions, community correctional facilities, conservation camps and for all offenders under its jurisdiction. All sexual misconduct is strictly prohibited.

CDCR is committed to providing a safe, humane, secure environment, free from sexual misconduct. This will be accomplished by maintaining a program to ensure education/prevention, detection, response, investigation and tracking of sexual misconduct and to address successful community re-entry of the victim.

All Contractors and their employees are expected to ensure compliance with this policy as described in Department Operations Manual, Chapter 5, Article 44.

If you are providing services for the confinement of our inmates, you and your staff are required to adopt and comply with the PREA standards, 28 Code of Federal Regulations (CFR) Part 115 and with CDCR's Department Operations Manual, Chapter 5, Article 44, including updates to this policy. This will include CDCR staff and outside audit personnel (who also conduct PREA audits of state prisons) conducting audits to ensure compliance with the standards.

As a Contractor with CDCR, you shall not assign an employee to a CDCR facility or assign an employee to duties if that employee will have contact with CDCR inmates, if that employee has 1) engaged in sexual abuse in a prison, jail, lockup, community confinement facility, juvenile facility, or other institution (as defined in 42 U.S.C. 1997); 2) been convicted of engaging or attempting to engage in sexual activity in the community facilitated by force, overt or implied threats of force, or coercion, or if the victim did not consent or was unable to consent or refuse; or 3) has been civilly or administratively adjudicated to have engaged in the activity described in this section.

The Contractor shall conduct a criminal background records check for each contract employee who will have contact with CDCR inmates and retain the results for audit purposes. By signing this contract the Contractor agrees to ensure that all of the mandates of this Section 5: Prison Rape Elimination Policy are complied with. Material omissions, by the contract employee, regarding such misconduct or the provision of materially false information, shall be grounds for removal from institutional grounds.

Contract employees, who have contact with inmates, shall be provided training via the Exhibit titled; "PRISON RAPE ELIMINATION POLICY, Volunteer/Contractor Informational Sheet" to learn their responsibilities under the agency's sexual abuse and sexual harassment prevention, detection, and response policies and procedures. A copy of this signed informational sheet will be provided to the institution before a contract employee may have contact with inmates.

Natural Languages LLC                                    Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)                Exhibit D
Special Terms and Conditions

Any contract employee who appears to have engaged in sexual misconduct of an inmate shall be prohibited from contact with inmates and shall be subject to administrative and/or criminal investigation. Referral shall be made to the District Attorney unless the activity was clearly not criminal. Reportable information shall be sent to relevant licensing bodies.

41. **Security Regulations**

a. Unless otherwise directed by the entrance gate officer and/or Contract Manager, the Contractor, Contractor's employees and subcontractors shall enter the institution through the main entrance gate and park private and nonessential vehicles in the designated visitor's parking lot. Contractor, Contractor's employees and subcontractors shall remove the keys from the ignition when outside the vehicle and all unattended vehicles shall be locked and secured while on institution grounds.

b. Any State- and Contractor-owned equipment used by the Contractor for the provision of contract services, shall be rendered temporarily inoperative by the Contractor when not in use, by locking or other means unless specified otherwise.

c. In order to maintain institution safety and security, periodic fire prevention inspections and site searches may become necessary and Contractor must furnish keys to institutional authorities to access all locked areas on the worksite. The State shall in no way be responsible for Contractor's loss due to fire.

d. Due to security procedures, the Contractor, Contractor's employees and subcontractors may be delayed at the institution vehicle/pedestrian gates and sally ports. Any loss of time checking in and out of the institution gates and sally ports shall be borne by the Contractor.

e. Contractor, Contractor's employees and subcontractors shall observe all security rules and regulations and comply with all instructions given by institutional authorities.

f. Electronic and communicative devices such as pagers, cell phones and cameras/micro cameras are not permitted on institution grounds.

g. Contractor, Contractor's employees and subcontractors shall not cause undue interference with the operations of the institution.

h. No picketing is allowed on State property.

42. **Gate Clearance**

Contractor and Contractor's employee(s) and/or subcontractor(s) must be cleared prior to providing services. The Contractor will be required to complete a Request for Gate Clearance for all persons entering the facility a minimum of ten (10) working days prior to commencement of service. The Request for Gate Clearance must include the person's name, social security number, valid state driver's license number or state identification card number and date of birth. Information shall be submitted to the Contract Liaison or his/her designee. CDCR uses the Request for Gate Clearance to run a California Law Enforcement Telecommunications System (CLETS) check. The check will include Department of Motor Vehicles check, Wants and Warrants check, and Criminal History check.

DocuSign Envelope ID: 680D18CA-5B48-448C-8F48-FB080A7423D1

Natural Languages LLC                                    Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)                    Exhibit D
Special Terms and Conditions

Gate clearance may be denied for the following reasons: Individual's presence in the institution presents a serious threat to security, individual has been charged with a serious crime committed on institution property, inadequate information is available to establish positive identity of prospective individual, and/or individual has deliberately falsified his/her identity.

All persons entering the facilities must have a valid state driver's license or photo identification card on their person.

Natural Languages LLC                                                Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)                        Exhibit E
Business Associates Agreement (HIPAA)

## BUSINESS ASSOCIATES AGREEMENT (HIPAA)

## AMERICAN SIGN LANGUAGE INTERPRETER SERVICES (ASL)
## IN-PERSON/VIDEO CONFERENCE

WHEREAS, Provider, hereinafter referred to in this Exhibit as "Business Associate," acknowledges that the CDCR, hereinafter referred to in this Exhibit as "Covered Entity," has in its possession data that contains individual identifiable health information as defined by Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191 ("HIPAA") and the regulations promulgated thereunder;

WHEREAS, Business Associate and Covered Entity acknowledge that the fulfillment of the Parties' obligations under this Service Agreement necessitates the exchange of, or access to, data including individual identifiable health information; and,

WHEREAS, the parties desire to comply with federal and California laws regarding the use and disclosure of individually identifiable health information, and in particular with the provisions of the federal Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the regulations promulgated thereunder.

NOW, THEREFORE, in consideration of the mutual promises and covenants hereinafter contained, the Parties agree as follows:

## ARTICLE 1
## DEFINITIONS

Terms used, but not otherwise defined, in this Exhibit shall have the meanings set forth below.

1.1    "HHS Transaction Standard Regulation" means the Code of Federal Regulations ("CFR") at Title 45, Sections 160 and 162.

1.2    "Individual" means the subject of protected health information (PHI) or, if deceased, his or her personal representative.

1.3    "Parties" shall mean the Covered Entity and Business Associate.  (Covered Entity and Business Associate, individually, may be referred to as a "Party".)

1.4    "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR Part 160 and Part 164, Subparts A and E.

1.5    "PHI" shall have the same meaning as the term "protected health information" in 45 CFR §164.501, limited to the information created or received by Business Associate from or on behalf of the Covered Entity.

1.6    "Required By Law" shall have the same meaning as "required by law" in 45 CFR §164.501.

1.7    "Secretary" shall mean the Secretary of the Department of Health and Human Services or his designee.

Natural Languages LLC                                                      Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)             Exhibit E
Business Associates Agreement (HIPAA)

Any other terms used, but not otherwise defined, in this Exhibit shall have the same meaning as those terms in the Privacy Rule.

## ARTICLE 2
## CONFIDENTIALITY

2.1 <u>Obligations and Activities of Business Associate</u>.  Business Associate agrees as follows:

   (a)  not to use or further disclose PHI other than as permitted or required by this Agreement or as Required By Law;

   (b)  to establish, maintain, and use appropriate safeguards to prevent use or disclosure of the PHI other than as permitted herein;

   (c)  to report to Covered Entity any use, access or disclosure of the PHI not provided for by this Agreement, or any misuse of the PHI, including but not limited to systems compromises of which it becomes aware and to mitigate, to the extent practicable, any harmful effect that is known to Business Associate as a result thereof.  Business Associate shall be responsible for any and all costs (including the costs of Covered Entity) associated with mitigating or remedying any violation of this Agreement;

   (d)  to enforce and maintain appropriate policies, procedures, and access control mechanisms to ensure that any agent, including a subcontractor, to whom it provides PHI received from, or created or received by Business Associate on behalf of Covered Entity agrees to the same restrictions and conditions that apply through this Agreement to Business Associate with respect to such information.  The access and privileges granted to any such agent shall be the minimum necessary to perform the assigned functions;

   (e)  to provide access, at the request of Covered Entity, and in the time and manner reasonable designated by Covered Entity, to PHI in a Designated Record Set (as defined in the Privacy Rule), to Covered Entity or, as directed by Covered Entity, to an Individual in order to meet the requirements under 45 CFR §164.524;

   (f)  to make any amendment(s) to PHI in a Designated Record Set that the Covered Entity directs or agrees to pursuant to 45 CFR §164.526 at the request of Covered Entity or an Individual, and in the time and manner reasonably requested by Covered Entity.

   (g)  to make internal practices, books, and records relating to the use and disclosure of PHI received from, or created or received by Business Associate on behalf of, Covered Entity available to the Covered Entity, or at the request of the Covered Entity to the Secretary, in a time and manner reasonably requested by Covered Entity or designated by the Secretary, for purposes of the Secretary determining Covered Entity's compliance with the Privacy Rule.

   (h)  to document such disclosures of PHI, and information related to such disclosures, as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 CFR §164.528.  Said documentation shall include, but not be limited to, the date of the disclosure, the

Natural Languages LLC
California Department of Corrections and Rehabilitation (CDCR)
Business Associates Agreement (HIPAA)

Agreement Number C5611397
Exhibit E

DocuSign Envelope ID: 680D18GA-5B48-448G-8F48-EB080A7423D1

Case 2:94-cv-02307-CW   Document 3630-13   Filed 10/16/24   Page 231 of 426

name and, if known, the address of the recipient of the PHI, a brief description of the PHI disclosed, and the purpose of the disclosure.  Said documentation shall be made available to Covered Entity upon request.

(i) to provide to Covered Entity or an Individual, in a time and manner reasonably requested by Covered Entity, information collected in accordance with Section 2.1(h) above to permit Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 CFR §164.528.

(j) to promptly notify Covered Entity of all actual or suspected instances of deliberate unauthorized attempts (both successful and unsuccessful) to access PHI.  Such notice shall be made to Covered Entity by telephone as soon as Business Associate becomes aware of the unauthorized attempt, and this telephone notification shall be followed within two (2) calendar days of the discovery of the unauthorized attempt by a written report to Covered Entity from Business Associate.  Business Associate shall, at the same time, report to Covered Entity any remedial action taken, or proposed to be taken, with respect to such unauthorized attempt.  Covered Entity shall have the discretion to determine whether or not any such remedial action is sufficient, and all such remedial action shall be at Business Associate's expense.

(k) to maintain and enforce policies, procedures and processes to protect physical access to hardware, software and/or media containing PHI (e.g., hardcopy, tapes, removable media, etc.) against unauthorized physical access during use, storage, transportation, disposition and /or destruction.

(l) to ensure that access controls in place to protect PHI and processing resources from unauthorized access are controlled by two-factor identification and authentication: a user ID and a Token, Password or Biometrics.

(m) to implement, use and monitor its compliance with appropriate technological, administrative and physical safeguards to prevent the use or disclosure of PHI other than as permitted by this Agreement.  Business Associate shall provide Covered Entity with evidence of such safeguards upon Covered Entities request.  Covered Entity has the right to determine, in its sole discretion, whether such safeguards are appropriate, and to require any additional safeguards it deems necessary.

(n) In the event that Business Associate is served with legal process (e.g. a subpoena) or request from a governmental agency (e.g. the Secretary) that potentially could require the disclosure of PHI, Business Associate shall provide prompt (i.e., within twenty-four (24) hours) written notice of such legal process (including a copy of the legal process served) to the designated person at the Covered Entity.  In addition, Business Associate shall not disclose the PHI without the consent of Covered Entity unless pursuant to a valid and specific court order or to comply with a requirement for review of documents by a governmental regulatory agency under its statutory or regulatory authority to regulate the activities of either party.

(o) to submit to periodic audits by Covered Entity verifying Business Associate's compliance with appropriate technological, administrative and physical safeguards

Natural Languages LLC                                                     Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)                              Exhibit E
Business Associates Agreement (HIPAA)

to prevent the use or disclosure of PHI other than as permitted by this Agreement, as well as compliance with the terms and conditions pursuant to this Agreement and compliance with state and federal laws and regulations. Audit review may be undertaken directly by the Covered Entity or by third parties engaged by the Covered Entity. Business Associate shall cooperate fully with Covered Entity or any such third party in connection with such audits.

2.2     <u>Disclosures Required By Law</u>.

In the event that Business Associate is required by law to disclose PHI, Business Associate will immediately provide Covered Entity with written notice and provide Covered Entity an opportunity to oppose any request for such PHI or to take whatever action Covered Entity deems appropriate.

2.3     <u>Specific Use and Disclosure Provisions</u>.

(a)     Except as otherwise limited in this Agreement, Business Associate may use PHI only to carry out the legal responsibilities of the Business Associate under this Service Agreement.

(b)     Except as otherwise limited in this Agreement, Business Associate may only disclose PHI (i) as Required By Law, or (ii) in the fulfillment of its obligations under the Service Agreement and provided that Business Associate has first obtained (A) the consent of Covered Entity for such disclosure, (B) reasonable assurances from the person to whom the information is disclosed that the PHI will remain confidential and used or further disclosed only as Required By Law or for the purpose for which it was disclosed to the person, and (C) reasonable assurances from the person to whom the information is disclosed that such person will notify the Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

2.4     <u>Obligations of Covered Entity</u>.

(a)     Covered Entity shall notify Business Associate of any limitations in its notice of privacy practices of Covered Entity in accordance with 45 CFR §164.520, to the extent that such limitation may affect Business Associate's use or disclosure of PHI.

(b)     Covered Entity shall notify Business Associate of any changes in, or revocation of, permission by an Individual to use or disclose PHI, to the extent that such changes may affect Business Associate's use or disclosures of PHI.

(c)     Covered Entity shall notify Business Associate of any restriction to the use or disclosure of PHI that Covered Entity has agreed to in accordance with 45 CFR §164.522, to the extent that such restriction may affect Business Associate's use or disclosure of PHI.

(d)     For any PHI received by Covered Entity from Business Associate on behalf of a third party or another covered entity, Covered Entity agrees to be bound to the obligations and activities of Business Associate enumerated in Section 2.1 as if

Natural Languages LLC
California Department of Corrections and Rehabilitation (CDCR)
Business Associates Agreement (HIPAA)

Agreement Number C5611397
Exhibit E

DocuSign Envelope ID: 680D18GA-5B48-448C-8F48-EB080A7423D1
Case 2:91-cv-02307-CW    Document 3630-13    Filed 10/16/24    Page 233 of 426

and to the same extent Covered Entity was the named Business Associate hereunder.

2.5  Permissible Requests by Covered Entity.

Covered Entity shall not request Business Associate to use or disclose PHI in any manner that would not be permissible under the Privacy Rule if done by the Covered Entity.

2.6  Policy and Procedure Review.

Upon request, Business Associate shall make available to Covered Entity any and all documentation relevant to the safeguarding of PHI including but not limited to current policies and procedures, operational manuals and/or instructions, and/or employment and/or third party agreements.

### ARTICLE 3
### SECURITY

3.1  Government Healthcare Program Representations.

Business Associate hereby represents and warrants to Covered Entity, its shareholders, members, directors, officers, agents, or employees have not been excluded or served a notice of exclusion or have been served with a notice of proposed exclusion, or have committed any acts which are cause for exclusion, from participation in, or had any sanctions, or civil or criminal penalties imposed under, any federal or state healthcare program, including but not limited to Medicare or Medicaid, or have been convicted, under federal or state law (including without limitation a plea of nolo contendere or participation in a first offender deterred adjudication or other arrangement whereby a judgment of conviction has been withheld), of a criminal offense related to (a) the neglect or abuse of a patient, (b) the delivery of an item or service, including the performance of management or administrative services related to the delivery of an item or service, under a federal or state healthcare program, (c) fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct in connection with the delivery of a healthcare item or service or with respect to any act or omission in any program operated by or financed in whole or in part by any federal, state or local government agency, (d) the unlawful, manufacture, distribution, prescription, or dispensing of a controlled substance, or (e) interference with or obstruction of any investigation into any criminal offense described in (a) through (d) above. Business Associate further agrees to notify Covered Entity immediately after Business Associate becomes aware that the foregoing representation and warranty may be inaccurate or may be incorrect.

3.2  Security Procedures.

Each Party shall employ security procedures that comply with HIPAA and all other applicable state and federal laws and regulations (collectively, the "Law") and that are commercially reasonable, to ensure that transactions, notices, and other information that are electronically created, communicated, processed, stored, retained or retrieved are authentic, accurate, reliable, complete and confidential. Moreover, each Party shall, and shall require any agent or subcontractor involved in the electronic exchange of data to:

Natural Languages LLC
California Department of Corrections and Rehabilitation (CDCR)
Business Associates Agreement (HIPAA)

Agreement Number C5611397
Exhibit E

(a)     require its agents and subcontractors to provide security for all data that is electronically exchanged between Covered Entity and Business Associate;

(b)     provide, utilize, and maintain equipment, software, services and testing necessary to assure the secure and reliable transmission and receipt of data containing PHI;

(c)     maintain and enforce security management policies and procedures and utilize mechanisms and processes to prevent, detect, record, analyze, contain and resolve unauthorized access attempts to PHI or processing resources;,

(d)     maintain and enforce policies and guidelines for workstation use that delineate appropriate use of workstations to maximize the security of data containing PHI;

(e)     maintain and enforce policies, procedures and a formal program for periodically reviewing its processing infrastructure for potential security vulnerabilities;

(f)     implement and maintain, and require its agents and subcontractors to implement and maintain, appropriate and effective administrative, technical and physical safeguards to protect the security, integrity and confidentiality of data electronically exchanged between Business Associate and Covered Entity, including access to data as provided herein.  Each Party and its agents and subcontractors shall keep all security measures current and shall document its security measures implemented in written policies, procedures or guidelines, which it will provide to the other Party upon the other Party's request.

**ARTICLE 4**
**EXCHANGE OF STANDARD TRANSMISSIONS**

4.1     <u>Obligations of the Parties</u>.  Each of the Parties agrees that for the PHI,

(a)     it will not change any definition, data condition or use of a data element or segment as proscribed in the HHS Transaction Standard Regulation.

(b)     it will not add any data elements or segments to the maximum denied data set as proscribed in the HHS Transaction Standard Regulation.

(c)     it will not use any code or data elements that are either marked "not used" in the HHS Standard's implementation specifications or are not in the HHS Transaction Standard's implementation specifications.

(d)     it will not change the meaning or intent of any of the HHS Transaction Standard's implementation specifications.

4.2     <u>Incorporation of Modifications to HHS Transaction Standards</u>.

Each of the Parties agrees and understands that from time-to-time, HHS may modify and set compliance dates for the HHS Transaction Standards.  Each of the Parties agrees to incorporate by reference into this Agreement any such modifications or changes.

Natural Languages LLC                                                  Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)                      Exhibit E
Business Associates Agreement (HIPAA)

4.3     Code Set Retention.

        If applicable, both parties understand and agree to keep open code sets being processed
        or used in this Agreement for at least the current billing period or any appeal period,
        whichever is longer.

4.4     Business Associate Obligations.

        (a)     Business Associate shall not submit duplicate transmissions unless so requested
                by Covered Entity.

        (b)     Business Associate shall only perform those transactions, which are authorized by
                Covered Entity.  Furthermore, Business Associate assumes all liability for any
                damage, whether direct or indirect, to the electronic data or to Covered Entity's
                systems caused by Business Associate's unauthorized use of such transactions.

        (c)     Business Associate shall hold Covered Entity harmless from any claim, loss or
                damage of any kind, whether direct or indirect, whether to person or property,
                arising out of or related to (1) Business Associate's use or unauthorized disclosure
                of the electronic data; or (2) Business Associate's submission of data, including
                but not limited to the submission of incorrect, misleading, incomplete or fraudulent
                data.

        (d)     Business Associate agrees to maintain adequate back-up files to recreate
                transmissions in the event that such recreations become necessary.  Back-up
                tapes shall be subject to this Agreement to the same extent as original data.

        (e)     Business Associate agrees to trace lost or indecipherable transmissions and make
                reasonable efforts to locate and translate the same.  Business Associate shall bear
                all costs associated with the recreation of incomplete, lost or indecipherable
                transmissions if such loss is the result of an act or omission of Business Associate.

        (f)     Business Associate shall maintain, for seven (7) years, true copies of any source
                documents from which it produces electronic data.

        (g)     Except encounter data furnished by Business Associate to Covered Entity,
                Business Associate shall not (other than to correct errors) modify any data to which
                it is granted access under this Agreement or derive new data from such existing
                data.  Any modification of data is to be recorded, and a record of such modification
                is to be retained by Business Associate for a period of seven (7) years.

        (h)     Business Associate shall not disclose security access codes to any third party in
                any manner without the express written consent of Covered Entity.  Business
                Associate furthermore acknowledges that Covered Entity may change such codes
                at any time without notice.  Business Associate shall assume responsibility for any
                damages arising from its disclosure of the security access codes or its failure to
                prevent any third party use of the system without the express written consent of
                Covered Entity.

(i)     Business Associate shall maintain general liability coverage, including coverage for general commercial liability, for a limit of not less than one million dollars, as well as other coverage as Covered Entity may require to compensate any parties damaged by Business Associate's negligence.  Business Associate shall provide evidence of such coverage in the form of a certificate of insurance and agrees to notify Covered Entity and/or HOI immediately of any reduction or cancellation of such coverage.

(j)     Business Associate agrees to conduct testing with Covered Entity to ensure delivery of files that are HIPAA-AS Compliant and to accommodate Covered Entity's specific business requirements.

4.5     Confidential And Proprietary Information.

(a)     Proprietary Information

Business Associate acknowledges that it will have access to certain proprietary information used in Covered Entity's business.  Covered Entity's proprietary information derives its commercial value from the fact that it is not available to competitors or any third parties, and the disclosure of this information would or could impair Covered Entity's competitive position or otherwise prejudice its ongoing business.  Business Associate agrees to treat as confidential, and shall not use for its own commercial purpose or any other purpose, Covered Entity's proprietary information.  Business Associate shall safeguard Covered Entity's proprietary information against disclosure except as may be expressly permitted herein.  Such proprietary information includes, but is not limited to, confidential information concerning the business operations or practices of Covered Entity, including specific technology processes or capabilities.

**ARTICLE 5**
**MISCELLANEOUS**

5.1     Indemnification.

Business Associate shall indemnify, defend, and save harmless the State, CDCR, and CDCR's officers, employees and agents, against any and all losses, liabilities, settlements, claims, demands, damages, or deficiencies (including interest) and expenses of any kind (including, but not limited to, attorneys' fees) arising out of or due to a breach of the terms of this Exhibit to the Service Agreement, and arising out of Business Associate's acts or omissions in regard to the terms of this Exhibit to the Service Agreement.  The foregoing indemnity is in addition to any other save harmless or indemnification set forth in this entire Agreement.

5.2     Term and Termination.

(a)     Term.  The Term of this Agreement shall be effective as of the first date of commencement of services under this entire agreement, and shall terminate when all of the PHI provided by Covered Entity to Business Associate, or created or received by Business Associate on behalf of Covered Entity is destroyed or returned to Covered Entity, or, if it is infeasible to return or destroy PHI, protections

Natural Languages LLC
California Department of Corrections and Rehabilitation (CDCR)
Business Associates Agreement (HIPAA)

Agreement Number C5611397
Exhibit E

DocuSign Envelope ID: 680D18GA-5B48-448C-8F48-EB080A7423D1
Case 2:91-cv-02307-CW    Document 3630-13    Filed 10/16/24    Page 237 of 426

are extended to such information, in accordance with the termination provisions in this Section.

(b)     Termination for Cause.  Upon a material breach by Business Associate of its obligation hereunder, Covered Entity may (i) terminate this Agreement and the Service Agreement;  (ii) permit Business Associate to cure the breach;  (iii) report the violation to the Secretary; and/or (iv) require Business Associate to take such other action as Covered Entity may request, at Business Associate's expense.

Covered Entity's remedies under this paragraph shall be cumulative, and the exercise of any remedy shall not preclude the exercise of any other.  If Covered Entity elects to terminate the Agreement pursuant to a breach of terms and conditions of this Exhibit, Covered Entity shall be relieved of any further obligations under the entire Agreement, and shall be immediately entitled to a refund of any amounts prepaid from the date of the termination through the end of the payment period, on a pro rata basis.

The foregoing termination language is in addition to any other termination language set forth in the entire agreement.

(c)     Effect of Termination.

(i)   Except as provided in paragraph 5.2(c)(ii), upon termination of this Agreement, for any reason, Business Associate shall return or destroy all PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity.  This provision shall apply to PHI that is in the possession of subcontractors or agents of Business Associate. Business Associate shall retain no copies of the PHI.

(ii)     In the event that Business Associate determines that returning the PHI is infeasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction infeasible.  Upon Covered Entity's agreement that return or destruction of PHI is infeasible, Business Associate shall extend the protections of this Agreement to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such PHI.

5.3     <u>Disputes</u>.

HIPAA Appeal Procedures

CDCR has established and shall maintain an appeal procedure in accordance with CDCR Department Operations Manual, Section 22040.16.  Business Associate agrees that disputes arising under the terms of this Exhibit shall be resolved in accordance with the following:

1.     <u>Verbal Appeal</u>
Business Associate and CDCR's Privacy Officer, shall first attempt to resolve the problem by informal discussion.  Business Associate agrees that CDCR's Division

DocuSign Envelope ID: 680D19GA-5B48-448G-8F48-FB080A7423D1

Natural Languages LLC
California Department of Corrections and Rehabilitation (CDCR)
Business Associates Agreement (HIPAA)

Case 2:94-cv-02307-CW    Document 3630-13    Filed 10/16/24    Page 238 of 426

Agreement Number C5611397
Exhibit E

of Correctional Health Care Services shall be used as a resource in solving potential disputes.

2.  <u>Informal Appeal</u>
    If the issue is not resolved at the verbal appeal level, Business Associate shall file, within thirty (30) working days, an informal written appeal specifying:  the issue(s) of dispute, legal authority or other basis for Business Associate's position, supporting evidence, and remedy sought, with the CDCR Chief, Licensing and Information Systems, and provide a photocopy to the CDCR Assistant Deputy Director, Office of Business Services.  The CDCR Chief, Licensing and Information Systems, shall make a determination on the issue and respond in writing within thirty (30) working days of receipt of the informal appeal, indicating the decision reached.

3.  <u>Formal Appeal</u>
    Should Business Associate disagree with the informal appeal decision, Business Associate shall submit, within ten (10) working days after Business Associate's receipt of the decision of the informal appeal, to the CDCR Deputy Director, Division of Correctional Health Care Services, and a photo copy to the CDCR, Assistant Deputy Director, Office of Business Services, written notification indicating why the informal appeal decision is unacceptable, along with a copy of the original statement of dispute and a copy of CDCR's response.  The CDCR Deputy Director, Division of Correctional Health Care Services, or his/her designee may meet with Business Associate to review the issues within twenty (20) working days of the receipt of Business Associate's notification and shall provide Business Associate with written notification of the decision within forty-five (45) working days from the receipt of the formal appeal.

The foregoing dispute process is solely for the purpose of disputes arising from the terms and conditions of this Exhibit.  Disputes in relation to the scope of work and other terms and conditions shall be in accordance with any other dispute language set forth in the entire Agreement.

5.4  <u>Injunctive Relief</u>.

Notwithstanding any rights or remedies provided for in Section 5.3, Covered Entity retains all rights to seek injunctive relief to prevent the unauthorized use of disclosure of PHI by Business Associate or any agent, contractor or third party that received PHI from Business Associate.

5.5  <u>Regulatory References</u>.

A reference in this Agreement to a section in the Privacy Rule means the section as in effect or as amended.

5.6  <u>Amendment</u>.

The Parties agree to take such action as is necessary to amend this Agreement from time to time to the extent necessary for Covered Entity to comply with the requirements of

Natural Languages LLC                                                                    Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)                                              Exhibit E
Business Associates Agreement (HIPAA)

HIPAA and its regulations.  All amendments to this Exhibit shall be in writing and signed by both parties through a formal amendment to the entire agreement.

5.7     Survival.

        The respective rights and obligations of Business Associate and Covered Entity under Sections 4.5, 5.1 and 5.2(c) of this Agreement shall survive the termination of this Agreement.

5.8     Limitation of Damages.

        Other than liabilities under Section 5.1, neither party shall be liable to the other for any special, incidental, exemplary, punitive or consequential damages arising from or as a result of any delay, omission, or error in the electronic transmission or receipt of any information pursuant to this Agreement, even if the other Party has been advised of the possibility of such damages.

5.9     Interpretation.

        Any ambiguity in this Agreement shall be resolved to permit Covered Entity to comply with the Privacy Rule.

5.10    Third Party Beneficiary

        Unless otherwise set forth herein, nothing contained herein is intended, nor shall it be construed, to create rights running of the benefit of third parties.

5.11    Notices.

        Any HIPAA related notice required hereunder shall be deemed to be sufficient if mailed to the parties at the addresses below.  In order to avoid unreasonable delay in the provision of the services to be rendered pursuant to this Agreement, Business Associate and Covered Entity shall each designate a specific "HIPAA" representative(s) for the purpose of communication between the parties.  Such representative(s) may be changed upon written notice to the other party.

Business Associate:

Lily Pacheco
NIC and Contract Administrator
Natural Languages LLC
13536 Lakewood Blvd. #103
Bellflower, CA 90706

Telephone: (201) 984-2505

Covered Entity:

California Department of Corrections and Rehabilitation
Privacy Officer

Natural Languages LLC                                    Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)              Exhibit E
Business Associates Agreement (HIPAA)


HIPAA Compliance Unit
Division of Correctional Health Care Services
P.O. Box 942883
Sacramento, CA  94283-0001

Telephone: (916) 327-1842
Facsimile: (916) 327-0545

Natural Languages LLC                                                              Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)                                     Exhibit F
CDCR 2301 PREA Policy Information for Volunteers and Contractors

**AMERICAN SIGN LANGUAGE INTERPRETER SERVICES (ASL)**
**IN-PERSON/VIDEO CONFERENCE**

CDCR 2301 PREA Policy Information for Volunteers and Contractors – Part A

The Prison Rape Elimination Policy for the California Department of Corrections and Rehabilitation (CDCR) is explained on this informational sheet.  As a volunteer or private contractor who has contact with CDCR offenders, it is your responsibility to do what you can, within the parameters of your current assignment, to reduce incidents of sexual violence, staff sexual misconduct, and sexual harassment and to report information appropriately when they are reported to you or when  you  observe  such  an incident.  For purposes of this Policy, the word "staff" includes volunteers and private contractors.

**Historical Information**
Both the Congress and State Legislature passed laws, the Federal Prison Rape Elimination Act (PREA) of 2003, the Sexual Abuse in Detention Elimination Act, Chapter 303, Statutes of 2005, and most recently the United States, Department of Justice Final Rule; National Standards of 2012 to help prevent, detect, and respond to sexual violence, staff sexual misconduct, and sexual harassment behind bars.  It is important that we, as professionals, understand all aspects of these laws and our responsibilities to help prevent, detect, and respond to instances by offenders and staff.

**CDCR Policy**
The CDCR policy is found in Department Operations Manual (DOM), Chapter 5, Article 44.  PREA addresses five types of sexual offenses.  Sexual violence committed by offenders against offenders encompasses: abusive sexual contact, non-consensual sex acts, and sexual harassment by an offender.  Other sections covered by PREA include staff sexual misconduct towards an offender and staff sexual harassment towards an offender.

CDCR's policy provides for the following:
- CDCR is committed to continuing to provide a safe, humane, secure environment, free from offender on offender sexual violence, staff sexual misconduct, and sexual harassment.
- CDCR maintains zero tolerance for sexual violence, staff sexual misconduct, and sexual harassment in its institutions, community correctional facilities, conservation camps, and for all offenders under its jurisdiction.
- All sexual violence, staff sexual misconduct, and sexual harassment is strictly prohibited.
- This policy applies to all offenders and persons employed by the CDCR, including volunteers and independent contractors assigned to an institution, community correctional facility, conservation camp, or parole.

Retaliatory measures against employees or offenders who report incidents of sexual violence, staff sexual misconduct, or sexual harassment as well as retaliatory measures taken against those who cooperate with investigations shall not be tolerated and shall result in disciplinary action and/or criminal prosecution.  Retaliatory measures include, but are not limited to:
- Coercion.
- Threats of punishments.
- Any other activities intended to discourage or prevent staff or offenders from reporting incident(s).

**Professional Behavior**
Staff, including volunteers and private contractors are expected to act in a professional manner while on the grounds of a CDCR institution and while interacting with other staff and offenders.  Key elements of professional behavior include:

DocuSign Envelope ID: 680D18GA-5B48-448G-8F48-FB080A7423D1

Natural Languages LLC

Agreement Number C5611397

California Department of Corrections and Rehabilitation (CDCR)

Exhibit F

CDCR 2301 PREA Policy Information for Volunteers and Contractors

- Treating everyone, staff and offenders alike, with respect.
- Speaking without judging, blaming, or being demeaning.
- Listening to others with an objective ear and trying to understand their point of view.
- Avoiding gossip, name calling, and what may be perceived as offensive or "off-color" humor.
- Taking responsibility for your own behavior.

CDCR 2301 PREA Policy Information for Volunteers and Contractors – Part A

**Preventative Measures**

You can help reduce sexual violence, staff sexual misconduct, and sexual harassment by taking various actions during the performance of your duties as a volunteer or private contractor.

The following are ways in which you can help:

- Know and enforce the rules regarding the sexual conduct of offenders.
- Be professional at all times.
- Make it clear that sexual activity is not acceptable.
- Treat any suggestion or allegation of sexual violence, staff sexual misconduct, and sexual harassment as serious.
- Follow appropriate reporting procedures and assure that the alleged victim is separated from the alleged predator.
- Never advise an offender to use force to repel sexual advances.

**Detection**

All staff, including volunteers and private contractors, is responsible for reporting immediately and confidentially, to the appropriate supervisor any information that indicates an offender is being, or has been, the victim of sexual violence, staff sexual misconduct, or sexual harassment.

After immediately reporting to the appropriate supervisor, you are required to document the information you reported. You will be instructed by the supervisor regarding the appropriate form to be used for documentation.

You will take necessary action (i.e., give direction or press your alarm) to prevent further harm to the victim. Staff, including volunteers and private contractors, will request the victim does not: 1) Shower; 2) Remove clothing without custody supervision; 3) Use the restroom facilities; and 4) Consume any liquids.

*I have read the information above and understand my responsibility to immediately report any information that indicates an offender is being, or has been, the victim of sexual violence, staff sexual misconduct, or sexual harassment.*


_____
Volunteer/Contractor Name (Printed)

_____
Date Signed


_____
Signature of Volunteer/Contractor

_____
Current Assignment within Institution


_____
Contact Telephone Number

_____
Supervisor in Current Assignment

Natural Languages LLC                                                        Agreement Number C5611397
California Department of Corrections and Rehabilitation (CDCR)                                Exhibit F
CDCR 2301 PREA Policy Information for Volunteers and Contractors

CDCR 2301 PREA Policy Information for Volunteers and Contractors – Part B

**PART B shall only be completed by contractors who, in the course of their assigned duties, have contact with inmates.**

**Duty to Report**
You are required to answer the following questions:

1) Have you ever engaged in sexual abuse in a prison, jail, lockup, community confinement facility, juvenile facility, other institution?
   ☐ Yes   ☐ No    If yes, provide the date of the incident and the facility name in the space below.

2) Have you ever been convicted of engaging or attempting to engage in sexual activity in the community facilitated by force, overt or implied threats of force, or coercion, or if the victim did not consent or was unable to consent or refuse?
   ☐ Yes   ☐ No    If yes, provide the date of the incident and the county in the space below.

3) Have you ever been civilly or administratively found to have engaged in the activity described in question (2) above?
   ☐ Yes   ☐ No    If yes, provide the date of the incident and the county in the space below.

4) Have you ever received any disciplinary action as a result of allegations of sexual harassment of an inmate in a prison, jail, lockup, community confinement facility, or other institution?
   ☐ Yes   ☐ No    If yes, provide the date of the incident and the facility name in the space below.

If you answered "Yes" to any of the questions, please provide the date of the incident and the facility name/county where it occurred:

Date:_____

Facility/County Name:_____

As a contract employee, you have a continuing duty to promptly report, and you are required to notify your employer and the Appointing Authority of the Institution to which you are assigned if the answer to any of the above questions changes.

I hereby certify that there are no misrepresentations, omissions, or falsifications, and that all answers are true and correct. I understand and agree that if any material facts are discovered which differ from those facts stated by me on this form, my services to the California Department of Corrections and Rehabilitation will be discontinued and my contract employer will be notified.

| Printed | |
|---|---|
| Signature: | Date |

Exhibit 138

**Rita Lomio**

| | |
|---|---|
| **From:** | Sharon Garske <Sharon.Garske@doj.ca.gov> on behalf of Sharon Garske |
| **Sent:** | Thursday, July 18, 2024 9:55 AM |
| **To:** | Sophie Hart; Trace Maiorino; Patricia.Ferguson@cdcr.ca.gov; Tamiya.Davis@cdcr.ca.gov; Ursula.Stuter@cdcr.ca.gov; Chor.Thao@cdcr.ca.gov; Ava.Lau-Silveira@cdcr.ca.gov; ramon.ruiz@cdcr.ca.gov; Katie.Riley@cdcr.ca.gov; Anne Kammer; Olena Likhachova; Dawn.Lorey@cdcr.ca.gov; Lourdes.White@cdcr.ca.gov; Darnell.Mebane@cdcr.ca.gov; Kristina.Davis@cdcr.ca.gov; Margo.Wilkerson@cdcr.ca.gov; Megan.Roberts2 @cdcr.ca.gov; Joseph.Williams@cdcr.ca.gov; Brianne.Burkart@cdcr.ca.gov |
| **Cc:** | ed@smllp.law; Audrey Barron; GGrunfeld@rbgg.com; Caroline Jackson; Penny Godbold; Daniel Greenfield; Jacob Hutt; Marissa Hatton; Skye Lovett; Rita Lomio |
| **Subject:** | RE: Armstrong: SATF 14 (RVR policy) & 15 (7362 process) update |
| **Attachments:** | 20240708 Limiting Licensed Health Care Staff Access to Rules Violation Reports - Signed.pdf |

All,

Attached is CCHCS's policy "Limiting Licensed Health Care Staff Access to Rules Violation Reports" for discussion at our meeting tomorrow.

Thank you,
Sharon

Exhibit 139

Docusign Envelope ID: E558E54E-A0BA-48E5-A6B4-05356262B432



# CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES



## MEMORANDUM

| | |
|---|---|
| **Date:** | |

| | |
|---|---|
| **To:** | Associate Directors, Division of Adult Institutions |
| | Regional Health Care Executives |
| | Wardens |
| | Chief Executive Officers |
| | Chief Support Executives |

**From:**

| DocuSigned by: | DocuSigned by: | DocuSigned by: |
|---|---|---|
| *Ronald Broomfield* | *Joseph Bick* | *JOSEPH J WILLIAMS* |
| RONALD BROOMFIELD | JOSEPH BICK, M.D. | JOSEPH (JASON) WILLIAMS |
| Director | Director | Director |
| Division of Adult Institutions | Health Care Operations | Corrections Services |

| | |
|---|---|
| **Subject:** | **LIMITING LICENSED HEALTH CARE STAFF ACCESS TO RULES VIOLATION REPORTS** |

The California Correctional Health Care Services (CCHCS) and California Department of Corrections and Rehabilitation (CDCR) leadership have identified instances in which institutional health care staff have written Rules Violation Reports (RVRs) when alternate behavioral interventions may have been more appropriate.  In an effort to reduce unnecessary RVRs and to allow health care staff to focus on health care related duties, Strategic Offender Management System (SOMS) RVR writing access will now be limited to the Chief Executive Officer (CEO), the Chief Support Executive (CSE), and the CEO's designee.

If a health care staff is the victim of or a witness to, an incarcerated person's misconduct of a serious nature necessitating  an incident report (e.g., use of force, indecent exposure, assault, battery, threat of serious/great bodily injury) the health care staff shall complete an incident report (via SOMS Incident Report or CDCR Form 837-C Crime/Incident Report Part C Staff Report).

The completed incident report shall be submitted to the Incident Commander for review, and if necessary, a custody supervisor will generate an RVR in SOMS.  The CEO review of the incident report, or the associated RVR is not required in these circumstances.

In instances when it is appropriate for health care staff to author an RVR, the RVR must be routed to the immediate health care supervisor for review.   After reviewing the RVR and the circumstances for appropriateness, the immediate health care supervisor shall consult with the area custody supervisor to ensure the circumstances documented is not a reportable incident. The immediate health care supervisor will then elevate the document to the CEO for review.  If

# MEMORANDUM

after considering alternate behavioral interventions and the CEO determines an RVR is necessary, the CEO will work with the health care SOMS designee to create the RVR in SOMS within three business days.  If the CEO, CSE, or designee, should have any questions regarding the RVR or the RVR process, they should consult the Health Care Access Lieutenant.  Health care supervisors will work with custody to ensure all required timeframes are met.  A tracking system will be developed for all RVRs generated and uploaded on behalf of health care staff.  These RVRs shall be tracked by the CEO or designee.

An eLearning course titled *Health Care Providers Role in the Rules Violation Report (RVR) Process* (Course Code 11063442) has been developed for institution healthcare staff in the classifications identified in Attachment A to complete. Registry and contractor staff in the identified classifications are required to take the training.

Current staff must complete this course one time within 90 days from release of this memorandum. New staff must complete this course one time within 90 days of hire.

Staff required to complete this training will be automatically enrolled in the course via the Learning Management System (LMS). Within two business days, staff will receive an email notification from the LMS of their enrollment. The eLearning course may be accessed via the LMS at www.cchcstraining.com.

Please direct all LMS-related questions to the Staff Development Unit (SDU) LMS Administration team by submitting a ticket using the Submit an LMS Request form through the ServiceNow Portal.

Thank you in advance for your cooperation.  Please contact Joseph Edwards, Correctional Administrator, Corrections Services, via email at Joseph.K.Edwards@cdcr.ca.gov regarding any questions or concerns.

Attachment

cc:  Christopher Mauldin, EIS Captain
     Maria Rocha, Chief, SDU
     Chessnia Maharaj, Program Manager, SDU
     Tunji Akilo, Staff Services Manager I, SDU
     Meghann Matthews, Staff Services Manager I, SDU
     Divya Diven, Staff Services Manager I, SDU

**Health Care Providers Role in the Rules Violation Report Process eLearning Course Announcement**
**Attachment A – Staff Required to Complete Training**
**Page 1**

| Classification Code | Classification Title |
|---|---|
| 8185 | CERTIFIED NURSING ASSISTANT |
| 9344 | CHIEF DENTIST, CORRECTIONAL FACILITY |
| 8216 | CHIEF EXECUTIVE OFFICER, HEALTH CARE (SAFETY) |
| 9267 | CHIEF PHYSICIAN AND SURGEON, CORRECTIONAL FACILITY |
| 9774 | CHIEF PSYCHIATRIST, CORRECTIONAL AND REHABILITATIVE SERVICES(SAFETY) |
| 9859 | CHIEF PSYCHOLOGIST, CORRECTIONAL FACILITY |
| 7500 | CHIEF SUPPORT EXECUTIVE |
| 9293 | CLINICAL LABORATORY TECHNOLOGIST, CORRECTIONAL FACILITY |
| 9851 | CLINICAL PSYCHOLOGY INTERN |
| 9877 | CLINICAL SOCIAL WORKER (HEALTH FACILITY) |
| 9872 | CLINICAL SOCIAL WORKER (HEALTH/CORRECTIONAL FACILITY)-SAFETY |
| 4910 | CORRECTIONAL HEALTH SERVICES ADMINISTRATOR I, CORRECTIONAL FACILITY |
| 4912 | CORRECTIONAL HEALTH SERVICES ADMINISTRATOR II, CORRECTIONAL FACILITY |
| 9296 | DENTAL ASSISTANT, CORRECTIONAL FACILITY |
| 9298 | DENTAL HYGIENIST, CORRECTIONAL FACILITY |
| 9268 | DENTIST, CORRECTIONAL FACILITY |
| 8427 | HEALTH PROGRAM MANAGER I |
| 8428 | HEALTH PROGRAM MANAGER II |
| 8429 | HEALTH PROGRAM MANAGER III |
| 8249 | LICENSED VOCATIONAL NURSE |
| 8257 | LICENSED VOCATIONAL NURSE, CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION |
| 7374 | MEDICAL ASSISTANT |
| 9249 | MENTAL HEALTH ADMINISTRATOR, CEA (SAFETY) |
| 8181 | NURSE CONSULTANT III (SPECIALIST) |
| 8179 | NURSE CONSULTANT III (SUPERVISOR) |
| 9353 | NURSE INSTRUCTOR, CORRECTIONAL FACILITY |
| 8212 | NURSE PRACTITIONER |
| 9278 | NURSE PRACTITIONER, CORRECTIONAL FACILITY |
| 8327 | NURSING CONSULTANT, PROGRAM REVIEW |
| 8101 | NURSING COORDINATOR (SAFETY) |
| 9280 | OCCUPATIONAL THERAPIST, CORRECTIONAL FACILITY |
| 9249 | MENTAL HEALTH ADMINISTRATOR, CEA (SAFETY) |
| 7971 | OPTOMETRIST, CORRECTIONAL FACILITY |
| 9281 | PHYSICAL THERAPIST I, CORRECTIONAL FACILITY |
| 9269 | PHYSICIAN AND SURGEON, CORRECTIONAL FACILITY |
| 9263 | PHYSICIAN AND SURGEON, CORRECTIONAL FACILITY (INTERNAL MEDICINE/FAMILY PRACTICE) |
| 8016 | PHYSICIAN ASSISTANT, CORRECTIONAL FACILITY |
| 8102 | PROGRAM ASSISTANT (MENTAL DISABILITIES-SAFETY) |
| 8103 | PROGRAM DIRECTOR (MENTAL DISABLITIES-SAFETY) |
| 8253 | PSYCHIATRIC TECHNICIAN (SAFETY) |
| 9283 | PSYCHOLOGIST-CLINICAL, CORRECTIONAL FACILITY |
| 9274 | PUBLIC HEALTH NURSE I, CORRECTIONAL FACILITY |
| 9345 | PUBLIC HEALTH NURSE II, CORRECTIONAL FACILITY |
| 9315 | RADIOLOGIC TECHNOLOGIST, CORRECTIONAL FACILITY |

Docusign Envelope ID: E558E54E-A0BA-48E5-A6B4-05356262B432

**Health Care Providers Role in the Rules Violation Report Process eLearning Course Announcement**
**Attachment A – Staff Required to Complete Training**
**Page 2**

| Classification Code | Classification Title |
|---|---|
| 8200 | RECEIVER'S CLINICAL EXECUTIVE (SAFETY) |
| 8239 | RECEIVER'S MEDICAL EXECUTIVE (SAFETY) *(working title may be Chief Medical Executive)* |
| 8241 | RECEIVER'S NURSE EXECUTIVE (SAFETY) *(working title may be Chief Nurse Executive)* |
| 9286 | RECREATION THERAPIST, CORRECTIONAL FACILITY |
| 9279 | REGISTERED DIETITIAN, CORRECTIONAL FACILITY |
| 9275 | REGISTERED NURSE, CORRECTIONAL FACILITY |
| 8420 | REHABILITATION THERAPIST, STATE FACILITIES (ART-SAFETY) |
| 8321 | REHABILITATION THERAPIST, STATE FACILITIES (MUSIC-SAFETY) |
| 8323 | REHABILITATION THERAPIST, STATE FACILITIES (OCCUPATIONAL-SAFETY) |
| 8324 | REHABILITATION THERAPIST, STATE FACILITIES (RECREATION-SAFETY) |
| 9316 | RESPIRATORY CARE PRACTITIONER, CORRECTIONAL FACILITY |
| 8184 | RESPIRATORY CARE SUPERVISOR, CORRECTIONAL FACILITY |
| 9348 | SENIOR CLINICAL LABORATORY TECHNOLOGIST, CORRECTIONAL FACILITY |
| 9346 | SENIOR OCCUPATIONAL THERAPIST, CORRECTIONAL FACILITY |
| 8252 | SENIOR PSYCHIATRIC TECHNICIAN (SAFETY) |
| 9759 | SENIOR PSYCHIATRIST (SPECIALIST), CORRECTIONAL AND REHABILITATIVE SERVICES (SAFETY) |
| 9761 | SENIOR PSYCHIATRIST (SUPERVISOR), CORRECTIONAL AND REHABILITATIVE SERVICES (SAFETY) |
| 9839 | SENIOR PSYCHOLOGIST (HEALTH FACILITY) (SPECIALIST) |
| 9831 | SENIOR PSYCHOLOGIST (HEALTH FACILITY) (SUPERVISOR) |
| 9287 | SENIOR PSYCHOLOGIST, CORRECTIONAL FACILITY (SPECIALIST) |
| 9288 | SENIOR PSYCHOLOGIST, CORRECTIONAL FACILITY (SUPERVISOR) |
| 9350 | SENIOR RADIOLOGIC TECHNOLOGIST, CORRECTIONAL FACILITY (SPECIALIST) |
| 9758 | STAFF PSYCHIATRIST, CORRECTIONAL AND REHABILITATIVE SERVICES (SAFETY) |
| 9349 | SUPERVISING CLINICAL LABORATORY TECHNOLOGIST, CORRECTIONAL FACILITY |
| 9255 | SUPERVISING DENTAL ASSISTANT, CORRECTIONAL FACILITY |
| 9371 | SUPERVISING DENTIST, CORRECTIONAL FACILITY |
| 9867 | SUPERVISING PSYCHIATRIC SOCIAL WORKER I |
| 9291 | SUPERVISING PSYCHIATRIC SOCIAL WORKER I, CORRECTIONAL FACILITY |
| 9292 | SUPERVISING PSYCHIATRIC SOCIAL WORKER II, CORRECTIONAL FACILITY |
| 8096 | SUPERVISING REGISTERED NURSE (SAFETY) |
| 9318 | SUPERVISING REGISTERED NURSE II, CORRECTIONAL FACILITY |
| 9319 | SUPERVISING REGISTERED NURSE III, CORRECTIONAL FACILITY |
| 8316 | SUPERVISING REHABILITATION THERAPIST |

Exhibit 140

## Rita Lomio

| | |
|---|---|
| **From:** | Sophie Hart <sophieh@prisonlaw.com> on behalf of Sophie Hart |
| **Sent:** | Thursday, August 22, 2024 5:06 PM |
| **To:** | Sharon Garske; ed@smllp.law; Joseph.Williams@cdcr.ca.gov; Brianne.Burkart@cdcr.ca.gov; Audrey Barron; Penny Godbold; Jacob Hutt; Caroline Jackson; Daniel Greenfield; GGrunfeld@rbgg.com; Dewi Zarni; Rita Lomio; Skye Lovett; Hartmann, Sarah@CDCR |
| **Cc:** | Trace Maiorino; Olena Likhachova; Anne Kammer; Patricia.Ferguson@cdcr.ca.gov; Lourdes.White@cdcr.ca.gov; Darnell.Mebane@cdcr.ca.gov; Kristina.Davis@cdcr.ca.gov; Ursula.Stuter@cdcr.ca.gov; Tamiya.Davis@cdcr.ca.gov; Margo.Wilkerson@cdcr.ca.gov; Chor.Thao@cdcr.ca.gov; Katie.Riley@cdcr.ca.gov; Megan.Roberts2@cdcr.ca.gov; ramon.ruiz@cdcr.ca.gov; Dawn.Lorey@cdcr.ca.gov; Ava.Lau-Silveira@cdcr.ca.gov |
| **Subject:** | RE: Armstrong: SATF 14 (RVR policy) & 15 (7362 process) update |
| **Attachments:** | HC_RVR_Training (002) (Pltfs 8-22 review).pdf; 24.08.22 Plaintiffs Comments on HC RVR Training.docx |

Hi Sharon and all,

Thank you for sending along the training materials – we appreciate the chance to review these before they're rolled out to the field.

I've attached our comments to this email, both as comments imbedded in the PDF and in a separate word document, in case the PDF comments are difficult to read.

Overall, we are concerned that the training does not provide sufficiently clear direction and limiting principles for when healthcare staff should initiate RVRs. We also have serious concerns with several specific provisions, which we've flagged in our comments.

We'd like to schedule another meeting to discuss, once you've had an opportunity to review our comments – I think it would help resolve our remaining disputes. Please let us know if you're amenable to meeting again, and we'll send our availability.

Sophie

--
Sophie Hart
Supervising Staff Attorney
Prison Law Office
1917 Fifth Street
Berkeley, CA 94710
(510) 280-2621
Pronouns: she/her

---

**From:** Sharon Garske <Sharon.Garske@doj.ca.gov>
**Sent:** Thursday, August 15, 2024 4:38 PM
**To:** 'Sophie Hart' <sophieh@prisonlaw.com>; 'ed@smllp.law' <ed@smllp.law>; 'Joseph.Williams@cdcr.ca.gov' <Joseph.Williams@cdcr.ca.gov>; 'Brianne.Burkart@cdcr.ca.gov' <Brianne.Burkart@cdcr.ca.gov>; 'Audrey Barron' <audrey@smllp.law>; 'Penny Godbold' <PGodbold@rbgg.com>; 'Jacob Hutt' <jacob@prisonlaw.com>; 'Caroline Jackson'

<CJackson@rbgg.com>; 'Daniel Greenfield' <danielg@prisonlaw.com>; 'GGrunfeld@rbgg.com' <GGrunfeld@rbgg.com>; 'Dewi Zarni' <dewi@prisonlaw.com>; 'Rita Lomio' <rlomio@prisonlaw.com>; 'Skye Lovett' <skye@prisonlaw.com>; Hartmann, Sarah@CDCR <Sarah.Hartmann@cdcr.ca.gov>
**Cc:** Trace Maiorino <Trace.Maiorino@doj.ca.gov>; Olena Likhachova <Olena.Likhachova@doj.ca.gov>; Anne Kammer <Anne.Kammer@doj.ca.gov>; 'Patricia.Ferguson@cdcr.ca.gov' <Patricia.Ferguson@cdcr.ca.gov>; 'Lourdes.White@cdcr.ca.gov' <Lourdes.White@cdcr.ca.gov>; 'Darnell.Mebane@cdcr.ca.gov' <Darnell.Mebane@cdcr.ca.gov>; 'Kristina.Davis@cdcr.ca.gov' <Kristina.Davis@cdcr.ca.gov>; 'Ursula.Stuter@cdcr.ca.gov' <Ursula.Stuter@cdcr.ca.gov>; 'Tamiya.Davis@cdcr.ca.gov' <Tamiya.Davis@cdcr.ca.gov>; 'Margo.Wilkerson@cdcr.ca.gov' <Margo.Wilkerson@cdcr.ca.gov>; 'Chor.Thao@cdcr.ca.gov' <Chor.Thao@cdcr.ca.gov>; 'Katie.Riley@cdcr.ca.gov' <Katie.Riley@cdcr.ca.gov>; 'Megan.Roberts2@cdcr.ca.gov' <Megan.Roberts2@cdcr.ca.gov>; 'ramon.ruiz@cdcr.ca.gov' <ramon.ruiz@cdcr.ca.gov>; 'Dawn.Lorey@cdcr.ca.gov' <Dawn.Lorey@cdcr.ca.gov>; 'Ava.Lau-Silveira@cdcr.ca.gov' <Ava.Lau-Silveira@cdcr.ca.gov>
**Subject:** RE: Armstrong: SATF 14 (RVR policy) & 15 (7362 process) update

All,

Following our July 19, 2024 meeting discussing SATF 14 (RVRs), CCHCS prepared the attached LMS training materials.  Please return any comments or questions related to the materials by August 22, 2024.  Also, CCHCS is working with the Office of Research and the SOMS team on a process to automate the CEO tracking and reporting that would alleviate the need for manual tracking.

Thank you,
Sharon


Sharon A. Garske
Supervising Deputy Attorney General
Department of Justice
Office of the Attorney General
455 Golden Gate Avenue
San Francisco, CA 94102
Office: 415-510-4438
Cell: 916-208-0222


**From:** Sharon Garske
**Sent:** Monday, July 22, 2024 2:14 PM
**To:** Sophie Hart <sophieh@prisonlaw.com>; ed@smllp.law; Dawn.Lorey@cdcr.ca.gov; Joseph.Williams@cdcr.ca.gov; Brianne.Burkart@cdcr.ca.gov; Audrey Barron <audrey@smllp.law>; Penny Godbold <PGodbold@rbgg.com>; Jacob Hutt <jacob@prisonlaw.com>; Caroline Jackson <CJackson@rbgg.com>; Daniel Greenfield <danielg@prisonlaw.com>; Margo.Wilkerson@cdcr.ca.gov; GGrunfeld@rbgg.com; Patricia.Ferguson@cdcr.ca.gov; Tamiya.Davis@cdcr.ca.gov; Katie.Riley@cdcr.ca.gov; Chor.Thao@cdcr.ca.gov; Ursula.Stuter@cdcr.ca.gov; Kristina.Davis@cdcr.ca.gov; Megan.Roberts2@cdcr.ca.gov; ramon.ruiz@cdcr.ca.gov; Marissa Hatton <mhatton@prisonlaw.com>; Dewi Zarni <dewi@prisonlaw.com>; Rita Lomio <rlomio@prisonlaw.com>; Lourdes.White@cdcr.ca.gov; Darnell.Mebane@cdcr.ca.gov; Skye Lovett <skye@prisonlaw.com>; Ava.Lau-Silveira@cdcr.ca.gov
**Cc:** Trace Maiorino <Trace.Maiorino@doj.ca.gov>; Olena Likhachova <Olena.Likhachova@doj.ca.gov>; Anne Kammer <Anne.Kammer@doj.ca.gov>
**Subject:** RE: Armstrong: SATF 14 (RVR policy) & 15 (7362 process) update

All,

Following our Friday meeting on SATF 14 & 15, CCHCS has provided the attached list of SOMS drop-down categories for incident reports.  In addition, below is the written summary that Jason Williams provided the group on SATF 15.

1. 7362 Automated Process:
    a. This process will be located with the Oracle Health "HealtheLife" application.
    b. The workflows for the 7362 process is currently being worked on by CCHCS' IT team.
    c. A proof of concept (POC) will be reviewed once the screens are completed, and the HealtheLife application is ready to test. There is currently no ETA for when that will happen, as IT is waiting on the HealtheLife application to be in a state where they can conduct a test.

2. HealtheLife Application Patient Portal:
    a. CDCR's Enterprise Information Services (EIS) continues to work on the registration functionality with CCHCS' IT team and Oracle Health.
    b. The registration functionality is what will allow the incarcerated person to log into their account. The registration security required for CDCR/CCHCS is more stringent than what is found in the patient portal in the consumer market, so this step is taking longer than expected.
    c. There is no ETA from EIS yet as to when they believe they will have their piece finished. Robert O'Brien has a meeting with EIS this week to get an update.

Thank you,
Sharon


Sharon A. Garske
Supervising Deputy Attorney General
Department of Justice
Office of the Attorney General
455 Golden Gate Avenue
San Francisco, CA 94102
Office: 415-510-4438
Cell: 916-208-0222


---

**From:** Sophie Hart <sophieh@prisonlaw.com>
**Sent:** Friday, July 19, 2024 10:07 AM
**To:** Sharon Garske <Sharon.Garske@doj.ca.gov>; Trace Maiorino <Trace.Maiorino@doj.ca.gov>;
Patricia.Ferguson@cdcr.ca.gov; Tamiya.Davis@cdcr.ca.gov; Ursula.Stuter@cdcr.ca.gov; Chor.Thao@cdcr.ca.gov;
Ava.Lau-Silveira@cdcr.ca.gov; ramon.ruiz@cdcr.ca.gov; Katie.Riley@cdcr.ca.gov; Anne Kammer
<Anne.Kammer@doj.ca.gov>; Olena Likhachova <Olena.Likhachova@doj.ca.gov>; Dawn.Lorey@cdcr.ca.gov;
Lourdes.White@cdcr.ca.gov; Darnell.Mebane@cdcr.ca.gov; Kristina.Davis@cdcr.ca.gov; Margo.Wilkerson@cdcr.ca.gov;
Megan.Roberts2@cdcr.ca.gov; Joseph.Williams@cdcr.ca.gov; Brianne.Burkart@cdcr.ca.gov
**Cc:** ed@smllp.law; Audrey Barron <audrey@smllp.law>; GGrunfeld@rbgg.com; Caroline Jackson <CJackson@rbgg.com>;
Penny Godbold <PGodbold@rbgg.com>; Daniel Greenfield <danielg@prisonlaw.com>; Jacob Hutt
<jacob@prisonlaw.com>; Marissa Hatton <mhatton@prisonlaw.com>; Skye Lovett <skye@prisonlaw.com>; Rita Lomio
<rlomio@prisonlaw.com>; Dewi Zarni <dewi@prisonlaw.com>
**Subject:** RE: Armstrong: SATF 14 (RVR policy) & 15 (7362 process) update

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Hi all,

Thank you for sending along the memorandum yesterday. We've reviewed and put together a brief agenda for our 11 AM meeting, attached here – I hope it's helpful in structuring our discussion.

See you shortly.

Sophie

--
Sophie Hart
Supervising Staff Attorney
Prison Law Office
1917 Fifth Street
Berkeley, CA 94710
(510) 280-2621
Pronouns: she/her

---

**From:** Sharon Garske <Sharon.Garske@doj.ca.gov>
**Sent:** Thursday, July 18, 2024 1:14 PM
**To:** Sophie Hart <sophieh@prisonlaw.com>; Trace Maiorino <Trace.Maiorino@doj.ca.gov>; Patricia.Ferguson@cdcr.ca.gov; Tamiya.Davis@cdcr.ca.gov; Ursula.Stuter@cdcr.ca.gov; Chor.Thao@cdcr.ca.gov; Ava.Lau-Silveira@cdcr.ca.gov; ramon.ruiz@cdcr.ca.gov; Katie.Riley@cdcr.ca.gov; Anne Kammer <Anne.Kammer@doj.ca.gov>; Olena Likhachova <Olena.Likhachova@doj.ca.gov>; Dawn.Lorey@cdcr.ca.gov; Lourdes.White@cdcr.ca.gov; Darnell.Mebane@cdcr.ca.gov; Kristina.Davis@cdcr.ca.gov; Margo.Wilkerson@cdcr.ca.gov; Megan.Roberts2@cdcr.ca.gov; Joseph.Williams@cdcr.ca.gov; Brianne.Burkart@cdcr.ca.gov
**Cc:** ed@smllp.law; Audrey Barron <audrey@smllp.law>; GGrunfeld@rbgg.com; Caroline Jackson <CJackson@rbgg.com>; Penny Godbold <PGodbold@rbgg.com>; Daniel Greenfield <danielg@prisonlaw.com>; Jacob Hutt <jacob@prisonlaw.com>; Marissa Hatton <mhatton@prisonlaw.com>; Skye Lovett <skye@prisonlaw.com>; Rita Lomio <rlomio@prisonlaw.com>
**Subject:** RE: Armstrong: SATF 14 (RVR policy) & 15 (7362 process) update

Hi again,

CCHCS advised that they had to finalize the policy memorandum before they could complete the associated training to avoid duplicative efforts or including or excluding pertinent information. The training material is still under stakeholder review. The LMS training will emphasize the content of the memorandum. CCHCS can share the training materials once they have been finished.

Thank you,
Sharon

---

**From:** Sophie Hart <sophieh@prisonlaw.com>
**Sent:** Thursday, July 18, 2024 11:10 AM
**To:** Sharon Garske <Sharon.Garske@doj.ca.gov>; Trace Maiorino <Trace.Maiorino@doj.ca.gov>; Patricia.Ferguson@cdcr.ca.gov; Tamiya.Davis@cdcr.ca.gov; Ursula.Stuter@cdcr.ca.gov; Chor.Thao@cdcr.ca.gov; Ava.Lau-Silveira@cdcr.ca.gov; ramon.ruiz@cdcr.ca.gov; Katie.Riley@cdcr.ca.gov; Anne Kammer <Anne.Kammer@doj.ca.gov>; Olena Likhachova <Olena.Likhachova@doj.ca.gov>; Dawn.Lorey@cdcr.ca.gov; Lourdes.White@cdcr.ca.gov; Darnell.Mebane@cdcr.ca.gov; Kristina.Davis@cdcr.ca.gov; Margo.Wilkerson@cdcr.ca.gov; Megan.Roberts2@cdcr.ca.gov; Joseph.Williams@cdcr.ca.gov; Brianne.Burkart@cdcr.ca.gov
**Cc:** ed@smllp.law; Audrey Barron <audrey@smllp.law>; GGrunfeld@rbgg.com; Caroline Jackson <CJackson@rbgg.com>; Penny Godbold <PGodbold@rbgg.com>; Daniel Greenfield <danielg@prisonlaw.com>; Jacob Hutt <jacob@prisonlaw.com>; Marissa Hatton <mhatton@prisonlaw.com>; Skye Lovett <skye@prisonlaw.com>; Rita Lomio

<rlomio@prisonlaw.com>
**Subject:** RE: Armstrong: SATF 14 (RVR policy) & 15 (7362 process) update

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Hi Sharon,

Thank you for sharing this. Are you able to send any slides/training materials for the training course referenced in the policy (the eLearning course titled "Health Care Providers Role in the Rules Violation Report (RVR) Process" (Course Code 11063442)) before our meeting tomorrow? It would be helpful if we could review those materials as well.

Thanks,

Sophie

--
Sophie Hart
Supervising Staff Attorney
Prison Law Office
1917 Fifth Street
Berkeley, CA 94710
(510) 280-2621
Pronouns: she/her

**From:** Sharon Garske <Sharon.Garske@doj.ca.gov>
**Sent:** Thursday, July 18, 2024 9:55 AM
**To:** Sophie Hart <sophieh@prisonlaw.com>; Trace Maiorino <Trace.Maiorino@doj.ca.gov>;
Patricia.Ferguson@cdcr.ca.gov; Tamiya.Davis@cdcr.ca.gov; Ursula.Stuter@cdcr.ca.gov; Chor.Thao@cdcr.ca.gov;
Ava.Lau-Silveira@cdcr.ca.gov; ramon.ruiz@cdcr.ca.gov; Katie.Riley@cdcr.ca.gov; Anne Kammer
<Anne.Kammer@doj.ca.gov>; Olena Likhachova <Olena.Likhachova@doj.ca.gov>; Dawn.Lorey@cdcr.ca.gov;
Lourdes.White@cdcr.ca.gov; Darnell.Mebane@cdcr.ca.gov; Kristina.Davis@cdcr.ca.gov; Margo.Wilkerson@cdcr.ca.gov;
Megan.Roberts2@cdcr.ca.gov; Joseph.Williams@cdcr.ca.gov; Brianne.Burkart@cdcr.ca.gov
**Cc:** ed@smllp.law; Audrey Barron <audrey@smllp.law>; GGrunfeld@rbgg.com; Caroline Jackson <CJackson@rbgg.com>;
Penny Godbold <PGodbold@rbgg.com>; Daniel Greenfield <danielg@prisonlaw.com>; Jacob Hutt
<jacob@prisonlaw.com>; Marissa Hatton <mhatton@prisonlaw.com>; Skye Lovett <skye@prisonlaw.com>; Rita Lomio
<rlomio@prisonlaw.com>
**Subject:** RE: Armstrong: SATF 14 (RVR policy) & 15 (7362 process) update

All,

Attached is CCHCS's policy "Limiting Licensed Health Care Staff Access to Rules Violation Reports" for discussion at our meeting tomorrow.

Thank you,
Sharon

**From:** Sophie Hart <sophieh@prisonlaw.com>
**Sent:** Wednesday, July 17, 2024 5:11 PM
**To:** Trace Maiorino <Trace.Maiorino@doj.ca.gov>; Sharon Garske <Sharon.Garske@doj.ca.gov>;
Patricia.Ferguson@cdcr.ca.gov; Tamiya.Davis@cdcr.ca.gov; Ursula.Stuter@cdcr.ca.gov; Chor.Thao@cdcr.ca.gov;
Ava.Lau-Silveira@cdcr.ca.gov; ramon.ruiz@cdcr.ca.gov; Katie.Riley@cdcr.ca.gov; Anne Kammer

<Anne.Kammer@doj.ca.gov>; Olena Likhachova <Olena.Likhachova@doj.ca.gov>; Dawn.Lorey@cdcr.ca.gov; Lourdes.White@cdcr.ca.gov; Darnell.Mebane@cdcr.ca.gov; Kristina.Davis@cdcr.ca.gov; Margo.Wilkerson@cdcr.ca.gov; Megan.Roberts2@cdcr.ca.gov; Joseph.Williams@cdcr.ca.gov; Brianne.Burkart@cdcr.ca.gov
**Cc:** ed@smllp.law; Audrey Barron <audrey@smllp.law>; GGrunfeld@rbgg.com; Caroline Jackson <CJackson@rbgg.com>; Penny Godbold <PGodbold@rbgg.com>; Daniel Greenfield <danielg@prisonlaw.com>; Jacob Hutt <jacob@prisonlaw.com>; Marissa Hatton <mhatton@prisonlaw.com>; Skye Lovett <skye@prisonlaw.com>; Rita Lomio <rlomio@prisonlaw.com>
**Subject:** Armstrong: SATF 14 (RVR policy) & 15 (7362 process) update

> **EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Hi all,

I'm writing to check in about SATF #14 (RVR policy). We're scheduled to discuss this issue Friday at 11 AM, but haven't yet received a copy of the policy. Do you know whether the RVR policy has been finalized and when CCHCS anticipates sharing a copy with the parties?

Thanks,

Sophie

--
Sophie Hart
Supervising Staff Attorney
Prison Law Office
1917 Fifth Street
Berkeley, CA 94710
(510) 280-2621
Pronouns: she/her

---

**From:** Trace Maiorino <Trace.Maiorino@doj.ca.gov>
**Sent:** Monday, July 1, 2024 3:58 PM
**To:** Ed Swanson <ed@smllp.law>; Rita Lomio <rlomio@prisonlaw.com>; Sharon Garske <Sharon.Garske@doj.ca.gov>; Audrey Barron <audrey@smllp.law>; Caroline Jackson <CJackson@rbgg.com>; Penny Godbold <PGodbold@rbgg.com>; Jacob Hutt <jacob@prisonlaw.com>; Marissa Hatton <mhatton@prisonlaw.com>; Skye Lovett <skye@prisonlaw.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Cc:** Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>; Stuter, Ursula@CDCR <Ursula.Stuter@cdcr.ca.gov>; Thao, Chor@CDCR <Chor.Thao@cdcr.ca.gov>; Lau-Silveira, Ava <Ava.Lau-Silveira@cdcr.ca.gov>; Ruiz, Ramon@CDCR <ramon.ruiz@cdcr.ca.gov>; Riley, Katie <Katie.Riley@cdcr.ca.gov>; Anne Kammer <Anne.Kammer@doj.ca.gov>; Olena Likhachova <Olena.Likhachova@doj.ca.gov>; Lorey, Dawn@CDCR <Dawn.Lorey@cdcr.ca.gov>; White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Mebane, Darnell@CDCR <Darnell.Mebane@cdcr.ca.gov>; Davis, Kristina@CDCR <Kristina.Davis@cdcr.ca.gov>; Wilkerson, Margo@CDCR <Margo.Wilkerson@cdcr.ca.gov>; Roberts, Megan@CDCR (DAI) <Megan.Roberts2@cdcr.ca.gov>; Williams, Joseph@CDCR <Joseph.Williams@cdcr.ca.gov>; Burkart, Brianne@CDCR <Brianne.Burkart@cdcr.ca.gov>
**Subject:** RE: Armstrong: SATF 14 (RVR policy) & 15 (7362 process) update

Thank you Ed and Rita.  I sent the invite for July 19 at 11:00 a.m., please forward as needed if I did not include everyone that needs to be there.  Trace

**From:** Ed Swanson <ed@smllp.law>
**Sent:** Monday, July 1, 2024 2:30 PM
**To:** Rita Lomio <rlomio@prisonlaw.com>; Trace Maiorino <Trace.Maiorino@doj.ca.gov>; Sharon Garske <Sharon.Garske@doj.ca.gov>; Audrey Barron <audrey@smllp.law>; Caroline Jackson <CJackson@rbgg.com>; Penny Godbold <PGodbold@rbgg.com>; Jacob Hutt <jacob@prisonlaw.com>; Marissa Hatton <mhatton@prisonlaw.com>; Skye Lovett <skye@prisonlaw.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Cc:** Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>; Stuter, Ursula@CDCR <Ursula.Stuter@cdcr.ca.gov>; Thao, Chor@CDCR <Chor.Thao@cdcr.ca.gov>; Lau-Silveira, Ava <Ava.Lau-Silveira@cdcr.ca.gov>; Ruiz, Ramon@CDCR <ramon.ruiz@cdcr.ca.gov>; Riley, Katie <Katie.Riley@cdcr.ca.gov>; Anne Kammer <Anne.Kammer@doj.ca.gov>; Olena Likhachova <Olena.Likhachova@doj.ca.gov>; Lorey, Dawn@CDCR <Dawn.Lorey@cdcr.ca.gov>; White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Mebane, Darnell@CDCR <Darnell.Mebane@cdcr.ca.gov>; Davis, Kristina@CDCR <Kristina.Davis@cdcr.ca.gov>; Wilkerson, Margo@CDCR <Margo.Wilkerson@cdcr.ca.gov>; Roberts, Megan@CDCR (DAI) <Megan.Roberts2@cdcr.ca.gov>; Williams, Joseph@CDCR <Joseph.Williams@cdcr.ca.gov>; Burkart, Brianne@CDCR <Brianne.Burkart@cdcr.ca.gov>
**Subject:** RE: Armstrong: SATF 14 (RVR policy) & 15 (7362 process) update

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

July 19 after 10 am works for us.

**From:** Rita Lomio <rlomio@prisonlaw.com>
**Sent:** Monday, July 1, 2024 10:06 AM
**To:** Trace Maiorino <Trace.Maiorino@doj.ca.gov>; Ed Swanson <ed@smllp.law>; Sharon Garske <Sharon.Garske@doj.ca.gov>; Audrey Barron <audrey@smllp.law>; Caroline Jackson <CJackson@rbgg.com>; Penny Godbold <PGodbold@rbgg.com>; Jacob Hutt <jacob@prisonlaw.com>; Marissa Hatton <mhatton@prisonlaw.com>; Skye Lovett <skye@prisonlaw.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Cc:** Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>; Stuter, Ursula@CDCR <Ursula.Stuter@cdcr.ca.gov>; Thao, Chor@CDCR <Chor.Thao@cdcr.ca.gov>; Lau-Silveira, Ava <Ava.Lau-Silveira@cdcr.ca.gov>; Ruiz, Ramon@CDCR <ramon.ruiz@cdcr.ca.gov>; Riley, Katie <Katie.Riley@cdcr.ca.gov>; Anne Kammer <Anne.Kammer@doj.ca.gov>; Olena Likhachova <Olena.Likhachova@doj.ca.gov>; Lorey, Dawn@CDCR <Dawn.Lorey@cdcr.ca.gov>; White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Mebane, Darnell@CDCR <Darnell.Mebane@cdcr.ca.gov>; Davis, Kristina@CDCR <Kristina.Davis@cdcr.ca.gov>; Wilkerson, Margo@CDCR <Margo.Wilkerson@cdcr.ca.gov>; Roberts, Megan@CDCR (DAI) <Megan.Roberts2@cdcr.ca.gov>; Williams, Joseph@CDCR <Joseph.Williams@cdcr.ca.gov>; Burkart, Brianne@CDCR <Brianne.Burkart@cdcr.ca.gov>
**Subject:** RE: Armstrong: SATF 14 (RVR policy) & 15 (7362 process) update

Unfortunately, Plaintiffs are not available the morning of July 17. We are free July 19 after 10 am. If that doesn't work, we can look at availability the following week.

**From:** Trace Maiorino <Trace.Maiorino@doj.ca.gov>
**Sent:** Friday, June 28, 2024 5:16 PM
**To:** Ed Swanson <ed@smllp.law>; Sharon Garske <Sharon.Garske@doj.ca.gov>; Rita Lomio <rlomio@prisonlaw.com>; Audrey Barron <audrey@smllp.law>; Caroline Jackson <CJackson@rbgg.com>; Penny Godbold <PGodbold@rbgg.com>; Jacob Hutt <jacob@prisonlaw.com>; Marissa Hatton <mhatton@prisonlaw.com>; Skye Lovett <skye@prisonlaw.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Cc:** Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>; Stuter, Ursula@CDCR <Ursula.Stuter@cdcr.ca.gov>; Thao, Chor@CDCR <Chor.Thao@cdcr.ca.gov>; Lau-Silveira, Ava <Ava.Lau-Silveira@cdcr.ca.gov>; Ruiz, Ramon@CDCR <ramon.ruiz@cdcr.ca.gov>; Riley, Katie <Katie.Riley@cdcr.ca.gov>; Anne Kammer <Anne.Kammer@doj.ca.gov>; Olena Likhachova

<Olena.Likhachova@doj.ca.gov>; Lorey, Dawn@CDCR <Dawn.Lorey@cdcr.ca.gov>; White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Mebane, Darnell@CDCR <Darnell.Mebane@cdcr.ca.gov>; Davis, Kristina@CDCR <Kristina.Davis@cdcr.ca.gov>; Wilkerson, Margo@CDCR <Margo.Wilkerson@cdcr.ca.gov>; Roberts, Megan@CDCR (DAI) <Megan.Roberts2@cdcr.ca.gov>; Williams, Joseph@CDCR <Joseph.Williams@cdcr.ca.gov>; Burkart, Brianne@CDCR <Brianne.Burkart@cdcr.ca.gov>
**Subject:** RE: Armstrong: SATF 14 (RVR policy) & 15 (7362 process) update

Thank you Ed.  CCHCS/COLA, and a rep from OLA, confirmed that they are available on July 17 at 11:00 a.m.  Once I hear from Plaintiffs, I'll send an invite to get this on everyone's calendar.  Trace

---

**From:** Ed Swanson <ed@smllp.law>
**Sent:** Friday, June 28, 2024 1:37 PM
**To:** Sharon Garske <Sharon.Garske@doj.ca.gov>; Rita Lomio <rlomio@prisonlaw.com>; Audrey Barron <audrey@smllp.law>; Caroline Jackson <CJackson@rbgg.com>; Penny Godbold <PGodbold@rbgg.com>; Jacob Hutt <jacob@prisonlaw.com>; Marissa Hatton <mhatton@prisonlaw.com>; Skye Lovett <skye@prisonlaw.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Cc:** Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>; Stuter, Ursula@CDCR <Ursula.Stuter@cdcr.ca.gov>; Thao, Chor@CDCR <Chor.Thao@cdcr.ca.gov>; Lau-Silveira, Ava <Ava.Lau-Silveira@cdcr.ca.gov>; Ruiz, Ramon@CDCR <ramon.ruiz@cdcr.ca.gov>; Riley, Katie <Katie.Riley@cdcr.ca.gov>; Anne Kammer <Anne.Kammer@doj.ca.gov>; Olena Likhachova <Olena.Likhachova@doj.ca.gov>; Trace Maiorino <Trace.Maiorino@doj.ca.gov>; Lorey, Dawn@CDCR <Dawn.Lorey@cdcr.ca.gov>; White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Mebane, Darnell@CDCR <Darnell.Mebane@cdcr.ca.gov>; Davis, Kristina@CDCR <Kristina.Davis@cdcr.ca.gov>; Wilkerson, Margo@CDCR <Margo.Wilkerson@cdcr.ca.gov>; Roberts, Megan@CDCR (DAI) <Megan.Roberts2@cdcr.ca.gov>; Williams, Joseph@CDCR <Joseph.Williams@cdcr.ca.gov>; Burkart, Brianne@CDCR <Brianne.Burkart@cdcr.ca.gov>
**Subject:** RE: Armstrong: SATF 14 (RVR policy) & 15 (7362 process) update

EXTERNAL EMAIL: This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

The morning of July 17 or anytime on July 19 would work for us. Thanks.

---

**From:** Sharon Garske <Sharon.Garske@doj.ca.gov>
**Sent:** Friday, June 28, 2024 12:13 PM
**To:** Ed Swanson <ed@smllp.law>; Rita Lomio <rlomio@prisonlaw.com>; Audrey Barron <audrey@smllp.law>; Caroline Jackson <CJackson@rbgg.com>; Penny Godbold <PGodbold@rbgg.com>; Jacob Hutt <jacob@prisonlaw.com>; Marissa Hatton <mhatton@prisonlaw.com>; Skye Lovett <skye@prisonlaw.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Cc:** Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>; Stuter, Ursula@CDCR <Ursula.Stuter@cdcr.ca.gov>; Thao, Chor@CDCR <Chor.Thao@cdcr.ca.gov>; Lau-Silveira, Ava <Ava.Lau-Silveira@cdcr.ca.gov>; Ruiz, Ramon@CDCR <ramon.ruiz@cdcr.ca.gov>; Riley, Katie <Katie.Riley@cdcr.ca.gov>; Anne Kammer <Anne.Kammer@doj.ca.gov>; Olena Likhachova <Olena.Likhachova@doj.ca.gov>; Trace Maiorino <Trace.Maiorino@doj.ca.gov>; Lorey, Dawn@CDCR <Dawn.Lorey@cdcr.ca.gov>; White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Mebane, Darnell@CDCR <Darnell.Mebane@cdcr.ca.gov>; Davis, Kristina@CDCR <Kristina.Davis@cdcr.ca.gov>; Wilkerson, Margo@CDCR <Margo.Wilkerson@cdcr.ca.gov>; Roberts, Megan@CDCR (DAI) <Megan.Roberts2@cdcr.ca.gov>; Williams, Joseph@CDCR <Joseph.Williams@cdcr.ca.gov>; Burkart, Brianne@CDCR <Brianne.Burkart@cdcr.ca.gov>
**Subject:** RE: Armstrong: SATF 14 (RVR policy) & 15 (7362 process) update

All,

For SATF #14 (RVR policy), CCHCS has advised that they completed the labor negations with CCPOA Supervisory on June 26 and with CCSO June 27.  They reached agreement with some minor edits to the policy memorandum.  CCHCS is

updating the suggested changes now and will be routing for signatures next week for a finalized policy.  Thereafter, CCHCS can share a copy of the policy with all of us.

For SATF #15 (7362s), CCHCS has advised that the teams are still working on registration with Oracle Health.  Information Technology Services Division (ITSD) are also simultaneously building the 7362 forms and workflow.  CCHCS will continue to provide updates as they are available.

In anticipation of the finalized RVR policy, which will be sent to you all via a separate email, we would like to schedule a meeting with you and Plaintiffs' counsel the week of July 15.  Please let us know when you are available.

Thank you,
Sharon

---

**From:** Ed Swanson <ed@smllp.law>
**Sent:** Monday, June 24, 2024 9:05 PM
**To:** Rita Lomio <rlomio@prisonlaw.com>; Sharon Garske <Sharon.Garske@doj.ca.gov>; Audrey Barron <audrey@smllp.law>; Caroline Jackson <CJackson@rbgg.com>; Penny Godbold <PGodbold@rbgg.com>; Jacob Hutt <jacob@prisonlaw.com>; Marissa Hatton <mhatton@prisonlaw.com>; Skye Lovett <skye@prisonlaw.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Cc:** Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>; Stuter, Ursula@CDCR <Ursula.Stuter@cdcr.ca.gov>; Thao, Chor@CDCR <Chor.Thao@cdcr.ca.gov>; Lau-Silveira, Ava <Ava.Lau-Silveira@cdcr.ca.gov>; Ruiz, Ramon@CDCR <ramon.ruiz@cdcr.ca.gov>; Riley, Katie <Katie.Riley@cdcr.ca.gov>; Anne Kammer <Anne.Kammer@doj.ca.gov>; Olena Likhachova <Olena.Likhachova@doj.ca.gov>; Trace Maiorino <Trace.Maiorino@doj.ca.gov>; Lorey, Dawn@CDCR <Dawn.Lorey@cdcr.ca.gov>; White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Mebane, Darnell@CDCR <Darnell.Mebane@cdcr.ca.gov>; Davis, Kristina@CDCR <Kristina.Davis@cdcr.ca.gov>; Wilkerson, Margo@CDCR <Margo.Wilkerson@cdcr.ca.gov>; Roberts, Megan@CDCR (DAI) <Megan.Roberts2@cdcr.ca.gov>; Williams, Joseph@CDCR <Joseph.Williams@cdcr.ca.gov>; Burkart, Brianne@CDCR <Brianne.Burkart@cdcr.ca.gov>
**Subject:** RE: Armstrong: SATF 14 (RVR policy) & 15 (7362 process) update

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Thanks, all. I'm fine with getting the written status on Friday, and we can schedule a meeting later if we need one.

---

**From:** Rita Lomio <rlomio@prisonlaw.com>
**Sent:** Monday, June 24, 2024 6:04 PM
**To:** Sharon Garske <Sharon.Garske@doj.ca.gov>; Ed Swanson <ed@smllp.law>; Audrey Barron <audrey@smllp.law>; Caroline Jackson <CJackson@rbgg.com>; Penny Godbold <PGodbold@rbgg.com>; Jacob Hutt <jacob@prisonlaw.com>; Marissa Hatton <mhatton@prisonlaw.com>; Skye Lovett <skye@prisonlaw.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Cc:** Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>; Stuter, Ursula@CDCR <Ursula.Stuter@cdcr.ca.gov>; Thao, Chor@CDCR <Chor.Thao@cdcr.ca.gov>; Lau-Silveira, Ava <Ava.Lau-Silveira@cdcr.ca.gov>; Ruiz, Ramon@CDCR <ramon.ruiz@cdcr.ca.gov>; Riley, Katie <Katie.Riley@cdcr.ca.gov>; Anne Kammer <Anne.Kammer@doj.ca.gov>; Olena Likhachova <Olena.Likhachova@doj.ca.gov>; Trace Maiorino <Trace.Maiorino@doj.ca.gov>; Lorey, Dawn@CDCR <Dawn.Lorey@cdcr.ca.gov>; White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Mebane, Darnell@CDCR <Darnell.Mebane@cdcr.ca.gov>; Davis, Kristina@CDCR <Kristina.Davis@cdcr.ca.gov>; Wilkerson, Margo@CDCR <Margo.Wilkerson@cdcr.ca.gov>; Roberts, Megan@CDCR (DAI) <Megan.Roberts2@cdcr.ca.gov>; Williams, Joseph@CDCR <Joseph.Williams@cdcr.ca.gov>; Burkart, Brianne@CDCR <Brianne.Burkart@cdcr.ca.gov>
**Subject:** RE: Armstrong: SATF 14 (RVR policy) & 15 (7362 process) update

Hi Sharon,

If there won't be any substantive updates at tomorrow's meeting, we agree that it doesn't seem like a good use of time and we should reschedule. But Ed, I know you were hoping to meet before you were out on vacation, so defer to you if you think a check-in tomorrow would be helpful.

Rita

---

**From:** Sharon Garske <Sharon.Garske@doj.ca.gov>
**Sent:** Monday, June 24, 2024 2:24 PM
**To:** Ed Swanson (ed@smllp.law) <ed@smllp.law>; Audrey Barron <audrey@smllp.law>; Caroline Jackson <CJackson@rbgg.com>; Penny Godbold <PGodbold@rbgg.com>; Jacob Hutt <jacob@prisonlaw.com>; Marissa Hatton <mhatton@prisonlaw.com>; Skye Lovett <skye@prisonlaw.com>; Rita Lomio <rlomio@prisonlaw.com>; Gay C. Grunfeld (GGrunfeld@rbgg.com) <GGrunfeld@rbgg.com>
**Cc:** Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>; Stuter, Ursula@CDCR <Ursula.Stuter@cdcr.ca.gov>; Thao, Chor@CDCR <Chor.Thao@cdcr.ca.gov>; Lau-Silveira, Ava <Ava.Lau-Silveira@cdcr.ca.gov>; Ruiz, Ramon@CDCR <ramon.ruiz@cdcr.ca.gov>; Riley, Katie <Katie.Riley@cdcr.ca.gov>; Anne Kammer <Anne.Kammer@doj.ca.gov>; Olena Likhachova <Olena.Likhachova@doj.ca.gov>; Trace Maiorino <Trace.Maiorino@doj.ca.gov>; Lorey, Dawn@CDCR <Dawn.Lorey@cdcr.ca.gov>; White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Mebane, Darnell@CDCR <Darnell.Mebane@cdcr.ca.gov>; Davis, Kristina@CDCR <Kristina.Davis@cdcr.ca.gov>; Wilkerson, Margo@CDCR <Margo.Wilkerson@cdcr.ca.gov>; Roberts, Megan@CDCR (DAI) <Megan.Roberts2@cdcr.ca.gov>; Williams, Joseph@CDCR <Joseph.Williams@cdcr.ca.gov>; Burkart, Brianne@CDCR <Brianne.Burkart@cdcr.ca.gov>
**Subject:** Armstrong: SATF 14 (RVR policy) & 15 (7362 process) update

All,

CCHCS advised that the labor table to discuss the draft Rules Violation Report (RVR) policy was moved from June 24 to June 26 and 27. As a result, we will not have an update on the status of the RVR policy negotiations until June 28. Also, CCHCS is internally meeting tomorrow to further discuss the status of the 7362 process. Because we will not have any substantive updates until June 28, we suggest canceling tomorrow's 12-1 p.m. meeting and we will provide a written update on Friday, June 28. If after Plaintiffs' counsel and the Court Expert have reviewed the update they decide a meeting is needed, we can schedule accordingly. Please confirm you are agreeable to this proposed manner of moving forward on SATF items 14 and 15.

Thank you.
Sharon

Sharon A. Garske
Supervising Deputy Attorney General
Department of Justice
Office of the Attorney General
455 Golden Gate Avenue
San Francisco, CA 94102
Office: 415-510-4438
Cell: 916-208-0222

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is

prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

# Exhibit 141

**Adobe Captivate**                                                    *Friday, August 02, 2024*

Slide 1 - Health Care (HC) Rules Violation Report (RVR)



**Text Captions**
Approximately 30 minutes
Staff Development Unit
October 2023
Version 2.0
BET ID#11063442
Licensed Health Care (HC) Staff Role in the Rules Violation Report (RVR) Process

Summary of Comments on Microsoft Word - HC_RVR_Training (002)

Slide 2 - Navigating this Course



**Text Captions**

$$cpInfoProjectName$$

Navigating this Course

◊ Use the Navigation Bar at the bottom of the slide to move through the course. Some of the following options may not be applicable to this course, but may include the following:

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

Exit

Displays Table of Contents

X

TOC

Previous Slide

Next Slide

Audio

Adobe Captivate                                    Friday, August 02, 2024

**Slide 3 - Introduction**



**Text Captions**

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

$$cpInfoProjectName$$
Welcome $$cpQuizInfoStudentName$$! Please select a guide to help you through the course.

**Adobe Captivate**                                      **Friday, August 02, 2024**

Slide 4 - Audience



**Text Captions**

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

$$cpInfoProjectName$$
Audience
This course is designed for all licensed health care staff. This includes, but is not limited to, Physicians, Dentists, Registered Nurses, Physician Assistants, Nurse Practitioners, Licensed Vocational Nurses, Certified Nursing Assistants, Psychiatrists, Psychologists, Licensed Clinical Social Workers, Licensed Psychiatric Technicians, Occupational Therapists, Recreational Therapists, Registered Dental Assistants, and Registered Dental Hygienists.
Throughout the presentation, we will refer to them as "licensed HC staff" or "HC staff."

Adobe Captivate                                     Friday, August 02, 2024

Slide 5 - What Brought Us Here?

---

**$$cpInfoProjectName$$**

## What Brought Us Here?

Statewide, we have seen many instances of unnecessary RVRs being written when alternative behavioral interventions may have been more appropriate by local, licensed HC staff. Some general principles include:

- HC staff **should** be focusing on patient health and safety.

- HC staff **should not** be in the business of writing RVRs.

- If a HC staff is a victim of or a witness to a crime (such as indecent exposure, assault, battery, threat of serious/great bodily injury, etc.), or a witness of staff's use of force, the HC staff shall submit a CDCR Form 837-C Crime/Incident Report or SOMS Incident Report (IR).

- The HC staff's narrative may later be used within the SOMS RVR.

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

**Text Captions**

$$cpInfoProjectName$$
What Brought Us Here?
Statewide, we have seen many instances of unnecessary RVRs being written when alternative behavioral interventions may have been more appropriate by local, licensed HC staff. Some general principles include:
- HC staff should be focusing on patient health and safety.
- HC staff should not be in the business of writing RVRs.
- If a HC staff is a victim of or a witness to a crime (such as indecent exposure, assault, battery, threat of serious/great bodily injury, etc.), or a witness of staff's use of force, the HC staff shall submit a CDCR Form 837-C Crime/Incident Report or SOMS Incident Report (IR).
- The HC staff's narrative may later be used within the SOMS RVR.

---

Page: 5

Author: sophieh     Subject: Rectangle   Date: 8/22/2024 4:14:30 PM

Author: sophieh     Subject: Sticky Note       Date: 8/22/2024 4:12:28 PM
The phrase "used within the SOMS RVR" is confusing and unclear. We recommend revising to clarify this is referring to the HC staff's narrative in the Incident Report, and that custody will ultimately decide whether an RVR is initiated. We suggest: "Custody staff may consider HC staff's narrative in the Incident Report when deciding whether to issue an RVR."

---

Adobe Captivate                                                    Friday, August 02, 2024

Slide 6 - What is the Licensed Health Care Staff's Role in the Rules Violation Report Process?



**Page: 6**

Author: sophieh    Subject: Rectangle    Date: 8/22/2024 4:15:12 PM

Author: sophieh    Subject: Sticky Note    Date: 8/22/2024 4:16:04 PM
This text should be stricken or revised. Incarcerated people must be able to disclose healthcare concerns to HC staff, without fear of discipline, even if such concerns stem from potentially dangerous or illicit conduct—e.g., obtaining a tattoo from a contaminated source, drug use, and sexual activity. As written, this slide suggests HC staff will now need to report this behavior, even when it is being disclosed in a confidential, clinical encounter.

Author: sophieh    Subject: Rectangle    Date: 8/22/2024 4:15:26 PM

Author: sophieh    Subject: Sticky Note    Date: 8/22/2024 4:16:21 PM
Same comment as above.

Author: sophieh    Subject: Rectangle    Date: 8/22/2024 4:14:55 PM

Author: sophieh    Subject: Sticky Note    Date: 8/22/2024 4:13:17 PM
This text should be revised. It suggests that HC staff should expect to author RVRs, albeit not on a "daily" basis. This message is inconsistent with CCHCS's representation to the Court Expert that line staff would not be permitted to author RVRs. See Dkt. No. 3500 at 16. It is also inconsistent with CCHCS's July 19, 2024, representation to Plaintiffs' counsel that training materials would contain express substantive limitations on the ability of healthcare staff to author RVRs. We suggest: "Discipline of patients, via Rules Violation Reports, is not a duty of HC staff."

Text Captions

$$cpInfoProjectName$$
What is the Licensed Health Care Staff's Role in the Rules Violation Report Process?
In many circumstances, HC staff witness or have been victims of crimes alleged to have been committed in prison.
HC staff shall communicate openly and regularly with custody staff, and immediately alert them to possible criminal activity.
HC staff shall document behavior in the progress notes of the patient health record. If the behavior is inappropriate or unusual, staff should discuss these instances with the care team, custody and HC supervisors and managers to seek behavioral interventions.
HC staff shall immediately alert custody when patient behavior is potentially dangerous.
HC staff should not consider Rules Violation Reports as part of their regular daily duties.
HC staff shall submit a CDCR Form 837-C, Incident Report, when they are a witness or victim of a crime (such as indecent exposure, assault, battery, threat of serious/great bodily injury, etc.), or a staff's use of force.

Adobe Captivate

Friday, August 02, 2024

Slide 7 - What is the Licensed Health Care Staff's Role in the Rules Violation Report Process? (Continued)

$$cpInfoProjectName$$

## What is the Licensed Health Care Staff's Role in the Rules Violation Report Process? (Continued)

HC staff **shall** alert custody to any potentially dangerous behaviors and immediately report possible criminal activity.

Various reports/documents regularly completed by HC staff may be used to support or refute the elements of a rule violation or crime.
(i.e., CDCR Form 7219, *Medical Report of Injury or Unusual Occurrence*; CDCR Form 7225, *Refusal of Examination and/or Treatment*; Interdisciplinary Progress Notes; CDCR Form 837-C, *Incident Report*; etc.).

Some behavior may be cause for referral for a mental health evaluation and treatment, rather than disciplinary action, such as:

- Behavior that occurred in connection with:
  - a cell extraction for the administration of involuntary medication (Penal Code 2602) or involuntary treatment (Probate Code 3200).
  - a cell extraction for transfer to or between mental health inpatient units.
  - being placed in mental health restraints and/or seclusion.
- Behavior that is determined to be an act of self-mutilation or attempted suicide.

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

**Page: 7**

Author: sophieh    Subject: Rectangle    Date: 8/22/2024 4:16:38 PM

Author: sophieh    Subject: Sticky Note    Date: 8/22/2024 4:16:56 PM
Same comment as above: This text should be stricken or revised. Incarcerated people must be able to disclose healthcare concerns to HC staff, without fear of discipline, even if such concerns stem from potentially dangerous or illicit conduct—e.g., obtaining a tattoo from a contaminated source, drug use, and sexual activity. As written, this slide suggests HC staff will now need to report this behavior, even when it is being disclosed in a confidential, clinical encounter.

**Text Captions**

$$cpInfoProjectName$$
What is the Licensed Health Care Staff's Role in the Rules Violation Report Process? (Continued)
HC staff shall alert custody to any potentially dangerous behaviors and immediately report possible criminal activity.
Various reports/documents regularly completed by HC staff may be used to support or refute the elements of a rule violation or crime.
(i.e., CDCR Form 7219, Medical Report of Injury or Unusual Occurrence; CDCR Form 7225, Refusal of Examination and/or Treatment; Interdisciplinary Progress Notes; CDCR Form 837-C, Incident Report; etc.).
Some behavior may be cause for referral for a mental health evaluation and treatment, rather than disciplinary action, such as:
Behavior that occurred in connection with:
a cell extraction for the administration of involuntary medication (Penal Code 2602) or involuntary treatment (Probate Code 3200).
a cell extraction for transfer to or between mental health 🗌 inpatient units.
being placed in mental health restraints and/or seclusion.
Behavior that is determined to be an act of self-mutilation or 🗌 attempted suicide.

Adobe Captivate        **Friday, August 02, 2024**

**Slide 8 - Staff Use of Force**



**Text Captions**

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

$$cpInfoProjectName$$
Staff Use of Force
Reporting Requirement Reminder

Adobe Captivate                                    Friday, August 02, 2024

Slide 9 - Reporting Requirements: Incident Reports - Staff Use of Force



**Page: 9**

Author: sophieh    Subject: Rectangle  Date: 8/22/2024 4:17:19 PM

Author: sophieh    Subject: Sticky Note    Date: 8/22/2024 4:17:29 PM
This text is inaccurate and harmful. It should be stricken. It directs HC staff to view their patients with distrust based on a biased view of staff uses of force. It also inappropriately suggests that HC staff's primary consideration when drafting these reports should be how their statement could be used to exonerate staff. Its inclusion will only further damage HC relationships with incarcerated people.

**Text Captions**

$$cpInfoProjectName$$
Reporting Requirements: Incident Reports - Staff Use of Force
DOM 51020.17: Any employee who uses force or observes a staff use of force shall report it to a supervisor as soon as practical and follow up with appropriate documentation prior to being relieved of duty.
CCR Title 15 3268.1 (a) (1): Any employee who uses force or observes a staff use of force shall report it to a supervisor as soon as practical and submit the appropriate documentation, prior to being relieved from duty.
It is likely that a staff's use of force is a result of a serious rule violation or crime committed by the patient. As such, the HC staff's observation may support the charge, and may provide clarity of the actions taken by staff.

**Adobe Captivate**                                                **Friday, August 02, 2024**

Slide 10 - Overview of the Rules Violation Report Process



**Text Captions**

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

$$cpInfoProjectName$$
Overview of the Rules Violation Report Process

Adobe Captivate                                                Friday, August 02, 2024

**Slide 11 - Licensed Health Care Staff Role in Rules Violation Report Process**



$$cpInfoProjectName$$

## Licensed Health Care Staff Role in the Rules Violation Report Process

If the employee is the victim of or a witness to patient misconduct of a serious nature necessitating custody intervention, which requires an incident report (i.e., use of force, indecent exposure, assault, battery, threat of serious/great bodily injury, etc.), the following steps will be taken:

- An incident report **shall** be completed (via SOMS Incident Report or CDCR Form 837-C Crime/Incident Report) and routed to their supervisor for review within the established timeframes.

- The CEO review of the incident report, or the associated RVR is not required in these circumstances.

- The incident report **shall** be submitted to the incident commander for review, and if necessary, custody staff will generate an RVR in SOMS.

- CEO or CSE have 3 business days to review and submit an RVR (RVRs not related to an 837-C Crime Incident Report) in SOMS.

Regardless of the RVR outcome, the Chief Executive Officer (CEO) and Chief Support Executive (CSE) **should** discuss alternative behavioral management strategies with the provider.

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

**Page: 11**

Author: sophieh    Subject: Rectangle    Date: 8/22/2024 4:18:40 PM

Author: sophieh    Subject: Sticky Note    Date: 8/22/2024 4:20:30 PM
This is inconsistent with the next slide and should be stricken. On the next slide, the training says CEOs "shall log" all such RVRs. We agree with that direction -- the CEO *should* track and log these RVRs, to ensure HC staff are using the Incident Report system appropriately, and that alternative behavioral modifications are being considered.

Author: sophieh    Subject: Rectangle    Date: 8/22/2024 4:17:54 PM

Author: sophieh    Subject: Sticky Note    Date: 8/22/2024 4:18:10 PM
This text should be stricken or revised. First, it is unclear what this bullet point is referring to -- the rest of the slide is about what happens if HC staff is the victim of or witness to serious misconduct requiring an Incident Report. The second bullet point says the "CEO review of the incident report . . . is not required in these circumstances." So it is unclear what the CEO/CSE is meant to be "reviewing" here when deciding whether to submit an RVR. Second, by indicating the CEO should consider submitting an RVR in circumstances where an Incident Report is not submitted, it suggests that HC staff should expect to instigate RVRs based on non-criminal incidents, and provides no limitations or guidance as to when such is appropriate. This is problematic and inconsistent with CCHCS's July 19, 2024, representation to Plaintiffs' counsel that training materials would contain express limitations on the ability of healthcare staff to author RVRs.

**Text Captions**

$$cpInfoProjectName$$
Licensed Health Care Staff Role in the Rules Violation Report Process
If the employee is the victim of or a witness to patient misconduct of a serious nature necessitating custody intervention, which requires an incident report (i.e., use of force, indecent exposure, assault, battery, threat of serious/great bodily injury, etc.), the following steps will be taken:
- An incident report shall be completed (via SOMS Incident Report or CDCR Form 837-C Crime/Incident Report) and routed to their supervisor for review within the established timeframes.
If a HC provider has alerted custody to serious patient misconduct or a possible crime, and has been asked to submit an IR, the following steps will be taken:
- Submit the IR to the HC Supervisor for review (grammar, accuracy, appropriateness).
- Once approved, the HC Supervisor will submit to custody for review and determination of disciplinary action.
- If it is determined that a HC RVR should be written, the HC Supervisor will submit the IR to the Chief Executive Officer (CEO) for tracking and entry in SOMS.
- The HC SOMS designee will enter the RVR in SOMS.
- Regardless of the RVR outcome, the CEO and Chief Support Executive (CSE) should discuss alternative behavioral management strategies with the provider.

Adobe Captivate                                                 Friday, August 02, 2024

Slide 12 - Reporting Process - Start to Finish



**Text Captions**

$$cpInfoProjectName$$
Reporting Process - Start to Finish
An RVR, resulting from a CDCR Form 837-C Incident Report, along with all supporting documents/evidence, shall be issued within 15 days. The CEO or designee shall log and track all RVRs resulting from a health care provider's incident report through completion of the disciplinary process.
Custody shall ensure all due process rights are afforded, to include providing a Staff Assistant or Investigative Employee, if necessary.
Hearing - Witness Testimony:
◉       Incarcerated person's right to call witnesses for serious RVRs only - Senior Hearing Officer may call witnesses for any RVR and will determine the relevance of the witness/testimony.

Adobe Captivate                                    Friday, August 02, 2024

Slide 13 - Rules Violation Report Flowchart for HC Staff



Text Captions

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

$$cpInfoProjectName$$
Rules Violation Report Flowchart for HC Staff
Download the full-size PDF.
CEO/CSE reviews incident for alternate behavioral management strategies.
The RVR is entered into SOMS. CEO or designee logs and tracks to completion.
Yes
No
RVR Required?
Determine if RVR  is Warranted.
Submit your IR to  Custody Supervisor (Incident Commander).
Discuss concerns with Custody and HC supervisors to determine alternate behavioral management strategies and appropriate documentation of patient behavior.
Write an Incident Report (IR) via SOMS or  CDCR Form 837-C.
Yes
No
Were you a witness/victim of a crime or Use of Force?

**Friday, August 02, 2024**

**Slide 14 - Reminder**



**Text Captions**

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

$$cpInfoProjectName$$
Reminder
HC staff should be focusing on patient health and safety.
HC staff should not be in the business of writing RVRs.
If a HC staff is a victim of or a witness to a crime (such as indecent exposure, assault, battery, threat of serious/great bodily injury, etc.), or a witness of staff's use of force, the HC staff shall submit a CDCR Form 837-C Crime/Incident Report or SOMS IR).

Adobe Captivate                                                Friday, August 02, 2024

**Slide 15 - Final Thoughts**



**Text Captions**

$$cpInfoProjectName$$
Final Thoughts

What is the HC staff's role in the inmate disciplinary process?
◉        Stay safe.

Adobe Captivate                                          Friday, August 02, 2024

Slide 16 - Conclusion



**Text Captions**

$$cpInfoProjectName$$
Complete
You may exit this training and continue to the next part of the course.

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

Exhibit 142

| Slide | CCHCS Text | Plaintiffs' Comment | Suggested Alternate Text If Appropriate |
|---|---|---|---|
| 5 | "The HC staff's narrative may later be used within the SOMS RVR." | The phrase "used within the SOMS RVR" is confusing and unclear. We recommend revising to clarify this is referring to the HC staff's narrative in the Incident Report, and that custody will ultimately decide whether an RVR is initiated. | "Custody staff may consider HC staff's narrative in the Incident Report when deciding whether to issue an RVR." |
| 6 | "HC staff should not consider Rules Violation Reports as part of their regular daily duties." | This text should be revised. It suggests that HC staff should expect to author RVRs, albeit not on a "daily" basis. This message is inconsistent with CCHCS's representation to the Court Expert that line staff would not be permitted to author RVRs. See Dkt. No. 3500 at 16. It is also inconsistent with CCHCS's July 19, 2024, representation to Plaintiffs' counsel that training materials would contain express substantive limitations on the ability of healthcare staff to author RVRs. | "Discipline of patients, via Rules Violation Reports, is not a duty of HC staff." |
| 6 & 7 | Slide 6: "HC staff shall communicate openly and regularly with custody staff, and immediately alert them to possible criminal activity." & "HC staff shall immediately alert custody when patient behavior is potentially dangerous."<br><br>Slide 7: "HC staff shall alert custody to any potentially dangerous behaviors and immediately report possible criminal activity." | This text should be stricken or revised. Incarcerated people must be able to disclose healthcare concerns to HC staff, without fear of discipline, even if such concerns stem from potentially dangerous or illicit conduct—e.g., obtaining a tattoo from a contaminated source, drug use, and sexual activity. As written, this slide suggests HC staff will now need to report this behavior, even when it is being disclosed in a confidential, clinical encounter. | N/A |

| 9 | "It is likely that a staff's use of force is a result of a serious rule violation or crime committed by the patient. As such, the HC staff's observation may support the charge, and may provide clarity of the actions taken by staff." | This text is inaccurate and harmful. It should be stricken. It directs HC staff to view their patients with distrust based on a biased view of staff uses of force. It also inappropriately suggests that HC staff's primary consideration when drafting these reports should be how their statement could be used to exonerate staff. Its inclusion will only further damage HC relationships with incarcerated people. | N/A |
|---|---|---|---|
| 11 | "CEO or CSE gave 3 business days to review and submit an RVR (RVRs not related to an 837-C Crime Incident Report) in SOMS." | This text should be stricken. First, it is unclear what this bullet point is referring to – the rest of the slide is about what happens if HC staff is the victim of or witness to serious misconduct requiring an Incident Report. The second bullet point says the "CEO review of the incident report . . . is not required in these circumstances." So it is unclear what the CEO/CSE is meant to be "reviewing" here when deciding whether to submit an RVR. Second, by indicating the CEO should consider submitting an RVR in circumstances where an Incident Report is not submitted, it suggests that HC staff should expect to instigate RVRs based on non-criminal incidents, and provides no limitations or guidance as to when such is appropriate. This is problematic and inconsistent with CCHCS's July 19, 2024, representation to Plaintiffs' counsel that training materials | N/A |

| | | would contain express limitations on the ability of healthcare staff to author RVRs. | |
|---|---|---|---|
| 11 & 12 | Slide 11: "The CEO review of the incident report, or the associated RVR Is not required in these circumstances."<br><br>Slide 12: "The CEO or designee shall log and track all RVRs resulting from a health care provider's incident report through completion of the disciplinary process." | These provisions are internally inconsistent – Slide 11 says the CEO will not review incident reports or associated RVRs, and Slide 12 says CEOs "shall log" all such RVRs. The text on Slide 11 should be stricken -- the CEO *should* track and log these RVRs, to ensure HC staff are using the Incident Report system appropriately, and that alternative behavioral modifications are being considered. | N/A |

Exhibit 143

**Sophie Hart**

| | |
|---|---|
| **From:** | Audrey Barron <audrey@smllp.law> on behalf of Audrey Barron |
| **Sent:** | Wednesday, August 28, 2024 10:03 AM |
| **To:** | Sophie Hart; Sharon Garske; Ed Swanson; Joseph.Williams@cdcr.ca.gov; Brianne.Burkart@cdcr.ca.gov; Penny Godbold; Jacob Hutt; Caroline Jackson; Daniel Greenfield; GGrunfeld@rbgg.com; Dewi Zarni; Rita Lomio; Skye Lovett; Hartmann, Sarah@CDCR |
| **Cc:** | Trace Maiorino; Olena Likhachova; Anne Kammer; Patricia.Ferguson@cdcr.ca.gov; Lourdes.White@cdcr.ca.gov; Darnell.Mebane@cdcr.ca.gov; Kristina.Davis@cdcr.ca.gov; Ursula.Stuter@cdcr.ca.gov; Tamiya.Davis@cdcr.ca.gov; Margo.Wilkerson@cdcr.ca.gov; Chor.Thao@cdcr.ca.gov; Katie.Riley@cdcr.ca.gov; Megan.Roberts2@cdcr.ca.gov; ramon.ruiz@cdcr.ca.gov; Dawn.Lorey@cdcr.ca.gov; Ava.Lau-Silveira@cdcr.ca.gov |
| **Subject:** | Re: Armstrong: SATF 14 (RVR policy) & 15 (7362 process) update |

Hi all,

Below are comments from Ed and me regarding the training:

- Slide 5 – In the last bullet, we suggest using the active voice to be clear *who* can use the incident report narrative to create an RVR. As read, it gives the impression any HC staff could still use the narrative to create an RVR. For example, this could be changed to say, "Custody staff may use the HC staff's narrative to create an RVR in SOMS."
- Slide 9 – We share Plaintiffs' concerns regarding the language about use of force in slide 9.
- Slide 11 – In the first and third bullet, we suggest using the active voice to be clear *who* must fill out an incident report, route it to their supervisor, and submit it to an incident commander. As read, it appears that the report might automatically get sent to a supervisor and the incident commander. Assuming the HC staff who witnesses the event needs to take action to route to the supervisor and incident commander, we suggest these read, "HC staff shall complete an incident report and route it to their supervisor…" and "HC staff shall submit the report to the incident commander…"
- Slide 11 – The last bullet is unclear to us. This slide seems to be about what happens when HC staff witness a serious incident and fill out an incident report. But the last bullet says it is about the CEO or CSE submitting an RVR "not related to an 837-C Crime Incident Report." Thus far in the presentation, there has been no explanation for what would cause a CEO or CSE to author an RVR that isn't about a crime incident report, or how HC staff are involved in that process. We suggest removing this bullet or moving it to a separate slide that expands on this topic.
- Slide 12 – In the opening paragraph, the use of passive voice leaves it unclear who authors/issues an RVR stemming from an 837-C. Right now, it reads that it "shall be issued within 15 days," leaving the impression that anyone could issue it, including HC staff. This should be edited to use the active voice to clarify that following receipt of an 837-C, an incident commander (or custody supervisor) may choose to issue an RVR and if they do so, they must issue the RVR within 15 days.
- Slide 13 – The blue box with text "Determine if RVR is Warranted" is confusing. This is a flow chart for HC Staff, so this box gives the impression that HC staff are to determine if an RVR is warranted. This box should be edited to say, "Custody Supervisor Determines if RVR is Warranted." We also don't understand the purpose to the next box that says "RVR required?" If that is an additional step the custody supervisor must take, then this box should be edited to say, "Custody Supervisor Determines if RVR Required." If it is the same step as "Determine if RVR is Warranted," we recommend eliminating the extra box and just moving to yes or no. Finally, after the "yes" there is a blue box that says "The RVR is entered into SOMS." This should be edited to use active voice to clarify *who* enters the RVR in SOMS. For example, it could read "Custody Supervisor enters the RVR in SOMS."

Thanks,

Audrey Barron

# Exhibit 144

**Sophie Hart**

| | |
|---|---|
| **From:** | Sharon Garske <Sharon.Garske@doj.ca.gov> on behalf of Sharon Garske |
| **Sent:** | Tuesday, September 17, 2024 1:14 PM |
| **To:** | Audrey Barron; Sophie Hart; Ed Swanson; Joseph.Williams@cdcr.ca.gov; Brianne.Burkart@cdcr.ca.gov; Penny Godbold; Jacob Hutt; Caroline Jackson; Daniel Greenfield; GGrunfeld@rbgg.com; Dewi Zarni; Rita Lomio; Skye Lovett; Hartmann, Sarah@CDCR |
| **Cc:** | Trace Maiorino; Olena Likhachova; Anne Kammer; Patricia.Ferguson@cdcr.ca.gov; Lourdes.White@cdcr.ca.gov; Darnell.Mebane@cdcr.ca.gov; Kristina.Davis@cdcr.ca.gov; Ursula.Stuter@cdcr.ca.gov; Tamiya.Davis@cdcr.ca.gov; Margo.Wilkerson@cdcr.ca.gov; Chor.Thao@cdcr.ca.gov; Katie.Riley@cdcr.ca.gov; Megan.Roberts2@cdcr.ca.gov; ramon.ruiz@cdcr.ca.gov; Dawn.Lorey@cdcr.ca.gov; Ava.Lau-Silveira@cdcr.ca.gov |
| **Subject:** | RE: Armstrong: SATF 14 (RVR policy) & 15 (7362 process) update |
| **Attachments:** | HC_RVR_Training.doc |

All,

Attached is the updated RVR training materials from CCHCS.  Please let us know if you have any questions or further comments.

Thank you,
Sharon

**Adobe Captivate**                                    **Sunday, September 29, 2024**

**Slide 1 - Health Care (HC) Rules Violation Report (RVR)**



**Text Captions**
Approximately 30 minutes
Staff Development Unit
October 2024
Version 2.0
BET ID#11063442
Licensed Health Care (HC) Staff Role in the Rules Violation Report (RVR) Process

**Adobe Captivate**                                                    **Sunday, September 29, 2024**

**Slide 2 - Navigating this Course**



**Text Captions**

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

$$cpInfoProjectName$$

Navigating this Course

   Use the Navigation Bar at the bottom of the slide to move through the course. Some of the following options may not be applicable to this course, but may include the following:

X

Exit

Displays Table of Contents

TOC

Previous Slide

Next Slide

Audio

**Adobe Captivate**                                                    **Sunday, September 29, 2024**

**Slide 3 - Introduction**



**Text Captions**

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

$$cpInfoProjectName$$
Welcome $$cpQuizInfoStudentName$$! Please select a guide to help you through the course.

Adobe Captivate                                                    **Sunday, September 29, 2024**

---

**Slide 4 - Audience**



$$cpInfoProjectName$$

## Audience

This course is designed for all licensed health care staff. This includes, but is not limited to, Physicians, Dentists, Registered Nurses, Physician Assistants, Nurse Practitioners, Licensed Vocational Nurses, Certified Nursing Assistants, Psychiatrists, Psychologists, Licensed Clinical Social Workers, Licensed Psychiatric Technicians, Occupational Therapists, Physical Therapists, Recreational Therapists, Registered Dental Assistants, and Registered Dental Hygienists.

Throughout the presentation, we will refer to them as "licensed HC staff" or "HC staff."

Click Box

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

**Text Captions**

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

$$cpInfoProjectName$$
Audience
This course is designed for all licensed health care staff. This includes, but is not limited to, Physicians, Dentists, Registered Nurses, Physician Assistants, Nurse Practitioners, Licensed Vocational Nurses, Certified Nursing Assistants, Psychiatrists, Psychologists, Licensed Clinical Social Workers, Licensed Psychiatric Technicians, Occupational Therapists, Physical Therapists, Recreational Therapists, Registered Dental Assistants, and Registered Dental Hygienists.

Throughout the presentation, we will refer to them as "licensed HC staff" or "HC staff."

Adobe Captivate                                                    **Sunday, September 29, 2024**

**Slide 5 - What Brought Us Here?**

| |
|---|
| **$$cpInfoProjectName$$** |

# What Brought Us Here?

Statewide, we have seen many instances of unnecessary RVRs being written when alternative behavioral interventions may have been more appropriate by local, licensed HC staff. Some general principles include:

- HC staff **should** be focusing on patient health and safety.

- HC staff **should not** be in the business of writing RVRs.

- If a HC staff is a victim of or a witness to a crime (such as indecent exposure, assault, battery, threat of serious/great bodily injury, etc.), or a witness of staff's use of force, the HC staff shall submit a CDCR Form 837-C Crime/Incident Report or SOMS Incident Report (IR).

- Custody staff may consider HC staff's narrative in the IR when deciding whether to issue a RVR

Click Box                                          $$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

**Text Captions**

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

$$cpInfoProjectName$$
What Brought Us Here?
Statewide, we have seen many instances of unnecessary RVRs being written when alternative behavioral interventions may have been more appropriate by local, licensed HC staff. Some general principles include:

- HC staff should be focusing on patient health and safety.

- HC staff should not be in the business of writing RVRs.

- If a HC staff is a victim of or a witness to a crime (such as indecent exposure, assault, battery, threat of serious/great bodily injury, etc.), or a witness of staff's use of force, the HC staff shall submit a CDCR Form 837-C Crime/Incident Report or SOMS Incident Report (IR).

- Custody staff may consider HC staff's narrative in the IR when deciding whether to issue a RVR

**Adobe Captivate**                                            **Sunday, September 29, 2024**

**Slide 6 - What is the Licensed Health Care Staff's Role in the Rules Violation Report Process?**

$$cpInfoProjectName$$                                    

## What is the Licensed Health Care Staff's Role in the Rules Violation Report Process?



HC staff **should not** consider Rules Violations Reports as part of their daily duties, however an RVR may be issued by HC staff with the approval of the CEO/CSE when alternate behavioral interventions have not corrected the behavior.

If HC staff observes behavior that is inappropriate or unusual, HC staff should discuss these observations with the care team, custody and HC supervisors and managers to seek behavioral interventions. HC staff **should** also document inappropriate or unusual behavior in the progress notes of the patient health record.

HC Staff **shall** immediately alert custody staff if they witness patient behavior or criminal activity that is a threat to the safety and security of the institution or believe a patient may cause harm to themselves or others.

HC staff **shall** submit a *SOMS Incident Report or CDCR Form 837-C Crime/Incident Report Part C Staff Report*, when they are a witness or victim of a crime (such as indecent exposure, assault, battery, threat of serious/great bodily injury, etc.), or a staff's use of force.

Click Box                                                $$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

**Text Captions**

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

$$cpInfoProjectName$$
What is the Licensed Health Care Staff's Role in the Rules Violation Report Process?
HC staff should not consider Rules Violations Reports as part of their daily duties, however an RVR may be issued by HC staff with the approval of the CEO/CSE when alternate behavioral interventions have not corrected the behavior.

If HC staff observes behavior that is inappropriate or unusual, HC staff should discuss these observations with the care team, custody and HC supervisors and managers to seek behavioral interventions. HC staff should also document inappropriate or unusual behavior in the progress notes of the patient health record.

HC Staff shall immediately alert custody staff if they witness patient behavior or criminal activity that is a threat to the safety and security of the institution or believe a patient may cause harm to themselves or others.

HC staff shall submit a SOMS Incident Report or CDCR Form 837-C Crime/Incident Report Part C Staff Report, when they are a witness or victim of a crime (such as indecent exposure, assault, battery, threat of serious/great bodily injury, etc.), or a staff's use of force.

Adobe Captivate                                         **Sunday, September 29, 2024**

**Slide 7 - What is the Licensed Health Care Staff's Role in the Rules Violation Report Process? (Continued)**

$$cpInfoProjectName$$  

## What is the Licensed Health Care Staff's Role in the Rules Violation Report Process? (Continued)



Various reports/documents regularly completed by HC staff may be used to support or refute the elements of a rule violation or crime.
(i.e., CDCR Form 7219, *Medical Report of Injury or Unusual Occurrence*; CDCR Form 7225, *Refusal of Examination and/or Treatment*; Interdisciplinary Progress Notes; CDCR Form 837-C, *Incident Report*; etc.).

Some behavior may be cause for referral for a mental health evaluation and treatment, rather than disciplinary action, such as:

- Behavior that occurred in connection with:
  - a cell extraction for the administration of involuntary medication (Penal Code 2602) or involuntary treatment (Probate Code 3200).
  - a cell extraction for transfer to or between mental health inpatient units.
  - being placed in mental health restraints and/or seclusion.
- Behavior that is determined to be an act of self-mutilation or attempted suicide.

Regardless of the RVR outcome, the Chief Executive Officer (CEO) and Chief Support Executive (CSE) **should** discuss alternative behavioral management strategies with the provider.

Click Box                                      $$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

**Text Captions**

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

$$cpInfoProjectName$$
What is the Licensed Health Care Staff's Role in the Rules Violation Report Process? (Continued)
Various reports/documents regularly completed by HC staff may be used to support or refute the elements of a rule violation or crime. (i.e., CDCR Form 7219, Medical Report of Injury or Unusual Occurrence; CDCR Form 7225, Refusal of Examination and/or Treatment; Interdisciplinary Progress Notes; CDCR Form 837-C, Incident Report; etc.).

Some behavior may be cause for referral for a mental health evaluation and treatment, rather than disciplinary action, such as:

- Behavior that occurred in connection with:

  o a cell extraction for the administration of involuntary medication (Penal Code 2602) or involuntary treatment (Probate Code 3200).
  o a cell extraction for transfer to or between mental health inpatient units.
  o being placed in mental health restraints and/or seclusion.

- Behavior that is determined to be an act of self-mutilation or attempted suicide.

Regardless of the RVR outcome, the Chief Executive Officer (CEO) and Chief Support Executive (CSE) should discuss alternative behavioral management strategies with the provider.

**Adobe Captivate**                                    **Sunday, September 29, 2024**

**Slide 8 - Staff Use of Force**



**Text Captions**

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

$$cpInfoProjectName$$
Staff Use of Force
Reporting Requirement Reminder

**Slide 9 - Reporting Requirements: Incident Reports - Staff Use of Force**



**Text Captions**

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

$$cpInfoProjectName$$
Reporting Requirements: Incident Reports - Staff Use of Force

DOM 51020.17: Any employee who uses force or observes a staff use of force shall report it to a supervisor as soon as practical and follow up with appropriate documentation prior to being relieved of duty.

CCR Title 15 3268.1 (a) (1): Any employee who uses force or observes a staff use of force shall report it to a supervisor as soon as practical and submit the appropriate documentation, prior to being relieved from duty.

It is likely that a staff's use of force is a result of a serious rule violation or crime committed by the patient. As such, HC staff shall ensure the information provided in the report is thorough and accurate.

**Adobe Captivate**                                                    **Sunday, September 29, 2024**

**Slide 10 - Overview of the Rules Violation Report Process**



**Text Captions**

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

$$cpInfoProjectName$$
Overview of the Rules Violation Report Process

**Slide 11 - Licensed Health Care Staff Role in Rules Violation Report Process**

| $$cpInfoProjectName$$ |   |
| --- | --- |

## Licensed Health Care Staff Role in the Rules Violation Report Process

**RVRs not generated from Incident Reports** (SOMS Incident Report or CDCR Form 837-C Crime/Incident Report Part C Staff Report)

- CEO or CSE have 3 business days to review and submit an RVR (not related to an 837-C Crime Incident Report) in SOMS.

**RVRs from Incident Reports** (SOMS Incident Report or CDCR Form 837-C Crime/Incident Report Part C Staff Report)

If the employee is the victim of or a witness to patient misconduct of a serious nature necessitating custody intervention, which requires an incident report (i.e., use of force, indecent exposure, assault, battery, threat of serious/great bodily injury, etc.), the following steps will be taken:

- An incident report **shall** be completed (via SOMS Incident Report or CDCR Form 837-C Crime/Incident Report) and routed to the Incident Commander for review within the established timeframes.

- The CEO **is not** required to review RVRs generated via an incident report.

- The incident report **shall** be submitted to the Incident Commander for review, and if necessary, custody staff will generate an RVR in SOMS.



Click Box

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

**Text Captions**

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

$$cpInfoProjectName$$

Licensed Health Care Staff Role in the Rules Violation Report Process

RVRs not generated from Incident Reports (SOMS Incident Report or CDCR Form 837-C Crime/Incident Report Part C Staff Report)

- CEO or CSE have 3 business days to review and submit an RVR (not related to an 837-C Crime Incident Report) in SOMS.

RVRs from Incident Reports (SOMS Incident Report or CDCR Form 837-C Crime/Incident Report Part C Staff Report)

If the employee is the victim of or a witness to patient misconduct of a serious nature necessitating custody intervention, which requires an incident report (i.e., use of force, indecent exposure, assault, battery, threat of serious/great bodily injury, etc.), the following steps will be taken:

- An incident report shall be completed (via SOMS Incident Report or CDCR Form 837-C Crime/Incident Report) and routed to the Incident Commander for review within the established timeframes.

- The CEO is not required to review RVRs generated via an   incident report.

- The incident report shall be submitted to the Incident Commander for review, and if necessary, custody staff will generate an RVR in SOMS.

Slide 12 - Reporting Process - Start to Finish



**Text Captions**

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

$$cpInfoProjectName$$
Reporting Process - Start to Finish

All RVRs along with all supporting documents/evidence shall be submitted within 15 days from the date of discovery of information leading to the disciplinary charges. A tracking system will be developed for all RVRs generated and uploaded on behalf of health care staff. These RVRs shall be tracked by the CEO or designee.

Custody shall ensure all due process rights are afforded, to include providing a Staff Assistant or Investigative Employee, if necessary.

Hearing - Witness Testimony:

- Incarcerated person's right to call witnesses for serious RVRs only - Senior Hearing Officer may call witnesses for any RVR and will determine the relevance of the witness/testimony.

- If requested as a witness, as the Reporting Employee, you    shall participate in the RVR hearing.

Finding and Disposition - the incarcerated person may be found guilty, guilty of a lesser offense, or not guilty and the charges dismissed.

**Adobe Captivate**                                          **Sunday, September 29, 2024**

**Slide 13 - Reminder**



**Text Captions**

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

$$cpInfoProjectName$$
Reminder
HC staff should be focusing on patient health and safety.

HC staff should not be in the business of writing RVRs.

If a HC staff is a victim of or a witness to a crime (such as indecent exposure, assault, battery, threat of serious/great bodily injury, etc.), or a witness of staff's use of force, the HC staff shall submit a CDCR Form 837-C Crime/Incident Report or SOMS IR).

**Adobe Captivate**　　　　　　　　　　　　　　　　　　　**Sunday, September 29, 2024**

**Slide 14 - Final Thoughts**

$$cpInfoProjectName$$

## Final Thoughts

What is the HC staff's role in the inmate disciplinary process?

- Stay safe.

- Provide the best possible care in all situations.

- Write all appropriate documentation according to your duties and responsibilities.

- Be a good witness (be descriptive - who, what, where, when, how).

- If you are a victim or witness to a crime (such as indecent exposure, assault, battery, threat of serious/great bodily injury, etc.) or witness staff's use of force, you **shall** report it on a CDCR Form 837-C, *Incident Report*.

- Communicate with custody staff throughout the process.

- When in doubt, ask questions.

Click Box

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

**Text Captions**

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

$$cpInfoProjectName$$
Final Thoughts

What is the HC staff's role in the inmate disciplinary process?
- Stay safe.

- Provide the best possible care in all situations.

- Write all appropriate documentation according to your duties and responsibilities.

- Be a good witness (be descriptive - who, what, where, when, how).

- If you are a victim or witness to a crime (such as indecent exposure, assault, battery, threat of serious/great bodily injury, etc.) or witness staff's use of force, you shall report it on a CDCR Form 837-C, Incident Report.

- Communicate with custody staff throughout the process.

- When in doubt, ask questions.

**Adobe Captivate**                                                    **Sunday, September 29, 2024**

Slide 15 - Conclusion



**Text Captions**

$$cpInfoCurrentSlide$$ / $$cpInfoSlideCount$$

$$cpInfoProjectName$$
Complete
You may exit this training and continue to the next part of the course.

# Exhibit 145

# (Intentionally left blank)

# Exhibit 146

# (Intentionally left blank)

# Exhibit 147

# (Intentionally left blank)

# Exhibit 148



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Deputy Director:*
Sara Norman

*Legal Director:*
Margot Mendelson

*Staff Attorneys:*
Rana Anabtawi
Tess Borden
Patrick Booth
Claudia Ceseña
Steven Fama
Mackenzie Halter
Alison Hardy
Sophie Hart
Marissa Hatton
Jacob Hutt
A.D. Lewis
Rita Lomio

BY EMAIL ONLY

June 5, 2023

Joseph Bick
Director, CCHCS Health Care Services

Joseph (Jason) Williams
Director, CCHCS Corrections Services

Re: *Armstrong v. Newsom; Plata v. Newsom*
   Need for SATF LOP and HCDOM Revisions to Ensure Timely Response
   to 7362 Requests for Durable Medical Equipment Repair and Replacement

Dear Dr. Bick and Director Williams:

  Following a year-long investigation at the California Substance Abuse Treatment Facility and State Prison, Corcoran ("SATF"), the *Armstrong* Court Expert found that the institution's process for timely repair and replacement of durable medical equipment is unclear and poorly-understood by both incarcerated people and staff. Absence of a clear policy "puts strain on incarcerated people, custody staff, healthcare staff," and the Reasonable Accommodation Panel (RAP); patients with disabilities report that their durable medical equipment is not repaired or replaced timely; nursing staff are interrupted with requests for assistance while performing other duties; and a heavier burden is placed on the RAP through the addition of CDCR 1824 requests from patients who have been unable to otherwise resolve their concerns through the 7362 process. Dkt. No. 3446 at 32-33 (Dec. 20, 2022).

  In response to the Court Expert's findings, SATF healthcare and ADA staff have said that they will clarify existing policy regarding repair and replacement of durable medical equipment. Defendants report that updates to SATF local operating procedure are in progress, as are revisions to related statewide policy.[1] We write now because we remain concerned that the problems

---

[1] SATF originally intended to revise local operating procedure with respect to DME repair and replacement by January 15, 2023 – a deadline that later was extended. *See* Dkt. No. 3453-1, Ex. A (Jan. 24, 2023) (Receiver's December 28, 2022 SATF Status Report in Response to the Court Expert's Report); *see also* Memorandum from N. Scaife, SATF Associate Warden, to Office of Legal Affairs (Mar. 20, 2023) (noting that SATF did not yet have revisions to local

**Board of Directors**
Harlan Grossman, President and Treasurer • Christiane Hipps, Vice President
Jason Bell • Vanita Gaonkar • Nick Gregoratos • Michael Marcum • Jean Lu
Claire McDonnel • Ruth Morgan • Seth Morris • Adrienne Yandell

Timely Response to 7362 Requests Regarding Durable Medical Equipment
June 5, 2023
Page 2

identified by the Court Expert last year persist for patients who elect to notify healthcare staff of their requests regarding durable medical equipment by CDCR 7362. We appreciate SATF healthcare leadership's openness to discussing our concerns with 7362 processing during our recent *Armstrong* monitoring tour. In this letter, we provide additional information and examples to further illustrate these concerns and inform forthcoming policy revisions.

## I.    Policy Should Be Revised to Include Response Timelines for 7362s Related to Durable Medical Equipment Repair and Replacement.

All 7362s are required to be collected daily and triaged by a registered nurse ("RN"), either at the facility clinic (on regular business days) or at the Triage and Treatment Area ("TTA") (on non-business days). The RN is expected to determine whether the 7362 describes symptoms of a medical, mental health, or dental condition (is "symptomatic") or does not describe symptoms (is "asymptomatic"). *See* Health Care Department Operations Manual ("HCDOM") § 3.1.5(c)(2)(B)(3), Scheduling and Access to Care.

Statewide policy sets a clear timeline for responding to 7362s determined to be "symptomatic." Patients who submit 7362s that nursing staff determine describe symptoms must be seen by the Primary Care RN by the next business day. *See* HCDOM § 3.1.5(c)(2)(B)(3)(a)(3).

7362s determined to be "asymptomatic" have no timeline for the patient to be seen. These 7362s, including 7362s requesting repair or replacement of durable medical equipment, renewal of medications, and prescription eyeglasses, simply must be routed "to appropriate staff" on the same day (if the 7362 is received on a business day) or by the next business day (if the 7362 is received on a non-business day).[2] HCDOM § 3.1.5(c)(2)(B)(3)(a)(5); *see also id.* § 3.1.5(c)(2)(B)(3)(b)(2). Separate policy requires that "[w]hen DME is in need of repair or replacement," "[h]ealthcare staff shall ducat the patient for an appointment and evaluate the condition of the DME," but again does not provide a timeline for doing so and provides no requirement that patients be notified that their 7362 has been received or what will happen next. *See* HCDOM § 3.6.1(e)(13)(B), Durable Medical Equipment and Medical Supply.

---

procedure regarding durable medical equipment). During our April 2023 monitoring tour, we learned that SATF has yet to execute final revisions; one policy related to durable medical equipment (Operating Procedure 467) reportedly was close to final, and remaining revisions to the other relevant policy (Operating Procedure 403) will be submitted for approval in August.

[2]   We did not investigate how patients' concerns regarding durable medical equipment reported by 7362 are addressed when the 7362 also describes symptoms. However, the HCDOM and local policy similarly do not describe clear timelines for addressing durable medical equipment concerns in that circumstance.

Timely Response to 7362 Requests Regarding Durable Medical Equipment
June 5, 2023
Page 3

As a result, and as the Court Expert observed, there currently is no requirement at SATF (or elsewhere) for "healthcare staff to inform patients that their [7362] request for DME assessment or the like has been received, what response they can expect, and when they can expect it." Dkt. No. 3446 at 27 (Dec. 20, 2022).

In April 2023, Plaintiffs' counsel conducted interviews with clinic staff and healthcare executives to better understand common practice at SATF. Healthcare executives said that they had the following unwritten expectations for processing asymptomatic 7362s raising concerns with durable medical equipment:

First, the triaging RN should note "MA" on the 7362 and forward the 7362 to the clinical medical assistant(s) by email. An example of this is below.



Image Description: Portion of CDCR 7362 titled, "Part II: To Be Completed by the Triage Registered Nurse," with completed fields for the name of the triaging RN, the date and time the 7362 was received and reviewed, and "MA" written in the top right corner.

Second, on the same day they receive the 7362 by email, the clinic medical assistant(s) should call the patient to the clinic to gather information about equipment repairs needed and offer a loaner device, where available. If the patient's equipment is turned in for repairs and a loaner device is issued, the medical assistant should complete, and the patient sign, a CDCR 7536 DME/Supply Receipt.

Healthcare executives explained that these expectations are not documented in writing, and it is not clear that they are followed regularly in practice at SATF.

In addition, we understand that SATF leadership is in the process of educating patients to go directly to the facility medical clinics to request durable medical equipment repair and replacement, rather than submit their requests by 7362. Healthcare leadership reported that when patients do so, healthcare staff are expected to address their durable medical equipment concerns the same day. Nonetheless, patients may continue to submit their requests by 7362, including because doing so is more convenient; because it creates a written record of their requests; because they want to ensure they requested accomodations in writing so that their healthcare grievances are not screened out; because the facility program may be modified such that they cannot report to

the clinic; because they do not know that they can now go to the clinic; because they are worried about how healthcare staff will treat them in the clinic; or because staff in certain circumstances may advise them to do so, in accordance with CCHCS policy. *See* HCDOM § 3.6.1 (patients shall submit a 7362 to alert staff of durable medical equipment concerns); *see also* Cal. Code Regs. Tit. 15 § 3999.226(a)(3) ("Patients shall not use the health care grievance process to request health care services without a previous attempt to seek health care assistance through approved processes.").[3]

Similar to requests submitted by 7362, we are not aware of any written policy directing how quickly clinic staff are expected to address and how they are expected to document patients' requests related to durable medical equipment when patients come unscheduled to the clinic.

## II. Policy Should Be Revised to Require Documentation of Action Taken in Response to Patients' 7362s Related to Durable Medical Equipment.

In addition, clinic medical assistants did not describe a consistent practice of documenting what happens for patients who do **not** have durable medical equipment issued to them in response to the 7362. In other words, medical assistants told us that they generally document encounters with patients regarding their durable medical equipment only when they issue the patient new equipment or a loaner device and ask the patient to sign a supply receipt – and not, for example, when they educate patients regarding correct use of durable medical equipment; when they provide patients with toolboxes or assistance performing small repairs to their devices; when they offer a loaner device that a patient declines; or when they determine that a loaner device may be needed but is not available at the clinic.

---

[3]    SATF healthcare leadership reported that patients are being advised to come directly to the facility medical clinics with durable medical equipment requests primarily through Inmate Advisory Council ("IAC") representatives, who meet weekly with clinic managers. As we discussed with leadership last month, we are concerned that these efforts may not be sufficient. Patients with disabilities may go to great lengths to minimize or hide their disabilities with their peers, and may not be comfortable approaching IAC representatives or be recognized by IAC representatives as having disabilities and therefore as requiring education regarding durable medical equipment requests. And people with disabilities at SATF have reported that healthcare staff at SATF medical clinics have previously "treated them in a manner that was rude and dismissive." Dkt. No. 3446 at 52-55 (Dec. 20, 2022). Even if advised to do so, patients currently may not be willing, without more, to request accommodations at the clinics and risk mistreatment from the same healthcare staff who historically have responded to their requests with "suspicion that [they were] faking their condition or need." *Id.*

The SATF Chief Nurse Executive ("CNE") reported that healthcare staff are expected to document every clinic encounter, and that medical assistants have access to the electronic medical record to enter progress notes and send letters to patients. The CNE acknowledged, however, that policy does not specify expectations for documenting action taken in response to 7362s regarding, for example, wheelchair repair, and that practically, medical assistants primarily complete CDCR 7536 DME/Supply Receipts to document encounters related to durable medical equipment. This information mirrors what Plaintiffs' counsel heard in facility medical clinics, where one medical assistant explained that although she can, she typically does not enter progress notes, and that "the documentation is the receipt."

In many cases, it simply is not clear from the electronic medical record what action was taken, if any, in response to a patient's 7362 requesting repair or replacement of their durable medical equipment, including whether they were seen by any medical personnel. We provide three examples below. In each, there is no indication that the patient was seen within one business day – or even a week – of submitting a 7362. In fact, documentation suggesting that the problem was resolved appears weeks later, only after more paperwork (in the form of additional 7362s and 1824s) was filed.

| Requests & Response | Calendar Days (Cumulative) |
|---|---|
| ███████████████████ | |
| 7362 (Jan. 20, 2023): "Need gloves wheelchair pad, wheelchair bag." | 0 |
| 7362 (Jan. 28, 2023): "████████ is an amputee and dependent on his wheelchair. He is requesting A.D.A. gloves, since his arrival he has never been issued gloves." | 8 |
| 1824 (Feb. 2, 2023): "I've been here for 3 weeks to 4 weeks put in 4 requ[e]st for gloves, wheel chair seat pad and a wheel chair bag! I mess my hands up today because I have no gloves." Log No. 23-00264. | 13 |
| 7536 (Feb. 2, 2023): "Blue eggcrate wheelchair cushion, wheelchair gloves" issued by the clinic medical assistant. | **13 days** |
| ████████████████ | |
| 7362 (Jan. 28, 2023): "Needs foot rest for the left side of his wheelchair. ████████ is 80 years old and dependent on this appliance." | 0 |
| 7362 (Feb. 2, 2023): "I need my leg rest to my wheelchair ASAP." | 5 |

Timely Response to 7362 Requests Regarding Durable Medical Equipment
June 5, 2023
Page 6

| | |
|---|---|
| 7362 (Feb. 4, 2023): "████ is 80 years old and dependent on his wheelchair. The Left foot-rest is missing. This is the third 7362 requesting an inspection of his chair." | 7 |
| RN Encounter (Feb. 15, 2023): "pt needed left foot rest replaced. pt issue has already been taken care of and now has both foot rests. states issue has resolved." | **18 days** |
| ████████ ████ | |
| 7362 (Feb. 12, 2023): "I need to speak to the doctor. I am having problems with my walker." | 0 |
| 7362 (Mar. 23, 2023): "████ is trying to improve his walking ability. His walker is to[o] small and causing him back pain. Please Replace." | 39 |
| RN Encounter (Mar. 23, 2023): Patient "states he has back pain when using walker to due it being too short for his height; contacted SRN and MA, was advised that walker should be delivered tomorrow. Pt educated on POC and told he will be called when delivered." **It does not appear that as of June 5, 2023, at 6:30 pm, ████ has received another walker.** There is no documentation (including no 7536) that a walker was issued to him in the medical record. In fact, ████ filed another 7362, received on June 2, requesting a different walker because he had fallen. *See* 7362 (June 2, 2023) ("████ is in a walker that is too small and light weight. He has fallen over in it and requesting something more sturdy."). The request appears to have been forwarded to the medical assistant, with no other action apparent in the electronic medical record. | **> 39 days** |

    In other cases, the absence of documentation may obscure medical assistants' efforts to resolve patients' concerns. For example, Plaintiffs' counsel interviewed a medical assistant regarding a patient whose personal wheelchair was out for repair, and who had submitted two 7362s ten days apart requesting a different loaner wheelchair because he has an "overactive" bladder and could not roll his wheelchair to the restroom quickly enough. The patient's electronic medical record contains no documentation of action taken in response to the first 7362. The medical assistant reported that although not documented, she had in fact met with the patient and offered him an alternative wheelchair, which the patient had declined. Neither that offer, nor the fact or reason for the patient's declination, was recorded in the medical record.

**III.    Failure to Timely Respond to 7362s Related to Durable Medical Equipment May Harm Patients and Unnecessarily Increase the Workload of the Reasonable Accommodation Panel.**

The absence of clear policy and consistent documentation at SATF has and continues to result in harm. First, as in the example of ██████████ in the table above, patients who do not receive prompt responses to their requests for disability accommodation submitted via 7362 may turn to an 1824. This puts additional and unnecessary strain on the RAP – a phenomenon that is documented throughout the Court Expert's report. *See, e.g.,* Dkt. No. 3446 at 28 (Dec. 20, 2022) ("failure to respond to medical requests in a timely manner has created a cascade of problems," including "the burden placed on the RAP at SATF.").

In addition, several patients reported that their concerns had gone unaddressed, sometimes for weeks, putting them at serious risk of harm and, in some cases, resulting in injury. We previously raised concerns regarding the institution's apparent lack of response to a patient who reported that his walker was in poor condition:

> ████████████, submitted a sick-call slip on 1/20/23 reporting that the right cable on his walker was frayed. The sick-call slip was processed but went unanswered. He again submitted a sick-call slip on 3/3/23 reporting it was his second request for repairs on his walker. On 3/8/23, he was finally brought to the clinic to be provided a loaner walker. He declined the walker because it was too short for him. No further action was taken to obtain a walker that was suitable for his height.

Letter from Rana Anabtawi, *Plata* Plaintiffs' Counsel, to Clark Kelso, Receiver, SATF Post-Visit Report at 6 (Mar. 24, 2023). When Plaintiffs' counsel interviewed ██████ during our *Armstrong* monitoring tour in April, he reported that the cable fraying on his walker was the brake cable, and that it stuck out, cutting his shoe and ankle. He reported that he was not seen for a month after his initial request, and that at that time, he was offered tape to cover the fraying portion of the brake cable.[4]

---

[4]    We are concerned that, even after we raised this issue on-site with healthcare leadership on March 15, 2023, ██████ did not receive a replacement walker. *See* Letter from Rana Anabtawi, *Plata* Plaintiffs' Counsel, to Clark Kelso, Receiver, SATF Post-Visit Report at 6 (Mar. 24, 2023). In fact, it does not appear that ██████ received a new walker until he filed a 7362 regarding a different issue and was seen by a nurse, with whom he discussed his walker. *See* CDCR 7362 (Mar. 25, 2023) ("replace neck brace/pain meds. Could you please check on my neck brace or give me a cortozone shot"); RN Encounter (Mar. 27, 2023) ("pt

In another instance, 75-year-old ██████████████████, an amputee with an intellectual disability who uses a wheelchair to ambulate, submitted a 7362 received January 5, 2023, reporting that the brakes on his wheelchair were worn and that the wheelchair needed to be serviced. The nurse who triaged the 7362 noted "MA" on his request, but his medical record otherwise contains no documentation of what action was taken in response to his 7362, and he reported to Plaintiffs' counsel that he was not seen. On January 12, after falling twice when the wheels on his wheelchair locked unexpectedly, he submitted a second 7362 reporting that his wheelchair also needed a footrest and was squeaking.[5] The 7362 was received on January 13 – seven business days after his first 7362 – when a CDCR 7536 DME/Supply Receipt documents that he finally was issued a loaner wheelchair.

As we discussed with institution staff on-site in April, ██████████ also received a rules violation report on January 11, two days before his second 7362 was received, for taking a wheelchair from someone who recently had transferred out of his unit, whom he believed no longer needed or wanted the wheelchair because they had left it behind. He explained to staff when he pled guilty at the hearing that he did so because "I didn't like my wheelchair." ██████████ who has not received a disciplinary write-up in the last five years and who will go before the parole board next year, was found guilty and lost 60 days of credit and 90 days of dayroom privileges. *See* RVR Log No. 7261007 (Jan. 11, 2023). **This RVR should have been dismissed in the interest of justice. We request that the chief disciplinary officer re-issue or void the RVR in consideration of the additional evidence presented here, which was not elicited by either the assigned staff assistant or the senior hearing official.**

\* \* \* \* \*

Plaintiffs' counsel has not completed a medical chart review for every patient at SATF prescribed durable medical equipment, and we do not know how frequently staff fail to meet leadership's unwritten expectation that patients be seen regarding durable medical equipment

---

requesting updates on. . . walker to help with pain"). It does not appear that SATF healthcare leadership reviewed ██████████ concern in response to Plaintiffs' advocacy.

[5] ██████████'s electronic medical record contains no documentation of either fall. It is not clear if and why ██████████ did not report these falls, but it may be as a result of his intellectual disability. *See, e.g.*, *Clark v. California*, 739 F. Supp. 2d 1168, 1186 (N.D. Cal. 2010) ("Because these prisoners [with developmental disabilities] may be masking their disabilities, are simply unaware that there is a problem, or do not know how to access assistance, they are not likely to request help. If they do attempt to self-advocate, they have difficult complying with multi-step procedures for accessing resources, such as medical and dental services, grievances, the law library, and religious services.") (internal citations omitted).

concerns on the business day their 7362 is triaged. But without clear policy or documentation, we do not believe the institution yet has the tools to determine the scope of the problem and to provide appropriate monitoring and oversight. This issue is not reflected in existing dashboard measures, which draw data from the electronic health record. The current ambiguity in policy and inconsistency in practice leaves patients at SATF at risk of being lost to follow-up and suffering adverse outcomes to their freedom of movement, program access, and overall health.

We make the following requests:

1. **CCHCS headquarters should update the HCDOM to include the following provisions**:

(a)    Clear timelines regarding how soon a patient must be seen in response to a 7362 related to durable medical equipment. We recommend that patients be seen no later than one business day after the 7362 is received. That is consistent with existing expectations regarding 7362s reporting symptoms (one business day) and when patients at SATF make an unscheduled visit to a clinic requesting repair or replacement of durable medical equipment (same day).

As with 7362s reporting symptoms, healthcare staff who see patients in response to reported durable medical equipment concerns must assess the risk of injury; develop an adequate understanding of the patient concern, which may not be clear from the 7362 alone; and identify problems significant to clinical judgment that may not be apparent to the patient – all of which is best accomplished in a face-to-face encounter. Healthcare staff also must determine whether an interim accommodation may be warranted if the durable medical equipment cannot be provided, repaired, or replaced immediately, and if necessary, coordinate with the ADA office.[6]

The policy also should describe how and by when durable medical equipment concerns reported in a 7362 should be addressed when that 7362 also is determined by the triaging nurse to describe symptoms.

---

[6]    We understand that nursing staff already are expected to consider whether a patient may require an interim accommodation. *See, e.g.*, Letter from Alexander Powell, CDCR Office of Legal Affairs, to Rita Lomio, Plaintiffs' Counsel, ████████████, DPM, DPV, at SATF at 3-4 (May 9, 2022) ("During a nursing encounter, an interim accommodation may be provided for patient submissions of Form CDCR 7362, Health Care Services Form (Form 7362), or licensed nursing can contact a provider to receive an order.").

(b)     Clarification that even absent reported symptoms, some patients who notify staff of concerns with their durable medical equipment may need to be seen sooner than one business day after the 7362 is received – either immediately or urgently (within 24 hours) – when their concern relates to patient safety or the ability to independently perform activities of daily living. *See also* Dkt. No. 3446 at 33 (Dec. 20, 2022) ("Neither the HCDOM nor the [SATF] local operating procedure explains who is responsible for repair or replacement of DME in urgent situations . . . such as when a person without the ability to walk has a wheelchair that no longer rolls."); *see id.* at 62-63 (recommending that SATF revise local operating procedure accordingly).

(c)     Clear expectations regarding how patient encounters concerning durable medical equipment are documented. Medical assistants and other healthcare staff must, through progress notes or patient letters, document all encounters with patients involving an exchange of healthcare information, including related to durable medical equipment. This policy would be consistent with documentation requirements when medical assistants, for example, provide technical support to providers, or when providers assess, evaluate, educate, or give orders regarding patient care. *See* HCDOM § 1.4.20, Medical Assistant ("Technical supportive services performed by the MA shall be documented in the health record."); *see also* HCDOM § 1.4.22, Medical Provider Documentation Expectations ("To provide safe and efficient treatment for patients, all health care staff shall have timely access to health information" through documentation by providers).

**We request copies of the draft HCDOM provisions regarding these issues within 30 days so we can review and comment on them before they are finalized.**

**We also request an estimate of how many additional healthcare staff positions, including nursing staff and medical assistants, SATF and CCHCS will need to allocate to ensure compliance with the timelines specified in revised policy.**

**2.      We request the following from SATF:**

(a)     As an interim remedy pending the revisions described above, SATF leadership should issue clear written directives to facility medical clinics on the current expectation that patients be seen in response to 7362s reporting durable medical equipment concerns within one business day of receipt. If healthcare staff determine that a patient's durable medical equipment cannot be repaired or replaced immediately, they must evaluate needed interim accommodations, and, if necessary, communicate with the ADA office to determine that the interim accommodations are provided. SATF leadership should require that these encounters with patients

Timely Response to 7362 Requests Regarding Durable Medical Equipment
June 5, 2023
Page 11

regarding their durable medical equipment be documented in progress notes or patient letters.

SATF leadership also should issue clear written directives to healthcare staff regarding expectations when patients request durable medical equipment repair or replacement directly at the clinic, including how those encounters are documented, and how patients' concerns should be addressed if they cannot be seen immediately. Leadership should not wait for revisions to local operating procedure or the HCDOM to articulate and train on these expectations.

**Please provide copies of all written directives issued to SATF healthcare staff and the date by which training was completed.**

SATF leadership also should audit compliance with these local directives for at least six months to ensure efficacy. **Please provide copies of any reports summarizing the outcomes of these audits.**

(b)    **Please re-issue or void RVR Log No. 7261007, issued to** ███████████
███.

(c)    **Please provide** ██████████████ **with a walker in the appropriate size, and explain why he was not issued an appropriate walker in response to his previous requests.**

Thank you for your attention to these matters. Please contact us if you require clarification regarding any of the information above.

Sincerely yours,

Skye Lovett                              Rita Lomio
Investigator                            Staff Attorney

cc:    Ed Swanson, Audrey Barron (Court Expert)
Counsel for Defendants in *Armstrong*
Counsel for Defendants in *Plata*

Exhibit 149

 

# MEMORANDUM

Date : August 9, 2023

To : Rita Lomio, Prison Law Office

Subject : **PRISON LAW OFFICE NON-PARAGRAPH 7 CONCERN RELATING TO TIMELY RESPONSE TO 7362 REQUESTS FOR DURABLE MEDICAL EQUIPMENT REPAIR AND REPLACEMENT**

California Correctional Health Care Services (CCHCS) and California Department of Corrections and Rehabilitation (CDCR) are providing the italicized information below in response to your inquiry dated June 5, 2023.

1. CCHCS headquarters should update the HCDOM to include [the provisions noted on pages 9 – 10 of the *Armstrong/Plata* letter regarding Need for SATF LOP and HCDOM Revisions to Ensure Timely Response to 7362 Requests for Durable Medical Equipment Repair and Replacement dated June 5, 2023]. We request copies of the draft HCDOM provisions regarding these issues within 30 days so we can review and comment on them before they are finalized.

   *CCHCS is considering the proposed revisions to the Health Care Department Operations Manual (HCDOM). Upon review and approval, a draft copy of any such revisions will be provided to the Prison Law Office for review as part of the established stakeholder review process.*

2. We also request an estimate of how many additional healthcare staff positions, including nursing staff and medical assistants, SATF and CCHCS, will need to allocate to ensure compliance with the timelines specified in revised policy.

   *The number of additional health care staff positions will vary based on the specific durable medical equipment (DME) needs of each institution. The Fiscal Management Section, in collaboration with Nursing Services and the Regional Health Care Executives, will develop a methodology to identify the necessary nursing staff for implementing the proposed policy changes. Once the methodology is established and position authority is authorized, Human Resources will assist each institution with recruiting and hiring for the required positions.*

3. Please provide copies of all written directives issued to SATF healthcare staff and the date by which training was completed [regarding 7362 requests concerning DME issues, documentation in EHRS, and repairs as noted on page 10 – 11 of the letter dated June 5, 2023].

   *On May 24, 2023, a memorandum was issued regarding updates to Local Operating Procedure (LOP) 467, Durable Medical Equipment, and was distributed to all SATF staff via the Learning Management System on June 5, 2023. Refer to Attachment A. As of July 6, 2023, 81% of staff have reviewed the memorandum. Weekly reminders are sent to staff who have yet to review.*

   *On June 19, 2023, a memorandum was distributed to all SATF staff regarding updates to LOP 403, Disability Placement Program (DPP), to ensure all staff are informed about current procedures and guidelines pertaining to the DPP and DME requirements. Refer to Attachment B.*

# MEMORANDUM

Re: Timely Response to 7362 Requests for Durable Medical Equipment Repair and Replacement

*On June 26, 2023, a memorandum was distributed to SATF nursing staff advising to promptly document and triage any patient with a DME concern noted on a CDCR 7362, Health Care Services Request Form. Refer to Attachment C.*

*DME encounters will be documented in progress notes, patient letters, and DME receipts. SATF will continue to monitor compliance and create accountability expectations to ensure staff adhere to the established process. Upon any updates to HCDOM policies, SATF will provide necessary training to applicable staff.*

4.  SATF leadership also should audit compliance with these local directives for at least six months to ensure efficacy.  Please provide copies of any reports summarizing the outcomes of these audits.

*In July 2023, SATF began conducting CDCR 7362 audits focused on the DME process. SATF will conduct these audits for the next six months to ensure process efficiency. Subsequently, the Nursing Sub-Committee and leaders will report and review the data to ensure accuracy and facilitate appropriate follow-up actions. Summaries of these audits may be available in the beginning of February 2024.*

5.  Please re-issue or void RVR Log No. 7261007, issued to ███████████

*RVR Log No. 7261007 will not be re-issued or voided.*

6.  Please provide ███████████████ with a walker in the appropriate size, and explain why he was not issued an appropriate walker in response to his previous requests [noted in CDCR 7362s submitted on February 12 and March 23, 2023].

*On June 21, 2023, ████████was provided a walker that meets his needs.  The matter was not addressed when ████████ submitted CDCR 7362s on February 12 and March 23, 2023. With the dissemination of information noted in the response to question 3 and establishment of accountability expectations and audits, SATF expects to mitigate similar occurrences in the future.*

Thank you.

cc:     Clark Kelso, Receiver
        Directors, CCHCS
        CCHCS Office of Legal Affairs
        Office of Legal Affairs, CDCR
        Office of the Attorney General
        Hanson Bridgett, LLP
        DeAnna Gouldy, Deputy Director, Policy and Risk Management Services, CCHCS
        Barbara Barney-Knox, CNE, Nursing Services, CCHCS
        Robin Hart, Associate Director, Risk Management Branch, CCHCS
        Regional Executives, Regions I-IV, CCHCS
        Chief Executive Officer, SATF

Exhibit 150



**PRISON LAW OFFICE**

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Deputy Director:*
Sara Norman

*Legal Director:*
Margot Mendelson

*Staff Attorneys:*
Rana Anabtawi
Patrick Booth
Tess Borden
Claudia Ceseña
Steven Fama
Alison Hardy
Mackenzie Halter
Sophie Hart
Marissa Hatton
Jacob Hutt
A.D. Lewis
Rita Lomio

MEMORANDUM

| | |
|---|---|
| To: | California Correctional Health Care Services and Receiver's Office of Legal Affairs |
| From: | Sophie Hart / Marie Berry |
| Date: | October 9, 2023 |
| Re: | *Plata* – Individual Patient Medical Concern – Request for Review |

⬛⬛⬛⬛⬛⬛⬛⬛ SATF

    I write with additional supplemental questions regarding ⬛⬛⬛⬛⬛⬛ at SATF. We sent a Paragraph 7 Memorandum regarding ⬛⬛⬛⬛ on 9/29. As we summarized in that memorandum, ⬛⬛⬛⬛ had right shoulder rotator cuff repair surgery on 8/29. Before surgery, ⬛⬛⬛⬛ used a seated walker. After his surgery, he was unable to use his walker because his arm was placed in a sling, so he was given a wheelchair as a temporary accommodation. Specifically, a PCP ordered ⬛⬛⬛⬛ a temporary wheelchair from 8/30 to 9/30.

    ⬛⬛⬛⬛ filed a 7362 requesting an extension of his wheelchair on 9/27 (he wrote: "My Wheelchair chrono needs to be extended because I still can't use my arm to ambulate with my walker."). He was seen by a RN regarding this on 10/3. The RN documented that he "uses wheelchair for going to school do [sic] to not being able to carry books" and that he "doesnt feel comfortable with walker and using right arm yet." The RN documented that she would "look into options for books weather [sic] a bag or helper and let him know." Following the encounter on 10/3, ⬛⬛⬛⬛ filed another 7362 reporting that the RN had informed him the wheelchair would be taken, and again asking to extend use of the wheelchair until he had recovered from surgery and completed physical therapy. He also reported fearing that use of a walker would "lead to a fall" given his condition. The 7362 appears to have been triaged as asymptomatic on 10/4; a corresponding order for

**Board of Directors**
Christiane Hipps, President and Treasurer • Seth Morris, Vice President
Jason Bell • Vanita Gaonkar • Nick Gregoratos • Michael Marcum • Jean Lu
Claire McDonnel • Ruth Morgan • Adrienne Yandell

an asymptomatic 7362 RN visit for "STILL NEED WHEELCHAIR" was entered that day with a 10/18 compliance date.

That appointment has not yet occurred. Nevertheless, ████████ reported to our office that he was required to return his wheelchair today, although his arm is still in a sling and he is still unable to use his walker. During his recent 10/4 post-op consult with his orthopedic surgeon, the surgeon documented that ████████ is still "unable to weight-bear on the right upper extremity." Documentation in EHRS (a DME Receipt entered by an MA) confirms he returned his wheelchair today, on 10/9, but I did not see documentation that medical staff had assessed whether ████████ still required a wheelchair or was able to use his walker. The DME Receipt simply notes that the wheelchair order had expired.

Please respond to the following:

1.  Should ████████ be re-ordered a wheelchair as a temporary accommodation? If yes, when was or will this be done? If no, please explain.

2.  Did medical staff assess whether ████████ still required a wheelchair or was able to use his walker, before requiring him to return his temporary wheelchair on 10/9? If yes, where is that documented in EHRS? If no, why not?

3.  Why was the 10/3 7362, in which ████████ reports fearing that use of a walker would "lead to a fall" given his condition, not treated as symptomatic? See Court Expert's Second Report on Treatment of People with Disabilities at SATF, Armstrong v. Newsom, Dkt. No. 3500 at 8 n.6 ("SATF healthcare leadership also told us they were encouraging nursing staff to treat 7362s regarding DME as 'symptomatic' so that patients with DME concerns are treated promptly, but we have not yet seen this instruction to staff clearly documented in LOP, memo, or training materials."). Has the direction referenced by the Armstrong Court Expert in his report been documented in LOP, memorandum, training materials, or other written materials? If yes, please provide a copy.

Exhibit 151

 **CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES** 

# MEMORANDUM

Date        :    November 8, 2023

To          :    Sophie Hart, Prison Law Office

Subject     :    **PRISON LAW OFFICE REQUEST FOR REVIEW OF PATIENT** ██████

Pursuant to the Stipulation for Injunctive Relief agreed to *in re Plata v. Newsom*, the Chief Medical Executive at Substance Abuse Treatment Facility (SATF) provided the following information in response to the questions asked by Sophie Hart of the Prison Law Office.

1.  Should ██████ be re-ordered a wheelchair as a temporary accommodation? If yes, when was or will this be done? If no, please explain.

    *On October 11, 2023, an order for a temporary wheelchair was placed, and ██████ was reissued a temporary wheelchair. Prior to the order expiring on April 11, 2024, ██████ will be assessed to determine continued medical necessity.*

2.  Did medical staff assess whether ██████ still required a wheelchair or was able to use his walker, before requiring him to return his temporary wheelchair on 10/9? If yes, where is that documented in EHRS? If no, why not?

    *According to the October 3, 2023, Nursing Face-to-Face text, ██████ was seen for an assessment and extension of a temporary wheelchair. The registered nurse (RN) notes indicate ██████ presented with a cane, not a wheelchair, and had full range of motion. During the encounter, ██████ disclosed he only used the wheelchair when he goes to school, so he does not have to carry his books. On October 17, 2023, the RN was interviewed and reported that she spoke with custody staff on October 3, 2023, and it was determined, to which the primary care provider agreed, that assigning an ADA worker to carry ██████s books to school would be a suitable accommodation. There was also discussion that ██████ would keep his wheelchair until after the October 4, 2023, orthopedic consultation. The RN has been made aware of the importance of documenting all efforts made for patients, as none of the follow up efforts disclosed in the interview were documented in the Electronic Health Records System. According to the October 4, 2023, Orthopedic Consultation note, ██████ was unable to bear weight on the right upper shoulder, and on the same day, a second CDCR 7362, Health Care Services Request Form, was submitted by ██████ to request an extension for his wheelchair.*

3.  Why was the 10/3 7362, in which ██████ reports fearing that use of a walker would "lead to a fall" given his condition, not treated as symptomatic? See Court Expert's Second Report on Treatment of People with Disabilities at SATF, Armstrong v. Newsom, Dkt. No. 3500 at 8 n.6 ("SATF healthcare leadership also told us they were encouraging nursing staff to treat 7362s regarding DME as 'symptomatic' so that patients with DME concerns are treated promptly, but we have not yet seen this instruction to staff clearly documented in LOP, memo, or training

# MEMORANDUM

materials."). Has the direction referenced by the Armstrong Court Expert in his report been documented in LOP, memorandum, training materials, or other written materials? If yes, please provide a copy.

*This 7362 was triaged appropriately as asymptomatic. The triaging RN notes on the 7362 that the RN from the previous day was looking at other options and notes ▇▇▇▇ still had his wheelchair.*

*After further review of Health Care Department Operations Manual (HCDOM) 3.1.5., Scheduling and Access to Care, SATF leadership determined that triaging all Durable Medical Equipment (DME)-related 7362's as symptomatic would not align with current HCDOM policy and could further impact the ability of SATF's medical department to timely deliver services to patients. On June 26, 2023, the CNE issued a memorandum which directed nursing staff to triage all DME-related 7362s per HCDOM 3.1.5, and ducat appropriately (refer to Attachment A). While the policy does not explicitly exclude DME from being triaged as symptomatic, the memorandum reiterated that RNs shall use clinical judgement during the 7362 review process. The 7362 dated October 3, 2023, was appropriately triaged as asymptomatic as the triaging RN noted the patient was still in possession of the wheelchair.*

Thank you for your assistance in this matter.

cc:    CCHCS Office of Legal Affairs
       Office of Legal Affairs, CDCR
       Office of the Attorney General
       DeAnna Gouldy, Deputy Director, Policy and Risk Management Services, CCHCS
       Robin Hart, Associate Director, Risk Management Branch, CCHCS
       Regional Executives, Region III, CCHCS
       Chief Medical Executive, SATF

# ATTACHMENT A

 **CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES** 

# MEMORANDUM

| Date | : | 6/26/2023 | 6/26/2023 |
|---|---|---|---|

| From | : | J. Ogbologu | *Juliet Ogbologu* |
|---|---|---|---|

Chief Nurse Executive
*Substance Abuse Treatment Facility/State Prison*

| To | : | Nursing Staff |
|---|---|---|

| Subject | : | DME Related 7362s |
|---|---|---|

The purpose of this memo is to serve as a notification of the expectations regarding all DME related 7362s.
All DME related 7362s should be triaged per the Access to Care policy and patients ducated appropriately for evaluation and to address of identified DME issues.
The reviewing RN should apply clinical judgement as for all 7362 review process.


Respectfully,
J. Ogbologu, Chief Nurse Executive
*Substance Abuse Treatment Facility/State Prison*

Exhibit 152

**ROB BONTA**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

455 GOLDEN GATE AVENUE, SUITE 11000
SAN FRANCISCO, CA 94102-7004

Public: (415) 510-4400
Telephone: (415) 510-4438
Facsimile: (415) 703-5843
E-Mail: Sharon.Garske@doj.ca.gov

February 5, 2024

*Via Email only:*

Rita Lomio
Skye Lovett
Prison Law Office
1917 Fifth Street
Berkeley, CA 94710
rlomio@prisonlaw.com
skye@prisonlaw.com

Gay Grunfeld
Rosen Bien Galvan & Grunfeld LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105
GGrunfeld@rbgg.com

Edward Swanson
Audrey Barron
Swanson & McNamara LLP
300 Montgomery Street, Suite 1100
San Francisco, CA 94104
ed@smllp.law
audrey@smllp.law

RE:    *Armstrong, et al. v. Newsom, et al.*
       United States District Court, Northern District of Ca., Case No. 4:94-cv-02307-CW
       SATF Stipulation Item #15

Dear Counsel and Court Expert:

    In compliance with the Court's order (ECF No. 3538), we write to provide an update to SATF Stipulation item "(15) Defendants shall request that CCHCS inform the Court Expert and Plaintiffs within 60 days of the Court's order of whether an electronic system for submitting 7362s has been implemented or when it expects to implement such a system, as well as whether CCHCS will implement any interim measures to communicate with patients regarding their requests for medical care."

    Defendant CDCR requested CCHCS provide an update as required by the stipulation. CCHCS advised that they are working on implementing an electronic system for submitting 7362 forms instead of an intermediary system. Specifically, CCHCS is working with CERNER to develop the CERNER Healthe Life Application Portal, which when completed the goal would be to allow patients to submit items to their medical providers, including 7362 forms, electronically via a kiosk. CCHCS has advanced to the testing stage and is developing the

February 5, 2024
Page 2

infrastructure to incorporate patient information into the platform, which will allow them to create a proof of concept.  In addition, CCHCS is exploring options to allow for 7362 forms to be submitted via the tablets used by the incarcerated population.  CCHCS is encouraged by the progress made to date and expects positive results from their efforts.  Because the electronic process is expected to be completed before an interim measure could be developed, implemented, and approved by Labor, an interim measure is not being pursued at this time.  CCHCS has advised that it will provide a status update to the *Armstrong* parties and Court Expert in 60 days, or sooner if one is available, as to the status of the Healthe Life Application Portal.

Sincerely,


*/s/Sharon A. Garske*
SHARON A. GARSKE
Supervising Deputy Attorney General

For    ROB BONTA
Attorney General

SAG:

CF1997CS0005 / 44051265.docx

Exhibit 153



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Executive Director:*
Margot Mendelson

*Attorneys:*
Rana Anabtawi
Patrick Booth
Tess Borden
Claudia Ceseña
Steven Fama
Mackenzie Halter
Alison Hardy
Sophie Hart
Marissa Hatton
Jacob Hutt
A.D. Lewis
Rita Lomio
Donald Specter

VIA EMAIL ONLY

April 10, 2024

Brianne Burkart
CCHCS Office of Legal Affairs

RE:     *Armstrong v. Newsom*
        Accessibility of New CCHCS Systems for Submitting 7362s Electronically

Dear Brianne:

I write in response to Ms. Garske's letter dated February 5, 2024, regarding CCHCS's plan to implement a system for patients to submit 7362s and other medical "items" electronically. Ms. Garske's letter outlined two different systems being considered:

(1)     "CERNER Healthe Life Application Portal, which when completed the goal would be to allow patients to submit items to their medical providers, including 7362 forms, electronically via a kiosk. CCHCS has advanced to the testing stage and is developing the infrastructure to incorporate patient information into the platform, which will allow them to create a proof of concept."

(2)     "CCHCS is exploring options to allow for 7362 forms to be submitted via the tablets used by the incarcerated population."

We are encouraged that CCHCS is exploring these options, which we hope will improve timely access to healthcare, including disability accommodations.

On March 20, 2024, Ms. Garske informed us that "[o]nce [CCHCS staff] have the technology portion of the application figured out, they will work to make the product accessible. As for the tablet based proposal, CCHCS requested to include the final version of the HealtheLife application on the tablet. At this time they do not know what the tablet will include but, will be evaluating accessibility features as part of the implementation process."

I write to share recommendations based on recent experiences with a CDCR-led technology program—the ViaPath tablet program. CDCR's tablet program failed to meaningfully consider accessibility at the outset of development, resulting in substantial delay and litigation. CDCR's tablet program remains in violation of the Americans with Disabilities Act. Hopefully, CCHCS can learn from CDCR's failures.

CDCR has distributed ViaPath tablets that are not accessible to blind and severely low-vision users, and people who otherwise have difficulty communicating in writing, including people with learning disabilities, primarily because the text-to-speech capability of the tablets (i.e., TalkBack) does not function properly, because the tablets lack appropriate sensitivity to the touch, requiring the user to tap

**Board of Directors**
Christiane Hipps, President and Treasurer • Seth Morris, Vice President
Jason Bell • Vanita Gaonkar • Nick Gregoratos • Jean Lu
Claire McDonnell • Ruth Morgan • Adrienne Yandell

Brianne Burkart
Re: Accessibility of New CCHCS Systems for Submitting 7362s Electronically
April 10, 2024
Page 2

repeatedly in attempts to trigger certain functions, and because the tablets constantly log the user out and force them to reset their accessibility features when they log back in, a process that itself is difficult for blind and severely low-vision users. Patients with disabilities report similar problems with the ViaPath kiosks.

To avoid these same problems, **we recommend CCHCS retain an accessibility technology specialist to provide support and guidance throughout the development, testing, and implementation stages.**

In addition, as you test the CERNER Healthe Life Application Portal and explore a tablet-based submission system, you should consider the following questions and recommendations to help evaluate accessibility:

(1)     Will the system allow blind and low-vision patients, and others with communication disabilities, to submit medical items, including 7362 forms, independently and privately?

(2)     What steps is CCHCS taking to ensure that the same problems that blind and low-vision users currently encounter when attempting to read and write using their ViaPath tablets do not occur for these users when using CCHCS's forthcoming electronic systems for submitting medical items, including 7362 forms?

(3)     Patients with vision disabilities should be included in testing of any proposed new electronic systems in their final user state (including any protective overlays and protective cases that will be used). The testing should also be conducted by a qualified accessibility technology specialist.

(4)     Patients with vision disabilities should be trained on how to use the new electronic systems for submitting medical items, including 7362 forms, including how to access any accessibility features. That training should be robust and accessible. Please see the attached letter regarding CDCR's failure to properly train people with disabilities on its tablet program.

(5)     Patients should be provided an accessible manner to submit tickets to identify accessibility-related problems with any new electronic system.

I hope this is helpful. We would appreciate the opportunity to discuss these issues when the parties and the Court Expert meet and confer about these new systems. If I can be of assistance in the meantime, please let me know.

Sincerely,

Jacob Hutt
Staff Attorney
Prison Law Office

Brianne Burkart
Re: Accessibility of New CCHCS Systems for Submitting 7362s Electronically
April 10, 2024
Page 3

cc:    Ed Swanson, Audrey Barron, Court Expert
Co-counsel
Patricia Ferguson, Tamiya Davis, Jennifer Neill, Ramon Ruiz, Ava Lau-Silveira, Katie Riley, Ursula Stuter (CDCR Office of Legal Affairs)
Trace Maiorino, Sean Lodholz, Olena Likhachova, Anne Kammer, Gurpreet Sandhu (OAG)

Exhibit 154



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Executive Director:*
Margot Mendelson

*Attorneys:*
Rana Anabtawi
Patrick Booth
Tess Borden
Steven Fama
Daniel Greenfield
Mackenzie Halter
Alison Hardy
Sophie Hart
Lily Harvey
Jacob Hutt
A.D. Lewis
Rita Lomio
Heather MacKay
Donald Specter
Jerrod Thompson

MEMORANDUM

To:        California Correctional Health Care Services and
           Receiver's Office of Legal Affairs
From:      Rana Anabtawi / Joshua Marin
Date:      August 20, 2024
Re:        *Plata* – Individual Patient Medical Concern – Request for Review

---

███████████████ SATF

████████████ may be lost to follow-up. ████████████ has a history of third degree burn injuries to his upper extremities, resulting in limited use of his hands. He is unable to hold objects, making it difficult for him to perform tasks such as eating and drinking (he cannot hold a spoon or regular cup) or wiping himself after using the restroom. As a result of the latter concern, he was ordered wet wipes by his provider on May 13th, shortly after his arrival to SATF. According to the PCP order, ████████████ was to get refills as requested. It is unclear why the order was set to expire on July 31st, but since that time, ██ ████████ has submitted two different sick-call slips asking for refills on his wet wipes and both have gone without a response. The first sick-call slip was submitted on 8/4/24 and triaged on 8/7/24, noting "MA/LVN". The second slip was submitted 8/15/24 and triaged 8/19/24, stating "I haven't gotten my wetwipes in 2 weeks!!! I don't have hands so those are what I use to wipe my butt with, this is very unacceptable because I've to use my clothes to wipe, please fix this error and get me my wipes ASAP!!!" The triaging nurse noted "MA/CNA" on the form. However, for both of these sick-call slips, there appears to be no pending order or action taken.

1)   Please explain the trajectory of what happened to the first sick-call slip dated 8/4/24. Why is there no corresponding order to see the MA/LVN and why was ███ ████████ not seen as of 8/20/24? What is the process currently in place to address sick-call slips requesting wet wipes and was it followed in the case of ████████████?

**Board of Directors**
Jason Bell • Chesa Boudin • Vanita Gaonkar • Nick Gregoratos • Christianne Hipps
Jean Lu • Claire McDonnell • Seth Morris • Keramet Reiter • Vishal Shah • Adrienne Yandell

2)  Will ███████████'s DME order be extended and when will he receive the requested wet wipes?

# Exhibit 155

STATE OF CALIFORNIA
**HEALTH CARE SERVICES REQUEST FORM**
CDCR 7362 (Rev. 03/19)

DEPARTMENT OF CORRECTIONS AND REHABILITATION
Page 1 of 2

| PART I: TO BE COMPLETED BY THE PATIENT |
|---|
| If you believe this is an urgent/emergent health care need, contact the correctional officer on duty. |

REQUEST FOR:    MEDICAL ☑    MENTAL HEALTH ☐    DENTAL ☐    MEDICATION REFILL ☐

NAME ███████    CDCR NUMBER ███████    HOUSING C2 ███████

PATIENT SIGNATURE ███████    DATE 8-4-24

REASON YOU ARE REQUESTING HEALTH CARE SERVICES. (Describe your health problem and how long you have had the problem)

Didn't get my Friday(8-2-24) wetwipes I need to get them ASAP

*NOTE: IF THE PATIENT IS UNABLE TO COMPLETE THE FORM, A HEALTH CARE STAFF MEMBER SHALL COMPLETE THE FORM ON BEHALF OF THE PATIENT AND DATE AND SIGN THE FORM*

| PART II: TO BE COMPLETED BY THE TRIAGE REGISTERED NURSE |
|---|

MH/LVN

Date / Time Received: 8/7/24    Received by: ███████
Date / Time Reviewed by RN: ___    Reviewed by: ___

S:    Pain Scale:    1    2    3    4    5    6    7    8    9    10

O:    T:    P:    R:    BP:    WEIGHT:

A:

P:
☐ See Nursing Encounter Form

E:

| APPOINTMENT SCHEDULED AS: | EMERGENCY (IMMEDIATELY) ☐ | URGENT (WITHIN 24 HOURS) ☐ | ROUTINE (WITHIN 14 CALENDAR DAYS) ☐ |
|---|---|---|---|

REFERRED TO PCP:    DATE OF APPOINTMENT:

COMPLETED BY    NAME OF INSTITUTION

PRINT / STAMP NAME    SIGNATURE / TITLE    DATE/TIME COMPLETED

*Unauthorized collection, creation, use, disclosure, modification or destruction of personally identifiable information and/or protected health information may subject individuals to civil liability under applicable federal and state law.*

Distribution: Original - Health Record ; Copy - Patient

# Exhibit 156

STATE OF CALIFORNIA
**HEALTH CARE SERVICES REQUEST FORM**
CDCR 7362 (Rev. 03/19)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 1 of 2

| PART I:  TO BE COMPLETED BY THE PATIENT |
|---|
| **If you believe this is an urgent/emergent health care need, contact the correctional officer on duty.** |

REQUEST FOR:    MEDICAL ☑    MENTAL HEALTH ☐    DENTAL ☐    MEDICATION REFILL ☐

| NAME ███████████████ | CDCR NUMBER ████████ | HOUSING ████████ |
|---|---|---|
| PATIENT SIGNATURE ████████████ | | DATE 6-15-24 |

REASON YOU ARE REQUESTING HEALTH CARE SERVICES. (Describe your health problem and how long you have had the problem)

I haven't gotten my wetwipes in 2 weeks!!! I don't have hands so those are what I use to wipe my butt with, this is very unacceptable because I've to use my clothes to wipe, please fix this error and get me my wipes ASAP!!!

*NOTE: IF THE PATIENT IS UNABLE TO COMPLETE THE FORM, A HEALTH CARE STAFF MEMBER SHALL COMPLETE THE FORM ON BEHALF OF THE PATIENT AND DATE AND SIGN THE FORM*

| PART II:  TO BE COMPLETED BY THE TRIAGE REGISTERED NURSE |
|---|

| Date / Time Received: | Received by: ████████████ |
|---|---|
| Date / Time Reviewed by RN: AUG 19 2024 | Reviewed by: |

S:                    @ 0730        Pain Scale:  1  2  3  4  5  6  7  8  9  10

O:        T:        P:        R:        BP:        WEIGHT:

Need wipes

A:

P:

☐ **See Nursing Encounter Form**

E:

| APPOINTMENT SCHEDULED AS: | EMERGENCY (IMMEDIATELY) ☐ | URGENT (WITHIN 24 HOURS) ☐ | ROUTINE (WITHIN 14 CALENDAR DAYS) ☐ |
|---|---|---|---|
| REFERRED TO PCP: | | DATE OF APPOINTMENT: | |
| COMPLETED BY | | NAME OF INSTITUTION | |
| PRINT / STAMP  NAME | SIGNATURE / TITLE | | DATE/TIME  COMPLETED |

*Unauthorized collection, creation, use, disclosure, modification or destruction of personally identifiable information and/or protected health information may subject individuals to civil liability under applicable federal and state law.*

Distribution:  Original - Health Record ; Copy - Patient

Exhibit 157

| | |
|---|---|
| **From:** | Sharon Garske <Sharon.Garske@doj.ca.gov> |
| **Sent:** | Friday, August 23, 2024 3:24 PM |
| **To:** | ed@smllp.law; audrey@smllp.law; Penny Godbold; Caroline Jackson; Jacob Hutt; Rita Lomio; Skye Lovett; Sophie Hart; Dewi Zarni; Armstrong Team; Armstrong Team - RBG only |
| **Cc:** | Anne Kammer; Olena Likhachova; Trace Maiorino; Ferguson, Patricia@CDCR; ursula.stuter@cdcr.ca.gov; tamiya.davis@cdcr.ca.gov; chor.thao@cdcr.ca.gov; ramon.ruiz@cdcr.ca.gov; Lau-Silveira, Ava; dawn.lorey@cdcr.ca.gov; White, Lourdes@CDCR; darnell.mebane@cdcr.ca.gov; Davis, Kristina@CDCR; Roberts, Megan@CDCR (DAI); Wilkerson, Margo@CDCR; Hernandez, Jillian@CDCR; Burkart, Brianne@CDCR; Hartmann, Sarah@CDCR; Bick, Joseph (CMF)@CDCR; Williams, Joseph@CDCR |
| **Subject:** | Armstrong: SATF 15 (CCHCS 7362 Process) update |

All,

I write to provide an update from CCHCS on the HealtheLife / automated 7362 process. The registration work with CDCR, CCHCS, and Oracle Health is working. CCHCS IT and Program staff are working to complete their respective workflows for the 7362 automation. Barring any unforeseen obstacles, the estimated time for completion for the 7362 workflow is the end of November 2024. CCHCS will provide an update by the end of November as to when a proof of concept with the workflow for the 7362 forms completed.

Thank you.
Sharon


Sharon A. Garske
Supervising Deputy Attorney General
Department of Justice
Office of the Attorney General
455 Golden Gate Avenue
San Francisco, CA 94102
Office: 415-510-4438
Cell: 916-208-0222


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

# Exhibit 158

# SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") pertains to the resolution of the case titled, *Jarboe, et al v. Maryland Department of Public Safety and Correctional Services (DPSCS), et al*, U.S. District Court of Maryland Case No. 1:12-cv-00572-ELH, and is entered into between Christopher Jarboe, Carroll Connelly, Vander Davis, Gary Denmark, and Garfield Redd (collectively, "Plaintiffs"), and Maryland Department of Public Safety and Correctional Services ("DPSCS"), Maryland Division of Correction ("DOC"), Maryland Department of Labor, Licensing and Regulation, Division of Workforce Development and Adult Learning (Correctional Education) ("DLLR"), Maryland Correctional Enterprises, DPSCS Secretary Gary D. Maynard, Stephen T. Moyer (as substitute for Gary Maynard pursuant to Fed. R. Civ. Pro. 25), J. Michael Stouffer, Wayne Webb (as substitute for J. Michael Stouffer pursuant to Fed. R. Civ. Pro. 25), Paulette Francois, Julie Squire (as substitute for Paulette Francois pursuant to Fed. R. Civ. Pro. 25), James Rzepkowski (as substitute for Julie Squire pursuant to Fed. R. Civ. Pro. 25), and Stephen M. Shiloh, Maryland Correctional Institution- Jessup ("MCI-J"), Western Correctional Institution ("WCI"), Dayena Corcoran, Carroll Parrish (as substitute for Dayena Corcoran pursuant to Fed. R. Civ. Pro. 25), J. Phillip Morgan, and Richard J. Graham (as substitute for J. Phillip Morgan pursuant to Fed. R. Civ. Pro. 25) (collectively, "Defendants"). The foregoing individuals and entities are each referred to as a "Party" and collectively as the "Parties."

The Parties hereby stipulate and agree as follows:

## *RECITALS*

**WHEREAS**, Plaintiffs are or were previously inmates in the custody of DPSCS who claim a disability by virtue of their being deaf and have filed a lawsuit against the Defendants in the United States District Court for the District of Maryland, styled *Jarboe, et al. v. Maryland Dept. Pub. Safety and Corr. Svcs., et al.*, Civil No. ELH-12-00572 (the "Litigation"), claiming violations of the Americans with Disabilities Act of 1990, Pub. L. 101-336, codified at 42 U.S.C. §§ 12101-12213, and regulations promulgated thereunder (the "ADA"), the Rehabilitation Act of 1973, Pub. L. 930112, codified at 29 U.S.C. §§ 701-797b, and regulations promulgated thereunder (the "Rehabilitation Act"), and the U.S. Constitution, based upon Defendants' alleged failures to provide technology, equipment, and services to accommodate Plaintiffs' disabilities;

**WHEREAS**, Defendants have denied and continue to deny liability for such alleged violations;

**WHEREAS**, the Parties desire, through this Agreement, to resolve and settle the Litigation without the costs and burdens associated with further litigation with respect to the claims and defenses raised in the Litigation.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and which consideration includes, but is not limited to, the mutual promises and covenants contained herein, the Parties hereby agree to be bound as follows:

***AGREEMENT***

I.    DEFINITIONS.

    A.    "Auxiliary Aids and Services" include, but are not limited to, "Interpreters," "Qualified Interpreters," or other effective methods of making aurally delivered materials available to individuals with hearing impairments," 42 U.S.C. § 12103, such as hearing aids, computer-aided transcription services, assistive listening systems, closed caption decoders, open and closed captioning, TDDs, TTYs, videotext displays, written materials, 28 C.F.R. § 35.104, as well as "Videophones," access to telephone relay services, and visual alert or alarm systems.  For purposes of this Agreement, Auxiliary Aids and Services do not include vibrating clocks or in-line amplifiers meaning DPSCS will not automatically provide or pay for such devices.  DPSCS will give "primary consideration" to the requests of the Deaf inmate in determining what type of auxiliary aid and service is necessary.  28 C.F.R. § 35.160(b)(2).

    B.    "Deaf" persons means individuals who are unable to hear well enough to rely on their hearing as a means of processing information and who rely on Auxiliary Aids and Services to effectively communicate and who qualify as individuals with disabilities under the Americans with Disabilities Act as amended by the ADA Amendments Act of 2008.  *See* 42 U.S.C. § 12102(4); P.L. 110-325.

    C.    "Direct Threat" means a significant risk to the health or safety of the Deaf Inmate or others that cannot be eliminated by reasonable accommodation.  A finding of Direct Threat will be based on and supported by objective evidence.

    D.    "DLLR" means the Maryland Department of Labor, Licensing and Regulation, and includes its Division of Workforce Development and Adult Learning and Department of Correctional Education.

    E.    "DLLR employees," "DLLR staff," and "DLLR personnel" include all employees, agents, and other staff of DLLR whose job responsibilities place them on a regular basis in contact with Deaf inmates and the immediate supervisors of those employees, agents, or other staff.

    F.    "DPSCS" means Maryland Department of Public Safety and Correctional Services.

    G.    A "DPSCS Activity" is any activity made available to inmates on a voluntary basis by DPSCS in which an inmate voluntarily participates, and is not assigned by case management in accordance with state law or COMAR 12.02.24.02.A.(10)-(11).

    H.    "DPSCS Correctional Facilities" means Baltimore City Correctional Center; Brockbridge Correctional Facility; Chesapeake Detention Facility; Central Maryland Correctional Facility; Correctional Mental Health Center-Jessup; Eastern Correctional Institution; Eastern Correctional Institution Annex; Jessup

2

Correctional Institution; Maryland Correctional Institution-Hagerstown; Maryland Correctional Institution-Jessup; Maryland Correctional Institution for Women; Maryland Correctional Training Center, Maryland Reception, Diagnostic and Classification Center; Metropolitan Transition Center; North Branch Correctional Institution; Patuxent Institution; Roxbury Correctional Institution; and Western Correctional Institution.

I.    "DPSCS employees," "DPSCS staff," and  "DPSCS personnel" include all staff of the Maryland Department of Public Safety and Correctional Services (DPSCS) whose job responsibilities place them on a regular basis in contact with Deaf inmates and the immediate supervisors of those employees.

J.    "DPSCS Prerelease Housing Units" mean all the pre-release housing units to which inmates confined in DPSCS Correctional Facilities set forth in section I(H) may be housed.

K.    "Effective Communication" means communication with Deaf inmates that is as effective as communication with the general inmate population, 28 C.F.R. § 35.160(a), and will, when necessary, include the provision of appropriate Auxiliary Aids and Services, such as Qualified Interpreters.

L.    "Effective Date" means the date that the Maryland Board of Public Works approves this Agreement.

M.    "Hard of Hearing Inmate" means an inmate whose hearing is corrected by hearing aids so that he or she can understand the spoken word, communicate orally, and use a standard telephone.  Hard of Hearing inmates are not covered by this Agreement, except the repair terms outlined in Section IX(E) for telecommunication devices and the maintenance terms of Section V(C) for Auxiliary Aids and Services will also apply to hearing aids for such individuals.

N.    "Intake" means the process from the point in time at which an inmate is taken into the custody of DPSCS at a DPSCS Correctional Facility through the point in time at which the inmate is received at and assigned to a unit within a maintaining DPCSC Correctional Facility, including but not limited to:  orientation, medical, psychological, education testing and evaluation, and assignment.

O.    "Intake Form" means the form included in a Deaf inmate's base file to be provided by DPSCS and completed by all deaf inmates to allow them to select which, if any, Auxiliary Aids and Services they would prefer for all programs, activities, medical appointments and procedures, disciplinary hearings, and all other complex or lengthy communication with prison staff.  The name of the Intake Form will be determined upon the creation of an executive directive.

P.    "Interpreter" means an interpreter who, via a video remote interpreting (VRI) service or an on-site appearance, is able to interpret effectively, accurately, and impartially, both receptively and expressly, using any necessary specialized vocabulary.  Examples of Interpreters include, but are not limited to, sign

3

language interpreters, oral transliterators, and cued-language translitertators.  *See* 28 C.F.R. § 36.104.

Q.      "Litigation" means the action filed in U.S. District Court for the District of Maryland styled *Christopher Jarboe, et al. v. MDPSCS, et al.*, Case No. ELH 12-00572.

R.      "Offsite Medical Care" means medical care that is provided at a location not owned, operated, or contracted by DPSCS.

S.      "Onsite Medical Care" means medical care that is provided at a DPSCS Correctional Facility, including medical care provided by third parties in DPSCS Correctional Facilities owned or operated by DPSCS.

T.      "Primary Consideration" means that in determining what type of Auxiliary Aids and Services are necessary to comply with the ADA and this Agreement, DPSCS agrees to give primary consideration to the expressed preference request for a particular Auxiliary Aid or Service by the individual with the disability, the Deaf inmate.  *See* 28 C.F.R. § 35.160.

DPSCS will honor the Deaf inmate's expressed request unless DPSCS can demonstrate that another effective means of communication exists or that use of the means chosen would not be required under 28 C.F.R. § 35.164.  The decision that a particular request for Auxiliary Aids and Services would result in a fundamental alteration of DPSCS' programs and services or in undue financial and administrative burdens must be made by the Secretary of DPSCS or his designee after considering all the resources available for use in the funding and operation of the agency's programs and services and must be accompanied by a written statement of the reasons for reaching that conclusion.  *See* 28 C.F.R. § 35.164.

U.      "Qualified Interpreter" means a person who is able to interpret effectively, accurately, and impartially, both receptively and expressively, with the individual Deaf inmate using any necessary specialized vocabulary.  A Qualified Interpreter depends on the needs of the inmate and could include an ASL interpreter, a sign language interpreter using more English based signs, an oral interpreter, a cued speech transliterator, or a tactile interpreter for a person who is Deaf and blind.  For sign language interpreters, a Qualified Interpreter is one who holds one or more of the following current, valid certifications:

- Registry of Interpreters for the Deaf Certification as a CI/CT, CSC, MCSC, OTC, CDI, or RSC;

- National Association of the Deaf (NAD) Certification Level 3, 4, or 5;

- NAD/RID National Interpreter Certification NIC, NIC Advanced, or NIC Master; or

- Any Maryland certification with the same or substantially equivalent proficiency standards.

A cued speech transliterator will be certified by the Cued Language Transliterator National Certification Examination.

The parties agree that future certifications that are the equivalent of these certifications will be considered valid minimum certification, so long as those certifications are kept current.

V.      "TTYs" or "TDDs" means devices that are used with a telephone to communicate with persons who are Deaf by typing and reading communications.

W.      "Video Remote Interpreting" (VRI) means video interpreting accomplished by use of video conference technology over high-speed internet lines.

X.      "Videophone" means a telephone with a camera and screen for visual, real-time communications.

## II.      GENERAL POLICIES

A.      Non-discrimination Based on Disability

DPSCS will ensure that Deaf inmates at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units have an equal opportunity to participate in and enjoy the benefits of services, programs, or activities as non-Deaf inmates similarly situated.

DPSCS will ensure that former Deaf inmates under post-release supervision by Parole and Probation have an equal opportunity to participate in and enjoy the benefits of services, programs, or activities as former non-Deaf inmates similarly situated.

DPSCS retains the discretion to determine that certain activities may present a Direct Threat to Deaf inmates or former Deaf inmates or others and may therefore choose not to provide such Deaf inmates or former Deaf inmates some of its services, programs, and activities. *See* 28 C.F.R. 35.104; 28 C.F.R. 35.139. DPSCS is not required to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burden. *See* 28 C.F.R. § 35.164.

B.      ADA Coordinator and Auxiliary Aids and Services Designees

DPSCS has designated an ADA Coordinator and will maintain the ADA Coordinator position as required by this Agreement. DPSCS agrees that the ADA Coordinator will be trained and knowledgeable concerning the requirements of federal and state law regarding DPSCS' obligations to provide full and equal enjoyment of its services, programs, and activities to Deaf inmates, and the contents of this Agreement.

DPSCS will notify counsel for the Plaintiffs of the ADA Coordinator designee assigned to DPSCS Headquarters. Thereafter, the name and contact information for the ADA

Coordinator will be kept updated in a prominent place on the DPSCS website. The ADA Coordinator's name and contact information will also be posted in a secure area in any housing unit in which Deaf inmates are held.

Within thirty days of the Effective Date of this Agreement, DPSCS will designate an individual or individuals at each DPSCS Correctional Facility where Deaf inmates are held who will be responsible for coordinating and overseeing Auxiliary Aids and Services for Deaf inmates and for implementing this Agreement as applicable to such DPSCS Correctional Facility.

Within thirty days of the Effective Date of this Agreement, DPSCS will designate an individual who will be responsible for coordinating and overseeing Auxiliary Aids and Services for Deaf inmates held at a DPSCS Prerelease Housing Unit and for implementing this Agreement as applicable to DPSCS Prerelease Housing Units.

Within thirty days of the Effective Date of this Agreement, DPSCS will designate regional coordinators for any Probation and Parole Office where any Deaf former inmate is actively on post-release supervision. These designees will be responsible for coordinating and overseeing Auxiliary Aids and Services for Deaf former inmates consistent with and for implementing this Agreement. These designees will be familiar with and knowledgeable concerning the contents of this Agreement and assist in implementing this Agreement as applicable to such office.

DPSCS agrees to train all Shift Commanders at each DPSCS Correctional Facility and DPSCS Prerelease Housing Unit where Deaf inmates are held on the procedures necessary to satisfy this Agreement.

DPSCS agrees that Deaf inmates will be given the opportunity to meet with the Warden, Assistant Warden, or Facility Administrator at least quarterly at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units. At these meetings, Deaf inmates will have the opportunity to discuss issues of importance to the Deaf inmate community with the Warden, Assistant Warden, or Facility Administrator. A Qualified Interpreter and Auxiliary Aids and Services will be provided at these meetings as necessary.

III.    INTAKE PROCEDURES AND SUBSEQUENT PROVISION OF AUXILIARY AIDS AND SERVICES

    A.    General Policy

At Intake, from the point that a Deaf inmate notifies DPSCS staff of his or her disability, the Deaf inmate will be provided with access to Qualified Interpreters or appropriate Auxiliary Aids and Services, as necessary, to afford the Deaf inmate Effective Communication. To achieve Effective Communication with respect to the Intake process, Qualified Interpreters or Auxiliary Aids and Services will be provided, upon request, to aid in the explanation of prison policies and procedures. After transfer to the maintaining facility, the Deaf inmate will participate in orientation and receive instruction on how to use the available telecommunications equipment and other Auxiliary Aids and Services at the facility. Within six months from the

Effective Date of this Agreement, DPSCS will implement a written policy governing the Intake process for Deaf inmates that includes, at a minimum, the following terms:

1. The assessment, and if necessary testing, for Deafness or hearing impairments by Medical staff of all inmates who demonstrate difficulty hearing or notify the proper officials of difficulty in hearing at any point during the Intake process.

2. The creation of a form to be used at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units appended to the policy, by which a Deaf inmate will indicate his or her preferences for Auxiliary Aids and Services for various prison services, programs, and activities in which an inmate would reasonably be expected to be involved while incarcerated, whether mandatory or voluntary, including all situations as to which Auxiliary Aids and Services are to be provided to Deaf inmates pursuant to this Agreement. The form is referred to herein as the "Intake Form." DPSCS will give primary consideration to the type of Auxiliary Aid or Service that is indicated on the inmate's Intake Form. This form will include, but is not limited to, the options for the following activities and programs to which DPSCS has agreed to provide Qualified Interpreters and/or interpreters as necessary that satisfy, at a minimum, the requirements of 28 C.F.R. § 36.104 under this Agreement:

   - For medical care and appointments, including dental, vision, audiological and mental health care for Deaf inmates

   - For disciplinary hearings in which Deaf inmates may participate

   - For transfer and classification meetings and interviews that impact Deaf inmates

   - For transitional programming for Deaf inmates

   - For educational programming for Deaf inmates

   - For work programming for Deaf inmates

   - For any other programs that require complex or lengthy communications between staff and Deaf inmates.

3. A procedure for administration of the Intake Form will be established. The Intake Form will be administered to any inmate who is deemed by the Medical Staff to be Deaf at the time that the inmate is received by their first maintaining DPSCS Correctional Facility for orientation. The Intake Form will be administered at the earliest practical opportunity during orientation.

4.      DPSCS will provide access to a Qualified Interpreter or other Auxiliary Aids and Services, upon request, for the Deaf inmate to understand and complete the Intake Form.

5.      DPSCS will provide written notification on initial Intake and orientation materials that the Deaf inmate may request a Qualified Interpreter or other Auxiliary Aids and Services for assistance in understanding any written materials provided and/or the Intake Form.

6.      A procedure for Deaf inmates to make amendments to the Intake Form will be established.  A Deaf inmate may change his or her preferences indicated in the Intake Form, including changing, adding, or waiving services, absent an objective showing of abuse.  If a determination is made by DPSCS that the inmate has abused the Intake Form process, the inmate may appeal the decision through the administrative remedy procedure.  A Deaf inmate may complete an Intake Form, upon request, at any time during his or her incarceration even if he or she had previously declined services.

7.      The Intake Form is to be maintained in the inmate's base file and will be consulted and used by DPSCS and/or DLLR staff that performs services at DPSCS Correctional Facilities or DPSCS Prerelease Housing Units for the entire duration of the inmate's incarceration.

B.      Provision of Auxiliary Aids and Services Specified in the Intake Form

After Medical staff determines that an inmate is Deaf and the Intake Form has been completed, DPSCS will make best efforts and give primary consideration to providing the types of Auxiliary Aids and Services requested on the Intake Form and continue to provide such services consistent with this Agreement, unless the Deaf inmate affirmatively indicates he or she does not want such services.  Accordingly, additional requests for Auxiliary Aids and Services by the inmate are not required, unless the inmate wishes to request Auxiliary Aids or Services other than those previously requested and provided; however, in the event that Auxiliary Aids and Services are not present or malfunctioning, the inmate has an affirmative duty to notify DPSCS staff.  The purpose of the Intake Form, however, is to be an administrative convenience for DPSCS and does not limit the obligation of DPSCS to provide Auxiliary Aids and Services to all Deaf inmates who have requested and qualify for such services as set forth in this Agreement or by law.

C.      Ensuring Staff Awareness Through Identification Cards

DPSCS will take appropriate steps to ensure that all DPSCS personnel at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units having regular contact with a Deaf inmate are made aware of such person's need for Auxiliary Aids and Services so that Effective Communication with such person and the safety of the person will be ensured.  Upon identifying an inmate as Deaf during the Intake process, the inmate will be offered a distinct identification ("ID") card that clearly identifies him or her as Deaf.  This ID card will use the term "Deaf" and

will not use the terms "Hearing Impaired." The inmate can accept this card or decline it in favor of a standard issue identification. If a Deaf inmate declines the distinct ID card, he or she will sign a Waiver and that document will be kept in the inmate's base file. The Waiver under this section does not waive the Deaf inmate's right and/or access to eligible services and is limited only to the inmate's option to accept the distinct ID card. The inmate will not be precluded from changing his or her preference during his or her period of incarceration to remove the waiver. The distinct ID card will be provided within a reasonable period of time.

The ID card will signify to DPSCS personnel that the inmate is Deaf, might not respond to oral commands, and may require Auxiliary Aids and Services. When DPSCS staff takes a Deaf inmate's ID card, the Deaf inmate will be given another item by DPSCS staff that will identify the inmate as Deaf**.**

All staff having regular contact with a Deaf inmate in a DPSCS Correctional Facilities or DPSCS Prerelease Housing Units will be trained on the meaning of the distinct ID cards.

D.    Interpretation of Written Materials

As of the Effective Date of this Agreement, and upon a Deaf inmate's request at the DPSCS Correctional Facility or DPSCS Prerelease Housing Unit where the inmate is incarcerated, DPSCS will provide the Deaf inmate written materials it provides to all inmates, and upon request, provide a Qualified Interpreter to permit the Deaf inmate to understand the contents of the written materials.

At the request of the Deaf inmate, DPSCS will promptly and within a reasonable period of time provide that Deaf inmate with the opportunity to meet with a DPSCS staff member and a Qualified Interpreter to ask any further questions regarding the written or interpreted materials.

E.    Creation of Jarboe Settlement Materials

Within six months of the Effective Date of this Agreement, DPSCS will create written materials outlining the services available to Deaf Inmates at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units. These written materials are referred to herein as "Jarboe Settlement Agreement Materials." The Jarboe Settlement Materials are intended to outline the services available pursuant to DPSCS' obligations under this Agreement. Immediately upon creation of the Jarboe Settlement Agreement Materials, and promptly upon any amendments thereto, DPSCS will provide the Jarboe Settlement Agreement Materials to all currently incarcerated Deaf inmates at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units and to Deaf former inmates supervised by the Department of Parole and Probation. DPSCS will create the Jarboe Settlement Agreement Materials using language designed to be accessible to Deaf inmates. DPSCS will provide the Jarboe Settlement Agreement Materials promptly to any other inmate housed at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units who is determined by Medical staff to be Deaf. During the Intake process, such Jarboe Settlement Materials will be provided to Deaf inmates with the orientation materials provided to all other inmates. Upon request, DPSCS will promptly and

9

within a reasonable period of time provide any Deaf inmate at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units with a Qualified Interpreter to interpret the Jarboe Settlement Agreement Materials and ask any questions regarding the Jarboe Settlement Agreement Materials.

Upon request, DPSCS will promptly and within a reasonable period of time provide any former Deaf inmate with a Qualified Interpreter to interpret the Jarboe Settlement Agreement Materials and ask any questions regarding the Jarboe Settlement Agreement Materials.

F.      Subsequent Need for Accommodations

If an inmate at a DPSCS Correctional Facility or a DPSCS Prerelease Housing Unit is not found to be Deaf at his or her Initial Classification, initially refuses, or does not request Auxiliary Aids and Services, but later believes that Auxiliary Aids and Services are necessary to ensure Effective Communication, he or she will have the opportunity to request these services through completing or amending his or her Intake Form. DPSCS will provide an inmate who was initially not found to be Deaf with a hearing assessment if so requested by Medical staff. If that individual is found to be Deaf, DPSCS will follow its policy implemented pursuant to Section III.A of this Agreement, as if the inmate were subject to the initial Intake process, and otherwise treat such inmate as a Deaf inmate under this Agreement.

IV.   HOUSING

A.      General Policy

DPSCS has the discretion to house Deaf inmates at whatever DPSCS Correctional Facility or DPSCS Prerelease Housing Unit it deems appropriate.

B.      Schedule of Accommodations

Regardless of which DPSCS Correctional Facility or DPSCS Prerelease Housing Unit is a Deaf inmate's place of incarceration, personnel at those DPSCS Correctional Facilities and DPSCS Prerelease Housing Units will provide the Deaf inmate with a schedule showing when Qualified Interpreters and/or other Auxiliary Aids and Services are available. This schedule will be provided to currently incarcerated inmates at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units within three months of the Effective Date of this Agreement.

V.    PROVISION OF AUXILIARY AIDS AND SERVICES

A.      General Policy

In order to ensure equal opportunity to participate in and enjoy the benefits of a service, program, or activity of DPSCS, DPSCS will provide appropriate Auxiliary Aids and Services, as required by this Agreement, the U.S. Constitution, the ADA, and the Rehabilitation Act. This will include programs or services to Deaf inmates provided by third party vendors, contractors, or state funded entities such as community colleges.

Appropriate Auxiliary Aids and Services, including Qualified Interpreters, will be made available so that Deaf inmates housed at DPSCS' Correctional Facilities and DPSCS Prerelease Housing Units may have an equal opportunity to participate in all services, programs, and activities offered to other inmates housed at DPSCS' Correctional Facilities and DPSCS Prerelease Housing Units.

These services, programs, and activities will include, but are not be limited to: orientation; medical evaluations and treatments; disciplinary proceedings; and during any other programs including, but not limited to, rehabilitative, educational, or transitional programs offered to other similarly situated incarcerated individuals.

In those instances where DPSCS permits volunteers to provide DPSCS Activities, and religious services, and religious meetings to inmates, DPSCS will notify the volunteer organization or individual volunteer, if it is aware, that the DPSCS Activity, religious services, and religious meetings will be attended by one or more Deaf inmates. The parties agree that the Interpreter for DPSCS Activities, religious services, and religious meetings does not need to be a "Qualified Interpreter" as defined in this Agreement. If the volunteer organization or individual volunteer has an interpreter for the DPSCS Activities, religious services, and religious meetings, DPSCS will ensure that the interpreter, at a minimum, satisfies the requirements of 28 C.F.R. § 36.104. If, however, the volunteer organization or individual volunteer does not provide an interpreter for the DPSCS Activities, religious services, and religious meetings, DPSCS will provide for those DPSCS Activities, religious services, and religious meetings that involve complex or lengthy communication an interpreter who satisfies, at a minimum, the requirements of 28 C.F.R. § 36.104. This provision does not alter DPSCS' obligation to provide other appropriate Auxiliary Aids and Services for DPSCS Activities, religious services, and religious meetings that involve complex or lengthy communication so that there is Effective Communication with the Deaf inmate. When providing any Auxiliary Aids and Services, DPSCS will give primary consideration to the Deaf inmate's preferred Auxiliary Aid or Service as indicated on the Intake Form referenced in section I(O) of this Agreement for the DPSCS Activities, religious services, and religious meetings.

DPSCS retains the discretion to determine that certain services, programs, or activities present a Direct Threat to Deaf inmates or others and may therefore choose not to provide such Deaf inmates some of its services, programs, and activities.

DPSCS is not required to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burden. 28 C.F.R. § 35.164.

DPSCS will provide and maintain written instructions for the use of all Auxiliary Aids and Services. These instructions will cover, though not necessarily be limited to, use of TTYs and Videophones when installed and implemented.

B.    Medical Devices

All Auxiliary Aids and Services required by this Agreement, the ADA, and Section 504 of the Rehabilitation Act, which are deemed by DPSCS or its medical provider to be

medically necessary, will be provided promptly upon request and free of charge to Deaf inmates at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units. Hearing aids are included in this subsection and will also be promptly provided upon request and free of charge to inmates who have been determined by DPSCS or its medical provider to require such devices, but are otherwise excluded from the remainder of this Agreement, pursuant to Section I(M) herein, because their hearing is corrected by hearing aids so that they can understand the spoken word, communicate orally, and use a standard telephone.

   C.   Maintenance of Auxiliary Aids and Services

    DPSCS will maintain all Auxiliary Aids and Services for Deaf inmates at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units in working condition at all times or promptly repair them. Hearing aids are included in this subsection and will be maintained in working conditions at all times or promptly repaired for all inmates who have been determined by DPSCS or its medical provider to require such devices, regardless of whether the inmate is otherwise excluded from the remainder of this Agreement, pursuant to Section I(M) herein, because his or her hearing is corrected by hearing aids so that they can understand the spoken word, communicate orally, and use a standard telephone. DPSCS staff will attempt to resolve complaints about any malfunctioning equipment within one week of receiving that complaint and no later than one month after receiving the complaint. DPSCS will initiate a work order or other applicable mechanism for resolving the issue within a week of the complaint. DPSCS will not be considered in breach of this provision if the delay is caused by third party vendors, delivery errors, or any other issue caused by third parties or circumstances outside of DPSCS control.

VI.  QUALIFIED SIGN LANGUAGE INTERPRETERS AND OTHER AUXILIARY AIDS AND SERVICES

   A.   Contracts

    In accordance with and subject to applicable procurement laws and regulations, DPSCS will enter into one or more written contracts with Interpreter Service Providers ("IS Providers"), to provide Qualified Interpreters at the events and intervals, set forth in this Agreement. The contracts with the IS Providers will specifically state that only "Qualified Interpreters," as defined in this Agreement, will be used by DPSCS and the IS Providers agree to provide only such interpreters to DPSCS. If DPSCS is currently bound by an IS Provider contract it will add this requirement at the next opportunity, to the extent feasible and permitted by applicable procurement laws and regulations.

   B.   General Policy

    DPSCS will provide an in-person Qualified Interpreter five days per week for seven hours per day at MCI-J. If there is a material change in the number or needs of Deaf inmates at MCI-J, DPSCS will re-evaluate the number and/or frequency of in-person Qualified Interpreters. The number of in-person Qualified Interpreters to be retained and the hours during which those interpreters shall be available to ensure compliance with this Agreement, shall be determined solely by the DPSCS.

DPSCS will provide an in-person Qualified Interpreter at other DPSCS Correctional Facilities and DPSCS Prerelease Housing Units where deaf inmates are incarcerated as necessary.

DPSCS will be responsible for scheduling and overseeing the provision of Qualified Interpreters. With the exception of DPSCS Activities, religious services, and religious meetings where such volunteers provide an interpreter for the DPSCS Activities, religious services, and religious meetings, all interpreters provided as accommodations to Deaf inmates will be Qualified Interpreters.

C.    Other Means of Communication

1.    General Policy

DPSCS agrees that at all times DPSCS employees will continue to attempt to communicate with Deaf inmates at its DPSCS Correctional Facilities and DPSCS Prerelease Housing Units for such purposes and to the same extent, as they would communicate with the individuals but for their disability, using all available means of communication. This provision in no way lessens DPSCS' obligation to provide Qualified Interpreters or other Auxiliary Aids and Services in certain situations and in a timely manner to the extent required by this Agreement.

2.    Video Remote Interpreting (VRI)

DPSCS will provide access to and have available for, emergency situations and otherwise as deemed necessary by DPSCS, on-demand video remote interpreting which comports with the following standards at all DPSCS Correctional Facilities at which Deaf inmates are incarcerated:

- high quality, clear, delay-free full-motion video and audio over a high-speed Internet connection;

- a clear, sufficiently large, and sharply delineated picture of the interpreter's and the Deaf individual's heads, arms, hands, and fingers, regardless of the body position of the Deaf inmate, unless rendered impracticable by an emergency situation;

- voices being transmitted are clear and easily understood, and

- operation is uncomplicated and easily accomplished by non-technicians.

DPSCS will implement VRI no later than twelve months of the Effective Date of this Agreement. In procuring VRI services, DPSCS will require that the VRI provider(s) selected will utilize only Qualified Interpreters. DPSCS will ensure that at least one of the VRI systems is housed in the medical unit of DPSCS Correctional Facility at which Deaf inmates are incarcerated.

3.      Written Notes

DPSCS employees at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units will receive training with respect to communication difficulties Deaf inmates have.  The training will include advising the DPSCS employees that note writing may be the only immediate form of communication available to a Deaf inmate and that DPSCS employees are expected to respond to a Deaf inmate in writing where that is the best present means of communication, to the same extent they would make a verbal response in a similar situation involving a non-Deaf inmate.  Where circumstances make a written response impractical at the time, training will instruct that the DPSCS employee should attempt to follow up with the Deaf inmate as time later permits.  This training will be coordinated by the ADA coordinator for the institution in conjunction with the statewide ADA coordinator.

D.      Onsite Medical Care

1.      General Policy

DPSCS will provide Auxiliary Aids and Services, including Qualified Interpreters, for scheduled appointments between Deaf inmates and medical personnel at DPSCS Correctional Facilities, including, but not limited to, review of medical history, medical appointments, follow up meetings or appointments, and treatment meetings.  DPSCS will give primary consideration to the type of Auxiliary Aid or Service that is indicated on the inmate's Intake Form.

2.      Informing Appropriate Medical Staff

DPSCS staff responsible for coordinating Auxiliary Aids and Services for Deaf inmates at the DPSCS Correctional Facility at which a Deaf inmate is incarcerated will ensure that Medical staff is aware that the inmate is deaf and notify Medical staff of the inmate's preferences as outlined on the Intake Form, if such classification has not already been performed by the Medical staff at that DPSCS Correctional Facility.  DPSCS staff responsible for coordinating Auxiliary Aids and Services for Deaf inmates housed in DPSCS Prerelease Housing Units will ensure that Medical staff is aware that the inmate is deaf and notify Medical staff of the inmate's preferences as outlined on the Intake Form, if such classification has not already been performed by the Medical staff at that DPSCS Prerelease Housing Unit.

3.      Scheduling Medical Appointments with Interpreters

DPSCS staff at each DPSCS Correctional Facility, or their designee, shall be responsible for ensuring that Qualified Interpreters are scheduled for all medical appointments requiring them or that other appropriate Auxiliary Aids and Services are provided in conjunction with such appointments.  Appointments for Deaf inmates will be scheduled within the same time period from the initial request as those for other inmates.

4.      Emergency Events

After VRI is implemented pursuant to this Agreement, DPSCS will make best efforts to provide VRI at DPSCS Correctional Facilities for use in unscheduled medical

emergencies. If remote interpreting services are not appropriate in the situation, DPSCS personnel will work in conjunction with Medical staff to attempt to secure an in-person Qualified Interpreter or other Auxiliary Aids or Services as soon as possible. Life saving and other emergency medical care should never be delayed because no interpretation services are available.

For the following categories of Deaf inmates, VRI may not provide Effective Communication, and an in-person Qualified Interpreter or other Auxiliary Aids or Services may be the most appropriate auxiliary aid or interpretive service. In such circumstances, DPSCS shall make best efforts to provide an in-person Qualified Interpreter

- Deaf inmates who have limited ability to move their heads, hands, or arms; vision problems; cognitive or consciousness issues; or pain issues;

- Deaf inmates who must be moved to areas of the DPSCS Correctional Facility that do not have a designated high speed Internet line; and

- Deaf inmates who will be treated in rooms where space considerations mitigate against using the service.

- Deaf inmates who have psychiatric or mental health issues that complicate communications through VRI.

E.    Offsite Medical Care

DPSCS or its designee will inform all offsite medical providers that a Deaf inmate at a DPSCS Correctional Facility or DPSCS Prerelease Housing Units requiring a Qualified Interpreter or other Auxiliary Aid or Service will be seeking medical care offsite as soon as possible.

In the case of an emergency, DPSCS will inform an offsite medical provider that a Deaf inmate at a DPSCS Correctional Facility or DPSCS Prerelease Housing Units requiring an in-person Qualified Interpreter or other Auxiliary Aid or Service is being transported to the offsite care provider. DPSCS will notify the offsite medical care provider as soon as possible. Notification will include the estimated time of arrival.

This Agreement may not be construed to require the DPSCS to provide Qualified Interpreters or other Auxiliary Aids or Services to inmates receiving offsite medical care. Provision of Qualified Interpreters or other Auxiliary Aids or Services to inmates in such circumstances by DPSCS shall be at the DPSCS' discretion in accordance with applicable law.

F.    Educational, Vocational, and Programming Instruction

DPSCS will provide appropriate Auxiliary Aids and Services for all programs offered at DPSCS Correctional Facilities in which Deaf inmates are qualified, admitted into, and actively participating. DPSCS, in determining the appropriate Auxiliary Aids and Services to be provided, will consider the request by the Deaf inmate on the inmate's Intake Form and any input by the Instructors or staff. Pursuant to 28 C.F.R. 35.160(b)(2), the Deaf inmate's preferred

form of Auxiliary Aid and Services as indicated on the inmate's Intake Form will receive primary consideration.

A "DPSCS Program" is any programs defined in COMAR 12.02.24.01 *et seq.* into which an inmate is placed by case management in accordance with State law or COMAR 12.02.24.02(A)(10)-(11).

When the Schedule of Accommodations referenced in Section IV.B changes, including when a Qualified Interpreter will be available, an updated Schedule of Accommodations will be given to all Deaf inmates at DPSCS Correctional Facilities and Prerelease Housing Units.

When a DPSCS inmate at a DPSCS Correctional facility has been found eligible to participate in a DPSCS program, DPSCS will provide a Qualified Interpreter or Auxiliary Aids or Services. In the event there is a delay in providing the service, DPSCS will make best efforts to as promptly as reasonably practicable resolve the delay and provide the service. DPSCS will make efforts to allow the Deaf inmate to continue to participate in the program.

Appropriate Auxiliary Aids and Services will be provided in the following programs:

1.      Correctional Educational and Workforce Skills Training provided by DLLR

DPSCS will provide Deaf inmates at DPSCS Correctional Facilities with written materials and open or closed-captioned material, where available. In addition, DPSCS will provide a Qualified Interpreter and other Auxiliary Aids and Services for correctional educational and workforce skills training at DPSCS Correctional Facilities as necessary. DPSCS, in determining the appropriate Auxiliary Aids and Services to be provided, will consider the request by the Deaf inmate on the inmate's Intake Form and any input by the Instructor of the class. Pursuant to 28 C.F.R. 35.160(b)(2), the Deaf inmate's preferred form of Auxiliary Aids and Services as indicated on the inmate's Intake Form will receive primary consideration.

2.      College Courses at DPSCS

DPSCS will provide Deaf inmates at DPSCS Correctional Facilities with written materials and open or closed captioned material, where available. In addition, DPSCS will provide a Qualified Interpreter and other Auxiliary Aids and Services for classes at DPSCS Correctional Facilities as necessary. DPSCS, in determining the appropriate Auxiliary Aids and Services to be provided, will consider the request by the Deaf inmate on the inmate's Intake Form and any input by the Instructor of the class. Pursuant to 28 C.F.R. 35.160(b)(2), the Deaf inmate's preferred form of Auxiliary Aids and Services as indicated on the inmate's Intake Form will receive primary consideration.

3.      Vocational Programs at DPSCS Correctional Facilities

DPSCS will provide Deaf inmates at DPSCS Correctional Facilities with written materials and open or closed captioned material, where available. In addition, DPSCS will

provide a Qualified Interpreter and other Auxiliary Aids and Services for vocational programs at DPSCS Correctional Facilities as necessary. DPSCS, in determining the appropriate Auxiliary Aids and Services to be provided, will consider the request by the Deaf inmate on the inmate's Intake Form and any input by the Instructor of the class. Pursuant to 28 C.F.R. 35.160(b)(2), the Deaf inmate's preferred form of Auxiliary Aids and Services as indicated on the inmate's Intake Form will receive primary consideration.

4.    DPSCS' Maryland Correctional Enterprises Programs ("MCE")

DPSCS will provide Deaf inmates at DPSCS Correctional Facilities with written materials and open or closed-captioned material, where available. In addition, DPSCS will provide a Qualified Interpreter and other Auxiliary Aids and Services for programs at DPSCS Correctional Facilities as necessary. DPSCS, in determining the appropriate Auxiliary Aids and Services to be provided, will consider the request by the Deaf inmate on the inmate's Intake Form and any input by the Instructor of the class. Pursuant to 28 C.F.R. 35.160(b)(2), the Deaf inmate's preferred form of Auxiliary Aids and Services as indicated on the inmate's Intake Form will receive primary consideration.

5.    DPSCS Programs

DPSCS will provide Deaf inmates at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units with written materials and open or closed-captioned material, where available. In addition, DPSCS will provide a Qualified Interpreter and other Auxiliary Aids and Services for DPSCS programs at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units as necessary. DPSCS, in determining the appropriate Auxiliary Aids and Services to be provided, will consider the request by the Deaf inmate on the inmate's Intake Form and any input by the Instructor of the class. Pursuant to 28 C.F.R. 35.160(b)(2), the Deaf inmate's preferred form of Auxiliary Aids and Services as indicated on the inmate's Intake Form will receive primary consideration.

6.    DPSCS Activities

A DPSCS Activity may be provided by volunteers and may or may not include a fee that is paid by inmates to support the Activity. DPSCS Activities do not include religious services provided to inmates.

DPSCS will provide Deaf inmates at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units with written materials and open or closed captioned material, where available. In those instances where DPSCS permits volunteers to provide DPSCS Activities to inmates, DPSCS will notify the volunteer organization or individual volunteer if the DPSCS Activity will be attended by one or more Deaf inmates. The parties agree that the interpreter at these volunteer activities does not need to be a "Qualified Interpreter" as defined in this Agreement. If the volunteer organization or individual volunteer provides an interpreter, DPSCS should ensure that the interpreter satisfies, at a minimum, the requirements of 28 C.F.R. § 36.104.

If, however, the volunteer organization or individual volunteer does not provide an "Interpreter" for the DPSCS Activity, and if that DPSCS Activity involves lengthy or

17

complex communication, DPSCS will provide an Interpreter for who satisfies, at a minimum, the requirements of 28 C.F.R. § 36.104.  This provision does not alter DPSCS' obligation to provide other appropriate Auxiliary Aids and Services for the DPSCS Activity that involves lengthy or complex communication.  DPSCS in determining the appropriate Auxiliary Aids and Services will consider the request by the Deaf inmate on the inmate's Intake Form and any input by the volunteer conducting the DPSCS Activity or DPSCS staff.  Pursuant to 28 C.F.R. 35.160(b)(2), the Deaf inmate's preferred form of Auxiliary Aids and Services as indicated on the inmate's Intake Form will receive primary consideration.

To ensure that an Interpreter or other appropriate Auxiliary Aids and Services are available at an activity attended by Deaf inmates, DPSCS may require a Deaf inmate to provide advance notification of his or her intent to attend whenever DPSCS provides in writing to the Deaf inmates the requirement for advance notification of attendance.  The Deaf inmate will provide advance notification to DPSCS of his or her intent to attend consistent with DPSCS' directives in the written notification of the scheduled activity.

DPSCS will allow and encourage outside volunteers to provide activities accessible to Deaf inmates without regard to a volunteer's hearing ability as long as the volunteer meets the same security requirements that are imposed on all other outside volunteers.

DPSCS will offer sign-language instruction to any inmate at a DPSCS Correctional Facility or DPSCS Prerelease Housing Unit who becomes deaf after incarceration if such instruction is ordered by a medical professional employed by the DPSCS' contractual medical provider or an expert employed or retained by DPSCS.

G.    Work Assignments at DPSCS Correctional Facilities and Prerelease Housing Units

DPSCS will provide opportunities for institutional work assignments for Deaf inmates at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units that are consistent with the opportunities for the same assignments given to similarly situated non-Deaf inmates.  DPSCS retains the discretion to determine that certain work assignments present a Direct Threat to Deaf inmates and may therefore choose not to provide Deaf inmates those work assignments.

H.    Religious Services

DPSCS will allow and encourage outside volunteers to provide religious services accessible to Deaf inmates at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units without regard to a volunteer's hearing ability as long as the volunteer meets the same security requirements that are imposed on all other outside volunteers.  DPSCS will notify the religious service provider if the activity will be attended by one or more Deaf inmates at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units.  The parties agree that the Interpreter provided by the religious service provider does not need to be a "Qualified Interpreter" as defined in this Agreement.  If the religious service provider provides an Interpreter, DPSCS should ensure that the Interpreter satisfies, at a minimum, the requirements of 28 C.F.R. § 35.104.  If, however, the religious service provider does not provide an interpreter

for the activity, DPSCS will provide for that activity an interpreter who satisfies, at a minimum, the requirements of 28 C.F.R. § 35.104. This provision does not alter DPSCS' obligation to provide other appropriate Auxiliary Aids and Services, as indicated on the inmate's Intake Form, for the activity. In determining the appropriate Auxiliary Aids and Services, DPSCS will consider the request by the Deaf inmate on the inmate's Intake Form and any input by the religious service provider conducting the activity. Pursuant to 28 C.F.R. 35.160(b)(2), the Deaf inmate's preferred form of Auxiliary Aids and Services as indicated on the inmate's Intake Form will receive primary consideration.

To ensure that an Interpreter or other appropriate Auxiliary Aids and Services are available at religious services attended by Deaf inmates at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units, DPSCS may require a Deaf inmate to provide advance notification of his or her intent to attend whenever DPSCS provides in writing to the Deaf inmates the requirement for advance notification of attendance. The Deaf inmate will provide advance notification to DPSCS of his or her intent to attend religious services consistent with DPSCS' directives in the written notification of the religious services. A Deaf inmate may provide advance notification of his or her intent to attend weekly religious services on the Intake Form.

I.    Transfer and Classification Matters

DPSCS will provide a Qualified Interpreter or Auxiliary Aids and Services for any meetings or interviews with DPSCS personnel relating to an inmate's transfer to another DPSCS Correctional Facility or change in security classification involving the exchange of information between the Deaf inmate at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units and DPSCS personnel. DPSCS, in determining the appropriate Auxiliary Aids and Services to be provided, will consider the request by the Deaf inmate on the inmate's Intake Form and any input by appropriate DPSCS personnel. Pursuant to 28 C.F.R. 35.160(b)(2), the Deaf inmate's preferred form of Auxiliary Aids and Services as indicated on the inmate's Intake Form will receive primary consideration.

In the event there is a delay in providing the Qualified Interpreters or Auxiliary Aids and Services for meetings or interviews with DPSCS personnel relating to an inmate's transfer to another DPSCS Correctional Facility or change in security classification involving the exchange of information between the Deaf inmate at DPSCS Correctional Facilities or DPSCS Prerelease Housing Units and DPSCS personnel, DPSCS will make best efforts to resolve the delay as promptly as reasonably practicable. DPSCS will schedule the meeting or interview within thirty days of the previously scheduled meeting or interview. DPSCS will not be considered in breach of this provision if there is a delay beyond thirty days that is caused by circumstances outside of DPSCS control.

J.    Post-Release Supervision

DPSCS will provide Effective Communication between DPSCS staff and a Deaf former inmate supervised by the Division of Parole and Probation. DPSCS will provide a Qualified Interpreter or Auxiliary Aids and Services for all meetings involving significant and complex communication with a former Deaf inmate in the offices of the DPSCS Department of Parole and

Probation after an initial request for a Qualified Interpreter or Auxiliary Aids and Services is received from the former Deaf inmate by DPSCS Department of Parole and Probation staff; more than one request for an Interpreter or Auxiliary Aids and Services will not be necessary. In determining the appropriate Auxiliary Aid and Service, DPSCS will consider the request by the Deaf former inmate.  Pursuant to 28 C.F.R. 35.160(b)(2), the Deaf former inmate's preferred form of Auxiliary Aid and Service will receive primary consideration.

VII.  DISCIPLINARY MATTERS

A.  Qualified Interpreters for Disciplinary Proceedings at DPSCS Correctional Facilities and Prerelease Housing Units

DPSCS will provide Deaf inmates at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units with a Qualified Interpreter or other Auxiliary Aids and Services in any disciplinary proceedings in which Deaf inmate is a victim, witness, suspect, or charged, where there occurs the exchange of information between the Deaf inmate and DPSCS personnel. DPSCS, in determining the appropriate Auxiliary Aids and Services, will consider the request by the Deaf inmate on the inmate's Intake Form.  Pursuant to 28 C.F.R. 35.160(b)(2), the Deaf inmate's preferred form of Auxiliary Aids and Services as indicated on the inmate's Intake Form will receive primary consideration.  A Qualified Interpreter will be available to the Deaf Inmate at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units at any time there is to be the exchange of information between the Deaf inmate suspect and DPSCS personnel, including the following situations:

- Investigative interviews that involve the exchange of information between a Deaf inmate and DPSCS personnel (such as when an adverse party is interviewed);

- Preparation of the Disciplinary Offense Report by the Reporting Officer if it involves the exchange of information between the Deaf Inmate suspect and DPSCS personnel;

- Supervisory Review of the Disciplinary Offense Report if it involves the exchange of information between the Deaf Inmate suspect and DPSCS personnel;

- During the Advisement of Rights/Service of the Disciplinary Report/Waiver of Hearing/Penalty Offer Process or equivalent proceedings, to the extent that they involve the exchange of information between the charged Deaf inmate and DPSCS personnel;

- During the Hearing, or any Re-Hearing, which involves the exchange of information between the charged Deaf inmate and DPSCS personnel.

Inmate representatives will be provided to charged Deaf inmates on the same terms as they are provided when requested by charged hearing inmates.  Access to the inmate representative shall be the same for charged Deaf inmates as charged non-Deaf inmates.  To the

extent that a Deaf inmate has access to his inmate representative, a Qualified Interpreter shall be made available to the Deaf inmate for any exchange of information between the Deaf inmate and his inmate representative.

B.    Disciplinary Offense Reports

The supervisor will meet with the Deaf inmate in the presence of a Qualified Interpreter to discuss the Notice of Inmate Rule Violation ("NOIRV") no less than 24 hours prior to when a Disciplinary Hearing has been scheduled if a NOIRV was filed against a Deaf inmate at a DPSCS Correctional Facility or DPSCS Prerelease Housing Unit, and no Qualified Interpreter or appropriate Auxiliary Aids and Services was provided to the inmate at the time of the pre-Report investigation to afford the Deaf inmate Effective Communication.

C.    Miscellaneous

If a Deaf inmate is a witness at a disciplinary hearing, DPSCS will provide Auxiliary Aids and Services at the hearing, while the witness is a participant.  DPSCS, in determining the appropriate Auxiliary Aids and Services, will consider the request by the Deaf inmate on the inmate's Intake Form.  Pursuant to 28 C.F.R. 35.160(b)(2), the Deaf inmate's preferred Form of Auxiliary Aids and Services as indicated on the inmate's Intake Form will receive primary consideration.

DPSCS will schedule disciplinary hearings for Deaf inmates within the same time frame as it schedules disciplinary hearings for non-Deaf inmates.  DPSCS may postpone and reschedule disciplinary hearings for a Deaf inmate in need of a Qualified Interpreter pursuant to COMAR 12.02.27.18(C) and COMAR 12.02.27.12.

In the event there is a delay in providing the Qualified Interpreter or Auxiliary Aids and Services, DPSCS will make best efforts as promptly as reasonably practicable to resolve the delay and reschedule the disciplinary hearing pursuant to COMAR 12.02.27.18(C) and 12.02.27.12.  DPSCS will schedule the disciplinary hearing date within thirty days of the previously scheduled disciplinary hearing date.  DPSCS will not be considered in breach of this provision if there is a delay beyond thirty days if the delay is caused by unavailability of a hearing officer, witnesses, or any other issue caused by third parties or circumstances outside of DPSCS control.

Nothing precludes a Deaf inmate at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units who is a suspect or charged with a disciplinary offense from voluntarily waiving his right to a Qualified Interpreter or Auxiliary Aids and Services and to proceed through any stage of a disciplinary proceeding without the benefits of a Qualified Interpreter or Auxiliary Aids and Services.  Nor will failure of DPSCS to provide a Qualified Interpreter in and of itself constitute a sufficient basis for the charged Deaf inmate to reverse or overturn any disciplinary finding or sanction.  However, if a Deaf inmate did not waive his right to a Qualified Interpreter or Auxiliary Aids and Services, the disciplinary hearing will be rescheduled to a time that a "Qualified Interpreter" can be present or the Auxiliary Aids and Services can be available.

Except to the extent specifically provided herein, all provisions of the DPSCS' regulations addressing the rules and procedures for the discipline of inmates shall apply with equal force to the discipline of Deaf Inmates.

## VIII.    VISUAL ALERT NOTIFICATIONS

### A.    General Policy

Deaf inmates incarcerated at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units should not miss announcements, alarms, or any other auditory information from DPSCS staff to the general inmate population solely because of their disability.

### B.    Relaying Information

DPSCS will provide an effective visual notification system that will notify Deaf inmates at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units of prison wide events and events specific to Deaf inmates.  This visual notification system will include notification of daily prison activities, such as wake-up calls, meal times, recreational time, and other announcements in the inmate's cell.  DPSCS has the discretion as to which type of notification system it will employ and to change that system, as it deems necessary.

### C.    Visual Alarms and Emergency Evacuation

DPSCS will provide Deaf Inmates at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units with an effective visual notification system, which will advise them of an emergency evacuation or other emergency.  DPSCS has the discretion as to which type of notification system it will employ and the discretion to change that system, as it deems necessary.

### D.    Personal Pagers

DPSCS will provide functional personal pagers, which include visual as well as vibrating functions, in those DPSCS Correctional Facilities and DPSCS Prerelease Housing Units where these aids are currently utilized.  Any alarm functions or other auditory function of the pagers that are disruptive to hearing inmates and unnecessary for Deaf inmates will be turned off if that function is available.  Pagers will be used as supplemental notification systems to aid in daily notification of consistent announcements and protocols, including wake-up calls, meal times, recreational times, and other normal and customary notifications.

DPSCS personnel will be responsible for operating the pagers and will be properly trained in how to effectively use the technology.

## IX.    TELECOMMUNICATION DEVICES

### A.    General Policy

DPSCS will provide Deaf inmates at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units with telecommunication devices so that they will have access to

communication with people outside of DPSCS that is substantially on the same basis as the access to telecommunication DPSCS provides inmates who are not Deaf and consistent with this Agreement.

        B.      Monitoring Communications

        DPSCS may provide for the monitoring of communications between Deaf inmates at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units and individuals outside of DPSCS to the same extent and with the same discretion applied to the monitoring of communications between non-Deaf inmates and individuals outside of DPSCS.

        C.      Additional Time for Communication

        DPSCS agrees that "equal access" may necessitate access that sometimes appears to be greater access. Within six months of the Effective Date of this Agreement, DPSCS will implement a written policy that allows Deaf inmates at its DPSCS Correctional Facilities and DPSCS Prerelease Housing Units at least twice as many minutes to complete a TTY call as the number of minutes afforded to non-Deaf inmates to make regular phone calls.

        D.      Technology DPSCS Will Provide

        DPSCS will make the following communication technologies available at its DPSCS Correctional Facilities and DPSCS Prerelease Housing Units where Deaf inmates are incarcerated to facilitate communication between Deaf inmates and people outside of DPSCS Correctional Facilities and DPSCS Prerelease Housing Unit.

        This list of technological equipment is not exhaustive. DPSCS agrees to keep abreast of evolving technology and to consider adding additional equipment to reflect technological advances, as it deems appropriate.

        DPSCS Correctional Facilities and DPSCS Prerelease Housing Units housing Deaf inmates will share a list of communications equipment available to Deaf inmates upon their arrival at the DPSCS Correctional Facility or DPSCS Prerelease Housing Unit.

        1.      TTY (teletypewriter)

        At every DPSCS Correctional Facility and DPSCS Prerelease Housing Units at which a Deaf inmate is incarcerated, DPSCS will provide at least one TTY which will be available and readily accessible during the same hours as the standard telephone is available for non-Deaf inmates. At each DPSCS Correctional Facilities and DPSCS Prerelease Housing Units where a Deaf inmate is incarcerated, DPSCS will keep an additional portable TTY unit for use when the regular TTY is broken or otherwise unavailable.

        2.      Relay Services

        DPSCS will enable all TTYs to access publicly available relay service phone numbers such as 711 and local 1-800 numbers. A Deaf inmate at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units using relay services may not be charged any more than

inmates not using relay services and will be charged the per minute rate established by the DPSCS' contract with its inmate telephone service provider, consistent with applicable law.

DPSCS will also afford Deaf inmates at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units the same or substantially similar payment options for personal fees as is allowed non-Deaf inmates, including but not limited to, the use of credit cards and the ability for family and friends to contribute funds to those credit cards.

       3.      Videophones

As long as a Deaf inmate is incarcerated at Maryland Correctional Institution-Jessup (MCI-J), DPSCS will make videophone technology available at MCI-J for use by Deaf inmates no later than twelve months from the Effective Date of this agreement.

As long as a Deaf inmate is incarcerated at Maryland Correctional Institution-Women (MCI-W), DPSCS will make videophone technology available at MCI-W for use by Deaf inmates no later than twelve months from the Effective Date of this agreement.

For any other DPSCS Correctional Facility where a Deaf inmate is incarcerated, DPSCS will make videophone technology available by way of a portable videophone for use by Deaf inmates at the particular DPSCS Correctional Facility no later than twelve months from the Effective Date of this Agreement. For any other DPSCS Correctional Facility, DPSCS will make videophone technology available by way of a portable videophone for use by Deaf inmates who use sign language or are unable to read the communication from TDD or TTY equipment. After videophone technology is implemented by way of a portable videophone pursuant to this Agreement, when a Deaf inmate subsequently becomes eligible for use of the portable videophone or is transferred to a DPSCS Correctional Facility other than MCI-J or MCI-W, DPSCS will make best efforts to make available videophone technology by way of a portable videophone for the inmate's use within one week of the inmate's eligibility or transfer.

Access to the videophones at MCI-J and MCI-W will be made available during the same time as standard telephones and TTYs. Videophones will allow voice carry over relay.

       E.      Responsibility for Maintaining Equipment and Training Staff

DPSCS will ensure that the technology used to permit communication between Deaf inmates at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units and people outside of DPSCS at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units is in working order. DPSCS staff will attempt to resolve complaints about any malfunctioning equipment within one week of receiving that complaint. DPSCS will also ensure that designated staff members are adequately trained in the operation of the technology.

X.      MEDIA

DPSCS will ensure that all audio-visual media purchased for inmate use in DPSCS Correctional Facilities and DPSCS Prerelease Housing Units housing Deaf inmates includes open or closed captioning.

Televisions which are purchased by DPSCS for inmate use at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units will support open or closed captioning and that captioning may be turned on at a Deaf inmate's request.

DPSCS will permit Deaf inmates at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units to purchase TVs which reliably support open or closed captioning with their own funds.

## XI.    HAND RESTRAINTS

### A.    Off-site Medical Care

DPSCS will implement an operating procedure relating to the handcuffing of Deaf inmates at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units that will, whenever possible, permit Deaf inmates to use their hands for Effective Communication. That procedure will permit DPSCS personnel to consider the needs of a Deaf inmate to use his or her hands for Effective Communication purposes. That procedure will also permit DPSCS to consider the use of alternative restraints, such as a stun-belt, in lieu of handcuffs that restrain the hands in a way that prevents Effective Communication. DPSCS will have the ultimate authority relating to decisions about the use/non-use of hand restraints, and whether, and in what manner, to keep a Deaf inmate handcuffed.

### B.    On-site Medical Care

If a Deaf inmate at a DPSCS Correctional Facility is permitted to see medical personnel for behavioral reasons and his or her hands have been restrained, DPSCS personnel will consider the needs of the Deaf inmate to use his or her hands for Effective Communication purposes. DPSCS personnel will also consider the use of alternative restraints, such as a stun-belt, in lieu of handcuffs that restrain the hands in a way that prevents Effective Communication. DPSCS will have the ultimate authority relating to decisions about the use/non-use of hand restraints, and whether, and in what manner, to keep a Deaf inmate handcuffed.

### C.    On-site Other Circumstances

If a Deaf inmate is being moved about at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units for any purpose other than for behavioral reasons, and his or her hands have been restrained, DPSCS personnel will consider the needs of the Deaf inmate to use his or her hands for Effective Communication purposes. DPSCS personnel will also consider the use of alternative restraints, such as a stun-belt, in lieu of handcuffs that restrain the hands in a way that prevents Effective Communication. DPSCS will have the ultimate authority relating to decisions about the use/non-use of hand restraints, and whether, and in what manner, to keep a Deaf inmate handcuffed.

## XII.    MISCELLANEOUS AUXILIARY DEVICES

Where devices such as vibrating clocks and in-line amplifiers are not deemed medically necessary, DPSCS agrees to consider on a case-by-case basis, whether it will allow a particular Deaf inmate at its at DPSCS Correctional Facilities and DPSCS Prerelease Housing

Units the opportunity to purchase these devices at his or her own expense.  DPSCS' decision in this regard will also consider whether these devices pose a security risk.  DPSCS will have the discretion to make the determination whether any of these devices, and the type of device, is permissible.  DPSCS agrees to allow Deaf inmates at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units to purchase headphones, in-line amplifiers/equalizers, and televisions that meet the particular needs of their disability from an approved vendor so long as the items do not pose a security risk.  DPSCS retains the discretion to limit purchases to devices available through the Commissary.  Deaf inmates may submit a request in writing to the ADA Coordinator requesting devices not available from the Commissary.  DPSCS will not deny a Deaf inmate at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units the right to purchase these devices except where they present a documentable security risk or as specified by DPSCS property policies and schedules.  The ADA Institutional Coordinator and ADA Prerelease Housing Coordinator will maintain records of all Deaf inmate requests for these devices and the outcome of the request.  These records will be maintained in accordance with DPSCS retention policies.  These records will be inspected by the ADA Coordinator assigned to DPSCS headquarters as set forth in section II.B on a quarterly basis.

XIII.   TRAINING

    A.   General Policy

        DPSCS will provide training as defined in Section XIII.B below to all DPSCS employees as defined in Section I.(I), as defined in this Agreement.  DPSCS will begin providing this training within six months of the Effective Date of this Agreement, and no less than annually thereafter.  DPSCS will incorporate this training into its regularly scheduled training for new and existing employees.  DPSCS may provide this training using in-person training, or via recorded training.  DPSCS will update the training materials as required by law.

    B.   DPSCS Employees

        Within six months of the Effective Date of this Agreement, DPSCS will begin training DPSCS employees at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units as that term is defined in this Agreement.  Training will include the following topics:

- best practices in communicating with Deaf individuals;

- the unique needs and problems encountered by Deaf individuals;

- identification of communication needs of persons who are Deaf;

- the psychological implications of Deafness and its relationship to interaction with hearing corrections personnel;

- the proper use and role of Qualified Interpreters;

- directions about using TTYs, TDDs, Videophones, and other equipment currently available at the facility, which facilitates communication with Deaf people; and

26

- Disciplinary Matters, described in Section VII, and Inmate Complaints;, described in Section XIV.

## XIV.   INMATE COMPLAINTS

The ADA Coordinator will review all written complaints and appeals filed through the Administrative Remedy Procedure ("ARP") concerning issues related to deafness submitted by Deaf inmates at DPSCS Correctional Facilities and DPSCS Prerelease Housing Units, and responses given to Deaf inmates, whether the request is terminated favorably, or unfavorably to the Deaf inmate, to ensure compliance with this Agreement.

The ADA Coordinator review under this section is not a part of the DPSCS inmate Administrative Remedy Procedure.

## XV.   MONITORING AND COMPLIANCE

### A.   Provision of Written Materials

DPSCS shall deliver to Plaintiffs' Counsel, within thirty days of completion, copies of any written policies, notifications and/or other written materials created or called for under this Agreement.

### B.   Plaintiffs' Counsel Investigation

To the extent Plaintiffs' Counsel maintains a current attorney-client relationship with any Deaf inmate at a DPSCS Correctional Facility or DPSCS Prerelease Housing Unit, they will be provided the same access to that client and to the records relating to that client, as any other attorney with a similar relationship to another non-Deaf DPSCS inmate.

In addition, and regardless of whether an attorney-client relationship exists, on an annual basis during the term of this Agreement, Plaintiffs' Counsel will have reasonable access to each DPSCS Correctional Facility or DPSCS Prerelease Housing Unit in which Plaintiffs still incarcerated are housed to conduct an investigation to determine DPSCS personnel's treatment of Deaf inmates.  During this investigation, DPSCS will permit Plaintiffs' Counsel (1) access to Deaf inmates who are willing to meet with them; (2) access to the formal requests made by inmates for miscellaneous auxiliary devices and the subsequent records maintained by ADA Coordinator pursuant to Section XII of this Agreement; (3) access to documents available under the Maryland Public Information Act ("MPIA"), as set forth below; and (4) access to equipment provided to or for use by Deaf inmates.  Requests for documents under (3) above shall be made by written request from Plaintiffs' Counsel and shall pertain to a subject areas that may be available under the MPIA, including, but not limited to, one or more of the following: (i) DPSCS' provider relationships for Auxiliary Aids and Services; (ii) written policies and procedures regarding Deaf inmates; and (iii) any contracts or Agreements related to Auxiliary Aids and Service.  In response to such written request, DPSCS will provide documents available for inspection under the MPIA within 30 days of Plaintiffs' Counsel's request, except that DPSCS will be provided an additional thirty days to provide the requested documents upon notification of Plaintiffs' counsel prior to the expiration of the first 30 days.  Access to formal requests and records under (2) above, shall include the opportunity to inspect the formal requests

27

and records and the opportunity to copy or receive copies of them. Access to equipment under (4) above, except equipment issued to or owned by an individual inmate, shall include, upon request, the reasonable opportunity to inspect the equipment and take photographs of the equipment on a semi-annual basis. The cost of duplication of documents requested or provided under this Section XV shall be borne as provided under the MPIA. Any documents that are either privileged and/or confidential may be excluded from this provision solely at DPSCS' determination.

Plaintiffs' Counsel will not be entitled to any attorneys' fees or costs associated with this monitoring provision.

## XVI.  NOTICE TO CURRENT INMATES OF AGREEMENT

Within 30 days of the Effective Date of this Agreement, DPSCS will notify each non-Plaintiff Deaf inmate in its custody at its DPSCS Correctional Facilities and DPSCS Prerelease Housing Units of its obligations under this Agreement.

## XVII.  RELEASE AND SETTLEMENT OF CLAIMS

### A.    Release

In consideration of the representations, promises and Agreements set forth herein, including the payments as set forth in this Agreement, the sufficiency of which is hereby acknowledged, each Plaintiff, by executing this Agreement on their behalf and on behalf of their representatives, assignees, heirs, executors, agents, family members, beneficiaries, administrators, successors, and anyone acting or claiming to act on their behalf, hereby releases and forever discharges the State of Maryland, its agencies, and their successors and assigns, departments, divisions, units, officers, servants, employees, agents, officials, representative and independent contractors, including, but not limited to, Defendants, from any and all claims, demands, damages, actions, causes of action, obligations, debts of whatsoever kind or nature, known and unknown, asserted and unasserted, direct and indirect and of any kind, nature or description whatsoever, which arise or may arise, or which arose or may have arisen, as a result of, or growing out of, injuries or damages alleged to have incurred as a result of facts alleged in the Litigation, whether or not such injuries or damages are contemplated at the present time or whether or not they arise following execution of this Agreement arising out of the facts set forth in the complaint and any amendments thereto filed with the U.S. District Court for the District of Maryland in civil action *Jarboe, et al. v. MDPSCS*, *et al.* ELH 12-0572.

### B.    Dismissal

Upon receipt of a fully-executed copy of this Agreement and the monetary payment required under Subsection C of this Section, Plaintiffs shall dismiss with prejudice the Litigation and all claims set forth therein, by filing in the Litigation within ten days of receipt of such monetary payment, a Stipulation of Dismissal with Prejudice, which counsel for Defendants shall approve and execute. The parties agree that the United States District Court for the District of Maryland will retain jurisdiction over this Agreement as set out in Subsection D of this Section.

Also within ten days of receipt of such monetary payment, Plaintiffs will withdraw any grievances or administrative complaints and terminate any administrative proceedings related to the subject matter of the Litigation.

      C.      Attorneys' Fees, Costs, Disbursements and Expenses, and Damages

This Agreement is contingent upon any necessary approvals, including the approval of the payment of any settlement funds by the Maryland Board of Public Works. Request for such approval shall be made to the Maryland Board of Public Works as soon as practicable after execution of this Agreement.

In settlement of all of Plaintiffs' claims arising out of their encounters with DPSCS up to and including the Effective Date, including any claims for attorneys' fees and costs, any disbursements and expenses, including experts fees incurred on behalf of Plaintiffs in this Litigation, and damages, the State of Maryland shall pay Plaintiffs the sum of $142,500.00 by check made payable to Foley & Lardner LLP, Client Trust Account within sixty days of Board of Public Works approval.

Counsel who brings an enforcement action on behalf of Plaintiffs pursuant to Subsection D of this Section and who obtains a judgment against DPSCS, will only be entitled to attorneys' fees starting from the date of the filing of the enforcement action, and only at an hourly rate limited to 150% of the hourly rate established under 18 U.S.C. § 3006A, regardless of jurisdiction of the suit.

      D.      Enforcement Provisions

Pursuant to 18 U.S.C. § 3626(c)(2), during the term of the Agreement, Plaintiff(s) may move the court for reinstatement of the lawsuit solely for a claim for breach or specific performance of this Agreement subject to notification as set forth in paragraph 3 of this Subsection. An action to enforce this Agreement does not include any action for damages.

As an alternative to an action for breach of this Agreement, pursuant to 18 U.S.C. § 3626(c)(2), during the term of the Agreement, any Plaintiff(s) may move the court for reinstatement of the lawsuit solely for a claim for breach or specific performance of this Agreement subject to notification as set forth in paragraph 3 of this Subsection. Such an action to enforce this Agreement does not include any action for damages.

The lawsuit may not be reinstated, nor a claim for breach or specific performance of this Agreement brought, before such Plaintiff(s) first notifies DPSCS of the nature of the alleged material non-compliance in writing to the ADA Coordinator designee assigned to DPSCS Headquarters and DPSCS' counsel, to be designated at a later date, and gives DPSCS 60 days to investigate and/or cure the alleged breach. In the event that the alleged breach is cured by DPSCS within the sixty day period, Plaintiff(s) may not move the court for reinstatement of the lawsuit or bring an action for breach or specific performance. Plaintiff is still obligated to comply with and exhaust all administrative remedies procedures prior to filing suit in the event the alleged breach is not cured within the time frame specified in this Agreement.

## XVIII. MISCELLANEOUS PROVISIONS

A.    Non-Admission

It is understood and agreed that this Agreement is a compromise of disputed claims, facts, and allegations.  Nothing in this Agreement constitutes an admission of any liability, wrongdoing, or violation of any law, or the admission of the validity of any defense.

B.    Private Settlement Agreement

This Agreement is a private settlement Agreement within the meaning of 18 U.S.C. § 3626. It is the intent of the parties that this Agreement will not, under any circumstances, be considered a consent decree or its equivalent. Except as expressly provided in part XII, section C of this Agreement, nothing in this Agreement gives rise to any right to recover attorneys' fees or cost of litigation.

C.    Confidentiality

No part of this Agreement is or will be considered confidential by the parties. This Agreement will be made available under the terms of the Maryland Public Information Act.

D.    Entire Agreement

This Agreement constitutes the entire Agreement between the parties.  There were no inducements or representations leading to the execution of this Agreement, except as stated within the Agreement itself.  The terms of this Agreement are contractual in nature.

E.    Binding

This Agreement is final and binding on the Parties, including all principals, agents, executors, administrators, representatives, successors in interest, beneficiaries, assigns, heirs, and legal representatives thereof.  Each Party has a duty to so inform any such successor in interest.

F.    Non-Waiver

Failure by the Plaintiffs to seek enforcement of this Agreement pursuant to its terms with respect to any instance or provision will not be construed as a waiver to such enforcement with regard to other instances or provisions.

G.    Severability

In the event that a court determines that any provision of this Agreement is unenforceable, such provision will be severed from this Agreement and all other provisions will remain valid and enforceable, provided; however, that if the severance of any such provision materially alters the rights or obligations of the Parties hereunder, the Parties will attempt, through reasonable, good faith negotiations, to agree upon such other amendments to this Agreement as may be necessary to restore the Parties as closely as possible to the relative rights and obligations initially intended by them hereunder.

XIX.    TERM OF AGREEMENT

This Agreement shall remain in effect for three (3) years from the Effective Date.

EXECUTED:

PLAINTIFFS

_____
Christopher Jarboe

_____
Gary Denmark

_____
Vander Davis

_____
Carroll Connelly

_____
Garfield Redd

31

## XIX.  TERM OF AGREEMENT

This Agreement shall remain in effect for three (3) years from the Effective Date.

**EXECUTED:**

PLAINTIFFS

_____
Christopher Jarboe

_____
Gary Denmark

_____
Vander Davis

_____
Carroll Connelly

_____
Garfield Redd

Exhibit 159

# SETTLEMENT AGREEMENT BETWEEN
# THE UNITED STATES OF AMERICA
# AND
# WISCONSIN DEPARTMENT OF CORRECTIONS
# UNDER THE AMERICANS WITH DISABILITIES ACT
# DJ # 204-85-131

## I.    BACKGROUND & JURISDICTION

1.    The parties ("Parties") to this Settlement Agreement ("Agreement") are the United States of America ("United States") and the Wisconsin Department of Corrections ("WDOC").

2.    This Agreement resolves the United States' investigation of WDOC for alleged discrimination against individuals with disabilities under Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131-12134 ("Title II"), and its implementing regulation, 28 C.F.R. Part 35.

3.    The United States initiated its investigation after receiving complaints from incarcerated individuals at the Felmers O. Chaney Correctional Center ("FCCC"), alleging that WDOC failed to provide auxiliary aids and services necessary to ensure effective communication to incarcerated individuals with hearing disabilities. The United States also received complaints from incarcerated individuals at Racine Correctional Institution ("RCI") that WDOC fails to provide effective communication for incarcerated individuals with hearing disabilities and thereby denied them participation in educational, vocational, religious, and other programs on the basis of their disabilities. They further allege that WDOC failed to timely repair and return hearing aids to incarcerated individuals, thereby preventing them from participating fully in counseling, educational, recreational, religious, and social programs. The United States also received a complaint from an incarcerated individual at Taycheedah Correctional Facility ("TCI") alleging that WDOC failed to provide access to auxiliary aids and services to ensure effective communication.  The United States' investigation included document review and interviews with WDOC incarcerated individuals at FCCC, RCI and TCI and interviews and discussions with personnel, and administrators at FCCC and RCI.

4.    The United States conducted an investigation of the programs, services, activities, and facilities of WDOC at FCCC, RCI, and TCI.

5.    The ADA applies to WDOC because it is a "public entity" as defined by Title II of the ADA.  42 U.S.C. § 12131(1). Title II prohibits discrimination against qualified individuals with disabilities on the basis of disability in the "services, programs, or activities of a public entity."  42 U.S.C. § 12132.

6.  The parties agree that it is in their best interests, and the United States believes that it is in the public interest, to resolve this matter without engaging in protracted litigation.  The parties have therefore voluntarily entered into this Agreement.

7.  In consideration of, and consistent with, the terms of this Agreement, the United States Attorney General agrees to refrain from filing a civil suit in this matter, except as provided in the section entitled "Implementation and Enforcement."

## II.    DEFINITIONS

8.  **"ADA Compliance Director"** means an employee of WDOC who has responsibility and authority to ensure that: WDOC facilities are readily accessible to and usable by incarcerated individuals with disabilities; and WDOC provides incarcerated individuals with disabilities equal opportunity to participate in and benefit from its services, programs, and activities, to include the provision of appropriate auxiliary aids and services to ensure effective communication; and that incarcerated individuals' requests for accommodations, complaints, and grievances are addressed and resolved as set forth in this Agreement.

9.  **"Auxiliary aids and services"** means those aids and services as set forth in 28 C.F.R. § 35.104, and accordingly, include qualified interpreters on-site or through video remote interpreting (VRI) services; note takers; computer-aided real-time transcription services (CART); written materials; exchange of written notes; telephone handset amplifiers; assistive listening devices; assistive listening systems; telephones compatible with hearing aids; closed caption decoders; open and closed captioning, including real-time captioning; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and captioned telephones, or equally effective telecommunications devices; videotext displays; accessible electronic and information technology; or other effective methods of making aurally delivered information available to individuals who are deaf, hard of hearing, or who have a speech disability.

10. **"Communication Plan"** means the individualized description of accommodations, including appropriate auxiliary aids and services that will be provided to each incarcerated individual with hearing disabilities to ensure effective communication and access to programs, services, facilities, and activities. The Communication Plan is based on information collected at Intake, and/or from the Secondary Hearing Assessment.  It is developed in coordination with the ADA Compliance Director and the Facility ADA Coordinator.

11. **"Correctional Facility"** means any institution or correctional center or facility, community corrections location, or resource center where WDOC operates, supervises, controls, manages, or contracts to receive services for incarcerated individuals who are serving the confinement portion of their sentence in WDOC's physical custody, or who are subject to reincarceration during extended supervision.

12. **"Critical Interactions"** means those interactions in which the risk of miscommunication or misunderstanding are high, and the consequences of miscommunications or misunderstandings may have serious repercussions for incarcerated individuals with hearing disabilities. Examples of Critical Interactions at WDOC facilities include, but are not limited to: medical care treatment and appointments, including dental, vision, audiological, mental health care and referral appointments; individual therapy and group counseling sessions; disciplinary matters, including investigations and disciplinary hearings; interviews with Internal Affairs or investigators; interviews or proceedings regarding protective custody; pre-release meetings and programs, including pre-release to extended supervision; grievance hearings; educational programs, specific training sessions and general educational opportunities and testing that include a verbal or aural component; vocational programs that include a verbal or aural component; transfer and classification meetings; religious services; prison job responsibilities; and meetings with the ADA Compliance Director or the Facility ADA Coordinator to discuss what auxiliary aids and services to include in the incarcerated individual's Communication Plan.

13. **"Effective Communication"** means communication with individuals who have hearing disabilities that is as effective as communication with others. Effective communication is achieved by furnishing appropriate auxiliary aids and services where necessary to afford qualified individuals with disabilities an equal opportunity to participate in or benefit from the services, programs, or activities of a public entity.

14. **"Facility ADA Coordinator"** means the designated person at each WDOC Correctional Facility with the responsibility and authority to develop an incarcerated individual's Communication Plan to provide incarcerated individuals with disabilities the auxiliary aids and services necessary to ensure effective communication and access to programs, services, facilities, and activities.

15. **"Intake Hearing Screening"** means the initial inquiry, conducted during an incarcerated individual's Intake, regarding whether an incarcerated individual may have a hearing disability. The Intake Hearing Screening forms the basis for follow up by WDOC if a hearing disability is identified, and, where a hearing disability is identified, triggers the development of an incarcerated individual's Communication Plan. If a hearing disability is suspected, but not identified, during the Intake Hearing Screening, a Secondary Hearing Assessment may be ordered to confirm or rule out a hearing disability.

16. **"Intake"** means the process from the point in time at which an incarcerated individual is taken into the custody of WDOC at a WDOC Correctional Facility, through the point in time the incarcerated individual is received at, and assigned to, a unit within a maintaining WDOC Correctional Facility. Intake includes orientation, medical and psychological assessment, educational testing and evaluation, and classification and housing assignment. This term also applies to any similar process for short-term detainees.

17. **"Incarcerated individual with Hearing Disabilities"** means an incarcerated individual who, if unaided by hearing aids or any medical device, is unable to hear in either one or

both ears to a sufficient degree to be able to understand the spoken word. Throughout this document, the term "incarcerated individuals with hearing disabilities" is used to refer to individuals who are deaf or hard of hearing.

18. **"Personnel"** means all WDOC employees and contractors who are responsible for the custody, oversight, and care of incarcerated individuals in WDOC facilities.

19. **"Qualified Individual with a Disability"** means "an individual with a disability who with or without reasonable modifications to policies, practices, or procedures, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity. 42 U.S.C. § 12131(2). *See also* 28 C.F.R. § 35.108.

20. **"Qualified Interpreter"** means an interpreter who, via a video remote interpreting (VRI) service or an on-site appearance, is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary, given the individual with hearing disabilities' language, skills and education. Qualified interpreters include, for example, sign language interpreters, oral transliterators, and cued-language transliterators. *See* 28 C.F.R. § 35.104, Pt. 35, App. A. "Qualified Interpreter." For the purposed of this Agreement, a Certified Deaf Interpreter is also considered a qualified interpreter.

21. **"Secondary Hearing Assessment"** means a hearing assessment to (1) determine whether an incarcerated individual has a hearing disability, (2) obtain additional information on the extent of an incarcerated individual's hearing disability, and/or (3) help determine what auxiliary aids and services are required to ensure effective communication. It may be ordered either after the initial Intake Hearing Screening, or when an incarcerated individual presents with a suspected hearing disability during incarceration. A Secondary Hearing Screening can be ordered at any time during incarceration and may require a third-party provider.

22. **"Text Telephone/Teletype Terminal/Teletypewriter"** (TTY) means a device that allows individuals with hearing disabilities to use a telephone to type and send text messages.

23. **"Telecommunications Relay Service"** (TRS) means an operator service that allows people with hearing disabilities to place calls to standard telephone users via keyboard or assistive device.

24. **"Videophone"** means a telephone with a camera and screen for visual, real-time communication.

25. **"Video Relay Service"** (VRS) means a telephone service using interpreters connected to callers by video hook-up that is designed to provide persons with hearing disabilities who use American Sign Language with telephone services that are functionally equivalent to those provided to users who are hearing.

26. **"Video Remote Interpreting"** (VRI) means an interpreting service that uses video conference technology over dedicated lines or wireless technology offering a high-speed, wide-bandwidth video connection that delivers high-quality video images as provided in 28 C.F.R. § 35.160(d).

## III.  GENERAL

27. **Nondiscrimination Based on Disability.** WDOC and its officers, employees, agents, successors, and assigns, will ensure that individuals with hearing disabilities are not discriminated against on the basis of disability in WDOC's services, programs, and activities, and will comply with all requirements of Title II of the ADA, 42 U.S.C. §§ 12131–12134, and its implementing regulation, 28 C.F.R. Part 35.  WDOC's obligations under the ADA include, but are not limited to, the following:

   a.  WDOC will not discriminate against or exclude qualified incarcerated individuals with disabilities from participation in, or deny such incarcerated individuals the benefits of, WDOC's services, programs, or activities, including, but not limited to, housing, recreation, commissary, dayrooms, telephones, regular meals, education, postsecondary education, and work and study release, on the basis of an incarcerated individual's disability, 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a), (b)(1)(i);

   b.  WDOC will not, on the basis of disability, deny qualified incarcerated individuals with hearing disabilities the opportunity to participate in or benefit from WDOC's aids, benefits, or services, 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(1)(i).

   c.  WDOC will not, on the basis of disability, provide aids, benefits, or services to qualified incarcerated individuals with hearing disabilities that are unequal to, or different or separate from, those afforded to incarcerated individuals who do not have disabilities, unless different or separate services are necessary to provide such incarcerated individuals with disabilities benefits, aids, or services that are as effective as those provided to others, 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(1)(ii), (iv);

   d.  WDOC will reasonably modify its policies, practices, and procedures where necessary to avoid discrimination on the basis of disability unless WDOC demonstrates that such modifications would fundamentally alter the nature of its services, programs, or activities, 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(7).

   e.  WDOC will not impose or apply eligibility criteria that screen out or tend to screen out incarcerated individuals with disabilities from fully and equally enjoying WDOC's services, programs, or activities, unless WDOC demonstrates that such criteria are necessary for its provision of those services, programs, or activities, 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(8); and

5

## IV.  EFFECTIVE COMMUNICATION AND AUXILIARY AIDS AND SERVICES

29.  WDOC will provide appropriate auxiliary aids and services to ensure effective communication and the equal opportunity to participate in and enjoy the benefits of WDOC's services, programs, and activities. This includes all programs, services, and activities provided by entities pursuant to a contract with WDOC, such as third-party vendors, contractors, or state funded entities such as community colleges.

30.  All auxiliary aids and services required by this Agreement will be provided promptly and free of charge to incarcerated individuals with hearing disabilities. In determining what types of auxiliary aids and services are necessary, WDOC will give primary consideration to an incarcerated individual's request for a particular auxiliary aid or service and will honor that request unless WDOC can demonstrate that another equally effective means of communication exists or unless providing the requested auxiliary aid or service would fundamentally alter the nature of the program, service, or activity, or result in an undue financial or administrative burden. 28 C.F.R. §§ 35.160, 35.164.  If a determination is made by WDOC that a particular request would fundamentally alter the service, program, or activity, or would result in an undue financial or administrative burden, WDOC will provide an appropriate alternative auxiliary aid or service to accommodate the incarcerated individual. WDOC will create a written record of any such denial documenting the reasons for the denial with specificity, and identify the appropriate alternative auxiliary aid or service provided in lieu of the original request. Such records will be maintained for the duration of this Agreement.

31.  WDOC will provide and maintain written instructions for incarcerated individuals and WDOC personnel that describe the proper procedures for when and how to request auxiliary aids and services and the proper operation for each type of auxiliary aid or service.

### Hearing Aids, Cochlear Processer Devices, and Batteries

32.  Consistent with its custodial role, WDOC will provide the appropriate type and number of hearing aids and cochlear processor devices, free of charge, to incarcerated individuals who have been prescribed hearing aid(s) or who have cochlear implants. Standard hearing aids and cochlear processor devices will be provided to incarcerated individuals requesting them as soon as reasonably possible after a request is received from the incarcerated individual or the incarcerated individual's treating health care provider. WDOC will place the order through the Health Services Unit (HSU) for the hearing aids and cochlear processor devices within 2 business days of receipt of the request. A copy of the order will be provided to the Facility ADA Coordinator for tracking purposes. Upon receipt of the hearing aids or cochlear processor devices at the Correctional Facility, WDOC will provide the item to the incarcerated individual within 3 business days. If more than 14 days elapses between ordering and providing the hearing aids or cochlear processor devices, WDOC will supply a temporary means of effective communication, investigate the delay, and provide the incarcerated individual with an update on the status of the order.

33. WDOC will provide the appropriate type and number of hearing aid and cochlear processor replacement batteries or battery chargers, free of charge, to incarcerated individuals who have been prescribed hearing aid(s) or who have cochlear implants. Replacement batteries will be provided to incarcerated individuals requesting them as soon as reasonably possible. The WDOC will place the order for the replacement through the Health Services Unit (HSU) within 2 business days of receipt of the request. A copy of the order will be provided to the Facility ADA Coordinator for tracking purposes. Upon receipt of the replacement batteries or battery chargers at the Correctional Facility, WDOC will provide the replacement item to the incarcerated individual within 3 business days. If more than 14 days elapses between ordering and providing the replacement batteries, battery chargers, or cochlear processor devices, WDOC will provide a temporary means of effective communication, investigate the delay, and provide the incarcerated individual with an update on the status of the order.

34. When an incarcerated individual's hearing aid, cochlear processor, or other such device is inoperable or malfunctioning, WDOC will send the device to an appropriate repair company as soon as reasonably possible. The WDOC will make every reasonable effort to send the device to the appropriate repair company within 2 business days after an individual health services request (form DOC-3035) is received from the individual. A temporary means of effective communication will be provided to the individual for use during the time that the original hearing aid is out for repairs. WDOC will inform the individual when the device was sent for repair and when it is expected to be returned by the repair company. WDOC will provide the individual with any written documentation provided by the repair company regarding the vendor used, the date of the repair, and the specific repairs performed.

35. If the incarcerated individual's hearing loss warrants clinical reassessment, WDOC will ensure the individual retains the original device (if functional), and WDOC will schedule an appointment for evaluation as soon as reasonably possible based on the availability of the third-party provider. WDOC will take additional appropriate steps to ensure effective communication with the incarcerated individual during any period in which the incarcerated individual is without their hearing aid, cochlear processor, or other such device.

### Interpreting Service Agencies

36. WDOC will maintain contracts with one or more interpreter service agencies to ensure that qualified interpreting services, including VRI, are available, 24 hours per day and 7 days a week. Alternatively, WDOC may make other appropriate arrangements such as contracting directly with, or hiring, qualified interpreters on a fee for service basis. Documentation of interpreter services contracts will be provided in the compliance reports required in "Monitoring and Reporting Requirements" in this Agreement.

### Use of Others to Facilitate Communication

37. WDOC will not use another incarcerated individual to interpret for an individual who has a hearing disability unless (1) the individual with a disability specifically requests such

assistance from another incarcerated individual, the incarcerated individual agrees, and reliance on that incarcerated individual is appropriate under the circumstances; or (2) in an emergency involving an imminent threat to the safety or welfare of the individual or the public where there is no interpreter available.  28 C.F.R. § 35.160(c).

38. Except for WDOC personnel hired specifically to serve as qualified sign language interpreters, WDOC will not use its personnel to serve as sign language interpreters except in appropriate circumstances, such as:  informal communications, providing basic information to an incarcerated individual with a hearing disability while waiting for a qualified interpreter to arrive, or in an emergency involving an imminent threat to the safety or welfare of the individual or the public where there is no qualified interpreter available. 28 C.F.R. § 35.160(c).

### Video Remote Interpreting (VRI)

39. To the extent WDOC utilizes VRI to provide effective communication, WDOC will provide access to, and have available for emergency situations and otherwise as deemed necessary by WDOC, on-demand video remote interpreting.  WDOC will ensure that the VRI provides:

    a. Real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication.

    b. A sharply delineated image that is large enough to display the interpreter's face, arms, hands, and fingers, and the participating individual's face, arms, hands, and fingers, regardless of his or her body position.

    c. A clear, audible transmission of voices; and

    d. Adequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the VRI.

40. WDOC will require that the VRI provider(s) use only Qualified Interpreters.  WDOC will ensure that at least one of the VRI systems is housed in WDOC Correctional Facilities at which incarcerated individuals with hearing disabilities are incarcerated.

41. When use of a qualified interpreter is necessary to provide effective communication for interactions, on-site interpreter services are required when VRI is not available or the use of VRI is not feasible or does not result in effective communication, such as where the incarcerated individual is unable to see clearly the video monitor (for example, due to vision difficulties or because the video monitor is out of the incarcerated individual's sightline), where the signal is interrupted causing unnatural pauses in communication, or where the image is grainy or otherwise unclear.  28 C.F.R. § 35.160(d).

### Telecommunication and Audio Devices

42. Within 30 days of the effective date of this Agreement, WDOC will make the following communication technologies available at all its WDOC Correctional Facilities where incarcerated individuals with hearing disabilities are incarcerated to facilitate communication between incarcerated individuals with hearing disabilities and people outside of WDOC Correctional Facilities. This list of equipment is not exhaustive.

    a. **TTY (teletypewriter) and Telephone.** Every WDOC Correctional Facility will provide access to a TTY and speech-to-text telephone that is compatible with hearing aids, and, where necessary, modified to enable volume control, in each unit housing individuals with hearing disabilities. WDOC will ensure that at least one TTY will be available and readily accessible during the same hours as the standard telephone.

    b. **Relay Services.** Incarcerated individuals with hearing disabilities at WDOC Correctional Facilities using relay services may not be charged any more than individuals not using relay services and will be charged the per minute rate established by WDOCs' contract with its telephone service provider, consistent with applicable law.

    c. **Videophones.** WDOC will make videophones, either portable or non-portable, available at every WDOC Correctional Facility housing incarcerated individuals with hearing disabilities. WDOC will provide a videophone at a location easily accessible to individuals with hearing disabilities and that provides privacy in a manner equal to individuals without hearing disabilities. Individuals with hearing disabilities will be provided access to these devices in a manner equivalent to the access afforded to individuals who use a standard telephone.

    d. **Over-the-Ear Headphones.** WDOC will make over-the-ear headphones available to incarcerated individuals with hearing disabilities who wear hearing aids to the same extent that individuals without hearing disabilities are provided earbuds or on-the-ear headphones for television and radio. Over-the-ear headphones enable the individual who wears hearing aids to listen to television and radio without removing their hearing aids.

43. WDOC agrees to keep abreast of evolving technology and to consider adding new equipment and technologies to reflect technological advances.

44. WDOC Correctional Facilities housing incarcerated individuals with hearing disabilities will provide a list of communications equipment available to individuals with hearing disabilities upon their arrival at WDOC Correctional Facility.

45. WDOC will maintain all auxiliary aids and services for incarcerated individuals with hearing disabilities at WDOC Correctional Facilities in working condition, or promptly repair them.

46. WDOC staff will resolve complaints about any malfunctioning equipment used for auxiliary aids and services (e.g., TTY, videophone) within one week of receiving that complaint, including initiating a work order if appropriate. WDOC will not be considered in breach of this provision if the delay is caused by third party vendors, delivery errors, or any other issue caused by third parties or circumstances outside of WDOC control. However, any delay beyond one week requires WDOC to identify and implement an interim solution to ensure effective communication until the device is repaired and returned to the incarcerated individual with hearing disabilities.

47. **Telecommunication Services.** WDOC will provide incarcerated individuals with hearing disabilities at WDOC Correctional Facilities with telecommunication devices to ensure communication with people outside of WDOC that is substantially similar to the access to telecommunication services WDOC provides to individuals who do not have hearing disabilities.

48. **Monitoring Communications.** WDOC may monitor communications between incarcerated individuals with hearing disabilities at WDOC Correctional Facilities and individuals outside of WDOC to the same extent and with the same discretion applied to the monitoring of communications between incarcerated individuals that do not have hearing disabilities and individuals outside of WDOC.

49. **Additional Time.** WDOC will maintain a written policy that provides incarcerated individuals with hearing disabilities at its WDOC Correctional Facilities three times the amount of time to use telecommunication services such as TTY or VRI, as incarcerated individuals who do not have hearing disabilities. WDOC will notify incarcerated individuals with hearing disabilities and correctional staff of such additional time for telecommunications.

50. **Privacy of Communications.** WDOC will ensure that the privacy of telephone calls by incarcerated individuals using a videophone, TTY, telephone with volume control, or other telecommunication device is equal to that of other incarcerated individuals' telephone calls.

### Process for Identification and Accommodation of Incarcerated individuals with Hearing Disabilities

51. **Intake Policies and Procedures.** WDOC will provide incarcerated individuals with access to Qualified Interpreters or appropriate auxiliary aids and services, as are necessary to afford the incarcerated individuals effective communication at Intake. Access to Qualified Interpreters or appropriate auxiliary aids and services will be provided from the point that an incarcerated individual with a hearing disability notifies WDOC of their disability, or WDOC suspects an incarcerated individual of having a hearing disability. Qualified Interpreters or auxiliary aids and services will be provided to aid in the explanation of WDOC policies and procedures. Primary consideration will be given to the request of the incarcerated individual for a Qualified Interpreter or a specific auxiliary aid or service.

    a. WDOC will provide access to a Qualified Interpreter or other auxiliary aids and

services necessary for the incarcerated individual with a hearing disability to understand and complete the Intake process. In the event WDOC is not aware, prior to Intake, that the incarcerated individual will require an interpreter or other auxiliary aid or service to ensure effective communication, WDOC will immediately notify the ADA Compliance Director or their designee, who will be responsible to obtain an interpreter, either in person or by video telephone or video relay. The interpreter must be provided within 2 hours of a request.

b.  WDOC will provide written notification on Intake and orientation materials for incarcerated individuals with hearing disabilities with information on how to request a Qualified Interpreter or other auxiliary aids or services for assistance in understanding information during the Intake process.

52. Within 30 days of the Effective Date of this Agreement, WDOC will implement a comprehensive procedure to identify and provide every incarcerated individual with hearing disabilities with appropriate auxiliary aids and services. The procedure will include, at a minimum, (1) an Intake Hearing Screening; (2) a Secondary Hearing Assessment if necessary, and (3) the development of a Communications Plan.

53. **Timeline Screening, Assessment, and Communication Plan.** The Intake Hearing Screening will occur within 3 business days of initial entry into WDOC.  A referral for a Secondary Hearing Assessment, if needed, will be made within 10 business days of the Intake Hearing Screening. The incarcerated individual and the Facility ADA Coordinator or their designee will meet to finalize the Communication Plan as soon as reasonably possible, but no later than 10 business days following the Intake Hearing Screening. Regardless of whether a Secondary Hearing Assessment is ordered, the Communications Plan shall be finalized within 10 business days of the Intake Hearing Screening.

54. **Intake Hearing Screening.** Within 3 business days of entry into WDOC, WDOC will screen every incarcerated individual for hearing disabilities as part of WDOC intake process.  WDOC will document the Hearing Screening with the Intake Hearing Screening Assessment Form, Attachment B, of this Agreement. In the event there is a disagreement about the type and number of hearing aids an incarcerated individual requires, WDOC will seek a Secondary Hearing Assessment, and will use the results of the Secondary assessment in its determination about the number and type of hearing aids and cochlear processor devices an incarcerated individual receives. If the incarcerated individual has a hearing disability or an apparent hearing disability (e.g., wears hearing aids), WDOC personnel will complete as much of the Communication Plan, Attachment C, as possible at Intake. Instead of using Attachments B and C, WDOC may electronically gather and document the information required by Attachments B and C in the incarcerated individual's Electronic Medical Record (EMR) and/or Wisconsin Integrated Corrections System (WICS) profile. If WDOC opts to use EMR and WICS to gather and document the information required in Attachments B and C, WDOC will include all the same substantive information from Attachments B and C, including the auxiliary aids and services and a complete copy of the incarcerated individual's Communication Plan.

55. **Secondary Hearing Assessment**. If WDOC determines a need for, or an incarcerated individual requests at any time during incarceration, assessment for a hearing disability,

11

WDOC will make a referral to an appropriate licensed professional (e.g., ENT, audiologist, licensed hearing aid dispenser), within 10 days of the determination or request, for Secondary Hearing Assessment. The Secondary Hearing Assessment may include an audiological examination or other appropriate diagnostic procedures. Information from the Secondary Hearing Assessment will be used to augment an incarcerated individual's existing Communication Plan, or to develop a new Communication Plan for incarcerated individuals who are suspected of having hearing disabilities during incarceration. If hearing aids or other auxiliary devices are recommended as a result of the Secondary Hearing Assessment, WDOC will review and, if appropriate, order those devices, through the Health Services Unit (HSU), within 7 business days upon receipt of the Secondary Hearing Assessment report. A copy of the Secondary Hearing Assessment will be provided to the Facility ADA Coordinator for tracking purposes. Any hearing aids or auxiliary devices will then be provided within 3 business days of their receipt at the incarcerated individual's Correctional Facility. If more than 14 days elapses between ordering and providing the hearing aids or other auxiliary devices, WDOC will supply a temporary means of effective communication, investigate the delay, and provide the incarcerated individual with an update on the status of the order. At the same time, WDOC will notify the United States of the delay and the plan to resolve it. If WDOC does not implement the recommendations of the Secondary Hearing Assessment, WDOC must fully document and explain the rationale for doing so. A copy of such rationale will be retained in the incarcerated individual's records and shall be available to the United Stated for review during the term of this Agreement.

56. **Communication Plan**. Within 10 business days of an Intake Hearing Screening, or Secondary Hearing Assessment, WDOC will finalize a Communication Plan, as set forth in Attachment C to this Agreement, for every incarcerated individual with a hearing disability. Instead of using Attachment C, WDOC may electronically gather and document the information required by Attachment C in the incarcerated individual's EMR and/or WICS profile. The Communication Plan will identify the auxiliary aids and services WDOC will provide to the incarcerated individual to ensure effective communication. Any interactions not covered by an incarcerated individual's individual Communications Plan will be governed by the other applicable provisions of this Agreement. To the extent that Attachment C is used in paper format, WDOC will also maintain an electronic copy of the Communication Plan in the incarcerated individual's EMR and/or WICS record. The most current version of the Communication Plan supersedes any previous versions and will be updated periodically to reflect changes to the incarcerated individual's hearing status.

   a. **Primary Consideration**. WDOC in consultation with the incarcerated individual will make the determination of the appropriate auxiliary aids and services necessary to ensure effective communication. In determining what type of auxiliary aids and services are necessary, WDOC will give primary consideration to the expressed choice of the incarcerated individual and must honor that choice unless WDOC can demonstrate that another equally effective means of communication exists. 28 C.F.R. § 35.160(b)(2).

   b. **List of Auxiliary Aids and Services.** The Communication Plan will include a list of the auxiliary aids and services the incarcerated individual is entitled to for

effective communication for critical interactions as defined above in paragraph 12.

    c.   **Amending the Communication Plan.** WDOC will establish and implement a procedure for incarcerated individuals with hearing disabilities to work with the ADA Compliance Director and/or the Facility ADA Coordinator to make amendments or modifications to the Communication Plan.  An incarcerated individual with a hearing disability may change their preferences, including modifying, adding, or waiving services.  An incarcerated individual with a hearing disability may request the ADA Compliance Director and/or ADA Facility Coordinator to supplement or modify the information contained on their Communications Plan at any time during their incarceration even if the incarcerated individual had previously declined services.

57.  **Transfers within WDOC.** WDOC will ensure that every incarcerated individual who transfers between WDOC facilities receives the same auxiliary aids and services at the receiving facility as were provided at the former WDOC facility. WDOC receiving facility is required to provide auxiliary aids and services, including Qualified Interpreters, to the incarcerated individual based on the Communication Plan.

58.  WDOC will inform all personnel having contact with an incarcerated individual with hearing disabilities of the incarcerated individual's disability and the auxiliary aids and services necessary to facilitate effective communication. An incarcerated individual's identity as someone with a hearing disability needing appropriate auxiliary aids and services for effective communication will be shared with WDOC personnel who have a job-related need to know. This obligation may be satisfied by including the information in an incarcerated individual's WICS profile and providing WDOC personnel access to the profile.

59.  During the Intake process, the incarcerated individual will be offered the opportunity to have a modified identification ("ID") card that clearly identifies the incarcerated individual as having a hearing disability on the card.  This ID card will use the designation "Deaf" or "Hard of Hearing" or "Hearing Disability." The incarcerated individual can decline the modified card in favor of a standard issue identification card.  The waiver of the modified card does not waive the incarcerated individual's right and/or access to eligible services. The incarcerated individual will not be precluded from changing their preference during the period of incarceration to remove the waiver and may opt to have a modified ID card issued at any time, and WDOC will provide the modified ID card within 10 business days.

### Unanticipated Interactions

60.  **Interactions not Addressed in Communication Plan.** WDOC will implement policies to timely address unanticipated interactions and to resolve conflicts that arise when determining the type of auxiliary aids and services to provide to an incarcerated individual with hearing disabilities.  In the event an unanticipated interaction or condition arises that is not addressed in the Communication Plan, WDOC will construe the obligation to provide auxiliary aids and services broadly and will use the most appropriate auxiliary aid or service that is analogous to other similar types of interactions required under the Communication

Plan.

61. **Time for Interpreter Response.** To the extent an interaction, meeting, or other event is not anticipated by the Communications Plan, or to the extent an incarcerated individual does not yet have a Communications Plan in place, WDOC will provide qualified interpreters accordingly:

    a. WDOC will provide a qualified interpreter when a qualified interpreter is necessary to ensure effective communication. The activity, service, or program may be delayed until the interpreter is made available or within 4 hours, whichever is earlier, or the incarcerated individual may elect to delay participation in the activity, service, or program until the interpreter is available, except in situations or circumstances involving an emergency as described in this Agreement.

    b. Unless an interpreter is scheduled in advance (e.g., for an upcoming disciplinary hearing or a scheduled medical appointment), the qualified interpreter will be provided at the earliest reasonable time, and in all events no later than 4 hours from the time an incarcerated individual with hearing disabilities requests an interpreter,  The incarcerated individual will not be required to attend the event without a qualified interpreter except in situations involving an emergency. However, the event (if it is specific to the individual) may be rescheduled until an interpreter can participate, but no later than 72 hours from the scheduled event, absent exigent circumstances.

    c. WDOC will use the most effective, readily available means of communicating with the incarcerated individual until such time as a qualified interpreter is present and will notify the incarcerated individual of the status of WDOC's efforts to secure a qualified interpreter on the incarcerated individual's behalf, within 30 minutes of WDOC making the request for the interpreter service. WDOC will provide additional updates to the incarcerated individual, as necessary, until an interpreter is secured. Notification of efforts to secure a qualified interpreter does not obviate WDOC's obligation to provide qualified interpreters in a timely manner.

## Documentation and Records

62. WDOC will document all requests it receives for qualified interpreters and the action taken in response to each request, including denials of services. When an oral request for a qualified interpreter is received by WDOC personnel, the employee receiving the request will document the request and the action taken in response to the request, including denials of services, in the incarcerated individual's WICS profile within one (1) hour from the time of the request, absent exigent circumstances. The documentation will be promptly provided to the United States for review of compliance with this Agreement upon reasonable notice and request by the United States and included in the compliance reports required in "Monitoring and Compliance" in this Agreement.

63. **Incarcerated Individuals' Records.** WDOC will maintain copies of the Intake Hearing Screening, Secondary Hearing Assessment, and Communication Plan in each incarcerated individual's records.

## Policies and Procedures

64. **Effective Communication Policy.** WDOC will adopt and implement the Effective Communication Policy that is set forth in Attachment D.  WDOC will ensure that all correctional and program staff, contractors, agents, and employees of WDOC are aware of, and comply with, the Effective Communication Policy.

65. If any incarcerated individual who has a hearing disability requires a different auxiliary aid or service than originally provided, WDOC will provide that other aid or service unless doing so would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens.  28 C.F.R. § 35.164.

66. **Adoption of the Policy and Procedure to Identify and Accommodate Incarcerated Individuals with Hearing Disabilities.** Within 60 days of the effective date of this Agreement, WDOC will adopt and implement the Identification and Accommodation of Incarcerated Individuals with Hearing Disabilities Policy set forth in Attachment D.

## Centralized Database of Incarcerated individuals with Hearing Disabilities

67. Within 90 days of the Effective Date, WDOC will modify its existing database, or create a new database, that provides a centralized location for information that identifies that each incarcerated individual with a hearing disability and the incarcerated individual's requirements for auxiliary aids and services. This centralized database will include at a minimum the following information:

    a. The name of the incarcerated individual;

    b. The facility at which the incarcerated individual is housed;

    c. Whether the incarcerated individual has an identification card or placard with the designation, "Hearing Disability";

    d. Copies of the incarcerated individual's Intake Hearing Screening, Secondary Hearing Assessment, if applicable, and the Communication Plan;

    e. An inventory of specific auxiliary aids and services WDOC provides to the incarcerated individual, as described in the incarcerated individual's Communication Plan; and

    f. Copies of authorizations and maintenance records for the incarcerated individual's auxiliary aids and services.

68. WDOC will promptly and regularly update the centralized database to account for information relating to all incarcerated individuals identified with a hearing disability and

any changes to the Communication Plan.

69.   The centralized database will be available to all WDOC custody and program staff.

### Interpretation of Written Materials

70.   WDOC will provide an incarcerated individual with a hearing disability the written materials it provides to all incarcerated individuals, and upon request, provide a Qualified Interpreter to ensure the incarcerated individual with a hearing disability understands the contents of the written materials.

71.   WDOC will effectively communicate the contents of the Inmate Handbook and other written materials, and if provided, the orientation video, and similar policies and publications to all incarcerated individuals who have a hearing disability, including those for whom written language is not an effective means of communication. WDOC may choose to meet this obligation by providing a video of a qualified interpreter signing the contents of the Inmate Handbook, Inmate Orientation Video, and similar policies, publications, and videos, along with appropriate technology for viewing, or by providing a qualified interpreter who will read and interpret the contents of the Inmate Handbook and similar policies and publications to the incarcerated individual who has a hearing disability.

72.   During the term of this Agreement, WDOC will include in all future printings of its Inmate Handbook and all similar publications a statement to the following effect:

> "To ensure effective communication with incarcerated individuals who have a hearing disability, the Wisconsin Department of Corrections will provide appropriate auxiliary aids and services free of charge, which may include:  qualified sign language interpreters and oral transliterators, TTYs, videophones, note-takers, computer-assisted real time transcription services, written materials, telephone handset amplifiers, assistive listening devices and systems, telephones compatible with hearing aids, closed caption decoders or TVs with built-in captioning, and open and closed captioning of Wisconsin Department of Corrections' programs."

### Visual Alerts and Notification Systems

73.   Incarcerated individuals with hearing disabilities incarcerated at WDOC Correctional Facilities shall not miss announcements, alarms, or any other auditory information from WDOC staff to the general incarcerated individual population solely because of their disability. Within 6 months of the effective date of this Agreement, WDOC will provide an effective visual or other notification system that will advise incarcerated individuals with hearing disabilities of announcements, alarms, or other auditory information provided to incarcerated individuals who do not have hearing disabilities. The visual notification system will include notification of emergencies, evacuations, education, work assignments, and daily prison activities, such as wake-up calls, mealtimes, recreational time, and other announcements.

74. WDOC will provide personal pagers, watches, or another similar device, that include visual as well as vibrating functions, in all WDOC Correctional Facilities that house incarcerated individuals with hearing disabilities. These personal devices will be used as supplemental notification systems to aid in daily notification of routine announcements and protocols, including wake-up calls, mealtimes, recreational times, and other normal and customary notifications. Incarcerated individuals may opt to forgo the use of these personal devices, in which case this information will be documented in the incarcerated individual's file and in the centralized database.

75. WDOC personnel will be properly trained in how to use the personal devices described in paragraph 74 and will be responsible for transmitting messages and alerts to the devices at the same time messages and alerts are broadcast to incarcerated individuals without hearing disabilities.

### Audio/Visual Media

76. WDOC will ensure that incarcerated individuals who have hearing disabilities have access to captioned audio-visual media and television programming available to incarcerated individuals.

77. WDOC will ensure that all audio-visual media purchased for incarcerated individual use in WDOC Correctional Facilities housing incarcerated individuals with hearing disabilities includes open or closed captioning and that captioning will be turned on for an incarcerated individual who has hearing disabilities, upon request.

### Medical Care

78. **Medical Emergencies.** If an incarcerated individual who has a hearing disability and requires a qualified interpreter for effective communication has a medical need that cannot wait for the assistance of a qualified interpreter to facilitate communication, WDOC will not delay in providing whatever medical care, treatment, evaluation, or service would be provided to other persons under similar circumstances. In such event, WDOC will use the most effective, readily available means of communicating with the incarcerated individual and will provide a qualified interpreter as soon as possible, but within no more than 2 hours. WDOC will require the interpreter service agencies with whom it contracts for VRI services to provide a qualified interpreter within 2 hours.

79. **Onsite Medical Care.** WDOC will provide auxiliary aids and services, including Qualified Interpreters, for scheduled appointments between incarcerated individuals with hearing disabilities and medical personnel at WDOC Correctional Facilities, including, but not limited to, review of medical history, medical appointments, follow-up meetings or appointments, and treatment meetings, consistent with the incarcerated individual's Communication Plan.

80. **Informing Appropriate Medical Staff.** WDOC staff will ensure that medical staff is aware that the incarcerated individual has a hearing disability and notify medical staff of the incarcerated individual's preferences as outlined on the Intake Hearing Assessment Form and Communication Plan.

81. **Scheduling Medical Appointments with Interpreters**. WDOC personnel at each WDOC Correctional Facility, or their designees, will be responsible for ensuring that Qualified Interpreters are scheduled for all medical appointments requiring them, and any other appropriate auxiliary aids and services are provided, consistent with the incarcerated individual's Communication Plan.

82. **Emergency Events.** WDOC will use VRI at WDOC Correctional Facilities for medical emergencies, if an in-person Qualified Interpreter would have otherwise been the appropriate auxiliary aid or service for that incarcerated individual in that context. If remote interpreting services are not appropriate in the situation, WDOC personnel will work in conjunction with medical staff to secure an in-person Qualified Interpreter or other auxiliary aids or services as soon as possible. Life-saving and other emergency medical care should never be delayed because qualified interpreter services are not available.

83. **Scheduled Offsite Medical Care.** WDOC or its designee will timely inform all offsite medical providers that an incarcerated individual with a hearing disability will require a Qualified Interpreter or other Auxiliary Aid or Service for medical care offsite. WDOC or its designee will confirm with the offsite medical provider that a qualified interpreter or appropriate other auxiliary aids and services will be provided before transporting the incarcerated individual to the appointment.

84. **Emergency Offsite Medical Care.** In the case of an emergency, WDOC will inform the offsite medical provider that an incarcerated individual with a hearing disability who requires an in-person, Qualified Interpreter or other Auxiliary Aid or Service, is being transported to the offsite care provider. WDOC will notify the offsite medical care provider as soon as possible. Notification will include the estimated time of arrival.

## Work Assignments at WDOC Correctional Facilities

85. WDOC will provide opportunities for institutional work assignments for incarcerated individuals with hearing disabilities at WDOC Correctional Facilities that are equal to opportunities provided to hearing incarcerated individuals. An incarcerated individual with hearing disabilities may not be prohibited from an institutional work assignment based on disability.

## Recreational Activities at WDOC Correctional Facilities

86. WDOC will provide opportunities for recreational activities for incarcerated individuals with hearing disabilities at WDOC Correctional Facilities that are equal to opportunities provided to hearing incarcerated individuals. An incarcerated individual with hearing disabilities may not be prohibited from recreational activities based on disability. WDOC Correctional Facilities will make reasonable modifications to its policies, practices, and procedures for incarcerated individuals with hearing disabilities, such as allowing incarcerated individuals to wear a headband to secure a hearing aid or cochlear processor, when exercising or engaging in sports activities.

### Extended Supervision

87. When an incarcerated individual is released to extended supervision, the WDOC Division of Community Corrections, in consultation with the Facility ADA Coordinator, will modify and update the individual's Communication Plan. Consistent with the updated Communication Plan, WDOC will provide auxiliary aids and services for all critical interactions at DOC facilities, including but not limited to, meetings with the individual's agent.

### Reasonable Modification of Handcuffing Policies

88. Unless legitimate safety concerns dictate otherwise, WDOC will ensure that, when incarcerated individuals who have hearing disabilities are handcuffed or restrained, they are handcuffed or restrained in a manner that permits effective communication (e.g., cuffing incarcerated individuals in the front so they can sign; having one hand free in order to write).

### ADA Compliance Director and ADA Facility Coordinators

89. Within 30 days of the effective date of this Agreement, WDOC will designate an ADA Compliance Director who will oversee the effective communication program and will be responsible to ensure compliance with WDOC policies and compliance with the ADA throughout WDOC.

90. Simultaneously with the designation of the ADA Compliance Director, each WDOC Correctional Facility will designate one or more Facility ADA Coordinators who are responsible for compliance with this Agreement at each respective WDOC Correctional Facility. The Facility ADA Coordinators are responsible for developing the Communication Plan in consultation with the ADA Compliance Director, and for providing prompt access to, and proper use of, appropriate auxiliary aids and services for incarcerated individuals with hearing disabilities.

91. WDOC will circulate broadly and throughout WDOC system the names and contact information, including telephone numbers, email addresses and office locations of each Facility ADA Coordinator and the ADA Compliance Director, including a TTY or videotelephone number for relatives, attorneys, persons holding powers of attorney, and any persons approved on the visitor list of incarcerated individuals with hearing disabilities can contact during normal business hours.

92. WDOC will implement and maintain a log of calls from relatives, attorneys, persons holding powers of attorney, and any persons approved on the visitor list of incarcerated individuals with hearing disabilities to the Facility ADA Coordinators or the ADA Compliance Director and include a copy of these logs to the United States upon request.

93. The ADA Compliance Director or designee will be available during regular business hours to answer questions and to provide assistance to the Facility ADA Coordinators regarding

immediate access to and proper use of auxiliary aids and services required by this Agreement, including providing qualified interpreters within the time frames set forth in this Agreement. Afterhours, WDOC personnel will use WDOC's on-call policy for any effective communication issues that arise.

94. ADA Facility Coordinators will be available at each Correctional Facility during and throughout the regular business hours of the individual facility. The Facility ADA Coordinators, in coordination with the ADA Compliance Director, will know where the auxiliary aids are stored, and how to operate and deploy them, and are responsible for facilitating the maintenance, repair, replacement, and distribution of them.

## <u>ADA Training</u>

95. Within 6 months of the effective date of this Agreement, WDOC will submit for pre-approval by the United States a proposed training program on the requirements of Title II of the ADA and this Agreement. The submission will include a description of the training, the agenda, any handouts, and the name, title, and address of the trainer. The United States will review the proposed training program and may provide comments to WDOC. WDOC will incorporate any comments provided by the United States and submit the revised ADA training program to the United States for final review and approval prior to its implementation.

96. Within 9 months of the effective date of this Agreement, and at least once per calendar year throughout the term of this Agreement, WDOC will provide training to all personnel who have contact with incarcerated individuals. The training will be sufficiently detailed to enable WDOC to effectively implement all provisions of this Agreement and all additional policies and procedures developed pursuant to this Agreement, including the Effective Communication Policy, and will also specifically address prohibitions against discrimination, coercion, intimidation, or retaliation with respect to persons who have complained or opposed any practice made unlawful by Title II or this Agreement, or who have made or participated in any complaint or investigation under Title II or this Agreement, or who may have requested, sought, or obtained the enforcement of any right, benefit, aid, or service under or required by Title II or this Agreement.

97. The training will include instruction on interactions with incarcerated individuals who have a hearing disability and on the effective communication measures required under this Agreement. The training will also include information regarding the types of auxiliary aids, such as cochlear implants and hearing aids, on which incarcerated individuals may rely for communication, and the differences between them.

98. WDOC will maintain records of each training and include attendance, dates, and times of training, and provide this information upon request of the United States as set forth in paragraph 103. WDOC will ensure that all relevant current and future personnel implement the terms of this Agreement.

99. WDOC will provide appropriate instruction regarding WDOC's Effective Communications Policy to contractors and volunteers who will have contact with incarcerated individuals with hearing disabilities.

100. Within 9 months of the effective date of this Agreement, WDOC will incorporate ADA training into the curriculum at the Wisconsin Correctional Academy for all new personnel who will have contact with incarcerated individuals.

### ADA Grievance Procedures

101. WDOC will use Wisc. Admin. Code DOC 310.10(8) and 310.12(8), to process ADA grievances, in consultation with the ADA Coordinator for each facility. Within 30 days of the effective date of this agreement, WDOC will distribute and publish grievance procedures to all wardens; post copies of the procedures in conspicuous locations at each facility; and include the procedures in all future publications, including online, of the Inmate Handbook. WDOC will amend the Inmate Handbook and similar materials to describe the requirements of the Effective Communication Policies and the ADA Grievance Procedure. Incarcerated individuals with disabilities, including, but not limited to hearing disabilities, shall use the Incarcerated individual Complaint Review System to raise those grievances. WDOC will make reasonable modifications to the grievance process to accommodate individuals with disabilities.

102. **Retaliation.** WDOC agrees that it will not retaliate against any person who seeks to enforce their rights, or the rights of others, under Title II ADA or this Agreement.

103. **Recordkeeping.** For the term of this Agreement, WDOC will preserve all records related to this Agreement. Such documents include, but are not limited to, revised policies, practices, and procedures; complaints or grievances; and training materials and attendance logs created pursuant to this Agreement. WDOC will, upon reasonable notice, provide copies of these records to the United States upon the United States' request.

## V.    COMPLIANCE, MONITORING, AND REPORTING

104. Within 6 months of the effective date of this Agreement, WDOC will provide the United States with a written status report, including any supporting documentation, delineating all steps taken during the reporting period to comply with each substantive provision of this Agreement. Thereafter, for the duration of this Agreement, WDOC will send a status report annually by email to counsel for the United States, referencing D.J. No. 204-85-131.

   a. Each status report will include a summary of all training required by this Agreement that was conducted within the reporting period, a copy of the training agendas, and the names of the employees who attended each training.

   b. Each status report will include records to document WDOC's compliance with the requirements of this Agreement, including, but not limited to, records of all auxiliary aids or services or reasonable modifications requested by or provided to individuals with hearing disabilities for the duration of this Agreement, and copies

21

of all new communication plans developed during the term of this Agreement. Such records will include the date of the request; the nature of the request; determination regarding the request; the date of the determination; and who participated in the decision-making.

c.   Each status report will include copies of WDOC maintenance logs that document routine review, maintenance, and testing of accessibility-related equipment and elements, including routinely testing accessibility aids and routinely auditing the accessibility of its programs and facilities. This provision, however, does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs.  28 C.F.R. § 35.133(b).

## VI.   <u>MONETARY RELIEF</u>

105.   WDOC agrees to pay a total of fifteen thousand dollars ($15,000) to compensate three (3) aggrieved persons identified by the United States during its investigation.

106.   Within 30 days of the effective date of this Agreement, the United States will send to each allegedly aggrieved person identified by the United States a copy of this signed Agreement, along with a Release of Claims Form, attached as Attachment A.

107. Within 7 days of WDOC's receipt of a completed Release of Claims Form, Attachment A, from any of these individuals, WDOC will pay and deliver to such individual a check in an amount agreed to as directed by the United States, consistent with Paragraph 105.

## VII.   <u>IMPLEMENTATION AND ENFORCEMENT</u>

108. **Implementation.** WDOC will implement all reforms necessary to effectuate the terms of this Agreement and will revise any policy, procedure, or practice, as necessary, to effectuate the terms of this Agreement. It is a violation of this Agreement for WDOC to fail to comply in a timely manner with any of the requirements of this Agreement.

109. **Notification of Noncompliance and Enforcement.** If the United States believes that this Agreement or any of its requirements has been violated, it will notify WDOC in writing and attempt to resolve the issue or issues in good faith.  If the United States and WDOC are unable to reach a satisfactory resolution of the issue or issues raised within 30 days of the date it provides notice to WDOC, the United States may commence a civil action in the U.S. District Court for the Eastern District of Wisconsin to enforce the terms of this Agreement or the ADA. The WDOC does not waive any defenses to any civil actions filed by the United States to enforce the terms of this Agreement, or the ADA.

110. **Lack of Waiver.** A failure by the United States to enforce any provision or deadline of this Agreement will not be construed as a waiver of its right to enforce any provision or deadline of the Agreement. By signing this Agreement, WDOC does not waive any of its rights or defenses to any further enforcement action by the United States.

111. **Headings**. The paragraph headings in this Agreement are for convenience only and will not be deemed to affect in any way the language of the provisions to which they refer.

112. **Entire Agreement.** This Settlement Agreement, including Attachments A-D constitutes the entire agreement between the Parties relating to settlement of Department of Justice Complaint No. 204-85-131. No other statement, promise, or agreement, either written or oral, made by any party or agents of any party that is not contained in this written Settlement Agreement, will be enforceable.

113. **Consideration.** In consideration of the terms of this Agreement, the United States agrees to refrain from filing a civil suit related to the allegations in paragraph 3, except as provided in Paragraph 109.

114. **Severability.** If any term of this Agreement is determined by any court to be unenforceable, the other terms of this Agreement shall nonetheless remain in full force and effect.

115. **Effective Date.** The effective date of this Agreement is the date of the last signature below.

116. **Limitation.** This Agreement does not purport to remedy any other potential violations related to incarcerated individuals with hearing disabilities. This Agreement does not affect WDOC's continuing responsibility to comply with all aspects of the ADA.

117. **Extension.** The Parties may agree in writing to extend any applicable deadlines specified in this Agreement. The United States will not unreasonably deny requested extensions, if made in advance of any deadline, and following WDOC's due diligence to meet such a requirement.

118. **Successors, Assignees, Employees, and Agents.** This Agreement is binding on all successors, assignees, employees, agents (including contractors) and all those working for or on behalf of WDOC.

119. **Counterparts.** This Agreement may be executed in counterparts, each of which will be deemed an original, and the counterparts shall together constitute one and the same Agreement, notwithstanding that each Party is not a signatory to the original or the same counterpart.

120. **Signatories Bind Parties.** The person signing for WDOC represents that they are authorized to bind WDOC to this Agreement.

121. **Term of Agreement.** The effective date of this Agreement is the date of the last signature below. This Agreement will remain in effect for three years from the effective date.

122. **Posting Policies and Procedures.** Within 14 days of the effective date of this Agreement, WDOC will provide notice to incarcerated individuals announcing adoption and implementation of the Effective Communication Policies and the ADA Grievance Procedure and describing their requirements.

123. **Public Document.** This Agreement is a public document. A copy of this document may be made available to any person upon request.

**AGREED AND CONSENTED TO:**

**For Wisconsin Department of Corrections:**

/s/Jared M. Hoy
JARED M. HOY
Secretary
Wisconsin Department of Corrections


9/25/24
Date

**For the United States of America:**

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

REBECCA B. BOND
Chief
AMANDA MAISELS
Deputy Chief
MELLIE H. NELSON
Supervisory Trial Attorney

/s/Beth A. Esposito
BETH A. ESPOSITO
Trial Attorney
Disability Rights Section
Civil Rights Division
United States Department of Justice
Washington, D.C.


9/30/2024
Date

GREGORY J. HAANSTAD
United States Attorney
Eastern District of Wisconsin

/s/Michael A. Carter
MICHAEL A. CARTER
Assistant United States Attorney
Deputy Chief, Civil Division
United States Attorney's Office
517 E. Wisconsin Ave., Suite 530
Milwaukee, Wisconsin  53202


9/27/2024
Date

# ATTACHMENT A

INTENTIONALLY BLANK

# ATTACHMENT B
## INTAKE HEARING SCREENING ASSESSMENT FORM

**WISCONSIN DEPARTMENT OF CORRECTIONS**
**INTAKE SCREENING**
**AUXILIARY AIDS AND SERVICES ASSESSMENT FOR DEAF OR HARD OF HEARING**
**INCARCERATED INDIVIDUALS**

Incarcerated individual Name: _____ ID#: _____
Facility: _____

Date Completed: _____    Disability (check one): [ ] Deaf   [ ] Hard of Hearing    [ ] Speech

### 1.  Assessment of Sign Language Ability

a. Incarcerated individual uses sign language? (check one):        [ ] Yes                    [ ] No

b. If yes to 1.a., is sign language the incarcerated individual's *primary* language:   [ ] Yes
        [ ] No

c. Incarcerated individual's proficiency with sign language: [ ] Beginner   [ ] Conversational
        [ ] Fluent

d. Type of interpreter needed (check one):

        [ ] ASL (American Sign Language)             [ ] Signed English

        [ ] ASL with Certified Deaf Interpreter       [ ]  Sign Language from another country

        [ ] Other (specify)

_____

### 2.  Assessment of Reading / Writing Ability

(For example: Is the person able to read and write in any language understood by DOC personnel? Does the person have the ability to engage in basic communications through reading / writing? If so, are there conditions required, such as no time constraints? List required conditions)

_____
_____
_____
_____
_____

### 3.  Assessment of Speaking Ability

(For example: Can the person speak sufficiently clearly for the average person to understand

them? If so, are there conditions required, such as a quiet setting? List required conditions)

_____

_____

_____

_____

_____

_____

### 4. Auxiliary Aids and Services and Devices Currently Used

a. Uses:        [  ] Hearing Aid(s)        [  ] Cochlear Implant / Implantable Device

        [  ] ASL Interpreter        [  ] other _____(specify)

b. Device:    [  ] Requires Batteries        [  ] Is Rechargeable

NOTE:  unless otherwise indicated, please CUFF IN FRONT.

### 5. If this is a Re-Assessment, Changes Since Prior Assessment

_____

_____

_____

_____

_____

_____

### 6. Additional Communication Assessment

_____

_____

_____

_____

_____

_____

Is referral to an audiologist recommended?   No_____        Yes_____    Date of Referral _____

Form completed by (DOC staff):

_____

_____

_____

Printed Name                                 Signature                                 Date

27

Incarcerated individual:

_____

_____

Printed Name                     Signature                          Date

# ATTACHMENT C
## WISCONSIN DEPARTMENT OF CORRECTIONS
### COMMUNICATION PLAN
#### FOR DEAF OR HARD OF HEARING INCARCERATED INDIVIDUALS

**A. Accommodations that must be provided for the following programs and activities:**

*Document whether Incarcerated individual requires an interpreter. If Incarcerated individual's primary language is sign language per initial assessment, presume an interpreter is needed for items 1-10.*

*For Other Accommodations: Document whether Incarcerated individual requires other Accommodations or Auxiliary Aids/Services, such as one-on-one meetings in quiet room, exchange of written notes, visual aids, etc.*

| Program, Service, or Activity | Interpreter Needed? (yes/no) | Other Accommodation Needed? (List what is needed) |
|---|---|---|
| 1. Disciplinary matters, including investigations and proceedings | | |
| 2. Interviews with Internal Affairs or investigators | | |
| 3. Interviews or proceedings re: protective custody | | |
| 4. Meetings with VT DOC staff to discuss Auxiliary Aids and Services | | |
| 5. Pre-release meetings & programs, including pre-release parole meetings | | |
| 6. Grievance hearings | | |
| 7. Educational Programs and testing that include a verbal component or aural component | | |
| 8. Vocational programs that include a verbal or aural component | | |
| 9. Religious Services | | |
| 10. Medical and mental health care services, including dental, vision, audiological, individual and group therapy (Unless medical care and appointment is routine and does not involve substantial conversation – see 11 below) | | |

| | | |
|---|---|---|
| 11. Medical care that is routine and does not involve substantial conversation (e.g., Routine blood work or tests, regular allergy shots) | | |
| 12. Daily environments and basic communications, including conversations with counselors, gym, meals, library | | |

### B. Hearing Aids and Other Devices

Incarcerated individual will be provided with (mark all that apply):

[ ] Hearing aid for right ear          [ ] Hearing aid for left ear          [ ] No hearing aid

[ ] Cochlear Implant

Battery requirements (include if incarcerated individual already possessed hearing aid):

_____

### C. Identification Card

Identification Card will be marked, or not, as follows (select one):

[ ] Deaf          [ ] Hard of Hearing          [ ] Incarcerated individual declines identification card marker

### D. Cell or Bunk Placard

Identification placard will be marked as follows or not be placed (select one):

[ ] Deaf                    [ ] Hard of Hearing                    [ ] Incarcerated individual declines identification placard

### E. Other Technologies

Incarcerated individual shall be entitled to the following (mark all that apply):

[ ] TTY                [ ] Video Phone                [ ] Amplified Phone                [ ] Traditional Phone

[ ] Vibrating Watch    [ ] Pager      [ ] Tactile Notification System [ ] Over-the-ear headphones

### F. Other Auxiliary Aids and Services or Accommodations Needed

_____
_____
_____
_____


Form completed by (DOC staff):

_____
_____

Printed Name                          Signature                          Date

30

Incarcerated individual:

_____

Printed Name                          Signature                          Date

**ATTACHMENT D**

**WISCONSIN DEPARTMENT OF CORRECTIONS**

Hearing Disabilities:  Identification, Documentation, and Provision of Accommodations

| | DAI Policy #: 000.00.00 | Page  of |
|---|---|---|
| **DIVISION OF ADULT INSTITUTIONS**<br><br>**POLICY AND PROCEDURES** | **Original Effective Date:**<br><br>00/00/00 | **New Effective Date:**<br><br>**00/00/00** |
| | **Supersedes:** | **Dated:** 00/00/00 |
| | Administrator's Approval: | |
| | **Required Posting or Restricted:**<br><br>**Incarcerated individual        All Staff Restricted** | |
| **Chapter:** | | |
| **Subject:**  Hearing Disabilities:  Identification, Documentation, and Provision of Accommodations | | |

**POLICY**

All DAI facilities shall ensure persons in our care who are deaf and/or hard of hearing are identified, documented, and provided access to a qualified interpreter or other appropriate auxiliary aids and services to ensure effective communication and the equal opportunity to participate in services, programs, and activities.

**REFERENCES**

DAI 300.00.35  Americans with Disabilities Act

DAI 303.72.01  Establishing Restitution for Disciplinary Dispositions

DAI 500.30.49  Initial Health Assessment

**DEFINITIONS, ACRONYMS, AND FORMS**

ACP - Advanced Care Provider

ASL - American Sign Language

Audiogram - A test recorded on a graph showing how loud sounds need to be to hear at

different frequencies.

Auxiliary Aids and Service - Aids and services that include but are not limited to qualified interpreters or means to make aurally materials available to PIOC with hearing impairments such as hearing aids, assistive listening systems, closed caption decoders, open and closed captioning TDDs, or TTYs, written materials, as well as videophones, access to telephone relay services and visual alert or alarm systems.

BHS – Bureau of Health Services

CDI – A Certified Deaf Interpreter (CDI) is an individual who is deaf or hard of hearing and has demonstrated knowledge and understanding of interpreting, deafness, the Deaf community, and Deaf culture.  CDI's work alongside hearing ASL interpreters to ensure accurate communication for deaf individuals whose native language is visual.

Communication Plan – A DAI record of the preferred method of communication for an individual with a communication disability, developed in coordination with the ADA Coordinator, which includes information about approved auxiliary aids and services necessary to ensure effective communication.

Critical Interactions - Those interactions in which the risk of miscommunication or misunderstanding are high and the consequences may have serious repercussions for PIOC with hearing disabilities.  Examples include, but are not limited to: medical and psychological care and appointments; disciplinary investigations and hearings; interviews or proceedings regarding protective custody, educational programs; transfer and classification meetings; release planning; religious services; prison job responsibilities; and meetings with the ADA Coordinator to discuss auxiliary aids and services involving the Communication Plan.

DAI – Division of Adult Institutions

DOC - Department of Corrections

DOC-3035 – Health Service Request and Copayment Disbursement Authorization

Effective Communication - A way of communicating with PIOC who are deaf and/or hard of hearing that is as effective as communicating with those PIOC who are not deaf and/or hard of hearing and shall, when necessary, include appropriate auxiliary aids and services.

EMR – Electronic Medical Record is the software system used by DOC which contains PIOC health care records.

33

<u>FCC – Federal Communications Commission</u>

<u>HCR</u> – Health Care Record

<u>Hearing Screening</u> - An inquiry to determine whether a PIOC needs to be examined to determine if they have a hearing disability or is suspected to have a hearing disability and requires further evaluation.

<u>HSU</u> – Health Service Unit

<u>Individual with a Hearing Disability</u> – a person who, if unaided by hearing aids or any medical device, is unable to hear in either one or both ears to a sufficient degree to be able to understand spoken word.  May be used to refer to PIOC who are deaf and hard of hearing.

<u>PIOC</u> - Person in our Care

<u>Primary Method of Communication</u> – The preferred method of communication a PIOC with hearing disabilities uses to give, receive, and understand information.   Examples include, but are not limited to, American Sign Language, signed English, written communication, or verbal communication with or without hearing aids.

<u>Qualified Interpreter</u> – A person who interprets effectively, accurately, and impartially, both receptively and expressively with an individual who is deaf or hard of hearing; must hold the necessary certification from the National Registry of Interpreters for the Deaf or National Association of the Deaf. A DOC PIOC is not a qualified interpreter.

<u>Secondary Method of Communication</u> – A method of effective communication that may be used only in limited situations if the PIOC primary method of communication is not available.

<u>TRS</u> - Telecommunications Relay Services are available to persons with hearing or speech disabilities through the FCC and include a variety of services to place and receive calls, which may include a trained consumer advocate/interpreter.  Services include captioned telephones and video relay services (VRS).  More specific information is available on the fcc.gov/consumers/ guides website or via the current DAI contracted provider.

<u>Videophone</u> – A telephone with a camera system for visual and real-time

34

communications.

Video Remote Interpreting (VRI) – A video telecommunication interpreting service that uses qualified interpreters for American Sign Language (ASL) and or Oral Transliteration (OTC)

**PROCEDURE**

**I.    General Guidelines**
   A.  HSU staff shall identify individuals with a hearing disability upon intake.

   B.  HSU staff shall provide any medical devices necessary to accommodate PIOC needs.
      1.  Hearing devices shall be free of charge through BHS.
      2.  Hearing aids shall be provided in the appropriate number (1 or 2) as recommended by offsite specialists.
      3.  Standard hearing aids and cochlear processor devices will be provided to PIOCs requesting them as soon as reasonably possible after a request is received from the PIOC or the PIOC's treating health care provider. An order will be placed through the Health Services Unit (HSU) for the hearing aids and cochlear processor devices within 2 business days of receipt of the request. A copy of the order will be provided to the Facility ADA Coordinator for tracking purposes. Upon receipt of the hearing aids or cochlear processor devices at the Correctional Facility, the item will be provided to the PIOC within 3 business days. If more than 14 days elapses between ordering and providing the hearing aids or cochlear processor devices, the ADA Facility Coordinator or designee will supply the PIOC with a temporary means of effective communication, investigate the delay, and provide the PIOC with an update on the status of the order.
      4.  In the event of a disagreement about the type and number of hearing aids/cochlear implants, HSU shall seek a secondary hearing assessment and will use the results of such assessment in its determination of the number and type of devices provided to the PIOC.  Any determination that contravenes the secondary hearing assessment recommendation must be fully documented and explain the rationale.  Any deviation may be reviewed by the ADA Compliance Director in consultation with the ADA Facility Coordinator.

   C.  DAI shall give primary consideration to the expressed choice of the PIOC for auxiliary aids and services necessary to ensure effective communication.

   D.  The Facility ADA Coordinator shall ensure appropriate auxiliary aids and services are provided to ensure effective communication for PIOC who are deaf and/or hard of hearing.

35

E. All staff shall communicate with PIOC who are deaf and/or hard of hearing to the same extent as they would communicate with non-deaf and/or hard of hearing PIOC.

F. PIOC who are Deaf and/or hard of hearing who use ASL or writing as their primary form of communication shall be restrained in a manner that allows them to continue to use their hands for effective communication, unless there is a documented safety and security concern or immediate security threat.

G. PIOC who are Deaf and/or hard of hearing who use hearing aids and cochlear implants shall not be required to remove them unless there is a documented extreme safety and security concern.

H. Facilities shall have an assorted supply of batteries available in a designated location when HSU is not onsite and there is a need for replacement.

I. HSU shall prioritize requests for replacement of batteries and facilitate the replacement free of charge and as soon as reasonably possible. Orders for replacement batteries will be placed within 2 business days of receipt of the request. A copy of the order will be provided to the Facility ADA Coordinator for tracking purposes. Upon receipt of the replacement batteries at the Correctional Facility, WDOC will provide the replacement item to the PIOC within 3 business days. If more than 14 days elapses between ordering and providing the replacement batteries, battery chargers, or cochlear processor devices, the ADA Facility Coordinator or designee will supply the PIOC with a temporary means of effective communication, investigate the delay, and provide the PIOC with an update on the status of the order.

J. The PIOC is responsible to notify HSU via DOC-3035 regarding the need for replacement/repair.

II. **Intake Process**
A. Intake facilities shall ensure PIOC are advised during initial screening of their rights to reasonable accommodations, including auxiliary aids and services, and how to request them.

B. During the initial intake, a hearing screening shall be completed as part of the intake screening exam completed by HSU.
   1. Intake hearing screening shall occur within 3 business days of initial admission into the DOC.
   2. The screening shall include any identified hearing disability and devices used for correction and/or communication.
   3. The screening shall be documented in the HCR and WICS.

4. HSU shall notify the facility ADA Coordinator/designee of the individual with a verified hearing disability via EMR.

C. When PIOC do not have their hearing device(s) with them upon intake/transfer, institution staff shall make every reasonable effort to locate and obtain the device(s).

D. Any PIOC with a perceived or reported (including self-reported) hearing disability who does not currently have their hearing corrected with hearing aids or cochlear implant devices at the time of intake shall have an on-site audiogram completed within 3 business days.
   1. The audiogram results shall be reviewed by an ACP.
   2. Upon review of the audiogram results, the ACP shall determine the need for a specialty consult and shall place the appropriate order in the HCR.
   3. If a specialty consult is ordered, the ACP shall notify the facility ADA Coordinator by sending a message via EMR.
   4. Scheduling of the specialty consult shall occur within 10 days of the order being placed.

E. Recommendations from the specialty consult shall be reviewed by the ACP as soon as possible, but no later than 3 business days after WDOC receives the consult report and recommendations. If hearing aids or other auxiliary devices are recommended, the ACP shall review the recommendations and, if appropriate, order those devices through HSU within 7 business days of receipt of the specialty consult report and recommendations. A copy of the order will be provided to the Facility ADA Coordinator for tracking purposes. Upon receipt of the hearing aids or other auxiliary devices at the Correctional Facility, the item will be provided to the PIOC within 3 business days. If more than 14 days elapses between ordering and providing the hearing aids or other auxiliary devices, the ADA Facility Coordinator or designee will supply the PIOC with a temporary means of effective communication, investigate the delay, and provide the PIOC with an update on the status of the order.

F. Upon notification, the ADA Coordinator shall meet with the PIOC with a hearing disability to finalize a communication plan as soon as reasonably possible, but no later than 10 days following the intake screening, regardless whether a specialty consult is ordered.

G. During the intake process, PIOC shall be offered the opportunity to have a modified identification (ID) card that clearly identifies the PIOC as having a hearing disability on the card.
   1. PIOC may decline a modified card in favor of a standard issue ID card.
   2. Declining the modified ID card does not waive the PIOC's right and/or access to eligible services.

      3. PIOC may change their preference during the period of incarceration to opt to have a modified ID card issued at any time.
      4. Facilities shall provide the modified ID card within 10 days of the receipt of the request from the PIOC.

  H. An assessment for a hearing disability can be initiated by referrals from facility staff or via a PIOC DOC-3035 request at any time during incarceration.

## III. Communication Plan

  A. A communication plan shall be developed by the ADA coordinator for all PIOC with a hearing disability.
      1. The communication plan shall identify auxiliary aids and services approved for use by PIOC.
      2. All auxiliary aids and services shall be provided in a timely manner, without delay, so they are provided for the entire duration of the programs, services, and activities addressed in the communication plan. Video telephone access should be available at the same times, and with the same frequency as telephone access is available to individuals without hearing disabilities.
      3. The communication plan shall be entered in WICS and a copy routed to HSU for inclusion in the HCR.
      4. The most current version of the communication plan supersedes any previous versions and shall be updated periodically to reflect changes in the PIOC's hearing status.

  B. PIOC with a hearing disability may change their preferences, including modifying, adding or waiving services.

## IV. Repair and Replacement of Hearing Aids and Cochlear Implants Devices

  A. PIOC are responsible to let HSU staff know their hearing aid, cochlear processing device or other such device is inoperable or malfunctioning by submitting a DOC-3035.

  B. HSU staff shall send the device to an appropriate repair company as soon as reasonably possible. This shall occur no later than 24 hours upon receipt of the DOC-3035 (48 hours after receipt of the DOC-3035 weekend/holiday).

## V. Interpreter Services

  A. The DOC shall contract with service agencies to ensure qualified interpreting services, including VRI are available 24 hours per day 7 days a week.

  B. DAI may make other appropriate arrangements, such as contracting directly with qualified interpreters on a fee-for-service basis.

C. Staff who receive a PIOC request to use an interpreter must document the request by filling out an incident report for an ADA Related incident, and include the reason for the PIOC's request. If the request is denied, the reason for the denial must be included.

**VI.    Interfacility Transfers**

Communication devices required by PIOC including hearing aids, cochlear implants, cochlear implant processing devices and other auxiliary aids necessary for communication shall remain in the possession of the PIOC and not be packed in their property during transfer.

**Administrator's Approval: _____Date Signed:_____**

Sarah E. Cooper, Administrator

39

# Exhibit 160

## Sophie Hart

| | |
|---|---|
| **From:** | Sophie Hart |
| **Sent:** | Tuesday, October 8, 2024 3:48 PM |
| **To:** | 'Ed Swanson'; 'Sharon Garske'; 'Audrey Barron'; 'Joseph.Williams@cdcr.ca.gov'; 'Brianne.Burkart@cdcr.ca.gov'; 'Penny Godbold'; 'Jacob Hutt'; 'Caroline Jackson'; 'Daniel Greenfield'; 'GGrunfeld@rbgg.com'; 'Dewi Zarni'; 'Rita Lomio'; 'Skye Lovett'; 'Hartmann, Sarah@CDCR' |
| **Cc:** | 'Trace Maiorino'; 'Olena Likhachova'; 'Anne Kammer'; 'Patricia.Ferguson@cdcr.ca.gov'; 'Lourdes.White@cdcr.ca.gov'; 'Darnell.Mebane@cdcr.ca.gov'; 'Kristina.Davis@cdcr.ca.gov'; 'Ursula.Stuter@cdcr.ca.gov'; 'Tamiya.Davis@cdcr.ca.gov'; 'Margo.Wilkerson@cdcr.ca.gov'; 'Chor.Thao@cdcr.ca.gov'; 'Katie.Riley@cdcr.ca.gov'; 'Megan.Roberts2@cdcr.ca.gov'; 'ramon.ruiz@cdcr.ca.gov'; 'Dawn.Lorey@cdcr.ca.gov'; 'Ava.Lau-Silveira@cdcr.ca.gov' |
| **Subject:** | RE: Armstrong: SATF 14 (RVR policy) & 15 (7362 process) update |

Hi Sharon,

Thank you again for sending these materials. We've reviewed, and appreciate CCHCS's work on this issue – I think we're very close to resolution. We have just a couple of remaining requests:

1. We ask that CCHCS revise the language in the training (slide 7), to be consistent with the language in the policy memorandum limiting the situations in which HC staff refer patient behavior to their supervisors, for a potential RVR. The memorandum limits this to "misconduct of a serious nature that does not involve use of force, indecent exposure, assault, battery, threat of serious/great bodily injury," whereas the training is much broader -- it instructs the process be initiated for "behavior that is not a crime or safety threat, but is otherwise serious, inappropriate, or unusual."

2. The memorandum states that "[a] tracking system will be developed for all RVRs generated and uploaded on behalf of health care staff." We appreciate this and think an active auditing process will be critical to the successful implementation of this policy. We ask that (1) CCHCS/Defendants confirm that RVRs generated from Incident Reports filed by healthcare staff will be included in this tracking system (we understood this was the plan from our July meet and confer, but this isn't clear from the policy or training materials); and (2) CCHCS/Defendants confirm that Plaintiffs' counsel in *Plata* and *Armstrong* will have access to the system (or reports generated from it) that CCHCS is developing to track these RVRs.

If Defendants and CCHCS are amenable to these requests, we can draft a proposed joint section for Stip. 14, memorializing the status of our agreements. And if it would be helpful to meet this week to talk these requests through, I'm available and happy to meet.

Thanks,

Sophie

--
Sophie Hart
Supervising Staff Attorney
Prison Law Office
1917 Fifth Street
Berkeley, CA 94710

(510) 280-2621
Pronouns: she/her

Exhibit 161

**Sophie Hart**

---

| | |
|---|---|
| **From:** | Sharon Garske <Sharon.Garske@doj.ca.gov> on behalf of Sharon Garske |
| **Sent:** | Thursday, October 10, 2024 2:13 PM |
| **To:** | Sophie Hart; Ed Swanson; Audrey Barron; Joseph.Williams@cdcr.ca.gov; Brianne.Burkart@cdcr.ca.gov; Penny Godbold; Jacob Hutt; Caroline Jackson; Daniel Greenfield; GGrunfeld@rbgg.com; Dewi Zarni; Rita Lomio; Skye Lovett; Hartmann, Sarah@CDCR |
| **Cc:** | Trace Maiorino; Olena Likhachova; Anne Kammer; Patricia.Ferguson@cdcr.ca.gov; Lourdes.White@cdcr.ca.gov; Darnell.Mebane@cdcr.ca.gov; Kristina.Davis@cdcr.ca.gov; Ursula.Stuter@cdcr.ca.gov; Tamiya.Davis@cdcr.ca.gov; Margo.Wilkerson@cdcr.ca.gov; Chor.Thao@cdcr.ca.gov; Katie.Riley@cdcr.ca.gov; Megan.Roberts2@cdcr.ca.gov; ramon.ruiz@cdcr.ca.gov; Dawn.Lorey@cdcr.ca.gov; Ava.Lau-Silveira@cdcr.ca.gov |
| **Subject:** | RE: Armstrong: SATF 14 (RVR policy) & 15 (7362 process) update |

Hi All,

Below under each request from Plaintiffs is CCHCS's response.

Thank you,
Sharon

---

**From:** Sophie Hart <sophieh@prisonlaw.com>
**Sent:** Tuesday, October 8, 2024 3:48 PM
**To:** Ed Swanson <ed@smllp.law>; Sharon Garske <Sharon.Garske@doj.ca.gov>; Audrey Barron <audrey@smllp.law>; Joseph.Williams@cdcr.ca.gov; Brianne.Burkart@cdcr.ca.gov; Penny Godbold <PGodbold@rbgg.com>; Jacob Hutt <jacob@prisonlaw.com>; Caroline Jackson <CJackson@rbgg.com>; Daniel Greenfield <danielg@prisonlaw.com>; GGrunfeld@rbgg.com; Dewi Zarni <dewi@prisonlaw.com>; Rita Lomio <rlomio@prisonlaw.com>; Skye Lovett <skye@prisonlaw.com>; Hartmann, Sarah@CDCR <Sarah.Hartmann@cdcr.ca.gov>
**Cc:** Trace Maiorino <Trace.Maiorino@doj.ca.gov>; Olena Likhachova <Olena.Likhachova@doj.ca.gov>; Anne Kammer <Anne.Kammer@doj.ca.gov>; Patricia.Ferguson@cdcr.ca.gov; Lourdes.White@cdcr.ca.gov; Darnell.Mebane@cdcr.ca.gov; Kristina.Davis@cdcr.ca.gov; Ursula.Stuter@cdcr.ca.gov; Tamiya.Davis@cdcr.ca.gov; Margo.Wilkerson@cdcr.ca.gov; Chor.Thao@cdcr.ca.gov; Katie.Riley@cdcr.ca.gov; Megan.Roberts2@cdcr.ca.gov; ramon.ruiz@cdcr.ca.gov; Dawn.Lorey@cdcr.ca.gov; Ava.Lau-Silveira@cdcr.ca.gov
**Subject:** RE: Armstrong: SATF 14 (RVR policy) & 15 (7362 process) update

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Hi Sharon,

Thank you again for sending these materials. We've reviewed, and appreciate CCHCS's work on this issue – I think we're very close to resolution. We have just a couple of remaining requests:

1. We ask that CCHCS revise the language in the training (slide 7), to be consistent with the language in the policy memorandum limiting the situations in which HC staff refer patient behavior to their supervisors, for a potential RVR. The memorandum limits this to "misconduct of a serious nature that does not involve use of force, indecent exposure, assault, battery, threat of serious/great bodily injury," whereas the training is much broader -- it instructs the process be initiated for "behavior that is not a crime or safety threat, but is otherwise serious, inappropriate, or unusual."

**CCHCS's response:** CCHCS believes that the draft language in training slide is consistent with spirit and intent of the policy memorandum and health care staff's care of its patients. There may be instances where behavior is serious, inappropriate, unusual, or repetitive, which may lead to more serious offences and therefore it is appropriate that staff discuss with the care team, custody, and health care supervisors and managers. CCHCS does not agree to edit the slide.

2.  The memorandum states that "[a] tracking system will be developed for all RVRs generated and uploaded on behalf of health care staff." We appreciate this and think an active auditing process will be critical to the successful implementation of this policy. We ask that (1) CCHCS/Defendants confirm that RVRs generated from Incident Reports filed by healthcare staff will be included in this tracking system (we understood this was the plan from our July meet and confer, but this isn't clear from the policy or training materials); and (2) CCHCS/Defendants confirm that Plaintiffs' counsel in *Plata* and *Armstrong* will have access to the system (or reports generated from it) that CCHCS is developing to track these RVRs.

    **CCHCS's response:** The policy provides that a tracking system will be developed for all RVRs generated and uploaded on behalf of health care staff. Incident reports are the responsibility of custody staff and not reviewed by the CEO. At this time, CCHCS is not agreeable to the request to grant the *Plata* and *Armstrong* class counsel access to the system or reports generated from it that CCHCS is developing to track these RVRs. Further, the request to grant access to the tracking system to *Plata* and *Armstrong* counsel is beyond the scope of the stipulation requirement.

If Defendants and CCHCS are amenable to these requests, we can draft a proposed joint section for Stip. 14, memorializing the status of our agreements. And if it would be helpful to meet this week to talk these requests through, I'm available and happy to meet.

Thanks,

Sophie

--
Sophie Hart
Supervising Staff Attorney
Prison Law Office
1917 Fifth Street
Berkeley, CA 94710
(510) 280-2621
Pronouns: she/her