DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
JACOB J. HUTT*
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California 94703
Telephone:    (510) 644-2555
Facsimile:    (510) 841-8645

* Admitted pro hac vice

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **DECLARATION OF SARA NORMAN** |
| v. | Judge:  Hon. Claudia Wilken |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

# DECLARATION OF SARA NORMAN

I, Sara Norman, declare:

1.     I am an attorney duly admitted to practice before this Court. As the sole proprietor of the Law Office of Sara Norman, I am counsel of record for the Plaintiff class in *Clark v. California*, No. C96-1486-CRB, and I am co-counsel of record for the Plaintiff class in *Plata v. Newsom*, No. 4:01-cv-1351-JST. I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify. I make this declaration in support of Plaintiffs' statement regarding compliance with the Court's December 7, 2023 Order regarding SATF.

Housing for people with developmental disabilities at SATF

2.     *Clark v. California* is a class action lawsuit on behalf of people incarcerated in the California Department of Corrections and Rehabilitation (CDCR) who have developmental disabilities. CDCR's program to address their needs is called the Developmental Disability Program (DDP). People in the DDP are evaluated by a clinician and classified as DD1, DD2, or DD3, on an ascending scale of support needs. Some individuals are vulnerable to victimization due to their disability; these individuals are required to be designated DD2 or DD3. People who are DD3 generally have very significant impairments that necessitate significant staff support.

3.     People in the DDP are generally housed at designated prisons, which have specialized staff and programs designed to meet their needs and provide them with appropriate protection. SATF is designated to house people in the DDP. As of September 1, 2024, SATF housed 213 people in the DDP. I obtained this information by consulting the "Disability Inmate Roster" produced to me on a monthly basis by CDCR.

4.     The DDP requires prisons to house people in the DDP only in specific designated housing units. Non-DDP people placed in those housing units must be screened, and people with significant histories of injurious behavior towards other incarcerated people, or towards people with disabilities, are not allowed to live in those units. In addition, people who are in the DDP but themselves have significant histories of

DECLARATION OF SARA NORMAN

1  injurious behavior towards other incarcerated people or towards other people with

2  disabilities (sometimes called "predatory case factors") can only be housed in specific

3  buildings, away from others in the DDP. This housing policy is one of the bedrock

4  protections of the DDP.

5      5.    At SATF, people who are DD1 can only be housed in the following units (in

6  addition to the CTC and RHU): A2, A3 (for DD1s with predatory case factors), B2, B3

7  (for DD1s with predatory case factors), D1, D2 (for DD1s with predatory case factors), E4

8  (for DD1s with predatory case factors), E5, F1, F2 (for DD1s with predatory case factors),

9  F3, G1, G2, and G3 (for DD1s with predatory case factors). People who are DD2 can only

10 be housed in the following units (in addition to the CTC and RHU): A2, B2, D1, D2, E5,

11 F1, F3, G1, and G2. People who are DD2 and themselves have predatory case factors can

12 only be housed in Building E4. People who are DD3 can only be housed in the following

13 units (in addition to the CTC and RHU): A2, B2, E5, F1, F3, G1, and G2. People who are

14 DD3 and themselves have predatory case factors can only be housed in Building E4.

15     6.    I obtained this information from SATF's Operational Procedure 178, which

16 sets forth the local rules governing the DDP at the institution. Attached hereto as **Exhibit**

17 **A** is a true and correct copy of SATF's Operational Procedure 178, Developmental

18 Disability Program, as of November 2023, with three memoranda containing updates to the

19 policy since that time (dated March 20, 2024; March 25, 2024; and May 21, 2024). I

20 obtained this document from CDCR's Office of Legal Affairs on September 19, 2024.

21     7.    Many people in the DDP also have physical disabilities such as hearing

22 disabilities that require them to use alternate modes of communication. Any policy that

23 requires people in the DDP to move to another building in order to obtain an

24 accommodation, if that building is not designated and other residents not appropriately

25 screened, would run afoul of the requirements of *Clark v. California*.

26     <u>Ducating process for medical appointments at SATF</u>

27     8.    *Plata v. Newsom* is a class action lawsuit regarding the provision of medical

28 care in CDCR. I have represented the Plaintiff class in *Plata v. Newsom* for more than two

decades, as staff attorney, managing attorney, and deputy director of the Prison Law Office and subsequently from the Law Office of Sara Norman. In that time, I have made dozens of site visits to CDCR prisons to investigate compliance with the various requirements regarding medical care, including two such trips in 2024. On these trips, I commonly speak to my clients and also to staff and administrators, including nurses, providers, schedulers, and supervisors. I am familiar with the rules regarding patient appointments and the ducating process.

9.      Although ducats are generally used to manage medical appointments that are scheduled days in advance, anyone familiar with the delivery of medical care in CDCR prisons knows that many patients are seen by medical staff without ducats. One of the ways this happens is when patients file a sick call slip (called a Form 7362). Nursing staff must collect and review these slips daily. Depending on what is written on the form, some patients are required to be seen quickly: patients who submit sick call slips that describe symptoms must be seen face-to-face by a nurse within one business day, and those with "urgent medical symptoms" must be seen face-to-face by a nurse or care team member the same day. HCDOM 3.1.5(c)(2)(B)(3)(a)(3) and 3.1.5(c)(2)(B)(5)(a), available at https://www.cdcr.ca.gov/hcdom/dom/chapter-3-health-care-operations/article-1-complete-care-model/3-1-5-scheduling-and-access-to-care/. To my knowledge, a ducat typically is not issued for these same-day encounters; there is not enough time to do so. Same-day appointments sometimes are referred to as "add-on" appointments.

10.     Same-day appointments are a common occurrence. In order to see how often they occur at SATF, I reviewed the "Forms7362" Report on the QM Reporting Server, which is part of the CCHCS electronic tracking system for medical care in CDCR prisons. I looked at the 7362s recorded at SATF for one week: September 8 through September 14, 2024.

11.     There were 1,713 forms in the report. In order to see how many appointments took place within one day of the review of the sick call slip, I sorted by "Business Days From Triage to Face-To-Face." I reviewed the patients noted as having

1  experienced 0 business days from the time their sick call slip was triaged by a nurse to the

2  time they were seen face-to-face by a nurse. I then compared the date and time the sick call

3  slip was received to the date and time of the face-to-face encounter.

4       12.    I counted several hundred patients who were seen by nursing staff on the

5  same day their sick call slip was received in this one-week period alone. Many of these

6  patients were seen within a few hours.

7       13.    Even when ducats are issued for appointments, they often do not take place

8  at the time written on the ducat, as CCHCS's Health Care Access Unit (HCAU) has found.

9  Attached hereto as **Exhibit B** is a true and correct copy of a memorandum entitled "Health

10  Care Access Unit Operations Monitoring Audit for Substance Abuse Treatment Facility –

11  Round VIIIb Focused Review," dated May 5, 2023. This report, which was provided to

12  *Plata* Plaintiffs' counsel by CCHCS, sets forth the findings of a Focused Review

13  completed at SATF in April 2023, an extension of a previous audit conducted September

14  12-15, 2022, the results of which were filed under Dkt. No. 3510-1 at 99-138.

15       14.    The May 2023 HCAU report, the most recent audit of SATF provided to

16  *Plata* Plaintiffs' counsel, reviewed 6,420 medical appointments. Exhibit B at 3. It found

17  that 28.5% of the time, patients arrived an hour or more *before* the scheduled appointment

18  time (in some cases as much as eight hours before), and 21.8% of the time, patients arrived

19  an hour or more *after* the more scheduled appointment time (in some cases more than nine

20  hours later). *Ibid.* In other words, more than half of all appointments took place at a

21  significantly different time than what was written on the ducat. The HCAU considers this

22  an "unresolved critical issue" at SATF. *Id.* at 1.

23       15.    The HCAU notes that these time differentials are not due to patient choice,

24  but instead due to "medical providers requesting patients to arrive early, and/or if there

25  were cancellations, request[ing] patients to come earlier than scheduled," and custodial

26  concerns: "the main facility clinic . . . only has four holding areas, in which patients are

27  escorted according to yard, and not the time of their appointment." Exhibit B at 3.

28       16.    Another reason the HCAU found that ducat times at SATF are so often

1  inaccurate is that "Primary Care Physicians and Registered Nurse lines within the facility

2  clinics see[] add-on patients prior to scheduled priority ducats." *Ibid.* These add-on

3  appointments include the unducated encounters pulled from the sick call slip triage process

4  that I discussed above.

5       17.    Although the HCAU report on SATF reviews data from a year and a half

6  ago, these problems continue to the present day. I know that from my review of SATF's

7  clinic check in/check out logs for the week of September 2-6, 2024, which note both the

8  time of the scheduled appointment and the times the patient actually checked in and out of

9  the clinic for that encounter. These documents were requested by *Plata* counsel from

10  CDCR and received on September 25, 2024. I reviewed the logs provided to us from

11  Facilities A, B, C, D, E, F, and G. I did not review the logs from the CTC or RHU, since

12  people are escorted individually to those appointments. I do not attach these logs because

13  they are covered by a protective order in *Plata.*

14       18.    My review of the check in/check out logs from SATF clinics for the week of

15  September 2-6, 2024, showed me that the "APPT TIME" and the "TIME IN" noted for

16  medical encounters continue to be frequently more than an hour before or after the ducated

17  time, and sometimes many hours different. For every single day of logs provided in which

18  medical appointments took place, I saw examples of appointments that started more than

19  an hour earlier or later than the time for which the patient was ducated. Nearly all the logs

20  had multiple such examples per day. Many of the appointments had notes accompanying

21  them that explain that "provider requested at later time" or "provider requested at earlier

22  time" (or some variation of that language).

23       19.    Finally, regarding refusals of medical care: CCHCS policy requires that

24  patients must refuse medical appointments in person, with healthcare staff; if they refuse to

25  go to the clinic in order to do so, healthcare staff are required to go to the patient, counsel

26  them, and have them sign a refusal form. HCDOM 3.1.5(c)(3)(C)(3), available at

27  https://www.cdcr.ca.gov/hcdom/dom/chapter-3-health-care-operations/article-1-complete-

28  care-model/3-1-5-scheduling-and-access-to-care. In practice, I have seen first-hand

Case No. C94 2307 CW

institution-wide failures to follow that policy: patients are often provided no notice of appointments, no counseling or education about what they missed, and no opportunity to explain conflicting schedules. I, along with other *Plata* counsel, have raised these concerns at multiple prisons in the last few years alone.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed at San Francisco, California, this 27th day of September, 2024.


_____

Sara Norman

DECLARATION OF SARA NORMAN

# Exhibit A

State of California

Department of Corrections and Rehabilitation

# Memorandum

**Policy 24-021**

<mark>Operational Procedure 178, Developmental Disability Program</mark>

Date:     May 21, 2024

To:       All Staff

Subject:  **OPERATIONAL PROCEDURE 178, DEVELOPMENTAL DISABILITY PROGRAM**

The purpose of this memorandum is to announce the amendment of Operational Procedure 178, Developmental Disability Program. This policy shall remain in effect until incorporated into the next annual revision.

~~Deletions~~/**Additions**

### III.  REFERENCES

**J.    Developmental Disability Program Rules Violation Report Training Announcement, dated May 1, 2024.**

### X.  INSTITUTION ACTIVITIES AND SERVICES

#### L.  <u>DISCIPLINARY PROCESS:</u>

5.  The ~~Class Action Management Unit (CAMU)~~ **Facility Captain** will make the determination on all Mental Health Assessments (MHA) where the MHA assessing clinician checks "yes" to MHA Question 2.b. If the ~~CAMU~~ **Facility** Captain agrees with the MHA clinician's recommendation, the ~~CAMU~~ **Facility** Captain will "document in an alternate manner" by either: reducing the level of the RVR to a Counseling-Only ~~Chrono~~ RVR for minor misconduct; or voiding the RVR and documenting the behavior via a CDC Form 128-B. If the ~~CAMU~~ **Facility** Captain does not agree with the clinician's recommendation, the ~~CAMU~~ **Facility** Captain will document their reasoning for having the RVR adjudicated at a disciplinary hearing on a CDC Form 128-B, or the comments section of the "Actions Taken" screen in the Strategic Offender Management System (SOMS). The ~~CAMU~~ **Facility** Captain will provide their decision in accordance with existing CDCR policy and regulations.

6.  To assure a fair and just proceeding, if the misconduct is recorded on an RVR, all DDP inmates shall be assigned a SA. The assigned SA shall be any custody staff who has received training in the "Disciplinary Process for Inmates in the Developmental Disability Program and Responsibilities of the Staff Assistant". The assigned SA may be assisted by a bilingual aide, mental health clinician, etc., as necessary. In accordance with CCR, Title 15, Section 3315(d) (2) and 3318(b), the SA shall:

    • Inform the inmate of his rights and ensure he understands the

Policy 24/021 OP 178 – Disability Placement Program

disciplinary procedures to the best of his ability.

- Assist the inmate in preparation for the disciplinary hearing.

- Represent the inmate's position at the hearing.

- Ensure the inmate's position is understood.

- Ensure the inmate understands–to the best of his ability-the decisions reached.

- Provide the hearing official with information related to the inmate's developmental disability and the adaptive support services required.

- Be present at the disciplinary hearing <u>and all interviews</u> related to the disciplinary process.

- Refrain from giving legal counsel or specifying the position the inmate should take in any disciplinary proceeding.

- Additional assistance as appropriate.

\*Staff Assistant Classification Training is addressed in Section XII. Training, C. Custody.

7. **The ADA Coordinator shall maintain up to three Senior Hearing Officers (SHO) and three Hearing Officers (HO) to receive specific DDP RVR hearing training from CAMU. Upon completion of the training, the designated SHO and HO shall be assigned to adjudicate all administrative and serious RVRs when an incarcerated person in the DDP is the subject of an alleged rules violation. The ADA Coordinator will contact CAMU if they need additional training for replacement HO or SHO. All institutional Captains and ADA Coordinators are required to complete the training.** ~~The SHO/HO shall be current in annual DDP training requirements.~~ The SHO/HO shall evaluate the circumstances of the misconduct and all evidence and information presented in the disciplinary hearing, including the inmate's identified adaptive support services, when determining the inmate's guilt or innocence.

8. The ~~CAMU~~ **Facility** Captain will serve as the reviewing and approving Captain for all administrative and serious RVRs related to inmates in the DDP. At the conclusion of the RVR hearing, the hearing official shall **assign the RVR to their Facility Captain for review in SOMS.** ~~select "CAMU, DDP Review" from the "Action Taken" dropdown titled, "Assigned to Staff," which will assign the CAMU Captain and notify them of the need for Captain's approval. The CAMU Captain is responsible for assessing the entire RVR process to ensure all DDP and due process requirements were met. If policy violations are discovered, the CAMU Captain shall document their findings and include a recommendation to remedy the violation, in the "Action~~

Policy 24/021 OP 178 – Disability Placement Program

Taken" screen in SOMS. Upon completion of the ~~CAMU~~ **Facility** Captain's review, the ~~CAMU~~ **Facility** Captain will assign the RVR to the institution's ADA Coordinator for Chief Disciplinary Officer review and approval.

Ensure this information is disseminated to all institutional staff. Should you have any questions regarding this matter, please contact the ADA Coordinator at extension 7516.

BRYAN D. PHILLIPS
Warden
California Substance Abuse Treatment
Facility and State Prison at Corcoran

ANU BANERJEE
Chief Executive Officer
California Substance Abuse Treatment
Facility and State Prison at Corcoran

DocuSign Envelope ID: 4942E575-537F-4EAD-A7D0-11B933976C4F

State of California

Department of Corrections and Rehabilitation

# Memorandum

# Policy Memo 24-015

Date : March 25, 2024

Operational Procedure 178, Developmental Disability Program

To : All Staff

Subject : **OPERATIONAL PROCEDURE 178, DEVELOPMENTAL DISABILITY PROGRAM (FACILITY E HOUSING)**

The purpose of this memorandum is to announce the following amendments to Operational Procedural (OP) 178, Developmental Disability Program (DDP).

**Additions/~~Deletions~~**

## X. INSTITUTION ACTIVITIES AND SERVICES

### B. HOUSING:

| FACILITY/BUILDING WING | PROGRAM TYPE | DD1 | DD2 | DD3 |
|---|---|---|---|---|
| BASED ON DDP DESIGNATED MISSIONS MATRIX Revision dated 5/2/2017 | | | | |
| FACILITY A/BUILDING 2 (*) Overflow-2nd | ~~LEVEL II SNY –DORM~~ **LEVEL II NDPF-DORM** | Y | Y | Y |
| FACILITY A/BUILDING 3 (*)(**) Overflow-2nd (predator building) | ~~LEVEL II SNY –DORM~~ **LEVEL II NDPF-DORM** | Y | DD2 predators require single cells (E-4 Only) | Go to **RHU**/~~CTC~~ **Not allowed on Level III or IV** |

| FACILITY/BUILDING WING | PROGRAM TYPE | DD1 | DD2 | DD3 |
|---|---|---|---|---|
| BASED ON DDP DESIGNATED MISSIONS MATRIX Revision dated 5/2/2017 | | | | |
| FACILITY E/BUILDING 4 (**) DD2 predators from A, E, F, & G will go to this unit. DD1 predators from E yard will go to E4. (predator building) | ~~LEVEL III SNY –CELL~~ **LEVEL II NDPF-CELL** | Y IDST Review | Y Single Cell only IDST Review | ~~Y~~ ~~Go to RHU/CTC Not allowed on Level III or IV~~ **Single Cell only IDST Review** |

DocuSign Envelope ID: 4942E575-537F-4EAD-A7D0-11B933976C4F

OP 178, DDP (Facility E Housing)
Page 2

| FACILITY E/BUILDING 5 | ~~EVEL III SNY~~ ~~CELL~~ **LEVEL II NDPF-CELL** | Y | Y | ~~Go to~~ ~~RHU/CTC~~ ~~Not allowed~~ ~~on Level III~~ ~~or IV~~ **Y** |
|---|---|---|---|---|

This policy will remain in effect until the changes can be incorporated into the next revision of the OP 178, DDP. Should you have any questions regarding this matter, please contact the ADA Coordinator at extension 7516.

**BRYAN D. PHILLIPS**
Warden
California Substance Abuse Treatment
Facility and State Prison at Corcoran

**ANU BANERJEE**
Chief Executive Officer
California Substance Abuse Treatment
Facility and State Prison at Corcoran

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date:    March 20, 2024

To:    All Staff

Subject:    **OPERATIONAL PROCEDURE 178, DEVELOPMENTAL DISABILITY PROGRAM**

**Policy 24/011**

**Operational Procedure 178, Developmental Disability Program**

The purpose of this memorandum is to announce the amendment of Operational Procedure 178, Developmental Disability Program. This policy shall remain in effect until incorporated into the next annual revision.

~~Deletions~~/Additions

### III.    REFERENCES

I.    **Clarification Of Appropriate Housing Placement For Incarcerated Persons In The Developmental Disability Program, dated January 4, 2024.**

### X.    INSTITUTION ACTIVITIES AND SERVICES

A.    **SAFETY AND SECURITY**

Legitimate safety and security concerns shall take precedence over any accommodations afforded to DDP inmates and may result in the temporary or permanent suspension of any such accommodation in order to ensure the safety of persons, security of the institution/facility, or the integrity of an investigation.  The Department is not required to provide accommodations for inmates with developmental disabilities if the accommodation poses a direct threat to the safety and/or security of staff, inmates, or the public.

B.    **Housing:**

During the initial bus intake screening process at CSATF/SP, all inmates with developmental disabilities will be screened for single cell status and compatibility by appropriate custody staff prior to housing, via the CDCR 1882.

**Upon an incarcerated person's placement in the DDP, custody/classification staff shall screen newly identified DDP incarcerated persons and their cellmate(s) to ensure appropriate housing placement is made, pending a review by classification staff and expedited transfer when necessary.**

Although the CRP does not require DD1 inmates to be clustered with DD2 and DD3 inmates, CSATF/SP clusters DD1/DD2, and DD3 inmates in the same building. Inmates identified, as DD1/DD2 or DD3 shall only be

Policy 23/030 OP 403 – Disability Placement Program

placed in the building designated for DD1/DD2 and DD3's. Custody staff shall screen all inmates placed in any housing unit designated for DD1/DD2 and DD3 inmates.

**Non-DDP inmates** with a history of sexual and/or predatory behavior against "weaker inmates" shall not be housed in those designated buildings.

**Identified DD1/DD2 and DD3 inmates** with a history of sexual and/or predatory behavior, as described below and consistent with existing single cell screening criteria (CDCR 1882), shall not be housed in a cell/dorm/bay/section with inmates who have victim concerns and may be single-celled based on single cell criteria.

Custody staff shall review at least the following to ensure appropriate housing:

1. Classification Chrono, for review of DDP category designation.

2. Adaptive Support Chrono, for review of adaptive support services and/or indication of potential victimization.

3. Enemy concerns noted on Notice of Critical Case Info-Safety of Persons (CDCR 812) and confidential folder.

4. Patterns of victimization, ~~or~~ predatory behavior, ~~especially within the past 12 months, such as:~~ **predatory case factors and minimum DDP housing exclusionary periods can be seen in the table below.**

| Predatory Case Factor | Minimum Exclusionary Period |
|---|---|
| Found guilty of an in-custody sexual offense, or an attempt (e.g., rape, forcible sodomy, oral copulation, sexual battery with aggravating factors, etc.). | Permanently excluded. |
| New commitments with documented incident(s) of sexual offenses against individuals with a physical, mental, or developmental disability. | Five years from date of reception to CDCR. |
| Single-cell status due to in-cell violence. | Double-celled during the previous two years without in-cell violence. |

Policy 23/030 OP 403 – Disability Placement Program

| Documented in-custody conduct (e.g., substantiated information in confidential C-File) that demonstrates victimization or manipulative behavior against an individual with a physical, mental, or developmental disability.<br><br>E.g., An incarcerated person is found guilty of any of the following offenses against a person with a disability:<br><br>• Battery<br>• Assault<br>• Criminal Threats<br>• Extorting<br>• Stalking<br>• Theft | Three years from most recent date of documentation.<br><br>Staff should use discretion and sound correctional judgement when determining appropriate housing for incarcerated persons in the DDP. Each decision made on the basis of this exclusionary factor should be evaluated on a case-by-case basis. An incarcerated person may have committed one of the listed offenses, but it may have not been against an individual with a disability, or the circumstances surrounding the violation may lead the reviewer to believe the offense was not predatory in nature. (E.g., A DD1 incarcerated person is found guilty of battering a DD2 incarcerated person while housed in the DDP building; however, documentation reveals that the battery occurred during an incident where the DD2 incarcerated person was attempting to steal from the DD1 incarcerated person. The DD1 incarcerated person may not be excluded form DDP housing because the offense appeared to be purely reactionary and not predatory.) |

- ~~History of physical or attempted assault.~~

- ~~History of possession of deadly weapons.~~

- ~~History of inciting disturbances, either verbal or written.~~

- ~~History of in-custody sexual offenses, i.e., rape, forcible sodomy, oral copulation.~~

- ~~Documented conduct that demonstrates a pattern of victimization or predatory and/or manipulative behavior.~~

This review should include, but not be limited to, the following documents: CDCR 128B, CDCR 128C, Classification Chrono, RVR, Crime/Incident Report, in SOMS, CDCR 1882, Confidential File, Probation Officer's Report, CDCR 174, Parole Charge Sheet, CDCR 1676, etc.

During intake screening at R&R, the Watch Commander or his or her designee will review the SOMS/ERMS for any documentation in the form of RVR's, Counseling Chrono, CDCR 128B, or Memorandums located in the confidential folder, which would indicate any previous history of vulnerability pursuant to other inmates with sexual and/or aggressive behavior.

The Facility Correctional Counselor II (CCII) shall ensure that each inmate's ERMS is reviewed to discern any history of sexual and/or other predatory behavior against "weaker individuals" during Initial/Annual Classification Committees. The Classification Chrono for each inmate shall reflect the findings of the review. Each inmate currently housed in a designated DDP building must have a current review.

During each inmate's initial, annual or program review, committee is to review each inmate's case factors and determine eligibility for housing in a DDP designated housing unit. Committee shall specifically document an inmate's eligibility for DDP housing within each committee action.

When reviewing a bed assignment request in SOMS, the Facility Sergeant/Lieutenant shall review the most recent committee action to identify the inmate's eligibility to housing in a DDP designated housing unit before recommending the bed request batch to Central Control. The Facility Sergeant/Lieutenant shall ensure inmates determined by committee to be ineligible for housing DDP designated housing units are placed into appropriate bed assignments pursuant to the DDP Housing Matrix.

In the event staff determine an inmate exhibits victimization or predatory behavior requiring review by a committee, staff shall document their observations/concerns on a CDCR 128B and immediately submit copies to their immediate supervisor, the Facility CCII, the inmates assigned Correctional Counselor-I, and the DDP designated housing unit staff. The Facility Sergeant/Lieutenant may remove the inmate from the DDP designated housing unit and rehouse them pursuant to the DDP Housing Matrix, pending review by committee. The Facility CCII shall ensure the inmate is scheduled for a committee review to address DDP housing eligibility.

Policy 23/030 OP 403 – Disability Placement Program

Ensure this information is disseminated to all institutional staff. Should you have any questions regarding this matter, please contact the ADA Coordinator at extension 7516.

DocuSigned by:

*Gloria Garcia, CEO(A)*

F2192AA6340040F...

**BRYAN D. PHILLIPS**
Warden
California Substance Abuse Treatment
Facility and State Prison at Corcoran

**ANU BANERJEE**
Chief Executive Officer
California Substance Abuse Treatment
Facility and State Prison at Corcoran

DocuSign Envelope ID: A7BC4C95-6DBB-4425-822B-73D68EAB46F5

# Memorandum

Date    :    November 30, 2023

To      :    All Staff

Subject:    **OPERATIONAL PROCEDURE 178, DEVELOPMENTAL DISABILITY PROGRAM**

The purpose of the memorandum is to announce there were numerous changes made to Operational Procedure 178, *Developmental Disability Program*, during this annual revision and should be read in its entirety. Additions are noted in **red bold font** within the procedure.

Ensure this information is disseminated to all institutional staff. Should you have any questions regarding this matter, please contact the ADA Coordinator at extension 7516.


BRYAN D. PHILLIPS
Warden (A)
California Substance Abuse
Treatment Facility and State Prison

A. BANERJEE
Chief Executive Officer
California Substance Abuse
Treatment Facility and State Prison

# PPIM

| New: | |
|------|------|
| Reviewed: | November 2023 |
| Revised: | November 2023 |

## CALIFORNIA SUBSTANCE ABUSE TREATMENT FACILITY AND STATE PRISON
Corcoran, California

Operational Procedure (OP)

## I.    PLAN TITLE AND NUMBER

A.    Developmental Disability Program (DDP)

B.    OP – 178

## II.    PURPOSE AND OBJECTIVE

It is the policy of the California Substance Abuse Treatment Facility and State Prison at Corcoran (CSATF/SP), to provide access to its programs and services to inmates and parolees with disabilities, with or without reasonable accommodation, consistent with legitimate penological interests. No qualified inmate with a disability–as defined in Title 42, United States Code, Section 12102–12103 shall, because of that disability, be excluded from participation in or denied the benefits of services, programs, or activities of the California Department of Corrections and Rehabilitation (CDCR) or be subjected to discrimination.

A.    To ensure access to programs, activities, services, and to ensure provision of adaptive support services as needed.

B.    To provide appropriate housing and classification to ensure identified inmates are not exposed to a significant risk of harm, abuse, or harassment from other inmates or staff.

## III.    REFERENCES

A.    Americans with Disabilities Act (ADA)

B.    Title 42 of the United States Code, Section 12102-12103

C.    Clark vs. California Court Ordered Remedial Plan (CRP) amended March 1, 2002.

D.    Applicable sections of the California Code of Regulations (CCR), Title 15

E.    Memorandum dated April 16, 2007, by the Director regarding revisions to the Clark Remedial Plan and Adaptive Supports Chronos.

F.    Memorandum dated June 14, 2021, by the Director regarding implementation of Developmental Disability Program Adaptive Support Logs in the Strategic Offender Management System (SOMS).

G.    Memorandum dated September 26, 2022, by the director regarding changes to the DDP RVR process.

H.   Memorandum dated May 4, 2023, by the director regarding Developmental Disability Process Rules Violation Report training announcement and reiteration of approval process.

## IV.   APPROVAL AND REVIEW

This OP will be reviewed annually during the month of November, or on an as-needed basis, by the ADA Associate Warden (AW).  The Warden will have final approval of any changes.  Any revisions to this OP must be sent to the Class Action Management Unit (CAMU) for review.

## V.   DEFINITION

Developmental disability is defined as a disability that originates before an individual attains the age of 18, continues–or can be expected to continue–indefinitely, and constitutes a substantial handicap for that individual.  It includes intellectual disability, cerebral palsy, epilepsy, and autism.   It also includes disabling conditions found to be closely related to intellectual disability or to require treatment that required for individuals with an intellectual disability, but does not include other disabling conditions that are solely physical in nature.

Intellectual disability is defined as a significantly sub-average intellectual functioning level (e.g., an Intelligence Quotient [IQ] of approximately 70 or below on an individually administered IQ test) with concurrent deficits or impairments in adaptive functioning  (e.g., a person's effectiveness in meeting expected standards for his age by his/her cultural group) in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of (inmate) resources, self-direction, functional academic skills, work, leisure, and health and safety.  The condition must have occurred before age 18.

The primary objective of the DDP is to provide equal access to programs and services to inmates/parolees with cognitive and adaptive deficits.

CDCR criteria for inclusion in the DDP are:

- Low cognitive functioning; and
- Concurrent deficits or impairments in adaptive function. Adaptive support functions are defined as abilities necessary to care for oneself and to access programming/services in a correctional setting.

Both criteria must be met.

On occasions, some inmates/parolees with low cognitive ability may have adequate adaptive functioning skills to cope in a correctional environment, but not on parole in a less structured community setting. In other words, they may need services outside prison but not in prison.

CDCR inclusion criteria differ from the State's Department of Developmental Services (DDS) criteria in that CDCR does not exclude for:

- Age of onset

- How the inmate became disabled (specific diagnosis)

- On a case-by-case basis, inmates with an IQ above 75 may be included in the DDP if their adaptive functioning is poor and their needs are not met through another program, e.g., Disability Placement Program (DPP), Enhanced Outpatient Program (EOP), Human Immunodeficiency Virus (HIV).

CAUTION:  Cognitive/adaptive deficits entirely due to mental/physical illnesses requiring long-term hospital care are not criteria for inclusion in the DDP.  Inmates with severe mental/physical illnesses may exhibit deficits in cognitive and adaptive abilities.  Such inmates may be excluded from the DDP if they meet both of the following criteria:

- Their mental/physical illness is entirely responsible for these deficits.  That is, they would not need the adaptive supports of DDP except for their illness.

- Their illness is being treated in a setting such as EOP and Correctional Treatment Center (CTC).

For example, an inmate with advanced dementia requiring 24-hour nursing care may be excluded from the DDP.  On the other hand, an inmate outside the hospital setting with mild dementia that has low cognitive scores and requires adaptive supports to program should be included in the DDP.

"Clustering" will help the DDP.  Clustering is housing groups of inmates who have similar needs together in designated sites.

## VI.    IDENTIFICATION

A.    **CATEGORIES OF ADAPTIVE SUPPORT SERVICES ON DDP SCREENING RESULTS CDCR ADAPTIVE SUPPORTS CHONO (FORMERLY 128C2) (Attachment A):**

**NCF:**  Inmate has Adequate Cognitive Functions (based on cognitive test scores) and therefore does not require adaptive functioning evaluation.

**NDD:**  Inmate evaluated at a mainline or parolee who may have low cognitive functioning but determined not to have adaptive support needs.

**DD1:**  Inmate can function successfully in a General Population (GP) setting in a designated DDP institution consistent with other case factors and usually does not require prompts to initiate activities of self-care and daily living.  Inmate may need supervision or guidance and assistance when under unusual stress or in new situations.

DocuSign Envelope ID: A7BC4C95-6DBB-4435-822B-73D68EAB46F5

**DD2:** Inmate can function successfully in a GP setting in a designated DDP institution consistent with other case factors. However, inmate requires prompts to initiate self-care and/or daily living activities and may have victimization concerns, thereby requiring housing in a designated DDP building/unit/wing.

**DD3:** Inmate requires placement in a highly structured, specialized program in a designated DDP institution capable of meeting his needs. Inmate requires constant prompts and will not complete tasks without them. DD3 inmates may have victimization concerns, thereby requiring housing in a designated DDP building/unit/wing.

B. **SCREENING PROCESS**:

All inmates will be screened for developmental disabilities using standard instruments, to ensure uniform application of departmental policies and procedures for screening, identifying, and verifying developmental disabilities and placing identified inmates in appropriate settings. A three-phase process and clinical judgment will be used to identify those inmates who fit the criteria for developmental disabilities. Phase I should take place within seven (7) days after an inmate arrives at a Reception Center (RC) or clinical staff receives a referral. Phase II should take place within seven (7) days after an inmate fails the test administered in Phase I. Phase III should take place within seven (7) days after an inmate fails the test administered in Phase II.

Phase I and Phase II cognitive tests may be refused and, with justification, skipped. The later phase is due seven (7) days after the decision to refuse or skip a phase is documented. The California Adaptive Support Evaluation (CASE), which is used for Phase III, is not dependent on inmate cooperation; however, if an inmate refused to be interviewed for the CASE, the clinician must make use of collateral information such as observation of the inmate and his living conditions, staff interviews, Electronic Records Management System (ERMS), Electronic Health Record System (EHRS), and other records. Any inmate, who refuses, is unable to take, or fails either of the cognitive functioning tests must be reviewed for adaptive functioning deficits. The clinician will document the inmate's reason for not completing the cognitive tests on a Development Disability Progress Note.

The three-phase process at CSATF/SP will involve the following:

1. **PHASE I:** Cognitive skills will be tested using the Quick Test based on established criteria. The Quick Test is a cognitive screening tool used in a variety of settings to provide a rapid estimate of cognitive functioning. The Quick Test takes approximately ten minutes to administer. A score above 80 passes and receives a designation of NCF. Inmates will not be informed of the estimated IQ. Hearing impaired inmates may take the test by reading a list of the test items.

2. **PHASE II:** This phase testing shall be conducted by using either the Testing of Non-Verbal Intelligence (TONI-IV Edition). The TONI is a standardized, language-free, problem-solving based test of cognitive ability. The TONI takes approximately 20 minutes. Because it can be administered without use of language, it may be used to obtain an estimate of cognitive skills in individuals who are not fluent in English or are hearing impaired. During administration of the test, no verbal instructions are used. The examiner uses gestures and modeled responses as a means of conveying the task to the inmate. Phase II must be completed within seven (7) days after the inmate did not pass Phase I or did not take a Phase I. Inmates scoring above 80 on the TONI-Four Edition receives a designation of NCF.

3. **PHASE III:** The CASE will provide a way to determine whether the inmate has an adaptive functioning deficit in the correctional setting. The CASE must be completed within seven (7) days after the inmate did not pass Phase II or did not take a cognitive test. Later re-evaluations will also be called Phase III and will be completed using the CASE. An Adaptive Supports Chrono must be generated for each new Phase III.

By observing, interviewing, and interacting with the inmate; receiving verbal reports from officers and staff familiar with the inmate; and reviewing existing records (ERMS and EHRS), a psychologist or social worker will complete the CASE. Clinical interviews must be conducted in a manner to ensure the inmate understands, to the best of his ability. The clinician will complete the CASE with a summary justifying the DDP designation and specifying any significant adaptive programming deficits. The CASE will be listed in "DOCUMENTATION" in the EHRS.

These initial results will be documented on an Adaptive Supports Chrono, which must be signed by a licensed mental health clinician. If the clinician completing the assessment is unlicensed, a licensed clinician must co-sign and date the Adaptive Supports Chrono, indicating approval. This approval process is visible only in EHRS. The Adaptive Supports Chrono document provided to ERMS by EHRS only provides the assessing clinician's name.

A new Adaptive Supports Chrono shall be generated to indicate changes in the inmate's adaptive support needs. A new CASE is not needed if there is no change in the inmate's DDP status/designation.

a. **Adaptive Deficits:** Examples of areas in which adaptive deficits may be identified and examples of the types of adaptive deficits that may be presented are as follows:

1) **Communication Skills:** The DDP inmates may have poor ability to express themselves verbally or in writing. They may have difficulty understanding basic verbal

requests or instructions. They may be unable to understand explanations of custody procedures or disciplinary and classification hearings. They will likely have difficulty with any task requiring reading or processing written material (thus, they may have difficulty with disciplinary, classification, and/or appeal processes that require reading and understanding). They will likely have difficulty with any task that requires making written requests.

2) **Academic Skills:** The DDP inmates may show evidence of poor cognitive abilities/skills related to learning, such as reading, writing, and using basic practical mathematical concepts. The focus of this skill area is not on grade level academic achievement but rather on the acquisition of those academic skills that are functional in terms of independent living.

3) **Self-Care Skills:** The DDP inmates may show evidence of poor self-care, e.g., seldom bathing, soiled or unkempt clothing, poor eating habits, and/or the inmate's cell may be disorganized/dirty.

4) **Socialization Skills:** The DDP inmates may show difficulty establishing and maintaining positive relationships. They may seem naive with respect to prison routine or culture. They may give up possessions to other inmates. They may become vulnerable to sexual predators, manipulation by other inmates, and/or be recruited for gang activities. The DDP inmates may engage in a repetitive cycle of disciplinary infractions involving other inmates or correctional officers. This could be suggestive of a lack of judgment and failure to understand the consequences of their actions.

5) **Self-Advocacy/Use of Inmate Resources:** The DDP inmates may have difficulty advocating for themselves during classification committee hearings, disciplinary proceedings, and the appeals process, and may waive their rights without understanding what they are doing. The DDP inmates may have difficulty understanding how to access inmate resources (such as medical/dental services, the law library, religious services, and the canteen) in a correctional setting.

6) **Work:** The DDP inmates may have difficulty maintaining a work assignment due to inappropriate social behavior and a lack of related work skills. For example, DDP inmates may be unable to complete

DocuSign Envelope ID: A7BC4C95-6DBB-4435-822B-73D68EAB46F5

tasks; follow work schedules, seek assistance, take criticism, or improve performance.  They may also be unable to apply functional academic skills; and to use skills concerning going to and from work, preparing for work, managing oneself while working, and communicating with individuals in the workplace.

7) **Health and Safety:**  The DDP inmates may appear naive about maintaining health in terms of eating; identifying, treating, or preventing illness; basic first aid; sexuality; physical fitness; personal habits; and basic safety considerations, such as following rules or seeking assistance.  These inmates will likely use inappropriate behavior with others and have difficulty communicating choices and needs and participating in social interactions.

8) **Self-Direction:**  The DDP inmates may have difficulty making choices; learning and following a schedule; initiating activities appropriate to particular settings, conditions, schedules, and personal interests; completing necessary or required tasks; seeking assistance when needed; resolving problems in familiar and unfamiliar situations; and demonstrating appropriate assertiveness and self-advocacy skills.

9) **Leisure:**  The DDP inmates may not have acquired many leisure and recreational interests that reflect personal preferences and choices.  The DDP inmates may have difficulty choosing and initiating interests, using and enjoying leisure and recreational activities alone and with others, taking turns, and/or terminating or refusing leisure or recreational activities.  Related skills include behaving appropriately in leisure and recreational setting, communicating choices and needs, participating in social interaction, applying functional academics, and exhibiting motor skills related to such activities.

b. **Support services** include but are not limited to the following:

1) **Prompting:**  These are reminders provided to inmates to begin or complete an activity or behavior, e.g., completing self-care, requesting cleaning supplies, accessing medical care, reporting to work, attending meals, conducting laundry exchange, complying with count procedures, etc.  Prompts may involve verbal, visual, or written reminders, as well as hand gestures.  With clinical review, attempts must be made to

systematically lessen prompting to promote independent functioning.

2) **Coaching:** This is prompting an inmate through specific (usually vocational) tasks until the inmate has acquired the skill to complete the task independently. This is done by teacher's aides and work supervisors.

3) **Assisting:** This is assistance by trained departmental staff to enable DDP inmates to understand and participate in (to the best of their ability) disciplinary, classification, and other administrative hearings. This assistance would also include completing any forms or documents necessary to secure any rights or benefits available to non-disabled inmates. The DDP inmates must be afforded reasonable accommodation to ensure equally effective communication, to the best of their ability.

- Inmates needing assistance to effectively use the Inmate **Grievance** Process must be provided assistance by the **Grievance** Coordinator **(GC)**, the assigned Correctional Counselor I (CCI) as described in CCR, Title 15, Section 3084.3(b)(3).

- The assigned CCI must assist DDP inmates with issues that include, but are not limited to, classification; program assignments; applications for credit restoration; completion of Notice and Request for Reasonable Accommodation (BPH 1073), safety and security concerns; and elements of due process.

- Staff Assistants (SA) who have received training must be assigned by a Senior Hearing Officer (SHO) to assist DDP inmates throughout the disciplinary process for both administrative and serious rules violations.

4) **Monitoring:** This is providing additional supervision of an inmate's self-care and/or cell maintenance, personal safety, behavior and property.

Staff shall provide inmates in the DDP with their Adaptive Supports Chrono's adaptive support not less than the minimum frequency specified on the inmate's Adaptive Support Logs (ASL) (Attachment B). However, frequency of assistance is determined by each inmate's individual needs and may be required more often than the minimum listed. There may be times where more help is specified on the

Adaptive Supports Chrono than is reflected on the ASL; staff shall use the Adaptive Supports Chrono. (For more information on Adaptive Support Service Minimum Frequencies, see Attachment D.)

There are two types of ASLs.  The primary ASL is the Housing Unit ASL.  For inmates in the DDP with a work assignment there is a Work ASL (Attachment B-1).  The Housing Unit ASL shall be used to record when the inmate's Adaptive Supports Chrono's adaptive support services are provided.  The Work ASL shall be used to record the provisions of work-related adaptive support services.  Work-related adaptive support services are specified on the Work ASL.  Staff shall document any unusual workplace occurrences on the Work ASL.  This includes any issues requiring staff attention.

Housing Unit Sergeants, Facility Sergeants, and work supervisors shall verify adaptive support services are being provided and documented consistently.  Housing Unit Sergeants, Facility Sergeants, and work supervisors will review their ASLs on a weekly basis; the supervisor shall document this review by signing the ASL.

Completed ASLs shall be kept in their respective location for a minimum of one week so staff can ensure infrequent prompts are given timely, and for the purposes of spot checks and audits.  ASLs that are over one week old shall be removed from their respective locations and archived by the institution, consistent with the Department Operations Manual. In the event an inmate in the DDP is transferred out of the institution, the Adaptive Supports Chrono will go with the inmate. The Housing Adaptive Support Logs (ASL) shall be retained and archived for a minimum of five (5) years by the DDP Office in Complex IV.

<u>All adaptive support services provided to DDP inmates must be documented.</u>  Forms and other instruments that may be used to record these services include, but are not limited to: ASLs, Isolation/Segregation Record (CDCR 114A); Rules Violation Report (RVR); Counseling Chrono; General Chrono (CDCR 128B); Classification Chrono; and/or any other form used to prove that CDCR provided DDP inmates with due process.

A confidential screening location that is free from distractions for all phases of DDP screening shall be provided.  If the inmate refuses to participate in Phases I and II of the screening, a CASE will be administered.  The CASE shall not be administered at cell side.  If the inmate refuses to be interviewed for the CASE in a confidential setting, a CASE should still be completed. The clinician should ensure additional collateral information is gathered and

observations of the inmate and cell are conducted and documented on the CASE.

Ensure that all screening sites have the following characteristics:

- No extended visual contact with other inmates. Any incidental visual contact must be brief or in passing.

- Conversations cannot be heard by other inmates.

- Discussions between inmate and evaluator can easily be heard using conversational tones (e.g., it is not necessary to raise one's voice to be heard or to whisper to avoid being overheard).

- Minimal distractions are present.

- Interruptions are limited to emergencies and other unforeseen circumstances.

During DDP on-site reviews, all on-site screening locations shall be observed by DDP Mental Health Program staff. During off-site reviews, characteristics of the screening location and specific settings shall be supplied by the institution and is but subject to verification.

C.    **IDENTIFICATION OF INMATES WITHIN THE EXISTING POPULATION:**

Efforts to identify inmates with developmental disabilities must be continuous.

**Staff Referral:**

If behavior is observed, or staff receives information indicating an inmate may have a developmental disability, staff shall refer the inmate for screening by directing a CDCR 128B, Mental Health Referral Form, to the CSATF/SP DDP Psychologist. A referral shall also be triggered by any of the following:

1.    The inmate self-identifies or claims to have a developmental disability.

2.    The inmate's EHRS or ERMS contains documentation of a possible developmental disability.

3.    A third party (such as a family member) requests testing of an inmate for an alleged developmental disability.

D.    **EXPEDITED TRANSFERS**

1.    Institution health care services clinical staff shall complete the appropriate testing and clinical review. A copy of the completed Adaptive Supports Chrono shall be forwarded to the Institution's

Classification and Parole Representative (C&PR) within seventy-two (72) hours after testing is completed. The original Adaptive Supports Chrono shall be routed to the inmate's assigned CCI.

Once an inmate is identified as DDP, the C&PR shall ensure the inmate appears before an appropriate Classification Committee for referral to a Classification Services Representative (CSR). All necessary committee actions and follow-up documentation, e.g., Classification Chrono, shall be completed and available for CSR review within 14 days.

2.    All identified DDP inmates shall be assigned housing in a manner that addresses their safety and security needs.

3.    In addition, staff must maintain a separate photo identification roster within all units housing inmates identified with developmental disabilities, including those pending transfer.

E.    **VERIFICATION:**

1.    Screening/verification of a developmental disability by clinical staff shall be recorded on an Adaptive Supports Chrono. Once completed and approved, the Adaptive Supports Chrono shall become part of the inmates ERMS and shall remain in effect until otherwise modified by a clinician as a result of changes in the inmate's adaptive functioning level in a correctional setting.

If an inmate refuses to cooperate, and has observable signs of adaptive functioning deficits, the facility's health care services clinical staff shall record the observable deficits and complete the CASE and any other tests within seven (7) days of Phase I or Phase II being skipped, making appropriate recommendations on an Adaptive Supports Chrono.

The clinician should observe the inmate, conduct interviews of correctional officers and other staff familiar with the inmate, and review existing records. This inmate can be designated as NDD if found not to need adaptive support services.

2.    The clinician shall complete an Adaptive Supports Chrono in EHRS. If the clinician is unlicensed, a licensed clinician must cosign and date the Adaptive Supports Chrono, indicating approval.

a.    If an inmate has adequate cognitive test scores and does not require adaptive functioning evaluation, the clinician shall check the appropriate box indicating "NCF."

b.    If an inmate does not receive a passing score on the Phase I or II cognitive tests and after completion of the CASE is found not to require adaptive support services; the clinician must

check the box on the Adaptive Supports Chrono indicating "NDD" and enter an explanation in the Comments Section.

Inmates designated as NDD require no adaptive support services from cognitive deficits and will not be re-evaluated unless problems with adaptive functioning arise.

c.    If it is determined that the inmate has a developmental disability that does not require special placement, does not usually require prompts to initiate self-care or daily living activities, and the inmate may be housed in one of the institutional designated DDP facilities in a GP setting consistent with other case factors, the clinician must check the box indicating "DD1". This inmate may require extra prompting during new or stressful situations.

d.    If it is determined that the inmate has a developmental disability, can function in a GP setting consistent with other case factors, but requires prompts to initiate self-care and/or daily living activities or has victimization concerns, thereby requiring special placement in a designated building, the clinician must check the box indicating "DD2".

e.    Special concerns, such as documented mental or physical health care needs, may be addressed by recording specific needs on a Medical/Psych/Dental Chrono (CDCR 128C) and scanning it into the EHRS and attaching it to the Adaptive Supports Chrono and placing it in ERMS. The Adaptive Supports Chrono Comments Section must reflect that a CDCR 128C has been prepared, alerting staff to read it. Recommended adaptive support services must also be noted. Additional notes, references, explanations, and/or information not indicated elsewhere may be noted in the Comments Section of the Adaptive Supports Chrono.

Information that would be considered confidential to an inmate's medical, dental, or mental health record must not be written on the Adaptive Supports Chrono (e.g., diagnoses, medical history, medication) because the Adaptive Supports Chrono is also placed in areas that are not considered confidential for medical or mental health privacy concerns.

f.    Adaptive support services noted on the Adaptive Supports Chrono must correspond to those of the specified developmental disability category.

g.    The Adaptive Supports Chrono identifying inmates as having a developmental disability (DD1, DD2, and DD3) must be distributed by making copies for the following: EHRS; the C&PR or CCII; Inmate Assignment's; the assigned work

supervisor and/or Education assignment; the inmate; and the DDP Library Technical assistant (LTA). The original Adaptive Supports Chrono shall be placed in the "General Chrono" section of the inmate's ERMS, via the assigned CCI.

h.    The Adaptive Supports Chrono identifying inmates not requiring adaptive support services (NCF, NDD) must be distributed by clinical staff as follows: original placed in the "General Chrono" section of the inmate's ERMS; copies scanned for the EHRS; the C&PR; and the inmate.

i.    Staff must ensure that information contained on the Adaptive Supports Chrono is not available to other inmates. Files with Adaptive Supports Chrono's and the separate photo identification rosters are to be maintained in secure locations and readily accessible to staff.

## VII.    STANDARDS

A.    **PLACEMENT CRITERIA:**

Placement must be determined by identifying the nature and severity of the developmental disability, adaptive deficits, and adaptive support services required. Determining the nature and intensity of adaptive support services that an inmate requires will be based on a clinical appraisal of each case. Some inmates identified by clinical staff as having a developmental disability will function adequately in designated institution settings and programs. However, where the level of disability includes potential vulnerability to predatory behavior or a need for more intensive supervision and intervention, special placement in a designated building/unit/wing will be considered. Once identified, adaptive support services must be reviewed and adjustments made as identified by the Interdisciplinary Support Team (IDST).

B.    **CATEGORIES:**

Developmental disabilities include the following categories and associated adaptive support services necessary to function in a correctional environment:

1.    **Intellectual disability:**

For each inmate found to have symptoms of intellectual disability and require adaptive support services through completion of the cognitive testing process and review of adaptive functioning, a clinician shall recommend the type of placement and adaptive support services. These recommendations will be based upon a combination of patterns and intensities identified by the American Association of Intellectual disability and levels of severity identified in the Diagnostic and Statistical Manual of Mental Disorders Fourth Edition. The

Department anticipates that with appropriate adaptive support services identified, DDP inmates' functioning level may improve and their DDP category may change.

**NCF:** Inmate received a passing score on Phases I or II cognitive tests and did not require adaptive functioning evaluation.

**NDD:** An inmate previously evaluated but found not to require adaptive support services or failing the Phase I and II, but found not to require adaptive support services.  These inmates should be re-evaluated for DDP placement if problems with adaptive functioning arise.

**DD1:** This inmate can function successfully in a GP setting in a designated DDP facility along with other case factors and usually does not require prompts to initiate activities of self-care and daily living.  Inmate may need supervision or guidance and assistance when under unusual stress.  This inmate must always have staff assistance in due process hearings, as the ability to understand may lessen in a stressful situation.

This inmate must always have a SA in disciplinary hearings, Administrative Segregation Placement Notice (ASPN) reviews, to determine the need for retention in Administrative Segregation Housing and Classification Committees.  The level and method used to provide staff assistance can be determined on a case-by-case basis to ensure the DDP inmates understand and participate (to the best of their ability) in any other due process function.  Their ability to understand may worsen in a stressful situation.

**Adaptive Support Services For DD1 Inmates:** Occasional support is needed, especially in more complex, stressful areas.  Support is required during disciplinary/classification hearings and may be needed with the inmate appeal process.

- **Self-Care:** The inmate has the ability to perform all components of self-care, although occasional prompts may be required to initiate some tasks.  Once prompted, inmate is capable of appropriately completing the task.

- **Daily Living Skills:** The inmate has the ability to perform all components of routine cell maintenance and laundry, but occasionally may require prompts to initiate some activities.  Once prompted, inmate is capable of performing these activities.

- **Social Skills:** The inmate appears to interact in a relatively normal fashion with other inmates.  There are

no observations to suggest the inmate is more submissive, apprehensive, or naive and a likely target for exploitation or victimization. The inmate may display various levels of aggressive or poorly controlled behavior when subjected to stressful situations.

- **Self-Advocacy:** The inmate may accidentally waive or not understand due process rights. The inmate should be able to follow and participate in classification or disciplinary hearings with a SA, who has met the training requirements, to provide additional explanation when necessary, or ask questions to ensure the inmate understands to the best of his ability the process. The inmate is able to participate and initiate communication during the advocacy when the SA provides assistance, e.g., helps by explaining the process or by writing for the inmate. The inmate is able to dictate relevant issues but may require assistance with writing and documentation.

**DD2:** This inmate can function successfully in a GP setting in a designated DDP facility consistent with other case factors. However, this inmate requires prompts to initiate self-care and/or daily living activities and may have victimization concerns, and therefore, requires housing in a designated DDP building/unit/wing. Once prompted, inmate can complete activity without further prompting. Inmate can perform unskilled and semiskilled work in a GP setting and adapts well to a correctional environment. Inmate must have a SA assigned at due process hearings to ensure issues are understood.

**Adaptive Support Services For DD2 Inmates:** Limited support is required. Inmate requires prompts and support in certain areas of functioning, e.g., laundry, due process hearings, access to medical appointments, etc.

- **Self-Care:** The inmate has the ability to perform all components of self-care, although occasional prompts may be required to initiate some tasks. Once prompted, inmate is capable of appropriately completing the task.

- **Daily Living Skills:** The inmate has the ability to perform all components of routine cell maintenance and laundry, but occasionally may require prompts to initiate some activities. Once prompted, inmate is capable of performing these activities.

- **Social Skills:** There are elements to the inmate's manner when interacting with other inmates to suggest a possible disadvantage to the developmentally disabled inmate in such personal interactions. The inmate may be noticeably meek, anxious, solicitous, or inappropriately submissive to other inmates. In addition, there may be observations that suggest the inmate is a likely target for exploitation or victimization. Also, the inmate may display various levels of aggressive or poorly controlled behavior when subjected to stressful situations.

- **Self-Advocacy:** The inmate may accidentally waive or not understand due process rights. The inmate should be able to follow and participate in classification or disciplinary hearings with the SA who has met the training requirements, to provide additional explanation when necessary, or ask questions to ensure the inmate understands, to the best of his ability, the process. The inmate is able to participate and initiate communication during the advocacy when the SA provides assistance, e.g., helps by explaining the process or by writing for the inmate. The inmate is able to dictate relevant issues but may require assistance with writing and documentation.

**DD3:** This inmate requires placement in a specialized program in a designated DDP institution capable of meeting their needs. Inmate can be trained in elementary self-care skills, master sight-reading of survival words, and can perform simple tasks in a correctional setting. Inmate requires constant prompts to complete self-care and daily living tasks and will not complete tasks without continued prompts. Inmate must have a SA assigned in due process hearings. Inmate requires special programs tailored to his level of comprehension. This inmate may have victimization concerns.

**Adaptive Support Services For DD3 Inmates:** Support is required on a daily basis.

- **Self-Care:** The inmate requires repeated prompts to perform basic self-care tasks. Unless carefully observed and prompted, this inmate fails to initiate or adequately complete all components of self-care tasks.

- **Daily Living Skills:** The inmate requires repeated prompts and/or other guidance to complete daily living tasks. When this inmate is prompted to complete a task, e.g., cleaning the cell, showering, etc., that task

may not be completed appropriately unless the inmate is prompted through each part and shown how to do the task. Reminders to simply initiate the task are not sufficient and may result in the task not being done or being done poorly.

- **Social Skills:** There are elements in the manner the inmate interacts with other inmates suggesting he will be at a clear disadvantage. The inmate may be noticeably meek, anxious, solicitous, or inappropriately submissive to other inmates. In addition, there may be observations suggesting the inmate is a likely target for exploitation or victimization, or the inmate may display various levels of aggressive or poorly controlled behavior when subjected to stressful situations.

- **Self-Advocacy:** The inmate has substantial difficulty or is incapable of following and participating in classification or disciplinary hearings, even when the SA is present to provide additional explanations. The inmate may inappropriately agree to waive due process rights without understanding what he is doing. The inmate may be marginally or completely unable to participate and/or initiate communication within an advocacy or appeal process even when assisted. This inmate may be unable to dictate relevant issues and will require assistance with writing or documentation.

2. **Autism/Cerebral Palsy/Epilepsy:**

   Inmates diagnosed with these developmental disabilities shall be evaluated on a case-by-case basis by health care staff. Institution placement shall be consistent with medical and custody factors.

   a. **Autism:** A mental disorder originating in infancy that is characterized by self-absorption, an inability to interact socially, repetitive behavior, language dysfunction, inflexible adherence to specific nonfunctional routines or rituals, stereotyped and repetitive motor mannerisms, and persistent preoccupation with parts of objects. This condition is usually accompanied by marked withdrawal from reality.

   b. **Cerebral Palsy:** A disability resulting from damage to the brain before, during, or shortly after birth and outwardly manifested by lack of muscular coordination and speech disturbances.

   c. **Epilepsy:** Any of the various disorders marked by disturbed electrical rhythms of the central nervous system and typically manifested by convulsive attacks usually with clouding of consciousness.

**Adaptive Support Services Required:** Support services must be provided as clinically indicated. Placement in a designated DDP facility will be dependent upon the facility's ability to provide identified adaptive support services.

C.  **INTERDISCIPLINARY SUPPORT TEAM:**

1.  The IDST is a multiple member interdisciplinary team at CSATF/SP comprised of clinical, classification, custodial, education, and other staff required to review and determine the program needs of DDP inmates. The IDST ensures the provision of adaptive support services necessary for a DDP inmate to function at an acceptable level in the correctional environment.

2.  The IDST shall act as the Initial Classification Committee, the Institutional Classification Committee (ICC) and the Unit Classification Committee (UCC) at CSATF/SP. The IDST composition shall include, at minimum, the staff as required by existing departmental policy, including but not limited to, the assigned CCI responsible for coordinating the inmate's classification actions within the institution and ensuring access to specified programs, services, and activities; clinical staff assigned to monitor the inmate's adaptive support services; a representative from education (during Initial Classification Committee and UCC); a CCII recorder; and the Facility Captain of the facility where the inmate is housed. The correctional officer assigned to monitor the inmate's daily activities, or a DDP CCI shall participate as a SA; however, is not considered a committee member.

3.  The IDST will periodically review the inmate's classification, custody, program, and adaptive support services based on the DDP category and individual need. The purpose of the review will be to ensure provision of adaptive support services indicated on the Adaptive Supports Chrono. The IDST shall identify/confirm specific adaptive support services that must be provided to the inmate, including prompting, coaching, and monitoring. The IDST may make the following recommendations: that staff assistance be provided during specific correctional processes, modify an initial recommendation for adaptive support services, and/or change the DDP designation. All decisions, actions, and/or recommendations shall be documented on the Classification Chrono. Modifications to the DDP level must be documented on an updated Adaptive Supports Chrono and referred to the CSR for review and endorsement as appropriate.

4.  An initial case review will be completed within 14 days of arrival at the institution; within the existing population, a case review will be completed within 14 days on inmates identified as requiring DDP services. Routine case reviews shall be completed by the IDST at least annually for DD1 inmates, at least every six months for DD2

inmates, and at least every three months for DD3 inmates.  The IDST may review a case more frequently because of unexpected changes in adaptive functioning, medical/psychiatric concerns, enemy situations, etc., or to ensure recommended program changes have been effective and the inmate's functioning level has not deteriorated.

5.  Staff assigned to the areas/programs with responsibility/supervision of identified DDP inmates may consult at any time with IDST members.  The IDST members may initiate a program review as a result of that consultation.

D.  **GRIEVANCE PROCESS FOR OBTAINING ACCOMMODATIONS:**

An inmate identified as having a developmental disability may request an accommodation to access programs, services, activities, or grieve alleged discrimination through submission of a CDCR 1824, Reasonable Accommodation Request **Form**.  The CDCR 1824 must be readily available to inmates.  The assigned DDP Correctional Officer, CCI, or LTA typically provides assistance to DDP inmates who require help in completing the CDCR 1824 and using the **grievance** process.  However, all staff are required to assist inmates, as needed.

The inmate must submit the request for accommodation on a CDCR 1824 to the appeals office via the institutional mail, or by placing it in the **Grievance** box located on the yard.  The **GC** will verify the inmate's DDP status via the Strategic Offender Management System (SOMS).  The **GC** shall note the DDP status on the appeal form.

If an inmate files a CDCR 1824 and there is no documentation of his developmental disability, the **GC** must forward the Request for Reasonable Accommodation to health care services staff.  Health care services staff shall conduct a Medical Verification and issue an Adaptive Support Chrono if necessary.

If the inmate claims there is other outside information regarding his disability, and the inmate is not able to make the contacts to get the information, CDCR staff, e.g., LTA or CCI should assist the inmate in attempting to get this information.

When an inmate files an accommodation or modification **Grievance** on an inappropriate form e.g., Inmate **Grievance** (CDCR 602) or Medical **Grievance** (CDCR 602-HC), the **GC** must attach a CDCR 1824 and process the appeal according to the timelines in this section.

1.  **Grievance** Screening Process:

Upon receiving a CDCR 1824, the **GC** must review it to determine whether the appeal meets one or more of the following guidelines:

• An issue covered by the Clark Remedial Plan.

- Allegation of discrimination on the basis of a developmental disability under the ADA.

- A request for access to a program, service, or activity based on a developmental disability.

- The **grievance** concerns an issue that substantially limits a major life activity, e.g., caring for oneself, performing essential manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

Inmates who are participants in the DDP will not be required to provide documentation to verify a disability.

E. **JUSTIFICATION FOR DENIAL OF REQUESTS FOR REASONABLE ACCOMMODATION:**

1. **Legitimate Penological Interest:**

A request for accommodation may be denied when the denial is based on legitimate penological interests. The factors to be considered in determining whether the accommodation can be denied on this basis are those four factors articulated by the Supreme Court in Turner v. Safley (1987) 482 U.S. 78. They are: 1) whether there is a valid, rational connection between the denial and a legitimate governmental interest; 2) whether there are alternative means for the inmate to exercise his rights; 3) the impact of accommodating the request on security, staff, other inmates and the allocation of prison resources; and 4) whether the denial represents an exaggerated response to prison concerns.

In all evaluations of requests for reasonable accommodation, the health, safety, and security of all inmates, staff, and public must remain overriding considerations.

2. **Undue Burden and Fundamental Alteration Defenses:**

A request for accommodation may be denied when the requested accommodation would impose an undue financial or administrative burden on the agency, or would fundamentally alter the nature of the service, program or activity. An accommodation is an undue financial burden when, in a cost-benefit analysis, its cost would be an unjustifiable waste of public funds. The Warden, Regional Parole Administrator, or (in the case of some medical accommodations) the Chief Executive Officer (CEO) or designee, will make the determination that an accommodation would result in an undue burden or fundamental alteration.

3. **Direct Threat:**

A request for accommodation may be denied when it poses a direct threat of substantial harm to the health or safety of the inmate, parolee, or anyone else, including the public.

4. **Equally Effective Means:**

A request for accommodation may be denied if equally effective access to a program, service, or activity may be afforded through an alternate method that is less costly or intrusive. Alternative methods, which may be less costly or intrusive to the existing operation/program, may be utilized to provide reasonable access in lieu of modifications requested by the inmate, so long as they are effective.

VIII. **INMATE PLACEMENT**

A. **PLACEMENT GUIDELINES:**

1. All inmates identified as having a developmental disability shall be referred to a CSR for review and endorsement.

2. In assessing appropriate placement, the CSR shall consider the inmate's prevailing case factors, documented degree of developmental disability, vulnerability, and any additional health/psychiatric care placement concerns.

3. Some inmates in the DDP may have concurrent physical or mental health needs, and may require placement in the Correctional Treatment Center (CTC) at CSATF/SP. Placements in the CTC must not prevent the inmate from receiving recommended adaptive support services, as reflected on the corresponding Adaptive Support Chrono, provided they do not conflict with required medical/psychological treatment. The provision of such services must be provided by staff assigned to the CTC.

4. Once the inmate is endorsed for DDP placement, any change in DDP level will require CSR review and endorsement.

B. **CLASSIFICATION:**

1. Classification procedures at CSATF/SP for DDP inmates shall assure that they are not exposed to a significant risk of harm, abuse, or harassment.

2. Case management for all DDP inmates shall comply with established classification procedures unless otherwise directed by policy contained within this plan.

3. The IDST at CSATF/SP shall review and record the continued appropriateness of a DDP inmate's placement on the Classification Chrono, including the inmate's designated endorsement and any determination made regarding adaptive support services. Classification staff shall assist DDP inmates to understand, to the best of their ability, issues involving classification, program assignments, safety and security, and elements of due process.

4. If members of the IDST disagree with the DDP level designation or the adaptive support services required indicated on the Adaptive Support Chrono, they will refer the case, including all relevant information, to the institution/facility's Chief of Mental Health for resolution. If the IDST disagrees on issues of security, the IDST will refer the case, including all relevant information, to the Warden for resolution.

5. The IDST at CSATF/SP members shall:

   a. Use the Initial Housing Review (CDCR 1882):

      1) Review for single cell status and/or housing restrictions. A DDP inmate with a history of vulnerability shall be housed in a designated building/unit/wing within the facility/institution. A DDP inmate with a history of vulnerability will not be housed in a cell or dorm/bay/section with an inmate with a history of sexual and/or other aggressive/predatory behavior against "weaker inmates".

      2) Ensure housing is appropriate based on DDP level designation.

   b. Ensure recommended adaptive support services are consistent with the designated category.

   c. Ensure work supervisors are informed/notified of the inmate's adaptive support needs, as appropriate via the CDCR 128B, Adaptive Support Chrono, or the Classification Chrono. The DDP Correctional Officer assigned to the immediate housing area of the DDP inmate will monitor the Institutional Daily Movement Recap/Master Pass List for any assignments of DDP inmates under his/her supervision. Upon assignment of any DDP inmate, the Officer will notify the work supervisor of the inmate's DDP classification and any specific adaptive support needs.

6. Initial/annual classification committees shall review SOMS/ERMS of **all inmates assigned** to a designated DD2/DD3 building/unit to discern any history of sexual and/or other predatory behavior against "weaker inmates." Non-DDP inmates with a history of such behavior

shall be excluded from designated DD2/DD3 housing/building/wing. Identified DD2 and DD3 inmates with a history of sexual and/or predatory behavior, as defined above, shall not be housed in a cell or dorm/bay/section with an inmate who has victim concerns and may be single-celled based on existing single cell screening criteria.

C.     **DESIGNATED DDP FACILITIES:**

Designated DDP facilities may be changed.  CDCR will notify inmates' counsel 60 days in advance of any action to add or delete designated institutions.

D.     **CONSERVATION CAMPS:**

1.     Inmates who are verified as being DDP shall not be precluded from assignment to a conservation camp based solely on their developmental disability.  The IDST at CSATF/SP shall review these inmates for camp assignment on a case-by-case basis, after a period of observation and thorough evaluation of adaptive deficits and required adaptive support services.  The evaluation will determine whether or not the inmate presents a potential for victimization, is capable of performing the essential functions of the assignment and can function safely given the limited custodial supervision of a camp setting, e.g., escape potential, victimization.

2.     When possible and without jeopardizing the fundamental nature of the program or legitimate penological interest, CDCR may provide reasonable accommodations to allow participation.

E.     **SPECIAL HOUSING PLACEMENT:**

1.     **Restricted Housing Unit (RHU):** DDP inmates at CSATF/SP shall be placed in the **RHU**, consistent with existing departmental procedures and inmate case factors.

The CSATF/SP's Clark Psychologist will provide **RHU** clinicians an updated weekly list of DDP inmates housed in **RHU**. Clinical staff shall personally interview the inmate within 24 hours of arrival in **RHU** and provide necessary information to custody staff via an Initial 24-Hour Contact (formerly 128C); (See Attachment C). The Initial 24-Hour Contact shall be placed in the EHRS.  A Psychiatric Technician shall make personal contact with each DDP inmate on a daily basis to monitor the inmate's adaptive functioning.  In the event a DDP inmate is placed into **RHU** and requires an American Sign Language Interpreter to provide effective communication, the Psychiatric Technician shall contact the ADA Office, at extension 5263, Monday through Friday from 0730 hours to 2000 hours. During non-business hours, the Psychiatric Technician shall ensure On-demand video remote interpreting is utilized for daily rounds.

A clinician who encounters a newly placed DDP inmate in **RHU** must review any prior **RHU** terms that the inmate might have undergone (including lengths of stay, reason[s] for placement, behavior, and functioning during previous stays), and provide a brief summary of that review in the <u>Initial 24-Hour Contact</u>.

If, in the course of monitoring the DDP **RHU** inmate, it is determined his condition is deteriorating, alternate placement and/or adaptive services must be recommended by the Inter Disciplinary Treatment Team (IDTT). The Senior Psychologist Supervisor (SPS) assigned to **RHU** will monitor all DDP **RHU** inmates in the course of the weekly staff meetings and will communicate any issues or concerns with the Clark Program Staff.

In addition, a DDP clinician must complete a **Weekly Restricted Housing Unit DDP Check** (Attachment C-1).  Each of these weekly contacts is to note (at minimum) the consistency and extent to which the inmate is meeting his ADLs, his program directives, and if/when prompts are needed to assist inmate in following staff directives, maintaining self-care, etc.

Documentation requirements for clinical contact between a MH clinician and a DDP inmate or patient while in **RHU** shall be completed in the Electronic Health Record System (EHRS) using the DDP Progress Note for DDP inmates or patients in **RHU** regardless of inclusion in the Mental Health Services Delivery System. Clinical contact includes the following:

  • Initial 24-hour contact

  • Weekly **RHU** contact by a DDP clinician

Clinicians shall use the "MH DDP Note" template in the EHRS and title the note "Initial 24-hour Contact" or "Weekly **RHU** DDP Check." If the primary clinician completes the required initial 24-hour DDP contact concurrently with the initial MHPC contact, the clinician can complete a "MH DDP Note" referring to the initial MHPC contact documentation to avoid duplicate documentation.

In the event an Inmate is placed in **RHU** (per DDP Housing Matrix) on weekends or holidays; **RHU** weekend coverage Psychologist/Social worker will complete Initial **RHU** 24-Hour Intake Chrono.  Due to the lack of office staff during weekends and holidays, the R&R Staff will notify **RHU** Custody Supervisor. **RHU** Custody supervisor will notify the **RHU** covering Psychologist/Social worker of the arrival of a new DDP Inmate to **RHU**.

In the event **RHU** covering Psychologist/Social worker is unavailable, **RHU** Custody supervisor will contact Alternative housing Psychologist/Social Worker at CTC to come to **RHU** and complete

Initial **RHU** 24 Hour Intake Chrono for the new arrival of DDP Inmate to **RHU**.

An <u>EHRS IDST</u> form will be completed by the clinician for IDST/ICC committee actions in **RHU**. Effective Communication will be documented on the EHRS form.

The documentation of routine adaptive support services provided to DDP inmates housed in **RHU** shall be completed by **RHU** staff using existing **RHU** processes, i.e., CDCR 114A.

A SA shall be present when the initial Administrative Segregation Unit Placement **Notice (ASUPN)** is issued to the DDP inmate; and when the Administrative Review is conducted by the Facility Captain. A SA shall also be present during all **RHU** committee reviews (IDST).

Periodic case review by the IDST will be done in accordance with CCR, Title 15, Section 3335.

2. **Immigration Custom Enforcement (ICE):** DD3 inmates must be retained at their respective program institution for ICE processing.

F. <u>**SUBSTANCE USE DISORDER TREATMENT:**</u>

1. **Substance Use Disorder Treatment:** The Department shall provide long-term, intensive, substance use disorder treatment (SUDT) programs for inmates with developmental disabilities comparable to those programs provided to non-disabled inmates.

   a. Inmates that are verified as DD1, DD2, or DD3 and are eligible for the substance abuse program within a designated DDP facility, in SUDT shall be placed consistent with existing eligibility criteria.

   b. The CSATF/SP IDST shall review eligible inmates for SUDT assignment on a case-by-case basis and complete a thorough evaluation of adaptive deficits and required adaptive support services.

IX. **TRACKING**

<u>**INSTITUTION TRACKING:**</u>

The C&PR at CSATF/SP shall utilize the SOMS for tracking DDP inmates based on the Adaptive Support Chrono. The Division and Department Heads may access SOMS for tracking DDP inmates assigned to their areas.

At CSATF/SP, Receiving and Releasing alerts the DDP Office Technician (OT) via institutional phone, fax, or email, of any new DDP arrival. The DDP OT will notify the appropriate DDP CCI, DDP Correctional Sergeant, and DDP Correctional

Officer of any new arrivals.

## X.    INSTITUTION ACTIVITIES AND SERVICES

A.   **<u>SAFETY AND SECURITY:</u>**

Legitimate safety and security concerns shall take precedence over any accommodations afforded to DDP inmates and may result in the temporary or permanent suspension of any such accommodation in order to ensure the safety of persons, security of the institution/facility, or the integrity of an investigation. The Department is not required to provide accommodations for inmates with developmental disabilities if the accommodation poses a direct threat to the safety and/or security of staff, inmates, or the public.

B.   **<u>HOUSING:</u>**

During the initial bus intake screening process at CSATF/SP, all inmates with developmental disabilities will be screened for single cell status and compatibility by appropriate custody staff prior to housing, via the CDCR 1882.

Although the CRP does not require DD1 inmates to be clustered with DD2 and DD3 inmates, CSATF/SP clusters DD1/DD2, and DD3 inmates in the same building. Inmates identified, as DD1/DD2 or DD3 shall only be placed in the building designated for DD1/DD2 and DD3's. Custody staff shall screen all inmates placed in any housing unit designated for DD1/DD2 and DD3 inmates.

**<u>Non-DDP inmates</u>** <u>with a history of sexual and/or predatory behavior against "weaker inmates" shall not be housed in those designated buildings.</u>

**<u>Identified DD1/DD2 and DD3 inmates</u>** <u>with a history of sexual and/or predatory behavior, as described below and consistent with existing single cell screening criteria (CDCR 1882), shall not be housed in a cell/dorm/bay/section with inmates who have victim concerns and may be single-celled based on single cell criteria.</u>

Custody staff shall review at least the following to ensure appropriate housing:

1.   Classification Chrono, for review of DDP category designation.

2.   Adaptive Support Chrono, for review of adaptive support services and/or indication of potential victimization.

3.   Enemy concerns noted on Notice of Critical Case Info-Safety of Persons (CDCR 812) and confidential folder.

4.   Patterns of victimization or predatory behavior, especially within the past 12 months, such as:

- History of physical or attempted assault.

- History of possession of deadly weapons.

- History of inciting disturbances, either verbal or written.

- History of in-custody sexual offenses, i.e., rape, forcible sodomy, oral copulation.

- Documented conduct that demonstrates a pattern of victimization or predatory and/or manipulative behavior.

This review should include, but not be limited to, the following documents: CDCR 128B, CDCR 128C, Classification Chrono, RVR, Crime/Incident Report, in SOMS, CDCR 1882, Confidential File, Probation Officer's Report, CDCR 174, Parole Charge Sheet, CDCR 1676, etc.

During intake screening at R&R, the Watch Commander or his or her designee will review the SOMS/ERMS for any documentation in the form of RVR's, Counseling Chrono, CDCR 128B, or Memorandums located in the confidential folder, which would indicate any previous history of vulnerability pursuant to other inmates with sexual and/or aggressive behavior.

The Facility Correctional Counselor II (CCII) shall ensure that each inmate's ERMS is reviewed to discern any history of sexual and/or other predatory behavior against "weaker individuals" during Initial/Annual Classification Committees. The Classification Chrono for each inmate shall reflect the findings of the review. Each inmate currently housed in a designated DDP building must have a current review.

During each inmate's initial, annual or program review, committee is to review each inmates case factors and determine eligibility for housing in a DDP designated housing unit. Committee shall specifically document an inmate's eligibility for DDP housing within each committee action.

When reviewing a bed assignment request in SOMS, the Facility Sergeant/Lieutenant shall review the most recent committee action to identify the inmate's eligibility to housing in a DDP designated housing unit before recommending the bed request batch to Central Control. The Facility Sergeant/Lieutenant shall ensure inmates determined by committee to be ineligible for housing DDP designated housing units are placed into appropriate bed assignments pursuant to the DDP Housing Matrix.

In the event staff determine an inmate exhibits victimization or predatory behavior requiring review by a committee, staff shall document their observations/concerns on a CDCR 128B and immediately submit copies to their immediate supervisor, the Facility CCII, the inmates assigned Correctional Counselor-I, and the DDP designated housing unit staff. The Facility Sergeant/Lieutenant may remove the inmate from the DDP designated housing unit and rehouse them pursuant to the DDP Housing

Matrix, pending review by committee. The Facility CCII shall ensure the inmate is scheduled for a committee review to address DDP housing eligibility.

| FACILITY/BUILDING WING | PROGRAM TYPE | DD1 | DD2 | DD3 |
|---|---|---|---|---|
| BASED ON DDP DESIGNATED MISSIONS MATRIX Revision dated 5/2/2017 | | | | |
| FACILITY **A**/BUILDING **2** (*) Overflow-2nd | LEVEL II SNY - DORM | Y | Y | Y |
| FACILITY **A**/BUILDING **3** (*)(**) Overflow-2nd   (predator building) | LEVEL II SNY - DORM | Y | DD2 predators require single cells **(E-4 Only)** | Go to **RHU**/CTC **Not allowed on Level III or IV** |
| | | | | |
| FACILITY **B**/BUILDING 2 | LEVEL II GP - DORM | Y | Y | Y |
| FACILITY **B**/BUILDING 3 (**) predator building) | LEVEL II GP - DORM | Y | Go to **RHU** | Go to **RHU**/CTC **Not allowed on Level III or IV** |
| | | | | |
| FACILITY **D**/BUILDING 1 (*) | LEVEL IV SNY - CELL | Y **Single Cell only** | Y **Single Cell only** | Go to **RHU**/CTC **Not allowed on Level III or IV** |
| FACILITY **D**/BUILDING 2 (*)(**) (predator building) | LEVEL IV SNY - CELL | Y **Single Cell only** | Y **Single Cell only** | Go to **RHU**/CTC **Not allowed on Level III or IV** |
| | | | | |
| FACILITY **E**/BUILDING **4** (**) DD2 predators from **A, E, F,** & **G** will go to this unit.  DD1 predators from **E** yard will go to **E4.** (predator building) | LEVEL III SNY - CELL | Y **IDST Review** | Y **Single Cell only IDST Review** | Go to **RHU**/CTC **Not allowed on Level III or IV** |
| FACILITY **E**/BUILDING 5 | LEVEL III SNY - CELL | Y | Y | Go to **RHU**/CTC **Not allowed** |

|  |  |  |  | on Level III or IV |
|---|---|---|---|---|
|  |  |  |  |  |
| FACILITY **F**/BUILDING 1 (*) Overflow-1st | LEVEL II SNY - DORM | Y | Y | Y |
| FACILITY **F**/BUILDING 2 (*) (**) Overflow-1st (predator building) | LEVEL II SNY - DORM | Y | DD2 predators require single cells **(E-4 Only)** | Go to **RHU**/CTC **Not allowed on Level III or IV** |
| FACILITY **F**/BUILDING 3 (*) Overflow-1st | LEVEL II SNY EOP - DORM | Y | Y | Y |
|  |  |  |  |  |
| FACILITY **G**/BUILDING 1 | LEVEL II Non-Designated EOP - DORM | Y | Y | Y |
| FACILITY **G**/BUILDING 2 | LEVEL II SNY - DORM | Y | Y | Y |
| FACILITY **G**/BUILDING 3 (**) (predator building) | LEVEL II Non-Designated EOP (B,C) & SNY – DORM (A,D) | Y | DD2 predators require single cells **(E-4 Only)** | Go to **RHU**/CTC **Not allowed on Level III or IV** |
|  |  |  |  |  |
| **CTC** | Medical/MHCB | Y | Y | Y |
| **RHU** | Administrative Segregation Unit (ASU) | Y **Can house with like concerns.  If safety concerns, must be housed with DDP IM or Single Cell** | Y **Housed with only DD2 & DD3 inmates or Single Cell** | Y **Housed with only DD2 & DD3 inmates or Single Cell** |
|  |  |  |  |  |

(*) DDP inmates will not be housed in these buildings unless ICC releases from **RHU** or prior approval from Warden, ADAC, or AOD.  These buildings are temporary overflow housing and require transfer to designated DDP institutions.

(**) House only DDP inmates with predatory behavior.

C.    **STAFFING:**

Staff identified below will augment the normal staff complement at CSATF/SP.  Designated DDP staff shall be assigned specific duties as listed in their post orders or job duty statements.

- ADA Coordinator
- CAMU CCII – assigned from headquarters.
- DDP Sergeant
- DDP CCI
- DDP Correctional Officer
- DDP Teacher
- Library Technical Assistant
- DDP Clinical Staff
- DDP Office Assistant/Technician

D.    **CONFIDENTIALITY:**

The DD designation of an inmate placed in the DDP is confidential. Confidentiality of DDP inmate materials/files will be maintained within the DDP Office Technician's office.  Additional areas where DDP forms/binders will be secured at CSATF/SP are as follows: Electronic Records Management System (ERMS) – Records Office (Administration Building), Electronic Unit Health Record – Medical Records (CTC), Education, housing unit, job site, Library.  Information contained in DDP binders must not be accessible to inmates.

E.    **COUNT AND MOVEMENT:**

CSATF/SP staff shall ensure DDP inmates are provided with necessary prompting to ensure they comply with count time expectations, respond to visits, maintain work/school schedules, and respond to meals and other movement calls.

Assigned DDP Correctional Officers or housing unit staff will tour their area housing DDP inmates prior to the beginning of Institutional count to prompt the DDP population and ensure their compliance with expectations of count procedures.

Assigned DDP Correctional Officers or housing unit staff will contact inmates individually regarding visits and medical appointments.  When meal release and/or work/school release have been completed the housing unit staff will tour the entire housing unit to ensure all DDP inmates responded to calls for release.

F.    **COUNTY JAIL PLAN FOR OUT-TO-COURT INMATES:**

When an inmate who is identified as a participant in the Developmental Disability Program (DDP) is summoned out-to-court, the California Substance Abuse Treatment Facility and State Prison at Corcoran (SATF) shall provide notification to the county jail advising that the inmate may require reasonable accommodations while housed at their facility.

Upon receiving notification an inmate is summoned out-to-court, the Case Records Technician shall prepare a Notice of Detainer in SOMS.  The Notice of Detainer shall be prepared in accordance with the Department Operations Manual, Section 72040.11 Departmental Detainers.

Once the Notice of Detainer is reviewed by the Classification and Parole Representative (C&PR), the C&PR or Assistant C&PR shall review SOMS to verify if the inmate has a disability and is designated as DPP, DDP, LD, or is a participant in the MHSDS at any level of care.  If the inmate has one of the aforementioned codes, the C&PR or Assistant C&PR will email the Americans with Disabilities Act (ADA) Coordinator, including a carbon copy to the DAPO Parole Litigation Management Unit (PLMU) at PLMU@cdcr.ca.gov, of the inmate's pending out-to-court status.  The email shall contain the following: Inmate's name, CDCR number, anticipated duration of time the inmate is scheduled to be out-to-court (if known), and the court location.

The SOMS portion maintained by DAPO generates an output file that contains applicable information for inmates who are out-to-court and who have the aforementioned codes.  The appropriate county jail staff and ADA Coordinator will be informed of the inmate's relevant disability information via email.

G.    **NOTICES, ANNOUNCEMENTS AND ALARMS:**

1.    **Written Materials:** CSATF/SP staff shall ensure that CCR notices, orientation packages, announcements, and similar printed materials are accessible to inmates with developmental disabilities. Institution staff shall provide the necessary assistance to all DDP inmates on a case-by-case basis to ensure those who have difficulty reading and/or communicating in writing will be provided reasonable access to forms, regulations, and procedures, i.e., verbal communication. Interpreters will be provided for all non-English speaking inmates.

All CSATF/SP staff shall ensure the DDP population has access, assistance and understanding of printed materials and announcements.

2.    **Verbal Announcements:** Effective communication shall be made with inmates with developmental disabilities regarding public address announcements and reporting instructions, including those regarding visiting, yard release and recall, count, lock-up, and unlock, etc.  DDP

and housing unit staff shall prompt DDP inmates who do not respond to verbal announcements.

3.  **Alarms:**  Alarm procedures shall be effectively communicated to all DDP inmates during inmate orientation, as noted in Section X (J) (1) of this OP.  On a case-by-case basis, staff may need to prompt some DDP inmates to comply with alarms.

H.  **SPECIAL IDENTIFICATION:**

Custody staff assigned to units housing DDP inmates shall maintain a separate roster with photo identification for each DDP inmate and the corresponding Adaptive Support Chrono in a secure location.  Staff shall use this information to identify DDP inmates and provide for their special needs. Inmates shall not have access to this information.

I.  **EVACUATION PROCEDURES:**

In the event of a fire or other emergency, which requires evacuation from any or all portions of a housing unit, each inmate shall be required to fully cooperate with staff instructions.  Inmates will exit the housing unit via the evacuation route designated by staff.

In the event of a fire or other emergency, serious enough to warrant evacuation of the building, the following procedures will be implemented.

1.  In the event of a cell fire, the first cells to be evacuated shall be in the following order:

    •   The cell in which the fire occurs.

    •   The adjacent cells

    •   The cells above the cell in which the fire occurs.

    •   The second tier

    •   The first tier

2.  In the event of a fire, other than a cell or related emergencies, requiring evacuation of the building, inmates will be released beginning with the second tier.

3.  Should a major evacuation be required in the buildings, due to an emergency situation, inmates will be directed to proceed to the yard. They will be instructed to sit in the grass area, and not be in the way of staff responding to the area of the emergency.

Staff will assist inmates with disabilities.  All DDP inmates will be personally notified by staff to ensure their understanding of the need to evacuate. Custody staff, assigned to units housing DDP inmates, must maintain a

DocuSign Envelope ID: A7BC4C95-6DBB-4435-822B-73D68EAB46F5

separate roster with photo identification for each DDP inmate, and corresponding CDCR Form 128C-2 in a secure location. Staff must use this information to identify the DDP inmates and provide for their special needs during evacuations.

J.    **INMATE SERVICES AND ACTIVITIES:**

Inmates shall be provided reasonable accommodations, as necessary, to ensure access to inmate services and activities in a manner consistent with their custody and privilege group designation.

1.    **Orientation Process:** The following orientation processes are provided for DDP inmates at CSATF/SP.

a.    General yard policy and evacuation procedures are provided via housing unit staff, the inmate orientation manual, and the CSATF/SP orientation video. *All* inmates are afforded this orientation within fourteen (14) days of arrival.

b.    DDP inmates are also provided personal orientation (within 14 days of arrival) by designated DDP officers that have been trained to effectively communicate with DDP individuals. Orientation shall comply with provisions of CCR, Title 15, Section 3002 and shall include information regarding inmate activities and services; alarm policy, appeals process, emergency procedures, mail processing, visiting, work/education assignments, access to medical, count, recreation, religious services, food services, etc. It shall also include information on which staff is available to provide needed assistance, e.g., all staff are available to assist with reading and writing; assigned DDP Officers that are available; and the assigned DDP CCI. The DDP officer shall document the orientation on a CDCR 128B (Attachment E or Attachment E-1 for Spanish) and forward to the DDP Office located in Complex-IV.

When an inmate arrives at the Facility, the DDP officer will provide orientation with each inmate individually. The orientation will be presented on a case-by-case basis, determined by the individual inmate's level of adaptive skills. The training will take place in the building where the DDP inmate is housed.

c.    The DDP LTA shall provide orientation to all DDP inmates for the Law Library and other Library services within **30** days of arrival. The orientation shall be conducted at the Facility Library. The LTA shall document the orientation on a CDCR 128B, DDP Library Orientation Chrono (Attachment F).

      d.      Assigned DDP CCIs also provide information regarding classification issues and available assignments at the time of the CDCR 128B-1, Notice of Classification Committee Hearing, for the Initial Classification Committee (within 14 days of arrival).

2.    **Visiting Policy:** Reasonable accommodations shall be afforded to DDP inmates in order to facilitate their full participation in visiting as provided in CCR, Title 15, Section 3170. This policy applies to contact, non-contact, and family visiting. The Housing Unit Officer will notify each inmate personally of his impending visit. The Officer will be responsible to prompt the inmate as necessary and ensure proper preparedness in regard to hygiene and dress prior to releasing him to the visiting area.

3.    **Recreation**: Inmates with developmental disabilities shall be provided an equal opportunity to participate in constructive athletic and recreational programs under safe and secure conditions, consistent with the inmate's custody level, classification, work/training assignment, privilege group, and security requirements consistent with CCR, Title 15, Section 3220.

4.    **Religious Services**: Reasonable efforts shall be made to provide for the religious/spiritual welfare of interested inmates with developmental disabilities, consistent with CCR, Title 15, Section 3210.

5.    **Food Services**: Staff shall ensure DDP inmates receive prompting to attend meals, as needed.

6.    **Library Access:** Each DDP inmate shall have access to a library, law library, and related services, consistent with CCR, Title 15, Section 3120 at CSATF/SP. Library services shall be provided by designated staff that has been trained to communicate with people with developmental disabilities. Services may include: provision of forms–including assistance interpreting and scribing them; identifying research materials and providing it to the inmate; access to electronic or inmate readers; and submission of forms/documentation to the appropriate court. Staff shall not provide legal advice or assistance and will not conduct legal research. Inmates shall not be prohibited from obtaining assistance from other inmates in completing necessary forms or conducting legal research.

The LTA will assist DDP inmates as necessary by providing opportunity and access to legal materials. The LTA will not, at any time, assist the DDP inmate with legal advice or direction. The LTA will assist in explanation of forms, materials, and procedures as needed.

7.  **Transportation**: The DDP level designation shall be indicated on an Inmate Transfer Record (CDCR 135) or a Notice of Return to Prison (CDCR 1018) to alert R&R and Transportation staff of a DDP inmate's status.  When requesting bus seats for DDP inmates, staff will indicate the DDP level designation in the "Comment/Purpose" field on the Male Institution Seat Request/Interim Transportation Scheduling System (ITSS).  This process will allow the Transportation Services Unit to prioritize the request and expedite the transfer of the DDP inmates.

8.  **Mail**: Each inmate with developmental disabilities shall be informed of the plan of operation for sending and receiving mail, consistent with CCR, Title 15, Section 3130.  The DDP Correctional Officer will provide all information regarding procedures for sending and receiving mail.  The Housing Unit Officer will remain assistive in providing the inmate direction, as needed, regarding the sending of mail.  When a DDP inmate receives mail, the Housing Officer will deliver it directly to him, reminding him that he is receiving mail and stating whom the mail is from, per the return address (when necessary).

9.  **Release Program Study**:  Prior to an inmate's release from custody, the assigned PSA shall use the CDCR 611 to provide documentation and notice to parole field staff of special needs related to the inmate's developmental disabilities.

    a.  The CCI shall refer appropriate DDP inmates to Regional Centers for eligibility assessment if the inmate may have had a developmental disability before the age of 18, or if the inmate has previously been identified as a prior Regional Center client.

    b.  The C&PR and the institution CEO must facilitate the Regional Center assessment of an inmate with developmental disabilities, as needed.

    c.  The C&PR will notify parole field staff, at least 210 days before the DDP inmate's parole date, via the CDCR 611 process, if an inmate has a verified developmental disability and what the inmate's specific needs are.  The CDCR 611 and copies of the latest Adaptive Support Chrono must be forwarded to the appropriate parole region in accordance with existing policies and procedures to ensure sufficient time for reentry processing.  Such forms should be transmitted in accordance with existing policies and procedures.  The CDCR 611 must also indicate whether the inmate has been referred to a Regional Center for assessment.

DocuSign Envelope ID: A7BC4C95-6DBB-4435-822B-73D68EAB46F5

K.  **MEDICAL CARE:**

Inmates with developmental disabilities shall have access to necessary medical, psychiatric, and dental care in accordance with CCR, Title 15, Section 3350.

1.  The CCI, Correctional Officers, and medical staff will be responsible for assisting DDP inmates in obtaining emergency and routine health care.  Assistance may include:
    a.  Assistance with completion of sick call requests, to include requesting and obtaining prescriptions and refills.

    b.  Prompt/escort to medical appointments.

    c.  Referral to medical staff if the inmate appears to have symptoms that may require medical care.

2.  Medical staff shall be trained to communicate with DDP individuals and to gather information necessary to provide appropriate medical/psychiatric/dental services.

3.  The inmate may accept or decline recommended treatment.  The decision to refuse treatment is reversible at any time and shall not prejudice future treatment.  The inmate shall not be deemed incapable of refusing or providing informed consent to treatment solely because of his developmental disability.  Refusal to accept recommended treatment shall be documented on a CDCR 128B or a Refusal of Examination and/or Treatment (CDCR 7225).

L.  **DISCIPLINARY PROCESS:**

1.  To assist inmates with a developmental disability to conform to departmental rules and regulations, all staff at CSATF/SP who interact with and have responsibility for this population shall closely monitor the inmates' daily activities.  An employee may attempt to address problematic behavior informally, e.g., direct instructions, prompting, and verbal counseling. **When verbal counseling achieves corrective action, a written report of the misconduct or counseling is unnecessary**. The employee must ensure the inmate understands the consequences of continued misconduct **to the best of their ability**. If this informal intervention successfully corrects the behavior, no disciplinary action is required.  If the inmate continues the misconduct and informal intervention was not successful–or the behavior was of a serious nature the misconduct shall be handled in accordance with CCR, Title 15, Section 3312. The method of discipline may include:

*   Preparation of a **Counseling Only RVR.**

*   **Administrative RVR.**

DocuSign Envelope ID: A7BC4C95-6DBB-4425-822B-73D68EAB46F5
Case 4:94-cv-02307-CW    Document 3630-17    Filed 10/16/24    Page 56 of 81

Developmental Disability Program-OP 178
Page 37 of 46

- **Serious RVR.**

  The staff member observing the misconduct shall take into consideration the level of the inmate's disability and the inmate's need for adaptive support services when determining the method of discipline.

2. **The DDP Correctional Sergeant shall serve as the approving supervisor for all RVRs (Counseling-Only, Administrative, and Serious) issued to inmates in the DDP.**

3. The approving supervisor shall review all RVR's and the inmate's Adaptive Supports Chrono to ensure the following is addressed:

   - What adaptive supports were needed, relevant to the RVR?

   - Did the staff member observing the misconduct take into consideration the severity of the inmate's disability and the inmate's need for adaptive support services when determining the method of discipline?

   - Did the reporting employee address/provide relevant identified adaptive support services (when/if applicable)?

   - If the circumstances were explained, was effective communication established and documented?

4. Inmates who are participants in DDP, designated DD1, DD2 or DD3, and have been alleged to have committed a rules violation shall receive a mental health assessment, via completion of the CDCR Form 115-MH-A, Rules Violation Report: Mental Health Assessment.

5. The Class Action Management Unit (CAMU) will make the determination on all Mental Health Assessments (MHA) where the MHA assessing clinician checks "yes" to MHA Question 2.b. If the CAMU Captain agrees with the MHA clinician's recommendation, the CAMU Captain will "document in an alternate manner" by either: reducing the level of the RVR to a Counseling-Only Chrono RVR for minor misconduct; or voiding the RVR and documenting the behavior via a CDC Form 128-B. If the CAMU Captain does not agree with the clinician's recommendation, the CAMU captain will document their reasoning for having the RVR adjudicated at a disciplinary hearing on a CDC Form 128-B, or the comments section of the "Actions Taken" screen in the Strategic Offender Management System (SOMS). The CAMU Captain will provide their decision in accordance with existing CDCR policy and regulations.

6. To assure a fair and just proceeding, if the misconduct is recorded on an RVR, all DDP inmates shall be assigned a SA. The assigned SA shall be any custody staff who has received training in the "Disciplinary Process for Inmates in the Developmental Disability Program and Responsibilities of the Staff Assistant". The assigned SA may be assisted by a bilingual aide, mental health clinician, etc.,

as necessary. In accordance with CCR, Title 15, Section 3315(d) (2) and 3318(b), the SA shall:

- Inform the inmate of his rights and ensure he understands the disciplinary procedures to the best of his ability.

- Assist the inmate in preparation for the disciplinary hearing.

- Represent the inmate's position at the hearing.

- Ensure the inmate's position is understood.

- Ensure the inmate understands–to the best of his ability-the decisions reached.

- Provide the hearing official with information related to the inmate's developmental disability and the adaptive support services required.

- Be present at the disciplinary hearing and all interviews related to the disciplinary process.

- Refrain from giving legal counsel or specifying the position the inmate should take in any disciplinary proceeding.

- Additional assistance as appropriate.

*Staff Assistant Classification Training is addressed in Section XII. Training, C. Custody.

7.  The SHO/HO shall be current in annual DDP training requirements. The SHO/HO shall evaluate the circumstances of the misconduct and all evidence and information presented in the disciplinary hearing, including the inmate's identified adaptive support services, when determining the inmate's guilt or innocence.

8.  The CAMU Captain will serve as the reviewing and approving Captain for all administrative and serious RVRs related to inmates in the DDP. At the conclusion of the RVR hearing, the hearing official shall select "CAMU, DDP-Review" from the "Action Taken" dropdown titled, "Assigned to Staff," which will assign the CAMU Captain and notify them of the need for Captain's approval. The CAMU Captain is responsible for assessing the entire RVR process to ensure all DDP and due process requirements were met. If policy violations are discovered, the CAMU Captain shall document their findings and include a recommendation to remedy the violation, in the "Action Taken" screen in SOMS. Upon completion of the CAMU Captain's review, the CAMU Captain will assign the RVR to the institution's ADA Coordinator for Chief Disciplinary Officer review and approval.

9.  The ADA Coordinator shall be designated as the DDP Chief Disciplinary Office (CDO) for any RVR's issued to inmates in the

DDP.  The Warden shall designate an alternative DDP CDO, in the absence of the ADA Coordinator.

10.   If the inmate is found guilty of an administrative rules violation, the DDP CDO shall review the completed RVR in accordance with CCR, Title 15, Section 3312(b).

11.   If the inmate is found guilty of a serious rule violation report, the DDP CDO must review the adjudicated RVR's per CCR, Title 15, Section 3312.

12.   In accordance with CCR, Title 15, Section 3313(c), the classification of a RVR may be changed-before, during, or after a disciplinary hearing-from serious to administrative.  Other decisions for RVR's can be to:

   •   Affirm, reverse, or modify the disciplinary action and/or credit forfeiture.

   •   Order a different action or a different method of discipline.

   •   Dismiss the charge.

   •   Order a rehearing of the charge.

   •   Order a combination of any of these actions.

   •   Refer the charge for criminal prosecution.

12.   If a DDP inmate exhibits ongoing behavioral problems, institution clinical staff shall refer the case to Division of Correctional Health Care Services Clark Coordinator for assistance in assessing the causes of the behavior and creating an intensive behavioral modification and treatment plan.

13.   The ADA Coordinator will review RVR's at least monthly to identify any patterns of misbehavior that may be related to the DDP inmate's disabilities.  The ADA Coordinator shall maintain proof of practice for the monthly review.  The ADA Coordinator shall also maintain the "Classification Services for Inmates in the Developmental Disability Program" log.

## XI.   INMATE EDUCATION AND WORK ASSIGNMENTS

A.   **ASSIGNMENT:**

1.   It shall be CSATF/SP policy to ensure that inmates with developmental disabilities are afforded access to education, vocational, work and other programs available to non-disabled inmates.  Access must include reasonable accommodations such as prompts, graduated supervision, training, etc.  Working with the DDP Counselor and the DDP Teacher, IDST will review at least once each

year the education, vocational, and work assignments of inmates in the DDP. This review is designated to ensure that no artificial barriers have been erected to exclude inmates from participating in particular classes or programs. Modification of reading prerequisites, terminal objectives for a class or program, and other accommodations are essential if DDP inmates are to have equal access to academic, vocational, and work assignments.

2. Inmates shall be evaluated by IDST at CSATF/SP for eligibility to participate in an education, vocational, work, or other program on a case-by-case basis. Eligibility to participate in any program depends upon the inmate's ability to perform the essential functions of the program with or without reasonable accommodations.

3. Inmates with developmental disabilities assigned to an education, vocational, work, or other program may receive additional supervision and training to assist them with meeting the requirements of the assignment. Accommodations may include oral rather than written tests, lower production expectations, expanded time frames for completion of projects, etc.

4. Evaluation of an inmate's removal from a program assignment shall be done on a case-by-case basis and will take into account a number of factors including the inmate's ability to perform the essential functions of the program. Whenever an IDST excludes an inmate from an assignment, the exclusion shall be based on one of the following criteria:

- The inmate's inability to perform the essential function of the assignment as documented by the work supervisor on a CDCR 128B, noting the specific essential function that the inmate cannot perform.

- The inmate's assignment would pose a risk to the safety of any inmate, staff, or the public; the security of the institution; or in any way adversely impacts legitimate penological interests.

- Accommodation for the assignment would result in a fundamental alteration to the program, i.e., the nature or business of the program would not be met as intended.

- The inmate, if assigned, would pose a threat to themselves or others.

- The reasonable accommodation for the assignment presents an undue financial/administrative burden.

B. **ESSENTIAL FUNCTIONS:**

Essential functions are the basic duties/requirements of services, assignments, or programs an inmate performs or receives. This does not

include the marginal duties of the position, services, assignments, or programs. Duties and/or requirements shall be examined to determine which tasks are essential and which are nonessential. Institutions shall be careful not to establish eligibility criteria that screens out, or tends to screen out, inmates with developmental disabilities who have the ability to participate in the programs being offered. Education/work assignments shall be defined to take into account functioning limitations, e.g., difficulty/complexity of each task, lack of initiative.

C.    **ASSIGNMENT MONITORING:**

The IDST actions at CSATF/SP shall be periodically monitored by the ADA Coordinator to ensure assignments of inmates with developmental disabilities are nondiscriminatory.

D.    **EDUCATION PROGRAM:**

1.    **Academic Assignments:** Appropriate classroom education shall be provided for eligible inmates with developmental disabilities at CSATF/SP. All instructional (educational) staff will have credentials issued by the California Commission on Teacher Credentialing. All education staff's credentials will allow instruction with an adult population. One instructor at CSATF/SP shall have a Special Education Credential. This instructor shall be assigned as a <span style="color:red">**Resource Specialist Program Teacher (RSPT)**</span> and shall provide consultation and assistance to other education staff as necessary.

Education shall include but is not limited to the following: education program for educating inmates with developmental disabilities, curriculum based testing, a basic literacy program, and individually tailored education programs. Education programs, currently in place in each of the institutions, have a competency-based curriculum that is individually tailored to meet the educational needs of the inmate. It consists of seven major academic areas and a wide variety of vocational programs. Included in the academic curriculum are the following courses of study: Reading/Writing, Listening/Speaking, Life Skills, Arithmetic, Mathematics, General Education Diploma preparation, and High School. These courses are divided into certification units and individual competencies. Each inmate will be assessed using this curriculum to determine what level of instruction is appropriate to ensure progress. As inmates complete and master the individual competencies, certifications (groups of related competencies) are mastered and completed, and the inmate progresses to more difficult or complex tasks.

The Reading/Writing course of study includes the competencies and skills necessary for a basic literacy program. Additionally, each institution has specific literacy programs that are available to all eligible inmates.

a.  **Identification:**  IDST will determine the academic/vocational, Prison Industry Authority (PIA), or other work program placement for DDP inmates.

b.  **Classification:**  Staff from the education program will participate in IDST to assist the committee in arriving at an assignment for the DDP inmate to ensure an appropriate education and/or work assignment.  Program decisions will be documented on a Classification Chrono.

c.  **Assessment:**  Once it has been determined by the IDST that the inmate wants and/or needs an educational program, the Inmate Assignment Office will place the inmate in an appropriate level Adult Basic Education (ABE) or Vocational program, when his name reaches the top of the assignment waiting list.

    1)  All inmates assigned to Education will have a CASAS Reading Score.  Scores from this test will determine the level of ABE class appropriate for the individual.

    2)  Education staff will review all relevant information in the student's ERMS to assist in identifying student educational needs, e.g., court, probationary, medical, school, and/or any other records as needed.  If educational records are not available, education staff shall assist the inmate in completing a request for records from the last school attended and/or other schools, as necessary, to determine the student's educational history.

    3)  Assigned education staff will have up to ten (10) days from the date the inmate is assigned to complete all testing and assessments, using assessment tools.  The assessment tools must include the Comprehensive Adult Student Assessment System (CASAS) and either the Brigance or Woodcock-Johnson.  Behavioral observations of actual classroom and housing performance and inmate goals should also be considered.  The assessment is conducted using the CDCR competency-based curricula and documented using the Competency Recording System.

d.  **Student Study Team:** The Student Study Team (SST) will consist of the **RSPT**, the classroom teacher, an Education Supervisor and the inmate.  The CCI will be available for consultation, when appropriate.  Its purpose will be to develop the ITEP and to discuss and record all needed accommodations for the inmate's educational needs.  The classroom teacher and/or the **RSPT** may request an SST

meeting whenever there are extreme behavioral issues that must be addressed to prevent removal from the Education assignment. The SST must review educational program revisions. Any member not in agreement with the SST's decision must submit, in writing, a statement of reason for objecting to the plan. If the inmate is not satisfied with the plan, the inmate may submit an appeal via a CDCR 602 or CDCR 1824.

e.  **Individually Tailored Education Program (ITEP):** All inmates who have been identified as DDP and assigned to Education programs **are eligible for the** development of an ITEP **upon their acceptance of receiving supplementary educational services provided by the RSP**. Its purpose is to identify and document the educational and behavioral strengths and weaknesses of the DDP inmate through cognitive testing, observation, and inmate feedback. The ITEP establishes the goals that appropriately address the areas identified and makes accommodations to the education program that enables the inmate to progress. It will be developed after placement in an education (Academic or Vocational) program and reviewed and reevaluated.

1)  One of the tests administered will be the CASAS. This test provides learner centered curriculum management, assessment and evaluation systems in education and training programs. The CASAS is an assessment system that includes standardized multiple choice, performance-based, and alternative assessment instruments to measure life skills, basic skills, and employability skills. All assessment is linked to competencies and instructional materials that focus on learner's goals.

2)  The second assessment tool can be either the Brigance or Woodcock-Johnson. These tests will determine the baseline level of functioning through academic testing and behavioral observation. The results will identify the needs of the inmate to achieve success and be documented on the ITEP by the classroom teacher.

3)  These tests will determine the baseline level of functioning through academic testing and behavioral observation. The results will identify the needs of the inmate to achieve success and be documented on the ITEP.

4)  Following the development of the ITEP, the classroom teacher will implement the recommended reasonable accommodations.

DocuSign Envelope ID: A7BC4C95-6DBB-4435-822B-73D68EAB46F5

5)      Periodic Review and Evaluation:

- A quarterly review shall be done by the **RSPT**. This review will document the inmate's progress on short-term goals.  The review will be reported on the CDCR 128B in conjunction with classroom teacher's Progress Report (CDCR 128E).

- The ITEP shall be reviewed at least every six (6) months by the SST to re-evaluate the goals, measure student progress, and develop new goal as needed.

- Every three years a full assessment shall take place prior to the annual classification committee review.

f.      Supplemental reasonable accommodations provided to academic and vocational students with developmental disabilities will be done on a "**push-in or** pull-out" basis. These modalities allow for a student to be pulled out of the regular classroom activity to a different location within the institution or education area.  This permits the student to remain "mainstreamed" in regular education programs while receiving specific assistance for the identified needs. **Push-in services are rendered when an alternate space is unavailable.** The **RSPT** will provide this service in all program areas of the institution.  The quota exemption for the **RSPT** allows flexibility for the teacher to move from one program area to another and allows the teacher to work with the inmates individually and in small groups, thereby reducing the inmate/teacher ratio as needed.  The frequency and duration of services shall be determined in the ITEP.

g.      All education staff shall ensure the information on all education records, e.g., ITEP; CDCR 128E; adaptive support logs; or any other record with information regarding the inmates' developmental disability is not available to other inmates and shall maintain files containing these documents in secure locations.

E.      **VOCATIONAL ASSIGNMENTS**:

One of the goals of vocational education is to provide eligible inmates with an opportunity to learn entry-level employment skills.  The inmate, with or without reasonable accommodation, must meet the eligibility criteria of the vocational assignment as defined in the course description and be able to perform the essential functions of the assignment.  Educational staff shall be careful not to establish eligibility criteria that screens out, or tends to screen out, inmates with developmental disabilities who have the ability to

participate in the programs offered. Vocational programs may be considered regardless of reading level if the inmate/student has the capacity to benefit from a program based on individual need and assessment. All procedures, forms, and assignments used when an inmate is assigned to an academic program may be applied to vocational assignments, i.e., done on a "pull-out" basis.

Vocational programs are also competency based and afford inmates a wide range of instructional opportunities ranging from acquiring basic remedial skills to advanced certification, and/or licensing. Specifically, all vocational programs provide for basic instruction and skills development through a progressive series of certification units, much like the academic curricula.

All vocational programs also provide safety and related training on a weekly basis to ensure workplace awareness and heighten shop/program safety as it pertains to the working environment. Similarly, literacy training is also provided on a daily basis, in conjunction with the regular curricular offerings, to promote reading and comprehension development, as well as reinforcing the instructional process within the curricular area or subject. The instructional process also provides additional assistance on a case-by-case basis to meet each inmate's specific needs.

## XII. TRAINING

### A. **GENERAL:**

CSATF/SP shall provide training to all custodial, clinical, and departmental staffs that identify, interact and work with, and have responsibility for DDP inmates.

As a means of increasing staff's general awareness of developmental disabilities and to increase their likelihood of making referrals to the facility's health care services when there are indications of less than average adaptive functioning, all non-custody staff at CSATF/SP shall receive new employee and annual training regarding the "Overview of Developmental Disabilities".

### B. **DEPARTMENTAL PSYCHOLOGISTS AND LICENSED CLINICAL SOCIAL WORKERS:**

Departmental Psychologists and Licensed Clinical Social Workers shall be provided training on testing and evaluating intellectual disability and other relevant cognitive deficits as well as making recommendations regarding placement and accommodations.

### C. **CUSTODY STAFF:**

All custody staff shall receive annually, the one-hour formal classroom-training module "Developmental Disabilities Program Annual Refresher."

All staff participating in classification functions (IDST), including Staff Assistants, shall receive one-time two-hour formal classroom training in "Classification Services for Inmates in the Developmental Disabilities Program."

All staff conducting disciplinary hearings, and the Staff Assistants, for inmates identified as DDP shall receive one-time two-hour formal classroom training in "Disciplinary Process for Inmates in the Developmental Disability Program, and Responsibilities of the Staff Assistant."

## XIII.    Compliance Review

The Warden shall have ultimate responsibility for ensuring compliance with this plan.

## XIV. Attachments

Attachment A: Adaptive Support Form
Attachment B: DDP Adaptive Support Log - Housing Unit
Attachment B-1: DDP Adaptive Support Log – Work / School
Attachment C: Initial 24 Hr. Contact
Attachment C-1: Weekly **RHU** DDP Check
**Attachment D: DDP Adaptive Support Services Minimum Frequencies**
Attachment E: DD1 DDP Orientation (English/ Spanish)
Attachment E-1: DD2/DD3 Orientation (English/ Spanish)
Attachment F: DDP Library Orientation Chrono

_____          11-30-2023
BRYAN D. PHILLIPS                         _____
Warden (A)                                Date

_____          11/30/2023
A. BANERJEE                               _____
Chief Executive Officer                   Date

**SATF – California Substance Abuse Treatment Facility**

| | |
|---|---|
| **Last Name:** | **First Name:** |
| XXXXXX | XXXXXXXX |
| **CDC #:** XXXXX | **DOB:** XXXXXX |

**DDP** Status: **XXX**

**CURRENT 128C2: XXXXX**

This chrono updates
chrono dated  xxxxxxxx

## Adaptive Support Chrono (CDCR 128

PHOTO

*Possible* developmental disability before age 18?

[ ] Yes/Unknown    [ ] No

Distribution: UHR/Mental Health, Assigned CC-I,
C&PR or CC-III, Housing Unit, Education File,
I/M Assignment Office, Work Supervisor, Inmate

(06/24/2021)
This form is to be printed out for staff to complete manually.
Case 4.95-cv-02120-KAW Document 3630-17 Filed 10/16/24 Page 67 of 81

DocuSign Envelope ID: A7BC4C95-6DBB-4425-822B-73D68EAB46F5

**Developmental Disability Program (DDP) Adaptive Support Log** **ATTACHMENT B**

| CDC Number: | Name: | Housing: | Bed Number: | DDP Code: | |
|---|---|---|---|---|---|
| | | | | | Inmate Photo if there is not a 128 C-2 in the unit |

Print Staff Initials & Name in Legend Below -Do not use PERNR numbers on this form

**Adaptive Support Log Instructions:** Staff shall maintain frequent contact with the inmate to monitor and provide staff assistance consistent with the adaptive support needs of the inmate. Staff shall initial and provide comments in the row of the corresponding date for any **monitoring, prompting, coaching or assistance** they provide the inmate, and document the outcome. **Staff shall never document, "No prompts needed" in the comments. Frequency of assistance is determined by the inmate's needs and may be required more frequently than the minimum frequencies listed in the Adaptive Support type/ needs row. If more space is needed, staff shall document on the back of the log using the date and their initials.** In the event an inmate in the DDP is transferred out of the institution, staff shall not send the Adaptive Support Logs. They shall be archived consistent with the Record Retention Schedule.

| Support Type/Needs: | | | | | | | |
|---|---|---|---|---|---|---|---|
| Include Mandatory Minimums, if any | | | | | | | |

Check when provided:

| | |
|---|---|
| MON | |
| TUE | |
| WED | |
| THU | |
| FRI | |
| SAT | |
| SUN | |

General Comments:

Supervisor's Review of Completed DDP Adaptive Support Log
Supervisor's Printed Name:_____ Signature:_____
Date of Supervisor's Review:_____

DocuSign Envelope ID: A7BC4C95-6DBB-4425-822B-73D68EAB46F5

This form is to be printed out for staff to complete manually.

(06/24/2021)

ATTACHMENT B-1

Developmental Disability Program (DDP) Adaptive Support Log - Work/School

| CDC Number: | Name: | Housing: | Bed Number: | DDP Code: |
|---|---|---|---|---|

Print Staff Initials & Name in Legend Below - Do not use PERNR numbers on this form

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| Hire Date: | Is Hire Date Within 2 Weeks: | Job/Position Number: | RDO's: |
|---|---|---|---|

**Work/School Adaptive Support Log (ASL) Instructions:** Staff shall maintain frequent contact with the inmate to monitor and provide staff assistance as documented on the Work/School ASL and the CDC Form 128C-2. Staff shall initial and provide comments in the row of the corresponding date for any monitoring, prompting, coaching or assistance they provide the inmate, and document the outcome. **Staff shall never use, "No prompts needed." Frequency of assistance is determined by the inmate's needs and may be required more frequently than indicated in the Adaptive Support type/need row. If more space is needed, document on the back of the log using the date and your initials.** In the event an inmate in the DDP is transferred out of the institution or into another Work/School Assignment, do not send the Adaptive Support Logs. They shall be archived consistent with the Record Retention Schedule.

| Support Type/Need: | Learning new tasks: Must be logged daily for first two weeks if assignment. | Adjusting to new routines: Must be logged daily for first two weeks if assignment. | Extra time for completion of tasks: Must be logged daily for first two weeks if assignment. | Unusual Workplace Occurrences (e.g. Hygiene/Safety Concerns, etc.): Any time Unusual Occurrences are observed (even outside of first two weeks of assignment), contact shall be made with DDP Mental Health staff and DDP Custody staff, if available. |
|---|---|---|---|---|
| Check When Provided: | | | | |
| MON | | | | |
| TUE | | | | |
| WED | | | | |
| THU | | | | |
| FRI | | | | |
| SAT | | | | |
| SUN | | | | |

General Comments:

Supervisor's Review of Completed DDP Adaptive Support Log

Supervisor's Printed Name:_____ Signature:_____

Date of Supervisor's Review:_____

Attachment C

**INITIAL 24 HR. CONTACT**

Purpose of Contact:  AdSeg Placement Weekly Follow up Evaluation    Current DD level:  [ ] DD1 [ ] DD2 [ ] DD3    MHSDS:  [ ] GP
[ ] CCCMS  [ ] EOP

Records Reviewed:  [ ] CASE    [ ] C-file/SOMS/ERMS
eUHR:  [ ] MHPC/MD Notes    [ ] Tx Dated   [ ] SARHIC

Previous AdSeg/SHU Terms:
Placement Date  Reason for Placement                                    Behavior/Functioning Problems During Placement

                        Safety Concerns

_____  _____  _____
_____  _____  _____
_____  _____  _____

Summary of 128-C2 Adaptive Supports Dated:
1. Assist with reading and writing CDCR forms
2. Give extra time and coaching to learn / adjust to new tasks and routines
3. Use simple language and 1 or 2 step instructions.  Ask inmate to explain in his own words to ensure he understands, repeat info.
   if necessary.
4. Monitor for undue influence from other inmates.
5. Explain prison policies, prompt inmate to complete ADLS, laundry, cleaning cell, and provide extra time for ADL's, redirect him if
   he loses focus.

VICTIMIZATION ISSUES:  [ ] None identified  [ ] Described below:

Victimization concerns; monitor for undue influence from other inmates
_____

Additional Adaptive Supports Recommended:  [ ] Yes (Specify Below)   [ ] No       Referral for Re-evaluation:  [ ] Yes   [ ] No
Supports Recommended:


MSE:   [ ] S/I [ ] H/I [ ] AH [ ] VH ~ Orientation:  [ ] Person [ ] Place [ ] Time [ ] Situation ~ Rx Compliant: [ ] Y [ ] N [ ] N/A

Movement: [ ] Unremarkable  [ ] Other (specify) _____

Speech:  Volume [ ] WNL [ ] Soft [ ] Loud ~ Pace [ ] WNL [ ] Rapid [ ] Slow/halting  ~  Rhythm [ ] talkative

Appearance: [ ] Well-groomed  [ ] Disheveled  [ ] Odiferous  Thought Process: [ ] Linear/goal-directed  [ ] Tangential
                [ ] Loose Assoc.

Affect: [ ] Full range  [ ] Flat/blunted  [ ] Other_____   Mood: [ ] Euthymic  [ ] Depressed  [ ] Anxious [ ] Other _____

Comments:  Appeared to be functioning well during his initial placement in Ag Seg.

ATTACHMENT C-1

**WEEKLY RESTRICTED HOUSING DDP CHECK**

**NAME: _____**                **CDC#: _____**

Inmate-patient _____ (CDC # _____), was initially interviewed in restricted housing by the undersigned Primary Clinician (PCP) on _____ at _____ hours. He is currently a participant in the Developmental Disability Program (DDP), meeting placement criteria at the _____ categorization. The inmate-patient's current 128C-2 for adaptive supports is / is not adequate for his stay in restricted housing.

The following are results based on a current Mental Health evaluation:

Appearance:


Participation:


Orientation:


Thought process:


Support services required (see 128C-2):


**DATE: _____**                                                        **CSATF/SP**

**Please leave a copy of this chrono initially in the inmate's 114A log for duration of restricted housing placement for audit purposes. Please complete this chrono weekly in the CERNER/Medical Records per Memorandum dated 11/19/18 for Documentation for Developmental Disability Program Inmate-Patients in restricted housing.**

**DEVELOPMENTAL DISABILITY PROGRAM ADAPTIVE SUPPORT SERVICES MINIMUM FREQUENCIES**

| DD1 | | | |
|---|---|---|---|
| | **Showers** | Monitor/prompt at least 2x per week (if listed on Adaptive Support Chrono). | Some DDP I/M's may need to be prompted more often, (after work, yard, or recreation activity). Document outcome of prompt/observation. |
| | **Brushing Teeth** | Monitor/prompt at least 1x perweek (if listed on Adaptive Support Chrono). | After any contact, may notice teeth need to be brushed. |
| | **Laundry Exchange** | Monitor/Prompt at least 1x per week (if listed on own, document observations (inmate exchanged laundry on his own). | Document prompt outcome. If I/M turns in Laundry on own, document observations (inmate exchanged laundry on his own). |
| | **Clean Clothing** | Monitor/prompt at least 1x per week (if listed on Adaptive Support Chrono). | If you notice I/M wearing dirty clothing prompt to shower and change (document observations if I/M is wearing clean clothers). |
| | **Cell Cleaing** | Monitor/prompt at least 1x per month (if listed on Adaptive Support Chrono). | Whenever you notice cell needs cleaning, prompt to do so. Document outcome of prompt/observations. |
| | **Meals/Yard/Dayroom Social Interaction** | Monitor/prompt at least every 2 weekss (if listed on Adaptive Support Chrono). Log unusual issues as needed. | Monitor behavior, prompt social interaction and document outcome of prompt/observation. |
| | **Assistance in Read/Writing (Completing Forms)** | Offer/Assist at least 1x per week if help is needed (if listed on Adaptive Support Chrono). | Document at least 1x a week that assistance was offered/provided or declined. |

| DD2 | | | |
|---|---|---|---|
| | **Showers** | Monitor/prompt at least 2x per week (if listed on Adaptive Support Chrono). | Some DDP I/M's may need to be prompted more often, (after work, yard, or recreation activity). Document outcome of prompt/observation. |
| | **Brushing Teeth** | Monitor/prompt at least 1x perweek (if listed on Adaptive Support Chrono). | After any contact, may notice teeth need to be brushed. |
| | **Laundry Exchange** | Monitor/Prompt at least 1x per week (if listed on Adaptive Support Chrono). | Document prompt outcome. If I/M turns in Laundry on own, document observations (inmate exchanged laundry on his own). |
| | **Clean Clothing** | Monitor/prompt at least 1x per week (if listed on Adaptive Support Chrono). | If you notice I/M wearing dirty clothing prompt to shower and change (document observations if I/M is wearing clean clothers). |
| | **Cell Cleaing** | Monitor/prompt at least 1x per month (if listed on Adaptive Support Chrono). | Whenever you notice cell needs cleaning, prompt to do so. Document outcome of prompt/observations. |
| | **Meals/Yard/Dayroom Social Interaction** | Monitor/prompt at least every 2 weekss (if listed on Adaptive Support Chrono). Log unusual issues as needed. | Monitor behavior, prompt social interaction and document outcome of prompt/observation. |
| | **Assistance in Read/Writing (Completing Forms)** | Offer/Assist at least 1x per week if help is needed (if listed on Adaptive Support Chrono). | Document at least 1x a week that assistance was offered/provided or declined. |
| | **Monitor canteen/Property** | Monitor/assist canteen monthly. Monitor canteen in cell 1x a month for canteen/property loss (if listed on Adaptive Support Chrono). Confidential one-on-one checks for any concerns. | After each canteen purchase, check canteen at least once to assess possible loss. Monitor for loss of property document outcome/observations. |
| | **Pressuring/ Victimization** | At least 1x a month, conduct private one-on-one interview (if victimization/pressuring is listed on Adaptive Support Chrono). | Some DDP I/M's will require more monitoring. Document outcome of confidential one-on-one interview. |

| DD3 | | | |
|---|---|---|---|
| | **Showers** | Monitor/prompt at least 3x per week (if listed on Adaptive Support Chrono). | Some DDP I/M's may need to be prompted more often, (after work, yard, or recreation activity). Document outcome of prompt/observation. |

DocuSign Envelope ID: A7BC4C95-6DBB-4435-892B-73D68EAB46F5    Case 4:94-cv-02307-CW    Document 3630-17    Filed 10/16/24    Page 72 of 81

Attachment D

| **Brushing Teeth** | Monitor/prompt at least 1x perweek (if listed on Adaptive Support Chrono). | After any contact, may notice teeth need to be brushed. |
|---|---|---|
| **Laundry Exchange** | Monitor/Prompt at least 1x per week (if listed on Adaptive Support Chrono). | Document prompt outcome. If I/M turns in Laundry on own, document observations (inmate exchanged laundry on his own). |
| **Clean Clothing** | Monitor/prompt at least 1x per week (if listed on Adaptive Support Chrono). | If you notice I/M wearing dirty clothing prompt to shower and change (document observations if I/M is wearing clean clothers). |
| **Cell Cleaing** | Monitor/prompt at least 1x per month (if listed on Adaptive Support Chrono). | Whenever you notice cell needs cleaning, prompt to do so. Document outcome of prompt/observations. |
| **Meals/Yard/Dayroom Social Interaction** | Monitor/prompt at least every 2 weekss (if listed on Adaptive Support Chrono). Log unusual issues as needed. | Monitor behavior, prompt social interaction and document outcome of prompt/observation. |
| **Assistance in Read/Writing (Completing Forms)** | Offer/Assist at least 1x per week if help is needed (if listed on Adaptive Support Chrono). | Document at least 1x a week that assistance was offered/provided or declined. |
| **Monitor canteen/Property** | Monitor/assist canteen monthly. Monitor canteen in cell 1x a month for canteen/property loss (if listed on Adaptive Support Chrono). Confidential one-on-one checks for any concerns. | After each canteen purchase, check canteen at least once to assess possible loss. Monitor for loss of property document outcome/observations. |
| **Pressuring/ Victimization** | At least 1x a month, conduct private one-on-one interview (if victimization/pressuring is listed on Adaptive Support Chrono). | Some DDP I/M's will require more monitoring. Document outcome of confidential one-on-one interview. |

Attachment E

# DD2 / DD3   DDP ORIENTATION (ENGLISH)

**CDC-128-B (Rev. 4/74)**

On _____, Inmate _____ CDC# _____ was provided verbal orientation.  This orientation consists of: alarm policy, appeals process, access to Legal Library, religious services, food services, count procedures, emergency procedures, medical procedures, mail procedures – including indigent writing materials, recreation, visiting policy, and work group/privilege group status.  'S' was advised which Correctional Officers are his contacts and that CCI _____ is his assigned Counselor.  'S' was informed he will be provided direct contact and daily supervision by the Correctional Officers and Counselor to assist with any Adaptive Support Services required.  The Inmate was afforded the opportunity to view the "Inmate Orientation Video."  The inmate **DID  /  DID NOT** elect to view the video.  To insure effective communication, **SLOW SIMPLE ENGLISH** was used and the inmate was also asked questions.  The inmate in his own words repeated back what had been said and also answered all questions appropriately.  Inmate was also advised that C/O_____ would be his staff assistant for his "Initial Classification Review" that would be held within 14 days of his arrival date.  I advised him that his counselor would interview him before committee and the reason for his incarceration, release date, custody, WG/PG, and Program needs would be discussed at this review.  I further advised Inmate that his adaptive support needs would also be reviewed by the committee and discussed with him.


_____                              _____
*Inmate's Signature (Print/Sign)*                                   *Staff's Signature (Print/Sign)*


Cc:    **C-File – Scanning
        CCI
        DDP Office**

**DATE: _____        INFORMATIONAL/ORIENTATION CHRONO        CSATF/SP**

DocuSign Envelope ID: A7BC4C95-6DBB-4425-892B-73D68EAB46F5

ATTACHMENT E

# DD1 DDP ORIENTATION (ENGLISH)

CDC-128-B (Rev. 4/74)

On _____, Inmate _____ (_____) was provided verbal orientation.  This orientation consists of: alarm policy, appeals process, access to Legal Library, religious services, food services, count procedures, emergency procedures, medical procedures, mail procedures – including indigent writing materials, recreation, visiting policy, and work group/privilege group status.  'S' was advised which Correctional Officers are his contacts and that CCI _____ is his assigned Counselor.  'S' was informed he will be provided direct contact and daily supervision by the Correctional Officers and Counselor to assist with any Adaptive Support Services required.  The Inmate was afforded the opportunity to view the "Inmate Orientation Video."  The inmate **DID  /  DID NOT** elect to view the video.  To insure effective communication, **SLOW  SIMPLE  ENGLISH** was used and the inmate was also asked questions.  The inmate in his own words repeated back what had been said and also answered all questions appropriately.


_____                    _____
*Inmate's Signature (Print/Sign)*                    *Staff's Signature (Print/Sign)*

Cc:     **C-File – Scanning**
         **DDP CCI**
         **DDP Inmate**
         **DDP Office**


**DATE: _____     DDP ORIENTATION CHRONO / INFORMATIONAL     CSATF/SP**

DocuSign Envelope ID: A7BC4C95-6DBB-4435-882B-73D68EAB46F5

Attachment E-1

# DD1 DDP ORIENTATION (SPANISH)

**CDC-128-B (Rev. 4/74)**

En la fecha _____, al preso, _____, CDC# _____, se le dió una orientación de palabra.  Esta orientación consiste de lo siguiente:  la política de alarma, la política para visitantes, el proceso de apelación, el acceso legal a la Biblioteca de Leyes, los servicios religiosos, y de alimentación, los procedimientos médicos, de emergencia, de conteo, de correo incluyendo para los pobres, materiales para escribir, recreación, y el estado del grupo/ privilegio de trabajo.  Se le informó al preso que sus oficiales correccionales son sus contactos y que <u>CCI</u>_____ es su consejero asignado.  Se le informó al preso que tendrá supervisión y contacto directo diariamente por sus Oficiales Correccionales y su Consejero para aistirle con cualquier Servicio de Apoyo Adoptivo requerido.  Al preso se le ofreció la oportunidad de ver el "Video Orientación de Preso." El preso escogió  <u>**VER / NO VER**</u> el video.  Para asegurar  comunicación eficiente, se le hicieron preguntas al preso  <u>**TRADUCIDO A ESPAÑOL**</u>.  El preso en sus propias palabras repitió lo que se había dicho y también contestó todas las preguntas adecuadamente.


_____            _____
*Inmate's Signature (Print/Sign)*                    *Staff's Signature (Print/Sign)*

**Cc:     C-File – Scanning**
         **DDP CCI**
         **DDP Inmate**
         **DDP Office**


**DATE: _____        INFORMATIONAL / ORIENTATION CHRONO (Spanish)      CSATF/SP**

Attachment F

STATE OF CALIFORNIA                    DEPARTMENT OF CORRECTIONS AND REHABILITATIONS

CDC 128 B (8-87)

**INMATE NAME:**                    **CDC:**                    **Housing:**

On _____, I/M _____ arrived at CSATF/SP.


On _____, I/M _____ received Law Library and other library services Orientation. It was conducted using simple and concise English. The Law Library Orientation included: How to access the "Door to the Court", library rules, accessing the Lexis Nexis law library, expectations and, a tour of the library was provided. Also covered were the hours of operations, review of the forms available, how to request a forms, recreation reading, research materials and how to check out books. The use of the following electronic equipment the: Law Library Computers/Lexis Nexis, ADA typewriter, ADA Computer, Merlin Machine Reader was reviewed. Effective communication was used to insure understanding by I/M _____ repeating back and an opportunity was given to ask questions.

X  _____                    X  _____

   Resource Specialist Program Teacher                    Education Vice Principal


cc: Central File
Counselor
Education File/Classroom File
Inmate


**DATE:**          **CSATF**              **INFORMATIONAL CHRONO**        **CDC 128 B (8-87)**

_____

# Exhibit B



# CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES

# MEMORANDUM

| | |
|---|---|
| **Date:** | May 5, 2023 |
| **To:** | BRYAN PHILLIPS, Warden (A)<br>Substance Abuse Treatment Facility<br>California Department of Corrections and Rehabilitation<br><br>ANU BANERJEE, Chief Executive Officer<br>Substance Abuse Treatment Facility<br>California Department of Corrections and Rehabilitation |
| **From:** | *Sadie Richmond*<br>DocuSigned by:<br>20E11214359E418...<br>SADIE RICHMOND, Correctional Administrator<br>Field Operations<br>Corrections Services |
| **Subject:** | **HEALTH CARE ACCESS UNIT OPERATIONS MONITORING AUDIT FOR SUBSTANCE ABUSE TREATMENT FACILITY – ROUND VIIIb FOCUSED REVIEW** |

As an extension of the Operations Monitoring Audit (OMA), Round VIIIb, conducted between September 12 and September 15, 2022, staff from Field Operations, Corrections Services per the Deputy Director, completed a Focused Review at the Substance Abuse Treatment Facility (SATF) on April 5 and April 6, 2023. The Focused Review consisted of a process assessment, document review, and recommendations to the hiring authorities to facilitate resolution of identified critical issues.

The Focused Review re-examined four questions from Component Five: new critical issue R8b.5.07, unresolved critical issue R8b.5.08 (formerly R7.2.16) since Round V, unresolved critical issue R8b.5.09 (formerly R7.2.20) since Round VI, and unresolved critical issue R8b.5.10 (formerly R7.4.03) since Round VII, where SATF has struggled to achieve a score at or above the minimum compliance threshold. The review team assisted in the assessment of question R8b.2.06 per the Director.

# MEMORANDUM

Page 2 of 4

| Critical Issue | Round VIIIb Audit | Round VIIIb Focused Review |
|---|---|---|
| **Question R8b.2.06** | 4.4% | 100% |

**In general population housing units under lockdown or modified program, are nursing rounds and collection of the CDCR Forms 7362, Health Care Services Request, documented in the housing unit logbooks(s)?**

The compliance threshold for this question is rated at 100%. There was one Program Status Report (PSR) reviewed for Facility C (C5, C6, C7), initiated March 1, 2023, with closure date March 7, 2023. The PSR addressed the continued access to health care services, identifying medical staff circulated CDCR Forms 7362, Health Care Services Request, and ensured documentation in the housing unit logbooks within the housing unit for collection and distribution. SATF improved their Round VIIIb OMA Audit score by 95.6%. The audit team encourages SATF to continue to utilize the rubber stamp in all logbooks when medical rounding is being completed.

| Critical Issue | Round VIIIb Audit | Round VIIIb Focused Review |
|---|---|---|
| **Question R8b.5.07** | 0.0% | 0.0% |

**Did the institution achieve the performance target of 99.00% for the Custody Access to Care Success Rate?**

During the Round VIIIb OMA, SATF's overall Custody Access to Care Rate was 98.14%, due primarily to incomplete Mental Health Services priority ducats.

A copy of SATF's report was obtained by the Focused Review audit team upon arrival. In January, SATF issued 35,758 Mental Health Services ducats, 177 add-ons, completing 97.42%. The total number of ducats and add-ons not completed was 19,563, with refusals being 11,531.

- Medical Services 100.00%
- Mental Health Services 97.42%
- Dental Services 99.87%
- Diagnostic/Specialty Services 100.00%
- Offsite Specialty Services 99.64%

The overall Access to Care Rate was discussed with the Health Care Access Unit (HCAU) Associate Warden (AW). SATF's HCAU AW provided the auditing team a copy of the SATF January 2023, Access to Quality Report Memorandum with the aforementioned breakdown of priority ducats. The number of Mental Health Services ducats not completed due to custody was 630 due to two fog counts - delaying program, a Code II, and yard recall due to multiple threats to the safety and security of facility.

DocuSign Envelope ID: C65285B9-07AA-48CD-A4F5-066710B38E15

# MEMORANDUM

| Critical Issue | Round VIIIb Audit | Round VIIIb Focused Review |
|---|---|---|
| Question R8b.5.08 | 79.1% | 71.5% |

**Does custody staff ensure patients appear for priority ducats no earlier than 60 minutes before the scheduled priority ducat time?**

The compliance threshold for this question is 90.0%.  During the January 2023 review period, 6,420 appointments were reviewed, with 4,589 appointments where patients appeared no earlier than 60 minutes before their scheduled time.  There were 1,831 appointments where patients appeared more than 60 minutes before scheduled ducat times ranging from 1 hour to 8 plus hours.  During the Focused Review, the auditors observed a patient in Facility D Clinic arriving at 1049 hours for a scheduled 1400 hour appointment. After speaking to staff within the Facility D Clinic, this is a common practice.  Additional observations/examples included medical providers requesting patients to arrive early, and/or if there were cancellations, requested patients to come earlier than scheduled, the main facility clinic (TTA/Primary) only has four holding areas, in which patients are escorted according to yard, and not the time of their appointment.  SATF has a total of seven yards: General Population, Non-Designated Programming Facility, Special Needs Yard, and Enhanced Outpatient, with one Short Term Restricted Housing unit.  The complexity of the population in conjunction with their placement of alternative housing (suicide precaution waiting for psych clearance) within their holding areas in the main clinic makes navigating ducat times, 60 minutes before, extremely challenging.  The audit team recommended SATF find another primary site for alternative housed patients.

| Critical Issue | Round VIIIb Audit | Round VIIIb Focused Review |
|---|---|---|
| Question R8b.5.09 | 72.8% | 78.2% |

**Does custody staff ensure patients complete priority ducats no later than 60 minutes after the scheduled priority ducat time?**

The compliance threshold for this question is 90.0%. During the January 2023 review period, 6,420 appointments were reviewed, with 5,018 appointments where patients completed priority ducats no later than 60 minutes after the scheduled priority ducat time.  There were 1,402 appointments where patients completed priority ducats more than 60 minutes after the scheduled priority ducat times ranging from 1 hour to 9 plus hours.  During the Focused Review, the auditors observed patients waiting in the main facility clinic (TTA/Primary) 60 minutes past their scheduled ducat times, as well as on Facility D, in which auditors were onsite at 1155 hours, and there were two patients waiting in the holding cells with ducat times of 1000 and 1030 hours. In speaking to Health Care Access Staff this happens on a regular basis due to Primary Care Physicians and Registered Nurse lines within the facility clinics seeing add-on patients prior to scheduled priority ducats.  As stated above, ducat times will not be in compliance with the 60 minutes after within the main facility clinic due to the size (four holding areas) and diverse patient population.  Primary Care Physicians will regularly run behind or postpone appointments in one

CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

DocuSign Envelope ID: C65285B9-07AA-48CD-A4F5-066710D38E15

# MEMORANDUM

facility for another, per Health Care Access staff, contributing to longer appointment times. Auditors discussed with the HCAU AW staff should always provide details of the appointment within the HCA Application comments section to assist in monitoring the reason for early/late appointment times. Additionally, auditors expressed concern over using holding areas in the primary clinic for alternative housing of patients, expediting the process for their triage to assist Health Care Access staff in the management of daily appointments, due to not having enough space, and to utilize dental and telemedicine spaces on the facilities.

| Critical Issue | Round VIIIb Audit | Round VIIIb Focused Review |
|---|---|---|
| Question R8b.5.10 | 93.0% | 83.3% |

**Are patients who are referred for mental health crisis bed placement to an alternate institution transferred and housed within 24 hours of referral?**

The compliance threshold for this question is 95.0%. During the January 2023 review period, there were 12 patients who transferred to an alternate institution for Mental Health Crisis Bed (MHCB) placement. On two occasions, a patient fell outside of the 24-hour standard due to institutional delay (emergency count), which delayed accepting the patient at California Men's Colony's (CMC) MHCB. Compliance is rated at 83.3%.

The review team met with the institutional leadership, shared their observations, and efforts to correct critical issues.

Thank you for your continued efforts to make access to health care services a success at your institution. Please contact Megan Cherinka, Captain, via email at Megan.Cherinka@cdcr.ca.gov should you have any administrative questions or concerns. For questions regarding document production, please send an email to: CCHCSFieldOperationsOMA@cdcr.ca.gov.