1  DONALD SPECTER – 083925
   RITA K. LOMIO – 254501
2  MARGOT MENDELSON – 268583
   JACOB J. HUTT – 5565791, *pro hac vice*
3  PRISON LAW OFFICE
   1917 Fifth Street
4  Berkeley, California  94710-1916
   Telephone:     (510) 280-2621
5  Facsimile:      (510) 280-2704

6  MICHAEL W. BIEN – 096891
   GAY C. GRUNFELD – 121944
7  THOMAS NOLAN – 169692
   PENNY GODBOLD – 226925
8  CAROLINE JACKSON – 329980
   ROSEN BIEN
9  GALVAN & GRUNFELD LLP
   101 Mission Street, Sixth Floor
10 San Francisco, California  94105-1738
   Telephone:     (415) 433-6830
11 Facsimile:      (415) 433-7104

12 LINDA D. KILB – 136101
   DISABILITY RIGHTS EDUCATION &
13 DEFENSE FUND, INC.
   3075 Adeline Street, Suite 201
14 Berkeley, California  94703
   Telephone:     (510) 644-2555
15 Facsimile:      (510) 841-8645

16 Attorneys for Plaintiffs

17

18                   UNITED STATES DISTRICT COURT

19                 NORTHERN DISTRICT OF CALIFORNIA

20

21 JOHN ARMSTRONG, et al.,              Case No. C94 2307 CW

22            Plaintiffs,               **[PLAINTIFFS' PROPOSED] ORDER RE
                                        COMPLIANCE WITH THE COURT'S
23     v.                               DECEMBER 7, 2023 ORDER (ECF NO.
                                        3538)**
24 GAVIN NEWSOM, et al.,
                                        Judge:   Hon. Claudia Wilken
25            Defendants.

26

27

28
   [4584913.2]
                                                          Case No. C94 2307 CW
   [PLAINTIFFS' PROPOSED] ORDER RE COMPLIANCE WITH THE COURT'S DECEMBER 7, 2023 ORDER
                                    (ECF NO. 3538)

**[PLAINTIFFS' PROPOSED] ORDER**

On November 8, 2021, in response to reports by Plaintiffs' counsel of discrimination and mistreatment against class members at Substance Abuse Treatment Facility (SATF), the Court ordered the Court Expert to investigate whether class members were being denied accommodations for their disabilities or discriminated against on the basis of their disabilities at SATF. *See* Dkt. No. 3338.

The Court Expert filed his report on December 20, 2022, finding "troubling" violations of the Americans with Disabilities Act (ADA) and *Armstrong* Remedial Plan (ARP) at SATF. Dkt. No. 3446 at 4. Specifically, the Court Expert found that Defendants had denied class members at SATF reasonable accommodations as a consequence of several systemic problems at SATF, including the absence of clear policies and procedures for requesting and delivering reasonable accommodations to class members; a lack of procedures and mechanisms that enable Defendants to identify and self-correct systemic problems that prevent them from promptly and effectively delivering reasonable accommodations to class members; an insufficient number of ADA and custody staff who are equipped to address requests for disability accommodations; the absence of clear policies and procedures for ensuring that class members are housed safely; and staff culture issues and practices that result in an adversarial relationship between class members and staff responsible for accommodating their disabilities. *See generally id.* As a result of these "breakdowns" at SATF, the Court Expert found that incarcerated people with disabilities were "living diminished and needlessly difficult lives" and enduring "harsher prison conditions, and thus greater punishment, than their peers" without disabilities. *Id.* at 4.

On February 24, 2023, the Court adopted the Court Expert's undisputed findings and ordered the Court Expert to continue to monitor Defendants' efforts to remedy the ongoing violations of the ADA and ARP at SATF and to file a further report in six months. Dkt. No. 3467. The Court also ordered Defendants to provide specific accommodations for class members who are deaf, have difficulty hearing, or have vision disabilities, as soon as possible. *See id.* at 3-4.

The Court Expert's second SATF report was filed on August 24, 2023. Dkt. No. 3500. The Court Expert found some improvements in the delivery of accommodations to class members at

1   SATF but noted continued problems with respect to the provision of necessary accommodations

2   for class members at SATF who are deaf, have difficulty hearing or vision disabilities, or who

3   require non-medical assistive devices, and with the tracking and provision of those devices. *See*

4   *generally id.*

5       The parties filed responses to the Court Expert's second report. Dkt. Nos. 3504, 3510,

6   3515. On November 7, 2023, the Court ordered the Court Expert to file an addendum to his

7   second SATF report to respond to the parties' assertions with respect to the progress, or lack

8   thereof, that Defendants had made in curing the ADA and ARP violations identified in the Court

9   Expert's first and second SATF reports. Dkt. No. 3521. The Court specified that to the extent the

10  Court Expert believed court action was necessary to ensure Defendants' timely compliance with

11  the ADA and ARP at SATF, either in the form that Plaintiffs proposed or otherwise, he should

12  (1) state so in his report; (2) specify the Court action he recommends; and (3) explain why the

13  Court action he recommends is, in his view, necessary to achieve compliance with the ADA and

14  ARP at SATF. *Id.* at 3; *see Armstrong v. Newsom*, 58 F.4th 1283, 1297 (9th Cir. 2023) ("[W]hen a

15  district court has previously tried to correct the deficiencies in prison operations through less

16  intrusive means, and those attempts have failed, relief prescribing more specific mechanisms of

17  compliance is appropriate" under the PLRA) (internal citations and quotation marks omitted).

18      The Court Expert filed his addendum to his second SATF report on November 28, 2023.

19  Dkt. No. 3529. The parties met and conferred and entered a stipulation to address the items in the

20  addendum report, which the Court issued as an order on December 7, 2023. Dkt. No. 3538.

21      The parties have since met and conferred with the assistance of the Court Expert and

22  provided a joint status update on each of the fifteen items in the stipulation. The Court finds that

23  further intervention is required regarding several of those items, which remain unresolved.

24  **I.      Access to Low-Vision Assistive Devices Beyond the Library (Item 5)**

25      Plaintiffs contend that Defendants provided incomplete information regarding DPV class

26  members who were evaluated by a vision specialist or who refused a vision specialist assessment

27  according to the Court's order, and that Defendants have not explained why Defendants did not

28  notify Plaintiffs' counsel that they would not meet the deadline despite months-long delays in

class members' assessments. *See* Declaration of Jacob J. Hutt ("Hutt Decl."), Ex. 69. Plaintiffs further informed Defendants that several class members documented as refusing an assessment in fact had not refused and that there were substantial delays in the issuance of recommended devices and/or training for those who had been seen. *Id.*, Ex. 70.

Within thirty days of this order, Defendants shall provide a substantive response to Plaintiffs' letter dated August 7, 2024, related to individual assessments of DPV class members at SATF.

## II.    Deaf and Hard-of-Hearing Accommodations

### A.    Announcements (Item 7)

Prison life at SATF is regulated by auditory announcements, made throughout the day, to notify all incarcerated people of the availability of programs, services and activities. *See, e.g.*, Hutt Decl., Ex. 7 ¶ 18, Ex. 4 ¶¶ 8-10, Ex. 2 ¶¶ 12-14, 19, Ex. 3 ¶¶ 20-21, 23, 25, Ex. 5 ¶¶ 10, 12, Ex. 1 ¶ 13, Ex. 6 ¶¶ 23-24 (class member declarations); Dkt. No. 3500 at 12. Missing announcements can have severe consequences. *See* Hutt Decl. Ex. 1 ¶¶ 8, 14, 24, 30, 37, Ex. 3 ¶¶ 21-25, 29, Ex. 9 ¶ 14, Ex. 12 ¶¶ 15-24, 25-58, Ex. 2 ¶¶ 14-16, Ex. 5 ¶¶ 10-12, Ex. 6 ¶ 53, Ex. 7 ¶¶ 15, 22-26 (class member declarations); Cal. Code Regs. tit. 15 § 3014 ("Incarcerated persons must respond promptly to notices . . . announced over the public address system").

In December 2022, the Court Expert found that "Deaf people and many hard of hearing people cannot hear an audio announcement played over the intercom," and recommended that prison officials at SATF "take immediate steps to address the needs of people who are deaf or hard of hearing," including to ensure effective communication of announcements "to people who cannot hear the intercom." Dkt. No. 3446 at 37, 41-42; *see also* Dkt. No. 3467 at 2 (adopting Court Expert's undisputed findings). Eight months later, the Court Expert found that "[d]eaf and hard-of-hearing people still do not consistently receive announcements" at SATF. Dkt. No. 3500 at 4. The Court then ordered Defendants to develop a proposal for ensuring effective communication of announcements at SATF. Dkt. No. 3538 at 5 (Item 7).

The Court finds that Defendants' responsive proposal fails to ensure effective communication of announcements to people who are deaf or hard-of-hearing for two main

reasons. First, Defendants' proposal in response to the Court's order covers only 1% of people with hearing disabilities at SATF (those who are deaf) and, second, for that 1%, Defendants' proposal neither commits to providing assistive devices that can transmit real-time, visual and tactile notification of announcements nor describes a viable system to audit and correct whether and how announcements are effectively communicated.

*First,* Defendants propose that an Assistive Technology Professional will conduct assessments of SATF class members designated DPH and that custody staff will audit effective communication of individual-specific announcements to these DPH class members.[1] But at SATF, 99% of those with documented hearing disabilities have a DNH code—defined in the *Armstrong* Remedial Plan § II.D.3 as those who "have residual hearing at a functional level with hearing aids"—and only 1% have a DPH code. Lorey Decl. ¶ 27. Thus, Defendants' effective communication plan only covers only 1% of people with hearing disabilities at SATF.

Defendants' exclusion of hard-of-hearing people designated DNH from their effective communication proposal cannot be squared with the Court's finding from over two decades ago that "[h]earing aids may improve an individual's ability to hear sound, but do not fully restore hearing, and may be rendered ineffective by background noise or poor acoustics." Dkt. No. 523 at 11. In this regard, the Court finds compelling the undisputed opinion of Plaintiffs' expert, Dr. Andrea Bourne, a licensed audiologist and Chief of Rehabilitation Service, Department of Veterans Affairs Health Care System, San Francisco, that SATF houses "a substantial percentage of [DNH-designated] people whose hearing loss is significant enough that they need non-auditory accommodations for announcements." Hutt Decl., Ex. 76 at 9. Defendants have not disputed Dr. Bourne's opinion regarding the need for Defendants to individually assess and make announcement accommodations available to DNH class members. Defendants' own expert, Assistive Technology Professional Dr. Swett, agrees with the critical importance of individual assessments for "an individual with disabilities." Declaration of Nathan V. Swett ¶ 20 ("Swett

---

[1] CDCR reserves the DPH code for incarcerated people that CDCR considers deaf or severely hearing impaired and accommodates through non-auditory aids. *Armstrong* Remedial Plan § II.C.2.

1  Decl."). Defendants' proposal also appears inconsistent with its own policy, which provides that

2  "[s]taff should not rely on … DPP/DDP codes in order to determine the necessary

3  accommodation." Dkt. No. 3453-1 at 180 (memorandum entitled, "Reiteration of Reasonable

4  Accommodation Requirements," and dated October 28, 2022). CDCR's denial of individualized

5  assessments to DNH class members also is at odds with the Court's recent order in the vision-

6  disability context that "DNV class members require accommodations by virtue of their DNV

7  code" Dkt. No. 3583 at 22.

8      The Court further finds, based on Plaintiffs' undisputed evidence, that even when class

9  members with hearing loss request announcement-related accommodations, prison officials at

10  SATF regularly deny these requests. Hutt Decl., Ex. 34 at 1, Ex. 24 at 1, Ex. 37 at 1, Ex. 38 at 1,

11  Ex. 43 at 1 (denials of class member requests); *id.*, Ex. 77 at 5-6. The Court also finds that existing

12  accommodations, such as hearing aids, pocket talkers, and vibrating watches, are inadequate to

13  ensure effective communication of announcements to all hard-of-hearing class members at SATF,

14  particularly given the poor quality of the public address (PA) system that transmits auditory

15  announcements. *See, e.g.*, Hutt Decl., Ex. 76 at 6-7; *id.*, Ex. 3 ¶¶ 17-25, Ex. 7 ¶¶ 15-16, Ex. 6

16  ¶¶ 25-31, 47, 82-83, Ex. 1 ¶¶ 8-9, 11, 24, Ex. 5 ¶¶ 9-12, Ex. 2 ¶¶ 10-14, Ex. 9 ¶¶ 26-29, Ex. 12

17  ¶¶ 11-12, 14-15, 24-28, Ex. 13 ¶¶ 13-15, 18 (DNH class member declarations). The Court finds

18  that CDCR must individually assess the hearing accommodation needs of all SATF class members

19  with hearing disabilities, regardless of code.

20      *Second*, even for the 1% of people with hearing disabilities at SATF who are assigned a

21  DPH code, the Court finds that CDCR's proposal is wholly inadequate for the effective

22  communication of both group and individual announcements. As an initial matter, CDCR

23  proposes individualized assessments for the handful of DPH class members at SATF by an

24  assistive technology professional, but has not specified the accommodations considered in the

25  assessments or committed to funding them. Hutt Decl., Ex. 84 at 1-2. As discussed below,

26  Plaintiffs' counsel has urged CDCR, to no avail, to ensure that CDCR will make available non-

27  auditory devices that transmit real-time, tactile and visual notifications of announcements—such

28  as wearable pagers and electronic video displays—to the class member, if indicated after an

1    individualized assessment.

2         For group announcements, CDCR proposes that a daily schedule of events be sent to

3    personal tablets. But the tablets do not provide real-time, tactile and visual notification that a

4    message has been received, they are not allowed and do not work in most areas of the prison, and

5    people with disabilities may not even have working tablets in their possession. Hutt Decl., Ex. 75

6    at 1; *id.*, Ex. 92 at 1; *id.*, Ex. 6 ¶¶ 92-99, Ex. 4 ¶¶ 13-14, Ex. 1 ¶¶ 26-29, Ex. 7 ¶ 30.5 (class

7    member declarations); Dkt. No. 3510-3 ¶ 30.

8         For individual announcements, CDCR proposes face-to-face notifications carried out by

9    housing unit staff or an ADA worker to DPH class members, and auditing this system as follows:

10        1.    Housing unit staff shall manually log each time an officer or ADA worker
              provides an individual announcement to a DPH class member, including the
11            date, time, appointment type. The DPH class member shall be required to
              sign the log "indicating they received and understood the notification."
12

13        2.    Facility sergeants will review the logs during daily housing unit tours and
              initial the log. If notifications are not documented, the sergeant "shall
              provide remedial training" and document it on a "Training Participation
14            Sign-In Sheet." "Defendants" will also "conduct monthly audits of the
              logs," although what that audit consists of and how it differs from the daily
15            review by the sergeant is not explained.

16        3.    "DPH class members will review the logs weekly and confirm receipt and
              understanding of the announcement(s)." They also will be interviewed by
17            compliance sergeants "to evaluate the occurrence and effectiveness of the
              face-to-face communication and log these interviews within the ADA
18            checklist," which will be reviewed weekly by the Compliance Lieutenant or
              ADA Coordinator, who will "address the non-compliant items through
19            corrective action" that is not identified.

20   Hutt Decl., Ex. 83 at 6-7. The Court finds that this auditing proposal falls far short of an audit that

21   ensures timeliness, accessibility, and accuracy and completeness—the very issues that the Court

22   Expert identified as lacking in CDCR's existing system. In particular, the Court Expert found that

23   deaf class members reported that the system of individual personal notification does not

24   "consistently result in them getting accurate or timely announcements, either because ADA

25   workers do not come to their cell as directed, they do not accurately communicate the

26   announcement, or they refuse to write down the announcement for the deaf person to read." Dkt.

27   No. 3500 at 12; *see also id.* at 4 (recommending "that CDCR devise a solution that is *not* reliant

28   on staff or ADA workers having to personally communicate announcements to the deaf

1  population") (emphasis added); Hutt Decl., Ex. 7 ¶ 26, Ex. 4 ¶ 6, Ex. 5 ¶¶ 10-12, Ex. 6 ¶¶ 86-87

2  (class member declarations). CDCR's proposal will not identify any of those problems.

3      The Court finds that CDCR's proposal also fails to explain whether and "*how* [it] will take

4  corrective action when officers are found to fail to communicate such announcements," Dkt. No.

5  3538 at 5 (emphasis added), beyond simply providing unidentified training. Hutt Decl., Ex. 83 at

6  3-4, 6-7. Training alone has been insufficient and at times even counterproductive to resolving this

7  longstanding issue at SATF. *See, e.g.*, Dkt. No. 3510-1 ¶¶ 29-32 & Exs. 12-14, 17 at 17; Hutt

8  Decl., Exs. 87-90; *Thomas v. Bryant*, 614 F.3d 1288, 1320-21 (11th Cir. 2010) (affirming

9  injunctive relief even though prison officials conducted additional training where, among other

10  things, "the record calls into question whether the . . . training has had any success").

11      The Court is not persuaded that the existence of a ducating system for certain individual

12  appointments cures the inadequacies of CDCR's proposal. The ducating system was in place at the

13  time of the Court Expert's investigation (and long before). *See* Dkt. No. 3510 at 11-12 (citing Dkt.

14  No. 3510-1 ¶¶ 21-24). Simply pointing to existing systems (i.e., the status quo) cannot solve

15  problems that have remained endemic within those systems. In any event, people with disabilities

16  at SATF have explained that they do not always receive ducats and, when they do, they often do

17  not include the correct time, and they are expected to wait for officers to tell them via the

18  announcement system to report to an appointment. Hutt Decl., Ex. 7 ¶¶ 19-20, Ex. 4 ¶ 9, Ex. 1

19  ¶ 13, Ex. 6 ¶¶ 32-38, 51-52 (class member declarations). Defendants assert that the "ducating

20  system is highly effective in ensuring that incarcerated individuals receive written notices and

21  attend their medical appointments," Mebane Decl. ¶ 7, but provide no underlying evidence except

22  a list of appointments that class members attended, without showing that receipt of a ducat itself

23  led to attendance. Banerjee Declaration ¶¶ 7-10. Based on undisputed evidence set forth by

24  Plaintiffs, the Court finds that underlying data specific to SATF confirms class member accounts.

25  *See* Declaration of Sara Norman ¶¶ 9-15 & Ex. B.

26                                          *  *  *

27      The Court finds that, in contrast to CDCR's longstanding refusal to ensure and audit

28  effective communication of announcements, Plaintiffs have identified concrete ways that CDCR

1 can remedy its violations of the ADA and the ARP. CDCR has refused to adopt these solutions or

2 propose an equally effective alternative.

### 1. Paging systems

4          First, Plaintiffs have recommended paging systems. Paging systems include the features

5 necessary to both effectively communicate <u>and</u> audit announcements—namely, real-time, non-

6 auditory notification of an announcement sent to a wearable and portable device, which can be

7 worn throughout the institution (including on the yard) <u>and</u> which stores a record of all transmitted

8 messages for auditing later. Hutt Decl., Ex. 76 at 15, 77-80 (User Manual for MMCall's

9 Correctional Facility Inmate Paging System).

10          Federal courts across the country have ordered prison officials to adopt paging systems to

11 ensure effective communication of announcements to people with hearing disabilities, and prison

12 officials in other jurisdictions have adopted such systems on their own including in Minnesota,

13 Colorado, Illinois, Kentucky, Massachusetts, Michigan, Vermont, Maryland, and Wisconsin. *Id.,*

14 Exs. 94, 95, 97, 99, 103, 106, 107, 158, 159. The Court finds that CDCR's head technologist,

15 Sylvia Dumalig, identifies no technological barriers to making pagers available at SATF. Instead,

16 Ms. Dumalig outlines the "planning, coordination, testing, and training" that CDCR would need to

17 undertake "to ensure a reliable and effective pager system." Declaration of Sylvia Dumalig ¶ 7

18 ("Dumalig Decl."). The Court finds that Plaintiffs have recommended since at least July 2021 that

19 CDCR adopt a pager system. *See* Dkt. No. 3459-5, Exs. 77-87 (meeting agendas including

20 requests for pagers for effective communication of announcements); Hutt Decl., Ex. 81 at 19-22.

21          CDCR has not identified a legitimate basis to refuse to provide this accommodation, and

22 there is no evidence in the record that CDCR has proposed an equally effective alternative.

### 2. Video display boards and upgrading of PA and alarm systems

24          Video display boards communicate the content of announcements in real-time and are seen

25 throughout the community, including in airports, DMVs, and pharmacies, Hutt Decl., Ex. 76 at 16.

26 People with disabilities report finding such displays useful. *Id.*, Ex. 1 ¶ 23, Ex. 4 ¶ 10, Ex. 5 ¶ 8,

27 Ex. 9 ¶ 27, Ex. 13 ¶ 20 (class member declarations). These displays also would help avoid any

28 disruptions in effective communication when other technologies, like the pagers, experience

1   disruptions, and could help communicate longer announcements in a more accessible manner.

2   SATF has installed electronic messaging displays in housing units, but these appear to have never

3   been used to communicate announcements. *See id.*, Ex. 1 ¶¶ 19-20, Ex. 6 ¶¶ 63-64 (class member

4   declarations). The parties have discussed CDCR's possible installation of video display boards

5   since at least 2019. Godbold Decl. ¶ 29. It is not clear why CDCR does not use such displays for

6   announcements.

7       As discussed above, people with disabilities at SATF report that the PA system at SATF is

8   difficult to hear. And people with disabilities at SATF routinely report that the visual alarm system

9   does not work because the lights are not noticeable. *See, e.g.*, *id.*, Ex. 3 ¶¶ 30-31 (class member

10  declaration); *id.*, Ex. 6 ¶¶ 80, 89. Defendants respond only with a description of the status quo. *See*

11  Mebane Decl. ¶¶ 9-10. It is not clear why CDCR does not upgrade its PA and visual alarm

12  systems.

13                                    *   *   *

14      The Court finds that "despite ample time and opportunity to do so," CDCR has failed "to

15  suggest—let alone implement—any viable" solution, and that this ongoing failure necessitates

16  Court intervention. *Armstrong v. Brown*, 768 F.3d 975, 986 (9th Cir. 2014); *see also Frew ex rel.*

17  *Frew v. Hawkins*, 540 U.S. 431, 440 (2004) ("Federal courts are not reduced to … hoping for

18  compliance."). The only plan submitted for the Court's consideration that would both provide

19  effective communication of announcements for deaf and hard-of-hearing people at SATF and

20  meaningfully audit and correct failures to ensure effective communication of announcements is

21  Plaintiffs' plan, as set forth in Plaintiffs' statement. This plan would meet the criteria the Court set

22  forth in its December 7, 2023 Order, as well as the Court Expert's recommendation "that CDCR

23  devise a solution that is *not* reliant on staff or ADA workers having to personally communicate

24  announcements to the deaf population," Dkt. No. 3500 at 4 (emphasis added), and leverages

25  technology used in other state prison systems to address this very issue.

26      Accordingly, the Court hereby ORDERS CDCR, within sixty days, to develop and produce

27  to Plaintiffs' counsel and the Court Expert a plan to both provide effective communication of

28  announcements for deaf and hard-of-hearing people at SATF and audit and correct failures to

[4584913.2]

ensure effective communication of announcements to deaf and hard-of-hearing people at SATF

that includes, at a minimum, the following elements:

(1)    Completion of the procedures described in paragraphs 5-6 of the declaration of

Sylvia Dumalig, for "careful planning, coordination, testing, and training to ensure a reliable and

effective pager system" (Dumalig Decl. ¶ 7), as well as installation of infrastructure for the use of

wearable paging devices by incarcerated people. These wearable paging devices must provide

real-time, tactile and visual notification of an announcement and the content of that announcement

to the wearer.

(2)    Implementation of a system for providing individual assessments by a qualified

assessor of all class members designated DPH, DNH, and all people who report hearing loss to

determine appropriate accommodations for these people, including but not limited to wearable

pagers and vibrating watches.

(3)    Implementation of a system for timely issuing and tracking all appropriate

accommodations identified in individual assessments, including but not limited to wearable pagers

and vibrating watches.

(4)    Funding and installation of visual displays in congregate settings capable of

providing the content of an announcement to incarcerated people in the vicinity of the display.

(5)    Evaluation and upgrading of PA systems and visual and/or tactile alarm systems.

(6)    Accessible, ongoing training for staff and incarcerated people on how to use

existing and new announcement technologies, on how to report problems with the technologies,

and on what interim accommodation will be provided in the event that the technologies are non-

functional.

(7)    Auditing of the timeliness, accessibility, accuracy, and completeness of staff and

incarcerated persons' use of existing and new announcement technologies.

(8)    Policy requiring CDCR leadership to regularly review the results of audits, take

prompt corrective action and impose individual progressive discipline where indicated, and

monitor the efficacy of corrective and disciplinary action taken.

Within seventy-five days of this Order, after reviewing comments from Plaintiffs' counsel

and the Court Expert, CDCR shall issue the plan in final form and implement its provisions

forthwith. CDCR must present drafts of all plans, policies, and procedures developed pursuant to

this Order to Plaintiffs' counsel and the Court Expert at least fifteen days in advance of CDCR's

issuance of the plan. Within seven days of the issuance of the plan, the parties shall meet and

confer, with the Court Expert's assistance, to resolve any disagreements as to the plan's adequacy.

CDCR shall ensure that staff with sufficient authority to amend and approve procedures attend all

meet-and-confer sessions. If a disagreement cannot be resolved, CDCR shall implement the

required policies and procedures as written on the date ordered and Plaintiffs' counsel shall file

objections with the Court. The Court will rule on the objections and issue orders as necessary.

### B.    TTY/TDD and Captioned Phones

This Court repeatedly has found that deaf and hard-of-hearing people at SATF have been

denied TTY/TDD and other accessible phones. Class members at SATF have had their requests

for TDD ignored for months, Dkt. No. 3217 at 10, and have lost touch with their families because

they, and the correctional staff in their housing unit, did not know how to request TDD calls or

whether TDD calls were available. Dkt. No. 3446 at 40, n.64; Dkt. No. 3467 (adopting Court

Expert's undisputed findings). The Court Expert and Plaintiffs' counsel have reported that these

issues of access persisted notwithstanding the Court's earlier findings. The Court Expert noted in

August 2023, eight months after his first report, that TDD did not work and that staff trained other

incarcerated people, rather than deaf people themselves, in how to use the phones. Dkt. No. 3500

at 13 ("It is not clear what, if any, action SATF took in response to our recommendation that

SATF ensure that the phones be made available to deaf people who do not sign.").

The parties have negotiated how and by when CDCR will provide direct training to deaf

and hard-of-hearing class members at SATF on captioned phones and how CDCR will provide

training to ADA and correctional housing staff at SATF regarding how to operate captioned

phones. Dkt. No. 3538 at 6-7. The Court finds that Defendants have not taken sufficient action to

make training accessible to class members who are designated DNH or to ensure that the training

of class members is effective. The Court also finds that Defendants have not complied with this

Court's order to train correctional housing staff on "how class members may sign up for captioned

phones." *Id.* at 7.

      1.      **Training for deaf and hard-of-hearing class members at SATF (Item 9)**

        (a)      **Defendants must affirmatively provide accommodations to DNH class members who require captioning to understand speech.**

It is undisputed that the DNH code at SATF is applied to a wide range of hearing disabilities, some of which may require non-auditory accommodations such as speech-to-text technology. Hutt Decl., Ex. 76 at 10-12; *id.*, Ex. 81 at 6. It also is undisputed that class members should be assessed individually to determine their needs regarding captioning.

The parties agree that, for class members who are designated DPH and who already have been provided a speech-to-text device, training should be provided with captioning in a one-on-one setting where the trainer monitors the captioning for accuracy, corrects errors, and checks for understanding. Defendants believe that affirmatively offering similar captioning for training of class members designated DNH is not necessary. Defendants have not explained, however, how they will reliably determine which class members designated DNH require captioning to understand the content of in-person training. In light of the undisputed evidence set forth by Plaintiffs that staff at SATF regularly have denied requests by DNH class members for captioning accommodations without conducting an in-depth assessment (and in fact, without interviewing these class members at all), the Court finds that reliance solely on the Reasonable Accommodation Panel (RAP) process is not sufficient. *See* Hutt Decl., Exs. 19-20, 23-24, 29, 35, 41, 44-62 (denied requests for speech-to-text accommodations). The accommodation request denials offered by Plaintiffs' counsel likely do not constitute a complete list of those DNH class members who may require captioning; class members may not have been educated about the availability of the accommodation, may have been told by staff or by other incarcerated people that they are not eligible, or may have become so discouraged by denied requests that they did not ask. *See id.*, Ex. 2 ¶¶ 24-28, Ex. 3 ¶¶ 33-42, Ex. 7 ¶¶ 31-37, Ex. 8 ¶ 26, Ex. 9 ¶¶ 8, 10-12, 19, 36-40 (class member declarations).

Defendants have an affirmative duty to assess and provide accommodations without waiting for a request. Dkt. No. 3583 at 19; *see also Pierce v. District of Columbia*, 128 F. Supp.

3d 250, 272 (D.D.C. 2015) (Jackson, J.). Defendants have been informed repeatedly of this concern by Plaintiffs' counsel through the advocacy process but have not corrected it. Hutt Decl., Exs. 78-79, 91, 110, 112, 114 (Plaintiffs' advocacy).

As a result, the Court hereby ORDERS that Defendants:

(1)     Within thirty days of this order, develop a process by which they (a) make speech-to-text devices available for class member training; (b) review requests for speech-to-text devices received in writing by 1824 or orally to a staff person; (c) provide a speech-to-text device for training to any resident who requests one, and administer that training in a one-on-one setting in which the trainer monitors the captioning for accuracy, corrects errors, and checks for understanding; (d) issue speech-to-text devices to residents who find them useful as an interim accommodation pending an individual assessment by an assistive technology professional; and (e) provide individual assessments by an assistive technology professional to determine what captioning and other services are necessary to accommodate the class member;

(2)     Within thirty days of this order, educate residents on upcoming training for class members with hearing or speech disabilities on captioned phones; on what speech-to-text accommodations are available, what features they provide (and do not provide), and what disability needs they may accommodate; and on (a)-(e) of the process enumerated in (1) above; and

(3)     Make available a speech-to-text device during all training sessions, even if a trainee did not request it in advance, should trainees believe that such an accommodation would be helpful. Within ninety days of this order, Defendants shall provide training to any trainee who requests a speech-to-text device at the time of training according to the process set forth in (c)-(e) of (1) above.

**(b)     Defendants must take appropriate measures to ensure that class member training is effective.**

The parties also agree that following initial training, supervisory staff at SATF will administer surveys to class members to monitor the efficacy of the training and to determine whether follow-up training is needed. The parties currently disagree on the content and design of

those surveys. Defendants have not addressed the report submitted by Plaintiffs' expert regarding what design elements are necessary to ensure that the surveys serve their intended function. Hutt Decl., Ex. 109 ¶¶ 51-55 (Declaration of Jen McDonald-Peltier). To the extent that the surveys as currently-written are the same surveys Defendants have described that failed previously to remedy denials of accommodations to class members at SATF, the Court finds that they must be revised. *See* Dkt. No. 3453-1 at 163-78; Dkt. No. 3467 at 1, 3. Defendants must take measures to monitor whether training has had its intended effect and, if not, to provide additional training, modify and improve the training, or both.

The Court therefore ORDERS the parties and the Court Expert to continue to meet to discuss the content and design of surveys administered to class members following initial training within thirty days of this order. If the parties reach an agreement, CDCR shall implement the proposed surveys within sixty days of that agreement. If the Court Expert determines that the parties are not able to reach agreement on the proposal, the parties shall, within thirty days of the Court Expert's determination that an agreement cannot be reached, submit a joint statement to the Court of no more than ten pages, with each party having five pages, for the Court to resolve the remaining disputes.

### 2.    Training for ADA and correctional housing staff at SATF (Item 10)

Plaintiffs contend that Defendants have not fulfilled this Court's requirement to train correctional housing staff on "how class members may sign up for captioned phones" because Defendants' training is not sufficiently specific regarding when a security concern lawfully may prohibit access to captioned phones installed outside of a class members' cell or housing unit. Dkt. No. 3538 at 6-7. Defendants respond that their policy clearly directs staff to provide class members with access to captioned phones during modified programming and to deny access when warranted due to a legitimate penological interest. *See* Lorey Decl. ¶¶ 28, 30.

The Court finds that instructing correctional staff to allow access to captioned phones absent undefined "security concerns" is insufficient guidance to ensure that all correctional staff will apply the standard appropriately and uniformly. The Court finds that similar such policies failed to prevent correctional housing staff from denying access in the circumstances described in

1   class member declarations. *See, e.g.*, Hutt Decl., Ex. 10 ¶¶ 24-26, Ex. 7 ¶¶ 13-14, Ex. 11 ¶ 12

2   (class member declarations). That correctional housing staff would deny class members at SATF

3   access to accommodations due to an altercation on another part of the facility, *id.*, Ex. 10 ¶ 26, or

4   as a blanket prohibition due to program modifications, *id.*, Ex. 7 ¶ 14, is improper. In light of

5   widespread class member reports, it is reasonable to believe that these improper denials stem from

6   insufficient training of correctional housing staff, and not solely from noncompliance by

7   individual staff members. Moreover, it is clear that such denials risk deterring class members from

8   further requesting accommodations. *Id.*, Ex. 11 ¶ 11, Ex. 7 ¶ 14-14.5 (class member declarations).

9       The Court is not persuaded that requiring correctional housing staff to document denials of

10  accommodations for the purpose of monitoring and correction is an undue administrative burden

11  given the necessity of oversight and analysis of training outcomes when that training pertains to

12  remedial measures for people with disabilities. *See Clark v. California*, 739 F. Supp. 2d 1168,

13  1210 (N.D. Cal. 2010). Rather, as noted above regarding training of class members, it is necessary

14  for Defendants to take further measures where existing self-monitoring mechanisms have not

15  proven effective.

16      The Court hereby ORDERS the parties and Court Expert to meet within thirty days of this

17  order to negotiate policy and related training that (a) provide clear and specific direction to staff

18  regarding when a security concern may prohibit access to a captioned phone, which may include

19  discussion of specific scenarios, including those that commonly lead to modified programming or

20  lockdowns; and (b) provide for monitoring the decisions of correctional housing staff regarding

21  whether to grant or deny access to a requested accommodation, including consideration of

22  correctional staff rationale, determination, and the manner of providing the person with a disability

23  with access to the captioned phone at the first available opportunity. If the parties reach an

24  agreement, CDCR shall implement the proposed surveys within thirty days of that agreement. If

25  the Court Expert determines the parties are not able to reach agreement on the proposal, the parties

26  shall, within thirty days of the Court Expert's determination that an agreement cannot be reached,

27  submit a joint statement to the Court of no more than twenty pages, with each party having ten

28  pages, for the Court to resolve the remaining disputes.

[PLAINTIFFS' PROPOSED] ORDER RE COMPLIANCE WITH THE COURT'S DECEMBER 7, 2023 ORDER
(ECF NO. 3538)

The Court also ORDERS the parties to meet and confer with the asssistance of the Court Expert on an expedited basis to try to reach a mutually acceptable resolution to the issue of phone standardization at SATF. CDCR agrees to provide to the parties and the Court Expert information relevant and non-privileged to the phone standardization at SATF. If the Court Expert determines the parties are not able to reach agreement on the policy at SATF, the parties shall, within thirty days of the Court Expert's determination that an agreement cannot be reached, submit a joint statement to the Court setting out the disputes regarding the SATF policy. The joint statement will be no more than 20 pages total (ten pages for each side). Plaintiffs will draft their position in the joint statement and then send it to Defendants for a response. The statement will then be filed with the Court. CDCR agrees that it will not implement a phone standardization plan at SATF or otherwise reduce tablet phone hours at SATF until the dispute resolution process as to SATF stipulation item 10 is completed.

## C.    Statewide Tablet Contract (Item 12)

### 1.    Videophones

The Court finds that the parties continue to negotiate a telecommunications solution that enables equal access to phone calls for people whose primary method of effective communication is sign language. The parties have entered into the following agreement:

> The parties agree to continue to meet and confer for a limited period, with the assistance of the Court Expert, to identify a solution, required by the ADA, that enables equal access to phone calls for people whose primary method of effective communication is sign language. This solution will address the situation when incarcerated people are not permitted to leave their cells during modified programming and in-cell phone access is available to incarcerated people without hearing impairments.

> The meet and confer period shall commence after the filing of the Joint Statement due on October 16, 2024 and shall end no later than February 17, 2025. The parties agree to work, in conjunction with any technology experts engaged by the parties, on identifying all practicable solutions that could address Plaintiffs' stated equal access concerns and address Defendants' stated security concerns, including the need to passively observe and monitor an incarcerated person's video communication with third parties, to disable camera access when the tablet is not plugged into the docking station, to prevent any modification to the tablet that may enable unauthorized use, and to prevent the transmission or possession of unauthorized images; unauthorized written, video or audio content; or contraband. The solution(s) considered by the parties must consider operational and infrastructural limitations present in the carceral setting.

The parties agree to gather all information to identify practicable solutions by February 1, 2025. If a solution is identified and it is feasible to implement the agreed-upon solution alongside the rollout of the new tablet contract, the parties agree to work to ensure implementation of the agreed-upon solution at the time of the rollout of the new tablets. If the parties are unable to agree on a solution that provides deaf signers equal access to phone call service, the Court Expert will certify disagreement. If the Court Expert determines the parties are not able to reach agreement, the parties shall, within 30 days of the Court Expert's determination that an agreement cannot be reached, submit a joint statement limited to 30 pages, with each party having 15 pages each, to the Court discussing the unresolved disputes.

The Court hereby ORDERS the parties to engage in the agreed-upon process outlined above.

### 2.    Dispute resolution

The Court finds that the parties have a disagreement regarding the dispute resolution process outlined in the Court's order. *See* Dkt. No. 3538 at 7. The Court finds that Defendants' position, that there is no requirement in the Court's prior order that the parties resolve disputes before a tablet contract is finalized, is inconsistent with the intent of the order, which is to engage in order to resolve disputes at the lowest levels possible, including before the tablet contract is finalized.

The Court clarifies that Defendants are required to meet to discuss disputed issues if Plaintiffs' counsel believe that the proposed statewide tablet contract, including the solicitation document, any amendments to the solicitation document, the publicly released bid proposal, and any public elements of the contract at any step in the contracting process prior to finalization, does not comply with the ADA and *Armstrong* remedial plans pursuant to SATF Stipulation Item 12. The purpose of meeting is to resolve disputes at the earliest stage possible in this process.

The Court ORDERS Defendants to develop a plan, including a proposed schedule for immediately sharing all information that is made public regarding the statewide Request for Proposal through the state contracting process, and meet with Plaintiffs' counsel shortly after the award of the contract, currently scheduled to occur on or before December 31, 2024. The purpose of meeting is to determine whether the state can and shall negotiate with bidders regarding the resolution to ADA issues that arise in this process. PUB. CONT. § 6611(a), (c), (e).

### D.    CART (Item 13)

CART is a well-recognized accommodation "for people who are deaf or have hearing loss

but do not use sign language." U.S. Dep't of Justice, Civil Rights Division, *ADA Requirements: Effective Communication*, ADA.gov, https://www.ada.gov/resources/effective-communication/ (last updated Feb. 28, 2020). It "can be provided on-site or remotely." *Id.* More than a year ago, this Court found that deaf people who do not know sign language have been for over a decade excluded from programs at SATF and ordered CDCR to make CART or an alternative reasonable accommodation available for due process events, programming, and education "as soon as possible." Dkt. Nos. 3446 at 14, 37-41, 3467 at 3. CDCR initially assured Plaintiffs and the Court Expert that it would implement CART to provide captioning accommodations for programming and education at SATF and other designated institutions, but suddenly abandoned plans to do so in favor of myViewBoard from ViewSonic ("ViewSonic"), a software that produces captions with artificial intelligence. Dkt. No. 3529 at 10-11. CDCR demonstrated ViewSonic alongside remote CART (that is, no human transcriptionist was present) at the San Quentin Rehabilitation Center on March 27, 2024, and produced videos showing the two technologies at San Quentin and the California Institution for Men in programs on June 21, 2024, again with the CART transcriptionist located off-site.

The Court finds that the CDCR demonstrations established that ViewSonic is not an equally effective alternative to CART. As explained by Plaintiffs' experts, including two who themselves are deaf, the ViewSonic display and visual presentation actually may *impede* comprehension.[2] First, ViewSonic is visually overwhelming due to "false starts," word changes, and error overwriting that make the visual display erratic and unpredictable. *See* Hutt Decl., Ex. 133 at 6, 8 (Declaration of Jen McDonald-Peltier); *id.*, Ex. 132 ¶¶ 19, 28-29 (Declaration of Etienne Harvey). Second, the two lines of text displayed and speed of transcription on ViewSonic make reading difficult or impossible. *See id.*, Ex. 134 ¶ 54 (Declaration of Tremmel Watson); *id.*, Ex. 133 at 6 (McDonald-Peltier); *id.*, Ex. 132 ¶¶ 31-32 (Harvey). Third, ViewSonic lacks error indicators, forcing deaf people to try to make sense of nonsense. *See id.*, Ex. 134 ¶¶ 36-37, 41-42

---

[2] Plaintiffs' experts include Etienne Harvey, an adventitiously deaf adult and retired professor of ASL and Deaf culture; Tremmel Watson, who became profoundly deaf in 2020, while incarcerated in CDCR; and Jen McDonald-Peltier, an Assistive Technology and Augmentative and Alternative Communication Specialist.

[PLAINTIFFS' PROPOSED] ORDER RE COMPLIANCE WITH THE COURT'S DECEMBER 7, 2023 ORDER (ECF NO. 3538)

1    (Watson). Fourth, ViewSonic does not distinguish between speakers. *See id.*, Ex. 135 at 4; *id.*,

2    Ex. 132 ¶¶ 40-42 (Harvey); *id.*, Ex. 134 ¶¶ 9, 47, 56-57 (Watson). Fifth, ViewSonic cannot be

3    customized for accessibility. *See id.*, Ex. 135 at 3-4; *id.*, Ex. 133 at 12-14 (McDonald-Peltier).

4    Sixth, ViewSonic has no ability to generate a transcript. *See id.*, Ex. 135 at 4; *id.*, Ex. 132 ¶ 24

5    (Harvey). Aside from display problems with ViewSonic, CDCR's demonstration of ViewSonic

6    showed that it not sufficiently accurate to be "as effective as communication with" hearing people.

7    28 C.F.R. § 35.160(a). ViewSonic introduced words and phrases that no one said, that have no

8    meaning in context, and that distorted the message entirely. *See* Swett Decl. ¶ 46.

9        The Court gives little weight to Defendants' expert Dr. Nathan Swett's opinion that

10   ViewSonic is an equally effective alternative, because his opinion contradicts his own

11   methodology. *See Sw. Fair Hous. Council v. WG Chandler Villas SH LLC*, 562 F. Supp. 3d 18, 26

12   (D. Ariz. 2021) (excluding expert testimony where "there is no way that [the expert] could have

13   properly applied his methodology to the facts at issue" where he conceded that he did not "have

14   enough information" about the deaf end-user). Dr. Swett explains that "[t]he limited

15   demonstrations of the two captioning services that were performed suffer from several drawbacks"

16   and that where a demonstration "does not include observation by and input from the individuals

17   the services are meant to accommodate," it "cannot produce valid or comprehensive results

18   regarding effectiveness[.]" Swett Decl. ¶ 45 (detailing "an important caveat"). Dr. Swett explained

19   that "comprehensive feedback" from deaf and hard-of-hearing individuals "is critical in evaluating

20   the overall effectiveness of and user satisfaction with the technology." *Id.* Dr. Swett explained that

21   "[a] limited demonstration test cannot gather this valuable data, leading to incomplete or

22   potentially misleading conclusions." *Id.* Yet Dr. Swett, who did not incorporate the views of deaf

23   end-users in developing his opinion, goes on to assert: "Nevertheless, I have reviewed the video

24   demonstrations of CART and ViewSonic and can attest to the fact that ViewSonic is an equally

25   effective alternative to CART." *Id.*

26       The Court finds that the CDCR demonstrations also established that CDCR does not have

27   the necessary equipment to facilitate "remote" CART (i.e., CART provided through a remote

28   transcriptionist). Ms. McDonald-Peltier explained that during the San Quentin demonstration that

[PLAINTIFFS' PROPOSED] ORDER RE COMPLIANCE WITH THE COURT'S DECEMBER 7, 2023 ORDER
(ECF NO. 3538)

1  she attended, there were "substandard microphones and audio feed," "CART appeared to have

2  connectivity issues," and "we were told that the receiver for the CART microphone had been lost."

3  Hutt Decl., Ex. 133 at 4-5. CDCR offers nothing to explain how the equipment and infrastructure

4  limitations revealed during its demonstrations will be addressed to facilitate remote captioning.

5  CDCR also has refused to engage with Plaintiffs' counsel's requests to discuss the matter or to

6  ensure better microphones for the demonstrations. Declaration of Skye Lovett, Ex. 1.

7       CDCR asserts that the expansion of remote CART may pose networking speed and

8  scheduling challenges, but provides no estimate as to the number of people who may require

9  CART at SATF, how specifically that will affect network speed, and what steps CDCR will take

10  to improve network speed to facilitate remote CART at SATF. CDCR's assertion is also surprising

11  in light of CDCR's representations to the Court last year that it could and would implement CART

12  for programming. Dkt. No. 3504-1 ¶ 18.

13       CDCR further asserts that CART raises privacy concerns for non-disabled programming

14  participants simply because a human transcriptionist will hear the content of programs and

15  generate a transcript. But CDCR does not explain why its concern about CART has not manifested

16  with respect to provision of sign language interpreters, and why its concern could not be cured by

17  simple education to program participants about what the technology is and how confidentiality

18  will be maintained.

19       While CDCR continues to delay the implementation of CART, people with hearing

20  disabilities who require captioning to fully understand speech remain excluded from programs,

21  services, and activities. *See generally* Hutt Decl., Ex. 8 (class member declaration); *see also* Swett

22  Decl. ¶ 40. The Court is mindful that developments in technology may yield equally effective

23  alternatives to CART, which CDCR may wish to implement in the future. Until CDCR

24  demonstrates the effectiveness of such a technology, however, and consistent with the Court's

25  previous orders as to sign language interpretation, CDCR must provide in-person CART services.

26  *See* Dkt. No. 2345 at 24 ("Defendants shall employ, through whatever salary is necessary,

27  sufficient qualified interpreters to serve the needs of the DPH prisoners housed at SATF, including

28  at all educational and vocational classes in which a DPH inmate is enrolled, barring unforeseen

1    circumstances."); Dkt. No. 1045 at 8.

2         The Court hereby ORDERS CDCR, within sixty days, to develop and produce to

3    Plaintiffs' counsel and the Court Expert a plan to employ, through whatever means is necessary,

4    sufficient qualified CART transcriptionists to serve the programming and education needs of

5    people with hearing disabilities in its custody at SATF. CDCR may seek relief from this provision

6    when it has demonstrated that it has the necessary infrastructure and equipment to provide an

7    equally effective alternative. CDCR's plan shall include a proof of practice such as a logging

8    system to document whether incarcerated people who rely upon CART in programming had

9    access to CART and, if not, the reason therefor. CDCR shall produce the previous month's logs to

10   Plaintiffs' counsel by the fifteenth of each month.

11        Within seventy-five days of this Order, after reviewing comments from Plaintiffs' counsel

12   and the Court Expert, CDCR shall issue the plan in final form and implement its provisions

13   forthwith. CDCR must present drafts of all plans, policies, and procedures developed pursuant to

14   this Order to Plaintiffs' counsel and the Court Expert at least fifteen days in advance of CDCR's

15   issuance of the plan. Within seven days of the issuance of the plan, the parties shall meet and

16   confer, with the Court Expert's assistance, to resolve any disagreements as to their adequacy.

17   CDCR shall ensure that staff with sufficient authority to amend and approve procedures attend all

18   meet-and-confer sessions. If a disagreement cannot be resolved, CDCR shall implement the

19   required policies and procedures as written on the date ordered and Plaintiffs' counsel shall file

20   objections with the Court. The Court will rule on the objections and issue orders as necessary.

21   **III.    Healthcare Issues**

22        **A.    RVR Policy (Item 14)**

23        The parties agree that CCHCS will issue their RVR policy to the field now and train their

24   staff. CCHCS is in the process of developing a tracking system to monitor the adequacy of this

25   policy. CCHCS will then work with the *Armstrong* Court Expert to identify information sufficient

26   to allow *Armstrong* Plaintiffs' Counsel to review the adequacy of CCHCS's policy as to

27   *Armstrong* class members at SATF. The identified information will then be produced to the

28   *Armstrong* Court Expert who may, at his discretion, provide the information to the Armstrong

1   Plaintiffs' counsel.

2          The Court ORDERS the parties to engage in these agreed-upon processes.

3          **B.      7362 Process (Item 15)**

4          Defendants have provided updates on behalf of CCHCS regarding the implementation of

5   an electronic system for submitting 7362s. Defendants have reported that CCHCS will provide

6   further updates regarding this system, and that the parties will continue to meet with CCHCS to

7   finalize this system.

8          Plaintiffs contend that the electronic system for submitting 7362s will not resolve all

9   systemic problems that the Court found eighteen months ago, namely that patients who submit

10  7362s requesting provision or repair of durable medical equipment (DME) are not seen promptly

11  in response to their requests. Dkt. No. 3446 at 27-28, 30, 32; Dkt. No. 3467 at 2 (adopting

12  undisputed findings of Court Expert). The parties have agreed to meet and confer, with CCHCS

13  and with the assistance of the Court Expert, to address Plaintiffs' concerns.

14         The Court ORDERS the parties to engage in these agreed-upon processes.

15                                         *   *   *

16         These remedies are all consistent with the Prison Litigation Reform Act's requirement that

17  the Court's orders be narrowly drawn, extend no further than necessary to correct the violation of

18  a federal right, and be the least intrusive means necessary to correct the violation. *See* 18 U.S.C.

19  § 3626(a)(1)(A). Anything short of these remedies will not ensure that *Armstrong* class members

20  housed at SATF have equal access to programs, services, and activities in CDCR custody. Given

21  CDCR's longstanding failure to reasonably accommodate these class members, including in

22  response to the Court's prior order, Dkt. No. 3538, the specificity of the remedies is appropriate.

23  *See Armstrong v. Brown*, 768 F.3d 975, 985-96 (9th Cir. 2014).

24         IT IS SO ORDERED.

25

26  DATED: _____, 2024

27                                           _____
                                             CLAUDIA WILKEN
28                                           United States District Judge