DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT – 5565791, *pro hac vice*
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone:   (510) 280-2621
Facsimile:   (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS
EDUCATION & DEFENSE FUND,
INC.
3075 Adeline Street, Suite 201
Berkeley, California 94703
Telephone:   (510) 644-2555
Facsimile:   (510) 841-8645

Attorneys for Plaintiffs

CALIFORNIA OFFICE OF THE
ATTORNEY GENERAL
ROB BONTA
Attorney General of the State of California
MONICA ANDERSON
Senior Assistant Attorney General
SHARON A. GARSKE
Supervising Deputy Attorney General
SEAN LODHOLZ
OLENA LIKHACHOVA
ANNE M. KAMMER
GURPREET SANDHU
TRACE O. MAIORINO
Deputy Attorneys General
State Bar No. 179749
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102-7004
Telephone:   (415) 510-3594
Fax:           (415) 703-5843
E-mail: Trace.Maiorino@doj.ca.gov

Attorneys for Defendants Gavin Newsom
and the California Department of Corrections
and Rehabilitation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GAVIN NEWSOM, et al., <br><br> Defendants. | Case No. C94 2307 CW <br><br> **JOINT CASE STATUS STATEMENT** <br><br> Judge:   Hon. Claudia Wilken |

[4605648.2]

The parties submit this Joint Case Status Statement pursuant to the Stipulation and Order entered March 28, 2011 (ECF No. 1868), which provides that "[t]he parties will file periodic joint statements describing the status of the litigation" every other month, beginning on May 16, 2011.

## CURRENT ISSUES[1]

**A.    Allegations of Abuse, Retaliation, and Violence by CDCR Staff Against Class Members**

      **1.    Plaintiffs' Statement**

          **a.    RJD and Five Prisons Orders**

Plaintiffs continue to monitor remedial efforts the Court found to be necessary in order to prevent further violations of the ARP and class members' ADA rights at six prisons, including changes to the staff misconduct investigation process and implementation of Audio Visual Surveillance Systems that include body-worn camera technology. *See* ECF Nos. 3059, 3060, 3217 and 3218. Party agreements regarding Court ordered changes are found in Defendants' RJD and Five Prisons Remedial Plans ("Plans"). *See* ECF No. 3393, Exs. A and B.

Plaintiffs have issued ten quarterly reports and have identified scores of cases that show failures by Defendants to conduct complete and unbiased investigations and impose appropriate and consistent discipline. Defendants are also failing to comply with other provisions of the Remedial Plans that impact class members statewide, including failing to meet deadlines for completing investigations and to appropriately route allegations of misconduct to the appropriate investigators. Even when investigators timely complete investigations, cases languish on the desks of Hiring Authorities for months. Plaintiffs' counsel have outlined additional reforms that are necessary to bring Defendants' accountability system into compliance and to avoid future litigation. *See* ECF No. 3592, Ex. A. Plaintiffs' counsel and the Court Expert have expressed serious concerns about the

---

[1] Statements are joint unless otherwise delineated as either *Plaintiffs' Statement* or *Defendants' Statement*.

lack of transparency and about unilateral changes to the accountability system that have been made by Defendants.  As the Court Expert has recognized, "both staffing levels and procedures may well be necessary to ensure investigators have the resources to conduct competent and thorough investigations.  But there is a Court ordered remedial plan in place.  If CDCR believes material changes to the investigation and disciplines system are necessary, it must proactively discuss those changes with Plaintiffs and with the Court Expert before implementation."  *See* ECF No. 3587 at 6.  Defendants responded that they will implement some, but not all, of the reforms outlined in ECF No. 3592, Exhibit A.  On July 8 and July 16, 2024, Defendants sent their own proposals to change the Court-ordered accountability system, and the parties and the Court Expert met on July 16, 2024 to discuss those proposed changes.

Plaintiffs share the Court Expert's concerns, expressed at the July 16 meeting, that Defendants' proposals are primarily designed to reduce the number of staff complaints in the system, and not to improve the quality of investigations.  Plaintiffs agree with the Court Expert that, unless the quality of investigations improves, the changes proposed by Defendants will not result in appropriate accountability for staff who violate policy and harm incarcerated people.  Plaintiffs have asserted for years that Defendants have failed to ensure adequate staffing to investigate allegations of staff misconduct, *see, e.g.,* ECF No. 3430 at 6, ECF No. 3440 at 6, ECF No. 3452 at 5, and Defendants' failure to acknowledge this resource problem has contributed to their longstanding failure to timely conduct complete and unbiased investigations, as required by the Court.  Nevertheless, Plaintiffs are engaging in good faith negotiations with Defendants on their proposed changes to the accountability system, and expect that Defendants will do the same with respect to the necessary reforms Plaintiffs have proposed in order to bring Defendants into compliance with the Court's Orders and to ensure that the system will hold staff accountable for abuse, retaliation and violence against class members.  Most recently, the parties have agreed to revisions to the Allegation Decision Index to streamline complaints regarding serious staff misconduct.  Plaintiffs continue to demand action to improve the

1   quality of investigations and to ensure accountability when violations occur.  *See*

2   October 23, 2024 Letter from Penny Godbold regarding Outstanding Items in Staff

3   Misconduct Negotiations, attached hereto as **Exhibit A**.

4          CDCR is a statewide system.  Violations of the ADA and ARP found thus far at six

5   prisons exist system-wide and Plaintiffs are committed to bringing such evidence before

6   the Court until all class members are protected.  *See* ECF No. 3592, Ex. A at 7-8.

7                    **b.       False, Retaliatory and Discriminatory RVRs**

8          Despite significant progress made towards Court-ordered improvements to the staff

9   misconduct investigation and disciplinary system, the endemic use of false and retaliatory

10  RVRs by staff to cover up disability-related misconduct and/or to retaliate against class

11  members who report misconduct remains a problem.  *See* ECF No. 3296 at 9.  Steps taken

12  thus far by Defendants to eliminate the problem have not gone far enough, and Plaintiffs'

13  counsel continues to identify class members who have received false, retaliatory,

14  discriminatory or otherwise inappropriate RVRs.  *See* ECF No. 3606, Exs. A and B.  The

15  use of RVRs to retaliate against and discourage the filing of staff misconduct complaints

16  will persist unless Defendants take action to identify and root out problems through

17  meaningful reforms to the RVR process.  Plaintiffs are hopeful that the parties can agree to

18  resolve problems and that additional court intervention will not be necessary.

19             **2.      Defendants' Statement**

20                    **a.       RJD and Five Prisons Orders**

21         CDCR has dramatically overhauled its processes to ensure unbiased and complete

22  investigations and, although not required by the Court's orders, Defendants have deployed

23  statewide processes that restructure CDCR's staff misconduct allegation, screening,

24  referral, investigative, and disciplinary processes.  As the Court has noted, "[t]hese agreed-

25  upon measures constitute substantial improvements that will go a long way to bringing

26  Defendants into compliance with the ARP and ADA at the six prisons."  ECF No. 3356 at

27  2.  The Court found, the "implementation of these [] remedial measures is likely to have a

28  positive impact on…the overall reliability of the outcomes of investigations."  *Id.* at 15.

Despite the tremendous efforts and resources directed toward improving the staff misconduct investigation and discipline processes, modifications are necessary to ensure sustainability. CDCR shared its initial modification proposal with the Court Expert and Plaintiffs. The parties and Court Expert have met extensively to discuss these proposals, Plaintiffs' responses, and to identify areas of agreement. CDCR will continue to discuss needed modifications to the current processes to ensure their sustainability and looks forward to proactively developing modifications without protracted delay.

**b.    Demands for RVR Reform**

Defendants have made significant progress and commitments to address Plaintiffs' demands that CDCR address the alleged practice of issuing false and retaliatory Rules Violations Reports ("RVRs") to class members, as detailed in previously filed statements. *See* ECF Nos. 3412 at 14-16, 3526 at 7-8. CDCR continues to address these issues to the extent they are specifically related to class-member accommodation, alleged discrimination, or retaliation and to the extent it is required to do so under the remedial plans, the ADA, or prior court orders. Plaintiffs may disagree with the investigation or discipline imposed, but that does not mean that the RVR was false or retaliatory. Plaintiffs' general complaints about the RVR process, unrelated to class-member accommodations, are not properly raised in this case.

**B.    Court Expert Investigation Into SATF**

**1.    Plaintiffs' Statement**

In November 2021, this Court ordered the Court Expert to investigate the treatment of people with disabilities at the California Substance Abuse Treatment Facility and State Prison, Corcoran ("SATF"). ECF No. 3338. In December 2022, the Court Expert filed a 67-page report, finding a substantial breakdown in the disability accommodation process at SATF. ECF No. 3446 at 4. The Court ordered corrective action, including additional analysis and reporting by the Court Expert and the development of policies and procedures by CDCR. *See* ECF No. 3467; ECF No. 3538. On October 16, 2024, the parties filed a joint status statement regarding compliance with the Court's corrective action order, and

brought several disputed issues to the Court for resolution. *See* ECF No. 3630 (Joint Status Statement); ECF No. 3630-30 (Plaintiffs' Proposed Order). The Court issued an order on November 8, 2024, finding that Items 1, 2, 3 were resolved. ECF No. 3639 at 1-2. Regarding Item 12, the Court held the parties' procedural dispute regarding conferring about the tablet contract was resolved, and ordered a further process for negotiating disputes after the contract is awarded; and approved the parties' agreed-upon process for meeting and conferring regarding in-cell videophone access on tablets for class members who communicate using sign language. *Id.* at 2-4. Regarding Item 14, the Court approved the parties' agreed-upon plan for the implementation and monitoring of the final RVR policy. *Id.* at 4. For the remaining items in the joint statement, the Court ordered the Court Expert to file recommendations as to their resolution no later than January 10, 2025, and set a briefing schedule for the parties. *Id.*

A detailed account of systemic concerns with the accommodation of *Armstrong* class member at SATF appears in the parties' last joint case status statement. *See* ECF No. 3622 at 5-11. In light of these concerns, Plaintiffs eagerly await the Court Expert's forthcoming report and recommendations on staffing and sustainability and hope it will result in the allocation of sufficient expertise and resources, and development of robust systems, necessary to comply with the *Armstrong* Remedial Plan and Americans with Disabilities Act.

### 2.    Defendants' Statement

The Court Expert's second report concerning the treatment of people with disabilities at SATF recognized the numerous proactive measures implemented at SATF to further respond to the needs of incarcerated people with disabilities. ECF No. 3500. The report demonstrates that the coordinated efforts between CDCR and California Correctional Health Care Services ("CCHCS"), with the Court Expert's guidance and with input from Plaintiffs, are working to effectively respond to the issues raised by the Court and addressed by the Court Expert following his initial investigation. In response to this Court's order, the Court Expert issued a November 28, 2023, Addendum to Second Report

Regarding the Treatment of People with Disabilities at SATF.  ECF Nos. 3500, 3521, 3529.  Based on the Court Expert's recommendations in this Addendum, the parties entered a stipulation addressing multiple issues.  ECF Nos. 3533, 3538.  Following 11 months of negotiations, policies and procedures were developed to address the Court Expert's key concerns and ensure long-term compliance with the ADA, the *Armstrong* Remedial Plan, and this Court's orders.  On October 16, 2024, the parties filed a joint statement providing a status update on all of the stipulation items and reporting on all unresolved issues.  *See* ECF No. 3630.  The Court issued an order on November 8, 2024, finding that Items 1, 2, 3, 12, and 14 were resolved.  ECF No. 3639.  For the remaining items in the joint statement, the Court ordered the Court Expert to file recommendations as to their resolution no later than January 10, 2025, and set a briefing schedule for the parties.  *Id.*

**C.    Accommodations for Deaf and Hard-of-Hearing Class Members**

      **1.    Plaintiffs' Statement**

As of October 2024, nearly 5,000 people who are deaf or hard-of-hearing are housed in a California state prison.  CDCR has failed to accommodate them for decades, and too many remain in significant isolation, unable to meaningfully participate in prison programs or maintain ties with loved ones.  The Court's December 7, 2023 Order ("SATF Stipulation") has spurred work by the parties and Court Expert to address (1) CART (computer-assisted real time transcription), or an equally effective reasonable accommodation; (2) accessible phones; (3) effective communication of announcements; and (4) the accessibility of services provided via tablet.  *See* ECF No. 3538.  The parties have updated the Court regarding those issues in a statement filed on October 16, 2024. *See* ECF No. 3630.  Plaintiffs incorporate by reference all statements made in that filing.

In this statement, Plaintiffs focus on two communication-related accommodations that are essential for deaf and hard-of-hearing class members to have full and equal access to group programming, and in particular to the rehabilitative programming necessary for class members to improve their chances of parole and of successful reentry into society.

1  Continuing to limit deaf and hard-of-hearing class members' access to rehabilitative

2  programming, by relegating them to inadequate and ineffective communication

3  accommodations or denying them accommodations altogether, has a litany of negative

4  consequences that result in prolonged incarcerations, more restrictive carceral conditions,

5  and lower chances of successfully reintegrating into society.  It is essential for Defendants

6  to take steps to ensure class members receive effective communication in these vital

7  programs.  *See* 28 C.F.R. § 35.160(a)(1).

8       **Sign Language Interpreter Shortage:**  In the previous Joint Case Status

9  Statement, Plaintiffs described class members' lack of access to on-site sign language

10  interpreters and Defendants' over-reliance on faulty video remote interpreting services.

11  *See* ECF No. 3622 at 18-20.  Defendants' website continues to report multiple vacancies

12  for sign language interpreters.  Since the previous Joint Case Status Statement, Plaintiffs

13  have continued to receive complaints from class members that they are unable to equally

14  participate in programs, activities, and services due to lack of effective interpretation.  The

15  lack of effective interpretation includes video remote interpreting services that display the

16  same technological shortcomings that rendered remote captioning services ineffective.  *See*

17  ECF No. 3630 at 110-113.  Plaintiffs are unaware of any positive developments on this

18  issue since the last Joint Case Status Statement.

19       **CART[2] captioning services:**  Plaintiffs incorporate by reference all statements

20  made in ECF No. 3630 at 106-127.  In addition to the parties' disputes regarding what

21  technology will be used to provide captioning services, other disputes remain.

22  Specifically, the parties have yet to reach agreement regarding:  (1) which class members

23  will be eligible for CART services; (2) which programs, services and activities will have

24  CART services available; and (3) the hours during which CART services will be available.

25  Resolving these disputes need not wait for a final determination regarding whether CART

26  or an equally effective alternative will be provided.  Plaintiffs place a high priority on

27

28  ———————————————
[2] For brevity, Plaintiffs use the term "CART" to refer collectively to CART or other
equally effective captioning service.

resolving these disputes quickly, to avoid further delaying the roll-out of captioning

services once the Court has ruled regarding which captioning technology to use.

**2.      Defendants' Statement**

Plaintiffs' overly broad allegations are not only largely inaccurate but lack the

nuance necessary to address this large population of class members in which there are vast

differences in degrees of qualifying disabilities.  As detailed in the October 16, 2024, joint

statement regarding SATF stipulation filed with the Court, incorporated by reference here,

Defendants have taken extraordinary measures to accommodate this population.  *See* ECF

Nos. 3631, 3631-1 to 3631-10.  These efforts are ongoing to ensure accommodation of this

population.  Defendants remain committed to providing deaf and hard-of-hearing class

members equal access to programs, services, and activities in accordance with the ADA,

the remedial plans, and this Court's orders.

**Sign-Language Interpretation**.  Defendants are mindful of their obligation to

provide sign-language interpretation services to serve the needs of the DPH population.

CDCR continuously works to ensure that qualified interpretation services are available to

deaf class members whose primary method of communication is sign language.  CDCR

puts forth significant effort to hire and retain qualified staff but CDCR does not have the

authority to unilaterally increase the salaries of state-employed sign-language interpreters.

CDCR, however, has submitted requests to increase the salary of certain positions.

Further, Plaintiffs fail to acknowledge the industry-wide shortage of interpreters willing to

work in a correctional setting irrespective of the associated earning potential and even

though CDCR pays various rates, from $95 and as much as $204, depending on the

location, notice, emergent circumstances, and other factors, for interpretation services.  To

support staff and identify and address workplace concerns, CDCR conducts quarterly

conference calls with sign-language interpreters and offers them additional training.  The

needs of deaf class members are now supplemented with sign-language interpreters

through three fully implemented service contracts.  These contracts are tracked to ensure

that contracted coverage is in place.  CDCR is currently reviewing staffing needs and the

workload of each staff member as part of its continued efforts to meet the needs of these

class members.

**Captioning Services**: As set forth in detail in the recently filed joint statement

(ECF No. 3630 at 128-49), Defendants understand the importance of meaningful access to

group programming for deaf class members who do not know sign language.  These class

members continue to have limited captioning accommodations because of their counsel's

fixation with CART and refusal to consider captioning technologies with greater

availability and scalability.  Nevertheless, Defendants have worked to find alternative

solutions for these class members, such as iPads with real time captioning capabilities, and

remain dedicated to providing the accommodations necessary to allow deaf people who

cannot sign to meaningfully participate in rehabilitative programs.

**D.     Accommodations for Blind and Low Vision Class Members**

**1.     Plaintiffs' Statement**

Plaintiffs' counsel have raised ongoing concerns including that class members are

being documented as "refusing" vision assessments when they report that they have not in

fact refused, that their writing needs are not being thoroughly evaluated resulting in class

members being forced to rely on others to write, that they are experiencing unnecessary

delays in receiving recommended devices, and that class members are experiencing long

wait times for vision assessments.  *See* Letter from Tania Amarillas and Rita Lomio

(August 7, 2024), attached as Exhibit H to ECF No. 3622.  Plaintiffs' counsel sent a follow

up to the letter, via email on September 11, 2024, asking the specific reason for the delays

in multiple cases from the letter including a class member that had not received glassed

160 days after they were recommended by the specialist, a class member who had not

received a laptop 244 days after recommended, and a class member who had not received

orientation and mobility training 203 days after it was recommended.  *See* Email from Rita

Lomio to Defendants (September 11, 2024), attached as Exhibit I to ECF No. 3622.

Plaintiffs' counsel await a response.

Plaintiffs also remain concerned about Defendants' failure to accommodate people

1  with monocular vision, who have a narrower field of vision and severely limited depth

2  perception, especially at shorter distances, and who may face safety risks in a prison

3  environment.  *See* Joint Case Status Statement, ECF No. 3606 at 20-21.  Plaintiffs continue

4  to encounter class members who have been denied accommodations because their DPP

5  vision code was removed by CDCR because they have monocular vision.  Plaintiffs

6  continue to assert that CDCR must develop and enforce a policy that ensures that people

7  with monocular vision are not categorically excluded from accommodation and are

8  affirmatively assessed to determine whether they need visual accommodations.

9       Shortly before the filing of this statement, on November 12, 2024, Defendants

10  produced to Plaintiffs a CCHCS policy dated April 17, 2024, entitled, "Confirmation of

11  DPV/DNV Disability Codes and Accommodations," a true and correct copy of which is

12  attached as **Exhibit B**.  Plaintiffs are currently reviewing the policy, but note that even

13  after the date of issuance of this policy, Plaintiffs have continued to encounter and report to

14  Defendants instances of class members with monocular vision being categorically denied

15  accommodations on the basis of not having a DPP code.

16       **2.    Defendants' Statement**

17       Defendants have addressed Plaintiffs' concerns regarding class members' refusals

18  to participate in vision specialist assessments in the October 16, 2024, joint statement

19  regarding SATF stipulation filed with the Court, incorporated by reference here.  *See* ECF

20  No. 3630 at 7-8; and *see* ECF No. 3631-8 at ¶¶ 9-11.  Defendants have been diligently

21  working to resolve any delays in the completion of class members' vision specialist

22  assessments and the issuance of the assistive devices recommended by the vision specialist

23  following assessment, including contracting with additional vision specialists to expand

24  assessment availability.  As indicated in the joint statement, reported delays in the issuance

25  of the recommended assistive devices raised in Plaintiffs' advocacy correspondence will

26  be addressed through the regular advocacy process.  *See* ECF No. 3630 at 8.

27       Finally, although Plaintiffs continue to assert that all incarcerated people with

28  monocular vision must be identified as having disability, monocular vision diagnosis—in

and of itself—does not qualify as a disability.  *See Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999) (The ADA requires monocular individuals, like others claiming the Act's protection, to prove a disability by offering evidence that the extent of the limitation on a major life activity caused by their impairment is substantial.).  While Defendants do not dispute that monocular vision could be a disability if it substantially limits the individual's major life activity, Defendants disagree that every individual with monocular vision needs to have an assigned DPP code.  Assignment of DPP codes for individuals with vision impairments is governed by the remedial plan and incarcerated people with monocular vision undergo the same visual tests for field of view and visual acuity to determine if they qualify for a DPP vision code.  *See* ECF No. 3606 at 23.  If an incarcerated person with monocular vision reports to their medical provider that their vision is interfering with their ability to function independently or their access to CDCR programs, services or activities, that person may be referred to a specialist to address their concerns or any accommodation needs.  *See* CCHCS's memorandum titled "Confirmation of DPV/DNV Disability Codes and Accommodations" dated April 17, 2024, a true and correct copy of which is attached as Exhibit B.

**E.    Problems Regarding Access to Assignments for Class Members**

The program-access workgroup continues to periodically meet to discuss credit earning, the assignment process, and disparities in the program-access assignment data in response to Plaintiffs' allegations of disability-related discrimination.  ECF No. 2680 at 1314.  Plaintiffs' counsel seeks to move forward with agreement on a standard for evaluating program assignment discrimination and continues to report on disparities in assignments that are identified in monitoring work on individual institutions and programs. For example, Plaintiffs continue to report on disparities in assignment rates for higher paying and higher status jobs, like Prison Industries Association jobs, which class members are assigned to at lower rates.

/ / /

/ / /

1    **F.    Statewide Durable Medical Equipment Reconciliation**

2        **1.    Plaintiffs' Statement**

3        Defendants have agreed to ensure that anyone who had not been seen by a health

4    care provider in the last year would be seen for the purpose of reconciling their DME.  The

5    only outstanding issue, then, is to ensure a process whereby health care providers actually

6    undertake a reconciliation during at least one encounter annually.  Defendants maintain

7    that this is already a requirement during visits with Primary Care Providers, yet thousands

8    of class members without needed DME were identified by Defendants, despite this

9    existing requirement.  A process for ensuring that staff actually reconcile DME during

10   encounters is necessary.  DME Reconciliation reports continue to show that there remain

11   substantial problems with missing DPP codes, and poorly documented and tracked DME.

12   These problems can result in staff members not knowing when someone has a disability

13   that has been verified and needs to be accommodated, and can result in improper removals

14   of DME when searching cells and when people transfer to new units or new prisons.

15       Unfortunately, Defendants' disability tracking system still fails to identify and track

16   class members with upper-extremity disabilities.  Plaintiffs are committed to resolving this

17   ongoing problem.  Plaintiffs are continuing to report on these problems in individual

18   monitoring reports and will also continue to work with Defendants towards resolution.

19       **2.    Defendants' Statement**

20       CCHCS informed Plaintiffs it would ensure class members who have not been seen

21   by a provider in the last year would be scheduled to be seen by their health care provider

22   and would be given an opportunity to discuss appropriate DME for their condition.  Aside

23   from the scheduled appointment, class members have several other means by which they

24   can have their DME needs accommodated, including submission of a Form 7362 (Health

25   Care Services Request Form) or Form 1824 (Reasonable Accommodation Request Form).

26   Additionally, CDCR and CCHCS have numerous checks and balances in place to ensure

27   DME is accounted for.  The DME Discrepancy Reports were specifically designed to

28   detect errors within the system and highlight the errors for staff to take necessary action to

1   remediate.  The success of this process is evidenced by the dramatic decrease in the

2   discrepancy rates since inception of these reports.  For example, the January 2020 report

3   reflected a 53% discrepancy rate, whereas the current rate of discrepancy is significantly

4   less, 11.1%.  It should be noted, and Plaintiffs are aware, the reports are working

5   documents and are reflective of and influenced by the timing of the information recorded.

6   This means that the report will reflect an error from the time the provider places an order

7   in the system until the patient is issued the DME.  CCHCS has committed to providing

8   Plaintiffs the DME Discrepancy Reports on a quarterly basis and will continue to

9   communicate with stakeholders about these issues.

**G.      Joint Monitoring Tool**

       The parties remain committed to developing a strong and effective joint monitoring

tool.  The parties continue to convene small work groups, confer with the Court Expert

about informal briefing, and continue to meet to discuss and resolve the few remaining

disputes between the parties such as a format for scoring and reporting compliance.  The

parties continue to work towards a collaborative solution for scoring and reporting.

**H.      ADA Structural Barriers, Emergency Evacuation Procedures, and Master Planning Process**

       The parties continue to engage in the Master Planning Process aimed at ensuring

that CDCR prisons are accessible to people with disabilities in compliance with the

ADA.  During the last few months, the parties have exchanged position statements on

disputed issues and are working with the Court Expert to try to narrow and resolve the

disputes.  These meetings have been successful and are ongoing.  The parties met most

recently with the Court expert on October 18, 2024, to discuss disputes and the process

for obtaining interim accommodations while longer-term, larger, Master Planning

construction projects to improve accessibility are in the works.  As noted in prior

statements, the parties have agreed on a new process for sharing information and plans

related to Master Planning projects, for having Plaintiffs' expert provide comments on

plans, and for touring completed projects.  Defendants recently shared initial construction

documents, including detailed plans for accessibility improvements, with Plaintiffs' expert who has reviewed the first three sets and will provide feedback on additional plans soon. Plaintiffs also have a number of outstanding information requests regarding the Master Planning process that the parties are working their way through with assistance from the Court Expert.

Respectfully submitted,

DATED:  November 15, 2024          ROSEN BIEN GALVAN & GRUNFELD LLP

By:   /s/ Penny Godbold
     Penny Godbold

Attorneys for Plaintiffs

DATED:  November 15, 2024          ROB BONTA
                                   Attorney General of the State of California

By:   /s/ Trace O. Maiorino
     Trace O. Maiorino
     Deputy Attorney General

Attorneys for Defendants

## FILER'S ATTESTATION

As required by Local Rule 5-1, I, Penny Godbold, attest that I obtained concurrence in the filing of this document from Deputy Attorney General Trace O. Maiorino, and that I have maintained records to support this concurrence.

DATED:  November 15, 2024           /s/ Penny Godbold
                                    Penny Godbold

# EXHIBIT A



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Penny Godbold
Email: pgodbold@rbgg.com

October 23, 2024

<u>VIA ELECTRONIC MAIL ONLY</u>

Edward Swanson                          Jennifer Neill
Court Expert                            Tamiya Davis
Swanson & McNamara LLP                  CDCR Office of Legal Affairs
ed@smllp.law                           Jennifer.Neill@cdcr.ca.gov
                                       Tamiya.Davis@cdcr.ca.gov

        Re:     *Armstrong v. Newsom*
                Outstanding Items in Staff Misconduct Negotiations
                <u>Our File No. 0581-03</u>

Dear Ed, Jenn, and Tamiya:

        Thank you for meeting with us on October 2, 3, and 4, 2024 to discuss changes to
CDCR's accountability system.  As discussed, Plaintiffs seek to discuss the following
outstanding items raised in prior correspondence from March 15, 2024, April 11, 2024,
June 10, 2024, July 8, 2024, July 15, 2024, August 2, 2024, and August 13, 2024.

        In an April 11, 2024 letter, Plaintiffs proposed a "series of additional remedies that
are necessary to bring Defendants into compliance and avoid future litigation, including
discovery."  In response, Defendants requested that the parties urgently engage in
negotiations to reduce the number of complaints in the system including by redefining
staff misconduct, changing the ADI, and by routing less serious allegations through the
local grievance process.  *See* July 8, 2024 email from Tamiya Davis.  While willing to
engage, Plaintiffs' counsel remain concerned that, thus far, aside from changes to reduce
the number of complaints, the only significant change the parties have meaningfully
discussed is the development of a Centralized Hiring Authority Unit.  Plaintiffs' counsel
remain at the negotiating table but view all proposed reforms in this process—whether
proposed by Defendants or Plaintiffs—as interconnected.  In other words, Plaintiffs'
ability to agree on changes proposed by Defendants, including the proposed change to
route less serious staff complaints through the routine grievance process (a significant
change that may reduce the quality of investigation in to those allegations) is related to
Defendants' willingness to make significant changes to improve the quality of

Edward Swanson, Jennifer Neill, Tamiya Davis
October 23, 2024
Page 2

investigations into and Hiring Authority decision-making for the serious allegations of staff misconduct that remain in the system.  Plaintiffs' counsel have provided ample evidence of ongoing problems with the quality of investigations.  *See* Plaintiffs' Staff Misconduct Reports dated August 16, 2024; May 20, 2024; February 9, 2024; November 6, 2023; August 11, 2023; May 12, 2023.

Below are the reforms we would like to discuss that we have raised in prior correspondence and the status of current negotiations regarding these requests:

## I.    CDCR MUST ENSURE COMPLETE AND UNBIASED INVESTIGATIONS

- Defendants must establish benchmarks for what constitutes a complete and unbiased investigation.  Prior to starting an investigation, Defendants must require investigators to describe all potential sources of evidence needed to determine what happened.  Investigators must then gather all such evidence and discuss it in the report.  Defendants must also require that investigators explain why they could not obtain any evidence.

  During a May 2, 2024 meeting, Defendants reported that they were developing a field guide to assist investigators.

  **Please report on the status of the field guide discussed in the May 2, 2024 meeting and produce a copy.**

- Investigative supervisors must perform meaningful and critical reviews of investigation reports and evidence, including reviewing all evidence discussed in the reports, to determine whether each investigation was complete and unbiased and the report accurately described the evidence.

  During a May 2, 2024 meeting, Defendants reported that the Post-Investigative Review Process is designed to address this issue.  However, this process is extremely limited and is designed as an ongoing training tool.  It is not designed as a real-time check on whether supervisors are conducting meaningful and critical reviews of reports and evidence that they are required to sign off on.  On June 10, 2024 Defendants reported that expectations for reforms are still in development.

  **Plaintiffs reiterate the request for Defendants to report on what steps CDCR is taking to ensure that supervisors are performing meaningful and critical reviews of investigation reports and evidence.**

- Defendants must retain all BWC and AVSS footage for a minimum of **180 days**, consistent with the recommendation of the OIG to "prevent the deletion of video

Edward Swanson, Jennifer Neill, Tamiya Davis
October 23, 2024
Page 3

evidence after 90 days" for cases under inquiry or investigation.  (*See* Annual
Report, Table 5 at 18, https://www.oig.ca.gov/wp-content/uploads/2024/03/2023-
OIG-Annual-Report.pdf.)  Currently, Defendants automatically destroy all video
after 90 days unless Defendants take affirmative steps to preserve the video.  Far
too frequently, video evidence that would resolve allegations of staff misconduct
is unavailable because Defendants failed to preserve it before it was destroyed.

Defendants have stated that, due to the current budget climate, this change is not
currently possible.

**Please report on any developments in this area.**

- Defendants must improve the format of reports and require that investigators
  provide a summary whether the evidence supports a finding that misconduct
  occurred.

  During a May 2, 2024 meeting Defendants reported that external stakeholders
  have opposed investigators summarizing evidence in investigation reports, but that
  Defendants may be open to discussing option for improving reports.  In a June 10,
  2024 letter Defendants reported that they do not agree to make this change as a
  result of a State Personnel Board decision.

  **Please report on any changes proposed by Defendants to improve the format
  of investigation reports.**

- Defendants must develop a robust system for tracking and evaluating the
  performance of investigators in the AIU and at the institutions.  Defendants must
  then use that information to provide additional training to poor-performing
  investigators.  If the investigator still cannot meet expectations with extra training,
  Defendants must remove such investigators from investigatory positions.

  During a May 2, 2024 meeting, CDCR reported they have a dashboard system to
  track performance, and are doing performance evaluations, probation reports and
  discipline.

  **Please produce documents that explain in detail what data is captured in the
  dashboard system CDCR discussed in the May 2, 2024 meeting.  Please
  produce information on when and how the dashboard system is used and
  when it was implemented.  Please produce information regarding the number
  of investigators who, because of poor performance, have received additional
  training, have been placed on probation, have been disciplined, or have been
  removed from investigatory positions.**

Edward Swanson, Jennifer Neill, Tamiya Davis
October 23, 2024
Page 4

II.     **ADDITIONAL STAFFING IS NECESSARY TO ENSURE COMPLETE, UNBIASED, AND TIMELY INVESTIGATIONS**

- Defendants must take steps to identify the average number of monthly staff complaints and the average time it takes for an investigator to complete a staff misconduct investigation, and to create a staffing plan to ensure they have enough investigator positions to complete unbiased and complete investigations by the deadlines set forth in the Remedial Plans.

    In an October 4, 2024 meeting, Defendants stated that they are shifting resources internally to increase the number of investigators in the AIU conducting investigations into allegations generated by incarcerated people.

    **Please provide information regarding how many AIU/OIA staff CDCR currently has and how many staff members CDCR projects it will need in order to keep pace with existing and projected caseload.**

III.    **CDCR MUST ENSURE CONSISTENT AND APPROPRIATE DISCIPLINE**

- Defendants must centralize disciplinary decision making at CDCR headquarters. Doing so will improve the likelihood of appropriate and consistent application of the Disciplinary Matrix. It will also ensure consistent application of statewide policies, including use-of-force policies, and it will enable Defendants to closely monitor misconduct in their prisons.

- CDCR confirmed in the July 16, 2024 meeting that CDCR plans to hire 12-14 personnel to staff a Centralized Hiring Authority Unit. The minimum qualification for the decision-making positions is a Chief Deputy Warden. CDCR is able to hire from within CDCR and externally to CDCR, for example, an attorney without a peace officer background could be hired for the unit. The personnel in the Centralized Hiring Authority Unit will make the final disciplinary decision, including in *Skelly* hearings. The institutional Hiring Authorities will receive a briefing on the decision made by the Centralized Hiring Authority Unit, but will not have a decision-making role. EROS and EAPTs will be hired to support the functioning of the Centralized Hiring Authority Unit. Additionally, in a memo dated July 16, 2024, CDCR wrote that the Centralized HA Unit will oversee AIU investigations only at this time.

    In an August 2, 2024 email, Defendants clarified that the staffing numbers were an estimation and the actual numbers will be determined once the ADI is finalized, and a more accurate number of investigations being forwarded to the Centralized

[4592753.1]

Edward Swanson, Jennifer Neill, Tamiya Davis
October 23, 2024
Page 5

Hiring Authority is determined. The basis for this estimate is assuming a 500-600 closure rate per month, at an average of two cases per staff member per day. Defendants stated they are open to discussing timelines for disciplinary decisions but believe it's premature at this time, wanting to wait 6-12 months post implementation to ensure a standard that will be successful.

Plaintiffs have requested to be informed before final staffing numbers are decided. Regarding the timeline for decisions, Plaintiffs see no reason to delay in instituting a timeframe. Regardless of what the timeframe is, the Centralized Hiring Authority unit will need to resolve the same amount of cases. Those cases should be resolved promptly pursuant to deadlines set in policy.

**Please confirm Plaintiffs understanding of CDCR's plans for the Centralized Hiring Authority Unit.**

In an October 4, 2024 meeting, CDCR stated they plan, by January 1, 2025, to have the Centralized Hiring Authority Unit operational for RJD, SATF, COR, CIW, KVSP, and LAC for all investigations at those prisons closed after January 1, 2025. **Please report on the timing for cases at all CDCR prisons to be decided by the Centralized Hiring Authority Unit.**

**As Plaintiffs have previously indicated, this important remedy must be memorialized. The parties are discussing this important issue.**

**Please share any additional plans that CDCR has for the Centralized Hiring Authority Unit and please share any data regarding staffing projections for the unit.**

- Defendants must require that disciplinary decisions are made within 30 days after the close of an investigation.

  As stated above, Defendants agreed that a timeline would be useful but have not committed to any specific timeline.

  **Please report on any updates regarding this important requirement.**

## IV.    RESOLUTION OF DISAGREEMENTS REGARDING USE-OF-FORCE CASES

- The parties should mutually agree on a use-of-force expert to review cases, resolve disputes between the parties, and make recommendations regarding changes

Edward Swanson, Jennifer Neill, Tamiya Davis
October 23, 2024
Page 6

within CDCR to either update its policies or to bring Defendants into compliance with policies.

**Plaintiffs request that Defendants respond with their position on this item.**

- In conjunction with retaining a use-of-force expert, the expert should review and evaluate the IERC process to make recommendations to ensure that staff involved in that process understand and apply all use-of-force policy requirements.

**Plaintiffs request that Defendants respond with their position on this item.**

- Defendants should ensure that all cases alleging excessive or unnecessary force are reviewed—and disciplinary decisions are made—by a use-of-force subject-matter expert at the headquarters level.

**Plaintiffs request that Defendants respond with their position on this item.**

- Defendants must clarify that an improper immediate use of force (force taken when there is no imminent threat) is an "unnecessary use of force" and violates existing policy.

**Plaintiffs request that Defendants respond with their position on this item.**

- Per the OIG's recommendation, Defendants should reinstate their de-escalation course as mandated training for all custody staff. This course should be in addition to the training required by the Six Prisons Orders.

**Plaintiffs request that Defendants respond with their position on this item.**

## V.    REMEDIES TO ENSURE STATEWIDE DISABILITY-RELATED STAFF MISCONDUCT IS ADDRESSED

- Defendants must, within a reasonable period of time, implement fixed cameras and BWCs at all prisons. Fixed cameras and BWCs are essential pieces of any system that can hold staff accountable for disability-related misconduct.

  In a May 2, 2024 meeting, Defendants reported they plan to roll out AVSS statewide at all CDCR prisons. Defendants also reported that a BWC roll-out depends on budget capacity. In a June 10, 2024 letter, Defendants stated they do not agree to implement BWC statewide.

[4592753.1]

Edward Swanson, Jennifer Neill, Tamiya Davis
October 23, 2024
Page 7

> **Please confirm the timeline for roll out of AVSS statewide.  Please provide any update regarding implementing BWCs statewide.**

- Defendants must agree to maintain the same accountability system—including screening, investigations, discipline, and all related processes—statewide.

  In a May 2, 2024 meeting, Defendants stated that staff misconduct complaints generated from any of the *Armstrong*-6 are now being screened in compliance with the remedial plans.

  **Please provide any update on whether and under what timeframe Defendants plan to implement the screening system currently at the *Armstrong*-6 at all prisons.  Please provide any update on whether the Centralized Hiring Authority Unit will apply statewide.  Please provide information on any aspects of CDCR's accountability system that will not apply statewide.**

## VI.    DEFENDANTS MUST COMPLY WITH THE ACCOUNTABILITY ORDERS FOR THE NON-SIX PRISONS

- Defendants must come into compliance with court-ordered accountability requirements which impact claims of disability-related staff misconduct at all CDCR prisons, to produce logs regarding the outcome of those cases to Plaintiffs' counsel, and to ensure production of investigation files to Plaintiffs' counsel. Plaintiffs' counsel remains unclear about where allegations of disability related staff misconduct at all prisons are being logged, as they do not appear to be on accountability logs.

  **CDCR and Plaintiffs agreed to discuss this unresolved issue.**

## VII.   ADDITIONAL ITEMS

The following additional items were proposed by Defendants in their March 15, July 8, and August 2, 2024 letters and discussed in a May 9, 2024 and July 16, 2024 meeting:

- End-to-End Case Management Technology Solution and Improved Early Warning System.  Accountability and transparency are essential to the process overall.  An end-to-end case management technology solution is essential to efficiently and effectively capturing each unique case from start to finish and is necessary to properly identify and evaluate trends and establish effective alerts for matters requiring additional attention. Current separate stand-alone systems impede the ability for timely and concise reporting and trend evaluation.  As a first step of the

Edward Swanson, Jennifer Neill, Tamiya Davis
October 23, 2024
Page 8

Early Warning System, select automated alerts for Hiring Authorities were
activated in the Fall of 2023; however, more are required.

**Please report on any developments in this area.**

- Incarcerated Persons Request for Assistance (Former GA 22 Process). CDCR is
  reinventing the former GA 22 process to provide the incarcerated population an
  avenue outside of the grievance process to resolve their issues, concerns, and
  requests in a more expeditious manner. In line with the California Model, working
  with staff to address issues promotes positive relationships between staff and
  incarcerated people through professional, positive, and respectful communication.
  CDCR is currently developing a new process and related procedures, forms, and
  departmental training for both staff and the incarcerated population.

  In an August 2, 2024 letter, Defendants stated they are creating workgroups to
  establish a process.

  **Please report on any developments in this area.**

- Resolution Specialist Program. CDCR is proposing a pilot program involving
  Resolution Specialists. A Resolution Specialist would be a trained full-time
  employee assigned to an institution who will make direct contact with the
  incarcerated person to better understand the issue. Then, they will work with staff
  to determine if a quick resolution is possible. The scope of this program is yet to
  be determined; but will undoubtedly assist in resolving an incarcerated persons
  complaint at the lowest level in an expedited manner. The Resolution Specialist
  Program is patterned after a program implemented in Washington state.

  In an August 2, 2024 letter, Defendants acknowledged Plaintiffs concerns and
  stated they have developed workgroups for a field-testing process, and said they
  would provide updates.

  **Please report on any developments in this area. Also, as previously stated,
  though Plaintiffs support the concept of this proposal, Plaintiffs do not believe
  that the Resolution Specialist should make direct contact with incarcerated
  people who have made allegations of staff misconduct. Any allegation of staff
  misconduct should be addressed solely through the appropriate investigative
  process.**

- Multi-disciplinary Grievance Team. The Division of Correctional Policy Research
  and Internal Oversight (CPRIO) developed this proposal to provide individuals
  who frequently file grievances with a meaningful opportunity to communicate

Edward Swanson, Jennifer Neill, Tamiya Davis
October 23, 2024
Page 9

their complaints to a team of experts who can help immediately resolve their issues or open an investigation if warranted by the facts. Individuals who frequently file grievances (meaning they file 12 or more grievances per quarter) would be directed to a multi-disciplinary Grievance Team which will conduct a face-to-face meeting with the claimant at least once per month. Under this proposal, the Grievance Resolution Team will consist of a Grievance Coordinator, Correctional Counselor, and mental health clinician (if the individual is a participant in a mental health program).

In a meeting on July 16, 2024, the parties discussed whether there is a limit for the number of grievances filed that would trigger the frequent flier categorization.

In an August 2, 2024 letter, Defendants shared that they would run a pilot at CHCF, HDSP, and SVSP with any claimant who filed more than 6 grievances between April and June 2024.

In response, Plaintiffs requested an explanation of the data presented in the one-page overview and expressed concerns that the threshold may be too low. Plaintiffs suggested potentially starting with the five most frequent filers at each prison.

**Please share the results of this pilot. Please also share any plans CDCR has for expanding the multi-disciplinary grievance team or any further criteria that has been established.**

- Misconduct Determination and Penalty Process (Forms 402/403). CDCR intends to update the current misconduct determination and penalty process and intends to exclude certain categories of cases from the 402/403 process.

  In Defendants' August 2, 2024 letter, Defendants wrote: "Changes to this process are still necessary, and Defendants maintain the position that there are instances where certain categories can be excluded. For example, when video evidence clearly refutes an allegation, utilization of a report signed by an investigator should be sufficient and should not require HA review."

  **Please report on any developments in this area. If this extends beyond the service report proposal, Plaintiffs request that Defendants provide more specific information regarding the proposal.**

- Improved Early Warning System (EWS)-Identification of Trends. CDCR is committed to continued enhancements of the EWS. CDCR is pursuing additional trend analysis and alerts to HAs, Ombudsman, CPRIO, the OIA, etc. The areas

Edward Swanson, Jennifer Neill, Tamiya Davis
October 23, 2024
Page 10

include but are not limited to ADI categories for discrimination, harassment, and retaliation, as well as the incarcerated/paroled population who frequently file complaints.

In their August 2, 2024 letter, Defendants wrote they are creating a workgroup on this.

**Please report on any developments in this area.**

- Enhanced Internal Auditing.  CDCR is committed to improving screening, grievance reviews, and investigations, through enhanced auditing. These enhanced audits will help ensure corrective and disciplinary actions are taken. The Post Investigation Review Process and several other audits have demonstrated the benefit of monitoring. Utilizing OACC for increased internal auditing will be implemented in coordination and collaboration with internal and external stakeholders.

  In the August 2, 2024 letter, Defendants wrote:  "OACC currently conducts compliance reviews for the different programs associated with the Allegations of Staff Misconduct process. As we **continue to review and enhance** audit objectives, we are willing to share with Plaintiffs and welcome input."

  **Plaintiffs' counsel have previously expressed concerns regarding audit standards set by Defendants including during negotiations related to BWC auditing and EWS auditing.  As a result, Plaintiffs have requested to review internal auditing standards regarding accountability.  Please report on any developments in this area.**

- In a May 9, 2024 meeting, the parties have discussed the possibility of Defendants creating an internal AIU service report for cases with clear evidence that therefore require less investigative time to reach a complete investigation.

  Defendants provided a proposal for the service report on August 2, 2024.

/ / /

/ / /

/ / /

/ / /

[4592753.1]

Edward Swanson, Jennifer Neill, Tamiya Davis
October 23, 2024
Page 11


**Plaintiffs look forward to discussing this proposed report. Please provide any status updates on this proposal.**

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Penny Godbold*

By:  Penny Godbold
     Of Counsel

PMG:ERL:cg

cc:  August Gugelmann
     Patricia Ferguson
     Ursula Stuter
     Chris Chambers
     Co-counsel

[4592753.1]

# EXHIBIT B



## CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES

# MEMORANDUM

| | |
|---|---|
| **Date:** | April 17, 2024 |
| **To:** | Chief Executive Officers, California Correctional Health Care Services |
| **From:** | |

Rainbow Brockenborough
RHCE, Region I

Brittany Brizendine
RHCE, Region II

Christopher Podratz
RHCE, Region III

Shereef Aref
RHCE, Region IV

| | |
|---|---|
| **Subject:** | Confirmation of DPV/DNV Disability Codes and Accommodations |

We are currently re-evaluating all patients who have a vision disability code to ensure that they are accurately categorized as DPV or DNV.  Once the disability codes are confirmed, all DPV and DNV patients will be referred to a low vision specialist for an individual assessment with the goal of ensuring that these patients receive the accommodations that are necessary to maximize their ability to function independently and access programs and services.

In addition, on a case-by-case basis, patients who have monocular vision (blind in one eye but do not meet the definition of DPV or DNV in the eye that has the best vision) may be referred to a low vision specialist if the patient reports that their vision is interfering with their ability to function independently and access programs and services.

Each institution will be provided a spreadsheet listing the patients who require evaluation. The spreadsheet will also include the results from a chart review conducted by Utilization Management (UM) detailing the most recent eye exam findings.

Each patient is to be seen by a primary care provider (PCP) no later than May 17, 2024.  PCPs are to inform the patient that they are being evaluated to ensure that they are receiving all necessary accommodations. Patients should be provided an opportunity to ask any questions that they may have.

All DPV and DNV patients and those patients who have monocular vision that impacts upon their daily activities will be assessed by a low vision specialist.  **Until further notice, these patients are scheduled by headquarters UM and not through institution schedulers.**

# MEMORANDUM

**Definitions:**
PCPs are to review the record for the most recent eye exam and using the results (measurement of central acuity with best corrected vision in the best eye) assign the patient the appropriate vision disability code.

> **DPV:** The DPV code shall be applied to individuals 1) whose vision cannot be improved in either eye to at least 20/200, and/or 2) those who have a visual field of 20 degrees or less in both eyes.

> **DNV:** The DNV code shall be applied to individuals whose vision can be improved in at least one eye to better than 20/200 but no better than 20/70.

> **No code:** Patients who have vision that can be improved to at least 20/70 in at least one eye.

> **Monocular Vision:** Patients who have vision in one eye that cannot be improved to at least 20/200 but have vision in the other eye that can be improved to at least 20/70. (Blind in one eye, and vision that does not qualify for either DPV or DNV in the other eye.)

If the PCP cannot find a measurement of central acuity with best corrected vision, the patient is to be referred for evaluation by optometry. After the optometry consultation, the PCP is to promptly see the patient to review the results of the examination and to assign the appropriate Disability-Vision code.

If a patient states that their vision has worsened since their last examination of visual acuity, the patient is to be referred for an updated evaluation by optometry. After the optometry consultation, the PCP is to promptly see the patient to review the results of the examination and to assign the appropriate Disability-Vision code.

The PCP is to document all encounters in the electronic health record (EHR), including documentation of effective communication. All changes in Disability Codes must be communicated in person to the patient.

**Detailed steps for those who are DPV:**
1) Discuss the determination with the patient.
2) Document the correct Disability-Vision code on an 1845 and provide the rationale.
3) Document effective communication.
4) If the patient does not have a vision impaired vest order one.
5) If a DPV patient has never used a white (tapping) cane and is interested in being evaluated for one, refer the patient for Certified Orientation and Mobility training. Do not issue a white cane until they have been evaluated and trained by a specialist, as patients need to be provided a properly sized cane and learn correct techniques from an instructor.
6) If the patient requests a lighted non-electronic magnifier, offer them one and Nursing staff will issue and complete a CDCR Form 7536, Durable Medical Equipment and Medical Supply Receipt.

**Detailed steps for those who are DNV:**
1) Discuss the determination with the patient.
2) Document the correct Disability-Vision code on an 1845 and provide the rationale.
3) Document effective communication.
4) If the patient does not have a vision impaired vest order one.
5) If the patient requests a lighted non-electronic magnifier, Nursing staff will issue and complete a CDCR Form 7536, Durable Medical Equipment and Medical Supply Receipt.

# MEMORANDUM

**Detailed steps for those who were classified as DPV or DNV who no longer qualify for either designation:**
1) Discuss the determination with the patient.
2) Document in the EHR a rationale for the removal of any Disability-Vision code.
3) Discontinue vision related DME if any were previously prescribed. If the patient does not want to relinquish their DME items and requests to keep them as an accommodation (cane, magnifier, vest, etc), healthcare will assist the patient in completing the CDCR 1824 and the institution's Reasonable Accommodation Panel (RAP) will be responsible for deciding whether the patient will be allowed to keep these items as a Reasonable Accommodation.  If approved, the ADAC or designee will document the item(s) in the patient's SOMS Property Module.
4) Document effective communication.

**Additional steps for those who have monocular vision:**
1) Discuss the determination with the patient.
2) Document the determination in the HER.
3) Document effective communication.
4) The impact of monocular vision varies from person to person. Some individuals with monocular vision have learned to compensate visually (e.g., by turning their head or using "monocular cues," such as shadows and highlights, to judge distances) effectively enough that they no longer are substantially limited. Others may experience significant functional impairments.
5) The PCP is to ask each patient who has monocular vision if the loss of vision in one eye is impacting upon any of their daily activities.  If the patients responds that they are experiencing difficulties, the PCP is to document this information in the EHR.


Cc:    Joseph Bick, Director
       Ron Broomfield, Director
       Jason Williams, Director
       Jennifer Benavidez, Deputy Director
       Jared Lozano, Deputy Director
       Dawn Lorey, Associate Deputy Director
       Renee Kanan, Deputy Director
       Grace Song, Deputy Medical Executive
       Barbara Barney-Knox, Deputy Director
       Brianne Burkhart, Attorney IV