MARGOT MENDELSON – 268583
JACOB J. HUTT*
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621
Facsimile:   (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS
EDUCATION & DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:   (510) 644-2555
Facsimile:   (510) 841-8645

* Admitted *pro hac vice*

Attorneys for Plaintiffs

CALIFORNIA OFFICE OF THE
ATTORNEY GENERAL
ROB BONTA
Attorney General of the State of California
MONICA ANDERSON
Senior Assistant Attorney General
SHARON A. GARSKE
Supervising Deputy Attorney General
SEAN LODHOLZ
OLENA LIKHACHOVA
ANNE M. KAMMER
GURPREET SANDHU
TRACE O. MAIORINO
Deputy Attorneys General
State Bar No. 179749
455 Golden Gate Avenue, Suite 11000
San Francisco, California  94102-7004
Telephone:   (415) 510-3594
Fax:             (415) 703-5843
E-mail:  Trace.Maiorino@doj.ca.gov

Attorneys for Defendants Gavin Newsom
and the California Department of
Corrections and Rehabilitation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN ARMSTRONG, et al.,

　　　　Plaintiffs,

　　v.

GAVIN NEWSOM, et al.,

　　　　Defendants.

Case No. C94 2307 CW

**JOINT CASE STATUS STATEMENT**

Judge:   Hon. Claudia Wilken

The parties submit this Joint Case Status Statement pursuant to the Stipulation and Order entered March 28, 2011 (ECF No. 1868), which provides that "[t]he parties will file periodic joint statements describing the status of the litigation" every other month, beginning on May 16, 2011.

## CURRENT ISSUES[1]

**A.**    **Allegations of Abuse, Retaliation, and Violence by CDCR Staff Against Class Members**

    **1.**    **Plaintiffs' Statement**

        **a.**    **RJD and Five Prisons Orders**

Plaintiffs continue to monitor remedial efforts the Court found to be necessary in order to prevent further violations of the ARP and class members' ADA rights at six prisons, including changes to the staff misconduct investigation process and implementation of Audio Visual Surveillance Systems that include body-worn camera technology.  *See* ECF Nos. 3059, 3060, 3217 and 3218.  Party agreements regarding Court ordered changes are found in Defendants' RJD and Five Prisons Remedial Plans ("Plans").  *See* ECF No. 3393, Exs. A and B.

Plaintiffs have issued multiple quarterly reports and have identified scores of cases that show failures by Defendants to conduct complete and unbiased investigations and impose appropriate and consistent discipline.  Most recently, Plaintiffs' counsel reported on investigation failures evident through a review of all cases produced from one quarter from Kern Valley State Prison.  *See* December 10, 2024 Letter from Penny Godbold, without attachments, attached hereto as **Exhibit A**.  Defendants are also failing to comply with other provisions of the Remedial Plans that impact class members statewide, including failing to meet deadlines for completing investigations and to appropriately route allegations of misconduct to the appropriate investigators.  Plaintiffs' counsel have outlined additional reforms that are necessary to bring Defendants' accountability system

---

[1] Statements are joint unless otherwise delineated as either *Plaintiffs' Statement* or *Defendants' Statement*.

into compliance and to avoid future litigation.  *See* ECF No. 3592, Ex. A.  Defendants responded that they will implement some, but not all, of the reforms outlined in ECF No. 3592, Exhibit A.  The parties are actively engaged in negotiations to reach agreement regarding changes that are necessary to the system to bring it in to compliance with Court Ordered Remedial Plans.

CDCR is a statewide system.  Violations of the ADA and ARP found thus far at six prisons exist system-wide and Plaintiffs are committed to bringing such evidence before the Court until all class members are protected.  *See* ECF No. 3592, Ex. A at 7-8.

### b.    False, Retaliatory and Discriminatory RVRs

Despite significant progress made towards Court-ordered improvements to the staff misconduct investigation and disciplinary system, the endemic use of false and retaliatory RVRs by staff to cover up disability-related misconduct and/or to retaliate against class members who report misconduct remains a problem.  *See* ECF No. 3296 at 9.  Steps taken thus far by Defendants to eliminate the problem have not gone far enough, and Plaintiffs' counsel continues to identify class members who have received false, retaliatory, discriminatory or otherwise inappropriate RVRs.  *See* ECF No. 3606, Exs. A and B.  The use of RVRs to retaliate against and discourage the filing of staff misconduct complaints will persist unless Defendants take action to identify and root out problems through meaningful reforms to the RVR process.  Plaintiffs are hopeful that the parties can agree to resolve problems and that additional court intervention will not be necessary.

### 2.    Defendants' Statement

### a.    RJD and Five Prisons Orders

CDCR has dramatically overhauled its processes to ensure unbiased and complete investigations and, although not required by the Court's orders, Defendants have deployed statewide processes that restructure CDCR's staff misconduct allegation, screening, referral, investigative, and disciplinary processes.  As the Court has noted, "[t]hese agreed-upon measures constitute substantial improvements that will go a long way to bringing Defendants into compliance with the ARP and ADA at the six prisons."  ECF No. 3356 at

2.  The Court found, the "implementation of these [] remedial measures is likely to have a positive impact on…the overall reliability of the outcomes of investigations."  *Id.* at 15. Despite the tremendous efforts and resources directed toward improving the staff misconduct investigation and discipline processes, modifications are necessary to ensure sustainability.  CDCR shared its initial modification proposal with the Court Expert and Plaintiffs.  The parties and Court Expert have met extensively to discuss these proposals, Plaintiffs' responses, and to identify areas of agreement.  CDCR will continue to discuss needed modifications to the current processes to ensure their sustainability and looks forward to proactively developing modifications without protracted delay.

### b.    Demands for RVR Reform

Defendants have made significant progress and commitments to address Plaintiffs' demands that CDCR address the alleged practice of issuing false and retaliatory Rules Violations Reports (RVRs) to class members, as detailed in previously filed statements. *See* ECF Nos. 3412 at 14-16, 3526 at 7-8.  CDCR continues to address these issues to the extent they are specifically related to class-member accommodation, alleged discrimination, or retaliation and to the extent it is required to do so under the remedial plans, the ADA, or prior court orders.  Plaintiffs may disagree with the investigation or discipline imposed, but that does not mean that the RVR was false or retaliatory. Plaintiffs' general complaints about the RVR process, unrelated to class-member accommodations, are not properly raised in this case.

## B.    Court Expert Investigation Into SATF

### 1.    Plaintiffs' Statement

In November 2021, this Court ordered the Court Expert to investigate the treatment of people with disabilities at the California Substance Abuse Treatment Facility and State Prison, Corcoran ("SATF").  ECF No. 3338.  In December 2022, the Court Expert filed a 67-page report, finding a substantial breakdown in the disability accommodation process at SATF.  ECF No. 3446 at 4.  The Court ordered corrective action, including additional analysis and reporting by the Court Expert and the development of policies and procedures

by CDCR.  *See* ECF No. 3467; ECF No. 3538.  On October 16, 2024, the parties filed a joint status statement regarding compliance with the Court's corrective action order, and brought several disputed issues to the Court for resolution.  *See* ECF No. 3630 (Joint Status Statement); ECF No. 3630-30 (Plaintiffs' Proposed Order).  The Court issued an order on November 8, 2024, finding that Items 1, 2, 3 were resolved.  ECF No. 3639 at 1-2.  Regarding Item 12, the Court held the parties' procedural dispute regarding conferring about the tablet contract was resolved, and ordered a further process for negotiating disputes after the contract is awarded; and approved the parties' agreed-upon process for meeting and conferring regarding in-cell videophone access on tablets for class members who communicate using sign language.  *Id.* at 2-4.  Regarding Item 14, the Court approved the parties' agreed-upon plan for the implementation and monitoring of the final RVR policy.  *Id.* at 4.  For the remaining items in the joint statement, the Court ordered the Court Expert to file recommendations as to their resolution no later than January 10, 2025, and set a briefing schedule for the parties.  *Id.*

A detailed account of systemic concerns with the accommodation of *Armstrong* class member at SATF appears in the parties' last joint case status statement.  *See* ECF No. 3622 at 5-11.  In light of these concerns, Plaintiffs eagerly await the Court Expert's forthcoming report and recommendations on staffing and sustainability and hope it will result in the allocation of sufficient expertise and resources, and development of robust systems, necessary to comply with the *Armstrong* Remedial Plan and Americans with Disabilities Act.

**2.      Defendants' Statement**

The Court Expert's second report concerning the treatment of people with disabilities at SATF recognized the numerous proactive measures implemented at SATF to further respond to the needs of incarcerated people with disabilities.  ECF No. 3500.  The report demonstrates that the coordinated efforts between CDCR and California Correctional Health Care Services (CCHCS), with the Court Expert's guidance and with input from Plaintiffs, are working to effectively respond to the issues raised by the Court

and addressed by the Court Expert following his initial investigation.  In response to this

Court's order, the Court Expert issued a November 28, 2023, Addendum to Second Report

Regarding the Treatment of People with Disabilities at SATF.  ECF Nos. 3500, 3521,

3529.  Based on the Court Expert's recommendations in this Addendum, the parties

entered a stipulation addressing multiple issues.  ECF Nos. 3533, 3538.  Following 11

months of negotiations, policies and procedures were developed to address the Court

Expert's key concerns and ensure long-term compliance with the ADA, the *Armstrong*

Remedial Plan, and this Court's orders.  On October 16, 2024, the parties filed a joint

statement providing a status update on all of the stipulation items and reporting on all

unresolved issues.  *See* ECF No. 3630.  The Court issued an order on November 8, 2024,

finding that Items 1, 2, 3, 12, and 14 were resolved.  ECF No. 3639.  In accordance with

the Court's order, the Court Expert filed his recommendations as to their resolution on

January 10, 2025, and the parties will respond to the recommendations under the Court's

briefing schedule.  *Id.*

**C.    Accommodations for Deaf and Hard-of-Hearing Class Members**

    **1.    Plaintiffs' Statement**

    Despite negotiations to resolve a number of issues facing the deaf and hard of

hearing population following the Court's December 7, 2023 order, *see* Dkt. No. 3538,

several disputes remain, *see* Dkt. No. 3639.  In addition to the disputes currently before the

Court Expert, Plaintiffs' counsel remain concerned about the significant shortage of sign

language interpreters, described in the last Joint Status Statement, *see* Dkt. No. 3641 at 8,

which has worsened in the past two years as several of CDCR's staff sign language

interpreters have left their positions and have not been replaced.  The parties also have

disputes regarding access to real-time captioning services that fall outside the scope of the

SATF Stipulation.  *See id*.  These accommodations play a crucial role in ensuring that deaf

and hard of hearing class members have equal access to the programming central to their

ability to rehabilitate, exit the carceral system, and successfully reintegrate into their

communities.  *See id.*

1    Unfortunately, the parties have made no progress to resolve these disputes since the

2  last Joint Status Statement.  Plaintiffs have sought multiple times to schedule a meeting of

3  the Deaf and Hard of Hearing Workgroup with Defendants to discuss these issues and

4  others that we have yet to bring to the attention of the Court.

5    Plaintiffs believe these meetings can allow the parties to resolve disputes to the

6  benefit of class members.  For example, Workgroup discussions yielded meaningful

7  improvements in access to sign language interpreters during medical encounters.

8  Conversely, when Plaintiffs have raised issues through advocacy letters, Defendants often

9  provide a delayed and inadequate response or no response at all.  *See, e.g.*, Dkt. No. 3622

10  at 9.  Plaintiffs remain committed to the Workgroup process and hopeful that Defendants

11  will agree to continue to work collaboratively to resolve class members' concerns.

12    Plaintiffs submitted our meeting agenda on December 16, 2024 and Defendants

13  responded in writing on January 13, 2025.  Additionally, there is an outstanding request for

14  a meeting the week of February 18.  We hope that Defendants will agree to a meeting of

15  the Workgroup.

16    **2.    Defendants' Statement**

17    As detailed in the October 16, 2024, joint statement regarding SATF stipulation

18  filed with the Court, incorporated by reference here, Defendants have taken extraordinary

19  measures to accommodate this population.  *See* ECF Nos. 3631, 3631-1 to 3631-10.  These

20  efforts are ongoing to ensure accommodation of this population.  There are areas of

21  disagreement, as Plaintiffs note above, primarily involving the scope of accommodations

22  for hard-of-hearing class members.  The Court Expert filed his recommendations on these

23  outstanding areas of dispute on January 10, 2025, and Defendants will provide their

24  response under the court-ordered briefing schedule.  Defendants remain committed to

25  providing deaf and hard-of-hearing class members equal access to programs, services, and

26  activities in accordance with the ADA, the remedial plans, and this Court's orders.

27    Defendants take issue with Plaintiffs' characterization above of the workgroup and

28  related correspondence.  Defendants advised Plaintiffs that CDCR looked forward to

1   receiving Plaintiffs' proposed workgroup agenda, and that, upon receipt, Defendants

2   would review the agenda, respond in writing as appropriate, and then determine whether

3   the parties should meet.  Defendants believe this is a reasonable and efficient approach,

4   particularly considering the areas of disagreement still awaiting court resolution, the

5   intervening holidays, and the inherent difficulty of convening a large group meeting.

6   Moreover, there are several other meetings in January already scheduled, where the parties

7   will have the opportunity to discuss key issues related to the deaf and hard-of-hearing

8   population.

9          Meanwhile, Defendants continue to be mindful of their obligation to provide sign-

10  language interpretation services for deaf class members whose primary method of

11  communication is American Sign Language (ASL).  As previously reported, CDCR has

12  submitted requests to increase the salary of certain positions to attract qualified interpreters

13  but there remains an industry-wide shortage of interpreters; the impact of this shortage is

14  compounded by the challenges associated with a correctional setting irrespective of the

15  associated earning potential.  CDCR will continue to work diligently to fill these essential

16  positions while supplementing the needs of deaf class members with sign-language

17  interpreters through three fully implemented service contracts.

18  **D.    Accommodations for Blind and Low Vision Class Members**

19         **1.    Plaintiffs' Statement**

20         Plaintiffs' counsel continue to raise concerns with the implementation of

21  Defendants' new visual accommodations program.  Specifically, Plaintiffs have

22  documented that class members are being documented as "refusing" vision assessments

23  when they report that they have not in fact refused or that they were not adequately

24  informed about the purpose of the assessment before refusing; that their writing needs are

25  not being thoroughly evaluated resulting in class members being forced to rely on others to

26  write; that they are experiencing unnecessary delays in receiving recommended devices;

27  and that they are experiencing long wait times for vision assessments.  *See* Letter from

28  Tania Amarillas and Rita Lomio (August 7, 2024), attached as Exhibit H to ECF No. 3622.

1   Plaintiffs are also concerned that Defendants still have not produced proof of

2   practice to show that they are, in fact, issuing recommended assistive devices—and

3   providing training on these devices—on a timely basis.  Plaintiffs have repeatedly

4   requested this proof of practice to no avail.  As of December 1, 2024, the monthly "DPP

5   roster" that Defendants produce to Plaintiffs' counsel, which identifies disability

6   accommodations that have been issued to each *Armstrong* class member statewide, does

7   not document whether a class member has been issued recommended vision assistive

8   devices, even though it records the issuance of other types of accommodations.

9   Defendants have maintained that Plaintiffs' counsel may request this information

10  from CDCR institutions before and after *Armstrong* monitoring tours, but these tours occur

11  only a few times per year; Plaintiffs' counsel must monitor more than just a few times per

12  year whether blind and low-vision *Armstrong* class members have been issued assistive

13  devices and received training.  Defendants have also encouraged Plaintiffs' counsel to ask

14  *Armstrong* class members for this information.  But by virtue of Defendants failing to issue

15  reading and writing assistive devices to blind and low-vision class members, these class

16  members often cannot reach out independently to Plaintiffs' counsel.  Furthermore, it is

17  Defendants' responsibility—not the *Armstrong* class's responsibility—to provide

18  Plaintiffs' counsel with "reasonable access to information sufficient to monitor defendants'

19  compliance with the guidelines, plans, policies and procedures that have been approved by

20  the Court." Dkt. 158 at 5.

21  Plaintiffs also remain concerned about Defendants' failure to accommodate people

22  with monocular vision, who have a narrower field of vision and severely limited depth

23  perception, especially at shorter distances, and who may face safety risks in a prison

24  environment.  *See* Joint Case Status Statement, ECF No. 3606 at 20-21.  Plaintiffs continue

25  to encounter class members who have been denied accommodations because their DPP

26  vision code was removed by CDCR because they have monocular vision.  Plaintiffs

27  continue to assert that CDCR must develop and enforce a policy that ensures that people

28  with monocular vision are not categorically excluded from accommodation and are

affirmatively assessed to determine whether they need visual accommodations. Plaintiffs note that, even after the date of issuance of a new CCHCS policy regarding, in part, visual accommodations for people with monocular vision, Plaintiffs have continued to encounter and report to Defendants instances of class members with monocular vision being categorically denied accommodations on the basis of not having a DPP code.

### 2.    Defendants' Statement

Defendants have addressed Plaintiffs' concerns regarding class members' refusals to participate in vision specialist assessments in the October 16, 2024, joint statement regarding SATF stipulation filed with the Court, incorporated by reference here. *See* ECF No. 3630 at 7-8; and see ECF No. 3631-8 at ¶¶ 9-11. Although Plaintiffs assert that class members' writing needs are not being thoroughly evaluated resulting in class members being forced to rely on others to write, Defendants dispute this contention and CDCR's Visual Accommodations for Incarcerated Persons With a Vision Code policy provides a process for a class member to request an alternate accommodation if the assistive device(s) issued to them are insufficient to address their needs. *See* ECF No. 3615 at 40 and 42.

Defendants have been diligently working to provide vision-impaired class members individualized vision assessments and the assistive devices recommended by the vision specialist following assessment, including contracting with additional vision specialists to expand assessment availability. Since December 7, 2023, Defendants have offered individualized assessment by a vision specialist to 249 vision-impaired class members, prioritizing evaluation of class members who had a Board of Parole Hearings hearing in 2024, as required by the Court's Order for Further Parole-Related Remedial Plan (*see* ECF No. 3584). Defendants continue to prioritize relevant class members with a Board hearing in 2025. On November 4, 2024, Defendants also issued an Interim Access to Assistive Devices for Incarcerated Persons with a Vision Impairment policy (a true and correct copy of which is attached as **Exhibit B**) to ensure that incarcerated people with a vision code, who are either awaiting their individualized assessment by the vision specialist or are pending receipt of the recommended device following assessment, are able to have access

1    to the assistive devices they need through their ADA office.  As indicated in the joint

2    statement regarding the SATF stipulation, reported delays in the issuance of the

3    recommended assistive devices raised in Plaintiffs' advocacy correspondence will be

4    addressed through the regular advocacy process.  *See* ECF No. 3630 at 8.  Defendants

5    dispute that any reported delays were unreasonable given the totality of the circumstances.

6         Although Plaintiffs assert that they are entitled to a "proof of practice" regarding

7    Defendants' issuance and training on the devices recommended by the vision specialist

8    (*see* supra), Defendants dispute that Plaintiffs' requested "proof of practice" constitutes

9    "reasonable access to information sufficient to monitor defendants' compliance with the

10   guidelines, plans, policies and procedures that have been approved by the Court."  ECF

11   No. 158 at 5.  Plaintiffs' requested "proof of practice" consists of production of (a) "all

12   post-assessment documentation by CCHCS/CDCR of Defendants' approval or denial,

13   purchase, and issuance of specific assistive devices" for each class member who undergoes

14   an individualized assessment no later than 14 days following the date of such

15   documentation; (b) "all documentation setting forth an approved plan or schedule for the

16   class member's training on assistive devices" for each class member who undergoes an

17   individualized assessment no later than 14 days following approval of the training; and (c)

18   "all CDCR- or CCHCS-generated documentation—including documentation generated by

19   a third-party contractor—arising from assistive device training sessions" for each class

20   member who undergoes an individualized assessment no later than 14 days following the

21   date of each training session.  *See* Letter from Jacob Hutt (April 5, 2024), true and correct

22   copy of which is attached as **Exhibit C**.  As explained in Defendants' third response to

23   Plaintiffs' request for information regarding individualized assessments of blind and low-

24   vision class members (true and correct copy of which, excluding attachments, is attached

25   as **Exhibit D**), Plaintiffs' requests are unduly burdensome because CDCR does not track

26   the requested information in the regular course of business in a centralized location

27   statewide and the information requested is already in Plaintiffs' possession because CDC

28   Form(s) 128-B are issued to each class member upon the issuance of and training on the

1   recommended assistive device(s).  *See* Exhibit D at 2-3.

2          Finally, although Plaintiffs "continue to assert that CDCR must develop and enforce

3   a policy that ensures that people with monocular vision are not categorically excluded

4   from accommodation and are affirmatively assessed to determine whether they need visual

5   accommodations" (*see* supra), Defendants' newly-enacted policy already ensures that

6   people with monocular vision are not categorically excluded from accommodation.  (*See*

7   ECF No. 3615 at 37 (providing for case-by-case consideration of requests for visual

8   accommodations from incarcerated persons who do not have a vision code).  Defendants

9   disagree that either the ADA or the remedial plan requires affirmative assessment of each

10  incarcerated person with monocular vision, regardless of whether they are experiencing

11  substantial limitations in any of their major life activities.  If an incarcerated person with

12  monocular vision reports to their medical provider that their vision is interfering with their

13  ability to access CDCR programs, services or activities, that person may be referred to a

14  specialist to address their concerns or any accommodation needs.  *See* CCHCS's

15  memorandum titled "Confirmation of DPV/DNV Disability Codes and Accommodations"

16  dated April 17, 2024, ECF No. 3641 at 29-31.

17  **E.     Problems Regarding Access to Assignments for Class Members**

18         The program-access workgroup continues to periodically meet to discuss credit

19  earning, the assignment process, and disparities in the program-access assignment data in

20  response to Plaintiffs' allegations of disability-related discrimination.  *See* ECF No. 2680

21  at 1314.  Plaintiffs' counsel seeks to move forward with agreement on a standard for

22  evaluating program assignment discrimination and continues to report on disparities in

23  assignments that are identified in monitoring work on individual institutions and programs.

24  For example, Plaintiffs continue to report on disparities in assignment rates for higher

25  paying and higher status jobs, like Prison Industries Association jobs, which class

26  members are assigned to at lower rates.

27  / / /

28  / / /

**F.      Joint Monitoring Tool**

The parties remain committed to developing a strong and effective joint monitoring tool.  The parties continue to convene small work groups, confer with the Court Expert about informal briefing, and continue to meet to discuss and resolve the few remaining disputes between the parties such as a format for scoring and reporting compliance.  The parties continue to work towards a collaborative solution for scoring and reporting.

**G.      ADA Structural Barriers, Emergency Evacuation Procedures, and Master Planning Process**

The parties continue to engage in the Master Planning Process aimed at ensuring that CDCR prisons are accessible to people with disabilities in compliance with the ADA.  During the last few months, the parties have exchanged position statements on disputed issues and are working with the Court Expert to try to narrow and resolve the disputes.  These meetings have been successful and are ongoing.  The parties met most recently with the Court expert on December 11, 2024, to discuss the process for obtaining interim accommodations while longer-term, larger, Master Planning construction projects to improve accessibility are in the works.  As noted in prior statements, the parties have agreed on a new process for sharing information and plans related to Master Planning projects, for having Plaintiffs' expert provide comments on plans, and for touring completed projects.  Defendants recently shared initial construction documents, including detailed plans for accessibility improvements, with Plaintiffs' expert who has reviewed the first ten plan sets. The parties also toured CMF with Plaintiffs' expert on December 9, 2024.  Plaintiffs also continue to have a number of outstanding information requests regarding the Master Planning process that the parties are working

/ / /

/ / /

/ / /

/ / /

/ / /

1  their way through with assistance from the Court Expert.

2

3                                    Respectfully submitted,

4  DATED:  January 15, 2025          ROSEN BIEN GALVAN & GRUNFELD LLP

5                                    By:    /s/ Penny Godbold

6                                           Penny Godbold

7                                    Attorneys for Plaintiffs

8

9  DATED:  January 15, 2025          ROB BONTA
                                     Attorney General of the State of California
10

11                                   By:    /s/Trace O. Maiorino

12                                          Trace O. Maiorino
                                            Deputy Attorney General
13                                   Attorneys for Defendants

14

15                      **FILER'S ATTESTATION**

16          As required by Local Rule 5-1, I, Penny Godbold, attest that I obtained concurrence

17  in the filing of this document from Deputy Attorney General Trace O. Maiorino, and that I

18  have maintained records to support this concurrence.

19

20  DATED:  January 15, 2025                  /s/Penny Godbold

21                                            Penny Godbold

22

23

24

25

26

27

28

# EXHIBIT A



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Penny Godbold
Email: pgodbold@rbgg.com

December 10, 2024

<u>VIA ELECTRONIC MAIL ONLY</u>
Jennifer Neill
Tamiya Davis
CDCR Office of Legal Affairs
Jennifer.Neill@cdcr.ca.gov
Tamiya.Davis@cdcr.ca.gov

Re:    *Armstrong v. Newsom*:  Additional Evidence of Accountability System
       Failures in Review of All Cases from KVSP Q3 2024
       <u>Our File No. 0581-03</u>

Dear Jenn and Tamiya:

We write as part of the parties' ongoing negotiations to ensure Defendants' compliance with the Court's orders and Remedial Plan requirements regarding conducting complete and unbiased investigations and issuing appropriate discipline in response to allegations of staff misconduct.

In April 2024, Plaintiffs analyzed all 133 staff misconduct allegation investigations produced for LAC in the most recent prior quarter.  *See* PG-Defs, Additional Evidence of Accountability System Failures in Review of All Cases from LAC Q4 2023 (April 24, 2024).  Plaintiffs' analysis found that CDCR's accountability system failed in more than 55% of cases.

The problems outlined in that letter are not limited to LAC, as Plaintiffs have repeatedly raised systemic issues with the quality of Defendants' investigations and accountability decision making in quarterly reports.  Investigators fail to collect relevant evidence, including video evidence, necessary to evaluate allegations, which makes it impossible to determine whether misconduct occurred.  Further, even when misconduct is identified, CDCR regularly fails to hold staff accountable.

Plaintiffs now provide another comprehensive review of staff misconduct allegations, this time for Kern Valley State Prison ("KVSP").  Attached to this letter is

[4613622.3]

Jennifer Neill
Tamiya Davis
December 10, 2024
Page 2


Plaintiffs' analysis of all 57 cases produced for KVSP in the most recent quarter, Q3 2024.

**Plaintiffs found that in nearly 50 percent of cases, Defendants' accountability system failed**.  The largest category of investigation failures includes, as was true during the LAC review, the failure to properly investigate allegations and determine what occurred.  Other, remaining problems include the ongoing failure to identify misconduct and hold staff accountable, and the failure to issue appropriate discipline when misconduct was uncovered.  When those consistent findings—approximately half of all cases at LAC and KVSP during one quarter—are projected over CDCR's entire accountability system, the number represents accountability failures in hundreds of cases.

Critically, these findings demonstrate the importance of (1) CDCR making meaningful improvements to the investigative process, including retaining video footage for more than 90 days; and (2) CDCR ensuring that investigation reports are complete and unbiased and that relevant evidence is presented to Hiring Authorities in a manner that allows them to easily determine whether the alleged violation occurred.

As with the LAC review, Plaintiffs reviewed each case and placed each into one of five categories[1]:

- **Category 1** (no evidence of misconduct) – The investigator established that misconduct did not occur or exhausted reasonable investigative avenues or the complaint was so general that it likely should not have been treated as a staff complaint (e.g., allegations that "staff are generally disrespectful" resulting from the quarterly interview process).

- **Category 2** (incomplete investigations) – The incompleteness of the investigation (e.g., failing to obtain available video evidence or to interview relevant witnesses) made it impossible to determine whether the alleged staff misconduct occurred.

---

[1] One case, KVSP-20046066, falls into Category 2 (incomplete investigation) and Category 4 (inappropriate discipline).  The investigator failed to adequately investigate the allegations in the 602.  Although not raised in the 602, the investigator noted multiple flagrant BWC violations by the subject, but the Hiring Authority failed to impose adequate discipline for the BWC violations.

Jennifer Neill
Tamiya Davis
December 10, 2024
Page 3

- **Category 3** (failure to sustain allegations) – The investigator provided enough evidence to the Hiring Authority to support sustaining an allegation of misconduct, but the Hiring Authority nevertheless failed to sustain the allegation.

- **Category 4** (failure to impose appropriate discipline) – The Hiring Authority sustained at least one allegation of staff misconduct, but imposed a penalty that was not appropriate for the misconduct and/or that was inconsistent with CDCR's policies, including the Disciplinary Matrix.

- **Category 5** (staff properly held accountable) – The Hiring Authority sustained one or more allegations of misconduct and imposed appropriate and consistent discipline.

Plaintiffs' analysis shows that in 17 of the 57 cases at issue,[2] or close to one third, investigators failed to conduct complete investigations (Category 2), including failing to retain relevant video or otherwise review relevant evidence to determine what occurred. These problems persist across both local inquiries and AIU investigations. The Hiring Authority also failed to either sustain demonstrated misconduct (Category 3) or issue adequate discipline (Category 4) in 9 cases. Thus, in 26 of 57 cases—close to half or over 45%---CDCR's accountability system failed. In the attached spreadsheet, Plaintiffs provide detailed explanations for each case in Categories 2, 3, and 4.

In sum, Plaintiffs' review of the KVSP cases reinforces what Plaintiffs showed in their review of LAC cases and what Plaintiffs repeatedly show in the quarterly reports: Defendants must take action to improve the quality of investigations, to preserve footage,

---

[2] Plaintiffs' counsel identified 11 atypical cases in this sample that impact the data and cause the totals to appear misleading. All 11 cases arose from unspecified "internal audits" that identified potential disability violations based on a review of documentation and referred those failures for local inquiries. These cases are atypical because it is not common for these types of cases, which do not arise as part of the staff complaint process, to appear in quarterly productions. The cases are: 20055377, 20055378, 20060563, 20060565, 20060577, 20060642, 20061830, 20062005, 20062006, 20064394, 20064523. Nevertheless, Plaintiffs' counsel included these cases in the totals reported above and included them, highlighted in yellow, in the attached spreadsheet. If these eleven cases are excluded from the sample, the total number of cases showing investigation failures is 26 out of 46 – or 56%, nearly identical to the failure rate identified at LAC.

[4613622.3]

Jennifer Neill
Tamiya Davis
December 10, 2024
Page 4


and to improve disciplinary decision making in order to ensure compliance with the
Court's orders and the Remedial Plans.


                                        Sincerely,

                                        ROSEN BIEN
                                        GALVAN & GRUNFELD LLP

                                        */s/ Penny Godbold*


                                 By:    Penny Godbold
                                        Of Counsel


Enclosure:  KVSP Case Analysis Spreadsheet


 Cc:  Ed Swanson              Trace Maiorino
      August Gugelmann        Sean Lodholz
      Audrey Barron           Olena Likhachova
      Patricia Ferguson       Sharon Garske
      Ramon Ruiz              Amarik Singh
      Chor Thao               Ursula Stuter
      Co-counsel

# EXHIBIT B

State of California                                                    Department of Corrections and Rehabilitation

# Memorandum

Date:     November 4, 2024

To:       See Distribution List

Subject:  **INTERIM ACCESS TO ASSISTIVE DEVICES FOR INCARCERATED PERSONS WITH A VISION IMPAIRMENT**

This memorandum provides direction to DPV (permanent vision impairment) designated institutions on interim access to assistive devices (e.g., electronic magnifiers, Americans with Disabilities Act [ADA] laptops, etc.) for incarcerated persons with a vision code who are either (1) pending an individualized assessment by the vision specialist or (2) pending receipt of a device recommended by the vision specialist.

Effective the date of this memorandum,  incarcerated persons with a vision code may request access to additional assistive devices via the reasonable accommodation process. DPV-designated institutions shall develop a plan to ensure incarcerated people with a vision code, who are either awaiting their individualized assessment by the vision specialist or are pending receipt of the recommended device following assessment, are able to access to assistive devices through their ADA office. Access shall be allowed within the housing units (to include restricted housing units, and specialized bed units as needed) for in-cell use as well as in program areas or transports to same day appointments . The incarcerated person will be able to check out the device, including for overnight use, and shall be allowed additional time to use the device in connection with any pending legal proceedings, to include Board of Parole Hearings preparation.

The ADA Office will utilize the attached inventory sheet for this equipment and will ensure  the assistive device is inspected upon return from any incarcerated person (or more frequently if needed), to ensure there is no damage or alteration to the equipment. If the assistive device is altered, damaged, misused, or destroyed, the ADA Office staff shall determine if the alteration, damage, misuse, to or destruction of the device was intentional or unintentional based on the circumstances (to include an interview with the incarcerated person, documented on a CDC Form 128B). If it is deemed intentional, the ADA Coordinator will determine the best course of action (i.e., limit access to the assistive device or provide an alternate reasonable accommodation). The attached check-in/check-out tracking sheet shall be completed by the ADA Office staff.

**PROCUREMENT AND TRAINING FOR THE ASSISTIVE DEVICES**

The Class Action Management Unit (CAMU) has procured the initial order of the assistive devices and will provide them to the ADA Offices at each DPV institution. Replacement or procurement additional device orders will be the responsibility of each institution. When ordering additional or replacements, all institutions shall order the same model for consistency (Electronic Device Information and Training); however, the choice of vendor is at the discretion of the institution, consistent with current established procurement policies.

See Distribution List
Page 2


Instruction guides for the devices are available on the CAMU SharePoint (Electronic Device Information and Training) for both staff and incarcerated persons. The ADA Office staff shall ensure all incarcerated person(s) authorized to utilize the assistive devices available as interim accommodations are provided training on the proper use and care of the assistive device(s). A CDC Form 128B information chrono documenting assistive device training shall be completed and forwarded to Case Records for scanning into the Electronic Records Management System.

The ADA Coordinator shall communicate this information regarding vision coded incarcerated persons' access to additional assistive devices to the local Inmate Advisory Council and by institutional bulletins/notices located within housing units.

All DPV-designated institutions shall update their Disability Placement Program (DPP) Local Operating Procedures (LOP) to reflect the direction included in this memorandum and provide a copy of the DPP LOP to their respective Mission Associate Director within 90 days of the release date of this memorandum. The LOP must clearly articulate the process for inventorying, tracking, and inspecting the electronic vision devices. The revision may be incorporated as an addendum to be included in the next scheduled revision of the LOP.

Wardens, or their designee, at all DPV-designated institutions shall ensure all staff are provided access to the updated LOP (e.g., an institutional share folder) to ensure awareness of this new process. The ADA Office staff shall conduct in-person training with all ADA staff that includes a review of the policy and the updated LOP within 30 days of this memorandum.

If you have any local institution questions, please contact your local ADA Office.

If you have any headquarters level questions, please contact Jillian Hernandez, Captain, CAMU, at (916) 628-9632 or Jillian.Hernandez@cdcr.ca.gov.

*Ronald Broomfield*
499F547FE65C411...

RON BROOMFIELD
Director
Division of Adult Institutions

See Distribution List
Interim Access to Assistive Devices for Incarcerated Persons with a Vision Impairment
Page 3


DISTRIBUTION LIST:

Associate Directors, Division of Adult Institutions
Anissa De La Cruz, Warden, Central California Women's Facility (CCWF)
Gena Jones, Warden, California Health Care Facility (CHCF)
Travis Pennington, Warden (A), California Institution for Men (CIM)
Dan Cueva, Warden, California Medical Facility (CMF)
Tammy Campbell, Warden, California State Prison, Corcoran (COR)
Rob St. Andre, Warden, High Desert State Prison (HDSP)
Leanna Lundy, Warden, California State Prison, Los Angeles County (LAC)
Patrick Covello, Warden, Mule Creek State Prison (MCSP)
Kevin Hixon, Warden, North Kern State Prison (NKSP)
James Hill, Warden, Richard J. Donovan Correctional Facility (RJD)
Raul Morales, Warden (A), Substance Abuse Treatment Facility (SATF)
Michael Dunn, ADA Coordinator, CCWF
Kim Petersen, ADA Coordinator, CHCF
Richard Montes, ADA Coordinator, CIM
Landon Bravo, ADA Coordinator, CMF
Timothy Henne, ADA Coordinator, COR
Bobby Wheeler, ADA Coordinator, HDSP
Michelle Wofford, ADA Coordinator, LAC
Eric Pedersen, ADA Coordinator, MCSP
Adrian Gonzales, ADA Coordinator (A), NKSP
Philip Bracamonte, ADA Coordinator, RJD
Allen Iversen, ADA Coordinator (A), SATF

cc:     Joseph Bick, M.D.                    Jillian Hernandez
        Joseph (Jason) Williams              Darnell Mebane
        Jennifer Benavidez                   Ava Lau-Silveira
        Jared D. Lozano                      Kristina Davis
        Antronne Scotland                    Megan Roberts
        Dawn Lorey                           CAMU Field Correctional Counselor IIs
        Lourdes White

# EXHIBIT C



# PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Executive Director:*
Margot Mendelson

*Attorneys:*
Rana Anabtawi
Patrick Booth
Tess Borden
Claudia Ceseña
Steven Fama
Mackenzie Halter
Alison Hardy
Sophie Hart
Marissa Hatton
Jacob Hutt
A.D. Lewis
Rita Lomio
Donald Specter

BY EMAIL ONLY

April 5, 2024

Chor Thao
CDCR Office of Legal Affairs

Brianne Burkart
CCHCS Office of Legal Affairs

      RE:    *Armstrong v. Newsom*
              Request for Information re: Individualized Assessments of Blind and Low-Vision Class
              Members

Dear Chor and Brianne:

    We write to request that Defendants produce information regarding Defendants' individualized assessments of blind and low-vision class members. The information request below contains two categories: (1) CDCR/CCHCS information, and (2) class member information.

| CDCR/CCHCS Information | | |
|---|---|---|
| **Request No.** | **Information Requested** | **Proposed Production Timeline** |
| **1** | Any and all written guidance or instructions that Defendants have provided to Defendants' vision consultants (e.g. Western University) regarding individualized assessments of blind and low-vision incarcerated people. | No later than April 19, 2024. |
| **2** | Any and all contracts or other agreements that CDCR or CCHCS has executed with Western University or other parties regarding (a) individualized assessments or (b) training on assistive devices to blind and low-vision class members. | No later than April 19, 2024 |

**Board of Directors**
Christiane Hipps, President and Treasurer • Seth Morris, Vice President
Jason Bell • Vanita Gaonkar • Nick Gregoratos • Michael Marcum • Jean Lu
Claire McDonnell • Ruth Morgan • Adrienne Yandell

| Class Member Information | | |
|---|---|---|
| **Request No.** | **Information Requested** | **Proposed Production Timeline** |
| **3** | An up-to-date spreadsheet identifying all class members who have undergone or refused an individualized visual accommodations assessment. The spreadsheet should include the following information: name of class member, CDCR #, date of assessment, location of scheduled assessment. | Biweekly (twice a month). |
| **4** | For each class member who undergoes an individualized assessment, all records of the vision consultants arising from the assessment, including but not limited to progress notes and recommendations. | No later than 14 days following Defendants' receipt of these records from vision consultants. |
| **5** | For each class member who undergoes an individualized assessment, all post-assessment documentation by CCHCS/CDCR of Defendants' determination of the specific accessible formats needed by the class member. | No later than 14 days following the date of such documentation. |
| **6** | For each class member who undergoes an individualized assessment, all post-assessment documentation by CCHCS/CDCR of Defendants' approval or denial, purchase, and issuance of specific assistive devices to the class member. | No later than 14 days following the date of such documentation. |
| **7** | For each class member who undergoes an individualized assessment, (a) all documentation setting forth an approved plan or schedule for the class member's training on assistive devices, and (b) all CDCR- or CCHCS-generated documentation—including documentation generated by a third-party contractor—arising from assistive device training sessions. | For (a), no later than 14 days following approval of the training plan or schedule. For (b), no later than 14 days following the date of each training session. |

Chor Thao and Brianne Burkart
Re: Request for Information re: Individualized Assessments of Blind and Low-Vision Class Members
Page 3

Please let me know if you have any questions.

Sincerely,

Jacob Hutt
Staff Attorney

cc:    Ed Swanson, Audrey Barron (Court Expert)
Co-counsel
Patricia Ferguson, Tamiya Davis, Nicholas Meyer, Ramon Ruiz, Ava Lau-Silviera, Ursula Stuter, OLAArmstrongCAT (OLA)
Sharon Garske, Trace Maiorino, Sean Lodholz, Olena Likhachova, Anne Kammer, Gurpreet Sandhu (OAG)
Mona Houston, Lourdes White, Jillian Hernandez, Cory Lo, CDCR CAMU Mailbox (DAI)
Brianne Burkart (CCHCS Legal)
Diana Toche, Joseph Bick, John Dovey, Robin Hart, Joseph (Jason) Williams, Cathy Jefferson, Jason Anderson, Dawn Lorey, Jane Moses, Joshua (Jay) Leon Guerrero, Aaron Perez, CCHCS Accountability (CCHCS)
Lois Welch, Steven Faris (OACC)

# EXHIBIT D

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                      GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



November 14, 2024

<u>VIA EMAIL ONLY</u>

Jacob Hutt
Prison Law Office
jacob@prisonlaw.com

RE:     ***ARMSTRONG V. NEWSOM***: THIRD RESPONSE RE: REQUEST FOR INFORMATION RE:
        INDIVIDUALIZED ASSESSMENTS OF BLIND AND LOW-VISION CLASS MEMBERS


Dear Jacob:

Please see responses to your email dated October, 29, 2024,  below.

***REQUEST #2: Any and all contracts or other agreements that CDCR or CCHCS has executed
with Western University or other parties regarding (a) individualized assessments or (b)
training on assistive devices to blind and low-vision class members.  I believe we are still waiting on
a drafted stipulated agreement from Defendants, which the AG's office was preparing. Please send
this over as soon as possible.***

**RESPONSE:**  Defendants have identified the following three contracts as responsive to your
request: (1) Agreement No. 22-00101 dated May 18, 2023;  (2) Agreement No. 22-00175  dated July
18, 2023;  and (3) Agreement No. 13-00201-26 dated April 29, 2024.

  1.  **Agreement No. 22-00101**

Attached is a copy of Agreement No. 22-00101,  except the payment rate sheet (Exhibit B-
2).  (Attachment A.)  Exhibit B-2 to Agreement No. 22-00101 is confidential and is not subject to
public inspection until May 18, 2027.  (*See* Gov. Code, § 7926.215(c).)  This exhibit is not relevant to
whether Defendants' guidelines, plans, policies, procedures, and evaluations comply with the
Americans with Disabilities Act (ADA) or Rehabilitation Act (RA); therefore, Defendants do not agree
to produce this document.

  2.  **Agreement No. 22-00175**

Attached is a copy of Agreement No. 22-00175,  except the payment rate sheet (Exhibit B-
1).  (Attachment B.)  Exhibit B-1 to Agreement No. 22-00175  is confidential and is not subject to
public inspection until July 18, 2027.  (*See* Gov. Code, § 7926.215(c).)  This exhibit is not relevant to
whether Defendants' guidelines, plans, policies, and procedures, and evaluations comply with the

Addressee
Page 2

Americans with Disabilities Act (ADA) or Rehabilitation Act (RA); therefore, Defendants do not agree to produce this document.

### 3.  Agreement No. 13-00201-26

The contents of Agreement No. 13-00201-26 are confidential and not subject to public inspection until April 29, 2025.  (*See* Gov. Code, § 7926.215(b)(1).)  Additionally, the portion of this contract containing the rates of payment is confidential and not subject to public inspection until April 29, 2028.  (*See* Gov. Code, § 7926.215(c).)

Despite the confidential nature of this agreement, Defendants will produce redacted copies of STD 213A form (Standard Agreement – Amendment) and Exhibit A-1 (Service Specifications) for Agreement Number 13-00201-26 subject to a stipulated protective order.  (*See* Attachment C.)  Defendants will redact the maximum amount of the agreement in section 3 of the STD 213A (Standard Agreement – Amendment) form and will redact information regarding services unrelated to vision assessments or training on assistive devices to blind and low-vision class members contained in section 4 of this form.  Defendants will also redact the contents of Exhibit A-1 (Service Specifications), except Section 2 titled "Optometry," because those contents are unrelated to individualized assessment or training on assistive devices to blind and low-vision *Armstrong* class members.

Defendants will produce redacted copies of the STD 213A form (Standard Agreement – Amendment) and Exhibit A-1 (Service Specifications) for Agreement Number 13-00201-26 to Plaintiffs' counsel following entry of the stipulated protective order.

***REQUEST #3: Regarding the final column of these rosters, can you please provide an update on Defendants' efforts to (1) contract with additional providers across the state to facilitate individualized assessments and (2) coordinate on-site individualized assessments, so that class members--including those with severe medical conditions and disabilities--do not have to travel extremely long distances to go to Western University's physical offices?***

**RESPONSE:**  Regarding (1), on April 29, 2024, Defendants contracted with an additional provider to facilitate, in part, individualized assessments of vision-impaired class members across the state.  This contract is referenced in Defendants' response to Plaintiffs' Request #2 above as Agreement No. 13-00201-26.  As to (2), Defendants have revised the last column of the roster to reflect the location of the scheduled assessments and will begin to include this information in the final column of the rosters moving forward.  (*See* Attachment D.)

***REQUEST #6: We are still awaiting a response from Defendants about how they will produce "all post-assessment documentation by CCHCS/CDCR of Defendants' approval or denial, purchase, and issuance of specific assistive devices to the class member." See June 18th email below. We first made this information request nearly seven months ago (see April 5th letter, Request #6), and Defendants have still not provided us with relevant information. Without this information, we are***

**CONFIDENTIAL:  ATTORNEY/CLIENT PRIVILEGED & ATTORNEY WORK DOCUMENT**

Addressee
Page 3

*unable to adequately monitor whether and when blind and low-vision class members have received their recommended assistive devices.*

**RESPONSE:** There are no documents responsive to Plaintiffs' request for post-assessment documentation of CDCR/CCHCS's approval or denial of assistive devices recommended by the vision specialist following vision-impaired class members' individualized assessments. Defendants will not agree to ongoing production of documentation related to the purchase of specific assistive devices for vision-impaired class members because CDCR does not track this information in the regular course of business in a centralized location statewide, rendering this request unduly burdensome. Plaintiffs can obtain this documentation through the regular document production process by requesting relevant documents either prior to or following tours of an institution.

Additionally, Defendants disagree with your assertion that no relevant information has been provided. As previously explained to Plaintiffs' counsel, the issuance of the assistive devices to class members is documented in a CDC Form 128-B, which class members receive at the time of the issuance of their assistive device(s). (*See* June 7, 2024, letter from Chor Thao to Jacob Hutt at 2.) Plaintiffs' counsel can obtain copies of these forms either directly from their clients, or by requesting the forms through the regular document production process, either before or after tours of an institution. (*See id.*) The process for obtaining the information you have requested has not changed.

***REQUEST #7: In our June 18th email, we wrote: "Plaintiffs have access via EHRS to Western U's initial, individual recommendations for training class members on the use of assistive devices. It is unclear, however, whether 'all CDCR- or CCHCS-generated documentation—including documentation generated by a third-party contractor—arising from assistive device training sessions,' will be documented in EHRS. Please confirm whether and how Plaintiffs can access this information in EHRS, and if we cannot, explain how Defendants will produce this information to Plaintiffs." We first made this information request nearly seven months ago (see April 5th letter, Request #7), and Defendants have still not provided us with relevant information. Without this information, we are unable to adequately monitor whether and how blind and low-vision class members are receiving training on how to use their assistive devices.***

**RESPONSE:** Defendants disagree with your assertion that no relevant information regarding CDCR- or CCHCS-generated documentation of class member training on the use of assistive devices has been provided to Plaintiffs' counsel to date. As explained in Defendants' June 7, 2024, second response letter, upon receipt of their training on the use of assistive devices, class members sign a copy of the CDC Form 128-B acknowledging that they understand when and where they can use the device(s), how to use the device(s) independently, and that they can request additional training if needed. (*See id.* at 3.) Plaintiffs' counsel can obtain copies of these forms either directly from their clients, or by requesting the forms through the regular document production process by requesting relevant documents either prior to or following tours of an institution.

///
///
///

**CONFIDENTIAL:  ATTORNEY/CLIENT PRIVILEGED & ATTORNEY WORK DOCUMENT**

Addressee
Page 4

***REQUEST #7a: We ask that Defendants promptly provide us with documentation laying out a training plan or schedule for accessible laptop education for Mr.          and all documentation arising from his training sessions.***

**RESPONSE:** CDCR will provide a response to this request via the regular advocacy process.

Sincerely,

Ava Lau-Silveira
Attorney

<u>**CONFIDENTIAL:  ATTORNEY/CLIENT PRIVILEGED & ATTORNEY WORK DOCUMENT**</u>