MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT* – 5565791
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621
Facsimile:   (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS
EDUCATION & DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:   (510) 644-2555
Facsimile:   (510) 841-8645

* Admitted *pro hac vice*

Attorneys for Plaintiffs

CALIFORNIA OFFICE OF THE
ATTORNEY GENERAL
ROB BONTA
Attorney General of the State of California
MONICA ANDERSON
Senior Assistant Attorney General
SHARON A. GARSKE
Supervising Deputy Attorney General
SEAN LODHOLZ
OLENA LIKHACHOVA
ANNE M. KAMMER
GURPREET SANDHU
TRACE O. MAIORINO
Deputy Attorneys General
State Bar No. 179749
455 Golden Gate Avenue, Suite 11000
San Francisco, California  94102-7004
Telephone:   (415) 510-3594
Facsimile:   (415) 703-5843
E-mail:  Trace.Maiorino@doj.ca.gov

Attorneys for Defendants Gavin Newsom
and the California Department of
Corrections and Rehabilitation

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **JOINT CASE STATUS STATEMENT** |
| v. | Judge:  Hon. Claudia Wilken |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

The parties submit this Joint Case Status Statement pursuant to the Stipulation and Order entered March 28, 2011 (ECF No. 1868), which provides that "[t]he parties will file periodic joint statements describing the status of the litigation" every other month, beginning on May 16, 2011.

## CURRENT ISSUES[1]

### A.    Allegations of Abuse, Retaliation, and Violence by CDCR Staff Against Class Members

#### 1.    Plaintiffs' Statement

##### a.    RJD and Five Prisons Orders

Plaintiffs continue to monitor remedial efforts the Court found to be necessary in order to prevent further violations of the ARP and class members' ADA rights at six prisons, including changes to the staff misconduct investigation process and implementation of Audio Visual Surveillance Systems that include body-worn camera technology. *See* ECF Nos. 3059, 3060, 3217 and 3218. Party agreements regarding Court ordered changes are found in Defendants' RJD and Five Prisons Remedial Plans ("Plans"). *See* ECF No. 3393, Exs. A and B.

Plaintiffs have issued multiple quarterly reports and have identified scores of cases that show failures by Defendants to conduct complete and unbiased investigations and impose appropriate and consistent discipline. Most recently, Plaintiffs' counsel reported on investigation failures evident through a review of half of the Office of Internal Affairs ("OIA")/Allegation Inquiry Unit ("AIU") cases produced during fourth quarter 2024. *See* February 10, 2025, Letter from Michael Freedman, without attachments, attached hereto as **Exhibit A**. According to Plaintiffs' review, the accountability system failed in nearly half (49.2%) of the cases reviewed. *Id*. In 30.4% of cases, Plaintiffs found that CDCR failed to conduct complete and unbiased investigations, making it impossible to determine whether staff misconduct occurred. *Id*. In 14.9% of cases, evidence showed that staff misconduct

---

[1] Statements are joint unless otherwise delineated as either *Plaintiffs' Statement* or *Defendants' Statement*.

did occur, yet the allegation was not sustained. *Id.*  In 3.9% of cases, CDCR sustained the allegation but the Hiring Authority did not issue appropriate discipline.  *Id.*  Defendants are also failing to comply with other provisions of the Remedial Plans that impact class members statewide, including failing to meet deadlines for completing investigations and to route allegations of misconduct to the appropriate investigators.  Plaintiffs' counsel have also raised concerns about ongoing and increasing delays in conducting investigations. *See* March 13, 2025 Letter from Penny Godbold, attached hereto as **Exhibit B**.  Plaintiffs' findings are corroborated by the Office of the Inspector General (OIG) who, in a recently released report, found that CDCR performed poorly in 119 of 162 cases, or 73 percent, of the staff misconduct investigations reviewed by the OIG in 2024.  (See OIG 2024 Annual Report Re: CDCR's Staff Misconduct Complaint Investigations and the Employee Disciplinary Process, https://www.oig.ca.gov/wp-content/uploads/2025/03/2024-Staff-Misconduct-Investigation-Monitoring-Report.pdf)

Plaintiffs' counsel have outlined additional reforms that are necessary to bring Defendants' accountability system into compliance and to avoid future litigation.  *See* ECF No. 3592, Ex. A.  Defendants responded that they will implement some, but not all, of the reforms outlined in ECF No. 3592, Exhibit A.  The parties are actively engaged in negotiations to reach agreement regarding changes that are necessary to the system to bring it in to compliance with Court Ordered Remedial Plans.

Defendants passed emergency regulations regarding the staff misconduct complaint process and routine grievance process, which will have an impact on how CDCR handles staff misconduct complaints.  Plaintiffs provided comments on problems with the emergency regulations, including that it remains unclear - based on the text of the regulations – how Defendants will process allegations of staff misconduct.  *See* January 16, 2025, Letter from Penny Godbold, attached hereto as **Exhibit C**.  Plaintiffs remain optimistic that the parties will resolve any disputes regarding the regulations before they become final.

CDCR is a statewide system.  Violations of the ADA and ARP found thus far at six

1    prisons exist system-wide and Plaintiffs are committed to bringing such evidence before

2    the Court until all class members are protected.  *See* ECF No. 3592, Ex. A at 7-8.

**b.    False, Retaliatory and Discriminatory RVRs**

4         Despite significant progress made towards Court-ordered improvements to the staff

5    misconduct investigation and disciplinary system, the endemic use of false and retaliatory

6    RVRs by staff to cover up disability-related misconduct and/or to retaliate against class

7    members who report misconduct remains a problem.  *See* ECF No. 3296 at 9.  Steps taken

8    thus far by Defendants to eliminate the problem have not gone far enough, and Plaintiffs'

9    counsel continues to identify class members who have received false, retaliatory,

10   discriminatory or otherwise inappropriate RVRs.  *See* ECF No. 3606, Exs. A and B.  The

11   use of RVRs to retaliate against and discourage the filing of staff misconduct complaints

12   will persist unless Defendants take action to identify and root out problems through

13   meaningful reforms to the RVR process.  Plaintiffs are hopeful that the parties can agree to

14   resolve problems and that additional court intervention will not be necessary.

**2.    Defendants' Statement**

**a.    RJD and Five Prisons Orders**

17        CDCR has dramatically overhauled its staff misconduct investigation process to

18   ensure unbiased and complete investigations.  And, although not required by the Court's

19   orders, Defendants have restructured CDCR's statewide staff misconduct allegation,

20   screening, referral, investigative, and disciplinary processes.  As the Court has noted,

21   "[t]hese agreed-upon measures constitute substantial improvements that will go a long way

22   to bringing Defendants into compliance with the ARP and ADA at the six prisons."  ECF

23   No. 3356 at 2.  The Court found, the "implementation of these [] remedial measures is

24   likely to have a positive impact on…the overall reliability of the outcomes of

25   investigations."  *Id.* at 15.

26        Despite the tremendous efforts and resources directed towards improving the staff

27   misconduct investigation and discipline processes, modifications are necessary to ensure

28   sustainability.  CDCR contends that many of the issues raised in the recent OIG report are

1  attributable to the operational realities of the large number of complaints that stretch the

2  capacity of the OIA to timely complete these cases.  *See* CDCR response to OIG March

3  2025 report at https://www.oig.ca.gov/wp-content/uploads/2025/03/2024-Staff-

4  Misconduct-Investigation-Monitoring-Report.pdf.  Since last year, with input from

5  Plaintiffs and other stakeholders, CDCR has been diligently working to identify and

6  implement necessary modifications to the investigative and disciplinary processes.  These

7  efforts include, but are not limited to, updating the applicable staff misconduct regulations,

8  simplifying the staff misconduct process, revising the Allegation Decision Index to provide

9  greater clarity, consolidating Information Technology systems to improve case tracking

10 and management, and developing certified training to enhance investigator preparedness.

11 *Id*.  CDCR recently completed a series of trainings for designated staff hired into the newly

12 established Centralized Allegation Resolution Unit, who will serve as the hiring authority

13 and review completed investigations which involved or originated from incarcerated

14 persons residing within the six institutions identified in the Court's staff misconduct

15 orders.  *Id*.  CDCR has implemented prioritization strategies to focus on meeting statutory

16 deadlines, addressing cases based on their age or complexity, and ensuring compliance

17 with legal obligations.  *Id*.  To further address timeframe related challenges, CDCR is

18 actively recruiting all vacant investigator positions within OIA and has repositioned

19 several internal vacancies to hire additional investigative staff.  *Id*.  CDCR also continues

20 to refine its intake process to reduce redundant investigative efforts and conserve limited

21 investigative resources while maintaining a complete review of all allegations.  *Id*.  CDCR,

22 in collaboration with Plaintiffs and other stakeholders, continues to identify and implement

23 additional improvements to ensure compliance with policies and regulations.  Throughout

24 this process, CDCR has regularly provided substantive updates to the OIG and will

25 continue to do so.

26                          **b.      Demands for RVR Reform**

27         Defendants have made significant progress in addressing Plaintiffs' allegation that

28 CDCR staff issue false and retaliatory Rules Violations Reports (RVRs) to class members,

as detailed in previously filed statements. *See* ECF Nos. 3412 at 14-16, 3526 at 7-8. Plaintiffs may disagree with the investigation or discipline imposed, but that does not mean that the RVR was false or retaliatory. Nevertheless, CDCR continues to address these issues to the extent they are specifically related to class-member accommodations, alleged discrimination, or retaliation and to the extent it is required to do so under the remedial plans, the ADA, or prior court orders. But, Defendants maintain that Plaintiffs' general complaints about the RVR process, unrelated to class-member accommodations, are not properly raised in this case.

**B.    Court Expert Investigation Into SATF**

   **1.    Plaintiffs' Statement**

   In November 2021, this Court ordered the Court Expert to investigate the treatment of people with disabilities at the California Substance Abuse Treatment Facility and State Prison, Corcoran ("SATF"). ECF No. 3338. In December 2022, the Court Expert filed a 67-page report, finding a substantial breakdown in the disability accommodation process at SATF. ECF No. 3446 at 4. The Court ordered corrective action, including additional analysis and reporting by the Court Expert and the development of policies and procedures by CDCR. *See* ECF No. 3467; ECF No. 3538. On October 16, 2024, the parties filed a joint status statement regarding compliance with the Court's corrective action order, and brought several disputed issues to the Court for resolution. *See* ECF No. 3630 (Joint Status Statement); ECF No. 3630-30 (Plaintiffs' Proposed Order). The Court issued an order on November 8, 2024, finding that Items 1, 2, 3 were resolved. ECF No. 3639 at 1-2. Regarding Item 12, the Court held the parties' procedural dispute regarding conferring about the tablet contract was resolved, ordered a further process for negotiating disputes after the contract is awarded, and approved the parties' agreed-upon process for meeting and conferring regarding in-cell videophone access on tablets for class members who communicate using sign language. *Id.* at 2-4. Regarding Item 14, the Court approved the parties' agreed-upon plan for the implementation and monitoring of the final RVR policy. *Id.* at 4. For the remaining items in the joint statement, the Court ordered the Court Expert

to file recommendations as to their resolution no later than January 10, 2025, and set a briefing schedule for the parties. *Id.*

On January 10, 2025, the Court Expert filed his recommendations, identifying five outstanding stipulation items that still required court action. ECF 3651. The Court Expert concluded that Defendants provided inaccurate information to the Court Expert and Plaintiffs when they reported that all DPV class members at SATF had been offered individualized vision assessments (Item 5), *id.* at 12; that Defendants had not developed an adequate plan to effectively communicate announcements to deaf and hard of hearing class members (Item 7), *id.* at 19-25; that Defendants' plan to ensure captioned phone training for class members at SATF is accessible improperly relies on their existing, inadequate process for determining how to effectively communicate with class members (Item 9), *id.* at 35; that Defendants' training for staff on class members' access to captioned phones during modified programming and lockdowns was inadequate (Item 10), *id.* at 40-41; and that Defendants are still not providing equal access to programming and education for deaf and hard of hearing class members at SATF who require real-time captioning, despite the Court having ordered it two years ago (Item 13), *id.* at 42, among other findings.

For each item of the five outstanding items, the Court Expert recommended that the Court order Defendants to take specific action to address their noncompliance and the resulting harm to class members. *See id.* at 62-65 (Court Expert summarizing his recommendations). The Court Expert's recommendations are carefully designed to ensure class members at SATF have equal access to programs, services and activities, while still allowing Defendants ample discretion to craft their own implementation plans, in consultation with the Court Expert and Plaintiffs through meet-and-confer processes.

On January 24, 2025, the parties filed objections to the Court Expert's recommendations, ECF 3655 (Plaintiffs), ECF 3656 (Defendants), with Plaintiffs making only a minor procedural point with respect to the meet-and-confer process for Item 7. The parties filed their respective responses to objections on February 7, 2025, ECF 3660 (Defendants), ECF 3661 (Plaintiffs), and Defendants filed a reply on February 14, 2025,

ECF 3665.  Plaintiffs encourage the Court to adopt the Court Expert's sound recommendations in each of the five areas outlined in his report.

Plaintiffs continue to eagerly await the Court Expert's forthcoming report and recommendations on staffing and sustainability and hope it will result in the allocation of sufficient expertise and resources, and development of robust systems, necessary to comply with the *Armstrong* Remedial Plan and Americans with Disabilities Act.

### 2.    Defendants' Statement

Plaintiffs appear to disregard that the Court Expert's second report concerning the treatment of people with disabilities at SATF also recognized the numerous proactive measures implemented at SATF to further respond to the needs of incarcerated people with disabilities.  ECF No. 3500.  The report demonstrates that the coordinated efforts between CDCR and California Correctional Health Care Services (CCHCS), with the Court Expert's guidance and with input from Plaintiffs, are working to effectively respond to the issues raised by the Court and addressed by the Court Expert following his initial investigation.  As detailed above, briefing is complete on the issues not resolved by the Court's November 8, 2024 order, and addressed in the Court Expert's January 10, 2025 recommendations, which included items 5, 7, 9, 10, and 13.  ECF Nos. 3639, 3651, 3655, 3656, 3660, 3661, and 3665.  For the reasons previously detailed in their filings, Defendants request that their objections be sustained.  ECF Nos. 3630, 3656, 3060, 3665.  With respect to item 5, Defendants' existing policies address Plaintiffs' concerns and ensure all DPV-designated class members receive timely vision assessments.  *Id.* Regarding item 7, a blanket implementation of a paging system does not account for the individualized needs of the deaf and hard-of-hearing population and does not account for the operational challenges associated with such a system.  *Id.*  For item 9, Plaintiffs reported that they are amenable to Defendants' proposed modification of the Court Expert's meet-and-confer process for class member training regarding captioned phones.  ECF Nos. 3661 at 4, 3656 at 12-14.  Defendants have fully complied with item 10 and its training of staff regarding captioned-phones component.  ECF Nos. 3630, 3656, 3060,

3665.  Plaintiffs' request for additional security-related clarifications is beyond the scope of the stipulation and order and unnecessary for compliance. *Id.*  Finally, with respect to item 13, the implementation for on-site CART transcriptionists lacks evidentiary and empirical support. *Id.*

**C.    Accommodations for Deaf and Hard-of-Hearing Class Members**

**1.    Plaintiffs' Statement**

Despite negotiations to resolve a number of issues facing the deaf and hard of hearing population following the Court's December 7, 2023 order, see Dkt. No. 3538, several disputes remain, see Dkt. No. 3639.  In addition to the disputes currently before the Court, Plaintiffs' counsel remain concerned about a number of issues that we have historically sought to resolve through the Deaf and Hard of Hearing Working Group (the Working Group).

The parties convened small group meetings starting in 2017 to collaboratively address issues facing deaf and hard-of-hearing class members statewide.  The parties met regularly in the current iteration of the working group from 2020 through July 2024, relying on an agenda that Plaintiffs' counsel provided in advance, and often exchanged written correspondence prior to the Working Group meeting.

Pursuant to this process, Plaintiffs sent a Working Group agenda on December 16, 2024, and requested to schedule a meeting in early 2025.  However, while the parties have exchanged written correspondence, Defendants have consistently refused Plaintiffs' repeated requests to meet.  Most recently, on January 28, Plaintiffs reiterated and sent follow-up questions in response to Defendants' comments.  Defendants responded on February 7 by sending Plaintiffs requested documents and otherwise ignoring Plaintiffs' remaining questions, except to refuse to schedule a meeting.  Plaintiffs reiterated a narrower set of questions on February 25 related to providing sufficient sign language interpreter staffing to comply with this Court's prior order, *see* Dkt. No. 1045 at 8, to providing effective interpretation services while staff position remain vacant, and to ensuring that disciplinary proceedings are effectively communicated to deaf people who

1  rely on sign language to communicate.  Defendants responded that they had "no update"

2  on almost any of these issues, including the timeline for when Defendants expect an update

3  about the interpreter salary increases they purportedly requested six months ago.  *See* Joint

4  Case Status Statement ("JCSS"), Dkt. No. 3622 at 23 (Sept. 17, 2024); JCSS, Dkt. No.

5  3641 at 9 (Nov. 15, 2024); JCSS, Dkt. No. 3654 at 8 (Jan. 15, 2025).

6      Plaintiffs are concerned that Defendants' refusal to meet with Plaintiffs may make it

7  impossible for the parties to resolve these disputes efficiently and without litigation.  Sign

8  language interpreter positions remain vacant at multiple institutions, and Defendants'

9  statements, below and elsewhere, provide no reassurance that the gap can be filled with the

10  use of on-site and remote contract interpreters.  Deaf signers at the Central California

11  Women's Facility have had no staff interpreter since June 2024, *see* Dkt. No. 3622 at 18-

12  19, 58-59, and class members statewide remain less able to participate in education,

13  rehabilitative groups, and other programming as a result of faulty and unreliable video-

14  conferencing equipment and a lack of on-site contract interpreters.  Due to Defendants'

15  refusal to schedule a meeting of the Working Group, Plaintiffs have elected to move a

16  selection of unresolved Working Group agenda items to the Meet and quarterly Meet and

17  Confer Agenda.  These and other outstanding disputes will not be resolved by the SATF

18  litigation currently before the Court.

19      The parties have used Working Group meetings effectively in the past to resolve

20  some disputes, and we find Defendants' refusal to participate in meetings concerning.

21  Plaintiffs remain committed to the Working Group process and hopeful that Defendants

22  will agree to work collaboratively to resolve class members' concerns.

23      **2.    Defendants' Statement**

24      As detailed in the October 16, 2024, joint statement regarding the SATF stipulation,

25  incorporated by reference here, Defendants are working continuously to appropriately

26  accommodate the deaf and hard-of-hearing population, not only, at SATF, but statewide.

27  *See* ECF Nos. 3631, 3631-1 to 3631-10.  There are areas of disagreement, as Plaintiffs note

28  above, primarily involving the scope of accommodations for hard-of-hearing class

members at SATF.  The Court Expert filed his recommendations on these outstanding

areas of dispute on January 10, 2025, and Defendants have responded.  *See* ECF Nos.

3651, 3656.  Defendants remain committed to providing deaf and hard-of-hearing class

members equal access to programs, services, and activities in accordance with the ADA,

the remedial plans, and this Court's orders.

Defendants take issue with Plaintiffs' characterization of the current process for

addressing deaf and hard-of-hearing class member concerns.  Contrary to Plaintiffs'

contention, Defendants have not refused to meet and confer on these issues.  After the last

workgroup meeting in July 2024, Defendants met and conferred with Plaintiffs within the

context of the SATF stipulation regarding key items on the deaf and hard-of-hearing

workgroup agenda, such that separate workgroup meetings were unnecessary.  The lines of

communication on these issues remain open for discussion and resolution where

appropriate.  Defendants have been providing written responses to Plaintiffs' inquiries on

deaf and hard-of-hearing issues.  Defendants received Plaintiffs' proposed workgroup

agenda on December 18, 2024, reviewed it carefully, and provided a comprehensive

written response on January 13, 2025.  Plaintiffs replied in writing to Defendants' response

on January 28, 2025.  Defendants reviewed Plaintiffs' reply and responded on February 28,

2025.  In the interim, Defendants provided an additional written response with requested

documents on February 7, 2025.

Contrary to Plaintiffs' assertions, a separate meeting on deaf and hard-of-hearing

issues is currently unnecessary because of Defendants' provision of written responses and

Plaintiffs' inclusion of key issues on the upcoming All-Party meeting agenda.  Plaintiffs

contend the working group is necessary for efficiency and to avoid litigation.  Defendants

disagree.  It is important to note that litigation regarding deaf and hard-of-hearing issues

ensued despite the significant amount of time and resources spent by the parties on the

workgroup process.  A new process is necessary.  To that end, Defendants believe the

ongoing exchange of written correspondence, combined with discussion of key items at the

All-Party meeting, will be a reasonable and efficient alternative approach to resolving deaf

1  and hard-of-hearing issues.

2      Defendants are mindful of their obligation to provide sign-language interpretation

3  services for deaf class members whose primary method of communication is American

4  Sign Language (ASL).  CDCR has submitted requests to increase the salary of certain

5  positions to attract qualified interpreters, but there remains an industry-wide shortage of

6  interpreters.  The request requires approval from another state agency and CDCR

7  continues to follow-up monthly regarding the status of the request. The impact of this

8  shortage is compounded by the challenges associated with working in a correctional

9  setting, irrespective of the associated earning potential.  CDCR will continue to work

10  diligently to fill these essential positions while meeting the needs of deaf class members by

11  providing qualified contract sign-language interpreters as accommodations.

12      CAMU meets with the SLIs quarterly and the SLIs are covering other institutions

13  remotely via TEAMS.  Currently, CCWF is the only DPH institution without a state SLI.

14  SATF's SLI is able to adequately manage the caseload for the 3 or 4 DPH individuals

15  housed there.  All other DPH institutions are staffed.

16  **D.    Accommodations for Blind and Low Vision Class Members**

17      **1.    Plaintiffs' Statement**

18      Plaintiffs have raised concerns from multiple class members that they are not being

19  issued the devices that were recommended during their vision assessments.  *See* letters

20  from Plaintiffs' counsel regarding class member at RJD, sent November 25, 2024; class

21  member at CMF, sent January 13, 2025; and class member at CHCF, sent January 15,

22  2025.  Plaintiffs' counsel continue to request proof of practice to show that Defendants are,

23  in fact, issuing recommended assistive devices—and providing training on these devices—

24  on a timely basis.  Defendants have maintained that Plaintiffs' counsel may request this

25  information from CDCR institutions before and after *Armstrong* monitoring tours.  Based

26  on a recent production of 128-B's produced for Plaintiffs' recent HDSP tour, which

27  appeared to have been generated in response to Plaintiffs' request and months after visions

28  assessments were conducted, Plaintiffs have serious concerns about whether the chronos

are being completed.  Defendants have also encouraged Plaintiffs' counsel to ask *Armstrong* class members for this information but, by virtue of their disabilities and the lack of reading and writing assistive devices provided to them, these class members often cannot reach out independently to Plaintiffs' counsel.  Plaintiffs' counsel will continue to raise this important issue and hope to work collaboratively with Defendants to confirm assessments are being conducted timely, recommended accommodations and training are being provided, and results are being timely documented.

Plaintiffs' counsel continue to hear from class members who are being documented as "refusing" vision assessments when they have not refused or were not informed about the purpose of the assessment before refusing.  *See* Letter from Tania Amarillas and Rita Lomio (August 7, 2024), attached as Exhibit H to ECF No. 3622.  Plaintiffs' counsel will continue to bring these issues to the attention of Defendants.

## 2.    Defendants' Statement

Plaintiffs' concerns about the issuance of the recommended assistive devices raised in their advocacy letters sent to Defendants on November 25, 2024, January 13, 2025, and January 15, 2025, are being addressed through the regular advocacy process.

Plaintiffs demand a "proof of practice" regarding Defendants' issuance of and training on the devices recommended by the vision specialist (*see supra*).  As discussed in more detail in Defendants' prior case status statement (*see* ECF No. 3654 at 11-12), Plaintiffs' requested "proof of practice" is unduly burdensome because CDCR does not track the requested information in the regular course of business in a centralized location statewide.  Additionally, the information requested is already in Plaintiffs' possession because CDC Form(s) 128-B are issued to each class member upon the issuance of and training on the recommended assistive device(s).

Under Defendants' existing policy, pending their individualized assessment and the issuance of the recommended assistive device, class members with the most severe vision impairments impacting placement (assigned a DPV disability code) have access to: (a) portable video magnifiers (*see* "Implementation of the Zoomax Snow 12 Electronic

Magnifiers for Incarcerated Persons with a Permanent Vision Impairment" memorandum dated January 4, 2024, a true and correct copy of which is attached as **Exhibit D**); (b) Vision Accommodation Computers and electronic assistive devices at the prison law libraries (*see* "Americans with Disabilities Act Printing in the Libraries" memorandum dated May 26, 2023, a true and correct copy of which is attached as **Exhibit E**; *see* *"*Americans with Disabilities Act Printing in the Libraries - Update" memorandum dated July 26, 2024, a true and correct copy of which is attached as **Exhibit F**; and *see* "Library Assistive Equipment Log" memorandum dated March 16, 2015, a true and correct copy of which is attached as **Exhibit G**); and (c) additional assistive devices through the reasonable accommodation process (*see* ECF No. 3654 at 21-23). Class members with vision impairments not impacting placement (assigned a DNV disability code), have access to non-electronic handheld or headband magnifiers, Zoomax Snow 12 electronic magnifiers with text-to-speech function, as well as other assistive devices (such as LyriQ scanner-reader, Ruby magnifier, and ADA laptop) through the reasonable accommodation process pending the issuance of any assistive device recommended to them by the vision specialist. *See* "Magnifier Distribution for Vision Impaired Incarcerated Persons" memorandum dated May 8, 2023, a true and correct copy of which is attached as **Exhibit H**; *see* "Expansion of Access to Zoomax Snow 12 Electronic Magnifiers" memorandum dated September 3, 2024, a true and correct copy of which is attached as **Exhibit I**; and *see* ECF No. 3654 at 21-23. Accordingly, Plaintiffs' claim that vision-impaired class members cannot reach out to their counsel because they lack access to assistive devices has no merit.

　　　Defendants have addressed Plaintiffs' concerns regarding class members' refusals to participate in vision specialist assessments in the October 16, 2024, joint statement regarding SATF stipulation filed with the Court. *See* ECF No. 3630 at 7-8; and see ECF No. 3631-8 at ¶¶ 9-11. Notably, class members who previously refused vision specialist assessment can request vision specialist evaluation through the reasonable accommodation process.

**E.      Problems Regarding Access to Assignments for Class Members**

The program-access workgroup continues to meet periodically to discuss credit earning, the assignment process, and disparities in the program-access assignment data in response to Plaintiffs' allegations of disability-related discrimination.  *See* ECF No. 2680 at 1314.  Plaintiffs' counsel seeks to move forward with agreement on a standard for evaluating program assignment discrimination and continues to report on disparities in assignments that are identified in monitoring work on individual institutions and programs.  For example, Plaintiffs continue to report on disparities in assignment rates for higher paying and higher status jobs, like Prison Industry Authority jobs, which class members are assigned to at lower rates.

**F.      Joint Monitoring Tool**

The parties remain committed to developing a strong and effective joint monitoring tool.  The parties continue to convene small work groups, confer with the Court Expert, and continue to meet to discuss and resolve the few remaining disputes between the parties such as a format for scoring and reporting compliance or non-compliance.  The parties continue to work towards a collaborative solution for scoring and reporting.

**G.      ADA Structural Barriers, Emergency Evacuation Procedures, and Master Planning Process**

The parties continue to engage in the Master Planning Process aimed at ensuring that CDCR prisons are accessible to people with disabilities in compliance with the ADA.  During the last few months, the parties have exchanged position statements on disputed issues and are working with the Court Expert to try to narrow and resolve the disputes.  These meetings have been successful and are ongoing.  The parties met with the Court Expert on February 28, 2025, to continue discussions on the Defendants' Quality Assurance/Quality Control Process which has been modified to try to prevent some of the errors and omissions that affected the first round of Master Planning projects in 2015.  As noted in prior statements, the parties have agreed on a new process for sharing information and plans related to Master Planning projects, for having Plaintiffs'

1  expert provide comments on plans, and for touring completed projects.  Defendants

2  recently shared initial construction documents, including detailed plans for accessibility

3  improvements, with Plaintiffs' expert who has reviewed the first ten plan sets and returned

4  them with comments to Defendants.  Defendants have received Plaintiffs' comments on

5  plans for LAC, RJD, PVSP, CIW, and SOL and are preparing responses to Plaintiffs'

6  expert's review.  The parties also toured CMF with Plaintiffs' expert on December 9,

7  2024.  Plaintiffs have several outstanding information requests regarding the Master

8  Planning process that the parties are working their way through with assistance from the

9  Court Expert.

10                              Respectfully submitted,

11  DATED:  March 17, 2025        ROSEN BIEN GALVAN & GRUNFELD LLP

12                              By:   /s/Penny Godbold

13                                    Penny Godbold

14                              Attorneys for Plaintiffs

15

16  DATED:  March 17, 2025        ROB BONTA
                                Attorney General of the State of California
17
18                              By:   /s/Trace O. Maiorino

19                                    Trace O. Maiorino
                                      Deputy Attorney General
20                              Attorneys for Defendants

21

22                          **FILER'S ATTESTATION**

23          As required by Local Rule 5-1, I, Penny Godbold, attest that I obtained concurrence

24  in the filing of this document from Deputy Attorney General Trace O. Maiorino, and that I

25  have maintained records to support this concurrence.

26

27  DATED:  March 17, 2025              /s/Penny Godbold

                                        Penny Godbold
28

# EXHIBIT A



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Michael Freedman
Email: MFreedman@rbgg.com

February 10, 2025

VIA ELECTRONIC MAIL ONLY

<div style="border:1px solid black">

**PRIVILEGED AND CONFIDENTIAL**

**SUBJECT TO PROTECTIVE ORDERS**

</div>

Edward Swanson                     Jennifer Neill
Court Expert                       Tamiya Davis
Swanson & McNamara LLP             CDCR Office of Legal Affairs
ed@smllp.law                       Jennifer.Neill@cdcr.ca.gov
                                   Tamiya.Davis@cdcr.ca.gov

Re:     *Armstrong v. Newsom*:  Plaintiffs' February 2025 Review of
        CDCR's Accountability System at the Six Prisons
        Our File No. 0581-03

Dear Ed, Jenn, and Tamiya:

    We write regarding our review of Defendants' system for holding staff accountable for misconduct.  The enclosed report is based on our review of investigation and discipline files produced from CSP-Los Angeles County ("LAC"), California Institution for Women ("CIW"), R.J. Donovan Correctional Facility ("RJD"), California Substance Abuse Treatment Facility ("SATF"), CSP-Corcoran ("COR"), and Kern Valley State Prison ("KVSP") (collectively "Six Prisons").  Plaintiffs continue to find that investigations and discipline fail to comply with the *Armstrong* Court Orders, as affirmed in relevant part by the Ninth Circuit, and with the RJD and Five Prisons Remedial Plans. *See* Dkts. 3059, 3060, 3217, 3218, 3393; *Armstrong v. Newsom*, 58 F.4th 1283, 1288 (9th Cir. 2023).

    Plaintiffs have again found substantial evidence that CDCR's accountability system is failing.  For this report, Plaintiffs analyzed half of all AIU cases for the six prisons in Q4 2024.[1]  *See* AIU Table.  Plaintiffs' analysis, which amounted to a review of

---

[1] Plaintiffs randomly selected half of the AIU cases produced for each prison in the Q4 2024 production sent by Defendants for review.

[4643882.3]

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**
Edward Swanson
Jennifer Neill
Tamiya Davis
February 10, 2025
Page 2

181 randomly selected AIU cases, involved reviewing each case and placing the case in one of five categories depending on whether there was an accountability failure and, if so, which type. **Plaintiffs' review found that CDCR's accountability system failed in more than 49.2% of cases.** The categories are intended to capture the key areas CDCR must improve in order to come into compliance with the *Armstrong* Court orders and the RJD and Five Prison Remedial Plans. In 30.4% of cases, Plaintiffs found that CDCR failed to conduct complete and unbiased investigations, making it impossible to determine whether staff misconduct occurred. In 14.9% of cases, evidence showed that staff misconduct did occur, yet the allegation was not sustained. In 3.9% of cases, CDCR sustained the allegation but the Hiring Authority did not issue appropriate discipline. The finding that approximately half of all cases failed to come into compliance with remedial plan requirements, when projected over CDCR's entire system, represents a colossal failure of accountability in hundreds of cases of alleged misconduct.

The finding that the system is failing in approximately half of the cases is entirely consistent with two prior reviews conducted by Plaintiffs' counsel using the same methodology. Specifically, Plaintiffs' November 2024 analysis of staff misconduct cases produced for KVSP Q3 2024 found that Defendants' accountability system failed in close to 50% of cases and Plaintiffs' April 2024 analysis of staff misconduct cases produced for LAC Q4 2023 found that the system failed in more than 55% of cases.[2]

Plaintiffs' findings are also corroborated by the Office of Inspector General ("OIG") monthly "Case Block" reports for local inquiries and use of force reviews. In their most recent local inquiry report, for December 2024, the OIG rated 46% of cases "poor" overall. The number of cases rated "poor" was even higher, 87% of cases, when the OIG monitored retroactively, suggesting that CDCR performs much better in cases when they know the OIG is looking. *See* OIG January 2025 Report at 1. The most recent monthly use of force "Case Block" review highlighted significant accountability concerns in six notable cases reviewed by the OIG. *See* OIG December 2024 UOF Report at 1-4.

---

[2] *See* PG-Defs, Additional Evidence of Accountability System Failures in Review of All Cases from KVSP Q3 2024 (December 10, 2024); PG-Defs, Additional Evidence of Accountability System Failures in Review of All Cases from LAC Q4 2023 (April 24, 2024).

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**
Edward Swanson
Jennifer Neill
Tamiya Davis
February 10, 2025
Page 3

Plaintiffs have discussed in their previous quarterly reports how Defendants' system fails to hold staff accountable in three critical ways. First, investigators fail to collect relevant evidence, including video evidence, needed to evaluate an allegation. Investigative failures in these cases make it impossible to determine if misconduct occurred. Second, even when evidence shows misconduct occurred, Defendants frequently fail to sustain allegations of misconduct. Third, even when Defendants sustain an allegation, they often fail to impose appropriate discipline. Plaintiffs have identified these three types of accountability failures in dozens of cases spanning more than two years and all six prisons. This quarterly review quantifies the scope of accountability failures by type. The fact that Plaintiffs discovered that Defendants failed in 49.2% of cases does not mean that Defendants system worked in the remaining cases. Only in very few cases (6 cases) did the system work to hold staff accountable when evidence of misconduct existed. In other words, the true measure of any accountability system working is the number of cases where, when misconduct is evident, appropriate action was taken in response. This small number of cases in which CDCR's system worked stands in contrast to the 34 other cases where CDCR failed to sustain allegations or ensure appropriate discipline despite evidence of staff misconduct.

The parties continue to negotiate improvements to the system to ensure Defendants' compliance with the *Armstrong* Court orders and RJD and Five Prison Remedial Plans. As Defendants are on the cusp of implementing the Centralized Allegation Resolution Unit (CARU), Plaintiffs are hopeful that CARU will improve appropriate and consistent disciplinary decision-making, improve the timeliness of decisions, and improve the quality of investigations by identifying incomplete and biased investigations and sending those investigations back to investigators for further review. Plaintiffs' review continues to show that the largest category of accountability failures involve incomplete and biased investigations. Defendants must take steps along the way – before important video evidence is destroyed – to identify incomplete and biased investigations and to remedy problems before cases reach the CARU. Plaintiffs will continue to monitor CDCR's accountability system to determine whether remedies such as CARU are having a significant impact.

/ / /

/ / /

/ / /

[4643882.3]

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**
Edward Swanson
Jennifer Neill
Tamiya Davis
February 10, 2025
Page 4


      Plaintiffs' counsel looks forward to discussing these cases with Defendants in second quarter 2025.  We remain hopeful that the parties can continue to work on identifying and implementing remedies to the system to improve accountability for staff misconduct.

<div style="margin-left:50%">

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Michael Freedman*

By:  Michael Freedman
     Senior Counsel

</div>

MLF:ERL:cg

cc:  August Gugelmann    Trace Maiorino
     Audrey Barron       Sean Lodholz
     Patricia Ferguson    Olena Likhachova
     Ramon Ruiz         Sharon Garske
     Chor Thao          Amarik Singh
     Co-counsel         Ursula Stuter

# EXHIBIT B



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Penny Godbold
Email: pgodbold@rbgg.com

March 13, 2025

<u>VIA ELECTRONIC MAIL ONLY</u>

Edward Swanson                          Jennifer Neill
Court Expert                            Tamiya Davis
Swanson & McNamara LLP                  CDCR Office of Legal Affairs
ed@smllp.law                            Jennifer.Neill@cdcr.ca.gov
                                        Tamiya.Davis@cdcr.ca.gov

  Re: *Armstrong v. Newsom:* Plaintiffs' Review of February 2025 AIU Data
    <u>Our File No. 0581-03</u>

Dear Ed, Jenn, and Tamiya:

  Plaintiffs write to provide an analysis of Defendants' most recent quarterly AIU data produced to Plaintiffs on February 19, 2025.

  In summary, AIU staff are increasingly failing to complete investigations by the deadlines set in the Remedial Plans: 120 days for investigations conducted by custody supervisors (Sergeants and Lieutenants), who conduct nearly all AIU investigations,[1] and 180 days for investigations conducted by Special Agents. The chart below shows that, for investigations the AIU received in December 2023 to September 2024,[2] the AIU closed 53.3% of the investigations late. For the most recent three months of available data (July 2024 to September 2024), the AIU closed on average 74.6% of investigations late. For comparison, in Plaintiffs' August 2024 staff misconduct report, Plaintiffs reported that the most recent three months of data at the time of the report (December

---

[1] In the last fourteen months for which Plaintiffs have data (December 2023 to October January 2025), the AIU assigned 98.9% of cases to be investigated by custody supervisors. The CST only assigned 58 cases (1.1%) to be investigated by Special Agents.

[2] Plaintiffs only present the data for December 2023 to September 2024 because the vast majority of investigations from more recent months (1) are not yet complete and (2) could not possibly be late because they have not yet run up against the deadlines in the Remedial Plans.

[4664202.2]

Edward Swanson, Jennifer Neill, Tamiya Davis
March 13, 2025
Page 2

2023 to February 2024) showed the AIU closed 28% of investigations late. *See* August
2024 Report at 27. The data shows that the problems with delayed investigations are
getting much worse.

|  | Month Received | Closed-On Time | Closed-Past Due | Open | Open-Past Due | Total | % Late |
|---|---|---|---|---|---|---|---|
| 2023 | December | 196 | 54 | 1 | 6 | 257 | 23.3 |
| 2024 | January | 223 | 76 | 0 | 40 | 339 | 34.2 |
|  | February | 158 | 62 | 0 | 8 | 228 | 30.7 |
|  | March | 133 | 68 | 2 | 4 | 207 | 34.8 |
|  | April | 148 | 79 | 0 | 18 | 245 | 39.6 |
|  | May | 282 | 216 | 2 | 48 | 548 | 48.2 |
|  | June | 163 | 166 | 0 | 81 | 410 | 60.2 |
|  | July | 134 | 81 | 0 | 161 | 376 | 64.5 |
|  | August | 108 | 61 | 1 | 276 | 446 | 75.6 |
|  | September | 71 | 25 | 1 | 321 | 418 | 82.8 |
|  |  | 1616 | 888 | 7 | 963 | 3474 | 53.3 |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Edward Swanson, Jennifer Neill, Tamiya Davis
March 13, 2025
Page 3


      Plaintiffs continue to assert that additional staff are necessary to resolve problems with delays in investigations that have existed since the implementation of the new system and are only getting worse.  Further, Plaintiffs support the recent recommendations of the OIG to eliminate inefficiencies in assigning cases for investigation which currently results in duplicate investigations of the same complaint by different investigators and single complaints involving a continuous course of conduct being divided up and assigned as separate cases to different investigators.  *See* OIG Annual Staff Misconduct Report dated March 10, 2025 at PDF page 12-15.  Given increasing delays and the difficulty in hiring new investigators reported by CDCR, all steps should be taken to ensure that departmental resources are managed efficiently.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Penny Godbold*

By:  Penny Godbold
Of Counsel

PMG:ERL:cg

cc:  August Gugelmann    Trace Maiorino
     Audrey Barron       Sean Lodholz
     Patricia Ferguson    Olena Likhachova
     Ramon Ruiz          Sharon Garske
     Chor Thao          Amarik Singh
     Co-counsel         Ursula Stuter

[4664202.2]

# EXHIBIT C



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Penny Godbold
Email: pgodbold@rbgg.com

January 16, 2025

<u>VIA ELECTRONIC MAIL ONLY</u>

Jennifer Neill
Tamiya Davis
CDCR Office of Legal Affairs
Jennifer.Neill@cdcr.ca.gov
Tamiya.Davis@cdcr.ca.gov

Re:    *Armstrong v. Newsom:*  Plaintiffs' Response re Review of Regulations
        <u>Our File No. 0581-03</u>

Dear Jenn and Tamiya:

Thank you for your responses to Plaintiffs' comments on the revised staff misconduct regulations.  As previously discussed, it is our understanding that Defendants filed emergency revisions to the staff misconduct regulations on December 6, 2024 and that the emergency regulations became effective on January 1, 2025.  It is also our understanding that the parties have approximately 160 days to resolve any outstanding regulatory disputes prior to implementation of final revised regulations.

After reviewing Defendants' responses to our initial comments, it appears multiple issues have been resolved.  For issues that remain unresolved, we have responded in the attached comments.

The primary problems are:

**1.    The regulations are unclear as to how staff misconduct complaints will be processed by CDCR.**

The Centralized Screening Team ("CST") is still responsible for identifying staff misconduct complaints.  After a complaint is identified as an allegation of staff misconduct, it will either be processed as a routine grievance or routed for investigation by Office of Internal Affairs ("OIA").  Yet, the current regulatory language makes it difficult to determine that there are two possible outcomes for staff misconduct complaint

[4633928.1]

January 16, 2025
Jennifer Neill
Tamiya Davis
Page 2

review (the routine grievance process or OIA investigation) and impossible to determine which outcome to expect for the following reasons:

- First, the explanation for CST screening offered by the regulations for how allegations of staff misconduct will be routed is vague and inaccurate. It says "allegations of staff misconduct which do not include complex issues requiring specialized investigative skills or resources shall be referred to the Office of Grievances for a routine review." *See* Section 3486.1(e)(4). This explanation is inaccurate. A clear cut act of serious misconduct caught on camera is not complex and does not require specialized investigative skills yet it should be routed to OIA for investigation. Defendants assert that this explanation for routing was included in prior regulations and therefore it remains appropriate. However, the routing distinction mattered less before because all staff complaints—even those investigated by locally designated investigators—were clearly identified as staff complaints and were handled outside of the routine grievance process. Now, that Defendants are routing those less serious allegations of staff misconduct (which are reviewed locally) through the routine grievance process, is essential to clearly communicate to people this change in process. Without a clear explanation that certain allegations of staff misconduct will be processed through the routine grievance process it will not be clear that CDCR has read and understood the staff complaint, that is has been identified as meeting the definition of staff misconduct, and that an appropriate screening decision was made to route the complaint. People will instead assume that their misconduct complaint was improperly routed through the grievance process.

- These two possible outcomes for staff complaints are not clear because "routine"—which can now include staff misconduct claims routed to the routine grievance process—has been entirely omitted from the staff complaint definition section (*see* Section 3486). The definition of routine must live in this section because a significant number of claims that meet the definition of staff misconduct will likely be routed as "routine". Further, all references to local inquiries into staff misconduct (previously called allegation inquires now called routine reviews) have been deleted in their entirety without explaining that those same cases will continue to be investigated locally but now that will be done through the routine grievance process. The staff misconduct regulation section should at least mention

January 16, 2025
Jennifer Neill
Tamiya Davis
Page 3

and refer back to the routine grievance processing section where the allegation inquiry section was prior to deletion.  Otherwise, the implication of this Section appears to be that if an allegation is not routed to OIA for processing, it is deemed not to be an allegation of staff misconduct, despite meeting the definition.

- Similarly, the distinction between the two possible outcomes for staff misconduct complaints is also not well defined in the administrative remedies section.  For example, the definitions state that "routine review" refers to the process used by the department to respond to allegations of staff misconduct that are not referred for an investigation.  *See* Section 3480.  What is actually meant by the regulation here is that routine review is the process that occurs when an allegation of staff misconduct is not referred to OIA for an investigation.  It is still staff misconduct and is still being addressed, albeit in the routine grievance process.  That should be made very clear.  Then later, the regulation states that claims that are "identified as staff misconduct" means that a claim was referred for an investigation.  *See* Section 3483(g)(8).  Here again, what is meant is routed to OIA for an investigation.  But claims that are "identified as staff misconduct" have two possible outcomes—they will either be routed for an OIA investigation or handled as a routine grievance, depending on CST screening.  Because a significant number of staff complaints could be identified as part of the CST process around routed for routine grievance processing, this process must be mentioned as part of the administrative remedies section.

    **2.    The regulations allow for conditional or "quick" closure of investigations under certain conditions.  Plaintiffs' counsel do not agree that the first condition warrants "quick" closure of a case.**

    Plaintiffs' counsel agree that there may be circumstances when the case can be closed quickly based on video evidence.  However, the presumption should be flipped and the case should be closed if video can quickly confirm that the alleged misconduct did in fact occur.  As currently worded the regulations allow for the quick closure of the case if the recording provides conclusive evidence that the alleged misconduct did not occur.  *See* Section 3486.2.  However, Plaintiffs have seen numerous examples where cases were closed after the wrong footage or not enough footage is reviewed as part of the investigation and the alleged misconduct was determined to not have occurred.  The absence of the alleged misconduct on video warrants further investigation and not

January 16, 2025
Jennifer Neill
Tamiya Davis
Page 4


"quick" closure.  Only if the conduct can be conclusively proven should the case be quickly closed based on video evidence.

Plaintiffs' counsel look forward to speaking with you on January 28, 2025 to discuss these concerns and the additional unresolved issues with the regulations outlined in the attached comments.


Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Penny Godbold*

By:   Penny Godbold
Of Counsel

PMG:erl
Enclosure:  Plaintiffs' Response re Review of Regulations
  Cc:  Ed Swanson              Trace Maiorino
       August Gugelmann        Sean Lodholz
       Audrey Barron           Olena Likhachova
       Patricia Ferguson       Sharon Garske
       Ramon Ruiz              Amarik Singh
       Chor Thao               Ursula Stuter
       Co-counsel

**PLEASE DO NOT USE TRACK CHANGES TO MAKE EDITS. USE THE COMMENT FUNCTION INSTEAD.**

**TEXT OF PROPOSED REGULATIONS**

In the following text, new language is indicated by <u>underline</u> and deleted text is indicated by ~~strikethrough~~.

**California Code of Regulations, Title 15. Crime Prevention and Corrections**
**Division 3. Adult Institutions, Programs and Parole**
**Chapter 1. Rules and Regulations of Adult Operations and Programs**

**Section 3392. Employee Discipline.**

**Subsections under 3392(a) are amended to repeal the definitions indicated by strikethrough. The remaining subsections are renumbered to account for repealed subsections and are otherwise unchanged.**

(a) Definitions -- The definitions in this section apply to Subchapter 5, Article 2, sections 3391 and 3392 through 3392.10.
(1) 5/8/40 Work Schedule -- A fixed work schedule consisting of five 8-hour days during a workweek.
(2) Administrative Time Off -- A form of paid leave initiated by a hiring authority when it is determined that an employee should not come to work as set forth in section 3392.9.
(3) Adverse Action -- A punitive action taken by a hiring authority to discipline an employee as set forth in section 3392.3.
~~(4) Allegation Inquiry Unit (AIU) -- The unit within the Office of Internal Affairs that conducts investigations into complaints alleging misconduct toward incarcerated persons and supervised persons as set forth in 3486.2, and reviews allegation inquiry reports completed by locally designated investigators.~~
(5<u>4</u>) Appointing Power -- The Secretary of the CDCR.
(6<u>5</u>) Bargaining Unit Agreement (also known as a Memorandum of Understanding) -- An agreement entered into between the State of California and an employee representative organization certified by the Public Employee Relations Board as the exclusive representative for an employee bargaining unit.
~~(7) Centralized Screening Team -- The entity that reviews documentation to determine if the documentation contains a routine issue, alleges misconduct toward an incarcerated person or supervised person, or alleges misconduct not involving an incarcerated person or supervised person.~~
(8<u>6</u>) Corrective Action -- A non-punitive action taken by a supervisor to assist an employee to improve work performance, or correct behavior or conduct as set forth in section 3392.2.
(9<u>7</u>) Designated Case -- An employee discipline case assigned to a vertical advocate.
(10<u>8</u>) Employee Disciplinary Matrix -- The department's Employee Disciplinary Matrix set forth in section 3392.5, utilized by all hiring authorities to identify misconduct allegations and determine the penalty to be imposed when an allegation(s) of misconduct is sustained.
(11<u>9</u>) Employee Relations Officer -- The department employee responsible for coordinating the administrative process for designated cases, and representing the department in non-designated cases during the disciplinary process and at any administrative hearings.
(12<u>10</u>) Hiring Authority – The appointing power may act, or delegate the power to act, as the hiring authority. The hiring authority has the power to hire, initiate the investigation process by submitting a confidential request for internal affairs investigation or approval for direct adverse action,

discipline, and dismiss staff.  The power to act as a hiring authority may be delegated to the following classifications: Undersecretary; Assistant Secretary; General Counsel; Chief Deputy General Counsel; Executive Officer; Chief  Information Officer; Director; Deputy Director; Associate Director; Assistant Deputy Director; Chief, Office of Correctional Safety; Chief, Office of Labor Relations; Warden;  Superintendent; Health Care Chief Executive Officer; Regional Health Care Administrator; Regional Parole Administrator; Parole Administrator; Superintendent of Education; Assistant Superintendent of Education; Administrator at the Richard A. McGee Correctional Training Center for Correctional Officer Cadets; or any other person authorized by the appointing power.

(~~13~~11) Job Steward -- A recognized union representative for a state bargaining unit.

(~~14~~12) Letter of Intent -- Written notification to a peace officer employee that an investigation has been completed, adverse action will be taken, and the proposed penalty.

(~~15~~13) Manager -- An employee in a managerial classification having significant responsibilities for formulating or administering agency or departmental policies and programs or administering an agency or department.

~~(16) Locally Designated Investigator -- Departmental staff trained by OIA to collect evidence and conduct Allegation Inquiries.~~

(17~~4~~) Monitored Case -- An employee discipline case monitored by the Office of the Inspector General.

(18~~5~~) Non-Designated Case -- An employee discipline case assigned to an employee relations officer.

(19~~6~~) Notice of Adverse Action -- A written notice of punitive action to an employee including the penalty, effective date of the action, causes for discipline, factual allegations of misconduct, pre-deprivation *(Skelly)* rights, and the right to appeal the action to the State Personnel Board.

(20~~17~~) Office of Internal Affairs -- The entity with authority to investigate allegations of employee misconduct.

(21~~18~~) Official Personnel File -- A file for a department employee containing records maintained by the department including records relating to the employee's performance or any grievances filed by the employee.

(22~~19~~) Preponderance of Evidence -- The standard of proof necessary to establish that it is more likely than not that the alleged misconduct occurred.

(23~~20~~) Progressive Discipline -- Written preventative, corrective, or disciplinary action, providing an employee with notice of departmental expectations, an opportunity to learn from prior mistakes, and correct and improve future work performance.

(24~~21~~) Qualifying Pay Period -- Eleven or more qualifying workdays of service in a monthly pay period.

(25~~22~~) Qualifying Work Day -- An employee's regularly scheduled workday, excluding regular-days-off, sick leave, holidays, vacation, annual leave, or other periods of approved leave.

(26~~23~~) *Skelly* Hearing -- A hearing, normally held prior to the effective date of an adverse action, which provides the employee with an opportunity to respond to the allegations of misconduct set forth in the notice of adverse action.

(27~~24~~) *Skelly* Letter -- A letter notifying the employee of the hiring authority's final decision regarding the imposition of a disciplinary penalty.

(28~~25~~) *Skelly* Officer -- An employee, normally a manager assigned to conduct a *Skelly* Hearing and make a recommendation to the hiring authority as set forth in section 3392.8.

(29~~26~~) *Skelly* Package -- All documents and materials relied upon by the hiring authority to impose adverse action.

(30~~27~~) Vertical Advocate -- An Employment Advocacy and Prosecution Team attorney who provides legal advice to the department during investigations and the employee discipline process for designated cases, and represents the department at administrative hearings and during any subsequent writ or appellate proceedings.

(34 28) Work Week -- Any seven consecutive days, starting with the same calendar day each week beginning at any hour on any day, so long as it is fixed and regularly occurring.

Note: Authority cited: Sections 5058 and 5058.3, Penal Code. Reference: Sections 5054, 5058.4 and 6053, Penal Code; Sections 3304(d)(1), 3513, 19570 and 19574, Government Code; Section 115, Evidence Code; *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194; *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995); and *Armstrong et al. v. Newsom et al.*, United States District Court for the Northern District of California, Court Case number 94-cv-02307-CW, *Madrid v. Woodford*, Special Masters Final Report Re: Department Of Corrections Post Powers Investigations And Employee Discipline; Case No. C90-3094-T.E.H. and *Madrid v. Woodford*, Order; and Case No. C90-3094-T.E.H. Class Action.

**Section 3392.1. Allegation Inquiry and Investigation Findings.**

(a) Upon receipt and review of an allegation inquiry report, investigation report, or approval of direct adverse action, the hiring authority shall render a determination for each allegation for each subject. The findings and their explanations are as follows:

**Subsections 3392.1(a)(1) through 3392.1(a)(5) are unchanged. Subsections 3392.1(b) and 3392.1(c) are repealed.**

(b) If the hiring authority finds an allegation inquiry report insufficient to make investigation findings, the hiring authority shall refer the case to OIA for investigation.

(c) When a hiring authority sustains misconduct as a result of an allegation inquiry, only corrective action can be imposed unless a request for direct adverse action is approved by OIA.

Note: Authority cited: Sections 5058 and 5058.3, Penal Code. Reference: Sections 5054 and 5058.4, Penal Code, *Armstrong et al. v. Newsom et al.*, United States District Court for the Northern District of California, Court Case number 94-cv-02307-CW, *Madrid v. Woodford*, Special Masters Final Report Re: Department Of Corrections Post Powers Investigations And Employee Discipline; Case No. C90-3094-T.E.H. and *Madrid v. Woodford*, Order; and Case No. C90-3094-T.E.H. Class Action.

**Section 3392.3. Adverse Action.**

**Subsections 3392.3(a) through 3392.3(c) are unchanged. Subsection 3392.3(d) is amended.**

(d) Adverse action for off-duty misconduct requires a N nexus between the employee's behavior and their employment.

Note: Authority cited: Sections 5058 and 5058.3, Penal Code. Reference: Sections 18524, 19571 and 19572, Government Code; Section 115, Evidence Code; and Sections 5054 and 5058.4, Penal Code; *Yancey v. State Personnel Board* (1985) 167 Cal.App.3d.478; *Armstrong et al. v. Newsom et al.*, United States District Court for the Northern District of California, Court Case number 94-cv-02307-CW, *Madrid v. Woodford*, Special Masters Final Report Re: Department Of Corrections Post Powers Investigations And Employee Discipline; Case No. C90-3094-T.E.H. and *Madrid v. Woodford*, Order; Case No. C90-3094-T.E.H. Class Action.

**Section 3392.5. Employee Disciplinary Matrix.**

**Commented [A1]:** Plaintiffs' counsel seek to ensure that it is possible to impose discipline when there is repeated sustained findings of supervisory reviews. Where in the regs is that possibility made clear?

**Commented [A2R1]:** Defendants agree that this issue deserves further discussion before these emergency regulations are finalized as permanent regulations.

**Commented [A3]:** Related to the comment above, if this provision is eliminated as a result of the elimination of the LDI and allegation inquiries, where is the analogous provision that allows for the imposition of corrective action and the potential for disciplinary action in the routine grievance (or supervisorial review) process?

**Commented [A4R3]:** Similar to the response above, defendants agree that this issue deserves further discussion before these emergency regulations are finalized as permanent regulations.

**Subsections 3392.5(a) and 3392.5(b) are unchanged. Subsection 3392.5(c) is amended.**

(c) Applying the Employee Disciplinary Matrix.
(1) The Employee Disciplinary Matrix shall be used for all disciplinary actions to identify the applicable matrix misconduct allegation(s) and determine the appropriate penalty.
(2) Prior to assessing a disciplinary penalty, the hiring authority must find the investigation or direct action materials sufficient to make investigation findings, which must be documented on CDCR Form 402 (Rev. 01/22), Hiring Authority Review of Investigation, which is incorporated by reference. If the hiring authority finds the investigation or direct action materials insufficient to make investigation findings, the Hiring Authority shall document that finding in the department's information technology system on the CDCR Form 402 and refer the case to OIA for investigation.

**Subsections 3392.5(c)(3) through 3392.5(c)(13) are unchanged.**

Note: Authority cited: Sections 5058 and 5058.3, Penal Code. Reference: Section 5054, Penal Code; Section 19572, Government Code; *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995.); *Armstrong et al. v. Newsom et al.*, United States District Court for the Northern District of California, Court Case number 94-cv-02307-CW, *Madrid v. Woodford*, Special Masters Final Report Re: Department Of Corrections Post Powers Investigations And Employee Discipline; Case No. C90-3094-T.E.H. and *Madrid v. Woodford*, Order; and Case No. C90-3094-T.E.H. Class Action

**Section 3450.        Personal Information Record Access and Amendment.**

**Section 3450 is amended.**

(a) Any person on whom the department maintains a record or file containing personal information has the right to inspect their record or authorize any person to inspect such records on their behalf and to request amendment to correct outdated, inaccurate, or incomplete information.
(1) Requests to inspect a record or file shall be submitted in writing to the Warden (if the person is incarcerated), the Regional Parole Administrator (if the person is supervised), or the Secretary (if neither of those circumstances apply) office or official responsible for maintaining the record. If the written request authorizes a third party to perform the inspection, then a copy of the third party's passport, driver's license, or other form of photographic identification must be included with the written request. The department shall permit the inspection to occur within 30 calendar days of receiving the request, unless the request involves records that are geographically dispersed or which are inactive and in central storage, in which case the inspection shall be permitted within 60 calendar days. In addition, the department shall permit the person to have an exact copy made of all or any portion of the record or file within 15 calendar days of the inspection.
(2) Requests to amend a record or file shall be submitted in writing, including documentary evidence to support the proposed amendment, to the Warden (if the person is incarcerated), the Regional Parole Administrator (if the person is supervised), or the Secretary (if neither of those circumstances apply)source of the contested information, or if the source is not available, to the office or official responsible for maintaining the record. Within 30 calendar days of receiving the request, the department shall either:
(A) adopt the requested amendment and inform the person that the amendment was adopted, or
(B) reject the requested amendment and inform the person that the amendment was rejected, the reason the amendment was rejected, how to request a review of the department's decision, and the deadline to request such a review.
(b) The denial of a request to amend information may be appealed in writing first to the institution head or headquarters' division head and then to the director, and shall include all documentation

**Commented [A5]:** Where is the discovery by a HA that an investigation was insufficient tracked and monitored? This is an important check on the investigation process. If an HA finds that an investigation was lacking that is important self-monitoring info. It is possible that investigator requires additional training and oversight.

This is also important for monitoring purposes; whatever form this is documented on will need to be produced to Plaintiffs and the Court Expert

**Commented [A6R5]:** Deleted phrase replaced with "in the department's information technology system."

**Commented [A7R5]:** PLTF REPLY: This comment is resolved as to the language in the regulation. However, related to staff misconduct monitoring, please confirm that CDCR can search "the department's information technology system" to identify and track the investigators who produced reports found by Hiring Authorities to be "insufficient" to make a disciplinary finding.

~~pertaining to the requested amendment. Incarcerated and supervised persons may appeal the denial of a request using the incarcerated and supervised person appeal process established in these regulations.~~

~~(c) When an individual's appeal of the request decision is denied, they may submit to the office or official responsible for maintaining the record a statement of disagreement for placement in the record or file. The statement shall normally be limited to three pages and shall remain a part of the record for as long as the disputed information is retained.~~

(<u>b</u>~~d~~) No incarcerated or supervised person shall prepare, handle, or destroy any portion of a departmental record containing confidential information as that term is defined in section 3321.

(<u>c</u>~~e~~) No incarcerated or supervised person shall prepare, handle, or destroy any portion of a departmental record containing personal information except:

(1) As provided for in section 3041(e), or

(2) Their copies of such records provided to them by the <u>D</u>~~d~~epartment.

Note: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code; and Section 1798.20, Civil Code.

**Subchapter 5.1. Incarcerated and Supervised Person Programs**

**Article 1. Administrative Remedies ~~for Incarcerated and Supervised Persons~~**

**Section 3480.        Implementation Date and Definitions.**

**Section 3480 is amended.**

(a) The provisions of this Article shall apply to all ~~incarcerated or supervised person~~ grievances<u>, reasonable accommodation requests, and appeals</u> received by the Department of Corrections and Rehabilitation <u>from persons under its legal custody or supervision</u> on or after January 1<u>5</u>, 20<u>25</u>~~2~~.

(b) For purposes of this a<u>A</u>rticle <u>and Article 1.5 of this Subchapter</u>, the following definitions shall apply:

(1) "Administrative remed<u>ies</u>~~y~~" <u>refers to</u>~~means~~ the non-judicial process provided by the department to address <u>grievances, reasonable accommodation requests, and appeals</u> ~~incarcerated or supervised person complaints~~.

(2) "Appeal" <u>refers to</u> ~~means~~ a written request <u>submitted to</u>~~from a claimant for review~~ by the Office of Appeals <u>to review one or more</u>~~of a~~ decision<u>s</u> issued by an<u>the</u> ~~Institutional or Regional~~ Office of Grievances.

~~(3) "Appeal package" means a written appeal from a claimant and all of its supporting documents.~~

~~(4) "Centralized Screening Team" refers to the unit responsible for screening all claims to determine if the claim meets the definition of "staff misconduct" or "routine claim" as defined in this section.~~

(3<u>5</u>) "Claim" means a single <u>issue or event</u> <span style="color:orange">or a course of conduct</span> ~~complaint~~ arising from a unique set of facts or circumstances.

(4<u>6</u>) "Claimant" refers to an <u>person</u>~~incarcerated or supervised person under the custody or control of the Department~~ who files a <u>claim</u>~~grievance or appeal~~ with the <u>D</u>~~d~~epartment.

(5<u>7</u>) "Coordinator" means the official responsible for the administrative functions of the Office of Grievances or Office of Appeals, depending on their assignment.

(6<u>8</u>) "Department" and "departmental staff" refers exclusively to the Department of Corrections and Rehabilitation and to all employees, contractors, and volunteers associated with the <u>D</u>~~d~~epartment, unless expressly excluded elsewhere in this article.

**Commented [A8]:** One of Plaintiffs' counsel's concerns with the proposed change in routing staff misconduct allegations as routine grievances is that there is no case file, per se. Thus, the deletion of an "appeal package" from the regs seems concerning here. It seems all efforts to maintain all documents and relevant evidence in one place should be kept together as part of a case file for any routine grievances that are staff misconduct complaints.

**Commented [A9R8]:** The entire submission will be stored in the department's information technology system (see section 3484(f) below).

**Commented [A10R8]:** PLTF REPLY: It remains unclear whether this means all documents/videos, etc. which were reviewed and relied on in a case will be stored in one location within the department's information technology system such that someone seeking to review the file and relevant evidence could easily do so?

**Commented [A11]:** I think I understand why the definition of CST was deleted from the discipline section above. However, the CST is relevant to the grievance process and seems necessary in this section. Why has it been removed here?

**Commented [A12R11]:** Similar to the response above, the CST does not need to be legally defined here; instead, its responsibilities are described in the staff misconduct regulations (see section 3486.1 below)."

**Commented [A13R11]:** PLTF REPLY: The CST still has responsibilities as far as this section goes. They are doing the screening to identify the staff complaints that will be routed through the routine grievance process and thus should still be defined and explained here.

(7~~9~~) "Grievance" refers to~~means~~ a written complaint containing one or more claims submitted to an~~request from a claimant~~ for review by the Institutional or Regional Office of Grievances that disputes a policy, decision, action, condition, or omission by the department or departmental staff~~of one or more claims.~~

~~(10) "Grievance package" means a written grievance from a claimant and all of its supporting documents.~~

(8) "Issued" refers to the date at the top of a document.

(9) "Personal interaction" means direct contact with a claimant, either face-to-face or by writing the claimant directly. Participating in a committee meeting that concerns a claimant or that the claimant attended does not, by itself, constitute personal interaction; nor does issuing a memo that applies to a group of individuals or issuing a decision pursuant to this Article.

(10) "Policy review" refers to the process used by the department to respond to complaints that departmental policy violates or contradicts an established rule of law.

(11) "Reasonable accommodation request" refers to a written request for one or more accommodations submitted to an Office of Grievances.

(12) "Reasonable accommodation review" refers to the process used by the department to respond to a written request for one or more accommodations.

(1~~3~~1) "Reviewing Authority" refers to~~means~~ the officials who oversees the Office of Grievances or Office of Appeals and who is responsible for the overall quality and timeliness of the written response to each claim raised in a grievance or appeal, respectively.

(12) "Routine review~~claim~~" refers to the process used by the department to respond to allegations of staff misconduct that are not referred for an investigation ~~any complaint submitted by an incarcerated or supervised person that does not involve a claim of staff misconduct as defined in this section.~~

~~(13) "Staff misconduct" refers to behavior that resulted in a violation of law, regulation, policy, or procedure, or actions contrary to an ethical or professional standard.~~

~~(14) "Supervisorial review" refers to the process used by the department to respond to allegations of staff misconduct that are not referred for an investigation.~~

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code.

**Existing Section 3481 is repealed and new Section 3481 is adopted.**

~~**3481. Claimant's Ability to Grieve and to Appeal.**~~

~~(a)    A claimant has the ability to submit a written grievance to the department containing one or more claims, subject to the requirements in section 3482, to dispute a policy, decision, action, condition, or omission by the department or departmental staff. In response, a claimant shall receive a written decision, as described in section 3483, from an Institutional Office of Grievances in the Division of Adult Institutions or a Regional Office of Grievances in the Division of Adult Parole Operations, clearly explaining the reasoning for the decision in each claim. A claimant also has the ability to submit a written appeal concerning one or more claims, subject to the requirements in section 3484, to dispute the decision by the Institutional or Regional Office of Grievances. In response, a claimant shall receive a written decision as described in section 3485 from the Office of Appeals clearly explaining the reasoning for the decision in each claim.~~

~~(b)    Reviewing Authorities.~~

~~(1)    The Institutional Reviewing Authorities authorized to grant or deny routine claims in a grievance received by an incarcerated person shall be of a rank no lower than a Chief Deputy Warden. The Director of the Division of Adult Institutions may also authorize an Associate Warden to serve as an Institutional Reviewing Authority. This authorization shall be in writing and shall indicate the start date and end date of the assignment.~~

---

> **Commented [A14]:** This definition is misleading and confusing, since the request is ultimately submitted to the ADAC, even if the OOG initially receives the form and opens the log number. We suggest a revision as follows:
>
> "Reasonable accommodation request" refers to a written request for one or more accommodations filed on a CDCR Form 602-1/1824."

> **Commented [A15R14]:** The specific form number is not included here because some people submit their requests for reasonable accommodations on regular paper and we want staff to process those requests the same as if the person had submitted the request on the official form.

> **Commented [A16R14]:** PLTF REPLY: The point Plaintiffs seek to clarify here is not the number of the form but rather that reasonable accommodation requests are not addressed/submitted for review to the OOG, they are submitted to the ADAC. Therefore this wording continues to be misleading.
>
> We suggest: ... [1]

> **Commented [A17]:** This needs to reference the Reasonable Accommodation Panel process. There is a whole set of requirements that must be followed under Armstrong for disability requests.

> **Commented [A18R17]:** The ADA Desk Reference Manual is currently under revision (in conjunction with Plaintiffs' counsel) and undeniably controls the reasonable ... [2]

> **Commented [A19]:** Related to the comment above, because allegations of staff misconduct are used to define what claims should be sent for supervisory revi ... [3]

> **Commented [A20R19]:** "Staff misconduct" is defined in the staff misconduct sections which apply equally here (see section 3486(b) which states: "For purposes of th ... [4]

> **Commented [A21R19]:** PLTF REPLY: Our informal comment remains true, because "allegations of staff misconduct are being referred to in this section, it seems necessary to define that term here too.  ... [5]

> **Commented [A22]:** Why is the definition of staff misconduct being deleted from this section of the regs? The parties agree that allegations of staff misconduct that are not on the ADI will be routed for supervisorial review.  ... [6]

> **Commented [A23R22]:** "Staff misconduct" is defined in the staff misconduct sections which apply equally here (see section 3486(b) which states: "For purposes of th ... [7]

> **Commented [A24R22]:** PLTF REPLY: This is confusing. This definition should also remain in this section since this section also covers the how some allegations of staff misconduct are processed.

(2) ~~The Regional Reviewing Authorities authorized to grant or deny routine claims in a grievance submitted by a supervised person shall be of a rank no lower than a Chief Deputy Parole Administrator. The Director of the Division of Adult Parole Operations may also authorize an Assistant Regional Administrator to serve as a Regional Reviewing Authority. This authorization shall be in writing and shall indicate the start date and end date of the assignment.~~
(3) ~~The Secretary shall appoint the Reviewing Authority authorized to grant or deny each claim in an appeal submitted by an incarcerated or supervised person, but in no case shall that official be of a rank lower than the Associate Director of the Office of Appeals. The Secretary may also authorize the Associate Warden of the Office of Appeals to serve as a Reviewing Authority. This authorization shall be in writing and shall indicate the start date and end date of the assignment.~~
(c) ~~A claimant may choose to informally resolve a claim; however, any attempt to informally resolve a claim does not extend the time for submitting a grievance or an appeal.~~
(d) ~~Staff shall not retaliate against a claimant for seeking to informally resolve a claim or for submitting a grievance or appeal.~~
(e) ~~A claimant does not have the right to grieve or appeal a policy, decision, action, condition, or omission that was not made by the department or departmental staff but instead was made by an entity or official outside of the department, including, but not limited to, a county jail, a private hospital, the Department of State Hospitals, or the Interstate Commission for Adult Offender Supervision; nor by an entity or official that is quasi independent of the department, including, but not limited to, the Board of Parole Hearings, the Prison Industry Authority, or the Commission on Correctional Peace Officer Standards and Training. This article does not preclude a claimant from filing a complaint with the outside entity or official.~~
(f) ~~CDCR Form 602-1 (Rev. 01/22), "Grievance," hereby incorporated by reference, shall be made available to incarcerated persons in all housing units and in all prison law libraries and to supervised persons at all parole offices statewide.~~
(g) ~~When submitting a grievance or appeal, or for purposes of a related interview, if a claimant requests assistance based on a disability, lack of literacy, or need for translation services, or departmental staff detect the need for such assistance, then staff shall provide reasonable accommodations and utilize effective communication techniques as required by the Americans with Disabilities Act, as applicable.~~

~~Note: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code.~~

**Section 3481. Claimant's Ability to Submit Grievances, Reasonable Accommodation Requests, and Appeals.**
(a) A claimant has the ability to submit one or more claims in a written grievance, a written reasonable accommodation request, or both (subject to the requirements in section 3482). In response, a claimant shall receive a written decision (as described in section 3483) clearly explaining the reasoning and the evidence in support of the decision for each claim. A claimant also has the ability to appeal one or more of those decisions (subject to the requirements in section 3484). In response, a claimant shall receive a final written decision (as described in section 3485) clearly explaining the reasoning and the evidence in support of the decision for each claim.
(b) Reviewing Authorities.
(1) The Warden and Chief Deputy Warden at each institution are the primary Reviewing Authorities for all grievances and reasonable accommodation requests received at that institution. The Warden may authorize one or more Associate Wardens to also serve as Reviewing Authorities.
(2) The Regional Parole Administrator and Chief Deputy Parole Administrator in each region are the primary Reviewing Authority for all grievances and reasonable accommodation requests

**Commented [A25]:** Because the ADAC reviews all requests for reasonable accommodations, we suggest the following revisions: "The Warden may authorize one or more Associate Wardens to also serve as Reviewing Authorities for grievances. The Warden shall authorize the Americans with Disabilities Act Coordinator to serve as Reviewing Authority for reasonable accommodation requests."

**Commented [A26R25]:** This level of specificity is best placed in the ADA Desk Reference Manual or DOM (or both).

**Commented [A27R25]:** PLTF REPLY:
We will keep this as a placeholder to ensure that is included clearly in that process.

received in that region. The Regional Parole Administrator may authorize one or more Assistant Regional Administrator to also serve as Reviewing Authorities.
(3) The Associate Director of the Office of Appeals shall serve as the primary Reviewing Authority for all appeals and answer them on behalf of the Secretary. The Associate Director may authorize one or more managers in the Office of Appeals to also serve as Reviewing Authorities.
(c) A claimant may choose to informally resolve a claim; however, any attempt to informally resolve a claim shall not extend the time for submitting that claim in a grievance or an appeal.
(d) Departmental staff shall not retaliate against a claimant for seeking to informally resolve a claim or for submitting a grievance, reasonable accommodation request, or appeal. In addition, staff shall not access grievances, reasonable accommodation requests, or appeals in the department's information technology system unless specifically assigned to respond to a claim or when fulfilling another legitimate business need.
(e) A claimant does not have the right to grieve or appeal a policy, decision, action, condition, or omission that was not made by the department or departmental staff, but instead was made by an entity or official outside of the department, including, but not limited to, a county jail, the Department of State Hospitals, or the Interstate Commission for Adult Offender Supervision; nor by an entity or official that is quasi-independent of the department, including, but not limited to, the Board of Parole Hearings, the Prison Industry Authority, or the Commission on Correctional Peace Officer Standards and Training. This Article does not preclude a claimant from filing a complaint with the outside entity or official.
(f) Forms.
(1) CDCR Form 602-1/1824 (Rev. 01/25), the "Grievance/Request for Reasonable Accommodation" form, hereby incorporated by reference, shall be made available to claimants at~~in~~ all housing units, fire camps, re-entry facilities, ~~prison~~ libraries, ~~prison~~ law libraries, and parole offices statewide, and made available during home visits upon request.
(2) CDCR Form 602-2 (Rev. 01/25), the "Appeal" form, hereby incorporated by reference, shall be made available to claimants as an attachment to each decision issued by an Office of Grievances.
(3) CDCR Form 602-3 (Rev. 01/25), the "Request to Implement Overdue Remedy" form, shall be made available to claimants as an attachment to each decision issued by an Office of Grievances or the Office of Appeals containing a remedy.
(g) Prior to submitting forms to an Office of Grievances or the Office of Appeals, a claimant may obtain two copies of the documents described in subsection (f) from a prison library or prison law library consistent with existing policies regarding fees and waivers of fees; however, the time needed to copy the forms shall not extend the time for submitting that claim in a grievance or an appeal.
(h) Departmental staff shall provide reasonable accommodations and comply with effective communication and documentation requirements if a claimant requests assistance based on a disability, lack of literacy, or need for translation services when submitting a grievance, reasonable accommodation request, or appeal; conducting a related interview; or receiving a decision issued by an Office of Grievances or the Office of Appeals. Departmental staff shall do the same if they detect the need for such assistance or the claimant has a documented need for effective communication under the same circumstances.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code.

**Existing Section 3482 is repealed and new Section 3482 is adopted.**

~~**3482. Preparation and Submittal of a Grievance.**~~
~~(a) Where to submit a grievance.~~

**Commented [A28]:** The 602-3 Form is confusing and should be revised.

First, it does not have anywhere for the person to state which portion of the remedy they have not received. This is a problem if they were granted multiple requests but failed to only receive one.

Second, the distinction between "grievance" and "appeal" is not clear to many incarcerated people. 602 - 1's have been considered "appeals" for years. The form should be more specific. Also, is there a relevant distinction for purposes of implementing a remedy?

Third, where is the response/notice to the person who filed the 602-3 that in fact their remedy has been provided, according to CDCR? A response is warranted if the goal is to close the loop, the person must be notified that it has been closed so they can determine whether they agree and what action they should take next.

**Commented [A29R28]:** The Office of Appeals does provide a closure letter to the claimant when the remedy issue has been fully resolved. Furthermore, CDCR Form 602-3 was modified so that no distinction is made between grievances and appeals and the claimant is prompted as follows:
**Claim No.** _____ was not satisfactory because _____

**Commented [A30R28]:** PLTF REPLY:
It appears the first two points have been resolved.

Regarding Pltfs third point, are Defs stating that the person will receive a response to the 602-3 stating that the issue has been fully resolved from Defs' perspective?

(1)    An incarcerated person who wishes to submit a grievance shall do so in writing to the Institutional Office of Grievances at the prison, or to the Institutional Office of Grievances designated for the re-entry facility or fire camp where they are housed. Every Warden, in consultation with the Director of the Division of Adult Institutions, shall issue a separate local rule in compliance with subdivision (c) of section 5058 of the Penal Code which shall be made available in all the law libraries at that institution, identifying the address where grievances may be mailed, the availability of electronic kiosks or tablets for submitting grievances, the physical location in each housing unit of all lock-boxes where grievances may be submitted, and the specific departmental staff permitted to collect grievances from those lock-boxes. Grievances shall be collected from lock-boxes at least once per business day by departmental staff not regularly assigned to that housing unit. Additional local processes and procedures regarding the preparation and submittal of a grievance may be promulgated by the Division of Adult Institutions so long as they are consistent with this Article, pursuant to Penal Code section 5058(c)(1).

(2)    A supervised person who wishes to submit a grievance shall do so in writing to the Regional Office of Grievances in the parole region where they are supervised. Every Regional Parole Administrator, in consultation with the Director of the Division of Adult Parole Operations, shall issue a written advisement to a supervised person within 15 calendar days of the supervised person's release from prison identifying the address where grievances may be mailed, the availability of electronic kiosks or tablets for submitting grievances, and the physical location where grievances may be submitted. Additional local processes and procedures regarding the preparation and submittal of a grievance may be promulgated by the Division of Adult Parole Operations so long as they are consistent with this Article, pursuant to Penal Code section 5058(c)(1).

(b)    Time constraints.

(1)    A claimant shall submit a claim within 60 calendar days of discovering an adverse policy, decision, action, condition, or omission by the department. Discovery occurs when a claimant knew or should have reasonably known of the adverse policy, decision, action, condition, or omission.

(2)    The time limit for a supervised person to submit a grievance shall not be extended while the supervised person is on suspended status, meaning the supervised person has absconded.

(3)    The time constraint to submit a claim shall be extended for the period of time that a claimant is:

(A)    in the custody of another authority for court proceedings;

(B)    in the case of an outside hospital;

(C)    temporarily housed in a medical or mental health crisis bed; or

(D)    actively and directly engaged in fire suppression.

(4)    Regardless of these time constraints, all allegations of staff misconduct shall be referred by the Centralized Screening Team to an appropriate authority within the department for the purpose of gathering facts needed to prove or disprove the allegation and respond to the claimant.

(c)    To submit a grievance, a claimant shall:

(1)    type or print legibly on an official CDCR Form 602-1 (01/22) or complete the form electronically, if available;

(2)    describe all information known and available to the claimant regarding the claim, including key dates and times, names and titles of all involved staff members (or a description of those staff members), and names and titles of all witnesses, to the best of the claimant's knowledge;

(3)    describe any attempt to resolve the claim informally and, if there was such an attempt, provide the details of that attempt, including key dates and times, names and titles of all involved staff members (or a description of those staff members), and the results of that attempt, to the best of the claimant's knowledge;

> **Commented [A31]:** This exception has been removed from the list of exceptions to time constraints in the new regs and it should be added back. There should be no time constraints on the submission of staff misconduct complaints.

> **Commented [A32R31]:** In consultation with the Office of the Attorney General, defendants have concluded that exhaustion requires timely submission of all grievances, even those involving allegations of staff misconduct. However, even if an allegation of staff misconduct is submitted untimely, the department agrees that the allegation must be investigated to determine if staff should be held accountable.

> **Commented [A33R31]:** PLTF REPLY:
> If we agree that the allegation must be investigated, regardless of time limits, it follows that the regs should retain this provision since it does not deal with exhaustion but instead makes clear that regardless of time limits, they need to refer it for investigation.

(4) ~~include all supporting documents available to the claimant related to the claim or identify to the best of the claimant's ability all relevant records with sufficient specificity for those records to be located; and~~

(5) ~~sign and date the CDCR Form 602-1 (01/22).~~

(d) ~~When completing a CDCR Form 602-1 (01/22), a claimant shall not:~~

(1) ~~use threatening, obscene, demeaning, or abusive language, except when quoting persons involved in the claim;~~

(2) ~~include information or accusations known to the claimant to be false;~~

(3) ~~contaminate the grievance package by including organic, toxic, or hazardous materials that may threaten staff safety or institutional security, in which case the grievance shall be safely discarded and the entire grievance disallowed. The claimant may re-submit the grievance concerning the same claim or claims so long as it is submitted within the time constraints set forth in subsection (b).~~

(e) ~~The entire grievance package shall be returned to the claimant with the acknowledgement of receipt described in subsection 3483(e).~~

(f) ~~The grievance package submitted by the claimant shall be stored electronically by the department.~~

~~Note: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code.~~

**Section 3482.      Preparation   and   Submittal   of   a   Grievance,   Reasonable Accommodation Request, or both.**

(a) Where to submit a grievance, reasonable accommodation request, or both.

(1) A claimant who wishes to submit a grievance or reasonable accommodation request shall do so in writing to the Office of Grievances at the prison, or to the Office of Grievances designated for the re-entry facility or fire camp where they are housed. Every Warden, in consultation with the Director of the Division of Adult Institutions, shall issue a separate local rule in compliance with subdivision (c) of section 5058 of the Penal Code which shall be made available in all the libraries and law libraries at that institution, identifying the address where grievances and reasonable accommodation requests may be mailed, the availability of electronic kiosks or tablets for submitting grievances and reasonable accommodation requests, the physical location in each housing unit of all lockboxes where grievances and reasonable accommodation requests may be submitted, and the specific departmental staff permitted to collect grievances and reasonable accommodation requests from those lockboxes. Grievances and reasonable accommodation requests shall be collected from lockboxes at least once per business day by staff not regularly assigned to that housing unit. If a written grievance or reasonable accommodation request is received by staff any other way, then it shall be forwarded to the Office of Grievances where the claimant is housed. Additional local processes and procedures regarding the preparation and submittal of a grievance or reasonable accommodation requests may be promulgated by the Division of Adult Institutions so long as they are consistent with this Article, pursuant to subdivision (c)(1) of section 5058 of the Penal Code.

(2) A supervised person who wishes to submit a grievance or reasonable accommodation request shall do so in writing to the Office of Grievances in the parole region where they are supervised. Every Regional Director, in consultation with the Director of the Division of Adult Parole Operations, shall issue a written advisement within 15 calendar days of the person's release from prison identifying the address where grievances and reasonable accommodation requests may be mailed, the availability of electronic kiosks or tablets for submitting grievances and reasonable accommodation requests, and the physical location where grievances and reasonable accommodation requests may be submitted. If a written grievance or reasonable accommodation request is received by departmental staff any other way, then it shall be forwarded to the Office of Grievances in the region where the claimant is supervised. Additional local processes and

procedures regarding the preparation and submittal of a grievance or reasonable accommodation requests may be promulgated by the Division of Adult Parole Operations so long as they are consistent with this Article, pursuant to subdivision (c)(1) of section 5058 of the Penal Code.

(b) Time constraints.

(1) A claimant shall submit a grievance within 60 calendar days of discovering an adverse policy, decision, action, condition, or omission by the department. Discovery occurs when a claimant knew or should have reasonably known of the adverse policy, decision, action, condition, or omission.

(2) The time constraint to submit a grievance shall be extended for the period of time that a claimant is:

(A) in the custody of another authority for court proceedings;

(B) in the care of an outside hospital;

(C) temporarily housed in a medical or mental health crisis bed; or

(D) actively and directly engaged in fire suppression.

(3) Grievances deemed untimely shall be rejected pursuant to subsection 3483(g)(6)(A). Even if rejected, all allegations of staff misconduct shall be referred for a routine~~supervisorial~~ review or an investigation.

(c) To submit a grievance or reasonable accommodation request, a claimant shall: ~~(1)~~ type or print legibly on an official CDCR Form 602-1/1824 or complete the form electronically, if available, and include the following:

(1~~2~~) for grievances, describe all information known and available to the claimant regarding the claim, including key dates and times, names and titles of all involved departmental staff (or a description of those staff), and names and titles of all witnesses, to the best of the claimant's knowledge;

(2~~3~~) for grievances, describe any attempt to resolve the claim informally and, if there was such an attempt, provide the details of that attempt, including key dates and times, names and titles of all involved departmental staff (or a description of those staff), and the results of that attempt, to the best of the claimant's knowledge;

(3~~4~~) for reasonable accommodation requests, describe the limitation, the cause of the limitation, and the accommodation requested;

(4) for grievances and reasonable accommodation requests, include all supporting documents available to the claimant related to the claim or identify to the best of the claimant's ability all relevant records with sufficient specificity for those records to be located; and

(5) for grievances and reasonable accommodation requests, sign and date the CDCR Form 602-1/1824.

(d) When submitting a grievance or reasonable accommodation request, a claimant shall not:

(1) use threatening, obscene, demeaning, or abusive language, except when quoting persons involved in the claim;

(2) include information or accusations known to the claimant to be false; or

(3) contaminate the submission by including organic, toxic, or hazardous materials that may threaten staff safety or institutional security, in which case the submission shall be safely discarded and disallowed. The claimant may re-submit the same claim or claims so long as it is submitted within the time constraints set forth in subsection (b).

(e) The entire submission shall be returned to the claimant with the acknowledgement of receipt described in subsection 3483(c).

(f) The submission from the claimant shall be stored electronically by the department.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code.

**Existing Section 3483 is repealed and new Section 3483 is adopted.**

**Comment [A34]:** As stated above, there also should be an exception for staff misconduct complaints which should not be subject to the 60 day time constraints.

**Comment [A35R34]:** See defendant's response to previous comment regarding exhaustion.

**Comment [A36R34]:** PLTF REPLY: See comment above.

**Comment [A37]:** We recommend adding, "or housed in an inpatient mental health care program at the acute or ICF level of care"

**Comment [A38R37]:** Persons housed in an inpatient mental health care program have access to the CDCR Form 602-1, have time to complete the form, and have the ability to ask for staff assistance if needed.

**Comment [A39R37]:** PLTF REPLY: People who are housed in acute inpatient programs should be covered by this because it seems that the same reasoning as to why we would want to extend timelines for medical or MH crisis would apply in their case? Also, in the care of an outside hospital, listed above, should cover DSH facilities like ASH, CSH or Patton.

**Comment [A40]:** This is confusing? If it is a staff misconduct claim it should not be rejected.

**Comment [A41R40]:** See defendant's response to previous comment regarding exhaustion.

**Comment [A42R40]:** PLTF REPLY: This remains confusing still. If people are told their claim is being "rejected" they will not understand that it is also being investigated.

**3483.  Grievance Review.**

(a)     The Reviewing Authority over each Office of Grievances shall designate at least one official to assess each written grievance within one business day of receipt to determine if it contains information concerning an imminent risk to personal safety, to institutional security, or of sexual abuse, including acts of sexual misconduct as defined by the federal Prison Rape Elimination Act and the California Sexual Abuse in Detention Elimination Act. In those instances, the official shall immediately take appropriate action as required by all applicable laws and regulations. The official shall ensure the claimant is notified of the department's course of action within five business days. In addition to the above requirements, if the grievance alleges that the claimant's Earliest Possible Release Date (EPRD) is erroneous and the claimant is scheduled to be released within 90 calendar days of the date the grievance was received by the Office of Grievances, then a comprehensive review of the EPRD shall be conducted and the results provided to the claimant within 30 calendar days of receipt of the grievance. Regardless of the above requirements, the grievance Coordinator shall ensure that a written grievance decision is provided to the claimant as required in subsection (g).

(b)     The grievance Coordinator shall ensure that the intake process as specified in subsection (a) is completed and each grievance is referred to the Centralized Screening Team within three business days of receipt of the grievance.

(c)     The grievance Coordinator shall acknowledge receipt of each grievance to the claimant in writing within four business days of its receipt indicating the date the grievance was submitted, the date the grievance was received, the calculated date for the department's response, and whether the grievance was disallowed pursuant to subsection 3482(d)(3).

(d)     The grievance Coordinator shall ensure that all routine claims returned from the Centralized Screening Team to the Office of Grievances are reviewed and answered in accordance with this section.

(e)     A claimant or witness shall be interviewed during the course of responding to a routine claim if departmental staff responsible for answering the claim determine it would assist in resolving the claim. The interview shall be conducted in a manner that provides as much privacy for the claimant as operationally feasible. If a claimant is unavailable to be interviewed or refuses to be interviewed, then those facts shall be documented in the written response.

(f)     The Reviewing Authority shall ensure that any individual whose personal interaction with a claimant forms part of the claim is excluded from participating in the grievance process as to that claim, including any interview of a claimant conducted as part of the grievance process.

(1)     If the individual in question is a Warden, then an Associate Director, Deputy Director, or the Director from the Division of Adult Institutions shall serve as the Reviewing Authority for that claim.

(2)     If the individual in question is a Regional Parole Administrator, then a Deputy Director or the Director from the Division of Adult Parole Operations shall serve as the Reviewing Authority for that claim.

(3)     Participating in a committee meeting to discuss a claimant, or that includes a claimant in attendance, does not, by itself, constitute personal interaction.

(g)     The grievance Coordinator shall ensure that a written grievance decision is completed no later than 60 calendar days after receipt of the grievance, unless other statutory or regulatory authority requires a response in less than 60 calendar days, and contains one of the following decisions as to each claim in the grievance:

(1)     "Denied," meaning that the Reviewing Authority found by a preponderance of the evidence available that all applicable rules were followed;

(2)     "Granted," meaning that the Reviewing Authority found by a preponderance of the evidence available that all applicable rules were not followed,in which case the Reviewing Authority shall order an appropriate remedy;

(3)    "No Jurisdiction," meaning that the claim concerns a policy, decision, action, condition, or omission by an independent entity or official which requires that the claimant file a complaint with that entity or official, as described in subsection 3481(e);

(4)    "Redirected," meaning that the claim will be forwarded to the appropriate authority described below because it fits one of the following circumstances:

(A)    An issue concerning medical, dental, or mental health services provided by the Correctional Health Care Services Division or a dispute concerning a policy, decision, action, condition, or omission by the Correctional Health Care Services Division or its staff shall be redirected to that Division;

(B)    A request for a reasonable accommodation based on a disability shall be redirected to the Institutional or Regional Americans with Disabilities Act coordinator;

(C)    A request for an interview, item, assistance, or service shall be redirected to a staff member designated by the Hiring Authority for a response;

(D)    A request for records that is made pursuant to the California Public Records Act or the California Information Practices Act shall be redirected to the Institutional or Regional Public Records Act coordinator;

(E)    A request regarding institutional placement or search preference pursuant to the Transgender Respect, Agency, and Dignity Act of 2020 shall be redirected to the Prison Rape Elimination Act Compliance Manager;

(F)    A complaint regarding a classification committee decision about institutional placement pursuant to the Transgender Respect, Agency, and Dignity Act of 2020 shall be redirected to the Departmental Review Board via the Office of Appeals; or

(G)    An allegation against an incarcerated or supervised person shall be redirected to a staff member designated by the Hiring Authority for a response;

(5)    "Reassigned," meaning that the claim will be reassigned to the appropriate authority described below because it fits one of the following circumstances:

(A)    A claim involving documents, witnesses, or other facts that are primarily located at another institution or parole region shall be reassigned to the Office of Grievances where the majority of those facts are located, in which case the Office of Grievances that is presented with the reassigned claim shall treat the claim as received on the date that the sending Office of Grievances received it; or

(B)    A request to implement a remedy shall be reassigned to the Remedies Compliance Coordinator referred to in subsection (j)(2).

(6)    "Rejected," meaning the claim will be rejected because it fits one or more of the following circumstances:

(A)    the claimant did not submit the claim within the time constraints required by subsection 3482(b), unless the claim concerns an allegation of staff misconduct;

(B)    the claim concerns an anticipated policy, decision, action, condition, or omission by the department or departmental staff;

(C)    the claim is substantially duplicative of a prior claim by the same claimant, unless the prior claim was rejected as anticipatory pursuant to subsection (B);

(D)    the claim concerns harm to a person other than the person who signed the grievance, unless the claim concerns an allegation of staff misconduct;

(E)    the claim disputes or contravenes the regulatory framework for the grievance and appeal process itself (specifically, Title 15, Subchapter 5.1, Article 1, Administrative Remedies for Inmates and Parolees);

(7)    "Disallowed," meaning the grievance package will be discarded because it was contaminated with organic, toxic, or hazardous materials that may threaten staff safety or institutional security;

**Commented [A43]:** This exception was deleted from the proposed regs and should not have been.

**Commented [A44R43]:** See defendant's response to previous comment regarding exhaustion.

**Commented [A45R43]:** PLTF REPLY:
As stated above, this should still remain in the regs.

(8) "Identified as Staff Misconduct," meaning that the claim involves an allegation of staff misconduct and was referred to the appropriate authority to gather relevant facts, resulting in exhaustion of the administrative remedies process for the claim;

(9) "Pending Legal Matter," meaning that the substance of the claim concerns pending litigation by a party other than the claimant (excluding class action litigation), pending legislation, or pending regulatory action, resulting in exhaustion of the administrative remedies process for the claim; or

(10) "Time Expired," meaning that the Institutional or Regional Office of Grievances was not able to respond to the claim within 60 calendar days, resulting in exhaustion of the administrative remedies process for the claim.

(h) If a claim is rejected as untimely under subsection (g)(6)(A), the grievance decision shall also include the following dates as determined by the grievance Coordinator: the date the claim was discovered, the date the claim was submitted, the date the claim was received, and the time constraint for submission of the claim pursuant to subsection 3482(b). A claim that is rejected as untimely by the Office of Grievances may be appealed for review by the Office of Appeals pursuant to the procedures in section 3484. If the Office of Appeals grants the appeal, then the claim shall be reassigned to the Office of Grievances at the institution or region where the majority of the facts and circumstances that gave rise to the claim occurred. The Office of Grievances shall treat the claim as received on the date that the Office of Appeals issued its decision and shall issue its own decision in compliance with subsection 3483(g).

(i) The written grievance decision shall be sent to the claimant within two business days of completing the written grievance decision letter.

(j) Implementation of Remedy

(1) If the Reviewing Authority grants a claim, then the corresponding remedy shall be implemented no later than 30 calendar days after the decision was sent to the claimant, unless:

(A) the remedy requires the disbursement of funds, in which case the remedy shall be implemented no later than 90 calendar days after the decision was sent to the claimant; or

(B) the remedy requires budget authorization outside the department's existing authority, in which case the remedy shall be implemented no later than one year after the decision was sent to the claimant.

(2) If the remedy has not been implemented and the applicable time constraint has passed, then a claimant may submit a CDCR Form 602-3 (Rev. 01/22), "Request to Implement Remedies," hereby incorporated by reference, directly to the Remedies Compliance Coordinator by regular mail sent to the "Remedies Compliance Coordinator, Department of Corrections and Rehabilitation, P.O. Box 942883, Sacramento, California 95811." Correspondence directed to this address shall not be opened by any departmental staff other than those in the Office of Appeals.

(k) Additional local processes and procedures may be promulgated by the Division of Adult Institutions and the Division of Adult Parole Operations so long as they are consistent with this Article, pursuant to Penal Code section 5058(c)(1).

(l) Exhaustion.

(1) Completion of the review process by the Institutional or Regional Office of Grievances resulting in a decision of "denied," "granted," "no jurisdiction," "redirected," "reassigned," or "rejected" in accordance with subsections (g)(1) through (g)(6) of this section does not constitute exhaustion of all administrative remedies available to a claimant within the department. Nor does completion of the review process resulting in a "disallowed" decision in accordance with subsection (g)(7) of this section because the claimant may submit a new grievance regarding the same claim or claims so long as it is submitted within the time constraints set forth in subsection 3482(b). Exhaustion requires a claimant to appeal such decisions as provided in section 3484.

(2) Completion of the review process by the Institutional or Regional Office of Grievances resulting in a decision of "identified as staff misconduct," "pending legal matter," or "time expired" in accordance with subsections (g)(8) through (g)(10) of this section does constitute exhaustion

~~of all administrative remedies available to a claimant within the department. No appeal is available because the claim was exhausted at the conclusion of the review by the Institutional or Regional Office of Grievances.~~

~~Note: Authority cited: Section 5058, Penal Code. Reference: Sections 832.5 and 5054, Penal Code; and Section 35.107, Title 28, Code of Federal Regulations.~~

**3483.  Office of Grievances Review and Response.**

(a) Initial Review.
(1) The Reviewing Authority over each Office of Grievances shall designate at least one official to assess each written grievance within one business day of receipt and determine if it contains information concerning an imminent risk to personal health or safety, to institutional security, or of sexual abuse, including allegations of sexual misconduct as defined by the federal Prison Rape Elimination Act and the California Sexual Abuse in Detention Elimination Act. In all the above instances, the official shall immediately refer the matter to the appropriate authority in the institution or parole region as required by all applicable laws and regulations. The official shall also ensure the claimant is notified of the referral within five business days.
(2) If a reasonable accommodation request is received, that request shall be referred to the Americans with Disabilities Act Coordinator within one business day of receipt to consider whether an interim accommodation is appropriate. If deemed appropriate, the Americans with Disabilities Act Coordinator shall ensure the interim accommodation is implemented within five business days.
(3) If a grievance alleges that the claimant's Earliest Possible Release Date (EPRD) is erroneous and the claimant is scheduled to be released within 90 calendar days of the date the grievance was received by the Office of Grievances, then a comprehensive review of the EPRD shall be conducted and the results provided to the claimant within 30 calendar days of receipt of the grievance.
(4) If a grievance disputes the denial of a request to amend a record or file containing personal information pursuant to section 3450, then a comprehensive review of the matter shall be conducted and the results provided to the claimant within 30 calendar days of receipt of the grievance.
(b) The Grievance Coordinator shall ensure that the intake process described in subsection (a) is completed and each grievance and reasonable accommodation request is referred to the Centralized Screening Team within three business days of receipt of the grievance.
(c) The Grievance Coordinator shall acknowledge receipt of each grievance and reasonable accommodation request to the claimant in writing within 14 calendar days of its receipt indicating the date the grievance was submitted, the date the grievance was received, the calculated date for the department's response, and whether the grievance was disallowed pursuant to subsection 3482(d)(3).
(d) The Grievance Coordinator shall ensure that all claims returned from the Centralized Screening Team to the Office of Grievances are reviewed and answered in accordance with this section.
(e) Answering a claim.
(1) The Grievance Coordinator shall assign all claims to a Reviewing Authority, who may delegate the claim to any supervisor, for the purpose of gathering relevant facts and determining whether to grant or deny the claim. If the claim requires a routine~~supervisorial~~ review, then the assigned supervisor shall be at least one rank higher than the highest-ranking employee involved in the alleged misconduct.

**Comment [A46]:** In general, more clarity is needed in this section to explain what the difference is between a policy and a supervisorial review, to explain that allegations of staff misconduct not on the ADI should receive a supervisorial review and, in the context of allegations of disability related staff misconduct not on the ADI, that those should be routed to the ADAC.

**Comment [A47R46]:** See subsection (2) which specifies the role of the ADAC during a reasonable accommodation review.

**Comment [A48R46]:** PLTF REPLY:
Plaintiffs are concerned the regulations remain unclear in that some allegations of staff misconduct will be handled in this process. Specifically, allegations of staff misconduct not on the ADI will be processed as routine grievances now. Right now, it is very hard to make out that distinction based on the way the regs are currently drafted.

**Comment [A49]:** Why has this timeframe been expanded from four days to 14 days?

**Comment [A50R49]:** The workload in the Office of Grievances continues to increase so more time has been afforded to process the acknowledgement letters.

**Comment [A51]:** Where does it make clear that the supervisor responsible for the ADA related allegations of staff misconduct = the ADAC?

**Comment [A52R51]:** This level of specificity is best placed in the ADA Desk Reference Manual or DOM (or both).

**Comment [A53R51]:** PLTF REPLY: This was part of our agreement to eliminate LDI's. Defendants made representations that a supervisor (specifically the ADAC in the case of disability related staff misconduct allegations) would be responsible for handling non-ADI staff misconduct complaints. It seems like a problem that this requirement is not captured in the regs.

(2) The assigned supervisor shall conduct a complete~~thorough~~ review of each claim and ensure all relevant evidence, including documents, is gathered and all necessary~~interviews, and video or audio recordings, are identified, summarized, and preserved~~conducted.

(3) A claimant or witness shall be interviewed during the course of responding to a grievance~~claim~~ if the supervisor responsible for answering the grievance~~claim~~ determines it would assist in resolving the claim. The interview shall be conducted in a manner that provides as much privacy for the claimant as operationally feasible. If a claimant is unavailable to be interviewed or refuses to be interviewed, then those facts shall be documented in the department's information technology system.

(4) Suspend and Elevate Process.

(A) If a supervisor assigned to conduct a policy review or a reasonable accommodation review discovers information suggesting the claim involves staff misconduct, then the supervisor shall immediately suspend their activities related to the allegation of staff misconduct and refer the allegation~~matter~~ to the Centralized Screening Team to determine if the claim should be elevated to a routine~~supervisorial~~ review or an investigation. If elevated to a routine~~supervisory~~ review by the Centralized Screening Team, a new claim shall be opened by the Office of Grievances to answer the allegation of staff misconduct.

(B) If a supervisor assigned to a routine~~supervisorial~~ review discovers information suggesting that the claim involves complex issues requiring specialized investigative skills or resources, that~~or the claim, if proven true, is likely to result in adverse action, or that similar staff misconduct was previously sustained against the departmental staff involved,~~ then the supervisor shall immediately suspend their activities and refer the matter to the Centralized Screening Team to determine if the claim should be elevated to an investigation.

(5) Upon completion of the review, the supervisor shall document their fact gathering, preserve all supporting documents and recordings in the department's information technology system, and draft a recommended decision for consideration by the Reviewing Authority.

(f) The Reviewing Authority shall ensure that any individual whose personal interaction with a claimant forms part of the claim is excluded from participating in the process as to that claim, including any interview of a claimant conducted as part of the process.

(1) If the individual in question is a Warden, then an Associate Director, Deputy Director, or the Director from the Division of Adult Institutions shall serve as the Reviewing Authority for that claim.

(2) If the individual in question is a Regional Parole Administrator, then a Deputy Director or the Director from the Division of Adult Parole Operations shall serve as the Reviewing Authority for that claim.

(g) The Grievance Coordinator shall ensure that a written decision is issued no later than 60 calendar days after receipt of the grievance, unless other statutory or regulatory authority requires a response in less than 60 calendar days, and contains one of the following decisions as to each claim in the grievance:

(1) "Denied," meaning that the Reviewing Authority found by a preponderance of the evidence available that:

(A) for policy reviews, the policy complained about was not a violation or contradiction of an established rule of law;

(B) for reasonable accommodation reviews, the accommodation requested was not reasonable pursuant to the Americans with Disabilities Act; or

(C) for routine~~supervisorial~~ reviews, the staff complained about were not in violation of applicable rules;

(2) "Granted," meaning that the Reviewing Authority found by a preponderance of the evidence available that:

(A) for policy reviews, the policy complained about was in violation or contradiction of an established rule of law, in which case the Reviewing Authority shall order an appropriate remedy;

**Comments (right margin):**

Commented [A54]: This should require that all relevant evidence is gathered and stored somewhere, in the case of allegations of staff misconduct.

This should also specifically require that, as Defendants have represented to us, supervisors are expected to obtain, review, and document relevant video and audio recordings, as well as other evidence.

Policy must also include a mandatory time frame for identifying and requesting relevant video that is soon enough after receipt of the grievance that video can be obtained before it is destroyed at the 90-day mark, per CDCR's current policy.

Commented [A55R54]: This section was amended to read: "The assigned supervisor shall conduct a complete review of each claim and ensure all relevant evidence, including documents, interviews, and video or audio recordings, are identified, summarized, and preserved."

Commented [A56R54]: PLTF REPLY: This updated language is good.

It remains unclear where this will be stored.     [...8]

Commented [A57]: This regulation is not consistent     [...9]

Commented [A58R57]: There is also nothing in th     [...10]

Commented [A59R57]: Section (B) was amended     [...11]

Commented [A60R57]: PLTF REPLY: The regulator     [...12]

Commented [A61]: The definitions at the very top     [...13]

Commented [A62R61]: Both "policy reviews" and     [...14]

Commented [A63R61]: PLTF REPLY:     [...15]

Commented [A64]: Plaintiffs continue to raise con     [...16]

Commented [A65R64]: This language has been in     [...17]

Commented [A66R64]: PLTF REPLY:  Plaintiffs' co     [...18]

Commented [A67]: Where?

Commented [A68R67]: The phrase, "in the depar     [...19]

Commented [A69R67]: PLTF REPLY: The regulator     [...20]

Commented [A70]: What about other conflicts of     [...21]

Commented [A71R70]: Defendants agree that fut     [...22]

Commented [A72]: This timeline is incorrect for     [...23]

Commented [A73R72]: Defendants agree this ma     [...24]

Commented [A74R72]: PLTF REPLY:     [...25]

Commented [A75]: Again, we are missing a large     [...26]

Commented [A76R75]: See earlier comment expl     [...27]

Commented [A77R75]: PLTF REPLY:     [...28]

(B) for reasonable accommodation reviews, the accommodation requested was reasonable pursuant to the Americans with Disabilities Act, in which case the Reviewing Authority shall order an appropriate remedy; or

(C) for routine supervisorial reviews, the staff complained about were in violation of applicable rules, in which case the Reviewing Authority shall order an appropriate remedy.

(3) "No Jurisdiction," meaning that the claim concerns a policy, decision, action, condition, or omission by an independent entity or official which requires that the claimant file a complaint with that entity or official, as described in subsection 3481(e);

(4) "Redirected," meaning that the claim was forwarded to the appropriate authority described below because it fits one of the following circumstances:

(A) An issue concerning medical, dental, or mental health services provided by the Correctional Health Care Services Division or a dispute concerning a policy, decision, action, condition, or omission by the Correctional Health Care Services Division or its staff, which shall be redirected to that Division;

(B) A request for assistance, which shall be redirected to departmental staff designated by the Hiring Authority for a response;

(C) A request for assistance implementing an overdue remedy, which shall be redirected to the Remedies Compliance Coordinator as described in subsection (j)(2);

(D) A request for records pursuant to the Public Records Act, which shall be redirected to a Public Records Act coordinator;

(E) A request to inspect a record or file containing personal information or to amend a record or file containing personal information pursuant to the Information Practices Act and section 3450 of Subchapter 5 of Article 6, which shall be redirected to a Public Records Act coordinator;

(F) A complaint regarding a decision issued by the Office of Grievances, which shall be redirected to the Office of Appeals; or

(G) A complaint against an incarcerated or supervised person, which shall be redirected to departmental staff designated by the Hiring Authority for a response;

(5) "Reassigned," meaning that the claim was assigned to a different Office of Grievances than the one which originally received it because the majority of evidence (documents, recordings, or witnesses) is located at the other Office of Grievances, however, regardless of the number of reassignments, the claim shall be treated as if it was received on the date the original Office of Grievances received it;

(6) "Rejected," meaning that the claim was rejected because it fits one or more of the following circumstances:

(A) The claimant did not submit the claim within the time constraints required by subsection 3482(b), unless the claim concerns a reasonable accommodation request;

(B) The claim concerns an anticipated policy, decision, action, condition, or omission by the department or departmental staff;

(C) The claim is substantially duplicative of a prior claim by the same claimant, unless the claim concerns a reasonable accommodation request and there has been a change in circumstance or the prior claim was rejected as anticipatory pursuant to subsection (B);

(D) The claim concerns harm to a person other than the person who signed the grievance, unless the claim concerns an allegation of staff misconduct;

(E) The claim objects to one of the following:

1. a decision issued by Office of Appeals;

2. the fact gathering process during a routine supervisorial review;

3. the fact gathering process during an investigation of staff misconduct;

4. the findings made by a hiring authority at the conclusion of an investigation of staff misconduct; or

**Commented [A78]:** Or an allegation of staff misconduct.

**Commented [A79R78]:** See defendant's response to previous comment regarding exhaustion.

**Commented [A80R78]:** PLTF REPLY: Same disagreement as above. This does not appear to apply only to exhaustion, it suggests that the claim itself will be "rejected" which is not consistent with agreements that the case will nevertheless be investigated if it is an allegation of staff misconduct.

**Commented [A81]:** There is a risk that staff misconduct complaints will be rejected as "duplicative" under this provision, if they are further overt actions of a similar nature by the subject officers

**Commented [A82R81]:** If a similar overt action occurs on a different date then it would not be rejected as duplicative unless it was already included in the earlier allegation as part of a course of conduct.

**Commented [A83R81]:** PLTF REPLY: Where is this made clear?

**Commented [A84]:** People should be able to grieve the investigation process.

**Commented [A85R84]:** Defendants agree that this issue deserves further discussion before these emergency regulations are finalized as permanent regulations.

5. the verbal or written statements submitted by staff under penalty of perjury to a court of law or administrative tribunal.

(7) "Disallowed," meaning the submission from the claimant was discarded because it was contaminated with organic, toxic, or hazardous materials that may threaten staff safety or institutional security, in which case the claimant may re-submit the grievance so long as it is submitted within the time constraints set forth in subsection 3482(b);

(8) "Identified as Staff Misconduct," meaning that the claim involved an allegation of staff misconduct which the Centralized Screening Team referred for an investigation:

(9) "Pending Legal Matter," meaning that the substance of the claim falls within the scope of pending litigation (excluding class action litigation), pending legislation, or pending regulatory action; or

(10) "Time Expired," meaning that the Reviewing Authority was not able to respond to the claim within 60 calendar days.

(h) If a claim is rejected as untimely under subsection (g)(6)(A), then the decision shall also include the following dates as determined by the Grievance Coordinator: the date the claim was discovered, the date the claim was submitted, the date the claim was received, and the time constraint for submission of the claim pursuant to subsection 3482(b). The Office of Grievances shall treat the claim as received on the date that the Office of Appeals issued its decision and shall issue its own decision in compliance with subsection 3483(g).

(i) The written decision shall be sent to the claimant within ~~ten~~two business days of its issuance by the Office of Grievances with a CDCR Form 602-2, Appeal (Rev. 01/25) which is incorporated by reference, attached. If the decision contains one or more granted claims, then a CDCR Form 602-3, Request to Implement Overdue Remedy (Rev. 01/25) which is incorporated by reference, shall also be attached.

~~(1) If effective communication is required pursuant to subsection 3481(h), the written decision shall be delivered to the claimant within five business days instead.~~

~~(2) If effective communication is required and the claimant has transferred to another location, the written decision shall be delivered to the claimant within ten business days instead.~~

(j) Implementation of Remedy

(1) If the Reviewing Authority grants a claim, then the corresponding remedy shall be implemented no later than 30 calendar days after the decision was issued, unless:

(A) the remedy requires the disbursement of funds, in which case the remedy shall be implemented no later than 90 calendar days after the decision was issued; or

(B) the remedy requires budget authorization outside the department's existing authority, in which case the remedy shall be implemented no later than one year after the decision was issued.

(2) If the remedy has not been implemented within the time period described in the above subsection, then a claimant may submit a CDCR Form 602-3 directly to the Remedies Compliance Coordinator by regular mail sent to the address indicated on the form. Correspondence directed to this address shall not be opened by any departmental staff other than those in the Office of Appeals.

(3) Upon receipt of a CDCR Form 602-3, the Remedies Compliance Coordinator shall contact the relevant Office of Grievances to confirm the remedy was implemented. If the remedy was already implemented, the Grievance Coordinator shall provide the Remedies Compliance Coordinator with documentation confirming the remedy was implemented, including the date it was implemented and the full name and title of the official responsible for implementing it. If the remedy was not yet implemented, the Grievance Coordinator and Remedies Compliance Coordinator shall regularly consult until the remedy is implemented.

(k) Pursuant to subdivision (c)(1) of section 5058 of the Penal Code, additional local processes and procedures may be promulgated by the Division of Adult Institutions and the Division of Adult Parole Operations so long as they are consistent with this Article.

(*l*) Exhaustion.

**Commented [A86]:** This seems to imply that claims identified as staff misconduct should not be in this process.

Could modify this language to say, "Identified by CST as an allegation of staff misconduct warranting OIA investigation"

**Commented [A87R86]:** For purposes of this "decisions type," the phrase "Identified as Staff Misconduct" only applies to allegations that are referred to OIA for investigation.

**Commented [A88R86]:** PLTF REPLY: Plaintiffs do not agree that this is the right way to distinguish between what is routed to OIA and what is not. The parties specifically agreed to NOT change the definition of staff misconduct. That means that some allegations of staff misconduct do not fall on the ADI. It is not true that if it is not on the ADI it is not staff misconduct and therefor this explanation of what is "identified as staff misconduct" is not accurate.

**Commented [A89]:** The response should not take longer due to someone's disability.

**Commented [A90R89]:** To avoid any disparity, the rule has been changed to 10 business days for all claimants.

**Commented [A91R89]:** PLTF REPLY: It is unfortunate that Defendants have elected to take this approach to resolving the disparity in timeframes. This timeframe will cause significant delay in the communication of responses.

**Commented [A92]:** The remedies for confirmed staff misconduct in this process are unclear now. Plaintiffs' counsel want to ensure that, if a violation is confirmed corrective action can be issued. Also, it remains unclear in the regs if and how staff should look for examples of repeated violations and, if discovered, how those cases get elevated to discipline.

**Commented [A93R92]:** Defendants agree that this issue deserves further discussion before these emergency regulations are finalized as permanent regulations.

(1) Under the following circumstances a claimant may appeal the answer issued by the Office of Grievances, therefore, the administrative remedies process is not yet exhausted:

(A) "denied" and the claimant is dissatisfied with the answer;

(B) "granted" but the claimant is dissatisfied with the answer or the remedy;

(C) "no jurisdiction;"

(D) "redirected;"

(E) "reassigned;"

(F) "rejected;"

(G) "disallowed;" or

(H) "pending legal matter."

(2) Under the following circumstances a claimant may not appeal the answer issued by the Office of Grievances, therefore, the administrative remedies process is exhausted:

(A) "identified as staff misconduct;" or

(B) "time expired."

NOTE: Authority cited: Section 5058, Penal Code. Reference: Sections 832.5 and 5054, Penal Code; and Section 35.107, Title 28, Code of Federal Regulations.

**Section 3484.        Preparation and Submittal of an Appeal.**

**Section 3484 is amended.**

(a) A claimant who wishes to appeal the written ~~grievance~~ decision or remedy issued~~provided~~ by an ~~Institutional or Regional~~ Office of Grievances ~~concerning one or more claims they previously submitted in a grievance~~ shall do so in writing by submitting a CDCR Form 602-2 directly to the Office of Appeals by regular mail sent to the address indicated on the form "~~Office of Appeals, Department of Corrections and Rehabilitation, P.O. Box 942883, Sacramento, California 95811,~~" or by electronic kiosk or tablet, if available. Correspondence directed to this address shall not be opened by any departmental staff other than those in the Office of Appeals. If a written appeal is received by any other staff, then it shall be forwarded to the Office of Appeals.

(b) Time constraints.

(1) A claimant who wishes to appeal a ~~grievance~~ decision or remedy issued by an Office of Grievances~~found in subsections 3483(g)(1) through 3483(g)(6)~~ shall submit an appeal within 60 calendar days of the date the decision was issued or~~f~~ discover~~ing the decision~~, whichever occurs later in time~~by the institutional or Regional Office of Grievances~~. Discovery occurs when a claimant knew or should have reasonably known of the decision or remedy.

~~(2) The time limit for a supervised person to submit an appeal shall not be extended while on suspended status, meaning the supervised person has absconded.~~

(23) The time constraint to submit an appeal ~~of a claim~~ shall be extended for the period of time that a claimant is:

(A) in the custody of another authority for court proceedings;

(B) in the care of an outside hospital;

(C) temporarily housed in a medical or mental health crisis bed; or

(D) actively and directly engaged in fire suppression.

(c) To submit an appeal, a claimant shall:

(1) type or print legibly on the appeal form~~an official~~ (CDCR Form 602-2) ~~(Rev. 01/22), "Appeal of Grievance," hereby incorporated by reference,~~ or complete the form electronically, if available;

(2) describe in detail why the decision issued~~provided~~ by the ~~Institutional or Regional~~ Office of Grievances is inadequate; and

Commented [A94]: Should be clarified to state, "identified as staff misconduct warranting OIA investigation"

Commented [A95R94]: The department's information technology system does not permit such a length title for a "decision type."

Commented [A96R94]: PLTF REPLY: Even if that will not fit in SOMS, and it is shortened to state "identified as staff misconduct" the point Plaintiffs are attempting to make is that the larger definition should be clarified to state "identified as staff misconduct warranting OIA investigation" in order to distinguish it from staff misconduct that will be routed for routine processing.

Commented [A97]: This exception should also be expanded to cover placement into an inpatient mental health care program in a PIP or DSH facility when someone is receiving mental health care at the acute or ICF level of care

Commented [A98R97]: See defendant's response regarding the same issue found in section 3482.

(3) sign and date the CDCR Form 602-2.

(d) When submitting an appealcompleting a CDCR Form 602-2, a claimant shall not:

(1) use threatening, obscene, demeaning, or abusive language, except when quoting persons involved in the claim;

(2) include information or accusations known to the claimant to be false; or

(3) contaminate the submissionappeal package by including organic, toxic, or hazardous materials that may threaten staff safety or institutional security, in which case the submissionappeal shall be safely discarded and the entire appeal disallowed. The claimant may re-submit the appeal concerning the same claim or claims so long as it is submitted within the time constraints set forth in section 3484(b); or

(4) include a new claims that waswere not included in the original grievance or reasonable accommodation request, in which case the new claim shall be referred to the appropriate Office of Grievancesreassigned pursuant to subsection 3485(g)(5)(A).

(e) The CDCR Form 602-2 shall contain a notification to the claimant that the Office of Appeals has access towill review all of the documents previously submitted by the claimant to the Office of Grievances so re-submitting those documents is not necessary and that any documents attached to the Form 602-2 will not be returnedbefore reaching a decision so none of those documents should be attached to the Form 602-2 submitted to the Office of Appeals, that a copy of the CDCR Form 602-2 will be returned to the claimant with the written appeal decision; but that no other documents submitted by the claimant to the Office of Appeals will be returned.

(f) The appeal package submissiontted fromby the claimant shall be stored electronically by the department.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code.

**Existing Section 3485 is repealed and new Section 3485 is adopted.**

**3485.   Appeal Review.**

(a)     The Reviewing Authority for the Office of Appeals shall designate at least one official to assess each written appeal within one business day of receipt to determine if it contains information concerning an imminent risk to personal safety, to institutional security, or of sexual abuse, including acts of sexual misconduct as defined by the federal Prison Rape Elimination Act and the California Sexual Abuse in Detention Elimination Act. In addition, the official shall assess if the grievance alleges that the claimant's Earliest Possible Release Date (EPRD) is erroneous and the claimant is scheduled to be released within 90 calendar days of the date the appeal was received by the Office of Appeals. In all instances described above, the official shall refer the matter to the Institutional or Regional Office of Grievances where the majority of the facts and circumstances that gave rise to the claim occurred to be handled pursuant to subsection 3483(a).

(b)     If the Office of Appeals determines that a claim involved staff misconduct and that claim was not referred to the appropriate authority to gather relevant facts according to subsection 3482(b), then the Office of Appeals shall grant that claim and order the Centralized Screening Team to refer the allegation to the appropriate authority to gather relevant facts.

(c)     The appeal Coordinator shall acknowledge receipt of each appeal to the claimant in writing within four business days of its receipt indicating the date the appeal was submitted, the date the appeal was received, the calculated date for the department's response, and whether the appeal was disallowed pursuant to subsection 3484(d)(3).

(d)     The appeal Coordinator shall ensure that all routine claims appealed by the claimant to the Office of Appeals are reviewed and answered in accordance with this section.

(e)     The full record of each claim shall be made available to the Office of Appeals for purposes of conducting its reviews. The record shall include the claimant's grievance, the claimant's appeal, both acknowledgment letters, all related interviews conducted for the Institutional or Regional

Office of Grievances, any relevant documentation prepared for the Office of Grievances, any records contained in the department's information technology system, and all department rules and memoranda. The record shall not include any new information provided by the claimant to the Office of Appeals that was not made available to the Office of Grievances for their review.

(f)    The Reviewing Authority shall exclude any individual whose personal interaction with the claimant forms part of the claim from participating in the appeal process as to that claim. If the individual in question is the Associate Director of the Office of Appeals, then the Director from the Division of Correctional Policy Research and Internal Oversight shall serve as the Reviewing Authority for that claim.

(g)    The appeal Coordinator shall ensure that a written appeal decision is completed no later than 60 calendar days after receipt of the appeal, unless other statutory or regulatory authority requires a response in less than 60 calendar days, and contains one of the following decisions as to each claim in the appeal:

(1)    "Denied," meaning that:

(A)    the Reviewing Authority found by a preponderance of the evidence available that the decision by the Institutional or Regional Office of Grievances pursuant to subsections 3483(g)(1) or (2) was proper; or

(B)    the appeal Coordinator found by a preponderance of the evidence available that the decision by the Institutional or Regional Office of Grievances pursuant to subsections 3483(g)(3) through (10) was proper;

(2)    "Granted," meaning that:

(A)    the Reviewing Authority found by a preponderance of the evidence available that the decision by the Institutional or Regional Office of Grievances pursuant to subsections 3483(g)(1) or (2) was not proper, in which case the Reviewing Authority shall order an appropriate remedy; or

(B)    the appeal Coordinator found by a preponderance of the evidence available that the decision by the Institutional or Regional Office of Grievances pursuant to subsections 3483(g)(3) through (10) was not proper, in which case the appeal Coordinator shall order an appropriate remedy;

(3)    "No Jurisdiction," meaning that the claim concerns a policy, decision, action, condition, or omission by an independent entity which requires that the claimant file a grievance with that entity, as described in subsection 3481(e);

(4)    "Redirected," meaning that a request for records maintained solely by the Office of Appeals that is made pursuant to the California Public Records Act or the California Information Practices Act shall be redirected to the Public Records Act Coordinator at the Office of Appeals;

(5)    "Reassigned," meaning that the claim will be reassigned to the appropriate authority described below because it fits one of the following circumstances:

(A)    A claim which was not first submitted in a grievance to an Institutional or Regional Office of Grievances shall be reassigned to the Institutional or Regional Office of Grievances where a majority of the facts and circumstances that gave rise to the claim occurred. The Office of Grievances that is presented with the reassigned claim shall treat the claim as submitted on the date the Office of Appeals received it.

(B)    A claim which was first submitted in a grievance but not answered by an Institutional or Regional Office of Grievances shall be reassigned to the Institutional or Regional Office of Grievances where a majority of the facts and circumstances that gave rise to the claim occurred. The Office of Grievances that is presented with the reassigned claim shall treat the claim as submitted on the date that the claim was first received but not answered by an Institutional or Regional Office of Grievances.

(C)    A request to implement a remedy shall be reassigned to the Remedies Compliance Coordinator referred to in subsection (j)(2).

(6)     "Rejected," meaning that the claim will be rejected because it fits one or more of the following circumstances:

(A)     the claimant did not submit the claim within the time constraints required by subsection 3484(b);

(B)     the claim concerns an anticipated policy, decision, action, condition, or omission by the department or departmental staff;

(C)     the claim is substantially duplicative of a prior claim by the same claimant, unless the prior claim was rejected as anticipatory pursuant to subsection (B);

(D)     the claim concerns harm to a person other than the person who signed the appeal;

(E)     the claim disputes or contravenes the regulatory framework for the grievance and appeal process itself (specifically, Title 15, Subchapter 5.1, Article 1, Administrative Remedies for Inmates and Parolees);

(7)     "Disallowed," meaning the appeal package will be discarded because it was contaminated with organic, toxic, or hazardous materials that may threaten staff safety or institutional security;

(8)     "Identified as Staff Misconduct," meaning that the claim involves an allegation of staff misconduct and was referred to the appropriate authority for the gathering of relevant facts, resulting in exhaustion of the administrative remedies process for the claim;

(9)     "Pending Legal Matter," meaning that the substance of the claim concerns pending litigation by a party other than the claimant (excluding class action litigation), pending legislation, or pending regulatory action, resulting in exhaustion of the administrative remedies process for the claim; or

(10)     "Time Expired," meaning that the department was not able to respond to the claim within 60 calendar days, resulting in the grievance level decision serving as the department's final decision and exhaustion of the administrative remedies process for the claim.

(h)     If a claim is rejected as untimely under subsection (g)(6)(A), the appeal decision shall also include the following dates as determined by the appeal Coordinator: the date the claim was discovered, the date the claim was submitted, the date the claim was received, and the time constraint for submission of the claim pursuant to subsection 3484(b). A claim that is rejected as untimely by the Office of Grievances may not be appealed by the claimant.

(i)     The written appeal decision shall be sent to the claimant within two business days of completing the written appeal decision letter. If the Reviewing Authority or appeal Coordinator grants a claim, then a copy of the decision shall be simultaneously sent to the appropriate Institutional or Regional Grievance Coordinator.

(j)     Implementation of remedy.

(1)     If the Office of Appeals grants a claim, then the Institutional or Regional Reviewing Authority shall ensure that the corresponding remedy is implemented no later than 30 calendar days after the decision was sent to the claimant, unless:

(A)     the remedy requires the disbursement of funds, in which case the remedy shall be implemented no later than 90 calendar days after the decision was sent to the claimant; or

(B)     the remedy requires budget authorization outside the department's existing authority, in which case the remedy shall be implemented no later than one year after the decision was sent to the claimant.

(2)     If the remedy has not been implemented and the applicable time constraint has passed, then the claimant may submit a CDCR Form 602-3 directly to the Remedies Compliance Coordinator by regular mail sent to the "Remedies Compliance Coordinator, Department of Corrections and Rehabilitation, P.O. Box 942883, Sacramento, California 95811." Correspondence directed to this address shall not be opened by any departmental staff other than those in the Office of Appeals.

(k)     Additional local processes and procedures may be promulgated by the Office of Appeals so long as they are consistent with this Article, pursuant to PC section 5058(c)(1).

(l)     Exhaustion.

(1) ~~Completion of the review process by the Office of Appeals resulting in a decision of "denied," "granted," "no jurisdiction," "identified as staff misconduct," "pending legal matter," or "time expired" in accordance with subsections (g)(1) through (g)(3) and (g)(8) through (g)(10) of this section constitutes exhaustion of all administrative remedies available to a claimant within the department.~~

(2) ~~Completion of the review process by the Office of Appeals resulting in a decision to "redirect," "reassign," or "reject" a claim in accordance with subsections (g)(4) through (g)(6) of this section does not constitute exhaustion of all administrative remedies available to a claimant within the department. Nor does completion of the review process resulting in a "disallowed" decision in accordance with subsection (g)(7) of this section because the claimant may submit a new grievance regarding the same claim or claims so long as it is submitted within the time constraints set forth in subsection 3484(b).~~

Note: Authority cited: Section 5058, Penal Code. Reference: Sections 832.5 and 5054, Penal Code; and Section 35.107, Title 28, Code of Federal Regulations.

**Section 3485.        Office of Appeals Review and Response.**

(a) Initial Review. The Reviewing Authority for the Office of Appeals shall designate at least one official to assess each written appeal within one business day of receipt and determine if it contains information concerning an imminent risk to personal health or safety, to institutional security, or of sexual abuse, including allegations of sexual misconduct as defined by the federal Prison Rape Elimination Act or the California Sexual Abuse in Detention Elimination Act. If an imminent risk is detected, the official shall immediately refer the matter to the Office of Grievances to be handled pursuant to subsection 3483(a), unless the official determines that the Office of Grievances already detected the matter.

(b) If the Office of Appeals determines that a claim involved staff misconduct and that claim was not referred to the appropriate authority to gather relevant facts according to subsection 3482(b), then the Office of Appeals shall grant that claim and order the Centralized Screening Team to refer the allegation to the appropriate authority to gather relevant facts.

(c) The Appeal Coordinator shall acknowledge receipt of each appeal to the claimant in writing within 14 calendar days of its receipt indicating the date the appeal was submitted, the date the appeal was received, the calculated date for the department's response, and whether the appeal was disallowed pursuant to subsection 3484(d)(3).

(d) The Appeal Coordinator shall ensure that all claims are reviewed and answered in accordance with this section.

(e) All of the information gathered for the purpose of answering a grievance or reasonable accommodation request, including interviews, documents, and video or audio recordings, shall be made available to the Office of Appeals for its review. If not already preserved in the department's information technology system, the Office of Grievances shall ensure the information is provided to the Office of Appeals and added to the system ~~or a reference is made in the system to the exact location of the information~~.

(f) The Reviewing Authority shall exclude any individual whose personal interaction with the claimant forms part of the claim from participating in the process as to that claim. If the individual in question is the Associate Director of the Office of Appeals, then the Director from the Division of Correctional Policy Research and Internal Oversight shall serve as the Reviewing Authority for that claim.

(g) The Appeal Coordinator shall ensure that a written decision is issued no later than 60 calendar days after receipt of the appeal, unless other statutory or regulatory authority requires a response

**Commented [A99]:** Note that "granting" a claim involving an allegation of staff misconduct is misleading when, in reality, all that is being done here is "accepting" the claim for review and forwarding it to the appropriate authority for investigation.

Plaintiffs' counsel receives a fair amount of mail from people who are confused when this happens under existing regulations.

**Commented [A100R99]:** The reason these decisions are characterized as "grants" is to permit the inclusion of a remedy that specifically orders CST to refer the matter for investigation or "routine review." Without issuing a "grant," the department's information technology system does not make allowances for a remedy.

**Commented [A101R99]:** PLTF REPLY: Plaintiffs understand that this decision has been made based on the limitations of the technology system but this should be flagged for update. "Granting" staff misconduct complaints (or any type of complaint for that matter) when all that is intended is to move it forward in the process and NOT to confirm the misconduct will continue to cause significant confusion in the process and only leads to further filing of complaints.

**Commented [A102]:** Here again, Plaintiffs are very concerned that evidence is not required to be preserved and stored in one location. It is essential that evidence is easily accessible for appeal reviews, internal audits and external oversight.

**Commented [A103R102]:** In the prior regs this provision also mentioned the requirement that any department rules or memoranda reviewed or relied on should also be collected and provided as part of the "record." So, department rules or memoranda should be added to this list.

**Commented [A104R102]:** The subsection was amended to make clear that any information that was not already preserved in the department's information technology system must be "added to the record."

**Commented [A105R102]:** PLTF REPLY: Is it not required to be preserved in the system?

in less than 60 calendar days, and contains one of the following decisions as to each claim in the appeal:

(1) "Denied," meaning that the Reviewing Authority found by a preponderance of the evidence available that the decision issued by the Office of Grievances was proper;

(2) "Granted," meaning that the Reviewing Authority found by a preponderance of the evidence available that the decision issued by the Office of Grievances was not proper, in which case the Reviewing Authority shall order an appropriate remedy:

(3) "Remanded," meaning that the decision issued by the Office of Grievances failed to clearly explain the reason for its decision, failed to preserve the evidence relied on to reach its decision, or failed to apply the correct burden of proof in its decision, in which case the Office of Appeals shall order the Office of Grievances to re-examine the claim and issue a new decision within 30 calendar days of the date the Office of Appeals issued its decision;

(4) "Overlooked," meaning that the claim was submitted in a grievance or reasonable accommodation request but not answered as required by subsection 3481(a), so the Office of Appeals logged the claim and assigned it to the Office of Grievances where a majority of the facts and circumstances that gave rise to the claim occurred;

(5) "Bypassed," meaning that the claim was not submitted in a grievance or reasonable accommodation request as required by subsection 3482(a), so the Office of Appeals logged the claim and assigned it to the Office of Grievances where a majority of the facts and circumstances that gave rise to the claim occurred;

(6) "Rejected," meaning that the claimant did not submit the claim within the time constraints required by subsection 3484(b);

(7) "Disallowed," meaning the submission from the claimant was discarded because it was contaminated with organic, toxic, or hazardous materials that may threaten staff safety, in which case the claimant may re-submit the grievance so long as it is submitted within the time constraints set forth in subsection 3482(b);

(8) "Previously Identified as Staff Misconduct," meaning that the claim was referred for an investigation by the Centralized Screening Team and may not be appealed pursuant to subsection 3483(I)(2);

(9) "Remedy Referred," meaning that the substance of the claim concerns implementation of a remedy and, as a result, shall be referred to the Remedies Compliance Coordinator; or

(10) "Time Expired," meaning that the Reviewing Authority was not able to respond to the claim within 60 calendar days and the grievance level decision shall serve as the department's final decision.

(h) If a claim is rejected as untimely under subsection (g)(6)(A), then the decision shall also include the following dates as determined by the Appeal Coordinator: the date the claim was discovered, the date the claim was submitted, the date the claim was received, and the time constraint for submission of the claim pursuant to subsection 3484(b).

(i) The written decision shall be sent to the claimant within ten~~five~~ business days of its issuance by the Office of Appeals. If the decision contains one or more granted claims, then a copy of the CDCR Form 602-3 shall also be attached. ~~If effective communication is required pursuant to the Americans with Disabilities Act, the written decision shall be delivered to the claimant within ten business days instead.~~ If the Reviewing Authority grants a claim, then notice of the decision shall be sent to the appropriate Grievance Coordinator. If the Office of Appeals grants an appeal and orders an Office of Grievances to open a new grievance to address the claim, then the Office of Grievances shall treat the claim as received on the date that the Office of Appeals issued its decision.

(j) Implementation of remedy.

**Commented [A106]:** Except that decisions on 1824 issues shall be issued within 30 days

**Commented [A107R106]:** See defendant's response regarding the same issue found in section 3483.

**Commented [A108R106]:** The regs refer throughout to the request for reasonable accommodation process. The different timeline for a response should be specifically memorialized in the regs.

**Commented [A109]:** Related to comment above, this is confusing and can lead people to believe they have filed in the wrong process when they have not. The language should be clarified to say:

"Identified as Staff Misconduct Warranting OIA Investigation" meaning the claim was referred for investigation by the CST and may not be appealed...

As far as what should be communicated to the incarcerated person, the response should not suggest their complaint is being shut down. Instead the could be told:

Your complaint was received and identified as an allegation of staff misconduct warranting an OIA level investigation. That investigation is pending. The decision to route your complaint for OIA investigation is not appealable. You will be notified when that investigation is complete and reviewed by a Hiring Authority which can take up to a year.

**Commented [A110R109]:** See defendant's response regarding the same issue found in section 3483.

**Commented [A111R109]:** PLTF REPLY: As stated above, this concern remains.

**Commented [A112]:** First, the regs should clarify this amounts to exhaustion of their administrative remedies, as is clear in the existing regs but was dropped from the proposed regs.

Also, Plaintiffs' counsel frequently sees frustration from people being told that the time has expired and no additional response will be forthcoming. This is an unsatisfying answer to many people who, for example, are just trying to get their property located or trying to fa... [29]

**Commented [A113R112]:** The regulations should also be required to tell the claimant that the time expired notice means their claim is now legally considered fully exhausted

**Commented [A114R112]:** See defendant's response regarding the same issue found in section 3483. Furthermore, subsection (I) clarifies that this "decision type" constitutes exhaustion.

**Commented [A115R112]:** PLTF REPLY: The concern remains that, for time expired appeals – even if they are considered exhausted – there should be a mechanism to address the problem if the person still wishes to do so. The property example is a good one. Even ... [30]

(1) If the Office of Appeals grants a claim, then the Office of Grievances shall ensure that the corresponding remedy is implemented no later than 30 calendar days after the decision was issued, unless:

(A) the remedy requires the disbursement of funds, in which case the remedy shall be implemented no later than 90 calendar days after the decision was issued; or

(B) the remedy requires budget authorization outside the department's existing authority, in which case the remedy shall be implemented no later than one year after the decision was issued.

(2) If the remedy has not been implemented and the applicable time constraint has passed, then the claimant may submit a CDCR Form 602-3 directly to the Remedies Compliance Coordinator by regular mail sent to the address indicated on the form. Correspondence directed to this address shall not be opened by any departmental staff other than those in the Office of Appeals.

(3) Upon receipt of a CDCR Form 602-3, the Remedies Compliance Coordinator shall contact the relevant Office of Grievances to confirm the remedy was implemented. If the remedy was already implemented, the Grievance Coordinator shall provide the Remedies Compliance Coordinator with documentation confirming the remedy was implemented, including the date it was implemented and the full name and title of the official responsible for implementing it. If the remedy was not yet implemented, the Grievance Coordinator and Remedies Compliance Coordinator shall regularly consult until the remedy is implemented.

(k) Additional local processes and procedures may be promulgated by the Office of Appeals so long as they are consistent with this Article.

(*l*) Exhaustion.

(1)    Under the following circumstances a claimant will receive a subsequent answer from the department, therefore, the administrative remedies process is not yet exhausted:

(A)    "denied" because the Office of Grievances correctly redirected, reassigned, or disallowed the claim;

(B)    "granted" and the claim is returned to the Office of Grievances for re-consideration and issuance of a new decision;

(C)    "remanded;"

(D)    "overlooked;"

(E)    "bypassed;"

(F)    "disallowed;"

(G)    "remedy referred;" or

(H)    "time expired" and the Office of Grievances redirected, reassigned, or disallowed the claim.

(2)    Under the following circumstances a claimant will not receive any further answer from the department, therefore, the administrative remedies process is exhausted:

(A)    "denied" on the merits or due to a lack of jurisdiction;

(B)    "granted" and the claim is not returned to the Office of Grievances for re-consideration and issuance of a new decision;

(C)    "rejected;"

(D)    "previously identified as staff misconduct;" or

(E)    "time expired" and the Office of Grievances denied the claim or screened it out due to a lack of jurisdiction.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Sections 832.5 and 5054, Penal Code; and Section 35.107, Title 28, Code of Federal Regulations.

**Commented [A116]:** Same comment as above that the incarcerated person should also be notified if CDCR believes the remedy has been implemented.

**Commented [A117R116]:** The Office of Appeals issues a closure memo after confirming the remedy has been implemented.

**Commented [A118R116]:** PLTF REPLY: Same as above, is this true in the case of a 602-3 – the person receives an additional response to their claim that the remedy has not been implemented?

**Commented [A119]:** Telling people their claim is "denied" when it was actually redirected, reassigned, or disallowed is confusing and results in people believing that the system has not worked or that they have not been heard when that is not actually the case.

Similarly, telling people their claim is "granted" when in reality it has simply been accepted for reconsideration is also very confusing. Plaintiffs' counsel receives a fair amount of mail from people who have been told their claim has been "granted" when accepted for reconsideration or remanded and it is confusing.

"granting" or "denying" should be reserved for decisions regarding the substance of the claim and not for processing the complaint.

**Commented [A120R119]:** Defendants agree that this issue deserves further discussion before these emergency regulations are finalized as permanent regulations.

**Commented [A121]:** Same as above, this should say "identified as a staff misconduct complaint warranting investigation by OIA" because that is more accurate since staff misconduct complaints can also go through this process as well.

**Commented [A122R121]:** See defendant's response regarding the same issue found in section 3483.

**Commented [A123R121]:** PLTF REPLY: Same as above, this is not yet resolved.

**Section 3486. Allegations of Staff Misconduct Toward an Incarcerated or Supervised Person.**

**Section 3486 is amended.**

(a) Right to submit ~~claim~~ complaint alleging staff misconduct toward an incarcerated or supervised person.~~:~~
(1) The provisions of this Article shall apply to all allegations of staff misconduct received by the Department of Corrections and Rehabilitation on or after January 1, 2025.
(2 1) Any person can submit a ~~claim~~ complaint alleging of staff misconduct toward an incarcerated or supervised person when they believe departmental staff have engaged in behavior that resulted in a violation of law, policy, regulation, or procedure, or an ethical or professional standard.
~~(A) CDCR Form 602-1, Grievance, (Rev. 01/22), which is incorporated by reference, may be submitted by incarcerated and supervised persons pursuant to sections 3482(a)(1) and 3482(a)(2) respectively.~~
~~(B) CDCR Form 602-HC, Health Care Grievance, (Rev. 07/24), which is incorporated by reference, may be submitted by incarcerated and supervised persons pursuant to section 3999.226(a).~~
~~(C) Citizen's complaints shall be submitted in writing pursuant to section 3417.~~
(3 2) Staff shall not retaliate against a reporting party or witness for submitting a ~~claim~~ complaint or reporting staff misconduct.
(4 3) As provided in this Article, and Article 2 of Subchapter 5, the department shall ensure all claims complaints of staff misconduct are properly documented consistent with section 3486.1~~, subsections (c) and (d)~~.
~~(b) If a complaint alleging staff misconduct is submitted on a CDCR Form 1824, Reasonable Accommodation Request, (Rev. 07/24), which is incorporated by reference, it will be processed pursuant to sections 3482(a)(1) and 3482(a)(2).~~
(b c) Definitions.  For purposes of this Article and Article 1 of this Subchapter, the following definitions shall apply:
(1) "Allegation Inquiry" refers to the process of gathering relevant facts and evidence by a Local Designated Investigator (LDI) concerning a complaint that involves an allegation of staff misconduct.
(2) "Allegation Inquiry Report" refers to the confidential report prepared by an LDI following an Allegation Inquiry.
(3) "Allegation Investigation Unit" (AIU) refers to the unit within the Office of Internal Affairs (OIA) that conducts investigations into complaints alleging misconduct toward incarcerated and supervised persons as set forth in section 3486.2, and reviews allegation inquiry reports completed by LDIs.
(4) "AIU Investigator" refers to an investigator within the AIU assigned to conduct a confidential investigation.
(5) "*Armstrong* class member" refers to an incarcerated person who is a class member under the federal court decree in *Armstrong v. Newsom* (previously: *Armstrong v. Schwarzenegger*).
(1 6) "Centralized Screening Team" refers to the entity that reviews documentation unit responsible for screening all grievances, reasonable accommodation requests, and allegations of staff misconduct, and then routing the claims. and making a screening decision. to determine if the documentation contains a Routine Issue, alleges misconduct toward an incarcerated or supervised person, or alleges misconduct not involving an incarcerated or supervised person meets the definition of "staff misconduct.", or "routine claim" as defined in this section.
(2) "Claim" means a single issue or event arising from a unique set of facts or circumstances.
(3) "Claimant" refers to a person who files a "claim" with the department.

**Commented [A124]:** Same as above, do not understand why this is being deleted.  It seems necessary to spell out the basis for people being able to file complaints?

**Commented [A125R124]:** Restored.

**Commented [A126R124]:** PLTF REPLY:
This is resolved as to this section but it should also be restored above.

**Commented [A127]:** The regs were previously drafted to make clear that a staff misconduct complaint could be submitted on any type of form – 602, HC-602, 1824.  These proposed regs omit any reference to what type of form can be used to submit a staff complaint.  It seems important to let people know that they can submit a staff complaint on any form or at least that it should go a 602 but will be accepted on any form?

**Commented [A128R127]:** A full description of the CDCR Forms 602-1, 602-2, and 602-3 are included in the administrative screening regulations (see section 3481(f)).  Furthermore, an allegation of staff misconduct can be submitted on regular paper and it will still be processed by staff. Note: the CDCR Form 602-HC is included in the Health Care regulations.

**Commented [A129R127]:** PLTF REPLY:
This does not seem to clear up the issue – that a staff misconduct complaint can appear on any type of form including 1824 and HC-602 forms.

Are Defendants attempting to change something with the process here?  There is some confusion after reviewing the HC regs – it appears there is a change and not all HC-602's are routed through CST.

**Formatted:** Highlight

**Commented [A130]:** This revised language is confusing.  It is plaintiffs' understanding that the CST does not perform any substantive screening role with respect to reasonable accommodation requests and simply opens claims within a log number, before routing the claims back to the OOG and, ultimately, ADAC. *See, e.g.,* email from S. Lodholz to T. Borden et al. re: ARMSTRONG/CLARK - Combined Form Materials (Oct. 25, 2024).

We ask that the the new language be rejected as misleading or else that it be revised to reflect that the CST does not substantively screen to identify ADA, reasonable accommodation requests.

Instead this could state:

"Centralized Screening Team" refers to the unit responsible for screening all grievances, including those filed as reasonable accommodation requests or health care grievances, for the limited purpose of identifying whether the grievance includes an allegation of staff miscond... [31]

(7) "Clarification Interview" refers to an interview conducted by CST staff when clarification is required to make a screening decision.

(8) "Complaint" refers to any documentation or verbal statements received by the Department from any source that contains a routine issue or alleges Staff Misconduct.

(9) "Reporting Party" refers to the person making a complaint against departmental staff.

(10) "Department" and "Departmental Staff" refer exclusively to CDCR employees, contractors, and volunteers.

(5 11) "Designated Case" refers to a case assigned to an attorney in the Employment Advocacy and Prosecution Team (EAPT), Vertical Advocate (VA).

(12) "Disabled Incarcerated Persons" as used in Article 1.5, Staff Misconduct Allegations, refers to all *Armstrong* class members, and incarcerated persons *in the* Mental Health Services Delivery System at the Enhanced Out Patient level of care or higher (i.e., Psychiatric Inpatient Program and Mental Health Crisis Bed).

(6 13) "Employment Advocacy and Prosecution Team" (EAPT) refers to the entity in the Office of Legal Affairs responsible for providing legal counsel and representation during the employee investigation, discipline, and appeal process.

(7 14) "Hiring Authority" has the same meaning in this Article as in subsection 3392(a)(12).

(8 15) "Investigation" refers to the gathering of facts and evidence by an AIU Investigator concerning an allegation of staff misconduct.

(16) "Investigation Assignment Decision" refers to the decision made by the AIU manager identifying the level of AIU investigator to be assigned to conduct an investigation.

(9) "Investigator" refers to a specially trained employee assigned to conduct a staff misconduct investigation.

(17) "Investigation Report" refers to the confidential report prepared by an AIU investigator following an investigation.

(18) "Locally Designated Investigator" refers to departmental staff trained by OIA to collect evidence and conduct Allegation Inquires.

(10 19) "Office of Internal Affairs" (OIA) refers to the entity with authority to investigate allegations of employee misconduct.

(20) "Routine Issue" refers to any complaint received by CST that is not identified as an allegation of Staff Misconduct.

(21) "Screening Decision" refers to the decision made by the CST of whether a complaint contains a Routine Issue, allegation(s) of staff misconduct toward an incarcerated or supervised person, or allegation(s) of staff misconduct not related to an incarcerated or supervised person. If the complaint contains allegation(s) of staff misconduct toward an incarcerated or supervised person which include complex issues requiring specialized investigative skills or resources, CST shall refer the allegations to AIU for investigation. If the complaint contains allegation(s) of staff misconduct toward an incarcerated or supervised person which do not include complex issues requiring specialized investigative skills or resources, CST shall refer the allegations to the hiring authority for an Allegation Inquiry.

(11 22) "Staff Misconduct" refers to behavior that results in a violation of law, regulation, policy, or procedure, or actions contrary to an ethical or professional standard.

(23) "Third Party" refers to a person or persons not directly involved in the incident or interaction that resulted in the allegation of staff misconduct.

(12 24) "Vertical Advocate" (VA) refers to an EAPT attorney who provides legal advice to the department during investigations and the employee discipline process for designated cases, and represents the department at administrative hearings and during any subsequent writ or appellate proceedings.

(d) Implementation  The provisions of this Article shall apply to staff misconduct complaints received by the department as follows:

---

**Commented [A131]:** The above definition of HA does not appear to include Chief Deputy Warden. However, the CARU will be staffed by Chief Deputy Wardens. How will this work?

Also, the numbers in 3392(a)(12) have been changed above and this should reference the updated number 3392(a)(10).

**Commented [A132]:** Do you mean to delete AIU here? It is otherwise deleted in other areas of the regulation and where you now refer only to investigators.

**Commented [A133]:** This definition is problematic because OIA doesn't handle all staff misconduct complaints.

Revise:
"Office of Internal Affairs" (OIA) refers to the entity with authority to investigate certain categories of allegations of serious employee misconduct.

**Commented [A134R133]:** Although OIA is primarily tasked with handling allegations of staff misconduct that fall on the Allegation Decision Index (ADI) and supervisors are tasked with handling all other allegations of staff misconduct, that does not mean OIA can't handle allegations of staff misconduct that do not fall on the ADI.

**Commented [A135R133]:** PLTF REPLY:
Plaintiffs agree, OIA can handle any allegation of staff misconduct BUT they do not do so under the current process . This language is therefore misleading because it implies that any allegation of misconduct will be sent to OIA. This problem is further compounded by the fact that the regs do not make clear which will stay routine and the language regarding which ones will be sent to OIA (those that are complex or need specialized investigative skills) is not accurate and further confuses the issue. If a class member is trying to determine whether they have filed a staff complaint and how it will be handled, they would not be able to tell from the regulations.

**Commented [A136]:** I don't understand why this would change. Based on our negotiations, this remains true

**Commented [A137R136]:** "Routine" was restored in the administrative remedy regulations (see section 3480(b)).

**Commented [A138R136]:** PLTF REPLY:
It also belongs here to help distinguish what is a staff complaint and what is not.

**Commented [A139]:** Why delete this? Third party complaints are still permitted in the staff misconduct context, correct?

**Commented [A140R139]:** Third parties are now referred to as claimants based on the definition of "claimant" found in 3480(b).

**Commented [A141R139]:** PLTF REPLY:
This is true, claimant has been changed such that anyone could presumably make a claim. Nevertheless, the ... [32]

(1) Allegations of staff misconduct toward an incarcerated or supervised person involving Use of Force and Prison Rape Elimination Act (PREA) complaints for all facilities and parole regions statewide, shall be referred to AIU (formerly known as AIMS) for an allegation inquiry.

(2) CDCR Form 602-1, Grievances, (Rev. 01/22) for all facilities and parole regions statewide shall be screened by CST, and allegations of staff misconduct toward an incarcerated or supervised person requiring specialized investigative skills or resources as described in subsection 3486(c)(21), shall be referred to AIU (formerly known as AIMS) for an allegation inquiry.

(3) CDCR Form 602-1, Grievances for all facilities and parole regions statewide shall be screened by CST, and allegations of staff misconduct toward an incarcerated or supervised person not requiring specialized investigative skills or resources as described in subsection 3486(c)(21), will be referred to the Hiring Authority for assignment to an LDI for an allegation inquiry, unless CST refers to AIU (formerly known as AIMS) for an allegation inquiry.

(4) For the following institutions, allegations of staff misconduct toward an incarcerated or supervised person contained in a CDCR Form 602-1, as set forth in subsection 3486.1(h):
(A) Richard J Donovan;
(B) California State Prison, Los Angeles County;
(C) California State Prison, Corcoran;
(D) Substance Abuse Treatment Facility;
(E) Kern Valley State Prison; and
(F) California Institution for Women.

(5) For allegations of staff misconduct toward an incarcerated or supervised person, contained in a CDCR Form 602-1 at the following institutions, assigned to an LDI for an allegation inquiry, the allegation inquiry report shall be reviewed and approved as set forth in subsection 3486.2(c)(4):
(A) Richard J Donovan;
(B) California State Prison, Los Angeles County;
(C) California State Prison, Corcoran;
(D) Substance Abuse Treatment Facility;
(E) Kern Valley State Prison; and
(F) California Institution for Women.

(6) For CDCR Form 602-HC, Health Care Grievances, (Rev. 07/24); CDCR Form 1824, Reasonable Accommodation Requests, (Rev. 07/24); and all Third Party Complaints (e.g., citizen complaints, staff, ombudsman, advocacy letters and any related interviews, etc.) that contains an allegation of staff misconduct towards an *Armstrong* Class Member at the Richard J Donovan Correctional Facility, and disabled incarcerated persons as defined in section 3486(b)(13) at the following institutions, shall be reviewed by the institution and if the complaint contains an allegation of staff misconduct toward an incarcerated or supervised person, the institution shall refer the complaint to CST for screening and disposition as set forth in subsections 3486.1(h) and 3486.2(c)(4):
(A) California State Prison, Los Angeles County;
(B) California State Prison, Corcoran;
(C) Substance Abuse Treatment Facility;
(D) Kern Valley State Prison; and
(E) California Institution for Women.

(7) Beginning on January 1, 2023, for allegations of staff misconduct toward an incarcerated or supervised person, contained in a CDCR Form 602-1, assigned to an LDI for an allegation inquiry, the allegation inquiry report shall be reviewed and approved as set forth in subsection 3486.2(c)(4).

(8) Beginning on March 1, 2023, allegations of staff misconduct toward an incarcerated or supervised person from all institutions and parole regions, contained in a CDCR Form 602-1,

~~requiring specialized investigative skills or resources as described in subsection 3486(c)(21), shall be referred to AIU for investigation as set forth in subsection 3486.2(b).~~
~~(9) Beginning on May 31, 2023, CDCR Form 602 HC, Health Care Grievances from all institutions and parole regions, shall be referred to CST for screening and disposition as set forth in subsections 3486.1(h) and 3486.2(c)(4).~~
~~(10) Beginning on August 31, 2023, CDCR Form 1824, Reasonable Accommodation Requests from all institutions and parole regions, shall be referred to CST for screening and disposition as set forth in subsections 3486.1(h) and 3486.2(c)(4); and~~
~~(11) Beginning on November 30, 2023, Third Party Complaints (e.g., citizen complaints, staff, ombudsman, advocacy letters and any related interviews, etc.) shall be referred to CST for screening and disposition as set forth in subsections 3486.1(h) and 3486.2(c)(4).~~

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code; *Armstrong et al. v. Newsom et al.*, United States District Court for the Northern District of California, Court Case number 94-cv-02307-CW; *Madrid v. Woodford*, Special Masters Final Report Re: Department of Corrections Post Powers Investigations and Employee Discipline; Case No. C90-3094-T.E.H; *Madrid v. Woodford*, Order; and Case No. C90-3094-T.E.H. Class Action.

**Section 3486.1. Centralized Screening.**

**Section 3486.1 is amended.**

(a) If departmental staff receives a written <u>claim</u> ~~complaint~~ from a <u>claimant</u> ~~reporting party~~ alleging staff misconduct toward an incarcerated or supervised person, the department staff receiving the <u>claim</u> ~~complaint~~ shall refer the <u>claim</u> ~~complaint~~ to the Centralized Screening Team (CST) and notify their supervisor to determine if it contains information constituting an imminent risk to personal safety, institutional security, or involves sexual abuse or acts of sexual misconduct as defined by the federal Prison Rape Elimination Act (PREA) and the California Sexual Abuse in Detention Elimination Act.
(b) Allegations of staff misconduct not involving an incarcerated or supervised person shall not be referred to CST. If a <u>claim</u> ~~complaint~~ is received by CST that does not contain allegations involving misconduct toward an incarcerated or supervised person, CST shall refer the <u>claim</u> ~~complaint~~ to the <u>H</u>~~h~~iring <u>A</u>~~a~~uthority ~~for disposition~~.
(c) <u>Claims</u> ~~Complaints~~ of misconduct not involving departmental staff.
(1) If a hiring authority receives a <u>claim</u> ~~complaint~~ of misconduct, that does not involve departmental staff, the hiring authority shall advise the reporting party that the subject of the <u>claim</u> ~~complaint~~ is not employed by CDCR and is outside the department's jurisdiction.
(2) For all allegations of misconduct, excluding sexual abuse or sexual misconduct allegations as defined in PREA <u>and the California Sexual Abuse in Detention Elimination Act.</u>, the reporting party shall be advised to file a <u>claim</u> ~~complaint~~ directly with the appropriate outside entity.
(3) For allegations of sexual abuse or sexual misconduct as defined by PREA <u>and the California Sexual Abuse in Detention Elimination Act.</u>, the hiring authority receiving the <u>claim</u> ~~complaint~~ shall notify the appropriate outside entity of the allegations as required by law, and inform the reporting party of this referral.
(d) Verbal <u>Claims</u> ~~Complaints~~
(1) Department staff shall document in writing any verbal <u>claims</u> ~~complaints~~ received that involve an allegation that an incarcerated or supervised person was subject to unnecessary or excessive use of force<u>,</u> ~~staff-on-offender~~ <u>or sexual abuse, including acts of sexual misconduct as defined by the federal Prison Rape Elimination Act and the California Sexual Abuse in Detention Elimination Act.</u> ~~or sexual harassment~~. If either of the above circumstances apply, <u>T</u>~~t~~he department staff ~~receiving the complaint~~ shall refer the <u>claim</u> ~~complaint~~ to CST if it involves a staff on offender

claim, and immediately forward the claim ~~complaint~~ to their hiring authority. If the subject of the claim ~~complaint~~ is a hiring authority, the allegation shall be referred to the hiring authority's supervisor.

(2) For all other verbal claims ~~complaints~~, departmental staff shall provide the reporting party with information on how to submit their claim ~~complaint~~ in writing.

(e) The CST shall review all claims ~~complaints~~ received involving an incarcerated or supervised person and make a Sscreening Ddecision.

(1) Claims challenging a~~a~~ departmental policy shall be referred to the hiring authority via the Office of Grievances for a policy review.

(2) Claims requesting a reasonable accommodation shall be referred to the Office of Grievances for a reasonable accommodation review.

(3) Allegations of staff misconduct which include complex issues requiring specialized investigative skills or resources shall be referred to OIA for an investigation.

(4) Allegations of staff misconduct which do not include complex issues requiring specialized investigative skills or resources shall be referred to the Office of Grievances for a routine review.

(5~~3~~) Notwithstanding subsections (1) through (4) above, Cc~~laims~~ related to health care services or staff, excluding allegations of staff misconduct referred ~~by CST~~ to OIA for investigation, shall be referred to the Division of hHealth cCare sServices.

~~(4) All claims that are not a policy issue listed in (1) above, or not an allegation of staff misconduct listed in (2) above, or not a health care issue listed in (3) above, shall be referred to the hiring authority via the Office of Grievances for a supervisorial review.~~

(f) Assigned CST staff shall review each document received to determine if it contains information constituting an imminent risk to personal safety, institutional security, or involves sexual abuse or acts of sexual misconduct as defined by the ~~federal Prison Rape Elimination Act (PREA)~~ and the California Sexual Abuse in Detention Elimination Act. In those instances, CST shall immediately notify the hiring authority of the affected institution or program for appropriate action.

(g) The CST may conduct a clarification interview if required to make a screening decision. The clarification interview shall be conducted in a manner that provides as much privacy for the claimant as operationally feasible.

~~(h) When an allegation of staff misconduct toward an incarcerated or supervised person is identified by CST, CST shall make a screening decision. If CST's screening decision is to refer the complaint to the hiring authority for an allegation inquiry, and the subject of the complaint is the hiring authority, CST shall refer the allegation(s) to the hiring authority's supervisor.~~

~~(i) If CST returns a complaint to the hiring authority as a routine issue, and the hiring authority identifies an allegation of staff misconduct towards an incarcerated or supervised person, the hiring authority shall refer the complaint and any supporting materials to CST for a screening decision.~~

(h_j) CST's Screening Decision shall be documented in the department's information technology system.

(i_k) The hiring authority shall be notified of CST's screening decision via the department's information technology system.

~~(l) The reporting party shall be notified in writing that their complaint has been received by CST within thirty (30) calendar days of receipt.~~

NOTE: Authority cited: Section 5058, Penal Code. Reference: Sections 2635, 2636, 2637, 2638, 2639, 2640, 2641, 2642, 2643, 2644 and 5054, Penal Code; 28 CFR Part 115, Code of Federal Regulations; Armstrong et al. v. Newsom et al., United States District Court for the Northern District of California, Court Case number 94-cv-02307-CW; Madrid v. Woodford, Special Masters Final Report Re: Department of Corrections Post Powers Investigations and Employee Discipline; Case No. C90-3094-T.E.H; Madrid v. Woodford, Order; and Case No. C90-3094-T.E.H. Class Action.

**Commented [A142]:** Same comment as above that "complex issues requiring specialized investigative skills or resources" is not actually consistent with the standard of screening based on the ADI.

Possible Revision:
Allegations of staff misconduct that warrant referral to OIA for investigation based on screening criteria provided to CST

**Commented [A143R142]:** This language has been included in the staff misconduct regulations since 2022.

**Commented [A144R142]:** PLTFF REPLY:
Same as above - this language is confusing and not accurate.

**Commented [A145]:** What about health care related staff misconduct that does not fall on the ADI and does not get routed to OIA? It sounds like, because there is not LDI, these would now be routed to health care for a review. Please explain how this will work and how these will be monitored?

**Commented [A146R145]:** For clarity, (3) was modified and is now (5). Note: (2) and (4) were also added.

**Commented [A147R145]:** PLTFF REPLY:
Please confirm our understanding, based on this language, that allegations of staff misconduct that fall on the ADI will be routed to OIA even if they involve health care staff. Allegations of staff misconduct not on the ADI that involve health care staff will be routed to the Division of Health Care Services.

**Commented [A148]:** If I am the general public trying to understand how staff complaints are handled by CDCR, this catchall is unclear.

The language could be tweaked slightly to make clear that if the claim is an allegation of staff misconduct, but it is not listed in (2) above then it is routed for supervisorial review.

**Commented [A149R148]:** This version of (4) is deleted and replaced with new (4) above.

**Commented [A150R148]:** PLTFS REPLY:
For the reasons stated above, new number 4 is not accurate.

**Section 3486.2. Staff Misconduct Investigations ~~and Allegation Inquiries~~ Involving Misconduct toward Incarcerated or Supervised Persons.**

**Section 3486.2 is amended.**

(a) ~~AIU~~ Investigation Processing.

(1) Upon receipt of a <u>claim</u> ~~complaint~~ from CST, <u>OIA</u> ~~AIU~~ staff shall analyze the <u>claim</u> ~~complaint~~, obtain initial information including records, documents, evidence, or recordings relating to the <u>claim</u> ~~complaint~~, and assemble an investigation file.

(2) An <u>OIA</u> ~~AIU~~ manager shall review the investigation file to determine the level of investigator to be assigned, in consultation with EAPT for designated cases.

(b) ~~AIU~~ Staff Misconduct Investigations.

(1) The department shall ensure that each <u>AIU</u> investigation is conducted pursuant to existing laws, regulations, and CDCR policies and procedures.

(2) ~~AIU~~ <u>When an investigators is assigned a case, they shall disclose if they have a conflict of interest in the case prior to</u> ~~conduct an investigation~~ <u>investigating for all</u> <u>the</u> allegations of staff misconduct toward incarcerated or supervised persons r~~eferred to AIU by CST~~.

(3) Completion of Investigations.

(A) <u>An</u> ~~AIU~~ investigat~~ors~~ shall conduct thorough investigations, and ensure all relevant evidence is gathered and reviewed, and necessary interviews are conducted.

(B) At the conclusion of an investigation, the assigned ~~AIU~~ investigator shall prepare a confidential draft investigation report which summarizes the facts and evidence gathered during the investigation.

<u>(4) Closure of Investigation Based on Special Conditions.</u>

<u>(A) The investigator may recommend an investigation be closed when one of the following special conditions is met:</u>

<u>1) Review of video and audio recordings provides</u> <span style="color:#4a90d9">conclusive</span> <u>evidence</u> ~~to establish~~ <u>that the alleged misconduct did not occur.</u>

<u>2) If during the investigation, no further investigatory steps can be pursued due to the lack of specificity provided by the claimant and the claimant's refusal to cooperate with the investigator's efforts to obtain additional information.</u>

<u>(B) If the investigator determines that either of the special conditions contained in subsection (A) apply, the investigator shall document and forward their recommendation to a manager and, if the case is designated, to the assigned VA. Thereafter:</u>

<u>1) If the case is designated and the manager and VA concur that either of the special conditions apply, then the manager shall approve the recommendation to close the investigation, and notify the hiring authority of the decision.</u>

<u>2) If the case is not designated and the manager concurs that either of the special conditions apply, then the manager shall refer the case to the OIA regional administrator to review. If the OIA regional administrator concurs, then the manager shall notify the hiring authority of the decision.</u>

<u>3) If the case is designated and the manager or the VA do not concur that either of the special conditions apply, then the manager shall refer the investigation back to the investigator for further investigation.</u>

<u>(C) After receiving notification, if the Hiring Authority:</u>

<u>1) Does not concur that either of the special conditions apply or determines additional investigation is warranted, then the hiring authority shall refer the investigation back to the investigator for further investigation.</u>

**Commented [A151]:** This presumption seems backwards. If this is the "quick close" provision of the new policy, it seems if the alleged misconduct can quickly confirmed through the video, that warrants closure. If the allegation does not appear on the video, it may be that the alleged time is off and additional investigation is warranted.

**Commented [A152R151]:** We see many examples where staff conclude, after reviewing the wrong video or too short of a video clip, that the alleged misconduct did not occur. This quick close exception rule will swallow the hole if this is the standard.

**Commented [A153R151]:** The word "conclusive" was added to the text to raise the threshold for closure. Furthermore, defendants believe this method of closure should be field tested, quantified, and then discussed before these emergency regulations are finalized as permanent regulations.

**Commented [A154R151]:** PLTF REPLY: So this is not intended currently to serve as a "quick close" provision? What is the special condition warranting closure then and how does it differ from other investigations? Plaintiffs' counsel maintain that the presumption is still backwards in this case. If you can confirm the allegation conclusively, that seems to warranting stopping work on the case. If you can't confirm conclusively, there is the potential that more should be done.

**Commented [A155]:** This also appears problematic. There are often many ways to investigate whether alleged staff misconduct occurred even if the 602 itself lacks specificity and the claimant will not cooperate, including by checking documents and video. We frequently see allegations of "lack of specificity" by investigators when there is actually enough in the 602 to investigate the claim, as an excuse for closing an investigation quickly. This should be a rare exception that can only be used if there is clear documentation of all the steps the investigator pursued before concluding that nothing further could be done.

**Commented [A156R155]:** Defendants agree that this should be a rare exception and must be adequately documented. Furthermore, Defendants believe this method of closure should be field tested, quantified, and then discussed before these emergency regulations are finalized as permanent regulations.

**Commented [A157R155]:** PLTF REPLY: Plaintiffs are willing to discuss this further. What is the plan for field testing this within 160 days?

2) Concurs that either of the special conditions apply and determines additional investigation is not warranted, then the hiring authority shall notify the subject of the investigation that the investigation was closed, which concludes the disciplinary process.

(5 4) Investigation Report Review.

(A) An OIA AIU manager shall review the draft investigation report, and supporting exhibits and recordings, to determine whether the investigation is sufficient, complete, and unbiased.

(B) For designated cases, the VA shall review the draft investigation report and all supporting exhibits and recordings, and provide feedback to OIA AIU.

(C) After the investigation report is finalized, the confidential final investigation report and all supporting exhibits and recordings, shall be provided to the VA for designated cases, and the hiring authority.

(D) If the hiring authority finds the investigation insufficient to determine a finding for each allegation, they shall request additional investigation in accordance with section 3392.5(c).

(E) If the hiring authority finds the investigation sufficient to determine a finding for each allegation, they shall do so in accordance with section 3392.1.

(c) Allegation Inquiry Process.

(1) When CST refers an allegation of staff misconduct to the hiring authority, the hiring authority shall have the Allegation Inquiry conducted by an LDI.

(2) The LDI shall be at least one rank higher than the highest-ranking subject allegedly involved in the misconduct.

(3) Completion of Allegation Inquiries.

(A) LDIs shall conduct thorough allegation inquiries, and ensure all relevant evidence is gathered and reviewed, and necessary interviews are conducted. The LDI shall complete the Allegation Inquiry except when one of the following situations occurs:

1. If the LDI discovers evidence of staff misconduct which requires investigative skills or resources as described in subsection 3486(c)(21), the LDI shall cease further inquiry, document the evidence in an Allegation Inquiry Report which summarizes the facts and evidence gathered during the inquiry, and refer the Allegation Inquiry to AIU for an investigation with notification to the hiring authority.

2. If the LDI finds evidence of staff misconduct which may not require investigative skills or resources as described in subsection 3486(c)(21), but which may result in adverse action, the LDI shall cease further inquiry, document the evidence in an Allegation Inquiry Report, and refer the Allegation Inquiry to the hiring authority for review. If the hiring authority agrees, the Allegation Inquiry shall be referred to AIU for investigation or request for direct adverse action. If the hiring authority does not believe adverse action may result, the matter shall be returned to the LDI for completion of the Allegation Inquiry.

(B) Upon completion of the Allegation Inquiry, the LDI shall author a confidential draft Allegation Inquiry Report with all applicable supporting exhibits, and provide the draft report to the AIU manager for review and approval.

(4) Allegation Inquiry Report Review.

(A) An AIU manager shall review the draft Allegation Inquiry Report, and supporting exhibits, to determine whether the Allegation Inquiry is sufficient, complete, and unbiased.

(B) Once approved by an AIU manager, the Allegation Inquiry Report shall be provided to the hiring authority.

(C) If the hiring authority finds the allegation inquiry insufficient to determine a finding for each allegation, they shall request additional fact gathering either by inquiry or investigation.

(D) If the hiring authority finds the allegation inquiry sufficient to determine a finding for each allegation, they shall do so in accordance with section 3392.1.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code; Armstrong et al. v. Newsom et al., United States District Court for the Northern District of

---

**Commented [A158]:** How this works in the new system is missing from the above.

When the CST refers an allegation of staff misconduct for supervisorial review, that review should be conducted by XXXXX and, in the case of an alleged failure to accommodate due to disability, that review should be conducted by the ADAC.  Something along those lines...

**Commented [A159R158]:** Regarding (c), because allegation inquiries have been replaced with routine reviews all the procedures for completing routine reviews are now included in the administrative remedy regulations, including the requirement that the supervisor be one rank higher than the subject (see section 3483(e)(1)).

**Commented [A160R158]:** PLTF REPLY:  This section – which is supposed to be a complete explanation of how staff complaints will be processed by CDCR – should at least cross reference the routine grievance process and explain that some staff misconduct complaints will be routed to that process for review.

California, Court Case number 94-cv-02307-CW; Madrid v. Woodford, Special Masters Final Report Re: Department of Corrections Post Powers Investigations and Employee Discipline; Case No. C90-3094-T.E.H; Madrid v. Woodford, Order; and Case No. C90-3094-T.E.H. Class Action.

**Section 3486.3. Staff Misconduct Determination Notification.**

**Section 3486.3 is amended.**

(a) The hiring authority shall notify the reporting party, in writing, of the finding(s) of the original claim ~~complaint~~ within thirty (30) calendar days of the determination of the disposition of the claim ~~complaint~~.
(1) The notification of the findings regarding the staff misconduct claim ~~complaint~~ shall be limited to whether the original claim ~~complaint~~ is sustained, not sustained, exonerated, unfounded, or no finding.
(2) Information related to any personnel action shall not be conveyed to the reporting party in the matter.
(b) The department's information technology system shall be updated to reflect all determinations made regarding the allegation of staff misconduct.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code; Armstrong et al. v. Newsom et al., United States District Court for the Northern District of California, Court Case number 94-cv-02307-CW; Madrid v. Woodford, Special Masters Final Report Re: Department of Corrections Post Powers Investigations and Employee Discipline; Case No. C90-3094-T.E.H; Madrid v. Woodford, Order; and Case No. C90-3094-T.E.H. Class Action.

# EXHIBIT D

DocuSign Envelope ID: E3895B80-553B-4B73-8430-F701A0D304F8

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date:  January 4, 2024

To:  Associate Directors, Division of Adult Institutions
Wardens
Americans with Disabilities Act Coordinators

Subject:  **IMPLEMENTATION OF THE ZOOMAX SNOW 12 ELECTRONIC MAGNIFIERS FOR INCARCERATED PERSONS WITH A PERMANENT VISION IMPAIRMENT**

The purpose of this memorandum is to implement a process for the use of the Zoomax Snow 12 electronic magnifiers in housing units, including in-cell, for incarcerated persons with a permanent vision impairment, impacting placement (DPV).

The California Department of Corrections and Rehabilitation (CDCR) has an obligation to provide access to programs, services, and activities for all incarcerated persons and paroled persons with disabilities, as required by Federal Law, the Americans with Disabilities Act (ADA), and the *Armstrong* Remedial Plan. The ADA guarantees equal opportunity and provides basic civil rights protections for individuals with disabilities in public and private sector services and employment.

A comprehensive evaluation was conducted and identified the capabilities of the Zoomax Snow 12 would provide the most beneficial accommodation to the DPV population. The Zoomax Snow 12 is a portable electronic video magnifier with various features and benefits that can provide independence to DPV incarcerated persons reading and writing needs. With the Zoomax Snow 12, the DPV incarcerated person can read, write, and look at objects more easily and perform full-page content scanning with Optical Character Recognition (OCR) text to speech.

Institutions designated to house DPV incarcerated persons shall develop a plan to allow access to the Zoomax Snow 12 electronic magnifier within the DPV housing units (to include in-cell use, restricted housing units, and specialized bed units as needed). The attached check-in/check-out tracking sheet shall be completed by the assigned custody supervisors to document the process and submitted to the ADA office by the 5th of the following month. The DPV incarcerated person will have the ability to check the device out, including overnight use, and shall be allowed additional time for pending legal proceedings, including Board of Parole Hearings preparation.

The Warden, or designee, shall designate the appropriate custody supervisor (e.g., ADA Field Training Sergeants or facility program sergeants) to inspect the Zoomax Snow 12 electronic magnifiers weekly to ensure there is no damage or alteration to the Zoomax Snow 12 electronic magnifier. If the Zoomax Snow 12 electronic magnifier is altered or destroyed, the supervisor shall determine if it was intentional or unintentional based on the circumstances, and all available information will be provided to the ADA Coordinator. If deemed intentional, the ADA Coordinator will determine the best course of action (i.e., access to the Zoomax Snow 12 electronic magnifier or provide an alternate reasonable accommodation).

DocuSign Envelope ID: E3895B80-553B-4B73-8430-F701A0D304F8

Associate Directors, Division of Adult Institutions
Wardens
Americans with Disabilities Act Coordinators
Page 2

**PROCUREMENT AND TRAINING FOR THE ELECTRONIC MAGNIFIERS**

The Class Action Management Unit (CAMU) has procured the initial order of the Zoomax Snow 12 electronic magnifiers and will provide them to the ADA Offices at DPV designated institutions. Replacement orders for the Zoomax Snow 12 electronic magnifiers will be the responsibility of each institution. When ordering replacements, all institutions shall order the same model for consistency (see attached specifications), however, the choice of vendor is at the discretion of the institution, consistent with current established procurement policies.

An instruction guide for the Zoomax Snow 12 electronic magnifiers will be provided to staff and DPV incarcerated persons (see attached). The ADA Coordinator or designee shall ensure all DPV incarcerated person(s) authorized to utilize the Zoomax Snow 12 electronic magnifier are provided training on the proper use and care. A CDC Form 128-B information chrono shall be completed documenting the training and forwarded to Case Records for scanning into the Electronic Records Management System.

If an incarcerated person who is not designated DPV submits a request for access to the Zoomax Snow 12 electronic magnifier, the incarcerated person shall submit a CDCR Form 1824, Request for Reasonable Accommodation. The Reasonable Accommodation Panel will consider all requests on a case-by-case basis.

The ADA Coordinator or designee shall communicate this information regarding access to Zoomax Snow 12 electronic magnifiers to the local Inmate Advisory Counsel and by institutional bulletins/notices located within housing units.

All CDCR institutions shall update their Disability Placement Program (DPP) Local Operating Procedures (LOP) to reflect the direction included in this memorandum and provide a copy of the DPP LOP to their respective Mission Associate Director and the CAMU mailbox (CDCR.CAMU@cdcr.ca.gov) within 90 days of the release date of this memorandum. The LOP must explain the process for access, inventorying, tracking, and security inspection of the electronic magnifiers. The revision may be incorporated as an addendum to be included in the next scheduled revision of the LOP.

Wardens or designees shall ensure all custody supervisors and managers (i.e., Sergeants, Lieutenants, Captains, Associate Wardens, Chief Deputy Wardens, and Wardens) are trained on the expectations set forth in this memorandum by utilizing the Learning Management System Course code 11063890 within 90 days of the date of this memorandum. Institutions shall provide proof of practice to their respective Mission Associate Directors.

Associate Directors, Division of Adult Institutions
Wardens
Americans with Disabilities Act Coordinators
Implementation of the Zoomax Snow 12 Electronic Magnifiers for Incarcerated Persons with a
Permanent Vision Impairment
Page 3


If you have any local institution questions, please contact your local ADA Office.

If you have any headquarters level questions, please contact Darnell Mebane, Captain, CAMU, at
(916) 202-5130 or Darnell.Mebane@cdcr.ca.gov.



RON BROOMFIELD
Director
Division of Adult Institutions

Attachments

cc:    Joseph (Jason) Williams
       Jennifer Benavidez
       Jared D. Lozano
       Sadie Richmond
       Raquel Buckel
       Dawn Lorey
       Lourdes White
       Darnell Mebane
       Chor Thao
       Megan Roberts
       In-Service Training Managers

DocuSign Envelope ID: E3895B80-553B-4B73-8430-F701A0D304F8

# Zoomax Snow 12 Tracking Sheet

Unit: _____     Date: _____

| Name | CDCR# | Housing | Time Checked out | Time Returned |
|------|-------|---------|------------------|---------------|
|      |       |         |                  |               |
|      |       |         |                  |               |
|      |       |         |                  |               |
|      |       |         |                  |               |
|      |       |         |                  |               |
|      |       |         |                  |               |
|      |       |         |                  |               |
|      |       |         |                  |               |

Incarcerated people in the Disability Placement Program (DPP) with a verified vision disability impacting placement (DPV) may sign up to check out the Zoomax Snow 12 portable desktop magnifier auxiliary device to include overnight use and shall be allowed additional time if pending legal proceedings.

DocuSign Envelope ID: E3895B80-553B-4B73-8430-F701A0D304F8





DocuSign Envelope ID: E3895B80-553B-4B73-8430-F701A0D304F8

# Put **SNOW 12** on the reading material and enjoy reading time now!





**Simple & intuitive**

Six simple buttons make it easy and intuitive for everyone to enjoy.



**Superior image quality**

Our best-ever camera produces the sharpest images with great details and lively colors.



**Slim and modern**

Thinner than a notebook computer, Snow 12 is stylish and comfortable to hold.

DocuSign Envelope ID: E3895B80-553B-4B73-8430-F701A0D304F8

# Writing is possible and more comfortable than ever with a **foldable** **stand!**





**Comfortable writing space**

Bigger writing space for you to use for writing, doodling, signing and creating!



**OCR and text-to-speech**

Quickly and easily convert printed text into speech with over 20 languages.



**See virtually everything with ease**

Hold a pill bottle, printed material, recipe or homework under and read it.

DocuSign Envelope ID: E3895B80-553B-4B73-8430-F701A0D304F8

# Technical Specifications

| | |
|---|---|
| Display | 12-inch full HD touch screen |
| Full HD camera | 13 megapixels |
| Magnification | 2.7x to 19x or 2.5x to 19x w/stand |
| Color modes | Full color & 10 high-contrast color modes |
| OCR and text to speech (optional) | 20+ languages |
| File formats | JPG, PDF, RTF, and TXT |
| Foldable stand | Yes |
| Working height under camera | 14 cm (5.5 in.) |
| Distance viewing | Yes (optional with SnowLink*) |
| Panning | Touch screen panning & analog stick panning |
| Connect to TV/monitor/iPhone | Yes |
| Continuous use time | 2.5 hours |
| Charging time | 2 hours |
| Weight | 960 g (2.12 lbs.) or 2,240 g (4.9 lbs.) w/stand |
| Dimensions (H/W/D) | 29x22x2.4 cm (12x9x1 in.) |

*Coming soon: optional distance camera for viewing presentations at school or in the workplace.

 +86-571-8700-6308       www.zoomax.com      sales@zoomax.com

# Quick Guide

## SNOW 12

V1.1



## Buttons

Home
Freeze
Analog
MENU
Mode
Zoom out
Zoom in

Power input

Power button

## Buttons

**Foot stand**

OPEN

CLOSE

- Push the **Release button** to open the Foot stand.

Release button

- Push the Foot stand back to close the stand.

## Foldable stand

lift

arm

Step 1

push

Step 3

Step 2

Slow & felt

Step 4

## Snow 12 with foldable stand

Close the Foot stand to use the Snow 12 with the foldable stand.

① Snow 12 can be used alone
② Snow 12 can be used with foldable stand

## Basic Function

| | | |
|---|---|---|
| Turn on/off the device | | Press power button |
| Zoom in/out | | Press 🔍 |
| Open hand | | Press the Release button on the bottom of the Foot stand |
| Change color mode (dual array) | | Press 🎨 |
| Freeze image | | Press and hold 🔒 |
| Move image with analog stick | | Move the Analog stick up/down/left/right to move the image |
| Rotating the module | | Rotate the module |

## Advanced Function / Setup Menu

| | | |
|---|---|---|
| | Main menu | Press 🏠 to enter main menu |
| 📷 | Save photo | Press ⭐ to save photo after taking the image |
| 🖼 | Check saved photo | Tap the photo icon in main menu |
| ⚙ | Settings | Tap the settings icon ⚙ in main menu |
| ℹ | System information | Tap the system information icon ℹ in main menu |
| A | Adjusting scaling | Press ➕ and ➖ to zoom in and out |

## Text to Speech

# EXHIBIT E

State of California                                    Department of Corrections and Rehabilitation

# Memorandum

Date:    5/26/2023

To:     Library Staff

Subject:   **AMERICANS WITH DISABILITIES ACT PRINTING IN THE LIBRARIES**

The purpose of this memorandum is to announce that printing of selected, fillable forms and Word documents is now available at designated institutions via the Americans with Disabilities Act (ADA) computer in the libraries.  The printed items will be provided as a no-cost accommodation to Disability Placement Vision (DPV) class members with the exception of court forms, in which the class member will be charged $0.10 per page, as non-class members are charged.  At present, the fillable forms include the CDC 193 Trust Account Withdrawal Form, the CDCR 1824 Reasonable Accommodation Form, the CDCR 7362 Health Care Services Request Form, a 1983 Civil Rights Complaint court form, and a habeas corpus writ.  Other fillable forms may be added as they become available.  Printing accommodations through the ADA computer is restricted to DPV incarcerated people (IP). The ADA computers are primarily provided for the purpose of generating legal work/documents.  Legal use includes, but is not limited to: parole board preparation, preparation for release on parole, completion of court and CDCR forms, correspondence with counsel, and preparation of writs and motions. Consistent with California Code of Regulations Title 15 § 3142, library staff shall not read the contents of confidential legal documents. Non-legal use may be authorized as a secondary use, if resources are available.  Non-legal use includes, but is not limited to: writing papers for student class assignments, student research/independent study, and writing letters to family, friends, and outside organizations.

Please see the attached job aids for instructions on printing using CANVAS.  Incarcerated people requiring ADA computer access shall request access to the Division of Rehabilitative Programs (DRP) Learning Network by informing the library staff at their facility library.  Incarcerated people using the DRP Learning Network will have 100 MB of space to save documents.  Any saved documents will remain in the incarcerated person's account even if they move to a different institution, or if they print a version of the document.

Please make this memorandum available for incarcerated persons to review in the library.

Library Staff
ADA Printing in the Library
Page 2


If you have any questions, contact Brandy Buenafe, Library Services Administrator, Office of Correctional Education.



BRANDY BUENAFE
Library Services Administrator
Office of Correctional Education
Division of Rehabilitative Programs

Attachments

cc:    Shannon Swain
       Associate Superintendents
       Principals
       Assistant Principals

# How to access ADA Law Library Forms

## CDCR Forms

The following forms can be found in the Law Library Resources course in Canvas:

- CDCR 0022 - Inmate/Parolee Request for Interview, Item or Service
- CDCR 1824 - Reasonable Accommodation Request
- CDCR 193 - Trust Account Withdraw Order
- CDCR 602 - Inmate/Parolee Appeal
- CDCR 7362 - Health Care Services Request Form
- Complaint for Violation of Civil Rights

Follow these steps to access the forms in Canvas:

Step 1.     Once logged into laptop, open up the Chrome Browser. (See Figure 1)



*Figure 1*

Step 2.     Click on Managed Bookmarks to find the DRP Learning Portal, then click on it to open. (See Figure 2)



*Figure 2*


Step 3.    Click on Canvas-Student in the DRP Learning Network under All Apps. (See Figure 3)



*Figure 3*

Note: If the 'Open VMWare Client Message pops up, then check the box for 'Always allow portal.services.root to open links of this type in the associated app' and then click Open VMWare Horizon Client 32-bit. (See Figure 4)



Figure 4

Step 4.    Accept the Acceptable Use Policy (AUP) agreement (See Figure 5)



Figure 5

Step 5.    After agreeing to the Acceptable Use Policy Agreement, you will enter your Canvas Dashboard area. Select the Law Library Resources Course. (See Figure 6)



*Figure 6*

Step 6.    Once in the Law Library Resources Course, scroll down to the Resources Module. There you will find the various CDCR and court form documents available for your use. Click on the form you would like to use. In this example, we have chosen to click on *CDC 193 – Trust Account Withdraw Order.pdf*. Once you click on the form, you will be displayed an image of the form. (See Figure 7)



*Figure 7*

Step 7.    Click on "Download CDC 193 – Trust Account Withdraw Order.pdf". The file will download and Chrome will alert you of the downloaded file on the lower left side of the browser window. (See Figure 8)



*Figure 8*

Step 8.    Click on the CDC 193 Trust Account file popup from the bottom left of the browser. (See Figure 8)

Note: If you happen to click on the up arrow next to the file name instead of clicking directly on it, a small window will pop up. You will click on Open. (See Figure 9)



*Figure 9*

Step 9.     The file will open in the browser. You will be able to fill out the form within the browser.

After you are done, click on the Printer icon located on the upper right corner of the screen.(See Figure 10)



*Figure 10*

Step 10.     In the Destination section, select Microsoft Print to PDF and click on Print. (See Figure 11)



*Figure 11*

Step 11.    The file explorer will open and you will need to select Documents on the left side panel. Name the file and click Save. This will save the filled out form in your Documents folder. (See Figure 12)



*Figure 12*

Step 12.    Go back to Canvas and click on "Test-Form Upload". The tab should still be open in the browser. (See Figure 13)



*Figure 13*

Step 13.    When in the Test-Form Upload section, click on Start Assignment. (See Figure 14)



*Figure 14*

Step 14.    This is where you will upload any saved form so that the law library staff can print out your document and then you can sign it. In the File Upload tab, click on Upload File. (See Figure 15)



*Figure 15*

Step 15.    The Upload File button will change to Choose File. Click Choose File to attach your saved form. (See Figure 16)



*Figure 16*

Step 16.    The file explorer will open and you will find your saved form. Select it and click on Open to attach it. (See Figure 17)



Figure 17

Step 17.    You will see the name of your form in the place where 'Choose File' is. You do have the ability to add multiple files if you have filled out multiple forms. When you are ready, click on Submit assignment. (See Figure 18)



Figure 18

Step 18.    After you click Submit Assignment, you will receive a Submitted message on the right side of screen. You now can tell the Law Library staff that you have completed the forms that you need them to print for you. (See Figure 18)

Note: It is advised that you leave the original form open before closing the tab in the browser window. If you happen to close the form in the browser window and afterward uploading, find out you have an error, you will have to do the whole form over. Also, the Canvas system will not allow you to delete submitted forms. You can resubmit and enter in comments such as, "Updated Form CDCR 620" or whatever notes you want the Law Library Staff to know about a duplicate submitted form.

# How to retrieve legal forms submitted into Canvas

Step 1.    Log into Canvas Teacher Account

*Figure 1:Canvas Login Screen*



Step 2.    Once logged into Canvas, you will be taken to your Dashboard where you will see Courses you are a member of. You can either click on the Law Library Resources Class to view submitted forms or you can look to the right under **To Do** to view the submitted forms. Either choice will have the To Do area on the right side of the window.

*Figure 2:Canvas Dashboard*



Step 3.     Under To Do, select the form you want to print. The form will open up in a preview window. From there you can download the form to the device you are using to print from by either clicking the  icon as show below on the left side of window on the grey bar or to the right next to the file name by clicking on the ↓ icon .

*Figure 3:File Preview Window*



Step 4.     The download will display either on the lower left screen of the browser (Chrome) or at the top right (Edge). Please see screenshots below.

*Figure 4:Edge File Download Example*



*Figure 5:Chrome File Download Example*



Step 5.    If you do not select to open the file within the browser, the file will be in the Downloads  folder which can be found by opening the File Explorer and finding the Downloads Folder on the left.

*Figure 6: File Explorer-Downloads Folder*

Step 6.    Select the file you want to print. Once it opens in Adobe Acrobat DC, then go to File>Print.  (Any questions regarding your printer, please reach out to your local IT)

# EXHIBIT F

State of California                                         Department of Corrections and Rehabilitation

# Memorandum

Date:    7/26/2024

To:    Library Staff

Subject:    **AMERICANS WITH DISABILITIES ACT PRINTING IN THE LIBRARIES -UPDATE**

The purpose of this memorandum is to provide two updates to the Americans with Disabilities Act Printing in the Libraries memorandum dated May 26, 2023.

First, the computers shall be referred to as Vision Accommodation Computers (VAC) not ADA computers. This more accurately reflects their purpose as a reading and writing accommodation to blind and low vision incarcerated persons.

Second, access to the VACs shall be afforded to both DPV and DNV incarcerated persons. This is the result of a recent court order which states that the Department's policies and procedures shall ensure that blind and low-vision incarcerated persons who require auxiliary aids for effective communication (reading and/or writing) have access to those aids to complete parole-related reading and writing tasks in a timely manner and in such a way that protects their privacy and independence.

If you have any questions, contact Brandy Buenafe, Library Services Administrator, Office of Correctional Education, at (916) 431-4443.



DocuSigned by:

*Brandy Buenafe*

3D6049E859BF44F...

BRANDY BUENAFE
Library Services Administrator
Office of Correctional Education
Division of Rehabilitative Programs

cc:    Shannon Swain
        Associate Superintendents
        Principals
        Assistant Principals

# EXHIBIT G

State of California                                          Department of Corrections and Rehabilitation

# Memorandum

Date    :    March 16, 2015

To      :    Principals
             Library Staff

Subject:    **LIBRARY ASSISTIVE EQUIPMENT LOG**

The purpose of this memorandum is to provide library staff with updated instructions and information related to the law library, general library operations, and legal mandates in regards to tracking the use of assistive equipment.

Library staff account for all contact with inmate library users via logs designated for the general population as well as class members specifically represented in the Armstrong and Clark Remedial Plans.  In accordance with the remedial plans, auxiliary aids that are reasonable, effective, and appropriate to the needs of the inmate are provided when standard written or oral communication is not effective. Such aids may include but are not limited to readers, sound amplification devices, audio tape (or other electronic media), Braille materials, and large print materials.

In order to improve the tracking of inmate use of assistive equipment, the attached Assistive Equipment Log is to be implemented and maintained at all libraries. Requests for usage are currently logged when access is provided or denied.  The new logging process includes clearly documenting the reason why access was denied (e.g. equipment was already in use, etc.).  Also, the library staff must note on the new Assistive Equipment Log instances where there are no requests for usage throughout the day/shift.   If there were no requests for usage throughout the day/shift, the notations must be completed by the end of the shift.  The completed logs shall be forwarded to the Principal and the American Disabilities Act (ADA) Coordinator after the last day of each month.

If you have any questions or require additional information, please contact Beverly Penland, Vice Principal, Office of Correctional Education, at (916) 322-6823 or via email at Beverly.Penland@cdcr.ca.gov.

**SHANNON M. SWAIN**
Deputy Superintendent
Office of Correctional Education

Attachment

cc: Wardens       Rick Wells        Jennifer Wynn     Jennifer Winistorfer
    Raul Romero   Janet Blaylock    David Ramirez     Beverly Penland
    Brandy Buenafe

# ASSISTIVE EQUIPMENT LOG

Institution _____
Facility/Yard _____
Library Days _____
Library Hours _____

Assistive Equipment _____

Staff Name _____
_____
(Print Name)

| Date | Time In | Inmate Name (Print Name) | CDCR # | Assistive Equipment Information | Time Out | Staff Initials | Total Time |
|------|---------|--------------------------|--------|--------------------------------|----------|----------------|------------|
| | | | | Equipment Requested:  ☐ Used ☐ Denied –Explain | | | |
| | | | | Equipment Requested:  ☐ Used ☐ Denied –Explain | | | |
| | | | | Equipment Requested:  ☐ Used ☐ Denied –Explain | | | |
| | | | | Equipment Requested:  ☐ Used ☐ Denied –Explain | | | |
| | | | | Equipment Requested:  ☐ Used ☐ Denied –Explain | | | |
| | | | | Equipment Requested:  ☐ Used ☐ Denied –Explain | | | |
| | | | | Equipment Requested:  ☐ Used ☐ Denied –Explain | | | |
| | | | | Equipment Requested:  ☐ Used ☐ Denied –Explain | | | |

**THE LIBRARY WAS OPEN AND NO REQUESTS WERE MADE:**
List Each Date

Comments:

# INSTRUCTIONS

Fill out the following information at the top of each page.  Use all the entry lines before starting a new page.  There must be an entry for every day the library is scheduled to be open.  If the library is closed for any reason; note the reason in the "Comments" section.  If there are no requests to use the assistive equipment, a "no" request entry must also be logged and completed by the end of the day/shift.  The notation shall include the reason why the assistive equipment request was denied for that day.

1. List your institution name
2. List the type or types of assistive equipment provided/denied
3. Print your name
4. List the days of the week the library is open
5. List the library hours for each day
6. List if no requests were made for the day or shift.

When a DDP or DPP inmate or any inmate is authorized to use the assistive equipment the following must be logged:

1. The date of use (mm/dd/yy)
2. The start time of use (i.e. 8:00, 9:15)
3. Inmate or staff will print their name
4. CDCR #
5. Assistive Equipment Information.  List equipment requested, check used or denied.  If denied give the reason
6. The end time (i.e. 8:00, 9:15)
7. Staff initial to verify equipment was used/denied
8. Total time equipment was used (i.e. 8:00, 9:15)

In the "library was open and no requests were made" section:

1. List the each date the library was open but not equipment was requested for use

In the "comments" section:

2. List time equipment was not operational and status to resolve its operation
3. List any library closures and the reason
4. List any other information that seems appropriate (e.g. inmate refusal of assistive equipment after it was provided)

# EXHIBIT H

DocuSign Envelope ID: 98AE3B6E-4EAE-4837-BF13-B12BCC24BE67

 **CALIFORNIA CORRECTIONAL**
**HEALTH CARE SERVICES** 

# MEMORANDUM

**Date:**    May 8, 2023

**To:**    Regional Health Care Executives
Chief Executive Officers
Associate Wardens, Health Care Access

**From:**

*Joseph Bick*
347167202A8A404...
JOSEPH BICK, M.D.
Director
Health Care Services

*JOSEPH J WILLIAMS*
6DD85FF0281341A...
JOSEPH (JASON) WILLIAMS
Director (A)
Corrections Services

**Subject:**    **MAGNIFIER DISTRIBUTION FOR VISION IMPAIRED INCARCERATED PERSONS**

It is expected that all vision impaired-impacting placement (DPV) incarcerated persons (IP) be offered either a handheld or headband magnifier as an accommodation for assistance with reading and writing.   IPs may be in possession of only one handheld magnifier or one headband magnifier.

For the initial rollout, all DPV IPs shall be ducated to the nursing line for issuance of these magnifiers within 14 days of receipt of this memorandum.  Nursing staff will complete a CDCR Form 7536, Durable Medical Equipment and Medical Supply Receipt (CDCR Form 7536) for these medical supplies.  IPs may refuse these magnifiers which will be documented on the CDCR Form 7536.

Vision impaired-non-impacting placement (DNV) IPs may request a magnifier via the institution's current CDCR Form 7362, Health Care Services Request (CDCR Form 7362).

In the event an IP's magnification device is broken or lost, an IP may request a new magnifier by submitting a CDCR Form 7362.

CEOs or designees shall ensure all appropriate staff are made aware of this directive.  In addition, this directive shall be shared with IPs and the Inmate Advisory Council (IAC) at the next health care IAC meeting.

All questions may be directed to Lieutenant Jason Anderson, Corrections Services, at Jason.Anderson@cdcr.ca.gov.

CC: ADA Coordinators
Health Care Compliance Analysts

# EXHIBIT I

Docusign Envelope ID: 8E556B58-5E4D-441B-9BB3-43E8674D977B

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date:   September 3, 2024

To:   Associate Directors, Division of Adult Institutions
      Wardens
      Americans with Disabilities Act Coordinators

Subject:   **EXPANSION OF ACCESS TO ZOOMAX SNOW 12 ELECTRONIC MAGNIFIERS**

This memorandum provides direction to institutions on expanding access to the Zoomax Snow 12 electronic magnifiers and informs institutions of the requirement to provide reading and writing accommodations to DNV class members.

Previously, as outlined in the memorandum titled, *"Implementation of the Zoomax Snow 12 Electronic Magnifiers for Incarcerated Persons with a Permanent Vision Impairment"*, dated January 4, 2024, institutions designated to house DPV incarcerated persons were directed to develop a plan to allow access to the Zoomax Snow 12 electronic magnifier within the DPV housing units (to include in-cell use, restricted housing units, and specialized bed units as needed). This direction has not changed and remains in place.

Effective as of the date of this memorandum, access to the Zoomax Snow 12 electronic magnifiers shall be made available for check out to incarcerated persons designated as having a vision impairment that does not impact placement (DNV) and non-class members. The following procedure shall be put into place.

Institutions housing DNV incarcerated persons shall develop a plan to ensure access to the Zoomax Snow 12 electronic magnifier through their ADA office. Access shall be allowed within the housing units (to include in-cell use, restricted housing units, and specialized bed units as needed). The DNV incarcerated person will have the ability to check the device out, including overnight use, and shall be allowed additional time if pending legal proceedings, to include Board of Parole Hearings preparation.

Incarcerated persons who are non-class members may request the Zoomax Snow 12 electronic magnifier access through the reasonable accommodation process, and all requests will be considered on a case-by-case basis. Should the Reasonable Accommodation Panel (RAP) approve access, these incarcerated persons will have the ability to check the device out through the ADA Office, to include overnight use, and shall be allowed additional time if pending legal proceedings, to include Board of Parole Hearings preparation. The ADA Office has the discretion to allow incarcerated persons access to existing Zoomax Snow 12 electronic magnifier machines, however priority use of Zoomax Snow 12 electronic magnifier machines will be for DPV and DNV class members.

The ADA Coordinator will establish an inventory for this equipment and will ensure that it is inspected upon return (or more frequently if needed) from any incarcerated persons, to ensure

Associate Directors, Division of Adult Institutions
Wardens
Americans with Disabilities Act Coordinators
Page 2

that there is no damage or alteration to the equipment. If the electronic magnifier is altered or destroyed, the ADA Office staff shall determine if it was intentional or unintentional based on the circumstances. If it is deemed intentional, the ADA Coordinator will determine the best course of action (i.e., access to the Zoomax Snow 12 electronic magnifier or provide an alternate reasonable accommodation). The attached check-in/check-out tracking sheet shall be completed by the ADA Office staff.

**PROCUREMENT AND TRAINING FOR THE ZOOMAX SNOW 12 ELECTRONIC MAGNIFIER**

The Class Action Management Unit (CAMU) has procured the initial order of the Zoomax Snow 12 electronic magnifiers and will provide them to the ADA Offices at each institution. Replacement orders for the device will be the responsibility of each institution. When ordering replacements, all institutions shall order the same model for consistency (*see* attached specifications), however, the choice of vendor is at the discretion of the institution, consistent with current established procurement policies.

An instruction guide for the devices will be provided to both staff and incarcerated persons (*see* attached). The ADA Office staff shall ensure all incarcerated person(s) authorized to utilize the Zoomax Snow 12 electronic magnifier are provided training on the proper use and care. A CDC Form 128B information chrono shall be completed and forwarded to Case Records for scanning into the Electronic Records Management System.

The ADA Coordinator shall communicate this information regarding access to electronic magnifiers to the local Inmate Advisory Council and by institutional bulletins/notices located within housing units.

All CDCR institutions shall update their Disability Placement Program (DPP) Local Operating Procedures (LOP) to reflect the direction included in this memorandum and provide a copy of the DPP LOP to their respective Mission Associate Director within 90 days of the release date of this memorandum. The LOP must explain the process for inventorying, tracking, and security inspection of the electronic magnifiers. The revision may be incorporated as an addendum to be included in the next scheduled revision of the LOP.

Wardens, or their designee, at all institutions shall ensure all staff are provided access to the updated LOP (e.g., an institutional share folder) to ensure awareness of this new process. The ADA Office staff shall conduct in-person training with all ADA staff that includes a review of the policy and the updated LOP.

Associate Directors, Division of Adult Institutions
Wardens
Americans with Disabilities Act Coordinators
Expansion of Access to Zoomax Snow 12 Electronic Magnifiers
Page 3


If you have any local institution questions, please contact your local ADA Office.

If you have any headquarters level questions, please contact Jillian Hernandez, Captain, CAMU, at (916) 628-9632 or Jillian.Hernandez@cdcr.ca.gov.

DocuSigned by:

*Ronald Broomfield*

499F547FE65C411...

RON BROOMFIELD
Director
Division of Adult Institutions


Attachments

cc:     Dr. Joseph Bick, M.D.
        Joseph (Jason) Williams
        Jennifer Benavidez
        Jared D. Lozano
        Antronne Scotland
        Dawn Lorey
        Lourdes White
        Jillian Hernandez
        Darnell Mebane
        Ava Lau-Silveira
        Kristina Davis
        Megan Roberts
        CAMU Field Correctional Counselor IIs

# Zoomax Snow 12 Tracking Sheet

Month: _____

| Name | CDCR# | Housing | Property Control Number | Date and Time Checked out | Date and Time Returned | Inspected by (staff initials) |
|------|-------|---------|-------------------------|---------------------------|------------------------|-------------------------------|
|      |       |         |                         |                           |                        |                               |
|      |       |         |                         |                           |                        |                               |
|      |       |         |                         |                           |                        |                               |
|      |       |         |                         |                           |                        |                               |
|      |       |         |                         |                           |                        |                               |
|      |       |         |                         |                           |                        |                               |
|      |       |         |                         |                           |                        |                               |
|      |       |         |                         |                           |                        |                               |
|      |       |         |                         |                           |                        |                               |
|      |       |         |                         |                           |                        |                               |

Staff is required to inspect the device upon return and notate, with their initials, their completion of the inspection. Inspection shall include: ensuring the device is still functional and no photos have been saved.

Docusign Envelope ID: 8E556B5B-FE4D-441B-9BB3-43E8674D977B

STATE OF CALIFORNIA                                                                                      DEPARTMENT OF CORRECTIONS

**ZOOMAX USER AGREEMENT CHRONO**
**CDC 128B (Rev. 09/2024)**                                                                              **Page 1 of 1**

_____      _____      _____
INCARCERATED PERSON NAME                             CDCR NO.                  HOUSING

On _____, you have been granted approval for use of an Zoomax Snow 12 electronic magnifier, as a reasonable accommodation. You will be able to utilize the Zoomax Snow 12 electronic magnifier in your assigned housing unit. The check-out period may not exceed 24 hours, to allow other incarcerated persons access to the device(s). Staff shall have the ability to extend the check-out period on a case-by-case basis, to include additional time for pending legal proceedings, including Board of Parole Hearings preparation. This accommodation will begin immediately and remain in effect until further notice.

If the Zoomax Snow 12 electronic magnifier is altered, destroyed or loaned to another incarcerated person, staff shall confiscate the device and notify the ADA Office to determine if it was intentional or unintentional based on the circumstances. The ADA Coordinator will determine the best course of action (i.e., continued use of the Zoomax Snow 12 electronic magnifier or access an alternate reasonable accommodation). Furthermore, by signing you acknowledge your responsibility for maintaining possession of the Zoomax Snow 12 electronic magnifier during your checkout period. Lastly, you understand that staff will conduct a security inspection upon return of the device.

Please sign and date below indicating you understand why the Zoomax Snow 12 electronic magnifier is being offered to you, when it may be used, and that you have been trained and understand how to operate the Zoomax Snow 12 electronic magnifier.

Do you wish to utilize the Zoomax Snow 12 electronic magnifier as a reasonable accommodation?

**YES**   ☐      **NO**   ☐

_____      _____      _____
INCARCERATED PERSON NAME                    CDCR NUMBER               INCARCERATED PERSON SIGNATURE

_____      _____      _____
STAFF NAME AND TITLE (PRINTED)              DATE ISSUED               STAFF SIGNATURE

If the incarcerated person refuses to sign, check this box   ☐

**DISTRIBUTION**      **Original:** ERMS      **Copies:**   ADA Coordinator, Incarcerated Person





# Put **SNOW 12** on the reading material and enjoy reading time now!





## Simple & intuitive

Six simple buttons make it easy and intuitive for everyone to enjoy.



## Superior image quality

Our best-ever camera produces the sharpest images with great details and lively colors.



## Slim and modern

Thinner than a notebook computer, Snow 12 is stylish and comfortable to hold.

Docusign Envelope ID: 8E556B58-5E4D-441D-9B93-43E8674D977B

# Writing is possible and more comfortable than ever with a **foldable** **stand!**





**Comfortable writing space**

Bigger writing space for you to use for writing, doodling, signing and creating!



**OCR and text-to-speech**

Quickly and easily convert printed text into speech with over 20 languages.



**See virtually everything with ease**

Hold a pill bottle, printed material, recipe or homework under and read it.

Docusign Envelope ID: 8E556B58-FE4D-441D-9BB3-43E8674D977B

# Technical Specifications

| | |
|---|---|
| Display | 12-inch full HD touch screen |
| Full HD camera | 13 megapixels |
| Magnification | 2.7x to 19x or 2.5x to 19x w/stand |
| Color modes | Full color & 10 high-contrast color modes |
| OCR and text to speech (optional) | 20+ languages |
| File formats | JPG, PDF, RTF, and TXT |
| Foldable stand | Yes |
| Working height under camera | 14 cm (5.5 in.) |
| Distance viewing | Yes (optional with SnowLink*) |
| Panning | Touch screen panning & analog stick panning |
| Connect to TV/monitor/iPhone | Yes |
| Continuous use time | 2.5 hours |
| Charging time | 2 hours |
| Weight | 960 g (2.12 lbs.) or 2,240 g (4.9 lbs.) w/stand |
| Dimensions (H/W/D) | 29x22x2.4 cm (12x9x1 in.) |

*Coming soon: optional distance camera for viewing presentations at school or in the workplace.

📞 +86-571-8700-6308        💻 www.zoomax.com        ✉ sales@zoomax.com

Download SNOW 12 SNP001 ZDM-A-EA-4 6884-4536 MANUAL



# Quick Guide

**SNOW 12**

Home
Freeze
Analog stick

Power input

V1.1

Home
Freeze
Analog stick

Mode
Zoom out
Zoom in

Power button



**Release button**

➢ Push the **Release button** to open the Foot stand.

**CLOSE** | **OPEN**

**Foot stand**

➢ Push the **Foot stand** back to close the stand.



Case & foldable stand accessory

lift

arm

**Step 1**

**PUSH**

brace & slot

**Step 2**

Press and hold for 1 second

Move the analog stick up/ down/left/right to move within a magnified image.

**PUSH**

**Step 3**

**Step 4**



Close the Foot stand to use the Snow 12 with the foldable stand.

① ②

① Snow 12 can be used alone.
② Snow 12 can be used with Foldable stand.



| Basic function | Operation |
|---|---|
| Turn on/off the device | Press power button ⏻ |
| Zoom in/out | Press ➕ or ➖ |
| Open the stand | Press ➕ and ➖ to confirm. Press ⏻ to go back. |
| Change color mode | Short press ⬤ |
| Change to full color fast | Long press ⬤ for 1 second |
| Freeze image | Short press ❄ |
| Move image with analog stick | Move the analog stick up/ down/left/right to move within a magnified image. |
| Reading line or masks | Press ❄ and ⬤ simultaneously in real-time viewing, or choose in Settings menu. |

| Advanced function | | Operation |
|---|---|---|
| 🏠 | Main menu | Short press the home button to enter/exit main menu. Move down/down/ down/ right/left to cycle through the icons. Press ➕ to confirm. Press ➖ to go back. Or tap the icons in main menu. |
| 🖼 | Save photo | Tap 💾 on the on-screen button bar after freezing the image. |
| | Check saved photo | Tap the gallery icon 🖼 in main menu. |
| ⚙ | Settings | Tap the settings icon ⚙ in main menu. |
| ⓘ | System information | Tap the system information icon ⓘ in main menu. |
| A/A | Adjust high contrast | Press and hold ⬤ first and short press ➕ or ➖, or choose in settings. |

| Text-to-speech function | | Operation |
|---|---|---|
| | Text-to-speech Mode | Press and hold the ❄ for 3 seconds to enter/exit Text-to-speech mode. |
| | | Place a document flat underneath Snow 12. Press ➕ to capture the image and convert the document into speech. Press ➖ to exit. |

**ZOOMAX TECHNOLOGY CO., LIMITED**

Add.: 9F, Building D, Paradise Software Park,
No.3 Xiaoumen Road, Xihu District, Hangzhou, China
Tel: +86-571-87006308
Fax: +86-571-87397220
Email: support@zoomax.com
Visit us at: https://www.zoomax.com





