MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT*
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

CLAUDIA CENTER – 158255
DISABILITY RIGHTS
EDUCATION & DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:    (510) 644-2555
Facsimile:    (510) 841-8645

* Admitted *pro hac vice*

Attorneys for Plaintiffs

CALIFORNIA OFFICE OF THE
ATTORNEY GENERAL
ROB BONTA
Attorney General of the State of California
MONICA ANDERSON
Senior Assistant Attorney General
SHARON A. GARSKE
Supervising Deputy Attorney General
SEAN LODHOLZ
OLENA LIKHACHOVA
ANNE M. KAMMER
GURPREET SANDHU
TRACE O. MAIORINO
Deputy Attorneys General
State Bar No. 179749
455 Golden Gate Avenue, Suite 11000
San Francisco, California  94102-7004
Telephone:    (415) 510-3594
Facsimile:    (415) 703-5843
E-mail:  Trace.Maiorino@doj.ca.gov

Attorneys for Defendants Gavin Newsom
and the California Department of
Corrections and Rehabilitation

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **JOINT CASE STATUS STATEMENT** |
| v. | Judge:  Hon. Claudia Wilken |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

The parties submit this Joint Case Status Statement pursuant to the Stipulation and Order entered March 28, 2011 (ECF No. 1868), which provides that "[t]he parties will file periodic joint statements describing the status of the litigation" every other month, beginning on May 16, 2011.

## CURRENT ISSUES[1]

**A.  Allegations of Abuse, Retaliation, and Violence by CDCR Staff Against Class Members**

**1.  Plaintiffs' Statement**

**a.  RJD and Five Prisons Orders**

Plaintiffs continue to monitor remedial efforts the Court found to be necessary in order to prevent further violations of the ARP and class members' ADA rights at six prisons, including changes to the staff misconduct investigation process and implementation of Audio Visual Surveillance Systems that include body-worn camera technology. *See* ECF Nos. 3059, 3060, 3217 and 3218. Party agreements regarding Court ordered changes are found in Defendants' RJD and Five Prisons Remedial Plans ("Plans"). *See* ECF No. 3393, Exs. A and B.

Plaintiffs have issued multiple quarterly reports and have identified scores of cases that show failures by Defendants to conduct complete and unbiased investigations and impose appropriate and consistent discipline. Plaintiffs' findings are corroborated by the Office of the Inspector General (OIG) who, in a recently released report, found that CDCR performed poorly in 119 of 162 cases, or 73 percent, of the staff misconduct investigations reviewed by the OIG in 2024. *See* March 25, 2025, Letter from Patrick Booth, attached hereto as **Exhibit A**; OIG 2024 Annual Report Re: CDCR's Staff Misconduct Complaint Investigations and the Employee Disciplinary Process, https://www.oig.ca.gov/wp-content/uploads/2025/03/2024-Staff-Misconduct-Investigation-Monitoring-Report.pdf).

Plaintiffs' counsel have outlined additional reforms that are necessary to bring

---

[1] Statements are joint unless otherwise delineated as either *Plaintiffs' Statement* or *Defendants' Statement*.

Defendants' accountability system into compliance and to avoid future litigation. *See* ECF No. 3592, Ex. A. Defendants responded that they will implement some, but not all, of the reforms outlined in ECF No. 3592, Exhibit A. The parties are actively engaged in negotiations to reach agreement regarding changes that are necessary to the system to bring it into compliance with Court Ordered Remedial Plans.

Defendants passed emergency regulations regarding the staff misconduct complaint process and routine grievance process, which will have an impact on how CDCR handles staff misconduct complaints. Plaintiffs provided comments on problems with the emergency regulations, including that it remains unclear—based on the text of the regulations—how Defendants will process allegations of staff misconduct. Plaintiffs remain optimistic that the parties will resolve any disputes regarding the regulations before they become final.

CDCR is a statewide system. Violations of the ADA and ARP found thus far at six prisons exist system-wide and Plaintiffs are committed to bringing such evidence before the Court until all class members are protected. *See* ECF No. 3592, Ex. A at 7-8.

### b. False, Retaliatory and Discriminatory RVRs

The use of RVRs to retaliate against and discourage the filing of staff misconduct complaints will persist unless Defendants take action to identify and root out problems through meaningful reforms to the RVR process. Plaintiffs are hopeful that the parties can agree to resolve problems and that additional court intervention will not be necessary.

### 2. Defendants' Statement

### a. RJD and Five Prisons Orders

CDCR has dramatically overhauled its staff misconduct investigation process to ensure unbiased and complete investigations. And, although not required by the Court's orders, Defendants have restructured CDCR's statewide staff misconduct allegation, screening, referral, investigative, and disciplinary processes. As the Court has noted, "[t]hese agreed-upon measures constitute substantial improvements that will go a long way to bringing Defendants into compliance with the ARP and ADA at the six prisons." ECF

No. 3356 at 2.  The Court found, the "implementation of these [] remedial measures is likely to have a positive impact on…the overall reliability of the outcomes of investigations." *Id.* at 15.

Despite the tremendous efforts and resources directed towards improving the staff misconduct investigation and discipline processes, modifications are necessary to ensure sustainability.  CDCR contends that many of the issues raised in the recent OIG report are attributable to the operational realities of the large number of complaints that stretch the capacity of the OIA to timely complete these cases.  *See* CDCR response to OIG March 2025 report at https://www.oig.ca.gov/wp-content/uploads/2025/03/2024-Staff-Misconduct-Investigation-Monitoring-Report.pdf.  Since last year, with input from Plaintiffs, the Court Expert, and other stakeholders, CDCR has identified and implemented necessary modifications to the investigative and disciplinary processes.  These efforts include, but are not limited to, updating the applicable staff misconduct regulations, simplifying the staff misconduct process, revising the Allegation Decision Index to provide greater clarity, consolidating Information Technology systems to improve case tracking and management, and developing certified training to enhance investigator preparedness. *Id*.  CDCR recently completed a series of trainings for designated staff hired into the newly established Centralized Allegation Resolution Unit located at department headquarters, who will serve as the hiring authority and review completed investigations which involved or originated from incarcerated persons residing within the six institutions identified in the Court's staff misconduct orders.  *Id*.  CDCR has implemented prioritization strategies to focus on meeting statutory deadlines, addressing cases based on their age or complexity, and ensuring compliance with legal obligations.  *Id*.  To further address timeframe related challenges, CDCR is actively recruiting all vacant investigator positions within Office of Internal Affairs and has repositioned several internal vacancies to hire additional investigative staff.  *Id*.  CDCR also continues to refine its intake process to reduce redundant investigative efforts and conserve limited investigative resources while maintaining a complete review of all allegations.  *Id*.  CDCR, in collaboration with

1   Plaintiffs and other stakeholders, continues to identify and implement additional

2   improvements to ensure compliance with policies and regulations.  Throughout this

3   process, CDCR has regularly provided substantive updates to the OIG and will continue to

4   do so.

5                       **b.      Demands for RVR Reform**

6           Defendants have made significant progress in addressing Plaintiffs' allegation that

7   CDCR staff issue false and retaliatory Rules Violations Reports (RVRs) to class members,

8   as detailed in previously filed statements.  *See* ECF Nos. 3412 at 14-16, 3526 at 7-8.

9   Plaintiffs may disagree with the investigation or discipline imposed, but that does not mean

10  that the RVR was false or retaliatory.  Nevertheless, CDCR continues to address these

11  issues to the extent they are specifically related to class-member accommodations, alleged

12  discrimination, or retaliation and to the extent it is required to do so under the remedial

13  plans, the ADA, or prior court orders.  Defendants maintain that Plaintiffs' general

14  complaints about the RVR process, unrelated to class-member accommodations, are not

15  properly raised in this case.

16  **B.     Court Expert Investigation Into SATF**

17          **1.      Plaintiffs' Statement**

18          Background of the Court Expert's investigation into the treatment of people with

19  disabilities at the Substance Abuse Treatment Facility (SATF) is set forth in Plaintiffs'

20  previous joint case status statement.  *See* ECF No. 3670 at 6-8.  On May 1, 2025, the Court

21  adopted, with some modifications, the Court Expert's Recommendations Regarding

22  Compliance With SATF Stipulation, which laid out steps that Defendants must take to

23  remedy longstanding violations of the ADA and ARP at SATF.  ECF No. 3651 (Court

24  Expert's recommendations); ECF No. 3679 (Court's order).  Plaintiffs will monitor

25  Defendants' compliance with the Court's order to ensure that *Armstrong* class members

26  are no longer denied reasonable accommodations and subjected to unequal access to

27  programs, services, and activities at SATF due to their disabilities.

28          Plaintiffs continue to eagerly await the Court Expert's forthcoming report and

1  recommendations on staffing and sustainability and hope it will result in the allocation of

2  sufficient expertise and resources, and development of robust systems, necessary to

3  comply with the ARP and ADA.

4      **2.**    **Defendants' Statement**

5      The Court Expert's second report concerning the treatment of people with

6  disabilities at SATF recognized the numerous proactive measures implemented at SATF to

7  further respond to the needs of incarcerated people with disabilities.  ECF No. 3500.  The

8  report demonstrates that the coordinated efforts between CDCR and California

9  Correctional Health Care Services (CCHCS), with the Court Expert's guidance and with

10  input from Plaintiffs, are working to effectively respond to the issues raised by the Court

11  and addressed by the Court Expert following his initial investigation.  On May 1, 2025, the

12  Court issued its order on the issues not resolved by the Court's November 8, 2024 order,

13  and addressed in the Court Expert's January 10, 2025 recommendations, which included

14  items 5, 7, 9, 10, and 13.  ECF Nos. 3639, 3651, 3655, 3656, 3660, 3661, 3665, and 3679.

15  With respect to item 5, the Court ordered Defendants to provide a written response to the

16  Court Expert and to Plaintiffs addressing Plaintiffs' concerns related to ensuring all DPV-

17  designated class members will receive timely vision assessments.  ECF No. 3679 at 7.  The

18  parties are to meet and confer to resolve any disagreements and, if a disagreement cannot

19  be resolved, Plaintiffs may file objections with the Court.  *Id.*  Regarding item 7, the Court

20  ordered Defendants to share with Plaintiffs and the Court Expert draft policies and

21  procedures that require the use of a qualified expert to conduct individualized assessments

22  of all current and future DPH- and DNH-designated class members at SATF to determine

23  the appropriate auxiliary aids to ensure they receive equal access to programs, services,

24  and activities, and equally effective communication, including communication of real-time

25  announcements made over the public-address system.  *Id*. at 12-13.  A paging device must

26  be included among the auxiliary aid options presented to these class members during the

27  individualized assessments.  *Id.* at 13.  Plaintiffs will have an opportunity to comment on

28  the policies and procedures and, after considering Plaintiffs' comments, Defendants must

issue the policies and procedures.  Once issued, the parties must meet and confer to resolve

any disagreements about the policies and procedures and, if a disagreement cannot be

resolved, Plaintiffs may file objections with the Court.  *Id.*  For item 9, the Court adopted

the Court Expert's recommendation and agreed to Defendants' proposed modification of

the Court Expert's meet-and-confer process for class member training regarding captioned

phones.  ECF Nos. 3661 at 4; 3656 at 12-14; 3679 at 14-15.  For item 10, the Court

ordered Defendants to share with Plaintiffs and the Court Expert an updated draft of SATF

staff training materials that includes detailed guidance on when a security concern may

prohibit access to a captioned phone, in conformity with ARP Section H.1.  ECF Nos.

3630, 3656, 3060, 3665, 3679 at 18.  Plaintiffs may comment on the updated draft SATF

staff training materials and, after considering Plaintiffs' comments, Defendants must issue

the training materials.  Once issued, the parties are to meet and confer to resolve any

disagreements and, if a disagreement cannot be resolved, Plaintiffs may file objections

with the Court.  *Id.*  Finally, with respect to item 13, the Court deferred ruling on the Court

Expert's recommendation for the implementation of on-site CART transcriptionists at

SATF, in light of the Court Expert's April 18, 2025, status update and the May 7, 2025,

demonstration of an alternative technology.  ECF No. 3675; 3679 at 21.  The Court

ordered the parties to meet and confer following the demonstration and for the Court

Expert to file a further status update report and recommendations for next steps after the

meet and confer process is completed.  ECF No. 3679 at 21-22.

**C.      Accommodations for Deaf and Hard of Hearing Class Members**

       **1.      Plaintiffs' Statement**

The parties have had limited discussions related to accommodations for deaf and

hard of hearing class members since the last Joint Case Status Statement. The same critical

issues outlined in Plaintiffs' statement then and in multiple filings prior remain

outstanding.  *See* ECF No. 3670 at 9-10.  At the March 21, 2025 all-parties meet and

confer, Plaintiffs raised issues related to the insufficiency of on-site staff sign language

interpreters (SLIs), the inadequacy of on-site contract interpreters, and the ineffectiveness

1  of video remote interpretation (VRI).  Defendants were unable to provide an update

2  regarding salary increases for staff SLIs or changes to workload allocation to improve

3  retention. Defendants also stated that statewide contracts for SLIs, including compensation

4  packages for retention, were under review but that the contract review and negotiations

5  remained confidential.  Defendants provided no updates regarding the VRI concerns that

6  Plaintiffs expressed, including issues related to connectivity and staff training, and have

7  taken only preliminary steps toward addressing SLI staffing problems at CCWF and

8  SATF.

9        Below, Defendants claim to have "addressed successfully" staff SLI vacancies at

10 CCWF and SATF, per their April 5, 2025, email to Plaintiffs' counsel.  On that date,

11 Defendants reported that they had found SLI coverage for CCWF on weekends only, and

12 had interviewed two staff SLI candidates at SATF.  However, staffing shortages persist

13 during the week, when a significant portion of due process encounters and programming

14 occur.

15       Plaintiffs remain concerned about Defendants' delay in resolving access to

16 communication services for deaf signers.  Defendants' claims of confidentiality leave open

17 the question of what steps Defendants are taking to remove barriers to access and ensure

18 compliance with the ADA, Remedial Plan, and this Court's prior orders.  *See, e.g.*, ECF

19 No. 1045 at 8.

20       Plaintiffs have raised multiple other concerns with Defendants regarding effective

21 communication with deaf and hard of hearing people, including ongoing failures statewide

22 to ensure the effective communication of announcements and to provide accessible phone

23 services.  For now, Plaintiffs will continue to raise such issues through the all-parties meet

24 and confer, advocacy letters, and other written correspondence to Defendants.  Plaintiffs

25 continue to believe that meeting separately to discuss issues impacting the deaf and hard of

26 hearing population could result in the swift resolution of outstanding concerns.

27       **2.    Defendants' Statement**

28       Defendants remain committed to providing deaf and hard-of-hearing class members

1   equal access to programs, services, and activities in accordance with the ADA, the

2   remedial plans, and this Court's orders.  During the March 21, 2025 All-Party meeting,

3   Defendants confirmed CDCR has requested salary increases for staff SLIs and the request

4   remains pending with the California Department of Human Resources.  Defendants

5   advised that CDCR continues to evaluate the workload statewide for staff SLIs and current

6   contracts for additional SLI services are currently under review.  In terms of video remote

7   interpreting (VRI), Defendants confirmed that CDCR's Compliance Sergeants and Class

8   Action Management Unit (CAMU) Correctional Counselor IIs continue to train staff,

9   check the functionality of equipment, and work with the vendor when necessary to resolve

10  technical issues.  The lines of communication on these and other important deaf and hard-

11  of-hearing issues remain open for discussion and resolution where appropriate.

12  Defendants will continue to provide written responses to Plaintiffs' inquiries when

13  appropriate and to address key issues during future All-Party meetings.  Defendants

14  believe the ongoing exchange of written correspondence, combined with discussion of

15  certain items at the All-Party meeting, is a reasonable and efficient approach to resolving

16  deaf and hard-of-hearing issues.

17         Defendants continue to be mindful of their obligation to provide sign-language

18  interpretation services for deaf class members whose primary method of communication is

19  American Sign Language (ASL).  As Defendants advised Plaintiffs on April 5, 2025, staff

20  SLI vacancies at SATF and CCWF have been addressed successfully, despite the industry

21  wide shortage of interpreters, and all other DPH institutions are staffed.  Additionally,

22  CMF hired an additional staff SLI in April and is now fully staffed.  Defendants continue

23  to closely monitor statewide hiring efforts and to ensure that any vacancies are posted until

24  filled.

25  **D.    Accommodations for Blind and Low-Vision Class Members**

26         **1.    Plaintiffs' Statement**

27         Plaintiffs have raised concerns from multiple class members that they are not being

28  issued the devices that were recommended during their vision assessments.  *See* letters

1  from Plaintiffs' counsel regarding class member at RJD, sent November 25, 2024; class

2  member at CMF, sent January 13, 2025; and class member at CHCF, sent January 15,

3  2025.  For those class members who do receive recommended devices, these devices are

4  issued by Defendants only after lengthy delays in violation of the Court's orders.  ECF No.

5  3615 at 33, 38.  In a recent example, in response to an advocacy letter by Plaintiffs'

6  counsel, CDCR acknowledged that a blind class member at CMF who was recommended

7  to receive an electronic magnifier on August 17, 2024, was not issued the magnifier from

8  CMF's supply of magnifiers until February 11, 2025, nearly six months after the

9  specialist's recommendation and one month after Plaintiffs' advocacy letter.

10       Plaintiffs' counsel continue to request proof of practice to show that Defendants are,

11  in fact, issuing recommended assistive devices—and providing training on these devices—

12  on a timely basis.  Defendants have maintained that Plaintiffs' counsel may request this

13  information from CDCR institutions before and after *Armstrong* monitoring

14  tours.  Plaintiffs have serious concerns about whether the chronos are being completed

15  based on a production of documents for a recent HDSP tour, which appeared to have been

16  generated in response to Plaintiffs' request for such documents and months after vision

17  assessments were actually conducted.  Defendants have also encouraged Plaintiffs' counsel

18  to ask *Armstrong* class members for this information, but, by virtue of their disabilities and

19  the lack of reading and writing assistive devices provided to them, these class members

20  often cannot reach out independently to Plaintiffs' counsel.

21       Despite representations from Defendants about the availability of assistive devices

22  for blind and low-vision class members, Defendants still do not provide word processors

23  with printing capability to blind and low-vision class members in their housing units, and

24  the provision of other devices is significantly delayed (see discussion above).  Plaintiffs'

25  counsel will continue to raise this important issue and hope to work collaboratively with

26  Defendants to confirm assessments are being conducted timely, recommended

27  accommodations and training are being provided, and results are being timely

28  documented.

1

### 2.   Defendants' Statement

Plaintiffs' concerns about the issuance of the recommended assistive devices raised in their advocacy letters sent to Defendants on November 25, 2024, and January 15, 2025, are being addressed through the regular advocacy process.  Defendants have provided a response to Plaintiffs' advocacy letter sent on January 13, 2025.  Although Plaintiffs complain in their example that a class member at CMF was not personally issued an electronic magnifier until February 11, 2025 (*see supra*), that class member had in-cell access to Zoomax Snow 12 electronic magnifier (recommended to him by the vision specialist) pending personal issuance of that device following procurement.  In accordance with CDCR policy, devices recommended by the vision specialist are available to class members on check-in/check-out basis and at the prison law libraries while they are waiting to receive their own dedicated devices.

Under Defendants' existing policy, pending their individualized assessment and the issuance of the recommended assistive device, class members with the most severe vision impairments impacting placement (assigned a DPV disability code) have access to: (a) portable video magnifiers (*see* ECF No. 3670 at 65-73, "Implementation of the Zoomax Snow 12 Electronic Magnifiers for Incarcerated Persons with a Permanent Vision Impairment" memorandum dated January 4, 2024; (b) Vision Accommodation Computers and electronic assistive devices at the prison law libraries (*see* ECF No. 3670 at 75-91, "Americans with Disabilities Act Printing in the Libraries" memorandum dated May 26, 2023; *see* ECF No. 3670 at 93, *"*Americans with Disabilities Act Printing in the Libraries - Update" memorandum dated July 26, 2024; and *see* ECF No. 3670 at 95-97, "Library Assistive Equipment Log" memorandum dated March 16, 2015); and (c) additional assistive devices to include the LyriQ and Ruby 10 through the reasonable accommodation process (*see* ECF No. 3654 at 21-23, "Interim Access to Assistive Devices for Incarcerated Persons with a Vision Impairment" memorandum dated November 4, 2024).

Class members with vision impairments not impacting placement (assigned a DNV disability code), have access to non-electronic handheld or headband magnifiers, Zoomax

1  Snow 12 electronic magnifiers with text-to-speech function, as well as other assistive

2  devices through the reasonable accommodation process pending the issuance of any

3  assistive device recommended to them by the vision specialist.  *See* ECF No. 3670 at 99,

4  "Magnifier Distribution for Vision Impaired Incarcerated Persons" memorandum dated

5  May 8, 2023; *see* ECF No. 3670 at 101-110, "Expansion of Access to Zoomax Snow 12

6  Electronic Magnifiers" memorandum dated September 3, 2024; and *see* ECF No. 3654 at

7  21-23, "Interim Access to Assistive Devices for Incarcerated Persons with a Vision

8  Impairment" memorandum dated November 4, 2024.

9       Plaintiffs' argument that "lengthy delays" in the issuance of class members' own

10  dedicated assistive devices violate the Court's orders (*see* supra) lacks merit.  In support of

11  this argument, Plaintiffs cite to Defendants' "Visual Accommodations for Incarcerated

12  Persons with a Vision Code" policy (ECF No. 3615 at 33, 38) which provides in relevant

13  part that:

14         "Assistive devices available in the ADA Coordinator's inventory shall be
            issued to the incarcerated person within five business days following the
15         ADA Coordinator's receipt of the vision specialist's recommendation or the
            RAP's written decision. The ADA Coordinator shall initiate procurement of
16         an assistive device(s) not available in their inventory within two business
            days of receipt of the documentation from the vision specialist or the RAP
17         and shall ensure the assistive device is issued to the incarcerated person
            within five business days of receipt in the ADA Office. If procurement of a
18         recommended assistive device(s) is needed, the ADA Coordinator shall
            ensure that the incarcerated person's reading and writing needs are
19         reasonably accommodated pending procurement of the assistive device(s)."

20       Plaintiffs have not shown that: (a) the device(s) recommended by the vision

21  specialist were not issued to class member despite availability in the ADA Coordinator's

22  inventory at the time of the ADA coordinator's receipt of the vision specialist's

23  recommendation; (b) the ADA coordinator failed to initiate procurement of device(s) not

24  available in their inventory within two business days of receipt of vision specialist's

25  recommendation; or (c) recommended assistive device(s) were not issued within five

26  business days of receipt in the ADA Office.  Therefore, it is unclear how Defendants

27  purportedly violated the orders of this Court.

28       As discussed in more detail in Defendants' prior case status statements (*see* ECF

No. 3654 at 11-12, and *see* ECF No. 3670 at 13), Plaintiffs' requested "proof of practice" is unduly burdensome because CDCR does not track the requested information in a centralized location statewide and the information requested is already in Plaintiffs' possession because CDC Form(s) 128-B are issued to each class member upon the issuance of and training on the recommended assistive device(s).

**E.     Problems Regarding Access to Assignments for Class Members**

The program-access workgroup continues to meet periodically to discuss credit earning, the assignment process, and disparities in the program-access assignment data in response to Plaintiffs' allegations of disability-related discrimination. *See* ECF No. 2680 at 13-14.  Plaintiffs' counsel seeks to move forward with agreement on a standard for evaluating program assignment discrimination and continues to report on disparities in assignments that are identified in monitoring work on individual institutions and programs. For example, Plaintiffs continue to report on disparities in assignment rates for higher paying and higher status jobs, like Prison Industry Authority jobs, which class members are assigned to at lower rates.  The parties will continue to work on issues related to program access.

**F.     Joint Monitoring Tool**

The parties remain committed to developing a strong and effective joint monitoring tool.  The parties continue to convene small work groups, confer with the Court Expert, and continue to meet to discuss and resolve the few remaining disputes between the parties such as a format for scoring and reporting compliance or non-compliance.  The parties continue to work towards a collaborative solution for scoring and reporting.

**G.     ADA Structural Barriers, Emergency Evacuation Procedures, and Master Planning Process**

The parties continue to engage in the Master Planning Process aimed at ensuring that CDCR prisons are accessible to people with disabilities in compliance with the ADA.  During the last few months, the parties have exchanged position statements on disputed issues and are working with the Court Expert to try to narrow and resolve the

disputes.  These meetings have been successful and are ongoing.  The parties met with the Court Expert on February 28, 2025, to continue discussions on the Defendants' Quality Assurance/Quality Control Process which has been modified to try to prevent some of the errors and omissions that affected the first round of Master Planning projects in 2015.  As noted in prior statements, the parties have agreed on a new process for sharing information and plans related to Master Planning projects, for having Plaintiffs' expert provide comments on plans, and for touring completed projects.  Defendants recently shared initial construction documents, including detailed plans for accessibility improvements, with Plaintiffs' expert who has reviewed the first 10 plan sets and returned them with comments to Defendants.  Defendants have received Plaintiffs' comments on plans for LAC, RJD, PVSP, CIW, and SOL, and are preparing responses to Plaintiffs' expert's review.  The parties also toured CMF together with Plaintiffs' expert on December 9, 2024, and LAC with Defendants' expert on March 19, 2025.  Plaintiffs have several outstanding information requests regarding the Master Planning process that the parties are working their way through with assistance from the Court Expert.  Recently, the parties exchanged communications addressing CDCR's accessible cell design for the most common type of Level III housing units in CDCR, emergency exits and evacuation

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

1    procedures, and standards for accessible fixtures including in new construction projects.

2

3                                              Respectfully submitted,

4    DATED: May 15, 2025              ROSEN BIEN GALVAN & GRUNFELD LLP

5                                              By: /s/Penny Godbold

6                                                   Penny Godbold

7                                              Attorneys for Plaintiffs

8

9    DATED: May 15, 2025              ROB BONTA
                                                Attorney General of the State of California
10

11                                             By: /s/Trace O. Maiorino

12                                                  Trace O. Maiorino
                                                    Deputy Attorney General
13                                             Attorneys for Defendants

14

15                              **FILER'S ATTESTATION**

16          As required by Local Rule 5-1, I, Penny Godbold, attest that I obtained concurrence

17   in the filing of this document from Deputy Attorney General Trace O. Maiorino, and that I

18   have maintained records to support this concurrence.

19

20   DATED: May 15, 2025                        /s/Penny Godbold
                                                Penny Godbold
21

22

23

24

25

26

27

28

# EXHIBIT A



*Executive Director:*
Margot Mendelson

*Attorneys:*
Rana Anabtawi
Patrick Booth
Tess Borden
Steven Fama
Daniel Greenfield
Mackenzie Halter
Alison Hardy
Sophie Hart
Lily Harvey
Jacob Hutt
A.D. Lewis
Rita Lomio
Heather MacKay
Megha Ram
Donald Specter
Jerrod Thompson

# PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

VIA EMAIL ONLY

March 25, 2025

Jennifer Neill
Tamiya Davis
CDCR Office of Legal Affairs

RE:    *Armstrong v. Newsom*
       Request to Improve the Quality of Staff Misconduct Investigations
       and Disciplinary Decision-Making

Dear Ms. Neill and Ms. Davis:

As you know, the Office of the Inspector General (OIG) published a report on March 10, 2025 that underscores the issues we have been raising in our reporting for years. *See* OIG Annual Monitoring Report re: 2024 CDCR Staff Misconduct Investigation (March 10, 2025) (herein "OIG Report").[1] Specifically, the OIG tracked 162 staff misconduct investigations from January 1, 2024 to December 31, 2024, and concluded that CDCR performed poorly in 119 of those cases (73 percent), and performed satisfactorily in only 43 cases (27 percent). OIG Report at p. 2. As described in more detail below, the OIG found widespread failures throughout the staff accountability system, including delays in investigations, incomplete investigations, failures to retain video footage before the footage was destroyed, duplicative and superfluous investigations that wasted significant resources, poor hiring authority decisions about sustaining misconduct or reaching settlements about sustained misconduct, and incorrect and deficient legal advice from department attorneys throughout the disciplinary process, among other issues. In some areas, CDCR received worse ratings in the OIG's 2024 report than it did in the OIG's 2023 report, indicating that the system appears to be getting worse, not better. We are increasingly concerned that not enough has been done by CDCR's staff misconduct investigations and hiring authority decision-making.

We appreciate that the parties have worked together to improve some aspects of the discipline process, including implementing a centralized hiring authority which will hopefully standardize and improve Hiring Authority decision-making. And we acknowledge that Defendants have taken some steps, like providing additional training to investigators and compiling a "field guide" aimed at improving investigations. But, standing alone, the changes made by Defendants thus far appear insufficient to correct widespread problems with cases that have been identified in our reports and are corroborated by the OIG. Additional steps must be taken to improve the quality of investigations and hiring authority decision-making statewide.

---

[1] The full title of the report is, "The Office of the Inspector General's Monitoring in 2024 of the Staff Misconduct Complaint Investigations and the Employee Disciplinary Process of the California Department of Corrections and Rehabilitation." The report is available here, and a summary of the OIG's findings are included at the end of this letter.

**Board of Directors**
Jason Bell • Chesa Boudin • Vanita Gaonkar • Nick Gregoratos • Jean Lu
Claire McDonnell • Seth Morris • Keramet Reiter • Vishal Shah • Adrienne Yandell

In April 2024, we asked Defendants to make specific changes system to correct the widespread problems with investigation and decision-making quality that we consistently identify in our reports. *See* Letter from P. Godbold, Plaintiffs' Counsel, to J. Neill and T. Davis, CDCR Office of Legal Affairs, Reforms Needed to Address Accountability System Failures (Apr. 11, 2024). Those changes included establishing benchmarks for what constitutes a complete and unbiased investigation, requiring investigators to describe all potential sources of evidence needed to determine what happened prior to starting an investigation, requiring investigators to explain why they did not retain certain evidence, requiring investigator supervisors to perform meaningful and critical reviews of investigation reports and evidence, and increasing the video retention timeline from 90 days to 180 days to ensure that delays or oversights in investigations do not result in lost video footage. *Id*. at 2-3. Defendants rejected all of our proposed changes.

Nearly a year after we suggested those changes, we and the OIG continue to identify the same issues with the quality of investigations. Notably, the OIG report evaluated the staff misconduct investigation and discipline system at prisons other than just the six prisons currently covered by *Armstrong* court orders. The same concerns raised by Plaintiffs' counsel with respect to the accountability at the six prisons appear, based on the OIG report, to be pervasive throughout CDCR's statewide staff misconduct investigation and discipline system.

In response to the OIG's report, Defendants do not set forth a robust plan to improve these issues. *See* OIG Report at pp. 23-24 (appending Defendants' letter responding to the OIG's findings). Defendants continue to point to the volume of staff misconduct allegations as the primary impediment to operating a functional staff accountability system. *Id*. at p. 23. While we are hopeful that the recent changes aimed at reducing the number of allegations will improve investigations, simply reducing the caseload will not be enough to correct significant problems regarding the quality of investigations; additional action is needed. Defendants must create clear benchmarks for investigators and require that supervisors conduct meaningful reviews of investigations, as set forth in our April 2024 letter. Defendants must also create written guidance for hiring authorities and department attorneys about the application of discipline, when to modify discipline, and when to settle cases. Without these improvements, the accountability system will continue to suffer.

## I.     CDCR Must Provide Clear Benchmarks to Investigators and Meaningful Supervisor Review to Improve the Quality of Investigations

The OIG found—consistent with our findings—that the Office of Internal Affairs (OIA) investigators routinely fail to conduct adequate investigations. Specifically, the OIG found that investigators conducted "poor" investigations in 99 of the 162 investigations (61 percent) it monitored in 2024. OIG Report at p. 3. Many of those poor investigations were a result of investigators' delays in the process, either in conducting the initial case conference, the first interview, or the final interview. *Id*.[2] But the OIG also found issues related to the quality of the investigations, including "a lack of preparedness, ineffective questioning during interviews, failure to collect relevant evidence, and unnecessary duplication of investigative work." *Id*.

---

[2] According to the OIG, investigators delayed in completing 100 of the 162 cases (62 percent). OIG Report at p. 3.

**A central problem with CDCR's current investigatory process is the lack of quality control throughout the process.** Because investigators do not have clear benchmarks for their investigations and do not have meaningful oversight after the investigations are completed, the quality of the investigations vary dramatically. For example, the OIG described in its report that CDCR conducted two different investigations of the same allegation, resulting in significantly different investigation reports and results. *See id*. at p. 8. The complaint alleged that officers endangered an incarcerated person and created an environment for other incarcerated people to injure him. *Id*. One month later, another incarcerated person filed a complaint alleging that he witnessed the conduct described in the initial complaint. *Id*. Though the allegation included the same incident, filed by two different people at different times, CDCR failed to recognize it as the same allegation and conducted two entirely different investigations in to the matter. *Id*. Setting aside the problem of the entirely inefficient use of resources, which is central to CDCR's claim that resources are strapped and are the cause of incomplete investigations (described more below), this case illustrates a wide variation in work product, making clear the lack of standards regarding investigation expectations and a lack of quality control over investigations. The investigation report of the initial complaint included interviews of 11 witnesses. *Id*. The investigation report of the second complaint only included interviews of four witnesses, two of whom were also interviewed as part of the investigation for the same allegation being conducted simultaneously. *Id*. The fact that two different investigations into the same allegation looked so different is troubling.[3] If supervisors were proactively reviewing investigation plans before the investigations began and once the investigations were completed, these discrepancies would likely not happen. **Please report on any steps that are being taken to address wide variations in the way investigations are being conducted and to further improve supervisorial review of investigations.**

Department attorneys would also benefit from clear guidelines for investigations. According to the OIG, these attorneys share much of the blame for these poor quality investigations. The OIG found that department attorneys provided poor advice to investigators about investigations in 41 of the 83 cases (49 percent) that the OIG monitored. *Id*. at p. 11. According to the OIG, "[d]epartment attorneys failed to advise investigators to include all relevant allegations, interview percipient witnesses, and collect necessary evidence such as medical records for investigations." *Id*. The OIG described one particularly horrific example:

> [I]n one case, a sergeant allegedly slammed an incarcerated person's face onto a concrete floor, causing the incarcerated person to suffer a fractured eye socket and spinal injuries. The department attorney failed to advise the investigator to interview the incarcerated person who filed the complaint and failed to advise the investigator to obtain medical records to evaluate the injuries the incarcerated person may or may not have received due to the incident. The department attorney failed to advise the investigator to include information about the extent of the injuries in the investigative report. The department attorney later inappropriately advised the hiring authority—a warden—to find the investigation to be sufficient even though the Office of Internal Affairs investigator failed

---

[3] Plaintiffs' counsel highlighted a similar case in one of our quarterly reports, where two different investigations were conducted by different investigators about the same allegation. *See* Plaintiffs' Review of CDCR's Accountability System (Aug. 11, 2023). In that case, the investigations resulted in two different outcomes—one resulted in a sustained finding while the other resulted in a not sustained finding.

to interview the incarcerated person who filed the complaint and did not include important information about the extent of the incarcerated person's injuries in the investigative report. The department attorney further advised the warden to find that the sergeant's use of force was justified, lawful, and proper, even though the Office of Internal Affairs had not thoroughly investigated the allegation.

*Id*.

**Plaintiffs' counsel requests the name and number of the incarcerated person involved in this incident and, if they are an *Armstrong* class member, requests a copy of this investigation.**

The changes that CDCR has proposed to improve investigations—compiling memoranda in a "field guide" and providing some additional training—do not address the lack of quality regarding the poor performance of CDCR attorneys, described by the OIG, nor do they go far enough to ensure quality control checks by investigation supervisors who themselves must be able to identify and ensure complete and unbiased investigations in the process. Without clear investigatory benchmarks and meaningful supervisor reviews built into the process, these problems regarding poor decision making at every stage in the process will continue to exist.

## II. CDCR Must Provide Clear, Written Guidance to Hiring Authorities about Imposing Discipline and Reaching Settlement Agreements with Disciplined Staff.

We look forward to reviewing cases that have been resolved by the Centralized Allegation Resolution Unit (CARU), and we continue to believe that a centralized decision-making body who sustains discipline and imposes penalties will improve the system. However, the OIG highlighted a number of concerns in its report that will not be automatically addressed by the creation of the CARU.

We have consistently reported that hiring authorities make decisions about whether to sustain or not sustain misconduct that are inconsistent with evidence, and when applying discipline, they often fail to impose the correct level of discipline. The OIG reached the same conclusion. It found that hiring authorities made poor substantive decisions in nearly one-quarter of the cases it monitored (39 of 162 cases, or 24 percent), "which reflects hiring authorities were making inappropriate findings in a substantial number of cases and did so at a rate even greater than that found during the prior year." *Id*. at p. 15 (noting that hiring authorities made poor findings in 19 percent of cases the year before). Hiring authorities' decisions to impose discipline was not the only problem; they also improperly settled cases or modified penalties in 85 percent of the cases the OIG monitored (17 of 20 cases). *Id*.

Similar to investigators, hiring authorities consistently received poor advice from department attorneys. According to the OIG, department attorneys gave poor advice to hiring authorities regarding investigations or disciplinary findings in 39 of the 83 cases (47 percent) that department attorneys were involved in. *Id*. at p. 11. That poor advice included "finding an investigation to be sufficient when incomplete; selecting an inappropriate finding for an allegation of sustained, not sustained, unfounded, exonerated, or no finding; and selecting an insufficient penalty." *Id*.

These problems are significant and deep-rooted, and the creation of the CARU does not automatically resolve them. Hiring authorities' poor decision-making is likely a product, at least in part, of a lack of written guidance describing how to impose discipline in certain situations. For example, the parties have discussed, at length, how it is unclear when a hiring authority should discipline an officer for "negligent endangerment" (D2) versus "intentional endangerment" (D3). The parties have also discussed how it is unclear whether an officer's improper use of immediate force instead of controlled force is an "unnecessary use of force" (L1, L2). Many other examples exist that highlight the lack of clarity in the disciplinary system. In the absence of written guidance to direct disciplinary decisions, hiring authorities are routinely making bad decisions. And department attorneys are providing advice that undermines that accountability system.

**Please report on what steps are being taken by the department to ensure that attorneys improve the advice provided to hiring authorities. Please also report on what steps will be taken to improve—both inside and outside of the CARU—hiring authority decision-making regarding when it is appropriate to sustain findings of misconduct, which findings should be sustained (such as how to distinguish between negligent and intentional endangerment), which penalties to impose as a result of any finding, and when to settle cases or modify discipline.**

### III.    CDCR Must Develop a System to Better Track Allegations of Staff Misconduct to Avoid Wasting Resources on Duplicative Investigations

Defendants have repeatedly pointed to the high number of complaints against staff as one of the primary reasons for their poor quality investigations. Defendants' primary focus, throughout negotiations to improve the system, has been on reducing the number of or reallocating responsibility for investigations in to staff complaints in order to drive case numbers down. However, significant inefficiencies exist in the current process that create unnecessary work and waste limited OIA resources. Addressing these inefficiencies could go a long way towards improving caseloads and prevent the unnecessary duplication of work.

For example, the OIG found that around 12 percent of the cases it monitored (19 of 162) were duplicative investigations. OIA knowingly creates separate cases when a complainant makes allegations in different forms—when someone makes "both a verbal and written complaint about the same incident, when one incarcerated person filed multiple complaints about the same incident, and when multiple people filed complaints about the same incident." *Id*. at 7. After creating separate cases, OIA does not consistently combine cases into one investigation, so the same allegation is frequently investigated multiple times, either by one or multiple investigators (as described above), then reviewed multiple times by the hiring authority. The OIG concluded that this practice "inflated the actual number of staff misconduct investigations the Office of Internal Affairs handled in 2024 and caused investigators to use resources inefficiently." *Id*. The OIG similarly concluded that, as a result of OIA investigating duplicative allegations, "it is difficult to measure the actual number of staff misconduct investigations [OIA] completed in 2024." *Id*.

Defendants also waste resources by splitting allegations into multiple investigations. The OIG determined that OIA's practice of  splitting single complaints into multiple cases "further unnecessarily duplicated investigatory work." *Id*. at p. 9. OIA reported 950 of the investigations it completed in 2024

Ms. Neill and Ms. Davis
March 25, 2025
Page 6

were related to its process of splitting cases. *Id*. The OIG provides one example, in which an incarcerated person alleged that a sergeant directed a nurse to falsify a medical form after an unreasonable use of force. *Id*. OIA split the allegations into an allegation against the nurse and an allegation against the sergeant, and both allegations were investigated separately. *Id*. This inefficient process requires two investigators to duplicate work.

The OIG recommends—and we agree—that CDCR should "implement a process to identify allegations that have already been investigated, are currently being investigated, or are related to an open investigation, and combine all related allegations into a single investigation." *Id*. at pp. 9, 21. Additionally, the OIG recommends that "only one investigator investigate all related allegations in one investigation and that the department discontinue the practice of dividing complaints." *Id*. at pp. 9, 21. **Please report on what steps will be taken to address inefficiencies in the system.**

\* \* \* \* \*

We look forward to discussing these, and other needed reforms to the staff misconduct investigation and disciplinary system with Defendants on April 16, 2025.


Sincerely,

*/s/ Patrick Booth*
Patrick Booth


cc:    Co-counsel
       Ed Swanson and August Gugelmann (Court Expert's Office)
       Carrie Stafford, Nicholas Meyer, Ursula Stuter, Ramon Ruiz, Ava Lau-Silveira (OLA)
       OLAArmstrongCAT@cdcr.ca.gov
       Chris Chambers, David Chriss, Bryan Phillips, Jennifer Benavidez, Dawn Lorey
       Sharon Garske, Trace Maiorino, Sean Lodholz (OAG)

# Summary of OIG Findings

***Overall Ratings***:

The OIG monitored 162 staff misconduct investigations in 2024:

- The department's performance was **poor** in 119 of those cases (73 percent).

- The department's performance was **satisfactory** in 43 of those cases (27 percent).

- The department did not perform in a **superior** manner in any cases pertaining to staff misconduct investigations and the employee disciplinary process.

***OIA Investigator Ratings***:

The OIG monitored 162 staff misconduct investigations in 2024:

- Investigators conducted poor investigations in 99 of those cases (61 percent).

- Investigators improperly delayed completing 100 of those investigations (62 percent).

- At least 19 of those cases (12 percent) were duplicative and had some relation to another pending or closed investigation, thereby wasting OIA resources.

***Hiring Authority Ratings***:

The OIG monitored 162 staff misconduct investigations involving hiring authorities in 2024:

- Hiring authorities performed poorly in 103 of those cases (64 percent).

- Hiring authorities made poor findings in 39 of those cases (24 percent), an increase from 19 percent in the OIG's 2023 report.

- Hiring authorities failed to timely conduct investigative and disciplinary findings conferences in 81 of those cases (50 percent).

- In 17 of the 20 cases (85 percent) where the hiring authority settled cases or modified the penalty, the settlement or modification failed to comply with policy.

***Department Attorney Ratings***:

The OIG monitored 83 cases involving department attorneys:

- Department attorneys performed poorly in 59 of those cases (71 percent).

- Department attorneys provided poor advice to investigators about investigations in 41 of those cases (49 percent).

- Department attorneys gave poor advice to hiring authorities regarding investigations or disciplinary findings in 39 of the cases (47 percent).

- Department attorneys gave poor advice to both investigators and hiring authorities in 27 of those cases (33 percent).

- Department attorneys provided poor advice to either the investigator or the hiring authority in 53 of those cases (64 percent).