MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT*
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621
Facsimile: (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104

CLAUDIA CENTER – 158255
DISABILITY RIGHTS
EDUCATION & DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California 94703
Telephone: (510) 644-2555
Facsimile: (510) 841-8645

* Admitted *pro hac vice*

Attorneys for Plaintiffs

CALIFORNIA OFFICE OF THE
ATTORNEY GENERAL
ROB BONTA
Attorney General of the State of California
MONICA ANDERSON
Senior Assistant Attorney General
SEAN LODHOLZ
Supervising Deputy Attorney General
ANNE M. KAMMER
GURPREET SANDHU
OLENA LIKHACHOVA
Deputy Attorneys General
State Bar No. 285574
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-6332
Fax: (916) 324-5205
E-mail: Olena.Likhachova@doj.ca.gov

Attorneys for Defendants Gavin Newsom
and the California Department of
Corrections and Rehabilitation

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

JOHN ARMSTRONG, et al.,

      Plaintiffs,

      v.

GAVIN NEWSOM, et al.,

      Defendants.

Case No. C94 2307 CW

**JOINT CASE STATUS STATEMENT**

Judge: Hon. Claudia Wilken

[4755070.2]

Case No. C94 2307 CW

The parties submit this Joint Case Status Statement pursuant to the Stipulation and Order entered March 28, 2011 (ECF No. 1868), which provides that "[t]he parties will file periodic joint statements describing the status of the litigation" every other month, beginning on May 16, 2011.

## CURRENT ISSUES[1]

A.    **Allegations of Abuse, Retaliation, and Violence by CDCR Staff Against Class Members**

1.    **Plaintiffs' Statement**

a.    **RJD and Five Prisons Orders**

Plaintiffs continue to monitor remedial efforts the Court found to be necessary in order to prevent further violations of the ARP and class members' ADA rights at six prisons, including changes to the staff misconduct investigation process and implementation of Audio Visual Surveillance Systems that include body-worn camera technology.  *See* ECF Nos. 3059, 3060, 3217 and 3218.  Party agreements regarding Court ordered changes are found in Defendants' RJD and Five Prisons Remedial Plans ("Plans").  *See* ECF No. 3393, Exs. A and B.

Plaintiffs have issued multiple quarterly reports and, at this point, have identified hundreds of cases that show failures by Defendants to conduct complete and unbiased investigations and impose appropriate and consistent discipline.  Plaintiffs' findings are corroborated by the Office of the Inspector General (OIG).  *See* OIG 2024 Annual Report Re: CDCR's Staff Misconduct Complaint Investigations and the Employee Disciplinary Process, https://www.oig.ca.gov/wp-content/uploads/2025/03/2024-Staff-Misconduct-Investigation-Monitoring-Report.pdf.

The parties are actively engaged in negotiations to reach agreement regarding changes that are necessary to the system to bring it into compliance with Court Ordered Remedial Plans.  Most recently, Defendants have claimed that, due to the high number of

---

[1] Statements are joint unless otherwise delineated as either *Plaintiffs' Statement* or *Defendants' Statement*.

1   complaints in the system, the statute of limitations for imposing discipline is at risk of

2   expiring in hundreds of cases. Defendants assert this is occurring because many cases that

3   do not warrant the time and resources of the Office of Internal Affairs ("OIA") are bogging

4   down the system, though they have not provided any concrete evidence to support this

5   assertion. In response, Defendants have proposed additional changes to the Allegation

6   Decision Index ("ADI") to attempt to divert hundreds of cases from OIA and route them

7   back to the routine grievance process. Plaintiffs' counsel have objected, and continue to

8   object, to all attempts to further revise the ADI such that complaints alleging serious staff

9   misconduct will be categorically excluded from OIA investigation. Defendants and

10  Plaintiffs have agreed to changes to the system to address repeated complaints filed by

11  those that file the highest number of complaints, statewide. Despite making progress

12  towards some changes to address inefficiencies in the system, Defendants have not done

13  enough to ensure that OIA is adequately staffed to handle <u>all</u> of the serious staff

14  complaints in the system. Plaintiffs' counsel are considering what action to take to ensure

15  Defendants comply with court-ordered requirements for processing staff complaints.

16  Plaintiffs continue to negotiate in good faith regarding changes to the system, but may be

17  required to seek relief from the Court if agreement is not reached to ensure that

18  investigators at OIA can keep pace with the flow of incoming staff complaints and comply

19  with timelines in the Remedial Plans for investigating cases, to prevent the statute of

20  limitations from lapsing in cases, and to prevent significant numbers of complaints of

21  serious staff misconduct from being routed through the routine grievance process.

22          The parties have also been discussing emergency regulations regarding the staff

23  misconduct complaint process and routine grievance process, which will have an impact

24  on how CDCR handles staff misconduct complaints. Plaintiffs provided comments on

25  problems with the emergency regulations and, most recently, provided comments

26  regarding the re-noticed regulations, dated July 25, 2025. *See* August 11, 2025, Letter

27  from Patrick Booth, attached hereto as **Exhibit A**. Among other issues, Plaintiffs' counsel

28  remain concerned that Defendants continue to fail to reference the Allegation Decision

1  Index ("ADI"), which they are required by the Court and party agreements to use to screen

2  and route staff misconduct complaints, and instead include euphemistic language referring

3  to claims involving "complex issues requiring specialized investigative skills or

4  resources." That language is confusing and inaccurate and fails to accurately describe how

5  the staff misconduct complaint system actually works. It is past time to correct this

6  misleading regulatory language—inserted by Defendants over Plaintiffs' objections—so

7  that the regulations no longer hide from incarcerated persons and the public how the court-

8  ordered accountability system works. The re-noticed regulations also fail to adequately

9  memorialize other, agreed on, provisions which, when compared to the proposed

10  regulatory language, would significantly limit the number of staff complaints that could be

11  routed through the routine grievance process. Plaintiffs remain hopeful that Defendants

12  will revise regulatory language to ensure that it is consistent with the parties' agreements

13  and the Court's orders.

14      CDCR is a statewide system. Violations of the ADA and ARP found thus far at six

15  prisons exist system-wide and Plaintiffs are committed to bringing such evidence before

16  the Court until all class members are protected. *See* ECF No. 3592, Ex. A at 7-8.

17              **b.    False, Retaliatory and Discriminatory RVRs**

18      The use of RVRs to retaliate against and discourage the filing of staff misconduct

19  complaints will persist unless Defendants take action to identify and root out problems

20  through meaningful reforms to the RVR process. Plaintiffs are hopeful that the parties can

21  agree to resolve problems, and that additional court intervention will not be necessary.

22      **2.    Defendants' Statement**

23              **a.    RJD and Five Prisons Orders**

24      CDCR has dramatically overhauled its staff misconduct investigation process to

25  ensure unbiased and complete investigations. And, although not required by the Court's

26  orders, Defendants have restructured CDCR's statewide staff misconduct allegation,

27  screening, referral, investigative, and disciplinary processes. As the Court has noted,

28  "[t]hese agreed-upon measures constitute substantial improvements that will go a long way

1   to bringing Defendants into compliance with the ARP and ADA at the six prisons." (ECF

2   No. 3356 at 2.) The Court found, the "implementation of these [] remedial measures is

3   likely to have a positive impact on…the overall reliability of the outcomes of

4   investigations." (*Id.* at 15.)

5       Despite the tremendous efforts and resources directed towards improving the staff

6   misconduct investigation and discipline processes, modifications are necessary to ensure

7   sustainability. CDCR contends that many of the issues raised in the recent OIG report are

8   attributable to the operational realities of the large number of complaints that stretch the

9   capacity of the OIA to timely complete these cases. (*See* CDCR response to OIG March

10  2025 report at https://www.oig.ca.gov/wp-content/uploads/2025/03/2024-Staff-

11  Misconduct-Investigation-Monitoring-Report.pdf.) CDCR further contends that a

12  disproportionately large number of these complaints are submitted by an extremely small

13  number of incarcerated people who, for some, submit repetitive claims on a daily or

14  weekly basis. With stakeholder input, CDCR is developing a process to address these

15  frequent filings that incorporates all available resources and draws upon mental, medical,

16  or correctional expertise to reduce the number of repetitive claims, while at the same time

17  ensuring that all allegations of staff misconduct are properly reviewed and routed for OIA

18  investigation, when warranted, in compliance with the orders of this Court. Over the last

19  year, with input from Plaintiffs, the Court Expert, and other stakeholders, CDCR has

20  identified and implemented necessary modifications to the investigative and disciplinary

21  processes. These efforts include, but are not limited to, updating the applicable staff

22  misconduct regulations, simplifying the staff misconduct process, revising the ADI to

23  provide greater clarity, consolidating Information Technology systems to improve case

24  tracking and management, and developing certified training to enhance investigator

25  preparedness. (*Id.*) CDCR recently completed a series of trainings for designated staff

26  hired into the newly established Centralized Allegation Resolution Unit located at

27  department headquarters, who will serve as the hiring authority and review completed

28  investigations which involved or originated from incarcerated persons residing within the

1   six institutions identified in the Court's staff misconduct orders.  (*Id*.)  CDCR has

2   implemented prioritization strategies to focus on meeting statutory deadlines, addressing

3   cases based on their age or complexity, and ensuring compliance with legal obligations.

4   (*Id*.)  To further address timeframe-related challenges, CDCR continues to actively recruit

5   to fill all vacant investigator positions within Office of Internal Affairs and has

6   repositioned several internal vacancies to hire additional investigative staff.  (*Id*.)  CDCR

7   also continues to refine its intake process to reduce redundant investigative efforts and

8   conserve limited investigative resources while maintaining a complete review of all

9   allegations.  (*Id*.)  CDCR, in collaboration with Plaintiffs and other stakeholders, continues

10  to identify and implement additional improvements to ensure compliance with policies and

11  regulations.  Throughout this process, CDCR has regularly provided substantive updates to

12  the OIG and will continue to do so.

### b.    Demands for RVR Reform

14      Defendants have made significant progress in addressing Plaintiffs' allegation that

15  CDCR staff issue false and retaliatory Rules Violations Reports (RVRs) to class members,

16  as detailed in previously filed statements.  (*See* ECF Nos. 3412 at 14-16, 3526 at 7-8.)

17  Plaintiffs may disagree with a specific investigation or discipline imposed, but that does

18  not necessarily mean the RVR was false or retaliatory.  Nevertheless, CDCR continues to

19  address Plaintiffs' concerns to the extent they are related to class-member

20  accommodations, alleged discrimination, or retaliation, and to the extent CDCR is required

21  to do so under the remedial plans, the ADA, or prior court orders.  Defendants maintain

22  that Plaintiffs' general complaints about the RVR process, unrelated to class-member

23  accommodations, are not properly raised in this case.

## B.    Court Expert Investigation Into SATF

### 1.    Plaintiffs' Statement

26      Background of the Court Expert's investigation into the treatment of people with

27  disabilities at the Substance Abuse Treatment Facility (SATF) is set forth in Plaintiffs'

28  previous joint case status statement.  *See* ECF No. 3670 at 6-8.  On May 1, 2025, the Court

1  adopted, with some modifications, the Court Expert's Recommendations Regarding

2  Compliance With SATF Stipulation, which laid out steps that Defendants must take to

3  remedy longstanding violations of the ADA and ARP at SATF.  ECF No. 3651 (Court

4  Expert's recommendations); ECF No. 3679 (Court's order).  Specifically, the Court's order

5  addressed stipulation items 5 (individualized assessments for DPV class members at

6  SATF), 7 (accommodations for people with hearing disabilities), 9 (class member training

7  for use of captioned phones), 10 (SATF staff training on class members' access to

8  captioned phones), and 13 (class members' access to CART).  *See* ECF No. 3679.

9        The parties have resolved stipulation item 5.  In the course of meeting and

10  conferring with Plaintiffs and the Court Expert regarding item 5, however, Defendants

11  again misrepresented the status of individualized assessments of DPV class members at

12  SATF.  Although Defendants subsequently corrected their misrepresentation, this occurred

13  only after Plaintiffs identified the error.  Plaintiffs remain concerned that Defendants have

14  not developed appropriate self-monitoring and self-correcting systems to identify these

15  types of problems.  *See* Doc 3679 at 5 (explaining that a reliance on Plaintiffs' monitoring

16  in order for class members to receive individualized assessments "suggests that Defendants

17  are not yet capable of identifying, on their own, problems that may prevent them from

18  conducting individualized assessments or delivering reasonable accommodations to class

19  members with vision-related disabilities at SATF on a timely basis").

20        On July 7, 2025, Defendants produced draft policies to Plaintiffs regarding

21  stipulation item 7.  Plaintiffs provided comments to Defendants on these draft policies on

22  July 15, and the parties met and conferred regarding the draft policies and Plaintiffs'

23  comments on August 8.  Defendants issued the policies to the field on August 12 and the

24  parties met on August 20 and 21 to discuss disagreements regarding these policies.  The

25  parties continue to meet and confer regarding Defendants' plans to comply with SATF

26  Stipulation Item #7 and the Court's May 1 order on this Item.

27        The parties have resolved stipulation items 9 and 10, and the Court has deferred

28  ruling on item 13 in light of the Court Expert's April 18, 2025, status update and the

1    planned demonstration of an alternative technology.  ECF No. 3675; 3679 at 21.

2          Plaintiffs continue to eagerly await the Court Expert's forthcoming report and

3    recommendations on staffing and sustainability and hope it will result in the allocation of

4    sufficient expertise and resources, and development of robust systems, necessary to

5    comply with the ARP and ADA.

6          **2.      Defendants' Statement**

7          The Court Expert's second report concerning the treatment of people with

8    disabilities at SATF recognized the numerous proactive measures implemented at SATF to

9    further respond to the needs of incarcerated people with disabilities.  (ECF No. 3500.)  The

10    report demonstrates that the coordinated efforts between CDCR and California

11    Correctional Health Care Services (CCHCS), with the Court Expert's guidance and with

12    input from Plaintiffs, are working to effectively respond to the issues raised by the Court

13    and addressed by the Court Expert following his initial investigation.  On May 1, 2025, the

14    Court issued its order on the issues not resolved by the Court's November 8, 2024 order,

15    and addressed in the Court Expert's January 10, 2025 recommendations, which included

16    items 5, 7, 9, 10, and 13.  (ECF Nos. 3639, 3651, 3655, 3656, 3660, 3661, 3665, and

17    3679.)  The parties, with input from the Court Expert, have resolved items 5, 9, and 10.

18          Regarding item 5, in explaining to Plaintiffs that "the volume of appointments with

19    the vision specialist at SATF has diminished significantly and the newly arriving or newly

20    coded DPV individuals at SATF should not experience assessment delays due to code

21    confirmation issues moving forward," Defendants stated that all existing DPV class

22    members at SATF had been assessed by a low-vision specialist or refused assessment.  In

23    response, Plaintiffs identified two individuals (none of whom were part of the original set

24    of SATF stipulation item 5 class members) who had neither been evaluated nor refused

25    assessment.  Defendants explained that those two individuals were pending low-vision

26    specialist evaluation due to ongoing treatment of their vision issues and had access to

27    assistive devices pending specialist assessment.  Thus, despite Plaintiffs' seeming

28    implication otherwise, inadvertent inaccuracy in Defendants' statement to Plaintiffs is not

1  reflective of Defendants' failure to develop "appropriate self-monitoring and self-

2  correcting systems to identify" systemic problems with accommodating class members'

3  reading and writing needs.

4          Regarding item 7, Defendants shared with Plaintiffs and the Court Expert draft

5  policies and procedures that require the use of a qualified expert to conduct individualized

6  assessments of all current and future DPH- and DNH-designated class members at SATF

7  to determine the appropriate auxiliary aids, including a paging system, to ensure they

8  receive equal access to programs, services, and activities, and equally effective

9  communication, including communication of real-time announcements made over the

10  public-address system.  (ECF No. 3679 at 12-13.)  The parties met and conferred on

11  August 8, 2025, to discuss Plaintiffs' comments and proposed revisions to the policies and

12  procedures.  Defendants issued the policies and procedures on August 12, 2025.  The

13  parties met and conferred regarding the issued policies and procedures on August 20 and

14  21, 2025.  Accordingly, the parties have complied with the Court's order regarding item 7.

15  (*Id.*)

16          With respect to item 13, the Court deferred ruling on the Court Expert's

17  recommendation for the implementation of on-site CART transcriptionists at SATF, in

18  light of the Court Expert's April 18, 2025, status update and the planned demonstration of

19  an alternative technology.  (ECF Nos. 3675; 3679 at 21.)  On May 7, 2025, the parties and

20  the Court Expert attended a preliminary demonstration at the main office of CCHCS.  An

21  on-site demonstration of the technology at SATF was held on August 19, 2025.

22  Defendants provided Plaintiffs with the video and transcript files produced during the

23  demonstration on August 25, 2025.  Plaintiffs will provide written feedback on the

24  alternative technology by September 19, 2025.  The parties are scheduled to meet and

25  confer on this item on October 7, 2025.  After the parties complete the meet-and-confer

26  process, the Court Expert will file a further status update with a report and

27  recommendation for next steps.  (ECF No. 3679 at 21-22.)

28  / / /

C.    **Accommodations for Deaf and Hard of Hearing Class Members**

    1.    **Plaintiffs' Statement**

Little progress has been made to resolve the critical issues that Plaintiffs have outlined in Joint Case Status Statements since September 2024: access to sufficient on-site staff sign language interpreters, access to on-site contract sign language interpreters, and meaningful and effective access to video remote interpreting services (VRI). *See* ECF Nos. 3695 at 7-8; 3670 at 9-10; 3641 at 7; 3622 at 18-19 (Plaintiffs' Statements). Plaintiffs also have concerns about access to phones designed to serve the deaf and hard of hearing population.

In September 2024, Defendants reported they had initiated the process to increase the salary range for staff interpreters. *See* ECF No. 3622 at 23 (Defendants' Statement). However, as of this filing, Defendants continue to report that the requested salary increases remain pending. Defendants have also acknowledged difficulty securing contract interpreters on-site at a number of prisons statewide, yet will not have an update until the end of October about whether they can offer additional incentives to entice interpreters on site. Defendants' reliance on pending approvals and anticipated actions does not amount to compliance with their legal obligations or ensure practical access to communication..

Meanwhile, many staff interpreter positions remain vacant statewide. The CCWF staff sign language interpreter position remains vacant, as it has been for well over a year, *see* ECF No. 3622 at 18-19, 58-59; and deaf signers endure additional staff interpreter vacancies at San Quentin, SATF, CMF and CHCF. Weekly check-ins and VRI are insufficient alternatives overlooking that VRI has a history of reliability problems and does not substitute for on-site interpreting.

Defendants continue to move toward being able to house deaf signers at the state's other women's prison, CIW; however, the timeline and process for transferring deaf signers to this prison remain unclear. While they wait, the state's entire female deaf signing population is served by a single staff interpreter who comes on site every other

Saturday.  Their only other communication option is Defendants' notoriously faulty Video Remote Interpreting service.  Plaintiffs appreciate that an interpreter is scheduled to begin at CIW in September 2025 but note that until class members are transferred, or Defendants fill the CCWF interpreter vacancy, class members continue to experience limited access to qualified on-site interpreting.

Plaintiffs have been advocating urgently for over a year regarding these concerns. It is troubling to see so little progress.  Although Defendants point to an "industry-wide shortage" of interpreters, this does not relieve the obligation to ensure timely and effective communication access.  Plaintiffs re-urge measures such as incentives, improved retention strategies, and expanded contracting.

Beyond access to interpreting services, Plaintiffs have raised several pressing issues regarding access to phone services.  Specifically, deaf non-signers have no means of leaving voicemail messages on the state hotlines for the Prison Rape Elimination Act and for the Office of the Inspector General, leaving them without access to these crucial protections.  Plaintiffs have also reported for years that deaf signers at California State Prison—Los Angeles County cannot place videophone calls due to problems with the videophone network.  Although Defendants report that vendors have been responsive to outages, the recurring nature of these problems demonstrates that class members do not have consistent access.  This, too, remains unresolved.

Plaintiffs' counsel will continue to attempt to work collaboratively with Defendants to resolve these important issues but the current reliance on future plans and temporary measures has not yet provided deaf and hard of hearing class members with consistent and effective access.

### 2.    Defendants' Statement

Defendants remain committed to providing deaf and hard-of-hearing class members equal access to programs, services, and activities in accordance with the ADA, the remedial plans, and this Court's orders.  Defendants remain mindful of their obligation to provide sign-language interpretation services for deaf class members whose primary

method of communication is American Sign Language (ASL).  CDCR requested salary increases for staff SLIs, and the request remains pending with the California Department of Human Resources, a separate state agency responsible for issues related to employee salaries and benefits.

CDCR continues to evaluate the workload for staff SLIs statewide.  One newly-hired SLI at SATF began providing in-person services on June 23, 2025, and the other selected applicants only need to complete the final requirements of the state hiring process before they can start.  The vacancy at CCWF is being addressed by coordinating efforts between CCWF and a nearby institution to provide temporary in-person and remote coverage at CCWF to accommodate its four deaf signer class members without disrupting services at either institution or denying access to class members.  In addition, other CDCR SLIs are providing remote coverage to CCWF.  The position remains advertised and will be filled as expeditiously as possible once applications are received and a qualified candidate is identified.  Compliance Sergeants at CCWF check in weekly with the four deaf signer class members to ensure these individuals are aware of VRI as a reasonable alternative accommodation and are able to access those services.  During the month of July 2025, there were no missed or cancelled appointments at CCWF due to the lack of an SLI or VRI.  Despite the industry-wide shortage of interpreters, all other DPH-designated institutions are staffed with interpreters, and four institutions (CIM, LAC, NKSP, and RJD) are fully staffed.  And as of June 3, 2025, CIW is now a DPH-designated institution and one SLI has been hired and is scheduled to start on September 15, 2025, thus expanding access to SLI services.  In the meantime, CDCR is working on updated duty statements, local operating procedures, and various other necessary logistical steps (*i.e.*, procuring and enabling equipment) to make CIW a fully functioning DPH-designated institution.  Defendants continue to closely monitor statewide hiring efforts and to ensure that any vacancies are posted until filled.

CDCR remains bound by its existing contracts for additional SLI services, but the terms of those contracts are under review.  CDCR communicates regularly with the current

1   contractors, who continue to actively recruit interpreters.  In terms of VRI, CDCR's

2   Compliance Sergeants and ADA Collaboration and Training Team (ACTT) (formerly

3   referred to as the Class Action Management Unit) Correctional Counselor IIs continue to

4   train staff, check the functionality of equipment, and work with the vendor when necessary

5   to resolve technical issues.  The lines of communication on these issues remain open for

6   discussion and resolution where appropriate.

7           Defendants are aware of Plaintiffs' reported concerns regarding deaf non-signers'

8   access to voicemail on the state hotlines for the Prison Rape Elimination Act and for the

9   Office of the Inspector General and will provide a response to the relevant advocacy letters

10  through the established process.  With respect to videophone calls, Plaintiffs inaccurately

11  contend that class members at LAC lack consistent access to VRS.  Although LAC has, at

12  times, experienced outages with their VRS equipment, the outages have been sporadic—

13  not recurring—and the vendor has been able to address the issues quickly.  Class members

14  have been making VRS calls regularly.  There have been no 602-1/1824's filed by class

15  members reporting any issues with the VRS within the last 90 days.

16  **D.      Accommodations for Blind and Low-Vision Class Members**

17          **1.      Plaintiffs' Statement**

18          Plaintiffs continue to receive reports from blind and low-vision class members that

19  they need standalone writing accommodations—such as laptops with screen-reading

20  software—but that the low-vision specialist did not discuss or evaluate their writing needs

21  or preferred writing accommodations.  Thus, even after their low-vision specialist

22  appointments, these class members remain without accommodations to write privately and

23  independently.  Plaintiffs have reported this problem to Defendants at length.  *See, e.g.*,

24  Multiple Advocacy Letters Re: class member at SATF (Jan. 18, 2024; Aug. 15, 2024; and

25  Feb. 21, 2025); class member at CHCF (Jan. 15, 2025).  Particularly for class members

26  who wish to write privately and independently and who are blind or severely low-vision,

27  and thus cannot handwrite even with a high-powered magnifier, writing accommodations

28  are vital.  For reasons discussed in the Court's March 20, 2024, Order Granting in Part the

Motion to Enforce the Revised Permanent Injunction, it is also vital that class members be issued these accommodations for personal use, and not be forced to go to the law library to use them.  *See* ECF No. 3583 at 21 (discussing how auxiliary aids in the law library "can only be accessed in a public setting and during the libraries' limited hours").  Extremely few blind and low-vision class members statewide have been recommended an accessible laptop by the low-vision specialist, despite extensive reports from class members that they are committed to learning how to use this accommodation, that they cannot write privately or independently without it (or an equally effective accommodation), and that the low-vision specialists did not discuss the possibility of receiving this accommodation with them.  Plaintiffs' counsel will continue to raise this important issue and hope to work collaboratively with Defendants to resolve it.

Defendants state that "this issue is effectively moot because a class member is free to request a different accommodation than the one recommended by the low-vision specialist if the recommended accommodation is insufficient to meet their needs, by submitting a CDCR Form 1824 to their institution's Reasonable Accommodation Panel." This statement, however, is at odds with Defendants' own policy.  Unfortunately, the policy restricts class members from requesting a new assessment or accommodation unless their vision or accommodation needs have "changed;" it does not permit them to request a new assessment or accommodation if they believe that the originally recommended accommodation is insufficient.  ECF No. 3615 at 42.  Additionally, it is unclear why reevaluations would produce appropriate results that differ from those of the original, inadequate evaluations, unless Defendants acknowledge the critical shortcomings of these assessments and work with Plaintiffs' counsel to ensure that the low-vision assessments meaningfully evaluate class members' writing accommodation needs.

Plaintiffs are concerned that Defendants have failed to provide mobility and orientation training for blind and low-vision class members as recommended by the low-vision specialist.  In a letter dated July 23, 2025, Plaintiffs explained to Defendants that Plaintiffs had reviewed healthcare records for the 55 DPV and DNV class members who

1  were recommended mobility and orientation training by a low-vision specialist between

2  December 2023 and May 2025 and found that 29 class members (53%) had not received

3  the recommended trainings, and 25 of the 29 class members did not have any current or

4  past order for COMS training.  Plaintiffs await Defendants' response.

5  **2.    Defendants' Statement**

6  As previously communicated to Plaintiffs, CDCR is actively working on training

7  and other logistical plans to enable issuance of the ADA laptops to blind and low-vision

8  class members for whom the low-vision specialist recommended a laptop.  CDCR will

9  continue to provide updates on these efforts as progress is made and will respond to

10  Plaintiffs' letters regarding specific class members as part of the established advocacy

11  process.

12  Plaintiffs' claim that the low-vision specialist did not discuss or evaluate certain

13  class members' writing needs or preferred writing accommodations and that class

14  members remain without writing accommodations is incorrect and premised on Plaintiffs'

15  lay opinion that anything short of a laptop is insufficient as a writing accommodation.

16  Plaintiffs' apparent assumption that a class member not being recommended a laptop

17  means the low-vision specialist did not conduct a meaningful evaluation of that class

18  member is likewise incorrect.  Laptops with screen-reading software are not suitable for

19  every blind or low-vision class member and may not align with every individual's writing

20  needs.  In some cases, class members have preferred the assistance of a scribe or an aid

21  over all other assistive technology.  Defendants dispute Plaintiffs' lay contention that these

22  evaluations are "inadequate" or suffer from "critical shortcomings," and remain confident

23  in the low-vision specialist's expertise to identify appropriate accommodations.  The low-

24  vision specialist has specialized knowledge and clinical expertise, makes recommendations

25  based on an individualized assessment of the class member, and applies the same standards

26  and best practices as are used in the community.  The low-vision specialist is also aware of

27  their obligation under the ADA, remedial plans, and Court orders, to give primary

28  consideration to the class member's preferred accommodation, unless other equally

1    effective accommodation is available.

2         Additionally, this issue is effectively moot because a class member is free to request

3    a different accommodation than the one recommended by the low-vision specialist if the

4    recommended accommodation is insufficient to meet their needs, by submitting a CDCR

5    Form 1824 to their institution's Reasonable Accommodation Panel. Plaintiffs attempt to

6    rebut this statement by incorrectly interpreting Defendants' visual accommodation policy

7    and representing that it "restricts class members from requesting a new assessment **or**

8    **accommodation** unless their vision or accommodation needs have 'changed'" and "does

9    not permit [class members] to request a new assessment **or accommodation** if they

10   believe that the originally recommended accommodation is insufficient." *See* Plaintiffs'

11   statement above (emphasis added). First, contrary to Plaintiffs' representations, there is

12   nothing in Defendants' policy that restricts blind and low-vision class members from

13   requesting a new accommodation if the class member believes that the assistive device(s)

14   issued to them based on the vision specialist's recommendation are insufficient to address

15   their reading or writing needs. *See* ECF No. 3615 at 40 (stating that "[i]f at any point the

16   incarcerated person reports that the assistive device(s) issued to them are insufficient to

17   address their needs, the ADA Coordinator will arrange to provide an alternate

18   accommodation in a timely manner."); and *see id.* at 36-45 generally (providing no

19   restrictions on class member requests for a new accommodation.) Second, although class

20   members and their counsel can only request a new vision specialist assessment if the class

21   member's vision or accommodation needs have changed after their individual assessment

22   by the vision specialist, this process directly mirrors requirements in the Court's Order for

23   Further Parole-Related Remedial Plan related to blind and low-vision class members. *See*

24   ECF No. 3584 at 3 (directing Defendants to develop policies that allow a DPV or DNV

25   class member or their counsel to request a new individual assessment by the vision

26   specialist "if the class member's vision or accommodation needs have changed" after their

27   initial assessment by the vision specialist). As such, despite Plaintiffs' representations

28   otherwise, a class member can request a new assessment if their vision or accommodation

needs have changed following evaluation by the vision specialist and can request a new or different accommodation if they believe that the assistive device(s) recommended to them by the vision specialist are insufficient to meet their reading or writing needs. *See* ECF No. 3615 at 36-45.

Defendants will respond to Plaintiffs' July 23, 2025, letter raising concerns related to the mobility and orientation training purportedly recommended to 55 DPV and DNV class members by the low-vision specialist between December 2023 and May 2025 as part of the regular advocacy process.

**E.    Problems Regarding Access to Assignments for Class Members**

The program-access workgroup continues to meet periodically to discuss credit earning, the assignment process, and disparities in the program-access assignment data in response to Plaintiffs' allegations of disability-related discrimination. *See* ECF No. 2680 at 13-14. Plaintiffs' counsel seeks to move forward with agreement on a standard for evaluating program assignment discrimination and continues to report on disparities in assignments that are identified in monitoring work on individual institutions and programs. For example, Plaintiffs continue to report on disparities in assignment rates for higher paying and higher status jobs, like Prison Industry Authority jobs, which class members are assigned to at lower rates. The parties will continue to work on issues related to program access.

**F.    Joint Monitoring Tool**

The parties remain committed to developing a strong and effective joint monitoring tool. The parties continue to convene small work groups, confer with the Court Expert, and continue to meet to discuss and resolve the few remaining disputes between the parties such as a format for scoring and reporting compliance or non-compliance. The parties continue to work towards a collaborative solution for scoring and reporting.

**G.    ADA Structural Barriers, Emergency Evacuation Procedures, and Master Planning Process**

The parties continue to engage in the Master Planning Process aimed at ensuring

1   that CDCR prisons are accessible to people with disabilities in compliance with the ADA.

2   As noted in prior statements, the parties have agreed on a new process for sharing

3   information and plans related to Master Planning projects, for having Plaintiffs' expert

4   provide comments on plans, and for touring completed projects.

5          On July 18, Defendants shared a response to Plaintiffs' questions about population

6   projections.  Defendants also provided a response to Plaintiffs' comments on the RJD site

7   plans, and the parties met on July 28 to discuss.  Defendants have continued construction

8   at RJD following pre-existing timelines and have not agreed to suspend this ongoing

9   construction during plan reviews to avoid further delays.  However, to ensure that both

10  parties remain updated on the status of design and construction, Defendants agreed to

11  maintain and share a spreadsheet with the updated status of design and construction.

12  Defendants shared a document showing the status of past, future, and ongoing projects on

13  September 2.  On July 31, Plaintiffs shared a letter regarding interim accommodations

14  required at CMF during the Master Planning process.  The parties continue to work

15  through these issues with assistance from the Court Expert.

16         The parties also scheduled an expert tour of LAC regarding emergency planning for

17  October 21.  Plaintiffs had a number of questions about the status of construction on some

18  master planning projects.  Defendants provided a response on September 8.  The parties

19  also continue to discuss a number of issues, including issues related to shower

20  accessibility; design plans for 270 cells (an issue that Defendants already partially

21  responded to on September 2); and responses to Plaintiffs' expert's review of site plans for

22  LAC, PVSP, CIW, CIM, and SOL.

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1

Respectfully submitted,

2 DATED:  September 15, 2025

ROSEN BIEN GALVAN & GRUNFELD LLP

3

By:   */s/ Penny Godbold*

4

Penny Godbold

5

Attorneys for Plaintiffs

6

7 DATED:  September 15, 2025

ROB BONTA
Attorney General of the State of California

8

9

By:   */s/ Olena Likhachova*

Olena Likhachova

10

Deputy Attorney General

11

Attorneys for Defendants

12

13

**FILER'S ATTESTATION**

14

As required by Local Rule 5-1, I, Penny Godbold, attest that I obtained concurrence

15 in the filing of this document from Deputy Attorney General Olena Likhachova, and that I

16 have maintained records to support this concurrence.

17

18 DATED:  September 15, 2025

*/s/ Penny Godbold*
Penny Godbold

19

20

21

22

23

24

25

26

27

28

# Exhibit A



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Executive Director:*
Margot Mendelson

*Attorneys:*
Rana Anabtawi
Patrick Booth
Tess Borden
Steven Fama
Daniel Greenfield
Mackenzie Halter
Alison Hardy
Sophie Hart
Lily Harvey
Jacob Hutt
Heather MacKay
Megha Ram
Donald Specter
Jerrod Thompson

*Via Email Only*

August 11, 2025

California Department of Corrections and Rehabilitation
Regulation and Policy Management Branch
RPMB@cdcr.ca.gov

Re: *Armstrong v. Newsom*: Renotice of Change to Regulations, NCR Number 25-06
(July 25, 2025), Changes to Regulations for Staff Complaints and Routine
Grievances

To Whom it May Concern:

I write as class-action counsel in *Armstrong v. Newsom*, a lawsuit involving the rights of incarcerated people with disabilities housed in prisons in California, to object to CDCR's proposed regulatory changes. *See* NCR 25-06 Renotice Text (July 25, 2025). The *Armstrong* Court ordered changes to the staff complaint process at six prisons in California in order to improve the quality of investigations and to ensure that staff would be held accountable for ongoing violations of the rights of people with disabilities. *Armstrong v. Newsom*, 484 F. Supp. 3d 808, 838-39 (2020); *Armstrong v. Newsom*, No. 94-cv-2307 CW, 2021 WL 933106 (N.D. Cal. Mar. 11, 2021); *Armstrong v. Newsom*, No. 94-cv-2307 CW, 2021 WL930454 (N.D. Cal. Mar. 11, 2021). Any changes to the staff misconduct regulations are therefore relevant to and must comply with existing *Armstrong* Court orders.

We previously submitted comment on Defendants' proposed revisions to the staff misconduct regulation on June 3, 2025. We now submit the following comment regarding additional, renoticed, proposed changes to the staff complaint regulations:

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

**Board of Directors**
Jason Bell • Chesa Boudin • Vanita Gaonkar • Nick Gregoratos • Jean Lu
Claire McDonnell • Seth Morris • Keramet Reiter • Vishal Shah • Adrienne Yandell

TABLE OF CONTENTS

I.      CDCR Refuses to Define the Staff Misconduct Screening Standard
        in the Regulations ..................................................................................2

II.     The Regulations Improperly Require the Routing of Serious
        Allegations of Staff Misconduct Through the Routine Grievance
        Process ...................................................................................................3

III.    The Regulations Fail to Capture the Parties' Agreement about the
        Suspend-and-Elevate Process ...............................................................5

IV.     The Regulations Should Not Include Quick Close of Cases .............7

V.      The Regulations Limit Incarcerated People's Ability to File
        Grievances About Staff Misconduct They Witness ..........................8

VI.     The Regulations Improperly Limit Documents that the CST will
        Review to Determine Whether an Urgent or Emergent Response is
        Necessary ...............................................................................................9

VII.    The Regulations Improperly Delete the Investigation Assignment
        Process ...................................................................................................9

VIII.   The Regulations Improperly Prohibit Grievances about the
        Investigation Process ..........................................................................10

IX.     The Regulations Continue to Omit Definitions of "Centralized
        Screening Team" and "Staff Misconduct" ......................................10

* * * * *

## I.      CDCR Refuses to Define the Staff Misconduct Screening Standard in the Regulations

Plaintiffs continue to object to CDCR's ongoing refusal to refer to the Allegation Decision Index (ADI) in the regulations.  The ADI—which was negotiated by CDCR, Plaintiffs' counsel, and the *Armstrong* Court Expert in order to comply with the *Armstrong* Court's orders and the court-ordered remedial plans—identifies the categories of allegations that are considered "serious" to ensure those allegations are routed to Office of Internal Affairs (OIA) for investigation.  When a grievance alleges staff misconduct that meets a

category on the ADI, it must be routed to the OIA for investigation. Conversely, when a grievance alleges staff misconduct that does not meet a category on the ADI, it must be routed back to the local prison for "routine" review. The ADI, therefore, is critical in determining how an allegation of staff misconduct is investigated.

But CDCR continues to refuse to acknowledge the ADI in the regulations. Instead, the regulations invent a standard that the parties have not agreed to, stating that a "claim [that] involves complex issues requiring specialized investigative skills or resources" should be "elevated for an investigation." NCR 25-06 Renotice Text (July 25, 2025), § 3486.1(e)(1)(A). Plaintiffs have long objected to this language as too vague and subjective and inconsistent with the ADI. This confusing standard is **not and has never been** the actual standard used to route complaints, and it is thus misleading to include it in the regulations. Inclusion of this standard in the regulations, rather than including any information about how staff complaints are actually routed, will make it difficult for anyone to determine how their complaint should be handled as part of this process.[1] CDCR should include the ADI in the regulations, either by adding the entire ADI into the regulations or incorporating the document by reference.

## II.     The Regulations Improperly Require the Routing of Serious Allegations of Staff Misconduct Through the Routine Grievance Process

The proposed regulations violate court orders and misrepresent the parties' agreement about the routing of certain serious allegations of staff misconduct. As explained above, all grievances that allege staff misconduct on the ADI must be routed to the OIA for investigation. For years, CDCR has been attempting to limit the number of allegations that are routed to OIA for investigation because, according to CDCR, the number of allegations requiring investigation outpace OIA's capacity to complete those investigations. Most recently, CDCR proposed that CDCR could route as "routine" an allegation that otherwise would have been routed to OIA in very limited circumstances. Specifically, CDCR could route as routine an allegation when:

---

[1]     This problem, where CDCR uses a confusing and unnecessarily long word or phrase instead of using the word or phrase more commonly used, pervades the regulations. For example, instead of referring to investigators at the Allegation Investigation Unit (AIU) or the Office of Internal Affairs (OIA) investigators, the renoticed regulations refer to "specially trained headquarters investigators." *See* NCR 25-06 Renotice Text (July 25, 2025), § 3486(b)(6) ("'Investigation' refers to the gathering of facts and evidence by **a specially trained headquarters investigator** concerning employee misconduct toward an incarcerated or supervised person") (emphasis added). This circumlocution makes the regulations more confusing than they need to be.

1. The allegation is filed by a person who, during the prior quarter, was among the 50 incarcerated people in CDCR who had filed the most grievances;

2. The allegation meets one of the five criteria on which the parties agreed (herein "frequent filer criteria")—insufficient detail; similar to three prior denied allegations; factually impossible; factually implausible; or documentary evidence disproves allegation of failure to act; and

3. All three members of the Grievance Resolution Team (GRT)—which consists of a Subject-Matter Expert, a representative from the Office of Appeal, and the Grievance Coordinator—agree that the allegation meets one of the above-listed criteria.

Plaintiffs agreed to not object to this proposal, in part because it includes two important safeguards—the proposal was limited to the top 50 "frequent filers" and the GRT could serve as a safety net to route meritorious allegations back to OIA. However, the regulations that CDCR now proposes do not include either safeguard. The regulations require the Centralized Screening Team (CST) to route as routine all allegations that meet the frequent filer criteria, regardless of whether the allegation was filed by one of the 50 most-frequent filers. Also, the regulations do not discuss the GRT and how it will operate. Both of these problems dramatically change the staff misconduct investigation process in a manner that is inconsistent with the *Armstrong* Court's prior orders and the parties' agreements.

As to the first issue—the requirement in the regulations that all allegations meeting the frequent filer criteria, regardless of who filed the allegation, be routed as routine—CDCR has admitted to a drafting mistake. During a meeting on August 7, 2025, CDCR stated that it intended the relevant language to read: [n]otwithstanding subsection (e)(1), claims concerning allegations of staff misconduct which meet one of the following criteria *may* be referred to the Office of Grievances for a routine review." (Emphasis added). This language, in CDCR's view, allows the CST to route allegations on the ADI as routine instead of to OIA. According to CDCR, a forthcoming internal memorandum will explain exactly which allegations will be routed as routine and which allegations will be routed to OIA.

But CDCR's proposed correction to the regulatory language does not resolve the problem. The proposed language does not provide enough clarity for the CST or for incarcerated people to understand when grievances meeting the frequent filer criteria will be routed as routine. According to that proposed language, an incarcerated person who files an allegation of staff misconduct that should be routed to the OIA "may" have their allegation routed as routine, and it remains entirely unclear under what circumstances that will happen. On its face, the proposed language provides the CST with unlimited discretion to route cases that meet the frequent filer criteria as routine or to the OIA, as it so chooses. But the parties agreed that the CST has no discretion in that decision—the CST *must* route grievances filed

by the top 50 frequent filers that meet the above criteria as routine, and it *must* route grievances alleging conduct on the ADI filed by anyone else to OIA. CDCR's proposed change to the regulations do not make that process clear.

As to the second issue—the fact that the regulations omit any reference to the GRT and how it will operate—CDCR states that the same internal memorandum describing the frequent filer plan will also describe the GRT and how it will operate. That proposal is similarly inadequate. Plaintiffs cannot agree to regulations that give CDCR sweeping authority to route allegations of serious staff misconduct as routine without the regulations mentioning the safeguards that the parties agreed to.

CDCR must either add a reference the internal memorandum in the regulations so that it is clear that the screening of grievances is subject to another document, or CDCR must add the content of that memorandum directly into the regulations.

## III. The Regulations Fail to Capture the Parties' Agreement about the Suspend-and-Elevate Process

The description of the "suspend-and-elevate" process in the regulations is confusing and inconsistent with the parties' agreements. *See* NCR 25-06 Renotice Text (July 25, 2025), § 3483(e)(6). First, the suspend-and-elevate process set forth in CDCR's proposed regulations misstates the parties' agreement on this issue. The parties agreed that a supervisor conducting a routine review of staff misconduct (*i.e.*, a claim of staff misconduct that alleges conduct not on the ADI) will suspend their investigation and refer the allegation to the CST for an OIA investigation in the following scenarios:

1. during the investigation, the supervisor discovers information suggesting the claim is on the ADI;

2. the claim, if proven true, is likely to result in adverse action (*i.e.*, the conduct is not on the ADI but is so egregious as to warrant adverse action); or

3. the claim is similar to previous staff misconduct that was sustained against the departmental staff involved and therefore adverse action should be considered.

The proposed regulations do not capture that agreement. *See* NCR 25-06 Renotice Text (July 25, 2025), § 3483(e)(6)(B)(1-3). They list part of the first scenario described above (the claim is on the ADI), but fail to mention the possibility that other misconduct is discovered as part of the investigation which should be referred.

The regulations also improperly combine the second and third scenarios into one provision that does not accurately represent the parties' agreement. *See* NCR 25-06 Renotice Text (July 25, 2025), § 3483(e)(6)(B)(2). Specifically, the proposed regulatory language states that the supervisor will suspend-and-elevate their investigation in circumstances where "[t]he claim, if proven true, is likely to result in adverse action, including instances when the accused staff member engaged in similar misconduct which was recently sustained by a Hiring Authority and resulted in corrective or adverse action." *Id*. Those are two distinct provisions and should be separated. All claims that allege misconduct similar to prior, sustained misconduct should be routed to OIA for investigation. Under the current language, however, only claims that relate to prior, sustained misconduct *and* are likely to result in adverse action will be elevated for investigation. That language requires the supervisor to analyze both factors before elevating the grievance. The parties agreed that all allegations where the alleged misconduct could result in adverse action should be elevated, and all allegations where the alleged misconduct is similar to prior, sustained misconduct should be elevated. The regulatory language improperly turns that provision into a two-part test.

Also, CDCR inappropriately added the requirement that the employee's misconduct must have been sustained "recently." The parties did not agree that the misconduct had to be "recent," nor is it clear what qualifies as "recently sustained misconduct." The requirement that misconduct be recent should be deleted from the regulations.

Second, the regulations are unclear in their explanation about what supervisors must do when they discover staff misconduct in the course of a reasonable accommodation review:

> If a supervisor assigned to conduct a reasonable accommodation review discovers information suggesting the claim involves staff misconduct, then the supervisor shall immediately suspend their activities related to the allegation of staff misconduct and refer the allegation to the Centralized Screening Team who shall determine if the claim should be elevated for a reasonable accommodation review, a routine review, or an investigation if any of the factors described in subsection (B) apply.

NCR 25-06 Renotice Text (July 25, 2025), § 3483(e)(6)(A). This language is confusing. It indicates that the supervisor must stop a reasonable accommodation review if the supervisor discovers staff misconduct; then, the supervisor must refer the allegation to the CST, who will determine whether the claim should be elevated for a reasonable accommodation review. That process does not make sense. Also, that provision does not make it clear what should happen with the ongoing reasonable accommodation review that the supervisor was conducting when they discovered the misconduct. For example, a supervisor is responding to a wheelchair-user's request to be pushed to his education class when the supervisor discovers that officers have been inappropriately instructing other incarcerated people not to assist that

person get to class. In that situation, it is unclear from this language whether the supervisor is prevented from responding to the person's reasonable accommodation request until the CST routes the allegation. The regulations should make clear that the underlying reasonable accommodation review should not be stopped—and the person should receive the disability accommodation, if warranted—while the staff misconduct allegation is being processed and investigated.

## IV.    The Regulations Should Not Include Quick Close of Cases

Plaintiffs object to CDCR's proposal of quickly closing cases based on a brief video review. The regulations state that an investigation can be closed if, "[u]pon review of all relevant video and audio recordings, sufficient evidence exists to prove conclusively that the alleged misconduct did not occur." NCR 25-06 Renotice Text (July 25, 2025), § 3486.2(d)(1)(A). Plaintiffs object based on our experience of reviewing cases where investigators close cases after reviewing too short of a video clip, or video from the wrong day. Plaintiffs have remained willing to engage CDCR on the use of the quick-close process, including by meeting with the Office of the Inspector General (OIG) to discuss how to effectively implement a quick-close process. To date, however, CDCR has refused to meaningfully engage on this issue. Plaintiffs cannot agree to this significant change to the investigation process without meeting with necessary stakeholders and coming to a common understanding of how this process will work in practice.

Plaintiffs similarly object to CDCR's proposal of quickly closing cases based on a brief review of documentary evidence. *See* NCR 25-06 Renotice Text (July 25, 2025), § 3486.2(d)(1)(D). As discussed above, Plaintiffs agreed to this provision in very narrow circumstances—when the claimant was in the top 50 grievance-filers in the previous quarter and when the Grievance Resolution Team still met with the claimant monthly to discuss the allegation. CDCR now appears to be attempting to roll out this very narrow agreement on a statewide-level and without the safeguards of the GRT. We cannot agree to this change to this proposed change.

Plaintiffs also object to CDCR's proposal of quickly closing a case when video evidence determines that misconduct did occur. NCR 25-06 Renotice Text (July 25, 2025), § 3486.2(d)(1)(B). CDCR included language in the regulations that allow an investigator to recommend a case be closed when, "[u]pon review of video and audio recordings, sufficient evidence exists to prove conclusively that the alleged misconduct did occur." *Id*. In those circumstances, the regulations require that "each of the employees engaged in the alleged misconduct were given the opportunity to respond to the allegation and provide any mitigating factors that the Hiring Authority should consider." *Id*. Plaintiffs have reviewed numerous cases where investigators completed comprehensive investigations and hiring authorities sustained misconduct, yet CDCR settled the case for no or very little discipline at

or before the State Personnel Board (SPB).  CDCR has expressed that holding employees accountable for their misconduct requires ample evidence.  In cases where CDCR believes misconduct definitively occurred, it should ensure that all relevant evidence is collected, not that investigators quickly close those cases.  This provision, although well-intentioned to make better use of limited investigatory resources, will likely have the effect of CDCR failing to hold employees accountable even when the employee engages in serious misconduct. Plaintiffs remain willing to discuss this process with CDCR, but given how often CDCR fails to hold staff accountable even when there is clear video evidence, it is unclear how this proposal would strengthen CDCR's accountability system.

V.      **The Regulations Limit Incarcerated People's Ability to File Grievances About Staff Misconduct They Witness**

The renoticed regulations limit an incarcerated person's ability to file a grievance about staff misconduct that they observe, in violation of the *Armstrong* Court-ordered remedial plans.  The regulations allow CDCR to "reject" a grievance when "[t]he claim concerns harm to a person other than the person who signed the grievance."  NCR 25-06 Renotice Text (July 25, 2025), § 3483(g)(6)(D).  However, under the current, operative version of this regulation (and in previous versions of these proposed regulations), CDCR cannot reject these grievances when the third-party "claim concerns an allegation of staff misconduct."  15 C.C.R. § 3483(g)(6)(D).  In other words, CDCR must provide a substantive response to an incarcerated person's grievance that alleges staff misconduct against another incarcerated person.

For the first time in the renoticed regulations, CDCR limited this language.  The language now states that CDCR can reject a third-party claim from an incarcerated person unless "the claim concerns an allegation of staff misconduct *that was referred for an investigation*."  NCR 25-06 Renotice Text (July 25, 2025), § 3483(g)(6)(D).  Under these proposed regulations, when an incarcerated person experiences misconduct and another incarcerated person witnesses that misconduct, CDCR can generally reject that witness's grievance.  The only time CDCR cannot reject that witness's grievance is when the incarcerated person who was the direct subject of the misconduct filed a grievance about that misconduct, and that grievance was referred to the OIA for investigation.  In effect, this newly added clause gives CDCR much broader authority to reject meritorious grievances about misconduct.

That language violates the court-ordered remedial plans.  *See Armstrong v. Newsom*, Case No. 4:94-cv-02307-CW, Doc. 3393 (Mar. 23, 2022) (Richard J. Donovan Correctional Facility and Five Prisons (LAC, COR, SATF, CIW, and KVSP) Court Ordered Remedial Plans) at 8 (requiring, without qualification, that "[a]ll grievances submitted by an incarcerated person or parolee shall be reviewed by CST").  The provision prevents

incarcerated people from filing third-party allegations of staff misconduct that does not fall on the ADI. For example, if an incarcerated person witnesses staff act incredibly discourteously to another incarcerated person, that witness is not able to file a staff misconduct complaint. Apart from violating the remedial plans, that outcome is counterproductive. CDCR should be encouraging people to report misconduct, not giving the Office of Grievances authority to reject valid complaints of staff misconduct. Some people are too afraid to come forward to report misconduct or otherwise cannot write a grievance as a result of their disability. Also, people who report observing staff misconduct as a third party could serve as important witnesses to the misconduct review, regardless of whether it results in an ADI investigation. This is especially true in the case of reports of allegations of denials of disability accommodations—most of which will be routed as routine—and which are central to the *Armstrong* case. The regulations must not limit people's ability to report misconduct that they observe.

**VI.    The Regulations Improperly Limit Documents that the CST will Review to Determine Whether an Urgent or Emergent Response is Necessary**

Newly added language in the renoticed regulations limit the scope of the documents that the CST will review for urgent and emergent situations. Specifically, the regulations state: "The Centralized Screening Team shall review all the documents it receives *from incarcerated or supervised persons* to determine" whether they contain issues requiring immediate action from the Hiring Authority. NCR 25-06 Renotice Text (July 25, 2025), § 3486.1(d) (emphasis added). It is unclear why the CST will only review documents submitted by incarcerated or supervised persons for urgent or emergent content. This provision should be expanded to include documents submitted by anyone, not only incarcerated or supervised persons.

**VII.    The Regulations Improperly Delete the Investigation Assignment Process**

CDCR is required by court-ordered remedial plan to review an allegation of staff misconduct and assign the level of investigator based on the complexity of the case. *See Armstrong v. Newsom*, Case No. 4:94-cv-02307-CW, Doc. 3393 (Mar. 23, 2022) (Richard J. Donovan Correctional Facility and Five Prisons (LAC, COR, SATF, CIW, and KVSP) Court Ordered Remedial Plans) at 50. That process is also set forth in the current regulations, *see* 15 C.C.R. § 3486.2(a), as well as in previous versions of these proposed regulations. CDCR has, however, struck this language in the renoticed proposed regulations. *See* NCR 25-06 Renotice Text (July 25, 2025), § 3486.2 (subsection (a) struck). It is unclear why CDCR would strike this language. Plaintiffs object to CDCR striking this language and request that it be reinserted into the forthcoming renoticed regulations.

## VIII.  The Regulations Improperly Prohibit Grievances about the Investigation Process

The regulations allow CDCR to "reject" a claim if the claim challenges "the fact gathering process during a routine review" or "the fact gathering process during an investigation of staff misconduct."  NCR 25-06 Renotice Text, § 3483(g)(6)(E)(2-3).  As we stated in our previous objections, incarcerated people should have the right to grieve if, for example, they were disrespected by investigation staff during the interview, they did not believe the interview was confidential, they were called out to speak with OIA staff over the intercom in their housing unit (undermining their ability to speak with investigative staff without legitimate fear of reprisal), or the interviewer was connected in some way to the subject of the complaint, increasing the likelihood of bias in favor of the subject and/or creating the appearance of bias. These are all legitimate complaints about the fact-finding process, and incarcerated people should not be prevented from grieving this kind of staff misconduct.  CDCR should have an interest in investigating grievances that allege significant problems with their internal investigation process.

## IX.    The Regulations Continue to Omit Definitions of "Centralized Screening Team" and "Staff Misconduct"

The renoticed regulations maintain a strike to the definitions of "staff misconduct" and the "Centralized Screening Team" from the administrative remedies section.  *See* NCR 25-06 Renotice Text (July 25, 2025), § 3480 (previously subsections (4) and (13)).  CDCR previously committed to including these definitions in this section and have not yet done so. We request that CDCR add these definitions into this section.

* * * * *

We thank you for considering these comments.

Sincerely,

*/s/ Patrick Booth*
Patrick Booth