MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT  – NY BN 5565791*
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621
Facsimile:   (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104

CLAUDIA CENTER – 158255
DISABILITY RIGHTS
EDUCATION & DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:   (510) 644-2555
Facsimile:   (510) 841-8645

* Admitted *pro hac vice*

Attorneys for Plaintiffs

CALIFORNIA OFFICE OF THE
ATTORNEY GENERAL
ROB BONTA
Attorney General of the State of California
LAWRENCE BRAGG
Acting Senior Assistant Attorney General
SEAN LODHOLZ
Supervising Deputy Attorney General
ANNE M. KAMMER
GURPREET SANDHU
OLENA LIKHACHOVA
Deputy Attorneys General
State Bar No. 285574
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone:  (916) 210-6332
Fax:  (916) 324-5205
E-mail:  Olena.Likhachova@doj.ca.gov

Attorneys for Defendants Gavin Newsom
and the California Department of
Corrections and Rehabilitation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN ARMSTRONG, et al.,

      Plaintiffs,

    v.

GAVIN NEWSOM, et al.,

      Defendants.

Case No. C94 2307 CW

**JOINT CASE STATUS STATEMENT**

Judge:   Hon. Claudia Wilken

[4783747.2]

Case No. C94 2307 CW

The parties submit this Joint Case Status Statement pursuant to the Stipulation and Order entered March 28, 2011 (ECF No. 1868), which provides that "[t]he parties will file periodic joint statements describing the status of the litigation" every other month, beginning on May 16, 2011.

## CURRENT ISSUES[1]

**A.  Allegations of Abuse, Retaliation, and Violence by CDCR Staff Against Class Members**

**1.  Plaintiffs' Statement**

**a.  RJD and Five Prisons Orders**

Plaintiffs continue to monitor remedial efforts the Court found to be necessary in order to prevent further violations of the ARP and class members' ADA rights at six prisons, including changes to the staff misconduct investigation process and implementation of Audio Visual Surveillance Systems that include body-worn camera technology.  *See* ECF Nos. 3059, 3060, 3217 and 3218.  Party agreements regarding Court ordered changes are found in Defendants' RJD and Five Prisons Remedial Plans ("Plans").  *See* ECF No. 3393, Exs. A and B.

Plaintiffs have issued multiple quarterly reports and, at this point, have identified hundreds of cases that show failures by Defendants to conduct complete and unbiased investigations and impose appropriate and consistent discipline.  Plaintiffs' findings are corroborated by the Office of the Inspector General (OIG).  *See* OIG 2024 Annual Report Re: CDCR's Staff Misconduct Complaint Investigations and the Employee Disciplinary Process, https://www.oig.ca.gov/wp-content/uploads/2025/03/2024-Staff-Misconduct-Investigation-Monitoring-Report.pdf.

The parties are actively engaged in negotiations to reach agreement regarding changes that are necessary to the system to bring it into compliance with Court Ordered Remedial Plans.  Most recently, the parties entered into a Stipulation aimed at addressing

---

[1] Statements are joint unless otherwise delineated as either *Plaintiffs' Statement* or *Defendants' Statement*.

ongoing concerns with the investigation and discipline process.  ECF No. 3721.  This agreement creates the Centralized Allegation Resolution Unit ("CARU"), a unit within CDCR headquarters that will now serve as the Hiring Authority for all allegations of staff misconduct against incarcerated people investigated by the Office of Internal Affairs ("OIA") at the six prisons covered by existing *Armstrong* orders.  *Id*. at 1-2.  Plaintiffs' counsel are hopeful that the CARU will address ongoing problems regarding delays in disciplinary decision making and will standardize and improve the quality of disciplinary decisions.  Per Stipulation, CDCR has also agreed to retain Nicholas Mitchell to "review and offer recommendations about CDCR's use-of-force policies and practices, use-of-force training, and the Institutional Executive Review Committee (IERC) process, including outcomes after the IERC has identified non-compliance with policy violations" and to provide "recommendations on whether the IERC, or some entity other than OIA, can conduct comprehensive and unbiased investigations" and "what, if any, modifications to Defendants' policies and procedures are necessary for the IERC, or some entity other than OIA, to conduct comprehensive and unbiased investigations into allegations of staff misconduct based on use-of-force policy violations." *Id*. at 3.  The expert consultant's report is expected by the end of the year.

Despite significant agreement between the parties on the potential reforms discussed above, Plaintiffs' counsel remains seriously concerned about the failure of Defendants to complete timely investigations and have sent notice of intent to enforce RJD and Five Prison Remedial Plan requirements within 30 days if agreement is not reached. *See* October 9, 2025 Letter from Michael Freedman Re Notice of Enforcement of Provisions of RJD and Five Prisons Remedial Plans Regarding Investigation Timeliness, attached hereto as **Exhibit A**.  As outlined in Plaintiffs' counsel's letter, the seven most recent months of data produced by Defendants show that, at the six prisons covered by the Court's orders, **Defendants closed more than 90% of investigations late**.  Exhibit A at 2. To bring Defendants into compliance with the Remedial Plans and to eliminate the serious problems caused by delayed investigations, Defendants must commit to staffing OIA with

1    a sufficient number of investigators to timely investigate all allegations of serious

2    misconduct. *Id*. at 4.

3         The parties have also been discussing emergency regulations regarding the staff

4    misconduct complaint process and routine grievance process, which will have an impact

5    on how CDCR handles staff misconduct complaints. Plaintiffs provided comments on

6    problems with the emergency regulations and, most recently, provided comments

7    regarding the re-noticed regulations, dated July 25, 2025. *See* ECF No. 3719 at Exhibit A.

8    Among other issues, Plaintiffs' counsel remain concerned that Defendants continue to fail

9    to reference the Allegation Decision Index ("ADI"), which they are required by the Court

10   and party agreements to use to screen and route staff misconduct complaints, and instead

11   include euphemistic language referring to claims involving "complex issues requiring

12   specialized investigative skills or resources." That language is confusing and fails to

13   accurately describe how the staff misconduct complaint system actually works. Plaintiffs

14   remain hopeful that Defendants will revise regulatory language to ensure that it is

15   consistent with the parties' agreements and the Court's orders.

16        CDCR is a statewide system. Violations of the ADA and ARP found thus far at six

17   prisons exist system-wide and Plaintiffs are committed to bringing such evidence before

18   the Court until all class members are protected. *See* ECF No. 3592, Ex. A at 7-8.

19              **b.    False, Retaliatory and Discriminatory RVRs**

20        The use of RVRs to retaliate against and discourage the filing of staff misconduct

21   complaints will persist unless Defendants take action to identify and root out problems

22   through meaningful reforms to the RVR process. Plaintiffs are hopeful that the parties can

23   agree to resolve problems, and that additional court intervention will not be necessary.

24        **2.    Defendants' Statement**

25              **a.    RJD and Five Prisons Orders**

26        CDCR has dramatically overhauled its staff misconduct investigation process to

27   ensure unbiased and complete investigations. And, although not required by the Court's

28   orders, Defendants have restructured CDCR's statewide staff misconduct allegation,

screening, referral, investigative, and disciplinary processes.  As the Court has noted, "[t]hese agreed-upon measures constitute substantial improvements that will go a long way to bringing Defendants into compliance with the ARP and ADA at the six prisons."  ECF No. 3356 at 2.  The Court found, the "implementation of these [] remedial measures is likely to have a positive impact on…the overall reliability of the outcomes of investigations."  *Id.* at 15.

Despite the tremendous efforts and resources directed towards improving the staff misconduct investigation and discipline processes, modifications are necessary to ensure sustainability.  CDCR contends that many of the issues raised in the recent OIG report are attributable to the operational realities of the large number of complaints that stretch the capacity of the OIA to timely complete these cases.  *See* CDCR response to OIG March 2025 report at https://www.oig.ca.gov/wp-content/uploads/2025/03/2024-Staff-Misconduct-Investigation-Monitoring-Report.pdf.  CDCR further contends that a disproportionately large number of these complaints are submitted by an extremely small number of incarcerated people who, for some, submit repetitive claims on a daily or weekly basis.  With stakeholder input, CDCR is implementing a process to address these frequent filings that incorporates all available resources and draws upon mental, medical, or correctional expertise to reduce the number of repetitive claims, while at the same time ensuring that all allegations of staff misconduct are properly reviewed and routed for OIA investigation, when warranted, in compliance with the orders of this Court.  With input from Plaintiffs, the Court Expert, and other stakeholders, CDCR continues to identify and implement necessary modifications to the investigative and disciplinary processes.  These efforts include, but are not limited to, updating the applicable staff misconduct regulations, simplifying the staff misconduct process, revising the ADI to provide greater clarity, consolidating Information Technology systems to improve case tracking and management, developing certified training to enhance investigator preparedness, and completing the recent September 26, 2025 stipulation on the Staff Misconduct Investigative and Discipline Process with Plaintiffs' counsel (ECF No. 3721).  CDCR also completed a series of

trainings for designated staff hired into the newly established Centralized Allegation
Resolution Unit located at department headquarters, who will serve as the hiring authority
and review completed investigations which involved or originated from incarcerated
persons residing within the six institutions identified in the Court's staff misconduct
orders. *Id*. CDCR has implemented prioritization strategies to focus on meeting statutory
deadlines, addressing cases based on their age or complexity, and ensuring compliance
with legal obligations. *Id*. To further address timeframe-related challenges, CDCR
continues to actively recruit to fill all vacant investigator positions within the Office of
Internal Affairs and has repositioned several internal vacancies to hire additional
investigative staff. *Id*. CDCR also continues to refine its intake process to reduce
redundant investigative efforts and conserve limited investigative resources while
maintaining a complete review of all allegations. *Id*. CDCR, in collaboration with
Plaintiffs and other stakeholders, continues to identify and implement additional
improvements to ensure compliance with policies and regulations. Throughout this
process, CDCR has regularly provided substantive updates to the OIG and will continue to
do so.

CDCR also continues to apply the Allegation Decision Index (ADI) to screen and
route staff misconduct complaints, which is memorialized in its Department of Operations
Manual, section 33070.9.7 (available at https://www.cdcr.ca.gov/operations-
manual/dom/chapter-3-personnel-training-and-employee-relations/article-26-staff-
misconduct-allegations-involving-an-inmate-or-parolee/33070-9-7-allegation-decision-
index/). However, CDCR contends that additional revisions are necessary to ensure the
appropriate use of investigative resources.

**b.    Demands for RVR Reform**

Defendants have made significant progress in addressing Plaintiffs' allegation that
CDCR staff issue false and retaliatory Rules Violations Reports (RVRs) to class members,
as detailed in previously filed statements. *See* ECF Nos. 3412 at 14-16, 3526 at 7-8.
Plaintiffs may disagree with a specific investigation or discipline imposed, but that does

not necessarily mean the RVR was false or retaliatory. Nevertheless, CDCR continues to address Plaintiffs' concerns to the extent they are related to class-member accommodations, alleged discrimination, or retaliation, and to the extent CDCR is required to do so under the remedial plans, the ADA, or prior court orders. Defendants maintain that Plaintiffs' general complaints about the RVR process, unrelated to class-member accommodations, are not properly raised in this case.

**B.      Court Expert Investigation Into SATF**

      **1.      Plaintiffs' Statement**

Background of the Court Expert's investigation into the treatment of people with disabilities at the Substance Abuse Treatment Facility (SATF) is set forth in Plaintiffs' previous joint case status statement. *See* ECF No. 3670 at 6-8. On May 1, 2025, the Court adopted, with some modifications, the Court Expert's Recommendations Regarding Compliance with SATF Stipulation, which laid out steps that Defendants must take to remedy longstanding violations of the ADA and ARP at SATF. ECF No. 3651 (Court Expert's recommendations); ECF No. 3679 (Court's order).

The parties continue to meet and confer regarding Defendants' plans to comply with SATF Stipulation Item #7 and the Court's May 1 order on this Item.

The Court has deferred ruling on item 13 in light of the Court Expert's April 18, 2025, status update and a planned demonstration of an alternative technology. ECF Nos. 3675; 3679 at 21. The demonstration of Defendants' proposed alternative transcription technology was conducted at SATF on August 19, 2025. Following the demonstration, the parties exchanged their respective positions regarding the alternative technology and are conferring concerning appropriate next steps.

Plaintiffs continue to eagerly await the Court Expert's forthcoming report and recommendations on staffing and sustainability and hope it will result in the allocation of sufficient expertise and resources, and development of robust systems, necessary to comply with the ARP and ADA.

### 2.    Defendants' Statement

The Court Expert's second report concerning the treatment of people with disabilities at SATF recognized the numerous proactive measures implemented at SATF to further respond to the needs of incarcerated people with disabilities.  ECF No. 3500.  The report demonstrates that the coordinated efforts between CDCR and California Correctional Health Care Services (CCHCS), with the Court Expert's guidance and with input from Plaintiffs, are working to effectively respond to the issues raised by the Court and addressed by the Court Expert following his initial investigation.  On May 1, 2025, the Court issued its order on the issues not resolved by the Court's November 8, 2024 order, and addressed in the Court Expert's January 10, 2025 recommendations, which included items 5, 7, 9, 10, and 13.  ECF Nos. 3639, 3651, 3655, 3656, 3660, 3661, 3665, and 3679.  The parties, with input from the Court Expert, have resolved items 5, 9, and 10.  The parties have also completed the required meet-and-confer process, and Defendants have fully complied with the Court's May 1, 2025, order regarding item 7.  The parties are continuing to meet and confer regarding item 13, and after the parties complete their meet-and-confer process, the Court Expert will file a further status update with a report and recommendation for next steps.  ECF No. 3679 at 21-22.

## C.    Accommodations for Deaf and Hard of Hearing Class Members

### 1.    Plaintiffs' Statement

In September 2024, Plaintiffs reported that deaf class members who use sign language had experienced "widespread failures to ensure access to on-site sign language interpreters," and that as a result, "class members [were] relegated to interpretation via endlessly faulty video-conferencing equipment that all but prohibits effective communication."  ECF No. 3622 at 18 (Plaintiffs' Statement).  Plaintiffs reported a 27% vacancy rate in sign language interpreter positions statewide, and noted that deaf signers at the Central California Women's Facility ("CCWF") had no staff interpreter at all, after their staff interpreter resigned due to, according to her, the mental and physical toll of CCWF's failure to accommodate deaf class members.  *Id.* at 18-19, 58-59.  A staff

interpreter at San Quentin similarly resigned due to overwhelm, overwork, and poor working conditions for less pay than he would receive outside state service. *Id*.

Little has changed over a year later. Although Defendants reported last year that they had initiated the process to increase the salary range for staff interpreters, *see id*. at 23, the issue remains unresolved. No other retention efforts have proven effective; with seven of the twenty-three sign language interpreter positions unfilled—a 30% vacancy rate—there now are more vacant staff interpreter positions than there were in September 2024. Defendants report no viable candidates for the CCWF staff interpreter position, which has remained vacant for well over a year, leaving the State's entire population of deaf signers who must be housed at an institution designated for women served entirely by staff interpreters assigned to other institutions. Deaf signers endure additional staff interpreter vacancies at the California Health Care Facility, California Medical Facility ("CMF"), SATF, and at San Quentin, where six Deaf class members rely on a single staff interpreter. Even at institutions with no current interpreter vacancies, such as RJD, Deaf class members report that the institution's existing allocation of interpreters is insufficient to meet their programming needs.

Defendants have been unable to make up the difference with either in-person contract interpreters or video remote interpretation ("VRI"). At institutions suffering staff interpreter vacancies—CCWF, CMF, and SATF—as well as at RJD, Defendants report that in-person contract interpreters do not appear for assignments consistently (or at all). And Deaf class members at CCWF, RJD, and elsewhere continue to report, as they have for years, that VRI is faulty and unreliable and that it cannot substitute for in-person interpretation. Plaintiffs have had no opportunity to investigate or monitor whether Defendants' proposed Facetok solution, announced to Plaintiffs' counsel on November 13, 2025, via this statement, will resolve the ongoing connectivity issues with VRI.

Defendants are not excused from their obligation to provide interpretation to Deaf class members by an "industry-wide shortage" of interpreters, particularly where

1  Defendants have been aware of the problem for over a year.  *See* ECF No. 3622 at 23

2  (Defendants' Statement); *see also* ECF No. 1045 at 8; ECF No. 1661 at 2; ECF No. 2345

3  at 22 (finding that Defendants failed to make a "reasonable effort" to accommodate deaf

4  class members, despite a shortage of contract interpreters in the community, because they

5  did not take sufficient steps to provide accommodations in light of the known interpreter

6  shortage).  Defendants must resolve these serious hiring and retention concerns as soon

7  as possible.

8       Plaintiffs also have raised several pressing concerns regarding phone access for

9  deaf non-signers.  Deaf non-signers have no means of leaving voicemail messages on the

10  state hotlines for the Prison Rape Elimination Act and for the Office of the Inspector

11  General, leaving them without access to these crucial protections.  Plaintiffs' counsel

12  have raised this concern in advocacy, which has been pending with Defendants for 147

13  days.  The resolution Defendants claim below—for deaf non-signers to leave voicemails

14  via the video relay service ("VRS")—is no resolution at all: VRS is a

15  telecommunications service for sign language users to connect to a relay interpreter and

16  is thus inaccessible to deaf non-signers.

17       Plaintiffs have also reported for years that deaf signers at California State Prison

18  — Los Angeles County cannot consistently place videophone calls due to problems with

19  the videophone network.  Defendants' strategy of implementing short-term fixes for

20  connectivity concerns only as they arise has not prevented problems from recurring, and

21  has ensured that denials of phone access will remain routine for deaf class members at

22  LAC.  Plaintiffs' counsel have raised these concerns in five advocacy letters since

23  February 2023, the most recent of which, which requested that Deaf class members be

24  offered the option to transfer to another institution capable of providing continuous

   videophone access, has been pending with Defendants for 122 days.

25      **2.**    **Defendants' Statement**

26       Defendants remain committed to providing deaf and hard-of-hearing class members

27  equal access to programs, services, and activities in accordance with the ADA, the

1   remedial plans, and this Court's orders.  This includes working diligently to provide sign-
2   language interpretation services for deaf class members whose primary method of
3   communication is American Sign Language (ASL).  Defendants continue extensive
4   recruitment efforts to fill SLI vacancies, including outreach to local interpreter-training
5   programs, community colleges, and regional interpreting businesses.  Defendants' current
6   contracted vendors have reported a nationwide post-pandemic shift in workforce
7   preference.  Many qualified Sign language interpreters now prefer remote assignments
8   rather than on-site work in correctional or healthcare environments.  Defendants' contract
9   vendors, including Interpreters Unlimited, continue to recruit aggressively, but many
10  qualified interpreters prefer remote-only assignments or work in urban areas.  Rural
11  institutions such as SATF and CCWF face additional geographic recruitment challenges,
12  which further explains localized shortages that are not attributable to CDCR policy or
13  action.

14          CDCR requested salary increases for staff SLIs and the request remains pending
15  with the California Department of Human Resources, a separate state agency responsible
16  for issues related to employee salaries and benefits.  Plaintiffs' vacancy figures also do not
17  account for legal restrictions on backfilling certain SLI positions.  At SQRC, the SLI
18  position identified as "vacant" cannot be filled because the incumbent employees are on
19  workers compensation leave.  Under state law and CALHR rules, these positions must
20  remain assigned to the employees on leave and cannot be reallocated or refilled until the
21  leave status is resolved.  Defendants have been transparent with Plaintiffs regarding these
22  statutory limitations.  Despite vacancies, the statewide ratio of SLIs to deaf signer class
23  members is favorable, averaging one SLI per 2.5 class members.  SLIs at SATF are
24  providing in-person services, and the other selected applicants only need to complete the
25  final requirements of the state hiring process before they can start.  The vacancy at CCWF
26  is being addressed in the immediate term through coordination with CIW, which is now a
27  DPH-designated institution and fully staffed with an SLI who will be able to support the
28  needs of the three deaf signers housed at CCWF.  In addition, Defendants have been

coordinating coverage assistance by the existing SLI staff.  For example, the staff SLI assigned to NKSP has been assisting CCWF with SLI services.  This SLI has provided both remote and in-person SLI services as needed at CCWF.  To further assist with sign language for the female population, one deaf SLI class member has been transferred from CCWF to CIW, where she is now receiving regular in-person SLI accommodations.  The remaining two class members at CCWF are scheduled to transfer to CIW in the near future, ensuring that all three will be housed at a DPH designated institution with a permanent in-person SLI.  All other DPH-designated institutions are staffed with interpreters, and three institutions (LAC, NKSP, and RJD) are fully staffed.  Defendants continue to closely monitor statewide hiring efforts and will work to ensure that any vacancies are posted until filled.

CDCR remains bound by its existing contracts for additional SLI services, but the terms of those contracts are under review.  CDCR communicates regularly with the current contractors, who continue to actively recruit interpreters.  In addition, Defendants have been actively involved in coordinated efforts with their contracted vendors to strengthen remote interpreter availability and service reliability.  As part of this work, Defendants have been piloting the Facetok VRI platform to improve SLI availability, pre-scheduling, and overall service coordination.  Facetok also allows for scheduled SLI services, improving advance planning and interpreter coverage at pilot institutions.  The pilot began at SQ, where it received positive feedback, and has since expanded to RJD, LAC, CMF, and SATF.  Defendants are currently awaiting feedback from RJD, LAC, CMF, and SATF on their use of Facetok.  Furthermore, CDCR's Compliance Sergeants and the Correctional Counselor IIs from the ADA Collaboration and Training Team (ACTT) (formerly referred to as the Class Action Management Unit) continue to train staff, check the functionality of equipment, and work with the vendor when necessary to resolve intermittent technical issues.  The lines of communication on these issues remain open for discussion and resolution.

Defendants have addressed Plaintiffs' reported concerns regarding deaf non-

1  signers' access to voicemail on the state hotlines for the Prison Rape Elimination Act and

2  for the Office of the Inspector General.  Incarcerated persons can now leave voicemails

3  with both state hotlines via VRS.  With respect to videophone calls, although LAC has, at

4  times, experienced outages with their VRS equipment, the outages have been sporadic—

5  not recurring—and CDCR has worked with the vendor to address the issues.  LAC staff

6  continue to test the equipment to ensure uninterrupted access to this service and class

7  members have been making VRS calls regularly.

8       In addition, Defendants are in the process of converting statewide VRS services

9  from ViaPath to Securus.  This transition will include installing multiple dedicated VRS

10  stations in accessible locations at DPH-SLI designated institutions including LAC to

11  strengthen reliability, increase the number of access points, and ensure continuous

12  communication access for Deaf and Hard-of-Hearing class members.  The conversion is

13  expected to provide enhanced equipment, improved network stability, and quicker vendor

14  response times.

15  **D.    Accommodations for Blind and Low-Vision Class Members**

16       **1.    Plaintiffs' Statement**

17       Plaintiffs continue to receive reports from blind and low-vision class members that

18  they need standalone writing accommodations—such as laptops with screen-reading

19  software—but that the low-vision specialist did not discuss or evaluate their writing needs

20  or preferred writing accommodations during their assessments with this specialist.  Thus,

21  even after their low-vision specialist appointments, these class members remain without

22  accommodations to write privately and independently.  Plaintiffs have reported this

23  problem to Defendants at length.  *See, e.g.*, Multiple Advocacy Letters Re: class member

24  at SATF (Jan. 18, 2024; Aug. 15, 2024; and Feb. 21, 2025); class member at CHCF

25  (Jan. 15, 2025).  Particularly for class members who wish to write privately and

26  independently and who are blind or severely low-vision, and thus cannot handwrite even

27  with a high-powered magnifier, writing accommodations are vital.  For reasons discussed

28  in the Court's March 20, 2024, Order Granting in Part the Motion to Enforce the Revised

1  Permanent Injunction, it is also vital that class members be issued these accommodations

2  for personal use, and not be forced to go to the law library to use them.  *See* ECF No. 3583

3  at 21 (discussing how auxiliary aids in the law library "can only be accessed in a public

4  setting and during the libraries' limited hours").  Extremely few blind and low-vision class

5  members statewide have been recommended an accessible laptop by the low-vision

6  specialist, despite extensive reports from class members that they are committed to

7  learning how to use this accommodation, that they cannot write privately or independently

8  without it (or an equally effective accommodation), and that the low-vision specialists did

9  not discuss the possibility of receiving this accommodation with them.  Plaintiffs' counsel

10  will continue to raise this important issue and hope to work collaboratively with

11  Defendants to resolve it.

12      Plaintiffs are concerned that Defendants have circumvented the requirements of the

13  Court's March 20, 2024, orders (ECF Nos. 3583 & 3584), which require Defendants to

14  issue assistive devices to blind and low-vision class members that are recommended by

15  Defendants' low-vision specialist.  ECF No. 3584 at 2 (requiring Defendants to formalize

16  and implement the procedures of the Lozano declaration, which represented to the Court

17  that Defendants would "issue" recommended devices for class members' private use, ECF

18  No. 3543-5 at ¶ 16 (Decl. of Jared Lozano)); ECF No. 3583 at 17 (noting that under

19  CDCR's new policy, if an auxiliary aid is recommended by the vision specialist, "CDCR

20  will issue the auxiliary device for the class member's private use as soon as reasonably

21  possible"); *id.* at 19 (requiring Defendants to "affirmatively provide" the recommended

22  accommodation "without waiting for a request").  Rather than issuing these devices,

23  Defendants have forced many blind and low-vision class members to request, from

24  custody staff, temporary access to assistive devices that the low-vision specialist

25  recommended for them, on a check-in/check-out basis.  Plaintiffs have repeatedly raised

26  this concern with Defendants.  Plaintiffs are hopeful that the parties will be able to resolve

27  this dispute without court intervention.

28

2. **Defendants' Statement**

As previously communicated to Plaintiffs, CDCR is actively working on training and other logistical plans to enable issuance of the ADA laptops to blind and low-vision class members for whom the low-vision specialist recommended a laptop. ADA laptops have been deployed to the institutions housing class members who were recommended an ADA laptop as a writing accommodation by the vision specialist. Those institutions have begun to issue ADA laptops the week of September 8, 2025, and training on the use of the laptops is now underway. CDCR will continue to provide updates on these efforts as progress is made and will respond to Plaintiffs' letters regarding specific class members as part of the established advocacy process.

Plaintiffs' claim that the low-vision specialist did not discuss or evaluate certain class members' writing needs or preferred writing accommodations and that class members remain without writing accommodations is incorrect and premised on Plaintiffs' lay opinion that anything short of a laptop is insufficient as a writing accommodation. Plaintiffs' apparent assumption that a class member not being recommended a laptop means the low-vision specialist did not conduct a meaningful evaluation of that class member is likewise incorrect. Laptops with screen-reading software are not suitable for every blind or low-vision class member and may not align with every individual's writing needs. In some cases, class members have preferred the assistance of a scribe or an aid over all other assistive technology. The low-vision specialist has specialized knowledge and clinical expertise, makes recommendations based on an individualized assessment of the class member, and applies the same standards and best practices as are used in the community. The low-vision specialist is also aware of their obligation under the ADA, remedial plans, and Court orders, to give primary consideration to the class member's preferred accommodation, unless other equally effective accommodation is available. Additionally, this issue is effectively moot because a class member is free to request a different accommodation than the one recommended by the low-vision specialist if the recommended accommodation is insufficient to meet their needs, by submitting a CDCR

1    Form 602-1/1824 to their institution's Reasonable Accommodation Panel.

2    Plaintiffs contend that the Court's March 20, 2024, orders (ECF Nos. 3583 &

3    3584), "require Defendants to [individually] **issue** assistive devices to blind and low-vision

4    class members that are recommended by Defendants' low-vision specialist." *See*

5    Plaintiffs' statement above (emphasis added).  Plaintiffs, however, appear to misinterpret

6    the Court's March 20, 2024, orders cited in support of this erroneous contention.  Indeed,

7    the Court's order for Further Remedial Measures (ECF No. 3584) requires Defendants to

8    "formalize and implement the procedures described in the declaration of Jared Lozano" but

9    limits those procedures to "conducting individualized assessments of DPV class members

10   to **identify, document, and track**" accessible formats and assistive devices that ensure

11   effective communication of printed materials. *Id.* at 2 (emphasis added).  Individual

12   issuance of the assistive devices identified by the vision specialist is notably missing from

13   the Court's directive regarding implementation of the procedures described in the Lozano

14   declaration. *See Id.* generally.  Instead, the Court ordered Defendants to provide class

15   members timely "access" to devices to complete parole-related reading and writing tasks in

16   a way that protects their privacy and independence. *See* ECF No. 3584 at 4.

17   Moreover, although the Court's order Granting in Part Motion to Enforce Revised

18   Permanent Injunction (ECF No. 3583) does state that CDCR is required to provide class

19   members reasonable accommodations without waiting for a request once it is on notice of

20   a need for an accommodation (*Id.* at 19), this statement has nothing to do with provision of

21   assistive devices on check-in/check-out basis, as Plaintiffs appear to represent.  Indeed, the

22   Court's statement Plaintiffs rely on relates to CDCR's prior policy, which required a DPV

23   class member to submit a reasonable accommodation request to obtain a reading or writing

24   accommodation when preparing for a parole suitability hearing. *See Id.* at 19-20.  Under

25   Defendants' current policy, when individual issuance of assistive devices is recommended

26   by the vision specialist following a class member's individualized assessment, the class

27   member is individually issued the recommended device.  When a class member is

28   recommended access to a particular device following their individualized assessment, that

1   class member can timely access the recommended device on a check-out basis for use in

2   their housing unit and other locations ensuring class member's privacy and independence.

3   By electing to issue assistive devices to class members upon vision specialist's

4   recommendation or, when appropriate, upon an incarcerated person's submission of a

5   CDCR Form 602-1/1824, Defendants have more than met the Court's orders requiring

6   timely access to assistive devices to class members for completion of parole-related

7   reading and writing tasks in a way that protects their privacy and independence.

8   **E.     Access to Assignments for Class Members**

9          Historically, the program-access workgroup met periodically to discuss credit

10  earning, the assignment process, and disparities in the program-access assignment data in

11  response to Plaintiffs' allegations of disability-related discrimination.  *See* ECF No. 2680

12  at 13-14.  The parties reached agreement on the relevant data to produce to Plaintiffs each

13  month in early 2024, and Defendants have been providing the updated data set every

14  month since April 2024.  The parties took a break from workgroup discussions in late 2024

15  as Defendants worked on new regulations to update various aspects of program

16  assignments.  With encouragement from the Court Expert, the parties are restarting the

17  workgroup discussions.  The first step is for Defendants to respond to Plaintiffs' May 17,

18  2024, e-mail with proposals for program assignments.  Defendants will provide

19  information on how the draft regulations address several of Plaintiffs' proposals.

20         Plaintiffs' counsel seeks to move forward with agreement on a standard for

21  evaluating program assignment discrimination.  While the workgroup discussion has been

22  paused, Plaintiffs have continued to report in our monitoring tour reports on disparities in

23  assignment rates between incarcerated people with and without disabilities at individual

24  institutions and programs.  For example, Plaintiffs continue to report on disparities in

25  assignment rates for higher paying and higher status jobs, like Prison Industry Authority

26  jobs, which class members are assigned to at lower rates.  The parties will continue to

27  work on issues related to program access.

28

**F.     Joint Monitoring Tool**

    **1.     Plaintiffs' Position**

Despite years of good faith commitments to engage with Defendants on the creation of a joint audit tool and process, Plaintiffs' counsel have consistently raised repeated and serious concerns about the efficacy of the joint audit tool as a means of assessing compliance with the ADA, the *Armstrong* Remedial Plan and the Court's prior orders. These concerns have been raised in multiple letters and meet and confer conversations.  As articulated in our November 22, 2019 and May 9, 2024 letters to the Court Expert, Plaintiffs believe that monitoring must be broad, it must evaluate harm to class members, it must seek to identify and report sufficient information to inform meaningful remedies, and it must reach the question of ADA compliance.  Despite good faith efforts by both parties, to date, these objectives have not been met.  Instead, the joint audit is consuming thousands of hours of Plaintiffs' counsel's time without meaningfully evaluating compliance with the ADA or bringing identifiable relief to the Class.  In some cases, class members have begun to question the utility of participation after reporting problems in multiple forums including during semi-annual interviews, joint audits, and Plaintiffs' counsel tours, all without seeing ADA improvements as a result.  Plaintiffs seek the opportunity to meet and confer regarding significant changes to this process.

**2.     Defendants' Statement**

The audit tool is the product of many years of extensive negotiation between the parties with the Court Expert.  The scored portion of the audit consists of document review, as well as staff and class members interviews.  Plaintiffs' November 2019 letter correctly observed that this portion of the tool does not directly audit ADA compliance. That is because the ADA is a statutory scheme that does not itself present an auditable standard.  Instead, the scored portion of the tool addresses institutional compliance with requirements of the *Armstrong* Remedial Plan (ARP), Court orders, and policies and procedures created to address ADA compliance.  CDCR subsequently added an unscored section to the tool, which contains additional data and information, including issues raised

by class members during the audit.  CDCR's ADA Collaboration and Training Team (ACTT) uses this information to evaluate the efficacy of its policies and procedures, and make updates as needed.

Plaintiffs did not claim that the audit tool failed to address compliance with the ARP until their May 2024 letter, and now claim that it also fails to assess compliance with Court orders.  This is incorrect.  The tool covers a variety of topics, including reasonable accommodations, the accommodation request process, access to written materials, identification and tracking of disabled persons, parole planning, durable medical equipment, ADA coordinators, duty statements, local policies and procedures, accountability, training, expedited transfers, accessible housing, accessible features and equipment, program assignments, education and library access, extended stay and credits, orientation, the ADA worker program, sign language interpretation, and effective communication.  Each topic includes a set of questions that relate directly to requirements in the ARP, Court orders, or policy and procedure (much of which was the product of negotiation between the parties).  Notably, Plaintiffs participated in drafting every single question used in the audit tool.

For example, the ARP requires that CDCR provide extended stay privileges to incarcerated people held in reception centers longer than sixty days because of a disability impacting placement or for dialysis treatment.  To evaluate this requirement, auditors review documentation about incarcerated persons' time spent in reception centers, question staff about their responsibilities to provide extended stay privileges, and interview incarcerated persons about whether they received extended stay privileges.

The Court's February 3, 2015, order (ECF No. 2496) prohibits placement of incarcerated persons in restricted housing units (RHU) because of insufficient accessible spaces and requires CDCR to document when someone is impermissibly housed.  To evaluate this requirement, auditors review documentation related to an incarcerated persons' placement in RHU and RHU logs, and interview incarcerated persons about whether they were housed in RHU due to their disabilities.

1    Defendants' position is that the audit tool is working well; is necessary for CDCR to

2   self-monitor its compliance with the ARP, Court orders, and its policies and procedures

3   relating to ADA compliance; and is worth completing.

4    Plaintiffs are compensated for their time spent working with Defendants and the

5   Court Expert on developing the tool and attending audits.  Currently, the parties are

6   working on increasing specificity in reporting and the information provided to institutions

7   regarding non-compliance.  While Defendants have worked collaboratively with Plaintiffs

8   at institutional audits, Plaintiffs are not required to participate and CDCR is amenable to

9   completing the audits without Plaintiffs' participation.  The parties can discuss this further

10  at their next meeting, but Defendants would prefer Plaintiffs' continued involvement.

11  **G.    ADA Structural Barriers, Emergency Evacuation Procedures, and Master Planning Process**

12  **1.    Plaintiffs' Position**

13   On September 30, 2025, the Court Expert sent a proposal to the parties regarding a

14  new framework for Master Planning given "the frustration of both parties at the pace and

15  progress" of the existing process.  The Court Expert's proposal provides a history of the

16  master planning process dating from 2011 through the present.  The Court Expert then

17  identifies three problems with the current master planning process, including "1) the need

18  for a system-wide schedule for when construction is expected to be completed at each

19  institution; 2) the need for agreement on what information Defendants will share with

20  Plaintiffs . . . and at what stage in the process they will share that information; and 3) the

21  need for a process to resolve disputes where negotiation between the parties has proved

22  unsuccessful."  The Court Expert proposes six elements of a new framework to address

23  those issues.

24   Plaintiffs generally agree with the Court Expert's concerns about the lack of a clear

25  timeline for construction at each institution, need for clarity about the timing of

26  Defendants' information-sharing, and the need for processes to resolve disputes between

27  the parties.  Plaintiffs also generally agree with the Court Expert's proposed framework to

28

1  resolve those problems so that CDCR can ensure class members have access to accessible

2  facilities as quickly as possible.  Plaintiffs provided a written response to the Court

3  Expert's proposal on October 30, 2025.

4  In the meantime, the parties are engaged in discussions about several issues,

5  including related to shower accessibility, design plans for 270 cells, interim

6  accommodations, and review of design plans.  Defendants agreed to maintain and share, on

7  a monthly basis, a spreadsheet with the updated status of design and construction for

8  current master planning projects.  Plaintiffs continue to await follow-up information from

9  Defendants after the parties' June 27, 2025, meeting about steps Defendants could take to

10  reduce the harm of currently inaccessible showers.  Plaintiffs also continue to await

11  information about anticipated dates of construction for 270-design cells going forward.

12  The parties  conducted a tour of LAC regarding emergency planning on October 21,

13  2025, based on Plaintiffs' concern about the adequacy of evacuation procedures for class

14  members given Defendants' refusal to add accessible emergency exits to buildings at LAC,

15  with many individuals who use wheelchairs either full-time or part-time.  In document

16  productions and public records requests on this topic, Plaintiffs learned that there were

17  widespread failures during the State Fire Marshal's inspection in 2022, and no annual

18  inspections in 2023 and 2024.  A spring 2025 inspection by an outside CDCR vendor also

19  found extensive problems at LAC, including broken fire alarms and other safety equipment

20  and procedure issues.  Although many of the problems or "faults" identified in the 2022

21  State Fire Marshal's inspection at LAC and in the more comprehensive Spring 2025

22  inspection by CDCR's outside fire safety contractor had been corrected at the time of our

23  October 2025 tour, there remained a significant number of faults in the fire alarm systems

24  that had not yet been repaired.  There were also problems identified on the recent tour with

25  the pressure levels in sprinkler systems, with water hoses not being properly stored, and

26  with extensive missed fire extinguisher inspections.  We also saw and heard no evidence

27  on the tour of new staff policies, new training, and/or new procedures implemented to

28  ensure that the same problems and faults identified in 2022 and 2025 will not recur.  We

also learned on the tour that, even though Defendants told us in setting up the fire safety

expert tour that they could not conduct actual evacuations of housing units with class

members due to safety issues, they in fact did conduct three such drills including full

evacuations of clustered housing units in the months prior to our tour, and that in one

instance it took 25 minutes to evacuate the building.  We also learned from class members

on the tour that during a recent evacuation due to the use of a chemical agent, individuals

in wheelchairs were forced to exit through one of the inaccessible, partly unpaved exit

doorways, across a curb, as the accessible doorway was blocked by the fumes.

Plaintiffs' position on creating additional accessible emergency exits is that

regardless of whether or not such additional exits are mandated by the codes (see

Defendants' section below), the ADA requires Defendants to make more emergency exits

fully accessible in housing units where people with mobility disabilities are clustered,

based on safety concerns and program access.

### 2.    Defendants' Statement

On September 30, 2025, the Court Expert circulated a letter making six proposed

changes to the Master Planning process: 1) a long-term and system-wide timeline; 2) a

system to track the progress towards existing timelines; 3) an agreement on interim

accommodations; 4) an agreement detailing what information to share regarding bed

planning, barrier identification and planning disputes, construction documents and pre-

construction disputes, and inspections of completed constructions; 5) a dispute resolution

process; and 6) an independent expert to aid in dispute resolution.  Defendants promptly

reviewed the letter and met with the Court Expert to develop a fuller understanding of the

six propositions.  Defendants submitted their position on the Court Expert's proposals on

October 30, 2025.  The parties met with the Court Expert on November 10, 2025, and are

collectively working to finalize a new Master Planning process.

The parties toured LAC on October 21, 2025.  Defendants understand that Plaintiffs

have concerns about the emergency planning features.  However, Defendants have yet to

receive a report or letter from Plaintiffs and believe that Plaintiffs' statements concerning

1    fire issues expressed in the section above are premature.  Defendants are closely

2    monitoring this issue and took several steps relating to LAC's emergency evacuation

3    system.  As Plaintiffs saw during the tour, LAC has made great progress in repairing fire

4    systems in housing units and other areas of the prison.  Further, all housing unit fire

5    systems are functional in case of a fire.  Defendants are working closely with the State Fire

6    Marshal's office on these items to ensure the health and safety of everyone at LAC.

7    Defendants also note that parties extensively met and conferred on the number of

8    emergency exits required at LAC and agree that both the relevant California Building

9    Codes and the 2011 ADA standards require one accessible emergency exit in LAC's

10    housing units.

11         The parties also continue to meet and confer about other issues such as shower

12    accessibility, design plans for 270 cells, interim accommodations, and review of design

13    plans.  Defendants are sharing monthly spreadsheets with the updated status of design and

14    construction for current master planning projects.  Defendants circulated the last monthly

15    report on October 21, 2025.

16    / / /

17    / / /

18    / / /

19    / / /

20    / / /

21    / / /

22    / / /

23    / / /

24    / / /

25    / / /

26    / / /

27    / / /

28

Respectfully submitted,

DATED:  November 17, 2025    ROSEN BIEN GALVAN & GRUNFELD LLP

By:    /s/Penny Godbold
       Penny Godbold

Attorneys for Plaintiffs


DATED:  November 17, 2025    ROB BONTA
                             Attorney General of the State of California

By:    /s/Sean W. Lodholz
       Sean W. Lodholz
       Supervising Deputy Attorney General

Attorneys for Defendants


## FILER'S ATTESTATION

As required by Local Rule 5-1, I, Penny Godbold, attest that I obtained concurrence in the filing of this document from Deputy Attorney General Sean W. Lodholz, and that I have maintained records to support this concurrence.


DATED:  November 17, 2025    /s/Penny Goldbold
                             Penny Godbold

# EXHIBIT A



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Michael Freedman
Email: MFreedman@rbgg.com

October 9, 2025

<u>VIA ELECTRONIC MAIL ONLY</u>

Tamiya Davis                                    Sean Lodholz
CDCR Office of Legal Affairs                    California Office of the Attorney General
Tamiya.Davis@cdcr.ca.gov                        Sean.Lodholz@doj.ca.gov

Re:     *Armstrong v. Newsom*: Notice of Enforcement of Provisions of RJD and
        Five Prisons Remedial Plans Regarding Investigation Timeliness
        <u>Our File No. 0581-03</u>

Dear Sean and Tamiya:

We write to inform Defendants that, unless the parties can reach an agreement within the next 30 days, Plaintiffs intend to move to enforce the provisions of the RJD and Five Prisons Remedial Plans ("Remedial Plans") that require Defendants to complete timely investigations.

Plaintiffs are pleased that the parties reached agreement on the Staff Misconduct Investigation and Discipline Process Stipulation ("Stipulation"), which the Court entered on September 26, 2025. *See* Dkt. 3721. We look forward to working with Defendants to evaluate the effectiveness of the Centralized Allegation Resolution Unit and to provide the use-of-force consultant, Nicholas Mitchell, with the information he requires to make recommendations regarding Defendants' use-of-force policies and practices.

Notwithstanding the Stipulation, other issues related to Defendants' non-compliance remain, with the untimeliness of investigations foremost among them.[1] The Remedial Plans provide that Office of Internal Affairs ("OIA") investigations into staff

---

[1] Other areas of non-compliance include, but are not limited to, failures by Hiring Authorities to hold staff accountable for proven misconduct and failures by investigators to gather and review all relevant evidence, including video evidence. Plaintiffs will continue to monitor these areas and work with Defendants to bring them into compliance. Plaintiffs do not, at this time, intend to enforce the provisions of the Remedial Plans governing these issues, but reserve the right to do so.

Tamiya Davis
Sean Lodholz
October 9, 2025
Page 2

misconduct allegations conducted by custody supervisors (sergeants and lieutenants) must be completed within 120 days of receipt by OIA, while OIA investigations conducted by special agents must be completed within six months.  RJD Remedial Plan at 5; Five Prisons Remedial Plan at 5.  Per data from Defendants, nearly all OIA investigations are completed by custody supervisors, not special agents.  The Plans further provide that the "timeframes can be extended for extenuating circumstances," but only if "approved by a supervisor and documented in writing."  RJD Remedial Plan at 5; Five Prisons Remedial Plan at 5-6.

The evidence that Defendants are not complying with these timelines is overwhelming and the problem is only getting worse.  The seven most recent months of data produced by Defendants[2] show that, at the six prisons covered by the Court's orders, **Defendants closed more than 90% of investigations late**.

| MONTH REC'D | CLOSED-ON TIME | CLOSED-PAST DUE | OPEN | OPEN-PAST DUE | TOTAL | % LATE |
|---|---|---|---|---|---|---|
| September | 70 | 172 | 0 | 178 | 420 | 83.3% |
| October | 54 | 71 | 0 | 256 | 381 | 85.8% |
| November | 29 | 18 | 0 | 233 | 280 | 89.6% |
| December | 27 | 24 | 0 | 431 | 482 | 94.4% |
| January | 46 | 16 | 0 | 420 | 482 | 90.5% |
| February | 36 | 8 | 0 | 407 | 451 | 92.0% |
| March | 23 | 5 | 0 | 341 | 369 | 93.8% |
| **TOTAL** | **285** | **314** | **0** | **2266** | **2865** | **90.1%** |

Not only are investigators failing to complete investigations by the Remedial Plan deadlines, they are closing them very late.  According to the same data set produced by Defendants, OIA received 801 complaints in September and October 2024.  Investigators closed only 124 of those investigations on time.  The remaining 677 cases were either closed late (243) or remained open as of July 31, 2025 (434 cases, which, by definition, will be closed late because the 120-day deadline had already passed).  Of the 677 late cases, 586 will be or already have been closed more than 90 days past the 120-day deadline (i.e., the investigation took at least 210 days).  And the 434 cases that remained

---

[2] On August 5, 2025, Defendants produced data for June 2024 to July 2025.  The data for April-July 2025 is not relevant because investigations received by Defendants in those months could not be possibly be late as of July 31, 2025 because they were not more than 120 days old.

Tamiya Davis
Sean Lodholz
October 9, 2025
Page 3

open were all so late as to be nearing the expiration of the one-year statute of limitations for imposing adverse action.[3]  In other words, investigators are not barely missing the deadline; they are missing the deadline by many months.

Defendants have admitted on numerous occasions that they are not complying and lack the resources to comply with the timelines in the Remedial Plans.  In CDCR Secretary Macomber's May 19, 2025 letter, he described how OIA was unable to keep pace with the inflow of cases and stated that CDCR "project[s] that by the end of [2025], a total of approximately 1,900 cases will have their [statute of limitations] expire, prior to the investigations being completed."  Letter from J. Macomber to E. Swanson, May 19, 2025.  Of course, the one-year statute of limitations is much longer than the required timelines in the Remedial Plans.  Chris Chambers, Director of CDCR's Division of Correctional Policy Research and Internal Oversight, has made multiple, similar admissions during the parties' negotiations regarding changes to the Court-ordered accountability system, including that, even if the parties implemented all of the proposals on the table for reducing the number of claims that OIA receives, OIA would be unable to complete investigations in a timely manner.  In their quarterly reports, Plaintiffs have also reported on multiple cases where Hiring Authorities confirmed that misconduct occurred, but could not impose discipline because the investigations had been so delayed that they exceeded the statute of limitations.

For more than three years, Plaintiffs have consistently and repeatedly expressed concern that Defendants have not provided OIA with sufficient staff to meet the investigation deadlines in the Remedial Plans.  In an April 2024 letter, Plaintiffs informed Defendants that, to avoid future litigation, they had to address the OIA staffing shortage.  In response, Defendants have done little.  Defendants have added a small handful of investigators, but not by nearly enough to keep up with the number of cases.  In recent communications, Defendants have indicated that they cannot further increase OIA staff until California implements its FY2026-27 budget, which will not be effective until July 1, 2026, and then could only do so with legislative approval.  And Defendants have also stated that they do not know how many investigators would be necessary to timely complete investigations.

---

[3] The 178 open cases that were received in September were all at least 184 days late, as they had all been open for a minimum of 304 days (from at least September 30, 2024 to July 31, 2025).  The 256 open cases that were received in October were all at least 153 days late, as they had all been open for a minimum of 273 days (from at least October 31, 2024 to July 31, 2025).

Tamiya Davis
Sean Lodholz
October 9, 2025
Page 4

Rather than put forward proposals to provide OIA with adequate staffing, Defendants have focused almost exclusively on efforts to reclassify cases in order to reduce the number of cases routed to OIA. Many of the proposals—such as Defendants' proposal to eliminate many categories from the Allegation Decision Index—were non-starters. And, as discussed above, high-ranking officials have already admitted that the ideas being considered by the parties, even if implemented, would not be sufficient to solve the problem.

The late investigations have a profoundly negative impact on the accountability system. Most obviously, in cases where Defendants do not close investigations prior to the expiration of the statute of limitations, Defendants cannot impose any adverse action against staff, even if the employees engaged in egregious misconduct. These employees are let completely off the hook, which undermines incarcerated people's and the public's confidence in CDCR and allows bad actors to continue to harm incarcerated people.

Even where Defendants close investigations prior to the deadline for imposing adverse action, delays in investigations cause serious harm, including, but not limited to:

- Loss of evidence, especially loss of video evidence, which (as Plaintiffs have shown) investigators routinely fail to preserve before the expiration of the 90-day retention period;

- Unavailability or faded recollections of witnesses;

- Lack of ability to deter future misconduct, both by the subject of the investigation and other officers in the system, because any adverse action occurs too removed in time from the misconduct; and

- Unnecessary time pressure on Hiring Authorities, who have less time to conduct a thorough review of the evidence, to request (if necessary) additional investigation, and to select appropriate discipline prior to the expiration of the statute of limitations.

The Office of the Inspector General and Plaintiffs' experts have previously addressed these issues. *See* Dkt. 3356 at 8-10; Dkts. 3336-2 and 3336-3. Plaintiffs have also reported on these issues in their quarterly reports.

To bring Defendants into compliance with the Remedial Plans and to eliminate the serious problems caused by delayed investigations, Defendants must commit to staffing OIA with a sufficient number of investigators to timely investigate all allegations of serious misconduct. Accordingly, Plaintiffs demand that on or before November 10,

[4764660.1]

Tamiya Davis
Sean Lodholz
October 9, 2025
Page 5


2025, Defendants enter into a Court-ordered stipulation that requires that Defendants develop a plan to ensure compliance with the timelines set forth in the Remedial Plans. In developing the plan, Defendants must conduct a thorough review of the expected number of cases routed to OIA and the number of investigators necessary to conduct comprehensive and unbiased investigations into those allegations.[4] Defendants' plan must include a plan for expeditiously obtaining funding to hire additional staff and for actually hiring the staff. We are willing to meet again with Defendants and the Court Expert to see if we can avoid litigation on this issue. If, however, we are unable to reach agreement by November 10, 2025, Plaintiffs will move to enforce these important provisions in the Remedial Plans.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Michael Freedman*

By:  Michael Freedman
Senior Counsel

MLF:MLF
cc: Ed Swanson          Olena Likhachova
    August Gugelmann    Carrie Stafford
    Audrey Barron       Co-counsel
    Ramon Ruiz
    Jessica Thoma
    Sharon Garske

---

[4] The plan must take into account the Investigation Assignment Index ("IAI"), to which the parties agree and which sets forth which types of investigations must be assigned to Special Agents, Lieutenants, and Sergeants. *See* Dep't Operations Manual § 33070.10.4. Plaintiffs note that Defendants' data—which shows that Defendants assigned to Special Agents only 2 of 3,825 cases received by OIA from November 2024 through July 2025—suggests Defendants are not complying with the IAI.