MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT  – NY BN 5565791*
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

CLAUDIA CENTER – 158255
DISABILITY RIGHTS
EDUCATION & DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:    (510) 644-2555
Facsimile:    (510) 841-8645

* Admitted *pro hac vice*

Attorneys for Plaintiffs

CALIFORNIA OFFICE OF THE
ATTORNEY GENERAL
ROB BONTA
Attorney General of the State of California
LAWRENCE BRAGG
Acting Senior Assistant Attorney General
SEAN LODHOLZ
ANNE M. KAMMER
Supervising Deputy Attorneys General
GURPREET SANDHU
JAIYE ZHOU
JENNIFER BURNS
NAMRATA KOTWANI
OLENA LIKHACHOVA
Deputy Attorneys General
State Bar No. 285574
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-6332
Fax: (916) 324-5205
E-mail: Olena.Likhachova@doj.ca.gov

Attorneys for Defendants Gavin Newsom
and the California Department of
Corrections and Rehabilitation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **JOINT CASE STATUS STATEMENT** |
| v. | Judge:   Hon. Claudia Wilken |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

The parties submit this Joint Case Status Statement pursuant to the Stipulation and Order entered March 28, 2011 (ECF No. 1868), which provides that "[t]he parties will file periodic joint statements describing the status of the litigation" every other month, beginning on May 16, 2011.

## CURRENT ISSUES[1]

**A.    Allegations of Abuse, Retaliation, and Violence by CDCR Staff Against Class Members**

### 1.    Plaintiffs' Statement

#### a.    RJD and Five Prisons Orders

Plaintiffs continue to monitor remedial efforts the Court found to be necessary in order to prevent further violations of the ARP and class members' ADA rights at six prisons, including changes to the staff misconduct investigation process and implementation of Audio Visual Surveillance Systems that include body-worn camera technology.  *See* ECF Nos. 3059, 3060, 3217 and 3218.  Party agreements regarding Court ordered changes are found in Defendants' RJD and Five Prisons Remedial Plans ("Plans").  *See* ECF No. 3393, Exs. A and B.

Plaintiffs have issued multiple quarterly reports and, at this point, have identified hundreds of cases that show failures by Defendants to conduct complete and unbiased investigations and impose appropriate and consistent discipline.  A copy of Plaintiffs' report issued December 2, 2025, Q4 2025 Review of CDCR's Accountability System for LAC, CIW, RJD, SATF, COR and KVSP, is attached hereto in redacted form as **Exhibit A.**  Plaintiffs' findings are corroborated by the Office of the Inspector General (OIG) who recently issued a report finding the Defendants performed poorly or otherwise needed improvement in the large majority of staff misconduct investigations.  *See* OIG Semiannual Report re Monitoring Internal Investigations, Staff Misconduct Complaint Investigations, and the Employee Disciplinary Process,  https://www.oig.ca.gov/wp-

---

[1] Statements are joint unless otherwise delineated as either *Plaintiffs' Statement* or *Defendants' Statement*.

1    content/uploads/2025/12/Staff-Misconduct-Monitoring-Report-January-June-2025.pdf.

2    The parties are actively engaged in negotiations to reach agreement regarding

3    changes that are necessary to the system to bring it into compliance with Court-ordered

4    Remedial Plans.  Recently, the parties entered into a Stipulation aimed at addressing

5    ongoing concerns with the investigation and discipline process.  ECF No. 3721.  This

6    agreement creates the Centralized Allegation Resolution Unit ("CARU"), a unit within

7    CDCR headquarters that will now serve as the Hiring Authority for all allegations of staff

8    misconduct against incarcerated people investigated by the Office of Internal Affairs

9    ("OIA") at the six prisons covered by existing *Armstrong* orders.  *Id*. at 1-2.  Plaintiffs'

10    counsel are hopeful that the CARU will address ongoing problems regarding delays in

11    disciplinary decision making and will standardize and improve the quality of disciplinary

12    decisions.  Per Stipulation, CDCR has also agreed to retain Nicholas Mitchell to "review

13    and offer recommendations about CDCR's use-of-force policies and practices, use-of-force

14    training, and the Institutional Executive Review Committee (IERC) process, including

15    outcomes after the IERC has identified non-compliance with policy violations" and to

16    provide "recommendations on whether the IERC, or some entity other than OIA, can

17    conduct comprehensive and unbiased investigations" and "what, if any, modifications to

18    Defendants' policies and procedures are necessary for the IERC, or some entity other than

19    OIA, to conduct comprehensive and unbiased investigations into allegations of staff

20    misconduct based on use-of-force policy violations."  *Id*. at 3.  The expert consultant's

21    report is expected early this year.

22    Despite significant agreement between the parties on the potential reforms

23    discussed above, Plaintiffs' counsel remains seriously concerned about the failure of

24    Defendants to complete timely investigations.   As outlined in Plaintiffs' counsel's letter of

25    October 9, 2025, the seven most recent months of data produced by Defendants show that,

26    at the six prisons covered by the Court's orders, **Defendants closed more than 90% of**

27    **investigations late**.  *See* ECF 3734, Exhibit A at 2.  To bring Defendants into compliance

28    with the Remedial Plans and to eliminate the serious problems caused by delayed

investigations, Defendants must commit to staffing OIA with a sufficient number of investigators to timely investigate all allegations of serious misconduct. *Id*. at 4. On November 24, 2025, after extensive negotiations, the parties entered into a stipulation requiring Defendants to produce to Plaintiffs and the Court Expert a proposed staffing analysis, staffing plan, and implementation plan to address these issues no later than July 31, 2026. *See* Order entered November 26, 2025, ECF 3737.

The parties have also been discussing emergency regulations regarding the staff misconduct complaint process and routine grievance process, which will have an impact on how CDCR handles staff misconduct complaints. Plaintiffs provided comments on problems with the emergency regulations and, most recently, provided comments regarding the second re-noticed regulations, issued September 23, 2025. *See* December 2, 2025 Letter from Michael Freedman attached hereto as **Exhibit B**.

CDCR is a statewide system. Violations of the ADA and ARP found thus far at six prisons exist system-wide and Plaintiffs are committed to bringing such evidence before the Court until all class members are protected. *See* ECF No. 3592, Ex. A at 7-8.

### b.    False, Retaliatory and Discriminatory RVRs

The use of RVRs to retaliate against and discourage the filing of staff misconduct complaints will persist unless Defendants take action to identify and root out problems through meaningful reforms to the RVR process. Plaintiffs are hopeful that the parties can agree to resolve problems, and that additional court intervention will not be necessary.

### 2.    Defendants' Statement

### a.    RJD and Five Prisons Orders

CDCR has dramatically overhauled its staff misconduct investigation process to ensure unbiased and complete investigations. And, although not required by the Court's orders, Defendants have restructured CDCR's statewide staff misconduct allegation, screening, referral, investigative, and disciplinary processes. As the Court has noted, "[t]hese agreed-upon measures constitute substantial improvements that will go a long way to bringing Defendants into compliance with the ARP and ADA at the six prisons." ECF

No. 3356 at 2.  The Court found, the "implementation of these [] remedial measures is likely to have a positive impact on…the overall reliability of the outcomes of investigations." *Id.* at 15.

Despite the tremendous efforts and resources directed towards improving the staff misconduct investigation and discipline processes, modifications are necessary to ensure sustainability.  CDCR contends that many of the issues raised in the recent OIG report are attributable to the operational realities of the large number of complaints that stretch the capacity of the OIA to timely complete these cases.  *See* CDCR response to OIG March 2025 report at https://www.oig.ca.gov/wp-content/uploads/2025/03/2024-Staff-Misconduct-Investigation-Monitoring-Report.pdf.  CDCR further contends that a disproportionately large number of these complaints are submitted by an extremely small number of incarcerated people who, for some, submit repetitive claims on a daily or weekly basis.  With stakeholder input, CDCR is implementing a process to address these frequent filings that incorporates all available resources and draws upon mental, medical, and correctional expertise to reduce the number of repetitive claims, while at the same time ensuring that all allegations of staff misconduct are properly reviewed and routed for OIA investigation, when warranted, in compliance with the orders of this Court.  With input from Plaintiffs, the Court Expert, and other stakeholders, CDCR continues to identify and implement necessary modifications to the investigative and disciplinary processes.  These efforts include, but are not limited to, updating the applicable staff misconduct regulations, simplifying the staff misconduct process, revising the ADI to provide greater clarity, consolidating Information Technology systems to improve case tracking and management, developing certified training to enhance investigator preparedness, and completing the recent September 26 and November 26, 2025, stipulations on the Staff Misconduct Investigative and Discipline Process with Plaintiffs' counsel (ECF Nos. 3721, 3737).  CDCR also completed a series of trainings for designated staff hired into the newly established Centralized Allegation Resolution Unit located at department headquarters, which will serve as the hiring authority and review completed investigations which

1   involved or originated from incarcerated persons residing within the six institutions

2   identified in the Court's staff misconduct orders.  *Id*.  CDCR has implemented

3   prioritization strategies to focus on meeting statutory deadlines, addressing cases based on

4   their age or complexity, and ensuring compliance with legal obligations.  *Id*.  To further

5   address timeframe-related challenges, CDCR continues to actively recruit to fill all vacant

6   investigator positions within the Office of Internal Affairs and has repositioned several

7   internal vacancies to hire additional investigative staff.  *Id*.  CDCR also continues to refine

8   its intake process to reduce redundant investigative efforts and conserve limited

9   investigative resources while maintaining a complete review of all allegations.  *Id*.  CDCR,

10  in collaboration with Plaintiffs and other stakeholders, continues to identify and implement

11  additional improvements to ensure compliance with policies and regulations.  Throughout

12  this process, CDCR has regularly provided substantive updates to the OIG and will

13  continue to do so.

14              **b.      Demands for RVR Reform**

15          Defendants have made significant progress in addressing Plaintiffs' allegation that

16  CDCR staff issue false and retaliatory Rules Violations Reports (RVRs) to class members,

17  as detailed in previously filed statements.  *See* ECF Nos. 3412 at 14-16, 3526 at 7-8.

18  Plaintiffs may disagree with a specific investigation or discipline imposed, but that does

19  not necessarily mean the RVR was false or retaliatory.  Nevertheless, CDCR continues to

20  address Plaintiffs' concerns to the extent they are related to class-member

21  accommodations, alleged discrimination, or retaliation, and to the extent CDCR is required

22  to do so under the remedial plans, the ADA, or prior court orders.  Defendants maintain

23  that Plaintiffs' general complaints about the RVR process, unrelated to class-member

24  accommodations, are not properly raised in this case.

25  **B.     Court Expert Investigation Into SATF**

26          **1.      Plaintiffs' Statement**

27          Background of the Court Expert's investigation into the treatment of people with

28  disabilities at the Substance Abuse Treatment Facility (SATF) is set forth in Plaintiffs'

previous joint case status statement. *See* ECF No. 3670 at 6-8. On May 1, 2025, the Court adopted, with some modifications, the Court Expert's Recommendations Regarding Compliance with SATF Stipulation, which laid out steps that Defendants must take to remedy longstanding violations of the ADA and ARP at SATF. ECF No. 3651 (Court Expert's recommendations); ECF No. 3679 (Court's order).

The parties continue to meet and confer regarding Defendants' plans to comply with SATF Stipulation Item #7 and the Court's May 1 order on this Item.

The Court has deferred ruling on item 13 in light of the Court Expert's April 18, 2025, status update and a planned demonstration of an alternative technology. ECF Nos. 3675; 3679 at 21. The demonstration of Defendants' proposed alternative transcription technology was conducted at SATF on August 19, 2025. Following the demonstration, the parties exchanged their respective positions regarding the alternative technology and are conferring concerning appropriate next steps.

Plaintiffs continue to eagerly await the Court Expert's forthcoming report and recommendations on staffing and sustainability and hope it will result in the allocation of sufficient expertise and resources, and development of robust systems, necessary to comply with the ARP and ADA.

## 2. Defendants' Statement

The Court Expert's second report concerning the treatment of people with disabilities at SATF recognized the numerous proactive measures implemented at SATF to further respond to the needs of incarcerated people with disabilities. ECF No. 3500. The report demonstrates that the coordinated efforts between CDCR and California Correctional Health Care Services (CCHCS), with the Court Expert's guidance and with input from Plaintiffs, are working to effectively respond to the issues raised by the Court and addressed by the Court Expert following his initial investigation. On May 1, 2025, the Court issued its order on the issues not resolved by the Court's November 8, 2024 order, and addressed in the Court Expert's January 10, 2025 recommendations, which included items 5, 7, 9, 10, and 13. ECF Nos. 3639, 3651, 3655, 3656, 3660, 3661, 3665, and 3679.

1   The parties, with input from the Court Expert, have resolved items 5, 9, and 10.  The

2   parties have also completed the required meet-and-confer process, and Defendants have

3   fully complied with the Court's May 1, 2025, order regarding item 7.  The parties are

4   continuing to meet and confer regarding item 13, and after the parties complete their meet-

5   and-confer process, the Court Expert will file a further status update with a report and

6   recommendation for next steps.  ECF No. 3679 at 21-22.

7   **C.      Accommodations for Deaf and Hard of Hearing Class Members**

8          **1.      Plaintiffs' Statement**

9        In September 2024, Plaintiffs reported that deaf class members who use sign

10  language continued to experience "widespread failures to ensure access to on-site sign

11  language interpreters," resulting in many class members relying on videoconferencing

12  equipment that frequently malfunctioned and impeded effective communication. ECF

13  No. 3622 at 18-19.  Plaintiffs also documented a statewide interpreter vacancy rate of

14  27% and noted that several staff interpreters had resigned after facing unsustainable

15  workloads and challenging working conditions.  *Id.* at 19, 58-59.

16       More than a year later, these issues persist.  Although Defendants stated last

17  September that they had submitted requests to the relevant authority to increase the

18  salary of state-employed sign language interpreters, *see id.* at 23, they have not shared

19  any results from that review.  The statewide vacancy rate for on-site interpreters has now

20  increased to almost 35%, with eight of 23 positions unfilled by an interpreter providing

21  services in-person.  At San Quentin, Defendants report no in-person interpreters to

22  accommodate the six Deaf class members currently housed at the institution.  And even

23  Deaf class members at facilities without a vacancy, such as RJD, have reported that

24  available interpreter hours do not meet their needs.  These ongoing shortages limit class

25  members' access to programs, services, and basic daily communication.  Regardless of

26  how vacancies are categorized for administrative or staffing purposes, the relevant

27  question under the remedial plans is whether Deaf class members are receiving timely and

28  effective in-person interpretation sufficient to ensure meaningful access to programs,

services, and daily communication. The record shows that they are not.

Defendants' repeated references to an industry-wide interpreter shortage do not relieve them of their obligation to accommodate Deaf signers.  *See* ECF No. 3622 at 23; *see also* ECF No. 1045 at 8; ECF No. 1661 at 2; ECF No. 2345 at 22.  The Court has held that Defendants must take reasonable measures to accommodate Deaf class members even when interpreter resources in the community are constrained.  Defendants must take effective steps to hire and retain interpreters.

Regarding remote interpretation provided through videoconferencing, Defendants recently informed Plaintiffs of a potential new technology, FaceTok, intended to assist with remote interpretation.  Plaintiffs understand FaceTok to be a scheduling software; it is not clear that the software would address longstanding problems with video remote interpretation like poor and unstable connections necessary to improve access to communication for Deaf class members.  Plaintiffs will request the information needed to evaluate the proposed technology.

Defendants have also not yet addressed Plaintiffs' concerns regarding communication access for Deaf non-signers.  Deaf non-signers still cannot leave voicemails on the PREA and OIG hotlines and therefore lack meaningful access to essential reporting mechanisms.  Plaintiffs first raised this issue 169 days ago.  Defendants' proposed solution for Deaf non-signers to leave voicemails through the video relay service ("VRS") is no solution at all: VRS is a service designed for individuals who use American Sign Language and is inaccessible to Deaf individuals who do not sign.

Additionally, Plaintiffs have reported since February 2023 that Deaf signers at LAC cannot consistently place videophone calls due to problems with the network. videophone calls often fail due to poor network connectivity.  Most recently, as detailed in Plaintiffs' October 2025 monitoring tour report, Plaintiffs' counsel met with Deaf class members in multiple housing units and tested the VRS terminals with LAC staff and the Office of Legal Affairs.  Testing confirmed that calls did not connect, and class members described making as many as 15 to 20 attempts before being able to place a successful call.  Plaintiffs also learned that, although the videophone vendor has not

identified a problem on their end of the system, LAC staff do not have an administrative

account for testing and so have been unable to test the videophones themselves to

confirm class members' reports or troubleshoot the problem.

Deaf class members at LAC have long lacked reliable access to telephone services

because of connectivity issues.  Defendants must take immediate action to address these

concerns.  If Defendants cannot improve videophone connectivity at LAC, Deaf class

members should be offered the option to transfer to an institution that can provide

reliable and continuous videophone access.

### 2.    Defendants' Statement

Defendants remain committed to providing deaf and hard-of-hearing class members

equal access to programs, services, and activities in accordance with the ADA, the

remedial plans, and this Court's orders.  This includes working diligently to provide sign-

language interpretation services for deaf class members whose primary method of

communication is American Sign Language (ASL).  Defendants continue extensive

recruitment efforts to fill Sign Language Interpreter (SLI) vacancies, including outreach to

local interpreter-training programs, community colleges, and regional interpreting

businesses.  However, Defendants' current contracted vendors have reported a nationwide

post-pandemic shift in workforce preference.  Many qualified SLIs now prefer remote

assignments rather than on-site work in correctional or healthcare environments.  Rural

institutions such as SATF and CCWF face additional geographic recruitment challenges,

which further explains localized shortages not attributable to CDCR policy or action.

Despite the industry-wide shortage, Defendants' contracted vendors, including Interpreters

Unlimited, remain steadfast in recruiting aggressively.

CDCR requested salary increases for staff SLIs and the request remains pending

with the California Department of Human Resources, a separate state agency responsible

for issues related to employee salaries and benefits.  Furthermore, Plaintiffs' vacancy

figures fail to account for legal restrictions on backfilling certain SLI positions.  At SQ, the

SLI position identified as "vacant" cannot be filled because the incumbent employees are

on workers compensation leave.  Under state law and CALHR rules, these positions must remain assigned to the employees on leave and cannot be reallocated or refilled until the leave status is resolved.  Defendants have been transparent with Plaintiffs regarding these statutory limitations.  Despite vacancies, the statewide ratio of SLIs to deaf signer class members is favorable, averaging one SLI per 2.5 class members.  At SATF, through December 2025, the one institutional SLI is supplemented by contract staff, who are often able to attend evening and weekend events in-person while SATF continues to advertise for more SLIs.   The vacancy at CCWF is being addressed in the immediate term through coordination with CIW, which is now a DPH-designated institution and fully staffed with an SLI who will be able to support the needs of the three deaf signers who are or were previously housed at CCWF.  Two deaf SLI class members have been transferred from CCWF to CIW, where they are now receiving regular in-person SLI accommodations.  The remaining deaf SLI class member at CCWF was transferred to CIW on January 9, 2026.  While waiting for those transfers, the staff SLI assigned to NKSP had been assisting CCWF with SLI services by providing remote and in-person SLI services as needed.  All other DPH-designated institutions are staffed with interpreters, and three institutions (LAC, NKSP, and RJD) are fully staffed.  Defendants continue to closely monitor statewide hiring efforts and will work to ensure that any vacancies are posted until filled.

CDCR remains bound by its existing contracts for additional SLI services, but the terms of those contracts are under review.  CDCR communicates regularly with the current contractors, who continue to actively recruit interpreters.  In addition, Defendants have been actively involved in coordinated efforts with their contracted vendors to strengthen remote interpreter availability and service reliability.  As part of this work, Defendants have been testing the FaceTok VRI platform to improve SLI availability, pre-scheduling, and overall service coordination.  FaceTok also allows for pre-scheduled SLI services, resulting in better planning and more consistent interpreter coverage at pilot institutions. In December 2025, CDCR completed limited  trials of Interpreters Unlimited FaceTok technology at RJD, LAC, CMF, SQ Reception Center and SATF institutions to assess

functionality, connectivity, and service delivery.  Based on the  trial and stakeholder

feedback, CDCR will allow transition to this technology at designated institutions by

January 26, 2026.  During the trial, average connection times ranged between

approximately one to two minutes.  Minor technical and connectivity issues were

identified and documented, and Interpreters Unlimited is working with its vendor partners

to address these items as part of ongoing refinement.  Furthermore, CDCR's Compliance

Sergeants and the Correctional Counselor IIs from the ADA Collaboration and Training

Team (ACTT) continue to train staff, check the functionality of equipment, and work with

the vendors to resolve intermittent technical issues.  The lines of communication on these

issues remain open for discussion and resolution.

Due to Defendants' efforts, deaf class members are receiving timely and effective

sign language interpretation sufficient to ensure meaningful access to programs, services,

and daily communication.  The November 2025 monthly SLI logs confirm no

appointments have been cancelled due to SLI absence.  Deaf signers are earning milestone

credits as a result of completing their credit earning programs and are earning bachelor's

degrees in college courses.

Defendants are evaluating Plaintiffs' reported concerns regarding deaf non- signers'

access to voicemail on the state hotlines for the Prison Rape Elimination Act and

for the Office of the Inspector General.  With respect to videophone calls, although LAC

has, at times, experienced outages with their VRS equipment, the outages have been

sporadic—not recurring—and CDCR has worked with the vendor to address the issues.

LAC staff continue to test the equipment to ensure uninterrupted access to this service and,

as a result, class members have been making VRS calls regularly.

In addition, Defendants are in the process of converting statewide VRS services

from ViaPath to Securus.  This transition will include installing multiple dedicated VRS

stations in accessible locations at DPH-SLI designated institutions, including LAC, to

strengthen reliability, increase the number of access points, and ensure reliable

communication access for Deaf and Hard-of-Hearing class members.  The conversion is

1 expected to provide enhanced equipment, improved network stability, and quicker vendor

2 response times.

3 **D.     Accommodations for Blind and Low-Vision Class Members**

4     **1.       Plaintiffs' Statement**

5       Plaintiffs continue to receive reports from blind and low-vision class members that

6 they need standalone writing accommodations—such as laptops with screen-reading

7 software—but that the low-vision specialist did not discuss or evaluate their writing needs

8 or preferred writing accommodations during their assessments with this specialist.  Thus,

9 even after their low-vision specialist appointments, these class members remain without

10 accommodations to write privately and independently.  Plaintiffs have reported this

11 problem to Defendants at length.  *See, e.g.*, Multiple Advocacy Letters Re: class member

12 at SATF (Jan. 18, 2024; Aug. 15, 2024; and Feb. 21, 2025); class member at CHCF

13 (Jan. 15, 2025).  Particularly for class members who wish to write privately and

14 independently and who are blind or severely low-vision, and thus cannot handwrite even

15 with a high-powered magnifier, writing accommodations are vital.  For reasons discussed

16 in the Court's March 20, 2024, Order Granting in Part the Motion to Enforce the Revised

17 Permanent Injunction, it is also vital that class members be issued these accommodations

18 for personal use, and not be forced to go to the law library to use them.  *See* ECF No. 3583

19 at 21 (discussing how auxiliary aids in the law library "can only be accessed in a public

20 setting and during the libraries' limited hours").  Extremely few blind and low-vision class

21 members statewide have been recommended an accessible laptop by the low-vision

22 specialist, despite extensive reports from class members that they are committed to

23 learning how to use this accommodation, that they cannot write privately or independently

24 without it (or an equally effective accommodation), and that the low-vision specialists did

25 not discuss the possibility of receiving this accommodation with them.  Plaintiffs' counsel

26 will continue to raise this important issue and hope to work collaboratively with

27 Defendants to resolve it.

28       Plaintiffs are concerned that Defendants have circumvented the requirements of the

Court's March 20, 2024, orders (ECF Nos. 3583 & 3584), which require Defendants to issue assistive devices to blind and low-vision class members that are recommended by Defendants' low-vision specialist.  ECF No. 3584 at 2 (requiring Defendants to formalize and implement the procedures of the Lozano declaration, which represented to the Court that Defendants would "issue" recommended devices for class members' private use, ECF No. 3543-5 at ¶ 16 (Decl. of Jared Lozano)); ECF No. 3583 at 17 (noting that under CDCR's new policy, if an auxiliary aid is recommended by the vision specialist, "CDCR will issue the auxiliary device for the class member's private use as soon as reasonably possible"); *id.* at 19 (requiring Defendants to "affirmatively provide" the recommended accommodation "without waiting for a request").  Rather than issuing these devices, Defendants have forced many blind and low-vision class members to request, from custody staff, temporary access to assistive devices that the low-vision specialist recommended for them, on a check-in/check-out basis.  Plaintiffs have repeatedly raised this concern with Defendants.  Plaintiffs are hopeful that the parties will be able to resolve this dispute without court intervention.

### 2.    Defendants' Statement

Plaintiffs' claim that the low-vision specialist did not discuss or evaluate certain class members' writing needs or preferred writing accommodations and that class members remain without writing accommodations is incorrect and premised on Plaintiffs' lay opinion that anything short of an assigned laptop is insufficient as a writing accommodation.  Plaintiffs' apparent assumption that a class member not being recommended a laptop means the low-vision specialist did not conduct a meaningful evaluation of that class member is likewise incorrect.  Laptops with screen-reading software are not suitable for every blind or low-vision class member and may not align with every individual's writing needs.  The low-vision specialist has specialized knowledge and clinical expertise, makes recommendations based on an individualized assessment of the class member, and applies the same standards and best practices as are used in the community.  The low-vision specialist is also aware of their obligation under

the ADA, remedial plans, and Court orders, to give primary consideration to the class member's preferred accommodation, unless other equally effective accommodation is available.  Additionally, this issue is effectively moot because a class member is free to request a different accommodation than the one recommended by the low-vision specialist if the recommended accommodation is insufficient to meet their needs, by submitting a CDCR Form 602-1/1824 to their institution's Reasonable Accommodation Panel.

Plaintiffs contend that the Court's March 20, 2024, orders (ECF Nos. 3583 & 3584), "require Defendants to [individually] **issue** assistive devices to blind and low-vision class members that are recommended by Defendants' low-vision specialist." *See* Plaintiffs' statement above (emphasis added).  Plaintiffs, however, appear to misinterpret the Court's March 20, 2024, orders cited in support of this erroneous contention.  Indeed, the Court's order for Further Remedial Measures (ECF No. 3584) requires Defendants to "formalize and implement the procedures described in the declaration of Jared Lozano" but limits those procedures to "conducting individualized assessments of DPV class members to **identify, document, and track**" accessible formats and assistive devices that ensure effective communication of printed materials. *Id.* at 2 (emphasis added).  Individual issuance of the assistive devices identified by the vision specialist is notably missing from the Court's directive regarding implementation of the procedures described in the Lozano declaration. *See Id.* generally.  Instead, the Court ordered Defendants to provide class members timely "access" to devices to complete parole-related reading and writing tasks in a way that protects their privacy and independence. *See* ECF No. 3584 at 4.

Moreover, although the Court's order Granting in Part Motion to Enforce Revised Permanent Injunction (ECF No. 3583) does state that CDCR is required to provide class members reasonable accommodations without waiting for a request once it is on notice of a need for an accommodation (*Id.* at 19), this statement has nothing to do with provision of assistive devices on check-in/check-out basis, as Plaintiffs appear to represent.  Indeed, the Court's statement Plaintiffs rely on relates to CDCR's prior policy, which required a DPV class member to submit a reasonable accommodation request to obtain a reading or writing

1    accommodation when preparing for a parole suitability hearing. *See Id.* at 19-20.

2    Regardless, under Defendants' current policy, Defendants do provide class

3    members with recommended accommodation(s) without waiting for class members'

4    reasonable accommodation requests (i.e., former CDCR Form 1824). When **individual**

5    **issuance** of assistive devices is recommended by the vision specialist following a class

6    member's individualized assessment, the class member is individually issued the

7    recommended device. When a class member is recommended **access to** a particular device

8    following their individualized assessment, that class member can timely access the

9    recommended device on a check-out basis for use in their cell, ensuring class member's

10    privacy and independence. Blind and low-vision class members can also use the checked-

11    out devices in their housing unit, program areas and transport to same-day appointments.

12    Class members can check out assistive devices for overnight use and are allowed

13    additional time to use the device based on individualized need, such as in connection with

14    any pending legal proceedings, including Board of Parole Hearings preparation.

15    By electing to issue assistive devices to class members upon vision specialist's

16    recommendation or, when appropriate, upon an incarcerated person's submission of a

17    CDCR Form 602-1/1824, Defendants have more than met the Court's orders requiring

18    class members' timely access to assistive devices for completion of parole-related reading

19    and writing tasks in a way that protects their privacy and independence.

20    All but one of Plaintiffs' advocacy letters referenced in their statement above have

21    been responded to as part of the regular advocacy process. Notably, Plaintiffs' January 18,

22    2024, August 15, 2024, and February 21, 2025, advocacies were for the same class

23    member at SATF. These advocacies requested, in part, re-evaluation of the class

24    member's writing needs by the vision specialist and issuance of the recommended writing

25    devices. Defendants responded to Plaintiffs' first two requests indicating that the class

26    member was issued the writing device recommended by the vision specialist and was

27    scheduled to be seen again by the vision specialist but refused his appointment. After the

28    class member's refusal, he was interviewed by the ADA staff and indicated that he did not

1    need any additional accommodations to access programs, services and activities.

2    Defendants' response to Plaintiffs' third advocacy letter is pending stakeholder approval.

3         Plaintiffs' January 15, 2025, advocacy requested, in part, that class member be

4    issued the Ruby 10 magnifier recommended by the vision specialist as a writing

5    accommodation.  As explained in Defendants' advocacy response, the class member

6    referenced in Plaintiffs' advocacy was issued the Ruby 10 electronic magnifier

7    recommended by the vision specialist.

8    **E.      Access to Assignments for Class Members**

9         Historically, the program-access workgroup met periodically to discuss credit

10   earning, the assignment process, and disparities in the program-access assignment data in

11   response to Plaintiffs' allegations of disability-related discrimination.  *See* ECF No. 2680

12   at 13-14.  The parties reached agreement on the relevant data to produce to Plaintiffs each

13   month in early 2024, and Defendants have been providing the updated data set every

14   month since April 2024.  The parties took a break from workgroup discussions in late 2024

15   as Defendants worked on new regulations to update various aspects of program

16   assignments.  With encouragement from the Court Expert, the parties are restarting the

17   workgroup discussions.  The first step is for Defendants to respond to Plaintiffs' May 17,

18   2024, e-mail with proposals for program assignments.  Defendants will provide

19   information on how the draft regulations address several of Plaintiffs' proposals.

20        Plaintiffs' counsel seeks to move forward with agreement on a standard for

21   evaluating program assignment discrimination.  While the workgroup discussion has been

22   paused, Plaintiffs have continued to report in our monitoring tour reports on disparities in

23   assignment rates between incarcerated people with and without disabilities at individual

24   institutions and programs.  For example, Plaintiffs continue to report on disparities in

25   assignment rates for higher paying and higher status jobs, like California Correctional

26   Training and Rehabilitation Authority (formerly Prison Industry Authority) jobs, which

27   class members are assigned to at lower rates.  The parties will continue to work on issues

28   related to program access.

**F.     Joint Monitoring Tool**

The parties have a fundamental disagreement over the efficacy of the joint audit tool as a means of assessing compliance with the ADA, the *Armstrong* Remedial Plan and the Court's prior orders.  *See* ECF No. 3734 at 18-20 (Nov. 17, 2025 statements regarding Joint Monitoring Tool).  Plaintiffs' Counsel wrote to the Court Expert and Defendants on December 1, 2025, about this matter, and about redefining and reducing their involvement in the joint audit process, which would no longer be identified as "joint."  A true and correct copy of Margot Mendelson and Gay Grunfeld's December 1, 2025, letter to Defendants is attached hereto as **Exhibit C**.  Defendants have asked to meet with Plaintiffs regarding their letter.  A meeting is pending scheduling.

**G.     ADA Structural Barriers, Emergency Evacuation Procedures, and Master Planning Process**

**1.     Plaintiffs' Position**

*Court Expert's Proposal for New Master Planning Process.*  On September 30, 2025, the Court Expert sent a proposal to the parties regarding a new framework for Master Planning given "the frustration of both parties at the pace and progress" of the existing process.  The Court Expert's proposal provided a history of the master planning process dating from 2011 through the present, identified problems with the current process, and proposed a new framework to address those issues.  On October 30, 2025, the parties responded to the proposal, and were largely supportive of the new framework.  On November 10, 2025, the parties met to discuss the proposal in greater detail.  At the meeting, the Court Expert and the parties determined that three categories of additional information were necessary to move forward with the proposal.

First, the parties determined that the proposed dispute resolution process required additional detail about timing, briefing, and court involvement.  Accordingly, on November 11, 2025, the Court Expert sent a more detailed proposal about how master planning disputes would be resolved.  On November 14, 2025, Plaintiffs sent comments on the detailed proposal.  Plaintiffs' counsel await a response from Defendants.

Second, the parties determined that it would be useful to have a list of topics (that the parties have discussed and been unable to resolve informally) for which the dispute resolution process should be utilized. On November 14, 2025, the Court Expert sent a list of topic areas. On November 21, 2025, Plaintiffs provided a response, agreeing with most of the Court Expert's topic areas, proposing additional questions for some of the topics, and proposing two additional topics that should go through the dispute resolution process. Plaintiffs' counsel await a response from Defendants.

Third, the Court Expert asked the parties to provide a list of preferred qualifications for the neutral expert(s) who will aid the Court Expert. On November 14, 2025, Plaintiffs and Defendants shared their lists of preferred qualifications.

The parties plan to meet in the coming weeks to discuss these and other components of the Court Expert's master planning proposal.

*Disability Discrimination in San Quentin California Model Programming.* On October 16, 2025, Plaintiffs sent Defendants a demand letter detailing how CDCR's decision to make San Quentin—a facility not designated for people with ambulatory and vision disabilities—the focal point of the California Model constitutes disability discrimination. Plaintiffs made several related requests. On November 12, 2025, Defendants stated that they would provide a response to Plaintiffs' letter by December 16, 2025.

*Emergency Evacuation Issues.* The parties conducted an expert tour of LAC regarding safety planning and emergency evacuation procedures on October 21, 2025, based on Plaintiffs' concern about the adequacy of evacuation procedures for class members given Defendants' refusal to add accessible emergency exits to key buildings at LAC where individuals who use wheelchairs either full-time or part-time are clustered. In document productions and public records requests on this topic, Plaintiffs learned that there were widespread failures during the State Fire Marshal's inspection in 2022, and no annual inspections in 2023 and 2024. A Spring 2025 inspection by an outside CDCR vendor also found extensive problems at LAC, including broken fire alarms and other

1  safety equipment and procedure issues.  Although many of the problems or "faults"

2  identified in the 2022 State Fire Marshal's inspection at LAC and in the more

3  comprehensive Spring 2025 inspection by CDCR's outside fire safety contractor had been

4  corrected at the time of our October 2025 tour, there remained a significant number of

5  faults in the fire alarm systems that had not yet been repaired.  There were also problems

6  identified on the recent tour with the pressure levels in sprinkler systems, with water hoses

7  not being properly stored, and with extensive missed fire extinguisher inspections.  We

8  also saw and heard no evidence on the tour of new staff policies, new training, and/or new

9  procedures implemented to ensure that the same problems and faults identified in 2022 and

10 2025 will not recur.  We also learned on the tour that, even though Defendants told us in

11 setting up the fire safety expert tour that they could not conduct actual evacuations of

12 housing units with class members due to safety issues, they in fact did conduct three such

13 drills including full evacuations of clustered housing units in the months prior to our tour,

14 and that in one instance it took 25 minutes to evacuate the building.  We also learned from

15 class members on the tour that during a recent evacuation due to the use of a chemical

16 agent, individuals in wheelchairs were forced to exit through one of the inaccessible, partly

17 unpaved exit doorways, across a curb, as the accessible doorway was blocked by the

18 fumes.  Plaintiffs' expert is working on a report on the LAC tour.

19      Plaintiffs' position on creating additional accessible emergency exits is that

20 regardless of whether or not such additional exits are mandated by the codes (see

21 Defendants' section below), the ADA requires Defendants to make more emergency exits

22 fully accessible in housing units where people with mobility disabilities are clustered,

23 based on safety concerns and program access.

24      *Other Master Planning Issues*.  Before the proposal from the Court Expert, the

25 parties were engaged in discussions about several issues, including related to shower

26 accessibility, design plans for 270 cells, interim accommodations, the adequacy of

27 Defendants' bed planning process, and review of design plans.  Defendants agreed to

28 maintain and have shared, on a monthly basis, a spreadsheet with the updated status of

design and construction for current master planning projects.  Plaintiffs continue to await follow-up information from Defendants after the parties' June 27, 2025, meeting about steps Defendants could take to reduce the harm of currently inaccessible showers.  Plaintiffs also continue to await information about anticipated dates of construction for 270-design cells going forward. Some of these pending issues may be appropriate for the new dispute resolution process, once Defendants have shared sufficient information to allow Plaintiffs and the Court Expert to determine whether there is a dispute about these issues.

### 2. Defendants' Statement

On September 30, 2025, the Court Expert circulated a letter making six proposed changes to the Master Planning process: 1) a long-term and system-wide timeline; 2) a system to track the progress towards existing timelines; 3) an agreement on interim accommodations; 4) an agreement detailing what information to share regarding bed planning, barrier identification and planning disputes, construction documents and pre-construction disputes, and inspections of completed constructions; 5) a dispute resolution process; and 6) an independent expert to aid in dispute resolution.  Defendants promptly reviewed the letter and met with the Court Expert to develop a fuller understanding of the six propositions.  Defendants submitted their position on the Court Expert's proposals on October 30, 2025.  The parties met with the Court Expert on November 10, 2025.  On November 11, 2025, the Court Expert submitted an updated, more detailed proposal, and Defendants provided their comments on the updated proposal on December 5, 2025. Defendants also provided their comments to the Court Experts proposed list of disputed topics on December 4, 2025.  The parties met on December 19, 2025, to discuss the dispute resolution process, which the Court Expert will include into a joint stipulated agreement for the parties' review and signature.  The parties also agreed on the list of disputed issues and scheduled a January 23, 2026, meeting to discuss the first three issues, which address scheduling and tracking of master planning projects.  The parties toured LAC on October 21, 2025.  Defendants understand that Plaintiffs have concerns about the

1    emergency planning features.  Defendants are closely monitoring this issue and took

2    several steps relating to LAC's emergency evacuation system.  As Plaintiffs saw during the

3    tour, LAC has made great progress in repairing fire systems in housing units and other

4    areas of the prison.  Further, all housing unit fire systems are functional in case of a fire.

5    Defendants are working closely with the State Fire Marshal's office on these items to

6    ensure the health and safety of everyone at LAC.  Defendants also note that parties

7    extensively met and conferred on the number of emergency exits required at LAC and

8    agree that both the relevant California Building Codes and the 2011 ADA standards

9    require one accessible emergency exit in LAC's housing units.  Notably, other than

10   informal discussions with Plaintiffs' counsel during the LAC tour, Plaintiffs' specific

11   concerns from the October 21, 2025, tour were expressed for the first time in the above

12   section of this CMC statement.  Defendants are still waiting for Plaintiffs to send their

13   monitoring tour report describing their observations from the LAC tour in writing.

14        Defendants agree that some of the additional issues listed by Plaintiffs in their

15   statement above (e.g., shower accessibility, design plans for 270 cells, interim

16   accommodations, and review of design plans) may be appropriate for the new dispute

17   resolution process.  Defendants look forward to working with the parties to begin working

18   through the disputed topics.  Finally, Defendants are sharing monthly spreadsheets with the

19   updated status of design and construction for current master planning projects.  Defendants

20   circulated the last monthly report on December 26, 2025.

21        Plaintiffs made several requests in connection with their demand letter contending

22   that CDCR's decision to make SQ—a facility not designated for people with significant

23   ambulatory and vision disabilities—the focal point of the California Model constitutes

24   disability discrimination.  Given the breadth of Plaintiffs' requests, Defendants require

25   more time to accurately respond and plan to send a response by the end of January 2026.

26   / / /

27   / / /

28   / / /

Respectfully submitted,

DATED: January 15, 2026          ROSEN BIEN GALVAN & GRUNFELD LLP

By:    /s/Penny Godbold
Penny Godbold

Attorneys for Plaintiffs

DATED: January 15, 2026          ROB BONTA
Attorney General of the State of California

By:    /s/Olena Likhachova
Olena Likhachova
Deputy Attorney General

Attorneys for Defendants

### FILER'S ATTESTATION

As required by Local Rule 5-1, I, Penny Godbold, attest that I obtained concurrence in the filing of this document from Deputy Attorney General Olena Likhachova, and that I have maintained records to support this concurrence.

DATED: January 15, 2026          /s/Penny Godbold
Penny Godbold

# EXHIBIT A



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Email: 

December 2, 2025

VIA ELECTRONIC MAIL ONLY

> **PRIVILEGED AND
> CONFIDENTIAL**
> ————————
> **SUBJECT TO
> PROTECTIVE ORDERS**





Re:  *Armstrong v. Newsom*:  Plaintiffs' December 2025 Review of
     CDCR's Accountability System at the Six Prisons
     Our File No. 0581-03

Dear ████████████ :

　　We write regarding our review of Defendants' system for holding staff accountable for misconduct.  The enclosed report is based on our review of investigation and discipline files produced from CSP-Los Angeles County ("LAC"), California Institution for Women ("CIW"), R.J. Donovan Correctional Facility ("RJD"), California Substance Abuse Treatment Facility ("SATF"), CSP-Corcoran ("COR"), and Kern Valley State Prison ("KVSP") (collectively "Six Prisons").

　　Plaintiffs continue to find that investigations and discipline fail to comply with the *Armstrong* Court Orders, as affirmed in relevant part by the Ninth Circuit, and with the RJD and Five Prisons Remedial Plans.  *See* Dkts. 3059, 3060, 3217, 3218, 3393; *Armstrong v. Newsom*, 58 F.4th 1283, 1288 (9th Cir. 2023).

　　Plaintiffs' counsel remains especially concerned about the ongoing failure to identify violations of the Americans with Disabilities Act ("ADA") and *Armstrong* Remedial Plan ("ARP") which are central to the case and the Court's efforts to bring CDCR into compliance.  The focus of this abbreviated report is to highlight a few of the egregious examples of Defendants' failures to identify and issue discipline when staff

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**



December 2, 2025
Page 2

violate the ADA rights of class members.  In one case a full-time wheelchair user is dragged half-naked from his wheelchair and left on the floor of his cell without assistance or the ability to get up in retaliation for an altercation with staff.  In another case staff denied a class member access to classification because there was no wheelchair accessible holding cage for him to use.  And in another case staff acknowledge that they failed to provide a class member use of a wheelchair that he was assigned, which ultimately led to an unnecessary use-of-force.  CDCR did not confirm any ADA violations in these cases.  The ongoing failure of CDCR to identify violations of the ADA and the ARP and to rectify problems is alarming.  We look forward to receiving your response and remain hopeful that the parties will be able to implement remedies to the system to address these longstanding systemic failures, and to improve accountability for staff misconduct.

<div style="margin-left:50%">

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

/s/

By:

</div>

cc:



**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

**TABLE OF CONTENTS**

Page

I.    ONGOING FAILURES TO IDENTIFY ADA VIOLATIONS ............................ 1

    (a)    LAC-███████ – AIU, Not Sustained.................................... 1

    (b)    KVSP-███████ – AIU, Not Sustained ................................ 5

    (c)    SATF-███████ – Local, Not Sustained ............................. 6

    (d)    SATF-███████ – Local, Not Sustained ............................. 8

II.    ONGOING FAILURE TO ENSURE APPROPRIATE DISCIPLINE.................. 8

    (a)    LAC-███████ – Sustained, Level 3 Discipline
    Reduced to Corrective Action.................................. 9

III.    CONCLUSION ..................................................... 10

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

## I.    ONGOING FAILURES TO IDENTIFY ADA VIOLATIONS

Plaintiffs' counsel continue to identify, every quarter, multiple cases in which staff's failure accommodate someone's disability is not confirmed by CDCR's accountability system and thus the opportunity to prevent further harm – either through corrective action or discipline – is missed.  In two cases below, the failure to accommodate disabilities ultimately resulted in the unnecessary use-of-force.  Neither case was identified as a failure to accommodate and neither was identified as a problematic use-of-force.  Plaintiffs' counsel acknowledge that CDCR has hired a use-of-force expert to make recommendations regarding training, policies and practices regarding force.  These cases are illustrative of the need for action.

Two additional cases below that illustrate basic failures to accommodate class members arose at SATF, a prison under Court-ordered investigation.

These cases illustrate precisely the type of ongoing violation the *Armstrong* Court has sought to stop for years, by requiring "Defendants to develop effective internal oversight and accountability procedures to ensure that Defendants learned what was taking place in their facilities, in order to find violations, rectify them and prevent them from recurring in the future, without involvement by Plaintiffs' counsel or the Court." August 22, 2012 Order, Dkt. 2180, at 10 (describing intent of January 18, 2007 Injunction).  Unfortunately, nearly two decades after the Court's 2007 Injunction, accountability is still not occurring.

### (a)    LAC-███████ – AIU, Not Sustained

This case represents one of the worst failures of the accountability system that Plaintiffs' counsel have observed since Defendants first began producing investigation case files from the Six Prisons. ███████ (███████████████)—an elderly, full-time wheelchair user in waist chains—requests assistance accessing his cell in ██. Mr. ███████ wheelchair is too wide to fit through the doorway, a known issue in some housing units at LAC.  Instead of accommodating him, as he claimed a sergeant and lieutenant had done previously, the officers forcibly removed Mr. ███████ from his wheelchair and dragged him, partially naked, onto the floor of the cell.  After removing his restraints, officers then leave Mr. ███████ lying half naked on the floor in retaliation for "kicking" an officer during the struggle.  The officers then close Mr. ███████ wheelchair so they can fit it through the cell door, push it into the cell, and close the door, while Mr. ███████ is yelling that he cannot get into his wheelchair without help.

LAC did not sustain any allegations and did not impose any discipline related to this egregious failure to accommodate Mr. ███████ disability, the resultant unnecessary force, and the disability-related retaliation.  The fact that no CDCR staff member, through multiple levels of review, identified this case as a problem decades into this lawsuit and

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

nearly five years after the Court's staff misconduct orders, shows there are still miles to go before CDCR comes into compliance with the ADA.

Video shows four officers surrounding Mr. ███████ who is sitting in his wheelchair in front of cell 119, in a section of the dayroom that otherwise appears to be empty. *See* AVSS at 1:07:27.  Officer ███[1] wheels Mr. ███████ forward to the cell entrance, and says, "So we're going to help you up to your feet and then I'm going to help you into your cell." *See* BWC 1 at 1:07:52.  Mr. ███████ protests, explaining that he needs his wheelchair in his cell.  He further explains that the way he gets into and out of the cell is by having officers fold up the wheelchair for him and holding onto the sink. Officer ███ tells Mr. ██████ he can hold onto the food port, and Mr. ██████ says "I don't do it like that … I'll fall, I'm a fall risk."  Mr. ███████ explains that a lieutenant is aware of the accommodations Mr. █████████ needs to get into the cell.  Officer ███████ states that he and another officer, Officer ██████ will pick Mr. ████ up and carry him into the cell.  When Mr. ███████ does not comply with Officer ████ orders for him to get out of his wheelchair so that they can carry him, an officer sounds his alarm.  Mr. ████████ pleads for the officers to wait so that they can contact a supervisor, but the officers ignore him.

Officer ████ Officer ██████ and another officer then forcibly remove Mr. ████ from his wheelchair against his will. *See* BWC 2; BWC 3 at 1:09:33.  Once Mr. ████ is out of the wheelchair, Officer █████ grabs Mr. ███████ under both arms and drags him on the ground into the cell.  Mr. ███████ is wearing only a smock or hospital gown, and is naked from the waist down.

Officer █████ then enters the cell.  Mr. ███████ moves his right leg toward Officer ███████ shin and makes contact with it with very little force.  Officer ████ states "we're going to leave him on the floor, he kicked my legs." *See* BWC 2 (linked above); BWC 3 (linked above) at 1:10:04.  Officer ███ rolls Mr. ███████ onto his side and the officers place a shield over him.  Officer ████ then removes the waist restraints.  The officers back out of the cell with Mr. ██████ lying on the floor.  An officer tries to push his wheelchair into the cell, but it cannot fit through the door.  The officer then folds up the wheelchair and pushes it into the cell.  As the cell door closes, Mr. ███████ yells "I can't get into my wheelchair!" *See* BWC 2 (linked above) at 1:11:44.

The officers later issued Mr. ███████ a serious RVR for Battery on a Peace Officer.  The Hearing Officer found Mr. ████████ guilty and sanctioned Mr. ██████ with 150 days of lost credits, 10 days of yard restriction, and 90 days of package and day room restrictions. *See* RVR at 73.

---

[1] Plaintiffs have reported on Officer ██████ violation of use-of-force policy in a prior report. *See* February 2024 Report at 22-23.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

Mr. ███████ made a complaint of unnecessary or excessive use of force. *See* 602 at 4-5. After an AIU investigation, the Hiring Authority did not sustain any allegations against any officer. *See* Closure Memo at 1.

The failure to sustain any violations in this case was egregious. First, the Hiring Authority failed to sustain any allegations for the officers' serious violations of Mr. ███████ rights under the *Armstrong* Remedial Plan and the ADA. Mr. ███████ repeatedly tried to explain that he could enter the cell with his wheelchair if provided certain accommodations. The officers ignored his requests for accommodation and his requests to speak with a lieutenant or sergeant who knew of the needed accommodations. Instead, the officers offered Mr. ███████ the unreasonable, dehumanizing, and embarrassing "accommodation" of carrying him into his cell. Officer ███, in his investigation interview, all but admitted the unreasonableness of his actions; when asked how he assisted Mr. ███████ into the cell, he stated, "I slowly dragged him for lack of better words." *See* AIU Report at 6. The Hiring Authority, however, did not even consider any disability-related allegations and looked only at whether the officers violated use-of-force policies.

Second, the Hiring Authority failed to sustain allegations against Officer ███████ and Officer ███████ for retaliating against Mr. ███████ for allegedly kicking Officer ███████. Mr. ███████ explained to the officers that he could not get up off of the ground on his own. Nevertheless, Officer ███████ explicitly instructed his fellow officers to leave Mr. ███████ on the ground because, as Officer ███████ stated, "he kicked me." The officers had a number of legitimate means to address Mr. ███████ actions, such as restraining Mr. ███████ and issuing an RVR. But it violated the ADA for officers, after becoming upset with Mr. ███████, to retaliate by knowingly leaving him helpless on the ground of his cell with no means of getting up as a result of his disability. Such conduct constitutes disability-related retaliation and violates the ADA and court orders in this case. The Hiring Authority, however, did not consider imposing any discipline regarding this violation either.

Third, the Hiring Authority failed to sustain any allegations for the officers' unnecessary use of force against Mr. ███████. At the time that Officer ███████ and Officer ███████ lifted Mr. ███████ out of his wheelchair without his consent, Mr. ███████ did not pose an imminent threat. In fact, in his investigation interview, Officer ███████ stated that Mr. "███████ was not resistant at the time." *See* AIU Report at 6. Accordingly, the officers were not authorized to use immediate force, but nevertheless did so. Moreover, the officers failed to deescalate the situation. Mr. ███████ explained that he required specific accommodations to enter the cell. The officers, however, insisted that they would carry him, without exploring with Mr. ███████ how he could enter the cell or conferring with a sergeant or lieutenant who had accommodated Mr. ███████ previously. Had staff made any effort to work with Mr. ███████, rather than insisting on dehumanizing and embarrassing him by dragging him naked into the cell, the officers

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

likely could have avoided any force. Instead, as a result of their failure to provide a reasonable accommodation to Mr. ███, the officers initiated an improper immediate use of force that then resulted in an assault on staff and substantial discipline for Mr. ███. The Hiring Authority did consider allegations of unnecessary and excessive use of force, but did not sustain any of them.[2]

The complete failure of the Hiring Authority to hold staff accountable for these serious disability-related policy violations that were captured clearly on video is extraordinarily concerning. The accountability system will never serve its intended purpose if CDCR cannot discipline staff for such fundamental and obvious violations of class members' disability rights.

The investigation into the misconduct was also incomplete and biased. First, the investigator provided a narrative of the video that is misleading and omits critical information. The investigator did not mention (1) that Mr. ███ requested that officers provide him with an accommodation other than being carried into the cell, but that staff refused; (2) that Officer ███ ordered that officers leave Mr. ███ on the cell floor because he had kicked Officer ███; or (3) that Mr. ███ stated he could not reach his wheelchair when officers left him on the floor. *See* AIU Report at 5. The investigator also highlights multiple verbal statements by Mr. ███ that paint him in a poor light but are irrelevant to the allegation. *Id.*

Second, the investigator allowed Officer ███ to review his BWC footage in advance of the interview. *See* AIU Report at 6. This is a poor investigative practice that allows staff to conform testimony to the video in an exculpatory manner rather than providing their recollection of the incident.

Third, the investigator did not mention in the investigation report that Officer ███ omitted from his incident report the fact that he dragged Mr. ███ into the cell. Officer ███ wrote in his report "Officer ███ maintain[ed] control of ███ right arm and assisted me in lifting ███ out of his wheelchair. I pivoted my body so that I was inside of the cell and *placed* ███ in a seated up right position. At this time ███ ceased all his resistive actions. I *placed* ███ to the front his bunk and was going to assist him onto the bunk." *See* Incident Report at 31 (emphasis added). This omission is peculiar because the investigator questioned Officer ███ at length about this discrepancy—that the video shows him dragging Mr. ███ but that he wrote in his incident report that he "placed" him.

---

[2] The IERC completed its first level of review before Mr. ███ filed his grievance. The lieutenant who completed the review concluded that the officers did not violate policy. *See* IERC at 2.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

Fourth, the investigator did not interview any of the other staff involved in the incident, even though they all failed to ensure disability accommodations for Mr. ███.

Fifth, the investigator highlighted negative but irrelevant information about Mr. ███. As an example, the investigator wrote in the narrative for Officer ███ interview: "███ is hostile, and difficult. ███ explained every interaction with ███ is negative because of his choice of language. ███ makes a lot of racial comments like, 'I don't want Mexicans touching me.'" *See* AIU Report at 6. Those comments shed no light on whether the officers violated policy by failing to accommodate Mr. ███ or used unnecessary or excessive force against him, but do serve to bias any reader against Mr. ███.

In sum, this case represents a tremendous failure of the accountability system.

**(b)    KVSP-███ – AIU, Not Sustained**

In this case, staff's denial of an ADA accommodation resulted in an unnecessary use of force on ███ (███). On July 16, 2024, Mr. ███ who was DPM and already had a cane and walker, was also issued a temporary wheelchair. *See* DPP Accommodation Report at 58. On July 20, 2024, while Mr. ███ was housed in ███ at KVSP, he was summoned to the medical clinic to address his reports of chest pains. When Officer ███ and Officer ███ removed him from his cell, Mr. ███ requests his wheelchair. Officer ███ denies his request. Officer ███ stated in his investigation interview he "did not allow ███ to utilize his wheelchair because he did not know if the wheelchair [in the hall across from cell] was ███." *See* Investigation Report at 8. Mr. ███, who is in waist chains with a triangle, then appears to fall as he exits his cell. *See* BWC 1 at 11:04:37. The officers immediately utilize force, forcing him face down on the ground to restrain him. Mr. ███ call out "I fell, man, I fell! Didn't you see I fell?! My leg gave out, my left leg.... I told you my left leg messed up, that's why they gave me the wheelchair!" *See* BWC 2 at 11:04:33. A third Officer calls "resistive inmate." *See* BWC 1 (linked above) at 11:04:43. Mr. ███ describes to another responding officer the reason he had been issued a wheelchair, that it didn't fit in his cell, and that prior to escort he had told the officers that he needed it because his left leg was messed up. *See* BWC 2 (linked above) at 11:05:26.

Mr. ███ filed a complaint alleging that officers denied him access to his wheelchair, and that they violated use-of-force policy when they jumped on his back after he fell. *See* 602 at 1-2. Despite camera footage confirming, and the officer's acknowledging that he requested but was not permitted to use his wheelchair, Mr. ███ allegation that he was denied access to this accommodation was not sustained. *See* Closure Memo at 8. This decision by the Hiring Authority was inappropriate and reflects a lack of understanding disability-related issues. The Hiring

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

Authority failed to recognize that the use of force occurred because staff initially failed to accommodate Mr. ███ by providing him with his wheelchair.

In addition, the investigation report omitted critical information. Though the report confirms that Mr. ███ was assigned a wheelchair and that a wheelchair was in close proximity to Mr. ███ cell, the report omits from its summary of the video the most relevant part of the interaction, where Mr. ███ requests to use his wheelchair and staff respond "no." *See* Investigation Report at 4.

Lastly, the officers improperly issued Mr. ███ an RVR for willfully resisting a peace officer in the performance of his duties. Plaintiffs acknowledge that, under the circumstances, it may have been reasonable for the officers to use force against Mr. ███ when he fell given that his fall could have reasonably been perceived as resistance in that moment. But the fact that force may have been justified (i.e., that the officers reasonably perceived a threat in the moment) does not, by itself, justify the issuance of an RVR. In the RVR, staff stated that Mr. ███ "tensed up his body, and without warning or provocation … lunged forward and dropped his body weight…" and that force was necessary "to overcome Inmate ███ resistive behavior." *See* RVR at 17-19. But the evidence—the video showing his request for his wheelchair and his immediate explanation that, once on the ground with officers on top of him, he had fallen and that doctors recently prescribed a wheelchair because of issues with his left leg—strongly supports the conclusion that he fell accidentally. Under such circumstances, the evidence does not support the charge that Mr. ███ willfully resisted in this case. Moreover, there is no recognition that if staff would have accommodated Mr. ███ with his wheelchair from the outset of the escort, he would not have fallen and the officers would not have needed to use force. The investigator noted in the Investigation Report, that CDCR had not heard the RVR through the date of the investigation report, nine months later. *See* Investigation Report at 3. **Plaintiffs' counsel requests to know the outcome of this RVR. If the RVR was sustained, Plaintiffs' counsel requests immediate reconsideration in light of footage that suggests he accidentally fell, and that just prior to the incident he was denied access to his wheelchair.**

    **(c)**    **SATF-███ – Local, Not Sustained**

This case is an example of an institutional failure to provide access to an Institutional Classification C meeting to a person in a wheelchair and a failure of the local investigator to conduct a comprehensive investigation.

On December 19, 2024, ███ (███) who was housed in ███, was scheduled for his ICC. BWC shows Officer ███ inform Mr. ███ that he would have to be placed in a non-ADA accessible holding cell prior to his hearing. He tells Mr. ███ that any refusal to be placed in the holding cell will be considered a refusal of his ICC. Mr. ███ is adamant that he is not refusing and wants to attend his hearing, but that he cannot transfer out of his wheelchair to a non-ADA

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

accessible holding cage. He asks why he can't simply remain in his own cell while waiting. *See* BWC 1. Officer ████████ tells Mr. ████ he will see what he can do. When he returns, he reports back that the Captain and CCII are aware of Mr. ████ issue, but that there are no wheelchair accessible holding cages available and there is nothing he can do. *See* BWC 2. Mr. ████ repeats that he is unable to transfer into a non-wheelchair accessible cell. Officer ████████ responds that Mr. ████ will be deemed to have refused the ICC.

The investigation performed by the LDI was substantially incomplete. The only investigative actions performed by the LDI were to interview Mr. ████ and to obtain and review the video of Officer ████████ BWC. But the LDI did not inspect the holding cell at issue to determine whether it was accessible to DPW class members. And the LDI did not interview Officer ████████ the Captain who was presiding over the ICCs, or other staff members with whom Officer ████████ may have discussed Mr. ████ issue (e.g., the CCII that Officer ████████ stated was "aware" of the issue). Those interviews were crucial to determine what, if any, efforts staff made to accommodate Mr. ████ and to ask why they deemed his decision not to endanger himself as a refusal.

The LDI also appeared to misunderstand the nature of the ADA violation that occurred. Specifically the investigator wrote in the report, "Inquiry Note: SOMS DPP Disability/Accommodation Summary shows ████ is a DPW inmate with no Transfer restrictions." *See* IR at 3. But in CDCR, there is no such type of holding cell. The holding cells that are accessible to DPW class members are large enough such that the person can enter the holding cell in his or her wheelchair. As such, the LDI's report demonstrates a lack of understanding of basic disability accommodations within CDCR.

As for the result of the investigation, Officer ████████ should have received at least corrective action. Though he attempted to find a solution, he not only failed to determine a way to accommodate Mr. ████, he also improperly construed Mr. ████ decision not to endanger himself by being placed in an inaccessible holding cell as a refusal of the ICC. The ICC is a crucial due process event in CDCR. Officer ████████ violated the ARP and Mr. ████ rights by forcing him to choose between participating in his ICC and his disability-related safety. Put simply, there was an obvious and important ADA violation shown on video, yet nobody was held accountable. In all likelihood, the Captain who Officer ████████ spoke with should also have been held accountable; as a supervisor, he was also responsible for ensuring that CDCR accommodated Mr. ████ so that he could participate in his ICC. These serious accountability failures regarding an obvious ADA violation at one of the prisons that houses the largest number of wheelchair users are very concerning.

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

**(d)    SATF-**████████ **– Local, Not Sustained**

This is another case of non-compliance with the ARP and failure of the local investigator to ensure accountability for the non-compliance.

On December 11, 2024, ████████████ (██████████) (incorrectly identified in the Report as ████████████████████ ████, was scheduled for a podiatrist appointment in the CTC. According to his grievance, earlier on the day of the appointment, he asked officers about it but was told he would need to wait until he was called to go. *See* Exhibits at 1. BWC shows the officer in the control booth, Officer ██████ announcing over the PA system for people to head to CTC, but does not show any attempt to notify Mr. ██████ of this announcement, either by flashing the lights or by personal notification. As a result, Mr. ██████ missed the CTC transport. *See* BWC 1 at 8:38:05. Because he missed the transport, staff concluded that he refused his appointment. *See* BWC 2 at 8:44:18.

In his March 11, 2025 interview with the investigator, Officer ██████ admitted that on the date of the incident, he was new to that particular housing unit and was "still familiarizing himself with the program and inmates." *See* IR at 3. Although Officer ██████ stated that he was currently aware of Mr. ██████ disability and ensures effective communication by flashing lights and/or sending an ADA worker to provide personal notification, he did not recall Mr. ██████ refusing any appointment on that date and did not claim he provided Mr. ██████ personal notification on that date. The transport officer had left CDCR employment on December 31, 2024, and so could not be interviewed. *See* IR at 3-4.

This allegation was not sustained despite the obvious policy violation. *See* Closure Memo at 1. The investigator failed to identify the specific policies in the ARP requiring staff to provide notifications to ensure effective communication of alarms and announcements to people with hearing disabilities. *See* ARP § IV.I.2.b. ("Each institution/facility (DPP designated institutions, non designated institutions and reception centers) shall ensure that effective communication is made with inmates who have hearing impairments impacting placement regarding public address announcements and reporting instructions, including those regarding visiting, yard release and recall, count, lock-up, unlock, etc.")

Additionally, the Hiring Authority failed to identify the violation. As a result, there was no accountability to prevent harm and ensure compliance going forward.

## II.    ONGOING FAILURE TO ENSURE APPROPRIATE DISCIPLINE

Plaintiffs' counsel continue to identify cases each quarter where, despite sustaining violations, Defendants fail to ensure appropriate discipline. The following case is illustrative of this ongoing problem.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

    (a)    **LAC-██████ – Sustained, Level 3 Discipline Reduced to Corrective Action**

In the following case, Officer ████ used improper immediate force, but the Hiring Authority inexplicably reduced the penalty from Level 3 discipline to corrective action based on an immaterial typo. Earlier this year, Plaintiffs reported on CDCR's failure to hold Officer ████ accountable for use-of-force violations. *See* Plaintiffs' May 2025 Review of CDCR's Accountability System at the Six Prisons at 16-17 (May 9, 2025). In that report, Officer ████ escalated an interaction with a class member and resorted to force too quickly, in violation of policy. Despite a finding of a violation and the initial imposition of adverse action, CDCR later reduced the discipline to corrective action. The instant case represents a failure of the progressive discipline system where the same officer had another sustained violation for a serious force incident and again received only corrective action.

Video shows ██████ (████████) sitting on a bucket on the top tier near the stairs while multiple incarcerated people are moving around the dayroom. *See* AVSS. Both Mr. ████ and Officer ████ confirmed that, before the video begins, Officer ████ instructed Mr. ████ to wait for his shower on the dayroom floor instead of on the tier. *See* IR at 5, 6. Officer ████ BWC begins as he then walks up the stairs to talk to Mr. ████. *See* BWC. At no point during the interaction is Mr. ████ a threat. Officer ████ orders Mr. ████ to "cuff up" while approaching Mr. ████, who is simply waiting for his shower on the top tier. Officer ████ again tells him to "cuff up" and backs Mr. ████ towards the wall. Mr. ████ slightly shakes his head as he backs up, at which point Officer ████ reaches towards Mr. ████ who pulls his hands up and away from Officer ████ saying he is not doing anything, as he continues to walk backwards. An alarm sounds, and Officer ████ grabs Mr. ████ arm. Officer ████ and two other officers struggle for about a minute to put Mr. ████ in handcuffs as Mr. ████ grabs the top tier railing. Additional staff arrive and walk Mr. ████ off camera in handcuffs.

The Hiring Authority (the now-former LAC warden) found that Officer ████ used unnecessary force and issued Level 3 discipline on June 10, 2024. *See* 402/403 at 2-4. Video shows that Officer ████ used force solely to comply with an order. Mr. ████ posed no threat and Officer ████ clearly initiated the incident that led to the use of force. This kind of behavior from officers jeopardizes their legitimacy and the security of the prison.

However, eight months later on February 14, 2025, the Hiring Authority held a second 402/403 conference and reduced the discipline to corrective action. *See* 402/403 (reconvene) at 1-3. The revised 402/403 contains a note that reads "upon further review of the case factors after the initial 402/403, based on flaws in the case, it was determined corrective action would be taken based on the discrepancy with the date of the allegations and the AIU Report," followed by the statement "correct date of allegation should have

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

been 5/28/23." *See* 402/403 (reconvene) at 3.  The 402/403 gives no other reason for reducing the discipline.

Although the AIU report lists June 3, 2023 as the incident date at the beginning of the report (which is incorrect), the investigator otherwise refers to the incident as occurring May 28, 2023.  For example, the investigator references the incident reports from May 28, 2023.  *See* IR at 2.  Also, the video in the case file, which aligns with the investigator's description, is from May 28, 2023.

The typo regarding the date was also immaterial with regards to the statute of limitations.  The statute of limitations for the case was June 14, 2024, one year after the date that CDCR Mr. ███ 602-1 alleging use-of-force violations.  The Hiring Authority issued the Level 3 discipline on June 10, 2024, within the statute of limitations deadline.  *See* 402/403 at 2.  The error in the investigation report therefore had no effect on whether the discipline was issued within the statute of limitations.[3]

Despite three confirmed use of force violations, and a history of reports of problematic interactions with Officer ███, Plaintiffs' counsel are unaware of any serious discipline issued to this officer.  Accordingly, CDCR's progressive discipline system has failed completely in addressing the ongoing harm that Officer ███ is causing to class members.[4]

## III.    CONCLUSION

Plaintiffs will continue to work with Defendants and the Court Expert to attempt to bring Defendants into compliance with the Court's Orders and the Remedial Plans.

---

[3] Several other cases in this production also showed a reduction in discipline after CDCR stipulated at SPB, including LAC-███, LAC-███, and LAC-███.

[4] Additionally, in this production, in LAC-███, the Hiring Authority also found a third instance where Officer ███ violated use-of-force policy, sustaining unnecessary and/or excessive force and issuing Level 3 discipline.  However, the Hiring Authority then stipulated to a Letter of Reprimand after Officer ███ appealed to the SPB.

# EXHIBIT B



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Michael Freedman
Email: MFreedman@rbgg.com

December 2, 2025

<u>VIA ELECTRONIC MAIL ONLY</u>
California Department of Corrections and Rehabilitation
Regulation and Policy Management Branch
RPMB@cdcr.ca.gov

Re:    *Armstrong v. Newsom*: Third Renotice of Change to Regulations, NCR
       Number 25-06 (Nov. 18, 2025), Changes to Regulations for Staff
       Complaints and Routine Grievances
       <u>Our File No. 0581-03</u>

To Whom it May Concern:

I write as class-action counsel in *Armstrong v. Newsom*, a lawsuit involving the rights of incarcerated people with disabilities housed in prisons in California, to object to CDCR's proposed regulatory changes. *See* NCR 25-06 Third Renotice Text (Nov. 18, 2025). We previously submitted comment on Defendants' proposed revisions to the staff misconduct regulation on June 3, 2025, to the first renotice of those regulations on August 11, 2025, and to the second renotice of those regulations on September 23, 2025. We incorporate those prior comments herein. We now submit the following comment regarding CDCR's third renotice to the regulations.

Our comments and objections relate to both the staff misconduct complaint and investigation processes described in the regulations, as well as to the disability accommodation request and response processes. The *Armstrong* Court ordered changes to the staff complaint process at six prisons in California in order to improve the quality of investigations and to ensure that staff would be held accountable for ongoing violations of the rights of people with disabilities. *Armstrong v. Newsom*, 484 F. Supp. 3d 808, 838-39 (2020); *Armstrong v. Newsom*, No. 94-cv-2307 CW, 2021 WL 933106 (N.D. Cal. Mar. 11, 2021); *Armstrong v. Newsom*, No. 94-cv-2307 CW, 2021 WL930454 (N.D. Cal. Mar. 11, 2021). Any changes to the staff misconduct regulations are therefore relevant to and must comply with existing *Armstrong* Court orders. Additionally, the administrative remedies provisions of the regulations implicate ongoing negotiations

[4790672.1]

California Department of Corrections and Rehabilitation
December 2, 2025
Page 2

between the parties in *Armstrong v. Newsom* regarding how CDCR will process disability-related requests and grievances.

It is essential the regulations comport with party agreements and existing court orders. Please find our comments and objections below.

### 1. § 3483.5(b)(4)

Plaintiffs object to the proposed change to this section.  Previously, the section gave the GRT the discretion, if a claimant refuses or is unavailable for a monthly GRT meeting, to determine whether to proceed with the monthly GRT meeting for that claimant in absentia.  Pursuant to the proposed revision, if a claimant refuses or is unavailable for a monthly GRT meeting, the GRT "*shall*" proceed with the monthly GRT meeting for that claimant in absentia.  (Emphasis added).  Plaintiffs do not understand the rationale for eliminating the discretion that existed in the Second Renotice of the regulations.  In particular, if a claimant is unavailable because of a medical appointment or other scheduling conflict, the GRT should have the discretion to conduct the GRT meeting at a time when the claimant is available.  The GRT meeting with the claimant is an important part of the GRT process, as it provides claimants an opportunity to explain their claims before the GRT makes a decision regarding whether those claims will receive a substantive response.  The meeting should occur with the claimant present whenever possible.

### 2. § 3483.5(d)(2)

Plaintiffs object to the two changes that Defendants have made to this section, both of which are inconsistent with Plaintiffs' prior agreements with CDCR.

First, the proposed revisions eliminate the GRT's discretion to route a claim for a routine review if the claim meets one of the five criteria set forth in subsection (c). Previously, subsection (d)(2) provided that, if all three GRT members agree that a claim meets one of the five criteria in subsection (c), then the claim "*may* be answered by the Office of Grievances without the necessity of a routine review or an investigation," i.e., closed without a substantive response.  (Emphasis added).  That discretion was consistent with agreements between Plaintiffs and CDCR that the GRT could send a claim for a routine review or OIA investigation, even if it met one of the five criteria in subsection (c), if the GRT decided such a review was appropriate.  The proposed revision would, in contravention of the parties' agreements, eliminate that discretion by requiring that any claim that the GRT determines meets one of the criteria in subsection (c) be answered without any routine review or investigation.  This removal of GRT discretion to route a claim for routine review or investigation is particularly problematic with respect to

California Department of Corrections and Rehabilitation
December 2, 2025
Page 3

criteria (c)(3), which applies to any claim that "is highly implausible (meaning the claim is factually possible but so improbable that any reasonable person would dismiss the claim as preposterous)," as Plaintiffs' counsel have raised serious concerns in the past that CDCR has used the "factually implausible" criteria to screen out meritorious allegations of staff misconduct, preventing them from being investigated or reviewed.

Second, the proposed revisions have changed what happens when the GRT determines that a claim meets criteria (c)(4) or (c)(5). Criteria (c)(4) applies to any claim that "closely mirrors three or more previous claims submitted by the same claimant during the most recent calendar quarter and is similar to at least one other claim which was previously denied by a Reviewing Authority or determined to be unfounded, exonerated, or not sustained by a Hiring Authority." Criteria (c)(5) applies to any claim that "accuses departmental staff of failing to take a specific action but documentary evidence found in the department's information technology system clearly shows that the action was taken by that same staff." Under the prior version of the proposed regulations, if the GRT determined that a claim met either of these criteria, then the GRT would route the claim for a routine review. The current version of the proposed regulations treat all of the criteria the same; if the GRT determines that the claims meets any of the five criteria, then the claim is resolved without any review or investigation.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[4790672.1]

California Department of Corrections and Rehabilitation
December 2, 2025
Page 4


This change is inconsistent with the agreement between Plaintiffs and CDCR regarding the GRT.  Plaintiffs and CDCR agreed that claims that met criteria (c)(4) and (c)(5) would receive a routine review, while claims that met criteria (c)(1), (c)(2), and (c)(3) could be resolved without a review (although the GRT would have discretion to determine that a particular claim should nevertheless receive a routine review or investigation).  That distinction makes sense, because a routine review can confirm whether a claim that meets criteria (c)(4) or (c)(5) is unfounded.  In contrast, it is very difficult for a routine review of claims that meet criteria (c)(1), (c)(2), or (c)(3) to uncover any information that would shed light on the veracity of the claim.  Because the proposed change is inconsistent with the parties' agreement and results in a worse process, Plaintiffs object to the change.

<div align="center">*****</div>

We thank you for considering these comments.



Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

By:  Michael Freedman
Senior Counsel

MLF:MLF

[4790672.1]

# EXHIBIT C



# PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

December 1, 2025

<u>VIA ELECTRONIC MAIL ONLY</u>

Jennifer Neill                          Sean Lodholz
Tamiya Davis                           California Department of Justice, Correctional
CDCR Office of Legal Affairs           Law Section
Jennifer.Neill@cdcr.ca.gov             sean.lodholz@doj.ca.gov
Tamiya.Davis@cdcr.ca.gov

Re:     *Armstrong v. Newsom*: Plaintiffs' Counsel's Role in the Joint Audit Process

Dear Counsel:

We write to express our concern about the utility of the joint audit process. Plaintiffs' counsel has participated in good faith in the joint audit process since its inception and have worked with Defendants' counsel year after year to craft a joint audit tool and process that evaluates Defendants' compliance with the Americans with Disabilities Act ("ADA"), the *Armstrong* Remedial Plan ("ARP"), and the Court's prior orders. Despite good faith efforts on the part of both parties, Plaintiffs' counsel does not believe the current tool or process satisfies this goal. We continue to believe that it fails to meaningfully assess compliance and consumes tremendous resources with little quantifiable benefit to class members.

In light of our ongoing concerns about the purpose and effectiveness of the joint audit process, and given the recently announced changes within the Office of Audits and Court Compliance ("OACC") impacting future audits, Plaintiffs' counsel seek to redefine our involvement. We request that it no longer be identified as a "joint" process. We would like to meet with Defendants and the Court Expert to discuss these changes and our involvement moving forward.

## I.    The Joint Audit Process Fails to Identify and Address Defendants' Noncompliance with ADA and the ARP in Significant Ways

For years, we have raised concerns about the joint audit tool. We have repeatedly expressed that, in our view, the joint audit tool does not meaningfully measure whether Defendants are meeting their obligations under the ADA, the ARP, and the Court's prior orders. At best, the tool measures staff's compliance with CDCR's own DPP policies. But as we have explained, that approach is insufficient because Defendants' policies frequently fall short of meeting the demands of the ADA and the ARP. *See, e.g.*, Court Order Granting in Part Motion to Enforce Revised Permanent Injunction, Dkt. 3583 (Mar. 20, 2024) at 12, 16 (finding that Defendants' policies deny deaf signers access to the parole process); *id.* at 21 (finding that

1

Defendants' policies and procedures for accommodating DPV class members to allow their participation in parole hearings "were not consistent with their obligations under the ADA"); Order re: Objections to Court Expert's Recommendations Regarding Compliance with SATF Stipulation Order, Dkt. 3679, (May 1, 2025) at 12 (finding that Defendants have a "long history of failures to ensure that deaf and hard-of-hearing class members receive effective communication of announcements" and requiring Defendants to develop policies to address the ongoing ADA violation).

Additionally, the tool, and Defendants' use of it, does not measure or address the full range of harms that class members experience when Defendants fail to accommodate them. We have previously described the limitations of the joint audit tool's random sampling approach, which limits the parties' ability to investigate and discover the extent of particular disability issues on a specific yard, in a housing unit, or among a given population of people with certain disability needs. *See, e.g.*, Letter from M. Mendelson & P. Booth, to E. Swanson, May 9, 2024, "Response to Defendants' Proposed Joint Audit Scoring & Reporting System," at 2-3 (reiterating these concerns). The joint audit tool also fails to investigate and identify the degree of harm of particular incidents of noncompliance. Consequently, the tool results in "bean-counting" that fails to place appropriate weight on certain findings of noncompliance. Failing to provide a class member with a functional wheelchair and requiring him to crawl throughout the prison is scored the same way as failing to provide someone a replacement neoprene knee sleeve.

The joint audit tool also fails to score a prison's compliance with numerous, critical requirements of the ADA and the ARP, despite the parties' work over many years to improve the tool. For example, the tool does not sufficiently assess a prison's compliance with requirements related to program assignment access, staff misconduct, and construction and repair of accessibility features and structural barriers associated with the Master Planning Process. The tool has also not been revised to account for progress on multiple, recent case issues including vision assessments for blind and low vision class members, new technology like caption phones, and access to non-medical assistive devices. And the tool still does not have any scoring items related to whether Defendants are appropriately accommodating class members with upper extremity mobility disabilities. In short, the joint audit tool is far from being a useful measurement of compliance, even with CDCR's own DPP policies.

Lastly, we continue to believe that the staff and class member interviews conducted during joint audits are of limited utility. The questions used for staff member interviews are superficial and consistent across audits, allowing staff to study the questions moments before the interview to relay the correct answer. With respect to class member interviews, it has been our experience that incarcerated people are not consistently willing to candidly report their disability experiences to a CDCR employee in a non-confidential interview to the degree necessary for reliable audit results. This is the case especially at prisons where reports of staff misconduct are common. Even more significant for Plaintiffs' counsel, we have concerns about the potential negative consequences to our attorney-client relationship when we participate in joint interviews at prisons where class members deeply mistrust staff.

Despite the best efforts of the parties, the joint audit process has not amounted to an effective monitoring tool.

## II.    The Joint Audit Process is Resource-Intensive and Yields Little to No Gain for the *Armstrong* Class

Because of the many shortcomings of the joint audit process described above, the output of the audits has minimal benefit to the *Armstrong* class. Joint audits have not consistently identified systemic issues at prisons, uncovered problems with CDCR's policies, or significantly improved CDCR's overall compliance with the ARP. When the joint audits do uncover policy violations, those violations are often technical and have limited impact on the lives of class members. CDCR also appears to localize the problem to one prison instead of analyzing and addressing system-wide shortcomings.

Importantly, the limited results produced by the joint audits come at the expense of many hundreds of hours of Plaintiffs' counsel's participation. That outcome is especially troubling because the most significant changes to Defendants' disability accommodation program have been the result of Plaintiffs' monitoring. For example, the Court's orders regarding ADA violations at SATF did not rely on any information learned in the joint audit process. Rather, the Court ordered its Expert to investigate ADA compliance at SATF "[i]n response to reports by Plaintiffs' counsel of discrimination and mistreatment" of class members at SATF. Order re: Court Expert's Report Regarding Treatment of People with Disabilities at Substance Abuse Treatment Facility at 1, Dkt. 3467. That investigation uncovered significant violations at SATF, and the litigation led to a series of additional policy requirements CDCR must implement, primarily at SATF. None of these changes is reflected in the joint audit tool. Plaintiffs' monitoring, not joint audits, has revealed and helped remedy Defendants' noncompliance with certain requirements. Dkt. 3679, at 2; *see also id.* at 5 ("the three DPV class members who were not offered an individualized assessment … would not have received one but for Plaintiffs' advocacy and diligence in discovering Defendants' failure to provide them with an individualized assessment").

Plaintiffs' concerns regarding staff misconduct also originated from Plaintiffs' monitoring, and ultimately led to litigation and Court orders imposing substantial remedies. *Armstrong v. Newsom*, 484 F. Supp. 3d 808 (N.D. Cal. 2020); *Armstrong v. Newsom*, 2021 WL 933106 (N.D. Cal. 2021), *aff'd in part*, *Armstrong v. Newsom*, 58 F.4th 1283 (9th Cir. 2023). Similarly, Plaintiffs' monitoring revealed Defendants' persistent failures to accommodate class members with vision and hearing disabilities in preparing for and following up on parole hearings. That monitoring resulted in court-ordered remedies that require Defendants to modify their policies to comply with the ADA. *See* Dkt. No. 3583; *see also* Order Sustaining in Part Objections to Further Parole-Related Remedial Plan, Dkt. No. 3609.

Despite the relative value to the class of Plaintiffs' monitoring compared to joint audits, the time required to participate in joint audits is so significant that it impedes Plaintiffs' ability to conduct our own monitoring. In preparing the 2025 joint audit schedule, Defendants proposed that the parties conduct 15 joint audits. Defendants similarly proposed 16 joint audits in 2026. The resources required to conduct those audits are tremendous. As you know, before each joint audit, Plaintiffs' counsel painstakingly reviews hundreds of documents to confirm that OACC's scoring is consistent with the agreed-upon tool. We develop a letter describing our many scoring disagreements, then we review OACC's response to that letter and, at times, draft another response. The on-site portion of the audits then requires participation of between two and five

members of Plaintiffs' counsel and can last up to four days on-site, excluding round-trip travel. In total, Plaintiffs' counsel has spent hundreds of hours conducting joint audits in 2025, for very limited benefit to the *Armstrong* class.

Resources would be better spent on Plaintiffs' own monitoring for the purpose of investigating ADA failures and ensuring CDCR compliance. We have little reason for confidence that the joint audit will identify CDCR's failure to meet its obligations under the ADA, the ARP, and the Court's orders. And even if the joint audit does identify noncompliance, we have little confidence that CDCR will take the necessary steps to resolve it. Given the serious time investment that is required for a process in which we lack confidence, we would like to redefine our involvement.

\* \* \* \* \*

Plaintiffs recognize that, from Defendants' perspective, it is valuable to develop an audit tool that can identify noncompliance at the prison- and headquarters-level. Plaintiffs remain willing to provide Defendants with feedback on such a tool, including the information it must collect to be more successful than the current tool. However, in light of our interest in redefining our involvement in the joint audit process, we request a meeting with Defendants. Because the joint audit schedule begins in 2026, we would like to meet as soon as possible. We look forward to an opportunity to discuss these issues in the near future.

Sincerely,

PRISON LAW OFFICE

*/s/ Margot Mendelson*

By:  Margot Mendelson


ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Gay Crosthwait Grunfeld*

By:  Gay Crosthwait Grunfeld


cc:  Ed Swanson, Audrey Barron, *Court Expert's Office*
Carrie Stafford, Nicholas Meyer, Ramon Ruiz, Katie Riley, Jessica Thoma, *CDCR Office of Legal Affairs (OLA)*
Olena Likhachova, Anne Kammer, Gurpreet Sandhu, Namrata Kotwani, Jennifer Burns, Jiaye Zhou, Tim Anguiano, *Office of Attorney General, California (OAG)*
Dawn Lorey, Lourdes White, Jillian Hernandez, Darnell Mebane, Cory Lo, Megan Roberts, *CDCR Division of Adult Institutions (DAI)*
Chor Thao, Saundra Alvarez, *CCHCS Legal*
Lois Welch, Marc Wilson, *CDCR Office of Audits and Court Compliance (OACC)*

4