MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT  – NY BN 5565791*
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

CLAUDIA CENTER – 158255
DISABILITY RIGHTS
EDUCATION & DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:    (510) 644-2555
Facsimile:    (510) 841-8645

CALIFORNIA OFFICE OF THE
ATTORNEY GENERAL
ROB BONTA
Attorney General of the State of California
LAWRENCE BRAGG
Acting Senior Assistant Attorney General
SEAN LODHOLZ
ANNE M. KAMMER
Supervising Deputy Attorneys General
GURPREET SANDHU
JAIYE ZHOU
JENNIFER BURNS
NAMRATA KOTWANI
OLENA LIKHACHOVA
Deputy Attorneys General
State Bar No. 285574
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone:  (916) 210-6332
Fax:  (916) 324-5205
E-mail:  Olena.Likhachova@doj.ca.gov

Attorneys for Defendants Gavin Newsom
and the California Department of
Corrections and Rehabilitation

* Admitted *pro hac vice*

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **JOINT CASE STATUS STATEMENT** |
| v. | Judge:   Hon. Claudia Wilken |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

[6005166.1]

Case No. C94 2307 CW

JOINT CASE STATUS STATEMENT

The parties submit this Joint Case Status Statement pursuant to the Stipulation and Order entered February 24, 2026 (ECF No. 3754), which provides that "[t]he parties will file periodic joint statements describing the status of the litigation on a quarterly basis."

## CURRENT ISSUES[1]

**A.    Allegations of Abuse, Retaliation, and Violence by CDCR Staff Against Class Members**

### 1.    Plaintiffs' Statement

#### a.    RJD and Five Prisons Orders

Plaintiffs continue to monitor remedial efforts the Court found to be necessary in order to prevent further violations of the ARP and class members' ADA rights at six prisons, including changes to the staff misconduct investigation process and implementation of Audio Visual Surveillance Systems that include body-worn camera technology.  *See* ECF Nos. 3059, 3060, 3217 and 3218.  Party agreements regarding Court ordered changes are found in Defendants' RJD and Five Prisons Remedial Plans ("Plans").  *See* ECF No. 3393, Exs. A and B.

Plaintiffs have issued multiple quarterly reports and, at this point, have identified many hundreds of cases that show failures by Defendants to conduct complete and unbiased investigations and impose appropriate and consistent discipline.  A copy of Plaintiffs' report issued February 6, 2026, Review of CDCR's Accountability System for LAC, CIW, RJD, SATF, COR and KVSP, is attached hereto in redacted form as **Exhibit A.**  Plaintiffs also recently released the first report on CDCR's routine reviews into disability-related staff complaints by institution staff, which identified accountability failures in more than three-fifths of the cases analyzed.  *See* February 27, 2026 Analysis of Routine Reviews of Staff Misconduct Allegations by Class Members at Six Prisons, attached hereto in redacted form as **Exhibit B**.  Plaintiffs' findings are corroborated by the Office of the Inspector General (OIG).  *See* OIG Semiannual Report re Monitoring Internal

---

[1] Statements are joint unless otherwise delineated as either *Plaintiffs' Statement* or *Defendants' Statement*.

Investigations, Staff Misconduct Complaint Investigations, and the Employee Disciplinary Process,  https://www.oig.ca.gov/wp-content/uploads/2026/05/Staff-Misconduct-Monitoring-Report-July-December-2025.pdf.  The OIG recently found, during their review of staff complaints filed by incarcerated people, that the Department's performance was inadequate in 56% of cases and needed improvement in another 29%.  *Id*. at 7.

The parties are actively engaged in negotiations to reach agreement regarding changes that are necessary to the system to bring it into compliance with Court-ordered Remedial Plans.  Last year, the parties entered into a Stipulation aimed at addressing ongoing concerns with the investigation and discipline process.  ECF No. 3721.  This agreement creates the Centralized Allegation Resolution Unit ("CARU"), a unit within CDCR headquarters that will now serve as the Hiring Authority for all allegations of staff misconduct against incarcerated people investigated by the Office of Internal Affairs ("OIA") at the six prisons covered by existing *Armstrong* orders.  *Id*. at 1-2.  Plaintiffs' counsel are hopeful that the CARU will address ongoing problems regarding delays in disciplinary decision making and will standardize and improve the quality of disciplinary decisions.  Per Stipulation, CDCR has also agreed to retain Nicholas Mitchell to "review and offer recommendations about CDCR's use-of-force policies and practices, use-of-force training, and the Institutional Executive Review Committee (IERC) process, including outcomes after the IERC has identified non-compliance with policy violations" and to provide "recommendations on whether the IERC, or some entity other than OIA, can conduct comprehensive and unbiased investigations" and "what, if any, modifications to Defendants' policies and procedures are necessary for the IERC, or some entity other than OIA, to conduct comprehensive and unbiased investigations into allegations of staff misconduct based on use-of-force policy violations."  *Id*. at 3.  The expert consultant's report is expected later this year.

Despite agreement between the parties on the potential reforms discussed above, Plaintiffs' counsel remains seriously concerned about the failure of Defendants to complete timely investigations.   As outlined in Plaintiffs' counsel's letter of October 9,

2025, the seven most recent months of data produced by Defendants show that, at the six prisons covered by the Court's orders, **Defendants closed more than 90% of investigations late**. *See* ECF 3734, Exhibit A at 2. To bring Defendants into compliance with the Remedial Plans and to eliminate the serious problems caused by delayed investigations, Defendants must commit to staffing OIA with a sufficient number of investigators to timely investigate all allegations of serious misconduct. *Id*. at 4. On November 24, 2025, after extensive negotiations, the parties entered into a stipulation requiring Defendants to produce to Plaintiffs and the Court Expert a proposed staffing analysis, staffing plan, and implementation plan to address these issues no later than July 31, 2026. *See* Order entered November 26, 2025, ECF 3737.

The parties have also been discussing revisions to CDCR's regulations regarding the staff misconduct complaint process and routine grievance process, which will have an impact on how CDCR handles staff misconduct complaints. Plaintiffs provided multiple rounds of comments on problems with the draft regulatory revisions. On January 22, 2026, CDCR adopted changes to the regulations, over Plaintiffs' objections, that do not comply with the Court's orders and remedial plans, and that are inconsistent with negotiated agreements between the parties to address CDCR's continuing non-compliance with those orders and remedial plans. *See* April 7, 2026 Letter from Benjamin Bien-Kahn, attached hereto as **Exhibit C**. When regulations are inconsistent with what CDCR is required to do to comply with the Court's orders and with court-ordered remedial plans, violations will be inevitable. Plaintiffs will be meeting with Defendants to discuss how to resolve this serious problem.

CDCR is a statewide system. Violations of the ADA and ARP found thus far at six prisons exist system-wide. Plaintiffs continue to report on violations raised by class members at multiple other prisons including California Health Care Facility, Stockton ("CHCF"). CHCF houses the third largest number of *Armstrong* class members statewide. Plaintiffs' counsel have reported on dozens of allegations of disability-related staff misconduct at that facility over the years but problems still persist. Plaintiffs are

concerned that CDCR is not doing enough to ensure that staff are held accountable for violations. On April 24, 2026, Plaintiffs' counsel served requests for the production of documents related to investigations into allegations by *Armstrong* class members of staff misconduct at CHCF. *See* April 24, 2026 Letter from Michael Freedman, attached hereto as **Exhibit D**. Plaintiffs continue to gather information about those incidents and are committed to bringing such evidence before the Court until all class members are protected. *See* ECF No. 3592, Ex. A at 7-8.

### 2. Defendants' Statement

#### a. RJD and Five Prisons Orders

CDCR has dramatically overhauled its staff misconduct investigation process to ensure unbiased and complete investigations. And, although not required by the Court's orders, Defendants have restructured CDCR's statewide staff misconduct allegation, screening, referral, investigative, and disciplinary processes. As the Court has noted, "[t]hese agreed-upon measures constitute substantial improvements that will go a long way to bringing Defendants into compliance with the ARP and ADA at the six prisons." ECF No. 3356 at 2. The Court found, the "implementation of these [] remedial measures is likely to have a positive impact on…the overall reliability of the outcomes of investigations." *Id.* at 15.

Despite the tremendous efforts and resources directed towards improving the staff misconduct investigation and discipline processes, modifications are necessary to ensure sustainability. CDCR contends that many of the issues raised in the recent OIG report are attributable to the operational realities of the large number of complaints that stretch the capacity of the OIA to timely complete these cases. (*See* CDCR response to OIG March 2025 report at https://www.oig.ca.gov/wp-content/uploads/2025/03/2024-Staff-Misconduct-Investigation-Monitoring-Report.pdf.) CDCR further contends that a disproportionately large number of these complaints are submitted by an extremely small number of incarcerated people who, for some, submit repetitive claims on a daily or weekly basis. With stakeholder input, CDCR has implemented a process to address these

frequent filings that incorporates all available resources and draws upon mental, medical, and correctional expertise to reduce the number of repetitive claims, while at the same time ensuring that all allegations of staff misconduct are properly reviewed and routed for OIA investigation, when warranted, in compliance with the orders of this Court.  With input from Plaintiffs, the Court Expert, and other stakeholders, CDCR continues to identify and implement necessary modifications to the investigative and disciplinary processes.  These efforts include, but are not limited to, updating the applicable staff misconduct regulations, simplifying the staff misconduct process, revising the ADI to provide greater clarity, consolidating Information Technology systems to improve case tracking and management, developing certified training to enhance investigator preparedness, and working to satisfy the requirements of the recent September 26 and November 26, 2025, stipulations on the Staff Misconduct Investigative and Discipline Process (ECF Nos. 3721, 3737).

CDCR also completed a series of trainings for designated staff hired into the Centralized Allegation Resolution Unit located at department headquarters, which serves as the hiring authority and reviews completed investigations which involved or originated from incarcerated persons residing within the six institutions identified in the Court's staff misconduct orders, and now oversees 19 institutions statewide.  *Id*.  CDCR has implemented prioritization strategies to focus on meeting statutory deadlines, addressing cases based on their age or complexity, and ensuring compliance with legal obligations.  *Id*.  To further address timeframe-related challenges, CDCR continues to actively recruit to fill all vacant investigator positions within the Office of Internal Affairs and has repositioned several internal vacancies to hire additional investigative staff.  *Id*.  CDCR also continues to refine its intake process to reduce redundant investigative efforts and conserve limited investigative resources while maintaining a complete review of all allegations.  *Id*.  CDCR, in collaboration with Plaintiffs and other stakeholders, continues to identify and implement additional improvements to ensure compliance with policies and regulations.  Throughout this process, CDCR has regularly provided substantive updates to the OIG and will continue to do so.

In accordance with the parties' November 2025 stipulation, Defendants created and provided Plaintiffs' counsel their proposed methodology for calculating the number of investigative staff necessary to comply with the remedial plans' 120-day deadline to complete staff misconduct investigations.  After agreement and application of the methodology to the six-month data set agreed to by the parties, Defendants will prepare and share their staffing plan with Plaintiffs on or before July 31, 2026.  The parties also agreed to continue to meet and confer about proposed revisions to the remedial plans.

Finally, Defendants reviewed the proposed regulations regarding the staff misconduct complaint and routine grievance processes prior to adoption and do not believe these regulations violate any court orders.  Defendants received Plaintiffs' April 7, 2026, correspondence alleging otherwise and expressing concern that the regulations do not comport with the parties' agreements.  Defendants intend to provide a formal written response and will meet and confer with Plaintiffs to address any remaining issues.

## B.    Court Expert Investigation Into SATF

### 1.    Plaintiffs' Statement

Background of the Court Expert's investigation into the treatment of people with disabilities at the Substance Abuse Treatment Facility (SATF) is set forth in Plaintiffs' previous joint case status statement.  *See* ECF No. 3670 at 6-8.  On May 1, 2025, the Court adopted, with some modifications, the Court Expert's Recommendations Regarding Compliance with SATF Stipulation, which laid out steps that Defendants must take to remedy longstanding violations of the ADA and ARP at SATF.  ECF No. 3651 (Court Expert's recommendations); ECF No. 3679 (Court's order).

The parties continue to meet and confer regarding Defendants' plans to comply with SATF Stipulation Item #7 and the Court's May 1 order on this Item.

The Court has deferred ruling on item 13 in light of the Court Expert's April 18, 2025, status update and a planned demonstration of an alternative technology.  ECF Nos. 3675; 3679 at 21.  The demonstration of Defendants' proposed alternative transcription technology was conducted at SATF on August 19, 2025.  Following the demonstration, the

parties exchanged their respective positions regarding the alternative technology and are conferring concerning appropriate next steps.

Plaintiffs continue to eagerly await the Court Expert's forthcoming report and recommendations on staffing and sustainability and hope it will result in the allocation of sufficient expertise and resources and development of robust systems necessary to comply with the ARP and ADA.

### 2. Defendants' Statement

The Court Expert's second report concerning the treatment of people with disabilities at SATF recognized the numerous proactive measures implemented at SATF to further respond to the needs of incarcerated people with disabilities.  ECF No. 3500.  The report demonstrates that the coordinated efforts between CDCR and California Correctional Health Care Services (CCHCS), with the Court Expert's guidance and with input from Plaintiffs, are working to effectively respond to the issues raised by the Court and addressed by the Court Expert following his initial investigation.  On May 1, 2025, the Court issued its order on the issues not resolved by the Court's November 8, 2024, order, and addressed in the Court Expert's January 10, 2025, recommendations, which included items 5, 7, 9, 10, and 13.  ECF Nos. 3639, 3651, 3655, 3656, 3660, 3661, 3665, and 3679. The parties, with input from the Court Expert, have resolved items 5, 9, and 10.  The parties are continuing to meet and confer regarding items 7 and 13.  After the parties complete their meet-and-confer process for SATF 13, the Court Expert will file a further status update with a report and recommendation for next steps.  ECF No. 3679 at 21-22.

### C. Accommodations for Deaf and Hard of Hearing Class Members

### 1. Plaintiffs' Statement

Plaintiffs appreciate Defendants' long-awaited update that staff sign language interpreters will receive a salary increase of 5%, plus an additional 3% increase retroactive to July 2025.  However, the statewide interpreter vacancy rate is now 35%—*worse* than the vacancy rate when Plaintiffs first raised concerns with interpreter staffing in September 2024.  Including interpreters on worker's compensation leave increases the vacancy rate to

over 43%.  Notwithstanding Defendants' attempt to re-frame the issue, Deaf signers are not receiving adequate access to interpreting services, as required by this Court's prior orders (*see* ECF No. 1045 at 8, ECF No. 1661 at 2, ECF No. 2345 at 22), preventing them from accessing the array of group programs essential to their rehabilitation.  Deaf class members continue to report that they rarely receive on-site contract interpreters to make up for the absence of staff interpreters.  And the video remote interpreting services that Defendants use in place of on-site interpreters remains riddled with flaws that cannot be fixed by simply changing providers.  Video remote interpreting is unsuitable for deaf signers to access group programs.

Many deaf individuals also remain without access to essential phone services.  Defendants still have no timeline for adding captioned telephone services to the tablet computers, meaning that most deaf non-signers cannot place natural and fully accessible calls from inside their cells.  Deaf non-signers who rely on TTY/TDD to place phone calls are unable to access PREA and OIG hotlines—a critical service for deaf people to accessibly report sexual abuse, harassment, and bullying.  While there are some promising updates regarding video relay service (VRS) access on the horizon, the longstanding issues with videophone connectivity at LAC currently remain unresolved, and Plaintiffs continue to request that Defendants offer transfers to deaf signers who have been unable to consistently place calls to their loved ones for over three years.

### 2.    Defendants' Statement

Defendants continue extensive recruitment efforts to fill Sign Language Interpreter (SLI) vacancies, including outreach to local interpreter-training programs, community colleges, and regional interpreting businesses.  Defendants' current contracted vendors have reported that many qualified SLIs prefer remote assignments rather than on-site work in correctional or healthcare environments.  Rural institutions such as SATF and CCWF face additional geographic recruitment challenges, which further explains localized shortages not attributable to CDCR policy or action.

Despite the industry-wide shortage, Defendants' contracted vendors, including

Interpreters Unlimited, remain steadfast in recruiting aggressively. Plaintiffs' vacancy figures fail to account for legal restrictions on backfilling certain SLI positions where the incumbent employees are on workers' compensation leave. Under state law and CALHR rules, these positions must remain assigned to the employees on leave and cannot be reallocated or refilled until the leave status is resolved.

Despite vacancies, the statewide ratio of SLIs to deaf signer class members is favorable, averaging one SLI per 2.5 class members. Defendants continue to closely monitor statewide hiring efforts and will work to ensure that any vacancies are posted until filled. Defendants have coordinated with their contracted vendors to strengthen remote interpreter availability and service reliability. On April 15, 2026, Defendants transitioned from the FaceTok to the Language Links VRI platform due to service-delivery concerns. Language Links now provides stronger platform stability, facilitates louder volume and longer call durations with fewer disconnections. Language Links allows pre-scheduled SLI services, resulting in better planning and more consistent interpreter coverage. Interpreters Unlimited is working with its vendor partners to address any technical or connectivity issues as part of ongoing refinement. Furthermore, CDCR's Compliance Sergeants and the Correctional Counselor IIs from the ADA Collaboration and Training Team (ACTT) continue to train staff, check the functionality of equipment, and work with the vendors to resolve any intermittent technical issues.

Deaf class members are receiving timely and effective sign language interpretation sufficient to ensure meaningful access to programs, services, and daily communication. The February 2026 monthly SLI logs confirm no appointments or classes have been cancelled due to SLI absence. Deaf signers are participating in and completing programs, as evidenced by earning milestone credits, earning bachelor's degrees, and participating in college courses, etc.

With respect to videophone calls, CDCR continues to work with the vendor to address issues with VRS equipment at LAC. Staff continue to test the equipment to ensure uninterrupted access to this service and, as a result, class members have been making VRS

calls regularly. Defendants have not been able to identify a sustainable solution to the bandwidth issues at LAC related to the current ViaPath devices, but new Securus tablets with built-in VRS function are scheduled to roll out at LAC the week of June 29, 2026. Pending the rollout of the new Securus tablets, Defendants have offered deaf signers an option to transfer out of LAC.

Defendants are in the process of converting statewide VRS services from ViaPath to Securus. This transition will include installing multiple dedicated VRS stations in accessible locations at DPH-SLI designated institutions, including LAC, to strengthen reliability, increase the number of access points, and ensure reliable communication access for Deaf and Hard-of-Hearing class members. The conversion is expected to provide enhanced equipment, improved network stability, and quicker vendor response times. Access to VRS will also be available on the state issued prisoner tablets, allowing deaf signers to place calls from inside their cells. The institution-by-institution transition from ViaPath to Securus began in February 2026 and is tentatively scheduled to be finished by the end of August 2026.

Finally, Defendants' new tablet vendor, Securus, has not provided Defendants with a definitive date when captioned telephone services will be available on the new prisoner tablets, but is aware of the need for the same. In the meantime, captioned telephone services are available to deaf non-signers upon request.

**D.    Accommodations for Blind and Low-Vision Class Members**

Since the last joint case status statement, the parties resolved their dispute regarding the manner in which Defendants will provide blind and low-vision class members access to the assistive devices recommended by a vision specialist. As set forth in prior joint case statements, the parties had disputed whether Defendants were required to personally issue all such devices to class members or make them available for use on a check-out basis. *See, e.g.*, ECF No. 3747 at 12-15. Defendants decided and have since confirmed that all individuals for whom the vision specialist recommended an assistive device for reading and/or writing will be offered personal issuance of the recommended device, regardless of

whether they have a pending parole hearing.  Defendants are revising their draft policy to memorialize this commitment.  Defendants will share this revised draft policy with Plaintiffs for review and comment.  Plaintiffs are monitoring the rollout of personal issuance of devices to class members who were recommended access to assistive devices by the vision specialist and were previously required to request access to the assistive devices through a checkout process.

The status of the parties' dispute regarding whether Defendants are evaluating blind and low-vision class members' writing accommodation needs and providing reasonable writing accommodations to class members, in line with ARP, ADA, and the Court's orders, is unchanged since the last joint case status statement.  *See* ECF No. 3747 at 13-16.

**E.    Access to Assignments for Class Members**

Historically, the program-access workgroup met periodically to discuss credit earning, the assignment process, and disparities in the program-access assignment data in response to Plaintiffs' allegations of disability-related discrimination.  *See* ECF No. 2680 at 13-14.  The parties reached agreement on the relevant data to produce to Plaintiffs each month in early 2024 but have not yet reached agreement on a standard for evaluating whether there is discrimination in program assignments.  The parties have agreed to temporarily pause workgroup discussions, at Defendants' request, to enable CDCR to resolve other pending case issues.  In the meantime, CDCR continues to work on a regulatory package to address programming waitlists, which includes responding to Plaintiffs' public comments on the proposed regulations.  CDCR has also responded to several proposals shared by Plaintiffs outside the regulatory processes to improve program assignment processes.  Plaintiffs will continue to report in the monitoring tour reports on disparities in assignment rates between incarcerated people with and without disabilities at individual institutions and programs.

**F.    ADA Structural Barriers, Emergency Evacuation Procedures and Master Planning Process**

*Court Expert's Proposal for New Master Planning Process.*  On September 30,

2025, the Court Expert sent a proposal to the parties regarding a new framework for master planning given "the frustration of both parties at the pace and progress" of the existing process. The Court Expert's proposal provided a history of the master planning process dating from 2011 through the present, identified problems with the current process, and proposed a new framework to address those issues. On October 30, 2025, the parties responded to the proposal and were largely supportive of the new framework. Subsequently, the parties have met to discuss the proposal in greater detail. The parties, with assistance from the Court Expert, negotiated a stipulation to memorialize the parties' agreement for dispute resolution. The Court issued an order on the parties' stipulation on April 22, 2026. ECF No. 3769.

The parties have also provided input to the Court Expert on neutral experts to aid the Court Expert with master planning issues. The parties have agreed to the Court Expert employing Eric McSwain as a consultant on physical accessibility issues and Mani Subramanian as a consultant on construction management. The Court Expert is arranging employment of the two consultants.

In addition, the parties and Court Expert have begun structured meetings about several master planning issues currently in dispute. The parties have met twice about the master planning construction timeline, as well as CDCR's processes for tracking and sharing information about the status of master planning design and construction. The parties have reached some agreements related to those issues. Specifically, Defendants have agreed to provide detailed barrier removal schedules for the current and the next two fiscal years for each master planning institution scheduled for construction during that timeframe. The detailed barrier removal schedules will be updated each February and August. Other discussions related to the master planning timeline—CDCR's 2025 transition plan currently has master planning construction being completed in 2034, a year later than projected in the 2024 transition plan—remain ongoing. The parties have also met about CDCR's process for projecting future class members populations to ensure sufficient accessible space. On April 21, 2026, the parties met to discuss the scope of

barrier removal under master planning.

*Other Master Planning Issues.*  On April 13, 2026, the parties and Court Expert's Office conducted a joint accessibility inspection of completed master planning construction at Salinas Valley State Prison.  The parties anticipate further discussion of the issues that arose during that inspection, including new concerns with the accessible cells in the 180-design buildings at SVSP, which have statewide implications.  The tour was also the first time the parties jointly inspected certain 270-design and 180-design cells that were originally designed to be ADA compliant.  Plaintiffs had some concerns about those accessible cells being non-compliant with requirements at the time of construction and presently.

On March 24, 2026, Plaintiffs sent Defendants a letter regarding problems with the cells intended to be accessible in 270-design buildings throughout the state.  Plaintiffs await Defendants' response to the letter.

On October 21, 2025, Plaintiffs and their expert conducted a tour of LAC regarding safety planning and emergency evacuation for class members.  Plaintiffs anticipate serving their expert's report from that tour soon.

In addition, on October 16, 2025, Plaintiffs sent Defendants a demand letter detailing how CDCR's decision to make San Quentin—a facility not designated for people with ambulatory and vision disabilities—the focal point of the California Model constitutes disability discrimination.  Plaintiffs made several related requests.  Defendants provided a response on February 4, 2025.  Plaintiffs anticipate providing a reply to that response soon.

The parties also continue to exchange information about other master planning issues.  For example, Defendants share, on a monthly basis, a spreadsheet with the updated status of design and construction for current master planning projects.  Defendants have recently agreed to add information to that spreadsheet reflecting any changes to the timelines for those master planning projects, as well as whether projects are funded.  Plaintiffs also continue to provide comments on Defendants' designs for master planning

construction.

Respectfully submitted,

DATED:  May 19, 2026                    ROSEN BIEN GALVAN & GRUNFELD LLP

By:  */s/Penny Godbold*
Penny Godbold

Attorneys for Plaintiffs

DATED:  May 19, 2026                    ROB BONTA
Attorney General of the State of California

By:  */s/Olena Likhachova*
Olena Likhachova
Deputy Attorney General

Attorneys for Defendants

## FILER'S ATTESTATION

As required by Local Rule 5-1, I, Penny Godbold, attest that I obtained concurrence in the filing of this document from Deputy Attorney General Olena Likhachova, and that I have maintained records to support this concurrence.

DATED:  May 19, 2026                    */s/Penny Godbold*
Penny Godbold

# EXHIBIT A



**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com



Email: ███████████

February 6, 2026

<u>VIA ELECTRONIC MAIL ONLY</u>

<div style="border:1px solid">

**PRIVILEGED AND**
**CONFIDENTIAL**

**SUBJECT TO**
**PROTECTIVE ORDERS**

</div>



Re:    *Armstrong v. Newsom*:  Plaintiffs' February 2026 Review of
       CDCR's Accountability System at the Six Prisons
       <u>Our File No. 0581-03</u>

Dear ███████████ :

We write regarding our review of Defendants' system for holding staff accountable for misconduct.  The enclosed report is based on our review of investigation and discipline files produced from CSP-Los Angeles County ("LAC"), California Institution for Women ("CIW"), R.J. Donovan Correctional Facility ("RJD"), California Substance Abuse Treatment Facility ("SATF"), CSP-Corcoran ("COR"), and Kern Valley State Prison ("KVSP") (collectively "Six Prisons").

Plaintiffs continue to find that investigations and discipline fail to comply with the *Armstrong* Court Orders, as affirmed in relevant part by the Ninth Circuit, and with the RJD and Five Prisons Remedial Plans.  *See* Dkts. 3059, 3060, 3217, 3218, 3393; *Armstrong v. Newsom*, 58 F.4th 1283, 1288 (9th Cir. 2023).

Plaintiffs have again found substantial evidence that CDCR's accountability system is failing to identify and confirm violations and to hold staff accountable for misconduct.  Plaintiffs' counsel looks forward to discussing these cases with Defendants

[4825674.1]

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**



February 6, 2026
Page 2

in March 2026.  We remain hopeful that the parties will be able to implement remedies to the system to address these longstanding systemic failures, and to improve accountability for staff misconduct.

<div align="right">

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

/s/

By:

</div>



cc:

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

## TABLE OF CONTENTS

**Page**

I.    DEFENDANTS FAILED TO HOLD OFFICERS ACCOUNTABLE FOR USING EXCESSIVE FORCE ............................................................... 1

    1.    SATF-███████ – AIU, Sustained (Corrective Action) ................... 1

    2.    RJD-███████ – AIU, Not Sustained ............................................... 4

    3.    SATF-███████ – AIU, Not Sustained ............................................. 6

    4.    COR-███████, COR-███████ – AIU, Not Sustained ................... 7

    5.    KVSP-███████ – AIU, Not Sustained ........................................... 9

II.   INVESTIGATORS FAILED TO CONDUCT COMPREHENSIVE AND UNBIASED INVESTIGATIONS .......................................................... 11

    1.    RJD-███████ – AIU, Not Sustained ............................................. 12

    2.    LAC-███████ – AIU, Not Sustained ............................................ 15

    3.    LAC-███████ – AIU, Not Sustained ............................................ 17

    4.    Failures to Obtain Relevant Video Evidence ................................ 18

        (a)   RJD-███████ ............................................................ 18

        (b)   RJD-███████ ............................................................ 19

        (c)   RJD-███████ ............................................................ 19

        (d)   LAC-███████ ............................................................ 19

        (e)   LAC-███████ ............................................................ 20

        (f)   COR-███████ ............................................................ 20

        (g)   SATF-███████ ........................................................... 20

        (h)   SATF-███████ ........................................................... 21

        (i)   SATF-███████ ........................................................... 21

        (j)   SATF-███████ ........................................................... 21

        (k)   KVSP-███████ .......................................................... 21

        (l)   KVSP-███████ .......................................................... 22

        (m)  KVSP-███████ .......................................................... 22

III.  HIRING AUTHORITIES—INCLUDING THE CARU AND WARDENS—FAILED TO SUSTAIN ALLEGATIONS AND IMPOSE APPROPRIATE DISCIPLINE .......................................................... 22

    1.    LAC-███████ – OIA, Sustained (L9; Reduced to L7) ................ 23

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

2.    RJD-███████ – AIU, Sustained (Letter of Instruction and Training) ....................................................................................... 25

3.    SATF-███████ – AIU, Sustained (Corrective Action, SOL Expired) ........................................................................................... 29

4.    LAC-███████ – AIU, Not Sustained ............................................. 30

IV.    CONCLUSION ...................................................................................... 31

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

## I.      DEFENDANTS FAILED TO HOLD OFFICERS ACCOUNTABLE FOR USING EXCESSIVE FORCE

In the following cases, officers used excessive and often unnecessary force against class members.  The Hiring Authorities, however, failed to sustain any use-of-force violations.

The first three cases involve officers throwing incarcerated people to the ground in extremely dangerous ways.  In all three of these cases, officers failed to attempt to deescalate the situations and significantly overreacted to the minor issues presented by the incarcerated people.  In the first case, an officer at SATF grabbed a ▮▮▮ class member around the waist and threw him head-first into the ground because the class member did not follow an order to stand on a line of a particular color, even though the class member told the officers he could not see colors due to his vision disability.  In the second case, an officer at RJD slammed the class member, who was restrained in handcuffs behind his back, to the ground when he momentarily paused an escort.  And in the third case, after an officer at SATF became upset at a class member for requesting the officer's name, the officer unnecessarily grabbed the class member and, when the class member attempted to pull away, picked him off his feet and slammed him to the ground.

The next three cases involve officers striking incarcerated people during cell extractions.  In the first two cases from COR, which address separate incidents involving the same class member, officers punched the class member in the head dozens of times when attempting to apply restraints.  The KVSP case involves an officer repeatedly striking the class member, who is in a mental health crisis and is curled in a defensive position, with a baton.  Though both incarcerated people resisted the application of restraints, neither were attempting to harm staff.  Accordingly, the gratuitous punches and strikes to the class members were all excessive, as they served no legitimate purpose for getting the class members into restraints.  In all three cases, the officers had the incarcerated person surrounded, had time on their side, and could have used strength and holds to ultimately effect custody of the class members.  Instead, the officers appear to have intended to inflict pain and suffering on the class members by striking them repeatedly.  The cases suggest that officers believe that a class member's refusal to submit to restraints gives them license to use whatever type of force they want.

### 1.      SATF-▮▮▮▮ – AIU, Sustained (Corrective Action)

In this case, an officer used unnecessary and excessive force on a class member with a vision disability, in part because the class member could not see well enough to follow officers' orders.  The use of force caused a significant head injury.  The CARU, however, only sustained an allegation that the officers failed to de-escalate the situation and issued corrective action.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

The entire incident occurred in less than 30 seconds. ▮▮▮▮▮ (▮▮▮▮▮ ▮▮▮▮) is walking on the track with a group of other incarcerated people. The track has two lines painted on it: an inner white line and an outer yellow line. Mr. ▮▮▮, who is legally blind and wearing a yellow disability vest, is walking on the yellow line instead of the white line that he was apparently supposed to be walking along. *See* BWC 1 at 10:32:46. Officer ▮▮▮, who is about 100 feet away from Mr. ▮▮▮, shouts to Mr. ▮▮▮ to "get on the white line," and Mr. ▮▮▮ responds, "I'm sorry? I don't see color." *Id.* Officer ▮▮▮ and several other officers then tell him to step to his right. Mr. ▮▮▮ keeps walking straight. Five officers then approach Mr. ▮▮▮, and Mr. ▮▮▮ stops walking about eight feet short of the officers. *See* AVSS at 10:33:00-20. The officers yell "get down" to Mr. ▮▮▮ several times, and he remains standing, repeating, "Do it." *See* BWC 1 (linked above) at 10:33:07. As the officers are yelling at Mr. ▮▮▮ to get down, one officer, Officer ▮▮▮ extends his baton, walks behind Mr. ▮▮▮ and places one of his hands on Mr. ▮▮▮ back. *Id.* at 10:33:13. Neither Officer ▮▮▮ nor any other officer orders Mr. ▮▮▮ to submit to handcuffs. Instead, without warning, Officer ▮▮▮ quickly grabs Mr. ▮▮▮ around the waist, picks him up several feet off the ground, and slams him head-first into the asphalt. *Id.* at 10:33:17. Mr. ▮▮▮ face and the ground are covered in blood. *See* BWC 2 at 10:33:42.



[4825674.1]

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**



Mr. ▮▮▮ suffered a serious laceration on his head that had to be glued shut. *See* Outpatient Progress Note at 1 dated July 7, 2024. CDCR found Mr. ▮▮▮ guilty of an RVR for Resisting Staff.[1] *See* Investigation Report at 8-9; RVR Paperwork at 85-87.

The CARU did not sustain allegations of unnecessary or excessive force against Officer ▮▮▮ but it did sustain allegations against all five officers (including Officer ▮▮▮) who were present for discourtesy (D1, 123456), negligent endangerment (D2, 123), and failure to observe and perform (D26, 12345). *See* 402/403 at 3, 7, 10, 13, 16. According to the 402, the CARU determined that each officer failed to use appropriate de-escalation techniques prior to using force. *Id.* at 2, 5, 8, 11, 14. The CARU imposed corrective action on all five officers.

The CARU should have sustained allegations for unnecessary and excessive force against Officer ▮▮▮. Officer ▮▮▮ did not even verbally order Mr. ▮▮▮ to submit to handcuffs. Instead, he immediately bear-hugged him from behind and slammed him to the ground. Although Mr. ▮▮▮ was not compliant with officers' orders being yelled in his face, he did not present an imminent threat by merely standing on the track,

---

[1] Although Mr. ▮▮▮ was blind and being ordered to comply with visual cues, which led to this incident, the questions on the RVR form about whether the incarcerated person's disability contributed to incident are marked "N/A" or "No." *See* RVR Paperwork at 85.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

surrounded by five officers. Even more glaring, the force was clearly excessive. Grabbing and picking up an elderly blind man (who had announced that he had a vision disability and was wearing a vision disability vest) and slamming his head into the concrete because he was a few steps out-of-bounds was objectively more force than was necessary. Had the CARU applied correct disciplinary matrix categories, Officer ███ would—and should—have been issued a more significant penalty (L2, Unnecessary use of force causing injury, 4**5**6789; L5, Excessive use of force causing injury, 4**5**6789). *See* Employee Disciplinary Matrix.

Putting aside the failure to sustain a use-of-force violation, the penalty for Officer ███ was inappropriate. While the CARU correctly identified and held accountable the four other officers who failed to use de-escalation techniques, Officer ███ should not have received the same consequences (corrective action) as those officers. Officer ███ actions were dangerous and resulted in injury, and his discipline should have reflected the seriousness of his misconduct.

### 2. RJD-███ – AIU, Not Sustained

In this case, the CARU failed to sustain any policy violations even though a sergeant failed to deescalate a conflict with a class member about housing safety concerns and then used unnecessary and excessive force to slam the class member to the ground while he was handcuffed.

According to ███████ (███████) 602, he did not feel safe accepting housing with a new assigned cellmate who refused to accept him. He requested that staff place him in administrative segregation. *See* 602 at 4-5. Video shows Sergeant ███ approaching the housing unit. The control booth officer, who is speaking through the window from the control booth to outside of the housing unit, tells Sergeant ███ that Mr. ███ is ready to go to administrative segregation. Sergeant ███ says "I don't give a fuck" and enters the building. *See* BWC 1 at 21:06:27; BWC 2 at 21:06:27. Before even reaching Mr. ███ Sergeant ███ has a set of handcuffs in his hands. Sergeant ███ walks aggressively toward Mr. ███ and angrily orders him three times in quick succession to "turn around." Without saying anything to Sergeant ███ Mr. ███ complies. Sergeant ███ applies the handcuffs. Sergeant ███ asks another officer where Mr. ███ cell is and then, once he knows the location (cell 224), begins escorting Mr. ███ towards the stairway. When they reach the stairway, Mr. ███ uses his leg to halt the escort by pushing against the bottom step. Sergeant ███ then immediately slams Mr. ███ to the ground, sending Mr. ███ glasses flying and causing abrasions and redness on his face. *See* BWC 3 at 21:07:04; AVSS at 21:07:04. Mr. ███ later complained of a head injury as well. *See* Primary and Secondary Assessment at 1-2 dated December 9, 2023; First Medical Responder Note at 1 dated December 9, 2023.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

Sergent ████ conduct before the use of force and the use of force itself violated policy. The CARU, however, did not sustain any policy violations. *See* Closure Memo at 1.

Before the force, Sergeant ████ knew that Mr. ████ was unwilling to accept his current housing assignment because of safety concerns regarding his cellmate. Sergeant ████ could have attempted to discuss the issue with Mr. ████ before deciding to escort him toward his cell; could have placed him in administrative segregation, as Mr. ████ requested; or could have threatened an RVR for refusing housing. Instead, Sergeant ████ chose the most confrontational approach, which involved aggressively cuffing Mr. ████ without any discussion and then immediately escorting him toward the cell he felt unsafe entering. *See* DOM § 51020.5 ("Wherever possible, verbal persuasion should be attempted in an effort to mitigate the need for force."); Investigation Report at 8 (Sergeant ████ acknowledging that CDCR policy requires de-escalation and that officers should have a "minimum reliance on force" and use "verbal persuasion and 'verbal judo' over physical intervention").

The use of force itself was excessive. An officer uses excessive force if they use "more force than is objectively reasonable to accomplish a lawful purpose." *See* DOM § 51020.4. Here, the amount of force that Sergeant ████ used was unreasonable for accomplishing any lawful purpose. When Mr. ████ used his foot to halt the escort, Sergeant ████ could have paused the escort and given Mr. ████ instructions to continue up the stairs. He could have requested that the two officers who were trailing him provide assistance with the escort. But he did none of those things and instead dangerously slammed Mr. ████ who was cuffed, to the ground.

The use of force was potentially also unnecessary. In Sergeant ████ incident report, he claimed that he used force because he did not "know[] [Mr. ████] intention and fear[ed] ████ would batter" him. *See* Incident Report at 33. Sergeant ████ explanation does not hold up under scrutiny, as it would give him license to body slam any incarcerated person who is handcuffed and who stops an escort. Mr. ████ did not push back off of the stairs into Sergeant ████ body. He simply stopped the forward progress of the escort. As a result, this case is no different than the many others Plaintiffs have discussed in which officers use small movements by incarcerated people during escorts as inadequate justification for serious uses of force.[2]

---

[2] The IERC completed its review of the use of force prior to Mr. ████ filing a staff complaint. The IERC found that this use-of-force did not violate policy. *See* IERC at 2, 3, 4, 6, 7.

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

3.    SATF-███████ – AIU, Not Sustained

In this case, the CARU failed to sustain an allegation of unnecessary and excessive force even though video shows an officer rapidly escalating a verbal dispute into a violent physical takedown. ██████████ (█████████) approaches the officer podium during medication pass and requests Officer ████████████████ name. *See* BWC 1 at 20:32:27; BWC 2 at 20:32:27. Officer ███████████ refuses to give his name to Mr. █████ and instead orders him to return to his section of the housing unit. *Id.* When Mr. █████ continues to ask for Officer ████████'s name, Officer ████████ approaches Mr. █████ and grabs his arm to "escort" him away while warning him not to resist. *Id.* at 8:32:41. As Officer █████████ grabs Mr. █████ arm, Mr. █████ tells Officer ████████, "I'm not a threat to you, bro." Mr. █████ stops walking and tells Officer ████████████ several times to get his hands off of him. Officer █████████████ then lifts Mr. █████'s body and slams him to the ground. *Id.* at 20:32:54; *see also* AVSS from 20:32:30 to 20:32:58. The entire incident—from the first request for the officer's name to the body slam—takes place over about 30 seconds. Mr. █████ was found guilty of an RVR for willfully resisting a Peace Officer in the performance of duties, and lost, *inter alia*, 90 days of credits.

The force in this case was both unnecessary and excessive. Initially, Officer ███████████ failed to use required verbal de-escalation techniques before initiating force. *See* 15 C.C.R § 3268(b)(1); DOM § 51020.5. If Officer ██████████ had simply told Mr. █████ his name, the entire situation could have been avoided. After refusing to provide his name, Officer █████████ was not justified in using force because Mr. █████ did not pose an imminent threat. *See* 15 C.C.R. § 3268(4); DOM § 51020.4. Mr. █████ was not being aggressive, he was generally moving in the direction that he was being ordered to move in, and a second officer had arrived to help Officer █████████ continue the escort.

Officer ████████████ also used "more force than is objectively reasonable to accomplish a lawful purpose." *See* 15 C.C.R § 3268(a)(3); DOM § 51020.4. Mr. █████ is a relatively small person, and Officer ████████████ picked him up by the waist, hoisted both of his feet off the ground, and slammed him into the concrete. The force was dangerous and unsafe. Nevertheless, the Hiring Authority did not sustain any allegations related to this incident. *See* 402/403 at 1.

**CDCR should immediately rescind and/or dismiss the RVR issued to Mr. █████ for this incident and remove all related consequences from his custodial records, including the loss of credits.**

The AIU also wasted resources by partially investigating this incident twice. Initially, Mr. █████ filed a 602 which resulted in opening AASTS investigation ████████ (the number for the instant case). He later made an oral report of misconduct

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

to a lieutenant, which the lieutenant forward to the CST. That report resulted in opening a separate investigation with AASTS number ███████. The second investigation was assigned to a different investigator, who proceeded to gather and review documents and to write a partial investigation report before realizing the existence of duplicative investigations and ending the second one. *See* AIU Report Exhibit at 91-93. Had the AIU recognized the second case as a duplicate, the second investigator would not have wasted time investigating this case.

### 4.    COR-███████, COR-███████ – AIU, Not Sustained

In these two cases, officers used extraordinary amounts of excessive force—including repeated, gratuitous head strikes—against ██████████ (██████████ ███████) during two different cell extractions that occurred about two weeks apart. The force used was far more than a reasonable officer would have used to accomplish the lawful objective of restraining and removing Mr. ███████ from the cell. Nevertheless, the Hiring Authority did not sustain any allegations of excessive use of force. That CDCR failed to hold any officers accountable for excessive beatings they applied to Mr. ███████ is a serious failure and reflects cultural use-of-force problems.

In COR-███████, officers conducted a cell extraction of Mr. ███████ related to Mr. ███████ lighting a fire in his cell. When officers open the door, Mr. ███████ charges at them. Many officers then force him back on the bed in the cell and surround him. Officer ███████ then proceeds to strike Mr. ███████ in the head many times. *See* BWC 1 at 18:59:25-19:00:25; BWC 2 at 18:59:25-19:00:25; BWC 3 at 18:59:25-19:00:25. Mr. ███████ does not appear to try to harm any of the officers. The officers eventually restrain him and remove him from the cell. Medical records show that Mr. ███████ had suffered serious, visible head injuries, though he refused treatment. *See* Progress Note, Aug. 25, 2024; Refusal of Examination, Aug. 25, 2024; Primary and Secondary Evaluation, Aug. 25, 2024.

In COR-███████, a large group of officers conducted an emergency cell extraction because Mr. ███████ had covered the windows of his cell. When officers open the cell door, Mr. ███████ charges at them. *See* AVSS at 00:31 (on the video player). Many officers take him to the ground and pile on top of him. Mr. ███████ does resist the placing of restraints on his wrists, but does not appear to take any offensive action toward the officers. Multiple officers proceed to punch Mr. ███████ repeatedly in the head over the course of more than a minute, while Mr. ███████ yells, "Keep hitting me!" *See* BWC 1 at 20:17:23-20:20:00; BWC 2 at 20:17:27-20:18:40. After a lengthy struggle, officers ultimately restrain Mr. ███████ with handcuffs and leg restraints and strap him to a gurney.

The head strikes and punches to other areas of Mr. ███████ body in these cases were all excessive. In both incidents, officers were authorized to use some force to get Mr. ███████ out of the cell and into restraints. But in both cases, after Mr. ███████

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

original charge toward the officers, the officers had Mr. ███████ surrounded and partially controlled. At that point, Mr. ██████ was not threatening the officers. Officers had time on their side and could wear Mr. ██████ down with pressure, strength, and holds. Striking him with punches, especially punches to the head, endangered Mr. █████ without furthering their goal of restraining Mr. ██████ The punches were therefore gratuitous and appear intended to hurt Mr. █████ These types of incidents—with multiple officers using force, including head strikes, to try to restrain an incarcerated person—can be incredibly dangerous.

The failure to hold any staff accountable in these cases suggests that CDCR approves of this gratuitous, dangerous violence against incarcerated people. And it sends a signal to officers that, when restraining an incarcerated person, they can strike the person in the head with impunity.[3] CDCR must take steps to address this entrenched cultural problem regarding use of force.

As Plaintiffs have previously written, CDCR should, update its policies and trainings to allow head strikes only when an officer has a reasonable fear that the force is necessary to prevent serious bodily injury or death, as the New York City Jail system has done. *See* Directive 5006R-D, Use of Force, at 2 ("The Department strictly prohibits the use of high impact force, including: (1) Strikes or blows to the head, face, groin, neck, kidneys, and spinal column," with exception for situations "where a Staff Member or other person is in imminent danger of serious bodily injury or death, and where lesser means are impractical or ineffective …").

In addition, the concentration of these incidents in one unit at COR reflects a dangerous culture about which our clients have frequently reported. Plaintiffs' counsel have heard additional reports from ██████ regarding retaliatory uses of force in the unit, including uses of force where officers use head strikes.

---

[3] Plaintiffs reviewed an additional case from this quarter, COR-████████, in which officers in the same housing unit ████ (an ████████) struck an incarcerated person in the head during two separate uses of force. In the first incident, six officers are escorting ████████████ (████████████), who is handcuffed behind his back. Mr. ██████ attempts to kick an officer. A different officer then strikes Mr. ██████ in the chin or neck with significant force as officers are taking Mr. ██████ to the ground. *See* BWC at 13:35:10. A group of officers then escort Mr. ██████ to another part of the building for a medical evaluation. Mr. ██████ who is seated in a chair and is now also in leg restraints, lunges toward an officer. As a different officer pulls Mr. ██████ away and brings him to the ground, that officer appears to strike or attempt to strike Mr. ██████ in the head or neck. *See* AVSS at :14 (time stamp of video player).

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS



> **5.    KVSP-███████ – AIU, Not Sustained**

In this case, officers used unnecessary and excessive force when they failed to comply with a class member's cuffing accommodation when extracting him from a cell. The CARU did not, however, hold the officers accountable for their misconduct.

On August 19, 2024, mental health staff determined the need for an immediate cell entry in order to transfer ███████ (███████████████████████) to a ██████ based on their assessment he posed a danger to himself. Mental health staff noted he suffered from a psychotic break "that significantly affects his ability to under [sic] request/commands and to follow directions" and an "inability to communicate effectively." *See* Mental Health Form 195-196.

Video shows four officers in protective gear approaching Mr. ██████ cell. Officer ██████ who is closest to the door and is holding a shield, tells Mr. ██████ to "Go ahead and hit the wall and then turn around and put your hands behind your back. We'll get you out." *See* BWC 1 at 15:15:30. Mr. ██████ can be seen through the window standing calmly, facing the officers with his hands held out in front of him as if submitting his hands for cuffing. Mr. ██████ appears to say something to Officer ██████ that cannot be heard on the video. He can also be seen through the window showing his wrists to the officers. *See* BWC 1 (linked above) at 15:15:45. In his September 14, 2024 use-of-force interview, Mr. ██████ stated, "All I wanted to do was to get cuffed, shackled, but they didn't respect the chrono so they came in and assaulted me ... with a baton." *See* ██████ UOF Interview at 1:49. At the time of the incident, Mr. ██████ had a chrono which required that staff cuff him in front of his body using waist restraints, rather than behind his back, due to prior left wrist surgery. *See* August 2024 SOMS roster ("Cuffing accommodation in front with waist chains because of Left Wrist prior surgery with metal hardware").

Officer ██████ still outside the cell, then tells Mr. ██████ "Go ahead and go behind. Go ahead and step back then." *See* BWC 1 (linked above) at 15:15:42. Officer ██████ statement appears to be in response to something that Mr. ██████ said that cannot be heard on the video or to Mr. ██████ gestures through the window. Mr. ██████ continues to stand quietly and calmly in the same position with his hands together in front of him as if submitting to handcuffs in front of his body.

The extraction team proceeds to open the cell door. Mr. ██████ still has his hands together in front of him. The officers rush into the cell, leading with the shield and with batons drawn. Mr. ██████ crouches to the ground in a defensive position, covering his head with his hands. Officer scream at him to "stop resisting." Officer ██████ then strikes Mr. ██████ several times with the baton. *See* BWC 1 (linked above), for example, at 15:16:11, 15:16:12; BWC 2 at 15:16:01; 15:17:28. Officers placed leg restraints on Mr. ██████ and place the two handcuffs of the waist restraint on Mr. ██████ Mr. ██████ resists, to some extent, the officer's attempts to secure the

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

waist chains by bringing his arms in close to his chest. Officer ███ strikes Mr. ███ additional times with the baton. Ultimately, officers secure the waist chains, remove him from the cell, and place him on a gurney. The IERC noted a total of 11 baton strikes. *See* 3035 at 1. Mr. ███ had an abrasion on his shin following the incident. *See* 7219 at 141.

This use of force was unnecessary and excessive. Although a cell extraction had been authorized, it appears from the video that there was an opportunity to avoid force if the officers had accommodated Mr. ███ disability by cuffing him in front of his body, rather than by insisting he turn around to submit to cuffs behind his back. Given Mr. ███ gestures prior to opening the cell door, it appears that he was calm and was attempting to submit to handcuffs, albeit in the front of his body. It does not appear that officers ever asked Mr. ███ to submit his hands in front of his body through the tray slot. None of the officers acknowledge Mr. ███ apparent gesture and possible verbal request for and entitlement to the accommodation of front cuffing. Officer ███ repeatedly ordered Mr. ███ to submit to cuffing behind his back. The failure to address Mr. ███ documented disability accommodation requirements was therefore a cause of this potentially unnecessary use of force.

Officer ███ eleven baton strikes were also excessive, as they were more force than is objectively reasonable to accomplish the lawful objective of placing Mr. ███ in restraints. Once the officers entered the cell, Mr. ███ was not trying to harm the officers or himself. He was, at times, curled up in a ball or holding his arms close to his body in an effort to protect himself and, it appears, because he was scared. As a result, officers had time on their side and could have used much less dangerous forms of force— namely physical strength and holds—to put pressure on Mr. ███ until they could apply the waist restraints. There was no need to endanger Mr. ███ by using a baton, which is a more dangerous form of force than physical holds and strength. This is especially true considering that the entire purpose of removing Mr. ███ from the cell was because he was suffering in mental health crisis and needed additional care to help him. In addition, the fact that Officer ███ struck Mr. ███ 11 times suggests that it was an ineffective form of force.

Statements in Officer ███ incident report and his AIU interview reflect a dangerous misunderstanding that CDCR's use-of-force policies permit baton strikes in circumstances like this case. In his incident report submitted on the date of the incident, Officers ███ claimed that he used force because Mr. ███ was "violently kicking his legs." *See* Incident Report at 124. However, Officer ███ authored a supplemental report after watching his body-worn camera footage and removed statements regarding Mr. ███ kicking his legs at staff. *See* Incident Report at 126. Instead, he noted that Mr. ███ was resisting staff by "enter[ing] a defensive position on the ground by crouching his body and lifting his hands by his head and facial areas." *Id.* Officer ███ claimed he utilized his baton "to gain compliance with a lawful order, effect custody, and

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

fearing that ▓▓▓▓ was going to strike Officer ▓▓▓▓ with his right fist or right foot …" *Id.* But offensive baton strikes, when Mr. ▓▓▓▓ was not threatening officers or himself, are not reasonable and therefore are excessive.

Even more troublingly, in Officer ▓▓▓▓ August 14, 2025 investigation interview (nearly one year after the August 19, 2024 incident), he stated he "utilized the baton because he was assigned to [sic] baton and that was the use of force he had ready to use. At the time of incident, ▓▓▓▓ did not think about utilizing any other force options." *See* Investigation Report at 11. This is a shocking statement for an officer to make to an investigator, and shows a profound lack of understanding of CDCR's use-of-force policies. It suggests that Officer ▓▓▓▓ believes he can use a baton any time that force is authorized so long as he has been assigned the baton or has a baton in his hand. But this statement does not reflect policy or the law. CDCR policy only permits him to use a baton if so doing would be reasonable to accomplish a lawful objective.[4]

Lastly, CDCR improperly issued Mr. ▓▓▓▓ an RVR for Willfully Resisting a Peace Officer in the Performance of Duties. *See* Incident Report at 118. The RVR Mental Health Assessment (MHA), which found that "mental health factors substantively and negatively impacted IP's judgment and behavior," also notes that "this incident on 8/19/24 occurred in connection with a cell extraction for transfer of the patient to a mental health inpatient unit, specifically to mental health crisis bed (MHCB)." *See* 08-26-2024 RVR MHA at 2. CDCR policy prohibits the issuance of RVRs for behavior that "occurred in connection with a cell extraction for transfer of the inmate to a mental health inpatient unit or between mental health inpatient units." *See* 2021 Program Guide, ECF 7333-1, at 4. **CDCR should immediately rescind and/or dismiss the RVR issued to Mr. ▓▓▓▓ for this incident and remove all related consequences from his custodial records.**

## II.    INVESTIGATORS FAILED TO CONDUCT COMPREHENSIVE AND UNBIASED INVESTIGATIONS

Plaintiffs continue to identify numerous cases every quarter where Defendants' investigators fail to conduct "comprehensive and unbiased investigations and ensure all relevant evidence is gathered and reviewed," including video evidence that likely would

---

[4] There are serious questions regarding why CDCR officers use batons at all for cell extractions. Plaintiffs' use-of-force expert has indicated that batons are generally for use in larger areas to extend an officer's reach (*e.g.*, on a yard). He further indicated that in the jurisdiction where he worked and helped to develop use-of-force policies, it was practice not to even bring weapons into cell extractions because they were, almost by definition, excessive for that purpose.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

have resolved whether the alleged misconduct occurred.  RJD Remedial Plan, § II.B; Five Prisons Remedial Plan, § II.B; *see also* Dkt. 3060, ¶ 5.c; Dkt. 3218, ¶ 5.c.



### 1.    RJD-████ – AIU, Not Sustained

In this case, two officers threw an *Armstrong* class member to the ground during an escort when he did not present any threat.  The officers then submitted incident reports with false claims about the class member's conduct.  The Hiring Authority, however, did not sustain any allegations related to the use of force and did not consider any allegations related to the false incident reports.  In addition, the investigator failed to conduct a comprehensive investigation into the allegation that the use of force was retaliatory, even though the suspicious circumstances of the use of force and other evidence supported that claim.

████ (████) alleged that on June 28, 2024, Officers ████ and ████ assaulted him in retaliation for "an incident that had taken place a prior day w[h]ere I was involve[d] in a scuffle with" a third, unnamed officer.  *See* Attachments at 6.  There is no video or any other information about this previous incident in the investigation file.

Prior to the use of force at issue, Mr. ████ is in a room in the ████.  *See* AIU Report at 21.  Officer ████ is with Mr. ████  Meanwhile, Officers ████ and ████ are at the officer station in ████.  *See* BWC 1 at 12:16:12.  Officer ████ says to Captain ████ "Want us to get him back?"  Captain ████ asks, "Is he ready?"  Officer ████ then says, "If he's ready, we'll bring him back."

Officers ████ and ████ then walk from ████ to the ████ and stand outside the room where Mr. ████ and Officer ████ are located.  *See* BWC 1 (linked above) at 12:17:15.  Right as Mr. ████ and Officer ████ are leaving the room, Officer ████ says to Officer ████, at a very quiet volume, "Ready?"  *See* BWC 2 at 12:17:40.  The two officers then catch up to Officer ████ and Mr. ████, who are a few steps ahead of them.  Officer ████ indicates that he and Officer ████ were sent to "relieve" Officer ████.  *See* BWC 1 (linked above) at 12:18:00.  Officer ████ and Officer ████ take over the escort and walk with Mr. ████ from the ████ to ████.

Once Mr. ████ Officer ████, and Officer ████ are inside ████, Officer Giroud tells Mr. ████ that he is being moved to cell 250, instead of cell 247 where he was previously housed.  *See* AIU Report at 23.  In response, Mr. ████ states "no, I'm not going there."  *See* BWC 1 (linked above) at 12:18:55.

A few seconds later, Officers ████ and ████ violently force Mr. ████ forward to the ground, slamming his head into the floor in the process.  *See* AVSS at

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

12:18:57. In the split second before the use of force, Mr. ███████ shoulders move upward slightly, though it is unclear whether he initiated that movement or the officers did so by pulling on his arms. Mr. ███████ does not appear to make any other movements with his body. The officers fall on top of Mr. ███████ sound a code, and then place leg restraints on Mr. ███████ with the assistance of other officers. After the incident, Mr. ███████ reported that staff returned him to his original cell, 247, rather than to cell 250 (as they had previously indicated they were going to do). *See* AIU Report at 18.

After an AIU investigation, the Hiring Authority (the acting warden at RJD) did not sustain any allegations. *See* Closure Documents at 1.

The Hiring Authority should have sustained the use-of-force allegations. The AVSS and BWC footage does not show that Mr. ███████ presented any threat, let alone an imminent threat that would justify an immediate use of force. *See* DOM § 51020.4. Mr. ███████ is walking with the escort when the officers, without any warning, throw him to the ground. Even if he did shrug his shoulders, that movement did not represent an imminent threat authorizing the officers to use force. Because there was no imminent threat, the use-of-force violated policy.[5]

In addition, the Hiring Authority should have, but did not, consider allegations that the officers submitted false incident reports. Officer ███████ wrote in his incident report that Mr. ███████ "attempted to resist the escort by planting his foot and turning toward Officer ███████." *See* Incident Report at 29. Officer ███████ claimed in his incident report that Mr. ███████ "dropped his weight, planted his foot, and turned towards me while raising his right arm." *See* Incident Report at 30. The footage, however, does not show any of those actions occurring.

Lastly, the investigation into Mr. ███████ allegation that the force was retaliatory was incomplete in ways that potentially shielded the officers from accountability. As explained below, there was substantial evidence supporting Mr. ███████ retaliation allegation. Given that evidence, it was incumbent on the investigator to turn over every stone. Instead, the investigator conducted a perfunctory investigation in which he failed to attempt to gather all of the available evidence that could have shed light on whether the misconduct was retaliatory.

The most damning evidence of retaliation is the video itself, which does not show any behavior by Mr. ███████ that could justify the force. The video therefore suggests that the officers used force against Mr. ███████ for some other reason, such as retaliation. The investigator should have used the video in the interview to force the

---

[5] The IERC, which completed its review before the AIU investigation, also failed to find any policy violations. *See* IERC at 3, 4, 5, 11, 12.

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

officers to explain, on a second-by-second basis, why they used force and to question the officers about the inconsistencies between the video and the incident reports. During the interviews with the officers, however, the investigator did not show the officers the video and did not push back on their false narratives regarding what occurred.

The investigator also failed to adequately explore why the officers relieved Officer ███ from escorting Mr. █████████ In their interviews, the two officers and Captain ██████ all stated that Captain ██████ ordered the officers to escort Mr. ████████ because he required a two-person escort. *See* AIU Report at 19-20, 21, 23. That explanation does not make sense. On the BWC, the officers state to Officer ████ that they were ordered to "relieve" him. But if the goal was to have two officers escort Mr. ████████ why did Captain ████ order both Officer ██████ and Officer █████████ to escort Mr. ███████ rather than simply order one of them to escort Mr. ████████ with Officer ██████ who was already with Mr. █████████ In addition, Mr. █████████ must have been escorted to the medical building before this incident occurred. The investigator could have obtained video of that escort (or other prior escorts) or interviewed Officer ████ to determine if, in fact, there was any evidence that Mr. ███████ had previously been escorted by two officers or whether the double escort in this instance was potentially a pretext. Instead, the investigator did not probe this issue at all and accepted at face value the officers' unsatisfying explanation for why they relieved Officer █████

Relatedly, the investigator did not ask the officers any questions about when Officer ████████ asked Officer █████ if he was "ready" right before taking over the escort. That statement, especially the way Officer ██████████ whispered it, was suspicious. Perhaps Officer ██████████ was asking only whether Officer ████████ was ready for the escort, but perhaps he was asking whether he was ready to follow through with their plan to retaliate against Mr. ████████. Since the investigator did not ask any questions about it, the case file is devoid of any explanation or clarification about that important moment.

The issue of Mr. █████████ cell assignment was also suspicious and insufficiently explored. Mr. ███████ claimed that, once the incident was over, he was taken to cell 247 (his original cell), rather than cell 250 (the cell the officers stated they were going to take him to in the seconds prior to the use of force). If that was true, it would support Mr. ████████ contention that the officers threatened a false cell move (from 247 to 250) to potentially upset Mr. █████████ and to provide cover for a use of force. In fact, both officers' incident reports tie the use of force to Mr. ███████ getting upset over the cell move.[6] And the use of force occurs a few seconds after officers mention the cell

---

[6] Officer ██████████ "Officer █████████ informed him that he would be relocated to cell 250. In response, Inmate ███████ immediately stated, 'I'm not going to cell 250,' and without provocation, attempted to resist the escort by planting his foot and turning towards Officer ██████ *See* Incident Report at 29.

[4825674.1]

14

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

move. If, instead, housing unit staff had actually initiated the cell move (as claimed by Officers ▮▮▮ and ▮▮▮ but not supported by any video), that would serve as exculpatory evidence. The investigator, however, did nothing to investigate this question, such as interviewing housing unit staff or obtaining their BWC footage.

The investigator also did nothing to establish what, if any, prior incident was the source of the alleged retaliation. Mr. ▮▮▮ claimed that he got into a "scuffle" with an officer in the days prior to the use of force. Officer ▮▮▮ indicated in his interview that the purported need for a double escort was because of an incident that had occurred the prior day. *See* ▮▮▮ AIU Interview at 19:15. If such an incident had occurred, there would be an incident report. Yet the file is devoid of any information about a prior incident or any efforts by the investigator to find that information.

Each of these unexplored investigatory avenues would have provided useful information regarding whether Mr. ▮▮▮ retaliation allegation was true. Of course, it is possible that, even if the investigator had pursued these leads, the evidence would either have exonerated the officers or have been inadequate to support sustaining the allegation. By not even attempting to discover this relevant information, the investigator ensured that the truth would not be uncovered and that if the officers did retaliate against Mr. ▮▮▮ they would not be held accountable, including through potential criminal prosecution.

### 2.   LAC-▮▮▮ – AIU, Not Sustained

In this case, LAC staff housed two incarcerated people with lower bunk chronos in the same cell, including a class member with mobility disabilities, ▮▮▮ (▮▮▮). Mr. ▮▮▮ advised an officer about the issue and asked to be moved. Six days later, while still housed in the same cell, he fell from the top bunk and injured his head. The investigator failed to adequately investigate the allegation by leaving unchallenged the officer's claims that he attempted to find the class member a new accessible bed before the fall. Despite those failures, the CARU did not send the case back for further investigation.

LAC issued Mr. ▮▮▮ a lower bunk, lower tier chrono on December 26, 2024. *See* DPP Accommodation Chrono at 11. On January 24, 2025, LAC moved Mr. ▮▮▮ to cell 145 and assigned him to the bottom bunk. *See* Facility ▮ Bed History at 13. As of that date, ▮▮▮ (▮▮▮) was assigned to the upper bunk in that cell. *Id.* However, LAC had issued Mr. ▮▮▮ a disability accommodation of a lower bunk on

---

Officer ▮▮▮ "As we informed inmate ▮▮▮ of his relocation to cell 250, he unexpectedly refused to comply, stating, 'I'm not going to cell 250.' In an attempt to resist the escort, he dropped his weight, planted his foot, and turned towards me while raising his right arm." *See* Incident Report at 30.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

December 24, 2024, though it had never reassigned him to a lower bunk. *See* Facility █ Bed History at 15. As a result, two people with lower bunk accommodations were housed in the same cell beginning on January 24, 2025, when Mr. █ moved in. According to Mr. █ 602 and interview, he took the upper bunk because he does not like confrontation and Mr. █ was older and had a hernia. *See* 602 at 6; AIU Report at 8.

On February 17, 2025, Mr. █ approached Officer █ in his housing unit to advise that he and his cellmate both had lower bunk, lower tier chronos. *See* BWC 1 at 8:39:10. Officer █ indicated that he would take care of the situation that day.[7] In the remainder of the video produced to Plaintiffs, Officer █ does nothing to address the problem of having two people with lower bunk chronos in the same cell.

Mr. █ and Mr. █ remained in the cell. Six days later, Mr. █ sustained a serious head injury that he claims occurred when he fell from or was getting down from the top bunk. Video shows Mr. █ holding a blood-stained t-shirt, telling Officer █ that he split his head open while coming down from the top bunk. *See* BWC 2 at 16:09; AIU Report at 4-5, 7. Mr. █ received six staples in his head following the incident and was diagnosed with a concussion. *See* Medical Record at 115, 118. LAC moved Mr. █ to a new cell shortly after the fall. *See* Facility █ Bed History at 13.

The investigation into this serious allegation of a failure to accommodate a disability was not comprehensive. The available evidence indicates that, even though Mr. █ put Officer █ on notice of the failure to accommodate his housing needs, Mr. █ remained in the unsafe assignment until he sustained a serious head injury from being housed inappropriately. That evidence strongly suggests that Officer █ violated policy requiring that staff accommodate people with disabilities. In order to complete the investigation, however, the investigator needed to address Officer █ claim that he attempted to rehouse Mr. █ and Mr. █ between February 17 and February 23. Specifically, Officer █ claimed that he offered Mr. █ numerous

---

[7] The investigator buried the description of this interaction in the investigation report. The report first states that the investigator first reviewed Officer █ BWC from 7:15-8:45 a.m. on February 17, 2025 and concluded there was no interaction between Mr. █ and Officer █ *See* Investigation Report. at 9. However, after Officer █ insisted that he spoke with Mr. █ about his bed assignment, the investigator re-reviewed the video and discovered the interaction that occurred at around 8:39 a.m. The investigator discussed this crucial piece of evidence in a short "investigator's note" sandwiched between two subject interviews, two pages after the investigator first concluded that the video showed no interaction between Officer █ and Mr. █ *Id.* at 11. The investigator should have simply identified the relevant footage for the CARU, rather than including two contradictory statements about the same footage.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

different lower bunk housing assignments, but that Mr. ▮▮▮▮ rejected them. *See* AIU Report at 10-11. The investigator failed to take any action to prove or disprove this crucial fact. The investigator did not interview Officer ▮▮▮ until June 9, 2025, outside of the 90-day retention period, despite being assigned to the case on March 17, 2025. *See* AIU Report at 9. The delay made it impossible to request additional footage to verify Officer ▮▮▮ claims that he offered Mr. ▮▮▮ accessible housing. The investigator also did not ask Mr. ▮▮▮ (or his cellmate) about Officer ▮▮▮ claims, as the investigator completed the interview with Mr. ▮▮▮ prior to interviewing Officer ▮▮▮ and did not reinterview them once he gathered information from Officer ▮▮▮. Officer  ▮▮▮ also claimed that he advised the second watch sergeant on February 17 about his attempts to find a new cell for either Mr. ▮▮▮ or Mr. ▮▮▮. *See* AIU Report at 11. The investigator did not take any steps to identify (beyond asking Officer ▮▮▮ if he remembered the sergeant's name four months later) or interview the sergeant to confirm Officer ▮▮▮ claims and, as discussed above, waited too long to obtain video of the alleged interaction.

Given the incomplete investigation, the CARU incorrectly found that the investigation was adequate. *See* Closure Memo at 1. Before resolving the case, the CARU should have sent the investigation back to AIU for the additional investigation necessary to confirm or disprove Officer ▮▮▮ claims.

### 3.     LAC-▮▮▮▮ – AIU, Not Sustained

This case involved a flawed investigation into a serious allegation. Class member ▮▮▮▮▮ (▮▮▮▮▮▮▮▮) alleged that on August 23, 2024, Sergeant ▮▮▮▮ organized a fight between two incarcerated people. *See* 602 at 3. The AIU investigator was assigned to the case on September 6, 2024, 14 days after the incident. The investigator interviewed Mr. ▮▮▮ on October 2, 2024, 40 days after the incident. During the interview, Mr. ▮▮▮ reported that at around 7:00 a.m. on August 23, 2024 (the same date reported in the 602), Sergeant ▮▮▮ said "if you guys are going to fight, then take it outside" to two incarcerated people who were fighting, rather than attempting to stop the fight. *See* AIU Report at 4.

Despite obtaining this information about the incident date and time from both the 602 and the interview, the investigator did not request any video. Instead, the investigator claimed in their investigation report that BWC and AVSS "were not available for review due to incarcerated Person ▮▮▮ not being able to identify a specific time or date of said allegation." *See* AIU Report at 2. That statement is contradicted by the 602 and the interview summary in the report.

In addition, the investigator failed to obtain potentially relevant footage from the unit despite being on notice of it. Specifically, the investigator found an incident report from August 23, 2024, in Mr. ▮▮▮ housing unit stating that two incarcerated people fought at around 12:21 p.m. *See* AIU Report at 2; Incident Report at 7. Given the

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

similarities to the allegations in Mr. ▬▬ 602, the investigator should have at least reviewed that video and asked Mr. ▬▬ about whether the fight in fact occurred around 12:00 p.m. rather than around 7:00 a.m. The investigator appeared to justify failing to review the incident video because Sergeant ▬▬ was "not involved" in the incident, but whether Sergeant ▬▬ responded to the incident is a different question than whether she encouraged or condoned the fight.

The investigator's inexcusable failure to obtain video made it impossible to confirm whether misconduct occurred.

The investigator also made other serious investigative errors. Despite interviewing Mr. ▬▬ in October 2024, the investigator did not interview Sergeant ▬▬ until August 17, 2025, almost a full year after the incident. The investigator also interviewed two incarcerated people—not identified as witnesses by the claimant—in August 2025. The investigator offered no explanation for these lengthy delays, during which memories likely faded.

Despite the investigator's failure to obtain video and provably false justification for doing so, the CARU closed the case without requesting additional investigation from the AIU. *See* Closure Memo at 1.

### 4. Failures to Obtain Relevant Video Evidence

Plaintiffs' counsel continue to identify a number of cases each quarter where video essential to the investigation was not retained. Despite CDCR policy that requires investigators to preserve footage within 10 days of the case being assigned, problems persist. *See* AIU Investigative Workflow; LDI Memo. Defendants are now piloting a Central Intake Triage Team within the AIU that is responsible for requesting and collecting video footage within five days. Plaintiff's counsel acknowledge this positive development. Plaintiffs will continue to monitor this issue.

### (a)   RJD-▬▬

A class member alleged that, on August 26, 2024, at around dinner time, two officers identified by name harassed him in retaliation for previously filing a grievance against one of the officers. The class member filed a grievance about the retaliation on that same day. *See* 602 at 3-4. The investigation was assigned to the AIU on August 31, 2024, but was not assigned by the AIU Southern Region to an investigator until January 17, 2025. As a result of the delay in assignment, the BWC footage of the interaction between the class member and the officers was destroyed before the investigator could request it. *See* Investigation Report at 2.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

**(b)     RJD-**▮▮▮▮

A class member, in a grievance filed on February 3, 2024, made a very serious allegation that on that same day an officer endangered the class member by disclosing the class member's disfavored commitment offense to other incarcerated people. *See* 602 at 5. For reasons not clear in the case file, this allegation that falls on the ADI (endangerment) was neither routed to the AIU for an investigation nor routed to an LDI for an inquiry, but was instead addressed with a routine grievance response. The routine reviewer did not gather any video evidence, even though the class member identified the officer and date of the retaliation, and denied the grievance. The Office of Appeals then granted the class member's appeal, because of the routine reviewer's failure to upload interview information into the Offender Grievance Tracking system. As a remedy, it reopened the claim, instructing that the new reviewer "review ... any relevant videotape footage." *See* AIU Report at 3. Of course, by that time the video had been destroyed.

**(c)     RJD-**▮▮▮▮

A class member, in a grievance filed on December 23, 2024, made a serious allegation that, on November 11, 2024, during the afternoon yard release, he told a sergeant and an officer that he needed to be separated from his cellmate for safety reasons, but that staff refused his request. He further alleged that his cellmate attacked him on November 15, 2024, causing a concussion, broken teeth, and other injuries. *See* 602 at 4-5. The officer involved, during his interview, admitted that the class member approached him because he was not getting along with his cellmate. *See* AIU Report at 11. Nevertheless, the investigator failed to obtain video of that or any other relevant interactions. The investigator determined that the relevant interaction between the class member and staff occurred on November 14, 2024, not on November 11, 2024, as alleged by the class member in his 602, because that was the only day during the relevant time period that the two subjects worked on the same day. The investigator then requested BWC for the officer (from 11:30-12:30) and sergeant (11:55-12:30). *See* AIU Report at 4, 6. But the time period requested by the investigator was likely wrong. The subject officer noted that the afternoon yard release occurs at 1:00. *See* AIU Report at 11. Unsurprisingly, neither video showed any interactions between the staff and the class member. Thereafter, the investigator did nothing to attempt to obtain video that captured the relevant interactions. He did not request additional footage from November 14, 2024, nor did he request footage from other days. As a result, the investigator did not obtain any video of the interaction between the class member and staff that was at the core of the allegation and that staff acknowledged occurred.

**(d)     LAC-**▮▮▮▮

A class member reported that staff used unnecessary and excessive force when they cut off her clothes with scissors and forcibly transported her to SATF, resulting in injury. The class member filed a grievance on June 3, 2024, three days after the incident,

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

and included the date and time of the incident.  *See* 602 at 6-8.  AIU did not assign an investigator until December 11, 2024, 191 days after the 602 and well outside the 90-day video retention period.  *See* AIU Report at 1.  CDCR thus failed to retain any video from the incident.  The investigator reported that "AVSS and BWC files were not available for review as the video retention period was exceeded."  *See* AIU Report at 6.

(e) **LAC-**▇▇▇▇▇

A class member reported that officers used unnecessary and excessive force by handcuffing him too tightly.  The class member filed the grievance on July 22, 2024.  CDCR assigned an investigator on August 26, 2024, but that investigator did not take any apparent action until the case was reassigned to a different investigator on March 18, 2025—239 days after the 602 was filed.  *See* AIU Report at 1.  Although the 602 did not contain a date or time of the incident, the class member reported in an interview that the incident likely occurred on July 22, 2024—the same date as the 602—between around 1-3 p.m.  *See* AIU Report at 2.  The investigator also discovered a 7219 from that same date that seemed consistent with the class member's allegation.  *See* AIU Report at 3.  The investigator did a capable job of identifying the date of the incident despite the lack of specificity on the 602.  However, the investigator's work was for naught because it occurred well after the 90-day retention period expired.  Even if video was retained and showed misconduct, the Hiring Authority would not have been able to impose adverse action because AIU did not return the case to the Hiring Authority until the statute of limitations expired.  *See* 403 at 2.

(f) **COR-**▇▇▇▇▇

The class member, in a 602 received by CDCR on November 5, 2024, raised multiple allegations, including allegations of sexual assault, sexual harassment, and endangerment occurring on specific dates in September and October 2024.  *See* 602 at 1.  The AIU received the case on November 14, 2024.  The AIU forwarded the case to the Central Intake Triage Team on July 3, 2025, and it was assigned to an investigator on July 7, 2025—nearly eight months after the AIU received the 602.  At that point, of course, footage was no longer available.  *See* AIU Report at 1.

(g) **SATF-**▇▇▇▇▇

The class member, in a 602 received by CDCR on July 15, 2024, alleged that, on May 30 and 31, 2024, staff refused to dim the day room lights in retaliation for filing a 602.  *See* 602 at 4-5.  The CST routed the case to the AIU on July 18, 2024.  An investigator was initially assigned to the case on July 30, 2024, which was still within the 90-day retention window to request footage, but the case was reassigned to another investigator on October 4, 2024, and by that time footage was no longer available.  *See* AIU Report at 1.  It is not clear why the initial investigator failed to request footage.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

(h)    SATF-██████

The class member alleged that staff retaliated against him for filing a grievance and provided the date and approximate time (August 17, 2024, at 8:30 am) in the 602 received by CDCR on August 19, 2024.  *See* 602 at 4-5.  CST routed the case to the AIU on August 22, 2024, and the AIU assigned an investigator on October 10, 2024—still within the 90-day retention deadline.  *See* AIU Report at 1.  However, the investigator failed to request AVSS/BWC footage before the 90-day retention period expired.

(i)    SATF-██████

In a 602 received by CDCR on September 13, 2024, the class member alleged that on September 12, 2024, staff members retaliated against him in response to staff previously assaulting the class member by putting him up for transfer, among other allegations.  *See* 602 at 3.  The case was assigned to the AIU on September 16, 2024, and the AIU assigned the case to an investigator on September 25, 2024.  The investigator failed to request video footage.  The AIU then reassigned the case to a second investigator on June 2, 2025.  That investigator requested video, but no video was available because the retention period had expired by the time he received the case.  *See* AIU Report at 1-2, 4.

(j)    SATF-██████

The class member, in 602s received by CDCR on July 31, 2024 and August 14, 2024, alleged, *inter alia*, that several officers assaulted him on July 12, 2024.  *See* 602 at 3.  CDCR closed the second 602 as a duplicate of the first.  *See* Investigation Report at 2-3.  According to the investigative report for SATF-██████ the AIU received the case on August 13, 2024, but did not assign the case to an investigator until January 2, 2025, several months after 90-day retention period had expired.  *See* AIU Report ██████ at 15.

(k)    KVSP-██████

In this case, a class member alleged that staff violated policy by placing him in a holding cell for longer than four hours without obtaining necessary approvals.  *See* 602 at 2.  The institution indicated that the holding cell logs for the class member could not be located.  Nevertheless, the investigator should have been able to determine how long staff held the class member in the holding cage by using AVSS or BWC footage.  Even though the AIU assigned the case to the investigator within 45 days of the incident, the investigator failed to request any video before the expiration of the 90-day retention period.  *See* AIU Report at 1-2.  As a result, the investigator failed to gather any evidence to answer the basic and easily answerable question of whether staff held the class member in the holding cell for longer than four hours.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

   **(l)**  **KVSP-**██████

  In this case, a class member alleged that officers used excessive force by forcing him to cuff behind his back, instead of waist chains, and squeezing the handcuffs too tight. *See* 602 at 1-2. At the time of the incident, the class member had a permanent cane and also appears to have had a special cuffing chrono. *See* 7536 DME/Supply Receipt at 1 dated July 16, 2024; 1845/7410 at 1 dated March 28, 2023. Some BWC footage was retained in connection with the corresponding RVR, but the footage ended prior to placement of the handcuffs. The investigator stated in his report that "additional AVSS/BWC was not requested" due to the class member providing inaccurate details and refusing to participate in a clarifying interview, and due to the class member's interview "being conducted beyond the 90-day retention policy." *See* AIU Report at 5. These reasons were irrelevant, as the RVR matched the description of the incident and the investigator could easily have retained additional video for that date and time. *See* AIU Report at 4. However, the investigator did not request the video until more than four months after his assignment, when he requested all video relating to the RVR and found that only footage ending before the alleged misconduct had been retained. *See* AIU Report at 1, 5; Video Request at 1.

   **(m)** **KVSP-**██████

  In this case, a class member alleged sexual misconduct, unnecessary force, and denial of medical attention in connection with a body search, handcuffing, and placement in a holding cell. *See* 602 at 5-6. Although the investigator was assigned less than one month after the date of the allegations, he did not make any request for AVSS/BWC, so only limited AVSS footage was available. The investigator noted in his report, "[b]y the time this case was opened, and [the class member] was interviewed for additional information, the ninety-day window of evidence preservation was expired, therefore no additional AVSS or BWC footage was requested or reviewed." *See* Investigation Report at 6. The BWC was necessary to hear whether the officer sexually harassed the claimant and whether the claimant complained to the officer about whether the handcuffs were too tight. And additional AVSS was necessary to determine whether the claimant was left unattended in a holding cell. Had the investigator requested the already retained footage in a timely manner, he would still have had enough time to request relevant missing BWC footage.

**III.** **HIRING AUTHORITIES—INCLUDING THE CARU AND WARDENS— FAILED TO SUSTAIN ALLEGATIONS AND IMPOSE APPROPRIATE DISCIPLINE**

  In the cases in this section, Hiring Authorities—both from the CARU and from the institutions—failed to sustain allegations supported by evidence and/or to impose appropriate discipline after sustaining an allegation. These cases are in addition to the cases discussed in the section regarding excessive force (*see supra*, Section I), in which

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

the hiring authorities should have, but did not, sustain allegations that officers violated CDCR's policy prohibiting excessive force. The cases involved the following issues:

1.      LAC-██████ – OIA, Sustained (L9; Reduced to L7)

This case involves a class member who committed suicide by hanging in ██, LAC's ██████. Officer ██████ failed to perform adequate safety checks in the hours before the class member was found hanging. Officer ████ then lied during the investigation, claiming that he had confirmed during his safety checks that the class member was living and breathing when he had not done so. The LAC warden initially terminated Officer ████ Following a *Skelly* hearing, however, the warden improperly agreed to reduce the penalty to a 90-day suspension. CDCR's capitulation in this case signals to staff that they can retain their jobs after misconduct—lying to an investigator in a case that involved the death of an incarcerated person—that fundamentally undermines the accountability system.

██████, ██████ (██) committed suicide at LAC on June 5, 2024. Officer ████ was responsible for conducting welfare and security checks in ██ that day. Under LAC local operating procedure, officers must conduct the welfare and security checks in that unit twice an hour at intervals no longer than 35 minutes. *See* ██ Security/Welfare Check Procedure at 18. The check requires "a visual/physical observation of a living, breathing inmate, free from obvious injury ensuring there is a clear and unobstructed view into the cell or ... self-injurious behavior." *Id.* After beginning his shift, Officer ████ conducted four checks before staff found Mr. ████ death, passing cell 241 at 2:24, 2:54, 3:17, and 3:54. *See* OIA Report at 12; *see also* BWC 1 at 2:24:23, BWC 2 at 2:54:27, BWC 3 at 3:17:31, BWC 4 at 3:54:26.[8] As the warden documented in the NOAA, Officer ████ spent only one second at the front of cell 241 for each of the first three checks and spent three seconds for the last check; he spent more time on the final check because he needed to re-tap the Guard One sensor. *See* NOAA at 16-17. Even though the cell was dark because the lights were off and Mr. ████ had affixed a privacy curtain covering much of the door, Officer ████ never moved his face close to the cell window to see past the privacy curtain or shined his light into the cell during any of the checks. *See* NOAA at 16-17.

At about 4:12 (18 minutes after Officer ████ final safety check), Officers ████ and ████ were performing count when they looked into Mr. ████ cell. *See* BWC 5 at 4:12:15. Officer ████ looked around the privacy curtain, used his flashlight, and stated he believed that Mr. ████ was hanging. *See* OIA Report at 4, 7; *see* BWC 5 (linked above) at 4:12:40. As Officer ████ began to activate his alarm, Officer ████ looked a second time and confirmed that Mr. ████ was hanging. *Id.*

---

[8] For reasons that are unclear, the investigator did not attempt to review any AVSS footage of the safety checks.

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

at 7. About a minute and a half later, Officer ███ Officer ███ and other officers entered the cell to cut Mr. ███ down. A responding health care staff member states, "oh, he's cold" after touching Mr. ███ arm. *See* BWC 5 (linked above) at 4:15:45; *see* NOAA at 17. When paramedics from the Los Angeles County Fire Department arrived on scene, one commented that Mr. ███ was in "rigor," and Mr. ███ was declared deceased shortly thereafter at 4:33 p.m. *See* NOAA at 18. According to internet sources, rigor mortis typically sets in within 2-6 hours after death.[9]

The investigator reviewed video of Officer ███ speaking partly in Spanish to another officer, Officer ███ after the incident.[10] According to OIA's translation of the conversation, Officer ███ said, in part, "I didn't get to see him" in reference to Mr. ███ *See* OIA Report at 14; *see also* Translation at 57.

The investigator asked Officer ███ about his safety checks, including the checks at 3:17 and 3:54. According to Officer ███ at the 3:17 and 3:54 checks, he saw Mr. ███ "alive and breathing," although he did not remember how he was positioned. *See* OIA Report at 12. Officer ███ told the investigator that he could see into the cell and that Mr. ███ was not harming himself. *Id.* at 13.

On June 6, 2025, the Hiring Authority (the now-former LAC warden) sustained violations for failure to observe and perform within the scope of training for failing to properly conduct health and safety checks, as well as a violation for intentional dishonesty during the OIA interview when he said that he saw Mr. ███ alive during each security check. *See* 402/403 at 1-2. Intentional dishonesty during an OIA investigation (E6) carries a baseline penalty of termination (Level 9). After listing a single mitigating factor (that the misconduct was not premeditated) and a litany of aggravating factors, the Hiring Authority imposed termination. *See* 402/403 at 3-4.

On June 17, 2025, the Hiring Authority served the NOAA on Officer ███ The NOAA indicated that Officer ███ failed to conduct proper security checks of Mr. ███ cell, that he failed to ensure Mr. ███ removed the privacy curtain from his cell window during any check, and that he lied during the OIA interview. *See* NOAA at 16, 18.

On June 23, 2025, the Hiring Authority conducted a *Skelly* hearing. After the *Skelly* hearing, on June 25, 2025, the Hiring Authority offered to resolve the case by

---

[9] *See, e.g.*, https://www.medicinenet.com/what_are_the_stages_of_rigor_mortis/article.htm.

[10] Potentially due to the investigator's long delay in initiating the investigation, Officer ███ did not recall this conversation from June 2024 when the investigator interviewed her on February 12, 2025. *See* OIA Report at 8. The investigator did not show Officer ███ the video of the conversation to refresh her memory.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

reducing the case to a "modified penalty of a suspension without pay for ninety (90) qualifying work days." *See* ███ *Skelly* Results at 1. A 90-day suspension is a level 7 penalty, which is at the lowest end of the range of possible penalties for intentional dishonesty during an investigation. Officer ███ returned to work as of October 31, 2025. *See* NOAA at 2.

The Hiring Authority's decision to reduce the discipline to a Level 7 penalty—before Officer ███ even appealed to the SPB—is inexplicable and dangerous. The record contains ample evidence that Officer ███ did not conduct proper welfare and security checks, which are intended to prevent people from committing suicide, and that Mr. ███ died as a result. The evidence also showed that Officer ███ lied about seeing Mr. ███ alive during these checks. Officer ███ admitted on camera after the incident that he did not see Mr. ███. Further, the fact that Mr. ███ was "cold" within 20 minutes of Officer ███ final check, on a June day at LAC, and had developed rigor mortis suggests that Mr. ███ had been hanging for a longer period of time, possibly including all of Officer ███ checks that day. The NOAA issued June 17, 2025, sets forth these supporting facts in detail, and the 403 identifies numerous aggravating factors. Yet a week later, the Hiring Authority agreed to a lower penalty. The evidence in this case, which resulted in the death of an incarcerated person, was airtight, with a contemporaneous statement contradicting Officer ███ claims in the OIA interview months later. Officer ███ should never work as a CDCR officer again. CDCR's accountability system failed by allowing that to happen.

Plaintiffs also note that the OIG monitored this case as OIG Case 24-0088560-DM and critiqued CDCR's performance in a summary publicly available on OIG's website. *See* Case 24-0088560-DM at 2.[11] The OIG criticized the Hiring Authority for the settlement agreement "even though the officer lied to the Office of Internal Affairs about the incident." The OIG also criticized the CDCR attorney because they "advised the hiring authority to enter into a settlement agreement reducing the penalty without sufficient justification."[12] *Id.*

## 2. RJD-███ – AIU, Sustained (Letter of Instruction and Training)

In this case, even though an officer engaged in conduct that was obviously threatening toward incarcerated people—helping another officer "rack" a rifle (*i.e.*,

---

[11] Although the OIG case summaries do not include subject names, the case in question is this case based on the common date of the incident, allegations, discipline, date of OIA interview, and ultimate resolution.

[12] The OIG also criticized the investigation, noting, *inter alia*, that the investigator "delayed the investigation, taking 179 days after the case was assigned to complete the first interview and 264 days after assignment to complete the investigation." *Id.*

[4825674.1]                                      25

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

pumping the gun to make the sound of chambering a round) over the PA system in the housing unit—the CARU failed to sustain that allegation. In addition, although the CARU did sustain allegations against the officer who helped the other officer rack the rifle for failing to intervene to stop misconduct and for endangerment, for which the baseline penalty is Level 5 discipline, the CARU improperly imposed an inappropriate Level 1 penalty (Letter of Reprimand) that is far outside the range for the violations. The CARU then withdrew the adverse action in its entirety and improperly imposed only corrective action.

During the incident, Officer ███████████ and Officer ████ were both in the control booth. The investigation report accurately describes what is shown on the video:

> "At approximately 6:43:56 AM ██████ asked ████████████ to hold the mic down on the public address system. ███████ is observed with the Mini-14 Rifle, places it next to the microphone, releases the magazine setting it down, slides the handle forward, picks up the magazine and taps it against the stock of the weapon multiple times, places the magazine down and pulls the slide handle multiple times thus making a metallic noise and mimicking the loading of the weapon, inserts the magazine and places the weapon down. Both ████████████ and ██████ can be heard laughing and Incarcerated Persons can be observed in the dayroom. ██████████████ releases the microphone at approximately 6:44:22 AM. ████████ keys the microphone at approximately 6:44:27 AM and states, 'it's going to be ████ up here.' Both ████████████ and ██████ continue to laugh and the BWC footage ends at approximately 6:44:39 AM."

See AIU Report at 3-4. In short, Officer ███████████ held down the button on the microphone for 20 seconds (from 6:44:06 to 6:44:25) while Officer ████ repeatedly "racked" and made other sounds with the gun in the control booth.

In a 602, ████████ (████████████████) claimed that *Coleman* and *Armstrong* class members "are suffering from depression, anxiety, and other mental health related problems triggered or aggravated" by officers' conduct in the housing unit, such as the instant incident involving Officers ███████████ and Officer ████ "racking" the gun.[13] See 602 at 10.

Defendants have not yet produced the investigation file for the case against Officer ████████ but have produced the investigation file for the case against Officer ████████. Our analysis here pertains only to the case against Officer ████████████.

---

[13] Mr. ████████ also made allegations about other misconduct, including officers verbally abusing incarcerated people.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

The CARU did not sustain allegations against Officer ███████████ for failing to report Officer ██████ misconduct, for misusing a duty weapon, and for threatening or intimidating incarcerated people. The CARU did sustain allegations against Officer ███████████ for endangerment and for failing to intervene in or attempt to stop staff misconduct by Officer ██████ The CARU imposed a Level 1 penalty (Letter of Reprimand), even though the CARU noted that the baseline penalty was Level 5. *See* 402/403 at 2-5. After a *Skelly* hearing, the CARU withdrew the adverse action and imposed corrective action—a letter of instruction and training. *See* Closure Documents at 24.

The CARU erred in this case in two ways: (1) by imposing an inappropriate penalty for the sustained allegation of failing to stop misconduct of another officer; and (2) by failing to sustain the allegation that Officer ███████████ intimidated or threatened incarcerated people.

With respect to the penalty for the sustained allegations, the initial Level 1 penalty and the ultimate corrective action imposed violated CDCR's regulations and was the result of a misapplication of mitigating and aggravating factors. The CARU properly identified that failure to intervene in or attempt to stop misconduct by another employee carries a baseline penalty of Level 5. *See* Employee Disciplinary Matrix (D29). The CARU, however, then decided that mitigating factors warranted a Level 1 penalty, which is substantially outside of the range for that violation (Level 4 to 9). The CARU, in the 402/403, explained the below-range penalty as follows:

> It was determined that while Officer ███████████ did engage in staff misconduct which fell under a penalty range of 5, he played a secondary role in the misconduct. His actions were not premeditated or intentional. During the course of his AIU investigative interview, he accepted responsibility of his actions and acknowledged that the misconduct was in violation of departmental policies. These factors along with his length of service at the time of the misconduct has led the Hiring Authority to determine that a Letter of Reprimand is appropriate.

*See* 402/403 at 5.

CDCR's regulations do not permit a hiring authority to impose a penalty outside of the range specified for a specific violation. The regulations provide that "[t]he hiring authority shall impose the base penalty unless aggravating or mitigating factors ... are identified. *The aggravating and mitigating factors shall be considered in determining the appropriate penalty level within the penalty range.*" *See* 15 C.C.R. § 3392.5(c)(5) (emphasis added). The regulations further provide that "[a]ggravating and mitigating factors may increase or decrease the penalty *within the identified penalty range*. Mitigating factors may be used to reduce the penalty level from the base penalty. Aggravating factors may increase a penalty from the base penalty up to and including

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

dismissal." *See* 15 C.C.R. § 3392.5(c)(8) (emphasis added). Nowhere do the regulations permit a below-range penalty. Accordingly, the lowest penalty that could have been imposed in this case is a Level 4 penalty at the bottom of the range for failing to stop misconduct of another officer.

Putting aside the regulations, the CARU's analysis of the mitigating and aggravating factors was flawed. The CARU wrongly concluded that Officer █████████ █████████ conduct was not intentional and that he played a secondary role in the misconduct. Officer █████████████ intentionally pressed the PA button for 20 seconds to broadcast the sounds of the gun being "racked" to the incarcerated population. And he was a necessary participant in the misconduct, as Officer ██████ was not able to push the PA button and "rack" the gun at the same time. The CARU also erred in concluding that Officer █████████████ "accepted responsibility of his actions and acknowledged that the misconduct was in violation of departmental policies." *See* 402/403 at 5. At the end of the interview, the investigator asked whether Officer █████████████ believed that any of the allegations against him were true. He answered no. *See* Officer █████ ██████ Interview at 40:43. Lastly, the CARU only identified two aggravating factors— that Officer █████████████ was sworn staff and that serious consequences occurred or could have resulted from the misconduct. *See* 402/403 at 5. The CARU should also have found that the conduct resulted in harm to public service (as the threat to incarcerated people constituted an abuse of authority, *see* discussion below) and was committed with malicious intent (as there is no other possible intent for engaging in the conduct, and Mr. ████████ in his 602, confirmed that the conduct was harmful for him and others). And, consistent with the discussion above, the CARU should have found that misconduct was intentional and that Officer █████████████ did not accept responsibility.

Under these circumstances, mitigating the penalty at all—let alone from a baseline of Level 5 to a Level 1 penalty far outside the range and then ultimately to corrective action—was inappropriate. Officer █████████████ engaged in harmful behavior that violated clear policies and that created a hostile, non-rehabilitative environment. He should have received significant adverse action. Instead, he received corrective action, which under the circumstances was essentially a slap on the wrist.

The CARU should have sustained the allegation for threatening or intimidating incarcerated people. Officer █████████████ admitted during his interview that his conduct was intimidating to incarcerated people. The investigator asked, "[l]ooking back now that we're here today, did you think that anything was wrong with holding down the microphone and allowing or watching ████ rack his weapon?" Officer █████████████ responded, "[n]ow seeing the video and everything, I can see where the intimidation part could come." *See* █████████████ Interview at 31:50. That admission, standing alone, should have been enough to sustain the intimidation/threat allegation. Moreover, Officers █████ and █████████████ conduct was intended to threaten all of the people who were in the housing unit at the time. There was no other reason to broadcast the

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

sounds of the gun being "racked." Their conduct communicated to the residents of the building that Officer ███ was armed and ready to use the weapon against incarcerated people. The intent to intimidate was highlighted by their laughter and by Officer ███ statement, after he had "racked" the rifle, that "it's going to be ███ up here." Though Officer ███ was the one who handled the weapon, he was only able to broadcast the threatening gun sounds because Officer ███████ held the PA button for him for 20 seconds, including for a long period after he knew what Officer ███ was doing.[14]

### 3.    SATF-███████ – AIU, Sustained (Corrective Action, SOL Expired)

In this case, the Hiring Authority appropriately sustained the allegation that an officer used unnecessary or excessive force when he pepper sprayed a class member in the face.[15] But because the Hiring Authority delayed and allowed the statute of limitations to expire before reviewing the incident, the Hiring Authority imposed no adverse action. Even though the base penalty for this misconduct is a Level 2 (L1, 1**2**3), the Hiring Authority could only impose corrective action, in the form of on-the-job training. Worse, it appears that, due to an administrative error, the officer never even received that training.

The facts here are undisputed. ███████ (███████) was acting erratically on the tier, and officers suspected that he was under the influence of drugs. During the course of the incident, he ran away from officers into one of the showers in the unit. After an alarm was activated, nine officers arrived to address Mr. ███ behavior and had the incident under control using de-escalation techniques. Officer ███ then arrived. By that point, most of the officers were shouting at Mr. ███ to get on the ground. Mr. ███ was in the back of a shower, which has a grilled door that can be closed, and was surrounded by officers. Officer ███ forced his way to the front, ordered Mr. ███ to get down, and, when he did not comply, pepper sprayed Mr. ███ in the face. *See* BWC at 9:26:18.

The Hiring Authority sustained an allegation of unnecessary and/or excessive force against Officer ███ but allowed the statute of limitations to expire before reaching that decision. Mr. ███ made a verbal allegation on December 1, 2023. *See* Memorandum re: Referral for Determination of Use of Force Allegation at 1. The AIU

---

[14] The Hiring Authority likely should also have sustained the allegations for failing to report the misconduct and for mishandling a duty weapon. Plaintiffs have not analyzed those allegations, as they carry less significant penalties than threatening incarcerated people.

[15] The Hiring Authority sustained an allegation of " unnecessary and/or excessive force," but the 402/403 does not indicate whether the Hiring Authority determined that Officer ███ used unnecessary force, excessive force, or both. *See* 402/403 at 1.

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

investigator completed her investigation on April 9, 2024. *See* AIU Report at 8. But the Hiring Authority did not complete his review until eight months later, on December 9, 2024, after the statute of limitations had expired. *See* 402/403 at 1. Accordingly, the Hiring Authority could only impose corrective action (here, on-the-job training). *Id.* Even then, a Clarification Memorandum dated August 6, 2025, states that Officer █ never even received that training. *See* Clarification Memorandum re: AASTS No. █ **Please explain whether Officer █ has received the on-the-job training the Hiring Authority ordered. If so, please explain when he received that training.**

4.      LAC-█ – AIU, Not Sustained

In this case, officers used unnecessary force against an *Armstrong* class member by grabbing him solely for failure to follow an order.

Video shows █ (█) slowly walking through the dayroom while talking on a tablet. Officer █ says "█ let's go." *See* BWC 1 at 13:19:46. Mr. █ continues to walk slowly forward past Officer █ towards the housing unit cells. Without warning, Officer █ grabs Mr. █ left forearm and pulls it behind his back, while Officer █ grabs the tablet and pulls Mr. █ right wrist behind his back. *See* BWC 1 (linked above); BWC 2 at 13:20:11. Officer █ says "turn around" while grabbing Mr. █. *See* BWC 1 (linked above) at 13:19:57. Mr. █ pulls his left elbow upwards away from Officer █ and one of the officers says "stop resisting," but the officers soon have Mr. █ hands pulled behind his back. Officer █ then slams Mr. █ face-first into the wall. Officers handcuff Mr. █. *See* AVSS at 1:20:08. The 7219 documents that Mr. █ had a swollen knee following the incident, and Mr. █ reported he had a history of a dislocated shoulder. *See* 7219 at 38; AIU Report at 7. Officer █ issued Mr. █ an RVR for resisting staff.

The force here was unnecessary because, according to the officer's incident reports, the officers initiated force due to Mr. █ allegedly failing to follow an order, which by itself is not an appropriate justification for immediate force. *See* Incident Reports at 28, 29; DOM § 51020.4. Officer █ twisted Mr. █ alleged failure to comply with an order into an attempted justification for using force, claiming that "█ apparent emotional state and refusing to listen to direct orders, [sic] presented a reasonable likelihood that he could become violent." *See* Incident Report at 29. Under Officer █ logic, however, any failure to follow orders means a person may become violent, justifying force. In the abstract, that approach violates existing policy. Moreover, the video does not support the claim that Mr. █ was violent or likely to become so. He shows no emotion in the video that an officer could reasonably interpret as a precursor to violence; in Officer █ own telling, he simply "ignored" Officer █. *Id.*

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

The officers also violated CDCR's policies requiring de-escalation and verbal persuasion prior to using force.  From the video, it is not clear that Mr. ▮▮▮ heard Officer ▮▮▮ order him to go back to his cell.  Even if he did, the situation allowed for substantial de-escalation, because Mr. ▮▮▮ did not pose any threat.  Many other incarcerated people were still in the dayroom, suggesting there was not urgency for Mr. ▮▮▮ to return to his cell.  Officers could have provided another order or could have threatened him with an RVR.  Instead, both officers immediately initiated force against Mr. ▮▮▮ by grabbing him and forcefully removing his tablet.

The CARU found the force appropriate, despite the video evidence and officers' statements in their incident reports.  Plaintiffs previously reported on a similar case at LAC, in which officers approached a class member at a water fountain in the dayroom, ordered him to return to his cell, and then used immediate force for failing to comply with an order, resulting in an injury that required stitches.  As here, the Hiring Authority in that case failed to impose discipline.  *See* Plaintiffs' August 16, 2024 Report at 16-17.  Even though the CARU resolved the instant case, the officers avoided accountability for their improper use of force.

## IV.    CONCLUSION

Plaintiffs will continue to work with Defendants and the Court Expert to attempt to bring Defendants into compliance with the Court's Orders and the Remedial Plans.

# EXHIBIT B



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

███████████████
Email: ████████████████

February 27, 2026



VIA ELECTRONIC MAIL ONLY

> **CONFIDENTIAL**
>
> **SUBJECT TO PROTECTIVE ORDERS**

Re:     *Armstrong v. Newsom*:  Plaintiffs' Analysis of Routine Reviews of Staff
        Misconduct Allegations by Class Members at Six Prisons from Q1 2025
        Our File No. 0581-03

Dear ████████████ :

We write regarding Plaintiffs' first analysis of Defendants' routine reviews of class members' allegations of staff misconduct that are not on the Allegation Decision Index ("ADI").

This report is based on our review of CDCR's routine reviews of staff misconduct allegations by class members from January 2025 through April 2025, produced from CSP-Los Angeles County ("LAC"), California Institution for Women ("CIW"), R.J. Donovan Correctional Facility ("RJD"), California Substance Abuse Treatment Facility ("SATF"), CSP-Corcoran ("COR"), and Kern Valley State Prison ("KVSP") (collectively, the "Six Prisons"), which were produced to Plaintiffs between November 2025 and January 2026.  Unfortunately, in the majority of cases, the routine review process failed to identify and confirm misconduct or hold staff accountable.

**Background on Changes to Defendants' System for Investigating Allegations of Staff Misconduct Not on the Allegation Decision Index**

Under the RJD and Five Prisons Remedial Plans, complaints alleging staff misconduct not listed on the ADI are to be sent to Locally Designated Investigators ("LDIs") for inquiry, whereas complaints that do not allege any form of staff misconduct are designated for "routine review" to the prisons' Offices of Grievance ("OOG").  *See*

[4821341.4]

CONFIDENTIAL



February 27, 2026
Page 2

RJD Remedial Plan §§ II.A.ii.; II.C; Five Prisons Remedial Plan §§ II.A.ii.; II.C.  At CDCR's request, the parties agreed to eliminate the LDI process and route all allegations of staff misconduct not on the ADI for routine review by local supervisory staff, effective January 1, 2025.  *See* Court Expert's Quarterly Report on Investigations and Discipline (Oct. 4, 2024), ECF No. 3625, at 3.  Defendants requested this change to reduce the workload on wardens, who were struggling to comply with their obligations under the Remedial Plans,[1] as well as on the supervisory staff conducting the LDI inquiries.

As a condition of this agreement, the parties also agreed that the supervisor conducting a routine review of staff misconduct will suspend their investigation and refer the allegation to the Centralized Screening Team ("CST") for an investigation by the Office of Internal Affairs ("OIA") in the following scenarios: (1) during the review, the reviewer discovers information suggesting the claim is on the ADI; (2) the claim, if proven true, is likely to result in adverse action (*i.e.*, the conduct is not on the ADI but is so egregious as to warrant adverse action); or (3) the claim is similar to previous staff misconduct that was sustained against the departmental staff involved, and therefore adverse action should be considered as progressive discipline.  *See* Plaintiffs' Comments on Second Renotice of Change to Regulations, NCR Number 25-06 (Sept. 8, 2025), Changes to Regulations for Staff Complaints and Routine Grievances (Sept. 23, 2025), at 8-9 (describing parties' agreement).

Under the parties' agreement, disability-related staff complaints that are not on the ADI must be referred to the institution's ADA Coordinator for assignment to an ADA-trained supervisor to conduct a routine review.  *See* ADI at 8 ("Allegations of policy violations related to disability, failure to accommodate a disability, or other allegations of ADA non-compliance that do not fall on the ADI shall be referred to the ADAC for managerial review and assignment to an ADA trained supervisor.").

**Plaintiffs' Analysis of Routine Reviews**

Plaintiffs' analysis of Defendants' first production of routine reviews shows that, in the majority of cases, the new routine review system for staff complaints failed to

---

[1] The Remedial Plans require wardens to review all completed LDI reports to determine whether the inquiry is comprehensive and unbiased; whether additional inquiry or investigation is needed; whether there is a preponderance of evidence to sustain the allegation(s) of misconduct; and whether to impose corrective or adverse action.  *See* RJD Remedial Plan § II.C; Five Prisons Remedial Plan § II.C.

[4821341.4]

CONFIDENTIAL



February 27, 2026
Page 3

identify and confirm violations and to hold staff accountable for misconduct, in violation of the *Armstrong* Court Orders.

For this report, Plaintiffs conducted a close analysis of 50 randomly selected routine review files out of the 99 routine reviews into staff misconduct allegations by class members at the Six Prisons produced by Defendants for the month of April 2025. *See* Routine Review Table. Our analysis involved reviewing each case file, and placing each case in one of five categories depending on whether there was an accountability failure and, if so, what type. We focused on the most recent month for which Defendants have completed production of routine reviews so that the results would not be skewed against Defendants by problems in the period immediately following the implementation of the new system. **Yet we still found that CDCR's routine review system failed in more than 60% of the cases.**

In the majority of the routine reviews analyzed (54.2%), the reviewer failed to conduct a complete and unbiased investigation, making it impossible to determine whether staff misconduct occurred. In the remainder of the routine reviews, where it is possible to determine what happened, the evidence showed that staff misconduct *did* occur in 13.6% of those cases, yet the allegation was not sustained and no staff received corrective action. **Defendants did not sustain a single allegation of misconduct in any of the routine reviews analyzed by Plaintiffs.**

Plaintiffs' analysis of the random sample of routine reviews from April 2025 also revealed additional problems with the process, including that: (1) in more than 27% of the cases, the complaint included an allegation of staff misconduct on the ADI that should have been routed for an investigation by the OIA; (2) more than half of the routine reviews into allegations of disability-related staff misconduct were not routed to the institution's ADA Coordinator, in violation of the parties' agreement; and (3) one-third of the routine review files were missing key evidence relied upon by the reviewer.

Given these findings, it is particularly important that Plaintiffs closely monitor whether Defendants will be capable of conducting comprehensive and unbiased investigations into staff complaints not on the ADI through the routine review process, and whether they will be able to impose consistent and appropriate discipline when the evidence shows that misconduct occurred, as required by the Court's accountability orders and Remedial Plans. Pursuant to the requirement that Defendants produce all documents related to staff misconduct complaints at the Six Prisons in which the complainant is a class member, *see* RJD Remedial Plan § IV; Five Prisons Remedial Plan § V, Plaintiffs request that Defendants commit to a consistent rolling production of

[4821341.4]

**CONFIDENTIAL**



February 27, 2026
Page 4

routine reviews of staff complaints from the Six Prisons, to avoid the difficulty and delay in monitoring due to the inconsistent and haphazard production of documents thus far.

Plaintiffs look forward to discussing these findings, and how to improve the routine review system, at the March 24, 2026 meeting with Defendants and the Court Expert regarding statewide reforms to the court-ordered accountability system.

Sincerely

ROSEN BIEN
GALVAN & GRUNFELD LLP

/s/ ████████████

By: ████████████
████████████

[4821341.4]

CONFIDENTIAL



February 27, 2026
Page 5

# TABLE OF CONTENTS

<div align="right">

**Page**

</div>

I. DEFENDANTS CONDUCTED INCOMPLETE AND BIASED ROUTINE REVIEWS AND FAILED TO HOLD STAFF ACCOUNTABLE FOR DISABILITY-RELATED MISCONDUCT NOT ON THE ADI .................................................................. 6

    A.    Routine Reviews of Allegations of Disability-Related Staff Misconduct Are Frequently Incomplete and/or Biased ........................... 9

        1.    KVSP-█████ ................................................. 10

        2.    KVSP-█████ ................................................. 10

        3.    SATF-█████ ................................................. 11

        4.    CIW-█████, CIW-█████, CIW-█████ ................. 13

        5.    RJD-█████ .................................................... 15

    B.    In The Rare Circumstances Where Routine Reviews Are Sufficiently Comprehensive and Unbiased to Reveal Evidence of Disability-Related Staff Misconduct, Staff Are Still Not Held Accountable .............. 17

        1.    LAC-█████ ................................................... 18

        2.    KVSP-█████ ................................................. 19

        3.    KVSP-█████ ................................................. 20

II. DEFENDANTS FAILED TO PROPERLY IDENTIFY AND ROUTE STAFF MISCONDUCT COMPLAINTS ................................................. 20

III. PLAINTIFFS IDENTIFIED OTHER PROBLEMS WITH THE NEW ROUTINE REVIEW PROCESS FOR STAFF COMPLAINTS ........................... 24

    A.    Defendants Frequently Failed to Route Allegations of Disability-Related Staff Misconduct to the ADA Coordinator .................................. 24

    B.    The Routine Review Files Frequently Omitted Key Documents Relied Upon By The Reviewer .................................................. 24

IV. PLAINTIFFS REQUEST THAT DEFENDANTS COMMIT TO A REGULAR PRODUCTION SCHEDULE FOR ROUTINE REVIEWS OF STAFF COMPLAINTS BY CLASS MEMBERS AT THE SIX PRISONS ........ 25

V. CONCLUSION ................................................................. 26

[4821341.4]

CONFIDENTIAL



February 27, 2026
Page 6

I.    **DEFENDANTS CONDUCTED INCOMPLETE AND BIASED ROUTINE REVIEWS AND FAILED TO HOLD STAFF ACCOUNTABLE FOR DISABILITY-RELATED MISCONDUCT NOT ON THE ADI**

The RJD and Five Prisons Remedial Plans require that Defendants conduct "comprehensive and unbiased investigations and ensure all relevant evidence is gathered and reviewed," and that appropriate and consistent discipline is imposed for staff misconduct.  *See* RJD Remedial Plan §§ II.B., II.D.; Five Prisons Remedial Plan §§ II.B., II.D.  To evaluate Defendants' compliance in the routine review process, Plaintiffs conducted a close analysis of half of all routine reviews into allegations of misconduct by class members at the Six Prisons produced by Defendants for the month of April 2025, or 48 randomly-selected cases,[2] and found that Defendants' accountability system failed in 29 cases (or 60.4%).  *See* Routine Review Table.  Specifically, Plaintiffs reviewed each case file and placed each into one of five categories:

- **Category 1 – No Evidence of Misconduct:**  The investigator established that misconduct did not occur or exhausted reasonable investigative avenues, or the complaint was so general and/or vague that it likely should not have been treated as a staff complaint (e.g., allegations that prison staff are generally disrespectful).

- **Category 2 – Incomplete Investigations:**  The incompleteness and/or bias of the investigation (e.g., failing to obtain available video evidence and/or to interview relevant witnesses) made it impossible to determine whether the alleged staff misconduct occurred.

- **Category 3 – Failure to Sustain Allegations:**  The investigator gathered enough evidence to support sustaining an allegation of misconduct by a preponderance of the evidence, but the Reviewing Authority and/or Hiring Authority nevertheless failed to sustain the allegation.

---

[2] Plaintiffs analyzed 50 of the 99 cases in the April 2025 routine review productions. Plaintiffs were unable to determine whether there was an accountability failure in two of these cases—RJD-██████ and COR-██████—as they were referred by the institutions' OOG to California Correctional Health Care Services ("CCHCS") to investigate allegations of misconduct by health care staff.  We omitted these two cases from the denominator since we are unable to categorize them.  **Please ensure that the routine reviews of allegations of staff misconduct by health care staff are no longer omitted from these court-ordered productions.**

[4821341.4]

**CONFIDENTIAL**



February 27, 2026
Page 7

- **Category 4 – Failure to Impose Appropriate Discipline:**  The Reviewing Authority and/or Hiring Authority sustained at least one allegation of staff misconduct, but imposed a penalty or corrective action that was not appropriate for the misconduct and/or that was inconsistent with CDCR's policies.

- **Category 5 – Staff Properly Held Accountable:**  The Reviewing Authority and/or Hiring Authority sustained one or more allegations of misconduct and imposed appropriate discipline or corrective action.

Plaintiffs identified 26 of 48 cases (or 54.2%) with incomplete and/or biased investigations (Category 2), and three of the remaining 22 cases (or 13.6%) where the review uncovered sufficient evidence to sustain an allegation of staff misconduct, but no violation was sustained (Category 3).  There were no cases in the random sample where misconduct was sustained (Category 4 and Category 5).  In other words, the routine review system did not work to discover staff misconduct and hold staff accountable in **any** of the 48 cases closely reviewed by Plaintiffs.

Although Plaintiffs identified 19 of 48 cases (or 39.6%) where the reviewer appropriately concluded that there was no staff misconduct (Category 1), this does not equate to Defendants' accountability system working in nearly two-fifths of the cases. First, in any complaint system, some number of complaints will not have merit.  Second, some of these cases involved allegations where the class members clarified to the reviewer that they had not intended to make a staff complaint.  Third, Defendants' accountability system has never appeared to be deficient in exonerating staff.  The primary problems with the system have been and continue to be discovering what happened, and holding staff accountable when the evidence shows that they engaged in misconduct.  **Here, there were accountability failures in more than three-fifths of the cases analyzed by Plaintiffs, and not a single allegation of misconduct was sustained.**

Indeed, Defendants sustained misconduct in only 19 of the 387[3] routine reviews produced from the Six Prisons from January through April 2025 (or 4.9%).[4]  To make

---

[3] This includes only cases produced prior to February 12, 2026.  Defendants have made additional supplemental productions of routine reviews for the months of January through April 2025 after this date, which Plaintiffs have not analyzed.

[4] Plaintiffs do not include the following six cases as sustaining misconduct even though the grievance response states that the claim is "granted," as in each case, the misconduct alleged by the class member was not sustained.  *See* KVSP-█████ (grievance granted

[4821341.4]

**CONFIDENTIAL**



February 27, 2026
Page 8

matters worse, in 7 of 19 routine reviews where misconduct was sustained, no action was taken to hold staff accountable or otherwise prevent future harm from occurring, not even training. In other words, Defendants took no action in 36.8% of the cases where they confirmed that staff misconduct occurred.[5]

Even though the number of sustained cases already appears low, those numbers are somewhat artificially inflated by the fact that, in seven of those cases, the policy violations were discovered during internal audits by CDCR employees, rather than being reported by incarcerated people. When those cases are removed from the calculation, Defendants sustained misconduct in only 12 of 380 routine reviews (or 3.2%) where the allegation of staff misconduct was made by a class member.

Plaintiffs understand that, in the event a reviewer determines that the complaint, if proven true, is likely to result in adverse action, they are required to suspend the routine review and request that the CST elevate the case to OIA for an investigation. As such, we would expect that the production of routine reviews would only include cases where the misconduct was not confirmed or where the Reviewing Authority determined only corrective action was warranted. **Please confirm that the routine review productions will not include cases that were suspended and elevated to OIA.**

---

because class member's lost DME was replaced, but no staff held accountable); SATF-██████ (staff received training for not completing paperwork, but allegation that staff lost class member's prescription glasses when packing his property not sustained); SATF-██████ (staff received training for not completing paperwork, but allegation that class member's DME were not sent with him to RHU not sustained); SATF-██████ (staff received training for not completing paperwork, but allegations that officers refused to honor class member's special cuffing chrono and broke his prescription glasses not sustained); LAC-██████ (grievance granted because class member's lost DME was replaced, but no staff held accountable); LAC-██████ (grievance granted because class member's delayed DME arrived, but no staff held accountable).

[5] Further, in two of the twelve cases where corrective action *was* imposed, Defendants have no record that staff actually received any training for the sustained misconduct. In KVSP-██████ and KVSP-██████, corrective action was imposed for failing to achieve and/or document effective communication during the service of RHU Placement Notices, but in each case, the routine review file includes a memo stating that there is no record confirming that the responsible staff received on-the-job training.

CONFIDENTIAL



February 27, 2026
Page 9

In order to properly evaluate whether the routine review process is capable of holding staff accountable, it is necessary to determine whether reviewers are properly identifying cases where adverse action may be appropriate, and suspending and elevating them to OIA.  **How many cases routed for routine review were suspended and elevated during this review period—from January 1 through April 30, 2025?  Please identify how many and which cases were suspended and elevated to OIA, and confirm how those cases will be produced to Plaintiffs.**

**What direction and/or training has been provided to supervisors conducting routine reviews regarding when they should suspend their review and request that CST elevate the case to OIA for investigation?**

Plaintiffs provide in greater detail below illustrative examples of cases that demonstrate failures to conduct a comprehensive and unbiased investigation into allegations of disability-related staff misconduct (Category 2), and failures to sustain allegations of disability-related staff misconduct where there is sufficient evidence to sustain the allegations of misconduct (Category 3).

> **A.    Routine Reviews of Allegations of Disability-Related Staff Misconduct Are Frequently Incomplete and/or Biased**

In 26 of 48 routine reviews randomly selected from the April 2025 production (or 54.2%), the reviewer failed to conduct a comprehensive and unbiased investigation, making it impossible to determine whether staff misconduct occurred.  *See* Routine Review Table.  These include cases where the reviewer failed to interview key witnesses or look for important documents, and some cases where the reviewer took no steps to investigate the allegations at all.  **More than three-quarters of these Category 2 cases—20 of 26 (or 76.9%)—involved failures to obtain the video evidence necessary to answer whether the misconduct occurred.**  This includes four cases where the reviewer obtained incomplete video footage or video footage from the wrong time period, and made no effort to correct the mistake, and 16 cases where the reviewer failed to take steps to review *any* video evidence, even though video was necessary to determine what happened in those cases.  The reviewers' failures to obtain video evidence are particularly egregious as, **in every one of these cases, the reviewer had time to obtain video before the expiration of the 90-day video retention period, but simply did not do so.**

Below we highlight several illustrative examples of cases from the April 2025 production where the reviewer failed to conduct a comprehensive and unbiased investigation into allegations of disability-related staff misconduct.

[4821341.4]

CONFIDENTIAL

███████████████

██████████

February 27, 2026
Page 10

 

    1.    **KVSP-**████████

This case exemplifies a common type of staff misconduct allegation that is simple to resolve with video, but nearly impossible to resolve without video: the allegation that disability accommodations were improperly taken or broken during a cell search.

████████████████████████████████████), a hard-of-hearing class member, alleged that his pocket talker "went missing" and his headphones with a microphone "were broken" during a recent cell search. *See* 1824 at 1. The reviewer interviewed Mr. ████████ to determine when the cell search occurred, but Mr. ████████ could not remember, and gave a vague estimate of about two days before he submitted the 1824 (which was about two months before he was interviewed). *See* Decision Letter at 1. The reviewer appropriately looked at prison records and located the cell search receipts, and was able to identify the date and time of the cell search and the officers who conducted the search. *Id.* at 1, 3. But the reviewer failed to request BWC footage from those officers, which would have resolved the case by showing whether they confiscated Mr. ████████ pocket talker or broke his headphones during the search.

Instead, the reviewer accepted as true the officer's accounting of property as recorded on the cell search receipt, which is frequently the source of dispute, and in this case stated that only "trash" was confiscated. *Id.* at 1. The reviewer also emphasized Mr. ████████ poor recollection of when the search occurred—noting that the search actually occurred nearly three weeks before Mr. ████████ submitted the 1824, and that his cell was searched on second watch (not third watch)—in an apparent attempt to cast doubt on his credibility. *Id.* The reviewer had all the information needed to request the relevant BWC evidence to confirm or refute the allegation that the officers confiscated and/or broke Mr. ████████ disability accommodations about two weeks before the expiration of the 90-day video retention period, but simply did not do so.

    2.    **KVSP-**████████

In this case, ████████████████████████████, a class member with a mobility disability who is prescribed incontinence supplies, alleged that, on April 2, 2025, Officers ████████ and ████████ "deliberately laughed" at and "minimized" his "ADA req[uest]," and refused to provide him briefs or clean laundry after an incontinence accident. *See* 602 at 1. The routine review into this allegation of disability-related staff

[4821341.4]

**CONFIDENTIAL**

████████████
████████████

February 27, 2026
Page 11

misconduct was incomplete and biased; indeed, there is no record that *any* investigatory steps were taken by the reviewer before denying the claim.[6]

Although Mr. ████ was interviewed as part of a parallel response to his 1824 disability request seeking access to incontinence supplies in the future, he was not asked about his allegations against Officers ████ and ████ The response to the 1824 states that Mr. ████ staff misconduct allegations would be separately addressed, and that he "will be contacted in an alternate manner related to this allegation should it be required." *See* 1824 Decision Letter at 2. Mr. ████ was not asked for further detail about his allegations against Officers ████ and ████ including whether there were any witnesses and what time of day the incident took place, so that the reviewer could request video. (Mr. ████ alleged that the incident occurred between 8:55 am and 1:00 pm, so the reviewer could have requested video even without interviewing him.) The reviewer does not appear to have interviewed *anyone* about the staff misconduct allegations, and there is no indication that they made any effort to seek out the video evidence that was necessary to resolve whether the officers laughed at and refused Mr. ████ requests for accommodation. *See* 10C Grievance Appeal Claim at 1.

After taking no investigatory steps, the reviewer stated that "[n]o evidence was provided or discovered" that would substantiate the allegations. *See* Decision Letter at 1. The response also includes a broad unsupported statement from an unknown source (potentially the reviewer's personal opinion) that is dismissive of the uninvestigated allegations:

> All Staff assigned to Facility C treat all Incarcerated Persons with dignity and respect, ensuring they are all treated equally and fairly.

*See* Decision Letter at 2. The inclusion of this dismissive statement shows the reviewer's bias. The reviewer's apparent presumption that no officer could have possibly treated Mr. ████ in the manner he alleged may explain why the reviewer took no steps to investigate this serious allegation of disability-related staff misconduct.

3.    **SATF-**████

This is another case where the reviewer conducted an incomplete and biased investigation into an allegation that an officer denied a class member's request for

---

[6] This allegation that officers ridiculed Mr. ████ based on his disability is on the ADI, and thus should have been routed to OIA for investigation. *See* II, *supra*.

[4821341.4]

**CONFIDENTIAL**



February 27, 2026
Page 12

incontinence-related disability accommodations. ██████████████████
██████), a hard-of-hearing class member who is prescribed incontinence supplies and
mobility-related DME for an unverified mobility disability, alleged that Officer ██████
frequently makes him wait hours for an incontinence shower, "humiliating me and …
making me and my cell mate smill [sic] my yurine [sic] and my shit in the cell," and that
he is developing a rash due to the long waits for showers. *See* 602 1-2. Mr. ████ also
alleged that he asked Officer ██████ for an incontinence shower on April 2, 2025 at
7:00 pm, but the officer denied his request, even though he was allowing white people to
shower at the same time. *Id.* He further alleged that Officer ██████ makes him wait
while allowing white people to shower "because of the color of my skin being brown."[7]

The reviewer conducted a cursory investigation into this serious allegation of
disability-related staff misconduct. Initially, the reviewer merely interviewed Mr. ████
and Officer ██████ who stated he did not remember whether Mr. ████ requested a
shower on April 2. *See* 10C at 1-2. The reviewer documented that fact gathering was
complete after those two interviews, even though video evidence was necessary to
resolve what happened. *Id.* at 1 (05/05/2025 20:26:45 Entry). The reviewer only
requested video footage after being instructed to do so by the Reviewing Authority's
designee. *Id.* at 1 (05/07/2025 10:28:23 Entry).

The reviewer did not obtain sufficient video footage to resolve the case, even after
being directed to do so by a supervisor. **The investigator reviewed only 46 seconds of
AVSS footage, beginning at 6:59:26 on April 2, and did not request any BWC
footage from Officer ██████.** *See* NICE Request at 5. Although the AVSS footage
has audio, it shows no interaction between anyone and does not show the housing unit
shower. *See* AVSS Footage at 6:59:21. It was necessary for the reviewer to watch more
than 46 seconds of video to determine if the interaction occurred within minutes before or
after 7:00 pm, to obtain Officer ██████ BWC footage to see if the interaction
occurred outside the view of the AVSS camera, and, if necessary, to clarify with Mr.
████ the approximate time of the interaction. Yet the reviewer took none of these steps.
The reviewer also took no steps to investigate the allegation that Officer ██████ was
allowing white people to shower while refusing showers to Mr. ████ because of his race.

The reviewer instead denied Mr. ████ claim based solely on the fact that the 46
seconds of AVSS footage he reviewed did not show Mr. ████ requesting an incontinence

---

[7] The allegation that Officer ██████ is providing discriminatory shower access based
on race is on the ADI, and should haave been routed to OIA. *See* II, *supra.*

[4821341.4]

CONFIDENTIAL

██████████████

██████████

February 27, 2026
Page 13


shower from Officer ███████ at exactly 7:00 pm on April 2, 2025. *See* Decision Letter at 1. This aggressively literal read of the alleged time of the incident, along with the reviewer's initial decision to close the case without reviewing any video, suggests the reviewer had predetermined the outcome of the investigation.

The reviewer's interview summaries also strongly suggest the investigation was biased. Although Officer ███████ claimed not to remember the incident in question, the reviewer included in the interview summary Officer ███████ self-serving general statement that "he makes every effort to ensure [Mr. ████ receives his incontinent [sic] shower." *See* 10C at 1-2. By contrast, the summary of Mr. ████ interview focuses almost entirely on recounting the reviewer lecturing Mr. ████ about CDCR shower policy, with no indication that the reviewer asked any questions aimed at figuring out what happened. *Id.* at 2 ("Claimant was advised that per OP 403 custody staff will accommodate additional showers at there [sic] earliest opportunity available, at the discretion of custody staff. Claimant was also advised that he needs to indicate to custody staff the reason for needing an extra shower.").[8] The reviewer also emphasized that Mr. ████ "stated that he felt that when he asks for a shower he needs to get one immediately," *id.*, making it seem like Mr. ████ had unreasonable expectations, even though this statement is not relevant to whether Mr. ████ was improperly denied an incontinence shower because of his race, and whether he is regularly forced to wait hours for incontinence showers by Officer ███████, as he alleged.

4.      **CIW-████, CIW-████, CIW-████**

These three cases each involve allegations that housing officers failed to provide personal notification of announcements to a hard-of-hearing class member, even though they were on notice from the ADA Sergeant that the class member required these notifications as an accommodation for her disability. The first complaint was denied after a cursory investigation, in which the reviewer failed to request video evidence that would have resolved the case. The next two cases were each improperly rejected as duplicative of the class member's first complaint, simply because she alleged that again, in a different circumstance, she was subject to the same type of misconduct that she had complained about in the past. Rather than rejecting these claims as "duplicative," the

---

[8] Based on the reviewer's advisement, he appears to have assumed that Mr. ████ must not have told Officer ███████ that he was requesting a shower due to an incontinence accident, even though Officer ███████ did not make this excuse and there is no evidence referenced in the file that would support this assumption.

[4821341.4]

**CONFIDENTIAL**

███████████████

██████████

February 27, 2026
Page 14

institution should have recognized a pattern of alleged misconduct and investigated them together to determine if corrective action or progressive discipline was necessary to address the reported disability discrimination.[9]

In the first case, CIW-███████ , █████████████████████████, alleged that she missed breakfast because she did not hear the announcement, and the housing officers did not provide her personal notification, even though the ADA Sergeant had told the officers that Ms. ████████ requires personal notification. *See* 602 at 1-2. Ms. ████████ alleged that one of the officers, Officer ████████, refused her request for a tray of food since she had missed breakfast. *Id.* The reviewer mischaracterized the allegation as against "unknown custody staff" on "an unknown date, unknown time in the morning." *See* OOG Decision at 1. But Ms. ████████ named the officer and stated that the incident happened "this morning." As such, the date could have been determined based on the date the grievance was stamped received (April 7, 2025, indicating that it was submitted the day before), and it would have been simple to determine when the announcement for breakfast occurred in Ms. ████████ housing unit that day. The reviewer interviewed Officer ████████, who denied the allegation and claimed that he provides personal notification to Ms. ████████ The reviewer should have requested BWC footage from Officer ████████ and AVSS from the housing unit during the relevant time period, but did not do so. Video evidence would have been dispositive in showing whether Ms. ████████ was provided personal notification that morning, and whether Officer ████████ refused her request for a tray of food after she missed breakfast.

In the second case, CIW-████████, Ms. ████████ submitted a 602 stamped received on April 8, 2025, the day after her first grievance was received, in which she alleged that she once again missed the announcement for breakfast that morning, and the housing officers again did not provide her personal notification. *See* 602 at 3. She further alleged that the housing officer on duty refused her request for a pass to go to the dining hall, and although he subsequently let her get two sack lunches, she missed out on the fruits, vegetables, and milk that other people received with their breakfast. *Id.*

The reviewer improperly rejected this case as duplicative of CIW-████████, apparently because both complaints involved the same type of misconduct. *See* OOG Decision at 2. But CIW-████████ concerns the failure to provide personal notification of the announcement for breakfast on a different date, and describes different events

---

[9] The allegations of disability discrimination in these three cases are on the ADI, and thus should have been routed to OIA for investigation. *See* II, *supra*.

[4821341.4]

CONFIDENTIAL

███████████████

████████████

February 27, 2026
Page 15

following the officers' failure to notify Ms. ████████ that it was time for breakfast. Indeed, Ms. ████████ wrote in the second grievance that this "keeps happening regardless of the multiple grievances I have filed." *See* 602 at 3.

In the third case, CIW-████████, Ms. ████████ submitted a 602 stamped received on April 9, 2025, the day after the second grievance was received, in which she alleged that a different officer, Officer ████████ "never personally notifies me of announcements" even though "[h]e knows I am hearing impaired & was informed by the ADA Sergeant … that officers need to personally notify me," and that she again "almost missed breakfast this morning." *See* 602 at 1. The reviewer again improperly rejected this complaint as duplicative of prior complaints alleging the same type of misconduct. *See* OOG Decision at 2. But this allegation cannot be duplicative of CIW-████████ or CIW-████████, as it concerns a different officer, a different day, and different circumstances.

Rather than rejecting the 602s as duplicative, the institution's OOG should have recognized a pattern of housing officers allegedly routinely failing to provide personal notification of the announcement for breakfast to Ms. ████████ and investigated these claims together in order to confirm whether the violations occurred and, if so, take the opportunity to provide training or take other corrective action against the officers.[10]

5.    **RJD-████████**

This case is an example of the type of improper claim-splitting that Plaintiffs have long reported on, which wastes time and investigatory resources and may result in

---

[10] In another case, LAC-████████, the routine reviewer also improperly rejected a disability-related staff misconduct complaint as "duplicative" simply because the class member alleged the same type of misconduct in a prior complaint. ████████ ████████████████████, a hard-of-hearing class member who is prescribed incontinence supplies and mobility-related DME for an unverified mobility disability, alleged in an 1824 that housing officers keep refusing his requests for incontinence showers, including most recently on April 21, 2025. *See* 1824 at 1. The routine reviewer rejected the claim without investigation as "substantially duplicative of a prior claim you already submitted." *See* OOG Response at 1. Although Mr. ████████ had filed an 1824 in early March 2025 about being denied incontinence showers, LAC-████████, that case involved a different incident, where Mr. ████████ was allegedly denied an incontinence shower on March 1, 2025, nearly two months earlier. *See* 1824 for LAC-████████ at 1. The only commonality between these two allegations is the housing officers' failure to allow Mr. ████████ to shower in a timely manner after an incontinence accident.

[4821341.4]

CONFIDENTIAL

████████████

████████████

February 27, 2026
Page 16

inconsistent findings.  Here, the same allegation raised on a single 602 was investigated three times by three different reviewers.  Each reviewer conducted such an incomplete investigation that it appears that they were not actually seeking to discover what happened in the case, but were instead seeking justification to close the case as quickly as possible.  Although video would have resolved whether the misconduct happened as alleged, none of the reviewers requested it.

████████████████████████████████████ ), a hard-of-hearing class member who uses a wheelchair, alleged that, during a March 25, 2025 cell search, Officer ████ improperly confiscated his personal bowls and damaged his state-issued laptop, which Mr. ████ is assigned to use for his college courses, and that the officer admitted to doing so the following day.  *See* 602 at 1.  Mr. ████ requested that he be reimbursed for the confiscated bowls, and that he not be charged by CDCR for the damage to the laptop.  *Id.*

The OOG inexplicably split this single allegation of staff misconduct into three separate routine reviews, with three different assigned fact-finders:  (1) a review of whether Officer ████ admitted to confiscating Mr. ████ bowls and damaging the laptop during the cell search; (2) a review of Mr. ████ request to be reimbursed for the confiscated bowls; and (3) a review of Mr. ████ request to be cleared of any fines relating to the broken laptop.  *See* OOG Response at 1-3.  The latter two "reviews" are not separate claims, but rather specific requests for relief related to Mr. ████ single allegation of staff misconduct.

The first reviewer simply checked the staff assignment records and concluded that Officer ████ was not assigned to Mr. ████ housing unit on the date and time that he alleged the cell search occurred, or on the date that he alleged that Officer ████ admitted to confiscating the bowls and breaking the laptop, and denied the claim on that basis.  *See* OOG Response at 1.  The reviewer did not interview Mr. ████ to see whether he got the date and time of the cell search and/or the name of the officer wrong on his 602.  Nor did they check records to see when Mr. ████ cell was searched.

The second reviewer separately checked the staff assignment records, concluded that Officer ████ was not on duty on the alleged date of the cell search, and closed the case without taking any further investigatory steps.  *See* OOG Response at 2.

The third reviewer also confirmed via staff assignment records that Officer ████ was not on duty at the alleged date and time.  Rather than immediately closing the case, the reviewer interviewed Mr. ████ who was adamant about when the search occurred.

[4821341.4]

CONFIDENTIAL

████████████
████████████

February 27, 2026
Page 17

The reviewer located the cell search receipt for the March 25 search, but closed the case on the grounds that Officer ███ did not sign the cell search receipt.  *See* OOG Response at 3.  Yet the reviewer took no steps to look into whether one of the officers who *did* sign the cell search receipt may have actually been responsible for confiscating Mr. ████ bowls and breaking the laptop.  The reviewer did not interview those officers regarding the search, nor request the BWC footage for the officers who actually searched the cell, which would have made it possible to confirm or disprove the claim.[11]

The Office of Appeals ("OOA") agreed that the response to Mr. ████ grievance "lacks sufficient reasoning in support of the decision," and instructed the prison's OOG to "open a new grievance, address appellant's claim, and upload all supporting documentation."  *See* OOA Appeal Decision at 1-2.  Unfortunately, this remedy was futile, as by the time of the OOA decision, on August 12, 2025, it was well past the 90-day retention date for any video evidence of the March 25, 2025 cell search.  Without video, it is impossible to determine what happened in this case.

    **B.**      **In The Rare Circumstances Where Routine Reviews Are Sufficiently Comprehensive and Unbiased to Reveal Evidence of Disability-Related Staff Misconduct, Staff Are Still Not Held Accountable**

In the rare circumstances where routine reviews uncovered sufficient evidence to sustain allegations of staff misconduct—3 of 22 cases (or 13.6%) in the random sample of the April 2025 production where the reviews were not so incomplete and/or biased that it was impossible to determine what happened—the allegations were still not sustained, and no staff received corrective action.  *See* Routine Review Table.

All three such cases involved allegations of disability-related staff misconduct where, at minimum, corrective action should have been imposed, but the allegations were not sustained against any staff.

---

[11] Notably, Mr. ████ attached to his 602 a cell search receipt for the March 25, 2025 search that is signed by Officer ███ just as he alleged.  *See* 602 at 3.  Unfortunately, because Defendants did not produce any of the documentation that purports to show that Officer ███ was not on duty when the cell search occurred, and that other officers signed the cell search receipt, Plaintiffs' counsel cannot explain this discrepancy.

[4821341.4]

CONFIDENTIAL

██████████████
██████████

February 27, 2026
Page 18

       1.      **LAC-**██████

In this case, ██████████████████████████████████████), a hard-of-hearing class member with an unverified mobility disability who was housed in a Mental Health Crisis Bed ("MHCB") in the prison's Correctional Treatment Center ("CTC"), alleged that officers made him "'scoot' on [his] ass in front of everyone in CTC, laughing at [his] disability." *See* 602 at 3.[12] [13]  The BWC footage showed that the officers violated CDCR's reasonable accommodation policy by failing to provide Mr. ██████████ with a temporary wheelchair to go down the hall for his telephone call, and that as a result, Mr. ██████████ scooted on the floor down the hallway to the phone, as he alleged. *See* BWC at 6:21:50.  Although the officers should have received training as a corrective action, the reviewer did not sustain the allegation. *See* OOG Decision at 2.

The BWC footage confirms that Mr. ██████████ requests a wheelchair from the CTC officers. *See* BWC (linked above) at 6:22:30.  Earlier that day, Mr. ██████████ went "man down" after reportedly coughing up blood and experiencing severe abdominal pain. *See* Inpatient Progress Note (dated Mar. 30, 2025) at 1.  The day before, he reported that he was unable to walk due to groin pain and possible testicular cancer (for which he had been seen at an outside hospital shortly before being admitted to the MHCB). *See* MHMD Initial Assessment Note (dated Mar. 29, 2025) at 2.  Given this, the CTC officers should have allowed Mr. ██████████ to use a loaner wheelchair as a temporary accommodation in order to access the phone, rather than having him scoot on the floor down the CTC hall.

Under CDCR policy, custody officers should use their judgment to temporarily provide reasonable accommodations pending a medical evaluation. *See* CDCR/CCHCS Memorandum re Reiteration of Reasonable Accommodation Requirements (Oct. 28, 2022) at 1 ("Staff should not rely on a medical diagnosis or DPP/DDP codes in order to determine the necessary accommodation.  Accommodations should be provided based on the IP's needs.  It is the expectation that staff utilize sound correctional judgment when

---

[12] Less than two months after this incident, Mr. ██████████ mobility disability was verified; he is now prescribed a permanent wheelchair and verified as ████. *See* 1845/7410 and 7536 (dated May 22, 2025); 1845/7410 (dated Oct. 22, 2025).

[13] This allegation that officers laughed at Mr. ██████████ because of his disability is on the ADI, and thus should have been routed to OIA for investigation. *See* II, *supra*.

[4821341.4]

CONFIDENTIAL

████████████
████████████

February 27, 2026
Page 19

determining the reasonableness of the IP's request, and understand they should provide reasonable accommodations without relying on a Chrono or medical prescription.").

Instead, the officers initially tell Mr. ████████ that there is no wheelchair available in the CTC, without first checking. *See* BWC (linked above) at 6:22:45. Although it seems implausible that there would be no extra wheelchairs in the CTC, the reviewer uncritically accepted this statement by the officers. *See* OOG Decision at 3 ("An interview was conducted with CTC Custody staff, who stated that the claimant was informed no wheelchair was available at the time of the scheduled phone call."). Yet while Mr. ████████ is scooting across the floor to the phone, one of the CTC officers says that when the doctor is in "tomorrow," the doctor can evaluate Mr. ████████ for a wheelchair, as "we have one in here," indicating that there actually is a wheelchair available. *See* BWC (linked above) at 6:23:30. The reviewer either missed or omitted this statement.

The reviewer's report also shows bias, emphasizing that the officers offered to help Mr. ████████ and that he "elected" to scoot on the floor, while ignoring that they did not provide him the requested wheelchair or offer an alternative accommodation to help him get to the phone, such as a walker. *See* OOG Decision at 3. The only offer of help by the officers was to point out that Mr. ████████ appeared to be able to use his legs to scoot on the floor, and state that if he stood up and tried to walk, they could "help," apparently by escorting him and helping to support his body weight. But the officers refused to help pick Mr. ████████ up off the floor when he asked in response to that offer. *See* BWC (linked above) starting at 6:22:50. That is not a valid offer to provide a reasonable accommodation for Mr. ████████ reported inability to walk.

2.    **KVSP-████**

In this case, ████████████████████████████), a class member who uses a walker and has a special cuffing chrono requiring the use of waist restraints, alleged that Officer ████ did not honor his special cuffing chrono and instead handcuffed him with standard cuffs when escorting him for an insulin shot. *See* 1824. The BWC footage confirmed the allegation: Officer ████ told Mr. ████ "I don't have any waist restraints" and asked whether he would like to be cuffed in the front, and when Mr. ████ told the officer that he needs waist restraints as he uses a walker, Officer ████ responded, "I know," confirming his awareness of the special cuffing chrono. *See* BWC at 11:42:50.

[4821341.4]

CONFIDENTIAL

██████████
██████████

February 27, 2026
Page 20

Despite the evidence confirming the violation, Mr. ████ grievance was denied. *See* Decision Letter at 2. The reviewer notes that Facility C was under modified programming that required escorts in restraints, but nothing in the modified program indicated that it was permissible to ignore an incarcerated person's special cuffing chrono, allowing staff to circumvent *Armstrong* Remedial Plan requirements regarding the provision of cuffing accommodations when cuffs are required. *See Armstrong* Remedial Plan § IV.I.7.; Daily PSR. The reviewer also makes an excuse for the violation, claiming that the officer handcuffed Mr. ████ due to the "urgency of the … medical procedure," but cites no policy that would treat an escort for a routine insulin shot as such an urgent matter that it would excuse a violation of a special cuffing chrono. *See* Decision Letter at 1. Although the facts uncovered by the routine review confirmed the violation, nobody was held accountable, and the opportunity for training or other corrective action was lost.

       3.    **KVSP-████**

In this case, ████████████████████████████, a class member who uses a wheelchair, alleged that he was forced to sleep on a concrete bench in a holding cell overnight when he first arrived at KVSP, because there were no wheelchair-accessible beds available. *See* 602 at 1. The reviewer confirmed that Mr. ████ was in fact forced to stay in a holding cell in Receiving & Release overnight because of the lack of wheelchair-accessible beds, but denied the claim on the ground that "every effort was made to accommodate appropriate and accessible housing for Claimant upon arrival." *See* OOG Decision at 1. The reviewer confirmed a policy violation here, but did not determine which officers were responsible for housing Mr. ████ in a holding cell overnight, so that they could receive training or other corrective action.

## II.    DEFENDANTS FAILED TO PROPERLY IDENTIFY AND ROUTE STAFF MISCONDUCT COMPLAINTS

Plaintiffs' analysis of the routine reviews produced for April 2025 also provide additional evidence of screening problems by the CST. The CST is responsible for determining whether a complaint alleges staff misconduct—i.e., "behavior that results in a violation of law, regulation, policy, or procedure, or to actions contrary to an ethical or professional standard," Cal. Code Regs., Tit. 15 § 3486(b)(7)—and, if so, whether the alleged misconduct is on the ADI, in which case it must be routed to the OIA.

[4821341.4]

CONFIDENTIAL



February 27, 2026
Page 21

In 13 of 48 routine reviews (or 27.1%), the complaint included allegations of staff misconduct that are on the ADI, and that should have been routed to the OIA for investigation, rather than to the institution for routine review:

- CIW-█████, CIW-████████, CIW-███████ – In each of these cases, the class member alleges that she was not provided personal notification by housing officers that it was time for breakfast, even though the ADA Sergeant told the officers she requires personal notification of announcements as an accommodation for her hearing disability. In CIW-████████, the class member claims that, through these refusals to accommodate her, she is "being discriminated against because of my disability." In CIW-███████, she alleges that this "keeps happening regardless of the multiple grievances I have filed," and that this is "discrimination" because she is "being treated unfairly due to my disabilities." In CIW-████████, the class member alleges that she almost missed another meal because a housing officer continues to refuse to provide her personal notification, even though the officer knows she has a hearing disability and requires this accommodation. These allegations of disability discrimination are on the ADI, and the alleged pattern of discriminatory conduct by housing officers should have been investigated together by the OIA. *See* Discrimination/Harassment (1).

- LAC-████████ – The class member alleges that he witnessed an officer (whom he names) punching an incarcerated person on the ground while he was handcuffed "a couple days / week ago." This allegation of excessive and/or unnecessary force is on the ADI. *See* Use of Force (2).

- LAC-████████ – The class member alleges that officers lied on their incident reports, falsely claiming that the class member said he was suicidal to justify a cell extraction and use of force. This allegation of material misrepresentations on incident reports is on the ADI. *See* Dishonesty (2).

- LAC-████████ – The class member alleges that a Sergeant and Nurse conspired to give him a false RVR in order to retaliate against him. The class member names the alleged perpetrators and provides the RVR log number. An allegation of falsification of an RVR is on the ADI, which provides that "[a]llegations of perjury, material misrepresentation, falsification, or intentionally misleading statements involving a Rules Violation Report ***shall be routed to OIA regardless of the status of the disciplinary process.***" *See* Dishonesty (2) (emphasis added). The class member also alleges that the same Sergeant put his life in danger by "telling inmates to kill [me] by putting this yellow paper on my door which

[4821341.4]

CONFIDENTIAL



February 27, 2026
Page 22

inmates get killed just for having … on their doors." This allegation that the Sergeant created an opportunity or motive for other incarcerated persons to harm the class member is also on the ADI. *See Other Misconduct (7).*

- LAC-████ – The class member alleges that, while on suicide watch, he called "man down" after he "began having extreme chest pain." He alleges that the responding officer delayed in addressing his medical emergency, and instead first asked that he remove all of his clothes, and then began questioning him on why he had clothes on while on suicide watch. This allegation of endangerment through an alleged policy violation is on the ADI. *See Other Misconduct (1).*

- LAC-████ – The class member alleges that officers in the CTC denied his request for a wheelchair to go to the phone for his scheduled phone call, forcing him to "'scoot' on [his] ass in front of everyone in CTC, laughing at [his] disability." This allegation of making insults and/or harassment based on a disability is on the ADI. *See Discrimination/Harassment (2), (3).*

- COR-████ – The class member alleges that, when he tried to report disrespectful conduct by an officer to the Sergeant, the Sergeant walked into his office and told other officers: "That guy is a fag." The allegation that the Sergeant made an insult pertaining to the class member's alleged sexual orientation is on the ADI. *See Discrimination/Harassment (3).*

- KVSP-████ – The class member alleges that officers laughed at his ADA requests and minimized them, and refused to provide him with briefs or clean laundry after an incontinence accident. The allegation of making insults and/or harassing an incarcerated person based on a disability is on the ADI. *See Discrimination/Harassment (2), (3).*

- SATF-████ – The class member alleges that an officer denied his request for an incontinence shower, even though the officer was allowing white people to shower at the same time, "because of the color of my skin being brown." The allegation that the officer is providing discriminatory shower access based on an incarcerated person's race is on the ADI. *See Discrimination/Harassment (1).*

- SATF-████ – The class member alleges that an officer refused to accept his outgoing mail, and that when he requested a 602 to report the refusal, the officer threatened him, stating "watch what I am going to do." The class member alleged that he interpreted this statement as a threat of assault due to the officer's "violent

[4821341.4]

**CONFIDENTIAL**



February 27, 2026
Page 23

history" of "battering inmates." The allegation that the officer engaged in conduct which interferes with the reporting of misconduct and/or intimidated, dissuaded or threatened an incarcerated witness is on the ADI. *See* Code of Silence (3), (4).

- CIW-▮▮▮▮▮ – The class member alleges that a third watch officer is knowingly allowing incarcerated people who do not live in her housing unit to enter the building and go into other people's cells, and that "it's all drug / sex related." She alleges that, in the past, the same officer put people at risk of harm by allowing someone into her housing unit who did not live there, leading to "enemy chronos." This is an allegation of endangerment through a policy violation, which is on the ADI. *See* Other Misconduct (1).

In the Stipulation and Order re Staff Misconduct Investigation and Discipline Process, ECF No. 3721, the parties agreed that, until March 6, 2026, the CST "may use the Staff Misconduct Quick Reference Guide, dated December 29, 2022, to screen cases from the six prisons to determine whether the complaint is an allegation of staff misconduct on the [ADI], warranting investigation by OIA." *Id.* ¶ 10. It is thus possible that the CST determined that the above allegations did not warrant an OIA investigation using the Staff Misconduct Quick Reference Guide, even though they allege misconduct that, on its face, is on the ADI. However, given the level of specificity and the plausibility of these allegations, Plaintiffs do not agree those exceptions apply in any of these cases.

**For each of the preceding cases, please provide the basis for the CST's screening decision, so that we can understand whether the CST failed to identify claims that are on the ADI, or whether we disagree with the CST's determination that the claims should have been diverted away from OIA despite being on the ADI.** In other words, for each case, did the CST decide to route the complaint for routine review because the CST did not believe that the complaint includes an allegation on the ADI, or because the CST determined (using the Staff Misconduct Quick Reference Guide) that the case did not warrant an OIA investigation even though the allegations, if taken at face value, are on the ADI? **Do Defendants agree with the CST's decisions in each of these cases?**

/ / /

/ / /

/ / /

[4821341.4]

CONFIDENTIAL



February 27, 2026
Page 24

### III.    PLAINTIFFS IDENTIFIED OTHER PROBLEMS WITH THE NEW ROUTINE REVIEW PROCESS FOR STAFF COMPLAINTS

#### A.    Defendants Frequently Failed to Route Allegations of Disability-Related Staff Misconduct to the ADA Coordinator

Plaintiffs' analysis of the sample of routine reviews from April 2025 also revealed that more than half of the routine reviews into allegations of disability-related staff misconduct were not routed to the institution's ADA Coordinator for assignment to an ADA-trained supervisor, as required by the parties' agreement.

In the 48-case random sample reviewed by Plaintiffs, 25 cases included one or more allegations of disability-related staff misconduct.  In 13 of those cases (or 52%), the disability-related allegations were *not* referred to the ADA Coordinator.  *See* Routine Review Table.  These include claims that are clearly and unambiguously disability-related, including allegations that staff fail to provide personal notification of announcements to a hard-of-hearing class member, that an officer refused a class member's request for an ADA worker to push his wheelchair, that officers lost or broke class members' DME or denied requests for DME as accommodations, that officers failed to honor a class member's special cuffing chrono, and that a class member was forced to sleep in a holding cell because there were no wheelchair-accessible beds available.  **What direction and/or training has been provided to ensure that disability-related complaints are identified and routed to the ADA Coordinator?**

#### B.    The Routine Review Files Frequently Omitted Key Documents Relied Upon By The Reviewer

One-third of the routine review files analyzed by Plaintiffs were missing critical evidence relied upon by the reviewer.  In 16 of 48 routine review files (or 33.3%), key documents or video were not included in the production.  *See* Routine Review Table. Although video evidence was usually (but not always) produced when it was obtained by the reviewer, the routine review files frequently omitted most or all of the documentary evidence relied upon by the reviewer.  In these cases, it is not clear whether the evidence was not saved by the reviewer in CDCR's internal records, or was simply not produced to Plaintiffs, although it appears that in at least some cases the reviewer failed to save the evidence internally.

When CDCR proposed ending the LDI process, Plaintiffs raised significant concerns that persons conducting routine reviews might not gather the same types of

[4821341.4]

CONFIDENTIAL



February 27, 2026
Page 25

evidence as LDIs, and Defendants assured Plaintiffs that the reviewers would save all evidence so that case files could be produced to Plaintiffs and the Court Expert for monitoring purposes. Plaintiffs' preliminary findings regarding the lack of consistent documentation of routine reviews and the frequent failures to save key evidence in the routine review files is troubling. **What direction and/or training has been provided to ensure that the persons who conduct routine reviews understand their obligations to save all evidence relied upon in the case file?**

IV.   **PLAINTIFFS REQUEST THAT DEFENDANTS COMMIT TO A REGULAR PRODUCTION SCHEDULE FOR ROUTINE REVIEWS OF STAFF COMPLAINTS BY CLASS MEMBERS AT THE SIX PRISONS**

After repeated inquiries by Plaintiffs regarding when Defendants would begin producing routine review files of allegations of staff misconduct by class members at the Six Prisons, as required by the Court's accountability orders and Remedial Plans, Defendants produced the routine reviews for the months of January 2025 through April 2025 in a haphazard fashion between November 2025 and January 2026.

Defendants have produced additional folders of routine review files in February 2026, in an even more disorganized fashion, and have not shared with Plaintiffs how they are determining what to produce and when. Thus far, we have received the following folders containing routine review files as of February 26, 2026, although we do not know whether these productions are complete, as Defendants made multiple supplemental productions of routine review files for January through April 2025.[14]

|           | CIW  | COR | KVSP | LAC | RJD | SATF |
|-----------|------|-----|------|-----|-----|------|
| **May**       | Yes  | Yes | Yes  | Yes | Yes | Yes  |
| **June**      | No*  | Yes | Yes  | Yes | Yes | Yes  |
| **July**      | Yes  | No  | No   | Yes | No  | Yes  |
| **August**    | No*  | No  | No   | Yes | No  | No   |
| **September** | No*  | No  | No   | Yes | No  | No   |

[14] There are a number of instances where Defendants produced a folder for one of the Six Prisons that is completely empty. We have marked these as "No*," with an asterisk.

[4821341.4]

CONFIDENTIAL



February 27, 2026
Page 26

|  | CIW | COR | KVSP | LAC | RJD | SATF |
|---|---|---|---|---|---|---|
| **October** | No* | No | No | Yes | No | No |
| **November** | No* | No | No | Yes | No | No |
| **December** | No* | No | No | No* | No | No |

**We request that Defendants produce the outstanding routine review files for the remainder of 2025 by no later than April 1, 2026, and that the parties agree to a regular production schedule for the routine reviews going forward.**

## V.    CONCLUSION

We look forward to discussing what can be done to improve the routine review system at the March 24, 2026 meeting with Defendants and the Court Expert.

[4821341.4]

# EXHIBIT C



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com


Email: ▮▮▮▮▮▮▮▮▮▮

April 7, 2026

VIA ELECTRONIC MAIL ONLY

▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
P.O. Box 942883
Sacramento, CA 94283
▮▮▮▮▮▮▮▮▮▮▮▮▮▮

    Re:    *Armstrong v. Newsom*: Plaintiffs' Ongoing Concerns Regarding Changes to Regulations for Staff Complaints and Routine Grievances, NCR Number 25-06 (Jan. 22, 2026)
           Our File No. 0581-03

Dear ▮▮▮▮▮:

The California Department of Corrections and Rehabilitation ("CDCR") adopted recent changes to the regulations regarding staff misconduct complaints and routine grievances. *See* NCR Number 25-06 (Jan. 22, 2026), attached hereto as **Exhibit A**. These regulations were adopted, *inter alia*, to comply with the Court-ordered changes to the staff complaint process, in order to improve the quality of investigations and to ensure that staff would be held accountable for ongoing violations of the rights of people with disabilities. Unfortunately, CDCR did not address most of the problems raised in Plaintiffs' comments on and objections to the proposed regulatory changes.

Prior to the adoption of the regulations, Plaintiffs provided multiple rounds of comments and objections to proposed changes that do not comply with *Armstrong* Court orders and remedial plans, that are inconsistent with negotiated agreements between the parties to address continuing non-compliance with those orders and plans, and/or that violate the Americans with Disabilities Act ("ADA"). *See, e.g.*, Third Renotice of Changes to Regulations for Staff Complaints and Routine Grievances (Dec. 2, 2025), attached hereto as **Exhibit B**; Second Renotice of Changes to Regulations for Staff Complaints and Routine Grievances (Sept. 23, 2025), attached hereto as **Exhibit C**.

[4841128.3]

April 7, 2026
Page 2

We are concerned that CDCR did not resolve most of the problems raised in our comments in the final regulations. Below, we memorialize the most important problems raised in our comments and objections that remain unaddressed in the final regulations.

It is essential that CDCR's regulations comport with party agreements and existing court orders and remedial plans. When regulations are inconsistent with what CDCR is required to do in order to comply with the Court's orders and remedial plans, party agreements, and the ADA, violations will be inevitable.

Plaintiffs request to meet with Defendants to discuss how to resolve this serious problem. This topic was on the agenda for the March 30 meeting on outstanding issues related to staff misconduct monitoring, but was not discussed. The parties agreed to schedule another meeting in April to cover the agenda items that were not substantively addressed at that meeting, once Defendants were able to confirm the availability of necessary participants. **Please propose meeting dates in April 2026.**

I.    **The Regulations Are Not Consistent with the Parties' Agreements to Address CDCR's Non-Compliance with the Court's Orders and Remedial Plans**

A.    **The Regulations Are Contrary to the Parties' Agreement Regarding the Grievance Resolution Team**

The final regulations are contrary to the parties' agreement regarding the Grievance Resolution Team ("GRT").

The parties reached agreement on implementation of the GRT as a means to help Defendants manage the flow of serious staff complaints by diverting some complaints, those that are filed by the fifty most active staff misconduct complainants statewide, away from the OIA to other staff members to address. Defendants requested and Plaintiffs agreed to negotiate these modifications to the court-ordered requirements regarding investigations into staff complaints because CDCR claimed to be "facing a crisis due to an overwhelming number of pending investigations that cannot be completed with existing resources before the statute of limitations expires." *See* E-Mail from ▮ ▮ (May 31, 2025).

During the negotiations over the parameters of the GRT, Defendants proposed and Plaintiffs agreed that, should the GRT members determine that any complaint referred to the GRT warranted further investigation, that the GRT would have the discretion to divert the claim for routine review or investigation. *See, e.g.,* Memorandum from Chris Chambers re Management of Staff Misconduct Allegations by "Frequent Filers" (June 11, 2025), attached hereto as **Exhibit D**, at 2 (explaining that, following an interview with the complainant, "the members of the GRT shall discuss which claims shall be

[4841128.3]

April 7, 2026
Page 3

referred for routine review and which shall be referred … for investigation").  However, CDCR's draft regulations to implement the GRT process were inconsistent with the parties' agreement in several ways.  Despite several rounds of comments by Plaintiffs, the final regulations still do not comport with the parties' agreement.

**The final regulation eliminates the GRT's discretion to route a claim for a routine review if the claim meets one of the five criteria set forth in Section 3483.5(c).**  Previously, Section 3483.5(d)(2) provided that, if all three GRT members agree that a claim meets one of these five criteria, then the claim "**may** be answered by the Office of Grievances without the necessity of a routine review or an investigation," i.e., closed without a substantive response (emphasis added).  That discretion is consistent with agreements between Plaintiffs and CDCR that the GRT could send a claim for a routine review or an OIA investigation, even if it met one of the five criteria in subsection (c), if the GRT decided that such a review was appropriate.  The final regulation eliminates that discretion, in contravention of the parties' agreement, by requiring that any claim that the GRT meets one of the criteria in subsection (c) "**shall**" be answered without any routine review or investigation (emphasis added).

**The final regulations have changed what happens when the GRT determines that a claim meets criteria (c)(4) or (c)(5).**  Criteria (c)(4) applies to any claim that "closely mirrors three or more previous claims submitted by the same claimant during the most recent calendar quarter and is similar to at least one other claim which was previously denied by a Reviewing Authority or determined to be unfounded, exonerated, or not sustained by a Hiring Authority."  Criteria (c)(5) applies to any claim that "accuses departmental staff of failing to take a specific action but documentary evidence found in the department's information technology system clearly shows that the action was taken by that same staff."  Under prior versions of the proposed regulations, if the GRT determined that a claim met either of these criteria, then the GRT would route the claim for routine review.  But in the final regulations, all five criteria are treated the same; if the GRT determines that a claim meets any of the five criteria, then the claim is closed without any review or investigation.

The removal of GRT discretion to route a claim for routine review or investigation is particularly problematic with respect to criteria (c)(3), which applies to any claim that "is highly improbable (meaning the claim is factually possible but so improbable that any reasonable person would dismiss the claim as preposterous)."  Plaintiffs have raised serious concerns in the past that CDCR has used this "factually implausible" criteria to screen out meritorious allegations of staff misconduct, preventing them from being investigated or reviewed.  Even the most active staff complainants sometimes raise meritorious complaints that may initially appear to be factually implausible—especially given the increased likelihood that staff will look skeptically at claims raised by the most

[4841128.3]

April 7, 2026
Page 4

frequent filers, assuming that they are "crying wolf"—so it is critical that the GRT retain discretion to send such claims for review or investigation where appropriate. Plaintiffs' agreement to permit CDCR to route to the GRT "factually implausible" claims made by the most frequent filers of staff complaints—in violation of the court-ordered remedial plans—was contingent on the GRT retaining that discretion.

**The final regulations also changed what happens if a claimant is unavailable for a monthly GRT meeting.** Under prior versions of Section 3483.5(b)(4), the GRT had discretion to determine whether to proceed with the monthly GRT meeting when a claimant is unavailable. In the final regulations, if a claimant refuses or is unavailable, the GRT "shall" proceed with the monthly GRT meeting for that claimant in absentia. Plaintiffs do not understand the rationale for eliminating this discretion. If a claimant is unavailable because of a medical appointment or other scheduling conflict, the GRT should have the discretion to conduct the monthly meeting at a time when the claimant is available. The GRT meeting is an important part of the negotiated GRT process, as it provides claimants an opportunity to explain or clarify their claims before the GRT makes a decision regarding whether those claims will receive a substantive response. The meeting should occur with the claimant present whenever possible.

### B. The Regulations Are Not Consistent with the Parties' Agreement As To When Staff Complaints Shall Be Suspended and Elevated to OIA

The final regulations are contrary to the parties' agreement as to when staff misconduct complaints routed for routine review shall be suspended and elevated for an investigation by the OIA. At CDCR's request, the Plaintiffs agreed to eliminate the Locally Designated Investigator ("LDI") process required by the court-ordered remedial plans, and to route all allegations of staff misconduct not on the ADI for routine review by local supervisory staff. Defendants requested this change to reduce the workload on wardens, who were struggling to comply with their obligations under the remedial plans, as well as on the supervisory staff conducting the LDI inquiries.

As a condition of this agreement, the parties agreed that the supervisor conducting a routine review of staff misconduct will suspend their review and refer the allegation to the CST for an investigation by the OIA in the following scenarios:

> (1) during the review, the reviewer discovers information suggesting the claim is on the ADI;
>
> (2) the claim, if proven true, is likely to result in adverse action (i.e., the conduct is not on the ADI but is so egregious as to warrant adverse action); or

[4841128.3]

April 7, 2026
Page 5

> (3) the claim is similar to previous staff misconduct that was
> sustained against the departmental staff involved and
> therefore adverse action should be considered.

The final regulations do not capture this agreement, because they improperly combine the second and third scenarios into one provision that distorts the parties' agreement. *See* Section 3483(e)(4)(B)(ii) ("The claim, if proven true, is likely to result in adverse action, including instances when the accused staff member engaged in similar misconduct within the past three years of the alleged misconduct which was granted by a Reviewing Authority or recently sustained by a Hiring Authority and resulted in corrective or adverse action."). This language makes it less likely that claims involving staff who engage in repeated misconduct will be issued adverse action.

Under the new regulations, a claim will only be elevated to OIA under subsection (e)(4)(B)(ii) if: (1) the subject had been previously found to have committed similar misconduct; **and** (2) the present claim is likely to result in adverse action if proven true. This requires the supervisor to analyze both factors before suspending and elevating . Under the parties' agreement, all claims that allege misconduct similar to prior sustained misconduct should be routed to OIA for investigation. The final regulations improperly turn the second and third scenarios for suspending and elevating into a two-part test.

CDCR also inappropriately added the requirement that an employee's prior misconduct must have been sustained "within the past three years." The parties did not agree that the misconduct had to be sustained in the recent past.

## II.    The Regulations Permit CDCR to Refuse to Investigate Allegations of Staff Misconduct in Violation of the Court's Orders, Remedial Plans, and the ADA

### A.    The Regulations Permit CDCR to Refuse to Investigate Allegations of Staff Misconduct by Witnesses to the Misconduct

Section 3483(g)(6)(D) states that CDCR may reject any third-party claim from an incarcerated person (i.e., a claim that "concerns harm to a person other than the person who signed the grievance") unless "the claim concerns an allegation of staff misconduct that was referred for an investigation." This language limits an incarcerated person's ability to file a grievance about staff misconduct that they witness, in violation of the court-ordered remedial plans. **Under the final regulations, the only time CDCR cannot reject the witness's grievance is when the person who was the direct victim of the misconduct also filed a grievance about that misconduct, _and_ that grievance was referred to the OIA for investigation**.

[4841128.3]

April 7, 2026
Page 6

This provision is inconsistent with provisions of the Remedial Plans.  *See* RJD and Five Prisons Remedial Plans § II.A.ii (requiring, without qualification, that "[a]ll grievances submitted by an incarcerated person or parolee shall be reviewed by CST"); *see also id.* § II.A.i ("Any person can submit a complaint of staff misconduct when they believe departmental staff have engaged in behavior that resulted in a violation of law, policy, regulation, or procedure, or an ethical or professional standard.").

CDCR's response to this Comment alleges that CDCR will still investigate allegations of staff misconduct made by witnesses to the misconduct, and that the regulations simply "establish that the witness shall not receive a substantive decision letter regarding the matter."  *See* **Exhibit A** at 69-70.  But that is not what the regulatory text itself says.  And CDCR has already used this provision to refuse to investigate serious allegations of staff misconduct made by witnesses to the misconduct.  For example, ██████████████████████, filed a staff complaint alleging that an officer at SVSP "failed to aid an inmate experiencing a health crisis," and alleged that the subject officer has had numerous complaints against him, but that supervisors have insulated him from being held accountable.  Rather than investigate this allegation, CDCR rejected the claim because Mr. ████ does "not have the ability to file a claim on behalf of another person …."  *See* Letter from ██████████████████ re Failure of CDCR to Meaningfully Respond to Disability-Related Grievance Requests (Oct. 10, 2025), attached hereto as **Exhibit E**, at 4.

If Defendants are serious about holding staff accountable for misconduct, they cannot permit allegations of misconduct to be ignored simply because they are made by witnesses rather than victims.

**B.      The Regulations Prohibit Incarcerated Persons from Filing Staff Misconduct Complaints Against Third Parties That Provide Services to Incarcerated Persons on CDCR's Behalf**

The final regulations continue to prohibit incarcerated persons from filing staff complaints against CDCR third party entities that provide services to incarcerated persons on CDCR's behalf, in violation of Title II of the ADA.

Section 3481(e) provides that the regulations "do[] not create a right to grieve or appeal a policy, decision, action, condition, or omission that was not made by the department or departmental staff, but instead was made by an entity or official outside of the department, including, but not limited to, a county jail, the Department of State Hospitals, or the Interstate Commission for Adult Offender Supervision; nor by an entity or official that is quasi-independent of the department, including, but not limited to, the Board of Parole Hearings, the Prison Industry Authority, or the Commission on

[4841128.3]

April 7, 2026
Page 7

Correctional Peace Officer Standards and Training."  Section 3480(b)(8) similarly defines "grievance" too narrowly, to include only "a written complaint containing one or more claims that challenges a policy, decision, action, condition, or omission by the department or departmental staff," excluding employees or personnel of "quasi-independent" agencies.[1]

The grievance process cannot be limited solely to allegations against departmental staff, as incarcerated people have the right to grieve actions taken by "quasi-independent" entities and officials, including Prison Industry Authority staff who provide services to incarcerated persons on CDCR's behalf.  Title II of the ADA prohibits public entities from discriminating against people with disabilities "directly or through contractual, licensing, or other arrangements."  *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1065 (9th Cir. 2010) (quoting 28 C.F.R. § 35.130(b)(1)); *see id.* at 1068 (explaining that the "'benefits' of programs or services provided to class members by defendants through their contracts … come under the purview of the ADA and its regulations").  As such, CDCR is directly responsible for ADA violations by such individuals.

CDCR has already relied on these provisions to refuse to investigate allegations of disability discrimination and retaliation by Prison Industry Authority ("CALCTRA") staff.  *See* CDCR's Response to Advocacy for ███████████████████ (Feb. 24, 2026), attached hereto as **Exhibit F** (confirming that CDCR refused to investigate allegations of disability discrimination and retaliation by CALCTRA staff on the ground that CDCR lacked jurisdiction).  Instead, CALCTRA conducted a cursory investigation into this allegation of serious disability-related staff misconduct that is on the ADI, and concluded that no misconduct occurred.  *See* CALCTRA Response to Advocacy for ████ ███████████████ (Mar. 4, 2026), attached hereto as **Exhibit G** (admitting that the inquiry was based solely on interviews with the subject of the inquiry and other staff).

CDCR cannot disclaim responsibility for completing comprehensive and unbiased investigations into allegations of disability-related staff misconduct simply because the

---

[11] In response to Plaintiffs' comments, CDCR clarified that the term "departmental staff" is defined to include all CDCR "employees, contractors, and volunteers associated with the department, except those employed by the Board of Parole Hearings, the Prison Industry Authority, and the Commission on Correctional Peace Officer Standards and Training."  *See* **Exhibit A** at 77 (quoting Section 3480(b)(6)).  It is our understanding that this means that CDCR *will* investigate staff misconduct allegations made against other CDCR contractors, including Transitional Case Management Program benefits workers, and against volunteers who provide programs, services or activities to the incarcerated.

[4841128.3]

April 7, 2026
Page 8

misconduct is allegedly committed by third parties who provide programs, services or activities to incarcerated persons on CDCR's behalf.

**C.      The Regulations Improperly Permit CDCR to Reject Grievances About The Investigation Process**

Sections 3483(g)(6)(E)(2) and 3483(g)(6)(E)(3) improperly allow CDCR to "reject" a claim that challenges "the fact gathering process during a routine review" or "the fact gathering process during an investigation of staff misconduct," in violation of the court-ordered remedial plans, which contain no such limitation. *See* RJD and Five Prisons Remedial Plans § II.A.i.

Incarcerated persons have the right to raise legitimate complaints about the fact-finding process of investigations and routine reviews into allegations of staff misconduct, which are often indicative of the bias in favor of accused staff and against incarcerated persons that the Court found to be prevalent in CDCR's investigations.[2]

Incarcerated persons should have the right to grieve if, for example, they were disrespected or discriminated against by investigative staff during the interview, they did not believe the interview was confidential, they were called out to speak with the investigator over the intercom in their housing unit (undermining their ability to speak with investigative staff or routine reviewers without legitimate fear of reprisal), or that the interviewer was connected in some way to the subject of the complaint, increasing the likelihood of bias in favor of the subject and/or creating the appearance of bias.

These are all legitimate complaints about the fact-finding process, and incarcerated persons should not be prevented from grieving this kind of staff misconduct.

---

[2] Defendants' response to Plaintiffs' comments is unintelligible and appears to misunderstand the comment, which does not relate to a challenge to the fact-gathering process by staff who are accused of misconduct, but rather by an incarcerated person who believes that the investigation into their staff complaint was not comprehensive and/or was biased in favor of the accused officer. *See* **Exhibit A** at 72 ("If the department receives an allegation of staff misconduct, staff are assigned to gather relevant evidence in order to determine if the allegation is true or not, and if the allegation is true, what disciplinary action is appropriate. These are important steps toward holding employees accountable for misconduct, which may or may not lead to adverse disciplinary action against an employee. Furthermore, these steps are part of a personnel action governed by the state's progressive disciplinary process, not by the department's administrative remedies process. Therefore, complaints regarding the steps taken by the department in a personnel action are outside the scope of these regulations.").

[4841128.3]

April 7, 2026
Page 9

It is also counterproductive for CDCR to put its head in the sand by refusing to investigate grievances that allege bias or other problems with their court-ordered accountability process.

**III.     The Regulations Are Inconsistent with Other Requirements of the Court's Accountability Orders and the Six Prisons Remedial Plans**

    **A.     The Regulations Misrepresent the Standard by Which CDCR is Required to Route Staff Complaints for Investigation by the OIA**

Section 3486.1(e)(1)(A) incorrectly states that the Centralized Screening Team ("CST") shall refer claims for investigation by OIA when "[t]he allegation involves complex issues complex issues requiring specialized investigative skills or resources," even though this confusing standard **is not and has never been the actual court-ordered standard used to route complaints to OIA**. It is misleading to include this made-up standard in the regulations, rather than describing how CDCR is actually required to route staff misconduct complaints for investigation.

Plaintiffs have repeatedly objected—and continue to object—to CDCR's ongoing refusal to refer to or incorporate the Allegation Decision Index ("ADI") in regulation. The ADI was negotiated by CDCR, Plaintiffs' counsel, and the Court Expert in order to comply with the Court's orders and the court-ordered remedial plans. The ADI identifies the categories of allegations that are considered "serious" to ensure that those allegations are routed to the OIA for investigation. When a grievance alleges staff misconduct that meets a category on the ADI, it must be routed to the OIA for investigation. Conversely, when a grievance alleges staff misconduct that does not meet a category on the ADI, it must be routed back to the prison. The ADI is the court-ordered standard by which CDCR is required to determine how an allegation of staff misconduct is screened and routed. *See* RJD and Five Prisons Remedial Plans § II.A.ii. ("CST will utilize an Allegation Decision Index (ADI) to determine whether a complaint should be referred to OIA for investigation or returned to the local hiring authority for inquiry.").

Instead, the regulations invent a standard that the parties never agreed to, and which Plaintiffs have objected to from the start as contrary to the ADI and the court-ordered remedial plans. Some claims of staff misconduct that are not on the ADI nevertheless require "specialized investigative skills or resources;" conversely, some claims that are on the ADI are straightforward and may not require specialized skills or resources.[3] The central fact that determines where those allegations are routed is whether

---

[3] For example, an allegation that an officer refused to let an incarcerated person go to canteen and told them, "that's what you get for filing a 602 against me," does not require

April 7, 2026
Page 10

the alleged misconduct is sufficiently "serious" to be on the ADI.  CDCR's inclusion of the invented standard in the regulations makes it virtually impossible for an incarcerated person who files a staff complaint to understand how their complaint should be handled.  CDCR should include the ADI in the regulations, either by adding the entire ADI into the regulations or by incorporating the document by reference.

CDCR has never been able to adequately explain their refusal to acknowledge the ADI in regulation.  They make no attempt to do so in response to Plaintiffs' comments.  *See* **Exhibit A** at 65 (defending CDCR's decision to invent a screening standard contrary to the court-ordered remedial plans on the ground that no court order has expressly mandated that they incorporate the ADI into regulation).  If CDCR insists on refusing to include the ADI in regulation, it is necessary, at minimum, to include in regulation a screening standard that is consistent with what is actually required by the Court.

In order to avoid the bias found to be prevalent in local investigations, the court-ordered remedial plans require that allegations of "**serious misconduct**, which include, but are not limited to, use of force, staff sexual misconduct, dishonesty to include allegations of false and retaliatory Rules Violation Reports, discrimination/harassment, retaliation, code of silence, and integrity" be routed away from the institutions for OIA investigation.  *See* RJD and Five Prisons Remedial Plans § II.A.ii (emphasis added).

Whether allegations of misconduct are required to be routed away from the local institution thus is tied to the seriousness of the alleged misconduct, not the "specialized investigative skills or resources" necessary to investigate the allegation.  If CDCR will not include the ADI in the regulations, the screening standard must be revised so that it accurately reflects this reality.

B.      **The Regulations Improperly Permit the Subject of a Staff Complaint to Participate in the Review or Investigation of the Complaint**

The final regulations continue to permit staff who are the subject of a staff misconduct complaint to participate in the review or investigation of the complaint against them under certain circumstances, in violation of the court-ordered remedial plans.  Sections 3483(f)(1) and 3483(f)(2) create exceptions to the requirement that "[a]ny individual whose personal interaction with a claimant forms a part of a claim shall be excluded by the Reviewing Authority from participating in the grievance under

---

any specialized skills or resources to investigate; it merely requires a review of the BWC footage to determine what happened.  The court-ordered remedial plans nevertheless require that this serious allegation of misconduct be investigated by OIA, rather than by institution staff, who may be biased in favor of their accused co-worker.

[4841128.3]

April 7, 2026
Page 11

review," for staff who "participated in a committee meeting that concerns a claimant" and for staff who "reviewed a disciplinary action" against the claimant.

If an incarcerated person is grieving the actions of the committee, and in particular the actions of an individual on the committee, the members of the committee and that specific staff member should be excluded from participating in the review of that grievance. Similarly, if the incarcerated person is grieving a disciplinary action, the person who reviewed the disciplinary action should be excluded from the grievance review. CDCR is court-ordered to conduct unbiased investigations into allegations of staff misconduct. Allowing staff who are the subject of a complaint to participate in the review or investigation of that complaint introduces impermissible bias.

* * *

We look forward to discussing with Defendants how to address the fact that their final regulations are contrary to the Court's orders and remedial plans, the parties' negotiated agreements to address Defendants' non-compliance with those orders and plans, and the ADA.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/* ▮▮▮▮▮▮▮▮

By: ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮



[4841128.3]

# EXHIBIT D



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Michael Freedman
Email: MFreedman@rbgg.com

April 24, 2026

VIA ELECTRONIC MAIL AND USPS

<div style="border">

**CONFIDENTIAL**

**SUBJECT TO
PROTECTIVE ORDERS**

</div>

Sean Lodholz
Supervising Deputy Attorney General
California Department of Justice
1300 I Street
Sacramento, CA 95814
Sean.Lodholz@doj.ca.gov

> Re:    *Armstrong v. Newsom*: Discrimination Against *Armstrong* Class Members
> Through Persistent and Ongoing Disability-Related Staff Misconduct at
> California Health Care Facility, Stockton ("CHCF")
> Our File No. 0581-03

Dear Sean:

We write regarding allegations of serious and ongoing harm to class members at the California Health Care Facility ("CHCF") as a result of disability-related staff misconduct. As described below, Defendants have repeatedly failed to comply with prior Court orders that require Defendants to share information with Plaintiffs regarding the existence and results of investigations into disability-related staff misconduct. As a result, Plaintiffs' counsel are unable to adequately monitor Defendants' compliance with the Americans with Disabilities Act ("ADA") and the *Armstrong* Remedial Plan ("ARP") at CHCF. *See Armstrong v. Newsom*, 58 F.4th 1283, 1299 (9th Cir. 2023) (noting that "the violations that the district court sought to remedy" in its Five Prisons Order "stemmed from defective systems of accountability and a problematic culture whereby staff targeted disabled inmates for abuse").

Defendants have long-standing obligations in this case to investigate, and when appropriate, discipline staff who fail to accommodate or discriminate against *Armstrong* class members. *See* Dkts. 1045 at 7 (2007 Inj.), 2180 at 10-12, 16-18 (Order Modifying Perm. Inj.), 2479 (Order Modifying January 18, 2007 Inj.). Defendants must track and

[4842438.11]

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**
Sean Lodholz
April 24, 2026
Page 2

investigate all allegations of disability-related staff misconduct, the outcome of those investigations, and what action was taken as a result. Dkt. 2479 at 1. That information must also be shared with Plaintiffs' counsel. *Id*. If Plaintiffs' counsel inform Defendants that they have a good-faith disagreement with the outcome of an investigation, Defendants must produce the underlying evidence to Plaintiffs' counsel upon request. *Id.* at 2.

Since at least 2021, Plaintiffs have reported dozens of incidents of disability-related staff misconduct at CHCF to Defendants. These allegations include reports of excessive and violent uses of force resulting in serious injuries, including multiple by the same officer, in connection with class members seeking to have their disabilities accommodated. Class members also allege harassment by staff related to their disabilities and failures to provide accommodations. With respect to the vast majority of these allegations, Defendants have failed to provide all required information about what, if any action, Defendants have taken in response.[1] Defendants failed to produce accountability logs over the last year. When Plaintiffs have reported specific allegations of misconduct to Defendants, Defendants frequently have failed to inform Plaintiffs if an investigation has occurred and, if so, the results of the investigation. And Defendants have failed to respond to the majority of Plaintiffs' requests for underlying investigatory documents when Plaintiffs have a good-faith disagreement with the result.

Defendants' repeated failures to produce information about investigations into allegations of disability-related staff misconduct at CHCF have made it impossible for Plaintiffs to monitor Defendants' compliance in this case. Accordingly, Plaintiffs have now served with this letter narrow document requests intended to determine whether Defendants are holding staff accountable when warranted. The requests primarily seek investigation case files (i.e., investigation reports, evidence, and disciplinary documents) related to investigations into allegations of staff misconduct made by *Armstrong* class members at CHCF that were completed since January 2024.

---

[1] After repeated requests for the production of logs, Defendants recently informed Plaintiffs' counsel during a January 2026 case management meeting that statewide logs, even if they were to be produced, would not be accurate. Plaintiffs agreed to forgo the inaccurate production of logs, and acknowledge that Defendants are in the process of improving statewide tracking of disability-related staff misconduct allegations. However, that does not absolve Defendants of all other Court-ordered requirements, including sharing information with Plaintiffs' counsel regarding the outcome of investigations and producing the underlying documents, when requested, as described above. Dkt. 2479 at 1-2.

[4842438.11]

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**
Sean Lodholz
April 24, 2026
Page 3

I.      **Plaintiffs Have Been Reporting on Pervasive Disability-Related Staff Misconduct at CHCF for Years**

Over the past five years, in letters and tour reports, Plaintiffs have made dozens of allegations of disability-related staff misconduct at CHCF. *See, e.g.*, February 2021 CHCF *Armstrong* Monitoring Tour Report; October 2021 CHCF *Armstrong* Monitoring Tour Report; Letter from J. Hutt & A. Norris to T. Davis & R. Gaultney, "Staff Misconduct Toward Armstrong Class Members at California Health Care Facility" (Oct. 5, 2022); Letter from J. Hutt to T. Davis, "Staff Misconduct Toward Armstrong Class Members at California Health Care Facility and Headquarters' Continued Failure to Respond to Plaintiffs' Advocacy" (June 1, 2023); Letter from J. Hutt & S. Mishara to T. Davis, "Mass Discriminatory RVRs at CHCF For Failure to Report for Assignments," at 6 (Aug. 23, 2023); Letter from J. Hutt, A. Norris & P. Booth to T. Davis, "Continued Staff Misconduct at CHCF Against People with Disabilities," at 3 (Oct. 23, 2024); Letter from J. Hutt to T. Davis, "Armstrong Advocacy Letter, ▇▇▇▇▇▇▇▇▇▇, CHCF" (Dec. 4, 2024); Letter from P. Godbold & E. Galvan to T. Davis, N. Weber, & S. Thind, "*Coleman v. Newsom* and *Armstrong v. Newsom*: Unnecessary/Excessive Force Allegation from CHCF Class Member ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ on July 23, 2024" (Jan. 15, 2025); Letter from L. Khabbaz to N. Weber, S. Thind, & C. Peters, "*Coleman v. Newsom* and *Armstrong v. Newsom*, Advocacy for Class Member ▇▇▇▇▇▇▇▇▇▇▇▇▇" (Nov. 3, 2025).

The allegations are serious and include reports of excessive and violent uses of force, failures to provide accommodations, and harassment by staff. And these allegations are especially concerning because CHCF houses the **third-largest population** of *Armstrong* class members. Class members have repeatedly reported to Plaintiffs' counsel that the pervasive staff misconduct has made them afraid of staff such that they sometimes refrain from requesting accommodations they require for their disabilities.

II.     **Defendants Have Failed to Comply with the Accountability Orders, Making It Impossible for Plaintiffs to Monitor Whether Defendants Are Holding Staff Accountable for Disability-Related Misconduct**

Given the importance of CHCF to Defendants' *Armstrong* compliance, there is a heightened need for Defendants to hold staff accountable for disability-related staff misconduct occurring at the prison. Over the past few years, however, Defendants have repeatedly failed to comply with the Court's orders to produce required accountability information to Plaintiffs in response to requests. *See* Dkt. 2479 at 1-2.

[4842438.11]

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**
Sean Lodholz
April 24, 2026
Page 4

By Plaintiffs' count, Defendants have failed to meet their obligations under the accountability orders with respect to at least 40 allegations of disability-related staff misconduct at CHCF. In May 2025 Plaintiffs' counsel wrote Defendants to inquire about the status of approximately 35 allegations previously raised by Plaintiffs' counsel. *See* Letter from J. Hutt to T. Davis, "*Armstrong v. Newsom*: Information Request Re: Defendants' Investigations into Discriminatory Staff Misconduct at CHCF" (May 23, 2025), (hereinafter "Letter from J. Hutt to T. Davis (May 23, 2025)"), attached hereto as **Exhibit A**. Plaintiffs' counsel never received a response to this letter, and for the vast majority of cases referenced, have never received any additional information nor the requested documents. For approximately 20 cases cited in the letter, Plaintiffs do not know the status of CDCR's investigation into the allegation. *Id.* In at least one case Defendants sustained an allegation but failed to inform Plaintiffs of the action that was taken in response. *Id.* And for approximately 14 others where Defendants did not sustain the allegation, they have failed to provide the investigation files and documentation requested by Plaintiffs' counsel. *Id.* These failures to comply with the accountability orders have frustrated Plaintiffs' ability to monitor whether Defendants are, as required by Court orders, holding staff accountable for disability-related staff misconduct.

The cases discussed below are illustrative. In all of the cases, Defendants have, in violation of the accountability orders, failed to produce to Plaintiffs the result of the investigation and/or the underlying evidence.

███████████████████████████████ now housed at KVSP, reported that on June 16, 2025, he suffered serious physical injuries due to a violent use of force by three custody officers while at the Acute level of care at CHCF and while seeking to have his special cuffing requirement met to accommodate his mobility disability. *See* Letter from L. Khabbaz to N. Weber, S. Thind, & C. Peters, "*Coleman v. Newsom* and *Armstrong v. Newsom*, Advocacy for Class Member ████████████████████████████" (Nov. 3, 2025). Mr. █████ reports that three officers entered his cell, threw him to the floor, punched him in the face and kicked him in the back, and one officer headbutted him. *Id.* at 2. Health care records confirm that Mr. █████ was rendered unconscious and suffered severe, life-threatening injuries during this incident, including a potential traumatic brain injury. *Id.* at 3. According to Mr. █████ until the beating rendered him unconscious, he was attempting to assert his right to be accommodated with special cuffing. *Id.* at 2-3. Video shows that when officers wheeled him out of his cell, unconscious, he was cuffed behind his back. *Id.* at 2-3. It is, however, impossible to know exactly what occurred because the incident took place in a cell and out of view of existing fixed cameras. Plaintiffs' counsel requested in our November 3, 2025 letter that Defendants investigate the allegation and issue the complete investigation file and Hiring Authority decision regarding the use-of-force incident. *Id.* at 1, 5. The investigation may

[4842438.11]

be ongoing, but nearly six months after our letter, Plaintiffs have received no response regarding these allegations.  Because Defendants are not currently producing *Armstrong* accountability logs, Plaintiffs do not even know whether Defendants are investigating the case as an allegation of disability-related staff misconduct.

, reported that on November 8, 2024, Officer ▮▮ grabbed him and slammed him to the ground while he was ambulating from his housing unit to a visiting room, purportedly in response to him standing too close to Officer ▮▮  *See* Letter from J. Hutt to T. Davis, "*Armstrong* Advocacy Letter, ▮▮, CHCF," at 1 (Dec. 5, 2024).  Because Mr. ▮▮ is completely blind, he is unable to easily tell how close he is to other individuals, and he reports that he did not hear Officer ▮▮ issue a verbal command. *Id.*  Mr. ▮▮ received injuries, experienced ongoing pain, and was deterred from attending programs, services, and activities outside of his housing unit, for fear of encountering Officer ▮▮  *Id.* at 1-2.  Medical records state that following the use-of-force, Mr. ▮▮ "ha[d] difficulty with extension and flexion of the elbow due to pain." *See* Progress Note dated November 8, 2024.  Mr. ▮▮ also reported a headache and knee pain following being slammed to the ground and was "real dizzy like he was drunk." *See* Outpatient Progress Note dated November 8, 2024.  A few days later, an x-ray showed "soft tissue swelling" in Mr. ▮▮ right hand.  *See* XR HAND dated November 14, 2024.  Plaintiffs' counsel requested in our December 5, 2024 letter that Defendants investigate this allegation of disability-related staff misconduct, inform Plaintiffs' counsel of the result, and "immediately reassign Officer ▮▮ to a position in which he will not interact with the incarcerated population." *Id.* at 2.  Since January 13, 2025, when Defendants informed Plaintiffs that their investigation of Mr. ▮▮ allegations was underway, Plaintiffs have received no further response or information regarding the investigation.  *See* Letter from K. Ratliff & R. Lowe to J. Hutt, "RE: *Armstrong v. Newsom*: Advocacy letter ▮▮, CHCF" (dated Jan. 9, sent Jan. 13, 2025).

▮▮, reported that on July 23, 2024, the same Officer ▮▮ grabbed Mr. ▮▮ wheelchair from behind and placed him in a chokehold, flipping his wheelchair and tipping him face-first onto the cement.  *See* Letter from J. Hutt, A. Norris & P. Booth to T. Davis, "Continued Staff Misconduct at CHCF Against People with Disabilities," at 3 (Oct. 23, 2024) (hereinafter "Letter from J. Hutt et al. to T. Davis (Oct. 23, 2024)"); Letter from P, Godbold & E. Galvan to T. Davis, N. Weber, & S. Thind, "*Coleman v. Newsom* and *Armstrong v. Newsom*: Unnecessary/Excessive Force Allegation from CHCF Class Member ▮▮ ▮▮ on July 23, 2024" (Jan. 15, 2025) (providing additional detail regarding the incident) (hereinafter "Letter from P. Godbold & E. Galvan to

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**
Sean Lodholz
April 24, 2026
Page 6

T. Davis et al. (Jan. 15, 2025)"). Mr. ████ reported that immediately before the use of force, he had been using a path of travel that accommodated his photosensitivity, a medically confirmed vision condition—which he reportedly told Officer ████ who responded, "I don't care." *See* Letter from J. Hutt et al. to T. Davis (Oct. 23, 2024), at 3. Again, it is impossible to know exactly what transpired due to the lack of body-worn cameras at CHCF. Mr. ████ who sustained shoulder and neck injuries, reaggravating past surgical sites, was hospitalized for facial weakness and also received an RVR for this incident. *Id.* at 3-4. *See also* Letter from P. Godbold & E. Galvan to T. Davis et al. (Jan. 15, 2025). Plaintiffs' counsel requested that Defendants investigate this allegation pursuant to Court-ordered requirements and notify Plaintiffs' counsel of the outcome. *See* Letter from J. Hutt et al. to T. Davis (Oct. 23, 2024), at 10-11; *see also* Letter from P. Godbold & E. Galvan to T. Davis et al. (Jan. 15, 2025). Defendants' investigation did not sustain the allegation. In violation of existing orders, Plaintiffs' counsel requested, but never received, the investigation report based on a good faith disagreement with the outcome in this case. *See* Letter from J. Hutt to T. Davis (May 23, 2025) at 2.

████████████████████, reported that on June 28, 2024, while he was resting on an ADA bench as an accommodation for his mobility disability, the same Officer ████ physically forced him into a standing position, cuffed him behind his back, and attempted to forcibly walk Mr. ████ to another location. *See* Letter from M. Campbell to N. Weber, S. Thind, & C. Peters, "*Coleman v. Newsom* and *Armstrong v. Newsom*: Continued Discriminatory Misconduct by Officer ████ at CHCF" (Oct. 23, 2025), at 2-3 (hereinafter "Letter from M. Campbell to N. Weber et al. (Oct. 23, 2025)"). According to Mr. ████ immediately prior to this discriminatory use of unnecessary force, Officer ████ ran toward him, ordered him to stand, and disregarded Mr. ████ explanation of his disability and mobility limitations, causing Mr. ████ to fear that Officer ████ would use more physical violence against him. *Id.* Plaintiffs requested that Defendants investigate this allegation pursuant to Court-ordered requirements, notify Plaintiffs' counsel of the outcome, and produce the completed investigation report. *Id.* at 6-7. Plaintiffs have received no response regarding Mr. ████ allegations.

████████████████████, reported that on January 17, 2024, the same Officer ████ threatened to knock him out and then pepper-sprayed him in front of a second lieutenant who had been attempting to deescalate the situation. *See* Letter from J. Hutt et al. to ████ (Oct. 23, 2024), at 3. Mr. ████ reported that the incident occurred as a result of his disability, as Officer ████ pepper-sprayed him immediately after he stood up from his wheelchair to improve communication with the second lieutenant by speaking face-to-face about the situation. *Id.* Though Mr. ████ reports that he was not expressing or posing any threat to staff, he received and was found guilty

[4842438.11]

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS
Sean Lodholz
April 24, 2026
Page 7

of an RVR for assault on a peace officer. *Id.* Defendants' investigation failed to address multiple allegations raised by Plaintiffs' counsel at the time, though it appears this particular allegation may not have been sustained. *See* Letter from G. Jones to J. Hutt (May 14, 2025), at 5. Plaintiffs wrote to confirm the status of Mr. █████ additional allegation but never received any response. *See* Letter from J. Hutt to T. Davis (May. 23, 2025) at 4.

█████████████████████████████, reported that on February 21, 2024, multiple staff used excessive force against her, disregarding her serious disabilities, including grabbing her out of her wheelchair and slamming her onto the floor simply because she reportedly used foul language. *See* Letter from J. Hutt et al. to T. Davis (Oct. 23, 2024), at 6. Another class member who witnessed the incident reported that this violent use of force caused Ms. █████ to lose consciousness. *Id.*[2] Defendants did not sustain the allegation. *See* Letter from G. Jones to J. Hutt (May 14, 2025), at 6. Defendants failed to respond to Plaintiffs' request for information based on their good-faith disagreement with the result. *See* Letter from J. Hutt to T. Davis, "*Armstrong v. Newsom*: Information Request Re: Defendants' Investigations into Discriminatory Staff Misconduct at CHCF" (May 23, 2025), at 1-2 (requesting information) (hereinafter "Letter from J. Hutt to T. Davis (May 23, 2025)").

█████████████████████████, reported that on December 17, 2023, while he was rolling himself back to his cell at Officer █████ instruction, Officer █████ grabbed his wheelchair and maneuvered the chair in a way that nearly caused Mr. █████ to fall out of his wheelchair. *See* Letter from J. Hutt et al. to T. Davis (Oct. 23, 2024), at 6. Defendants informed Plaintiffs that the allegation was sustained, but did not respond to Plaintiffs' request for information required pursuant to court order regarding what, if any, corrective or adverse action was taken against Officer █████ *See* Letter from G. Jones to J. Hutt (May 14, 2025), at 7 (indicating allegation was sustained); Letter from J. Hutt to T. Davis (May 23, 2025), at 2 (requesting information pursuant to Order Modifying the January 18, 2007 Injunction, Dkt. No. 2479 at 2). Defendants also failed to respond to Plaintiffs' request for information regarding two

---

[2] Plaintiffs' counsel have also reported additional disability-related staff misconduct against Ms. █████ *See id.* (reporting custody staff's failure to protect her from physical attack by another incarcerated person targeting class members with disabilities); Email from J. Hutt to C. Thao et al., "*Armstrong* Advocacy ██████████████████," Jan. 19, 2023 (reporting custody staff assault and requesting investigation and preservation of audio and visual recordings).

[4842438.11]

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**
Sean Lodholz
April 24, 2026
Page 8

other allegations made by this class member that were not sustained. *See* Letter from J. Hutt to T. Davis (May 23, 2025) at 2.



, who is 93 years old and has significant disabilities, was punished (RVR Log No.        ), by Officer        for apparently failing to take a shower. It had been 26 days since staff last spoke to Mr.           about taking a shower. The officer wrote in the RVR narrative, "Inmate           did not provide a statement." Plaintiffs' counsel raised concerns about punishing a 93 year old with significant disabilities for not showering without any indication that staff attempted to determine *why* he might not be showering and whether it was the result of his disabilities. *See* Letter from J. Hutt et al. to T. Davis (October 23, 2024) at 7. Defendants responded that a case was opened but was not sustained. Letter from G. Jones to J. Hutt (May 14, 2025), at 7. Plaintiffs' counsel requested, but never received, a copy of the investigation report. *See* Letter from J. Hutt to T. Davis (May 23, 2025), at 2.

Plaintiffs have reported numerous other examples in letters, advocacies, and tour reports for many years. *See supra* at 1-2.

## III.    The Narrow Discovery Requests Are Necessary for Plaintiffs to Monitor

In light of the allegations of pervasive staff misconduct endangering class members at CHCF and Defendants' failures to comply with the Court's accountability orders, Plaintiffs are now serving narrow requests for production of documents on CDCR.

Plaintiffs have "a right to reasonable discovery … of facts that are relevant to proving whether [D]efendants' guidelines, plans, policies, procedures and evaluations comply with the ADA or § 504." Remedial Order, Inj., and Certification of Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b), Dkt. 158 at 4. Further, Plaintiffs are "entitled to reasonable access to information sufficient to monitor [D]efendants' compliance with the guidelines, plans, policies and procedures that have been approved by the Court," and that "[s]uch monitoring shall include access to relevant documents." *Id.* at 5.

Plaintiffs request that Defendants produce the case files—including, but not limited to, complaints, investigation reports, underlying evidence, and disciplinary documents—for all staff misconduct investigations at CHCF where (1) the complainant or alleged victim was an *Armstrong* class member and (2) CDCR closed the case on or after January 1, 2025. Plaintiffs are also seeking staff misconduct complaints filed by *Armstrong* class members for which Defendants have not yet completed an investigation.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

Sean Lodholz
April 24, 2026
Page 9

Plaintiffs are entitled to and need these documents because they are necessary for Plaintiffs to monitor Defendants' compliance with the ARP and the Court's orders governing accountability for CDCR staff misconduct against class members.  *See* Dkt. 158 at 4-5; Dkts. 1045 at 7 (2007 Inj.), 2180 at 10-12, 16-18 (Order Modifying Perm. Inj.), 2479 (Order Modifying January 18, 2007 Inj.).  Given Defendants' failure to maintain reliable Accountability Logs and to adequately respond to Plaintiffs' requests for the results of and documents underlying certain investigations, Plaintiffs have no other means for obtaining the information.

        We look forward to discussing these issues with you and receiving the requested documents as soon as possible.

                                    Sincerely,

                                    ROSEN BIEN
                                    GALVAN & GRUNFELD LLP

                                    */s/ Michael Freedman*

                            By:    Michael Freedman
                                    Senior Counsel

MLF:cg
cc:  August Gugelmann      Sarah Brattin
     Audrey Barron          Olena Likhachova
     Ramon Ruiz             Ed Swanson
     Co-counsel             Carrie Stafford
     Tamiya Davis

[4842438.11]

# EXHIBIT A

MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT – N.Y. Bar No. 5565791*
TESS BORDEN – MJP 805022
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:    (510) 644-2555
Facsimile:    (510) 841-8645

* Admitted *pro hac vice*

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **PLAINTIFFS' REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANT CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, SET ONE** |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | Judge:  Hon. Claudia Wilken |

[4834353.3]

Case No. C94 2307 CW

PROPOUNDING PARTY:    PLAINTIFFS JOHN ARMSTRONG ET AL.

RESPONDING PARTY:    DEFENDANT CALIFORNIA DEPARTMENT OF CORRECTIONS

SET NO.    ONE

## **REQUEST FOR PRODUCTION OF DOCUMENTS**

PLEASE TAKE NOTICE pursuant to Federal Rules of Civil Procedure 26 and 34, that Defendants are required to produce the following documents for copying and inspection at 101 Mission Street, 6th Floor, San Francisco, CA 94105, 30 days from service of this Request:

### **INSTRUCTIONS**

1.    The following Requests require the production of all responsive documents within the sole or joint possession, custody, or control of any agents, agencies, boards, departments, employees, servants, representatives, consultants, counsel, and/or other persons or entities acting or purporting to act on Defendants' behalf, or otherwise subject to the control of any Defendants.

2.    The following Requests are continuing in nature and require prompt supplemental responses for any and all responsive documents that come into any Defendant's sole or joint possession, custody, or control after the service of any initial responses hereto.

3.    The following Requests require the production of preliminary drafts, revisions, and/or copies of any such document if the copy is in any way different from the original.

4.    The following Requests require the production of all transmittal sheets, cover letters, exhibits, enclosures and attachments to the documents, in addition to the documents themselves.

5.    Pursuant to Federal Rule of Civil Procedure 34(b), all responsive documents are required to be produced either: (a) as they are kept in the usual course of business (together with copies of any file labels or binder covers for the files or binders in which

[4834353.3]

they are maintained); or (b) organized and labeled to correspond with the categories of the Requests to which they respond.

6. If any responsive document is maintained electronically, the document shall be produced on disc in native format and with metadata intact.

7. In construing the Requests herein, the singular shall include the plural and the plural shall include the singular. A masculine, feminine or neutral pronoun shall not exclude the other genders, so that the interpretation applied results in the more expansive production. The terms "and" and "or" shall be construed broadly and expansively as "and/or," and shall not be construed to limit the documents or information sought in any manner.

8. If any Request demands production of documents that have been lost, discarded, or destroyed, identify such documents as completely as possible. Such identification shall include, but is not limited to, a description of the subject matter of the document, the author of the document, the date of the document's creation, the date of disposal, manner of disposal, reason for disposal, person authorizing the disposal and person disposing of the document.

9. For any responsive document or portion thereof that is either redacted or withheld, in whole or in part, on the basis of any assertion of privilege or other asserted exemption from discovery, furnish a list identifying each document, or portion thereof, not produced for this reason, together with the following information: (a) the title or identity of the document; (b) the date of the document; (c) the type or nature of the document; (d) the identity, title, or responsibilities, and relationship to Defendants of all persons who either prepared or received the document; (e) the number of pages and attachments; (e) the type and nature of the privilege or exemption asserted; and (f) the contents or subject matter of the document, with sufficient detail to explain the basis for the privilege or exemption asserted (see Fed. R. Civ. P. 26(b)(5)). For any responsive document or portion thereof that may not properly be redacted or withheld in its entirety, produce each and every portion thereof to which the claimed privilege or exemption does not apply and

specify, on the face of each such page or portion, the fact and reason for the redaction or withholding.

## DEFINITIONS

1.     "ANY" and "ALL," as used herein, shall include "each" and "every" and is not to be construed to limit a Request.

2.     "DOCUMENTS" means all writings, whether fixed in a tangible medium or electronically stored.  DOCUMENTS includes, but is not limited to, all of the following: papers, video recordings (including body-worn camera footage and Audio-Visual Surveillance System footage), audio recordings (including audio recordings of interviews), transcriptions of video and audio recordings, correspondence, emails, MS Excel files, MS Word files, MS PowerPoint files, text files, instant messages, postings on internet websites or blogs including Twitter and Facebook, training manuals, employee manuals, policy statements, trade letters, envelopes, memoranda, telegrams, cables, notes, messages, reports, studies, press releases, comparisons, books, accounts, checks, pleadings, testimony, articles, bulletins, pamphlets, brochures, magazines, questionnaires, surveys, charts, maps, plans, graphs, computer programs, photographs, newspapers, calendars, desk calendars, pocket calendars, lists, logs, publications, notices, diagrams, instructions, diaries, minutes of meetings, orders, resolutions, agendas, memorials or notes of oral communications, whether by telephone or face-to-face, contracts, agreements, memoranda of understanding, and letters of intent.  DOCUMENTS includes any writings recorded or stored in any medium or location, including desktop computers, laptops, PDAs, cell phones, home computers used for work, calendars, computer tapes, computer drives or memories, computer diskettes or disks, email, CD-ROMs, DVDs, BlackBerrys, iPhones, or other similar handheld devices used to send and receive electronic mail, instant messaging ("IM"), blogs or other internet or intranet postings, text messages, Twitter postings, Facebook postings, or any other tangible thing on which any handwriting, typing, printing, photostatic, electronic or other form of communication or information is recorded or reproduced.  DOCUMENTS also includes all notations on any of the foregoing, all

[4834353.3]

3

PLAINTIFFS' REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANT
CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, SET ONE

originals, file copies or other unique copies of the foregoing and all versions or drafts thereof, whether used or not, and all metadata. DOCUMENT has the broadest possible meaning and includes anything coming within the definition of "writings" and "recordings" as set forth in Rule 1001(1) of the Federal Rules of Evidence.

3. "COMMUNICATIONS" means any exchange of information by any means of transmission, including, face-to-face conversations, Zoom, Teams, mail, electronic mail, IM, blog or other internet or intranet posting, telegram, text messages, overnight delivery, telephone, facsimile or telex.

4. "DEPARTMENT" or "CDCR" means the California Department of Corrections and Rehabilitation, including any boards, divisions, units, agencies, agents, servants, representatives, consultants, or counsel thereof, including the Board of Parole Hearings, the Division of Adult Parole Operations, and the Board of State and Community Corrections, and any predecessor entities thereof, including the former California Department of Corrections, the Board of Prison Terms, and the Corrections Standards Authority.

5. "CHCF" means California Health Care Facility, Stockton, located at 7707 Austin Road, Stockton, CA 95215.

6. "STAFF MISCONDUCT" means staff behavior in violation of law, policy, regulation or procedure, or appearing contrary to an ethical or professional standard as defined in Title 15, § 3084(g) and Departmental Operations Manual § 54110.25.

7. "INCLUDING" means "including, but not limited to," and is not to be construed to limit a Request.

8. "OR" shall be construed as disjunctive and conjunctive and, as used herein, shall include "and" and is not to be construed to limit a Request.

9. "RELATING TO" means relating to, referring to, constituting, representing, defining, depicting, concerning, embodying, reflecting, identifying, stating, mentioning, addressing, or pertaining to the subject matter of the request in whole or in part, directly or indirectly.

10.    "INVESTIGATION CASE FILE" means all DOCUMENTS and COMMUNICATIONS RELATING TO an INVESTIGATION into an ALLEGATION of STAFF MISCONDUCT, including, but not limited to, all 602, 1824, 602-HC, and 602/1824 combination forms and memorandum authored by staff that include an ALLEGATION OF STAFF MISCONDUCT, all INVESTIGATION reports (including investigation reports authored by the Office of Internal Affairs and inquiry reports and routine review responses authored by staff at prisons), all evidence gathered as part of the INVESTIGATION (including DOCUMENTS, video footage, and audio recordings), all 402 and 403 forms, all Notices of Adverse Action, all closure documents, all DOCUMENTS RELATING TO *Skelly* hearings, and all DOCUMENTS RELATING TO proceedings before the State Personnel Board.

11.    "ALLEGATION" means a claim that someone has done something wrong.

12.    "INVESTIGATION" means the act, either formal or informal, of conducting an inquiry into someone or something.  INVESTIGATION includes, but is not limited to, investigations conducted by the Office of Internal Affairs or an inquiry or routine review conducted by staff at a prison.

13.    "RELEVANT PERIOD" means from January 1, 2024 to the present, INCLUDING ALL DOCUMENTS dated, prepared, generated OR received during the RELEVANT PERIOD and ALL DOCUMENTS and information RELATING TO whole OR in part, such period, OR to events OR circumstances during such period, even though dated, prepared, generated OR received prior OR subsequent to the RELEVANT PERIOD.

## DOCUMENT REQUESTS

**REQUEST FOR PRODUCTION NO. 1:**

ALL INVESTIGATION CASE FILES RELATING TO STAFF MISCONDUCT at CHCF (a) in which the alleged victim of the STAFF MISCONDUCT or the complainant was an *Armstrong* class member and (b) that CDCR closed during the RELEVANT PERIOD.

/ / /

**REQUEST FOR PRODUCTION NO. 2:**

ALL 602, 602-HC, 1824, and 602/1824 combination forms that include ALLEGATIONS of STAFF MISCONDUCT at CHCF (a) in which the alleged victim of the STAFF MISCONDUCT or the complainant was an *Armstrong* class member, (b) that were received by CDCR during the RELEVANT PERIOD, and (c) for which the INVESTIGATION into the ALLEGATION of STAFF MISCONDUCT is not yet closed.

**REQUEST FOR PRODUCTION NO. 3:**

ALL DOCUMENTS and COMMUNICATIONS during the RELEVANT PERIOD RELATING TO body-worn cameras at CHCF.

**REQUEST FOR PRODUCTION NO. 4:**

ALL reports, memoranda, corrective action plans, assessments, audits, reviews, and other analyses authored, commissioned, received, or adopted by CDCR RELATING TO STAFF MISCONDUCT at CHCF authored by CDCR, from January 1, 2022 to the present, that examine, evaluate or make findings or recommendations regarding STAFF MISCONDUCT at CHCF on a systemic, institution-wide, facility-wide, programmatic, cultural, pattern-and-practice, or trend basis, as distinguished from DOCUMENTS analyzing a single alleged incident of STAFF MISCONDUCT.

**REQUEST FOR PRODUCTION NO. 5:**

ALL COMMUNICATIONS from January 1, 2022 to the present between any warden of CHCF and the Secretary of CDCR or any Undersecretary, Assistant Secretary, Director, Deputy Director, or Associate Director of CDCR RELATING TO STAFF MISCONDUCT.

DATED:  April 24, 2026

ROSEN BIEN GALVAN & GRUNFELD LLP

By:  */s/ Michael Freedman*
Michael Freedman

Attorneys for Plaintiffs