MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT – NY BN 5565791*
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621
Facsimile: (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104

CLAUDIA CENTER – 158255
DISABILITY RIGHTS
EDUCATION & DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California 94703
Telephone: (510) 644-2555
Facsimile: (510) 841-8645

* Admitted *pro hac vice*

Attorneys for Plaintiffs

CALIFORNIA OFFICE OF THE
ATTORNEY GENERAL
ROB BONTA
Attorney General of the State of California
NEAH HUYNH
Senior Assistant Attorney General
SEAN LODHOLZ
Supervising Deputy Attorney General
GURPREET SANDHU
JAIYE ZHOU
JENNIFER BURNS
NAMRATA KOTWANI
OLENA LIKHACHOVA
Deputy Attorneys General
State Bar No. 285574
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-6332
Fax: (916) 324-5205
E-mail: Olena.Likhachova@doj.ca.gov

Attorneys for Defendants Gavin Newsom and the California Department of Corrections and Rehabilitation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN ARMSTRONG, et al.,

Plaintiffs,

v.

GAVIN NEWSOM, et al.,

Defendants.

Case No. C94 2307 CW

**JOINT CASE STATUS STATEMENT**

Judge: Hon. Claudia Wilken

The parties submit this Joint Case Status Statement pursuant to the Stipulation and Order entered February 24, 2026 (ECF No. 3754), which provides that "[t]he parties will file periodic joint statements describing the status of the litigation on a quarterly basis."

## CURRENT ISSUES[1]

### A. Allegations of Abuse, Retaliation, and Violence by CDCR Staff Against Class Members

#### 1. Plaintiffs' Statement

##### a. RJD and Five Prisons Orders

Plaintiffs continue to monitor remedial efforts the Court found to be necessary in order to prevent further violations of the ARP and class members' ADA rights at six prisons, including changes to the staff misconduct investigation process and implementation of Audio Visual Surveillance Systems that include body-worn camera technology. *See* ECF Nos. 3059, 3060, 3217 and 3218. Party agreements regarding Court ordered changes are found in Defendants' RJD and Five Prisons Remedial Plans ("Plans"). *See* ECF No. 3393, Exs. A and B.

Plaintiffs have issued multiple quarterly reports and, at this point, have identified many hundreds of cases that show failures by Defendants to conduct complete and unbiased investigations and impose appropriate and consistent discipline. A copy of Plaintiffs' report issued May 8, 2026, Review of CDCR's Accountability System for LAC, CIW, RJD, SATF, COR and KVSP, is attached hereto in redacted form as **Exhibit A.** Plaintiffs continue to identify cases where Defendants fail to hold staff accountable for serious staff misconduct. Plaintiffs' findings are corroborated by the Office of the Inspector General (OIG) whose recent report found that the Department's performance was inadequate in over half of the cases reviewed and needed improvement in another 29%. *See* OIG Semiannual Report re Monitoring Internal Investigations, Staff Misconduct Complaint Investigations, and the Employee Disciplinary Process,

[1] Statements are joint unless otherwise delineated as either *Plaintiffs' Statement* or *Defendants' Statement*.

https://www.oig.ca.gov/wp-content/uploads/2026/05/Staff-Misconduct-Monitoring-Report-July-December-2025.pdf ("OIG Report") at 7. The parties are actively engaged in negotiations to reach agreement regarding changes that are necessary to bring the system into compliance with Court-ordered Remedial Plans. Per Stipulation, CDCR has agreed to retain Nicholas Mitchell to "review and offer recommendations about CDCR's use-of-force policies and practices, use-of-force training, and the Institutional Executive Review Committee (IERC) process, including outcomes after the IERC has identified non-compliance with policy violations" and to provide "recommendations on whether the IERC, or some entity other than OIA, can conduct comprehensive and unbiased investigations" and "what, if any, modifications to Defendants' policies and procedures are necessary for the IERC, or some entity other than OIA, to conduct comprehensive and unbiased investigations into allegations of staff misconduct based on use-of-force policy violations." ECF 3721 at 3. The expert consultant's report was received on July 19, 2026. The parties are currently reviewing the report and preparing responses.

Despite agreement between the parties on the potential reforms discussed above, Plaintiffs' counsel remains seriously concerned about the failure of Defendants to complete timely investigations. As outlined in the OIG's most recent report, the AIU closed 5,379 cases in 2025, and in 5% of those cases the statute lapsed prior to completion of the investigation. *See* OIG Report at 33. At the time of the report, the deadline had already run on 15% of the cases that were open at the end of 2025. *Id.* To bring Defendants into compliance with the Remedial Plans and to eliminate the serious problems caused by delayed investigations, Defendants must commit to staffing OIA with a sufficient number of investigators to timely investigate all allegations of serious misconduct. On November 24, 2025, after extensive negotiations, the parties entered into a stipulation requiring Defendants to produce to Plaintiffs and the Court Expert a proposed staffing analysis, staffing plan, and implementation plan to address these issues no later than August 17, 2026. *See* ECF Nos. 3737 and 3789.

Plaintiffs' counsel remain concerned that, on January 22, 2026, CDCR adopted

changes to the regulations, over Plaintiffs' objections, that do not comply with the Court's orders and remedial plans, and that are inconsistent with negotiated agreements between the parties to address CDCR's continuing non-compliance with those orders and remedial plans. *See* Exhibit C to ECF No. 3775. Plaintiffs will be meeting with Defendants to discuss how to resolve this serious problem.

CDCR is a statewide system. Violations of the ADA and ARP found thus far at six prisons exist system-wide. Plaintiffs continue to report on violations raised by class members at multiple other prisons including California Health Care Facility, Stockton ("CHCF"). On April 24, 2026, Plaintiffs' counsel served requests for the production of documents related to investigations into allegations by *Armstrong* class members of staff misconduct at CHCF. *See* Exhibit D to ECF No. 3775. Defendants have begun to produce the requested documents and plan to do so on a rolling basis. Plaintiffs continue to gather information about those incidents and are committed to bringing such evidence before the Court until all class members are protected. *See* ECF No. 3592, Ex. A at 7-8.

**2. Defendants' Statement**

**a. RJD and Five Prisons Orders**

CDCR has dramatically overhauled its staff misconduct investigation process to ensure unbiased and complete investigations. And, although not required by the Court's orders, Defendants have restructured CDCR's statewide staff misconduct allegation, screening, referral, investigative, and disciplinary processes. As the Court has noted, "[t]hese agreed-upon measures constitute substantial improvements that will go a long way to bringing Defendants into compliance with the ARP and ADA at the six prisons." ECF No. 3356 at 2. The Court found, the "implementation of these [] remedial measures is likely to have a positive impact on…the overall reliability of the outcomes of investigations." *Id.* at 15.

Despite the tremendous efforts and resources directed towards improving the staff misconduct investigation and discipline processes, modifications are necessary to ensure sustainability. CDCR contends that many of the issues raised in the recent OIG report are

attributable to the operational realities of the large number of complaints that stretch the capacity of the OIA to timely complete these cases. *See* CDCR response to OIG March 2025 report at https://www.oig.ca.gov/wp-content/uploads/2025/03/2024-Staff-Misconduct-Investigation-Monitoring-Report.pdf. With input from Plaintiffs, the Court Expert, and other stakeholders, CDCR continues to identify and implement necessary modifications to the investigative and disciplinary processes. These efforts include, but are not limited to, updating the applicable staff misconduct regulations, simplifying the staff misconduct process, revising the ADI to provide greater clarity, consolidating Information Technology systems to improve case tracking and management, developing certified training to enhance investigator preparedness, and working to satisfy the requirements of the recent September 26 and November 24, 2025, stipulations on the Staff Misconduct Investigative and Discipline Process (ECF Nos. 3721, 3737).

CDCR also staffed, trained, and implemented the Centralized Allegation Resolution Unit located at department headquarters, which serves as the hiring authority and reviews completed investigations which involved or originated from incarcerated persons residing within the six institutions identified in the Court's staff misconduct orders, and now oversees the investigative and disciplinary process for nineteen institutions statewide. *Id.* CDCR has implemented prioritization strategies to focus on meeting statutory deadlines and ensuring compliance with legal obligations. *Id.* To further address timeframe-related challenges, CDCR continues to actively recruit to fill all vacant investigator positions within OIA and has repositioned several internal vacancies to hire additional investigative staff. *Id.* CDCR also continues to refine its intake process to reduce redundant investigative efforts and maximize effectiveness of limited investigative resources while maintaining a complete review of all allegations. *Id.* CDCR, in collaboration with Plaintiffs and other stakeholders, continues to identify and implement additional improvements to ensure compliance with policies and regulations, including a new screening tool for the Centralized Screening Team, which is currently being negotiated by the parties. Throughout this process, CDCR has regularly provided substantive updates to

the OIG and will continue to do so.

In accordance with the parties' November 2025 stipulation, Defendants created and provided Plaintiffs' counsel their proposed methodology for calculating the number of investigative staff necessary to comply with the remedial plans' 120-day deadline to complete staff misconduct investigations. After application of the methodology to the six-month data set agreed to by the parties, Defendants will prepare and share their plans with Plaintiffs on or before August 17, 2026. The parties also received Nicholas Mitchell's draft report on July 19, 2026, and will be meeting to discuss the draft report in accordance with the September 26, 2025 stipulation. The parties further agreed to continue to meet and confer about proposed revisions to the remedial plans.

Finally, Defendants reviewed the proposed regulations regarding the staff misconduct complaint and routine grievance processes prior to adoption and do not believe these regulations violate any court orders. Defendants received Plaintiffs' April 7, 2024 correspondence alleging otherwise and expressing concern that the regulations do not comport with the parties' agreements. Defendants provided their written response to this correspondence on August 14, 2026 and will meet and confer with Plaintiffs to address any remaining issues.

## B. Court Expert Investigation Into SATF

### 1. Plaintiffs' Statement

Background of the Court Expert's investigation into the treatment of people with disabilities at the Substance Abuse Treatment Facility (SATF) is set forth in Plaintiffs' previous joint case status statement. *See* ECF No. 3670 at 6-8. On May 1, 2025, the Court adopted, with some modifications, the Court Expert's Recommendations Regarding Compliance with SATF Stipulation, which laid out steps that Defendants must take to remedy longstanding violations of the ADA and ARP at SATF. ECF No. 3651 (Court Expert's recommendations); ECF No. 3679 (Court's order).

The parties continue to meet and confer regarding Defendants' plans to comply with SATF Stipulation Item #7 and the Court's May 1 order on this Item. Regarding

Defendants' statements below about their new process and the parties' discussions of this process, Plaintiffs offer the following clarification. At the May 15, 2026 meeting, the parties agreed that people who are deaf or have DPH codes need not first see the audiologist before being assessed by the ATP. While the parties did not agree that people with DNH codes must first see an audiologist to confirm hearing loss before an appointment with the ATP, the parties agreed to create a process for educating people with DNH codes—and especially people with DNH codes who had refused appointments with either the audiologist or ATP—about the reasons for and importance of those appointments, as well the benefits they might obtain by attending those appointments, and the consequences of refusing to participate in this process.

The Court has deferred ruling on item 13 in light of the Court Expert's April 18, 2025, status update and a planned demonstration of an alternative technology. *See* ECF Nos. 3675; 3679 at 21. The demonstration of Defendants' proposed alternative transcription technology was conducted at SATF on August 19, 2025. Following the demonstration, the parties exchanged their respective positions regarding the alternative technology and are conferring concerning appropriate next steps.

Regarding SATF Stipulation Item #14, on June 23, 2026, the Court Expert notified Plaintiffs that Defendants released a statement announcing their intention to rescind the CCHCS policy regarding RVRs entitled, "Limiting Licensed Health Care Staff Access to Rules Violation Reports." But Plaintiffs and Defendants previously reported to the Court that they had resolved Item #14 by agreeing on this policy. Specifically, the parties reported that they "agree that they have met and conferred with the Court expert regarding the adequacy of CCHCS's policy regarding RVRs and they also agree as to a plan for the implementation and monitoring of the policy." ECF No. 3630 at 149-52. The Court then "approve[d] the parties' agreed-upon plan." ECF No. 3639 at 4. On July 2, 2026, Plaintiffs submitted a letter to Defendants expressing deep concern regarding Defendants' intended action, requesting that Defendants refrain from rescinding the policy, and asking Defendants a series of questions regarding the decision to rescind the policy. Plaintiffs

have not received a response to this letter.

Plaintiffs continue to eagerly await the Court Expert's forthcoming report and recommendations on staffing and sustainability and hope it will result in the allocation of sufficient expertise and resources and development of robust systems necessary to comply with the ARP and ADA.

**2. Defendants' Statement**

The Court Expert's second report concerning the treatment of people with disabilities at SATF recognized the numerous proactive measures implemented at SATF to further respond to the needs of incarcerated people with disabilities. ECF No. 3500. The report demonstrates that the coordinated efforts between CDCR and California Correctional Health Care Services (CCHCS), with the Court Expert's guidance and with input from Plaintiffs, are working to effectively respond to the issues raised by the Court and addressed by the Court Expert following his initial investigation. On May 1, 2025, the Court issued its order on the issues not resolved by the Court's November 8, 2024, order, and addressed in the Court Expert's January 10, 2025, recommendations, which included items 5, 7, 9, 10, and 13. ECF Nos. 3639, 3651, 3655, 3656, 3660, 3661, 3665, and 3679. The parties, with input from the Court Expert, have resolved items 5, 9, and 10. The parties are continuing to meet and confer regarding items 7 and 13. After the parties complete their meet-and-confer process for SATF item 13, the Court Expert will file a further status update with a report and recommendation for next steps. ECF No. 3679 at 21-22.

SATF item 7 requires specialist assessment of deaf and hard-of-hearing class members to determine what assistive technology—including a paging device—is necessary for those class members to access announcements. *See* ECF No. 3679 at 12. Defendants developed a process whereby, following audiologist assessment, deaf and hard-of-hearing class members will be evaluated by Assistive Technology Professionals (ATP) to determine the class members' assistive technology needs. Plaintiffs and the Court Expert agreed to this approach during the parties' May 14, 2026 meeting, and the

parties held an introductory meeting with Defendants' ATP on June 1, 2026. To educate DNH class members about the reasons for and importance of participating in assessments by audiologists and ATPs, Defendants created a "script" that was provided to Plaintiffs and the Court Expert for review and comment. Plaintiffs and the Court Expert provided their feedback on the draft "script" in July 2026. Defendants have now finalized their contract for pagers and have prepared a draft pager policy that was provided to Plaintiffs and the Court Expert on July 21, 2026.

Regarding SATF item 14, the decision to rescind the policy titled, "Limiting Licensed Health Care Staff Access to Rules Violation Reports" (SATF 14 Policy) was made by the court-appointed Receiver in the *Plata v. Newsom,* Northern District of California Case No. 4:01-cv-01351-JST, (*Plata*) matter. The rescission of this policy was discussed with the *Armstrong* Court Expert during the CCHCS Executive Staff meeting. Defendants received Plaintiffs' July 2, 2026 letter and the parties are scheduled to discuss the *Plata* Receiver's decision to rescind the SATF 14 Policy on August 20, 2026.

### C. Systemic Denials of Disability Accommodations to Class Members Defendants House in the Los Angeles County Jail System

#### 1. Plaintiffs' Statement

On June 4, 2026, Plaintiffs sent a letter, attached hereto in redacted form as **Exhibit B**, demanding that Defendants take immediate steps to address longstanding and systemic denials of disability accommodations to class members whom Defendants house in the Los Angeles County Jail system ("LACJ") while they are out-to-court from CDCR, detained on a parole hold or for an alleged parole violation, or while serving a parole revocation term. Class members with mobility disabilities housed at LACJ are routinely denied wheelchairs, walkers and other durable medical equipment ("DME"); housed on top bunks, upper tiers, cells without grab bars, and in housing units without accessible showers; and impeded from attending yard, medical appointments, visiting, and court due to escalators that are frequently inoperable. Class members with hearing and vision disabilities experience significant delays in being evaluated for and receiving hearing aids

and prescription glasses at LACJ, without access to interim accommodations to help them hear, see, and read. And class members with learning disabilities, cognitive/intellectual disabilities, and low reading scores are routinely denied assistance with reading and writing at LACJ. *See* **Exhibit B** at 9-11 and Attachment A.

These systemic ADA violations continue despite multiple rounds of remedial orders by this Court over many years aimed at ensuring that class members housed at county jails receive the disability accommodations they need. *See, e.g.*, Order Granting Motion to Enforce Revised Permanent Injunction, ECF No. 933 (May 30, 2006); Order Granting in Part Motion to Enforce May 30, 2006 Order, ECF No. 1199 (Sept. 11, 2007); Order Granting Plaintiffs' Motion to Require Defendants to Track and Accommodate the Needs of Armstrong Class Members Housed in County Jails, ECF No. 1587 (Sept. 16, 2009); Amended Order Granting Plaintiffs' Renewed Motion to Require Defendants to Track and Accommodate the Needs of Armstrong Class Members Housed in County Jails, ECF No. 2034 (Apr. 11, 2012); Opinion in Support of Order Distributing and Enforcing the Amended County Jail Order and Plan, ECF No. 2194 (Aug. 28, 2012). Below, Defendants emphasize that, after refusing to conduct any investigation into these well-documented disability accommodation denials at LACJ for more than a decade, *see* **Exhibit B** at 11-14, they finally did so in the fall of 2025 through the spring of 2026. But that investigation used such an artificially limited scope—which excluded consideration of any of the extensive evidence available from Plaintiffs' reporting and advocacy—that Defendants were unable to reach any conclusions and proposed a similarly limited follow-up inquiry before they would even consider whether any steps should be taken to try to ensure that class members will finally be accommodated at LACJ. *See* **Exhibit B** at 4-5.[2]

---

[2] Below, Defendants state that they do not recall Plaintiffs objecting to the investigation's scope when they first verbally notified Plaintiffs that they would be investigating LACJ. Plaintiffs recall urging Defendants to also consider the problems raised in Plaintiffs' reporting and advocacies for class members at that meeting, and Defendants stating that they planned to do so. Indeed, Plaintiffs conducted additional touring and interviews of class members at LACJ during the six-month investigation period to ensure DAPO would have as much evidence as possible regarding the systemic denials of disability (footnote continued)

Unless CDCR promptly takes robust remedial steps designed to put an end to the longstanding pattern of denials of disability accommodations to class members CDCR houses at LACJ, Plaintiffs will file a motion for further remedial measures to protect class members' rights under the ADA and this Court's prior orders. Plaintiffs recommended remedial steps to Defendants that may dissuade us from seeking relief from the Court. *See* **Exhibit B** at 16-18. Defendants sent a written response to Plaintiffs' demand letter on July 10, 2026, and the parties are scheduled to meet on August 27, 2026.

Plaintiffs understand Defendants position, below, that they do not "choose" to house class members at LACJ because they are required to do so under certain circumstances by state statute. But Plaintiffs recommended additional remedial steps that Plaintiffs believe are available to Defendants now, notwithstanding those statutes, as well as remedial measures that they could undertake pursuant to a stipulated court order, given that their actions thus far have not prevented class members from routinely suffering disability discrimination while housed at LACJ. *See* **Exhibit B** at 16-17. The parties are scheduled to meet and confer regarding these issues on August 27, 2026.

On June 9, 2026, Plaintiffs served document requests, interrogatories, and a draft Rule 30(b)(6) deposition notice on Defendants, seeking discovery regarding CDCR's knowledge of the systemic disability accommodation denials to class members housed at LACJ and what actions CDCR has taken to protect class members' rights. Plaintiffs and Defendants are meeting and conferring on Defendants' objections to this discovery. Plaintiffs also took the deposition of the Los Angeles Sheriff's Department's Rule 30(b)(6) designated witness on August 13, 2026.

**2. Defendants' Statement**

Defendants' obligations under the County Jail Remedial Plan (Plan) were extensively negotiated among the parties, approved by this Court, and affirmed by the

---

accommodations to class members housed there and requested in writing on multiple occasions that the findings in our reporting be included in the investigation. Plaintiffs were surprised that none of that evidence was considered in DAPO's investigation report.

Ninth Circuit. ECF No. 2193; *Armstrong v. Brown*, 732 F.3d 955 (9th Cir. 2013). A true and correct copy of the Plan is attached hereto as **Exhibit C**. Pursuant to the Plan, upon discovery of a pattern of denials of disability accommodations to class members at a particular county jail following review of CDCR 1824 (now 2275- CJ) grievances by Regional ADA Parole Administrators, Defendants are required to: (1) investigate, to the extent possible, the situation at a particular county jail; (2) determine what steps, if any, can be taken to remedy the situation; and (3) provide a written report to CDCR's Office of Legal Affairs. *See* ECF 2194-1 at 8.

Pursuant to the Plan requirements, the Department of Adult Parole Operations (DAPO) conducted an investigation at the Los Angeles County Jails (LACJ), identified issues needing remediation, and prepared a written report (Report) that was shared with Los Angeles County Counsel (LACC) on May 1, 2026. A true and correct redacted copy of the Report (without attachments) is attached hereto as **Exhibit D**. In the Report, DAPO recommended a 60-day waiting period to give LACC and LACJ time to determine if policy changes are required. *See* **Exhibit D** at 15. The Report also recommended conducting a second round of investigation at LACJ following that 60-day waiting period to verify whether LACJ has remediated the issues described in the Report. *Id.* DAPO began their second round of investigation on July 1, 2026. Notably, although Plaintiffs now take issue with how Defendants conducted their first round of LACJ investigation, the parties met before Defendants started that investigation. At that meeting, Defendants provided a summary of the planned investigation process and do not recall Plaintiffs raising concerns about Defendants' intended investigation process at that time. Furthermore, the process used during the second round of investigation, currently in progress, incorporates some of the steps requested by Plaintiffs in the spring of 2026.

Defendants responded to Plaintiffs' June 4, 2026 demand letter on July 10, 2026. Defendants' response is attached hereto as **Exhibit E**. The parties are scheduled to discuss Plaintiffs' demand letter and Defendants' response on August 27, 2026. Defendants do not choose to "house" class members at LACJ, nor can Defendants unilaterally transfer class

members to other Counties as Plaintiffs proposed in their June 4, 2026 demand letter. *See* **Ex. B** at 5, 6, 11, 16, and 17. Instead, as acknowledged in Plaintiffs' letter, out-to-court class members are transferred from CDCR institutions to the custody of LACJ pursuant to court orders. *See* Cal. Pen. Code §§ 1567, 2620-2621 (process for ordering CDCR to relinquish custody of prisoners for court proceedings); and *see* Pls.' Letter, **Exhibit B** at 16. CDCR does not pay counties to house class members for out-to-court proceedings– counties do so at their own expense. *See* Cal. Pen. Code §§ 2620-2621 ("The expense of executing such order shall be a proper charge against, and shall be paid by, the county in which the order shall be made."); and *see* Defs.' response letter, **Exhibit E** at 4. Likewise, class members who are awaiting parole revocation hearings are booked into LACJ pursuant to California law requiring detention at the county jail in which a supervised person is arrested. *See* Cal. Pen. Code § 3056(a); and *see* Defs.' response letter, **Exhibit E** at 4. LACJ maintains sole legal custody of supervised persons housed in its facilities during this process, who are not under the supervision or jurisdiction of DAPO[3]. Cal. Pen. Code § 3056(a).

Further, "all present and future detainees and inmates with mobility impairments who, because of their disabilities, need appropriate accommodations, modifications, services, and/or physical access in accordance with federal and state disabilities laws" at LACJ are part of the plaintiff class in *Johnson, et al. v. Los Angeles County Sheriff's Department*, Central District of California Case No. 2:08-cv-03515-MWF-Ex. *Johnson* is

[3] Contrary to Plaintiffs' representation (*see* fn. 2 above), Defendants are not implying or taking a position that they have no responsibility related to class members held at LACJ. *See* Defendants' statement *supra* (describing Defendants' obligations regarding class member accommodations at county jails). Indeed, Defendants' obligations are laid out in a County Jail Plan extensively negotiated by the parties and approved by the Ninth Circuit. *See* **Exhibit C**, the County Jail Plan; *see Armstrong v. Brown*, 732 F.3d 955, 962 (9th Cir. 2013) (describing Defendants' obligations under the August 28, 2012 orders for implementation of the County Jail Plan); and *see id.* (finding that the measures described in the County Jail Plan, "consisting largely of notifications, collection of data, and reports to county officials, respect California's division of authority" because they "do not require that defendants compel the counties to do anything" or "require any kind of punitive or coercive action on the part of defendants if county officials fail to comply with their state and federal duties.")

in the remedial phase, and compliance is monitored by the Office of the Inspector General (OIG). *See Johnson* settlement agreement[4] at ECF No. 222-1. The Office of the Attorney General is also seeking injunctive and declaratory relief against Los Angeles County and its Sheriff's Department, including preventing LACJ and its employees from discriminating against and failing to provide reasonable accommodations for incarcerated persons with disabilities. *See* Los Angeles County Superior Court, Case No. 25STCV26152. Defendants continue to engage with LACC to address issues brought to CDCR's attention and are specifically working to address concerns outlined in Plaintiffs' demand letter.

**D. Accommodations for Deaf and Hard of Hearing Class Members**

**1. Plaintiffs' Statement**

Defendants reported earlier this year that staff sign language interpreters received a retroactive salary increase of up to 8%. *See* ECF No. 3775 at 8. Unfortunately, Defendants explained in June that the salary increase has had no impact on recruiting, and that the statewide vacancy rate for civil service positions is now 43%. Plaintiffs remain deeply concerned about the sufficiency of sign language interpreting services necessary to ensure deaf signers have access to programming. The parties are working to better understand and resolve barriers to recruiting and retaining staff interpreters. In the meantime, however, Deaf class members who use sign language continue to report that they inconsistently receive on-site contract interpreters to make up for the absence of staff interpreters. And the video remote interpreting services that Defendants use in place of on-site interpreters remain unreliable and unsuitable for group programming. Mere enrollment in education and rehabilitative programs is not enough—Defendants must ensure that Deaf class members have an equal opportunity to participate in programming. Deaf class members commonly report that they do not.

---

[4] The *Johnson* settlement agreement aims "to ensure that [Los Angeles County] Defendants provide Class Members with non-discriminatory and meaningful access to programs, services, and activities available to non-mobility impaired inmates in all Jail Settings."

Below, Defendants point out that "Deaf signers are participating in and completing programs, as evidenced by earning milestone credits, earning bachelor's degrees, and participating in college courses, etc." *See infra* at D.2. However, this is not evidence of sufficient interpreter access due to the manner of how milestone credits are awarded and how college classes are conducted. Nor do the June 2026 SLI Logs "confirm" that "no appointments or classes have been cancelled due to SLI absence." *See infra* at D.2. Plaintiffs' counsel has previously identified categorical omissions from the SLI Logs, such as omission of all VRI use at a single prison, and cannot be assured they are complete. Defendants' ratio of staff interpreters to Deaf signers statewide also obscures the reality that the ratio is much worse at some institutions. San Quentin, for example, is a program-heavy institution with just one staff interpreter for six Deaf signers. Moreover, merely having interpreters on staff does not ensure the interpreters' schedules overlap with the times when interpreting services are needed. At the California Institution for Men, for example, around 30% of programs and jobs to which Deaf signers are assigned take place at a time when no staff interpreter is scheduled. Several other prisons have similar limitations.

Many deaf individuals who do not use sign language also remain without access to essential phone services. Although captioned telephone services are required under Defendants' contract for tablet computers, Defendants still have no timeline for adding these services to the tablets, meaning that unlike their hearing peers, most deaf non-signers cannot place accessible calls from inside their cells. Deaf non-signers who rely on TTY/TDD to place phone calls also are unable to access PREA and OIG hotlines—critical services for deaf people to accessibly report sexual abuse, misconduct, harassment, and bullying.

**2. Defendants' Statement**

Defendants continue extensive recruitment efforts to fill Sign Language Interpreter (SLI) vacancies, including outreach to local interpreter-training programs, community colleges, and regional interpreting businesses. Defendants' current contracted vendors

have reported that many qualified SLIs prefer remote assignments rather than on-site work in correctional or healthcare environments. Rural institutions such as SATF and CCWF face additional geographic recruitment challenges, which further explains localized shortages not attributable to CDCR policy or action.

Despite the industry-wide shortage, Defendants' contracted vendors, including Interpreters Unlimited, remain steadfast in recruiting aggressively. And the statewide ratio of SLIs to deaf signer class members is favorable, averaging one SLI per 3.25 class members. Defendants continue to closely monitor statewide hiring efforts and will work to ensure that any vacancies are posted until filled. Defendants have coordinated with their contracted vendors to strengthen remote interpreter availability and service reliability. On April 15, 2026, Defendants transitioned from the FaceTok to the Language Links VRI platform. Language Links provides stronger platform stability, facilitates louder volume and longer call durations with fewer disconnections. Language links allows pre-scheduled SLI services, resulting in better planning and more consistent interpreter coverage. Interpreters Unlimited continues to work with its vendor partners to address any technical or connectivity issues as part of ongoing refinement. Furthermore, CDCR's Compliance Sergeants and the Correctional Counselor IIs from the ADA Collaboration and Training Team (ACTT) continue to train staff, check the functionality of equipment, and work with the vendors to resolve any intermittent technical issues.

Importantly, June 2026 monthly SLI logs confirm no appointments or classes have been cancelled due to SLI absence. Deaf signers are participating in and completing programs, as evidenced by earning milestone credits, earning bachelor's degrees, and participating in college courses, etc.

Defendants are in the process of converting statewide VRS services from ViaPath to Securus. This transition will include installing multiple dedicated VRS stations in accessible locations at DPH-SLI designated institutions to strengthen reliability, increase the number of access points, and ensure reliable communication access for Deaf and Hard-of-Hearing class members. The conversion is expected to provide enhanced equipment,

improved network stability, and quicker vendor response times. Access to VRS will also be available on the state issued prisoner tablets, allowing deaf signers to place calls from inside their cells. The institution-by-institution transition from ViaPath to Securus began in February 2026 and is ongoing. Defendants are working with Securus to address concerns raised regarding Deaf non-signers who rely on TTY/TDD to place phone calls who are unable to access PREA and OIG hotlines.

Finally, Defendants' new tablet vendor, Securus, has not yet provided Defendants with a definitive date when captioned telephone services will be available on the new prisoner tablets, but is aware of the need for the same. In the meantime, captioned telephone services are available to deaf non-signers upon request.

**E. Accommodations for Blind and Low-Vision Class Members**

Defendants have produced a draft policy to memorialize Defendants' commitment to offer personal issuance of all recommended assistive devices to blind and low-vision class members. Plaintiffs will review and comment on this draft. Plaintiffs are monitoring the rollout of personal issuance of devices to class members who were recommended access to assistive devices by the vision specialist and were previously required to request access to the assistive devices through a checkout process. Defendants are finalizing how best to share information on a quarterly basis and expect to start sharing soon.

The status of the parties' dispute regarding whether Defendants are evaluating blind and low-vision class members' writing accommodation needs and providing reasonable writing accommodations to class members, in line with ARP, ADA, and the Court's orders, is unchanged since the last joint case status statement. *See* ECF No. 3747 at 13-16. The parties are meeting in August to discuss this and other issues.

**F. Access to Assignments for Class Members**

Historically, the program-access workgroup met periodically to discuss credit earning, the assignment process, and disparities in the program-access assignment data in response to Plaintiffs' allegations of disability-related discrimination. *See* ECF No. 2680 at 13-14. The parties reached agreement on the relevant data to produce to Plaintiffs each

month in early 2024 but have not yet reached agreement on a standard for evaluating whether there is discrimination in program assignments. The parties have agreed to temporarily pause workgroup discussions, at Defendants' request, to enable CDCR to resolve other pending case issues. In the meantime, CDCR continues to work on a regulatory package to address programming waitlists, which includes responding to Plaintiffs' public comments on the proposed regulations. CDCR has also responded to several proposals shared by Plaintiffs outside the regulatory processes to improve program assignment processes. Plaintiffs will continue to report in the monitoring tour reports on disparities in assignment rates between incarcerated people with and without disabilities at individual institutions and programs.

**G. ADA Structural Barriers, Emergency Evacuation Procedures and Master Planning Process**

The parties, with assistance from the Court Expert, negotiated a stipulation to memorialize the parties' agreement for dispute resolution related to master planning. The Court issued an order on the parties' stipulation on April 22, 2026. ECF No. 3769.

In addition, the Court approved the Court Expert's request to retain two experts to aid the Court Expert with master planning issues. ECF No. 3772. The Court Expert retained Eric McSwain as a consultant on physical accessibility issues and Mani Subramanian as a consultant on construction management. Both experts have begun working with the Court Expert on master planning issues.

The parties also continue to engage in structured meetings about several master planning issues currently in dispute. The parties have met six times this year, including multiple times about the master planning construction timeline, as well as CDCR's processes for tracking and sharing information about the status of master planning design and construction. The parties have reached some agreements related to those issues. Specifically, Defendants have agreed to provide detailed barrier removal schedules for the current and the next two fiscal years for each master planning institution scheduled for construction during that timeframe. The detailed barrier removal schedules will be

updated each February and August. CDCR has also agreed to Plaintiffs' requests for more information in the quarterly Change Request Tracking Logs and the sharing of other informational documents. Additionally, all of Plaintiffs' questions regarding the bed projection process for *Armstrong* class members have been addressed. Other discussions related to the master planning timeline and budgeting—CDCR's 2025 transition plan currently has master planning construction being completed in 2034, a year later than projected in the 2024 transition plan—remain ongoing. The parties will meet in September to continue discussing these issues and the Court Expert's retained expert Mani Subramanian will be providing input to the Court Expert.

On April 13, 2026, the parties and Court Expert's Office conducted a joint accessibility inspection of completed master planning construction at Salinas Valley State Prison. The parties anticipate further discussion of the issues that arose during that inspection, including new concerns with the accessible cells in the 180-design buildings at SVSP, which have statewide implications. The tour was also the first time the parties jointly inspected certain 270-design and 180-design cells that were originally designed to be ADA compliant. Plaintiffs had some concerns about those accessible cells being non-compliant with requirements at the time of construction and presently. Plaintiffs' expert conducted another inspection of completed master planning construction at SVSP in July, as the April inspection did not cover all completed construction at SVSP. After the July inspection, on August 7, 2026, Plaintiffs sent an email about several areas at SVSP where programs are running, but that are not included on the transition plan or change request log.

On June 17, 2026, Plaintiffs served a report by their expert Mark Larson about fire safety issues and inaccessible emergency exits for class members in CDCR, based on a review of documents and an October 21, 2025 tour of LAC. Plaintiffs await Defendants' response to the report.

On July 9, 2026, the parties met to discuss Plaintiffs' concerns about the cells intended to be accessible in 270-design buildings throughout the state. Defendants will be

providing more information in response to that meeting, including a revised proposed design for accessible cells in 270 buildings within two months of the July 9 meeting.

The parties also continue to exchange information about other master planning issues. For example, Defendants share, on a monthly basis, a spreadsheet with the updated status of design and construction for current master planning projects. Defendants have recently agreed to add information to that spreadsheet reflecting any changes to the timelines for those master planning projects, as well as whether projects are funded. Plaintiffs also continue to provide comments on Defendants' designs for master planning construction. The parties anticipate meeting with the Court Expert's retained expert Eric McSwain soon to discuss issues related to master planning designs. The Court Expert will visit RJD with his expert in September 2026.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Respectfully submitted,

DATED: August 18, 2026 ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/Penny Gobold*
Penny Godbold

Attorneys for Plaintiffs

DATED: August 18, 2026 ROB BONTA
Attorney General of the State of California

By: */s/Olena Likhachova*
Olena Likhachova
Deputy Attorney General

Attorneys for Defendants

**FILER'S ATTESTATION**

As required by Local Rule 5-1, I, Penny Godbold, attest that I obtained concurrence in the filing of this document from Deputy Attorney General Olena Likhachova, and that I have maintained records to support this concurrence.

DATED: August 18, 2026 */s/Penny Godbold*
Penny Godbold

# EXHIBIT A

ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

[redacted]
Email: [redacted]

May 8, 2026

**PRIVILEGED AND CONFIDENTIAL**

**SUBJECT TO PROTECTIVE ORDERS**

VIA ELECTRONIC MAIL ONLY

[redacted]

[redacted]

Re: *Armstrong v. Newsom*: Plaintiffs' May 2026 Review of CDCR's Accountability System at the Six Prisons
Our File No. 0581-03

Dear [redacted]:

We write regarding our review of Defendants' system for holding staff accountable for misconduct. The enclosed report is based on our review of investigation and discipline files produced from CSP-Los Angeles County ("LAC"), California Institution for Women ("CIW"), R.J. Donovan Correctional Facility ("RJD"), California Substance Abuse Treatment Facility ("SATF"), CSP-Corcoran ("COR"), and Kern Valley State Prison ("KVSP") (collectively "Six Prisons").

Plaintiffs continue to find that investigations and discipline fail to comply with the *Armstrong* Court Orders, as affirmed in relevant part by the Ninth Circuit, and with the RJD and Five Prisons Remedial Plans. *See* Dkts. 3059, 3060, 3217, 3218, 3393; *Armstrong v. Newsom*, 58 F.4th 1283, 1288 (9th Cir. 2023). These findings are corroborated by the Office of Inspector General who conducted a recent review of staff misconduct investigations and discipline and found that approximately 70 percent of cases involving complaints filed by incarcerated people were inadequate or needed improvement. *See* July – December 2025 Report Monitoring Internal Investigations, Staff Misconduct Complaint Investigations, and the Employee Disciplinary Process of the California Department of Corrections and Rehabilitation.

Plaintiffs have again found substantial evidence that CDCR's accountability system is failing to identify and confirm violations and to hold staff accountable for misconduct. Plaintiffs' counsel looks forward to discussing these cases with Defendants in June 2026. We remain hopeful that the parties will be able to implement remedies to the system to address these longstanding systemic failures, and to improve accountability for staff misconduct.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

/s/ [redacted]

By: [redacted]

[redacted]

# TABLE OF CONTENTS

**Page**

I. CASES INVOLVING A SINGLE OFFICER AT SATF THAT EXEMPLIFY SERIOUS AND ONGOING FAILURES OF THE ACCOUNTABILITY SYSTEM ..... 1

1. Officer [redacted] (SATF-[redacted] SATF-[redacted] SATF-[redacted] SATF-[redacted] ..... 1

(a) SATF-[redacted] & SATF-[redacted] ..... 2

(i) SATF-[redacted] – AIU, Sustained (L1; Reduced to Corrective Action) ..... 2

(ii) SATF-[redacted] – Sustained (L2; Reduced to Level 1) ..... 3

(b) SATF-[redacted] – AIU, Not Sustained ..... 4

(c) SATF-[redacted] – AIU, Not Sustained ..... 7

(d) Conclusion ..... 10

II. OTHER FAILURES TO HOLD OFFICERS ACCOUNTABLE FOR USING FORCE ..... 13

1. SATF-[redacted] – AIU, Not Sustained ..... 14

2. SATF-[redacted] – AIU, Not Sustained ..... 16

3. LAC-[redacted] – AIU, Sustained (L4 for two officers, L3 for one officer) ..... 18

4. COR-[redacted] – AIU, Sustained (Letter of Instruction) ..... 21

5. COR-[redacted] – AIU, Not Sustained ..... 21

6. KVSP-[redacted] – AIU, Not Sustained ..... 22

III. FAILURE TO HOLD STAFF ACCOUNTABLE DUE TO THE FAILURE TO RETAIN VIDEO FOOTAGE ..... 24

1. SATF-[redacted] ..... 24

2. SATF-[redacted] ..... 25

3. LAC-[redacted] ..... 25

4. LAC-[redacted] ..... 25

5. LAC-[redacted] ..... 25

IV. FAILURE TO HOLD STAFF ACCOUNTABLE DUE TO THE FAILURE TO COMPLY WITH THE STATUTE OF LIMITATIONS ..... 26

1. LAC-[redacted] – AIU, Sustained (Letter of Instruction and Training, SOL Expired) ..... 27

2. LAC-[redacted] – AIU, Sustained (Letter of Instruction and Training, SOL Expired) ..... 29

3. LAC-[redacted] – AIU, Sustained (Training, SOL Expired) ..... 31

V. FAILURE TO CONFIRM ACCIDENTAL OR UNINTENTIONAL MISCONDUCT ..... 32

1. COR-[redacted] – AIU, Not Sustained ..... 33

VI. AN EXAMPLE OF THE ACCOUNTABILITY SYSTEM WORKING ..... 33

1. LAC-[redacted] – OIA, Sustained (L9) ..... 34

VII. CONCLUSION ..... 36

# I. CASES INVOLVING A SINGLE OFFICER AT SATF THAT EXEMPLIFY SERIOUS AND ONGOING FAILURES OF THE ACCOUNTABILITY SYSTEM

Four cases in this report involve a single officer at SATF who, despite engaging in very serious and sustained uses of force against people with disabilities, has not been held appropriately accountable for ongoing misconduct.

As explained in detail below, these cases illustrate multiple failures of the accountability system including: (1) the failure to recognize when officers are not accommodating disabilities leading to unnecessary uses of force; (2) the failure to implement appropriate discipline when violations are sustained; (3) the failure to conduct thorough investigations identifying all involved officers; and (4) the colossal failure of the system to recognize a problematic pattern involving multiple serious allegations of use of force violations involving a single officer. Each of the four allegations worked their way through the system at the same time independently of one another and with zero interventions to prevent ongoing harm to class members. The full extent of the harm caused by this officer to the incarcerated population is not known because Plaintiffs' counsel only receive a limited production of cases.

## 1. Officer [redacted] (SATF-[redacted] SATF-[redacted] SATF-[redacted] SATF-[redacted]

Between June 2024 and February 2025, Officer [redacted] slammed or tackled four different *Armstrong* class members to the ground. In each of these incidents, the force was either unnecessary or excessive. And in two of them, Officer [redacted] used force after the class members explicitly requested disability accommodations.

In the first two incidents, from June and July 2024, the Hiring Authority concluded that Officer [redacted] used unnecessary and excessive force when he "suplexed" two class members, but imposed only corrective action and a Level 1 penalty. The Hiring Authority said nothing about Officer [redacted] actions in the third incident, from September 2024, because the investigator focused myopically on the actions of another officer, closed the matter without considering Officer [redacted] use of force in response to a requested disability accommodation, and did not complete the investigation before the expiration of the statute of limitations. Finally, in the fourth incident, from February 2025, the Hiring Authority incorrectly found no policy violation when Officer [redacted] again slammed a class member with a mobility disability—who repeatedly asked Officer [redacted] to cuff him in front to accommodate his documented disability needs—to the ground. Despite this pattern of violating class members' rights, CDCR has taken only one formal disciplinary action against Officer [redacted] issuing him a single Official Reprimand.

These four incidents of misconduct demonstrate that Officer [redacted] should not be working in any position where he comes into contact with incarcerated people with disabilities. **Though CDCR can no longer discipline Officer [redacted] for this misconduct, Plaintiffs request that he be assigned to a position in which he does not interact with class members.**

**(a) SATF-[redacted] & SATF-[redacted]**

The first two incidents occurred within three weeks of each other and illustrate the ongoing problem of the failure of CDCR to recognize when two similar cases are making their way through the system that may have bearing on how discipline should be handled for this officer. In both incidents, Officer [redacted] approached an incarcerated person, and after telling the incarcerated person that he was going to escort them to their cells—but without first ordering them to turn around or "cuff up"—grabbed the incarcerated person by the arm. Then, when it appeared to Officer [redacted] that the incarcerated person was "resisting," he used immediate force by wrapping his arms around their waists, lifting them into the air, and slamming them to the ground.

In both incidents, the Hiring Authority found that Officer [redacted] had used improper force—excessive force in the first case and unnecessary force in the second. In both incidents, following a Skelly Hearing, the Hiring Authority sustained the discipline imposed. And in both incidents, upon Officer [redacted] appeal to the State Personnel Board ("SPB"), CDCR stipulated to a reduced penalty. As a result, despite using excessive and unnecessary force in an especially dangerous manner against two different class members, in incidents that occurred within 19 days of each other, Officer [redacted] ultimately received only an Official Reprimand. That outcome was inappropriate and undermines CDCR's system of progressive discipline.

**(i) SATF-[redacted] – AIU, Sustained (L1; Reduced to Corrective Action)**

This first incident occurred on June 21, 2024. It begins when Officer [redacted] approaches [redacted] ([redacted]), a 51-year-old class member who is in the dayroom speaking with several other incarcerated individuals. *See* BWC 1 at 15:20:21 to 15:20:3. Officer [redacted] believed that Mr. [redacted] was on "C-Status" and therefore should not have been in the dayroom at this time. *See* Investigative Report at 20. Officer [redacted] orders Mr. [redacted] to return to his cell. Mr. [redacted] shrugs and says, "So what you gonna do after that?" Officer [redacted] responds, "Alright, I'mma escort you to your cell," and reaches to grab Mr. [redacted] Mr. [redacted] backs up and evades Officer [redacted] grasp. *See* BWC 2 at 15:20:20 to 15:22:31. Officer [redacted] then immediately wraps both arms around Mr. [redacted] waist, lifts him into the air, and slams him to the ground, landing on top of him. *See* BWC 1 at 15:20:34 to 15:20:40. At no point during the brief interaction leading up to the force did Officer [redacted] direct Mr. [redacted] to turn around or submit to handcuffs.

The Hiring Authority correctly sustained an allegation of excessive force without injury (L4, 12**3**). *See* 402/403 at 3. It concluded that, during the incident, Mr. [redacted] "was non-compliant and refused to follow staff directives," but "at no time did [he] pose an imminent threat." *See* Skelly Recommendation at 2. According to the Hiring Authority, "where there is no immediate threat to staff or others, DOM Section 51020.17 mandates that a controlled use of force be considered." *Id*. Instead, "Officer [redacted] engaged [Mr. [redacted] by immediately making physical contact in an attempt to apply restraints. The evidence indicates that a controlled use-of-force option was available and should have been pursued." *Id*.

The Hiring Authority erred, however, by imposing a below-baseline, Level 1 penalty (Letter of Reprimand). *See* 402/403 at 2. The Hiring Authority found three mitigating factors (lack of premeditation, lack of understanding of consequences, honesty during the investigation[1]) and five aggravating factors (intentional and willful, sworn staff, potential serious consequences, harm to public service, and the employee did not accept responsibility). *Id*. Confronted with these factors, the Hiring Authority's decision to mitigate the penalty at all—let alone to mitigate it down two levels—was unreasonable. And mitigation was especially inappropriate because, as discussed below, Officer [redacted] had engaged in repeated acts of improper force.

CDCR then compounded the Hiring Authority's error after Officer [redacted] appealed to the SPB. In those proceedings, CDCR agreed to reduce his penalty from an Official Reprimand to corrective action, specifically a Letter of Instruction. *See* Stipulation and Release at 2.

**(ii) SATF-[redacted] – Sustained (L2; Reduced to Level 1)**

The second incident occurred on July 10, 2024, 19 days after the first. In this incident, Officer [redacted] approaches [redacted] ([redacted]),[2] who is seated at a table in the dayroom. *See* BWC at 22:04:30. Mr. [redacted] is complaining that he has been unable to get his prescribed mental health medication. During the conversation, Mr. [redacted] is animated but seated; he does not present as an imminent threat. Officer [redacted] directs Mr. [redacted] to stand up. *See* BWC at

[1] Plaintiffs have repeatedly explained how honesty during the investigation should not be a mitigating factor, as CDCR policy requires officers to be honest during investigations.

[2] As of the date of this report, CDCR has assigned Mr. [redacted] a [redacted] code. According to the attachments to the Investigation Report, at the time of this incident, CDCR had not assigned Mr. [redacted] a DPP code, but had issued him a "Mobility Impaired Disability Vest," a "Wrist Support Brace," "Therapeutic Shoes/Orthotics," and "Incontinence Supplies." *See* DPP Summary at 93. CDCR also issued Mr. [redacted] a "Lower/Bottom Bunk Only" housing restriction, a "Lifting Restriction," and noted that Mr. [redacted] needed "Special Cuffing." *Id*.

22:04:40 to 22:04:58. Mr. [redacted] complies. Officer [redacted] then says, "I'm taking you back to your cell, alright? Come on." *See* BWC at 22:04:58 to 22:05:00. As he says this, Officer [redacted] reaches with his left arm to grab Mr. [redacted] right arm. *See* AVSS at 22:04:51. Mr. [redacted] then reaches in the direction of the table to retrieve his water bottle and ID card. As he does so, Officer [redacted] wraps his arms around Mr. [redacted] waist, lifts Mr. [redacted] into the air, and slams him into the ground. Mr. [redacted] lands on his right shoulder, and his head bounces on the floor. *See* AVSS at 22:04:52 to 22:04:56. At no point during the interaction leading up to the force did Officer [redacted] direct Mr. [redacted] to turn around or submit to handcuffs.

The case conference for this incident took place about two weeks before the case conference for the incident discussed above. The Hiring Authority determined that Officer [redacted] engaged in unnecessary force without injury (L1, 1**2**3), though medical records suggest the assault may have broken Mr. [redacted] shoulder.[3] As with the incident above, the Hiring Authority found more aggravating factors than mitigating factors. But unlike for that incident, here, the Hiring Authority elected to impose the base penalty (Level 2). *See* 402/403 at 1-3. Once Officer [redacted] appealed to the SPB, however, CDCR again agreed to reduce the penalty—from Level 2 to Level 1, a Letter of Reprimand. *See* Stipulation and Release at 1.

As a result, an officer who, two times in less than three weeks, unnecessarily body-slammed two incarcerated people—an extremely dangerous maneuver—received only a Letter of Reprimand and corrective action.

**(b) SATF-[redacted] – AIU, Not Sustained**

In the third incident, Officer [redacted] tackles a handcuffed class member with a mobility disability to the ground because the class member attempted to sit down while being escorted after officers refused to give him his cane. But because the class member's allegations implicated only a different officer and included details about the force that the investigators concluded were unsubstantiated by video, the Hiring Authority did not discipline Officer [redacted] There is no indication in the file that the

---

[3] Of note, Mr. [redacted] appears to have been injured during this incident. *See* 7362 dated July 14, 2024 stating, "I'm in pain in my sholder [sic] and been asulted [sic] for no reason."; see also 7362-A dated July 16, 2024 ("On 7/10/24 at 10:00 pm I was attacked from the C/O's at [redacted] yard because of it my back and sholder [sic] hurts. I need my back brass [sic]."); 7362-B dated July 16, 2024 ("I'm in pain. I need help."); 7362 dated July 17, 2024 ("On 7/10/24 at 10:00 pm [redacted] yard the c/o jumped me and brock [sic] my sholder [sic]. I need to see the doctor for sling and back brass [sic]. I'm in pain."). X-Rays of Mr. [redacted] right shoulder taken on July 22, 2024 reveal a "chronic appearing ununited fracture deformity proximal humerus," in other words, a broken shoulder. *See* XR Shoulder Right dated July 22, 2024.

Hiring Authority connected the actions of Officer [redacted] to the two other serious use of force violations, above. And even if the investigation had been adequate and resulted in allegations against Officer [redacted] the Hiring Authority would not have been able to impose any discipline because the statute of limitations had expired.

The incident occurs on September 12, 2024, the same date that the class member, [redacted] ([redacted])[4] arrived at SATF. The AIU Report and body-worn camera footage suggest that, prior to the incident, Mr. [redacted] had protested his housing assignment and had made statements that the primary escort officer during this incident, Officer [redacted] interpreted as a threat. *See* Investigative Report at 3; BWC at 7:47:30–7:48:11.

The video begins with Officer [redacted] escorting Mr. [redacted] from the housing unit to the yard. *See* BWC at 19:46:14. Officer [redacted] has his hand on Mr. [redacted] right arm, and Mr. [redacted] hands are handcuffed behind his back; Officer [redacted] trails a few steps behind. *See* AVSS at 19:46:22. As they leave the building, Mr. [redacted] addresses Officer [redacted] saying "You just asked me if I'm all ready to leave." Officer [redacted] replies, "Stop. First off, stop tensing up." Mr. [redacted] replies, "I'm not threatening you," and then stops and asks if he can get his cane, saying, "Bro can I get my cane? I need my cane." *See* BWC at 19:46:20 to 19:46:27. Mr. [redacted] then tries to sit down, while Officer [redacted] shouts, "No, no, no stalling. Do not—" *See* BWC at 19:46:27; *see also id*. at 19:47:03–05 (Mr. [redacted] explaining that he was trying to sit down); *id*. at 19:48:45-46 (same).

Rather than retrieve Mr. [redacted] cane or allow him to sit down, Officer [redacted] who has now moved alongside Mr. [redacted] wraps his arms around Mr. [redacted] upper torso and drives him forward four or five steps, before tackling Mr. [redacted] to the ground. *See* AVSS at 19:46:25 to 19:46:30.

Mr. [redacted] 602 alleges that Officer [redacted] "drug" him outside, "'dipped' [him], placed [him] into a headlock, and smashed [his] face into the ground and choked [him]." *See* AIU Report at 1. Mr. [redacted] also alleged that Officer [redacted] placed his knee into Mr. [redacted] back. *Id*. The AIU Report notes that the investigator did not "witness[]" these "UOF allegations . . . during review of BWC." *Id*. at 3. For that reason, the investigator found that "pursuant to CCR Section 3486.2(b)(4)(A)(1), this case meets the criteria for closure under special circumstances." *Id*. at 4. The investigator took no further investigative action and closed the investigation. *Id*.

---

[4] At the time of the incident, Mr. [redacted] was prescribed a cane and a mobility disability vest, and he had a lower bunk/lower tier housing restriction. He likely should have had a [redacted] code instead of a [redacted] code.

But the AIU Report omits the central role Officer [redacted] played in the use of force. For example, this is how the investigator described his review of the AVSS and BWC from the incident:

> [redacted] gives orders to [redacted] to stop his actions and tells [redacted] "No" several times. [redacted] is observed with his feet planted in front of his body and appears to be pushing his body weight backwards. [redacted] appears to lose his balance. When [redacted] regains his footing, he responded to the location where [redacted] is on the ground, gives orders to [redacted] to stop resisting.

*See* AIU Report at 2.

Missing from this description is any explanation of how Mr. [redacted] wound up on the ground. The investigator's description of Officer [redacted] statement is also sparse on details. He summarizes [redacted] statement as follows:

> [redacted] detailed, he was assisting the escort of [redacted] after [redacted] told [redacted] to take his badge and belt off and come into [redacted] cell. [redacted] detailed during the escort [redacted] planted his feet against the ground and pushed his body back towards [redacted]

*Id*.

But Officer's [redacted] statement is far more explicit about how he tackled Mr. [redacted] "I immediately wrapped both of my arms around [Mr. [redacted] torso area and utilizing my body weight and driving forward with my legs I forced him to the ground in a prone position. *See* [redacted] Incident Report at 23.

The investigator should have made clear that video showed Officer [redacted] tackling Mr. [redacted] to the ground after he asked for his cane, stopped his escort, and tried to sit down. And the investigator should have amended his report to consider whether the officers' failure to accommodate Mr. [redacted] disability, as well as Officer [redacted] use of force, violated policy. Had the investigator done so—and done so before the statute of limitations had expired—rather than exonerating Officer [redacted] and making no findings about Officer [redacted] the Hiring Authority could have appropriately considered the conduct of Officer [redacted] in this case.

The Hiring Authority should have found two policy violations. *See* 402/403. First, Officers [redacted] and [redacted] failed to accommodate Mr. [redacted] mobility disability by not providing him with his cane as he requested. Second, Officer [redacted] used unnecessary force. Mr. [redacted] was not presenting an imminent threat when

Officer [redacted] tackled him. Requesting a reasonable accommodation like a cane and stopping an escort to sit down does not constitute an imminent threat. The officers could have avoided force entirely if they had allowed Mr. [redacted] to sit down, then retrieved his cane and continued the escort. Using immediate force and tackling a handcuffed person with a mobility disability was not justified under CDCR policy.

Moreover, Mr. [redacted] sustained a laceration to his forehead above his right eyebrow, for which he received medical attention—a nurse cleaned his wounds and applied "appropriate dressings," including "steri-strips." *See* Progress Note at 1 dated September 12, 2024; Nursing Face-to-Face/7362 at 1 dated September 13, 2024; *see also* Attachments at 35 (documenting bruising and abrasions or scratches on Mr. [redacted] right knee; an abrasion on Mr. [redacted] right hand; bruising/discolored area on right shoulder; and an abrasion/scratch and dried blood above Mr. [redacted] right eyebrow). And more than a month after the incident, Mr. [redacted] was still complaining of pain on the left side of his body, due to being slammed to the ground. *See* Outpatient Progress Note at 1 dated September 19, 2024; 7362 at 1 dated September 21, 2024 ("I got slammed and my ribs hurt really bad, hard for me to sleep"); 7362 at 1 dated October 10, 2024; 7362 at 1-2 dated October 13, 2024.[5] The Hiring Authority could therefore have sustained an allegation of unnecessary force causing injury (L2, 456789).

### (c) SATF-[redacted] – AIU, Not Sustained

In the fourth incident, Officer [redacted] disregards a class member's bright yellow mobility-impaired disability vest, the class member's walker, and the class member's repeated entreaties that Officer [redacted] honor his special cuffing restriction and handcuff him in front of his body. Officer [redacted] instead tells the class member that he "doesn't care" about the class member's special cuffing restriction and insists on handcuffing the class member behind his back. As Officer [redacted] twists the class member's arm behind his back, the class member complains of pain to his wrist and moves his body so that his arm is not twisted behind him. Officer [redacted] immediately wraps his arms around the class member's waist, lifts the class member into the air, and slams him onto the ground. Despite this officer's failure to accommodate the class member's disability and his use of unnecessary and excessive force, the Hiring Authority does not sustain any allegation of misconduct.

[redacted] ([redacted]) who was fifty-one years old at the time of the incident and uses a walker to ambulate, is walking on the track in the yard, wearing his yellow mobility impaired disability vest, when another incarcerated person approaches him aggressively initiating an altercation. *See* AVSS at 07:17:55; Investigative Report at 4. Mr. [redacted] responds to the attack, striking the other incarcerated person, but the skirmish ends quickly: the other incarcerated person moves away from

---

[5] Though x-rays were ordered, Mr. [redacted] refused those appointments.

Mr. [redacted] and drops to the ground in a prone position, while Mr. [redacted] moves away from the other incarcerated person and begins collecting personal items that scattered from his walker, which had tumbled over during the incident. *See* AVSS at 07:18:00 to 07:18:18.

When Officer [redacted] approaches, Mr. [redacted] is calm. *See* BWC 1 at 07:18:50 to 07:18:55. Officer [redacted] orders Mr. [redacted] to turn around and cuff up. Mr. [redacted] responds by crossing his hands in front of his body while stating, "I'm not cuffing up. I got front cuffing." Officer [redacted] replies, "**I don't care**." Over the next several seconds, Mr. [redacted] explains repeatedly that he has "front cuffing," while Officer [redacted] continues to order Mr. [redacted] to turn around and submit to handcuffs behind his back. Eventually, Officer [redacted] says, "So look, I'mma cuff you up," grabs Mr. [redacted] left wrist,[6] and again directs Mr. [redacted] to turn around. Mr. [redacted] again attempts to explain his cuffing restriction, saying, "From the front," before exclaiming, "Hey! Why you trying to hit the alarm on me? I got front cuffing." Officer [redacted] responds simply, "Cuff up." Mr. [redacted] says, for the fifth or sixth time, "I got front cuffing." *See* BWC 1 at 07:18:50 to 07:19:09.

Officer [redacted] then tells Mr. [redacted] "Don't resist." Mr. [redacted] replies, "I ain't not resisting. Hit the alarm." Officer [redacted] then again instructs Mr. [redacted] to turn around and repeats that instruction twice more. Mr. [redacted] twice exclaims, "I got front cuffing!" and then, as Officer [redacted] twists Mr. [redacted] left arm behind his back to handcuff him, "You gonna break my wrist! I got front cuffing!" Mr. [redacted] shifts his body so that his arm is no longer twisted behind his back. Officer [redacted] immediately moves behind Mr. [redacted] wraps his arms around Mr. [redacted] waist, lifts Mr. [redacted] into the air, and then slams him to the ground. *See* BWC 1 at 07:19:09 to 07:19:22; AVSS at 07:19:10 to 07:19:20

As the incident unfolds, a Sergeant approaching Officer [redacted] and Mr. [redacted] from across the yard shouts in their direction, calling Mr. [redacted] by his last name four or five times. *See* BWC 2 at 07:19:11 to 07:19:15. After Officer [redacted] slams Mr. [redacted] to the ground, the Sergeant sighs and, referring to Officer [redacted] asks, "Why the fuck is this kid doing that?" *See* BWC 2 at 07:19:15 to 07:19:19.

Once on the ground, Mr. [redacted] explains to other officers who have just arrived that he told Officer [redacted] about his cuffing restriction "ten times." Now on top of

---

[6] Mr. [redacted] had surgery to repair a radial fracture in his left wrist in April 2020. More specifically, Mr. [redacted] medical records suggest he underwent a procedure called open reduction and internal fixation (ORIF). ORIF wrist surgery is a procedure used to repair severe, displaced, or unstable fractures of the wrist (usually the distal radius). It involves making an incision, re-aligning the bones, and using hardware like plates, screws, or pins to stabilize the bones internally while they heal. *See* Brandon P. Donnelly, *ORIF Wrist Surgery*.

Mr. [redacted] and cuffing Mr. [redacted] left arm, Officer [redacted] instructs Mr. [redacted] to put his other hand behind his back. Mr. [redacted] says again, "I got front cuffing man, my wrist is messed up man. I got front cuffing. I told you that. I got front cuffing." *See* BWC 1 at 07:19:30 to 07:19:40. As Mr. [redacted] is speaking, the sergeant who expressed dismay at Officer [redacted] actions arrives and tells Officer [redacted] who is still trying to handcuff Mr. [redacted] behind his back, "Hold on he's gotta get the waist [restraints]." Mr. [redacted] addresses the sergeant saying, "I told him I had front cuffing, sergeant. Ten times. Review the camera." *See* BWC 2 at 07:19:39 to 07:19:46.

Eventually, Mr. [redacted] was "escorted to [a] holding cell without further incident" while "secured in waist restraints." *See* AIU Report at 3. Mr. [redacted] later complained of pain in his left foot, right wrist, and right shoulder, injuries he attributed to Officer [redacted] slamming him into the ground. *See* 7362 at 1 dated February 5, 2025 ("I think my toe is broken. And my wrist is sprung. I had an incident with staff 2-2-25 approx 7:19 am. Now my left foot big toe is swollen and my right sholder [sic] and right wrist has pain. I was slammed by Officer [redacted] to the ground."); 7362 at 1 dated February 7, 2025 ("Still having discomfort in left big toe, right wrist area, and right shoulder area.").

During his interview with the AIU investigator, Officer [redacted] explained that he attempted to handcuff Mr. [redacted] behind his back for two reasons: first, it was an emergency situation and he only had regular handcuffs on him; second, in Officer [redacted] view, if Mr. [redacted] was "willing to push his assistive medical equipment away from him to attack another inmate" then Mr. [redacted] "did not need any assistance and he was able to cuff up behind his back without an issue." *See* [redacted] Interview at 24:26–25:30.

Mr. [redacted] filed a 602 alleging that Officer [redacted] "used excessive and unreasonable" force when he picked Mr. [redacted] up and slammed him to the ground. *See* 602 at 4. The Hiring Authority did not sustain the allegation. *See* 402/403 at 1.

The Hiring Authority's failure to sustain any allegation of misconduct was wrong in several ways. To begin with, force could have been avoided had Officer [redacted] simply listened to Mr. [redacted] Rather than forcing Mr. [redacted] to submit to handcuffs behind his back, Officer [redacted] could have directed Mr. [redacted] to sit on his walker and then waited for other officers to arrive with waist restraints. Instead, Officer [redacted] ignored Mr. [redacted] and, based in part on his own uninformed assessment of the severity of Mr. [redacted] disability, insisted that Mr. [redacted] cuff up behind his back. In fact, CDCR policy requires Officer [redacted] to accommodate Mr. [redacted] disability when applying handcuffs. *See* DOM 51020.6(g) (mechanical restraints "shall be applied" to people with disabilities to "ensure effective application while reasonably accommodating the [incarcerated person's] disability."). The Hiring Authority should have sustained an allegation of staff misconduct against Officer [redacted] for failing to perform within the

scope of his duties and training when he improperly denied Mr. [redacted] a reasonable disability accommodation.

The Hiring Authority should also have sustained an allegation of either unnecessary or excessive force. Mr. [redacted] neither presented an imminent threat when Officer [redacted] approached, nor threatened Officer [redacted] during their interaction. To the extent that Mr. [redacted] "resisted" Officer [redacted] at all, he did so only because Officer [redacted] failed to provide him a disability accommodation and to avoid the pain caused by Officer [redacted] twisting his surgically repaired left-wrist behind his back. Under these circumstances, slamming Mr. [redacted] to the ground was unnecessary and dangerous. The amount of force was also much more than necessary and resulted in injury[7]: for days afterward Mr. [redacted] complained of pain in his left foot, right shoulder, and right wrist. He described his pain as a 7 on a scale of 1 to 10 to the medical professionals who responded to his requests for treatment. And notes of those encounters show that Mr. [redacted] sustained bruising to his left big toe and experienced pain when walking and lifting his right arm. The Hiring Authority could therefore have sustained allegations of unnecessary force causing injury (L2, 4**5**6789) or excessive force causing injury (L5, 4**5**6789). At a minimum, the Hiring Authority should have sustained unnecessary force without injury (L1, 1**2**3) and excessive force without injury (L4, 12**3**).

Instead, the only person disciplined for this incident was Mr. [redacted] He received an RVR for resisting staff. He lost 90 days of credits. He lost yard recreation privileges and package privileges for 90 days. And SATF imposed property restrictions on him for 90 days. *See* RVR at 77-78; Disciplinary Hearing Results at 80-89.

**(d) Conclusion**

These incidents evince a pattern: Officer [redacted] resorts to unjustified immediate and dangerous force against class members with disabilities who present no imminent threat. The third and fourth cases, in which he used force after class members requested accommodations for their disabilities, are particularly problematic. It is clear to Plaintiffs' counsel that Officer [redacted] is not equipped to work with people with disabilities. We recognize that CDCR can no longer discipline him for these incidents. But we ask that you reassign Officer [redacted] to a post in which he cannot interact with and harm class members.

---

[7] *See* Cal. Pen. Code § 243(f)(5) ("'Injury' means any physical injury which requires professional medical treatment"); *see also People v. Adams*, No. B293152, 2020 WL 1969364, at *13 (Cal. Ct. App. Apr. 24, 2020) ("a swollen, sore knee that hurts when it is moved" and pain rated 7 or 8 on scale of 10 constitutes an injury for purposes of Penal Code Section 243).

Setting aside our specific concerns about Officer [redacted] these incidents also illustrate several problems with CDCR's accountability system—problems we have raised repeatedly over the last several years. For example, as we have pointed out before, CDCR undermines its own progressive discipline system by stipulating to lesser penalties when clear evidence establishes that misconduct occurred. The first two incidents should have resulted in penalties higher than Level 1. But the slap on the wrist that CDCR gave Officer [redacted] made it more likely that he would engage in dangerous conduct and harm class members in the future, which he did.

The third case highlights how inadequate and untimely investigations can result in officers avoiding appropriate discipline. There, the investigator either ignored or downplayed Officer [redacted] actions, focusing myopically on the only officer named in the class member's allegations. And even assuming the investigator's report had accurately described Officer [redacted] misconduct, the investigation was not completed until the day after the statute of limitations had expired. So, the Hiring Authority would have had no opportunity to discipline Officer [redacted]

In addition, the fourth incident shows an officer ignoring the obvious indicia of a class member's disability—and indeed the class member's repeated request for a reasonable accommodation—because, in the officer's own uninformed judgment, the class member's disability was not severe enough to warrant an accommodation.

Finally, in combination and viewed over time, these cases show the failure of the system to recognize a problematic pattern of behavior and how the slow pace of investigations allow a single officer to repeatedly harm class members without receiving any interventions such as interim training or guidance that might prevent future, continued misconduct. Indeed, as the timeline below illustrates, the Hiring Authority did not discipline Officer [redacted] for his June 2024 suplex of Mr. [redacted] for more than a year. And while that investigation proceeded deliberately, Officer [redacted] used excessive or unnecessary force against three more class members.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**




Plaintiffs' counsel request to know:

1. What, if any, information in Defendants' accountability system should have led to the Hiring Authority or other CDCR management to detect a pattern of allegations of serious use of force incidents involving the same officer?

2. What, if any, action could have been taken by the Hiring Authority had Defendants' accountability system led to the Hiring Authority or other CDCR management detecting a pattern of allegations of serious use of force incidents involving the same officer?

3. What, if any, information in Defendants' accountability system should have led investigators to connect these allegations for the benefit of Hiring Authority decision-making?

4. What, if any, action could have been taken by investigators in these cases to connect these allegations for the benefit of Hiring Authority decision-making?

5. Are there currently any other pending use of force allegations against Officer [redacted] currently under investigation by CDCR? If so, how many? What steps will be taken to ensure that investigators and the Hiring Authority are aware of the problematic pattern of sustained and non-sustained cases involving this single officer?

6. Plaintiffs' counsel request that, given conduct revealed on footage where this officer has acted in complete disregard of people's disabilities and has rushed to use

dangerous force when there is no imminent risk of harm, this officer be immediately re-assigned to a position in which he does not come into direct contact with incarcerated people with disabilities or serious mental health issues. Please report on what action is taken in response to this request.

## II. OTHER FAILURES TO HOLD OFFICERS ACCOUNTABLE FOR USING FORCE

Plaintiffs' counsel continue to identify a number of cases each quarter in which CDCR's accountability system fails to hold staff accountable for serious use of force incidents. Some cases show a failure to confirm violations of policy that otherwise appear very clear in video footage. In other cases, staff are not held accountable despite violations of policy being confirmed by the Hiring Authority. In all cases, these examples represent ongoing failures of Defendants' accountability system.

The OIG's recent report corroborates problems with hiring authority decision-making. *See* Cal. Off. of the Inspector Gen., Monitoring Internal Investigations, Staff Misconduct Complaint Investigations, and the Employee Disciplinary Process of the California Department of Corrections and Rehabilitation: Semiannual Report, July–December 2025 (May 2026) ("May 2026 OIG Report"). Specifically, the OIG disagreed with nearly a quarter of all hiring authority decisions regarding whether to sustain an allegation of misconduct. *Id*. at 61 (explaining that it disagreed with 24 percent of decisions made by the CARU and 23 percent of decisions made by non-CARU hiring authorities). In one case described in the report, a CARU hiring authority initially sustained an allegation of misconduct after an officer allegedly slammed a handcuffed incarcerated person to the ground during an escort, fracturing his nose. *Id*. However, before imposing discipline, the hiring authority changed his mind and did not sustain the allegation, stating the incarcerated person's injury should not be a factor in the decision to the sustain misconduct. *Id*. The OIG disagreed, finding that "the force must be proportionate to the threat posed by the incarcerated person." *Id*.

The OIG's concerns with hiring authority decision-making are broader than just their decisions to sustain allegations. The chart below summarizing the OIG's findings indicates that the OIG also disagreed with the penalty that the hiring authority assessed in 48 percent of cases, and disagreed with the hiring authority's settlement with the disciplined employee in 86 percent of cases. The relevant category for our review, "Staff Misconduct Complaint," is highlighted in yellow:

/ / /

/ / /

/ / /

**Table 2. OIG Disagreements With Hiring Authorities' Decisions**

| Case Type | Disagreement with Allegation Findings | Disagreement with Penalty | Disagreement with Settlement | Disagreement at Any Juncture |
|---|---|---|---|---|
| Administrative Disciplinary and Criminal | 13% (24/178 cases) | 16% (23/145 cases) | 37% (20/54 cases) | 30% (53/178 cases) |
| Staff Misconduct Complaint | 23% (32/141 cases) | 48% (14/29 cases) | 86% (6/7 cases) | 27% (38/141 cases) |
| **Totals** | **18% (56/319 cases)** | **21% (37/174 cases)** | **43% (26/61 cases)** | **29% (91/319 cases)** |

Source: The Office of the Inspector General Tracking and Reporting System.

The cases below include examples of the failure to identify violations and the failure to impose appropriate discipline:

### 1. SATF-[redacted] – AIU, Not Sustained

In this incident, an officer used unnecessary and excessive force when he slammed a class member with a mobility disability to the ground while the class member was handcuffed and flanked by two other officers. Plaintiffs' counsel reported on an incident where this same officer similarly body slammed another incarcerated person in our last quarterly report. *See* Plaintiffs' February 2026 Review of CDCR's Accountability System at the Six Prisons at 7–8 (Feb. 6, 2026). The Hiring Authority did not sustain any misconduct in either case and, similar to the cluster of cases reported above, there is no apparent acknowledgement of the pattern of problematic behavior exhibited by this officer.

Prior to the primary use of force, [redacted] ([redacted]), a 72-year-old class member, and Officer [redacted] were in a verbal dispute related to photos that Mr. [redacted] claimed were missing after a cell search. Over the course of about two minutes, the dispute escalates, with Mr. [redacted] refusing to follow Officer [redacted] orders to return to his cell. *See* BWC 1 at 3:30:30-32:24. The dispute culminates with Officer [redacted] radioing that he has a disruptive inmate, pointing his pepper spray at Mr. [redacted] face, and ordering Mr. [redacted] to "get on the ground." *Id*. at 3:32:25-33. Mr. [redacted] does not get on the ground, but instead turns his back to Officer [redacted], places his hands at his side, and suggests that Officer [redacted] place him in handcuffs. *Id*. at 3:32:34-36. Before restraining Mr. [redacted], Officer [redacted] forcibly removes Mr. [redacted] cane from his hands and tosses it to the ground. *Id*. at 3:32:38-41. Ultimately, Officer [redacted] handcuffs Mr. [redacted] behind his back. *Id*. at 3:32:43-51.

By the time that Officer [redacted] finishes applying the handcuffs, five officers, including Officer [redacted], surround Mr. [redacted]. *See* AVSS at 3:32:50. Officer

[redacted] then begins to escort Mr. [redacted] *Id.* at 3:32:54. Depending on the camera angle, Mr. [redacted] then appears either to move or stumble in Officer [redacted] direction, or to resist the escort slightly. *See* AVSS (linked above) at 3:32:54-58 (showing Mr. [redacted] stepping in Officer [redacted] direction); BWC 2 at 3:32:54-57 (same); BWC 3 at 3:33:02-06 (showing Mr. [redacted] torso remain relatively stationary). Officer [redacted] tugs on Mr. [redacted] arm and says, "I'm walking you." *See* BWC 1 (linked above) at 3:33:05; BWC 3 (linked above) at 3:33:02. Mr. [redacted] responds, "Walk, then," and shuffles or stumbles in Officer [redacted] direction. *See* BWC 3 (linked above) at 3:33:04. Officer [redacted] again says "I'm walking you," and Mr. [redacted] appears to say "I'm gonna walk." *See* BWC 3 (linked above) at 3:33:06. Officer [redacted] says, "I'm walking you," once more as Officers [redacted] and [redacted] move towards Mr. [redacted] from behind and the left, respectively, and place their hands on Mr. [redacted] arms. *See* BWC 2 at 3:32:57 (linked above). Officer [redacted] then wraps his arms around Mr. [redacted] waist, lifts him off the ground, drops backwards, and slams Mr. [redacted] onto the ground. *See* BWC 1 (linked above) at 3:33:08-11; AVSS (linked above) at 3:32:58-33:03. Officer [redacted] was on the scene for less than twenty seconds before he body slammed Mr. [redacted]

During the IERC's review of the incident, a captain determined that the use of force may have been unnecessary or excessive and requested an investigation. In the request, he wrote that Mr. [redacted] "had been restrained and was being escorted without his [cane]"; that Mr. [redacted] neither made "threatening remarks" nor "physically pose[d] a threat to staff safety as he was being escorted"; and that "[i]t appeared as though there was a sufficient amount of staff who responded to this incident to complete the escort without lifting and forcing a restrained [Mr. [redacted] to the ground." *See* Memorandum re: Request for Administrative Review (Oct. 17, 2024); *see also* AIU Report at 2. The AIU then conducted a generally thorough investigation into the use of force, gathering video and other evidence and interviewing officers. Following the investigation, the Hiring Authority did not sustain the allegation of excessive and/or unnecessary force against Officer [redacted]

The Hiring Authority's decision was wrong. The Hiring Authority should have sustained allegations of misconduct against Officers [redacted] and [redacted] First, Officer [redacted] failed to accommodate Mr. [redacted] mobility disability by ripping Mr. [redacted] cane away from him and not returning it before escorting Mr. [redacted] out of the unit. Officer [redacted] failure to return Mr. [redacted] cane also likely contributed to the perception that Mr. [redacted] was resisting the escort, when in fact, it appears he was stumbling in the direction Officer [redacted] pulled him and then attempting to regain his balance. Second, at the time Officer [redacted] used force, Mr. [redacted] did not present an imminent threat. Mr. [redacted] willingly submitted to handcuffs and was attempting to comply with the escort. An immediate use of force was therefore not justified under CDCR policy. *See* 15 C.C.R. § 3268(4) (allowing the use of immediate force only "to respond to a situation or circumstance that constitutes an

imminent threat to institution/facility security or the safety of persons"); DOM § 51020.4(a)(4)(A) at 1 (same).

Even assuming that Captain [redacted] interpretation of events was wrong and Mr. [redacted] resisted his escort, justifying some amount of immediate force, Officer [redacted] used significantly "more force than [was] objectively necessary to accomplish a lawful purpose." *See* DOM § 51020.4(a)(3)(A). Put simply, body-slamming a handcuffed senior citizen who has a mobility disability, and who is surrounded by four other officers, is objectively unreasonable. What's more, by using force in this situation, and this level of force, Officer [redacted] also failed to reasonably accommodate Mr. [redacted] disability. *See Armstrong v. Newsom*, 484 F. Supp. 3d 808, 824 (N.D. Cal. 2020) ("A failure to provide a reasonable accommodation can occur where a correctional officer could have used less force or no force during the performance of his penological duties with respect to a disabled person").

Plaintiffs note that Officer [redacted] has a history of body slamming *Armstrong* class members. In our last report, we wrote about an incident during which Officer [redacted] grabbed a blind class member around the waist, picked him up several feet off the ground, and slammed him head-first into the asphalt. *See* Plaintiffs' February 2026 Review of CDCR's Accountability System at the Six Prisons at 7–8 (Feb. 6, 2026) (discussing SATF-[redacted] The use of force was very similar to the use of force in the instant case. That incident occurred a little less than three months before the incident described above. CDCR's failure to hold Officer [redacted] accountable creates an unsafe situation for class members and staff.

**2. SATF-[redacted] – AIU, Not Sustained**

In this incident, officers' failure to reasonably accommodate [redacted] ([redacted]) a 69-year-old class member with a mobility disability, lead to an unnecessary use of force. Mr. [redacted] uses a walker and has a special cuffing restriction. According to the investigation report, officers were escorting Mr. [redacted] across the yard following a verbal dispute with officers in his housing unit. Video of the escort shows two officers flanking Mr. [redacted] accompanied by a third officer. *See* AVSS at 3:48:11. Mr. [redacted] does not have his walker, and his hands are cuffed behind his back. *Id.* at 3:48:29. The officer on Mr. [redacted] left, Officer [redacted] is holding Mr. [redacted] by the arm. *Id.*

Shortly after the group reaches the basketball court, Mr. [redacted] slows down and says, "Excuse me, can I pull my pants up?" *See* BWC at 3:48:28. Officer [redacted] responds, "You gotta ask before. I don't know what your intentions are." *Id.* at 3:48:29-30. Mr. [redacted] replies, "Yeah well you got eyes, shit. I just got finished telling you, [turns to read the officers name] [redacted] stop pulling on my arm." *Id.* at 3:48:32-41. Officer [redacted] tells Mr. [redacted] to stop looking at him, and when Mr. [redacted] looks at him again, Officer [redacted] shouts "Look forward!" *Id.* at 3:48:40-42. Mr. [redacted] then

turns to the officers on his right and asks, "What's wrong with your boy?" referring, presumably, to Officer [redacted] *Id.* at 3:48:43-46.

Then, again addressing Officer [redacted] Mr. [redacted] says "Look man," while appearing to slow down the escort. *Id.* at 3:48:49-50. Officer [redacted] shouts, "Don't stop my escort, man." *Id.* Mr. [redacted] begins to ask "Why are you? Why are you?" when Officer [redacted] forces Mr. [redacted] to the ground. *Id.* at 3:48:51-52; AVSS (linked above) at 3:48:50-52. When Officer [redacted] then radios for a "resistive inmate," Mr. [redacted] shouts: "How am I resisting man? I asked you ten times to stop pulling on me. I asked you three times: would you stop pulling on me. I'm an old man. I got problems with my knees. I got a walker, you didn't bring that?!" *Id.* at 3:48:57-3:49:12. He continues to explain that he "can't walk as fast" as Officer [redacted] *Id.* at 3:49:17-24. When a fourth officer arrives and asks Mr. [redacted] what's going on, Mr. [redacted] says: "I got a walker. I told them I can't be walking that fast. And he gone tell me don't look at him? And then when I say 'listen my pants coming down, I can't walk as fast as you,' he's pulling on me and acting all rough. He's abusing me. And then he's gone push me down?" *Id.* at 3:49:31-49.

As a result of the use of force, Mr. [redacted] suffered injuries to his shoulder and knee, and Officer [redacted] injured his knee. *See* 7219 at 11 ([redacted] 7219 at 13 ([redacted]

Mr. [redacted] filed a 602 alleging that Officer [redacted] failed to accommodate his mobility disability during the escort, which resulted in an unnecessary and excessive use of force. *See* 602 at 4-5. The Hiring Authority, however, "exonerated" Officer [redacted] of the allegation. *See* 402/403 at 1.

The Hiring Authority should have sustained allegations of misconduct against Officer [redacted] First, Officer [redacted] and the other escorting officers failed to accommodate Mr. [redacted] mobility disability by not providing him with his walker or any assistive device, then walking him across uneven terrain at a pace that he was unable to maintain. That failure alone should have been sufficient evidence to sustain an allegation of staff misconduct. Second, Mr. [redacted] was not an imminent threat at the time Officer [redacted] used force. Mr. [redacted] was repeatedly slowing down the escort because his disability was not accommodated, not because he was being resistive. And even if he did not have a mobility disability, his pants were falling down; slowing down the escort to allow him to secure his pants around his waist is also not resistance. Officer [redacted] was therefore not permitted to use immediate force merely because Mr. [redacted] could not keep up with the pace of the escort.

Force likely could have been avoided in this situation had the escorting officers reasonably accommodated Mr. [redacted] disability by allowing him to use his walker

during the escort and observing his special cuffing chrono,[8] or simply walking more slowly, as Mr. [redacted] repeatedly requested. Instead, Officer [redacted] failures to accommodate Mr. [redacted] resulted in an unnecessary use of force that injured Mr. [redacted] and Officer [redacted]

In addition, the investigation into this incident was incomplete. While Mr. [redacted] was on the ground after the use of force, he repeatedly stated that he asked to be able to use his walker and for the officers to walk more slowly. The investigator should have reviewed and included in the case file additional video of the officers cuffing Mr. [redacted] and starting the escort to determine whether Mr. [redacted] had asked for accommodations. Instead, the video in the case file starts only 30 seconds before the use of force, well after the escort began.

**3. LAC-[redacted] – AIU, Sustained (L4 for two officers, L3 for one officer)**

In this case, the CARU found that three officers involved in a use-of-force incident omitted material facts in their incident reports, a violation with a baseline Level 4 penalty. However, the officers' incident reports not only omitted material facts, but also contained intentionally false and misleading statements, a violation with a baseline Level 7 penalty. The failure of the CARU to sustain the more serious allegation resulted in a failure to hold the officers sufficiently accountable for their serious misconduct.

The BWC video shows [redacted] ([redacted]) standing in a hallway, in waist chains, in the [redacted] leaning against a wall next to an open [redacted] cell. Lieutenant [redacted] Officer [redacted] and Officer [redacted] are surrounding Mr. [redacted] Mr. [redacted] is speaking peacefully with the officers but is refusing to enter the [redacted] cell. While Mr. [redacted] is speaking with Lieutenant [redacted] Officer [redacted] says: "ready?" A moment later, he sneaks up behind Mr. [redacted] grabs his waist restraints, and uses a great deal of force to yank Mr. [redacted] backwards approximately ten feet. In the same motion, he hurls Mr. [redacted] to the ground in the cell. *See* BWC (linked above)at 18:55:38. Officer [redacted] then lifts Mr. [redacted] by the waist restraints onto the bed in the [redacted] cell. *See* BWC(linked above) at 18:55:43. The officers then strip off his clothes and remove the restraints. Lieutenant [redacted] Officer [redacted] Officer [redacted] then exit the cell and secure the door. *See* BWC (linked above) at 18:57:18.

---

[8] DOM 51020.6. ("Incarcerated persons who have a disability that prevents . . . application of restraint equipment in the prescribed manner shall be afforded reasonable accommodation under the direction of the Response Supervisor. Mechanical restraints shall be applied to ensure effective application while reasonably accommodating the incarcerated person's disability.")

CDCR opened an investigation into the use of force when, during the first level of IERC review, a captain found that the officers' incident reports were not consistent with video of the incident. Specifically, the captain wrote that "Officer [redacted] reported a perceived threat when he stated that [redacted] attempted to pull forward and lunge towards Officer [redacted] however, the video evidence does not show that [redacted] lunged toward Officer [redacted] *See* Exhibits at 6.

Following an AIU investigation, the CARU correctly identified that the use of force was unnecessary because Mr. [redacted] was not an imminent threat. *See* IRT at 6. In addition, the CARU also found that Officers [redacted] and [redacted] "failed to include a critical fact" in their incident reports, when they wrote that Officer [redacted] "assisted" Mr. [redacted] to the bed, rather than writing that Officer [redacted] lifted Mr. [redacted] by the waist restraints onto the bed. *See* 402/403 [redacted] 402/403 [redacted] NOAA [redacted] at 19; NOAA [redacted] at 19. The CARU determined that this "materially understate[d] the level of physical engagement that occurred." *See* 402/403 [redacted] and 402/403 [redacted] at 2. The CARU also found that Lieutenant [redacted] failed to review the officers' incident reports to ensure accuracy and content. *See* 402/403 [redacted] at 2.

With respect to discipline, the CARU determined that all three officers violated category E.4 on the Disciplinary Matrix for "making evasive statements, failing to report, or omitting material facts or information to a supervisor by sworn staff." Category E.4 carries a baseline penalty of Level 4, and a range between Levels 2 and 7. The CARU imposed Level 4 penalties on Officer [redacted] and Lieutenant [redacted] (10% salary reduction for 12 pay periods) and a Level 3 penalty on Officer [redacted] (5% salary reduction for 6 qualifying pay periods). Ultimately, after the officers appealed the discipline to the State Personnel Board, the CARU agreed to reduce the discipline—the CARU reduced Officer [redacted] penalty to a 10% salary reduction for 10 pay periods (still Level 4), Officer [redacted] penalty to a 5% salary reduction for 5 pay periods (still Level 3), and Lieutenant [redacted] penalty to a 10% salary reduction for 6 pay periods (below a Level 4 penalty). *See* Stipulations and Releases for Officer [redacted] Officer [redacted] and Lt. [redacted]

Though it is appropriate that the CARU imposed some adverse action in this case, the CARU made a host of errors that resulted in insufficient accountability for the officers. The most serious error, by far, was failing to conclude that the Officers [redacted] and [redacted] made intentionally false or misleading statements in their incident reports (Matrix category E.5, 456789). Both officers wrote in their incident reports that the force against Mr. [redacted] was justified because Mr. [redacted] pulled away from Officer [redacted] and lunged toward Officer [redacted] and that Mr. [redacted] "fell" to the ground. *See* [redacted] Incident Report at 34 ("Inmate [redacted] pulled away when I grabbed his waist chain from the middle of his back, he attempted to pull forward and lunge towards Officer [redacted] With my right hand I grabbed the chain portion of the waist restraint and pulled

[redacted] back towards me. With a combination of [redacted] [sic] and my body weight coupled with his forward momentum and me pulling backward simultaneously, he spun around causing inmate [redacted] to fall to the ground inside the cell."); [redacted] Incident Report at 35 ("While the inmate [redacted] was being escorted by Officer [redacted] inmate [redacted] without warning lunged forward towards me, causing officer [sic] [redacted] utilizing physical force, to pull the restraints towards him causing the inmate to land on the floor inside of cell #1."). But the video footage does not show Mr. [redacted] lunging toward Officer [redacted] nor does it show Mr. [redacted] falling to the ground. Instead, it shows Officer [redacted] grabbing Mr. [redacted] without warning, dragging him ten feet backward by the waist restraints, and then tossing him to the ground. What is particularly damning is Officer [redacted] asking Lieutenant [redacted] if he was "ready;" that question suggests that Officer [redacted] had a premeditated plan to use force and undermines any assertion that he used force in response to any lunge by Mr. [redacted] Put simply, the officers lied in their reports to manufacture a threat where none existed and to minimize the impropriety of the force Officer [redacted] used.

For reasons unclear, the CARU did not, in either the 402/403s or the NOAAs, address these false statements in the incident reports. This failure is especially notable because the falsity of these statements, identified during the first level of IERC review, led to the opening of the investigation in the first place. Instead, the CARU focused on the much less important, albeit still misleading, statements the officers made regarding lifting Mr. [redacted] onto the bed by his waist chains. Had the CARU identified the intentionally false statements made by the officers in their incident reports, category E.5 of the Matrix, along with its higher baseline Level 7 penalty, would have applied and the CARU likely would have imposed a more serious punishment on the officers.

The CARU also erred by applying the wrong Matrix category to the dishonesty violation that the CARU did identify. Category E.4, which is what the CARU applied, covers "making evasive statements, failing to report, or omitting material facts." Category E.5 applies to "making intentionally false or intentionally misleading statements regarding a material fact or intentionally omitting a material fact." Officers [redacted] and [redacted] both indicated that Officer [redacted] "assisted" Mr. [redacted] to the bed when, in fact, he used force to lift him by the waist chains onto the bed. Their description of Officer [redacted] conduct was "intentionally misleading." It was not "evasive" and did not involve a negligent omission of a material fact. Accordingly, the CARU should have found that category E.5 and its higher penalties applied to this misconduct.

The CARU also erred by misapplying aggravating and mitigating factors. The CARU found a host of aggravating factors and two mitigating factors—"the misconduct was unintentional and not willful" and "the misconduct was not premeditated." But neither of those mitigating factors should have applied here. The evidence strongly suggests that the officers intentionally lied on their incident reports. Accordingly, the

CARU should have found additional aggravating factors for intentionality and premeditation.

### 4. COR-[redacted] – AIU, Sustained (Letter of Instruction)

In this case, the Hiring Authority sustained an allegation of unnecessary force, determining that the officer violated policy by using force when he threw a handcuffed class member to the ground. However, the Hiring Authority failed to apply the appropriate matrix category and instead only issued corrective action.

In this case, Officer [redacted] is escorting [redacted] ([redacted]) from his cell in the [redacted] to the recreation yard. *See* BWC. Upon opening Mr. [redacted] cell door, Officer [redacted] grabs Mr. [redacted] bicep, and Mr. [redacted] says that he can walk on his own and the officer does not have to hurt him. He then takes a few steps out of his cell, and another officer searches Mr. [redacted] with a handheld metal detector wand. *See* BWC (linked above) at 17:48:40; AIU Report at 4. Mr. [redacted] expresses his frustration because he believes that he is being singled out for additional searching. After about 15 seconds, the escort continues, but Mr. [redacted] stops again and tells Officer [redacted] not to hurt him by grabbing his arm. *See* BWC (linked above) at 5:48:49. Officer [redacted] tells him that he is not hurting him, and Mr. [redacted] becomes loud and agitated. Officer [redacted] quickly grabs Mr. [redacted] who is handcuffed and has a mobility disability, and pulls him to the ground. The fixed camera provides a clearer view of the force. *See* AVSS.

The Hiring Authority sustained the allegation of unnecessary force, finding that "there was no imminent threat that required the use of physical force to pull IP [redacted] to the ground." *See* Closure Documents at 7 (Letter of Instruction). The Hiring Authority determined that Officer [redacted] failed to perform within the scope of his training (D26, **1**2345) and used unnecessary force (L1, 1**2**3). The Hiring Authority found several mitigating factors and several aggravating factors but only imposed corrective action. *See* 402/403. It is unclear why the Hiring Authority did not impose adverse action. Consistently failing to apply the base penalty set forth in the matrix—and only imposing corrective action—when officers engage in dangerous and violent behavior sends a message that CDCR does not take seriously enough staff's repeated use of improper force.

### 5. COR-[redacted] – AIU, Not Sustained

In this case, an officer used unnecessary force against a handcuffed class member during an escort in COR's [redacted]. The Hiring Authority failed to sustain the allegation of unnecessary force. Two officers are escorting [redacted] ([redacted]) from his second-tier cell in the [redacted] to the recreation yard. *See* BWC at 17:41:02 to 17:41:08; AVSS. Mr. [redacted] is handcuffed behind his back, with Officer [redacted] holding Mr. [redacted] bicep and the second officer a couple steps behind. When they reach the

bottom of the stairs, Mr. [redacted] stops and tells Officer [redacted] to let go of him and asks him what he is doing. *See* BWC (linked above) at 17:41:10 to 17:41:12. He appears to be reacting to Officer [redacted] grabbing him or pulling him. Officer [redacted] tells him to look forward and keep walking. Mr. [redacted] complies, and they take a few more steps. As he continues walking, Mr. [redacted] turns his head very slightly to look at the officer—the movement is so small it is basically imperceptible on the fixed camera footage—and Officer [redacted] immediately pulls him to the ground. *See* BWC (linked above) at 17:41:12 to 17:41:18; AVSS (linked above). Mr. [redacted] received a serious RVR for "Resisting Staff" for his actions prior the force. *See* CDCR Rules Violation Report.[9]

The Hiring Authority should have sustained an allegation of unnecessary force. As we have reported many times in our quarterly reports, the escort officer was not justified using force in this case. Mr. [redacted] slightly turning his head towards the officer does not represent an imminent threat or resistance. *See* 15. C.C.R. § 3268(4) (allowing an immediate use of force only in response to an "imminent threat"); DOM § 51020.4(a)(4)(A) (same); *see also* 15. C.C.R. § 3268(5); DOM § 51020.4(a)(5)(A) (defining "imminent threat" as "any situation or circumstance that jeopardizes the safety of persons or compromises the security of the institution, requiring immediate action to stop the threat"). Instead of resorting to a dangerous use of force on a restrained class member, Officer [redacted] had many options: he could have stopped the escort, given another verbal warning to Mr. [redacted] to look forward, or threatened an RVR. But quickly throwing him to the concrete floor was not allowed under policy and was dangerous. Such unnecessary uses of force further strain relationships between staff and the incarcerated population. In our quarterly reports, we have written about many unnecessary and excessive uses of force that have occurred in COR's [redacted]. Officers repeatedly violating policy in ways that can and do harm class members, in view of the entire building, creates a terrible culture and dynamic between staff and the incarcerated population.

### 6. KVSP-[redacted] – AIU, Not Sustained

Officers in this case tricked an incarcerated class member into leaving his cell in order to transfer him—against his will—resulting in a foreseeable use of force incident that unnecessarily endangered themselves, the class member, and institutional safety and security.

On the morning of December 5, 2024, an ICC committee found that [redacted] ([redacted]) could be released from the [redacted] (where he had been

[9] Neither the body-worn camera footage nor the fixed camera footage appear to show Mr. [redacted] resisting at any time after he was ordered to continue walking. He did slightly turn his head towards Officer [redacted] while walking, but that behavior does not amount to "resisting" and should not have justified the issuance of an RVR.

housed due to safety concerns) and transferred to [redacted], temporarily, pending transfer to SVSP. *See* Classification Committee Chrono at 14. Mr. [redacted] claims that the committee was held in absentia despite his stated desire to appear in person to voice his concern that his life would be in danger on [redacted] *See* 602 at 1-2. (Mr. [redacted] made separate misconduct allegations against [redacted] regarding denial of his due process rights.) On being informed that he would be transferred from the [redacted] to [redacted] that day, Mr. [redacted] repeated his objection to the move because he was [redacted], and because he believed that [redacted] was not appropriate housing for his case factors, and that his life would be in danger there. *See* 602 at 3. He requested to speak with the Captain, unsuccessfully. *See* 602 at 3. At this point, [redacted] staff were aware that a controlled use of force might become necessary in order to effect his transfer.

Instead of initiating controlled use of force protocols, which are designed to put people on notice that force is imminent and to allow them time and opportunity to comply in order to avoid force altogether, staff lured him out of his cell to receive his insulin and then coordinated to force his immediate transfer, while he was out of his cell, by pulling him in the direction of [redacted], rather than back to his cell. *See* BWC; AIU Report at 7; and 602 at 3. Mr. [redacted] who claims staff did not tell him he would be transferred at this time, acknowledges that he resisted the officers' pull toward [redacted] resulting in Officers [redacted] and [redacted] using physical force to pull him to the ground. *Id*. Mr. [redacted] continued to object, stating "Nah, Nah, that's bullshit." *See* BWC (linked above) at 16:09:10. Officer [redacted] assisted in gaining compliance from Mr. [redacted] and placing him in leg restraints until his eventual placement on a gurney. *See* AIU Report at 7. Although the escorting officers forced his transfer to [redacted], documents confirm, consistent with his assertions, that he should not be housed on [redacted], and he was quickly returned to the [redacted] where he remained. *See* 602 at 4; *see also* Intrafacility Transfer 24.1 notes dated 12/5/2024 (order given at 16:46 PST transferring back to [redacted] approximately 20 minutes after being received in [redacted]; Disciplinary Hearing Results at 48 (1/10/2025 indicating still housed in [redacted] ([redacted]).

Mr. [redacted] received a 115 for Willfully Resisting a Peace Officer. During his RVR hearing, Mr. [redacted] admitted to pulling his left arm away from Officer [redacted] but clarified, "I did because I was expecting to go back to my cell and not out of the building. Nobody told me I was going to [redacted]." *See* RVR at 52.

The CARU did not sustain any force violations in this case. *See* 402 at 2, 8; *see also* 3035. The review focused narrowly on the question of whether Mr. [redacted] was "resisting" giving rise to the need for immediate force. *See* 3035. However, the larger question of whether staff violated policy by circumventing the controlled use of force process in this case was never considered. Had staff utilized controlled force, it is possible that no force was necessary. Furthermore, the actions of the officers in this case escalated the encounter, making an immediate use of force almost inevitable, when policy instead requires staff to attempt to deescalate encounters, including through the use of

verbal persuasion. *See* 15 C.C.R § 3268(b)(1). Failing to tell Mr. [redacted] that he would be transferred if he exited his cell—while staff were well aware that he was attempting to remain in the [redacted] due to safety concerns—resulted in a very foreseeable immediate use of force incident that occurred in an open, busy, area of the prison that placed multiple other staff and incarcerated people at risk. This deception likely eroded his trust in staff and impacted his willingness to seek help from staff including to leave his cell for medical treatment for his serious condition in the future.

Plaintiffs' counsel have reviewed multiple cases where staff have tricked class members into exiting their cells for one purported purpose only to force an involuntary transfer on them once out of their cell.[10] In none of these cases has CDCR confirmed any violation of policy. **Please confirm whether CDCR views this practice as a violation of controlled use of force policies.**

## III. FAILURE TO HOLD STAFF ACCOUNTABLE DUE TO THE FAILURE TO RETAIN VIDEO FOOTAGE

Plaintiffs' counsel continue to identify a number of cases each quarter where video essential to the investigation was not retained. Despite CDCR policy that requires investigators to preserve footage within 10 days of the case being assigned, problems persist. *See* AIU Investigative Workflow; LDI Memo. Defendants are now piloting a Central Intake Triage Team within the AIU that is responsible for requesting and collecting video footage within five days. Plaintiff's counsel acknowledge this positive development but continue to find a number of cases each quarter where video has not been retained.

Plaintiffs' counsel did not inventory whether video was retained appropriately in all cases, however, through our random review of select cases we continue to encounter multiple cases where video was not retained. Below are several examples of cases with video retention issues.

### 1. SATF-[redacted]

A class member alleged in a grievance filed on August 18, 2024, that staff used excessive and unnecessary force against him on August 5, 2024. *See* 602 at 3-4. The investigator in this case relied on BWC footage preserved as part of the RVR hearing process, which only captured 90 seconds of the interaction between the class member and staff before the use of force incident begins. *See* AIU Report at 5. In the investigation report, the investigator incorrectly noted that "[n]o additional AVSS or BWC files were available for review, as the video retention period was exceeded at the time the allegations were made." *See* AIU Report at 5. In fact, the class member reported the allegations less than two weeks after the incident and AIU was assigned the case within

[10] One such case was previously reported in Plaintiffs' May 20, 2024 Report at 32.

three weeks of the incident. An investigator was assigned on October 10, 2024, still within the retention period. *See* AIU Report at 1. It is also not clear why additional video was unavailable, as the use of force was a triggering event that should have led to the preservation of video.

**2. SATF-[redacted]**

A class member alleged that on January 2, 2025, staff committed an act of sexual misconduct while the class member was in a holding cell. The allegation was forwarded to AIU for investigation on January 9, 2025, an investigator was assigned the case on February 20, 2025, and it was reassigned to a different investigator on March 14, 2025. *See* AIU Report at 1. The investigator did not request video evidence until April 7, 2025, five days after the video was no longer available. *See* AVSS/BWC Request at 61. As a result, the investigator failed to obtain video evidence vital to investigate whether the alleged serious staff misconduct occurred.

**3. LAC-[redacted]**

A class member alleged that on August 15, 2024, at about 5:50 pm, a named sergeant forced another incarcerated person into a cell despite possible safety concerns. The investigator was assigned to the case on September 5, 2024. *See* AIU Report at 1. The investigator did not obtain video and claimed in the investigation report that "[d]ue to the lack of specific information from both [the class member and the alleged victim], no AVSS or BWC footage could be identified or requested." *See* AIU Report at 6. However, the class member's 602 in fact provided specific information about the date, time, and subject. *See* 602 at 3.

**4. LAC-[redacted]**

A class member made a verbal allegation that on July 18, 2024, a named sergeant kicked his walker and kicked him in the leg, as well as made PREA-related allegations. LAC staff reported reviewing the AVSS and not seeing any interaction between the subject and claimant. *See* Exhibits at 4. However, that AVSS was not preserved. AIU was assigned the investigation on August 16, 2024, within a month of the incident, but the investigator was not assigned until January 9, 2025, outside the 90-day retention period. The investigation was then reassigned on July 3, 2025. *See* AIU Report at 1. Neither LAC or AIU took any action to preserve the AVSS footage, or attempt to obtain additional footage. Accordingly, AIU was unable to verify the allegations, including whether the sergeant kicked the class member's walker.

**5. LAC-[redacted]**

A class member alleged that on October 8, 2024, a named control booth officer endangered him by stating that the class member was delaying showers. *See* 602 at 3.

The class member filed a grievance the same day. The investigator requested footage on January 3, 2025, within the retention period. *See* NICE Request at 14. Apparently, no BWC was located for the officer, only AVSS—but whether there was misconduct turned on what the officer said, and thus BWC was necessary to investigate the allegation. *See* AIU Report at 4. The AIU Report offers no information about why the BWC footage was missing, despite it being requested within the retention period.

In at least five other cases from LAC alone this quarter, CDCR failed to retain video footage necessary to investigate the staff misconduct allegations. *See* **LAC-[redacted]**; LAC-[redacted], LAC-[redacted], LAC-[redacted], LAC-[redacted].

## IV. FAILURE TO HOLD STAFF ACCOUNTABLE DUE TO THE FAILURE TO COMPLY WITH THE STATUTE OF LIMITATIONS

Plaintiffs' counsel continue to encounter cases each quarter where discipline cannot be imposed because the statue of limitations has expired. As Defendants have acknowledged, the significant backlog of open, pending investigations means that many cases are reaching or are past the statute of limitations to impose discipline. The OIG confirmed this issue in their recent report. *See* May 2026 OIG Report at 33. According to the OIG, the AIU closed 5,379 cases in 2025 and finished the year with 13,393 open investigations. *Id*. "Of the 5,379 investigations the [AIU] closed in 2025, the deadline to impose discipline had expired before the investigations concluded in 265 investigations, or 5 percent." *Id*. However, "[o]f 13,393 investigations that were open at the end of the year, the deadline to impose discipline had already expired in 1,774 investigations, or 15 percent." *Id*. As Defendants have warned, the issue of cases being lost to the statute of limitations is worsening.

One of the problems that the OIG identified is understaffing. The total number of OIA cases continues to grow each year (10,963 in 2022; 12,659 in 2023; 12,602 in 2024; and **24,224** in 2025), but the total number of investigators has remained relatively constant:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**Table 5. Investigator Staffing Within the Allegation Investigation Unit**

| Date | Filled Positions | Vacant Positions | Allocated Positions |
|---|---|---|---|
| January 1, 2024 | 95 | 14 | 109 |
| January 1, 2025 | 88 | 33 | 121 |
| January 1, 2026 | 95 | 28 | 123 |

Source: The California Department of Corrections and Rehabilitation.

*Id*. at 34.

With more allegations of misconduct to investigate but no increase in staffing, AIU investigators are carrying exceptionally large caseloads and are not able to meet the demand. According to the OIG, "even at its current allocated capacity of 123 total investigators, each investigator would still need to carry an average of 86 active investigations to process all investigations being referred to the [AIU]." *Id*. Those caseloads are unsustainable.

Below, Plaintiffs describe specific cases where the expiration of the statute of limitations precluded Defendants from imposing appropriate discipline.

**1. LAC-[redacted] – AIU, Sustained (Letter of Instruction and Training, SOL Expired)**

In this case, CDCR could only impose corrective action against an officer who engaged in serious misconduct—failing to effectively communicate with a deaf class member and then forging the class member's signature—because delays in the investigation resulted in OIA delivering the investigation report to the CARU on the date the statute of limitations expired. This failure is particularly egregious because CDCR knew nine months before the expiration of the statute of limitations that misconduct had occurred that likely warranted adverse action: following an LDI inquiry, an AIU manager had elevated the case for an OIA investigation, which generally occurs only when the LDI uncovered serious misconduct. This case therefore strongly suggests that CDCR is failing to appropriately prioritize cases during the AIU understaffing crisis, despite CDCR's claims to be doing so.

[redacted] ([redacted]) whose primary method of communication is written notes, filed a 602 on November 8, 2024, alleging that he did not receive indigent envelopes from Officer [redacted] on November 7 and that Officer [redacted] forged his name on the indigent envelope list, falsely indicating that Mr. [redacted] declined indigent envelopes. *See* Exhibits at 3. CDCR received the allegation on November 13, 2024, and determined that the statute of limitations would expire on November 12, 2025.

Officer [redacted] BWC footage confirmed Mr. [redacted] allegation. On the morning of November 7, 2024, Officer [redacted] was going cell to cell in Mr. [redacted] housing unit with a form titled "INDIGENT SUPPLIES SIGNUP LIST." *See* Exhibits at 62 (screenshot showing form). The indigent supplies list contains a column for "Inmate Signature upon receipt," so a person can confirm they received the supplies. Before reaching Mr. [redacted] cell that day, Officer [redacted] signs in the "signature" column for Mr. [redacted] *See* BWC at 9:09:25; *see also* Exhibits at 62-66 (screenshots from BWC). Officer [redacted] then approaches Mr. [redacted] cell, which is dark, and waves envelopes by the cell door. BWC at 9:09:35. A sign outside the door indicates that Mr. [redacted] has a hearing disability. *See id.* Officer [redacted] waves the envelopes once more, peers in the door, and steps back after about 15 seconds near the cell. *Id.* at 9:09:48.

CDCR initially routed Mr. [redacted] 602 to an LDI at LAC, who received the inquiry on November 22, 2024. The LDI reviewed the BWC footage, interviewed Mr. [redacted] Officer [redacted] other staff, and incarcerated witnesses, and reviewed documents. The LDI completed his inquiry on January 14, 2025. On February 21, 2025, an AIU manager elevated the case to OIA for an investigation. *See* Allegation Inquiry at 33, Exhibits at 33. That same day, the AIU assigned an investigator to the case. At this point, there were almost nine months remaining within the statute of limitations period. *See* AIU Report at 1.

The AIU investigator, however, performed no apparent investigation. On October 27, 2025, OIA assigned a new investigator to the case, just 18 days before the expiration of the statute of limitations. *Id.* Given the short time frame, the investigator conducted an acceptable investigation. He used BWC screenshots to confirm that Officer [redacted] signed Mr. [redacted] name to the column acknowledging receipt of supplies. In his November 5, 2025 interview with the investigator, Officer [redacted] admitted that Mr. [redacted] was asleep on the day in question and that he knew Mr. [redacted] required accommodations for his hearing disability (generally making written notes on his tablet), but that he nevertheless signed Mr. [redacted] name to the list even though he did not communicate with Mr. [redacted] at all.

The investigator did not, however, finalize the investigation report until November 12, 2025, the day the statute of limitations expired. The CARU held the 402/403 conference the same day. The CARU sustained allegations that Officer [redacted] violated D26 (failure to perform within the scope of duty) and E10 (falsification of material facts in reports or official records) by forging Mr. [redacted] signature on the

indigent supplies list. *See* 402, 403. Under the matrix, the falsification of material facts in reports or records carries a base penalty of Level 9 (which is termination), with a range of potential penalties between Level 7 and Level 9.

For reasons not clear from the case file, however, the CARU did not complete the 402/403 process until November 13, 2025, the day after the expiration of the statute of limitations. As a result, the CARU could not impose any adverse action, writing on the 403, "[d]ue to the time constraints and short statute of limitations, corrective action will be issued." The CARU issued Officer [redacted] a letter of instruction stating that he failed to effectively communicate with Mr. [redacted] and forged Mr. [redacted] signature. Officer [redacted] also had to participate in one 30-minute training.

The inexcusable delays in this case made it impossible for CDCR to impose appropriate discipline against Officer [redacted] for his misconduct. Defendants have represented to Plaintiffs that, notwithstanding the AIU backlog of cases, CDCR has put in place processes to ensure that it prioritizes investigations into the most serious misconduct. This case suggests that CDCR's system of prioritization is not working. Nine months before the statute of limitations, an AIU manager elevated the case for an OIA investigation. The elevation of cases occurs rarely. And when it does occur, it is tantamount to someone in CDCR shouting at the AIU to pay attention to the case. Yet CDCR still failed to process this case in time to impose adverse action against an officer who deserved such discipline.

**2. LAC-[redacted] – AIU, Sustained (Letter of Instruction and Training, SOL Expired)**

In this case, an officer endangered a class member on suicide watch by failing to maintain constant observation of the class member, who tried to commit suicide by drowning himself in his sink. Despite the fact that the investigation originated after the OIG noted the misconduct, CDCR delayed substantially in conducting the investigation. As a result, the statute of limitations expired before the investigation was complete and CDCR could not hold the officer accountable.

On the November 16, 2023, Officer [redacted] was assigned to provide constant observation of [redacted] ([redacted]) who was housed in cell 149. While assigned to monitor Mr. [redacted] Officer [redacted] walked away from Mr. [redacted] cell for nearly three minutes. Then, even after he returned to the cell, he failed to adequately observe Mr. [redacted] Mr. [redacted] placed his mouth, nose, and eyes underwater in the sink in his cell for some period of time without Officer [redacted] noticing. In fact, Officer [redacted] only recognized that Mr. [redacted] was trying to drown himself when an incarcerated person pointed out that Mr. [redacted] head was submerged in the sink. *See* BWC at 15:04:42. During the AIU investigation interview, Officer [redacted] admitted that he left his post observing Mr. [redacted] without being relieved, that he failed to properly

monitor Mr. [redacted] when he was at the post, and that his failures to abide by policy endangered Mr. [redacted] *See* IR at 10-11.

Notwithstanding this ironclad video and testimonial evidence of policy violations, CDCR was unable to impose adverse action in this case because of the expiration of the statute of limitations. The procedural history of the case is filled with multiple, inexcusable delays. In January 2024, the IERC initially reviewed the use of pepper spray and found no policy violations. In June 2024, the OIG reviewed additional footage prior to the use of force and identified the policy violations discussed above. The OIG notified CDCR of the violations on June 16, 2024, which CDCR treated as the date of discovery, meaning the statute of limitations would expire on June 15, 2025. The LAC Warden sat on the case for nearly three months, until September 13, 2024, when he submitted a request for administrative review to OIA. The CST received the allegation on September 26, 2024, and assigned the investigation to the Southern Region on September 27, 2024. At that point, the AIU still had more than 8 months to complete the investigation.

On October 4, 2024, the AIU initially assigned the investigation to one investigator, who appeared not to perform any investigative tasks. On January 17, 2025, the AIU then assigned the investigation to another investigator. That investigator requested video in March 2025 and some documents in August 2025. The investigator did not, however, interview Officer [redacted] until September 16, 2025, which was already after the statute of limitations expired. The investigator completed the investigation report on September 22, 2025.

In a 402/403 on October 24, 2025, the CARU sustained the allegation that Officer [redacted] violated policy by not providing constant observation of Mr. [redacted] *See* 402/403. The CARU identified that Officer [redacted] negligently endangered Mr. [redacted] (D2 on the Disciplinary Matrix, 123456) and failed to observe and perform within policy (D26, 12345). Even though these violations carried a baseline penalty of Level 2 and Officer [redacted] conduct placed Mr. [redacted] in serious danger that came to fruition, the Hiring Authority only imposed corrective action (a Letter of Instruction). *See* 403.

It is unclear from the file whether the Hiring Authority believed that corrective action was the appropriate discipline for this policy violation or would have imposed adverse action if the statute of limitations had not expired. Either way, the result of this case is problematic. Corrective action is not an appropriate response for an officer who failed to directly observe an incarcerated person on suicide watch such that the officer did not notice that the incarcerated person was trying to drown himself in the flooded sink.

As with the prior case, this case, where the OIG identified misconduct, suggests that Defendants' process for prioritizing cases with serious misconduct is not working.

### 3. LAC-[redacted] – AIU, Sustained (Training, SOL Expired)

In this case, LAC staff kept [redacted] ([redacted][11]) in a holding cell for two days, but CARU could only issue corrective action because the AIU investigator delayed the investigation and completed it four days after the statute of limitations expired. This is especially problematic because after an initial LDI inquiry, the case was elevated to the AIU eight months before the statute of limitations expired. Further, the AIU investigation largely relied on the interviews and findings from the prior LDI inquiry, making it a relatively easy case to close well within the statute of limitations. The handling of this case, as with the prior two, indicates the AIU is failing to correctly prioritize cases to avoid losing cases to the statute of limitations.

Mr. [redacted] filed a 602 alleging that on September 23, 2024, Sergeant [redacted] and Sergeant [redacted] left him in holding cells for multiple days. Mr. [redacted] wrote that while in the holding cells, he did not receive his medication, staff gave him cold meals with no utensils, and he had no blanket or toothbrush. Mr. [redacted] who has a mobility disability and had a walker and cane at the time, reported that his "body ached, [his] bones ache as [he] st[oo]d and squatted for over '4' hours in the gym cage." He wrote that after some time, he was moved to a medical holding cell. *See* 602 at 3-4.

The 602 was initially routed to an LDI. The LDI interviewed Lieutenant [redacted] Sergeant [redacted] and Sergeant [redacted] who all stated that Mr. [redacted] was kept in a "medical holding cell" for about two days. *See* LDI Inquiry at 8-11. Records confirmed that Mr. [redacted] was placed in a holding cage starting on September 23, 2024, at 6:05 p.m., but staff failed to house him in the [redacted] until two days later on September 25, 2024, around 1:00 p.m. *See* Holding Cell Log, Out-Count Roster, Bed Assignments at 59-72 (cited in the LDI Inquiry at 10). Policy requires supervisory approval to keep a person in a holding cell for more than four hours. *See* LOP 511 at 81. Lieutenant [redacted] reported that Associate Warden April Chapman initially approved placement for "a holding cell overnight [on September 23]…[and] instructed him to work on housing the next day." The investigator failed to interview AW Chapman, but there is no evidence that she or any supervisor approved holding Mr. [redacted] beyond the initial overnight placement. The documents and the officers' own admissions demonstrate that Mr. [redacted] was held in a holding cage or holding cells for almost two days without the necessary supervisory authorization. Officer [redacted] also said that he "believed [Mr. [redacted] allegations to be true" regarding receiving cold meals. He explained that Mr. [redacted] would not have received a toothbrush, and he did not know whether utensils would have been provided. *See* LDI Inquiry at 10. An LVN also confirmed that

---

[11] On October 1, 2025, eight days after the incident, Mr. [redacted] mental health deteriorated and he was placed in a [redacted].

Mr. [redacted] did not receive his medication while in the holding cell. *See* LDI Report at 8.[12]

The AIU captain who reviewed the completed inquiry referred the case for investigation on February 18, 2025, with more than eight months remaining until the October 23, 2025 statute of limitations expiration date. The AIU investigator, however, did not complete the case until October 27, 2025, which was four days after the statute of limitations expired. The case should have been easy to resolve, as the LDI inquiry included much of the evidence necessary to confirm misconduct. Indeed, the AIU investigator conducted no interviews of their own, and the AIU Report consists largely of summarizing the LDI inquiry findings. *See* AIU Report.

The Hiring Authority sustained a finding of misconduct for failure to perform within the scope of training, which carries a penalty range of 1 to 5. However, AIU's failure to complete the investigation on time meant that CARU could only impose corrective action, in the form of training. "Corrective Action will be implemented in the form of 844 training for Local OP 505 Restricted Housing Unit and Local IP 511 Holding Cell **due to the statute of limitations date expiring**." *See* 402 at 1 (emphasis added). AIU's failure prevented CARU from holding the officers accountable for leaving Mr. [redacted] in holding cells, including in painful conditions for his mobility disability, for almost two days. This case suggests that AIU is failing to appropriately prioritize cases. AIU elevated the case for investigation after the LDI inquiry, and the investigation took almost no additional work. AIU should have promptly completed the investigation upon referral so that CARU could hold the officers accountable.

## V. FAILURE TO CONFIRM ACCIDENTAL OR UNINTENTIONAL MISCONDUCT

Each quarter Plaintiffs' counsel identify multiple cases where, despite potentially being no harm/no foul, there is definitive proof that staff misconduct occurred and CDCR fails to confirm the violation. The *Armstrong* Court was clear: "[a]ll such allegations shall be tracked, even if the non-compliance was unintentional, unavoidable, done

[12] The LDI did not request AVSS or BWC, claiming that Mr. [redacted] did not provide "substantial details of evidentiary value (subjects, witnesses, time, or place) to capture the alleged event." *See* LDI Inquiry at 12. However, Mr. [redacted] 602 specified the date (beginning September 23, 2024), location ([redacted] gym), and subjects (Sergeants [redacted] and [redacted] in his 602. The LDI should have reviewed AVSS footage from the Facility C gym and the medical holding area to identify the time of any interactions between Mr. [redacted] and staff, and then requested BWC footage from Sergeants [redacted] and [redacted] accordingly, to assess Mr. [redacted] allegations about the officers' treatment of him—including his comments about how uncomfortable the holding cage was given his mobility disability.

without malice, done by an unidentified actor or subsequently remedied." *See* Dkt. 2479 at 2. The following is a clear example of one such case:

### 1. COR-[redacted] – AIU, Not Sustained

In this case, an officer failed to reactivate his body-worn camera after an unclothed body search, in violation of policy. The investigation report provided all of the relevant information to the Hiring Authority to confirm the policy violation—the investigator correctly summarized the video evidence and properly identified the relevant policy, and the officer admitted to the investigator that he forgot to reactive his body-worn camera. However, for reasons that are completely unclear, the Hiring Authority still did not sustain the allegation.

The facts of this incident are straightforward. Officers in COR's [redacted] are escorting people one-by-one to the small management cages on the yard. After completing the unclothed body search, Officer [redacted] applies waist chains to Mr. [redacted] and escorts him to a cage on the yard. He closes the door of the cage and begins to remove the waist chains when Mr. [redacted] asks him why his body-worn camera is off. *See* BWC at 9:06:28. The two engage in a brief back-and-forth about whether the body-worn camera should be on, and then the two officers walk away to continue their duties.

Mr. [redacted] 602 alleged, correctly, that Officer [redacted] body-worn camera was deactivated when it should not have been. The investigator accurately summarized the relevant body-worn camera footage and relevant policy and interviewed Officer [redacted] about his failure to reactivate his camera. *See* AIU Report at 2-4. Officer [redacted] told the investigator that "there are times when he would forget to deactivate his BWC at the completion of the unclothed body search," including the time in question. *Id.* at 4. The Hiring Authority, however, did not sustain the allegation.

Although the officer failed to reactive his camera only for several minutes, the Hiring Authority should have sustained the allegation. Failing to sustain misconduct, even relatively low-level misconduct, undermines class members' trust in the accountability system. Mr. [redacted] was correct that Officer [redacted] was required by policy to have his body-worn camera activated. He filed a 602 to report that policy violation. In response, he received a closure letter that his 602 was inexplicably not sustained.

## VI. AN EXAMPLE OF THE ACCOUNTABILITY SYSTEM WORKING

The measure of a functional accountability system is not how well the system works to exonerate staff when misconduct did not occur (which CDCR's system appears to do well), but instead how well it functions to hold staff fully accountable when there is

evidence that staff misconduct has occurred. Below, we discuss a case where the system worked effectively to hold an officer accountable for serious and somewhat complex misconduct. We are including this case because it represents the rare case where the process and the result complied with Court's orders and the Remedial Plans.

### 1. LAC-[redacted] – OIA, Sustained (L9)

In this case, CDCR terminated Officer [redacted] after finding that she conspired to facilitate an attack on a class member and deactivated her BWC to conceal her misconduct. CDCR took many positive steps during the investigation. LAC staff, upon reviewing video of the incident, promptly asked OIA to investigate. OIA then conducted a criminal investigation and referred Officer [redacted] to the district attorney, though the district attorney declined to prosecute. Following the subsequent administrative investigation, the LAC warden fired Officer [redacted] CDCR fought Officer [redacted] appeal before the SPB, which then issued a reasoned decision upholding her firing.

On January 20, 2022, multiple incarcerated people attacked class member [redacted] ([redacted]) in his cell at LAC. Mr. [redacted] suffered an injury requiring six stitches. Mr. [redacted] filed a 602 on January 27, 2022 alleging that Officer [redacted] (the tower officer) conspired with three incarcerated people to open Mr. [redacted] door so that they could attack him. *See* OIA Exs. at 38-40. An LAC lieutenant reviewed the grievance, apparently to assess safety concerns Mr. [redacted] expressed in the 602. *See* OIA Criminal Report at 4. The lieutenant discovered video evidence showing that Officer [redacted] deactivated her BWC and allowed people into Mr. [redacted] cell to attack him. *See* Criminal Evidence at 14. Within three days, the LAC warden submitted a request for OIA investigation. Criminal Evidence at 21-24. Officer [redacted] was reassigned to the mailroom.

An OIA special agent conducted a criminal investigation. The investigation showed that Officer [redacted] deactivated her BWC while speaking with three incarcerated people through the tower window. *See* Criminal Report at 6. Several minutes later, Officer [redacted] opened Mr. [redacted] cell while one of those people stood near Mr. [redacted] cell and looked toward the tower. That person then entered the cell to attack Mr. [redacted] while the other two people who Officer [redacted] spoke with watched the attack. The attack continued for almost two minutes without Officer [redacted] sounding her alarm. *See* AVSS 1076 at 10:54:15; *see also* [redacted] BWC at 10:54:23 (opening Mr. [redacted] cell). According to the special agent, Officer [redacted] participated in "a well-coordinated, pre-planned attack" on Mr. [redacted] including ensuring the attack occurred while no other officers were in the building. *See* Criminal Report at 8. When interviewed, Mr. [redacted] reported that Officer [redacted] targeted people with disabilities, *id.* at 17, and the investigator uncovered evidence that Officer [redacted] orchestrated at least one other assault. *Id.* at 10-12. Finally, the investigator found that, after the assault, Officer [redacted] reviewed SOMS records on Mr. [redacted] and his assailants numerous

times while reassigned to the mailroom. *Id.* at 21; *see also* OIA Admin Report at 12. Officer [redacted] refused to be interviewed during the criminal investigation. *See* Criminal Report at 22. Ultimately, around July 31, 2023, CDCR referred the case to the district attorney for potential prosecution. *Id.* at 24. Though the case file does not contain documentation of the district attorney's charging decision, the existence of a subsequent administrative investigation by CDCR indicates the district attorney decided not to charge Officer [redacted]

LAC requested an administrative investigation on September 13, 2023, and OIA conducted a subject interview-only investigation, interviewing Officer [redacted] more than six months later, on March 28, 2024. *See* OIA Admin. Report at 5. OIA completed the administrative investigation on May 10, 2024. *Id.* at 14.

On June 24, 2024, the Hiring Authority found in a 402 that Officer [redacted] committed no fewer than 14 separate categories of misconduct, including, but not limited to, intentional endangerment (D3), improperly accessing confidential information (D12), intimidation, threat, or assault with the intent to inflict serious injury (D16), and intentionally disabling her BWC (E19). *See* 402/403. The Hiring Authority terminated Officer [redacted] and issued the NOAA on July 29, 2024. *See* NOAA. Officer [redacted] appealed to the SPB. After a hearing over several days, the SPB issued a resolution and order on September 15, 2025, finding that Officer [redacted] "facilitated an inmate assault, deceitfully attempted to cover up her part in that scheme, and violated other CDCR policies." *Id.* The SPB upheld her termination. *Id.*

CDCR deserves credit for many aspects of the handling of this case. LAC promptly recognized the potential misconduct and referred the case to OIA. OIA properly treated the investigation as a potential criminal matter, preserving the opportunity to charge Officer [redacted] by not interviewing her before a decision whether to charge her had been made. The investigation itself was comprehensive and gathered enough evidence to survive an SPB appeal. The Hiring Authority made an appropriate decision to terminate Officer [redacted] based on the extremely serious nature of her misconduct. And CDCR did not settle the case before the SPB and successfully obtained an SPB decision in its favor. Though not every part of the investigation was perfect,[13]

---

[13] The criminal investigation took nearly a year and a half due to unexplained delays, and the staff misconduct investigation that consisted only of interviewing Officer [redacted] took more than six months from referral. Delay is a persistent problem in CDCR investigations, and can lead to lost, stale, or unavailable evidence, faded or unreliable memories, and unavailable witnesses. CDCR is fortunate that the delays in this case did not jeopardize the investigation. In addition, the delays allowed Officer [redacted] to continue working at LAC in the mailroom for well more than a year. During that time period, she not only received her pay, but she also used her position to engage in

CDCR's conduct in this case was generally compliant with the Remedial Plans and Court orders and met Plaintiffs' expectations for how CDCR should investigate and address serious allegations of misconduct.

Finally, we note that many class members raise similar allegations about officers coordinating in-cell assaults. Plaintiffs have previously described incomplete and biased investigations into these types of allegations. This case demonstrates that such misconduct does occur and that CDCR must take such allegations seriously by conducting prompt and comprehensive investigations.

## VII. CONCLUSION

Plaintiffs will continue to work with Defendants and the Court Expert to attempt to bring Defendants into compliance with the Court's Orders and the Remedial Plans.

---

additional, serious misconduct—improperly accessing SOMS information on Mr. [redacted] and his assailants, and potentially attempting to interfere in the investigation.

# EXHIBIT B

ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Benjamin Bien-Kahn
Email: bbien-kahn@rbgg.com

June 4, 2026

VIA ELECTRONIC MAIL ONLY

Sean Lodholz
Deputy Attorney General
California Department of Justice
Sean.Lodholz@doj.ca.gov

Tamiya Davis
Nicholas Meyer
CDCR Office of Legal Affairs
Tamiya.Davis@cdcr.ca.gov
Nicholas.Meyer@cdcr.ca.gov

Re: *Armstrong v. Newsom*: Plaintiffs' Demand for Remedial Measures to Address Systemic Denials of Disability Accommodations to Class Members Defendants House in the Los Angeles County Jail System
Our File No. 0581-09

Dear Counsel:

Governor Newsom, the California Department of Corrections and Rehabilitation ("CDCR") and its Division of Adult Parole Operations ("DAPO") (collectively, "Defendants") must take immediate steps to address systemic denials of disability accommodations to *Armstrong* class members whom Defendants house in the Los Angeles County Jail system ("LACJ"), in violation of the Americans with Disabilities Act ("ADA") and Court orders in this case.

As we have reported in dozens of advocacy letters and monitoring reports, class members are frequently denied disability accommodations when they are housed by Defendants at LACJ while they are out-to-court, detained on an alleged parole violation, or serving a parole revocation term. The majority of these class members are housed by Defendants at Men's Central Jail, even though Defendants admit that it "is so antiquated and dilapidated that it cannot comply with basic requirements of the ADA …." *See* Complaint ¶ 251, *Bonta v. County of Los Angeles*, No. 25STCV26152 (L.A. Sup. Ct. Sept. 8, 2025) ("*Bonta* Complaint").

Class members with mobility disabilities are routinely denied wheelchairs, walkers, canes, and other durable medical equipment ("DME") and medical supplies that they were prescribed as disability accommodations while in CDCR custody; housed

inaccessibly in top bunks, upper tiers and cells without grab bars, and in housing units without accessible showers; prevented from attending yard, medical appointments, visiting, and court due to escalators that are frequently inoperable; and housed in more restrictive settings due to their disability and/or without access to mental health care and other programs in order to obtain needed disability accommodations.

Class members with hearing and vision disabilities routinely experience significant delays in being evaluated for and receiving hearing aids and prescription glasses that they were prescribed while in CDCR custody, without access to interim accommodations such as pocket talkers to help them hear and magnifiers or large print forms to help them see and read. And class members with learning disabilities, developmental and cognitive/intellectual disabilities, and/or low reading scores are routinely denied assistance with reading and writing.

These systemic ADA violations at LACJ continue despite multiple rounds of remedial orders by the *Armstrong* Court over many years aimed at ensuring that class members whom Defendants house at county jails receive the disability accommodations they need. The June 21, 2012 *Armstrong* County Jail Plan ("CJP"), adopted and implemented pursuant to the Court's April and August 2012 Orders, requires Defendants to take a number of steps so that LACJ and other county jail systems will accommodate class members whom Defendants house there. *See* CJP at 1 (acknowledging *Armstrong* Court's finding that class members housed in county jails "are entitled to the same reasonable accommodations that CDCR provides within its institutions and facilities").

Pursuant to the CJP, Defendants must provide Los Angeles County with e-mail notifications containing detailed information about class members' disability needs shortly after they are booked into custody, CJP at 2; meet with class members at LACJ within three business days and inform jail staff about any accommodation needs within four business days of their arrival, CJP at 3, 5; provide disability grievance forms to class members at LACJ and forward any disability grievances to Los Angeles County within three business days of receipt, CJP at 4; and work with LACJ to respond to advocacy requests submitted by Plaintiffs' counsel on behalf of class members who are denied accommodations at LACJ within 15 business days, CJP at 6-7. Defendants are also required to proactively review disability grievances to identify and investigate patterns of denials of disability accommodations "such as improper housing and/or denial of assistive devices to class members" at county jails, and prepare an investigation report on what steps can be taken to remedy the situation. CJP at 7.

Although Defendants generally comply with the CJP's procedural and notice requirements, this has not come close to "remedying the ongoing violations of the rights of class members housed at [LACJ]," as required by the Court's orders. *See, e.g.*,

Amended Order Granting Pls.' Renewed Motion to Require Defs. to Track and Accommodate Needs of Armstrong Class Members Housed in County Jails ("April 2012 Order"), Dkt. 2034 (Apr. 11, 2012) at 25; *see also id.* at 33-34, 37 (finding that "system-wide" relief is necessary to "prevent *Armstrong* class members from experiencing future ADA violations when housed in county jails," and ordering Defendants to develop revised plan "for ensuring timely and appropriate accommodations for *Armstrong* class members in county jails" that includes "at a minimum" enumerated requirements).

For more than a decade, Defendants refused to conduct **any** investigation into the well-documented pattern and practice of disability accommodation denials at LACJ, and disclaimed responsibility for doing more than notifying Los Angeles County of Plaintiffs' allegations and passing on the County's inadequate responses to us. But the Court's orders require more of Defendants than being middle-men between Plaintiffs and intransigent county jail systems like LACJ. Although Defendants appear to view their obligations as purely procedural, the Court could not have been more clear that the purpose of its remedial orders are "to remedy the ongoing harm to *Armstrong* class members" housed in county jails and "to ensure that Defendants meet their obligations under the ADA and Rehabilitation Act and prior Court orders …." April 2012 Order at 36.

Shortly after Defendants' counsel, Attorney General Bonta, sued Los Angeles County for, *inter alia*, violations of disability law in its jails, *Bonta v. County of Los Angeles*, No. 25STCV26152 (L.A. Super. Ct., Complaint filed Sept. 8, 2025), Defendants announced that they would at last open an investigation under the CJP into LACJ's discrimination against class members. Defendants told Plaintiffs that, from September 29, 2025 through March 31, 2026, DAPO would be monitoring 2275-CJ disability request forms submitted by class members at LACJ that request current disability accommodations provided to the class members by CDCR, and would conduct follow-up inquiries with class members and LACJ staff to determine whether the class members received the accommodation(s) they requested. *See* Oct. 3, 2025 Letter from DAPO Parole Administrator R. Gold to Los Angeles Deputy County Counsel A. Loeliger. At the September 25, 2025 meeting in which we were notified of the long overdue CJP investigation, we urged Defendants to consider the problems documented in our reporting and advocacy letters on behalf of class members at LACJ. Defendants stated that they planned to do so.

But Defendants' investigation failed to consider the extensive evidence of systemic disability accommodation denials to class members at LACJ. They were thus unable to resolve the threshold question of whether class members' rights are being violated at LACJ, let alone how to remedy the situation so that class members will finally be provided the accommodations they need while they are housed by Defendants at

LACJ. *See* April 30, 2026 Report on Los Angeles County Jail System Accommodations for Class Members Pursuant to the April 11, 2012 [sic] *Armstrong* County Jail Plan ("CJP Report").

Plaintiffs notified Defendants through monitoring reports and advocacy letters of **nineteen class members** during the six month investigation period who reported they were denied necessary accommodations at LACJ, yet Defendants chose to ignore this evidence.[1] Instead, the investigation was limited to interviews with nine class members who reported that they were denied accommodations on 2275-CJ disability request forms, the limited information that LACJ shared with Defendants about those class members, and written answers from LACJ to fifteen questions about their intake, screening and disability request processes. This hardly qualifies as an investigation.

Defendants concluded that "it is currently difficult to make final conclusions on … whether or not there 'is a pattern of denials of disability accommodations'" at LACJ. CJP Report at 15. The CJP Report instead recommended that, 60 days after the provision of the report to Los Angeles County and Plaintiffs, Defendants "conduct another set of interviews for a six-month period" using the same methodology, but including also "a reasonable amount of class members identified in Paragraph 5 Letters submitted by Plaintiffs during the investigative period." *Id.*[2]

It took more than thirteen years for Defendants to finally conduct this limited investigation of LACJ under the CJP. Given the extensive evidence already available to Defendants before the investigation commenced, it is inconceivable that they were unable

---

[1] Although Defendants did interview one of these class members about being denied accommodations at LACJ, that is only because that class member also submitted a 2275-CJ form making the same allegations. *See* CJP Report at 8.

[2] Notwithstanding the limited scope of the CJP investigation, Defendants learned concerning information that corroborates Plaintiffs' reporting about LACJ's indifference to the disability accommodation needs of class members whom CDCR houses there. First, until October 2025, LACJ Correctional Health Services apparently had no process for evaluating or responding to the *Armstrong* e-notifications providing class members' verified disability needs, even though they had been receiving this critical information for approximately 13 years. CJP Report at 12, 15. LACJ also did not begin treating 2275-CJ disability requests and allegations in Paragraph 5 letters as disability grievances until January 1, 2026. CJP Report at 13, 15. And LACJ admitted they use a "medical necessity" standard to assess whether class members should be provided DME and lower bunks as accommodations, rather than the "reasonable accommodation" standard required by the ADA. CJP at 14.

to even determine whether there is a pattern of denying disability accommodations to class members housed there. It is unacceptable to wait another eight months for a second CJP investigation to be completed—with another artificially limited scope—before taking steps to try to ensure class members will finally be accommodated at LACJ.

The *Armstrong* Court's remedial orders already require Defendants to "**transfer [a] class member to a facility that is able to provide accommodations**" if they are unable to "ensure that needed accommodations are promptly provided" by a particular county jail. Order Granting Plaintiffs' Motion to Require Defendants to Track and Accommodate Needs of Armstrong Class Members Housed in County Jails and Ensure Access to a Workable Grievance Procedure ("September 2009 Order"), Dkt. 1587 (Sept. 16, 2009) at 13 (emphasis added); *see also* April 2012 Order at 40 (same). These Orders also require Defendants to consider what steps can be taken to remedy a pattern of disability accommodation denials at a county jail system like LACJ, "**including monetary fines and penalties for continued violations**." September 2009 Order at 13-14 (emphasis added); *see also* April 2012 Order at 41 (same). It is past time for Defendants to finally take steps to address the longstanding and well-documented systemic disability discrimination against class members Defendants house at LACJ.

Unless CDCR promptly takes robust remedial steps designed to put an end to the longstanding pattern of denials of disability accommodations to class members CDCR houses at LACJ, Plaintiffs will file a motion for further remedial measures to protect our class members' rights under the ADA and the Court's prior orders. We will also be serving written discovery requests and Fed. R. Civ. Proc. 30(b)(6) deposition notices on Defendants and the Los Angeles County Sheriff's Department.

We request a written response to this letter by **July 6, 2026**, and progress reports regarding the remedial steps that CDCR is taking to address the systemic disability discrimination against class members at LACJ at 60 and 90 days after receipt of this letter. If we do not see meaningful steps forward within 90 days, we will need to seek relief for our class members from the Court.

## I. CDCR is Obligated to Address Disability Discrimination Against Class Members Whom Defendants House in the Los Angeles County Jail System

Los Angeles County operates the largest county jail system in the United States, with an average daily population that is about three times as large as any other California county.[3] In 2025, LACJ's eight jails and patrol station detention areas had an average

---

[3] *See generally* Board of State & Communication Corrections Jail Profile Survey, *accessible at* https://www.bscc.ca.gov/jps-dashboard/ (last accessed May 29, 2026).

daily population of 13,054, including a daily average of 573 people identified by Jail staff as requiring ADA housing—196 who use wheelchairs, 359 with other mobility disabilities, 11 with vision disabilities, and 7 with hearing disabilities—plus an average of 7 people identified as developmentally disabled each day.[4] (Given how many *Armstrong* class members report being denied accessible housing at LACJ, this is almost certainly a significant undercount.) On June 3, 2026, there were 13,024 people housed at LACJ, including 207 people serving parole revocation terms.[5] Almost all of the people with disabilities at LACJ are housed at either the Men's Central Jail or Twin Towers Correctional Facility in downtown Los Angeles; all women are housed at the Century Regional Detention Facility in Lynwood.[6]

The jails operated by Los Angeles County are dangerously overcrowded and understaffed, and do not contain sufficient accessible housing to meet the needs of the individuals with disabilities who are housed there. The combination of overcrowding, understaffing, and decrepit physical infrastructure make LACJ's facilities unsafe and unsanitary, with limited access to medical and mental health care, including to disability accommodations that require approval from LACJ medical staff. LACJ also has a shockingly high rate of in-custody deaths: 143 people have died at LACJ since the start of 2023, including 20 deaths so far in 2026.[7]

---

[4] *See* Los Angeles County Sheriff's Department Custody Division Population Year End Review – 2025 ("2025 Population Year End Review") at 3, 14, 31, https://lasd.org/wp-content/uploads/2026/04/Transparency_Custody_Division_Population_2025_Year_End_Report.pdf (last visited June 3, 2026).

[5] Los Angeles County Sheriff's Department Correctional Services Daily Briefing (June 3, 2026), https://lasd.org/wp-content/uploads/2026/06/Transparency_Custody_Division_Daily_Briefing_060326.pdf. The daily briefing reports do not track how many people housed at LACJ are on parole holds or are out-to-court from CDCR.

[6] In 2025, Men's Central Jail and Twin Towers Correctional Facility housed a daily average of 331 and 198 people with disabilities, respectively, and Century Regional Detention Facility housed a daily average of 35 people with disabilities. *See* 2025 Population Year End Review at 14-16.

[7] *See* Los Angeles County Sheriff's Department LASD Inmate In-Custody Deaths – Current Year, https://lasd.org/transparency/icd/ (last visited June 3, 2026); *see also 140 Dead in Los Angeles Jails Since Start of 2023*, VERA (May 4, 2026), https://www.vera.org/news/la-county-jail-deaths.

Defendants currently house by far the largest number of out-to-court and parole-supervised *Armstrong* class members in this dangerous jail system. A review of the daily out-to-court and parole notification e-mails for the month of April 2026 shows that LACJ is housing more than 17% of all class members going out-to-court from CDCR, and nearly 24% of the class members who were booked into any county jail on an alleged parole violation. **In total, over one-fifth of all class members whom Defendants housed at county jails across the state in April 2026 were at LACJ.** And more than one-quarter of the 3,557 class members on parole in California in April 2026 reside in Los Angeles County, meaning that Defendants would most likely house them at LACJ should they face parole revocation charges or be arrested on a parole hold. The 908 class members under parole supervision in Los Angeles County include 137 who are verified permanent wheelchair users, an additional 520 with verified mobility disabilities, 281 with verified hearing disabilities, 27 with verified vision disabilities, and 105 with verified developmental disabilities.[8]

Defendants house the majority of these class members at Men's Central Jail, even though they consider it "is so antiquated and dilapidated that it cannot comply with basic requirements of the ADA and Section 504 [of the Rehabilitation Act]." *Bonta* Complaint ¶ 251. Defendants describe LACJ's facilities as "uninhabitable" and "inhumane," with class members and other detainees "forced to live in filthy cells with broken and overflowing toilets, infestations of rats and roaches, and no clean water for drinking or bathing …. [with] spoiled, moldy, and nutritionally inadequate meals; little to no access to hygiene items, such as soap, toilet paper, and menstrual products; and almost no time outside their cells." *Id.* ¶ 2. Defendants' counsel Mr. Bonta admits that LACJ's medical and mental health care systems are constitutionally inadequate, *id.* ¶¶ 110-213, and that LACJ engages in systemic disability discrimination against class members and other detainees, *id.* ¶¶ 221-254, consistent with Plaintiffs' reporting over the years.

If Defendants wish to continue relying so heavily on LACJ to house class members on parole holds, parole revocation terms, and while out-to-court from CDCR, they must take action to address these well-known and longstanding ADA violations.[9] The Ninth Circuit has twice affirmed that Defendants are responsible under the ADA and

---

[8] These numbers are under-inclusive. The monthly address list of class members on parole produced for April 2026 did not include people with learning disabilities.

[9] The mere filing of the *Bonta* Complaint more than eight months ago is not enough, as no steps have been taken through that case to put a stop to the ongoing violations at LACJ. Mr. Bonta has not filed a motion for a preliminary injunction and no discovery has been served. We understand the case has been stayed since it was remanded back to Los Angeles Superior Court on January 8, 2026, nearly five months ago.

*Armstrong* Court orders "for providing reasonable accommodations to the disabled prisoners and parolees that they house in county jails," including at LACJ. *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1063 (9th Cir. 2010). As the Ninth Circuit put it: "[T]he state cannot house persons for whom it is responsible in jails where the state reasonably expects indignities and violations of federal law will continue to occur, turn care over to county custodians, and then disown all responsibility for their welfare." *Armstrong v. Brown*, 732 F.3d 955, 961-62 (9th Cir. 2013).

Although realignment changed the funding mechanism for how Defendants pay for persons housed in county jails, the Ninth Circuit affirmed that "defendants have the responsibility of ensuring that their prisoners are afforded their rights under the ADA, regardless of where the State incarcerates them." *Armstrong v. Brown*, 732 F.3d at 957 (quoting *Armstrong v. Schwarzenegger*, 622 F.3d at 1072).[10]

Defendants have once again suggested that they bear no responsibility for ensuring class members receive accommodations at LACJ, based on language in the California Penal Code stating that parolees are "under the sole legal custody and jurisdiction of local county facilities" while housed in county jails. *See* CJP Report at 1 (quoting Cal. Penal Code § 3056(a)). The Ninth Circuit considered the same statutory language and rejected this same argument during the 2012 litigation regarding the implementation of the CJP. The Ninth Circuit held that the statute "do[es] not relieve defendants of all responsibility for the discrimination suffered by *Armstrong* class members housed in county jails, past and present, or of their obligation to assist in preventing further violations." *Armstrong v. Brown*, 732 F.3d at 960. The Ninth Circuit has made abundantly clear that Defendants "cannot shirk their obligations to plaintiffs under federal law by housing them in facilities

---

[10] In response to the Supreme Court's decision in *Plata v. Brown*, 131 S. Ct. 1910 (2011), affirming a three-judge panel's order requiring California to reduce prison overcrowding, then-Governor and *Armstrong* Defendant Jerry Brown signed into law changes to the State's criminal legal system, referred to as "realignment," that took effect on October 1, 2011. A.B. 109 & A.B. 117, 2011-2012 Leg, Reg. Ses. (Cal. 2011). Under these laws, persons released from CDCR on state parole "shall not" be returned to prison for parole revocation terms unless they had been sentenced to life imprisonment, and instead "may" be housed by the State in a county jail "while awaiting revocation proceedings" and "upon revocation of parole." Cal. Penal Code § 3056(a). Realignment changed the funding source for counties to house persons on parole revocation terms to Local Community Corrections Accounts, which are block grants providing state money that "shall be" used by the counties to fund Post Release Community Supervision of individuals releasing from CDCR and **"to fund the housing of parolees in county jails."** Cal. Gov't Code § 30025(f)(11) (emphasis added).

operated by the third-party counties." *Id.* at 957 (quoting *Armstrong v. Schwarzenegger*, 622 F.3d at 1074).

## II. Defendants Have Known For Years That Class Members Are Routinely Denied Disability Accommodations When CDCR Houses Them At LACJ

Defendants have known for more than a decade that class members are routinely denied disability accommodations when Defendants house them at LACJ. In the last five years alone, Plaintiffs have notified Defendants through monitoring reports and advocacy letters of **more than seventy-five separate times that class members reported denials of needed disability accommodations while housed at LACJ.** *See* Attachment A. This does not include hundreds of additional reported denials of disability accommodations raised by class members at LACJ in 2275-CJ disability requests, some of which are highlighted in Plaintiffs' reports on DAPO's quarterly document productions.[11]

Class members report horrific conditions at LACJ. *See generally* Attachment A. For example, in May 2025, a class member who is a verified wheelchair rider reported that he was forced to crawl to the toilet to defecate after LACJ staff confiscated his wheelchair and housed him in an "ADA" cell that lacked grab bars, after he had been left on a gurney for three days in a diaper that was not changed for two days, leaving him soaked in urine. *See* Report on Q2 2025 Class Member Interviews at LACJ (May 30, 2025) at 2. In December 2025, two verified full-time wheelchair riders with DPW codes reported that they were not allowed wheelchairs while housed by CDCR at LACJ, which was confirmed by Los Angeles County's advocacy responses. *See* Letter from B. Hattem to T. Davis & N. Meyer re Failure to Accommodate Class Members at LACJ (Feb. 3, 2026). And class members typically report multiple denials of accommodations during a detention at LACJ. For example, in March 2026, a class member with a verified mobility disability reported that, after being arrested by his parole agent and booked into custody at LACJ on a parole hold: he was housed in a top bunk on an upper tier for about three weeks, despite being prescribed lower/lower housing in CDCR; his requests for a four-wheeled walker, orthotic shoes and prescription glasses were denied, even though he was prescribed these accommodations in CDCR; and the grab bars in the ADA shower in his

---

[11] *See, e.g.*, Report on DAPO's Q3 2025 Document Production (Dec. 5, 2025) at 3-4; Report on DAPO's Q2 2025 Document Production (Oct. 22, 2025) at 3-4; Amended Report on DAPO's Q1 2025 Document Production (June 27, 2025) at 2-4; Amended Report on DAPO's Q3 & Q4 Document Production (Sept. 12, 2024); Report on DAPO's Q2 2024 Document Production (Sept. 12, 2024) at 3-5; Report on DAPO's Q1 2024 Document Production (June 24, 2024) at 4-6.

housing unit were covered in black mold, making it unsanitary for him to safely use the shower. *See* Report on Q1 2026 Class Member Interviews at LACJ (Mar. 19, 2026) at 5.

Class members report a number of persistent patterns of disability accommodation denials at LACJ. Scores of class members report they are denied canes, walkers, braces and other DME and medical supplies that they were prescribed while in CDCR as accommodations for mobility disabilities—including out-to-court class members who are not allowed to use the DME that they transferred with from CDCR, and people who are recognized by CDCR as permanent wheelchair riders with DPW or DPO disability codes, but who are denied wheelchairs at LACJ. *See* Attachment A (columns G and H). Dozens of class members also report that they are housed inaccessibly at LACJ—in cells without grab bars, on top bunks and upper tiers, and/or in housing units without accessible showers they need to safely bathe themselves. *See id.* (column I). Class members also report barriers to accessing programs, services, and activities at LACJ—including yard time, medical appointments, visiting, and court appearances—due to escalators and elevators that are routinely broken for extended periods and the lack of accessible paths of travel from their housing units. *See id.* (column K).

Class members with hearing disabilities who were prescribed hearing aids while in CDCR consistently report significant delays in receiving hearing evaluations and replacement hearing aids, and no interim accommodations such as pocket talkers are available to help them hear. *See id.* (column L). Class members with vision disabilities who were prescribed prescription glasses while in CDCR similarly report significant delays in receiving vision evaluations and replacement glasses, and no interim accommodations such as magnifiers or large print forms are available to help them see and read. *See id.* (column M). And class members with developmental disabilities, learning disabilities, and low reading scores consistently report that do not receive any help reading, writing and understanding forms at LACJ. *See id.* (column N).

Some class members also report that they are housed in medical or other restrictive housing settings because of their disabilities, where they have limited access to programs and activities, or that they are forced to choose between program access and disability accommodations. *See id.* (column J). For example, in May 2026, a class member with a verified mobility disability who received mental health treatment at the EOP level of care while in CDCR reported that when he moved into the LACJ Mental Health Unit, he was not provided the bottom bunk he needs as an accommodation, and has had to sleep on the floor. *See* Paragraph 5 Request (May 12, 2026) at 1-2.

Plaintiffs' reporting on the systemic denials of disability accommodations to class members housed by Defendants at LACJ are corroborated by the findings of the Los Angeles County Office of Inspector General ("OIG"), the court-appointed monitor of the

settlement agreement in *Johnson v. Los Angeles County Sheriff's Department*, No. 2:08-cv-03515-MWF-Ex (C.D. Cal.), a class action on behalf of detainees with mobility disabilities at Los Angeles County's Men's Central Jail, Twin Towers Correctional Facility, and Century Regional Detention Facility.

In its March 31, 2026 Implementation Status Report, the OIG reported that LACJ does not have sufficient accessible housing areas to meet the needs of detainees with mobility disabilities, and that class members housed in other parts of the jails "face architectural barriers, which pose safety risks, and are denied accommodations or provided inadequate accommodations." *See* Inspector General's Tenth Implementation Status Report, Dkt. 293 (Mar. 31, 2026) at 7-9; *see also id.* at 53-55 (describing architectural barriers in showers in both ADA and non-ADA housing areas, long waits to use accessible showers, and class members being forced to climb stairs to use the only working shower in their unit); *id.* at 55-57 (describing routinely out-of-service escalators that force class members to descend and ascend narrow staircases to attend court, yard, and medical appointments, and class member reports that custody personnel do not accommodate them during rushed escorts); *id.* at 57-60 (describing inadequate tracking of mobility assistive devices, resulting in many people who need wheelchairs, walkers and crutches not having them).

## III. Defendants Have Failed to Take Adequate Action to Address the Longstanding Systemic Violations of Class Members' Rights At LACJ

The continuing violations of class members' rights at LACJ show that remedial efforts ordered by the *Armstrong* Court have not worked thus far, due to Defendants' failure to take adequate action to address these longstanding systemic violations.

Concerns about failures to accommodate class members whom Defendants choose to house in county jails date back to earliest years of this case. In 1999, the Court found that "certain large jail facilities utilized by … Defendants for parole proceedings, including the Los Angeles County Men's Jail, were inaccessible for people with disabilities," and held that Defendants have "violated the rights of class members in county facilities" to receive disability accommodations required by the ADA, including by "depriving them of assistive devices for mobility problems or accommodations for hearing and vision impairments." April 2012 Order at 4 (citing Findings of Fact and Conclusions of Law, Dkt. 523 (Dec. 22, 1999)).

Over the years, the Court has repeatedly found that further relief was necessary to ensure class members are accommodated at county jails, including LACJ, and has issued additional remedial orders. *See, e.g.*, Order Granting Motion to Enforce Revised Permanent Injunction, Dkt. 933 (May 30, 2006) at 8-9 (ordering Defendants to "develop

and implement a plan to assure that accommodations … are actually provided at each parole proceeding" for class members housed at county jails "without delay"); Order Granting in Part Motion to Enforce May 30, 2006 Order, Dkt. 1199 (Sept. 11, 2007) at 19-20 (ordering Defendants to report which housing in county jail systems, including LACJ, were currently accessible, and how Defendants track and accommodate class members housed at county jails); September 2009 Order at 11 (ordering Defendants to notify and instruct "all county jail facilities of their duty to comply with the ADA in housing *Armstrong* class members and that Defendants will enforce these obligations," and to "develop a plan for ensuring timely and appropriate accommodations for *Armstrong* class members in county jails").

Defendants issued a County Jail Plan in 2010, but in April 2012, the Court again found that Defendants were failing to ensure that class members were accommodated in county jails. *See* April 2012 Order at 18 ("Plaintiffs' evidence demonstrates that, both before and after Defendants issued the County Jail Plan, *Armstrong* class members have suffered significant violations of their ADA rights while housed in county jails."). The Court found that class members were not housed accessibly in county jails, a Deaf class member housed at LACJ's Twin Towers Correctional Facility was denied sign language interpretation for medical and mental health appointments, and that "[c]lass members with mobility impairments were denied assistive devices, or had assistive devices taken away from them, while housed in county jails, even though Defendants had previously determined the assistive devices were necessary for class members to access programs and services while in custody." *Id.* at 19-20, 22. Following negotiations and further litigation, the Court ordered that Defendants implement the 2012 County Jail Plan that remains in effect today. Opinion in Support of Order Distributing and Enforcing the Amended County Jail Order and Plan, Dkt. 2194 (Aug. 28, 2012) at 22.

In 2013, the Ninth Circuit affirmed the Court's 2012 Orders, holding that Defendants "have a continuing obligation to assist in alleviating the conditions that result in ADA and Rehabilitation Act violations in county jails," and that "their 'ongoing failure to communicate with county jails regarding the known needs of class members'" are "actions and culpable failures to act" that "have played a significant role in *causing* the undoubted discrimination against *Armstrong* class members in county jails." *Armstrong v. Brown*, 732 F.3d at 961-62.

Since 2014, Plaintiffs have repeatedly urged Defendants to investigate LACJ pursuant to the CJP, given the significant evidence of a pattern of denials of disability accommodations to class members there. *See, e.g.*, Letter from J. Stark to R. Boyd & A. Moon, Review of Responses to 2275 & 1824 Accommodation Requests and Grievances from Class Members in County Jails and on Parole; SLI Tracking Reports/Logs (Q1 2016) (July 25, 2016) at 2 (reporting pattern of denials of accommodations to class

members at LACJ documented since 2014, and stating that "[p]ursuant to the County Jail Plan, DAPO must undertake an investigation to determine whether there is indeed a pattern of violations"); Letter from P. Godbold to N. Meyer & P. Lee, Plaintiffs' Request for Compliance with County Jail Order (July 7, 2017) ("July 2017 Letter"); Letter from B. Bien-Kahn to N. Meyer & R. Boyd, Plaintiffs' Report re Class Member Interviews at Los Angeles County Jails (Q4 2017) (Jan. 4, 2018) at 2-3 (documenting that all four class members interviewed who were prescribed a cane by CDCR were denied a cane by LACJ, and requesting "that CDCR investigate and take all available steps to remedy this pattern of disability accommodation denials at LACJ"); Letter from B. Bien-Kahn to R. Boyd & N. Meyer, Systemic Denials of Disability Accommodations to Class Members at the Los Angeles County Jails (July 30, 2018) (discussing and citing prior correspondence from Plaintiffs regarding ADA violations at LACJ dating back to 2016).

Prior to September 29, 2025, Defendants had never undertaken an investigation of LACJ (or any other county jail system) under the CJP. Instead, they maintained that, because Los Angeles County either ignores or fails to provide substantive responses to disability grievances, advocacy letters, and Defendants' inquiries, Defendants cannot determine whether a pattern of denials of accommodations exists, and for that reason they were not required to conduct an investigation under the CJP. *See, e.g.*, Letter from A. Moon to J. Stark, Review of Responses to 2275 & 1824 Accommodation Requests and Grievances from Class Members in County Jails and on Parole, SLI Tracking Reports/Logs (Q1 2016) (Sept. 15, 2016) at 1 (contending that "DAPO was not aware of any pattern of violations" at LACJ, and that "because the county did not respond to many of DAPO's requests for information … DAPO is unable to confirm the existence or non-existence of a pattern"); Joint Case Management Statement, Dkt. 2660 (Jan. 13, 2017) at 16 ("With respect to Los Angeles County Jail, Defendants continue to maintain that without … additional information from the jail, and because the county failed to respond to a September 15, 2016 letter from Defendants, they are without sufficient information to determine the existence of a pattern of denial. Because Defendants have not discovered a pattern of denial, Defendants maintain that they are not required under the Court's order to conduct an investigation.").

Depositions taken by Plaintiffs in 2016 and 2017 of the Los Angeles County Sheriff's Department's Fed. R. Civ. Proc. 30(b)(6) designees provided additional evidence of a pattern and practice of denials of disability accommodations to class members. With CDCR officials present, the County's designees testified that they had never seen the CJP prior to preparing for their depositions, that they were not familiar with the DPP codes included on the e-notifications from CDCR, that they took no action in response to class members' requests for accommodation, and that LACJ did not permit basic accommodations to class members, including walking canes and tapping canes for

the blind,[12] and did not provide hearing aids absent "exigent circumstances." *See* July 2017 Letter, Ex. B at 23:6-22, 31:17-19; *id.*, Ex. C at 62:2-64:9, 64:10-65:11, 66:12-68:5, 83:11-16, 83:25-84:7. Despite this testimony, Defendants still did not initiate an investigation into LACJ under the CJP.

Over the past five years alone, Plaintiffs have issued at least 35 monitoring reports and Paragraph 5 Requests reporting on denials of disability accommodations to class members whom Defendants house at LACJ.

During this time, Defendants began justifying their failure to identify a pattern of disability accommodation denials based on Los Angeles County's assertion that federal and state privacy laws prevent them from sharing information with the *Armstrong* parties regarding whether they accommodate *Armstrong* class members.[13] This is untrue.

First, contrary to Los Angeles County's assertion, HIPAA does not prohibit the County from disclosing "the PHI [personal health information] of any individual to the CDCR." *See* CJP Report at 3. CDCR states that it "has not identified an applicable HIPAA exception that would permit" disclosure. *See id.* However, under 45 C.F.R. § 164.512(k)(5), CDCR, as a correctional institution, may seek disclosure of *Armstrong* class members' information from the County, and LACJ may disclose the information. As relevant here, a correctional institution may use the protected health information of individuals in their custody without obtaining their authorization in a manner that is necessary for "[t]he provision of health care to such individuals," "[t]he health and safety of such individuals or other inmates," and for other limited purposes. 45 C.F.R. § 164.512(k)(5)(i).

Alternatively, Defendants could seek these records from Los Angeles County through "a subpoena, … or other lawful process … not accompanied by an order of a

---

[12] Although LACJ lifted its blanket ban on tapping canes in April 2018 and purportedly lifted its blanket ban on walking canes later that year, LACJ did not provide walking canes to anyone at its jails and continued to confiscate class members' canes when they arrived at LACJ until at least 2021. Class members prescribed canes while in CDCR continue to report that they are denied canes at LACJ. *See generally* Attachment A.

[13] Other counties have not made this claim, and routinely share information with the *Armstrong* parties regarding accommodations provided to class members in response to Plaintiffs' Paragraph 5 Requests. *See, e.g.*, Letter from R. Gold to E. Stodder re Requests Under Paragraph 5 of the April 11, 2012, Order for Class Members at Sacramento County Jail (Apr. 20, 2026) (providing detailed information about the evaluations for and provision of requested disability accommodations to class members).

court." 45 C.F.R. § 164.512(e)(1)(ii). The existing *Armstrong* protective orders meet the regulation's requirements to permit CDCR to then disclose this information to Plaintiffs' counsel without individual notice to class members. 45 C.F.R. §§ 164.512(e)(1)(ii)(B), (v). Information about class members' disability accommodations and other personal health information is covered by the *Armstrong* protective orders binding Defendants and Plaintiffs' Counsel. *See* Dkts. 47, 1044; 45 C.F.R. § 164.512(e)(1) (permitting disclosure subject to a protective order).

Second, the California Medical Information Act ("CMIA") does not preclude CDCR from seeking information to enable it to comply with its obligations under the CJP and *Armstrong* Court orders. *Cf.* Order Granting Pls.' Motion to Compel Production of Documents as Modified, Dkt. 3763 (Mar. 13, 2026). CDCR can compel production of class member records from LACJ pursuant to Cal. Civ. Code § 56.10(b). And for out-to-court class members, who remain under CDCR custody, Cal. Civ. Code § 56.10(c)(1) permits the County to share information with LACJ.

Defendants try to put the onus on Plaintiffs to obtain individual signed medical releases from each and every class member on whose behalf they advocate. But it is not feasible to expect Plaintiffs' counsel to travel to a LACJ facility to meet in person with every class member to obtain a signed waiver—at the taxpayer's expense—simply because Defendants have not negotiated with Los Angeles County to obtain the information they need to comply with their court-ordered obligations. Having Plaintiffs obtain waivers would cause significant delays in sending advocacies about ongoing violations of class member's rights, and it would frequently be impracticable (if not impossible) to visit the class member in order to obtain a release in a timely manner.

If Los Angeles County insists that a release or court order is necessary before they can respond to Defendants regarding whether they are accommodating class members whom CDCR houses in its jail system, the more practical course is for Defendants negotiate a protective order to permit Los Angeles County to share information with CDCR and Plaintiffs.

## IV. Defendants Must Take Immediate Steps to Address the Systemic Violations of Class Members' Rights at LACJ

Unless CDCR promptly takes robust remedial steps to address the systemic violations of class members' rights at LACJ by **September 4, 2026**, Plaintiffs will file a motion for further remedial orders to ensure class members whom Defendants house at LACJ are provided the reasonable accommodations that they need for their disabilities.

Defendants have known for more than a decade that class members are routinely subjected to disability discrimination when CDCR houses them at LACJ. If Defendants cannot ensure the rights of class members at LACJ, they must stop housing them there.

CDCR is not required to invoke the parole revocation process and therefore does not have to incarcerate class members on parole at LACJ. Cal. Penal Code §§ 1203.2; 3000.08(f). And although state statute requires CDCR to send people who are out-to-court to county jails, Cal. Penal Code §§ 2620-2621, the parties can seek an Order from the *Armstrong* Court requiring that out-to-court class members be housed at the California State Prison, Los Angeles County ("LAC"), near the Los Angeles County courthouses, to prevent them from being subjected to disability accommodation denials at LACJ. At a minimum, Defendants must stop housing class members with mobility disabilities at Men's Central Jail, which they admit has no ADA-compliant housing and has a "structural design" that "renders it impossible to comply with the ADA." *Bonta* Complaint ¶¶ 251-253.

It is past time for Defendants to use their leverage to put pressure on Los Angeles County to improve conditions for class members at LACJ. Defendants are authorized by *Armstrong* Court orders to transfer class members away from LACJ if they are unable to "ensure that needed accommodations are promptly provided," and to remedy "continued violations" by county jail systems with "monetary fines and penalties." September 2009 Order at 13-14; April 2012 Order at 40-41. To Plaintiffs' knowledge, Defendants have never used these levers to address the systemic disability violations against class members at LACJ.

Moreover, Los Angeles County receives hundreds of millions of dollars each year from the State of California in Community Corrections Account block grants "to fund the housing of parolees in county jails." Cal. Gov't Code § 30025(f)(11). **Los Angeles County has received nearly $470 million in state funds for this purpose in the Fiscal Year 2025-2026 alone**. *See* California State Controller's Office, Community Corrections (formerly Local Community Corrections) Fiscal Year 2025-2026 – Allocation Year to Date, *available at* https://www.sco.ca.gov/ard_payments_local_community_fy2526.html (last accessed June 3, 2026). Defendant Newsom can take steps through his budget to decrease this realignment funding if Los Angeles County refuses to address disability discrimination against class members housed at LACJ.

Remedial steps that would show progress and may dissuade Plaintiffs from seeking further remedial orders from the Court include:

- Within 30 days, negotiate and obtain a protective order with Los Angeles County to permit information sharing of class members' health information, so that

Defendants will be able to learn substantive information about whether and how class members are accommodated at LACJ. Plaintiffs are willing to join CDCR in these negotiations if helpful.

- If Los Angeles County refuses to enter into a protective order, take all necessary steps to obtain the records needed to comply with court-ordered obligations to ensure class members are accommodated at LACJ, including by seeking records via subpoena.

- Proactively review 2275-CJ grievances and Plaintiffs' advocacy letters and reports to identify whether any class member housed at LACJ is not receiving required disability accommodations, and take immediate steps with county jail staff to ensure accommodations are promptly provided;

- Transfer class members away from LACJ if they are denied required disability accommodations even after Defendants take steps with county jail staff to try to ensure accommodations are promptly provided;

- Impose monetary fines and penalties against LACJ for continued violations of class members' rights;

- Conduct an inventory of LACJ's accessible housing with a CASp expert in order to determine what remediation is needed to existing ADA housing and whether there is adequate accessible housing to meet the needs of class members whom Defendants house at LACJ;

- Demand that LACJ improve or obtain elevator and escalator repair contract(s) to ensure elevators and escalators are operable so that class members are not denied equal access to yard, medical appointments, visiting, court, and other programs, services, and activities at LACJ because of a disability;

- Demand that LACJ ensure that all DME transferred with class members who are out-to-court from CDCR are provided to them for use in LACJ, and create a mechanism to send to LACJ any prescribed DME that was not transferred with the class member from CDCR;

- Demand that LACJ adopt the "reasonable accommodation" standard to evaluate whether class members should be provided DME and housing accommodations, and that they end any blanket bans on any type of DME;

- Demand that LACJ adopt reasonable timelines for evaluations of class members for disability accommodations, and for providing class members those accommodations after they have been approved;

- Demand that LACJ provide interim accommodations for class members with hearing disabilities if they require but do not have hearing aids at LACJ, such as pocket talkers or other personal sound amplification devices;

- Demand that LACJ provide interim accommodations for class members with vision disabilities if they require but do not have prescription eyeglasses or other prescribed vision accommodations at LACJ, such as handheld magnifiers and access to large print or Braille forms;

- Demand that LACJ create a mechanism for providing reading and writing assistance for class members with learning disabilities, developmental and/or cognitive/intellectual disabilities, and with low reading scores (whether via staff assistance or an incarcerated worker program);

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

We will shortly be serving discovery requests and Fed. R. Civ. Proc. 30(b)(6) deposition notices on Defendants and the Los Angeles County Sheriff's Department related to the failures to ensure class members are accommodated at LACJ.

We look forward to discussing these issues further in the coming weeks.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Ben Bien-Kahn*

By: Ben Bien-Kahn
Senior Counsel

BBK:cg
Encl. Attachment A
cc: Ed Swanson
Audrey Barron
Hannah Pollack
Sarah Brattin
Carrie Stafford
Ramon Ruiz
Katie Riley
Jessica Thoma
OLA *Armstrong*
OLA *Armstrong* Attorney Mailbox
Tim Anguiano
Olena Likhachova
Anne Kammer
Gurpreet Sandhu
Namrata Kotwani
Jennifer Burns
Jiaye Zhou
Tim Anguiano
Dawn Lorey
Lourdes White
Darnell Mebane
Cory Lo
Jillian Hernandez
Megan Assenza
ACTT Advocacy Mailbox
Brianne Burkart
Chor Thao
Diana Toche
Brittany Brizendine
John Dovey
Robin Hart
Kenneth Martin
Dawn Stevens
Dharmendra Sharma
Antronne Scotland
Joseph Edwards
Sadie Richmond
Mary Ramos
CCHCS Accountability
Lois Welch
David Rios
Wendy Enos
Roger Gold
Maria Mendoza
RBGG *Armstrong* Team
PLO *Armstrong* Team

# Attachment A

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **Name** | **CDC#** | **DPP/DDP codes** | **Date of Allegation** | **Source of Allegation** | **Allegation Description** | **Denied Wheelchair** | **Denied DME or Medical Supplies for Mobility Disability** | **Inaccessible Housing** | **Housed in Medical or Restrictive Housing Setting Due to Disability** | **Denied Equal Access to PSAs Due to Physical Access Barriers** | **Denied Hearing Accommodations** | **Denied Vision Accommodations** | **Denied LD/DD Accommodations** |
| 2 | [redacted] | [redacted] | DD2 | 3/31/2021 | Par. 5 Request (3/31/21); Pls' Report on Q1/Q2 2021 CM Interviews (4/28/21) | Denied cane; Housed on upper tier despite L/L and no stairs chronos + fell down stairs; Denied accessible shower and shower chair + fell in shower; Needs help reading + writing/monitoring for victimization | | X | X | | | | | X |
| 3 | [redacted] | [redacted] | DPO, DD1 | 4/28/2021 | Pls' Report on Q1/Q2 2021 CM Interviews (4/28/21) | Denied cane (given a single crutch instead that is wrong height) | | X | | | | | | |
| 4 | [redacted] | [redacted] | DPW | 4/28/2021 | Pls' Report on Q1/Q2 2021 CM Interviews (4/28/21) | No wheelchair accessible location for attorney visits at Men's Central | | | | | X | | | |
| 5 | [redacted] | [redacted] | DPV, DNH | 4/28/2021 | Pls' Report on Q1/Q2 2021 CM Interviews (4/28/21) | Denied accommodations for vision disability to use phone for legal call | | | | | | | X | |
| 6 | [redacted] | [redacted] | DPO, DD1 | 11/18/2021 | Par. 5 Request (11/18/21); Pls' Report on Q4 2021 CM Interviews (12/7/21) | Denied wheelchair, knee brace + fell; Denied help completing forms | X | X | | | | | | X |
| 7 | [redacted] | [redacted] | DNM, Low TABE Score | 11/18/2021 | Par. 5 Request (11/18/21); Pls' Report on Q4 2021 CM Interviews (12/7/21) | No evaluation for hearing aids or other hearing accommodations (even though DAPO used assistive hearing device for notice serve); Denied help completing forms | | | | | | X | | X |
| 8 | [redacted] | [redacted] | DPW, Low TABE Score | 11/18/2021 | Par. 5 Request (11/18/21); Pls' Report on Q4 2021 CM Interviews (12/7/21) | Denied of egg crate mattress or extra mattress; Denied help completing forms | | X | | | | | | X |
| 9 | [redacted] | [redacted] | DNM | 11/18/2021 | Par. 5 Request (11/18/21); Pls' Report on Q4 2021 CM Interviews (12/7/21) | Not given cane or hearing evaluation despite hearing loss | | X | | | | X | | |
| 10 | [redacted] | [redacted] | DPO, DNH, DNV | 11/18/2021 | Par. 5 Request (11/18/21); Pls' Report on Q4 2021 CM Interviews (12/7/21) | Denied adequate urologic and incontinence supplies | | X | | | | | | |
| 11 | [redacted] | [redacted] | DNH | 4/1/2022 | Par. 5 Request (4/1/22) | Denied Over-the-Ear Headphones and Pocket Talker while out-to-court, needed to hear in court | | | | | | X | | |

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **Name** | **CDC#** | **DPP/DDP codes** | **Date of Allegation** | **Source of Allegation** | **Allegation Description** | **Denied Wheelchair** | **Denied DME or Medical Supplies for Mobility Disability** | **Inaccessible Housing** | **Housed in Medical or Restrictive Housing Setting Due to Disability** | **Denied Equal Access to PSAs Due to Physical Access Barriers** | **Denied Hearing Accommodations** | **Denied Vision Accommodations** | **Denied LD/DD Accommodations** |
| 12 | [redacted] | [redacted] | DLT | 5/10/2022 | Par. 5 Request (5/10/22) | Denied placement in ADA housing; Denied accessible shower or shower chair; Denied dayroom access (on upper tier) as elevator is frequently broken; Denied yard because it is up flight of stairs | | | X | | X | | | |
| 13 | [redacted] | [redacted] | DPM | 11/29/2022 | Pls' Report on Q3 2022 CM Interviews (11/29/22) | Denied special shoes and foot orthoses | | X | | | | | | |
| 14 | [redacted] | [redacted] | DPM | 11/29/2022 | Pls' Report on Q3 2022 CM Interviews (11/29/22) | Denied wheelchair (given crutches); Struggles to get help carrying meal trays; Denied placement in ADA housing | X | | X | | | | | |
| 15 | [redacted] | [redacted] | DPO | 11/29/2022 | Pls' Report on Q3 2022 CM Interviews (11/29/22) | Housed in "ADA" unit where toilets lack grab bars and shower bench is old and unstable; Denied access to yard, television, and telephones since transferred to ADA unit | | | X | X | | | | |
| 16 | [redacted] | [redacted] | DPM | 11/29/2022 | Pls' Report on Q3 2022 CM Interviews (11/29/22) | Denied cane or walker | | X | | | | | | |
| 17 | [redacted] | [redacted] | DLT, DPS | 11/29/2022 | Pls' Report on Q3 2022 CM Interviews (11/29/22) | Denied cane or walker + fell several times, including in shower | | X | | | | | | |
| 18 | [redacted] | [redacted] | PO, DD1 | 11/29/2022 | Pls' Report on Q3 2022 CM Interviews (11/29/22) | Denied wheelchair cushion; Leg brace confiscated | | X | | | | | | |
| 19 | [redacted] | [redacted] | DNV | 11/29/2022 | Pls' Report on Q3 2022 CM Interviews (11/29/22); Par. 5 Request (12/12/22) | Denied medical appointments for glaucoma + deteriorating vision; Denied help reading grievance forms; Magnifier + large print forms not available | | | | | | | X | |
| 20 | [redacted] | [redacted] | DLT | 1/17/2023 | Par. 5 Request (1/17/23) | Shower in housing unit is up flight of stairs (must climb handcuffed behind back); Requires frequent showers for incontinence | | | X | | | | | |
| 21 | [redacted] | [redacted] | DLT | 5/12/2023 | Par. 5 Request (5/12/23) | Escalator used to access visiting, medical appointments, anger management program, and court always broken, requiring him to climb up/down stairs w/o assistive device while handcuffed behind back + fell down stairs | | | | | X | | | |

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **Name** | **CDC#** | **DPP/DDP codes** | **Date of Allegation** | **Source of Allegation** | **Allegation Description** | **Denied Wheelchair** | **Denied DME or Medical Supplies for Mobility Disability** | **Inaccessible Housing** | **Housed in Medical or Restrictive Housing Setting Due to Disability** | **Denied Equal Access to PSAs Due to Physical Access Barriers** | **Denied Hearing Accommodations** | **Denied Vision Accommodations** | **Denied LD/DD Accommodations** |
| 22 | [redacted] | [redacted] | DPO | 5/23/2023 | Par. 5 Request (5/23/23) | Denied use of wheelchair inside cell or, alternatively, walker or cane; No functioning accessible shower or toilet in housing unit | | X | X | | | | | |
| 23 | [redacted] | [redacted] | DPM | 6/6/2023 | Par. 5 Request (6/6/23) | Denied cane, resulting in lost opportunity to attend religious services and drug rehab classes | | X | | | | | | |
| 24 | [redacted] | [redacted] | DNH | 6/26/2023 | Par. 5 Request (6/6/23); Follow-Up E-Mail (7/19/23) | Denied hearing aid batteries + knee brace; Inconsistent access to incontinence supplies + showers | | X | | | | X | | |
| 25 | [redacted] | [redacted] | DPO, DNH | 3/15/2024 | Par. 5 Request (3/15/24) | Housed in restrictive medical floor while out-to-court at Men's Central due to disability, w/ limited yard + dayroom + no mental health care; Inaccessible cell w/o grab bars; Not allowed to wear his CDCR-prescribed orthopedic boots | | X | X | X | | | | |
| 26 | [redacted] | [redacted] | DPM | 3/29/2024 | Par. 5 Request (3/29/24) | Housed in restrictive medical floor while out-to-court at Men's Central due to disability, w/ limited yard + dayroom + no access to radio; Custody staff told him to relinquish DME in order to have access to privileges, programs, and activities;<br>Inaccessible housing w/o grab bars + threshold at entrance to cell;<br>Inaccessible shower lacks grab bars or shower chair | | | X | X | | | | |
| 27 | [redacted] | [redacted] | DNH, DLT | 8/28/2024; 10/28/2024 | Par. 5 Request (8/28/24); Follow-Up Advocacy (10/28/24) | Denial of effective communication to Deaf person who uses written notes as exclusive EC method; Jail staff refuse to use written notes; Denied access to TTY machine for phone calls; Jail staff do not EC announcements re law library time, depriving him of access to law library while out-to-court | | | | | | X | | |
| 28 | [redacted] | [redacted] | DPO | 12/12/2024 | Pls' Report on Q4 2024 CM Interviews (12/12/24) | Not provided wheelchair for a full day after booked into Jail; Denied therapeutic shoes, wheelchair cushion, back brace that fits; Dangerous conditions in housing unit (consistent leaking from bathroom makes floor slippery) | X | X | X | | | | | |

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **Name** | **CDC#** | **DPP/DDP codes** | **Date of Allegation** | **Source of Allegation** | **Allegation Description** | **Denied Wheelchair** | **Denied DME or Medical Supplies for Mobility Disability** | **Inaccessible Housing** | **Housed in Medical or Restrictive Housing Setting Due to Disability** | **Denied Equal Access to PSAs Due to Physical Access Barriers** | **Denied Hearing Accommodations** | **Denied Vision Accommodations** | **Denied LD/DD Accommodations** |
| 29 | [redacted] | [redacted] | DPO | 12/12/2024 | Pls' Report on Q4 2024 CM Interviews (12/12/24) | Denied maintenance for broken wheelchair + staff threaten to confiscate it; Wheelchair cushion confiscated; Denied replacement for deteriorating orthopedic shoes; Dangerous conditions in housing unit (bathroom regularly floods, makes floor slippery; shower bench needs repairs) | X | X | X | | | | | |
| 30 | [redacted] | [redacted] | DPO | 12/12/2024 | Pls' Report on Q4 2024 CM Interviews (12/12/24) | Denied wheelchair-accessible transportation to court, causing him to miss court date; Cane confiscated by jail staff; Denied wet wipes and incontinence showers; Forced to climb stairs to use upper tier shower due to broken shower on lower tier; Initial housing placement was not wheelchair-accessible | | X | X | | X | | | |
| 31 | [redacted] | [redacted] | DPM | 12/12/2024 | Pls' Report on Q4 2024 CM Interviews (12/12/24) | Denied walker, wrist support braces, orthotic shoes, prescription glasses; Improperly housed on upper tier; Required to walk long distance to access yard | | X | X | | X | | X | |
| 32 | [redacted] | [redacted] | DPM, DD2 | 12/12/2024 | Pls' Report on Q4 2024 CM Interviews (12/12/24) | Denied back brace, knee brace, orthotics, incontinence supplies; Denied help completing forms; Denied yard because it is up flight of stairs; Denied access to programs because must stand in line for prolonged period | | X | | | X | | | X |
| 33 | [redacted] | [redacted] | DPO | 12/12/2024 | Pls' Report on Q4 2024 CM Interviews (12/12/24) | Denied wheelchair, walker, crutches; Improperly housed on top bunk; Denied placement in ADA housing (no grab bars for toilet or shower, no shower chair or bench); Denied access to yard because he has to climb two flights of broken escalators; Has to climb down two flights of stairs to go to court | X | X | X | | X | | | |
| 34 | [redacted] | [redacted] | DPW | 12/12/2024 | Pls' Report on Q4 2024 CM Interviews (12/12/24) | Denied wheelchair, walker, cane; Afraid to request wheelchair lest Jail house him in restrictive medical unit (as they did in 2023); Denied ADA housing placement (no grab bars for shower or toilet); Has to climb down three broken escalators to get to court | X | X | X | X | X | | | |

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **Name** | **CDC#** | **DPP/DDP codes** | **Date of Allegation** | **Source of Allegation** | **Allegation Description** | **Denied Wheelchair** | **Denied DME or Medical Supplies for Mobility Disability** | **Inaccessible Housing** | **Housed in Medical or Restrictive Housing Setting Due to Disability** | **Denied Equal Access to PSAs Due to Physical Access Barriers** | **Denied Hearing Accommodations** | **Denied Vision Accommodations** | **Denied LD/DD Accommodations** |
| 35 | [redacted] | | DNH, DLT | 12/12/2024 | Pls' Report on Q4 2024 CM Interviews (12/12/24) | No accessible programs - Deaf person forced to sit in group programs without use of EC methods to allow participation; Not allowed to use CDCR-prescribed incontinence supplies that were transferred with him to Jail | | X | | | | X | | |
| 36 | [redacted] | | DD2 | 12/12/2024 | Pls' Report on Q4 2024 CM Interviews (12/12/24) | Denied adaptive support needs including reminders to complete activities of daily living, help with completing forms, and protection due to vulnerability to pressuring | | | | | | | | X |
| 37 | [redacted] | | Formerly DNV | 1/17/2025 | Par. 5 Request (1/17/25) | Class member w/ Keratoconus prescribed therapeutic contacts for vision disability denied necessary supplies to clean and insert hard contact lenses by Jail | | | | | | | X | |
| 38 | [redacted] | | DNH, Low ABE Score | 2/10/2025 | Par. 5 Request (2/10/25); Follow-Up (4/4/25) | Denied replacement for lost hearing aid while out-to-court from CDCR; Denied help completing forms as accommodation for unverified LD; Housed in restrictive medical unit due to incontinence w/ limited program access | | | | X | | X | | X |
| 39 | [redacted] | | DNV | 5/13/2025 | Par. 5 Request (5/13/25) | Denied replacement for broken prescription glasses; Tapping cane confiscated | | | | | | | X | |
| 40 | [redacted] | | DPO | 5/15/2025 | Par. 5 Request (5/15/25) | Denied access to law library due to housing in Medical Unit because of his disability | | | | X | | | | |
| 41 | [redacted] | | DNH | 5/27/2025 | Par. 5 Request (5/27/25) | Denied incontinence showers after being moved out of Medical Unit to general population | | X | | | | | | |
| 42 | [redacted] | | DPO | 5/30/2025 | Pls' Report on Q2 2025 CM Interviews (5/30/25) | Wheelchair confiscated + denied access to wheelchair + housed inaccessibly for 2 weeks (left bed-ridden in cell w/o assistive devices + left on a gurney for 3 days); Forced to sit in soiled diapers for days, urinate in bag, crawl to toilet to defecate, and wait hours for nurse or porters to assist to urinal; Denied shower for first five days | X | X | X | | | | | |

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Name | CDC# | DPP/DDP codes | Date of Allegation | Source of Allegation | Allegation Description | Denied Wheelchair | Denied DME or Medical Supplies for Mobility Disability | Inaccessible Housing | Housed in Medical or Restrictive Housing Setting Due to Disability | Denied Equal Access to PSAs Due to Physical Access Barriers | Denied Hearing Accommodations | Denied Vision Accommodations | Denied LD/DD Accommodations |
| 43 | [redacted] | [redacted] | DPW | 5/30/2025 | Pls' Report on Q2 2025 CM Interviews (5/30/25) | Confiscated CDCR-prescribed wheelchair, walker, foot orthoses, prescription glasses, incontinence supplies upon arrival for court from CDCR; Forced to use wheelchair that was too small and had fixed foot pedals for ~2 months; Denied showers after incontinence accidents; Housed in restrictive medical unit because of disability; Housed in cell that is not wheelchair accessible (bed too high; desk has built-in stool) | X | X | X | X | | | X | |
| 44 | [redacted] | [redacted] | DPM | 5/30/2025 | Pls' Report on Q2 2025 CM Interviews (5/30/25) | Denied cane, knee brace, and back brace | | X | | | | | | |
| 45 | [redacted] | [redacted] | DPM | 5/30/2025 | Pls' Report on Q2 2025 CM Interviews (5/30/25) | Confiscated CDCR-prescribed walker upon arrival for court from CDCR (not returned for 3-5 days); Denied program access due to housing in medical unit because of disability | | X | | X | | | | |
| 46 | [redacted] | [redacted] | DPM | 5/30/2025 | Pls' Report on Q2 2025 CM Interviews (5/30/25) | Denied replacement for broken cane; Denied prescription glasses | | X | | | | | X | |
| 47 | [redacted] | [redacted] | DPM, DNH | 8/25/2025 | Par. 5 Request (8/25/25); Pls' Report on Q3 2025 CM Interviews (9/12/25) | Denied incontinence supplies and appropriate laundry exchanges; Broken hearing aids not repaired | | X | | | | X | | |
| 48 | [redacted] | [redacted] | DPW | 8/25/2025 | Par. 5 Request (8/25/25); Pls' Report on Q3 2025 CM Interviews (9/12/25) | Housed w/o accessible shower (high threshold, no grab bars, no shower chair or bench) + has fallen twice in the shower | | | X | | | | | |
| 49 | [redacted] | [redacted] | DPM | 8/25/2025 | Par. 5 Request (8/25/25); Pls' Report on Q3 2025 CM Interviews (9/12/25) | Denied use of CDCR-prescribed orthopedic shoes while out-to-court; Denied showers, phones, and program access for first 10 days | | X | | | | | | |
| 50 | [redacted] | [redacted] | DPM, DNH | 9/12/2025 | Pls' Report on Q3 2025 CM Interviews (9/12/25) | Denied walker, cane, insoles, orthopedic shoes, C-PAP machine; Confiscated hearing aids after return from court appearance; | | X | | | | X | | |

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Name | CDC# | DPP/DDP codes | Date of Allegation | Source of Allegation | Allegation Description | Denied Wheelchair | Denied DME or Medical Supplies for Mobility Disability | Inaccessible Housing | Housed in Medical or Restrictive Housing Setting Due to Disability | Denied Equal Access to PSAs Due to Physical Access Barriers | Denied Hearing Accommodations | Denied Vision Accommodations | Denied LD/DD Accommodations |
| 51 | [redacted] | | DPM | 9/12/2025 | Pls' Report on Q3 2025 CM Interviews (9/12/25) | Denied cane or walker; Improperly housed on upper tier; Must climb down flight of stairs for visiting, medical appointments, yard, court; Denied incontinence supplies and showers + mocked by staff | | X | X | | X | | | |
| 52 | [redacted] | | DPM | 9/12/2025 | Pls' Report on Q3 2025 CM Interviews (9/12/25) | Denied cane or walker | | X | | | | | | |
| 53 | [redacted] | | DPM | 9/12/2025 | Pls' Report on Q3 2025 CM Interviews (9/12/25) | Denied walker + egg crate mattress | | X | | | | | | |
| 54 | [redacted] | | DLT | 9/12/2025 | Pls' Report on Q3 2025 CM Interviews (9/12/25) | Inadequate toilet access in housing unit (2 of 4 toilets clogged for weeks), disadvantaging people w/ mobility disabilities | | | | | X | | | |
| 55 | [redacted] | | DPW | 9/12/2025 | Pls' Report on Q3 2025 CM Interviews (9/12/25) | No access to showers, hygiene supplies for 2 weeks (very difficult to clean himself in cell as full-time wheelchair user) | | | X | | | | | |
| 56 | [redacted] | | DPM | 11/4/2025 | Par. 5 Request (11/4/25) | Housed in medical unit due to disability w/ limited out-of-cell and yard time / no program access | | | | X | | | | |
| 57 | [redacted] | | DPM, DD2 | 12/22/2025 | Par. 5 Request (12/22/25); Pls' Report on Q4 2025 CM Interviews (1/20/26) | Denied properly-sized cane + therapeutic shoes + wrist brace; Denied vision evaluation for prescription glasses; Inaccessible housing (only ADA shower is broken; no grab bars for toilets + has fallen in shower and trying to use toilets); difficulty traversing jail due to broken escalators | | X | X | | X | | X | |
| 58 | [redacted] | | DPM | 12/22/2025 | Par. 5 Request (12/22/25); Pls' Report on Q4 2025 CM Interviews (1/20/26) | Denied wheelchair accessible cell (insufficient space to maneuver WC; bed too low; no grab bars to transfer to bed or toilet); Denied back brace; Housed in restrictive medical setting where he is denied access to yards; Denied sanitary shower conditions + cannot safely clean himself due to disability | | X | X | X | | | | |

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Name | CDC# | DPP/DDP codes | Date of Allegation | Source of Allegation | Allegation Description | Denied Wheelchair | Denied DME or Medical Supplies for Mobility Disability | Inaccessible Housing | Housed in Medical or Restrictive Housing Setting Due to Disability | Denied Equal Access to PSAs Due to Physical Access Barriers | Denied Hearing Accommodations | Denied Vision Accommodations | Denied LD/DD Accommodations |
| 59 | [redacted] | [redacted] | [redacted]PM, DNH, DNV | 12/22/2026 | Par. 5 Request (12/22/25); Pls' Report on Q4 2025 CM Interviews (1/20/26) | Denied seated walker w/ bag to carry belongings; Denied knee braces + orthotic shoes/footwear accommodations; Shower lacks shower hose or sanitary shower bench; Dangerous conditions in housing unit (leak in bathroom makes floor slippery + he's fallen); long waits for toilets + sinks as many are broken | | X | X | | | | | |
| 60 | [redacted] | [redacted] | DPW | 12/23/2025 | Par. 5 Request (12/23/25); Pls' Report on Q4 2025 CM Interviews (1/20/26) | Denied wheelchair or walker; Confiscated cane; Inaccessible housing (has to climb stairs to get to his bed); Inaccessible shower (threshold barrier; broken shower chair) | X | X | X | | | | | |
| 61 | [redacted] | [redacted] | DPO | 12/23/2025 | Par. 5 Request (12/23/25); Pls' Report on Q4 2025 CM Interviews (1/20/26) | Denied wheelchair, knee brace, back brace, incontinence supplies, C-PAP; Inaccessible shower (threshold barrier; no shower seat or grab bars) | X | X | X | | | | | |
| 62 | [redacted] | [redacted] | DPW | 12/23/2025 | Par. 5 Request (12/23/25); Pls' Report on Q4 2025 CM Interviews (1/20/26) | Denied properly-sized wheelchair, which is too wide to maneuver in his cell and does not fit in his shower; | X | | | | | | | |
| 63 | [redacted] | [redacted] | DLT | 1/20/2026 | Pls' Report on Q4 2025 CM Interviews (1/20/26) | Denied therapeutic/orthotic shoes, compression stockings | | X | | | | | | |
| 64 | [redacted] | [redacted] | DPW | 1/20/2026 | Pls' Report on Q4 2025 CM Interviews (1/20/26) | Inaccessible housing (no grab bars in cell; shower has threshold barrier + no shower chair; Not consistently provided cuffing accommodations to allow for wheelchair use | | | X | | | | | |
| 65 | [redacted] | [redacted] | DPO | 1/20/2026 | Pls' Report on Q4 2025 CM Interviews (1/20/26) | Inaccessible shower (must climb stairs to use shower; no shower house) | | | X | | | | | |
| 66 | [redacted] | [redacted] | DNM | 1/21/2026 | Par. 5 Request (1/21/26); Follow-Up (2/6/26) | Denied cane; Denied lower bunk | | X | X | | | | | |
| 67 | [redacted] | [redacted] | DPO | 2/27/2026 | Par. 5 Request (2/27/26); Pls' Report on Q1 2026 CM Interviews (3/19/26) | Denied wheelchair; Inaccessible housing (housed on upper tier; shower lacks grab bars + fell in shower) | X | | X | | | | | |

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Name | CDC# | DPP/DDP codes | Date of Allegation | Source of Allegation | Allegation Description | Denied Wheelchair | Denied DME or Medical Supplies for Mobility Disability | Inaccessible Housing | Housed in Medical or Restrictive Housing Setting Due to Disability | Denied Equal Access to PSAs Due to Physical Access Barriers | Denied Hearing Accommodations | Denied Vision Accommodations | Denied LD/DD Accommodations |
| 68 | [redacted] | | DPM | 2/27/2026 | Par. 5 Request (2/27/26); Pls' Report on Q1 2026 CM Interviews (3/19/26) | Denied cane for 2 to 3 weeks; Denied prescription glasses + incontinence supplies | | X | | | | | X | |
| 69 | [redacted] | | DNH | 2/27/2026 | Par. 5 Request (2/27/26); Pls' Report on Q1 2026 CM Interviews (3/19/26) | Denied replacement for broken hearing aids; Denied evaluation for cane due to mobility issues resulting from diabetes | | X | | | | X | | |
| 70 | [redacted] | | DD3 | 3/19/2026 | Pls' Report on Q1 2026 CM Interviews (3/19/26); Par. 5 Request (3/23/26) | Denied cane + C-PAP machine prescribed by CDCR; Housed in top bunk up two flights of stairs, despite L/L chrono at CDCR | | X | X | | | | | X |
| 71 | [redacted] | | DPO | 3/19/2026 | Pls' Report on Q1 2026 CM Interviews (3/19/26); Par. 5 Request (3/23/26) | Inaccessible housing (no grab bars in cell for toilet transfers + fell several times; no wheelchair-accessible shower in unit) | | | X | | | | | |
| 72 | [redacted] | | DPO | 3/19/2026 | Pls' Report on Q1 2026 CM Interviews (3/19/26); Par. 5 Request (3/23/26) | Denied cane, orthotic shoes, air cushion for wheelchair, knee and ankle braces; Denied wheelchair for more than one day; Frequent denial of cuffing accommodations | X | X | | | | | | |
| 73 | [redacted] | | DPM | 3/19/2026 | Pls' Report on Q1 2026 CM Interviews (3/19/26); Par. 5 Request (3/23/26) | Denied seated four-wheeled walker, orthotic shoes, prescription eyeglasses; Housed in upper tier for several weeks; Shower grab bars covered in black mold, making it unsanitary/unsafe to use | | X | X | | | | X | |
| 74 | [redacted] | | DLT | 3/19/2026 | Pls' Report on Q1 2026 CM Interviews (3/19/26) | Denied knee brace + shoes used w/ ankle/foot orthoses; Inaccessible housing for >1 week (upper tier + top bunk); Denial of incontinence supplies and showers | | X | X | | X | | | |
| 75 | [redacted] | | DNM | 5/12/2026 | Par. 5 Request (5/12/26) | Denied lower bunk due to placement in mental health housing unit (EOP in CDCR) | | | X | | | | | |
| 76 | [redacted] | | DNM | 5/12/2026 | Par. 5 Request (5/12/26) | Denied wheelchair for extended period (temporarily provided for court appearances only after fell in court); Denied orthotics + ankle brace + prescription glasses; Provided walker in disrepair; Threatened removal of accommodations | X | X | | | | | X | |

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Name | CDC# | DPP/DDP codes | Date of Allegation | Source of Allegation | Allegation Description | Denied Wheelchair | Denied DME or Medical Supplies for Mobility Disability | Inaccessible Housing | Housed in Medical or Restrictive Housing Setting Due to Disability | Denied Equal Access to PSAs Due to Physical Access Barriers | Denied Hearing Accommodations | Denied Vision Accommodations | Denied LD/DD Accommodations |
| 77 | [redacted] | [redacted] | Unverified Mobility | 5/12/2025 | Par. 5 Request (5/12/26) | Not allowed to use CDCR-prescribed diabetic shoes while out-to-court | | X | | | | | | |

# EXHIBIT C

## INTRODUCTION

This plan results from a finding by the Federal Court that state parolees and state inmates are under the jurisdiction of California Department of Corrections (CDCR) when housed in a County Jail and therefore are entitled to the same reasonable accommodations that CDCR provides within its institutions and facilities.

By complying with the Court's order of April 11, 2012, and developing this plan to track, and provide parolees and inmates with a grievance process, the CDCR does not concede or assent that it has control over the County Jails. County Jails are operated under the authority of the County Sheriffs.

## DAILY JAIL LIST -

The CDCR will be responsible for sending an electronic message to the County's designee or legal counsel where a CDCR parolee has been newly booked.

CDCR will send notifications to impacted counties via a batch process to be disseminated daily at the same time each day, seven days a week.

The electronic notification will include, at minimum, for each Armstrong parolee:

a. Full name.
b. CDC number.
c. The CDCR Disability Placement Program (DPP) code and definition of the DPP Code.
d. Any housing accommodations as stated in DECS.
e. Any programming accommodations as stated in DECS.
f. Health Care Appliances.
g. Last release date from prison.

The CDCR automated process will allow for counties to reply via email. This will also allow for CDCR to become aware of electronic messages that are returned undeliverable.

PAROLE HOLDS IN COUNTY JAILS

As part of the Notice of Rights (NOR) process:

1. Current operating procedures for the NOR will remain in place. Parole/Notice Agents shall check Disability and Effective Communication System (DECS), review field file and source documents and determine if any reasonable accommodations are needed. All information will be documented in Section I on the Notice and Request for Assistance at Parole Proceeding BPH form 1073.

2. The parole/notice agent will ask the parolee to self-identify any disability needs related to housing and programming and will document the information in the "Other" field in Section II of the BPH 1073.

3. Within three business days, while informing the parolee of his/her Notice of Rights/Notice of Charges, the parole/notice agent shall provide a parolee identified as an Armstrong class member with a Reasonable Modification or Accommodation Request CDCR form 1824 and explain to the parolee that they may use that form as a grievance process if they are a person with a disability and are not receiving a housing or programming accommodation that they need in the County Jail.

   The parolee will also be provided a self-addressed/postage paid envelope (Business Reply Mail) to be used for sending a completed grievance form to the respective Regional ADA Unit.

   Parolees will be informed of and encouraged to use the local facility's grievance process in addition to CDCR's grievance process.

4. DAPO staff shall assist parolees in completing a CDCR form 1824 when the parolee is unable to complete the form on his/her own due to a disability. The parole/notice agent will forward the completed grievance form to their Regional ADA Unit within one business day of receipt.

5. DAPO staff shall inform County Jail staff about a need for an accommodation or possible medical or mental health examination, no later than four business days after a parolee's date of arrival at the county jail. Any notification given to county jail staff shall be documented on the Notice and Request for Assistance at Parole Proceeding BPH form 1073 and recorded in the DECS.

GRIEVANCES and their COLLECTION (CDC Form 1824)

Upon receipt of a CDCR 1824 grievance form, the notice/parole agent shall send the CDCR form 1824 to the Regional ADA Parole Unit within one business day.

The Regional ADA Parole Administrator shall ensure the grievance is entered into the DAPO tracking system and assigned to an ADA Unit staff member for a response. If the Administrator identifies the stated issue on the CDCR 1824 qualifies as an emergency, he/she shall ensure a response is completed within 5 calendar days. If the Administrator deems the CDCR 1824 is a non-emergency then he/she shall ensure a response is completed within 15 calendar days.

The Regional ADA Parole Administrator will ensure the grievance is forwarded as soon as possible and no later than three business days after receipt to the respective County's designee or legal counsel for subsequent notification to the County Jail housing the subject parolee.

1. For Armstrong class members who are scheduled to go "out to court" for more than three business days, the institutional Case Records staff will include a Request for Reasonable Modification or Accommodation Request CDCR form 1824 post card with the OTC packet at the prison facility where they are housed prior to be transferred out to court. The institution's Recieving and Release staff will give the post card to the inmate at the time of departure from the facility.

   The post card will be self-addressed/postage paid, with the return address for DAPO HQ – Parole Litigation Compliance Unit (PLCU) in Sacramento, CA.

The PLCU will verify the location of the inmate and notify the respective Regional ADA Unit, who will deploy a parole/notice agent to the jail to provide the inmate with necessary forms within three business days of receipt of the post card.

2. The parole/notice agent shall provide an inmate identified as an Armstrong class member with a Reasonable Modification or Accommodation Request CDCR Form 1824 and explain to the inmate that they may use that form as a grievance process if they are a person with a disability and are not receiving a housing or programming accommodation that they need in the County Jail.

3. DAPO staff shall assist inmates in completing a CDCR form 1824 when the inmate is unable to complete the form on his/her own due to a disability. The parole/notice agent will forward the completed grievance form to their Regional ADA Unit within one business day of receipt.

   The inmate will also be provided a self-addressed/postage paid envelope (Business Reply Mail) to be used for sending a completed grievance form to the respective Regional ADA Unit.

   Parolees will be informed of and encouraged to use the local facility's grievance process in addition to CDCR's grievance process.

4. DAPO staff shall inform County Jail staff about a need for an accommodation or possible medical or mental health examination, no later than four business days after the date of arrival at the county jail. Any notification given to county jail staff shall be documented.

5. The Division of Adult Institutions (DAI), Americans with Disabilities Act (ADA) Associate Warden (AW) will notify the Regional ADA Unit of the <u>Armstrong</u> class member's name, number, county where inmate will be housed, and date of departure within three business days of departure from the CDCR institution.

6. The DAI ADA AW will be responsible for notifying the County's legal counsel (or designee) of the inmate's out-to-court status and ADA information that impacts the housing and programming of the inmate, within three business days of departure from the CDCR institution. A copy of the notice sent to the County legal counsel (or designee) will then be forwarded to the Office of Legal Affairs, Class Actions Team– Attention: Armstrong Counsel, at CDCR Headquarters in Sacramento, and to the Plaintiff's counsel simultaneously.

CDCR form 1824's collected at the County Jail shall be sent to the Regional ADA Parole Unit for processing in accordance with this plan.

## EMERGENCY APPEALS

If any CDCR staff person becomes aware, whether through a hearing, notice service, or otherwise, that an Armstrong class member being housed in a County Jail has an urgent or emergent situation (i.e., if it alleges a condition which is a threat to the parolee's health or safety, or is necessary for participation or effective communication in a parole revocation proceeding) that person shall immediately notify the Regional ADA Parole Administrator, as well as the County's designee or Legal Counsel using contact information provided by the County's Legal Counsel.

The Regional ADA Parole Administrator shall respond to such a grievance within five calendar days of receipt and make their best efforts to ensure that necessary and reasonable accommodations are provided on an interim basis, and shall document their efforts on the CDCR 1824 form.

## PARAGRAPH 5 RESPONSES

If plaintiff's counsel raises concern regarding individual class members, those letters are to be sent simultaneously to the Office of Legal Affairs, Class Actions Team– Attention: Armstrong Counsel, at CDCR Headquarters in Sacramento, and to the respective county Legal Counsel.

With the assistance of the Regional ADA Parole Administrator, non-urgent issues will be addressed within 15 business days and urgent issues will be addressed within five business days.

PATTERNS OF ALLEGED MISCONDUCT OR DENIAL OF ADA ACCOMODATIONS

Each Regional ADA Parole Administrator shall review all CDCR 1824 grievances and determine if there is a pattern of denials of disability accommodations such as improper housing and/or denial of assistive devices to class members at a particular county jail facility.

If a pattern is discovered, the Regional ADA Parole Administrator must write to the County's Legal Counsel (or designee), within five days of discovery and provide the evidence alleged. The letter must be copied to plaintiff's counsel, care of the Office of Legal Affairs, Class Actions Team – Attention: Armstrong Counsel, at CDCR Headquarters in Sacramento.

The Regional ADA Parole Administrator shall assign one of their Parole Agent II, Supervisors to investigate the alleged deficiencies at the specific county jail. Such agent of CDCR shall audit and/or investigate the situation at the County Jail, to the extent possible, and determine what steps, if any, can be taken to remedy the situation. A written report shall be provided to the Office of Legal Affairs, Class Actions Team – Attention: Armstrong Counsel, at CDCR Headquarter in Sacramento.

ACCOUNTABILITY

Failure by CDCR staff to comply with any portion of this plan may result in employee referrals for accountability to a Supervisor and/or the Office of Internal Affairs for investigation. Parole Region and Institution employee accountability logs shall be used and maintained consistent with prior memorandums for documentation of employee accountability.

# CDCR ADDRESSES

**Office of Legal Affairs, Class Actions Team**
– Attention: Armstrong Counsel
1515 S Street, Rm 314S
Sacramento, CA 95811

**DAPO HQ – Litigation Compliance Unit**
1515 S Street, Rm 212N
Sacramento, Ca 95811

**Region 1**
**Regional ADA Unit**
9825 Goethe Road, Ste 200
Sacramento, CA 95827-2572

**Region 2**
**Regional ADA Unit**
1515 Clay Street, 10th Floor
Oakland, CA 94612-1499

**Region 3**
**Regional ADA Unit**
320 W. 4th Street, Suite 1000
Los Angeles, CA 90013-2489

**Region 4**
**Regional ADA Unit**
21015 Pathfinder Road, Suite 200
Diamond Bar, CA 91765-4002

# EXHIBIT D

**DIVISION OF ADULT PAROLE OPERATIONS**
**Roger Gold, Parole Administrator**
**9838 Old Placerville Road**
**Sacramento, CA 95827**

April 30, 2026

California Department of Corrections and Rehabilitation
Office of Legal Affairs
*Armstrong* Counsel
via Email

**REPORT ON LOS ANGELES COUNTY JAIL SYSTEM ACCOMMODATIONS FOR CLASS MEMBERS PURSUANT TO THE APRIL 11, 2012, *ARMSTRONG* COUNTY JAIL PLAN**

## INTRODUCTION

There are two circumstances in which a person under the jurisdiction of the California Department of Corrections and Rehabilitation (CDCR), (also referred to in this report as Defendants) will be housed in the Los Angeles County Jail (LACJ) system. For the purposes of this report, an Incarcerated Person (IP) is a person serving a prison commitment, and a Supervised Person (SP) is a person serving a parole supervision term.

First, Penal Code (PC) § 3000.08(g) specifically mandates parole revocations (except for persons under PC § 3000.1 and PC § 3000(b)(4)(B)) to be served in the county jail. PC § 3000.08(f) requires a parole revocation to be filed in the county of supervision or the county in which the violation occurred and allows the court to order a revocation to be served in county jail. PC § 3056(a) states that "*If a parolee is housed in a county jail, they shall be housed in the county in which they were arrested or the county in which a petition to revoke parole has been filed or, if there is no county jail in that county, in the housing facility with which that county has contracted to house jail inmates*." This same statute further states, "*When housed in county facilities, parolees shall be under the sole legal custody and jurisdiction of local county facilities. A parolee shall remain under the sole legal custody and jurisdiction of the local county or local correctional administrator, even if placed in an alternative custody program in lieu of incarceration, including, but not limited to, work furlough and electronic home detention. When a parolee is under the legal custody and jurisdiction of a county facility awaiting parole revocation proceedings or upon revocation, the parolee shall not be under the parole supervision or jurisdiction of the department*."

Second, in the case of an IP returned to LACJ for "out to court," in these situations the county is taking custody of an IP pursuant to a removal order. This removal order is issued by the court for a specific case and is a court order to Defendants and to the County Sheriff to cause the IP to appear for court. The authority for the "out to court" process is governed by PC §§ 1567 and 2620-2621.

**CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDERS**
In providing this response, neither CCHCS nor CDCR accepts plaintiffs' representation of the facts set forth in the advocacy letter and only provides an answer to the questions asked.

On April 11, 2012, the Court amended the *Armstrong* Permanent Injunction to include procedures for *Armstrong* class members being held in county jail facilities. The order required implementation of the County Jail Plan (the Plan), which contains procedures for CDCR to provide reasonable accommodations when IPs and SPs are held in a county jail. The plan included the requirement for each "Regional ADA Parole Administrator" to assign one of their Parole Agent II Supervisors to conduct an investigation to determine if there is "a pattern of denials of disability accommodations such as improper housing and/or denial of assistive devices to class members at a particular county jail facility" and to produce a written report to the CDCR Office of Legal Affairs.

During the past two years, *Armstrong* Plaintiffs (Plaintiffs) have made a number of allegations about potential discrimination in the LACJ based on class member interviews and reviews of document production. On September 8, 2025, the State of California, under Attorney General Rob Bonta, filed a new complaint (Los Angeles County Superior Court case 25STVC26152) against the Los Angeles County Sheriff's Department (LASD) and Los Angeles County Department of Health Services, Correctional Health Services (CHS). In summary, as it relates to the Plan, the complaint alleges LASD and CHS do not provide appropriate disability accommodations to persons incarcerated in the LACJ.

Effective September 29, 2025, pursuant to the Plan, the Division of Adult Parole Operations (DAPO), Parole Litigation Management Unit (PLMU), which is the successor to the "Regional ADA Parole Administrator," initiated an investigation independent of the complaint filed September 8, 2025, into the potential for a pattern of denials of disability accommodations to class members housed at the LACJ.

## I. INVESTIGATION METHODOLOGY

Under the Plan, class members are provided a process to make a request for a reasonable accommodation to DAPO while incarcerated in a county jail. Defendants determined the investigation process would be initiated when the class member submitted a CDCR Form 2275 that indicates a pattern of denial of accommodations. The methodology was as follows:

1. CDCR continued providing *Armstrong* class members access to the CDCR Form 2275 forms and stamped self-addressed envelopes within 3 business days of IP or SP's arrival at the LACJ. Upon request, DAPO will assist with completing the Form 2275. When DAPO receives a Form 2275, in accordance with current procedures, it contacts the LACJ Americans with Disabilities Act (ADA) representatives to obtain a response and then provides a response to the class member. This allows LACJ to address the request prior to further action by DAPO.

2. PLMU compares the Durable Medical Equipment (DME) item or accommodation request described in the Form 2275 to accommodation information found in CDCR records. If the Form 2275 requests an ADA accommodation currently provided by CDCR, as reflected in CDCR records, DAPO conducts a further inquiry by interviewing the class member to determine if they have received the accommodation and if so, when.

3. If the class member reports not receiving the accommodation, DAPO contacts the ADA staff at LACJ as well as the Los Angeles County Counsel's Office and requests a response.

This process was explained to Plaintiffs on September 25, 2025, and CDCR received no objections at the time. Additionally, this process was explained in a letter to the Los Angeles County Counsel (LACC) on October 3, 2025.

On February 17, 2026, LACC informed PLMU of its position on the release of medical information to PLMU. LACC stated, "*The County continues to urge the California Department of Corrections and Rehabilitation to obtain authorization that would permit the County to share the Personal Health Information ("PHI") of the individuals at issue in accordance with applicable law, including, but not limited to, the Health Insurance Portability and Accountability Act ("HIPAA"). Without such authorization, the County will not disclose the PHI of any individual to the CDCR, even if that information is directly responsive to the CDCR's Armstrong inquiries. At present, the CDCR has not identified an applicable HIPAA exception that would permit the County to disclose PHI in this matter.*"

Plaintiffs were notified of LACC's position on the release of medical information in Defendants' March 27, 2026, response to Plaintiffs titled "Follow Up to Paragraph 5 Letter Dated January 22, 2026, Regarding [redacted], [redacted]". LACC's position on the release of medical information resulted in limited responses by LACC to each of the class members' allegations listed below in Class Member Interviews. CDCR is unable to obtain waivers for the release of medical information from class members as they are represented by Plaintiffs. This position has been communicated to Plaintiffs multiple times.

## II. <u>CLASS MEMBER INTERVIEWS</u>

Each of the class members identified in this section submitted a CDCR Form 2275 alleging (in part) that a DME item and/or reasonable accommodation that was provided to them while in CDCR custody was not being provided to them while in LACJ custody. The allegation(s) on each CDCR Form 2275 are paraphrased and summarized for clarity in this report, as is the subsequent class member interview with DAPO staff. Only Form 2275s, which alleged an *Armstrong* accommodation previously provided by CDCR was not provided by LACJ, are reflected below.

The name and CDC number of each person is listed below, along with their Disability Placement Program or Developmental Disability Program class code, and status while in LACJ custody as either an Out to Court IP or an SP in custody for a parole violation. Class members transferred from a State Prison are required to be transferred to the County Jail with all DME.

**A. [redacted], [redacted] (DPM, Out to Court IP)**

On September 30, 2025, PLMU received a CDCR Form 2275 from [redacted] in which he alleged he was denied a walker, which was a DME item provided by CDCR. [redacted]'s Form 2275 is dated September 16, 2025. On October 3, 2025, he was interviewed by DAPO staff. During the interview, [redacted] claimed he had a walker in his possession when he was transferred to LACJ custody. He also claimed he asked LACJ staff for his walker. As of the date of the interview, he was still not in possession of a walker.

On October 15, 2025, LACC provided a response to [redacted]'s claim. LACC stated, "[redacted] *arrived at the Inmate Reception Center ("IRC") on September 11, 2025.* [redacted] *arrived with a walker which was held in his property by the Los Angeles County Sheriff's Department ("LASD"). All inmates entering the IRC are evaluated by a jail medical provider, including an assessment for assistive devices, if clinically indicated.* [redacted] *was seen by jail medical and outside providers multiple times throughout his time at the LACJ. He was provided appropriate care and referrals, as clinically indicated. According to LASD records, there were no orders for a walker or other mobility device.* [redacted] *was released from LACJ custody on October 7, 2025."*

[redacted]'s allegation was also included in Plaintiffs' December 5, 2025, report on 3rd Quarter 2025 Document Production.

**B. [redacted], [redacted] (DNH, Out to Court IP)**

On November 13, 2025, PLMU received a CDCR Form 2275 from [redacted] in which he alleged he was being denied hearing aids, medical care, and access to a CPAP machine. [redacted]'s Form 2275 is dated October 24, 2025. [redacted] was issued the following DME items by CDCR: Hearing Aid, Abdominal Binder, Back Braces, Non-invasive Airway Assistive Devices - CPAP Machine, Electrical Access [for CPAP], Hearing Impaired Disability Vest, Incontinence Supplies, Night Guard, Therapeutic Shoes/Orthotics. [redacted] also requested placement in a housing unit with a job opportunity and access to programming.

On November 18, 2025, he was interviewed by DAPO staff. During the interview at LACJ, [redacted] confirmed he had the following items: Hearing Aid, Abdominal Binder, and Non-Invasive Airway Assistive Devices – CPAP Machine with an Electrical Access for the CPAP. [redacted] claimed he was not in possession of the following: Back Braces, Hearing Impaired Disability Vest,

Incontinence Supplies, Night Guard, and Therapeutic Shoes/Orthotics. [redacted] claimed he asked LACJ staff for the missing items.

On December 11, 2025, LACC provided a response to [redacted]'s claims. LACC stated, "[redacted] *arrived at the Inmate Reception Center ("IRC") on September 17, 2025. All inmates entering the IRC are evaluated by a jail medical provider, including an assessment for assistive devices, if clinically indicated.* [redacted] *has been seen by jail medical providers multiple times throughout his time at the LACJ. He was provided with appropriate care and referrals, including those responsive to your November 18, 2025, email.* [redacted] *is currently housed in Medical Outpatient Specialty Housing located at Men's Central Jail.*"

On April 20, 2026, PLMU received a supplemental response from LACC, which stated, in part, "*…Subsequent to counsel's initial response,* [redacted] *has executed a written consent permitting Correctional Health Services to disclose his personal medical information in order to respond to your inquiry.*

[redacted] *arrived at the Inmate Reception Center ("IRC") on September 17, 2025. All inmates entering the IRC are evaluated by a jail medical provider, including an assessment for assistive devices, if clinically indicated.* [redacted] *has been seen by jail medical providers multiple times throughout his time in custody at the Los Angeles County Jail (the "LACJ"). At the time of his arrival,* [redacted] *was noted as wearing an abdominal binder, however, he was unaware of his CPAP settings. An order for medications and an abdominal binder was placed, and* [redacted] *was placed in line for CPAP evaluation.*

*On October 5, 2025,* [redacted] *submitted a Health Service Request ("HSR") asking for stomach hernia surgery, a CPAP machine, hearing aid batteries, and orthopedic shoes. Staff addressed the HSR the next day.* [redacted] *stated that he had been seen for the CPAP machine and orthopedic shoes but wanted to be seen about his hernia concern. On October 7 and October 9,* [redacted] *submitted two additional HSRs requesting a CPAP machine, stomach hernia care, a back brace, and hearing aid batteries. Between October 10, 2025, and October 17, 2025, staff addressed the two HSRs by scheduling an appointment for* [redacted] *with a primary care provider and ordering hearing aid batteries. On October 17, 2025,* [redacted] *received a CPAP machine and an abdominal binder. On October 20, 2025,* [redacted] *saw a provider and made no complaints. He was discharged to Medical Outpatient Specialty Housing ("MOSH") for CPAP in Men's Central Jail. On October 30, 2025,* [redacted] *received new hearing aid batteries. By November 26, 2025,* [redacted] *had been placed on primary care provider line for evaluation for durable medical equipment and subsequently received incontinence supplies, a night guard, and a back brace.*

*On February 19, 2026, a provider ordered orthopedic shoes to be obtained from [redacted]'s property, however, IRC staff found that there were no orthopedic shoes in the property. IRC staff informed [redacted] how to obtain orthopedic shoes from home. On March 19, 2026, [redacted]'s family brought orthopedic shoes, and they were delivered to him. Please note, there is no record of [redacted] requesting a "hearing impaired disability vest" while in custody at the LACJ. [redacted] is still in custody and is currently housed at MOSH with access to a CPAP machine."*

**C. [redacted], [redacted] (DLT, Supervised Person)**

On November 18, 2025, PLMU received a CDCR Form 2275 from [redacted] in which he alleged he was being denied a wheelchair and eyeglasses. This form was completed on [redacted]'s behalf by DAPO staff when [redacted] was served his Notice of Charges for his parole violation. The form was completed on November 7, 2025. [redacted] was not issued a wheelchair as DME while in CDCR custody but did have glasses while in CDCR custody.

On December 9, 2025, [redacted] was interviewed by DAPO staff. Regarding his eyeglasses, [redacted] said that during his first week in custody LACJ deputy notified [redacted] that the deputy had [redacted]'s glasses; however, due to his supervision level in the jail, he could not have them. At the time of his interview, [redacted] was being housed in a "High Observation Mental Health Treatment" area, which indicates access to his glasses may have been restricted for safety reasons.

On February 17, 2026, LACC provided a response to [redacted]'s claims. LACC stated, "[redacted] *arrived at the Inmate Reception Center ("IRC") on or about November 4, 2025. All inmates entering the IRC are evaluated by a jail medical provider, including an assessment for assistive devices, if clinically indicated. As your office is likely aware, safety and security issues related to specific inmates at times may pose obstacles in completing their related property orders.*

*At the time of his arrival, [redacted] did not possess a mobility device. He was seen by jail medical providers during his time at the LACJ and provided with appropriate care and referrals, including with respect to any mobility and visual concerns raised in your January 22, 2026, email. During his time in custody, he did not file any grievances with LASD related to the allegations raised in your e-mail. LASD is in receipt of your e-mail containing the November 19, 2025, CDCR 2275-CJ Form by [redacted]."*

**D. [redacted], [redacted] (DPM, DNH, Out to Court IP)**

On December 17, 2025, PLMU received a CDCR Form 2275 from [redacted] in which he alleged he was being discriminated against by not being provided effective communication for his hearing impairment. Wright's Form 2275 was dated October 26, 2025.

On December 29, 2025, [redacted] was interviewed by DAPO staff. During his interview, [redacted] claimed he was in possession of his hearing aids when he transferred to LACJ custody. [redacted] said he was still in possession of the hearing aids at the time of the interview; however, they "stopped working" about a month and a half prior. [redacted] said he has not been denied access to anything in the jail due to lack of access to effective communication. [redacted] also said he had asked for assistance from jail staff at least once per week to get his glasses, orthopedic shoes, and a walker, which were transferred to LACJ with him.

On February 17, 2026, LACC provided a response to [redacted]'s claims. LACC stated, "[redacted] *arrived at the Inmate Reception Center ("IRC") on or about September 23, 2025. All inmates entering the IRC are evaluated by a jail medical provider, including an assessment for assistive devices, if clinically indicated.* [redacted] *has been seen by jail medical providers multiple times throughout his time at the LACJ, including for the substance of the present allegations as described in your January 22, 2026, e-mail. At the time of his arrival,* [redacted] *did not possess eyeglasses. He was provided with appropriate care and consultations and informed of the procedures for obtaining orthopedic shoes that satisfy applicable security concerns for a jail setting and eyeglasses.* [redacted] *is currently housed in Men's Central Jail. He had not previously submitted any health service requests or grievances for issues related to hearing aids. LASD is in receipt of your e-mail containing the December 17, 2025, CDCR 2275-CJ Form by* [redacted]*.*"

**E. [redacted], [redacted] (DNM, Supervised Person)**

On January 20, 2026, PLMU received a CDCR Form 2275 from [redacted] in which he alleged he was denied reading glasses. [redacted]' Form 2275 is dated December 25, 2025.

On January 29, 2026, [redacted] was interviewed by DAPO staff. During his interview, [redacted] claimed that he was in possession of his reading glasses when he arrived to LACJ and that they were removed by LACJ staff at the time of his booking. [redacted] also stated he had not been provided any alternate method of accommodation (such as a page magnifier). [redacted] stated his reading glasses were tinted and may have been mistaken by LACJ staff for sunglasses.

On April 22, 2026, LACC provided a response to [redacted]'s claims. LACC stated, "[redacted] *arrived at the IRC on or about December 15, 2025. All inmates entering the IRC are evaluated by a jail medical provider, including an assessment for assistive devices and medical appliances, if clinically indicated.*

*In response to the CDCR notification for [redacted], on December 18, 2025, an obtain from property order was issued for glasses. However, [redacted] did not possess glasses in his property and therefore LASD provided him information on how to obtain this item from home. Additionally, [redacted] was provided with appropriate care, including appointments with appropriate providers, if needed. [redacted] submitted one HSR related to the underlying allegation, which was addressed appropriately via care or referrals. On January 21, 2026, the County received a 2275 notice regarding [redacted]' request for reading glasses. This notice was processed as a grievance and [redacted] was provided with a timely response. [redacted] was released from custody on February 23, 2026.*

*As [redacted] has not executed a written release form authorizing the County to share his protected health information, no further information can be disclosed in response to your inquiry."*

**F. [redacted], [redacted] (DPO, Out to Court IP)**

On January 21, 2026, PLMU received a CDCR Form 2275 from [redacted] in which he alleged he was denied his orthopedic shoes, back brace, and wheelchair. [redacted]'s Form 2275 is dated December 19, 2025. On January 28, 2026, PLMU received an additional CDCR Form 2275 from [redacted] in which he alleged he was denied his DME, did not have access to a wheelchair, and was not being housed in an ADA compliant cell.

[redacted]'s allegation was also included in a Paragraph 5 Letter submitted by Plaintiffs on March 23, 2026, and Plaintiffs' March 23, 2026, report on First Quarter 2026 Class Member Interviews at LACJ.

On January 29, 2026, [redacted] was interviewed by DAPO staff. During this interview, [redacted] stated he was in possession of his orthopedic shoes, back brace, and wheelchair when he was transferred to LACJ. [redacted] said he was allowed to keep his back brace and wheelchair and was given a mobility vest and that those had not been removed. [redacted] said he still needed his orthopedic shoes, which he requested from LACJ staff. DAPO staff were informed by LACJ staff that orthotics sometimes have shoestrings on them, and for safety reasons, such orthotics are not allowed in the housing unit.

On February 24, 2026, [redacted] was interviewed again by DAPO staff regarding the second CDCR Form 2275 he submitted. [redacted] stated he still did not have his orthopedic shoes; however, he understood that it was due to the shoes having laces. [redacted] also stated he now had his wheelchair and was being housed in an ADA cell.

On April 22, 2026, LACC provided a response to [redacted]'s claims. LACC stated, "*Custody records indicate [redacted] arrived at the IRC on December 11, 2025. All inmates entering the IRC are evaluated by a jail medical provider, including an assessment for assistive devices, durable medical equipment, and medical appliances, if clinically indicated. [redacted]'s personal property included a pair of boots with shoelaces which were removed and stored by custody. Under CDM 6-07/010.00, Inmate Searches, shoelaces must be "removed and placed in the inmate's property" to eliminate the risk of the laces being used as ligatures. [redacted] has been seen by medical personnel and specialty providers throughout his time at the LACJ and provided with appropriate care and referrals. He was issued orthopedic shoes on April 14, 2026.*"

**G. [redacted], [redacted] (DNM, Out to Court IP)**

On January 28, 2026, PLMU received a CDCR Form 2275 from [redacted], in which he alleged he was denied knee braces, orthotics/therapeutic shoes, diabetic supplies, and a mobility impaired vest. [redacted] also asked for a CPAP machine, which was not a DME item provided to him while in CDCR custody. [redacted]'s Form 2275 is dated August 29, 2024. [redacted] was transferred to LACJ custody on August 9, 2024.

On February 5, 2026, [redacted] was interviewed by DAPO staff. [redacted] said he was in possession of his knee braces and shoes when he was transferred to LACJ custody. [redacted] received his knee braces, but not his shoes. [redacted] said he had asked LACJ staff for those items. At the time of the interview, [redacted] was housed in a high security setting with restrictions on shoes with laces.

On April 22, 2026, LACC provided a response to [redacted]'s claims. LACC stated, "[redacted] *is currently housed in diabetic housing in the Medical Outpatient Specialty Housing ("MOSH") located at Men's Central Jail ("MCJ"). [redacted] has been seen by medical personnel and provided with appropriate care and referrals, including for issues set forth in your email, throughout his time at the LACJ. On January 28, 2026, the County received a 2275 request regarding [redacted] which was processed as a grievance. A timely response was provided to [redacted], including appropriate care and referrals. He received a cane on February 9, 2026. The LACJ does not utilize mobility impaired vests.*"

**H. [redacted], [redacted] (DNM, Supervised Person)**

On February 10, 2026, PLMU received a CDCR Form 2275 from [redacted] in which he alleged he was denied lower bunk access, orthotic shoes, knee braces, and eyeglasses. [redacted] also requested mental health care.

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDERS

On February 24, 2026, [redacted] was interviewed by DAPO staff. [redacted] said he was not in possession of his orthotic shoes, knee brace, or eyeglasses. [redacted] said he had asked LACJ staff for those items.

On April 22, 2026, LACC provided a response to [redacted]'s claims. LACC stated, "[redacted] *arrived at the IRC on December 16, 2025. All inmates entering the IRC are evaluated by a jail medical provider, including an assessment for assistive devices, durable medical equipment, and medical appliances, if clinically indicated. On February 10, 2026, the County received a 2275 request regarding* [redacted] *which was processed as a grievance. A timely response was provided to* [redacted]*. He received appropriate care and referrals in response to this grievance. Additionally, custody records indicate* [redacted] *received an order to obtain glasses from home on February 12, 2026. Custody personnel met with* [redacted] *on February 16, 2026, to inform him how to obtain this item and what is allowed."*

**I. [redacted] (DPM, Supervised Person)**

On March 24, 2026, PLMU received a CDCR Form 2275 in which [redacted] alleged he was denied a cane. [redacted] also requested 5mg Haldon and 5000mg Vitamin D.

On April 1, 2026, [redacted] was interviewed by DAPO staff. [redacted] said he was not in possession of his cane when he was booked into LACJ. [redacted] said he had not been provided a cane since booking; however, he acknowledged he was being housed on a "mental health floor" and believed he may not have a cane due to safety restrictions. [redacted] said he had asked staff for a cane.

On April 22, 2026, LACC provided a response to [redacted]'s claims. LACC stated, "[redacted] *arrived at the IRC on March 20, 2026, and was released on April 14, 2026. All inmates entering the IRC are evaluated by a jail medical provider, including an assessment for assistive devices, durable medical equipment, and medical appliances, if clinically indicated. On March 24, 2026, the County received a 2275 request regarding* [redacted]*'s request for a cane and medication. A grievance was submitted regarding these issues and was timely addressed by medical personnel."*

## III. <u>INTAKE, SCREENING, AND REQUEST PROCESS IN THE LOS ANGELES COUNTY JAIL SYSTEM</u>

On February 9, 2026, LACC agreed to respond in writing to questions regarding the medical screening and evaluation process at LACJ. On February 11, 2026, this writer submitted a list of ten (10) questions. On February 27, 2026, this writer received a response from Natasha Mosely,

Deputy County Counsel, Health Services Division. The questions are detailed below, with Ms. Mosely's response in *italic* beneath each question.

**1:** After a person enters the Los Angeles County Jail (LACJ) system, when does a screening for disabilities and potential accommodations occur?

**Response**: *A medical and mental health screening occurs during intake in the Inmate Reception Center (IRC).*

**1(a):** What does the screening consist of and who completes it?

**Response**: *The medical and mental health screening is completed by CHS nursing personnel. The screening is documented in the patient's electronic medical record (EMR). Please see attached document* [Attachment A: Intake Screening Screenshots] *with screenshots that show what the screening consists of. The screening process was developed by CHS with input from the federal DOJ and designed to address any issues or identify factors related to medical and mental health needs, including disabilities and accommodation needs.*

**1(b):** Is a screening for disabilities separate from a medical screening conducted during intake/booking?

**Response**: *No, this is part of the medical and mental health screening.*

**1(c):** During the screening, is there ever an opportunity for the person to decline an accommodation (such as a person saying they do not want a wheelchair, ADA housing, etc.?).

**Response**: *Yes.*

**2:** For persons booked into LACJ on a parole hold or an Out-to-Court transfer from CDCR, is information from the CDCR Email [refer to Attachment E, Sample DECS notice redacted, for a sample of this notification] notice given to staff who complete the screening?

**Response**: *The medical and mental health screening is completed before the LASD ADA compliance team receives email notification from CDCR.*

**3:** When a person is booked into LACJ, are they informed of the request and grievance process at the time of booking?

**Response**: *Yes, individuals are informed of this in several different formats. At the IRC, there is a video played on a loop entitled "ACLU Jail Video-May 2025" which includes information about*

*grievances and requests. Additionally, every roll of clothing, which is provided to most individuals at reception, includes a four page "Guide Through Custody Los Angeles County Jail"* [refer to Attachment B Guide Through Custody Los Angeles County Jail] *which includes information about grievances and requests. Additionally, there is signage throughout the facilities advising individuals about grievance timelines.*

**4:** If the email from CDCR is received after the screening is complete, does anyone review that email and determine if there are any significant differences or a need to re-screen?

**Response:** *Based on a process implemented in October 2025, in conjunction with LASD, CHS evaluates and responds to notifications for Armstrong class members, which includes reviewing the patient's needs to ensure they continue to receive appropriate accommodations following the initial medical and mental health screening.*

**4(a):** If there is a need to re-screen, what occurs and when?

**Response:** *This is determined on a case-by-case basis. Whether or not there is a need to re-screen depends on specific factors, including the nature of the request, and/or the patient's medical needs as assessed by a CHS provider.*

**5:** After the initial screening, is there any other regularly scheduled review for accommodations or is it dependent upon the person submitting a request for an accommodation?

**Response:** *Any patient encounter with a CHS provider would include an overall assessment of the patient (based on examination, taking patient's history, and/or evaluation of the patient's current condition), sufficient to identify patient medical conditions requiring durable medical equipment (DME), medical supplies, or other medically necessary accommodations that are provided or prescribed by CHS providers. Accordingly, following the initial assessment at IRC intake, patients are assessed in the normal course of their care and treatment. Finally, as described below, patients are assessed following submission of a Health Service Request Form (HSRF)* [Refer to Attachment C Health Request Form]. *LASD regularly schedules inspections to ensure wheelchairs are in proper working condition and that braille and audio books are available at Twin Towers Correctional Facility (TTCF), Men's Central Jail (MCJ), and Century Regional Detention Facility. Individuals needing additional custody related accommodations can request them through the grievance or request process.*

**5(a):** If a person submits a request, is it tracked, and if so, can you include a general explanation of the tracking/logging process?

**Response**: *HSRFs are scanned and documented in the patient's EMR. CHS nursing staff review HSRFs and patients are referred for a nursing assessment or referred for medical services with other appropriate provider(s), based on medical need. CHS personnel document actions taken on HSRFs in the EMR.*

**6:** If the LASD ADA unit is notified by a Parole Agent via email of a person who expressed a need for an accommodation to the Parole Agent, what is the LASD/LACJ/CHS process?

**Response**: *The LASD ADA unit receives and documents accommodation requests. If such a request requires input or action by CHS, CHS evaluates the request, reviews the patient record, and plans for appropriate follow up.*

**7:** When LASD/CHS receives a CDCR 2275 or a notice from Parole about a Paragraph 5 letter or allegation from *Armstrong* Plaintiff's Counsel, what is the process?

**Response**: *Effective January 1, 2026, 2275 notices and allegations set forth in Paragraph 5 letters are treated as grievances and entered into the Custody Inmate Grievance System (CIGA) with a response provided directly to the inmate.*

**8:** What criteria is used to determine when a person should receive any of the following: Walker? Cane? Wheelchair? Lower bunk?

**Response**: *For DME, such as walkers, canes, and wheelchairs, there is no set criteria that applies to all patients and the determination of whether DME is medically necessary will depend on the patient's condition and specific medical needs, as assessed by the CHS provider when evaluating the patient.*

**9:** Are certain LACJ facilities designated for specific accommodations (for example, housing all hearing-impaired males in one facility)?

**Response**: *There are dedicated housing modules for the intellectually disabled, hearing impaired, vision impaired as well as wheelchair users. Specifically, Modules 232 and 272 of TTCF as well as the Medical Outpatient Specialty Housing (MOSH) modules at MCJ are the designated ADA housing areas.*

**10:** If Durable Medical Equipment (such as a walker, wheelchair, hearing aids, cane, etc.) is provided to a person while in LACJ custody and that person is released to the community, do they retain that DME? If some items are retained and some are not, which ones are released with the person and which ones are retained by LACJ?

**Response**: *Patients retain DME at the time of release. Not applicable* [response to second question].

On April 23, 2026, LACC provided the Clinical Services Policy 61.16, titled Sensory Impaired (Vision, Hearing, Speech) Identification and Housing (Attachment F, Clinical Services Policy 61.16). Regarding issuance of hearing aids, LACC stated in writing that, "*The jail primary care provider refers the patient to ENT for initial evaluation. If hearing aids are needed, the patient is referred to the hospital for an audiology consult. Once a recommendation is made by ENT and audiology for hearing aids, CHS enters the order. An outside vendor is used to fabricate the hearing aids*."

Based on LACC's statement and the policy, the audiology consult is provided by a specialty clinic at the University of Southern California Medical Center.

## IV. CONCLUSION

DAPO staff interviewed 9 class members who claimed they were not receiving the same (or similar) Durable Medical Equipment and/or accommodations at LACJ which they received while in Defendants' custody. Based on the class member interviews and LACC responses for each class member, a review of LACC's responses in Section III above, and a review of the screenshots in Attachment A, it appears Defendants and LACJ utilize different care models and standards when determining reasonable accommodations.

In Section III, Questions 5 and 8 above, regarding criteria for DME including walkers, wheelchairs, and lower bunks, LACC referenced "medical necessity" or "medically necessary." This indicates the need for reasonable accommodation(s) at LACJ is evaluated based on a medical necessity standard. Medical necessity means LACJ staff evaluate the need for an accommodation to assist with an injury or illness. In the context of disability accommodations, Defendants evaluate the need for DME based on a reasonable accommodation standard. This means DME intended as a reasonable accommodation is provided to ensure equal access to programs, services and activities. For example, an IP may be issued a walker or cane while in Defendants' custody to enable them to access all areas of the institution on their own, even though they may not have an active injury or illness. Based on LACC's response, there does not appear to be an assessment for reasonable accommodations separate from a medical evaluation.

The LACC's position on release of medical information to Defendants makes it difficult to draw further conclusions on LACJ's criteria for medical necessity. Defendants are willing to facilitate meetings between LACC, Defendants, and Plaintiffs to mitigate or resolve the issues surrounding release of medical information.

During this investigation and Defendants' regular interactions with LACJ and LACC staff as a result of *Armstrong Remedial Plan* requirements, LACJ reported the following changes to their processes for IPs and SPs in LACJ custody:

1. Beginning in October 2025, LACJ medical staff review each CDCR email notification and determine if there is a need to re-evaluate the IP or SP. This statement indicates LACJ is reviewing these notices and, at a minimum, triggering an internal review of the intake screening.

2. Beginning January 2026, requests submitted to LACJ from PLMU staff upon receipt of a CDCR Form 2275 from an IP or SP, or from Plaintiffs' Counsel on a Paragraph 5 letter, are entered into the LACJ internal grievance tracking system. The response is sent directly to the IP or SP. This statement indicates that, at a minimum, at least the IP or SP is notified of the outcome of their request and can elevate that request in the internal grievance system.

3. Beginning January 2026, LACJ agreed to allow the internal grievance forms to be available in the office at Men's Central Jail where DAPO staff conduct Notice of Charges. This is the location where the majority of *Armstrong* class members in LACJ custody are served.

Based on the first investigative period, it is currently difficult to make final conclusions on the primary focus in the County Jail Plan, which is whether or not there "is a pattern of denials of disability accommodations such as improper housing and/or denial of assistive devices". Therefore, DAPO recommends the following steps:

1. Provide this report to LACC.

2. 60 days after provision of this report, conduct another set of interviews for a six-month period as described in Methodology; however, this set will include both class members that submit a CDCR Form 2275 and a reasonable amount of class members identified in Paragraph 5 Letters submitted by Plaintiffs during the next investigative period. The 60-day waiting period is strongly recommended to give LACC and LACJ time to determine if any changes are needed.

## V. <u>LIST OF ATTACHMENTS</u>

Attachment A: Intake Screening Screenshots
Attachment B: Guide Through Los Angeles County Jail
Attachment C: Health Request Form

Attachment D: Inmate Grievance Form
Attachment E: Sample DECS notice redacted
Attachment F: Clinical Services Policy 61.16

Respectfully submitted,

DocuSigned by:
Roger Gold
5F7461AF00FD49F...
4/30/2026

Roger Gold
Parole Administrator, Parole Litigation Management Unit
Division of Adult Parole Operations

# EXHIBIT E

CALIFORNIA
DEPARTMENT OF JUSTICE

**Rob Bonta**
**Attorney General**

1300 I STREET, SUITE 125
SACRAMENTO, CA 95814

Public: (916) 445-9555
Telephone: (916) 210-6332
Facsimile: (916) 324-5205
E-Mail: Olena.Likhachova@doj.ca.gov

July 10, 2026

Benjamin Bien-Kahn
Rosen Bien Galvan & Grunfeld LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
*Via e-mail only to* bbien-kahn@rbgg.com

RE: June 4, 2026 Demand Letter Regarding Class Members at Los Angeles County Jails
*John Armstrong, et al. v. Newsom, et al.*
USDC, N.D. Cal., Case No. 4:94-cv-02307-CW (PC)

Dear Ben:

I am writing in response to Plaintiffs' June 4, 2026 demand letter related to the Los Angeles County Jail System (Pls.' Letter). Defendants appreciate Plaintiffs' acknowledgment that Defendants are complying with the procedural and notice requirements of the Los Angeles County Jail Plan[1] (Plan), which outlines CDCR's obligations to *Armstrong* class members housed in county jails. *See* Pls.' Letter at 2.

Defendants' obligations under the Plan were extensively negotiated among the parties, approved by the court, and affirmed by the Ninth Circuit. ECF No. 2193; *Armstrong v. Brown*, 732 F.3d 955 (9th Cir. 2013). Pursuant to the Plan, Defendants are required to: (a) review all CDCR 1824 grievances to determine if there is a pattern of denials of disability accommodations such as improper housing or denial of assistive devices at a particular county jail facility; (b) upon discovery of a pattern, write to the County's Legal Counsel (or designee) and provide the evidence alleged; (c) assign one of the Parole Agent II Supervisors to investigate the alleged deficiencies at the specific county jail; (d) determine what steps, if any, can be taken to remedy the situation; and (e) provide a written report to CDCR Office of Legal Affairs. *See* Attachment 1 at 7.

Plaintiffs contend that Defendants are required to "transfer [a] class member to a facility that is able to provide accommodations" and remedy accommodation denials by issuing "monetary fines and penalties for continued violations." Pls.' Letter at 5. Not so. That specific relief came from the Court's 2009 and April 2012 orders. ECF Nos. 1587 and 2034. The Ninth Circuit struck down the relief in the 2009 order. *See Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1073-74 (9th Cir. 2010). And the Court's August 2012 orders, which include the operative Plan, superseded and rendered moot the April 2012 orders. *Armstrong v. Brown*, 732 F.3d 955, 963, 962 n.9 (9th Cir. 2013) (dismissing Defendants' appeal of the Court's April 2012 orders at

[1] A copy of the Plan is included with this letter as **Attachment 1.**

ECF No. 2039 as moot and explaining, "[o]n this appeal, we review only the August 28 orders because they supersede the April orders, which are now moot.") In fact, in affirming the August 2012 orders, the Ninth Circuit emphasized that those "orders do not require that defendants compel the counties to do anything; nor do the orders require any kind of punitive or coercive action on the part of defendants if county officials fail to comply with their state and federal duties." Rather, they contain only "minimal measures, consisting largely of notifications, collection of data, and reports to county officials" which "respect California's division of authority." *Id*. at 962.[2]

The demands outlined in Plaintiffs' letter are best addressed in different forums. First, the demands relating to physical access should be addressed through the Los Angeles County Office of the Inspector General (LAC OIG), the court-appointed monitor in *Johnson, et al. v. Los Angeles County Sheriff's Dept.*, No. 2:08-cv-03515-MWF-Ex (C.D. Cal.). *Johnson* is a class action lawsuit, currently in the remedial phase, which governs "all present and future detainees and inmates with mobility impairments who, because of their disabilities, need appropriate accommodations, modifications, services, and/or physical access in accordance with federal and state disabilities laws." *Johnson* at ECF No. 222-1 (settlement agreement). The *Johnson* settlement agreement aims "to ensure that [Los Angeles County] Defendants provide Class Members with non-discriminatory and meaningful access to programs, services, and activities available to non-mobility impaired inmates in all Jail Settings." Therein, LA County agreed to provide class members equal access to programming; physical therapy and outdoor recreation; physically accessible housing, including expansion and construction of ADA compliant housing; and reasonable accommodations, including lower bunks, shower benches, and mobility accommodations. *Id.*

Second, the Office of the Attorney General's complaint for injunctive and declaratory relief against Los Angeles County and its Sheriff's Department already seeks the relief pursued by Plaintiffs, including preventing LACJ and its employees from "discriminating against and failing to provide reasonable accommodations for incarcerated persons with disabilities and failing to ensure equal access to programs, services, and activities for incarcerated persons with disabilities." *See* Los Angeles County Superior Court, Case No. 25STCV26152.

Notwithstanding the above, Defendants respond to Plaintiffs' demands as follows:

/ / /

/ / /

---

[2] In the interest of brevity, Defendants have not included a detailed correction of every assertion in Plaintiffs' 19-page demand letter. This should not be construed as a concession, agreement, or acceptance of Plaintiffs' characterizations of relevant facts or legal authority.

## I. Plaintiffs' Demand No. 1:

Within 30 days, negotiate and obtain a protective order with Los Angeles County (LAC) to permit information sharing of class members' health information and subpoena class members' medical records if LA County refuses to enter into a protective order.

**Defendants' Response**:

CDCR will attempt to negotiate a protective order for production of class members' medical records held in LACJ custody. However, there is nothing preventing Plaintiffs from issuing their own subpoena for production of their clients' medical records. Plaintiffs could also obtain waivers from their clients by mail when counsel is informed of a class member's transfer to LACJ via regular e-notice.

## II. Plaintiffs' Demand No. 2:

Proactively review 2275-CJ grievances and Plaintiffs' advocacy letters and reports to identify whether any class member housed at LACJ is not receiving required disability accommodations and take immediate steps with county jail staff to ensure accommodations are promptly provided.

**Defendants' Response**:

Defendants already proactively review 2275-CJ grievances, Plaintiffs' advocacy letters, and reports to identify whether any class member housed at LACJ is not receiving required accommodations.

Generally, Defendants follow three processes to address issues that arise with accommodations. First, if during a Notice Serve, a Notice Agent becomes aware that a class member is missing accommodation, the Agent notifies LACJ staff and documents the notice on a Form 2271. Second, if CDCR is notified about an alleged missing accommodation through a Form 2275-CJ, CDCR contacts the designated staff at LACJ. LACJ logs the issue in its internal grievance system and provides a response to CDCR. The response is sent back to the class member via a Form 2267. Lastly, if CDCR is notified about an alleged missing accommodation through a Paragraph 5 letter, CDCR contacts LACC, who provides a response. Additionally, although not required by the Plan, upon learning of an accommodation issue, Defendants contact LACC or LACJ to help ensure class members receive their required accommodation(s).

## III. Plaintiffs' Demand No. 3:

Transfer class members away from LACJ if they are denied required disability accommodations even after Defendants take steps with county jail staff to try to ensure accommodations are promptly provided.

**Defendants' Response**:

Defendants lack the authority to transfer class members away from LACJ. There are two

ways a class member is placed in LACJ: a parole violation or a required state court appearance—neither is discretionary.

First, when a supervised person is arrested for a suspected parole violation in Los Angeles County, their placement is determined by statute, not DAPO, and they are booked into the LACJ system pending further action. *See* Cal. Pen. Code § 3056(a) (requiring detention at the county jail in which a supervised person is arrested). If DAPO declines to file a parole revocation petition, the § 3056 hold is removed and—if there are no other charges—the supervised person is released back into the community. If a parole revocation petition is filed, the hold is converted to a Penal Code § 3000.08(f) hold pending adjudication of the violation by the Superior Court. LACJ maintains sole legal custody of supervised persons housed in its facilities during this process, who are not under the supervision or jurisdiction of DAPO. Cal. Pen. Code § 3056(a).

Second, class members who are ordered to appear at state court proceedings within LA County are transferred to LACJ pursuant to court orders. *See* Cal. Pen. Code §§ 2620-2621. CDCR has no authority to refuse such orders, which require it to relinquish custody of class members to counties for court proceedings. *Id.* CDCR's compliance with orders issued under the Penal Code is mandatory. *See* CDCR Department Operations Manual (DOM) § 73040.6.

## IV. Plaintiffs' Demand No. 4:

Impose monetary fines and penalties against LACJ for continued violations of class members' rights.

**Defendants' Response**:

The Ninth Circuit's order was clear—the Plan "respect[s] California's division of authority" and does not "require any punitive or coercive action on the part of defendants if county officials fail to comply with their state and federal duties." *See Armstrong v. Brown*, 732 F.3d at 963. Moreover, CDCR lacks any regulatory or statutory authority to impose fines or penalties against LACJ, or any other county.

## V. Plaintiffs' Demand No. 5:

Conduct an inventory of LACJ's accessible housing with a CASp expert in order to determine what remediation is needed to existing ADA housing and whether there is adequate accessible housing to meet the needs of class members whom Defendants house at LACJ.

**Defendants' Response**:

Physical accessibility of LACJ's housing is subject to the *Johnson, et al. v. Los Angeles County Sheriff's Department* settlement agreement and compliance monitoring by the LAC OIG. *See Johnson* settlement agreement, ECF No. 222-1 at 8-10; and *see* OIG's Tenth Implementation Status Report, ECF No. 293 at 53-55. Defendants suggest Plaintiffs refer this demand to the LAC OIG.

## VI. Plaintiffs' Demand No. 6:

Demand that LACJ improve or obtain elevator and escalator repair contract(s) to ensure elevators and escalators are operable so that class members are not denied equal access to yard, medical appointments, visiting, court, and other programs, services, and activities at LACJ because of a disability.

**Defendants' Response**:

Defendants will request that LACJ ensure that class members who need to use an elevator or escalator to access LACJ programs, services and activities, are accommodated if or when elevators or escalators are inoperable or undergoing maintenance or repairs. However, programming, accommodations, and physical accessibility of LACJ's housing for mobility impaired class members are covered by the *Johnson, et al. v. Los Angeles County Sheriff's Department* settlement agreement and are subject to compliance monitoring by the LAC OIG. *See Johnson* settlement agreement, ECF No. 222-1 at 6 (programming), 8-10 (physical accessibility), 14 (accommodations).

Defendants note that no 2275-CJ forms submitted by class members at LACJ since January 1, 2025, grieve issues related to the operation of LACJ's elevators or escalators. The same is true for Plaintiffs' paragraph 5 advocacies sent to Defendants since January 1, 2024.

## VII. Plaintiffs' Demand No. 7:

Demand that LACJ ensure that all DME transferred with class members who are out-to-court from CDCR are provided to them for use in LACJ, and create a mechanism to send to LACJ any prescribed DME that was not transferred with the class member from CDCR.

**Defendants' Response**:

Defendants already strive to ensure that all DME transfers with class members who are out-to-court from CDCR as required by HCDOM 3.6.1(d)(19). When Defendants discover that LACJ does not allow an out-to-court class member to use the DME transferred with them, Defendants discuss this issue with LA County and, unless there is a legitimate reason for withholding a class member's DME (e.g., the class member has been placed on a suicide watch), Defendants request that the class member's DME be provided to them.

Additionally, as Plaintiffs are aware, DAPO has advised LACJ that DME provided to class members by Defendants is a disability accommodation based on a "reasonable accommodation standard" that is "provided to ensure equal access to programs, services and activities." *See* DAPO's April 30, 2026 report (DAPO Report) at 14. DAPO's Report, which was sent to the LACC on May 1, 2026, recommended a 60-day waiting period to give LACC and LACJ time to determine if policy changes are required. *See id.* at 15. DAPO's Report also recommended conducting a second round of interviews at LACJ following that 60-day waiting period to verify whether LACJ has remediated the issue. DAPO's investigative period began on July 1, 2026.

Additionally, there have been some cases where a DME has not been properly transferred to LACJ in violation of policy. When this has been discovered, CDCR, CCHCS, and LACJ strive to work together to ensure that the proper DME is transported to LACJ.

Notwithstanding this information, Defendants will reiterate to LACJ that DME transferred with an out-to-court class member must be provided for their use while at LACJ. And, as already planned, DAPO will also verify during its follow-up investigation whether LACJ has updated their policies and practices regarding provision of assistive devices sent with class members to LACJ.

**VIII. PLAINTIFFS' DEMAND NO. 8:**

Demand that LACJ adopt the "reasonable accommodation" standard to evaluate whether class members should be provided DME and housing accommodations, and that they end any blanket bans on any type of DME.

**Defendants' Response**:

Based on Defendants' investigation, LACJ appears to use the "medical necessity" rather than "reasonable accommodation" standard to evaluate reasonable accommodations. DAPO expressly informed LACJ about this issue in its April 30, 2026 report. *See* DAPO Report at 14. DAPO recommended a 60-day waiting period to give LACC and LACJ time to determine if LACJ needed to make any changes to their procedures. The DAPO Report also recommended conducting a second round of interviews at LACJ following the 60-day waiting period to verify whether LACJ has remediated the issue. DAPO's investigative period began on July 1, 2026.

To the extent that LACJ has not already updated its policies following receipt of the DAPO Report, Defendants will request that LACJ adopt a "reasonable accommodation" standard in evaluating class members' accommodation needs.

**IX. PLAINTIFFS' DEMAND NO. 9:**

Demand that LACJ adopt reasonable timelines for evaluations of class members for disability accommodations, and for providing class members those accommodations after they have been approved.

**Defendants' Response**:

To the extent that LACJ has not already updated its policies following receipt of the DAPO Report, Defendants will request that LACJ re-evaluate class members' accommodation needs upon receipt of Defendants' electronic notification required by the County Jail Plan if LACJ and CDCR have differing assessments of a class member's accommodation needs.

**X. Plaintiffs' Demand No. 10:**

Demand that LACJ provide interim accommodations for class members with hearing disabilities if they require but do not have hearing aids at LACJ, such as pocket talkers or other personal sound amplification devices.

**Defendants' Response**:

Defendants will contact LACC to inquire about existing hearing accommodations available to class members who require and do not have their hearing aids while at LACJ. To the extent that LACJ does not currently provide interim accommodations to those class members, Defendants will request that LACJ do so.

**XI. Plaintiffs' Demand No. 11:**

Demand that LACJ provide interim accommodations for class members with vision disabilities if they require but do not have prescription eyeglasses or other prescribed vision accommodations at LACJ, such as handheld magnifiers and access to large print or Braille forms.

**Defendants' Response**:

Defendants will contact LACC to inquire about the existing reading and writing accommodations available to class members who require but do not have their prescription glasses or other vision accommodations while at LACJ. To the extent that LACJ does not currently provide accommodations, such as large print or magnifiers, to those class members, Defendants will request that LACJ do so. However, Defendants are not aware of any class member who was at LACJ without their prescription glasses and was denied reading accommodations such as Braille, large print or a magnifier.

**XII. Plaintiffs' Demand No. 12:**

Demand that LACJ create a mechanism for providing reading and writing assistance for class members with learning disabilities, developmental and/or cognitive/intellectual disabilities, and with low reading scores (whether via staff assistance or an incarcerated worker program).

**Defendants' Response**:

Defendants will contact LACC to inquire about the existing reading and writing assistance available at LACJ to class members with low reading scores or learning, developmental, or cognitive/intellectual disabilities. To the extent that LACJ does not currently provide reading and writing assistance to those class members, Defendants will request that LACJ do so. However, it is worth noting that class members' 2275-CJ grievances and Plaintiffs' Paragraph 5 advocacies from January 1, 2025 through present do not show a pattern of LACJ's denial of reading or writing assistance to class members with low reading scores or learning, developmental, or cognitive/intellectual disabilities.

Sincerely,

***/s/ Olena Likhachova***

OLENA LIKHACHOVA
Deputy Attorney General

OL:

For ROB BONTA
Attorney General

SF2025401968 / 39937109

# Attachment 1

*Armstrong v. Brown, et al.*

U.S. District Court, Northern District of California,
Case No. C 94-2307 CW

Draft 6-21-12

# California Department of Corrections and Rehabilitation's County Jail plan for addressing *Armstrong* class members housed in County Jails, as ordered by the Federal District Court on April 11, 2012.

The CDCR also does not intend for this document to provide any legal advice to Counties or their staff and reserves the right to make changes to this plan, based on future legislative actions or legal clarifications.



June 22, 2012

## INTRODUCTION

This plan results from a finding by the Federal Court that state parolees and state inmates are under the jurisdiction of California Department of Corrections (CDCR) when housed in a County Jail and therefore are entitled to the same reasonable accommodations that CDCR provides within its institutions and facilities.

By complying with the Court's order of April 11, 2012, and developing this plan to track, and provide parolees and inmates with a grievance process, the CDCR does not concede or assent that it has control over the County Jails. County Jails are operated under the authority of the County Sheriffs.

Draft 6-21-12

## DAILY JAIL LIST -

The CDCR will be responsible for sending an electronic message to the County's designee or legal counsel where a CDCR parolee has been newly booked.

CDCR will send notifications to impacted counties via a batch process to be disseminated daily at the same time each day, seven days a week.

The electronic notification will include, at minimum, for each Armstrong parolee:

a. Full name.
b. CDC number.
c. The CDCR Disability Placement Program (DPP) code and definition of the DPP Code.
d. Any housing accommodations as stated in DECS.
e. Any programming accommodations as stated in DECS.
f. Health Care Appliances.
g. Last release date from prison.

The CDCR automated process will allow for counties to reply via email. This will also allow for CDCR to become aware of electronic messages that are returned undeliverable.

PAROLE HOLDS IN COUNTY JAILS

As part of the Notice of Rights (NOR) process:

1. Current operating procedures for the NOR will remain in place. Parole/Notice Agents shall check Disability and Effective Communication System (DECS), review field file and source documents and determine if any reasonable accommodations are needed. All information will be documented in Section I on the Notice and Request for Assistance at Parole Proceeding BPH form 1073.

2. The parole/notice agent will ask the parolee to self-identify any disability needs related to housing and programming and will document the information in the "Other" field in Section II of the BPH 1073.

3. Within three business days, while informing the parolee of his/her Notice of Rights/Notice of Charges, the parole/notice agent shall provide a parolee identified as an Armstrong class member with a Reasonable Modification or Accommodation Request CDCR form 1824 and explain to the parolee that they may use that form as a grievance process if they are a person with a disability and are not receiving a housing or programming accommodation that they need in the County Jail.

   The parolee will also be provided a self-addressed/postage paid envelope (Business Reply Mail) to be used for sending a completed grievance form to the respective Regional ADA Unit.

   Parolees will be informed of and encouraged to use the local facility's grievance process in addition to CDCR's grievance process.

4. DAPO staff shall assist parolees in completing a CDCR form 1824 when the parolee is unable to complete the form on his/her own due to a disability. The parole/notice agent will forward the completed grievance form to their Regional ADA Unit within one business day of receipt.

Draft 6-21-12

5. DAPO staff shall inform County Jail staff about a need for an accommodation or possible medical or mental health examination, no later than four business days after a parolee's date of arrival at the county jail. Any notification given to county jail staff shall be documented on the Notice and Request for Assistance at Parole Proceeding BPH form 1073 and recorded in the DECS.

GRIEVANCES and their COLLECTION (CDC Form 1824)

Upon receipt of a CDCR 1824 grievance form, the notice/parole agent shall send the CDCR form 1824 to the Regional ADA Parole Unit within one business day.

The Regional ADA Parole Administrator shall ensure the grievance is entered into the DAPO tracking system and assigned to an ADA Unit staff member for a response. If the Administrator identifies the stated issue on the CDCR 1824 qualifies as an emergency, he/she shall ensure a response is completed within 5 calendar days. If the Administrator deems the CDCR 1824 is a non-emergency then he/she shall ensure a response is completed within 15 calendar days.

The Regional ADA Parole Administrator will ensure the grievance is forwarded as soon as possible and no later than three business days after receipt to the respective County's designee or legal counsel for subsequent notification to the County Jail housing the subject parolee.

Draft 6-21-12

1. For Armstrong class members who are scheduled to go "out to court" for more than three business days, the institutional Case Records staff will include a Request for Reasonable Modification or Accommodation Request CDCR form 1824 post card with the OTC packet at the prison facility where they are housed prior to be transferred out to court. The institution's Recieving and Release staff will give the post card to the inmate at the time of departure from the facility.

   The post card will be self-addressed/postage paid, with the return address for DAPO HQ – Parole Litigation Compliance Unit (PLCU) in Sacramento, CA. The PLCU will verify the location of the inmate and notify the respective Regional ADA Unit, who will deploy a parole/notice agent to the jail to provide

the inmate with necessary forms within three business days of receipt of the post card.

2. The parole/notice agent shall provide an inmate identified as an Armstrong class member with a Reasonable Modification or Accommodation Request CDCR Form 1824 and explain to the inmate that they may use that form as a grievance process if they are a person with a disability and are not receiving a housing or programming accommodation that they need in the County Jail.

3. DAPO staff shall assist inmates in completing a CDCR form 1824 when the inmate is unable to complete the form on his/her own due to a disability. The parole/notice agent will forward the completed grievance form to their Regional ADA Unit within one business day of receipt.

   The inmate will also be provided a self-addressed/postage paid envelope (Business Reply Mail) to be used for sending a completed grievance form to the respective Regional ADA Unit.

   Parolees will be informed of and encouraged to use the local facility's grievance process in addition to CDCR's grievance process.

4. DAPO staff shall inform County Jail staff about a need for an accommodation or possible medical or mental health examination, no later than four business days after the date of arrival at the county jail. Any notification given to county jail staff shall be documented.

5. The Division of Adult Institutions (DAI), Americans with Disabilities Act (ADA) Associate Warden (AW) will notify the Regional ADA Unit of the <u>Armstrong</u> class member's name, number, county where inmate will be housed, and date of departure within three business days of departure from the CDCR institution.

6. The DAI ADA AW will be responsible for notifying the County's legal counsel (or designee) of the inmate's out-to-court status and ADA information that impacts the housing and programming of the inmate, within three business days

Draft 6-21-12

of departure from the CDCR institution. A copy of the notice sent to the County legal counsel (or designee) will then be forwarded to the Office of Legal Affairs, Class Actions Team– Attention: Armstrong Counsel, at CDCR Headquarters in Sacramento, and to the Plaintiff's counsel simultaneously.

CDCR form 1824's collected at the County Jail shall be sent to the Regional ADA Parole Unit for processing in accordance with this plan.

EMERGENCY APPEALS

If any CDCR staff person becomes aware, whether through a hearing, notice service, or otherwise, that an Armstrong class member being housed in a County Jail has an urgent or emergent situation (i.e., if it alleges a condition which is a threat to the parolee's health or safety, or is necessary for participation or effective communication in a parole revocation proceeding) that person shall immediately notify the Regional ADA Parole Administrator, as well as the County's designee or Legal Counsel using contact information provided by the County's Legal Counsel.

Draft 6-21-12

The Regional ADA Parole Administrator shall respond to such a grievance within five calendar days of receipt and make their best efforts to ensure that necessary and reasonable accommodations are provided on an interim basis, and shall document their efforts on the CDCR 1824 form.

PARAGRAPH 5 RESPONSES

If plaintiff's counsel raises concern regarding individual class members, those letters are to be sent simultaneously to the Office of Legal Affairs, Class Actions Team– Attention: Armstrong Counsel, at CDCR Headquarters in Sacramento, and to the respective county Legal Counsel.

With the assistance of the Regional ADA Parole Administrator, non-urgent issues will be addressed within 15 business days and urgent issues will be addressed within five business days.

PATTERNS OF ALLEGED MISCONDUCT OR DENIAL OF ADA ACCOMODATIONS

Each Regional ADA Parole Administrator shall review all CDCR 1824 grievances and determine if there is a pattern of denials of disability accommodations such as improper housing and/or denial of assistive devices to class members at a particular county jail facility.

If a pattern is discovered, the Regional ADA Parole Administrator must write to the County's Legal Counsel (or designee), within five days of discovery and provide the evidence alleged. The letter must be copied to plaintiff's counsel, care of the Office of Legal Affairs, Class Actions Team – Attention: Armstrong Counsel, at CDCR Headquarters in Sacramento.

The Regional ADA Parole Administrator shall assign one of their Parole Agent II, Supervisors to investigate the alleged deficiencies at the specific county jail. Such agent of CDCR shall audit and/or investigate the situation at the County Jail, to the extent possible, and determine what steps, if any, can be taken to remedy the situation. A written report shall be provided to the Office of Legal Affairs, Class Actions Team – Attention: Armstrong Counsel, at CDCR Headquarter in Sacramento.

Draft 6-21-12

ACCOUNTABILITY

Failure by CDCR staff to comply with any portion of this plan may result in employee referrals for accountability to a Supervisor and/or the Office of Internal Affairs for investigation. Parole Region and Institution employee accountability logs shall be used and maintained consistent with prior memorandums for documentation of employee accountability.

## CDCR ADDRESSES

**Office of Legal Affairs, Class Actions Team**
– Attention: Armstrong Counsel
1515 S Street, Rm 314S
Sacramento, CA 95811

**DAPO HQ – Litigation Compliance Unit**
1515 S Street, Rm 212N
Sacramento, Ca 95811

**Region 1**
**Regional ADA Unit**
9825 Goethe Road, Ste 200
Sacramento, CA 95827-2572

**Region 2**
**Regional ADA Unit**
1515 Clay Street, 10th Floor
Oakland, CA 94612-1499

**Region 3**
**Regional ADA Unit**
320 W. 4th Street, Suite 1000
Los Angeles, CA 90013-[illegible]489

**Region 4**
**Regional ADA Unit**
21015 Pathfinder Road, Suite 200
Diamond Bar, CA 91765-4002

Draft 6-21-12