MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621
Facsimile: (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104

CLAUDIA CENTER – 158255
DISABILITY RIGHTS
EDUCATION & DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California 94703
Telephone: (510) 644-2555
Facsimile: (510) 841-8645

Attorneys for Plaintiffs

CALIFORNIA OFFICE OF THE
ATTORNEY GENERAL
ROB BONTA
Attorney General of the State of California
NEAH HUYNH
Senior Assistant Attorney General
SEAN LODHOLZ
Supervising Deputy Attorney General
GURPREET SANDHU
JAIYE ZHOU
JENNIFER BURNS
NAMRATA KOTWANI
OLENA LIKHACHOVA
Deputy Attorneys General
State Bar No. 285574
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-6332
Fax: (916) 324-5205
E-mail: Olena.Likhachova@doj.ca.gov

Attorneys for Defendants Gavin Newsom and the California Department of Corrections and Rehabilitation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN ARMSTRONG, et al.,

Plaintiffs,

v.

GAVIN NEWSOM, et al.,

Defendants.

Case No. C94 2307 CW

**JOINT CASE STATUS STATEMENT**

Judge: Hon. Claudia Wilken

The parties submit this Joint Case Status Statement pursuant to the Stipulation and Order entered February 24, 2026 (ECF No. 3754), which provides that "[t]he parties will file periodic joint statements describing the status of the litigation on a quarterly basis."

## CURRENT ISSUES[1]

### A. Allegations of Abuse, Retaliation, and Violence by CDCR Staff Against Class Members

#### 1. Plaintiffs' Statement

##### a. RJD and Five Prisons Orders

Plaintiffs continue to monitor remedial efforts the Court found to be necessary in order to prevent further violations of the ARP and class members' ADA rights at six prisons, including changes to the staff misconduct investigation process and implementation of Audio Visual Surveillance Systems that include body-worn camera technology. *See* ECF Nos. 3059, 3060, 3217 and 3218. Party agreements regarding Court ordered changes are found in Defendants' RJD and Five Prisons Remedial Plans ("Plans"). *See* ECF No. 3393, Exs. A and B.

Plaintiffs have issued multiple quarterly reports and, at this point, have identified many hundreds of cases that show failures by Defendants to conduct complete and unbiased investigations and impose appropriate and consistent discipline. A copy of Plaintiffs' report issued August 14, 2026, Review of CDCR's Accountability System for LAC, CIW, RJD, SATF, COR and KVSP, is attached hereto in redacted form as **Exhibit A.** Plaintiffs continue to identify cases where Defendants fail to hold staff accountable for serious staff misconduct. Plaintiffs' findings are corroborated by the Office of the Inspector General (OIG) whose recent report found that the Department's performance was inadequate in over half of the cases reviewed and needed improvement in another 29%. *See* OIG Semiannual Report re Monitoring Internal Investigations, Staff Misconduct Complaint Investigations, and the Employee Disciplinary Process,

---

[1] Statements are joint unless otherwise delineated as either *Plaintiffs' Statement* or *Defendants' Statement*.

https://www.oig.ca.gov/wp-content/uploads/2026/05/Staff-Misconduct-Monitoring-Report-July-December-2025.pdf ("OIG Report") at 7. The parties are actively engaged in negotiations to reach agreement regarding changes that are necessary to bring the system into compliance with Court-ordered Remedial Plans. Per Stipulation, CDCR agreed to retain Nicholas Mitchell to "review and offer recommendations about CDCR's use-of-force policies and practices, use-of-force training, and the Institutional Executive Review Committee (IERC) process, including outcomes after the IERC has identified non-compliance with policy violations" and to provide "recommendations on whether the IERC, or some entity other than OIA, can conduct comprehensive and unbiased investigations" and "what, if any, modifications to Defendants' policies and procedures are necessary for the IERC, or some entity other than OIA, to conduct comprehensive and unbiased investigations into allegations of staff misconduct based on use-of-force policy violations." ECF 3721 at 3. The expert consultant issued a draft report on July 19, 2026. The parties provided responses. On October 1, 2026, Mr. Mitchell issued his final report, a copy of which is attached as **Exhibit B**. Mr. Mitchell made 34 recommendations for changes that Defendants should implement. Pursuant to the parties' stipulation, Defendants must inform Plaintiffs by no later than November 15, 2026, which of the recommendations CDCR agrees to implement. ECF No. 3721, ¶ 9. Defendants provided their response on November 16, 2026 and Plaintiffs are in the process of reviewing it.

On October 29, 2026, Plaintiffs' counsel and Defendants' use-of-force expert received a draft copy of proposed changes to CDCR's Use of Force DOM and Regulations for comment. Plaintiffs' counsel have ongoing concerns about whether the proposed changes will result in greater accountability for staff misconduct. Mr. Mitchell commented on proposed changes on November 16, 2026.

Despite agreement between the parties on the potential reforms discussed above, Plaintiffs' counsel remains seriously concerned about the failure of Defendants to complete timely investigations. According to the OIG's recently released, November 2026 Semiannual Staff Misconduct Monitoring Report, OIG report, investigations were delayed

in 82% of staff misconduct complaint cases reviewed. *See* https://www.oig.ca.gov/wp-content/uploads/2026/11/Staff-Misconduct-Monitoring-Report-January-%E2%80%93-June-2026.pdf at 41. Delayed investigations led to cases being delivered to the Hiring Authorities without sufficient time to prepare for and conduct the disciplinary findings conference, request any additional investigative work and to serve a notice of discipline, if warranted. *Id*. at 42. As a result, the OIG found that lengthy investigative delays—and in some cases, the lack of any investigation at all—are the primary factors driving the decline in the department's performance. *Id*. at 37. To bring Defendants into compliance with the Remedial Plans and to eliminate the serious problems caused by delayed investigations, Defendants must commit to staffing OIA with a sufficient number of investigators to timely investigate all allegations of serious misconduct. On November 24, 2025, after extensive negotiations, the parties entered into a stipulation requiring Defendants to produce to Plaintiffs and the Court Expert a proposed staffing analysis, staffing plan, and implementation plan to address these issues. *See* ECF Nos. 3737 and 3789. On August 17, 2026, Defendants produced the analysis, staffing plan, and implementation plan, a copy of which is attached hereto as **Exhibit C**. The parties are currently meeting and conferring about Defendants' analysis and plans.

Plaintiffs' counsel remain concerned that, on January 22, 2026, CDCR adopted changes to the regulations, over Plaintiffs' objections, that do not comply with the Court's orders and remedial plans, and that are inconsistent with negotiated agreements between the parties to address CDCR's continuing non-compliance with those orders and remedial plans. *See* Exhibit C to ECF No. 3775. Plaintiffs will be meeting with Defendants to discuss how to resolve this serious problem.

CDCR is a statewide system. Violations of the ADA and ARP found thus far at six prisons exist system-wide. Plaintiffs continue to report on violations raised by class members at multiple other prisons including California Health Care Facility, Stockton ("CHCF"). On April 24, 2026, Plaintiffs' counsel served requests for the production of documents related to investigations into allegations by *Armstrong* class members of staff

misconduct at CHCF. *See* Exhibit D to ECF No. 3775. Defendants indicated that they completed the production in September. Plaintiffs are in the process of reviewing the documents. Plaintiffs continue to gather information about those incidents and are committed to bringing such evidence before the Court until all class members are protected. *See* ECF No. 3592, Ex. A at 7-8.

**2. Defendants' Statement**

**a. RJD and Five Prisons Orders**

CDCR has dramatically overhauled its staff misconduct investigation process to ensure unbiased and complete investigations. And, although not required by the Court's orders, Defendants have restructured CDCR's statewide staff misconduct allegation, screening, referral, investigative, and disciplinary processes. As the Court has noted, "[t]hese agreed-upon measures constitute substantial improvements that will go a long way to bringing Defendants into compliance with the ARP and ADA at the six prisons." ECF No. 3356 at 2. The Court found, the "implementation of these [] remedial measures is likely to have a positive impact on…the overall reliability of the outcomes of investigations." *Id.* at 15.

Despite the tremendous efforts and resources directed towards improving the staff misconduct investigation and discipline processes, modifications are necessary to ensure sustainability. CDCR contends that many of the issues raised in the recent OIG reports are attributable to the operational realities of the large number of complaints that stretch the capacity of the OIA to timely complete these cases. With input from Plaintiffs, the Court Expert, and other stakeholders, CDCR continues to identify and implement necessary modifications to the investigative and disciplinary processes. These efforts include, but are not limited to, updating the applicable staff misconduct regulations, simplifying the staff misconduct process, revising the ADI to provide greater clarity, consolidating Information Technology systems to improve case tracking and management, developing certified training to enhance investigator preparedness, and working to satisfy the requirements of the recent September 26 and November 24, 2025, stipulations on the Staff Misconduct

Investigative and Discipline Process (ECF Nos. 3721, 3737).

CDCR also staffed, trained, and implemented the Centralized Allegation Resolution Unit located at department headquarters, which serves as the hiring authority and reviews completed investigations which involved or originated from incarcerated persons residing within the six institutions identified in the Court's staff misconduct orders, and now oversees the investigative and disciplinary process for nineteen institutions statewide. CDCR has implemented prioritization strategies to focus on meeting statutory deadlines and ensuring compliance with legal obligations. To further address timeframe-related challenges, CDCR continues to actively recruit to fill all vacant investigator positions within OIA and has repositioned several internal vacancies to hire additional investigative staff. CDCR also continues to refine its intake process to reduce redundant investigative efforts and maximize effectiveness of limited investigative resources while maintaining a complete review of all allegations. CDCR, in collaboration with Plaintiffs and other stakeholders, continues to identify and implement additional improvements to ensure compliance with policies and regulations, including a new screening tool for the Centralized Screening Team, which is currently being negotiated by the parties. Throughout this process, CDCR has regularly provided substantive updates to the OIG and will continue to do so.

In accordance with the parties' November 2025 stipulation, Defendants produced a staffing analysis, staffing plan, and implementation plan on August 17, 2026. The parties are currently meeting and conferring regarding these plans. The parties also received Nicholas Mitchell's final report on October 1, 2026. In accordance with the September 26, 2025 stipulation, Defendants informed Plaintiffs on November 16, 2026, which of the recommendations in Mitchell's report CDCR agrees to implement.

Finally, Defendants reviewed the proposed regulations regarding the staff misconduct complaint and routine grievance processes prior to adoption and do not believe these regulations violate any court orders. Defendants received Plaintiffs' April 7, 2026 correspondence alleging otherwise and expressing concern that the regulations do not

comport with the parties' agreements. Defendants provided their written response to this correspondence on August 14, 2026 and will meet and confer with Plaintiffs to address any remaining issues.

**B. Court Expert Investigation Into SATF**

**1. Plaintiffs' Statement**

Background of the Court Expert's investigation into the treatment of people with disabilities at the Substance Abuse Treatment Facility (SATF) is set forth in Plaintiffs' previous joint case status statement. *See* ECF No. 3670 at 6-8. On May 1, 2025, the Court adopted, with some modifications, the Court Expert's Recommendations Regarding Compliance with SATF Stipulation, which laid out steps that Defendants must take to remedy longstanding violations of the ADA and ARP at SATF. *See* ECF No. 3651 (Court Expert's recommendations); ECF No. 3679 (Court's order). The parties continue to meet and confer regarding Defendants' plans to comply with SATF Stipulation Item 7 and the Court's May 1 order on this Item. SATF Item 7 requires specialist assessment of deaf and hard-of-hearing class members to determine what assistive technology—including a paging device—is necessary for those class members to access announcements. *See* ECF No. 3679 at 12. The parties had previously agreed to create a process for educating people with hearing loss—and especially people with DNH codes who had refused appointments with either the audiologist or the assistive technology professional (ATP)—about the reasons for and importance of those appointments, as well the benefits they might obtain by attending those appointments, and the consequences of refusing to participate in this process.

On September 11, 2026, Defendants reported that they had completed interviews of all people with DPH and DNH codes at SATF pursuant to that agreement. According to Defendants, staff interviewed or attempted to interview 503 class members: 427 individuals agreed to further assessment with the audiologist, the ATP, or both; 72 individuals declined further assessment; and 4 individuals were out to court when the interview was attempted. Defendants updated Plaintiffs' and the Court Expert on the

status of audiology and ATP assessments on October 28, 2026. In their response, Defendants agreed to provide monthly updates about those assessments until all 503 incarcerated individuals on the list provided to Plaintiffs on September 11 have completed the evaluation process. Thereafter, Defendants will provide quarterly updates. Defendants will produce their first monthly production in December 2026.

Plaintiffs commented on Defendant's most recent iteration of the draft pager policy on September 23, 2026. Those comments identified several problems with the draft policy. Most crucially, the draft policy's section on auditing announcements delivered by the new paging system does not explain how staff will audit the timeliness, accessibility, accuracy, or completeness of those announcements. Defendants responded to Plaintiffs' comments on October 16, 2026, and informed Plaintiffs that they were finalizing the paging policy and routing it for signature so that the required 45-day review period with the Office of Labor Relations can begin. Defendants promised to provide a copy of the final paging policy after release.

Based on Defendants' responses to our comments, we are concerned that the final policy will not adequately address our concerns. We remain especially concerned that the final policy's auditing provisions continue to fail to explain how staff will audit the timeliness, accessibility, accuracy, and completeness of announcements transmitted by the paging system. But without a copy of the final, revised policy, we cannot evaluate the adequacy of any changes Defendants made in response to our comments.

Regarding SATF Stipulation Item 13, on October 12, 2026, the Court Experts provided reports from Dr. Christian Vogler, Dr. Pablo Romero Fresco, and Jennifer Peirson assessing the accuracy of the proposed transcription technologies. The parties will confer regarding next steps.

Regarding SATF Stipulation Item 14, on June 23, 2026, the Court Expert notified Plaintiffs that Defendants released a statement announcing their intention to rescind the CCHCS policy regarding RVRs entitled, "Limiting Licensed Health Care Staff Access to Rules Violation Reports." But Plaintiffs and Defendants previously reported to the Court

that they had resolved Item 14 by agreeing on this policy. Specifically, the parties reported that they "agree that they have met and conferred with the Court expert regarding the adequacy of CCHCS's policy regarding RVRs and they also agree as to a plan for the implementation and monitoring of the policy." ECF No. 3630 at 149-52. The Court then "approve[d] the parties' agreed-upon plan." ECF No. 3639 at 4. On July 2, 2026, Plaintiffs submitted a letter to Defendants expressing deep concern regarding Defendants' intended action, requesting that Defendants refrain from rescinding the policy, and asking Defendants a series of questions regarding the decision to rescind the policy. Plaintiffs have not received a response to this letter. However, on August 20, 2026, the parties, counsel for *Plata* and *Coleman*, the *Plata* Receiver, and the *Armstrong* Court Expert met to discuss the decision to rescind the policy. During the call, Defendants committed to creating a form with a checkbox that would indicate when a custody staff issued an RVR on behalf of healthcare personnel, classification staff, and so on. At the conclusion of the call, the *Armstrong* Court Expert summarized that once the new form/checkbox is created in SOMS, and more information is provided about planned training for healthcare and custody staff about this issue, the parties would reconvene for additional discussion and to determine whether it is necessary to go back to the Court. On November 10, 2026, *Armstrong* counsel sent an email to follow up on the meeting. The email requested a status update on the actions Defendants committed to take, and a response from Defendants to outstanding questions raised in Armstrong counsel's July 2, 2026 letter.

Plaintiffs continue to eagerly await the Court Expert's forthcoming report and recommendations on staffing and sustainability and hope it will result in the allocation of sufficient expertise and resources and development of robust systems necessary to comply with the ARP and ADA.

**2. Defendants' Statement**

The Court Expert's second report concerning the treatment of people with disabilities at SATF recognized the numerous proactive measures implemented at SATF to further respond to the needs of incarcerated people with disabilities. ECF No. 3500. The

report demonstrates that the coordinated efforts between CDCR and California Correctional Health Care Services (CCHCS), with the Court Expert's guidance and with input from Plaintiffs, are working to effectively respond to the issues raised by the Court and addressed by the Court Expert following his initial investigation. On May 1, 2025, the Court issued its order on the issues not resolved by the Court's November 8, 2024, order, and addressed in the Court Expert's January 10, 2025, recommendations, which included Items 5, 7, 9, 10, and 13. ECF Nos. 3639, 3651, 3655, 3656, 3660, 3661, 3665, and 3679. The parties, with input from the Court Expert, have resolved Items 5, 9, and 10. The parties are continuing to meet and confer regarding Items 7 and 13. After the parties complete their meet-and-confer process for SATF Item 13, the Court Expert will file a further status update with a report and recommendation for next steps. ECF No. 3679 at 21-22.

SATF Item 7 requires specialist assessment of deaf and hard-of-hearing class members to determine what assistive technology—including a paging device—is necessary for those class members to access announcements. *See* ECF No. 3679 at 12. Defendants developed a process whereby, following audiologist assessment, deaf and hard-of-hearing class members will be evaluated by Assistive Technology Professionals (ATP) to determine the class members' assistive technology needs. Plaintiffs and the Court Expert agreed to this approach during the parties' May 14, 2026 meeting, and the parties held an introductory meeting with Defendants' ATP on June 1, 2026. To educate DNH class members about the reasons for and importance of participating in assessments by audiologists and ATPs, Defendants created a "script" that was provided to Plaintiffs and the Court Expert for review and comment. Plaintiffs and the Court Expert provided their feedback on the draft "script" in July 2026. Defendants finalized their pager contract and prepared a draft pager policy, which they provided to Plaintiffs and the Court Expert on July 21, 2026. Defendants received Plaintiffs' comments on the draft pager policy on September 23, 2026, and provided their final response on October 16, 2026. In their response, Defendants indicated that CDCR has implemented several measures to ensure

that paging notifications are timely, accurate, and received by class members, without adopting any specific auditing methodology proposed by Plaintiffs. For instance, ADA workers can now see each pager user in their assigned housing unit by referring to a list maintained by the Lynx system without having to consult staff or SOMS. Defendants are also updating the "Hearing Accommodations at SATF" policy to implement the new workflow and HA chrono developed in collaboration with Plaintiffs and the Court Expert. Defendants will provide that policy to Plaintiffs' counsel when it is finalized. Defendants have also received 32 transmitters and 100 devices that are ready for deployment once the paging policy is issued. Defendants informed Plaintiffs and the Court Expert on November 10, 2026.

Defendants provided an update on the status of audiology and ATP assessments on October 28, 2026.

As to SATF Item 13, on October 12, 2026, Defendants received the reports prepared by Dr. Christian Vogler, Dr. Pablo Romero-Fresco, and Jennifer Peirson on assessing the accuracy of the three proposed transcription technologies. Defendants are currently reviewing the reports. The parties will confer regarding the next steps.

Regarding SATF Item 14, the decision to rescind the policy titled, "Limiting Licensed Health Care Staff Access to Rules Violation Reports" (SATF 14 Policy) was made by the court-appointed Receiver in the *Plata v. Newsom,* Northern District of California Case No. 4:01-cv-01351-JST, (*Plata*) matter. The anticipated rescission of this policy was discussed with the *Armstrong* Court Expert during the CCHCS Executive Staff meeting. Defendants received Plaintiffs' July 2, 2026 letter and the parties discussed the *Plata* Receiver's decision to rescind the SATF 14 Policy on August 20, 2026.

**C. Systemic Denials of Disability Accommodations to Class Members Defendants House in the Los Angeles County Jail System**

**1. Plaintiffs' Statement**

On June 4, 2026, Plaintiffs sent a letter demanding that Defendants take immediate steps to address longstanding and systemic denials of disability accommodations to class

members whom Defendants house in the Los Angeles County Jail system ("LACJ") while they are out-to-court from CDCR, detained on a parole hold or for an alleged parole violation, or while serving a parole revocation term. *See* ECF 3798, Ex. B. Class members with mobility disabilities housed at LACJ are routinely denied wheelchairs, walkers and other durable medical equipment ("DME"); housed on top bunks, upper tiers, cells without grab bars, and in housing units without accessible showers; and impeded from attending yard, medical appointments, visiting, and court due to escalators that are frequently inoperable. Class members with hearing and vision disabilities experience significant delays in being evaluated for and receiving hearing aids and prescription glasses at LACJ, without access to interim accommodations to help them hear, see, and read. And class members with learning disabilities, cognitive/intellectual disabilities, and low reading scores are routinely denied assistance with reading and writing at LACJ.

These systemic ADA violations continue despite multiple rounds of remedial orders by this Court over many years aimed at ensuring that class members housed at county jails receive the disability accommodations they need. *See, e.g.*, Order Granting Motion to Enforce Revised Permanent Injunction, ECF No. 933 (May 30, 2006); Order Granting in Part Motion to Enforce May 30, 2006 Order, ECF No. 1199 (Sept. 11, 2007); Order Granting Plaintiffs' Motion to Require Defendants to Track and Accommodate the Needs of Armstrong Class Members Housed in County Jails, ECF No. 1587 (Sept. 16, 2009); Amended Order Granting Plaintiffs' Renewed Motion to Require Defendants to Track and Accommodate the Needs of Armstrong Class Members Housed in County Jails, ECF No. 2034 (Apr. 11, 2012); Opinion in Support of Order Distributing and Enforcing the Amended County Jail Order and Plan, ECF No. 2194 (Aug. 28, 2012).

Unless CDCR takes robust remedial steps designed to put an end to the longstanding pattern of denials of disability accommodations to class members CDCR houses at LACJ, Plaintiffs will file a motion for further remedial measures to protect class members' rights under the ADA and this Court's prior orders. Plaintiffs recommended remedial steps available to Defendants that may dissuade us from seeking relief from the

Court. The parties have met several times to try to negotiate a resolution, most recently on November 3, 2026.

On June 9, 2026, Plaintiffs served document requests, interrogatories, and a draft Rule 30(b)(6) deposition notice on Defendants, seeking discovery regarding CDCR's knowledge of the systemic disability accommodation denials to class members housed at LACJ and what actions CDCR has taken to protect class members' rights. Plaintiffs also took the depositions of the Los Angeles County Sheriff's Department and Los Angeles County's Corrections Health Services' Rule 30(b)(6) designated witnesses on August 13 and October 20, 2026, respectively. Plaintiffs agreed to pause the meet and confer over Defendants' discovery objections while we try to negotiate a resolution to avoid litigation.

**2. Defendants' Statement**

Defendants' obligations under the County Jail Remedial Plan (Plan) were extensively negotiated among the parties, approved by this Court, and affirmed by the Ninth Circuit. ECF No. 2193; *Armstrong v. Brown*, 732 F.3d 955 (9th Cir. 2013). A true and correct copy of the Plan is attached hereto as **Exhibit D**. Pursuant to the Plan, upon discovery of a pattern of denials of disability accommodations to class members at a particular county jail following review of CDCR 1824 (now 2275- CJ) grievances by Regional ADA Parole Administrators, Defendants are required to: (1) investigate, to the extent possible, the situation at a particular county jail; (2) determine what steps, if any, can be taken to remedy the situation; and (3) provide a written report to CDCR's Office of Legal Affairs. *See* ECF 2194-1 at 8.

Pursuant to the Plan requirements, the Department of Adult Parole Operations (DAPO) conducted an investigation at the Los Angeles County Jails (LACJ), identified issues needing remediation, and prepared a written report (Report) that was shared with Los Angeles County Counsel (LACC) on May 1, 2026. *See* ECF 3798, Exhibit D**.** In the Report, DAPO recommended a 60-day waiting period to give LACC and LACJ time to determine if policy changes are required. *See Id.* at 15. The Report also recommended conducting a second round of investigation at LACJ following that 60-day waiting period

to verify whether LACJ has remediated the issues described in the Report. *Id.* DAPO began their second round of investigation on July 1, 2026.

Defendants responded to Plaintiffs' June 4, 2026 demand letter on July 10, 2026. *See* ECF 3798, Exhibit E. The parties discussed Plaintiffs' demand letter and Defendants' response on August 27, 2026 and agreed to exchange their respective positions regarding additional remedial measures Defendants may be able to implement to address Plaintiffs' concerns regarding LACJ. Plaintiffs shared their written position on September 30, 2026, and Defendants shared theirs on October 2, 2026. The parties met and conferred regarding those position letters on October 8, 2026, and agreed to continue their negotiation in an attempt to avoid litigation. After exchanging additional written communication regarding Defendants' purported authority to undertake enforcement actions demanded by Plaintiffs, the parties met again on November 3, 2026. The parties' meet and confer efforts are ongoing.

Additionally, Defendants continue to engage with LACC to address issues brought to CDCR's attention and are specifically working to address concerns outlined in Plaintiffs' demand letter.

## D. Accommodations for Deaf and Hard of Hearing Class Members

### 1. Plaintiffs' Statement

Plaintiffs are increasingly concerned about deaf signers' access to on-site interpreting services. Defendants report receiving <u>no applicants at all</u> for multiple vacant positions, making clear that the 8% pay raise, which went into effect last year, is not sufficient to attract qualified applicants. And Defendants currently cannot explain the dearth of applicants except to point to a nationwide shortage.

Defendants' contracts for providing on-site sign language interpreting services remain seriously deficient. Both RJD and San Quentin—which jointly house one third of the deaf signing population—reported pervasive difficulties providing on-site interpreters during times when staff interpreters are not available. This challenge is particularly pronounced at San Quentin, which currently does not have *any* staff interpreters to support

its six deaf signers. The situation appears to be no better at other prisons, especially those in remote locations.

Remote interpreting services, known as VRI, routinely fail. Despite their efforts, the ADA Coordinator at RJD confirmed that the VRI interpreters cannot hear the other participants in group programming when they are participating (not merely having side conversations or cross-talk, as Defendants contend below), corroborating Plaintiffs' long-held position that VRI is not capable of providing effective communication in group programming. Class members and CDCR employees/contractors at RJD and San Quentin continue to report other technical problems that render communication ineffective during part or all of group programming. This is despite Defendants' representation previously and below that a change in VRI platform has solved this problem. *See* ECF No. 3798 at 16. Staff and class members at both RJD and at San Quentin have reported that Defendants' contractor, Interpreters Unlimited, routinely provides interpreters who use a form of sign language that is unintelligible to deaf class members, including during healthcare encounters. San Quentin class members with no functional command of English report being relegated to communicating through written notes.

The effect on class members is profound. Multiple deaf class members at RJD report not being able to participate in religious programming due to the lack of available interpreting services. At RJD, one class member reported not even trying to sign up for rehabilitative programming because it is all offered on evenings and weekends, when interpreters are reportedly rarely available. Plaintiffs have been reporting significant, pervasive problems at other institutions for years.

We understand that Defendants currently are in the process of developing a new contract for on-site interpreting services. At Defendants' invitation, Plaintiffs provided recommendations for the contract. However, we are concerned that the published bid package does not incorporate our most important recommendation: increasing interpreter compensation by increasing the minimum paid duration of assignments. We remain hopeful that the new SLI contract will nonetheless remedy Defendants longstanding

failures to provide qualified interpreters. However, if that does not occur, litigation may become necessary.

In addition, deaf signers remain unable to call the Office of the Inspector General, despite previous advocacy from Plaintiffs' counsel and Defendants' representation that the problem had been resolved. Deaf non-signers have severely limited access to telephone services: the landline captioned telephones in many institutions are often broken for months, and despite the requirements of Defendants' contract for tablets, the tablet computers still do not support captioned phone calls. And deaf non-signers remain without *any* access to group programming due to the ongoing absence of real-time captioning services and other assistive technology, including remote microphone systems.

**2. Defendants' Statement**

Defendants continue extensive recruitment efforts to fill Sign Language Interpreter (SLI) vacancies, including outreach to local interpreter-training programs, community colleges, and regional interpreting businesses. Defendants have given Plaintiffs an opportunity to review and provide input on SLI contracts. This collaborative effort has resulted in new contract language in the most recent bid for services. Defendants' current contracted vendors have reported that many qualified SLIs prefer remote assignments rather than on-site work in correctional or healthcare environments. Remote assignments are now the industry standard. This shift is driven by post-COVID demand from hospitals and other medical facilities. Indeed, between 2020 and 2023, remote interpretation increased by more than 30% in healthcare environments. Rural institutions such as SATF and CCWF face additional geographic recruitment challenges, which further explains localized shortages not attributable to CDCR policy or action. Although Plaintiffs claim that Defendants indicated that they received no SLI applications for multiple vacant positions, the recent 8% pay raise resulted in the hiring of an SLI interpreter at CMF.

Despite industry-wide changes, Defendants' contracted vendors, including Interpreters Unlimited, remain steadfast in recruiting aggressively. And the statewide ratio of SLIs to deaf signer class members is favorable, averaging one SLI per 3.25 class

members. Defendants continue to closely monitor statewide hiring efforts and will work to ensure that any vacancies are posted until filled. Defendants have coordinated with their contracted vendors to strengthen remote interpreter availability and service reliability. On April 15, 2026, Defendants transitioned from the FaceTok to the Language Links VRI platform. Language Links provides stronger platform stability, facilitates louder volume and longer call durations with fewer disconnections. Language Links allows pre-scheduled SLI services, resulting in better planning and more consistent interpreter coverage. Interpreters Unlimited continues to work with its vendor partners to address any technical or connectivity issues as part of ongoing refinement. Furthermore, CDCR's Compliance Sergeants and the Correctional Counselor IIs from the ADA Collaboration and Training Team (ACTT) continue to train staff, check the functionality of equipment, and work with the vendors to resolve any intermittent technical issues.

Importantly, June 2026 monthly SLI logs confirm no appointments or classes have been cancelled due to SLI absence. Deaf signers are participating in and completing programs, as evidenced by earning milestone credits, earning bachelor's degrees, and taking college courses. Although Plaintiffs contend that VRI interpreters cannot hear non-deaf participants in a group setting, an in-person SLI would likewise be unable to translate each instance of group-talk, cross-talk, or side conversation that occurs during group programs.

Defendants are in the process of converting statewide VRS services from ViaPath to Securus. This transition will include installing multiple dedicated VRS stations in accessible locations at DPH-SLI designated institutions to strengthen reliability, increase the number of access points, and ensure reliable communication access for Deaf and Hard-of-Hearing class members. The conversion is expected to provide enhanced equipment, improved network stability, and quicker vendor response times. Access to VRS will also be available on the state-issued prisoner tablets, allowing deaf signers to place calls from inside their cells. The institution-by-institution transition from ViaPath to Securus began in February 2026 and is ongoing. Defendants are working with Securus to address

concerns raised regarding Deaf non-signers who rely on TTY/TDD to place phone calls and are unable to call OIG hotlines.

Finally, Defendants' new tablet vendor, Securus, has not yet provided Defendants a definitive date when captioned telephone services will be available on the new prisoner tablets, but is aware of the need for the same. In the meantime, captioned telephone services are available to deaf non-signers upon request.

**E. Accommodations for Blind and Low-Vision Class Members**

Defendants produced a draft policy to memorialize Defendants' commitment to offer personal issuance of all recommended assistive devices to blind and low-vision class members. Plaintiffs reviewed and commented on this draft on September 4, 2026, and Defendants sent Plaintiffs the final policy on Friday October 23, 2026. Plaintiffs continue to monitor the rollout of personal issuance of devices to class members who were recommended access to assistive devices by the vision specialist and were previously required to request access to the assistive devices through a checkout process. Defendants produced their first quarterly report showing that 227 class members who are blind or have low vision have been issued at least one assistive device.

The status of the parties' dispute regarding whether Defendants are evaluating blind and low-vision class members' writing accommodation needs and providing reasonable writing accommodations to class members, in line with ARP, ADA, and the Court's orders, is unchanged since the last joint case status statement. *See* ECF No. 3747 at 13-16. The parties met in August to discuss this issue, and Defendants responded to Plaintiffs' questions on September 11, 2026. Class members continue to report to Plaintiffs' counsel that when evaluated by the low-vision specialist, the specialist failed to evaluate their need for an auxiliary aid that can assist them with writing tasks. Defendants continue to maintain that the low-vision specialists are properly evaluating class members' writing accommodation needs. On September 30, 2026, Defendants provided Plaintiffs an updated report template for the low-vision assessments and examples of specialists' evaluation reports.

On Friday October 16, 2026, Defendants received Plaintiffs' letter that addressed (1) questions raised by the Court Expert at the parties' October 1, 2026 meeting, (2) responses to the recently shared low-vision assessment template, and (3) responses to Defendants' September 11, 2026 email. Defendants are preparing a written response to Plaintiffs' October 16, 2026 letter. Defendants will provide their response by November 20, 2026.

**F. Access to Assignments for Class Members**

Historically, the program-access workgroup met periodically to discuss credit earning, the assignment process, and disparities in the program-access assignment data in response to Plaintiffs' allegations of disability-related discrimination. *See* ECF No. 2680 at 13-14. The parties reached agreement on the relevant data to produce to Plaintiffs each month in early 2024 but have not yet reached agreement on a standard for evaluating whether there is discrimination in program assignments. The parties have agreed to temporarily pause workgroup discussions, at Defendants' request, to enable CDCR to resolve other pending case issues. In the meantime, CDCR continues to work on a regulatory package to address programming waitlists, which includes responding to Plaintiffs' public comments on the proposed regulations. CDCR has also responded to several proposals shared by Plaintiffs outside the regulatory processes to improve program assignment processes. Plaintiffs will continue to report in the monitoring tour reports on disparities in assignment rates between incarcerated people with and without disabilities at individual institutions and programs.

**G. ADA Structural Barriers, Emergency Evacuation Procedures and Master Planning Process**

The parties, with assistance from the Court Expert, negotiated a stipulation to memorialize the parties' agreement for dispute resolution related to master planning. The Court issued an order on the parties' stipulation on April 22, 2026. ECF No. 3769.

In addition, the Court approved the Court Expert's request to retain two experts to aid the Court Expert with master planning issues. ECF No. 3772. The Court Expert

retained Eric McSwain as a consultant on physical accessibility issues and Mani Subramanian as a consultant on construction management. Both experts have begun working with the Court Expert and the parties on master planning issues, as discussed further below.

The parties also continue to engage in structured meetings about several master planning issues currently in dispute. The parties have met many times this year, including multiple times about the master planning construction timeline, as well as CDCR's processes for tracking and sharing information about the status of master planning design and construction. The parties have reached some agreements related to those issues. Specifically, Defendants have agreed to provide detailed barrier removal schedules for the current and the next two fiscal years for each master planning institution scheduled for construction during that timeframe. The detailed barrier removal schedules will be updated each February and August. CDCR has also agreed to Plaintiffs' requests for more information in the quarterly Change Request Tracking Logs and the sharing of other informational documents. Additionally, all of Plaintiffs' questions regarding the bed projection process for *Armstrong* class members have been addressed. Other discussions related to the master planning timeline and budgeting—CDCR's 2025 transition plan currently has master planning construction being completed in 2034, a year later than projected in the 2024 transition plan—remain ongoing.

On April 13, 2026, the parties and Court Expert's Office conducted a joint accessibility inspection of completed master planning construction at Salinas Valley State Prison (SVSP). The tour was the first time the parties jointly inspected certain 270-design and 180-design cells that were originally designed to be ADA compliant. Plaintiffs had some concerns about those accessible cells being non-compliant with requirements at the time of construction and presently. Because the April inspection did not cover all completed construction at SVSP, Plaintiffs' expert conducted another inspection of completed master planning construction at SVSP in July, and plans to conduct a third inspection in December. After the July inspection, on August 7, 2026, Plaintiffs sent an

email about several areas at SVSP where programs are running, but that are not included on the transition plan or change request log.

On June 17, 2026, Plaintiffs served a report by their expert Mark Larson about fire safety issues and inaccessible emergency exits for class members in CDCR, based on a review of documents and an October 21, 2025 tour of LAC. Plaintiffs await Defendants' response to the report.

On July 9, 2026, the parties met to discuss Plaintiffs' concerns about the cells intended to be accessible in 270-design buildings throughout the state. Following the meeting, Defendants provided more information, including a revised proposed design for accessible cells in 270 buildings. Plaintiffs and their access expert provided responses to that design on October 9, 2026. The parties anticipate meeting with the Court Expert and his team about issues with 270 design accessible cells in the near future.

In August, Expert Subramanian began gathering information about various aspects of the master planning process, including scope, schedule development, resource constraints, staffing and prioritization, tracking progress, budgeting, and areas for collaboration and improvement. Also in August, Expert McSwain reviewed two sets of construction documents provided to Plaintiffs as well as the parties' comments on those documents. The parties, Expert McSwain, and the Court Expert's Office met to discuss and resolve disputes related to those plan sets on October 7, 2026, and plan to meet a second time to complete their joint review and discussion of those plan sets. The parties, Expert McSwain, and the Court Expert's Office are also discussing a standard timeline for future plan reviews. Mr. McSwain toured RJD in September 2026 for an informal review of completed construction, areas where master planning construction is planned, and other elements related to master planning issues in dispute, such as showers.

The parties also continue to exchange information about other master planning issues. For example, Defendants share, on a monthly basis, a spreadsheet with the updated status of design and construction for current master planning projects. Plaintiffs also

///

continue to provide comments on Defendants' designs for master planning construction.

Respectfully submitted,

DATED: November 17, 2026

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/Penny Godbold*
Penny Godbold

Attorneys for Plaintiffs

DATED: November 17, 2026

ROB BONTA
Attorney General of the State of California

By: */s/Sean W. Lodholz*
Sean W. Lodholz
Supervising Deputy Attorney General

Attorneys for Defendants

**FILER'S ATTESTATION**

As required by Local Rule 5-1, I, Penny Godbold, attest that I obtained concurrence in the filing of this document from Supervising Deputy Attorney General Sean Lodholz, and that I have maintained records to support this concurrence.

DATED: November 17, 2026

*/s/Penny Godbold*
Penny Godbold

# EXHIBIT A

ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

[redacted]
Email: [redacted]

August 14, 2026

**PRIVILEGED AND CONFIDENTIAL**

**SUBJECT TO PROTECTIVE ORDERS**

VIA ELECTRONIC MAIL ONLY

[redacted]

[redacted]

Re: *Armstrong v. Newsom*: Plaintiffs' August 2026 Review of CDCR's Accountability System at the Six Prisons
Our File No. 0581-03

Dear [redacted]:

We write regarding our review of Defendants' system for holding staff accountable for misconduct. The enclosed report is based on our review of investigation and discipline files produced from CSP-Los Angeles County ("LAC"), California Institution for Women ("CIW"), R.J. Donovan Correctional Facility ("RJD"), California Substance Abuse Treatment Facility ("SATF"), CSP-Corcoran ("COR"), and Kern Valley State Prison ("KVSP") (collectively "Six Prisons").

Plaintiffs continue to find that investigations and discipline fail to comply with the *Armstrong* Court Orders, as affirmed in relevant part by the Ninth Circuit, and with the RJD and Five Prisons Remedial Plans. *See* Dkts. 3059, 3060, 3217, 3218, 3393; *Armstrong v. Newsom*, 58 F.4th 1283, 1288 (9th Cir. 2023).

Plaintiffs have again found substantial evidence that CDCR's accountability system is failing to identify and confirm violations and to hold staff accountable for misconduct. We look forward to discussing these cases and the patterns of accountability system problems revealed by these cases. Plaintiffs' counsel remains concerned about the ongoing failure to take appropriate action in response to repeated violations by the same staff members after, even in our limited sample of cases, it is clear there is a serious

problem. We remain hopeful that the parties will be able to implement remedies to the system to address these longstanding systemic failures, and to improve accountability for staff misconduct.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/* [redacted]

By: [redacted]

[redacted]

[redacted]

# TABLE OF CONTENTS

Page


I. CASES INVOLVING A SINGLE OFFICER AT SATF THAT EXEMPLIFY SERIOUS AND ONGOING FAILURES OF THE ACCOUNTABILITY SYSTEM ..... 1

(a) [redacted] SATF-[redacted] Sustained (Reduced to Letter of Reprimand) ..... 1

(b) SATF-[redacted] Sustained (Reduced to Letter of Reprimand) ..... 2

(c) Third Incident ..... 3

(d) SATF-[redacted] Sustained (Reduced to Letter of Reprimand) ..... 3

(e) Fifth Incident - [redacted] ..... 7

(f) Consolidated Appeal to the SBP ..... 8

(g) Conclusion ..... 8

II. CARU IMPROPERLY IMPOSES CORRECTIVE ACTION FOR SUSTAINED ALLEGATIONS OF IMPROPER FORCE ..... 9

III. FAILURE TO ACCOMMODATE DISABILITIES RESULTING IN THE USE OF FORCE ..... 13

1. KVSP-[redacted] Not Sustained ..... 13

2. RJD-[redacted] Not Sustained ..... 16

3. COR-[redacted] Not Sustained ..... 18

4. SATF-[redacted], Not Sustained ..... 20

IV. MISUSE OF THE SPECIAL-CONDITIONS CLOSURE PROCESS ..... 22

V. FAILURE TO ADEQUATELY INVESTIGATE STAFF MISCONDUCT ALLEGATIONS RELATED TO A DEATH IN CUSTODY ..... 24

1. RJD-[redacted] & RJD-[redacted], Not Sustained ..... 24

VI. FAILURE TO HOLD STAFF ACCOUNTABLE DUE TO THE FAILURE TO RETAIN VIDEO FOOTAGE ..... 27

1. KVSP-[redacted], Not Sustained ..... 27

VII. FAILURE TO HOLD STAFF ACCOUNTABLE DUE TO THE FAILURE TO COMPLY WITH THE STATUTE OF LIMITATIONS ..... 29

VIII. CONCLUSION ..... 30

# I. CASES INVOLVING A SINGLE OFFICER AT SATF THAT EXEMPLIFY SERIOUS AND ONGOING FAILURES OF THE ACCOUNTABILITY SYSTEM

In our last report, we wrote about an officer at SATF for whom CDCR had sustained multiple findings of misconduct, but who nonetheless had received only a single letter of reprimand. *See* Plaintiffs' May 2026 Review of CDCR's Accountability System at the Six Prisons at PDF pp. 4-14 (May 8, 2026). In this report, we write about another officer at SATF in a similar situation.[1]

Between March 2024 and October 2024, Officer [redacted] was involved in at least four staff misconduct incidents in which he was alleged to have used excessive or unnecessary force against an incarcerated person. In at least three incidents during this period, CDCR sustained findings of misconduct against Officer [redacted] and imposed penalties. But when Officer [redacted] appealed these three cases to the State Personnel Board ("SPB"), CDCR agreed to resolve them simultaneously and reduce the penalties in all three cases to Letters of Reprimand. In other words, CDCR did not impose progressive discipline despite finding that an officer repeatedly committed similar, serious misconduct.

As explained in detail below, these cases again illustrate that, even when the accountability system results in sustained allegations, Defendants fail to impose appropriate discipline. This failure is especially troubling when the violations involve multiple, serious improper uses of force committed by a single officer. The full extent of the harm caused by this officer to the incarcerated population is not known because Plaintiffs' counsel only receive a limited production of cases. Defendants' undermine the entire accountability system by failing to appropriately hold staff accountable for sustained allegations and by failing to progressively discipline officers who repeatedly violate CDCR rules.

**(a) [redacted], Sustained (Reduced to Letter of Reprimand)**

The first incident is described in the Notice of Adverse Action issued to Officer [redacted] for Incident [redacted] (detailed below).

According to the NOAA, "[o]n or about March 27, 2024," Officer [redacted] was working as a Floor Officer in [redacted] at SATF when he observed [redacted] talking to another incarcerated person through a cell door. *See* NOAA at 13. Officer [redacted] "approach[ed] [Mr.] [redacted] and advised him he had

[1] In addition to these incidents, Officer [redacted] was also involved in SATF-[redacted] which we wrote about in our May 2026 report. *See* Plaintiffs' May 2026 Review of CDCR's Accountability System at the Six Prisons at PDF pp. 18-20.

no reason to be out and to return to his cell . . . . [Mr. [redacted] was holding a broom making sweeping motions and began to walk away from" Officer [redacted] Officer [redacted] then announced loudly, "I am going to escort you to your, hey college, I am going to escort you to your cell, don't make any sudden movements." As he did so, Officer [redacted] reached for Mr. [redacted] arm. Mr. [redacted] pulled away saying, "No, no," and continued to walk away from Officer [redacted] At that point, Officer [redacted] jumped on Mr. [redacted] back, wrapped both his arms around Mr. [redacted] torso, and tackled Mr. [redacted] to the ground, landing on top of him. *Id.*.

The NOAA explained that the force Officer [redacted] used was "not necessary or reasonable to subdue an attacker, overcome resistance, effect custody, or gain compliance with a lawful order." *See* NOAA at 13. Mr. [redacted] was walking away from Officer [redacted] and therefore did not pose "an imminent threat warranting the use of immediate force." *Id.* at 14. Instead of tackling Mr. [redacted] Officer [redacted] should have used "other options," such as "additional dialogue, notifying a supervisor, or implementing a controlled use of force." *Id.* at 13-14.

**(b) SATF-[redacted], Sustained (Reduced to Letter of Reprimand)**

The second incident occurred on May 16, 2024. [redacted] was standing in the day room of [redacted]. In an interview, Mr. [redacted] explained that he had asked Officer [redacted] for a shower, but Officer [redacted] refused. *See* Investigation Report at 3. That refusal prompted Mr. [redacted] to ask to speak with sergeant. But Officer [redacted] also refused this request and ordered Mr. [redacted] to return to his cell. *See* BWC 1 at 15:12:54. An unidentified incarcerated person standing nearby asked Officer [redacted] why he was not allowing Mr. [redacted] to speak to a sergeant. Officer [redacted] responded, "Because this is my building and I'm running it right now. You don't need to talk to the sergeant for that." *Id.* at 15:13:00 to 15:13:03.

After another interaction with the unidentified incarcerated person standing nearby, Officer [redacted] turned to Mr. [redacted] and said "I'm allowing you a chance right now to walk to your cell." Mr. [redacted] responded, "I am asking you patiently and kindly may I talk to the sergeant?" Officer [redacted] replied, "No." *Id.* at 15:13:20 to 15:13:28. "For what reason?" asked Mr. [redacted] "For what reason? You don't need to because I'm giving you the answers you need." *Id.* at 15:13:28 at 15:13:32. At this point both the unidentified incarcerated person and Mr. [redacted] object, and Mr. [redacted] replies saying, "And I feel the answers that you are giving me are not justifying what's going on." *Id.* at 15:13:32 to 15:13:39.

Officer [redacted] then directs his attention to the incarcerated person standing nearby, telling him to step back and not to move. Turning to Mr. [redacted] Officer [redacted] says, "I'm going to escort you to your cell, do you understand that?" *Id.* at 15:13:45 to 15:13:47. Officer [redacted] then reaches to grab Mr. [redacted] left bicep with his right hand

and pulls on Mr. [redacted] arm. With his hands crossed in front of his body, Mr. [redacted] shrugs his left shoulder up to retract his left arm away from Officer [redacted] *Id.* at 15:13:50 to 15:13:51; *see also* BWC 2 at 15:13:50 to 15:13:51. Officer [redacted] continues to pull on Mr. [redacted] arm. When Mr. [redacted] does not move, Officer [redacted] immediately wraps his arms around Mr. [redacted] torso and hip tosses him to the ground. *See* BWC 2 (linked above) at 15:13:51 to 15:13:53. Other than slightly pulling away from Officer [redacted] grasp, at no time during this incident, including after he had been tossed to the ground, did Mr. [redacted] resist Officer [redacted]

The Hiring Authority considered the first and second incidents together and found that, in both, Officer [redacted] had used unnecessary force (L1). The Hiring Authority did not find that the force Officer [redacted] used in either incident was excessive. *See* 402/403. The baseline penalty for unnecessary force is Level 2—a 5% salary reduction for a period of 1-2 qualifying pay periods. But the Hiring Authority elected to impose a Level 3 penalty and reduced Officer [redacted] salary by 5% for a period of 9 qualifying pay periods. Though the Hiring Authority's rationale for escalating the penalty against Officer [redacted] is unclear, we suspect that it did so because it found that the mitigating factors were outweighed by aggravating factors, including that Officer [redacted] had committed "repeated acts of misconduct resulting in prior sustained adverse action," and that he did not accept responsibility for his misconduct. *Id.* at 3; *see also* 15 C.C.R. section 3392.5.

#### (c) Third Incident

We have little information about the third incident involving Officer [redacted] during this period. We are aware of it only because it was consolidated with Officer [redacted] appeal to the SBP in the first two incidents, described above, and the fourth incident, described below. The effective date of the NOAA related to this incident was June 30, 2025, and the Hiring Authority imposed a Level 3 penalty, reducing Officer [redacted] salary by 5% for 6 qualifying pay periods. *See* Stipulation at 3.

**Please produce the investigation file for this incident. In the alternative, please provide a summary of the incident and the misconduct findings the Hiring Authority sustained.**

#### (d) SATF-[redacted], Sustained (Reduced to Letter of Reprimand)

In the fourth incident, the Hiring Authority again sustained an allegation of unnecessary force against Officer [redacted]

Prior to the force, [redacted]—a class member with mobility and vision disabilities—had reported chest pains. The incident begins with Officer [redacted] approaching Mr. [redacted] and explaining that he

is going to put Mr. [redacted] in waist restraints, presumably to facilitate Mr. [redacted] transport to medical. *See* BWC 1 at 19:26:10 to 19:26:11. What unfolds next is a force incident against a person with disabilities that is so clear on video it should have resulted in immediate action against the officer. Mr. [redacted] who is seated in wheelchair and wearing dark sunglasses, asks, "Who is that?" *Id*. at 19:26:11. After Officer [redacted] identifies himself, Mr. [redacted] says, "I want to talk to a Sergeant," and appears to object to being put in waist restraints.[2] *Id*. at 19:26:11 to 19:26:15. Officer [redacted] responds, saying something like "Ok we gotta get you in waist restraints." Mr. [redacted] then begins to turn his wheelchair away from Officer [redacted] *Id*. at 19:26:15 to 19:26:24.

At the same time, Officer [redacted] approaches Mr. [redacted] and says, "We're going to take you to the clinic. We gotta put chains on." *Id*. at 19:26:24 to 19:26:25. Mr. [redacted] does not respond but wheels himself backward, away from Officers [redacted] and [redacted] and under the stairs to the upper tier. Officer [redacted] says in a louder force, "Hey. You're going to put chains on. Hey, stop moving your hand." *Id*. at 19:26:26 to 19:26:31. Mr. [redacted] hands are on the wheels of his wheelchair and he is using them to move away from Officer [redacted] Officer [redacted] again says, "We need to put waist restraints on you." Mr. [redacted] who is now beneath the tier stairs, again says, "I want to talk to a sergeant." *Id*. at 19:26:32 to 19:26:34.

As Mr. [redacted] spins his wheelchair to point it away from Officer [redacted] and roll forward, Officer [redacted] asks, "What are you doing?" *Id*. at 19:26:35. Mr. [redacted] continues to roll forward in his chair, away from Officer [redacted] and out from underneath the stairs as Officer [redacted] shouts, "Hey [redacted] You need to stop." *Id*. at 19:26:36 to 19:26:43. At this point, two more officers, including Officer [redacted], approach Mr. [redacted] *Id*. at 19:26:43. While standing in front of Mr. [redacted] and facing him, one or both of these officers tell Mr. [redacted] that they need to put him in waist restraints. *Id*. Mr. [redacted] takes out his tapping cane, extends it, and then holds it with two hands between his legs, with the upper portion of the cane leaning against his left shoulder. *Id*. at 19:26:43 to 19:26:47.

There are now four officers surrounding Mr. [redacted] at least two of whom are telling Mr. [redacted] in loud voices that they are going to put him in "chains" or waist restraints. Mr. [redacted] begins to object, and says to Officer [redacted] "Get away from me." *Id*. at 19:26:48. Mr. [redacted] then asks whether another officer would "tell [Officer [redacted] to get away from me?" *Id*. at 19:26:50 to 19:26:53. Officer [redacted] does not "get away" from Mr. [redacted] Instead, he reaches with both of his hands to grab Mr. [redacted] right arm.

---

[2] From the BWC produced, it appears that a Sergeant was present in the unit when Mr. [redacted] made this request.

[redacted]

*Id*. at 19:26:52.

When Mr. [redacted] tries to move his right arm away from Officer [redacted] Officer [redacted] rears back, pulling Mr. [redacted] arm with his left hand, and then strikes Mr. [redacted] right shoulder with his right elbow. *Id*. at 19:26:53.

After Officer [redacted] strikes him, Mr. [redacted] leans forward and away from Officer [redacted] in his wheelchair. Officer [redacted] than wraps his right arm around Mr. [redacted] neck, and pulls him out of the wheelchair and on to the ground. The wheelchair topples over, Mr. [redacted] face slams into the floor, and Officers [redacted] and [redacted] land on top of Mr. [redacted] *Id*. at 19:26:53 to 19:26:57. *See also* BWC 2 at 19:26:53.

[redacted]

*See* AVSS at 19:26:50.

[redacted]

*See AVSS* at 19:26:52.

After tackling Mr. [redacted] out of his wheelchair, Officers [redacted] and [redacted] handcuff Mr. [redacted] behind his back using regular restraints; Mr. [redacted] is silent and not moving as they do so. *See* BWC 1 at 19:26:58 to 19:27:24. When the officers sit him up a few seconds later, Mr. [redacted] says something to the effect of, "I still have chest pains," and then, a few moments later, "I can't be in these handcuffs. I gotta be in waist restraints." *Id*. at 19:27:46 to 19:28:06. Officer [redacted] responds:

> Right now, that's the only thing that you are going to be in because you cannot comply with direct orders. We tried--I tried to place you in regular waist restraints, now you made it into an emergency. That's all that we have available. We're going to help you up and you're going to sit on this chair and we're going to take you to medical to the holding cell. And you'll be evaluated for a 7219, all right?

*Id*. at 19:28:06 to 19:28:23.

As Officer [redacted] finishes this sentence, another voice, presumably an incarcerated person, can be heard shouting, "Stop lying!" *Id*. at 19:28:20. Video and Officer [redacted] Staff Narrative of the incident (*see* Exhibits at 56)—and Officer [redacted] own words—confirm that Officer [redacted] was lying: waist restraints were readily available.

The Hiring Authority found that the force Officer [redacted] used was unnecessary (L1) and imposed a Level 3 penalty, reducing Officer [redacted] pay by 5% for 6 qualifying pay periods. *See* 402/403.

**(e) Fifth Incident -** [redacted]

Plaintiffs have not done an extensive search but became aware of one complaint, the fifth incident involving Officer [redacted] during this period, from a civil rights complaint filed in the United States District Court for the Eastern District of California in December 2025. [redacted], the plaintiff in this case, alleges that on October 10, 2024, Officer [redacted] was escorting him out of [redacted] in handcuffs when Officer [redacted] joined the escort. *See* FAC at 5. Mr. [redacted] First Amended Complaint (FAC) alleges that "[i]t is well known that Defendant [redacted] enjoys assaulting inmates especially while they are in restraints." *Id*. . So, when Officer [redacted] joined the escort, Mr. [redacted] "turned his head to the right," saw Sgt. [redacted], and said, "I don't want [[redacted] to escort me. I don't feel safe!" *Id*.

At this point, Officer [redacted] picked Mr. [redacted] "up off the ground and slamed [sic] him on his face." *Id*. Then Officer "[redacted] punched Plaintiff in the right side of the face." *Id*. at 6. As Mr. [redacted] hit the ground, Officer [redacted] "tripped and landed on [Mr. [redacted] back and head." *Id*. . A third officer then intervened and "pushed

[Mr. [redacted] face into the hot asphalt giving him a severe road rash on the side of his face." *Id.* Officers [redacted] and [redacted] joined this third officer in "grinding [Mr. [redacted] face into the asphalt." *Id.*

Notably, Mr. [redacted] also alleges that Officer [redacted] "has an extensive history of assaults on Inmates who are in restraints," and has "openly admitted to [Mr. [redacted] and other Inmates that he is a proud member of the 'Green Wall' Gang." *Id.* at 7.

**(f) Consolidated Appeal to the SBP**

In November 2025, the parties agreed to a stipulation that resolved Officer [redacted] appeals of the first four incidents described above.[3] In effect, the stipulation reduced a penalty that, in the aggregate, amounted to a 5% reduction in pay for 21 qualifying periods, to a 5% reduction in pay for just 6 months, and three letters of reprimand. *See* Stipulation at 2-4.

**(g) Conclusion**

These incidents evince a pattern: Officer [redacted] resorts to unjustified, immediate, and dangerous force against class members with disabilities who present no imminent threat. We recognize that CDCR can no longer discipline him for these incidents, **but we ask that you reassign Officer [redacted] to a post in which he cannot interact with and harm class members.**

The manner in which these incidents were ultimately resolved also illustrates problems with CDCR's accountability system—problems we have raised repeatedly over the last several years. For example, as we have pointed out before, CDCR undermines its own progressive discipline system by stipulating to lesser penalties when clear evidence establishes that misconduct occurred. These cases also demonstrate how the failure to recognize a problematic pattern of behavior and the slow pace of investigations can combine to allow a single officer to repeatedly harm class members without receiving any interventions such as interim training or guidance that might prevent future, continued misconduct.

Plaintiffs' counsel would like to know:

1. What, if any, information in Defendants' accountability system should have led the Hiring Authority or other CDCR management to detect a pattern of allegations of serious use of force incidents involving Officer [redacted]?

---

[3] The first two incidents were consolidated together in SBP case number [redacted]. The third incident's SBP case number is [redacted]. And the fourth incident's SBP case number [redacted].

2. What, if any, action could have been taken by the Hiring Authority had Defendants' accountability system led to the Hiring Authority or other CDCR management detecting a pattern of allegations of serious use of force incidents involving the same officer?

3. What, if any, information in Defendants' accountability system should have led investigators to connect these allegations for the benefit of Hiring Authority decision-making?

4. What, if any, action could have been taken by investigators in these cases to connect these allegations for the benefit of Hiring Authority decision-making?

5. How many complaints alleging unnecessary or excessive force have been filed against Officer [redacted] since March 2024?

6. Are there any other pending use of force allegations against Officer [redacted] currently under investigation by CDCR? If so, how many? What steps will be taken to ensure that investigators and the Hiring Authority are aware of the problematic pattern of sustained and non-sustained cases involving this single officer?

7. How are staff trained to respond to incarcerated people who ask to speak with a Sergeant? Under what circumstances are those requests honored? Under what circumstances are they denied?

8. Plaintiffs' counsel request that, given conduct revealed on footage where this officer has acted in complete disregard of people's disabilities and has rushed to use dangerous force when there is no imminent risk of harm, this officer be immediately re-assigned to a position in which he does not come into direct contact with incarcerated people with disabilities or serious mental health issues.

**Please report on what action is taken in response to this request.**

## II. CARU IMPROPERLY IMPOSES CORRECTIVE ACTION FOR SUSTAINED ALLEGATIONS OF IMPROPER FORCE

In multiple cases produced this quarter, the Centralized Allegation Resolution Unit ("CARU") properly identified and sustained use-of-force violations but imposed only corrective action, which is inconsistent with CDCR's disciplinary matrix. Unnecessary Force Without Injury (L1) has a baseline penalty of Level 2 (1**2**3), but the CARU did not impose adverse action in any of the cases below. *See* 15 C.C.R. § 3392.5. In one case, the CARU explained that it imposed a lower-than-baseline penalty because the employee does not have a history of discipline, but that justification is inconsistent with regulations.

See 15 C.C.R. § 3392.5(c)(4) ("The Employee Disciplinary Matrix is based on the assumption that there is a single act of misconduct at issue and **this is the employee's first adverse action**.") (emphasis added). In another case, the CARU listed no aggravating or mitigating factors, yet imposed a lower-than-baseline penalty, again in violation of regulations. *See* 15 C.C.R. § 3392.5(c)(5) ("The hiring authority shall impose the base penalty unless aggravating or mitigating factors… are identified"). In a third case, it is unclear why the CARU imposed less than the baseline penalty; the mitigating factors listed on each of the 402/403s did not justify the CARU's downward departure from the matrix[4]:

- **COR-[redacted], Sustained (Letter of Instruction)**: On April 1, 2025, Officer [redacted] used unnecessary force on [redacted]. The video footage shows Officer [redacted] removing Mr. [redacted] from his cell in [redacted], an EOP unit, after Mr. [redacted] was reportedly experiencing chest pains. Mr. [redacted] is handcuffed behind his back and calmly walking in the direction of the escort. While walking forward, he begins looking over his right shoulder (Officer [redacted] is on Mr. [redacted] left side), and Officer [redacted] tells him to look forward. Mr. [redacted] complies and also tells Officer [redacted] to "quit grabbing me." In response, and immediately, Officer [redacted] places his leg in front of Mr. [redacted] and throws him to the ground head-first. *See* BWC at 17:20:40 to 17:21:00. The CARU appropriately sustained allegations of failure to observe and perform within the scope of training (D26, <u>1</u>2345) and unnecessary use of force without injury (L1, 1<u>2</u>3). *See* 402/403 at 4. In so doing, the CARU found that "there did not appear to be an imminent threat when [Officer [redacted]] utilized force against IP [redacted]." *See* Closure Documents at 6. The CARU found three mitigating factors and three aggravating factors. *Id. at* 4. But the CARU concluded that, because of "factors" (which were not described in the 402/403) and because Officer [redacted] did not have any prior sustained allegations of adverse action, "a mitigation downward to an LOI was the appropriate penalty." *Id.* The CARU only imposed corrective action. *Id. at* 3.

- **COR-[redacted], Sustained (Letter of Instruction and Training)**: On February 13, 2025, Officer [redacted] used unnecessary force on [redacted]. Officer [redacted] and another officer were waiting for Mr. [redacted] to be medically evaluated by a nurse in the dayroom of the EOP Restrictive Housing Unit, Building [redacted]. Mr. [redacted] was handcuffed behind his back and sitting in a chair, and Officer [redacted] was standing behind him over his left shoulder. The video shows Mr. [redacted] being verbally disrespectful to Officer [redacted] and Officer [redacted] tells him several times

[4] These cases reveal the failure of staff to react appropriately during interactions with people with mental illness in multiple situations that led to dangerous, harmful, and confirmed unnecessary uses of force.

to face forward but otherwise makes no attempt to de-escalate the situation. Around 15 seconds after sitting in the chair, Mr. [redacted] calls Officer [redacted] a "bitch," at which point Officer [redacted] immediately grabs Mr. [redacted] by the neck or chest and throws him backwards to the ground. *See* AVSS. The CARU appropriately sustained allegations of failure to observe and perform within the scope of training (D26, **1**2345) and unnecessary use of force without injury (L1, 1**2**3). *See* 402/403 at 4. The CARU concluded that, "[w]hile IP [redacted] continued to make belligerent statements, his body language remained compliant and it did not appear that he resisted physically or attempted to stand." *See* Closure Documents at 24. According to the CARU, Officer [redacted] decision to use force was not justified by policy because "[t]here was not an imminent threat present or articulated which would warrant the immediate use of force you utilized when you pulled him to the ground." *Id.* The 403 lists a number of mitigating and aggravating circumstances, none of which appear more significant than any other. *Id.* at 4. However the CARU imposed only corrective action. *Id at 2*. Staff should have been prepared to react differently to Mr. [redacted] given that his behavior was foreseeable in the EOP RHU. His actions align with his active mental health problems including but not limited to antisocial personality disorder, bipolar I disorder, and intermittent explosive disorder. *See* 7/2/2026 MH Master Treatment Plan.

- **SATF-[redacted], Sustained (Letter of Instruction and Training)**: On October 30, 2024, Sergeant [redacted] used unnecessary force when he punched or pushed (it is unclear from the video) [redacted] in the back while Mr. [redacted] was in a holding cage. The investigation was initiated because Associate Warden Carrie Critchlow authored a memorandum to the warden indicating that, while reviewing this incident package, she observed that Sergeant [redacted] "appears to punch/strike incarcerated person [redacted] in the back." *See* IR at 3. A.W. Critchlow highlighted discrepancies between Sergeant [redacted] written incident report and the video footage, suggesting that his report is not accurate and may have been dishonestly written. *Id.* She referred the case for administrative investigation. *Id.* At the start of the incident, Mr. [redacted] is in a holding cage in the program office, apparently because he was refusing to accept his housing assignment. *Id.* at 4. A sergeant approaches the holding cage and is immediately verbally aggressive with Mr. [redacted] dismissing his concerns with his housing compatibility and telling him that he "is the problem." *See* BWC 1 at 11:07:20-40. After the sergeant escalates the situation, Mr. [redacted] spits on her, which is most clearly seen on the body-worn camera of Sergeant [redacted] who was standing just behind the incident. *See* BWC 2 at 11:07:46.[5] The sergeant who

---

[5] Mr. [redacted] explained to the investigator that his actions were the result of his mental illness: "It's my mental health. I was paranoid." *See* IR at 13. Instead of requesting that clinical staff speak with Mr. [redacted] the sergeant antagonized him and downplayed his

was spit on immediately steps away, and Sergeant [redacted] approaches the holding cage, pulls out his OC spray, points it at Mr. [redacted] and says, "Turn your ass around! Turn around!" *See* BWC 2 (linked above) at 11:07:51. Sergeant [redacted] then deactivates his body-worn camera so that he can conduct a strip search on Mr. [redacted] before escorting him to a restrictive housing unit. Moments after deactivating his camera, Sergeant [redacted] appears to look down the hallway then punch (or push) Mr. [redacted] through the tray slot of the holding cage. *See* AVSS 1 at 11:08:06; AVSS 2 at 11:08:06. Sergeant [redacted] explained to the investigator that he used force because Mr. [redacted] "pulled away" "[a]s he began to remove his jacket and hand it to me." *See* IR at 20. The investigator appropriately highlights the inconsistency between the sergeant's testimony and the video footage: "[redacted] did not appear to remove any clothing until after [redacted] punched/pushed [redacted]." *Id*. at 11. For reasons that are unclear, the CARU did not sustain an allegation of dishonesty but did appropriately sustain an allegation of unnecessary force. *See* 402/403 at 8. The CARU listed no mitigating or aggravating factors on the 403, even though the CARU could have found that the misconduct was intentional and willful, that Sergeant [redacted] was a supervisor and should be held to a higher standard, that the inherent nature of the act was inappropriate, or that Sergeant [redacted] was evasive, dishonest, or intentionally misleading during the investigation, among others. *See* 15 C.C.R. § 3392.5(c)(11) (listing potential aggravating factors). The CARU imposed only corrective action and listed no justification for departing from the disciplinary matrix, in violation of CDCR policy. *See* 402/403 at 10-11.

According to CDCR's own regulations, officers found to have engaged in excessive or unnecessary use of force should receive adverse action unless consideration of the aggravating and mitigating factors warrants a downward departure in penalty. In the cases discussed above, the CARU failed to justify any mitigation of the penalties. In fact, in the second and third cases, any departure from the baseline should have increased the penalty, as the officers' improper uses of force were intentional and retaliatory (for being verbally abused in the second case and for spitting on a sergeant in the third case). These accountability failures send a consistent message to officers that improper uses of force are not serious forms of misconduct.

These cases represent a growing pattern that we have observed, where the CARU is increasingly likely to identify and sustain misconduct but fails to impose the appropriate level of discipline. *See, e.g.*, Pls.' May 2026 Review of CDCR's

---

mental health needs: "There's no problem. You have no problem. <u>You are the problem. I'm tired of moving you and I'm tired of you going mental health.</u> Stop and listen. Stop and listen. I'm not moving you anywhere. You are properly endorsed." *Id*. at 11 (emphasis added). The CARU did not identify any policy violations related to the sergeant's escalatory behavior.

Accountability System at PDF p. 25 (COR-[redacted] sustained an allegation of unnecessary force but imposed only corrective action); Pls.' Feb. 2026 Review of CDCR's Accountability System February 2026 at PDF pp. 29 to 33 (RJD-[redacted] sustained an allegation of failing to intervene to stop misconduct and endangerment, a baseline Level 5 penalty, but imposed only Level 1). The CARU's reasoning for departing from the baseline penalty is either unclear from the documentation or inconsistent with regulations. The CARU's failure to impose correct discipline is often compounded before the State Personnel Board ("SPB"), where CDCR often inexplicably stipulates to even lower penalty. *See, e.g.*, Pls.' May 2026 Review of CDCR's Accountability System (linked above) at 2 to 3 (SATF-[redacted] & SATF-[redacted], CDCR stipulated to corrective action after sustaining allegations of excessive force in one case and unnecessary force in another case); Pls.' Aug. 2025 Review of CDCR's Accountability System at PDF pp. 21 to 22 (SATF-[redacted], CDCR stipulated to no penalty after a hiring authority imposed a Level 5 penalty for an officer punching a class member in the face). If CDCR is serious about reducing improper uses of force in its prisons, it must start imposing appropriate adverse action for use-of-force policy violations.

## III. FAILURE TO ACCOMMODATE DISABILITIES RESULTING IN THE USE OF FORCE

Plaintiffs' counsel continue to identify multiple cases each quarter in which CDCR's accountability system fails to hold staff accountable for the failure to accommodate class members with disabilities, including serious mental illness, resulting in the inappropriate, unnecessary, dehumanizing, and sometimes excessive use of force against people with disabilities. The first two cases illustrate how, despite the clear need, staff fail to provide basic *Armstrong* disability accommodations to class members, ultimately resulting in uses of force that – with disability accommodations – could have likely been avoided. In both cases, the investigator and all subsequent reviewers failed to identify the connection between the need for a disability accommodation and the inappropriate use of force, and failed to reference any disability-related, policies and policy failures on the part of staff in the investigation report. The third case illustrates an egregious failure to accommodate a class member in mental health crisis during escort to a crisis bed. And the fourth case illustrates how the use of force can unnecessarily result in the expansion of the *Armstrong* and *Coleman* class.

Ultimately, these cases represent ongoing examples of how the accountability system continues to fail to hold staff accountable for clear, disability-related staff misconduct in violation of years of court orders.

### 1. KVSP-[redacted] Not Sustained

In this case, officers failed to accommodate [redacted]), when they refused to provide accessible

transportation. Instead, they attempted to lift the class member out of his wheelchair and force him up steps and into an inaccessible van. Their actions resulted in an avoidable and unnecessary use of force that violated Mr. [redacted] ADA rights. Despite clear video evidence of the incident, the CARU did not sustain any allegations about either the ADA violation or the unnecessary use of force. Moreover, the investigation was incomplete, as it failed to mention that the class member is [redacted] and has a no-stairs restriction, which made the use of a transport van with a large step inappropriate for him.

On April 22, 2025, at approximately 11:00 am, officers initiated an appropriate and court-ordered controlled use of force to extract Mr. [redacted] from his cell and transport him to a mandatory court appearance. Staff removed Mr. [redacted] from the cell, placed him in restraints, and put him in his wheelchair. *See* Exhibits at 25.

Mr. [redacted] asserts that, after he was extracted from his cell, he made clear to staff that, because he is unable to climb stairs, he could not be transported in a van without a wheelchair lift. He states that staff informed him that no wheelchair accessible van was available and that therefore they would instead force him into an inaccessible van. *See* [redacted] Interview at 2:37 to 3:15.

Available video of the incident begins after this conversation when staff begin to record him being forced against his will into the inaccessible van. As the video shows, the van that staff were attempting to force Mr. [redacted] to board requires a person to climb three steps. Mr. [redacted] is sitting in his wheelchair outside of R&R in waist restraints. A lieutenant announces that officers are continuing the controlled use of force from earlier in the day because Mr. [redacted] is refusing to board the transportation van, failing to acknowledge that the refusal related to his asserted right to ADA accommodations. Mr. [redacted] states, "I am an ADA inmate and I am refusing to be touched." He then says, "There's my wheelchair." Viewed in context, these statements reflect his effort to reiterate to staff and make clear on video that he is refusing to board the van because it is inaccessible. *See* BWC at 12:42:22 to 12:42:45.

Officers then push Mr. [redacted] wheelchair to the entrance of the van. Two officers grab Mr. [redacted] under his arms and lift him from the chair. Mr. [redacted] goes limp. Two other officers approach to assist. As the officers attempt to force Mr. [redacted] into the van, he begins to resist. A significant use of force ensues, during which Mr. [redacted] head hits the sliding door of the van, officers forcefully push him into the van, and Mr. [redacted] allegedly bites one of the officers. Ultimately, the officers are able to close the door with Mr. [redacted] in the van. *See* BWC (linked above) at 12:42:40 to 12:44:44.

Four days later, Mr. [redacted] filed a 602 about the incident. He wrote: "While at R&R awaiting transport, I refused to climb the trans van steps to load up. [The officers] took it upon themselves to physically grab me and load me up the trans van. While doing so, they beat me by socking me in the face and slamming my head into the van floor." *See* 602.

Following an AIU investigation, the CARU did not sustain any allegations of unnecessary or excessive force.[6] *See* 402/403. The CARU did not consider any allegations that officers violated the ADA.

The CARU's decision not to hold any staff accountable was a serious error. First, the CARU should have considered and sustained allegations that officers violated CDCR's ADA policies. At the time of the incident, Mr. [redacted] was [redacted] and had a documented "no stairs" chrono. *See* April 2025 DPP Roster. As shown in the video, the van that officers wanted Mr. [redacted] to enter had three steps. Moreover, Mr. [redacted] informed officers that he was not agreeing to board the van because it was not accessible. Any attempt to require him to board the van violated policy because it was not consistent with Mr. [redacted] documented accommodation needs. Nevertheless, the CARU failed to even consider this obvious ADA violation.

Second, the CARU should have sustained the unnecessary use-of-force allegations. The officers caused this unnecessary and dehumanizing force incident by failing to accommodate a class member with confirmed disabilities and stair limitations. The start of the video in this case shows that Mr. [redacted] had made the officers aware of his valid reason for not entering the inaccessible vehicle. With a wheelchair accessible vehicle, the use of force could have been avoided entirely. Instead, the officers ignored Mr. [redacted] ADA rights and escalated the situation, resulting in the use of force in which both Mr. [redacted] and at least one of the officers sustained injuries.

With respect to the failure to accommodate Mr. [redacted] disability, the investigation report is incomplete. See IR. Though the investigation report does mention that Mr. [redacted] was in a wheelchair when this incident occurred, it does not (1) identify that Mr. [redacted] is designated as [redacted] (2) list any of his limitations or required accommodations, including the no-stairs limitation, or (3) mention that accessing the van required climbing three steps. In addition, the report's exhibits do not include any documentation of Mr. [redacted] disability or accommodations. *Id.* at 6. Finally, the investigation report fails to mention the remedial plan requirement that "[t]he special needs of inmates with disabilities shall be considered in transporting them", nor the requirement that "[a]ccessible vehicles shall be used to transport inmates/parolees in wheelchairs and those whose disability, i.e., mobility, necessitates specialized transportation." *See Armstrong* Remedial Plan, Section IV.I.9. These shortcomings in the report do not excuse the CARU's failings; the ADA violation in this case is documented on video and clear. Nevertheless, the investigator's incomplete report set the

---

[6] At First and Second Levels of Review, the IERC did not identify any issues with the use of force. *See* Exhibits at 67 to 72. For reasons unclear, the Second Level Review occurred on May 13, 2025, more than two weeks after the filing of the staff complaint. The IERC then suspended its review while the AIU investigated.

CARU up for failure by not including all relevant information regarding the officers' failure to accommodate Mr. [redacted] disability.

This case, in which the AIU and the CARU both failed to recognize quintessential violations of CDCR's disability policies, suggests that Defendants still have a long way to go before they come into compliance with the Court's staff misconduct orders.

**2. RJD-[redacted], Not Sustained**

In this case, officers' failure to reasonably accommodate [redacted]) led to an unnecessary use of force.

Ms. [redacted] uses a walker and a cane and has a special cuffing restriction. According to the investigation report, officers were escorting Ms. [redacted] out of the housing unit after she was seen throwing property around the day room and was deemed a risk. *See* IR at 3. Video footage shows that, at the time the officers initiate her escort, Ms. [redacted] quickly complies with officers' orders to cuff up, and Officer [redacted] uses two sets of handcuffs to cuff Ms. [redacted] in front of her body. *See* BWC 1 at 14:02:00 to 14:02:10. The officer and Ms. [redacted] both confirm that prior to being cuffed, Ms. [redacted] requested that her special cuffing chrono be honored, but Officer [redacted] denied her this request "until the waist restraints arrived". *See* Exhibits at 40, 74. As the escort begins, Ms. [redacted] is seen holding her cane in her left hand, and the right side of her walker with her right hand. Due to the short length of the cuffs, she is unable to reach both sides of her walker. *See* BWC 1 (linked above) at 14:02:10 to 14:02:17. As such, she stops momentarily; she states as she lost her balance. *See* BWC 1 (linked above) at 14:02:18; IR at 5. Officer [redacted] grabs onto Ms. [redacted] right arm with both hands and says: "Stop, don't even start. Just go. Stop." Meanwhile, Officer [redacted] tells Ms. [redacted] "Don't resist." Ms. [redacted] responds, "I'm not homie, I'm not resist…" Before she can finish her sentence, Officer [redacted] drives her backwards and throws her and her walker to the ground. *See* BWC 2 at 14:02:09 to 14:02:22. Ms. [redacted] sustained injuries to her shoulder and hip. *See* Exhibits at 57.

CDCR opened an investigation into the use of force when, during review of the incident, Ms. [redacted] alleged excessive and unnecessary force against staff. The Incident Commander then suspended and referred the case for further review. *See* Exhibits at 3. During the first level of IERC review, Ms. [redacted] explained that "[she has] a hard time walking by [herself] without [her] walker," and that her "hands would [not] go across [the walker] like they do with the waist chains." She further explained that she "lost her balance [and] they took it as resisting." *See* Exhibits at 5.

As justification for why Officer [redacted] did not retrieve waist restraints prior to escorting Ms. [redacted] out of the unit, he said that he feared that other incarcerated people might attack Ms. [redacted] and he did not believe that he had time to retrieve waist restraints. *See* IR at 6. Instead he opted to accommodate her by applying two sets of handcuffs until

the waist restraints could be obtained. *See* Exhibits at 40. Despite his awareness of a need for an accommodation to safely escort Ms. [redacted] and the obvious difficulty of using a walker when unable to extend one's hands to the width of the walker handles, Officer [redacted] quickly resorted to immediate force, taking her to the ground when she paused, later stating that he "did not believe [redacted] lost her balance." *See* IR at 6.

The Hiring Authority incorrectly failed to sustain any allegation of misconduct. *See* 402/403 at 2.

Force could have been avoided had Officer [redacted] accommodated Ms. [redacted] disability. Rather than forcing Ms. [redacted] to attempt to walk without full use of her walker, Officer [redacted] could have taken multiple different actions to respond to the situation – including his perceived threat to her safety. The officer could have initiated an alarm, prior to the use of force, to secure the unit. He could have then retrieved waist restraints or a wheelchair to conduct the escort. Or, because there were two escort officers present, they could have sat her down while radioing for another officer to retrieve waist restraints, a wheelchair, or some other accommodation. Instead, despite acknowledging her apparent need for a cuffing accommodation in order to use her walker, Officer [redacted] proceeded with the escort anyway, even after it was apparent that she was not able to use her walker, in violation of CDCR policy that requires officers to accommodate class member's disability when applying handcuffs. *See* DOM 51020.6(g) (mechanical restraints "shall be applied" to people with disabilities to "ensure effective application while reasonably accommodating the [incarcerated person's] disability"). This failure to accommodate ultimately resulted in an unnecessary use of force when, after she paused during escort, immediate force was used to take her down. Ms. [redacted] neither presented an imminent threat during the escort nor threatened Officer [redacted] during the interaction. Ms. [redacted] "resistance" was only because Officer [redacted] failed to provide her a disability accommodation. As such, both shoving Ms. [redacted] into the wall and throwing her to the ground was unnecessary and dangerous. The Hiring Authority should have sustained an allegation of staff misconduct against Officer [redacted] for failing to perform within the scope of his duties and training when he improperly denied Ms. [redacted] a reasonable disability accommodation. The Hiring Authority should have also sustained unnecessary force without injury (L1, 123).

This case involves two extremely common force scenarios for *Armstrong* class members observed by Plaintiffs' counsel during case reviews; use of immediate force when someone with a mobility disability pauses or hesitates during escort, and use of immediate force when a class member is deemed to be "resisting" when asserting their right to cuffing accommodations during an incident. Recently, Defendants have said that no front cuffing accommodation exists, and that policy does not provide for front cuffing. If true, this directly violates the *Armstrong* Remedial Plan ("ARP") requirement that "inmates who have a disability that prevents application of restraint equipment in the ordinarily prescribed manner shall be afforded reasonable accommodation… mechanical

restraints shall be applied to ensure effective application while reasonably accommodating the inmates' disability." *See* ARP § IV.I.7. Plaintiffs' counsel wish to continue to discuss the requirement that staff must provide cuffing accommodations to people who, as in this case, are unable to safely walk without accommodation. Plaintiffs also seek to continue to discuss how, as in this case, it is essential for staff to consider disabilities during escort, and especially whether the escort is paused as a result of the disability, before resorting to dangerous and unnecessary immediate force.

**3. COR-[redacted], Not Sustained**

This case involves an officer two-hand shoving a suicidal class member to the ground for no apparent reason while the class member was handcuffed behind his back, in ankle restraints, and struggling to walk. The investigation was initiated after the associate warden over Corcoran's restrictive housing units authored a memorandum to the warden describing the force as unnecessary and excessive, indicating that the officer's incident report was inconsistent with the video footage, and stating what appears to be happening is that the class member is having trouble walking. *See* Exhibits at 4. Despite the associate warden's concern about the officer's improper use of force and inaccurate reporting, the allegations were not sustained. In fact, the only discipline issued in this case was to the class member who was thrown to the ground, for "resisting staff," which is not evident in the video. *Id.* at 50.

On December 20, 2024, officers are escorting [redacted] from his housing unit to the [redacted] because Mr. [redacted] reported that he was suicidal. *See* Investigation Report at 1, 4. The fixed-camera footage shows Mr. [redacted] being escorted around the track with an officer on either side of him and a sergeant behind him. *See* AVSS at 17:37:00. Mr. [redacted] is handcuffed behind his back, secured in ankle restraints, and appears to be struggling to walk. At 17:37:15, Officer [redacted] stops the escort and says something to Mr. [redacted] who appears to listen to the order before the escort begins again. Mr. [redacted] takes a few steps forward, and seconds later, Officer [redacted] puts both of his hands on Mr. [redacted] right shoulder and shoves him to the ground, with Mr. [redacted] momentarily becoming airborne. *See* AVSS (linked above) at 17:37:22.

The body-worn camera footage does not make the impetus for Officer [redacted] decision to use force any clearer. As Mr. [redacted] is walking around the track, Sergeant [redacted] who is trailing the escort, starts making friendly small-talk with Mr. [redacted] Mr. [redacted] answers each of the sergeant's questions in a calm manner. At 17:37:25, however, Officer [redacted] stops the escort and says, "Stop pulling, alright. Stop pulling. I'm going to tell you one more time: stop pulling." Again, it is not clear on the video that Mr. [redacted] is pulling at all though, as noted by the associate warden, he is shackled and is struggling to walk. But after taking a couple more steps, Officer [redacted] says, "Stop", then immediately initiates a use-of-force. Mr. [redacted]

does not appear to do anything in the moments before the force that would justify Officer [redacted] decision to use immediate force. *See* BWC at 17:37:00 to 17:37:32.

Mr. [redacted] received an RVR for this incident, and neither the RVR narrative nor any of the officers' incident report narratives are consistent with the video footage. The narrative of the RVR, issued for "Resisting Staff," tracks with Officer [redacted] incident report and states that Mr. [redacted] "began to start aggressive behaviors and demeanor as he stopped the escort multiple times, began tensing his right forearm and pulling his forearm in a downward motion towards the center of his body and was stating 'don't touch me.'" *See* Exhibits at 43, 58. Those alleged actions are not evident on the video; Mr. [redacted] did not stop the escort, nor did he say "don't touch me," in any of the video files produced in the investigation file. The investigation report notes this fact—"It should be noted during my review I did not observe or hear [redacted] say the words 'don't touch me' or 'get off me'"—but caveats that finding by explaining that "the BWC footage of the subjects started mid escort when the escort was half way across the facility yard." See IR at 5.[7] Sergeant [redacted] wrote in his incident report that he observed Mr. [redacted] "suddenly stop the escort and turn his head to Officer [redacted] while pulling forward with his right arm," causing Officer [redacted] to react with immediate force. *See* Exhibits at 38. But Officer [redacted]—not Mr. [redacted]—stopped the escort, and the video footage from Sergeant [redacted] body-worn camera shows Mr. [redacted] head facing downward at the time force was used.

The associate warden responsible for the restrictive housing units at the prison, Associate Warden Chappell, identified the force as both unnecessary and excessive and called into question the accuracy of Officer [redacted] incident report. In a memo to the warden, A.W. Chappell wrote:

> In viewing the footage provided, it appears as if IP [redacted] is struggling to walk as he is cuffed behind his back and has leg restraints on. Officer [redacted] indicates in his report that IP [redacted] during the escort began "to start aggressive behaviors and demeanor as he stopped the escort multiple times." Officer [redacted] indicates the necessity of his force was for his safety as well as his partners safety due to IP [redacted] "violent behavior." This appears to be contrary to what the AVSS and BWC footage shows. At no time does IP [redacted] appear to be violent. When reviewing the footage for this IRT, it appears IP [redacted] is struggling to walk with the leg

---

[7] The longest video footage produced in this file—one of the escort officer's BWCs—includes one minute and 42 seconds of footage before Officer [redacted] used force. *See* BWC 2. At no point during that nearly two minutes did Mr. [redacted] say, "Don't touch me."

> restraints. The amount of force that officer [redacted] uses appears to be unnecessary and excessive.

*See* Exhibits at 4.

The investigator in this case did not thoroughly identify the discrepancies between the officers' incident reports and the video footage, other than noting the inconsistency about whether Mr. [redacted] stated "don't touch me." The investigator, who was not assigned until eight months after the incident was initially flagged by the AW, was unable to interview Officer [redacted] because he was out on a medical leave and "not responding to [the investigator's] attempts to contact him." *See* IR at 10, Exhibits at 4. Ultimately, the investigator concluded the investigation without interviewing the main subject because of "the impending statute of limitations for this investigation." *Id.* The CARU did not sustain allegations of dishonesty against any of involved officers for their inaccurate incident reports. *See* 402/403.

As A.W. Chappell pointed out in the memo to the warden, the use-of-force in this case violates policy. At the time Officer [redacted] used immediate force, Mr. [redacted] is not presenting an imminent threat; he is secured in handcuffs and ankle restraints, shuffling around an otherwise empty track, and being escorted by three officers. Moreover, the amount of force was extremely disproportionate to the threat presented in that shoving a person who is handcuffed and restrained around the ankles with full force onto the ground is excessive and very dangerous. The CARU had sufficient video footage to sustain allegations of unnecessary and excessive use of force against Officer [redacted] Its reasoning for failing to do so is both unclear and contrary to CDCR policy.

**We request that CDCR void the RVR issued to Mr. [redacted] that resulted from this incident.**

**4. SATF-[redacted], Not Sustained**

In this incident, an officer used immediate and unnecessary force against a person who was calmly and passively standing against her cell door in an empty dayroom. The officer's use of immediate force escalated the situation, triggering additional force by ten more officers. This case came to the AIU after being referred for investigation during the First Level Review as part of the Institutional Executive Review Committee ("IERC") process. *See* Exhibits at 3-4. Despite clear evidence that officers used unnecessary and excessive force, the CARU failed to sustain the allegation of staff misconduct.

AVSS and BWC footage from the incident shows officers responding to a Code 1 (disruptive incarcerated person) in building [redacted]. The fixed-camera footage shows [redacted] leaned back against her cell door, with every other cell door closed and no other incarcerated person in view. *See* AVSS at 19:33:15; BWC at 19:33:00 to 19:33:15. According to Ms. [redacted] medical records, one of her close

family members died around the time of the incident. A mental health clinician noted that Ms. [redacted] has been "feeling unsupported by custody staff that would ask her for help with the housing unit but would not give her time on the phone with her family to process the loss." *See* Inpatient Progress Note. The video footage of the incident shows nearly a dozen officers arrive as Ms. [redacted] remains standing by her cell door with her arms crossed in front of her in an empty dayroom. She does not present an immediate threat to staff. Officer [redacted] approaches Ms. [redacted] and immediately escalates the situation by grabbing her right arm to cuff her. *See* AVSS (linked above) at 19:33:39. When she resists handcuffs, multiple officers grab her and throw to the ground for passively resisting cuffing. In all, it appears eleven officers used force to grab, throw, and restrain Ms. [redacted] without any attempt to use de-escalation techniques or controlled force, as she did not pose an imminent threat.

Ms. [redacted] was not in the Mental Health Delivery System at the time of the incident. The day after this incident, Ms. [redacted] was admitted to a mental health crisis bed ("MHCB") after endorsing suicidal ideation with a plan and intent to hang herself. *See* Inpatient Progress Note (linked above). After her eight-day stay in the MHCB, Ms. [redacted] was discharged to the EOP level of care, where she remains today. *See* 8-14-24 IDTT.

The body-worn camera footage makes clear that no staff member attempts to de-escalate the situation, in violation of CDCR policy. *See* 15 C.C.R § 3268(b)(1) (officers must attempt to use verbal persuasion to prevent the need for force); DOM § 51020.5(a) (same). As Officer [redacted] approaches Ms. [redacted] he says, "Turn around." He takes a few more steps and says again, "turn around," while twirling his finger. He then immediately grabs Ms. [redacted] resulting in a violent and likely avoidable use-of-force. *See* BWC at 19:33:35. Neither Officer [redacted] nor any of the other ten officers on the scene stop to ask Ms. [redacted] why she is refusing to return to her cell, what would make her go back to her cell peacefully, or even explain to her that she needs to submit to handcuffs. After entering the building, assessing the situation, and determining that only one incarcerated person was passively noncompliant, the officer had ample time to de-escalate the situation to avoid force. Instead, Officer [redacted] created the necessity to use force and violated CDCR's de-escalation requirements. *See* 15 C.C.R. § 3268(b)(2) (officers should only use force if "verbal commands and de-escalation techniques do not work, or are not feasible in light of the situation").

According to the Request for Administrative Review, a captain at SATF wrote: "The force used by Officer [redacted] appears to be unnecessary and/or excessive and controlled use of force should have been initiated." *See* Exhibits at 4. Yet, the CARU found no violation of policy without any explanation and clear video evidence to the contrary. *See* 402/403.

## IV. MISUSE OF THE SPECIAL-CONDITIONS CLOSURE PROCESS

CDCR regulations permit the Department to close certain staff-misconduct investigations without completing the full range of ordinary investigative steps. Under 15 C.C.R. § 3486.2(b)(4), an investigator may recommend closure based on a "special condition" when either: (1) video and audio recordings provide conclusive evidence that the alleged misconduct did not occur; or (2) no additional investigative steps can be pursued because the claimant provided insufficiently specific information and refused to cooperate with efforts to obtain additional information. If the special condition does not apply, or if additional investigation is warranted, the case must be returned for further investigation.

Plaintiffs' counsel has supported—and continues to support—CDCR's use of this process. Properly applied, the "special conditions" closure process allows CDCR to focus investigative resources on cases that require further factual development. When objective evidence conclusively proves that alleged misconduct did not occur, requiring investigators to conduct unnecessary interviews or review cumulative evidence wastes resources that could be directed to cases that need them.

Our review of special conditions cases shows that Defendants are using the process to end investigations when the evidence, particularly video evidence, is not conclusive. Two cases in this production illustrate CDCR's misuse of the "special conditions" closure process. In the first case, the evidence confirmed the misconduct occurred, but the Hiring Authority did not sustain the allegation; in the second case, the video evidence was inconclusive as to whether the misconduct occurred, but CDCR still closed the case without conducting any other investigation:

- **SATF-[redacted], Not Sustained:** This case involves CDCR using the "special conditions" closure process to not sustain an allegation, even though the video footage actually proves the misconduct occurred. [redacted] alleged that Officer [redacted] violated body-worn-camera requirements by failing to deactivate his camera during an unclothed body search on September 6, 2025. The video confirms Mr. [redacted] allegation. At approximately 09:23:18 a.m., during a search in the dayroom of his housing unit before release to yard, Mr. [redacted] turned around in front of Officer [redacted] squatted, and coughed without lowering his boxers. At 9:23:24 a.m., Officer [redacted] told him, "Aye, you got to drop the boxers homie." Mr. [redacted] then lowered his boxers, squatted, and coughed. Officer [redacted] did not reach toward his BWC to turn it off until approximately 9:23:32 a.m., after Mr. [redacted] had lowered his boxers and completed the search procedure. *See* BWC; AVSS 1; AVSS 2; IR at 2.

  The video also appears to show a separate violation that CDCR did not identify or investigate. Officer [redacted] conducted the unclothed body search in the housing-

unit dayroom while other incarcerated people were present. The footage shows approximately three incarcerated people in the dayroom as Officer [redacted] released people from their cells for yard. As Mr. [redacted] approached the exit, Officer [redacted] directed him to lower his boxers, squat, and cough, and Mr. [redacted] complied in the open dayroom. See BWC; AVSS 1; AVSS 2. CDCR regulations provide that, "[w]henever possible, unclothed body inspections of incarcerated persons shall be conducted outside the view of others." 15 C.C.R. § 3287(b). Nothing in the Investigation Report addresses why the search was conducted in view of other incarcerated people or identifies this apparent violation for further investigation.

During the investigation, Officer [redacted] acknowledged that his BWC remained on during the unclothed search and agreed with Mr. [redacted] allegation that he failed to deactivate it. See IR at 3. He explained that he was distracted by other incarcerated people and that Mr. [redacted] lowered his boxers before he could turn off the camera. *Id.* He denied recording the search intentionally or for sexual gratification. *Id.*

Despite the video and Officer [redacted] admission, CDCR closed the investigation using the special-conditions process and did not sustain the allegation. The 402/403 reasoned that [redacted] knew the policy, had properly deactivated his camera during two earlier searches, and began reaching for his camera "[a]s soon as the UBS [unclothed-body search] started," although there was "a delay in that process." *See* 402/403 at 3. But the video shows Officer [redacted] directing Mr. [redacted] to lower his boxers and Mr. [redacted] complying before Officer [redacted] turned off his camera. Officer [redacted] explanation may be relevant to whether the violation was inadvertent and what corrective or adverse action to take, but it does not establish that the alleged conduct did not occur. Indeed, the video and [redacted] own statement establish that the misconduct occurred. The same footage also appears to show an additional violation of CDCR's requirement that unclothed body searches be conducted outside the view of others whenever possible, yet the Investigation Report does not address that conduct at all. CDCR should not have used the special-condition process for to not sustain the allegations in this case. *See* 15 C.C.R. § 3486.2(b)(4)(A)(1).

- **SATF-[redacted], Not Sustained:** CDCR closed this case using the "special conditions" process even though the video footage does not prove that the misconduct did not occur. [redacted] alleged that Correctional Supervising Cook [redacted] slammed a dining-hall serving window shut on or immediately in front of his face and called him an "entitled" n-word while Mr. [redacted] was attempting to obtain a diabetic snack. *See* IR at 1. The available recordings capture portions of the incident, but do not conclusively establish

whether the alleged misconduct occurred. The kitchen-side fixed-camera footage shows Supervisor [redacted] attempting to close the serving window, the window swinging back open twice, and Supervisor [redacted] succeeding in closing it on his third attempt. *See* AVSS 1 at 17:46:40 to 17:46:55. The recording does not establish the amount of force [redacted] used or what prompted him to close the window. The other surveillance angle does not clearly show the relevant interaction. *See* AVSS 2 at 17:46:43 to 17:46:52. An officer standing nearby, Officer [redacted] is wearing a BWC, but that footage does not provide a clear view or clear audio of the disputed interaction. *See* BWC 1 at 17:46:50 to 17:47:00. Another nearby officer's BWC footage begins after it occurred. *See* BWC 2 at 17:46:45 to 17:47:00.

Nevertheless, the investigator concluded that the recordings conclusively disproved Mr. [redacted] allegation. The investigator found that Supervisor [redacted] did not forcefully slam the window, was not laughing, and was not seen speaking to Mr. [redacted] and concluded that the incarcerated kitchen worker, rather than Supervisor [redacted] appeared to be laughing. *See* IR at 3–4. Based on that conclusion, CDCR did not interview Mr. [redacted] Supervisor [redacted] or other potential witnesses, even though several incarcerated people were present during the incident, including an incarcerated kitchen worker who was standing next to Supervisor [redacted] at the serving window. CDCR closed the investigation under § 3486.2(b)(4)(A)(1). *Id.* at 4–5.

CDCR's use of the "special conditions" closure process was inappropriate in this case. The video does not conclusively disprove the alleged misconduct conduct occurred because the conduct, including whether Supervisor [redacted] made the alleged racial comment is not clearly captured. The OIG, who was attached to this case, likewise disagreed that the investigation was sufficient, noting that staff witnesses had not been interviewed and that additional video evidence should have been included. *See* 402/403. The Hiring Authority nevertheless found the investigation sufficient, did not sustain the allegation, and took no action. *Id.*

## V. FAILURE TO ADEQUATELY INVESTIGATE STAFF MISCONDUCT ALLEGATIONS RELATED TO A DEATH IN CUSTODY

### 1. RJD-[redacted] & RJD-[redacted] Not Sustained

[redacted], died by suicide on January 6, 2025 in an EOP housing unit at RJD. *See* IR at 3.

Following his death, two clinical staff interns filed reports disclosing the names of three incarcerated witnesses who were living in his unit at the time and who independently reported to staff that they heard someone who was suicidal and crying out for help before Mr. [redacted] was found. *See* Exhibits at 4, 8. One witness reported

that the cries for help went silent and then, sometime later, they heard keys rustling and staff attempting to resuscitate someone. *Id.* at 8. The investigation report mentions that the floor officer had been in his office watching YouTube videos in the hours before Mr. [redacted] was discovered unresponsive in his cell. *See* IR at 4. This evidence is not addressed further beyond stating that it was referred to OIA for a separate investigation into whether he was violating policy by watching videos on a state computer. *Id.* Despite the discovery that floor staff may have been less than alert on the night of Mr. [redacted] death, the investigator fails to gather additional relevant evidence necessary to determine whether staff failed to perform within the scope of their duties in order to prevent a death in custody in a mental health housing unit. Instead the investigator concludes the report by stating that, "*no subject(s) were identified for this investigation*" and, based on a *"lack of evidence to support the allegations, all investigative efforts were exhausted."* *Id.* at 9.

The three incarcerated witnesses each reported the same general allegation that they heard someone crying for help and saying they were suicidal before Mr. [redacted] was discovered unresponsive in his cell at 3 am on January 6th. *See* IR at 3-6. According to the investigation report, the witnesses could not provide many details and could not say the exact time they heard the cries, but they believed it was third watch. *Id.* at 4-6. When asked how long it took in between the calls for help and when the alarm sounded one stated, "it seemed to be a longer time than he would have expected for someone who is calling for help from their cell." *Id.* at 6. Another stated he heard the yelling and approximately two hours later, staff entered the [redacted] in building [redacted] and took [redacted] out of the cell". *Id.* at 5-6. Taken together, the allegations place the alleged failure to respond to suicidality and cries for help somewhere between third watch on January 5th and first watch on January 6th, when he was discovered.

First, the investigator fails to retain and review all relevant footage during this time period. The investigator pulls only three videos. The is fixed camera AVSS footage for the dayroom but only video during third watch on January 5th, and not first watch on January 6th was retained. Also, it is unclear whether fixed cameras in this unit have audio, some units at RJD do have audio. This camera does not and is therefore not helpful in this case. The other two videos were BWC video for only one of multiple staff members who were in the unit at the time, the floor officer. *See* IR at 9.

The investigator fails to accurately report on the relevance of critical evidence discovered during his review of BWC footage. Specifically, during his review of first watch BWC footage, the investigation report states, "I reviewed BWC footage, dated January 6, 2025, titled [redacted] 131800 **23:00:00-03:31:00 (Exhibit 8)**." *See* IR at 4. The following is a synopsis of what is depicted within the BWC footage:

> Correctional Officer [redacted] is observed conducting his institutional counts. During the course of his shift, leading up to the incident of Incarcerated Person [redacted] suicide, no verbal call for

> assistance, help or advisement of suicidal ideations were captured during BWC review.

*Id.*

This statement mischaracterizes the Officer [redacted] actions and omits reference to a large chunk of missing footage. In reality, the BWC reveals that Officer [redacted] is in his office, at points with the door closed, and at points with a loud fan going, watching videos on the computer for most of his watch. *See* BWC. For example, only a few minutes after the clip begins, music can be heard playing in the background and, at around 23:02:18 a loud audible humming, possibly a fan, can also be heard. *Id.* at 23:02:18. He remains in the office with the door closed for approximately 20 minutes before walking on to the floor. *Id.* At around 23:32:14 he is back in the office watching videos again. By 23:36:15 he removes his BWC and places it on his desk while videos can be heard playing in the background. *Id.* at 23:36:15. The camera remains on the desk, an additional violation of BWC policy that is not referenced in the report, with the lights out in the office and the door opened only a crack while videos can be heard playing in the background until around 12:10:30. *See* 15 C.C.R. Section 3270.3. At 00:17:31 a female officer enters the unit and, after saying something to the officers at which point one responds, "No way! What the fuck!" she instructs them to deactivate their cameras, also in potential violation of BWC policy. *See* BWC (linked above) at 00:17:31. When Officer [redacted] camera is reactivated, around 00:24:33, he is back in the office with the lights off and videos playing. Over the next few hours he is on the phone, at one point for nearly thirty minutes until his call is interrupted when count was ordered. *Id.* at 00:32:37 – 01:01:15. Following count, Officer [redacted] is back in the office with the lights off, his camera removed, and he is watching loud videos with the additional loud sound of the apparent fan in the background. *Id.* at 01:09:47. This continues until the BWC footage clip ends, inexplicably at 01:29:52. The next clip does not pick back up until 2:57:44 am, just before Mr. [redacted] is found. None of this context, which is directly relevant to whether Officer [redacted] may have been unable to hear whether anyone cried out for help in the mental health housing unit, was mentioned in the investigation report.[8] Nor was there any explanation for why an hour and a half of the floor officer's BWC footage is missing.

---

[8] The footage revealed additional concerns where at around 11:22:0 Officer [redacted] steps in to relieve a custody officer who is conducting an apparent one-on-one observation of a different suicidal class member at cell 145. During the period he is supposed to be watching the class member he can be seen checking his apple watch, turning his body/camera away from the door, flipping through a notebook, and, at one point leaves the door to talk to the other staff member, failing to maintain direct observation of the cell. *See* BWC (linked above) at 23:22:01 to 23:23:11; 23:24:32 to 23:24:52; 23:26:09 to 23:26:54.

The investigator does include an additional note, that appears to be an aside, stating that the officer was observed watching YouTube videos and was observed not wearing his personal alarm. *See* IR at 4. These observations were apparently not deemed relevant to this investigation as they were instead referred to OIA to be addressed in a separate case, [redacted]. However, the issue of whether the floor officer was in his office watching YouTube videos and therefore may not have heard the cries for help coming from Mr. [redacted] are central to the allegation in this case.

Also central to this case is an explanation for why an hour and a half of footage is missing, just prior to Mr. [redacted] being discovered.

The investigator fails to interview Officer [redacted] who should have been identified as the subject of this investigation. Other staff members who were apparently present were interviewed including the correctional officer who was stationed as suicide watch for a different class member 19 cells away. *See* IR at 7. He stated that he did not hear cries for help that night, but was unsure about whether he would have heard anything based on where he was positioned. *Id*. The control booth officer was also interviewed and stated that he did not hear cries for help that night, and had he heard anything he would have notified the floor officer on duty. *Id.* at 8-9. There is no explanation for why BWC was not retained or reviewed for these staff members.

Although the investigator concluded that the statements from the three incarcerated witnesses, who independently reported hearing cries for help were "inconsistent", there was no effort to identify and interview others who were living in the unit at the time and who may have additional information.

Finally, the investigation report concluded with a note stating, "*During the course of the investigation, coupled with inconsistent incarcerated person witness interviews and completed staff witness interviews, <u>no subject(s) were identified</u> for this investigation. Based upon video evidence, witness interviews, and lack of evidence to support the allegations, all investigative efforts were exhausted.*" *See* IR at 9 (emphasis added).

This is a surprisingly poor investigation in to serious allegations surrounding the death of a person in custody.

## VI. FAILURE TO HOLD STAFF ACCOUNTABLE DUE TO THE FAILURE TO RETAIN VIDEO FOOTAGE

### 1. KVSP-[redacted], Not Sustained

In this case, *Armstrong* class member [redacted], alleged that officers failed to protect him as four other incarcerated people violently attacked him on the yard at KVSP. AVSS footage appears to confirm that, as alleged by Mr. [redacted] there was a delay in officers

taking visible action to attempt to stop the attack that, given the incident involved multiple people attacking him, could have resulted in life threatening injuries or death. Investigative failures make it difficult to fully confirm whether staff misconduct occurred in this case. Regardless, the evidence that is uncovered suggests that, at the very least, a questionable response to a serious attack occurred and additional training should have been provided but was not.

The investigator accurately reported the events of March 4, 2025, as captured by AVSS, beginning at approximately 11:01:24 hours when three incarcerated people began to hit, kick and jump on Mr. [redacted] who had been seated outside the incontinence laundry exchange. *See* Incident Report at 2; 602. Officer [redacted] who was approximately 40 feet away, was the closest officer to the incident. He did not begin to make a radio call until approximately 7 seconds after it started; at that same time, yard Officer [redacted] who was responding from approximately 150 yards away, was the first to make the radio call. *See* [redacted] Interview at 4:27 to 4:47. In the meantime, the three assailants, soon joined by a fourth, continued their assault, including picking up a walker and using it to strike Mr. [redacted] "During this time [redacted] was observed pacing back and forth approximately forty (40) feet from the incident. At approximately 11:01.43 hours, [redacted] reached for his duty belt and unholstered what appeared to be a grenade. [redacted] was observed fiddling with the object; however, never used it." See IR at 2-3. The attack continued for over 20 seconds, until approximately 11:01:47, when the assailants stopped and assumed a prone position as two other responding officers ran towards the incident with their MK9's unholstered and aimed. *See* AVSS at 11:01:25 to 11:02:00.

Extreme delays compromised the investigation in this case. The KVSP OOG received Mr. [redacted] 602 on March 13, 2025, less than 10 days after the March 4, 2025 incident, and the investigator was assigned shortly thereafter on April 1, 2025; however, the investigator waited until January 21, 2026, more than 10 months after the incident, to request video. *See* 602; Email dated January 21 re Footage Request. As a result, only limited AVSS footage of the incident was available, presumably what had already been preserved related to the attack itself. BWC footage was not available making it difficult to corroborate multiple statements made by the subject officer regarding what action (or lack thereof) he took. For example, during his investigation interview, Officer [redacted] stated that he did in fact give multiple orders to the assailants to stop the attack. *See* [redacted] Interview at 8:28 to 8:35. In answer to why he did not close the distance to within 20 feet of the attack in order to utilize his MK9, Officer [redacted] stated he "was waiting for responding staff so we could proceed together for [his] safety" reporting that other incarcerated people, not visible in the limited AVSS footage, were behind him. *Id.* at 9:55 to 10:20. Additional footage from other angles was essential to evaluate the risk of action vs. the risk of non-action in order to determine what action should have been taken. He further stated he pulled out his grenade, but did not have time to fully prep it before the attack ended. *Id.* at 10:42 to 10:53. The video evidence shows that Officer

[redacted] did not utilize force available to him to stop the violent, potentially life-threatening, attack on a disabled incarcerated person for more than 20 seconds.

Officer [redacted] the primary subject of the investigation, was not even identified until the first responding officer was interviewed on February 6, 2026, 11 months after the 602 was received. *See* IR at 3. No interview of the class member, Mr. [redacted] was conducted. Although he did not identify COs by name in his 602, an interview may have revealed the subject officer more quickly. Instead, the investigator wrote no interview was conducted because AVSS captured the entire incident. *Id.* at 4.

The investigation also fails to address the additional allegation that staff further compromised his safety by making him sign a compatibility chrono under "duress" that resulted in him being placed back in the same housing unit as the assailants who just attacked him. *See* 602. Immediately following the incident, Mr. [redacted] was documented in extreme pain, as evidenced by bruised ribs. *See* TTA RN Summary, March 4, 2025. Mr. [redacted] alleged that he refused subsequent medical attention, including an x-ray of his ribs, because he feared the assailants were waiting to attack him again if he sought medical treatment. *Id.* On March 14, 2025, Mr. [redacted] was seen by nursing staff, where he presented with similar pain levels. *See* 7362, Nursing Face-to-Face. The investigator should have gathered additional evidence about whether staff violated policy by returning everyone to the same housing section following the attack and whether Mr. [redacted] did sign the compatibility chrono under "duress."

Class members with serious disabilities in prison are especially vulnerable and must rely on staff to take action to protect them, if attacked. The investigation failures prevent us from having a clear picture of exactly what unfolded on the yard that day and following the incident when everyone was returned to the same housing unit. But, the limited video that was produced suggests that something more should have been done in response to the complaint filed in this case, even if simply to provide additional training to the subject officer.

## VII. FAILURE TO HOLD STAFF ACCOUNTABLE DUE TO THE FAILURE TO COMPLY WITH THE STATUTE OF LIMITATIONS

Plaintiffs' counsel continue to encounter cases each quarter where discipline cannot be imposed because the statute of limitations has expired. As Defendants have acknowledged, the significant backlog of open, pending investigations means that many cases are reaching or are past the statute of limitations to impose discipline. The OIG confirmed this issue in their recent report. *See* May 2026 OIG Report at 33. According to the OIG, the AIU closed 5,379 cases in 2025 and finished the year with 13,393 open investigations. *Id.* "Of the 5,379 investigations the [AIU] closed in 2025, the deadline to impose discipline had expired before the investigations concluded in 265 investigations, or 5 percent." *Id.* However, "[o]f 13,393 investigations that were open at the end of the year, the deadline to impose discipline had already expired in 1,774 investigations, or 15

percent." *Id*. As Defendants have warned, the issue of cases being lost to the statute of limitations is worsening.

In the May report, Plaintiffs reported on multiple cases in which CDCR elevated a case for AIU review based on potential misconduct requiring adverse action, but then failed to complete those investigations within the statute of limitations. *See* May 2026 Report at 30 to 36. As the Court Expert noted in his most recent report on Defendants' accountability system, "it is especially unfortunate if adverse action is precluded in a case where CDCR staff has already found evidence of misconduct." Dkt. 3785 at 2. The problem continues. For example, in LAC-[redacted], a class member's allegation that officers deprived him access to a restroom while he was locked in a holding cage was initially routed for an institution-level review. *See* IR at 1. After that review and report was completed, the case was elevated for AIU investigation in January 2025, with 10 months to go before the statute of limitations expired. *Id.* However, the AIU investigation was not completed for another year, in January 2026, even though the local inquiry had already ascertained many of the relevant facts. *Id.* at 8. As a result, despite a sustained finding of misconduct, the CARU was only able to issue corrective action in the form of training to both officers. *See* [redacted] 402; [redacted] 402. CDCR must prioritize cases with likely adverse action for completion within the statute of limitations. Plaintiffs will follow up with Defendants to seek any documents or guidance that CDCR issues about AIU's prioritization of cases for completion within the statute of limitations

## VIII. CONCLUSION

Plaintiffs will continue to work with Defendants and the Court Expert to attempt to bring Defendants into compliance with the Court's Orders and the Remedial Plans.

# EXHIBIT B

# The Use of Force in California Department of Corrections and Rehabilitation Prisons

**INDEPENDENT MONITOR LLC**

**Submitted By:**
**Nicholas E. Mitchell, Principal**

THIS PAGE INTENTIONALLY LEFT BLANK

<u>Project Team</u>:

Nicholas E. Mitchell, Principal

Dr. Matthew Buttice, Director of Data Analysis

Suzanne Iantorno, Force and Investigations Reviewer

THIS PAGE INTENTIONALLY LEFT BLANK

# Table of Contents

**ONE: INTRODUCTION & EXECUTIVE SUMMARY ..... 1**

CHAPTER TWO: THE HANDLING, TRIAGE & INVESTIGATION OF FORCE COMPLAINTS ..... 1
CHAPTER THREE: THE INSTITUTIONAL REVIEW OF FORCE ..... 2
CHAPTER FOUR: USE OF FORCE PRACTICES ..... 3
CHAPTER FIVE: RECOMMENDATIONS ..... 4
METHODOLOGY ..... 5

**TWO: THE HANDLING, TRIAGE, AND INVESTIGATION OF FORCE COMPLAINTS ..... 7**

THE CORE PURPOSES OF A PRISON COMPLAINT AND INVESTIGATION PROCESS ..... 9
TRIAGE: PURPOSE, STRUCTURE, AND BEST PRACTICES ..... 10
THE CURRENT COMPLAINT HANDLING PROCESS IN CDCR ..... 12
THE CURRENT COMPLAINT HANDLING SYSTEM HAS SEVERAL KEY ASSETS ..... 15
THE CURRENT COMPLAINT HANDLING PROCESS DOES NOT EFFICIENTLY OR EFFECTIVELY EMPLOY ITS LIMITED RESOURCES ..... 17

**THREE: THE INSTITUTIONAL REVIEW OF FORCE ..... 35**

THE CORE PURPOSES OF INSTITUTIONAL FORCE REVIEW IN CORRECTIONS ..... 35
CDCR'S CURRENT FORCE REVIEW PROCESS ..... 39
THE CURRENT IERC PROCESS DEMONSTRATES SIGNIFICANT STRENGTHS ON WHICH TO BUILD ..... 41
THE CURRENT IERC PROCESS DOES NOT CONSISTENTLY ACCOMPLISH THE CORE PURPOSES OF INSTITUTIONAL FORCE REVIEW ..... 43

**FOUR: USE OF FORCE PRACTICES ..... 66**

NUMBERS AND SCOPE ..... 66
THE DEPARTMENT HAS FORMALLY ADOPTED MANY BEST PRACTICES REGARDING USE OF FORCE ..... 69
INSTITUTIONAL STRENGTHS THAT POSITION THE DEPARTMENT FOR CHANGE ..... 71
THE GAPS BETWEEN POLICY AND PRACTICE ..... 72
UNDERSTANDING THE GAPS BETWEEN POLICY AND PRACTICE ..... 80
THE DEPARTMENT'S TRAINING PROGRAM HAS NOT KEPT PACE WITH THE REFORMS IT IS MEANT TO SUPPORT ..... 84
THE SKILLS THE DEPARTMENT NEEDS TO CULTIVATE ALREADY EXIST IN ITS WORKFORCE ..... 92

**FIVE: RECOMMENDATIONS ..... 93**

RECOMMENDATIONS RELATED TO COMPLAINT HANDLING ..... 93
RECOMMENDATIONS RELATED TO FORCE REVIEW ..... 101
RECOMMENDATIONS RELATED TO FORCE PRACTICES ..... 107

# One: Introduction & Executive Summary

The parties to *Armstrong v. Newsom* have been engaged in long-running negotiations about a problem that resists easy resolution: a growing backlog of use of force allegations awaiting investigation in the California Department of Corrections and Rehabilitation's ("CDCR" or "Department") Office of Internal Affairs ("OIA") and its Allegation Investigation Unit ("AIU"). The Court's remedial plans in *Armstrong* require most investigations involving class members to be completed within 120 days. In 2025, the average AIU investigation closed in 324 days.

CDCR retained us to evaluate its use of force policies and practices, use of force training, and the Institutional Executive Review Committee ("IERC") process (which manages force review in the prisons), and to answer a specific question posed by a stipulation filed in *Armstrong*: "whether the IERC, or some entity other than OIA, can conduct comprehensive and unbiased investigations, in accordance with the Court's orders and remedial plans, into allegations of staff misconduct based on use-of-force policy violations."[1] We began that work where the pressure is most visible, in the complaint system, and followed the problems upstream. What we found is that the backlog in AIU results from a confluence of conditions that begin in the housing units and run through every system this report examines across its five chapters: 1) Introduction & Executive Summary; 2) The Handling, Triage & Investigation of Force Complaints; 3) The Institutional Review of Force; 4) Use of Force Practices; and 5) Recommendations.

## Chapter Two: The Handling, Triage & Investigation of Force Complaints

In the complaint system, we found a sound architecture operating without proper calibration. The centralized screening of all force complaints by the Centralized Screening Team ("CST") is a genuine institutional asset, and the Department's AIU investigators are smart and capable. But the system treats force complaints as largely uniform when they are not. Complaints that the documentary and video record show to be meritless or to involve policy-compliant force are sometimes fully investigated, consuming scarce capacity, while some complaints that include evidence of non-compliant force are closed prematurely and without adequate investigation.

Both failures have similar sources. The Department has no framework for stratifying force complaints by risk, and insufficient criteria to distinguish the allegations demanding AIU's full investigative depth from those a competent local investigation could resolve. Every force complaint therefore enters the same pipeline regardless of what it alleges, and closure mechanisms that could relieve the pressure in AIU are not sufficiently used. This results in stacking delays in AIU's caseload. Moreover, AIU functions without an operating procedure or a working definition of the "comprehensive investigations" the *Armstrong* Court's orders require. This leaves to the discretion of individual investigators and their supervisors when sufficient evidence has been obtained, which produces inconsistency in the quality of AIU's outputs.

While we believe that AIU's staffing level is likely insufficient given the size of CDCR's population and the requirements of the *Armstrong* Court orders, increased staffing will not be a panacea, and additional investigators assigned to a miscalibrated system will produce more investigations of the same kind the system is currently generating.

## Chapter Three: The Institutional Review of Force

Among the first opportunities to identify and correct problematic force practices is in the IERC process at the institutions. But a review process that does not reliably identify and correct force problems leaves them to recur and contribute to the glut of complaints that arrive at AIU. We found that the IERC process reflects genuine institutional commitment but does not perform adequately. It operates without written standards governing how cases are presented and evidence is examined, and with no formal training for the use of force coordinators who assemble and present the cases on which its judgment depends. The result is a process where the rigor of the force reviews varies by institution and habit.

In the IERC meetings we observed, the reviews focused almost exclusively on the conduct of individual employees. Panels rarely asked what an incident revealed about tactics, training, equipment, or policy, and the process has no reliable path for converting review findings into corrective actions or operational changes. Moreover, notwithstanding the panels' almost singular focus on officer conduct, they rarely inquired whether the force used in the incidents under review was necessary, as the Department Operations Manual ("DOM") requires it to be, or whether non-force options were considered. In addition, both the clinical representatives and the institutional

training managers, whose specific expertise should enrich the quality and depth of IERC discussions, often did not meaningfully contribute even when the underlying incident facts called for their input.

The IERC system as a whole also has no way of evaluating its own performance: the institutions operate their IERC processes independently, with no centralized mechanism to examine whether completed IERC reviews were properly conducted, which creates further inconsistency in the quality of IERC reviews across the Department.

## Chapter Four: Use of Force Practices

We also examined use of force practices themselves, including several significant institutional strengths that relate to force. The workforce is, on the whole, committed and talented, which is a noteworthy asset. And the Department has substantially modernized its formal use of force policy in commendable ways. But the principles the Department has adopted on paper have not yet consistently taken root in the daily habits, instincts, and shared expectations of the staff.

In the sample of incidents and investigations we reviewed, officers did not consistently satisfy the DOM's requirement that force be used only when necessary. Takedowns, which may be appropriate given the level of threat presented, are at times used when less risky options would suffice. The Department's policy also leaves a significant gap: the DOM does not clearly address when force is authorized in response to facility security concerns that do not constitute an imminent threat, which creates confusion for the officers who must put the DOM's abstract policy language into daily practice. Moreover, force concentrates heavily among incarcerated persons ("IPs") with mental health designations, who represent 42% of the population but were involved in approximately 84% of all documented uses of force.

We identified several explanations for the gaps between policy and practice. Although Department training teaches that de-escalation benefits officers in various ways, many officers continue to understand de-escalation only as a mandatory policy requirement rather than as a practice that keeps them safer, too. Officers who understand de-escalation only as an imposed mandate may apply it selectively. Further, an old mental model for managing IP non-compliance, which is known in the institutions as "ask/tell/make," has been implicitly retired by the de-escalation requirements of the DOM. But it retains a strong hold in the institutions, and sometimes leads officers into force decisions that diverge from the DOM's requirements.

We also examined the Department's training and found three key issues that must be addressed. First, the delivery of in-service training varies from institution to institution, and there is no centralized quality control mechanism to detect that variation. Thus, CDCR does not have one in-service training program; it has 31 of varying quality and rigor. Second, while Oleoresin Capsicum ("OC") is an essential tool that is often used properly, particularly to interrupt IP fights, the training on OC deployment diverges from the DOM's requirements in ways that are likely contributing to the problematic OC deployments we identified in the review. Third, notwithstanding the disproportionate share of force incidents concentrated among IPs with mental health designations, the Department does not provide the specialized training that officers assigned to those units require.

## Chapter Five: Recommendations

Two conclusions organize the 34 recommendations in Chapter Five. The first answers the stipulation's direct question. The IERC cannot and should not serve as an investigative body; investigation is not its function and assigning it that role would compromise its review mission. But an entity other than OIA can responsibly conduct a defined portion of use of force investigations. The Department should stratify force complaints by risk at intake. High-risk complaints should remain with AIU, whose centralized structure and independence are assets to preserve and reinforce. Lower-risk complaints should be routed to a rebuilt Locally Designated Investigator program, restructured to insulate local investigators from institutional pressures and subject to enhanced training, supervisory review, and mandatory escalation requirements, as we specify in the recommendations.

The second concerns the other interventions the report identifies. The issues documented in this report are not capability deficits. In our review, we found repeated examples of CDCR officers resolving dangerous encounters with patience, the use of time and distance, the acceptance of assistance, and minimal force, under the same policy and the same training that governed the incidents we critique. The variance within the workforce is itself diagnostic: where the same rules produce different practice, the gap lies not in the rules but in the habits, supervision, and expectations that determine how the rules are understood and applied.

That is why the recommendations that conclude the report largely concentrate on management systems, training delivery, supervision, quality control, and leadership, rather than on new models of

correctional practice. Each finding has corresponding recommendations in Chapter Five that will enable the Department to meet the identified challenges. Given the significant strengths the Department already possesses, implementing the recommendations and bringing force practice into compliance Department-wide is well within CDCR's reach.

## Methodology

Between August 2025 and September 2026, the team that performed this review ("Team") gathered and analyzed information from CDCR about staff use of force, the review of force incidents, and the investigation of complaints alleging force-related misconduct. To inspect the facilities where force occurs, and meet with staff and IPs, the Team visited 10 CDCR institutions, including Folsom State Prison; California State Prison, Sacramento; Central California Women's Facility; Valley State Prison; California State Prison, Corcoran; Substance Abuse Treatment Facility; Richard J. Donovan Correctional Facility; California Institution for Women; California Institution for Men; and California State Prison, Los Angeles County.

During each of these visits, the Team toured yards and housing units, led structured focused groups for both staff and IPs, participated in informal conversations with staff and IPs dispersed throughout the prisons, and in some cases, met with inmate advisory councils and IP peer support specialists. At each facility, the Team observed IERC meetings, and later supplemented these in-person IERC observations with virtual attendance of another seven IERC meetings at: High Desert State Prison; California Correctional Institution; Kern Valley State Prison; San Quentin Rehabilitation Center; Salinas Valley State Prison; California State Prison, Centinela; and Pelican Bay State Prison.

The Team also held meetings and conducted interviews with various CDCR personnel, including command staff at the institutions listed above and staff within the Centralized Screening Team, Allegation Investigation Unit, Office of Internal Affairs, Centralized Allegation Resolution Unit, Employment Advocacy and Prosecution Team, Audits and Court Compliance, Office of Research, and Peace Officer Selection and Employee Development. The Team also met with Secretary Jeff Macomber, Operations Undersecretary Jason Johnson, and Division of Adult Institutions Director Gena Jones. It had three meetings with counsel for the *Armstrong* Plaintiffs and Court Expert Ed Swanson, and a single meeting with the Office of the Inspector General ("OIG").

The Team reviewed relevant sections of Title 15 of the California Code of Regulations ("Title 15"), DOM, and various internal memoranda establishing procedures related to force and complaint handling. To understand how those policies were being applied, the Team requested incident-level data about recent uses of force. From these data, the Team identified all closed force incidents that occurred at the six *Armstrong* prisons in 2024; stratified those incidents by facility, the presence of a mental health designation, and the type of force used; and randomly sampled a total of 100 for review. The Team took a similar approach to understanding current complaint handling practices by identifying all closed force-related complaints that occurred at the six *Armstrong* prisons in 2023 and 2024; stratifying the complaints by facility, the presence of a mental health designation, and whether the complaint was received from a CDCR employee; and randomly sampled 75 complaints with at least one not sustained outcome and 25 complaints with at least one sustained outcome. For both samples, the Team requested and reviewed relevant video, incident reports, incident commander and manager reviews, complaint investigation materials, and findings and disciplinary determinations, if any'

To learn how CDCR specifically trains its officers for potential force encounters, the Team requested and reviewed Academy and in-service training materials used by CDCR since 2023 regarding the use of force, de-escalation, force reporting, and the investigation and review of force incidents. The Team also reviewed recent training materials used to onboard new AIU complaint investigators

Throughout the review, the staff of CDCR were open, forthright, and transparent, and all requests for data and information were honored. Line staff in the institutions were extremely frank and cooperative, as were the IPs with whom we spoke. We are grateful for the openness and collegiality we experienced as we conducted the review.

# Two: The Handling, Triage, and Investigation of Force Complaints

We were retained, in part, to help the Department address a growing backlog of misconduct complaints pending in the AIU, many of which allege improper use of force. The backlog is not static. Each month the unit receives more complaints than it closes, and the inventory of open matters grows accordingly. A complaint process that falls further behind every month cannot deliver on its purposes. Officers facing unfounded allegations are kept waiting for exoneration. IPs with legitimate grievances wait longer for resolution. Evidence ages, memories fade, and the deterrent and corrective value of the process erodes with every month of delay.

The backlog has an important structural history. Under court-ordered reforms, the Department centralized the triage of misconduct complaints, and individual facilities no longer screen or handle these complaints locally. Every allegation of staff misconduct, regardless of its severity or evidentiary support, now flows to a single centralized unit where it is assessed and routed by CST. The reforms responded to documented failures in local complaint handling, and centralization brought real benefits in consistency, independence, and insulation from local pressures. We do not propose to unwind it. But centralization concentrated the entire complaint intake of a large correctional system at a single point, and the decision rules governing that point now determine whether the system functions or breaks. Our review found that several of those rules are mis-calibrated.

The Department's own goals supply the standard against which we measure. The Department wants a complaint process that protects its officers by quickly closing retaliatory and unfounded complaints, and that fully investigates and resolves complaints supported by evidence. The system as it is currently constructed is not consistently hitting either objective. At one end of the spectrum, the unit investigates complaints that an unambiguous record has already resolved. When an IP makes allegations that are conclusively refuted by available video, the investigation should end. The Department has a mechanism for exactly this, the Special Conditions Closure Process, but it is underutilized, and resources are expended on investigations that confirm what the record already establishes. At the other end, complaints involving serious alleged misconduct, where the evidence suggests policy may genuinely have been violated, are not always investigated fully or appropriately.

The result is a system that sometimes over-invests in its easiest cases and under-invests in its hardest ones. The growing backlog is the arithmetic consequence.

Figure 1 presents monthly counts of AIU cases open for more than 120 days, demonstrating AIU's ballooning backlog over the last 17 months. As of May 31, 2026, there were 10,984 cases older than 120 days, with average ages of 360 days, and the oldest case nearly 3 years old. These counts do not include another 3,682 open cases pending in AIU that are less than 120 days old.

Figure 1: AIU Backlog of Cases Open for More than 120 Days
by Month, January 2025 through May 2026




This chapter examines the decision points that have produced this result. We consider which complaints require the specialized, independent investigative capability that AIU exists to provide, and which can be handled closer to where the conduct occurred without compromising the accountability the *Armstrong* court orders require. We examine how force complaints are currently sorted and why the existing taxonomy does not support risk-based sorting, as it should. We consider how AIU's investigations should evolve as evidence develops, and what it would take to ensure that cases receive the level of investigative attention the record warrants. And we examine the operational architecture AIU would need to function accountably, including an operating procedure ("OP") to define how the unit operates and what a complete investigation requires.

# The Core Purposes of a Prison Complaint and Investigation Process

When designed and implemented effectively, a prison complaint process serves multiple distinct functions: it provides management with actionable information about operational problems; it establishes and reinforces behavioral expectations for staff; supports the agency's legal compliance obligations; and creates a structured channel through which IPs can communicate grievances without resorting to disobedience, violence, or self-help.

## The Management Function

A complaint process generates data that no other source can fully replicate. Complaints and grievances, even those that are ultimately unsubstantiated, serve as early signals of policy breakdowns, supervisory failures, and staff confusion. Patterns that emerge from complaint data can reveal problems with particular shifts, housing units, staff members, or policies that could otherwise remain invisible to department or prison leadership. When an agency identifies a pattern of this kind, responding means more than just opening administrative investigations. It means asking why the pattern exists: whether training is adequate, supervision is sufficient, policy is clear, and if personnel are in the right assignments. A complaint process that generates data but does not drive that kind of institutional analysis delivers only a fraction of its potential management value.

## The Accountability and Professionalization Functions

The accountability function of a complaint process operates on multiple levels simultaneously. Most directly, a credible process provides the mechanism for the agency to identify staff misconduct, and intervene with corrective or adverse action, when necessary. But the accountability function also operates prospectively, as a deterrent. Correctional officers frequently work independently, with only minimal, intermittent supervision, and in environments with few witnesses (the proliferation of fixed or body-worn cameras has somewhat changed this). In such circumstances, staff awareness that complaints are taken seriously, thoroughly investigated, and acted upon when warranted serves as a meaningful check on misconduct that no supervisory structure alone can fully replicate.

Equally important, a well-functioning complaint process protects staff from false or exaggerated allegations. When staff understand that complaints will be investigated fairly and that management will support those who have acted within the rules, confidence in the process increases. Staff who know that unfounded complaints will be promptly identified and closed, and that the agency will

stand behind employees who have conducted themselves appropriately, are more likely to view the complaint process as a tolerable and necessary management tool rather than as an illegitimate adversarial threat.

### Legal Compliance

A credible complaint process also serves as a critical vehicle for legal compliance in ways that extend across multiple areas of correctional law and liability. At the most basic level, some of the constitutional and statutory obligations that govern correctional agencies, including obligations related to the use of force, conditions of confinement, protection from staff abuse, and access to medical and mental health care, are operationalized through the complaint and grievance processes. When those processes function well, it creates a documented record that the agency is receiving, investigating, and responding to allegations of constitutional violations. When they function poorly, that same record becomes evidence of deliberate indifference, a standard that courts apply in evaluating whether agency officials knew of a risk of harm and failed to act. Moreover, potential misconduct that is identified early, investigated promptly, and addressed appropriately is far less likely to escalate into the kind of serious incident that generates civil liability, adverse findings by oversight bodies, or damaging public attention.

### Institutional Legitimacy and Safety

A complaint process perceived as legitimate enhances cooperation among IPs and reduces institutional violence.[2] When IPs believe that they have a meaningful, accessible channel for communicating problems and that complaints will be taken seriously, they are less likely to resolve grievances through self-help. The legitimacy of the complaint process is therefore not merely a matter of procedural fairness. It is a practical security concern, with direct implications for the daily safety of everyone who lives and works within each prison.

## Triage: Purpose, Structure, and Best Practices

Receiving a complaint is the beginning of a complaint process, and how an agency sorts, evaluates, and routes received complaints, a function commonly known as "triage," is equally important and more operationally complex. Effective triage ensures that serious allegations receive the investigative attention they warrant, that lower-level matters are handled efficiently and at the appropriate level, and that limited investigative resources are deployed where they can do the most good.

Triage is best understood not as a single event but as a continuous process of risk assessment that persists throughout complaint receipt, handling, and investigation. An allegation that appears minor at intake may reveal more serious concerns as interviews are conducted and records are reviewed. Conversely, an allegation that initially appears serious may be appropriately de-escalated as the factual picture becomes clearer. A well-designed triage system must be capable of escalating, de-escalating, closing, or re-opening cases as new information becomes available. This requires clear written guidelines and standards that specify the criteria for each of these decisions, and a documentation practice that creates a reviewable record of the reasoning behind each triage determination.

## Tradeoffs in Centralized vs. Localized Triage

One of the most consequential structural decisions a large corrections agency must make in designing its complaint system is the degree to which triage and investigation will be centralized at the agency level or delegated to individual facilities. Centralized triage offers significant advantages in terms of consistency, credibility, and protection against local pressure. Centralization promotes consistency across facilities and tends to enhance the perceived legitimacy of the process among IPs, who are understandably more likely to distrust a complaint process administered by the same institution they are complaining about. In systems where leadership quality varies significantly across facilities, centralization also serves as a corrective: it insulates complaint handling from the weaknesses of any individual facility's management.

At the same time, centralized systems have real limitations. They can be slower to respond, particularly in large systems with geographically dispersed facilities, like CDCR. They may lack the facility-level context necessary to fully understand the dynamics of a particular complaint, including the staff-IP history, the unit culture, and the supervisory environment, that a local reviewer would bring. And purely centralized systems can inadvertently reduce local ownership of misconduct problems, allowing facility leadership to treat complaint referrals to a central office as a way of offloading responsibility rather than as a prompt for local action.

Localized triage and investigation, by contrast, can be faster, more contextually informed, and more likely to generate meaningful local accountability. When facility leadership is responsible for handling some percentage of complaints arising from their institutions, they may have the information and the incentive to address underlying problems without simply offloading responsibility by making a referral to OIA.

# The Current Complaint Handling Process in CDCR

## Complaint Origin and Closure Numbers

Allegations of CDCR staff misconduct generally originate from complaints filed by IPs or internal referrals.[3] Complaints from IPs most often come from written grievances. Title 15 requires CDCR to make grievance forms available in all housing units, among other locations, and "during face-to-face contact upon request."[4] IPs must submit grievances within 60 days of the relevant event or issue, though allegations of staff misconduct are still referred for a routine review or an investigation even if the grievance itself is rejected for being untimely.[5]

Internal referrals generally come from CDCR personnel who observe potential misconduct or identify it through the review of incidents. The DOM generally requires that "[e]ach employee shall report misconduct or any unethical or illegal activity in a timely manner."[6] In 2025, AIU closed cases with a total of 5,132 allegations of force-related misconduct, including that staff used excessive or unnecessary force (91%), failed to report uses of force that they participated in or witnessed (7%), used restraints improperly (1%), misused or carelessly handled duty weapons (<1%), and inappropriately displayed duty weapons (<1%).

## Relevant Recent History Regarding Complaint Handling

In 2022, CDCR centralized its process for screening and triaging misconduct complaints. This change was in response to orders from the United States District Court for the Northern District of California requiring CDCR to implement measures to achieve compliance with the existing *Armstrong* Remedial Plan and documented in the Richard J. Donovan Correctional Facility Court Ordered Remedial Plan and Five Prisons Court Ordered Remedial Plan ("Remedial Plans"). Previously, CDCR processed complaints from IPs locally at individual prisons. Under the Remedial Plans, all complaints are sent to the CST for review:

> All grievances submitted by an incarcerated person or parolee shall be reviewed by CST. In addition, if departmental staff receive a written complaint outside the grievance process that alleges staff misconduct toward an incarcerated person or parolee, staff will immediately refer the complaint to CST, as well as forward a copy of the complaint to their hiring authority. If departmental staff receive a verbal complaint involving unnecessary or excessive use of force, staff-on-offender sexual misconduct, or sexual harassment, staff must refer the complaint to CST.[7]

CST compares incoming complaints against an Allegation Decision Index ("ADI"), a list of allegations of staff misconduct that require referral for investigation. The CST screening decision does not address the likelihood that the alleged misconduct occurred or that investigation into the complaint will yield sufficient evidence to make such a determination. Instead, "[w]hen allegation of staff misconduct toward an incarcerated or supervised person is identified by CST, CST shall first refer to the ADI to determine if the allegation is listed in ADI. CST shall refer allegations listed in the ADI to AIU for investigation."[8] CST staff use a reference guide that lists factors to consider when determining if a complaint alleges misconduct included on the ADI, such as whether it describes an overt act from staff, uses "buzz words" without specificity, or makes claims that raise possible mental health concerns.[9] If the complaint is vague or CST requires more information to make its screening decisions, it may conduct a clarification interview with the complainant.

The ADI includes items addressing sexual misconduct, dishonesty, discrimination, and harassment. Most important for our analysis, the ADI includes five allegations related to the use of force:

- Failure to report own or witnessed use of force;
- Excessive or unnecessary use of force;
- Improper use of restraints;
- Misuse, non-use, or careless handling of duty weapon(s); and
- Inappropriate display of duty weapons.[10]

Of the 219,161 complaints received in 2025, CST determined that 12,247 included allegations found on the ADI and were routed for investigation. Those routed for investigation contained 6,685 allegations related to the inappropriate use of force.

## Structure of OIA & AIU

OIA has two investigation-focused units. The Field Operations and Special Investigation Unit, referred to as the "Traditional" section of OIA, is generally responsible for, among other things, investigating allegations of misconduct resulting in significant injury or death, criminal misconduct, sexual violence, and misconduct not directed toward IPs. AIU, which is most important for the analysis in the report, is responsible for investigating the majority of complaints alleging staff misconduct toward IPs, which includes most investigations into force complaints.

Under a relatively new process, complaints that CST refers to AIU for investigation are first reviewed by the Centralized Intake Triage Team ("CITT"). CITT consolidates complaints that include the same allegations and conducts some initial investigative work, such as preserving relevant video and collecting existing documentation related to the complaint. It then forwards complaints to AIU for more extensive investigation.

AIU assigns complaints to investigators using the Investigation Assignment Index, which links allegations included in the ADI to the level of investigator required. All force-related allegations require a lieutenant to conduct the investigation. AIU investigators then collect additional evidence, including conducting necessary interviews. The DOM requires that these investigations are "sufficient, thorough, complete, and unbiased," and the Remedial Plans require investigators to conduct "comprehensive and unbiased investigations and ensure all relevant evidence is gathered and reviewed."[11] When finished with their initial investigation, AIU investigators draft an investigation report that summarizes the evidence and share it with a supervisor. The supervisor reviews the report and associated evidence and, if necessary, sends it back to the investigator for additional work. If no additional work is necessary, final investigation reports are provided to hiring authorities for their determinations regarding findings and potential disciplinary outcomes.[12]

As of May 2026, AIU was staffed by 102 sergeants and lieutenants responsible for conducting investigations and 24 captains who supervise those investigators. At that time, AIU had 14,666 open investigations with 17,254 unique allegations. Of these unique allegations, 6,428 related to the use of inappropriate force. AIU investigators thus were carrying an average caseload of 144 total investigations. The average age of these open cases as of May 2026 was 282 days.

Hiring authorities review the investigation reports and make finding determinations for each allegation and subject included in the complaint. Allegations are sustained when the "investigation disclosed a preponderance of the evidence to prove the allegation(s) made in the complaint."[13] For sustained allegations, hiring authorities can impose corrective action if they determine that employee behavior is correctable by counseling or training. Adverse action, such as a letter of reprimand, salary reduction, or dismissal, is imposed according to an employee disciplinary matrix.

Traditionally, wardens and chief deputy wardens of the institution at which the alleged misconduct occurred served as the hiring authority when making finding and disciplinary decisions. In 2025, CDCR began centralizing this process by developing the Centralized Allegation and Resolution Unit

("CARU") to serve as the hiring authority for all allegations of staff misconduct against IPs at the six *Armstrong* prisons. As of May 2026, CDCR had expanded CARU to serve as the hiring authority for 19 total institutions.

### Complaint Resolution Timelines

California law, the DOM, and the Remedial Plans establish various deadlines for investigations. Specifically, Title 15 prohibits adverse action for peace officers if the complaint investigation is not completed within a year. The Remedial Plans require that most investigations of complaints involving class members be completed within 120 days of receipt by OIA. Notwithstanding these timeframes, the average age of all AIU investigations closed in 2025 was 324 days. On average, these investigations spent 12 days with CST for screening, 219 days with AIU for investigation, and 99 days with the hiring authority for review.

We note that these timelines are under pressure from a source outside the complaint system itself. As discussed more fully in Chapter Four, the number of documented uses of force in CDCR has risen dramatically over the past five years. A portion of the increase coincides with the deployment of body-worn cameras ("BWC") and likely reflects more complete reporting of force rather than an increase in actual force incidents. There have also been system-wide population changes that may be contributing to more institutional violence and an increase in actual force incidents, and a greater percentage of force incidents involving IPs with mental illness. We return to these increases in Chapters Four and Five but note here that increases in the number of force incidents are one likely driver (among many) of AIU's backlog.

## The Current Complaint Handling System Has Several Key Assets

While some of our analysis of the current complaint handling process identifies areas for improvement, we identified several important assets that stood out during our review.

### The Department's Goals for the Complaint Process Align with Best Practice

Throughout our review, the Department's Executive Leadership Team, as well as leaders in the Division of Correctional Policy Research and Internal Oversight ("CPRIO") (which oversees AIU and OIA), articulated an understanding of what CDCR's complaint process should accomplish that aligns with best practice. The Department wants unfounded and retaliatory complaints to be closed quickly, and complaints supported by evidence to be investigated fully and fairly. This dual

commitment reflects an understanding that a complaint system serves staff and IPs simultaneously, which bodes well for the changes that are necessary.

### The Department Has Already Made Significant Investments in Complaint Handling & Investigation That Will Facilitate Reform

The Department has made substantial investments in AIU and CST, and is currently completing a study to assess whether current staffing levels are adequate to AIU's mission and complaint volume. Although some of these investments were a product of litigation, they align with our discussions with the Department's senior leaders, who are invested in building a credible and reliable complaint process. Moreover, these resource commitments will facilitate the necessary work of reform set forth throughout this chapter and report.

### The Special Conditions Closure Mechanism Is a Promising Development

The Department has developed a Special Conditions Closure Process that is responsive to some of the problems identified in this chapter. Through it, cases may be closed when the available record demonstrates conclusively that there was no policy violation. The Special Conditions Closure Process demonstrates that the Department understands that some complaints are conclusively resolved by the record without full investigation. The reforms this chapter recommends thus do not require the Department to accept a new principle, only to apply a principle it has already adopted consistently in the appropriate cases.

### The Department's Investments in Specialized Training for AIU Investigators Will Bear Fruit

AIU investigators receive training specific to the demands of misconduct investigation: interviewing techniques, evidence gathering and preservation, report writing, and the legal and procedural standards that govern administrative investigations in a correctional setting. That investment reflects a recognition that investigating alleged staff misconduct is a distinct professional function requiring special preparation, and it is one the Department deserves credit for making. While the findings that follow identify gaps in the operational architecture surrounding that investigative function, they do not diminish the value of what the Department has already built in AIU.

### The Department's Creation of a Post-Investigation Review Panel Reflects Its Commitment to Identifying and Fixing Problems in AIU Investigations

The Department has created a Post-Investigation Review Panel that meets quarterly to assess a sample of closed AIU investigations. The Panel's membership reflects meaningful breadth: it includes an outside law enforcement expert alongside representatives from OIA, the Employment Advocacy and Prosecution Team, the Division of Adult Institutions, and Correctional Health Care Services. Its mandate is correspondingly comprehensive. Panel reviews assess the entire complaint handling process, including whether CST screening and routing decisions were consistent with the ADI, AIU investigations were comprehensive and unbiased, and whether hiring authority findings and disciplinary decisions were appropriate. The Panel produces a written report after each review and identifies training recommendations for AIU investigators and hiring authorities.

We observed one of the Panel's meetings and have reviewed its reports. What we observed is encouraging. The Panel takes its work seriously, engages critically with the cases before it, and generates findings that reflect genuine institutional learning rather than pro forma review. The structure the Department has built here, regular sampling of closed cases, outside expertise, cross-divisional membership, and a training feedback loop, reflects exactly the kind of quality control architecture a centralized investigative unit requires.

## The Current Complaint Handling Process Does Not Efficiently or Effectively Employ its Limited Resources

Before turning to our other findings, a key observation is necessary: the status quo is not sustainable for at least two reasons. First, a complaint system that opens more matters than it closes will fall further behind every month. That is just math. And the costs of those compounding delays are borne by every constituency the system serves. Officers remain in limbo under open allegations, IPs wait longer for the resolution that may impact their day-to-day safety in confinement, all while case closure times elongate, resulting in degraded evidence, faded memories, and the worsening of AIU's capacity to give serious cases the attention they require. The present trajectory is not sustainable, and we believe that the Department and the Plaintiffs understand this. While agreement has not yet been reached on the remedy, the consensus that changes must be made is a necessary precursor to such agreement.

Second, this consensus is not only shared in the office suites of the Department's leaders and the Plaintiff's lawyers; it also pervades the yards and housing units in prisons across the state. Staff

perceive the complaint process as adversarial and unfair. Officers told us they feel targeted by a system they believe presumes complaints to be true. Given the relatively low sustain rates for misconduct complaints, the lengthy delays for case resolution are likely a significant contributor to that perception. Officers rightly perceive that complaints that could be readily disproven by video are allowed to remain open, potentially tarnishing their reputations or restricting their eligibility to promote or transfer. Communication failures compound it further. Officers told us they are sometimes informed of AIU investigation outcomes in an extremely impersonal way. Some described learning of the outcome only by being summoned to an office to read a findings letter in front of an official they may not know. A process experienced that way teaches staff that the system is indifferent to their needs, at best, and allows them to presume that it's openly hostile at worst.

IPs hold the inverse perception with equal conviction. In focus groups across all of the facilities we visited, IPs described the process as fixed against them. They believe that investigators are biased toward staff, that complaints will not be fairly handled, and that filing one accomplishes nothing but creating increased exposure to potential retaliation. Complaint volume is very high, which might seem to suggest that IPs retain enough faith in the complaint process to continue using it. But an IP who believes that filing a legitimate complaint will accomplish nothing but invite retaliation has every reason not to file one. The more precise concern is selective deterrence: that a system perceived as stacked against IPs deters the complaints most likely to reflect genuine misconduct, while leaving intact the complaints filed for improper reasons, such as IP retaliation against staff. A complaint system that the seriously aggrieved will not use cannot perform its core function of surfacing problems that must be addressed. The Department's leadership, to its credit, does not defend the status quo, and is motivated to make the changes needed for the system to work properly.

## The Centralization of Screening and Investigative Assignment Decisions In CST Must Not Be Disturbed

During interviews and focus groups conducted across the Department's facilities, we heard a consistent and understandable view: that facilities should be able to handle low-level misconduct matters without ever routing them for centralized screening by CST. The frustration behind that view is real. Supervisors who believe they already know what happened, have the video, and could resolve a complaint in hours or days, instead watch it disappear into a centralized queue for

sometimes many months. We understand why the current system produces that frustration, and the desire for a more direct path is reasonable. The approach it points toward is not.

Allowing facilities to make the initial determination that a complaint is low-level enough to handle internally is precisely the authority the current system was designed to eliminate. That judgment, that a particular allegation about a particular officer is not worth centralized attention, is the judgment that produced the complaints that disappeared, the investigations that stalled, and the outcomes that reflected institutional self-protection rather than honest inquiry. The remedy to those failures was to remove the screening decisions from the facilities entirely. Restoring them, even in a limited form, restores the vulnerability.

### Force Complaints Can be Stratified by Risk and Investigative Complexity, Which Should Determine the Investigative Response

Triage and investigation, however, are separate functions, and because triage should be centralized does not necessarily mean that all force investigation must be. To determine what kind of investigation is needed, force complaints can be stratified by the risks that they present. A complaint alleging that an officer applied a control hold to overcome minor resistance to handcuffing, producing no injury, captured on video consistent with the officer's account, presents a fundamentally different set of questions than a complaint alleging that an officer struck a restrained IP resulting in medical attention. Those differences determine what investigative capabilities a complaint requires, what is at stake if the investigation falls short, and what the Department's obligations under its court orders demand in response. A complaint system calibrated to those differences is more efficient and better positioned to deliver reliable investigative outcomes.

Two distinct dimensions determine what a force complaint requires: risk and investigative complexity. Risk refers to the organizational and legal exposure the underlying conduct presents if it occurred as alleged. Higher-risk force complaints are those in which the potential misconduct, if substantiated, would reflect a serious abuse of authority, implicate the Department's obligations under its court orders, or carry significant legal consequences. Some factors that bear on that assessment include but are not limited to the following:

- Any injury, including minor injuries
- Use of strikes, impact techniques, takedowns, or (with some possible exceptions) less lethal tools

- Force applied to a restrained IP
- Large divergence between resistance level and force type[14]
- Force involving a member of a vulnerable population, including persons who are pregnant, elderly, physically disabled, or with a serious mental health designation
- Any material divergence among officer reports or between officer reports and available video

Lower-risk complaints are those presenting none of the above characteristics. They involve minor, defined force techniques applied to overcome limited resistance, producing no injury, and generating a documentary record consistent with the officer's account.

Investigative complexity is a separate dimension. Some complaints, regardless of their risk level, present investigative demands that exceed routine local capacity. Multiple witnesses requiring coordinated interviews, various video sources that demand synthesis and comparison across angles and timeframes, or genuinely disputed facts requiring credibility assessment across conflicting accounts are markers of investigative complexity that warrant specialized handling independent of the risk factors above.

The Department's current system does not account for either dimension at the point of investigative assignment. Every force complaint enters the same queue and travels the same investigative pathway regardless of the risk it presents or the complexity it requires, which contributes to the glut of unresolved complaints in AIU. The specific contours of a risk stratification taxonomy will require negotiation between the Department and Plaintiffs. The framework above identifies some factors and dimensions that any such taxonomy should address. The particular thresholds, force type classifications, and population-specific criteria that define the boundary between higher-risk and lower-risk complaints should be informed by the Department's own aggregate data. Sustained rates by force type, injury rates, and complaint volume trends are not merely reporting outputs, they are inputs into how risk should be defined for CDCR specifically. A force type that generates elevated sustained rates in CDCR's complaint history presents organizational risk that general criteria alone would not capture, and the taxonomy should reflect that. The risk framework, once established, should be subject to periodic recalibration as the Department's data accumulates and its complaint system matures.

## High-Risk Force Complaints Must Be Investigated By AIU

When a force complaint presents the characteristics that place it in the higher-risk category, the investigation must be capable of meeting the demands those characteristics create. Meeting it requires investigators with specialized training who can conduct probing interviews designed to test the credibility of staff accounts, not simply document them. It demands the capacity to scrutinize force video closely and systematically, comparing what the recording shows against what officers reported, and identifying discrepancies that a less rigorous review would miss. It requires independence from facility leadership sufficient to ensure that the investigation follows the evidence rather than the institutional interest. A high-risk force allegation investigated by personnel who report to the same command structure as the officer under scrutiny carries structural risks that no amount of individual integrity can fully eliminate.

AIU exists, in part, because that investigative capability needs to be housed somewhere insulated from the pressures that bear on facility command. Further, AIU investigators receive specialized training, including an initial 40-hour academy addressing evidence collection, interviewing techniques, the Peace Officer Bill of Rights, and report writing. They also attend external training sessions related to general internal affairs functions, interview and interrogation techniques, and criminal investigation skill building. High-risk force complaints thus belong at AIU.

## Lower-Risk Force Allegations May Sometimes Be Properly Investigated by Entities Other Than AIU

Lower-risk force complaints share a recognizable profile. They involve defined and limited applications of force, such as control holds, physical escorts, or restraint techniques applied to overcome minor resistance. They produce no injury. They do not involve disputed circumstances, aggravating factors, or any indication that the force applied was motivated by something other than a legitimate penological purpose. Taken together, those characteristics describe a complaint in which the core question, whether the force applied was consistent with policy and supported by the available record, is answerable without the specialized investigative capabilities AIU can provide.

Investigating complaints of that kind involves a different and less demanding set of tasks than AIU-level investigation requires. The relevant video must be reviewed. The officer's account and any witness statements must be compared against it and if any factual ambiguity remains, some limited investigation can be performed. A closing memo must document the basis for the disposition. That work benefits from oversight and quality control. But it does not require the specialized interview

techniques, independent command structure, or forensic video analysis capacity that serious force allegations demand. The current system, however, routes all force complaints to AIU no matter how serious. That is, there is no sorting by risk level to determine who should investigate and how.

Department data help to illustrate the point. In 2025, AIU investigated 5,132 use of force allegations. This represents approximately one-third of the Department's entire allegation volume during that period. Of those, 4,664 or more than 90%, were logged under the single category of "Excessive or Unnecessary Use of Force." That category does no sorting work. It assigns no risk level, distinguishes no severity tier, does not identify the alleged force type, and provides no basis for determining what kind of investigation a complaint warrants. A routine control hold and a serious assault resulting in hospitalization arrive at AIU under the same label and travel the same investigative pathway. The Department cannot implement meaningful risk stratification under its current complaint taxonomy because that taxonomy does not capture the information stratification requires. Before complaints can be sorted by risk, they must first be classified in terms that make risk visible.

## The Department's Complaint Tracking and Incident Management Systems Are Not Integrated, Which Will Impede Stratification by Risk

Risk-based sorting of force complaints requires information about the underlying incident at the moment a complaint is received: the type of force applied, whether injury resulted, whether the IP was restrained, the number of staff involved, and other characteristics that determine where a complaint falls on the risk spectrum. That information is not generated by the complaint itself, it lives in the Department's Strategic Offender Management System ("SOMS"), where force incidents are logged and tracked as a matter of course. The complaint tracking system, the Allegations Against Staff Tracking System ("AASTS") and SOMS are not integrated. No automatic link connects an incoming complaint to the incident record that describes what actually happened.

CST staff can query SOMS manually by date, time, and location to pull the relevant incident record, and they do so, at least in some cases. But a manual process dependent on individual initiative and adequate time is not a reliable substitute for system integration at the volume AIU operates. The gap matters most for risk stratification. A sorting framework that depends on knowing the force type, injury status, and other incident characteristics at intake cannot function reliably when access to that information is manual, inconsistent, and undocumented.

## Investigating All Force Complaints, Regardless of Risk Level, Through AIU Has Costs That Must Be Acknowledged

AIU's investigative capacity is finite. As of May 2026, the unit was carrying a caseload of 14,666 open investigations handled by 102 investigators, a ratio that leaves each investigator responsible for an average of 144 active matters at any time. That capacity is consumed without distinction between complaints that require AIU's specialized capabilities and those that do not. Every lower-risk force complaint that enters AIU's queue displaces time and attention that a high-risk force allegation could use. The costs of this delay are paid on every serious case that waits longer for assignment, moves more slowly through investigation, or receives less investigative attention than it warrants because the unit's resources are distributed across a complaint population that does not uniformly require them.

The costs extend to facility leadership. When every force complaint, regardless of how minor, leaves the prison and routes to AIU, facility managers are relieved of responsibility for low-level staff conduct issues they should be positioned to identify, address, and resolve. A supervisor who could review available video, speak with the involved officer, and close a matter within days instead refers it upward and waits.

The costs reach individual staff members as well. An officer who applied a control hold by the book, documented it accurately, and is captured on video doing exactly what policy requires may nonetheless wait 12 months for AIU to reach and close their complaint. Officers and their representatives have consistently raised complaint resolution timelines as a significant morale concern, which is not unreasonable. A system that cannot distinguish between a routine complaint and a serious one will resolve both on the timeline that serious ones require. For the officer whose complaint is routine, that timeline is experienced as institutional indifference.

## The Execution of the LDI Program Was Flawed But Not Its Underlying Philosophy

As we make these observations, we must grapple with the fact that the Department once experimented with a program to allow prison-based investigators to investigate certain non-force misconduct allegations. Until December 31, 2024, allegations not on the ADI were routed to the facilities for a local inquiry conducted by a locally designated investigator ("LDI"). LDIs were facility-level personnel specifically trained for the role. They were responsible for gathering facts, reviewing evidence, conducting interviews, and preparing a draft report that was reviewed by a

manager within OIA before reaching the hiring authority. The manager review was the quality control mechanism designed to ensure that local inquiries met a minimum standard before a disposition was reached.

The architecture of that system reflects the same principle this chapter advances: that investigative responsibility should be allocated based on what an allegation actually requires, with the most serious allegations handled by a specialized, independent unit and less serious matters handled closer to where the conduct occurred. Notably, use of force was on the ADI and therefore LDIs did not cover force complaints, a distinction that matters for how its lessons apply here.

The OIG monitored the LDI program closely and identified persistent quality problems. In its reports documenting its monitoring of local inquiries, the OIG found that LDIs frequently failed to complete all necessary interviews, did not consistently request or preserve relevant video evidence, inadequately documented their fact-gathering, and did not identify the departmental policies applicable to the alleged misconduct. The OIG also found that managers approved inquiry reports that contained these deficiencies without identifying or remedying them. The OIG's recommendations focused on training, conflict-of-interest protocols, expanded video access authority, and improved managerial review, not on eliminating the local inquiry function itself.

CDCR discontinued the LDI program entirely on January 1, 2025, replacing it with a process in which CST routes complaints alleging misconduct not on the ADI to hiring authorities for an allegation inquiry, generally conducted by facility supervisors. The OIG's initial monitoring of that replacement process found it performed inadequately in 45 percent of the cases reviewed, with deficiencies in interviews, video preservation, documentation, and policy identification appearing at rates comparable to or worse than those under the LDI program. The substitution of an untrained supervisor for a trained local investigator did not improve outcomes. It reproduced the same deficiencies while eliminating the training and role-specificity that gave the LDI model its structural logic.

From these facts, we draw the following lessons. First, LDIs should not answer to the institutions whose staff they investigate. LDIs previously answered to the local chain of command. The program's written requirements were in place throughout the period the OIG documented its deficiencies, so the problem was not the absence of rules, it was a structure that placed the investigator's independence in the hands of the institution being examined. Second, for prison-

based misconduct investigations to be workable, there must be genuine and meaningful supervisory oversight. The OIG found that OIA managers approved inquiry reports containing significant deficiencies without identifying or remedying them. Local inquiry conducted without meaningful quality control does not produce reliable outcomes.

Third, the investigators conducting local inquiries must be specifically trained for the role. CDCR's decision to replace dedicated LDIs with ad hoc supervisor reviews did not improve outcomes. In fact, they got worse. Fourth, the mechanism for escalating matters that prove more serious than they appeared at intake must function as a mandatory obligation, not a discretionary option. The OIG found cases in which supervisors uncovered evidence of more serious misconduct and did not invoke the escalation pathway back to OIA. A local inquiry program without a reliable, enforced escalation trigger is a program that will periodically absorb cases it should not be handling.

Notwithstanding these lessons, CDCR's experience with LDIs does not reflect that the underlying philosophy was unsound or should have been abandoned. The OIG's own recommendations, dedicated training for local investigators, conflict-of-interest protocols, expanded video access authority, mandatory escalation, and meaningful managerial review, describe the conditions of a well-functioning local inquiry program. We view them as a blueprint for improvement of the LDI program, not a case for complete abandonment of the concept.

### The Current Process Erroneously Treats Triage as a Single Determination Rather Than a Continuous Reassessment Until Complaint Resolution

The findings above address a threshold question: which complaints require centralized investigation by AIU and which do not, and the recommendations in Chapter Five make a number of responsive recommendations. But implementing these fixes would not alone be sufficient; the complaints that belong with AIU must still be investigated adequately. The findings that follow address how AIU handles the cases it receives: whether investigations are calibrated to what the evidence shows as it develops, whether the unit operates under a governing framework that defines what adequate investigation looks like, and whether the Department has the tools to know whether AIU is achieving its mission.

Triage, properly understood, is not a gate a complaint passes through once. It is a question the system should ask at every significant stage of a complaint's life: does what we now know still justify the track this matter is on? A complaint routed to an AIU investigation at intake may be

conclusively resolved by the first piece of evidence reviewed, and the system should be able to close it then. A complaint that may seem implausible on its face may prove, as the record develops, to involve conduct far more serious than the intake decision assumed, and the system should be able to escalate the investigation accordingly. Calibration must run in both directions, and it must run for the life of the complaint, because the intake decision is necessarily made on the least information the system will ever have.

The Department's process does not work this way, and the routing decision made at intake generally operates as a final assignment of investigative effort rather than a provisional one. Matters placed on the investigation track remain there even when preliminary investigation should resolve them, and matters routed for limited handling are not reliably revisited when the basis for closure proves wrong. The consequences of this run in both directions, and we address each below.

### Force Complaints Are Sometimes Being Investigated Even When Preliminary Evidence Reflects That No Force Was Used, Or That Force Was Used but It Complied with Policy

The first evidentiary review of a force complaint is itself a triage event, and when that review establishes that no force was used, or that force was used that complied with policy, the complaint should be closed without further investigation.[15] Instead, complaints are being investigated even when the evidence available at that preliminary stage makes clear that there was no policy violation.

The following examples are drawn from a random sample of complaints investigated by AIU. In each, preliminary review of the available evidence, typically video reviewed against the allegation, resolved the complaint: the record established that no force was used, that the allegation was factually unfounded, or that the force used complied with policy. In these cases, the preliminary review itself should have been a closing event, as the record answered the question the complaint raised before a full investigation began. For example:

- An IP alleged that an officer delivering his meal assaulted him by forcefully pushing a meal tray through the food port, causing it to hit the IP. Video of the incident showed that during meal pass, the IP asked the officer to pass a book to an IP in another cell, and when the officer refused, the IP became profane and abusive. The officer calmly handed the IP a food tray through the slot, and the tray accidentally dropped inside the cell. He then provided a replacement tray. Although the video made clear that the allegation was

unfounded, the incident was fully investigated, including the development of an investigation plan; interviews of the involved IP and officer; the collection of training records, roster information, and rules violation reports; and creation of a six-page investigation report with 14 exhibits. The investigation took nearly five months to complete.

- An IP alleged that a nurse was rude and pulled on his shirt while cursing. Although there were no allegations against sworn staff, nor any claims of misconduct, AIU conducted an investigation that included obtaining documents, medical records, and video footage; interviewing the IP, the sergeant who was present, a medical witness, and the involved nurse; and drafting a nine-page report with 23 exhibits. The investigation took more than three months to complete.
- An IP alleged that when he was being escorted to his cell, officers pulled on his waist chains in retaliation for a prior incident. The investigation revealed that the IP was in waist chains with a triangle due to a history of staff assaults. Video showed that when he was placed into the cell, he grabbed the waist chains and refused to relinquish them. Footage revealed that the only pulling of the chains was to recover them from his grasp. The investigation, which took more than four months to complete, involved obtaining all relevant documents (including the RVR to which the IP pleaded guilty), reviewing and assessing staff accounts and medical reports, reviewing the IP's bed assignment history, and drafting of a nine-page Investigation Report with 16 exhibits.
- An IP complained that a nurse "forcefully" put a blood pressure cuff on her upper arm when the IP wanted her to put the cuff on her lower arm. BWC video showed officers entering the IP's cell to take her vitals. A nurse applied a blood pressure cuff, the IP yelled that she wanted the cuff on lower, and she ripped the cuff off. The video demonstrated that neither the nurse nor the officer used force. The investigation took nearly two months to complete, included interviews of the involved IP and two nurses, and was closed with a nine-page report, with 20 exhibits, summarizing various departmental records, the IP's medical record, as well as BWC and AVSS video.
- An IP alleged that he was asked to strip out of his uniform in his cell in order to shower. He alleged that an officer opened the food port and needlessly sprayed him with OC spray. But video showed that OC was used only when the IP reached through the port and grabbed the officer's duty belt. The IP refused orders to let go of the duty belt, prompting officers to

deploy OC spray. Although the IP refused to participate in an interview with a facility sergeant, and later told AIU he did not want to pursue the matter, it was fully investigated. The investigation included interviews with the subject officers and a witness IP, the and collection of housing assignment, medical, and roster records, and took over seven months to complete, resulting in a 13-page report with 31 exhibits.

- An IP alleged that an officer violated policy by forcing him to stand up and dragging him back to his cell. Video showed that the IP sat on the stairs refusing to continue an escort to medical. Because the IP would not voluntarily stand up and continue walking, officers had medical respond to the unit to assess the IP, who was medically cleared. After officers tried for a prolonged period to verbally persuade him, they used minor force to lift him into a standing position and then walked him back to his cell. Although video made clear that there were no policy violations, a full investigation was conducted that included interviews with the IP and officers, collection of officer reports and other records, and preparation of a written summary. It took more than four months to complete and resulted in an 11-page report with 19 exhibits.

## The Department's Utilization of Its Special Conditions Closure Process for Concluding Record-Resolved Complaints Should Be Expanded

The Department has already designed a solution to part of the identified problem. The Special Conditions Closure Process permits a complaint to be closed without investigation where the available record conclusively resolves the allegation under any of the following conditions:

- Upon review of all relevant video and audio recordings, sufficient evidence exists to prove conclusively that the alleged misconduct did not occur;
- Upon review of all relevant video and audio recordings, sufficient evidence exists to prove conclusively that the alleged misconduct did occur and each of the employees engaged in the alleged misconduct were given the opportunity to respond to the allegation and provide any mitigating factors that the Hiring Authority should consider;
- Upon review of an allegation that staff engaged in misconduct, no reasonable investigatory steps remain for the investigator to pursue because the allegation lacks sufficient detail and the claimant refused to participate in an interview, participated in

an interview but was still unable to provide sufficient detail, or could not participate in an interview due to their long-term unavailability; or

- Upon review of an allegation that staff failed to take a specific action, documentary evidence found in the department's information technology system clearly shows that the action was taken by that same staff.

Special Conditions Closures require review and agreement from OIA supervisors and the hiring authority. Thus far in 2026, 584 AIU investigations have been closed through the Special Conditions Closure Process. Figure 2 documents the increased use of this option over the last several months.

Figure 2: Cases Closed Through the Special Conditions Closure Process by Month




Many of the cases recently closed through the Special Conditions Closure Process are old, which suggests that the Department is using the mechanism to reduce the backlog. But its full value lies at the front of the process, in the prompt review of material evidence before a complaint becomes part of the backlog, and the Department is capturing only part of that value when the mechanism is applied to cases that have already aged.

## Serious Allegations That Merit Full Investigation Are Sometimes Being Prematurely Closed

The current model also sometimes fails in the opposite direction by closing complaints alleging serious misconduct before the investigative steps necessary to prove or disprove the allegation had

been taken. In these matters, the available evidence did not refute the complaint. In fact, in some cases it supported it and suggested that a policy violation may genuinely have occurred. But the questions that evidence raised went unanswered because the matter was closed before anyone seriously pursued them.

A closure decision is a triage decision, and it is sound only if the record at the time of closure actually supports it. Some of the closures we reviewed reflect records that were materially incomplete: identified witnesses were never interviewed or material discrepancies between officer statements and video evidence did not lead to probing officer interviews. At the margins, those defects might be attributed to the volume pressures this chapter documents, but that is not a complete explanation. In a number of cases, the investigative file contained evidence that supported the allegation or raised questions that warranted further review, and the matter was nonetheless closed without sufficient investigation. For example:

- An IP alleged that he was unnecessarily sprayed with OC. AVSS and BWC showed that officers were securing IPs into their cells while the complainant was speaking to a sergeant. The complainant was ordered to return to his cell and began walking in that direction. When an officer approached with OC in hand, the sergeant could be heard telling the officer to "step back" and "no, he's good" but the officer sprayed the complainant with OC anyway. Multiple officer reports described resistance from the complainant that was not corroborated by available video. The investigation involved interviewing the IP and obtaining video and other documentary proof, but no officer interviews were conducted before the investigation was submitted as complete.
- An IP filed a grievance about two related incidents. Regarding the first incident, he alleged that he observed officers using excessive force by assaulting an IP in a wheelchair who had physical and mental disabilities. Regarding the second incident, he alleged that when he expressed concerns to an officer about the first force incident, the officer sprayed him with OC. Video showed that numerous officers were involved in a use of force in a housing unit and an officer delivered multiple head strikes to an IP. Video also showed that as the first use of force was occurring, the complainant, who uses a walker, began walking in the direction of the incident and one officer fired a 40 mm round at him, and another officer sprayed him in the face with OC. AIU interviewed the two officers who used force on the

complainant, but no investigation was conducted into the force used on the first IP despite video showing that the strikes may have been disproportionate.

- An IP made a verbal allegation of excessive and unnecessary force. One officer's report stated that OC was used but indicated that just before the officer deployed OC, the IP clenched his fist and took a step towards the officer. BWC of the incident showed the officer deploy OC at the IP, who was not a threat, appeared to be suffering from a suspected overdose, and was in a contained shower cell. No officer interviews were conducted before AIU submitted the investigation as complete.

Unwarranted case closure or dismissal is among the costliest failures a complaint system can produce. An over-investigated meritless complaint wastes resources. But where there is evidence that out-of-policy force was used, and an inadequate investigation leads to the improper closure of the complaint, a core purpose for which the system exists is defeated.

## AIU Operates Without a Governing Operating Procedure

We have above identified some of the problems with AIU's investigations. Here we hone in on the lack of a governing OP as a significant contributor to those problems and an obstacle to resolving them. AIU is the Department's primary instrument for investigating allegations of certain kinds of staff misconduct. It receives thousands of complaints each year, exercises authority over matters with significant consequences for IPs, staff, and the Department's obligations under its court orders, and produces records that form the evidentiary basis for disciplinary determinations by the hiring authorities. A unit with that responsibility requires a governing operational document, one that defines what the unit is, how it works, and how anyone inside or outside the Department would know whether it is working as intended. AIU does not have one.

The Department has training materials that prepare individual investigators to handle cases.[16] We have reviewed them and find them to be useful primers. The Department also has an AIU investigative workflow document that gives investigators guidance on several decisions an OP would govern, including when an abbreviated report may be used and when certain interviews may be unnecessary. That guidance is useful. But neither the training materials nor the workflow document serve as an OP. Training materials teach investigators skills, and the workflow document offers considerations for investigators to weigh in individual cases. An OP governs how the unit operates: how cases enter the system, how they are assigned, how evidence is obtained and preserved, what

timelines govern investigator and supervisory action, how records are maintained, what standards determine when an investigation is complete, and how the unit's performance is measured against its mission. Without such a document, each of those questions is answered, if at all, by informal practice, individual judgment, or institutional habit. That is not an adequate governance structure.

The consequences of that absence run throughout this chapter. The lack of clearly defined standards for what constitutes a complete investigation means there is no shared basis for determining when a case is ready to close. The lack of clear standards for when investigations should be escalated or de-escalated means that the determinations are made by individual investigators without adequate guidance. Each of these gaps is addressed in the subfindings that follow.

**AIU Lacks a Usable Working Definition of "Comprehensive Investigation"**

The Remedial Plans require the Department to conduct "comprehensive and unbiased investigations" and to ensure that "all relevant evidence is gathered and reviewed." The obligation is sound. But the Remedial Plans state a standard rather than an operating procedure. The workflow document addresses one part of the question, identifying circumstances in which no further investigative steps are needed, such as when video clearly refutes the allegation. But nowhere has the Department translated "comprehensive" into a working definition that tells an investigator what a complete investigation of a given allegation contains, or a supervisor reviewing a proposed closure what the file must answer, or tells the triage function what investigative plan a complaint requires. In the absence of a definition, comprehensiveness is determined case by case, investigator by investigator, and the two failure directions documented in this chapter are the result. Some investigators treat the obligation as exhaustive, gathering additional evidence even after the material questions are answered, and the backlog absorbs the cost. Others treat it as formless and cases close without proof to answer the allegation they were opened to resolve.

**AIU Lacks Written Standards Governing Escalation, De-Escalation, and Case Closure Decisions**

As the findings above document, AIU investigations are not being reliably calibrated to what the evidence shows as it develops. Some cases receive more investigative attention than the record warrants, and others receive less. A governing OP would address that pattern directly by establishing written standards for the decisions that should drive those adjustments: when new evidence requires an investigator to pursue additional interviews, request additional records, or elevate the case for supervisory attention, when the available record is sufficient to support closure,

and what the file must reflect before any such decision is made and reviewed. Those standards would identify the circumstances that should prompt an investigator to intensify a case, such as a witness account materially inconsistent with video, evidence of injury not documented at intake, or a pattern in the officer's prior complaint history bearing on the current allegation. They would also establish the threshold a file must meet before closure: whether all material evidence has been obtained, all necessary witnesses interviewed, and the investigative reasoning documented in a form a reviewer can assess.

AIU has no formal standards that should prompt an investigator to intensify a case, such as a witness account materially inconsistent with video, evidence of injury not documented at intake, or a pattern in the officer's prior complaint history bearing on the current allegation. Neither are the conditions under which a case may appropriately be narrowed or closed, such as video that conclusively establishes the alleged conduct did not occur as described, or an allegation that does not describe a policy violation even if proven. The threshold a file must meet before closure, whether all material evidence has been obtained, all necessary witnesses interviewed, and the investigative reasoning documented in a form a reviewer can assess, is similarly unspecified. Without those standards, each of those decisions is made by individual investigators and supervisors on the basis of informal practice and personal judgment.

## AIU Staffing Levels Are Likely Insufficient, but Staffing Increases Alone Will Not Fix the Backlog

Plaintiffs have consistently identified increased AIU staffing as important to addressing the backlog and the delays that follow from it. We agree that AIU's current staffing levels are likely inadequate. AIU is responsible for investigating misconduct complaints across a department of significant scale—31 institutions housing 90,000 incarcerated persons—and receives 200,000 complaints each year. The ratio of investigators to complaints, and of investigators to facilities, does not reflect what a unit carrying that responsibility requires. An AIU staffing study is underway by CDCR, and we expect it to confirm that AIU needs more investigators than it currently has.

Comparative staffing data across large correctional agencies is difficult to obtain and interpret. On raw numbers, AIU's investigator complement may appear adequate or even generous relative to investigative units in other large departments. But that comparison is less informative than it might seem. Most large correctional agencies do not operate under the framework of court orders and legal requirements that govern CDCR, which mandate centralized screening of all misconduct

complaints and impose specific investigative obligations that go beyond what agencies without that oversight history typically maintain. An agency that handles complaints informally, routes them to facility supervisors, or has a limited centralized investigative function will show a very different OIA/AIU staffing picture than one required by court order to investigate complaints comprehensively and centrally. Thus, comparing AIU's staffing to those agencies does not necessarily establish adequacy.

Increased staffing will not be a panacea, and the Department should not treat it as one. More investigators assigned to a miscalibrated system will produce more investigations of the same kind the system is currently generating. The backlog is not simply a product of insufficient personnel. It is also a product of decision points that are not properly calibrated. Additional staffing deployed into that system will reduce the backlog at the margins but will not fix it.

Thus, staffing increases and structural reforms are not alternatives, both are likely necessary. But the structural issues this chapter identifies should not wait for staffing levels to be resolved, and staffing decisions should be made with a clearer picture of what AIU's caseload should look like once the system is properly calibrated. A staffing model built around the current complaint volume, in which every force complaint travels the same investigative pathway regardless of risk, will overstate what AIU needs. But a staffing model built around a risk-stratified system, in which AIU handles the complaints that require its specialized capabilities and others are handled differently, will produce a more accurate and more defensible picture.

# Three: The Institutional Review of Force

The complaint and investigations process is not the only aspect of the Department's internal force architecture that needs attention. The institutional review of force, operating through the Department's IERCs also reflects areas of significant need. Every use of force reveals information about the conditions, personnel, and systems that produced it. A force review process exists to evaluate that information, analyze it through a multi-disciplinary team, and mobilize it in order to improve the institution. A well-designed and implemented force review process enables proactive management of the prison, facilitates staff development and targeted investments in personnel, and enhances staff culture and accountability regarding the use of force.

CDCR operates a force review process that reflects genuine institutional commitment to these goals, but fails to achieve them in ways that are both consequential and correctable. We provide below our specific findings regarding CDCR's force review process and, in the closing chapter of the report, targeted recommendations for revision and improvement.

## The Core Purposes of Institutional Force Review in Corrections

Policy and training establish the framework under which force may be used. But while policy and training are necessary, they are not sufficient to manage or mitigate the significant risks presented by force incidents. Doing so requires active and engaged supervisors who are available in the units, systems for tracking and analyzing force data across incidents and over time, and the development of a culture of critical examination of force incidents. A prison that reviews its uses of force systematically, seriously, and with a range of relevant expertise, is an institution that learns from its force record and strives to continually make improvements of several kinds.

### Proactive Management of the Prison

Force incidents are among the most diagnostically useful events that occur in a correctional facility. In the majority of cases, a use of force is preceded by a set of conditions that either made the incident more likely or more difficult to resolve without physical contact. Identifying and addressing those conditions is one of the primary purposes of an institutional force review program.

The range of management issues that force reviews can surface is broad. Repeated force incidents in a particular housing unit may reflect a classification or housing assignment error, in which incompatible IP populations have been placed in proximity in ways that generate predictable conflict. A cluster of incidents on a specific shift may point to a staffing deficit, a supervision gap, or a post assignment that is generating disproportionate staff-IP tension. Incidents concentrated around particular spaces within the facility may reveal physical plant issues, such as blind spots, inadequate space for IP movement, or areas where the physical environment itself creates conflict that could be mitigated through modifications. And patterns of force that cut across multiple units or shifts may reflect a policy that is unclear, poorly conceived, or inconsistently applied, and that should be revised or clarified at the institution or Department levels.

None of these management issues will be visible to facility leadership if force incidents are reviewed only in isolation and evaluated only on the narrow question of policy adherence. They become visible only through systematic review that looks across incidents over time, identifies patterns, and asks why those patterns exist. The information generated by that process should flow directly to prison or unit managers with both the authority and the responsibility to make needed adjustments. A force review program that generates findings but does not produce management or corrective action plans delivers only a fraction of its potential institutional value.

## Developing Staff and Investing in Personnel

Force incidents also serve as a crucible in which staff capabilities, limitations, and needs are revealed in ways that routine supervision rarely captures. An officer who handles a tense situation with skill and restraint demonstrates competencies that deserve recognition and can inform deployment decisions. An officer who struggles reflects needs that, in many cases, can be addressed through targeted investment, such as mentoring and retraining, rather than discipline.

The range of staff development needs that force reviews can identify is considerable. Some officers who use force inconsistently with policy do so not out of indifference or bad faith, but because they have genuinely misunderstood a policy requirement or received formal or informal training that did not adequately prepare them for the situations they encounter. For those officers, additional training or clarification may be all that is required. Others may be well-trained in policy generally but poorly matched with the specific population they are assigned to manage. Not every officer is suited to work in a mental health unit, for example, and force reviews that reveal a persistent pattern of difficult interactions between an officer and a particular population should prompt supervisors to

consider whether a reassignment is necessary. Still others may be experiencing work-related stress or the kind of cumulative fatigue that extended correctional careers can produce, and that manifests in shortened patience, diminished judgment, and a reduced capacity for the kind of de-escalation that prevents force incidents from occurring in the first place.

Where force reviews identify developmental needs of this kind, the appropriate institutional response is sometimes investment rather than reflexive adverse action. That investment may take the form of additional training, closer mentoring by experienced supervisors, reassignment to a post or unit better suited to the officer's strengths, or placement under the direct supervision of a sergeant whose management approach is well-suited to developing staff in need of guidance. The key is that force review findings must actually drive these decisions. A review program that identifies staff development needs but does not produce a corresponding supervisory response has failed one of its core purposes.

## Accountability and Staff Culture Related to the Use of Force

Institutional force review also serves a critical accountability function, though one that is distinct in important respects from the disciplinary process that may follow formal complaints or investigations. The accountability generated by a well-run force review program operates on at least three levels. At the most direct level, force review provides the mechanism through which potential policy violations are identified and referred for administrative investigation. Not every use of force that warrants a closer look will generate a complaint. An officer who applies force in a manner inconsistent with policy may do so in a setting where the affected person does not file a grievance, where witnesses do not come forward, or where the incident is documented in ways that obscure rather than illuminate what actually occurred. A systematic force review process that examines every incident, reviews available video, and evaluates the force against applicable policy standards provides a reliable check that does not depend on any of those external conditions.

At a second level, force review supports the kind of data tracking that makes meaningful performance management possible over time. A single use of force, even one that raises concerns, may not by itself warrant adverse action. But an officer with a pattern of force incidents involving a particular type of situation or population, presents a very different picture, and one that supervisors cannot see unless the data necessary to identify it is being systematically collected, maintained, and reviewed.

Finally, and perhaps most importantly, a well-run force review program sends a clear and consistent message to staff about the agency's expectations and its commitment to enforcing them. When staff understand that every use of force will be carefully reviewed, and that both appropriate and inappropriate force will be recognized as such, the program creates meaningful deterrence against uses of force that violate policy, while simultaneously providing clear institutional support for staff who use force appropriately.

## The Role of Curiosity in Force Reviews

A force review that stops at the surface of an incident has not done its job. The surface of a use of force incident is the conduct of the involved officers at the moment of physical contact. But a review program that treats the moment of force as the beginning and end of its inquiry will systematically miss the more important questions: why did this incident occur, and what does the answer to that question tell us about conditions we have the ability to change?

The key question that must iteratively be asked in any force review process is "Why?" An officer used force – why? Because the incarcerated person refused a direct order. Why did the incarcerated person refuse? Was this behavioral pattern consistent with prior conduct, or was it a departure? If it was a departure, was there a precipitating event such as a housing change, a program disruption, or a mental health decompensation that made the refusal predictable in retrospect? If the pattern is consistent, what prior interventions have been attempted, and why have they not been sufficient? Asking these types of questions in sequence does not excuse conduct of an IP that led to the use of force. But it provides the information necessary to determine whether the incident was genuinely unforeseeable or whether it was the product of conditions that the institution had both the knowledge and the opportunity to address.

Inquisitiveness is the engine of a force review program's institutional value. It is also the quality most frequently lacking. When panel members do not treat each incident as genuinely worthy of inquiry, when presentations are abbreviated and analysis is formulaic and focused on buzz words associated with the force policy, and when reviews begin to generate findings that focus on the minutia of incident paperwork rather than meaningful examination of the underlying conditions that may have driven the use of force, the program loses most of what makes it valuable. It becomes an exercise in paper compliance rather than a driver of proactive management, as it should be.

## CDCR's Current Force Review Process

Each CDCR institution administers its own force review program under the supervision of the warden through its IERC. The DOM establishes the purpose of IERC, requiring that the IERC "shall determine if the use of force was reasonable and in compliance with policy, procedures and training. The IERC shall also examine the critique and conclusions of the managers and supervisors, and ensure the appropriateness of completed documentation."[17] IERCs are also responsible for "identifying possible employee misconduct and recommending the initiation of training, corrective action or disciplinary action in such cases."[18] Further, IERCs "may recommend changes to procedure or training" and wardens can either "initiate changes to local procedure or training based on the findings or recommendations of the IERC, or forward a recommendation of change to the CDCR policy or procedure via the Associate Director."[19]

Title 15 identifies the following staff as IERC participants:

- Institution Head or Chief Deputy Warden, as chairperson and final decision maker;
- At least one other manager assigned on a rotational basis;
- In-Service Training Manager;
- One health care practitioner or clinician; and
- A use of force coordinator.[20]

Use of force coordinators "log and track all use of force incidents and all allegations of excessive or unnecessary force."[21] They also prepare complete copies of the incident packages for IERC members to review, and they establish the IERC schedule so that incidents are reviewed within 60 days.[22] IERCs are required to meet at least monthly, but generally meet once a week.

During IERC meetings, the use of force coordinators read narrative descriptions of the incidents and present available, relevant video. The amount of video varies by institution and incident, but the current DOM requires that, "at a minimum, the committee members shall view the portions of the controlled use of force video from the admonishment through the last use of force. When video recording captures the immediate use of force, at a minimum, the committee members shall view the video from the initial use of force through the last use of force."[23]

After video of the incident is played, the captain of the area where the incident occurred may provide additional information. The IERC chair then leads a discussion of the incident that may

begin with a statement about their assessment of the incident. In many cases, the IERC chair may ask individual panel members, such as command staff, the in-service training manager, and healthcare practitioner, one at a time and to identify concerns or point out positive observations. In the vast majority of incidents across the institutions we observed, the responses to these polls were all "no issues" and discussion was very limited.

If the IERC members identify a concern and the incident has not already been investigated by AIU, the review is paused and the incident is referred to OIA. After such incidents are investigated and hiring authority decisions are made regarding the findings and appropriate discipline, if any, they are returned to the IERC. The IERC then reviews these incidents with knowledge of the investigation outcome.

Before IERC meetings, response supervisors "[g]ather written reports from staff involved in the use of force incident," "ensure that all necessary information is contained in these reports," and collect other applicable reports and forms, such as medical reports from healthcare staff.[24] Incident commanders then review completed reports and, if necessary, request clarifications from the officers involved to ensure that the reports are complete and accurate. Under some circumstances, such as the use of deadly force, they notify OIA, the OIG, and potentially local law enforcement. Incident commanders then prepare the incident package and conduct the first level of review, which includes their determinations about whether officer actions prior to, during, and following the "use of force were in compliance with the Use of Force policy, procedure, and training."[25] The DOM requires that, "[i]n the event the Incident Commander believes an investigation may be necessary, the Incident Commander shall suspend review and recommend that the case be referred for investigation."[26]

The force packages are then reviewed by first- and second-level managers. At each stage, policy requires mangers to review all the documentation included in the incident package, determine if the force used was consistent with policy, and assess prior levels of review. As with incident commanders, the first- and second-level managers can recommend that an incident be referred for investigation if they believe one is necessary. After second-level managers complete their review, the completed incident package moves on to use of force coordinators, who review the entire package and document their findings regarding whether the force used complied with policy. They may also share recommendations for potential revisions to policy, procedure, and training. After their review,

force coordinators schedule the incident for presentation before the IERC and prepare complete copies of incident packages for the participants.

CDCR and its IERCs completed the review of 10,418 force incidents in 2025 and another 5,725 between January and May 2026.

## The Current IERC Process Demonstrates Significant Strengths on Which to Build

Although much of our feedback about the IERC process represents constructive criticism, we begin with some significant bright spots that deserve to be highlighted.

### Prison Leaders Demonstrate Real Commitment to Working with Staff to Improve Decision-Making Related to Personal Safety

While CDCR officers as a whole display sound officer safety practices, in several incidents reviewed during IERC meetings across multiple institutions, some staff members made decisions that risked compromising their safety. Invariably, at each of those prisons, the warden and their subordinate leaders identified those decisions as problematic, and committed to following up with training, coaching, and mentoring to ensure that the staff members would not repeat their errors in the future. This commitment to enhancing staff safety was highly encouraging.

For example, in one incident reviewed during an IERC meeting we observed, an IP brandished a sharp broken broom in a hallway and was using it to attempt to break a window. In an effort to resolve the incident quickly and minimize risks to other staff members or IPs, a staff member quickly closed the distance to seize the improvised weapon. Yet, they did so without sufficient protection or cover, and in a manner that risked their own safety. The panel members immediately identified this decision to abandon the safety of distance as concerning, and noted their intention to closely coach the staff member to adopt safer practices in the future.

In another case, an IP in handcuffs was being removed from a holding cell by an officer. But the handcuffs were not sufficiently secure and the IP slipped a cuff and struck the officer in the face. The prison's leaders immediately identified that the officer needed additional training and coaching on handcuffing protocol to ensure that this would not happen again, and committed to that follow up. At another institution, multiple cases discussed at the IERC meeting raised concerns about officer safety, and the panel members indicated their intent to work with the involved staff on their alarm response protocols and the quality of their skirmish lines during a yard disturbance, to ensure

officer safety in the future. This commitment to using force reviews as a mechanism for improving staff safety cut across most or all CDCR institutions, and was highly promising.

## The Department has Already Made Investments That Will Facilitate the Implementation of Recommendations to Improve the Force Review Process

In several respects, the Department has already made investments and structural decisions that position it well to operationalize the recommendations to improve the force review process, and those investments deserve recognition. Most significantly, the Department has established dedicated force coordinator positions at each facility, which is not a universal feature of large correctional systems. Dedicated force coordinators who are responsible for assembling the evidentiary record, preparing case presentations, and managing the administrative infrastructure of the review process provide the institutional foundation without which even a well-designed review program cannot function. Systems that rely on collateral assignment of force review responsibilities to supervisors who carry other primary duties routinely find that the quality and timeliness of reviews degrades under competing operational demands. The Department has avoided that structural vulnerability.

Equally significant is the composition of the force review panels already in place. The Department has assembled the right disciplines in the room: custody leadership at the prison and unit levels, as well as mental health, medical, and training representatives. The Department's commitment to multi-disciplinary panel participation reflects an institutional understanding of what comprehensive force review requires.

The Department has also made substantial investment in the video infrastructure that force reviews depend on to function effectively. Comprehensive fixed camera coverage was in place at all prisons where we observed force reviews except one, providing reviewers with a reliable visual record of force incidents that is independent of the accounts provided in incident documentation. This allows force review panels to evaluate whether the documentary record accurately reflects what occurred, to identify inconsistencies that warrant further inquiry, and to conduct the kind of evidence-grounded analysis that distinguishes a serious review process from one that takes incident paperwork at face value.

At a smaller number of facilities, the Department has deployed body-worn cameras, which extend video coverage into spaces and interactions that fixed cameras do not capture and provide a perspective on force incidents that is closer to the officer's point of view than facility cameras can

provide. BWC footage, where it exists, is already significantly enhancing the possible depth and reliability of force reviews, and the Department's investment in this technology, even at an early stage of deployment, reflects a commitment to the evidentiary foundations that serious force review requires. Expanding BWC deployment across the remaining facilities should be understood as a priority that will compound the value of every other improvement to the force review process recommended in this report.

Moreover, force reviews are occurring weekly at each institution. A force review program that meets on a defined and consistent schedule enables the development of the institutional habits and pattern recognition that sporadic or incident-triggered reviews cannot produce. Weekly reviews mean that incidents should be examined while the facts are relatively fresh, that panel members develop and maintain fluency with the review process, and that the time between an incident and its institutional examination is short enough to support timely corrective action where it is warranted. The Department's commitment to weekly reviews at each facility is commendable, and the recommendations in this report are designed to build on it.

## The Current IERC Process Does Not Consistently Accomplish the Core Purposes of Institutional Force Review

With that said, there are a number of significant, and in some cases, glaring problems with the way in which the force review process currently operates, each of which will be highlighted and discussed in turn.

### Prison Leaders are Not Consistently Identifying or Fixing Operational Problems Revealed by Cases Presented in the IERC

The accountability and staff development functions of a force review process are well understood. Less consistently recognized is its capacity to surface operational problems that are not primarily about individual officer conduct at all. Force reviews should therefore include an explicit inquiry into whether the incident reflects a correctable operational condition. The questions are not complicated, but they must be asked deliberately: is this location within the facility generating a disproportionate share of force incidents, and if so, does the physical environment contribute to that pattern? Is this time of day or shift associated with elevated incident rates, and if so, does staffing, supervision, or post configuration explain the pattern? Is this incarcerated person or population

involved in a disproportionate share of incidents, and if so, does classification, housing assignment, program access, or treatment status explain the pattern?

When the answer to any of these (or other similar) questions points toward an operational condition rather than individual conduct, the force review panel should explicitly document that finding and assign responsibility for follow-up with a defined timeline. A finding that a particular housing unit's physical layout creates predictable conflict conditions should generate a facilities assessment, not a note in a case file. A finding that a specific post consistently produces staff-IP tension should generate a review of post assignment criteria and supervision practices, not simply closure of the force review with a notation that the officer's conduct has been cleared. The force review program's capacity to drive operational improvement depends entirely on whether its findings are treated as action items by the wardens, chief deputy wardens, associate wardens, and other subordinate leaders who are in a position to generate and act on them.

These kinds of inquiries were notably absent in a majority of the IERC meetings we observed. In a majority of IERC meetings, the exclusive focus of the panel was on determining whether the force complied with policy (and as set forth below, there were significant problems with the way those determinations were being made), and there was no discussion of operational issues revealed by the force incidents. In some cases, this absence was striking because the incidents revealed potential security problems, the heart of any prison's responsibilities, that were neither mentioned or discussed.

In one case, for example, an IP had been jumped by two other IPs on the yard and was being repeatedly stabbed with two edged weapons. The incident dragged on for nearly a minute and a half with no staff intervention, while the IP was stabbed dozens of times. A single staff member arrived and deployed an instantaneous blast grenade ("IBG") at the assailants that had no effect. Other staff eventually arrived and deployed multiple additional IBGs, which were also not immediately effective. The assault continued until OC was used, which was effective. Almost two minutes elapsed between the initiation of the assault and its eventual end. The victim IP suffered numerous puncture wounds to his hands, arms, back, shoulders, chest, ear, and legs.

The presentation during the IERC meeting involved watching a single fixed camera of the incident and hearing a short summation of the relevant incident reports and other records. No radio transmissions were played reflecting when staff were alerted to the incident (such that their response

time could be accurately assessed), nor was there any meaningful discussion about the timeliness of their response. The IERC had a short conversation about whether the use of IBGs was consistent with policy, along with a brief discussion of the holding cell log, and the panel moved on to the next case after determining that the force used was authorized by policy.

But of course it was. The IBGs were deployed to interrupt a serious felony crime in progress within the institution, and whether their use aligned with policy was never in serious doubt. The significant questions that should have been raised by this incident had nothing to do with policy compliance, but instead related to the timeliness of the staff response, the ineffectiveness of the IBGs due to windy conditions, and the lack of a 40mm or other extended range less lethal tool available on the yard to interrupt the attempted murder from a distance. The force review was entirely silent about these subjects, which created the perception that that leaders were either unaware of them or, more likely, laboring under the misunderstanding that their exclusive focus should be on policy compliance rather than proactively solving potential operational problems revealed by the incident.

This misguided focus was not isolated to this institution alone, and a lack of searching inquiry in IERC meetings was the norm rather than the exception. For example, at multiple prisons, we observed IERC meetings with force incidents during which BWCs were dislodged during scuffles with IPs. Yet, not once did an IERC member raise a concern about this obvious (and correctable) equipment problem. At one institution, there were two separate cases discussed in the same IERC meeting in which BWCs were dislodged and fell to the floor during tussles, which no panel member remarked on.

Given that this happened during two of a small number of incidents discussed at that meeting, we asked if this was a persistent equipment problem, and we were told by the training manager that it was not, even though our later interviews with officers at that prison reflected that staff are frustrated by the frequency with which BWCs fall off during uses of force that involve the use of close grappling techniques. Moreover, this issue is entirely fixable, as there are a range of fastening solutions available to address it, including magnetic mounts, spring, alligator or retention clips, strap mounts, or pin and lock systems, but they will not be implemented if prison leaders are not proactively using the information from force reviews to identify the problem, and then taking steps to correct it.

Another case helps to illustrate the point. In it, a controlled cell entry was being made to administer involuntary injectable medication to an incarcerated patient with serious mental illness. A team was assembled and staged outside the cell, alongside an RN to administer the meds, with seemingly little coordination before they made entry. When they breached the door, a team member pressed the IP to the bunk with an extraction shield and began to give confusing directions, such as instructing her to turn over, which was likely not possible given that she was already pinned to the bunk. A stalemate of sorts ensued, which led to the incident dragging on for a prolonged period. The shield was covering much of the IP's leg, which made it difficult to administer the injection in the thigh, so team members began calling out to the RN in the hallway to ask whether an alternate location could be used instead. Others repeated "stop resisting," even though the IP, at that point, remained pinned by the shield and the problems that the team was having primarily related to its own lack of coordination and preparation rather than any actions of the IP.

The short discussion in the IERC meeting centered exclusively on whether the minimal force used was appropriate or not. There was no discussion of the poor coordination on the team, the seeming lack of supervision by the sergeant, or the obviously deficient pre-planning with medical to arrive at clear understanding and objectives before entry was made. And because these issues were not identified, or even remarked on by the panel, little confidence was created that they would be fixed before the next similar deployment at that institution.

### Clinical and Training Representatives on the IERC Panel Are Generally Passive and Do Not Adequately Contribute to Force Reviews

The potential benefits of having a multi-disciplinary force review panel are significant and rest on a straightforward premise: a correctional use of force incident is often the product of a convergence of factors, some custodial, some clinical, some operational, some environmental, and no single discipline is equipped to see all of them clearly. A panel composed exclusively of custody supervisors will evaluate a force incident through a custody lens, which is necessary but not sufficient in every case. An incident that appears, from a custody perspective, to be a straightforward response to IP resistance may look quite different when viewed through the clinical history of the involved individual, the injury pattern documented by medical staff, or the training record of the involved officer. A well-constituted multi-disciplinary panel does not dilute the custody analysis. It deepens and tests it, surfacing dimensions of the incident that a custody-only review would struggle to reach.

Perhaps the most immediate contribution of a multi-disciplinary panel is the capacity to place the incident in the full context of the involved incarcerated person's history and current status. Custody supervisors reviewing an incident will typically have access to the disciplinary record and the incident reports. What they frequently do not have, and cannot fully interpret without clinical input, is the mental health and medical context that may be essential to understanding why the incident occurred, how it should be classified, and whether new approaches are necessary to more safely manage the IP in the future.

**The Role That Mental Health, Medical, and Training Representatives Should Play in Force Reviews**

A mental health clinician on a force review panel should bring information that can reframe the entire incident. An individual who refused a direct order and escalated to physical resistance may have done so in the context of an acute psychiatric decompensation, a medication change, a recent traumatic event within the facility, or a chronic condition whose behavioral manifestations are well-documented in the clinical record. That context does not excuse the conduct that required a force response, but all of it is directly relevant to whether the incident was foreseeable, whether earlier clinical intervention might have prevented it, whether the officer's response was appropriately calibrated to someone in mental health distress, and whether the individual's current treatment plan needs to be revised. A custody-only panel cannot answer those questions. But a panel that includes an engaged mental health clinician with knowledge of the individual's treatment history can.

Medical staff should contribute a related but distinct layer of context. Correctional facilities today, including numerous CDCR prisons, house populations with significant and varied medical complexity. Chronic illnesses including diabetes, cardiovascular disease, respiratory conditions, and seizure disorders are prevalent at rates that substantially exceed those of the population at large. Mobility impairments affect a meaningful share of the incarcerated population. Sensory impairments, including hearing and vision loss, are common and frequently under documented. Cognitive deficits, whether from traumatic brain injury, intellectual disability, dementia, or the neurodevelopmental effects of long-term substance use, shape how individuals perceive and respond to officer commands in ways that may be entirely invisible to the officer in the moment. This population complexity has direct and significant implications for force review.

A medical professional on the panel who knows, or can quickly access, an involved individual's medical profile brings information that is essential to evaluating both the incident and the response to it. An IP with a seizure disorder who appears to be actively resisting restraint may be

experiencing a postictal state. An individual with significant hearing loss may have failed to comply with verbal commands not out of defiance but because the commands were not received. An IP with a mobility impairment may have moved in a way that an officer interpreted as aggressive but that was in fact a function of how that person's body moves under stress or physical contact. In each of these scenarios, the custody account of the incident may be accurate as far as it goes, and the officer's response may have been reasonable given what the officer knew in the moment. But the force review panel's obligation goes further than evaluating what the officer knew. It extends to asking what the institution knew, whether that knowledge was accessible to the officer, and if not, whether it should have been.

Medical participation in the review of incidents involving individuals with known physical conditions also requires attention to the specific injury risks that those conditions create. Standard use of force techniques that carry acceptable injury risk when applied to a healthy adult may carry substantially elevated risk when applied to an individual with osteoporosis, a bleeding disorder, a recent surgical site, or compromised cardiovascular function. A medical professional who can identify these risk factors and evaluate whether the force applied was calibrated appropriately given the individual's known condition adds a layer of analysis that custody supervisors are not equipped to provide. Where the review reveals that an officer applied a technique without apparent awareness of a condition that significantly elevated the risk of harm, the finding has implications for the institution's systems for communicating medical information to custody staff at the point of need.

The medical reviewer is also positioned to evaluate the quality and timeliness of the post-incident medical response, an assessment that matters both for the individual's welfare and for the institution's liability exposure. Whether the individual was assessed promptly, whether the assessment was thorough given the known medical history, whether injuries were documented with sufficient specificity, and whether follow-up care was initiated, where indicated, are all questions that belong in a force review and that only a medical professional can evaluate with authority.

Moreover, a medical professional can also evaluate the injuries resulting from the force and assess their nature, location, and severity, considered alongside the type of force reported and the resistance behavior that preceded it, to either corroborate or complicate the official account of what occurred. A medical professional on the panel who can speak to whether the documented injuries are consistent with the reported mechanism of force adds an evidentiary dimension to the review that no other discipline can provide. Where there is consistency, the panel's confidence in the

accuracy of the record is strengthened. Where there is inconsistency, the panel has identified a question that demands further inquiry, one that might never surface in a custody-only review that takes the incident report at face value.

A training manager also plays an essential role in assessing what the involved officer did and why. The relevant question is not only whether the force used seemed reasonable in the abstract, but whether it conformed to the specific techniques that the officer was trained to apply. Those are different questions, and they can produce divergent answers. An officer may have used force that seemed roughly proportionate to a custody supervisor but applied a restraint technique incorrectly in a way that created unnecessary injury risk, or failed to attempt de-escalation options that training specifically teaches under those circumstances. Only the training manager, with direct knowledge of what the facility's training program teaches is able to make that evaluation with precision. And where the officer's conduct deviated from training, the training manager is also positioned to identify whether the deviation reflects an individual failure or a gap in the training program itself, a distinction with significant implications for how the institution should respond.

**Medical, Mental Health, and Training Representatives Failed to Flag Issues Within Their Domains of Expertise**

At most of the IERC meetings that we observed, after the force coordinator's presentation, there would sometimes be a short discussion by training or by the captain who supervises the unit where the force incident occurred. Following those, the warden would usually poll the room by going around the table and calling on each panel member, including training, medical, and mental health, to weigh in. In the vast majority of cases, training, medical, and mental health merely said "no issues" before the warden moved on and a conclusion was reached about the incident. In 17 meetings across 17 institutions, we recall only a single case in which any clinical history was shared by a member of the panel. Yet, there were cases where contributions from those specific domains were necessary.

In one case, a female patient was in a mental health crisis bed in a suicide smock and tried to force her way out of the cell door when staff were checking on her well-being after she covered her cell window. The officer pushed her back into the cell, she fell backwards, and the force incident ended. This is a simple enough fact pattern, but it illustrates with clarity what a mental health representative on a force review panel makes possible that no other discipline can replicate.

The starting point for the mental health reviewer in this kind of case should be the clinical record at the moment of the incident. An individual in a crisis bed in a suicide smock is not an unknown quantity to the institution. A clinical determination has already been made that this person is in acute psychiatric crisis and that the risk of self-harm is serious enough to warrant the most restrictive and protective housing available. The mental health reviewer should be able to tell the panel what that clinical picture looked like preceding the incident: what the individual's documented mental status was, whether the person was actively psychotic, whether there had been recent changes to medication or treatment, whether the clinical notes reflected any anticipation of behavioral escalation, and whether the individual had a documented history of prior force incidents in similar states of crisis. That information is foundational to the force review because it establishes what the institution knew about this person before the cell door was opened.

The mental health reviewer should also evaluate the force response itself through a clinical lens. An individual in a suicide smock in a crisis bed is, by definition, a person in severe psychological distress. The behavioral presentation that preceded the use of force, whether the person was agitated, disorganized, unresponsive to verbal commands, or actively threatening, needs to be interpreted in that clinical context. Behavior that might indicate volitional resistance in another setting may indicate psychotic disorganization, dissociation, or acute fear response in this one, and the distinction matters for how the panel evaluates the officer's response. That interpretive work begins before the door opened. The window covering itself, and the attempt to push past staff when the door was opened, are behaviors whose meaning depends on her clinical state. For a patient in a suicide smock, covering the window is clinically significant conduct, a possible signal of decompensation, a bid for privacy in a setting that allows none, or a precursor to self-harm, and the clinical record may distinguish among those. The mental health reviewer should be able to tell the panel whether the individual's behavior at the time of the incident was consistent with the documented clinical presentation, whether it was the kind of behavior that crisis intervention training specifically addresses, and whether the officer's response reflected any adaptation to the clinical context or treated the individual as an undifferentiated custody problem.

The mental health reviewer should also address the entry itself. A covered window in a crisis bed presents a genuine dilemma: staff cannot leave a person at acute risk of self-harm unobserved, and the need to restore visual contact may be urgent. The question for the panel is not whether custody should have waited for clinical direction before acting, but whether the response followed a protocol

designed for exactly this situation, and whether that protocol reflects clinical input where the timeline allows for it. Was there an established procedure for window coverings in crisis housing, and was it followed? Did staff attempt verbal contact and receive any response that bore on the urgency of entry? Was clinical staff notified or summoned while custody prepared to open the door, even if entry could not wait for their arrival? The mental health reviewer is the panel member positioned to press these questions, and the answers bear directly on whether the incident reflects a sound protocol working under pressure, a protocol gap, or a coordination failure.

Finally, the mental health reviewer should address what the incident reveals about the adequacy of the systems that are supposed to govern this exact situation. Crisis housing environments require clear protocols about when and how custody interacts with IPs, what clinical involvement is required before physical contact is made, and how officers assigned to crisis units are trained to recognize and respond to acute psychiatric presentations. The mental health reviewer is the panel member responsible for making that examination and for translating its findings into actionable clinical and operational recommendations.

Yet in this case, as in basically every other case we observed across institutions, when the mental health representative was polled, they simply recited "no issues," and the discussion moved on. They did not share anything about the clinical history of the patient, why they were in a crisis bed, or whether steps were being taken in the treatment plan to address the patient's behavior. When we asked whether the patient was a continuing management problem, the mental health representative had to look the patient up before responding later in the meeting, creating the impression that there was no familiarity with the specific incident or the patient before the force review. Which was extraordinary given that the very next case up for discussion by the panel involved another use of force with the exact same patient in the very same crisis cell on the same day.

Medical representatives, too, were largely passive observers during the IERC meetings rather than engaged and informed participants. In one case, an IP was lying in hallway and reported to staff that he had a broken scapula. The force involved dragging him into a holding cell. In a case like this, we would expect the medical representative to have evaluated the pre-incident medical record. A reported broken scapula is not a vague or ambiguous complaint. It is a claim about a specific, serious, and painful orthopedic injury, and the force review panel needs to know whether that claim had any documented basis in the medical record at the time of the incident. Was a scapular fracture previously diagnosed and documented? If so, when, and under what circumstances? Was the

diagnosis reflected in any housing, activity, or handling restrictions that custody staff were required to observe? Was the injury flagged in any system that would have made it accessible to the officers involved in the incident? The answers to those questions determine whether the officers who decided to drag this individual were acting in ignorance of a documented medical condition or in disregard of one, which would be a meaningful distinction.

The medical reviewer should have also addressed the specific risks created by the mechanism of force in relation to the reported injury. Dragging a person with a scapular fracture is not a generic use of force applied to an undifferentiated body. The scapula is positioned such that dragging could exert direct mechanical stress on the injury site. A medical professional on the panel can explain those risks in concrete terms, and in doing so can reframe the custody account of the incident in ways that are essential to a complete evaluation. What appeared, from a custody perspective, to be a straightforward decision to move a non-compliant individual may have been, from a medical perspective, a decision to apply a mechanism of force to a serious orthopedic injury without apparent awareness of or regard for the consequences.

The medical reviewer should also evaluate the post-incident response. Following a dragging incident involving a person who had reported a serious pre-existing injury, the panel needs to know whether the individual was evaluated promptly after being placed in the holding cell, whether the evaluation was sufficiently thorough given the reported injury and the nature of the force applied, and whether appropriate diagnostic steps were taken. A cursory post-incident assessment that fails to document the condition of a reported fracture site following a dragging incident is itself a finding, one that reflects on the institution's post-incident medical protocols and the seriousness with which they are implemented.

Finally, the medical reviewer should address the origin and documentation history of the scapular fracture itself. Scapular fractures are relatively uncommon injuries whose causes in a correctional setting may warrant examination. The medical reviewer should be able to tell the panel how the injury was sustained, whether the circumstances of its origin were documented and investigated, and whether the injury's presence in this individual's medical history reflects any prior incident or pattern that is relevant to the current review. That inquiry goes to the completeness of the institution's understanding of what happened to this person and why.

Yet, when the medical representative was polled about this case, they simply said "no issues." They raised no discussion of any of the subjects raised above, nor did any other panel representative ask questions to elicit relevant information from them.

Training managers also frequently failed to contribute meaningful perspective or insight in force reviews. The training manager is the panel member best positioned to evaluate force incidents against the precise standards taught in the prison's force training program. An officer who applied a technique incorrectly may have done so because the training was inadequate, not reinforced, or because the officer deviated from what was taught. The training manager can distinguish between those possibilities in ways that other panel members cannot, and that distinction has direct implications for whether the appropriate institutional response is remedial training, enhanced supervision, or referral for investigation.

The training manager should also be responsible for identifying, across incidents and over time, whether force review findings reveal any systemic training gap: a technique that is consistently being applied incorrectly, a scenario type that training does not adequately prepare staff for, or a policy requirement that staff appear to genuinely misunderstand. Those findings should flow directly into the facility's training calendar, closing the loop between what force reviews reveal and what the training program addresses.

Yet at most institutions, the training manager would give a cursory (and sometimes seemingly defensive) presentation indicating that the force used was consistent with training, and then when polled, join the chorus of voices reciting "no issues," without providing any insight. Worse, in one case, the training manager was openly contributing misinformation and misapplying Department policy without being corrected or challenged. In that institution, the training manager gave a short summation of each incident after the force coordinator presentation. In all cases, the training manager described the force used as being in response to an "imminent threat," even when that was not accurate given the definition of "imminent threat" in the DOM. Further, in at least one case, based on the information excerpted from the staff reports, the involved staff did not even claim to have used force due to an "imminent threat" but instead due to other security concerns. No other panel member challenged this distorted presentation.

In another case, the force itself appeared to be appropriate and consistent with Department policy. Yet, after the force was applied, the IP was left in handcuffs prone on the ground for a prolonged

period of time, raising risks of positional asphyxia or other significant breathing complications. Here, a finding that the initial application of force was appropriate and consistent with Department policy was a necessary starting point but not a complete evaluation of the incident. The period following the application of force, during which the incarcerated person was in prone restraints on the ground for a prolonged period, presented a set of questions that the training manager was uniquely positioned to answer.

The first question the training manager should have addressed is what Department training actually teaches about post-application monitoring and positioning obligations regarding prone restraint. The risks of positional asphyxia associated with prolonged prone restraint are well known and documented. The training manager should be able to tell the panel precisely what Department training teaches on this point: whether there is a defined time limit on prone restraint, what monitoring obligations officers are trained to observe, at what point officers are trained to reposition a restrained individual into a recovery position, and what indicators of respiratory distress officers are trained to recognize and respond to. And to then provide insight to the panel on whether those guidelines were adhered to in this case.

When an employee has already received remedial training on a topic, the training manager should also report that training history to the panel. When a force incident requires institutional action in response to an employee's conduct, the panel must decide whether that action should be corrective or adverse. The employee's history bears directly on that decision. A first violation by an officer who has never been trained on the subject presents a different disciplinary question than the same conduct by an officer who was sent for additional training after a prior incident and has now repeated the violation.

Finally, the training manager should consider whether this incident reflects a pattern rather than an isolated lapse. If the review of other recent force incidents reveals similar post-application conduct, the implication is not that multiple officers independently made the same error in judgment. It is that the training program has not produced reliable compliance with post-application restraint standards across the officer population, which is a systemic finding that requires a systemic response. The training manager is responsible for surfacing that pattern if it exists and for recommending the curricular or delivery changes necessary to address it.

Yet, the training manager in this case raised none of these discussion points, nor did any other panel member. Instead, when polled, the training manager simply said "no issues" and the discussion moved on. This lack of meaningful engagement from training was the norm at many of the IERC meetings rather than the exception.

## The IERC is Not Consistently Identifying Force Incidents That Should Be Referred for Administrative Investigation

Notwithstanding the almost exclusive focus of the IERC on whether or not the force complied with policy, we found that the IERC is not reliably identifying force incidents that should be referred for administrative investigation. One of the most consequential decisions a force review program makes is when a force incident should be referred for administrative investigation rather than resolved within the review process itself. The absence of a defined standard for making this determination, or an unclear one, creates predictable problems, like referral decisions being made inconsistently across facilities, influenced by the perceived severity of the incident, or the preferences of the warden. The force review program loses credibility as a result, both internally and with external stakeholders, such as oversight bodies and courts, that may ultimately scrutinize its outputs.

Several cases illustrate the problems we observed. In one incident, an IP was being cleared from a mental health bed but refused to respond to staff verbally. Staff made entry into the cell with a team, and the IP turtled and did not give up his hands. Staff delivered two face strikes, which resulted in a nasal fracture and a fracture to the eye socket. We believe that there were threshold questions about whether cell entry should have been made on an emergency basis given the nature of the IP's conduct. But setting those aside for the moment, to properly assess whether this incident required a referral for administrative investigation, the panel also needed to assess the proportionality of the force used in response to the IP's resistance.

The IP turtled and did not give up his hands. While that required some force to take control of the hands, face strikes are not intermediate force. They carry a significant and well-documented risk of serious injury, as the fractures in this this incident demonstrate, and they are usually reserved for situations in which a serious imminent threat must be immediately interrupted and less serious options are not reasonably available. A person who is turtled on a cell floor, refusing to present his hands, is not presenting that kind of threat. He was not striking staff, he was not reaching for a

weapon, and he was not creating an imminent threat the only available means of interrupting was strikes to the face.

The clinical context in which the incident occurred further strengthened the case for referral for administrative investigation. This individual was being cleared from a mental health bed. Thus, the institution had knowledge about this person's mental state and behavioral profile that was directly relevant to interpreting his conduct during the cell entry. An individual being cleared from a mental health housing placement who goes silent, does not respond verbally to staff, and turtles when a team enters his cell is presenting a behavioral profile with an obvious clinical interpretation that is consistent with acute psychiatric distress, dissociation, or a fear response, and that is not readily distinguishable, without clinical input, from the kind of volitional, threat-generating resistance that serious force is designed to interrupt. In a case like this, the force review panel should ask whether the entry team had any awareness of the individual's current mental status, and whether it was considered before the decision to deliver face strikes was made. If the answer to any of those questions is no, the incident reflects not only a proportionality failure but a possible coordination failure with direct bearing on whether the force used was necessary.

For all of these reasons, this incident should have been referred for administrative investigation. Such a referral would not prejudge the outcome. But it would reflect a determination that the proportionality question this incident raised cannot be resolved at the force review level without further investigation and review. Yet, in the meeting, the panel did, in fact, find the face strikes to be consistent with policy (we note that we asked a series of questions during the meeting reflecting our skepticism about that decision and we were informed after the meeting that the case was being sent back for additional review).

Another case with a somewhat similar fact pattern further highlights the problem. In that incident, officers went into a cell because the IP was not responsive. Upon entry, he was passively resisting and an officer delivered face punches in response. When the IP was exiting the cell, a takedown was also performed due to an allegation that he "lunged." This behavior was not visible on the video shown during the meeting. The panel failed to ask meaningful questions about the decision-making during the incident, the proportionality of the face strikes given the level and type of resistance, and accepted at face value that a takedown was necessary in response to a "lunge," without addressing the gap between that description and what was visible on the video. A referral should have been made to evaluate these questions in an administrative investigation, but none was made.

Another incident presented this problem, and others in the force review process. The incident involved an elderly IP who was seated on a bench in a housing unit and requested to speak with a sergeant before complying with an officer's directive to move. The officer issued multiple commands. The IP did not comply. The officer then pulled him to the ground and placed him in handcuffs. The force review panel cleared the incident without meaningful discussion, which reflects several of the deficiencies this report identifies as recurring features of the Department's force review process.

First, although the force used in this incident was not, in isolation, severe, authorization is not the same as necessity, and the force review panel appeared to treat the former as a substitute for the latter. The incarcerated person was elderly, was seated, and was not presenting a threat. He was asking to speak with a sergeant before moving, a request that, whatever its merits, signals that the situation had not yet reached a point where physical intervention was the only available option. Department policy requires de-escalation before force is used where circumstances permit. The panel did not ask whether de-escalation was attempted, whether the officer sought supervisory involvement before resorting to physical contact, or whether the IP's request to speak with a sergeant was itself a signal that a brief supervisory intervention might have resolved the situation without force. Those questions were not asked because the panel appeared to have satisfied itself that the force was authorized, without pausing to consider whether it was necessary.

Moreover, perhaps the most striking deficiency in the panel's review of this incident is what was never shown and never requested. The panel did not view video of the verbal interaction between the officer and the incarcerated person that preceded the use of force. It did not establish what the incarcerated person was asking to speak with the sergeant about. It did not inquire into whether the reason for his request was known to staff, whether it reflected a legitimate concern that supervisory attention might have addressed, or whether there was any clinical or medical context that bore on his reluctance to comply. No panel member raised any of these questions. The result is that the panel cleared an incident without examining the conditions that produced it, which is precisely the analytical failure that renders a force review program unable to function as a proactive management tool. A panel that does not ask why an incarcerated person refused a directive before evaluating whether the force used to compel compliance was necessary has not conducted a force review; it has conducted a paperwork check.

The absence of pre-incident BWC video from the panel's review was not acknowledged as a limitation, and no panel member asked why it had not been shown. In a facility with the camera coverage the Department has invested in, including BWC, the failure to present video of the verbal interaction leading to a force incident should itself be a finding that requires explanation. Neither occurred.

### There Is a Lack of Standardization in the Way IERC Meetings Are Conducted

The Department's force review program operates without a governing OP. While the DOM establishes a minimum of video to be reviewed, no written protocol establishes how force review meetings are to be conducted, what evidence must be presented, how video is to be used, how the warden is to solicit input from panel members, or what standards govern the determination of whether conduct should be addressed through corrective or adverse action. In fact, the Force Coordinator Manual specifically disclaims standardization across institutions:

> When it comes to presenting use of force cases during your IERC, there is nothing in the policy that provides specific direction on how to present the material; however, the policy does give us guidelines on when we should conduct these meetings, as well as who must be in attendance. The way the material is presented is optional, and you should discuss the options with your Warden, as well as the committee, to provide a well thought out and functional plan.[27]

The absence of that governing document has produced significant variability across institutions that undermines the program's consistency, its credibility, and its capacity to function as a reliable accountability mechanism in several ways. The most immediately consequential area of variability involves the use of video in force reviews. Video is an evidentiary foundation of a serious force review process. It is the mechanism through which the panel can evaluate whether the documentary record accurately reflects what occurred, whether the force used was necessary, proportionate to the resistance presented, and critically, whether the conditions and conduct that preceded the use of force support or complicate the account provided in incident paperwork. The DOM currently establishes:

> During the IERC, at a minimum, the committee members shall view the portions of the controlled use of force video from the admonishment through the last use of force. When

> video recording captures the immediate use of force, at a minimum, the committee members shall view the video from the initial use of force through the last use of force.[28]

Without more guidance about what video must be shown, institutions have developed widely divergent practices. Some panels view all available footage, including the events and interactions that preceded the use of force. Others review only the brief moment of physical contact itself, treating the force incident as though it began at the instant of application and had no prior history worth examining.

The consequences of the latter approach were made plain during our review. In one incident, a female IP on a yard refused to surrender a head covering, and a takedown was performed. The force review panel was shown only the video of the moments of her refusal and the subsequent takedown for noncompliance. The panel deliberated, raised no concerns, and marked the incident compliant. Following the panel's determination, a non-participant observer requested that additional footage be shown. That footage revealed that the involved officer's conduct in the period leading up to the use of force was unprofessional, escalatory, and profane. The panel's determination was reversed, and the case was referred back for additional review. But the panel initially cleared an incident it should not have cleared, and it did so not because its members lacked the judgment to identify the problem but because the problem was never placed before them. An OP that requires that pre-force video to be shown as a condition of completing a force review, where such video exists, would have prevented that outcome.

A second incident illustrates the same deficiency in a clinical context. The incident involved a suicidal incarcerated person being cleared from a mental health bed who was not responding to staff. The panel viewed video of the force itself before making its determination. It did not view video of the attempts to contact the individual, any clinical engagement that preceded the cell entry, or whatever interactions between staff and the incarcerated person led to the decision to make entry. Whether a clinician attempted to assess or speak with the individual before the entry team was deployed, and what that interaction revealed about the person's mental state, were questions the panel could not answer because the evidence necessary to answer them was never shown. The panel's review of a force incident involving a suicidal individual in mental health housing was conducted without the most relevant available evidence of what preceded the force. This is a structural failure that an OP governing video presentation requirements would correct.

Another area of variability involves the manner in which the warden solicits input from panel members, and current practice varies across institutions. In most facilities, the warden polled the panel members for their views before offering any assessment, creating conditions for input from each discipline before the warden's perspective is known. In several facilities, however, the warden would share their perspective on the incident and whether it should be cleared first. In one facility, review forms shared on the conference room screen indicated that the IERC had already found the incident to be in policy before the panel discussion occurred. The practical effect of this is to foreclose the deliberation that the multi-disciplinary panel structure is designed to produce. Subordinates who know their supervisor's conclusion before they have spoken are not positioned to offer genuinely independent assessments, and the institutional knowledge that each discipline brings to the review is filtered through the question of whether it is consistent with what the person in authority has already said. The OP must establish a uniform practice: the warden polls each panel member by discipline before offering any assessment of the incident, and reserves their own analysis until all other voices have been heard.

Another critical issue is the absence of a defined standard governing when conduct identified in force review should be referred for investigation and potentially addressed through corrective action, such as additional training or mentoring, or when it should be referred for formal administrative investigation that may result in adverse action. Title 15 requires that, "[i]f the IERC determines, during their review, a potential use of force violation occurred, the incident shall be referred to the Allegation Investigation Unit (AIU) for an investigation."[29] The DOM provides the following guidance:

> Should an incident or allegation warrant investigation by the DFIT, the OIA, or any other outside investigating agency, or if direct action has been requested for any incident or allegation, the IERC shall suspend all review of that incident until the investigation/direct action is complete. Examples of what may be referred for investigation include but are not limited to:
>
> - Unexplained injuries.
> - Impact strikes to lethal target areas (head, eyes, throat, or spine).
> - Incomplete/conflicting reports.

- The application of weaponry that exceeds what would normally be expected for the type of force reported.[30]

While this guidance is helpful, it is vague and open to varying interpretations, and only articulates what *may* be referred for investigation rather than what *must* be. Without a specific standard, determinations of this kind are made through the unguided discretion of individual wardens, producing outcomes that vary across facilities and incidents in ways that cannot be explained by differences in the conduct at issue. An officer whose force raises the same concerns in two different facilities may receive remedial training at one and face administrative investigation at the other, not because the conduct warrants different responses but because no common framework exists to ensure consistent decision-making. This variability carries consequences that extend beyond individual fairness. It creates legal exposure for the Department when similarly situated officers are treated differently without a principled basis for the distinction. It undermines the deterrent function of the force review program by making the consequences of policy-inconsistent force unpredictable. And it erodes staff confidence in the fairness of the review process, which is among the most important institutional assets a force review program can produce.

### There Is No Formal Training for Use of Force Coordinators and the Quality and Depth of Information They Provide Varies Across Institutions

The force coordinator occupies a position of considerable consequence in the force review process. It is the force coordinator who assembles the evidentiary record for each incident, determines what information the panel will receive, decides how that information will be organized and presented, and controls, in practical terms, the evidentiary foundation on which the panel's deliberations rest. The quality of every force review depends, in the first instance, on the quality of the coordinator's case presentation. A panel that receives a complete, well-organized, and accurately summarized evidentiary record is positioned to conduct a serious review. A panel that receives an incomplete, inconsistent, or poorly framed presentation is not, regardless of the experience or judgment of its members.

We met with a sample of force coordinators during this review and found them to be articulate, thoughtful, and committed. However, they indicated that they receive no formal, standardized training for the position. Instead, they rely on informal on-the-job training specific to the institution where they work and a Use of Force Coordinator Manual. The manual includes, among other things, sections addressing the review of force incident packages, IERC presentations, and

requirements specific to controlled uses of force. It also includes copies of memoranda from the last 20-plus years about topics such as the handling of grievances alleging inappropriate force, the use of cell door boot locking systems, and supervisor training regarding recorded interviews.

As noted above, guidance about IERC presentations begins with a recognition that "there is nothing in the policy that provides specific direction on how to present the material."[31] The manual addresses options for hard-copy, digital, and PowerPoint presentation and lists the following items about what to include in IERC presentations:

- The date and location of the incident
- Identify all staff and IPs involved
- Give a brief summary of the incident, ensuring you highlight and address the three
- major sections of the incident that occurred prior, during, and following the incident.
- With the recent changes to DOM, Section 51020.19.5, all video recordings related to the UOF must be reviewed during the IERC. The coordinator will need to ensure video reviewing equipment is available.[32]

The predictable consequence of this approach, which provides only minimal guidance and leaves considerable discretion, is that practices have developed differently across institutions. At some facilities, coordinators present comprehensive evidentiary packages that include pre-force video, incident documentation, medical findings, and relevant background on the involved individuals. At others, presentations are sparse, video selection is narrow, and the panel receives only the minimum necessary to complete the administrative record of the review. Neither approach reflects a deliberate institutional choice about what the force review process should produce. Both reflect the accumulated informal practices of individual facilities operating without guidance.

The consequences of this variability are not merely procedural. The force coordinator's presentation choices shape what the panel sees, and thus what it can evaluate. A coordinator who does not present pre-force video because that is not the convention at their facility produces a panel that cannot assess the conditions that led to the use of force. A coordinator who summarizes incident documentation without flagging inconsistencies between the written record and the video footage produces a panel that may clear an incident it would have questioned if the inconsistency had been surfaced. A coordinator who does not include relevant medical or mental health background in the case presentation produces a panel that lacks the clinical context necessary to evaluate whether the

force used was appropriate given what the institution knew about the involved individual. In each case, the panel's analytical capacity is constrained not by the judgment or experience of its members but by the completeness of the evidentiary record placed before it. The coordinator controls that record, and without training and written standards governing how that control is exercised, the integrity of the force review process is only as reliable as the informal conventions of each individual facility.

## Line Staff Misperceive the Role of The OIG in the Force Review Process

In our interviews across facilities, line staff consistently described the force review process as an instrument of the OIG, and many expressed the conviction that the OIG uses it to unjustly pursue officers. The belief was stated as common knowledge rather than suspicion, and it was remarkably uniform across institutions. It is also, in its literal form, wrong. The OIG does not conduct force reviews or make review decisions. It does not attend most IERC meetings. The reviews that staff attribute to an external adversary are conducted by the Department's own personnel, applying the Department's own policy.

The belief nonetheless captures something the finding cannot dismiss. We were told that wardens and other Department decision-makers know that force review outcomes may be examined in OIG reports, and some may adjust findings defensively in anticipation of that scrutiny. The OIG's influence on force review is therefore real, but it operates through a mechanism different from the one line staff imagine. It is not that the OIG controls the reviews. It is that Department decision-makers reportedly sometimes conduct the reviews with an eye to how the OIG will read them, and that anticipation may shape outcomes.

A misperception this uniform does not arise by accident, and its sources are visible in findings we make elsewhere in this report. The force review process is opaque from the line. Officers experience its outputs, the corrective action, the training referral, the finding, without seeing who decided or how, and consequences that arrive from an unseen mechanism are attributed to the most threatening actor available. Decades of litigation and external oversight have made the OIG the personification of scrutiny in how the workforce perceives external authority. The attribution is reinforced from within. When supervisors deliver unwelcome review outcomes by invoking an external actor, and when wardens conduct reviews defensively rather than confidently, line staff draw the reasonable inference that the process belongs to someone else.

The cost of the misperception is that it defeats half the purpose of force review. The Department's framework should treat IERC review as a management and staff development tool as much as an accountability mechanism. An officer who describes the process as a witch hunt cannot learn from it. They write their reports defensively, regard the panel as an adversary, and discount its feedback as persecution rather than instruction. No improvement in the quality of the reviews themselves can overcome a workforce conviction that the reviewer is an enemy.

The Department should be clear with its workforce who conducts force review, what it is for, and what the OIG does and does not do. But telling is not enough on its own. Wardens and other review decision-makers should conduct force reviews with confidence in their own judgment, not with an eye to how those decisions will read in an external report.

## Body-Worn Camera Footage Enhances the Quality and Depth of Force Reviews

Finally, our observation of force review meetings across facilities confirmed a consistent and meaningful difference in review quality between facilities where body-worn camera footage was available and those where it was not. Where BWC video was presented, panel discussions were informed by clear, close-range footage of the interaction between staff and the IP, including audio of the verbal exchanges that preceded and accompanied the use of force. That audio and visual clarity allowed panel members to evaluate officer conduct, assess the tone and content of verbal interactions, and examine the IP's behavior with a level of specificity that facility camera footage alone does not provide.

In facilities without BWC, panels were more dependent on incident reports to interpret what was visible on CCTV footage, which is frequently distant, angled, or obstructed in ways that limit its evidentiary value. The discussion in those reviews was correspondingly shallower, with panel members less able to independently assess what occurred and more reliant on the characterizations provided in staff documentation.

Which relates to a conclusion about the IERC process as a whole. When panels were given better information, they conducted more thoughtful reviews. The panel members we observed were capable of careful, independent evaluation, but the process does not require it, and too often it did not occur. Panels were sometimes denied the information a rigorous review requires, and sometimes failed to press for it. Correcting this requires more than better inputs. It requires written

standards that define what a force review must examine, training that equips coordinators and panel members to meet them, and an institutional expectation that the panel's job is to scrutinize use of force rather than reflexively ratify it. A process rebuilt on those terms would give the Department what it presently lacks: a reliable means of learning from every use of force and acting on what it learns. The recommendations in the final chapter are directed at that goal.

# Four: Use of Force Practices

In Chapter Two, we identified the policy-level changes, court orders, and complaint-screening structures that have contributed to a complaint backlog that has grown beyond the Department's capacity to manage. In Chapter Three, we evaluated the IERC process, focusing on the ways in which it is not adequately serving as a corrective to operational problems, including deficiencies in documentation, supervisory review, and the identification of tactical and training issues that individual force incidents reveal. We turn now to the use of force practices themselves. The Department deserves credit for its development of a formal, written use of force policy that now incorporates principles of de-escalation and necessity. Yet, as we detail below, there are gaps between what the formal policies require and the informal norms and practices that play out in the institutions.

Our discussions with officers across numerous prisons, our analyses of uses of force, and our review of completed force investigations, reflect that some of the principles the Department has adopted on paper have not yet consistently taken root in the daily habits, instincts, and shared expectations of the workforce. The findings that follow document that gap in several subject areas. In each, we describe what the Department's policy now requires, and present evidence that practice on the ground has not yet followed. The recommendations in the final chapter of this report are directed at closing that gap.

## Numbers And Scope

Before turning to our findings, we must begin with relevant data about force, including one striking number. Between 2021 and 2025, documented use of force incidents more than doubled in CDCR.

Figure 3: Yearly Use of Force Incidents, 2021-2025[33]




An increase of this magnitude in the system's most consequential category of staff/IP interaction demands attention, both for what it could reveal about conditions in the institutions and for what it requires of every downstream system this report examines. There are many possible causes of such an increase. This includes changes in reporting requirements or practices, population changes, classification and housing decisions, or staffing deficits.

We believe that some part of the rise likely reflects better capture rather than more force. The deployment of BWCs likely made unreported force riskier and reporting more complete, and the incident counts generally rose at facilities as BWCs were activated. For example, the 10 institutions with BWCs reported 3,189 total force incidents in the year prior to BWC rollout and 3,985 in the year after, a 25% increase, which suggests that BWCs may have increased force reporting rather than force itself.

CDCR has shared that the rise in documented force incidents also coincided with significant changes in the prison population and with rising institutional violence generally. Over the same period, for example, the rate of serious and violent rule violation reports per 100K IPs rose substantially. In 2020, there were 1,250 serious and violent rule violation reports per 100K IPs. But in 2025, that number had steadily risen to 2,312 such reports per 100K IPs. A system experiencing more violence will, other things being equal, also tend to have a greater number of uses of force as a result.

There are likely multiple causes of the rising force numbers, and we do not resolve them here. But the question deserves resolution, and as we recommend in the final chapter of this report, CDCR should undertake an evaluation to determine whether its force numbers are rising because of changes in measurement, population, conditions, or practices as a precondition to knowing which interventions will halt the increase. Whatever mix of causes produced it, one consequence is likely: more force incidents means more force complaints. Each documented use of force is an event that can generate a grievance, and the increase has almost certainly increased the flow of complaints into AIU. The rise in documented force incidents is therefore not only a question about conditions in the institutions. It is also an unappreciated contributor to the investigative backlog described in Chapter Two.

Regarding the frequency of different types of force, between January 2025 and May 2026, the most common type of force was "physical strengths and holds," which includes all physical contact from minor control holds to more serious takedowns and strikes. OC was the second most common type, which includes the use of MK-9 streamers and IBGs that release OC powder.

Figure 4: Type of Force Used, January 2025 through May 2026[34]



## The Department Has Formally Adopted Many Best Practices Regarding Use of Force

Many modern use of force principles have been incorporated into the Department's written force policy. Across many important subject areas, the policies on the books align in many respects with contemporary correctional practice. We walk through some of the most important examples:

Authorization to Use Force: Correction officers must be authorized to use force when necessary to protect themselves or others, or to address a security threat. CDCR policy provides that authorization in clear terms. CDCR officers "may use reasonable force as required in the performance of their duties."[35] This includes non-deadly force when reasonably necessary to subdue an attacker, overcome resistance, effect custody, or gain compliance with a lawful order, and deadly force when reasonably necessary to defend against an imminent threat of death or great bodily injury, prevent an escape, or stop a riot or other act posing immediate jeopardy to institutional security.[36] That authorization is foundational to the operation of a prison and, without it, officers could not perform their core functions. But it is not unlimited. National standards and the policies of well-run correctional agencies consistently impose a set of limiting principles that define when force may be used and to what degree. The Department has adopted those limiting principles, and we walk through the most significant of them here.

Minimal Reliance on Force and Use of De-escalation: Sound correctional practice understands that while force is sometimes necessary, it should be a last resort. That premise rests on an understanding that custodial confrontations often arise from IP frustration, fear, mental illness, intoxication, or simple misunderstanding rather than from intent to do harm. Policy built on that understanding treats the officer's first tools as observation, assessment, and communication, and reserves serious physical intervention for the situations that truly require it.

The operational case for de-escalation is equally strong. An officer trained to slow an encounter down, lower the temperature, and give the IP a face-saving path to compliance will resolve many confrontations without force. Every encounter resolved that way avoids the risks that accompany even justified force: injury to staff or the IP, formal reporting and review burdens, complaint and litigation exposures, and the residue of tension that makes the next encounter on that unit harder. De-escalation is sometimes characterized as a constraint, but it is also properly understood as an officer safety doctrine. While use of force is sometimes inevitable, staff who do not engage in

needless physical confrontations avoid creating unnecessary risk for themselves, their fellow officers, or the institutions for which they work.

Department policy explicitly adopts de-escalation at three distinct points in the force decision. Before any encounter, the foundational policy statement commits the agency to accomplishing its custodial functions "with minimal reliance on the use of force."[37] At the threshold of force, the policy directs that verbal persuasion should be attempted whenever possible to mitigate the need for force, and requires verbal orders before controlled force is used.[38] And once force has been used, the policy affirms that staff may recalibrate at any point and terminate the force if it is no longer needed.[39]

Each of those commitments matters, but the last deserves particular note. The authority to terminate replaces older assumptions that once force was justified, its continuation did not require ongoing justification, and it converts de-escalation from a preliminary step into a continuous obligation that runs through an entire encounter. The Department's reporting requirements reinforce the same principle from the other direction: officers must document in their force reports whether de-escalation strategies were attempted and what came of them.[40] A policy that requires officers to attempt de-escalation, empowers them to stop force in progress, and makes them account in writing for their de-escalation efforts is a policy that treats de-escalation as a continuous obligation rather than a preliminary checkbox.

Necessity: Relatedly, necessity asks the threshold question: does this situation require physical intervention at all? A policy grounded in necessity demands an affirmative justification for every use of force framed in terms of the threat presented or the lawful objective that could not otherwise be achieved. The Department's policy embeds this limit in its definitional architecture. It defines unnecessary force as force used "when none is required or appropriate," and it authorizes non-deadly force only when reasonably necessary to subdue an attacker, overcome resistance, effect custody, or gain compliance with a lawful order.[41] Force used for any other reason falls outside the authorization entirely.

Individualized Assessment: Contemporary standards recognize that the appropriate response to resistance depends on who is resisting and why. Department policy requires staff to evaluate the totality of circumstances before acting, including the individual's demeanor, mental health status (if known), medical concerns, and ability to understand and comply with orders.[42] This requirement

converts what was once left to instinct into an affirmative analytical obligation, and it is especially meaningful for encounters involving IPs with mental illness, whose conduct may reflect psychosis, delusion, or crisis rather than volitional defiance.

Structured Alternatives to Immediate Force: Where no imminent threat exists, sound correctional practice treats time, planning, and clinical expertise as tools that prevent force. The Department's controlled use of force procedures embody that principle. They mandate a cool down period before any controlled use of force, require clinical intervention by a licensed mental health practitioner during that period, require managerial authorization and presence, and direct that the cool down continue until all reasonable interventions have been attempted or an imminent threat emerges.[43]

The Duty to Intervene and Report: Finally, every officer is a guarantor of every other officer's compliance. Department policy requires any employee who observes unnecessary or excessive force to attempt to stop it, and any employee who uses or observes force to report it before being relieved from duty.[44] Peer intervention is an important cultural lever a policy can pull because it declares that loyalty to a colleague does not extend to silence about possible misconduct.

Taken together, these provisions place the Department's formal framework largely in line with how correctional use of force policy has developed over the past several decades. The principles are sound, and they reflect deliberate policy choices that, when faithfully implemented through training and supervision, will foster compliant force outcomes across the Department.

## Institutional Strengths That Position the Department for Change

Before identifying areas for improvement, we note three significant strengths that distinguish the Department and provide a foundation for the changes we recommend. First, and most consequentially is the workforce itself. In the course of our review, we met with CDCR officers, individually and in groups, across many Department facilities. They presented as professional, engaged, and committed. They are focused on maintaining safe custody, and they understand that their mission impacts public safety both inside and beyond institutional walls. That kind of orientation is a durable organizational strength, and it means that the recommendations we make will land in an environment where the workforce is genuinely capable of adopting and implementing them.

Second, the Department's executive leadership team shares that commitment. The Department's leaders demonstrate a sincere dedication to improving force practices and to ensuring the safety of both staff and IPs. That was evident throughout our review, in leadership's engagement with our process, their candor about areas requiring improvement, and their expressed determination to act on what the review reveals. The Department's openness to this review is itself worth mentioning. Our review depended on access to records, facilities, staff at every level, and leadership willing to engage candidly with our conclusions. The Department provided that access fully and without reservation, which bodes well for the implementation of the changes that must be made.

Finally, the fact that the California Correctional Peace Officer's Association ("CCPOA"), is an engaged and active institutional voice can also be an asset. A union that takes seriously its role in advocating for officer wellbeing, including the conditions under which they work, the training they receive, and the policies they are expected to follow, is a resource, not an obstacle. Many of the issues discussed in this report impact officer wellbeing, and the feedback shared with us by CCPOA representatives at several institutions was constructive, insightful, and influenced our perspectives. We anticipate that meaningful officer input, channeled through that union relationship, will strengthen the changes that result from this review.

The findings in this chapter are also, at their core, about changing norms and beliefs about force, which does not happen through policy revision alone; it requires workforce buy-in. The CCPOA is a significant opinion shaper in the institutions, and officers look to its leadership to signal whether changes being asked of them are legitimate, fair, and worth internalizing. A union that engages constructively with the changes this report identifies, not as an adversary but as a partner in shaping how the reforms are implemented, can accelerate the kind of genuine adoption that policy mandates alone cannot produce.

## The Gaps Between Policy and Practice

A brief structural note before the remainder of the chapter. The evidence before us shows that policy language is not primarily where the Department's remaining challenges with force live. Many of the incidents we reviewed went wrong in ways the existing policy already addresses. Officers who made use of force errors of the kinds described below were not doing so because the DOM failed to address those circumstances. They were acting on the norms and assumptions that actually govern conduct in their institution, which have not yet absorbed all of what the policy commands.

That diagnosis shapes how we have written this chapter. Most reports of this kind catalogue factual findings about use of force alongside recommendations for specific policy provisions or wording changes to existing policy language. We could have followed that model. But a chapter focused on policy language would sharpen an instrument the workforce has not yet fully adopted, and the Department is already revising its force policies through a separate effort that addresses provision-level refinement. The findings in this chapter therefore focus on the conditions under which written policy translates into sound correctional practice.

There is an old saying in change management that "culture eats policy for breakfast." The saying is overused, but it endures because it is true. An agency's written rules compete with a second, unwritten rulebook: the norms officers absorb from their training officers and peers, the war stories that teach what "really works," and the lessons about what conduct earns respect on a unit and what choices mark an officer as weak or naive. When the two rulebooks conflict, the unwritten one usually wins, because it is enforced daily, informally, and by the people whose opinions officers care about most: their peers, immediate supervisors, and to some extent, their executive leaders. All of which is to say that changing a force policy is only the first, and often least impactful step in changing a Department's practices regarding use of force.

Our findings draw on officer focus groups conducted at 10 institutions in three regions across California, informal conversations with line staff dispersed at those same facilities, discussions with supervisors and command staff, and focus groups with IPs to understand their perspectives on use of force. They also draw on our review of samples of force incidents, investigations by AIU into force complaints, and importantly, the nature of the discussions about force incidents during IERC meetings at the institutions. Together, these sources give us a layered picture of how force is understood, authorized, and used in practice in CDCR, one that reveals certain gaps between what formal policy requires and the outcomes that informal norms and daily practice produce.

## Officers Are Not Consistently Satisfying the Necessity Requirement Before Using Force

The Department's policy framework, as described above, asks several distinct questions about every use of force. The first is the threshold question of necessity: does this situation require force at all to address the IP's behavior and any threat it may present? The second is an implicit question of proportionality: is the force properly calibrated to the resistance? Department policy treats these as distinct inquiries, defining unnecessary force and excessive force as separate violations. Necessity is

the threshold question. Once an officer has determined that force is necessary, proportionality is the next inquiry.

In our review of force incidents, we saw evidence that officers are not consistently satisfying the necessity requirement before using force. In the incidents we examined, officers confronting noncompliance used force in situations that, on the facts, did not warrant it. For example:

- A handcuffed IP was removed from his cell for an insulin shot. He ran from an officer and out of the housing unit door to a dead end in the yard. Officers pursued the IP and, when he stopped running, an officer told him to get down. The IP did not immediately get down. Although the IP was cornered in the yard against a fence and made no threatening movements or statements, the officer deployed OC spray into the IP's face, noting that he did so "because you weren't listening to my orders."
- An officer told an IP to return to his cell. The IP briefly argued with the officer, and other staff activated an alarm. The IP turned around and began walking toward his cell. The officer followed the IP and told him to get on the ground. The IP continued to walk toward his cell and displayed no threatening behavior. When the officer caught up with the IP, however, the officer grabbed him around the chest and took him to the ground.
- While working to return IPs to their cells, a sergeant was talking to an upset IP. Several other officers approached, and one of them activated an alarm and ordered the IP to get down. The sergeant told the officer to step back, but as the IP was walking to his cell, the officer sprayed the IP in the side and back of the head with OC.
- Officers told an IP in a wheelchair that they were taking him to a new housing unit. The IP refused and said he did not want to go without his property. Officers attempted to grab the IP's arms to place him in restraints. The IP tried to pull his arms away, but did not engage in threatening behavior, and one of the officers sprayed the IP in the face with OC.
- Several officers were restraining an IP who was handcuffed behind his back and on the ground in a prone position. The IP refused to roll over and sit up and began using racial slurs towards one of the officers. That officer lunged at the IP, attempted to punch him, and was pushed away from the IP by other officers.

These incidents, and others we reviewed, involved the use of force when none was necessary, and the pattern we saw suggests that more work is needed to fully operationalize the DOM's necessity requirement in the institutions.

The tendency we observed in the incidents mirrors what we saw in IERC reviews, where reviewers rarely considered necessity as a distinct analytical step. Reviews proceeded directly to an overall reasonableness assessment focused on execution: whether the technique used matched the resistance displayed and whether proper procedures were followed. There was little discussion of a more fundamental question: was force needed here at all? A review structure that skips that inquiry downplays the importance of the policy's necessity requirement and signals to officers that they can downplay it, too.

In addition, the IPs we interviewed across institutions described the same problem from the other side of the interactions. We approach these accounts with appropriate caution, as we did not investigate the specific incidents IPs described, and we do not credit any individual account here. But two features of what we heard are worth reporting. First, IPs across the system were remarkably consistent that the introduction of fixed cameras and BWCs (where they have been deployed), improved use of force significantly, and contributed to a feeling of safety in staff/IP interactions. Second, they consistently indicated that some staff members use force when none is necessary, often in response to an IP's statements or verbal conduct rather than any threatening behavior. Notwithstanding our caution about the claims, we saw sufficient evidence of such force during the review that these reports warrant attention.

### Takedowns Are Sometimes Used in Situations That Do Not Warrant Them

Proportionality is implicit in the DOM's requirements that force be necessary and objectively reasonable. To be reasonable, there must be some correspondence between the resistance an officer encounters and the force selected in response. In the incidents we reviewed, we saw officers successfully applying the proportionality principle in many encounters. But we also identified a pattern of proportionality mistakes involving one technique in particular: the takedown.

One feature of the Department's written policy deserves note here. Although proportionality is inherent in the DOM's necessity and reasonableness requirements, the DOM itself never explicitly states the principle. Officers encounter proportionality in the classroom and are held to it in review,

but the policy that governs their conduct does not explicitly articulate it. We return to this gap in the recommendations chapter.

The Department's officers work in an environment that includes real physical risk, including working with IPs classified at the highest security levels, some of whom have documented histories of serious staff assault. Based on data provided by CDCR, 24% of all uses of force involve a reported staff injury, which reflects the genuine risks for CDCR officers. Managing those populations is difficult, sometimes dangerous, and many CDCR officers do it very well.

The Department's force framework requires officers to select the tool or technique that fits the resistance the officer actually faces, weighing its risk against the threat it is being used to address. Under that standard, takedowns are sometimes an appropriate option. When an IP presents an active threat and lesser measures have failed or are plainly inadequate, bringing the individual to the ground can be the fastest way to gain control and protect everyone involved.

But the technique carries real risk. A takedown is a dynamic, momentum-driven maneuver executed against a person who is often off balance and unable to protect himself as he falls. Front takedowns present particular danger because they risk driving the individual's head into the floor, an impact that can produce serious injury. Those risks may be acceptable when the threat justifies them. They are difficult to defend when it does not. In our review of a sample of force incidents, we identified a set of cases in which officers used takedowns in situations where the level of resistance presented did not warrant them and where other, less risky techniques were available. In each of these incidents, officers resorted to takedowns against IPs who were noncompliant but presented no active threat, and where control holds, escort techniques, or simply additional time and staff support would have offered a safer path to resolution. For example:

- An IP who used a walker was seated on a bench in the yard, refusing to return to his cell. Officers approached either side of the IP, had him stand up, and took control of his arms. As they began walking, the IP attempted to pull away. The officers took the IP to the ground face first while his arms were restrained, resulting in orbital bone, cheekbone, and pelvis fractures.
- Officers stopped an IP who was out of bounds in the yard and appeared to be under the influence of a controlled substance. Officers handcuffed the IP behind his back, and an officer began to escort him away. While walking, the IP stopped and tried to pull away from

the officer. The officer maintained control of the IP, grabbed him around the waist, and took him to the ground.

- An officer was escorting a handcuffed IP through a housing unit. The IP stopped walking, began arguing with the officer, and attempted to pull away. The officer remained in control of the IP, placed his leg in front of the IP and pushed, causing the IP to trip and fall to the ground.
- Officers told an IP in the yard that they were going to reach for him and to not resist. The IP continued walking and tried to move his arms out of their grasp, but two officers were able to grab his arms. The IP stopped walking. As officers were telling the IP to put his hands behind his back, a sergeant approached from the back and grabbed the IP's legs, causing him to fall face first to the ground. Officers handcuffed the IP and as they escorted him away, the IP's pants began to fall down. The IP stopped walking again, and officers pushed the IP to the ground onto his chest.
- An officer was talking with an IP who was handcuffed behind his back and sitting in an office chair. The officer told the IP to stop referring to the officer as "bro," and the two argued. The IP called the officer a "bitch," and the officer approached the IP. The IP started to stand up and the officer took him to the ground.

We were unable to determine the frequency with which CDCR officers use takedowns, as the Department combines all uses of physical force into a single reporting category. What we can say is that within the incidents we examined, takedowns were used in circumstances that did not warrant them with sufficient consistency to raise concern about why the Department's general force framework is being misapplied with respect to this technique.

## Officers Are Using Force to Address Facility Security Concerns That Department Policy Does Not Clearly Cover

The Department's force framework, as developed in the DOM, addresses two categories of force with reasonable clarity. Immediate force is authorized when there is an imminent threat to institution or facility security or the safety of persons, and time and circumstances do not permit advanced planning. Controlled force is authorized for planned deployments where advance preparation is possible. Both categories are grounded in specific policy provisions and procedural requirements.

Prisons regularly produce a third type of situation that fits neither framework cleanly: IPs whose noncompliance impacts facility security or operations, but who do not present any imminent threat. This includes, for example, IPs who refuse to cuff up for an escort, return to housing, or who have refused a lawful order and whose refusal implicates facility security or operations even when no person faces an imminent threat. These situations are common. But they are not typically imminent threats to the safety of persons, and they do not always permit the advance planning that controlled force procedures assume. The policy framework does not clearly define what force, if any, is appropriate to address them, or under what conditions.

The absence of a defined policy for this category is not merely an analytical gap. It is a gap officers are actively navigating in their daily work, and one they described explicitly in our focus groups. Across multiple facilities, some officers characterized refusal to comply with a lawful order, such as refusal to move, submit to a search, or return to a cell, as itself constituting an "imminent threat" sufficient to justify force. That framing does not fit the DOM's use of "imminent threat," which contemplates a genuine safety or security risk that requires an immediate response. But officers deploying it are not really misunderstanding the policy. They are extending the only authorizing category it offers to cover situations the policy does not otherwise address. When the policy provides no clear standard for force used to address facility security concerns short of imminent threat, officers understandably reason their way to one.

The pattern in the focus group discussions and the incidents in our review suggests that the corrective is not simply better training. Officers acting on a framework that does not clearly address a substantial category of the situations they face will continue to produce these outcomes regardless of training. The Department's policy requires an explicit standard for force used to address facility security concerns short of imminent threat, one that authorizes the use of force where necessary while defining the guardrails and guidelines that ensure such force is proportionate to the concern presented and limited to what is required to address it.

## A Disproportionate Percentage of Force Incidents Involve IPs With Mental Health Designations

The Department is responsible for a substantial population of incarcerated persons with documented mental illness, with a full 42% of the Department's population are members of the class in *Coleman v. Newsom*. In 2025, a disproportionate share of the total number of force incidents, or approximately 84%, involved IPs with a documented mental illness. Moreover, that number has

been steadily increasing at a rate that exceeds the overall increase in documented uses of force during that same period. Indeed, the dramatic increase in documented uses of force discussed Chapter Two appears to be almost entirely composed of increases within this population.

Figure 5: Yearly Force Incidents by Involvement of IPs with Mental Health Designations, 2021-2025




Some portion of this concentration is structural, as certain categories of force occur almost exclusively within this population, including controlled uses of force to administer court-ordered psychiatric treatment and interventions responding to self-harm. Individuals in crisis may also present the kinds of resistance and threat behavior that policy authorizes officers to meet with force, at rates that differ from the general population. The Department's violent incident data reflect a similar concentration. In 2025, IPs with mental health designations were involved in 6,916 of the Department's 8,363 violent incidents, or approximately 83%. The parallel is consistent with the Department's view that force in this population partly reflects the conduct officers encounter. It does not establish that the force used was necessary. We return to the sources of this pattern in the explanatory material later in this chapter, including the adequacy of the training and skills the Department provides to the officers assigned to this population.

# Understanding The Gaps Between Policy and Practice

The discussion above documents certain problematic patterns related to the use of force in the institutions. It does not, on its own, explain why the patterns persist despite a policy framework that formally addresses them. That explanatory question is what this section takes up.

Officers have been given training on the written policy. What we observed alongside that training was an informal culture that prioritizes quick resolution, which often overrides the formal instruction officers have received. The primary explanatory work here concerns why the informal culture has developed and persisted.

## Officers Understand De-Escalation as a Compulsory Policy Requirement, Not as Foundational to Their Own Safety

The Department has invested in training on de-escalation, and officers we spoke with demonstrated both familiarity with de-escalation as a concept, and an ability to describe some relevant techniques and methods. What was less evident was a shared understanding of *why* de-escalation serves officers' own interests, and why force avoidance, when circumstances permit, makes officers safer rather than weaker or more vulnerable.

Our discussions with officers made the gap concrete. When we asked officers why they should use de-escalation tactics when time and circumstances permit, the answer was generally some version of the same response: because policy requires it. When we pressed further and asked why that policy exists, the answers did not deepen. Officers told us, in effect, that they de-escalate because the Department says to. That is a circular answer that locates the entire rationale in the rulebook rather than in any benefit officers themselves receive. Across our discussions, officers in the aggregate had difficulty articulating what de-escalation does for them: keeping them safer, protecting their fellow officers, sparing them needless complaints and the investigations that follow, minimizing legal risk to the Department and to officers individually, and preserving force for the situations that truly require it.

This is not because the training has failed to make the case. Our review of the Department's de-escalation training materials, including the Communication and De-Escalation Techniques in-service course, found that the course is well-constructed, if short.[45] Officers are instructed on effective strategies for de-escalation and communication, elements of active listening, and techniques for communicating with IPs. The course includes role-playing scenarios intended to sharpen de-

escalation skills. And it addresses the importance of de-escalation for reducing use of force and the officer safety benefits of effective communication. The affirmative case that officers we spoke with could not articulate is, in fact, present in the training materials the Department has built.

What is happening between the curriculum and daily practice is not fully clear from the evidence in our review. The case exists on paper. Whether it is reaching officers as designed is a question neither we nor the Department can currently answer, because, as we discuss elsewhere in this report, the Department does not systematically evaluate whether in-service training is being delivered consistent with its expectations. The gap we observed could arise at any of several points: the classroom delivery may not match the written course, the case may be landing in the classroom but being displaced by the informal norms of the units where officers spend their working hours, or it may not be reinforced through the supervision that would build on what the classroom addresses. We cannot fully diagnose the mechanism from the evidence available, and under the Department's current practices, neither can it.

What we can say is that, in general, officers who understand de-escalation as a policy obligation rather than as something that serves their own safety may apply it selectively, in situations where it feels comfortable or where supervision is present, and revert to more familiar patterns when it does not. That is one specific way the workforce has not internalized what the framework asks of them. The corrective must attend to the gap between what the training presents and what officers carry into their work.

## The Persistence of an "Ask/Tell/Make" Framework for Managing IP Noncompliance

Another specific dynamic that shapes officer response to noncompliance is the persistence of an older mental model for managing it, which officers described in our focus groups as "“ask/tell/make." Department policy does not treat physical compulsion as the natural endpoint of all IP noncompliance. Through its de-escalation requirements, force avoidance obligations, and the threshold analysis it requires before force may be used, the DOM establishes a more nuanced framework for how officers are expected to manage refusals to cooperate. Physical compulsion, under the policy, is only one option that may become appropriate under specific conditions, but it is not the inevitable default response.

Across multiple facilities and officer focus groups, however, staff articulated a philosophy of inmate management that they expressed as "ask/tell/make." The framework is intuitive. It maps cleanly onto the power dynamic that defines the correctional environment, and it gives officers a simple mental model for escalating their response to noncompliance. Ask an IP to comply; if that does not work, tell them to comply; and then make them comply if telling did not work.

But ask/tell/make, as typically understood and applied, skips over the framework the policy actually establishes. It treats force as the default response to continued refusal rather than as one option that must be tested against the policy's requirements before it is used. The gap between what the policy requires and what the ask/tell/make framework licenses is precisely where many of the force incidents we reviewed went wrong.

The persistence of ask/tell/make also reflects a training and communication gap as much as a cultural one. Staff expressed genuine confusion about when they are authorized to compel compliance and when the policy requires them to first exhaust de-escalation options. That confusion is understandable when informal unit-level norms and formal written policy point in different directions. Resolving it requires more than a policy revision. It requires sustained situation-based training, supervisory reinforcement, and a deliberate effort to retire a framework that, whatever its intuitive appeal, no longer reflects how the Department expects its officers to manage IP noncompliance.

## CDCR Officers Highly Value Independence as a Mark of Skilled Practice

One of the specific understandings that shapes how officers respond to the situations documented throughout this report is a culture of self-reliance and independent action. The Department's force policy and training expect that officers will manage difficult situations by drawing on the tactical resources available to them, when possible, rather than acting alone. De-escalation, use of time and distance, positioning, supervisor consultation, and coordinated response are all implicit in what the policy asks of officers when they handle possible force encounters. This makes sense given that the most effective correctional officers are not simply capable individuals. They are tacticians who assess a situation and position themselves to use every advantage available, including time and distance, the ability to secure a door or create a buffer, and the option to summon a supervisor or fellow officers before a situation escalates to force.

The officers we met with across the Department's facilities left a strong impression. They are committed, genuinely oriented toward public service, and willing to make real personal sacrifices to do their jobs well. We heard from staff who routinely cover shifts on their days off, forfeiting family time to ensure their units are staffed, and who take very seriously their responsibilities to protect both IPs and their fellow officers. That level of dedication is not something that can be trained into a workforce, and it is a significant institutional asset.

Closely related to that commitment is a culture of self-reliance that arose again and again in our discussions with staff. Officers articulated a view of themselves as capable, trained, and equipped to manage their housing units and yards independently. They are comfortable with the tools on their duty belt, confident in the judgment they have developed through training and on-the-job experience, and prepared to resolve difficult situations without waiting for support that may be long seconds or minutes away. In a correctional environment, where conditions can change rapidly and backup is not always immediately available, that self-sufficiency is extremely valuable. Officers who freeze, hesitate, or cannot act without direction create risk. The Department's officers, by and large, do not have that problem.

However, when self-reliance becomes an identity marker; when officers understand acting alone and quickly to be what a good officer does, and if they believe that calls for backup, requests for supervisor input, or deliberate use of time and distance are departures from that identity, use of force problems will result. Self-reliance, unchecked, can shade into a preference for speed over strategy, and for independent action over the deliberate use of available resources.

The consequences run in a direction the report has already documented. An officer who handles things alone has fewer options, and the options he has are the escalatory ones. A team of officers facing noncompliance can apply a measured escort hold or simply wait while one of them talks; a single officer facing the same conduct has his voice, his hands, and the tools on his belt. An identity that prizes solo resolution therefore steers officers toward precisely the force choices this chapter identifies as recurring problems: force used before it was necessary, because waiting for assistance felt like failing to properly handle the situation, and force disproportionate to the resistance presented, because the proportionate response required people who were never summoned.

## The Department's Training Program Has Not Kept Pace with the Reforms It Is Meant to Support

The Department's training challenges deserve separate treatment, both because training surfaced repeatedly in the findings above and because our review examined the training function directly. The staff of CDCR's Peace Officer Selection and Employee Development Team ("POSED"), which is responsible for developing and coordinating use of force training, is committed, knowledgeable, and engaged. Our interactions with them reflected that they have a serious understanding of what modern force training requires and a clear commitment to delivering it. The findings that follow are not a critique of that team, its talented members, or their expertise. They concern the delivery system through which the team's work has to travel to reach officers on the units, and the design of that system leaves the team's efforts substantially at the mercy of factors they do not control.

The bones of a sound training structure are present. Every officer receives use of force instruction at the Academy. The Department maintains an annual in-service requirement, and it has a mechanism for pushing updated content to the field each year. Headquarters distributes updated training material to a designated training manager at each facility, who is responsible for ensuring the new content is delivered to every sworn staff member at that institution. The architecture, on paper, reaches the entire sworn workforce every year. The findings below concern what happens between the distribution of that material and its arrival in the mind of the officers on the unit.

POSED and its Office of Training and Professional Development ("OTPD") are responsible for the overall management of CDCR's training programs. Among other things, they:

- Evaluate and assist in the development and implementation of training programs and development of standardized course content;
- Ensure CDCR meets the training standards required by the Commission on Correctional Peace Officer Standards and Training; and
- Act as liaison for in-service training managers and headquarters' training coordinators.[46]

POSED and OTPD organize and administer the Basic Correctional Officer Academy ("BCOA"), which all sworn CDCR employees hired to work in adult correctional office classifications attend. The training lasts 13 weeks and includes, among other lessons, the following related to the use of force:

- Use of Force – 8-hour lesson "developed to ensure correctional staff have the knowledge, skills, and abilities required to utilize minimal reliance on the use of force (UOF) when performing their job duties."[47]
- Communication and De-Escalation Techniques – 28-hour lesson on "skills and practice in effective communication and de-escalation techniques" consistent with CDCR's commitment to "resolving conflicts at the lowest and least invasive level, avoiding the use of force."[48]
- Arrest and Control – 2-hour lecture and 14 hours of practical application providing cadets with basic skills in unarmed self-defense necessary to "maintain order, confront and control disorderly conduct, and affect the arrest of individuals who are in violation of state laws."[49]
- Cell Extraction – 2-hour lecture and 14 hours of practical application on the "knowledge, skills, and abilities required to remove an incarcerated person from an area, using the reasonable force necessary to control an incarcerated person."[50]
- Chemical Agents – 10-hour lesson providing "comprehensive knowledge and skills in the understanding, use, and application of chemical agents in correctional facilities."[51]
- Expandable Baton – 14-hour lesson instructing cadets on the "basic knowledge, skills, and abilities to use the [expandable baton] properly to protect themselves and others."[52]
- Impact Munitions and Assuming an Armed Post – 8-hour lesson on the "safe operation of impact munitions launchers and firearms when assuming an armed post."[53]
- Alarm Response – 4-hour lecture and 28 hours of practical application addressing how correctional officers "maintain order in a correctional facility in case of perilous situations, including fights, riots, escapes, medical emergencies, and natural disasters."[54]
- Legal Issues – 2-hour lesson addressing the "myriad of laws, court rulings, and Department policies" correction officers must comply with during search, arrest, and related operations.[55]

After BCOA, CDCR staff continue to receive force-related lessons through in-service training ("IST"). On an annual basis, POSED determines the training requirements for CDCR staff and distributes an Annual Training Schedule, which is implemented by IST managers at individual institutions. These IST managers report directly to an institution's warden or their designee and are responsible for implementing "formalized classroom instruction or on-the-job-training to meet local operational needs, legal requirements, and individual employee job performance needs."[56] POSED

and OTPD review and approve specific IST lesson plans, but the IST managers for individual institutions implement this training and have discretion to "consolidate training subjects and programs within the established departmental requirements."[57]

IST managers direct the work of IST instructors and subject matter experts. IST instructors are required to complete specialized training approved by POSED and teach a minimum of four hours a year. Subject matter experts must either have a minimum of 3 years of full-time experience in the subject matter, possess a relevant degree or certificate, have previous experience as a trainer on the topic, or otherwise be recognized by as an expert by CDCR. In recent years, IST related to the use of force has addressed similar topics as the BCOA, including lessons on Use of Force (2 hours), Controlled Use of Force (1 hour), Contact Skills (4 hours), and Alarm Response (2 hours).

## The Quality of In-Service Training Appears to Vary Significantly from Facility to Facility

The Department's delivery model places enormous weight on the facility IST manager and instructors. POSED provides a slide presentation, a teaching guide, and, in some cases train-the-trainer classes, and what officers actually experience depends on what the IST managers and instructors do with those materials. Our review found indications that what they do varies widely. Officers reported that some training managers coordinate skilled instructors who bring the material to life, weaving in scenarios drawn from incidents at their own facilities and engaging officers in discussion about how the content applies on their units. Others reportedly oversee instructors who deliver something closer to a rote recitation of the slides. Officers at some facilities described in-service training as useful and concrete, while others see it as a less valuable compliance exercise.

The consequence is that the Department does not have one in-service training program. It has 31 programs of varying quality, loosely organized around a common slide deck and instructor guide. For routine content, that variation might be tolerable. For use of force training, where the Department is attempting to move officer attitudes and practices system-wide, it means the instrument of change performs well at some facilities and poorly at others, and the facilities where it performs poorly are unlikely to be the ones where the underlying culture requires the least attention.

## The Department Lacks Sufficient Quality Control Over Training Delivery in the Institutions

The variation described above persists because no one is positioned to catch it. Our review found no centralized auditing of in-service training delivery, and no other systematic method for verifying that the material is being delivered as intended, or delivered well. Once the annual update leaves headquarters, the Department's visibility into its own training program effectively ends. Facilities certify completion, but completion data measures attendance rather than instruction. It cannot distinguish the facility where officers worked through realistic scenarios from the facility where slides were read aloud to a room to little effect.

## The Department's Training Authorizes OC Deployments the DOM Does Not Expressly Permit

OC is one of the most frequently used force types in the Department. Indeed, as Figure 6 reflects, in 2025, there were 5,239 incidents in which staff deployed OC, which represented approximately 42% of all documented force incidents.

Figure 6: Yearly Use of Force Incidents Involving the Use of OC, 2021-2025




CDCR officers regularly use OC to address situations that clearly warrant its deployment. In our review, we observed many instances of officers using OC to disrupt IP fights, disable IPs who were physically threatening staff or other IPs, and to bring imminent-threat situations under control quickly. OC is an important tool for maintaining safe custody that is often appropriately and effectively deployed by CDCR's officers.

Yet other OC deployments we reviewed were not consistent with Department policy, and they shared a structure: officers deployed a chemical agent in situations that presented no imminent threat, and that called for lesser force or for no force at all. Absent other factors, an individual refusing to submit to handcuffs, declining to move for an escort, or remaining in a location after being ordered to leave presents a situation that policy may authorize officers to resolve with physical contact, a guided movement, an escort hold, or the application of restraints, or to resolve without force, through time, containment, or continued communication. In the incidents discussed below, officers facing those situations deployed OC spray instead.

The origin of these deployments may lie in Department training on chemical agents that authorizes more than the DOM expressly permits. The DOM's structure is clear: immediate force may be used when there is an "imminent threat to institution/facility security or safety of persons," and time and circumstances do not permit advanced planning, staffing and organization. DOM § 51020.15.7 applies this framing specifically to chemical agents by requiring a verbal warning prior to their use unless the circumstances preclude it, and by authorizing additional deployments "if an imminent threat still exists." The word "still" presupposes that an imminent threat existed at the first deployment, confirming that the DOM treats imminent threat as the operative standard for the immediate deployment of chemical agents.

The Department's training on chemical agents, on the other hand, both in the academy and in-service, follows the DOM's general framework for the use of non-deadly force. Pursuant to DOM 51020.8, non-deadly force may be used "only when reasonably necessary" for four authorized purposes: to subdue an attacker, overcome resistance, effect custody, or gain compliance with a lawful order. The Department's training on chemical agents identifies these four purposes as "situations when it is appropriate to use chemical agents as a less-lethal force option" and adds another, to prevent escape. That list converts Section 51020.8's general assertion of the kinds of situations that might permit non-deadly force, assuming all other requirements of Department policy are met, into a menu of authorizations for chemical agents specifically.

**A. Appropriate Use**

**Learning Objective 1: You will recall the five use of force situations when it is appropriate to use chemical agents as a less-lethal force option.**

The UOF policy identifies five situations when chemical agents are appropriate as a less-lethal force option:

- Gain compliance with a lawful order

  If force is used for the sole purpose to gain compliance with a lawful order, controlled force shall be used.
- Overcome resistance
- Effect arrest and custody
- Subdue an attacker
- Prevent escape [58]

Two of these authorizations are facially consistent with the DOM: to subdue an attacker and prevent escape, as they describe circumstances in which an imminent threat is ordinarily present. The other three sweep more broadly than the DOM's standard. "Overcome resistance" spans everything from violent physical struggle, where an imminent threat exists, to a handcuffed IP stopping during an escort, where it may not. The remaining two warrant closer examination:

Effecting arrest and custody: In some situations where an officer must effect arrest and custody, an imminent threat is present. An IP who is actively resisting handcuffing, physically struggling with staff, or attempting to prevent officers from taking him into custody may create the imminent threat that the DOM contemplates. But in many other arrest-and-custody situations, the IP is compliant, submits to handcuffing, walks willingly, or offers only verbal objection without the threat of physical violence. The inclusion of "effect arrest and custody" as one of the five authorized uses in training, without any indication that an imminent threat is required, broadens the training's authorization beyond what the DOM permits. Officers acting on the training's five-category framework could treat the arrest-and-custody category as authorization for OC deployment during any arrest-and-custody situation, regardless of whether an imminent threat is present.

Gain compliance with a lawful order: Similarly, some situations where a lawful order is issued involve physical resistance that creates an imminent threat. But in other situations, an order is issued and the IP does not comply, but there is no physical resistance and no imminent threat that would authorize OC. Both the academy and in-service training materials we reviewed do include a parenthetical noting that "if force is used for the sole purpose of gaining compliance with a lawful

order, controlled force shall be used."[59] However, the qualification is stated as a parenthetical, which is easy to miss or forget. In the classroom, the qualification is clear. In an operational setting, where officers work from the mental models the training has produced rather than from the training documents themselves, officers are less likely to retain the parenthetical qualifier than the mental model of "five authorized uses" formed in training, particularly during a dynamic and quickly evolving incident. We saw evidence of this confusion in incidents we reviewed. For example:

- Officers approached an IP on the top tier of a housing unit who was acting erratically. As the officers approached, the IP ran from the officers into a shower cell. The officers ordered the IP to get on the floor to turn around to be handcuffed. The IP refused. Other officers arrived and one of them ordered the IP to get on the ground. The IP refused again but did nothing to threaten the officers. The officer sprayed the IP in the face with OC.
- An IP in a wheelchair was arguing and being verbally aggressive because he was told it was time to leave an office. An officer activated her alarm, and a sergeant responded and immediately said "get on the ground or you're going to get fucking sprayed." The IP said that he could not get on the ground, and when the sergeant attempted to grab him, he pulled his arm away. Instead of attempting verbal de-escalation to get the IP to cooperate, the sergeant immediately sprayed the IP in the face with OC, and the IP was forced out of his wheelchair to the ground.
- An IP in a housing unit dayroom was acting strangely, stumbling, and falling and was obviously in an altered mental state. An officer asked the IP to "take it in" and return to his cell, but the IP remained in the dayroom. Officers activated an alarm in the unit, and the officer told the IP to "take a seat" several times. The IP instead walked away from the officer but did not engage in any threatening behavior. The officer sprayed him in the face with OC, which caused the IP to become more agitated, resulting in the use of serious additional force to subdue him.
- An IP was yelling in a housing unit, and an officer told him that he would be receiving a "115." The IP became more upset, pushed a food cart into a gate near the housing unit office, and walked out of the building into the yard, ignoring the officer's orders to get down. Officers followed the IP and an officer approached him from the front, immediately sprayed him in the face with OC, and grabbed him by the waist and slammed him to the ground.

Officers acting on the training's five-category framework will reach conclusions about authorized OC deployment that are broader than what the DOM permits. Correcting the pattern requires conforming the training to the DOM, as recommended in the report's final chapter.

## The Department's Training on Managing IPs With Mental Illness Is Inadequate

As set forth above, the Department is responsible for a substantial population of IPs with documented mental illness, and approximately 84% of all documented force incidents involve IPs in this population. During our visits to facilities housing large populations of such IPs, however, we met with officers assigned to those units and asked what specialized training they had received on managing this population. They invariably told us they had received none. In our meetings with POSED, we learned that some related content is woven into the Academy curriculum but that no standalone training unit exists, and no enhanced training is provided to officers when they are assigned to work mental health units. The officers' answers were therefore more accurate than not: what they receive on this subject is incidental Academy exposure, not the specialized preparation the assignment requires.

The training that should be provided to officers in mental health units is not mysterious; its elements are well established in the agencies that provide it. Officers working these units should be trained to recognize the symptoms of the conditions they will encounter, including psychosis, mania, severe depression, and cognitive impairment, and to distinguish behavior driven by symptoms from volitional resistance, because the two call for different responses and are easily confused. They should understand how those symptoms affect an IP's ability to receive, process, and comply with instructions, and how to adjust their communication accordingly: simplified commands, added time for responses, and the recognition that an IP in crisis may be unable, rather than unwilling, to comply. They should be trained in de-escalation techniques specific to psychiatric crisis, which differ from the general de-escalation curriculum, and in the behaviors that signal decompensation or precede self-harm. These are the specialized tools that separate general population supervision from the work required on mental health units, and they are the tools officers on those units are not currently being given.

## The Skills the Department Needs to Cultivate Already Exist in Its Workforce

Notwithstanding the findings above, our review of force incidents and AIU force investigations revealed numerous examples of staff displaying excellent de-escalation practices and skillfully managing difficult conflicts with IPs in ways that minimized reliance on force and maximized the safety and wellbeing of officers and IPs alike. These examples matter beyond the individual encounters they describe. The central finding of this chapter is that the Department's culture has not yet caught up with its policies, and the work of closing that gap cannot be accomplished by policy mandates alone. It requires officers to see, in colleagues they respect, that patience, use of time and distance, and restraint are the marks of a skilled professional and not indicators of weakness. That evidence already exists inside the Department.

During the review, we saw officers talking patiently with IPs experiencing significant mental health decompensation, sometimes for long stretches, until the crisis passed without force. We saw officers use time and distance as tools, averting confrontations in situations that did not need to be won immediately and letting an agitated IP settle rather than closing on him. We saw officers accept help, calling for clinical staff, waiting for a colleague with an established rapport, or stepping back so that another officer could take over an exchange that had gone badly. We saw officers talk IPs into compliance that force could have compelled at greater cost, and end encounters with handcuffs when force wasn't the only option. And we saw officers encouraging their partners to avoid force when none was needed. None of this conduct was exceptional in the sense of being beyond what the Department trains or expects.

These observations are the foundation on which our recommendations rest. CDCR does not need to import a new model of correctional practice. The model already exists in officers like those described above, who are the Department's proof that the standard its policy sets is attainable. The work ahead is to make that model general: to identify the practices these officers demonstrate, hold them up across the institutions, reinforce them through training, supervision, and leadership, and make them, over time, the customary and expected standard at all 31 institutions. The recommendations in the final chapter are designed to support that work. Given the Department's institutional strengths, that goal is within CDCR's reach.

# Five: Recommendations

To address the findings documented above, we make 34 actionable recommendations below, numbered consecutively and organized to follow the structure of the report:

## Recommendations Related to Complaint Handling

### Recommendation 1: Investigative Responsibility for Force Complaints Should Not Be Delegated to the IERC

The parties' stipulation that resulted in our appointment asked whether the IERC (or some entity other than OIA) can conduct comprehensive and unbiased investigations into allegations of staff misconduct based on use of force policy violations. The answer is no as to IERC, which cannot, and should not, serve that function. Investigation is not the IERC's purpose. The IERC exists to review uses of force after the factual record is assembled, to evaluate compliance, tactics, and training implications, and to direct institutional improvement. Assigning it investigative responsibility would compromise both functions, and the deficiencies documented in Chapter Three, including the absence of an OP, consistent standards, and quality control, make it unsuited to absorb a new mission when its existing one is not yet performing.

### Recommendation 2: The Department Should Preserve the Centralization of Screening and Investigative Assignment Decisions in CST

This is a recommendation to keep what works. Chapter Two documented the value of the Centralized Screening Team's architecture; screening and routing decisions about staff misconduct allegations are made outside the institutions where the complaints arise by a dedicated unit applying uniform criteria. That centralization is one of the Department's most important structural protections for the impartiality of its complaint system, and it is a precondition for the risk-based sorting recommended below, which depends on consistent screening decisions applied statewide. As the Department implements the changes recommended in this chapter, and as it responds to the pressures of the backlog, it should not decentralize these functions or return screening authority to the institutions.

### Recommendation 3: The Department Should Expand Its Use of the Special Conditions Closure Process

Chapter Two found that the Special Conditions Closure Process is a valuable tool that is not yet used with sufficient regularity. While its use has steadily increased throughout 2026, our understanding is that the recent increase is largely a product of working through AIU's substantial backlog. The Department should ensure that its use is expanded going forward in appropriate cases. Complaints that meet the special conditions should be identified at screening and closed through the process designed for them, with the closure documented and subject to oversight and audit. Every complaint closed through this mechanism releases investigative capacity for the complaints that need it.

### Recommendation 4: The Department Should Stratify Force Complaints by Risk

The Department currently treats force complaints as largely uniform for investigative purposes, which Chapter Two found produces miscalibration at both ends of the severity spectrum: meritless complaints or those reflecting only compliant force receiving full investigation while serious allegations are prematurely closed. The Department should develop a risk stratification framework that CITT applies at intake and that investigators apply during the course of their investigation. The framework should sort complaints using criteria that bear on the seriousness of the allegation and the demands of investigating it, which may include the nature and severity of the force alleged, injury to the complainant, the availability and content of video evidence, the involved employee's history, indicators of vulnerability in the complainant, and inconsistencies between the allegation and the incident record. The framework should be documented, uniformly applied, and periodically validated against outcomes.

The Department should develop the stratification criteria in consultation with Plaintiffs. The complaints being sorted include allegations by class members whose investigation the Court's orders govern, and a framework developed with Plaintiffs' input will be more durable, and more credible, than one presented to them as finished work.

### Recommendation 5: The Department Should Create Linkage Between SOMS and AASTS to Facilitate Risk-Based Sorting

Risk stratification is only as good as the information available to the screeners applying it. A screener assessing a force complaint needs ready access to the underlying incident record: the use of

force reports, the incident package, video references, and the involved employees' relevant history. Today that information resides in SOMS while complaint processing runs through AASTS, and the absence of linkage between the two systems forces screeners to work without the incident record or to assemble it manually. The Department should build the linkage, so that when a force complaint is registered, the associated incident documentation is automatically identified and available to CST at screening. This is an enabling investment; without it, risk-based sorting will be slower and less accurate than the framework requires.

### Recommendation 6: High-Risk Force Complaints Should Be Investigated by AIU

Under risk based stratification, complaints presenting the highest risk, including allegations of serious injury, dishonesty, retaliation, or force against vulnerable individuals, and complaints in which the incident record and the allegation materially diverge, should be investigated by AIU. These are the cases that most demand investigative depth, independence from the institution, and the training and resources of a centralized unit, and they are the cases in which the consequences of an inadequate investigation are most severe. Concentrating AIU's capacity on this group of cases is the point of the division recommended in this chapter, and the unit's caseload should be composed of the investigations that justify its structure.

### Recommendation 7: The Department Should Rebuild the LDI Program on a Strengthened Foundation and Route Lower-Risk Force Complaints Through It

The LDI program is the natural home for lower-risk force complaints, but the program is now defunct and must be recreated before it can receive them. That necessity is also an opportunity, because the program should not be recreated the same as before. The prior program's governing procedures contained, on paper, several of the elements a sound program requires, including that LDI reports were subject to review and approval by AIU managers, and escalation was required upon the discovery of ADI-related misconduct. The weaknesses documented in the prior program arose despite those requirements, which tells the Department that the failures were not failures of written procedure alone, and a rebuilt program that merely restores the old rules might well reproduce the old results. The rebuilt program should differ from its predecessor in four ways.

First, the rebuilt program should be structured differently. The prior program embedded LDIs within the institutions, subject to the chain of command and institutional pressures of the facilities whose staff they investigated, and we believe that embedding is the most likely explanation for why

the requirements that existed on paper did not hold in practice. The rebuilt program should make LDI a standalone position without competing responsibilities, reporting to AIU rather than up the institutional chain of command. That structure preserves what makes local investigation valuable, proximity to the facts, the witnesses, and the video, while removing the local dependencies that compromised it.

Second, the training must improve. LDIs received training in the prior program but the documented weaknesses show that it was not sufficient. The rebuilt program's training should be more rigorous and should be validated against the deficiencies the prior program actually produced: formal instruction in investigative methods, evidence handling, interviewing, and the documentation standards LDI reports must meet, with refresher training on a defined cycle and completion required before an LDI receives a caseload.

Third, every LDI investigative product should be reviewed before closure and a sample audited after it. The prior requirement that AIU managers review and approve LDI reports should be retained and strengthened into review against defined sufficiency standards, applying the comprehensive investigation definition discussed elsewhere in these recommendations. To that existing review layer the Department should add what the prior program lacked: periodic quality audit of the program's outputs, with results reported and deficiencies corrected through the corrective action process recommended elsewhere in this report.

Fourth, the escalation obligations must broaden. The prior program's requirement to escalate an investigation to AIU was triggered by the discovery of ADI-related misconduct. The rebuilt program's operating procedure should broaden the mandatory triggers to include the discovery of evidence suggesting serious misconduct of any kind, material conflict between the incident record and developing facts, and indications of dishonesty in staff reports. Escalation should be mandatory when a trigger is met; the failure to escalate should itself be auditable, and LDIs whose investigations repeatedly fail to conform to the program's standards should be subject to corrective action and removal from the role.

## Recommendation 8: The Department Should Develop an Operating Procedure for AIU

AIU operates without an OP, and Chapter Two traced several of its investigative deficiencies to that absence. The Department should adopt one. Three elements are essential. First, the OP must

define what a comprehensive investigation requires. The Court's orders require comprehensive and unbiased investigations, and Chapter Two found that the Department has no working definition of the term, leaving individual investigators to decide what enough evidence looks like. The definition should be organized around materiality: a comprehensive investigation is one that identifies and pursues the evidence material to the allegations presented, including the interviews, video, documentation, and physical evidence a reasonable investigator would recognize as bearing on whether the alleged conduct occurred. Materiality both demands depth where the allegation requires it and licenses proportionality where it does not; the definition should make clear that comprehensiveness is measured against the allegation, not against a uniform checklist applied to every case.

Second, the OP should establish escalation and de-escalation triggers within AIU's own processes, defined conditions under which an investigation's scope must expand because of what has been found, and defined conditions under which a case that no longer presents the risk that warranted full investigation may be resolved through a proportionate closure process.

Third, the OP should build supervision into the life of every case through defined checkpoints: supervisory approval of the investigative plan at the outset, a mid-course review for cases exceeding a defined age, and a pre-closure sufficiency review that measures the completed investigation against the comprehensive investigation definition before the case closes. These checkpoints convert supervision from an aspiration into a document requirement, and they are the Department's own answer to a structural fact of the current oversight arrangement. Many of the OIG's published quality assessments of these investigations arrive after closure, when the deficiencies they identify can no longer be corrected in the case that produced them. The pre-closure review is where the Department catches its own deficiencies while correction is still possible.

### Recommendation 9: The Department Should Develop a Formal Process to Follow Up on the Recommendations of the Post-Investigation Review Panel

Chapter Two credited the post-investigation review panel as one of the complaint system's assets. But its value depends entirely on what is done with its findings. The Department should treat the panel's outputs the way quality improvement functions in medical care treat theirs. Every finding generates a corrective action plan, every plan has an owner and a deadline, and implementation is documented and reported. A review function whose findings are received but not acted on will atrophy. A review function whose findings visibly change practice becomes an engine of

improvement, and the same model, applied to force review in Recommendation 16, can serve both systems.

### Recommendation 10: The Department Should Add Personnel, Including Supervisors, to AIU, CST, and CITT, Informed by the Ongoing Staffing Analysis

Even with risk-based sorting and assignment in place, AIU requires more capacity than it has. The Department's ongoing staffing analysis should be completed and its results implemented, and the analysis should size the unit against the projected rather than the historical complaint volume, for the reasons discussed in Chapters Two and Four. The Department's documented uses of force have risen substantially, and if any portion of that rise reflects an increase in actual force incidents, complaint volume will follow it. A unit staffed to yesterday's intake will always remain behind.

The additional positions should include supervisors, not only line investigators. Several of the investigative deficiencies documented in Chapter Two are the kind that supervisory review exists to catch, and no OP can substitute for a supervisor with the time to apply it. Supervisory capacity should grow in proportion to the investigative staff it oversees. Further, implementation of the recommendations in this chapter to stratify complaints based on risk and to increase the use of the Special Conditions Closure Process may require additional staff within CST and CITT.

### Recommendation 11: The Department Should Pilot Mixed Investigative Teams in AIU

The Court's orders require AIU investigations to be unbiased. During the review, we were generally impressed with the competence and fairness of the AIU leaders and investigators with whom we spoke. However, we did hear some concerns from within the Department about potential bias in AIU. We make no finding about that claim. We do observe that in addition to the other issues we have documented, such as overwhelming case volume and a lack of clear operating guidelines, potential bias could explain some of the problematic investigative outputs that we saw from AIU.

Drawing on our work with other agencies, we recommend that the Department move towards piloting mixed investigative teams in AIU, sworn CDCR investigators working alongside investigators drawn from other professional backgrounds, such as former investigators from other law enforcement agencies, inspectors general offices, or oversight bodies. Mixed composition brings independent perspective into the investigative process itself, at the point where investigative choices are made, rather than only in after-the-fact review. A pilot, evaluated after a defined period

for investigative quality, timeliness, and the confidence of stakeholders, would be a good first step, and its results should determine whether the model expands. We understand that there may be labor complications associated with implementing this recommendation, which should be explored by CDCR and its legal team.

## The Department Should Adopt a Time-Limited Plan to Reduce the Existing Backlog

The recommendations provided thus far address how the Department should handle complaints going forward. They will take time to implement, and in the meantime the existing inventory of cases continues to grow, with cases reaching the statute of limitations before investigations are complete. The Department also needs a plan to work through that inventory in parallel with the reforms recommended here. Without one, the backlog will continue to consume the investigative capacity those reforms are meant to free and Recommendation 18 cannot take effect.

*Apply this chapter's tools to the existing inventory.* The Department should begin by applying the recommendations in this chapter to cases already in the backlog, as well as to new complaints. Backlogged cases in which video establishes that the allegation lacks merit should be resolved through the special conditions closure process (Recommendation 3). The remaining inventory should be sorted using the risk factors in Recommendation 4, and AIU should order its work by risk and by time remaining before the statute of limitations, giving priority to cases in which discipline remains possible and the evidence suggests the allegation may have merit. The Department should also consider temporary investigative capacity, such as detailed or contract investigators, informed by the ongoing staffing analysis.

*Diversion of lower-risk cases.* As a temporary measure, the Department may also route lower-risk cases approaching or past the statute of limitations to hiring authorities for local investigation or review. That approach can be a reasonable use of limited resources, and it carries risks this report has documented, including the premature closure of serious allegations and the structural weaknesses of local investigation that Recommendation 7 addresses. Any diversion plan should meet the following conditions.

*Classification.* Decisions about which cases are diverted should be made centrally by OIA supervisors, using written criteria consistent with the risk factors in Recommendation 4. They should not be made by the hiring authority to whom a case would be sent.

*Exclusions.* The plan should identify categories of allegations that are never diverted, and the same exclusions should apply whether or not the statute of limitations has expired. At a minimum, they should include sexual misconduct, force resulting in serious bodily injury, force against restrained or non-resisting IPs, dishonesty, retaliation, and potentially criminal conduct. Dishonesty findings retain significance after discipline is time-barred, because they bear on an employee's credibility in later proceedings. The plan should also exclude cases involving employees with a significant number of prior complaints, so that patterns are not broken into individually minor cases.

*Cases approaching the statute of limitations.* Cases should be referred early enough that a local investigation can be completed and discipline imposed within the limitations period. If a local investigation develops evidence supporting discipline, the plan should provide a realistic way to complete the case in time, either through AIU support to the hiring authority or through AIU capacity reserved for that purpose. Because the LDI program has not yet been rebuilt, local investigations conducted under the plan should meet written minimum standards and be subject to the audit described below.

*Cases past the statute of limitations.* Closure should follow a documented review that, at a minimum, considers the complaint, the incident documentation, and available video, and records a written rationale. Where the review identifies a training, supervision, or policy problem, the hiring authority should address it through non-disciplinary means. Where it reveals conduct within the excluded categories, the case should return to AIU.

*Recording and audit.* The outcome of every diverted case should be recorded in the Department's central tracking systems, so that diverted cases remain available for pattern analysis. AIU should audit a sample of diverted cases for classification accuracy and investigative quality, and the Department should share the results with the parties.

*Notice and duration.* Complainants whose cases are diverted should be told how their case will be handled. The plan should have a defined end point, tied to reducing the backlog to a specified level, and the Department should report regularly on the number and categories of cases diverted. The

purpose of the plan is to clear the existing inventory so that the reforms in this chapter can take hold. It should—and must—end when that purpose has been met.

## Recommendations Related to Force Review

### Recommendation 12: The Department Should Create an Operating Procedure for the IERC Process

The IERC process operates without a written OP governing how reviews are conducted, and Chapter Three found that the consequences include inconsistency across institutions, variable case presentation, and reviews whose depth depends on local habit rather than departmental standards. The Department should adopt an OP that governs, at minimum, four elements of the review. First, the structure of the meeting and the sequence of its business. Second, how the warden's views are introduced and how members are polled, so that the panel's judgment is formed rather than announced. Third, the video that must be shown. Where practical and watching the video would not create unreasonable delay, the video should begin at the start of the interaction between staff and the IP. Where the full interaction is too long for that, the footage shown must at minimum capture the circumstances that produced the conflict and any de-escalation attempted. Fourth, the case materials that must be distributed. Force packages should be provided to panel members in advance of the meeting, with a stated expectation that members arrive having reviewed them, so that meeting time is spent on evaluating the facts rather than orienting to them.

### Recommendation 13: The Department Should Develop Formal Training for Use of Force Coordinators

The use of force coordinator assembles and presents the cases on which the IERC's judgment depends, and Chapter Three found that coordinators receive no formal training, and that the quality of case presentation varies accordingly. The Department should develop a training program covering case assembly, the evidentiary standards of the OP recommended above, video selection and presentation, the elements the panel must be equipped to evaluate, and the coordinator's role in the quality processes recommended in this chapter. Coordinators should complete the training before assuming the role, with periodic refreshers, and the headquarters position recommended in Recommendation 16 should own the curriculum and its consistency across institutions.

## Recommendation 14: The Department Should Ensure Meaningful Clinical Contribution to IERC Review

Chapter Three described what mental health and medical participation in force review makes possible, and what is lost when clinical members are present without contributing. While some incidents may genuinely present "no issues" of a clinical nature, that should no longer be the default response from clinical personnel. Three measures will convert clinical participation from attendance into function.

First, the Department should adopt a guidance document, drawn from the analysis in Chapter Three, that defines what clinical reviewers are expected to contribute: the clinical picture preceding the incident, the interpretation of the individual's behavior in light of it, the adequacy of clinical/custody coordination in the incident, and what the incident reveals about the protocols governing crisis settings. Second, the structured review instrument recommended in Recommendation 16 should include a clinical section that the mental health or medical reviewer completes, so that clinical contribution produces an auditable record in every reviewed case rather than an impression in the room. Third, the Department's healthcare leadership should designate a position with specific responsibility for the IERC function, training clinical staff on the expectations, monitoring the quality of clinical contributions through the file record, and serving as the counterpart to the custody-side headquarters IERC role recommended in Recommendation 16 below.

## Recommendation 15: The Department Should Define the Training Representative's Contribution to IERC Review

The training representative's contribution should be defined with the same specificity. As Chapter Three describes, the training representative is the panel member uniquely positioned to perform four functions, and at most institutions we observed performs none of them. First, the training representative should evaluate the force against what officers are actually taught: not whether the force seemed reasonable in the abstract, but whether it conformed to the specific techniques, sequences, and decision points of the Department's training, an evaluation that extends past the application of force to the post-application obligations, monitoring, positioning, and response to distress that training also addresses. Second, where conduct deviated from training, the training representative should tell the panel which kind of problem the deviation reflects: an individual failure, training that was inadequate, or training that has not been adequately reinforced. The

appropriate institutional response, remedial training, enhanced supervision, or referral for investigation, turns on that distinction, and no other panel member can draw it.

Third, whenever the panel is considering institutional action in response to an employee's conduct, the training representative should present the employee's training history on the conduct at issue, including whether the employee has been trained or retrained on the subject before, and whether the incident represents a repeat violation after corrective training has already been provided. Fourth, the training representative should look across incidents and over time for systemic training gaps, such as techniques consistently applied incorrectly, scenario types training does not prepare staff for, or a requirements staff genuinely misunderstand. Those findings should flow directly into the facility's training calendar and, through the headquarters coordination recommended in Recommendation 16, into the Department's curriculum, closing the loop between what force reviews reveal and what the training program teaches. Each of these contributions should be captured in the training section of the structured review instrument recommended in Recommendation 16.

## Recommendation 16: The Department Should Build Quality Control into the IERC Process

The Department should first revise its structured review instrument. The current form contains sections with checklists addressing the force used, the requirements of controlled force incidents, and more general questions about whether staff actions before, during, and after the force incident were consistent with policy. Only when issues are identified does the form require more detailed narrative explanation. The revised instrument should require the panel to answer, with citation to evidence in the file, the questions a rigorous review must ask. Was the force necessary, and what specific facts establish that it was or was not? Did time and circumstances permit attempts at de-escalation, and if so, were they made? Was the force proportional to the threat or resistance faced? Does the incident reveal correctable operational conditions, and what are they? The instrument converts the standard of review from an expectation into a record, and it should include the clinical section described in Recommendation 14 and a training section reflecting Recommendation 15. It should also include a framework for the corrective-versus-adverse determination, so that similar conduct and histories produce similar outcomes across institutions.

Second, the Department should establish a review body equivalent to the post-investigation review panel that Chapter Two credited on the complaint side. The body should have sufficient expertise in force review, training, and clinical practice, and it should select a sample of completed IERC cases

and evaluate whether each review was properly conducted. The same body should evaluate submissions from Plaintiffs and the OIG identifying cases they contend were improperly reviewed, determine whether the Department agrees, and where it does, direct the corrective response. A department that examines its own force reviews, and that answers external challenges to them on the merits, is a department that owns its force review process.

Third, the findings of that body should produce structured corrective action. As in Recommendation 9, every deficiency finding by the review body should generate a corrective action plan with an owner, a deadline, and documented implementation. The model is quality assurance in healthcare, and findings that do not produce documented change are observations, not quality control.

Fourth, the Department should give the IERC process a headquarters owner. The institutions currently operate the IERC process too independently, and no one below the executive level is responsible for the IERC system as a whole. The Department should establish a headquarters position with specific responsibility for the IERC process: periodic and unannounced attendance at IERC meetings, coordination across use of force coordinators, ownership of the OP and the review instrument, and integration of the system's outputs, so that a lesson learned at one institution becomes a lesson available to all 31.

### Recommendation 17: The Department Should Adopt a Clear Standard for Referring Incidents From Force Review to AIU

When force review identifies use of force that may violate policy, the path from the IERC to investigation should be governed by a written standard, not by institutional discretion. Chapter Three found that IERCs are not consistently identifying force incidents that should be referred for administrative investigation. One explanation for this finding is that there is an absence of a defined standard. The current guidance provides examples of what may be referred and requires IERC to refer incidents if a "potential use of force violation occurred." While this guidance is helpful, it is vague and open to varying interpretations. Without a specific standard, determinations of this kind are made at the discretion of individual IERCs, producing outcomes that vary across facilities, create legal exposure, undermine the deterrent effect of force review, and erode staff confidence in the process.

### Recommendation 18: Consideration of Parallel Tracks for Force Reviews and Misconduct Investigations Should Be Deferred Until AIU's Caseload and Timelines Are Substantially Reduced

During interviews and meetings conducted as part of this review, Department leaders and others raised the question of whether force reviews and misconduct investigations could proceed on parallel tracks. We address it here because it reflects an understandable frustration with the current system, and because the answer has implications for how the Department should sequence its reform priorities.

At present, when an IP files a misconduct complaint arising from a force incident, the facility's IERC review is mostly paused until AIU's investigation is complete. The rationale is protective, allowing facility supervisors to conduct a force review while a misconduct investigation is pending risks contaminating the investigative record, prejudging individual culpability, or creating findings that complicate the misconduct track.

The cost of the pause, however, is significant. IERC reviews should serve a different purpose than administrative investigations. While an administrative investigation asks whether an individual officer violated policy, a force review should also ask whether the incident reveals systemic issues in tactics, training, supervision, or policy that the organization should address. Under current conditions, with AIU investigations frequently extending seven months or longer, the pause means that organizational learning from a force incident is delayed by the length of AIU's backlog. Lessons about tactics, training, and supervision that could prevent future incidents are not being drawn for months or years after the incident that generated them.

The concept of running these two tracks simultaneously, an administrative investigation focused on individual accountability and a force review focused on organizational learning, has support in policing reform literature, though less in correctional practice. But the appeal is straightforward, and if the two tracks ask different questions of different evidence, one need not wait for the other. The complications, however, are real and would need to be resolved before parallel tracks could be responsibly implemented. First, some tactical assessments cannot be made from documentary evidence alone and require understanding what the officer perceived and why they made the choices they did, which begins to overlap with the interview the AIU investigation may need. Second, if a force review reaches a conclusion about whether force was tactically appropriate before the AIU investigation concludes, that finding may prejudice the investigation or create institutional pressure

toward a consistent outcome. Third, labor agreements may restrict what facility supervisors can ask officers to participate in while an AIU investigation is pending, a constraint that would need to be verified and potentially negotiated before any parallel track design is viable.

There is a further complication specific to CDCR. As set forth above, the facility-level force review process currently suffers from significant deficiencies in its own right. The organizational learning that a parallel force review track would be designed to accelerate is, under present conditions, largely theoretical. Investing in structural reforms to enable parallel tracks before the force review process itself is functioning adequately would be premature.

For these reasons, we do not recommend that the Department attempt to implement parallel tracks at this time. The more direct path to reducing the harm caused by the pause is to reduce AIU's backlog and bring its case timelines to a reasonable standard. If the average AIU investigation is resolved within a reasonable timeframe, the cost of pausing the force review during that period becomes operationally tolerable. Once AIU's timelines are substantially reduced and the force review process is functioning as designed, the Department should revisit the question of whether parallel tracks are feasible and appropriate. At that point, the complications identified here would provide the framework for that analysis.

### Recommendation 19: Wardens Should Take Ownership of Force Review, and the Department Should Tell Its Workforce Who the Process Belongs To

Chapter Three documented two related problems: decision-makers who reportedly conduct force reviews with an eye to how the OIG will read them, and a workforce that believes, wrongly, that the OIG runs the process. The remedy for both is ownership, practiced and communicated.

In practice, wardens and other review decision-makers should decide force reviews on the facts and their own judgment. Where the OIG disagrees and the facts support the Department's position, the decision-maker should explain the disagreement and stand on the record. Where the OIG is right, the decision-maker should be willing to reconsider, and a decision changed on the merits after feedback is still the decision-maker's own. What should end is the practice of attributing outcomes to the OIG, in either direction.

In communication, the Department should tell its workforce, plainly and repeatedly, who conducts force review, what it is for, and what the OIG does and does not do. The officials who make review decisions should be visible in making them, and supervisors should deliver review outcomes in their

own voice rather than the borrowed voice of an external actor. Most problems identified in this report require resources, structures, or sustained institutional effort. This one requires only clear and consistent communication by leaders willing to own a process that is already theirs.

# Recommendations Related to Force Practices

### Recommendation 20: The Department Should Analyze the Causes of the Rise in Documented Uses of Force

Documented uses of force roughly doubled between 2021 and 2026. Determining why was beyond the scope of this review, but the question should not remain unanswered because the answer determines which interventions will halt the trend.

### Recommendation 21: The Department Should Deploy Body-Worn Cameras at All 31 Prisons

Body-worn cameras are currently deployed at 10 of the Department's institutions, and as we understand it, funding to complete deployment statewide has not been secured. It should be. This report supplies the Department's own evidence for the investment: Chapter Three documented a consistent and meaningful difference in the quality of force review between institutions with BWCs and those without it. The value of every review-side recommendation in this chapter is higher where BWCs exist, because the panel is evaluating evidence rather than characterizations.

BWCs also do work before any review begins. In our experience, including our observations and interviews across the Department's institutions, BWCs have a de-escalatory effect on interactions between staff and IPs. Both parties conduct themselves differently when they know the encounter is recorded, which helps prevent force incidents, reviews, or complaints. A tool that improves the quality of review, the completeness of reporting, and the conduct being reported on should not be operating in only part of the system. The Department should seek the funding and complete the deployment of BWCs to all 31 prisons on a defined timeline.

### Recommendation 22: The Department Must Operationalize the DOM's Necessity Requirement

Chapter Four found that officers are not consistently satisfying the DOM's necessity requirement, and Chapter Three found that force review does not reliably ask the necessity question. Neither problem stems from the requirement's absence on paper. The DOM's definition of reasonable force incorporates necessity, and the Department's incident reporting already requires the incident

commander to identify the necessary and reasonable purpose for the application of force, selecting among listed purposes.

However, identifying an authorized purpose from a list does not ask the question the necessity standard actually poses: whether staff had other options, and why force, and that force, at that moment, was used instead. A requirement satisfied by selection from a list rather than articulation will be satisfied in every case regardless of the underlying facts. The remedy is to convert the necessity requirement from a label into a question, asked and answered at each point where an officer's account of force is composed or examined.

At documentation, the Department should revise its force reporting so that the necessity element requires articulation rather than selection: the options other than force that were available or attempted, and why those options were not used or did not suffice. At supervision, the first-line supervisor's review of every force report should ask the same question: not only whether the force described falls within policy, but whether the report demonstrates that alternatives were considered and why they were inadequate. At review, the IERC instrument in Recommendation 16 should require the panel to answer the alternatives question independently of authorization, with citation to the file: what options short of the force used existed, and what in the record shows they would not have sufficed.

At training, the Department should add a dedicated block to annual in-service training focused on situation-based instruction in necessity and de-escalation, as described in Recommendation 30, because consideration of non-force alternatives requires iterative, situation-based instruction. In-service training now runs 40 hours annually; it was previously 48. The Department should restore at least the prior commitment, and preferably more, and the added hours should go to this situation-based material.

### Recommendation 23: The Department Should Make the Proportionality Requirement Explicit in Policy

Proportionality is inherent in the DOM's necessity and reasonableness requirements, is taught by name in the Department's training, and appears in substance in the DOM's review criteria, which direct reviewers to evaluate the relationship between the need for force and the amount of force used. But the section of the DOM that governs an officer's selection among force options states neither the word nor the principle. Officers are trained on proportionality and reviewed against it,

but the policy governing their conduct never explicitly names it. The Department's pending DOM revision is expected to address proportionality, and we have provided technical assistance to that effort. Because the revision remains in draft and subject to negotiation, so we make the recommendation expressly here.

### Recommendation 24: The Department Should Address the Third Force Category in Policy

Chapter Four found that the DOM's framework addresses immediate force, responding to imminent threat, and controlled force, but does not address a third category the institutions regularly confront: situations presenting no imminent threat but a genuine security concern that requires resolution, in which officers currently act without policy guidance written for the situation they face. The pending DOM revision should close this gap by defining the category, the authorization and consultation it requires, and the role of time, planning, and de-escalation within it.

### Recommendation 25: The Department Should Collect and Analyze Force Data at a Greater Level of Detail

Three improvements are needed. First, the Department should disaggregate physical force in its reporting and data systems. All physical force is currently combined into a single category, which means the Department cannot distinguish a control hold from a takedown from a strike, cannot measure its takedown rate, cannot determine how often head strikes are used, and cannot see the patterns Chapter Four identifies. The Department should define these subcategories in policy and require force reports to identify which was used and, for any strike, the part of the body struck.

Second, the Department should require force reports to identify the level of resistance the IP presented, using defined resistance categories. Proportionality is a relationship between resistance and response, and a data system that captures the response but not the resistance cannot evaluate proportionality adequately in individual reviews or in the aggregate.

Third, the Department should distinguish OC deployments by context, separating deployments in response to fights between IPs from deployments in other circumstances. The problematic OC uses in our review arose entirely outside the IP fight context, and a department that does not separate the two cannot see where OC problems actually live.

The need for this detail is clearest with head strikes. Head strikes carry a substantial risk of serious injury, and several of the incidents we reviewed involved them. We considered recommending that

the Department adopt a standard restricting head strikes to circumstances in which an IP presents an imminent threat of serious bodily injury and less dangerous options are not reasonably available. The Department's current data, however, do not allow us to determine how often its officers strike IPs in the head or at what levels of resistance, and without that information we cannot determine whether a specific standard is needed or how it should be drawn. Once the Department captures strike location and resistance level, it should analyze how often head strikes occur and the resistance the IP presented in each. If that analysis shows a pattern of officers striking IPs in the head when the IPs did not present a serious threat, and that the Department's existing review and disciplinary processes are not identifying and correcting those incidents, the Department should adopt a standard of this kind.

### Recommendation 26: The Department Should Invest in the Rank of Sergeant

Our experience working with other agencies is consistent on this point: the sergeant is the linchpin of any effort to change culture and expectations regarding use of force. Sergeants are present when force decisions are made, they set the tone their officers absorb, and they are the level at which coaching either happens or does not. In our facility visits, we heard that debriefing by sergeants after force incidents almost never occurs, which means the Department's most frequent teaching opportunity is passing unused.

An investment in sergeants would have three parts. In coverage, the Department should ensure sufficient sergeant staffing in the facilities, with spans of control set by the population's demands rather than a uniform ratio; a Level IV institution housing individuals who present frequent management challenges warrants a smaller span than a low-security setting with few incidents requiring active supervision. In training, sergeants should receive dedicated instruction in leadership, de-escalation, and coaching, so that they are equipped to develop their subordinates and not only to supervise them. In practice, the Department should establish the expectation, in policy and in the IERC's review of incidents, that sergeants debrief force incidents with involved staff, and the occurrence of the debrief should be documented.

### Recommendation 27: The Department Should Focus Corrective Attention on Takedowns, and on OC That Is Not Deployed to Interrupt IP Fights

Chapter Four identified recurring problems concentrated in two force types, with different origins. Takedowns were used against individuals whose resistance did not call for them. OC was deployed in situations that presented no imminent threat and warranted at most hands-on control, a pattern

that traces to training that authorizes more than the DOM expressly permits. Notably, we did not generally observe these problems where OC was used in response to fights between IPs; the problems are specific, which makes them correctable. The focus should take three forms. In training, the situation-based module recommended in Recommendation 30 should include content built from these two fact patterns, refusal-to-cuff and refusal-to-move scenarios in which the trained resolution is hands-on control, and the OC content should be corrected as part of the training reconciliation in Recommendation 28. At review, the IERC instrument should flag these force types for a mandatory proportionality answer, requiring the reviewer to state what resistance was presented and why the tool or technique selected matched it. And in its data, the Department should track takedown and non-fight OC rates by institution as management indicators, so that divergent institutions are visible and the headquarters coordinator in Recommendation 16 has the information to act on them.

### Recommendation 28: The Department Should Closely Analyze Its Training to Ensure It Aligns With the DOM

Chapter Four documented a significant divergence between the DOM and the Department's training regarding the standards for OC deployment, which helps to explain the disproportionate OC uses the chapter describes. The OC training that diverges from the DOM standard should be corrected, but the finding's implication is broader than OC. A divergence of that significance, discovered in one area we examined closely, suggests there may be others we did not identify. Once the DOM revision is complete, the Department should audit its use of force training curriculum against the revised policy, systematically and in full, and should adopt a process that keeps the two aligned going forward, so that every future policy change triggers a corresponding training review. Officers should not be placed in the position of following their training into potential uses of force that deviate from Department policy.

### Recommendation 29: The Department Should Create a Training Module for Officers Assigned to Mental Health Units, and Ensure That Every Officer Working Those Units Receives It

Chapter Four found that force concentrates heavily among IPs with mental health designations, and that the officers assigned to the units housing them operate in the system's most demanding environments with no training specific to the assignment. This recommendation therefore has two elements. First, the Department should create a dedicated training module for officers assigned to

units housing IPs with mental health designations. The module should cover the recognition of symptoms across different mental illness presentations, how those symptoms affect an IP's ability to receive and process instructions, de-escalation techniques specific to psychiatric crisis, the behaviors that signal decompensation or precede self-harm, when and how to involve clinical staff, and the force considerations specific to clinical settings. We are very familiar with the Los Angeles County Sheriff's Department's DVRT training, which is strong and can serve as a model.

Second, the Department should ensure the module reaches everyone the assignment covers. Completion should be required before an officer is assigned to a mental health unit and the requirement should extend to officers already working those units when the module is adopted, on a defined schedule. The Department should track completion by unit and institution, so that compliance is visible, and refresher training should follow on a defined cycle. A module that exists but is not reliably delivered to the officers doing the work would repeat the pattern this report documents elsewhere: the Department possessing the right material on paper while the workforce operates without it.

### Recommendation 30: In-Service Training Should Include More Situation-Based Content

The Department's in-service training is heavily classroom-based. Chapter Four's findings are about decisions made under pressure, in real spaces, with real people, and classroom instruction does not build the skills those decisions require. The Department should add additional situation-based content to every year's in-service training, such as scenario exercises in which officers practice the necessity decision, de-escalation, the use of time, and proportionate tool selection, with the scenarios drawn from the incident patterns this report documents and from the Department's own best practices.

### Recommendation 31: The Department Should Create Training That Explicitly Retires the "Ask, Tell, Make" Approach to IP Non-Compliance

Chapter Four found that the ask, tell, make progression retains a strong hold within the workforce as an informal doctrine of how encounters should proceed, and that it is in tension with the Department's current force framework, which expects time, communication, and de-escalation where circumstances permit. A doctrine with that kind of hold cannot be overruled implicitly. If policy simply stops mentioning it, officers will keep practicing it. Training should name it, explain where it came from and what it got right, and explain specifically why it no longer reflects the

Department's expectations and what has replaced it. Officers are professionals; they will change practices they understand the reasons for far more readily than practices that are quietly retired without explanation.

### Recommendation 32: The Department Should Establish Quality Control Over the Delivery of In-Service Training

The Department trains its trainers, but no one currently evaluates whether in-service training is being delivered consistent with Departmental expectations, and with 31 institutions delivering the curriculum locally, drift is certain. Auditing every delivery is neither feasible nor necessary. The Department should adopt a sampling model: a rotating audit schedule that places observers in each institution's in-service delivery on a defined multi-year cycle; standardized delivery fidelity checklists so that observations are comparable across sites; analysis of student assessment results by institution between visits, to identify outliers warranting attention; and, for the highest-priority modules, consideration of recorded delivery submitted for central review. The model is the same one this chapter recommends for investigations and for force review: sample against a standard, find the outliers, correct, and document.

### Recommendation 33: The Department Should Recognize Officers Who Effectively De-Escalate Potential Force Encounters

The skills the Department needs already exist within its workforce and this report documents them. What the Department's culture does not yet do is adequately prize them. In our focus groups, officers described independence and the ability to resolve situations quickly as the qualities their peers value most, and those values can be escalatory; communication skill and deliberateness ranked below them. Values follow what leadership visibly honors. The Department should establish official recognition, by wardens and executive leadership, of officers whose specific, documented conduct and skills resolved incidents through de-escalation, drawing directly on the kinds of cases cited above. The recognition should name the conduct, not just the officer, because the point is to show the workforce what the Department means by excellent work, and it should specifically include incidents in which an officer slowed a situation down, summoned assistance, or used time and distance, so that those choices are visibly coded as skill.

### Recommendation 34: Leadership Should Make the Affirmative Case for De-Escalation and Track Whether Norms and Expectations Are Changing

Chapter Four found that officer buy-in to de-escalation is uneven, and that officers locate the rationale for it in the rulebook rather than in anything it does for them. Asked why they de-escalate, officers told us, in effect, because the Department says to. Officers who understand de-escalation as a policy obligation rather than as something that serves their own safety will apply it selectively, and the corrective is for the Department's leaders to make the case the rulebook cannot. The affirmative case for de-escalation, that it protects officers, that it works, and that it is what the Department's best people already do, should be made in training, in incident reviews, in the recognition recommended above, and in leadership's direct communication with line staff, consistently and over time. That case should also speak to a specific element of officer identity documented in Chapter Four: the Department should say aloud, and demonstrate through what it honors, that using time, summoning assistance, and waiting are professional skills, not their absence. A message delivered once is a memo. A message delivered everywhere the workforce encounters the institution's voice becomes what the institution believes.

The Department should also give itself a way to know whether the culture is shifting over time. The Department should periodically repeat structured focus groups on force-related attitudes, conducted internally by its own personnel using a consistent protocol, so that leadership can see over time whether the values the workforce describes are shifting toward the ones the framework asks of them.

## Sequencing and Priorities

Many of the recommendations in this report require significant time, staffing, and funding, and the Department will not be able to implement them all at once. This section sets out the order in which we believe the work should proceed and identifies the recommendations on which others depend. We have not ranked the recommendations individually. Each responds to a finding in this report, and each remains our recommendation.

*Recommendations the Department should implement now.* Several recommendations are primarily matters of policy and procedure. They require drafting, approval, and communication to the workforce, but little new funding, and none depends on other recommendations being completed first. These include Recommendations 1, 2, 8, 9, 12, 17, 19, 22, 23, 24, and 34. Recommendations 1 and 2 ask the Department to preserve arrangements that are working and cost nothing to follow.

*Foundational investments the Department should begin now.* Other recommendations will take longer to complete, and much of this report's other work depends on them. The Department should begin them immediately, even though completion will take time. These are BWC deployment (Recommendation 21), investigative staffing (Recommendation 10), linkage between SOMS and AASTS (Recommendation 5), force data collection (Recommendation 25), and the review of training content against the DOM (Recommendation 28), which should come before the Department builds new training.

The most consequential of these is BWC deployment, and its importance extends across this report. BWCs are currently deployed at 10 of the Department's 31 prisons. As Chapter Three documents, force reviews at institutions with BWC footage were consistently deeper than reviews that relied on fixed cameras alone. The difference comes largely from audio and perspective. BWC footage captures what officers and IPs said before, during, and after force was used. That is the evidence reviewers need to assess de-escalation, the clarity of officers' orders, and how the IP was presenting, and for several recommendations it is essential.

The clinical and training representatives' contributions to force review (Recommendations 14 and 15) are meant to address exactly those questions, and without footage of the verbal exchange, the representatives have little basis for answering them. The necessity and proportionality requirements (Recommendations 22 and 23) can and should be written into policy now. But without footage that captures what was said, however, reviewers will largely be left to evaluate officers' written accounts of necessity and proportionality against mostly silent fixed camera footage, and the Department will have no reliable means of confirming that the requirements are being followed. Special conditions closures and risk-based sorting of complaints (Recommendations 3, 4, 6, and 7) can proceed with fixed camera footage and other data, and BWC footage will make them faster and more accurate, reducing the investigative workload that drives the backlog.

Taken together, the reforms this report recommends to IERC review, force practices, and investigations rest on the Department's ability to see and hear what happened when force was used. Without statewide BWC deployment, the Department will be implementing those reforms with the evidence needed to verify them at only a third of its prisons. BWCs are the investment on which the success of this package of reforms most depends.

Yet, none of these recommendations should wait for BWC deployment to be completed. The Department can implement them now, at the institutions where BWCs are deployed and with the evidence available elsewhere, and their value will grow as BWC deployment proceeds. Until deployment is complete, however, the quality of IERC review, reporting, and investigation will continue to depend on which institution an incident occurs in. The Department should prioritize securing funding to complete BWC deployment on a defined, expeditious timeline.

*Recommendations that build on earlier work*. The remaining recommendations depend in part on the work described above. Risk-based sorting of complaints to AIU and a rebuilt LDI program (Recommendations 4, 6, and 7) depend on the SOMS and AASTS linkage, adequate investigative staffing, and a rebuilt LDI program. Training for use of force coordinators, clinical and training representatives' roles, and quality control in the IERC process (Recommendations 13 through 16) should follow the IERC operating procedure in Recommendation 12. New training content and quality control over its delivery (Recommendations 30, 31, and 32) should follow the training review in Recommendation 28 and the policy changes in Recommendations 22 and 23. Analysis of the causes of the rise in force (Recommendation 20) depends on the data improvements in Recommendation 25. By its terms, Recommendation 18 is deferred until AIU's caseload and timelines are substantially reduced. Recommendations 11, 26, 27, and 33 can proceed as resources allow.

*Recommendations warranting particular emphasis*. Within these groups, several recommendations warrant particular emphasis. BWC deployment, the IERC operating procedure, and the necessity and proportionality requirements are the most consequential, because together they determine whether the Department can see and properly evaluate its own use of force. Two others are urgent. Force is heavily concentrated among IPs with mental health designations, and officers assigned to the units that house them receive no specialized training. The Department should begin implementing Recommendation 29 now, before the broader training review is complete, and refine the module as that review proceeds. The investigation backlog has caused cases to be lost to the statute of limitations, which makes investigative staffing and the expanded use of special conditions closures (Recommendations 10 and 3) urgent as well.

# Use of Force Recommendations for CDCR

## Recommendations Related to Complaint Handling:

**1: Investigative Responsibility for Force Complaints Should Not Be Delegated to the IERC**

**2: The Department Should Preserve the Centralization of Screening and Investigative Assignment Decisions in CST**

**3: The Department Should Expand Its Use of the Special Conditions Closure Process**

**4: The Department Should Stratify Force Complaints by Risk**

**5: The Department Should Create Linkage Between SOMS and AASTS to Facilitate Risk-Based Sorting**

**6: High-Risk Force Complaints Should Be Investigated by AIU**

**7: The Department Should Rebuild the LDI Program on a Strengthened Foundation and Route Lower-Risk Force Complaints Through It**

**8: The Department Should Develop an Operating Procedure for AIU**

**9: The Department Should Develop a Formal Process to Follow Up on the Recommendations of the Post-Investigation Review Panel**

**10: The Department Should Add Personnel, Including Supervisors, to AIU, CST, and CITT, Informed by the Ongoing Staffing Analysis**

**11: The Department Should Pilot Mixed Investigative Teams in AIU**

## Recommendations Related to Force Review:

**12: The Department Should Create an Operating Procedure for the IERC Process**

**13: The Department Should Develop Formal Training for Use of Force Coordinators**

**14: The Department Should Ensure Meaningful Clinical Contribution to IERC Review**

**15: The Department Should Define the Training Representative's Contribution to IERC Review**

**16: The Department Should Build Quality Control into the IERC Process**

**17: The Department Should Adopt a Clear Standard for Referring Incidents From Force Review to AIU**

**18: Consideration of Parallel Tracks for Force Reviews and Misconduct Investigations Should Be Deferred Until AIU's Caseload and Timelines Are Substantially Reduced**

**19: Wardens Should Take Ownership of Force Review, and the Department Should Tell Its Workforce Who the Process Belongs To**

## Recommendations Related to Force Practices:

**20: The Department Should Analyze the Causes of the Rise in Documented Uses of Force**

**21: The Department Should Deploy Body-Worn Cameras at All 31 Prisons**

**22: The Department Must Operationalize the DOM's Necessity Requirement**

**23: The Department Should Make the Proportionality Requirement Explicit in Policy**

**24: The Department Should Address the Third Force Category in Policy**

**25: The Department Should Collect and Analyze Force Data at the Level of Detail Its Own Standards Require**

**26: The Department Should Invest in the Rank of Sergeant**

**27: The Department Should Focus Corrective Attention on Takedowns, and on OC That Is Not Deployed to Interrupt IP Fights**

**28: The Department Should Closely Analyze Its Training to Ensure It Aligns With the DOM**

**29: The Department Should Create a Training Module for Officers Assigned to Mental Health Units, and Ensure That Every Officer Working Those Units Receives It**

**30: In-Service Training Should Include More Situation-Based Content**

**31: The Department Should Create Training That Explicitly Retires the "Ask, Tell, Make" Approach to IP Non-Compliance**

## 32: The Department Should Establish Quality Control Over the Delivery of In-Service Training

## 33: The Department Should Recognize Officers Who Effectively De-Escalate Potential Force Encounters

## 34: Leadership Should Make the Affirmative Case for De-Escalation and Track Whether Norms and Expectations Are Changing

---

[1] *See* Stipulation and Order Re Staff Misconduct Investigation and Discipline Process, *Armstrong v. Newsom*, No. 4:94-cv-02307-CW (N.D. Cal. Sept. 26, 2025, Dkt. No. 3720).

[2] *E.g.*, Bierie, David M. (2013). Procedural Justice and Prison Violence: Examining Complaints Among Federal Inmates (2000–2007). *Psychology, Public Policy, and Law*, *19*(1), 15–29 ("Two features of the grievance process consistently predicted inmate violence: the proportion of responses which were late, and the proportion which were substantively rejected. In this case, the relationship was significant and in the direction procedural justice predicts (more late responses and substantive rejections corresponded to more violence that month, or the following month).").

[3] Complaints may originate from other sources, such as individuals who are not incarcerated, the counsel for incarcerated individuals, the Office of the Ombudsman, and Office of Inspector General, but these sources make up a small percentage of all complaints.

[4] California Code of Regulations, Title 15 § 3481(f)(1).

[5] California Code of Regulations, Title 15 § 3482(b).

[6] California Department of Corrections and Rehabilitation, Department Operations Manual § 31140.5.

[7] Richard J. Donovan Correctional Facility Court Ordered Remedial Plan, page 4; Five Prisons Court Ordered Remedial Plan, page 4.F

[8] California Department of Corrections and Rehabilitation, Department Operations Manual § 33070.9.7(a).

[9] Centralized Screening Team, Staff Misconduct Quick Reference Guide (revised 12-29-22).

[10] California Department of Corrections and Rehabilitation, Department Operations Manual § 33070.9.7(b).

[11] Richard J. Donovan Correctional Facility Court Ordered Remedial Plan, page 5; Five Prisons Remedial Plan, page 6.

[12] Some investigations also include vertical advocate or Office of Inspector General involvement during the investigation and review of the investigation report.

[13] California Code of Regulations, Title 15 § 3392.1(a)(5).

[14] We understand that the Department does not, at present, track resistance levels in its use of force reporting.

[15] This assumes that there are no other allegations that independently require investigation by AIU.

[16] AIU also has several internal memoranda that bear on investigative quality, such as its Review Guidelines for OIA Managers, Hiring Authorities, and EAPT, which is more useful, but still incomplete.

[17] California Department of Corrections and Rehabilitation, Department Operations Manual § 51020.19.5(i).

[18] California Department of Corrections and Rehabilitation, Department Operations Manual § 51020.19.5(l).

[19] California Department of Corrections and Rehabilitation, Department Operations Manual §§ 51020.19.5(l-m).

[20] California Code of Regulations, Title 15 § 3268.1(e)(2)(E).

[21] California Department of Corrections and Rehabilitation, Department Operations Manual § 51020.19.4(a).

[22] California Code of Regulations requires that IERC meet "on a schedule to ensure all cases are reviewed within 60 calendar days" (15 CCR § 3268.1(e)(2)(D), while the DOM identifies a 30-day deadline (DOM 51020.19.5(e).

[23] California Department of Corrections and Rehabilitation, Department Operations Manual § 51020.19.5(g).

[24] California Department of Corrections and Rehabilitation, Department Operations Manual § 51020.17.4(a).

[25] CDCR 3010, Incident Commander's Review/Critique Use of Force Incidents (revised July 2024).

[26] California Department of Corrections and Rehabilitation, Department Operations Manual § 51020.19.1(c).

[27] California Department of Corrections and Rehabilitation, Use of Force Coordinator Manual, page 4 (2022).

[28] California Department of Corrections and Rehabilitation, Department Operations Manual § 51020.19.5(g).

[29] California Code of Regulations, Title 15 § 3268.1(e)(2)(F).

[30] California Department of Corrections and Rehabilitation, Department Operations Manual § 51020.19(c).

[31] California Department of Corrections and Rehabilitation, Use of Force Coordinator Manual, page 4 (2022).

[32] California Department of Corrections and Rehabilitation, Use of Force Coordinator Manual, page 4 (2022). We note that the last item on this list, stating that the DOM requires "all video recordings related to the UOF must be reviewed during the IERC" appears inconsistent with the current DOM requirements establishing a minimum amount of video to be reviewed.

[33] Information in this figure and elsewhere in the report addressing yearly counts between 2021 and 2025 come from online incident reports found here: https://www.cdcr.ca.gov/research/compstat-incident-reports/. CDCR personnel have indicated that these are historic reports and that current counts may not be identical, but our understanding is that the general trends discussed here are consistent with more current data.

[34] The counts in this figure sum to more than the total number of documented uses of force during the time period because more than one type of force can be used during an incident.

[35] California Department of Corrections and Rehabilitation, Department Operations Manual § 51020.1

[36] California Department of Corrections and Rehabilitation, Department Operations Manual §§ 51020.8, 51020.7

[37] California Department of Corrections and Rehabilitation, Department Operations Manual § 51020.1.

[38] California Department of Corrections and Rehabilitation, Department Operations Manual § 51020.5.

[39] California Department of Corrections and Rehabilitation, Department Operations Manual § 51020.1.

[40] California Department of Corrections and Rehabilitation, Department Operations Manual § 51020.17.

[41] California Department of Corrections and Rehabilitation, Department Operations Manual §§ 51020.4(a) and 51020.8.

[42] California Department of Corrections and Rehabilitation, Department Operations Manual § 51020.5.

[43] California Department of Corrections and Rehabilitation, Department Operations Manual § 51020.12.

[44] California Department of Corrections and Rehabilitation, Department Operations Manual §§ 51020.17, 51020.18.

[45] *See* Communication and De-Escalation Techniques In-Service Training, Version 2.1, Course Code 11055221.

[46] California Department of Corrections and Rehabilitation, Department Operations Manual § 32010.6(a)(2).

[47] California Department of Corrections and Rehabilitation, Basical Correctional Officer Academy Use of Force Lesson Cover Sheet, page 4 (modification date May 2025).

[48] California Department of Corrections and Rehabilitation, Basical Correctional Officer Academy Communication and De-Escalation Techniques Lesson Cover Sheet, page 6 (modification date February 2023).

[49] California Department of Corrections and Rehabilitation, Basical Correctional Officer Academy Arrest and Control Lesson Cover Sheet, page 4 (modification date May 2025).

[50] California Department of Corrections and Rehabilitation, Basical Correctional Officer Academy Cell Extraction Lesson Cover Sheet, page 4 (modification date May 2025).

[51] California Department of Corrections and Rehabilitation, Basical Correctional Officer Academy Chemical Agent Lesson Cover Sheet, page 4 (modification date March 2025).

[52] California Department of Corrections and Rehabilitation, Basical Correctional Officer Academy Expandable Baton Lesson Cover Sheet, page 4 (modification date October 2023).

[53] California Department of Corrections and Rehabilitation, Basical Correctional Officer Academy Impact Munitions and Assuming an Armed Post Lesson Cover Sheet, page 5 (modification date July 2025).

[54] California Department of Corrections and Rehabilitation, Basical Correctional Officer Academy Alarm Response Lesson Cover Sheet, page 5 (modification date August 2023).

[55] California Department of Corrections and Rehabilitation, Basical Correctional Officer Academy Legal Issues Lesson Cover Sheet, page 4 (modification date July 2024).

[56] California Department of Corrections and Rehabilitation, Department Operations Manual §32010.6(g).

[57] California Department of Corrections and Rehabilitation, Department Operations Manual § 32010.8.2.2.

[58] *See* Chemical Agents In-Service Training, Version 4.1, Course Code 11064195.

[59] California Department of Corrections and Rehabilitation, Basic Correctional Officer Academy Chemical Agents Instructor Text, page 6 (modification date March 2025).

# EXHIBIT C

# CDCR INVESTIGATIVE STAFFING ANALYSIS AND STAFFING & IMPLEMENTATION PLANS

## I. INTRODUCTION

In accordance with the parties stipulated agreement, CDCR has completed a proposed staffing analysis for Office of Internal Affairs (OIA) investigations into allegations of staff misconduct against incarcerated people; a staffing plan setting forth the number of investigative and other staff that are necessary for OIA to complete comprehensive and unbiased investigations into all staff misconduct allegations by the deadlines in Remedial Plans; and an implementation plan setting forth Defendants' plan for filling the positions indicated in the staffing plan. (See ECF No. 3736.)

## II. STAFFING ANALYSIS

The parties' stipulation required CDCR to prepare a methodology for its staffing analysis that, as a baseline, uses the average number of monthly staff misconduct allegations received for investigation that, on their face, fall on the Allegation Decision Index (ADI). (ECF No. 3736 at § 1-2.) The parties agreed to use the following methodology:

$$Ceil\left(\frac{(Total\ cases\ on\ ADI\ from\ Jan - Jun) - \sum Completed_Cases_i}{\left(6 \times \frac{\sum Completed_Cases_i}{\sum Staff_Count_i}\right)} + \frac{Backlog\ \div\ 12}{\left(\frac{\sum Completed_Cases_i}{\sum Staff_Count_i}\right)}\right)$$

### STEP 1 – Total Cases Received (Jan-Jun)

The parties agreed to determine the total cases received on the ADI from January to June, 2026, by determining a referral rate using sampling and applying that figure to the total number of source documents received during the relevant period. The parties reviewed a sample of 993 source documents (7 source documents were excluded by agreement) and the referral rate for this sample was <u>13%</u>. This included 118 source documents on the ADI and an additional 12 identified for clarifying interview.[1] Applied to the number of source documents received during

[1] 59 source documents were identified for clarifying interview. CST data shows that 80%

this period (108,009), there are an estimated **14,041.17** cases on the ADI for purposes of the staffing analysis.[2]

**STEP 2 – Total Cases completed (Jan-Jun)**

CDCR data shows that **2,483** cases were closed from January to June, 2026.

**STEP 3 – Estimated Unmet Demand**

Unmet case demand is: $14{,}041.17 - 2{,}483 = \mathbf{11,558.17}$

**STEP 4 – Total Active Staff Months (Jan-Jun)**

The number of total active staff months is the sum of all staff actively working each month from January to June, 2026, excluding vacancies and staff on leave:

$$97 + 94 + 95 + 93 + 101 + 98 = \mathbf{578}$$

**STEP 5 – Monthly Completion Rate per Staff**

Calculate the average monthly case completion rate per staff by dividing the result of STEP 2 (2,483) by STEP 4 (578): **4.296**

**STEP 6 – Six-Month Completion Capacity per Staff**

Calculate the average case completion capacity per staff from January to June, 2026, by multiplying 6 by the result of STEP 5 (4.3): **25.775**

**STEP 7 – Staff Needed for Unmet Demand**

Calculate the raw estimated number of additional staff required to address unmet case demand from January to June, 2026, by dividing the result of STEP 3 (11,558.17) by STEP 6 (25.775): **448.425**

**STEP 8 – Staff Needed to Clear Backlog in 12 Months**

Calculate the raw number of staff required to clear the backlog within 12 months, by dividing the number of cases in the backlog by 12; and divide that result by the result of STEP 5:

---

of such cases result in a referral for routine review or are routine allegations of staff misconduct, and 20% are referred to the Allegation Investigation Unit (AIU).

[2] The actual number of cases received by AIU during this period, which included a combination of Quick Reference Guide and Face Value Screening, was 5,443.

$$\frac{14{,}669 \div 12}{4.3} = \mathbf{284.283}$$

**STEP 9 – Baseline Staffing under Current System & Backlog**

Add the estimated raw number of additional staff required to address unmet case demand (STEP 9) and the raw number of staff required to clear the backlog within 12 months (STEP 10). The result, rounded up to the nearest whole number, is the estimated total additional investigative staff required to meet incoming case demands and clear the existing backlog within 12 months under the current system and ADI based on the parties' sampling review, and without implementing any necessary reforms or remedial measures:

$$Ceil(448.425 + 284.283) = \mathbf{733}$$

## III. Staffing Plan

The following staffing plan proposes reforms to the staff misconduct process and outlines the California Department of Corrections and Rehabilitation's (CDCR) strategy for staffing that process. The objective is to ensure comprehensive, unbiased investigations into all staff misconduct allegations referred to the OIA within the deadlines established in the Remedial Plans.

CDCR recognizes the need for additional investigative staffing to ensure the timely completion of investigations, consistent with the requirements of the *Armstrong* Stipulated Agreement and the findings of the department's staffing analysis. Simultaneously, the department acknowledges the concerns identified through a mutually agreed-upon expert review: adding significant staffing to the current operating model without first addressing underlying process and workload-calibration issues would increase resources without proportionately improving timeliness or reducing the structural backlog. CDCR shares this concern.

Accordingly, CDCR proposes a phased approach to staffing that addresses both immediate investigative capacity and systemic workload drivers. This strategy provides targeted staffing to

address critical backlog and case-aging concerns, while implementing operational changes intended to reduce unnecessary workload and improve the allocation of cases based on risk, complexity, and available evidence.

As an initial stabilization measure, CDCR proposes adding approximately 42 positions in addition to the continued recruitment of all vacant investigative positions, with resources prioritized toward the *Armstrong*-six institutions.[3] This initial increase expands capacity to reduce the existing backlog (as discussed below) and address core investigative requirements, while avoiding an immediate commitment to the substantially larger staffing level that would be required if the current system were modeled without mitigation.

To better align resources with need, CDCR proposes several system-level interventions, including: establishing additional triage between the Centralized Screening Team (CST) and the Allegation Investigation Unit (AIU); expanding the use of special-conditions closures when objective evidence can resolve an allegation without a full investigation; and revising assignment criteria to permit high-risk and other appropriate cases to be assigned to OIA, rather than concentrating the entire workload within AIU.

These proposals are subject to negotiation and approval by the parties and some may require revision of the Remedial Plans.

Furthermore, CDCR proposes—subject to negotiation—expanding body-worn camera (BWC) deployment to five additional institutions as part of a phased strategy. These institutions would be selected based on the highest volume of complaints submitted by the incarcerated population. Increased availability of objective video evidence is expected to improve the Department's ability to resolve cases efficiently. CDCR will monitor the impact of this expansion on investigative duration, closures, special-condition dispositions, and overall referral-to-closure workload.

[3] Currently there are 28 vacancies in OIA and 33 vaccines in AIU.

Ultimately, the proposed approach recognizes that staffing and process improvement are not mutually exclusive. While additional staffing is necessary to address current capacity, staffing alone is not a practical or sustainable solution if the underlying system is not substantially overhauled. The 42-position increase is, therefore, intended as an initial capacity investment while the department implements and evaluates the following workload-reduction and triage strategies.

The overarching objective is to establish a sustainable staff misconduct system in which allegations are appropriately screened, investigative resources are matched to risk and complexity, objective evidence is utilized to resolve matters efficiently, and sufficient capacity exists to ensure the timely completion of cases requiring a full investigation.

## A. Staff Misconduct Proposals

### 1. Proposed Complaint Intake, Screening, and Investigative Triage Process

This proposal establishes a dedicated Complaint Intake, Screening, and Investigative Triage Unit responsible for the initial review and routing of all staff complaints prior to formal investigation.

The Unit consists of two specialized teams that perform distinct but complimentary functions. The CST ensures consistent statewide review of all incoming source documents and complaints, distinguishing routine issues and low-level allegations of staff misconduct from serious staff misconduct on the ADI based on information presented in the source documents and using a negotiated screening tool.[4] In addition, and consistent with recommendations from the Use of Force (UOF) Consultant, screeners with the assistance of subject matter experts (SME) review the complaint, source documents, and readily available electronic information, including UOF reports, incident reports, etc., to understand the context and determine the appropriate

[4] The screening tool remains under negotiation. A current draft that addresses the Court Expert's recommendations during the parties' sampling review is included with this plan. In addition to completing this tool, Defendants request that the parties discuss whether certain categories currently on the ADI can be returned to the institutions to address.

pathway. This review is administrative in nature and is intended to support informed routing decisions, not to conduct an investigation or resolve disputed facts.

Complaints alleging staff misconduct on the ADI are transferred to the Centralized Intake and Triage Team (CITT), which serves as the preliminary inquiry unit. The CITT conducts evidence-based assessments by obtaining available video (audio video surveillance system (AVSS) and BWC footage), electronic records, and other readily accessible evidence. Based on this review, the unit determines whether the allegation is objectively refuted, requires referral for mental health assessment, or should be assigned for formal investigation.

Complaints requiring formal investigation are assigned to one of two (2) specialized investigative bodies based on seriousness, complexity, risk, and investigative need. Less serious misconduct investigations are referred to AIU, while more serious or complex allegations are assigned to OIA Field Operations or Headquarters.

This model creates a structured, risk-based complaint management process that ensures complaints are reviewed consistently, investigative resources are focused where they provide the greatest value, objective evidence is preserved early, and every complaint receives a level of review proportionate to its complexity and potential impact.

**2. Centralized Screening Team**

The CST remains the Department's centralized entry point for all allegations of staff misconduct and performs first level complaint stratification. Consistent with recommendations from the UOF Consultant, complaints are evaluated using the totality of circumstances to determine the most appropriate routing.

Screeners, with the support of SMEs, review the source documents and readily available electronic information to understand context, assess risk, and evaluate the investigative need.

Based on this review, complaints are routed through one of several pathways:

1. <u>Routine:</u> Routine complaints are those that are low-level misconduct not identified on the ADI. These complaints/requests shall be routed locally for routine review. If staff

misconduct on the ADI is discovered or alleged during the course of fact-finding for a routine review, the matter will be immediately suspended and elevated.

2. Centralized Intake and Triage Team (CITT): Allegations that contain staff misconduct listed on the ADI will be assigned to CITT for review of available evidence and further stratification.
3. Mental Health: Allegations that are clearly impossible, fanciful, fantastical, or delusional in nature should be closed at intake and referred to mental health for assessment and potential treatment. Processing such complaints through investigative channels diverts critical resources for matters involving legitimate misconduct while failing to address the underlying issue that may be driving the complaint. Referring these matters to mental health ensures the incarcerated person receives appropriate clinical evaluation and support, while allowing investigative and administrative resources to remain focused on allegations that can be meaningfully assessed and evaluated through established grievance and investigative processes.

### 3. Centralized Intake and Triage Team

This team serves as the preliminary inquiry unit and performs the Department's second level of complaint stratification through a limited, evidence-based assessment. The unit is comprised of a multidisciplinary team of sworn peace officers and investigators and non-sworn investigators and support staff, whose combined expertise supports consistent and risk-informed decision making. Unlike the CST, which evaluates complaints based on limited information for routing purposes (i.e. information contained within the written complaint, gathered in a clarifying interview, etc.), the CITT obtains, preserves, and reviews additional readily available evidence, including video evidence, reports, electronic records, and other documentary evidence, and may conduct complainant interviews to determine whether additional investigative efforts are warranted.

The purpose of this unit is not to conduct a full investigation, but rather to perform an inquiry to quickly assess whether available evidence resolves the allegation, identifies an

alternative pathway for resolution, or supports referral for formal investigation. Timely preservation and review of evidence also reduce the risk of losing critical evidence while ensuring serious allegations warranting investigation are identified and prioritized early in the process.[5]

Based on CITT's assessment, complaints may be routed or resolved through several pathways:

1. Routine: Complaints that are determined to be routine based on additional information gathered by CITT shall be routed locally for routine review. If staff misconduct on the ADI is discovered or alleged during the course of fact-finding for a routine review, the matter will be immediately suspended and elevated.
2. Administratively Closed: Complaints may be administratively closed when evidence clearly refutes the allegation or accounts for operations within policy and procedure. Like Special Condition Closures and the Central Intake Model, these cases will be closed; however, they will not require 402/403. This approach also prevents staff from being put under formal investigation when there is early evidence that clearly refutes the allegation.
3. Mental Health Referral: Allegations that are clearly impossible, fanciful, fantastical, or delusional in nature should be closed and referred to mental health for assessment and treatment.
4. Discrimination, Harassment, Retaliation Inquiry Screening: Complaints alleging discrimination, harassment, or retaliation are referred to trained SMEs for initial assessment utilizing the Office of Civil Rights (OCR) Equal Employment Opportunity (EEO) process. The purpose of this review is to determine whether the allegations, if accepted as true, establish a sufficient nexus to a protected class or protected activity.

---

[5] CITT is currently in AIU and would be expanded and repositioned outside of AIU. This remains consistent with the UOF Consultant's recommendations regarding an inquiry process within OIA and the stratification of complaints at each level.

This review ensures complaints are consistently evaluated by personnel with specialized expertise in discrimination, harassment, and retaliation claims before investigative resources are committed. Where the allegations establish a potential nexus to a protected class or protected activity, and there is no evidence that clearly refutes or accounts for operations within policy and procedure, the complaint is referred to the appropriate investigative authority (AIU or OIA) for further review. Complaints that do not establish a nexus and lack evidence of a violation of policy or procedure may be administratively closed.

5. Formal Investigation: In all other cases not listed on the pathways above, including when available evidence supports additional investigative efforts or material factual issues remain unresolved, the complaint is referred for formal investigation. Complaints are then assigned to either AIU or OIA Field Operations or Headquarters based on the nature, complexity, risk, and potential severity of the alleged misconduct (see Case Referral Guidelines below).

The CITT conducts a limited evidentiary review but does not replace formal investigation. Consistent with recommendations from the UOF Consultant regarding the Locally Designated Inquiry concept, the unit is situated outside of institutional operations to provide an independent, standardized review of complaints. This model promotes statewide consistency, preserves investigative independence, improves the quality of investigative referrals, and ensures investigative resources are focused on allegations requiring formal investigation.

**4. Implementation of Case Referral Guidelines (Risk Classification)**

The following guidelines were developed collaboratively by representatives from OIA, Division of Adult Institutions, California Correctional Health Care Services, Employment Advocacy and Prosecution Team, and the Office of the Inspector General, and have been updated based on the feedback received from the UOF Consultant. They established a structured methodology for allocating investigative resources to staff misconduct complaints across three (3) severity categories. The framework ensures that the most serious cases,

including complaints under Categories 1 and 2, are handled by the most skilled and experienced investigators, while supervisors resolve less-complex matters quickly and consistently using established processes.

Office of Internal Affairs – Category 1: (1) Staff sexual misconduct (as defined by CCR, Title 15, § 3401.5, Staff Sexual Misconduct (a)(3)(A)-(D)); (2) Unnecessary or excessive use of force resulting in Great Bodily Injury (GBI), Serious Bodily Injury (SBI), or death; (3) Dishonesty (not related to (RVRs); (4) Integrity; (5) Bringing contraband into a security area for an incarcerated person (IP); (6) Creating an opportunity or motive for an incarcerated person to harm another incarcerated person or themselves; (7) Criminal misconduct; (8) Gross negligence/incompetence resulting in GBI, SBI, or death; and (9) Media/politically sensitive cases.

Allegation Investigation Unit – Category 2: (1) Endangering IPs by violation of laws, court orders, regulations, policy, or training; (2) Discriminating, harassing, or insulting an IP pertaining to a protected class; (3) Improper access to confidential information; (4) Failure to intervene or attempt to stop misconduct that another employee engaged in; (5) Failure to follow lawful instructions or refusal to act as lawfully directed by a supervisor/higher ranking official; (6) Use of force not resulting in GBI, SBI, or death; (7) Misuse of restraints; (8) Failure to report own or witnessed use of force; (9) Misuse, non-use, or careless handling of duty weapon(s) in an institutional setting; and (10) Inappropriate display of duty weapon(s) in an institutional setting.

Hiring Authority – Category 3: (1) General unprofessional conduct; (2) Attendance issues; (3) Failure to comply; (4) Less than alert with no injury; (5) Violation of departmental policy and or general negligence/incompetence resulting in no injury/harm; and (6) Misuse of equipment or property.[6]

---

[6] Multiple repeated offenses of an item in Category 3 can be elevated to AIU or OIA for investigation.

Given the scope of these proposed changes, it is recommended that the Department implement a pilot program. A pilot program would allow the Department to evaluate how the new intake, stratification, and investigative triage model works in practice, identify operational challenges, better determine staffing and workload needs, and refine processes before full implementation. It would also provide an opportunity to develop consistent procedures, identify training and technology needs, and evaluate the impact of investigative timeliness, quality, and resource utilization. Lessons learned during the pilot can be used to adjust and ensure the model is practical, effective, and ready for statewide implementation.

### 5. Temporary Management of Cases with Statue of Limitations (SOL) Between 90 and 120 Days Until Expiration

For a specified time period (to be determined), cases that have SOLs that are between 90 and 120 days of expiration may be referred back to the Hiring Authority for local review and disposition, excluding those deemed to be Category 1 cases, as noted above (OIA investigations).

Specifically, AIU investigators would gather all evidence collected for the cases that meet these criteria, and would forward the information to the Hiring Authority, without additional investigative work being completed by OIA/AIU, for the Hiring Authority's review and disposition. Local staff will receive training similar to the training AIU investigators receive, and would assist with the collection of additional information to assist the Hiring Authority with the resolution of these cases.

To ensure adverse personnel action is taken when warranted, in the event the Hiring Authority discovers information or evidence that supports the issuance of adverse personnel action, the case will be elevated back to AIU for consideration and approval of direct adverse action.

### 6. Temporary Management of Cases with Expired SOLs

For a specified time period (to be determined), after confirming a case has an expired SOL, it may be closed for investigation and referred back to the Hiring Authority for their review and disposition, excluding those that warrant a criminal investigation or cases that meet the following

Category 1 criteria: (1) Staff sexual misconduct (as defined by CCR, Title 15, § 3401.5, Staff Sexual Misconduct (a)(3)(A)-(D)); (2) Unnecessary or excessive use of force resulting in Great Bodily Injury (GBI), Serious Bodily Injury (SBI), or death; and/or (7) Criminal misconduct.

Specifically, AIU investigators would review the details of each expired case to determine if the alleged misconduct is criminal in nature or meets the specified Category 1 criteria. If the case appears to contain allegations that meet any of these criteria, the case will be referred to OIA for review. If OIA determines the case meets the specified criteria, the case will be transferred to OIA for investigation. If it is determined that a case does not meet the specified criteria, then the AIU investigator would gather all evidence collected, and forward the information to the Hiring Authority, without additional investigative work being completed by OIA/AIU. The Hiring Authority would then be responsible for the review and disposition of the returned case to determine if corrective action (training) should be taken, and/or if any policy/procedural changes need to be implemented.

Additionally, a letter would be sent by CPRIO to the subject(s) and the claimant(s), notifying them that the Department has administratively closed the case, as the time period to complete the investigation has expired.

### 7. Introducing an Electronic Grievance and Appeals Process

Implementing an electronic grievance and appeals process through the incarcerated population's tablets would modernize and streamline the submission, tracking, and resolution of claims. A digitized system would provide real-time submission and status updates, reduce paper handling and administrative workload, improve record retention and data accuracy, and enhance transparency for both incarcerated individuals and staff. It could also potentially reduce some retaliation allegations by removing any opportunity for housing staff to review a grievance. Electronic processing would also allow for more efficient routing, monitoring, and reporting of grievances, reduce delays associated with manual processes (e.g. imminent risk detection), and provide leadership with better data to identify trends, allocate resources, and address systemic issues while maintaining appropriate security and accountability measures.

The Department is currently working on a system that would allow for automated triage and initial case routing based on the ADI with the future use of Artificial Intelligence (AI).

### 8. AI Augmented Reporting

The Department plans to utilize AI tools to assist in the drafting of investigative reports. A review of AIU time keeping data shows that a high percentage of investigator time is spent on the drafting and preparation of case reports. A recent limited trial using the Department's Co-Pilot system found using AI tools improved the quality of reports and saved an average of five (5) hours per case. The Department acknowledges that there will be limits to this system, which will require quality controls and continued managerial level review.

### B. Staffing Proposal

The proposed staffing model is designed to address the staff misconduct workload at multiple points within the investigative process rather than relying solely on increasing AIU investigative capacity. The positions would establish additional triage and evidence-review capacity between centralized screening and formal investigation, while simultaneously expanding investigative resources for cases requiring higher levels of expertise and risk-based handling.

<u>Centralized Intake, Triage, and Evidence Review – CITT – prevent and resolve unnecessary investigative referrals:</u>

- 8 Analyst II positions assigned to the Preliminary Inquiry Unit within CITT and trained by the Office of Civil Rights (OCR). These positions would provide an additional preliminary inquiry function between CST and AIU for EEO-related staff misconduct allegations. The model would leverage OCR's existing experience conducting preliminary inquiry and screening of staff-on-staff EEO complaints to determine whether allegations require a full AIU investigation or can be appropriately resolved through another process.
- 8 Sergeant positions assigned to CITT to conduct focused reviews of available body-worn camera, institutional video, electronic, documentary, and other objective

evidence. These positions would identify cases in which available evidence clearly establishes or refutes the material allegation and where the case may, therefore, qualify for a special-conditions closure, reducing the need for a full investigative assignment.

- 1 Captain position assigned to CITT to provide supervisory oversight and ensure consistency, quality control, and coordination across the preliminary inquiry and evidence-review functions.

<u>AIU Investigative Capacity- Increase investigative Capacity:</u>

- 14 Lieutenant positions assigned to AIU to provide additional supervisory and investigative management capacity, support case assignment and workload distribution, and increase AIU's ability to address the existing backlog and ongoing investigative intake.

<u>OIA Field Operations – Higher-Risk Investigations - Distribution of Investigative workload:</u>

- 10 Special Agent positions assigned to OIA Field Operations to provide additional investigative capacity for higher-risk, complex, or otherwise appropriate cases that can be assigned outside of AIU. This creates an additional investigative pathway and reduces the concentration of investigative workload within AIU.
- 1 Senior Special Agent Supervisor position assigned to OIA Field Operations to provide supervisory oversight for the additional field investigative capacity.

**1. Staffing Strategy**

Collectively, the above positions are intended to create a tiered investigative model that matches resources to the nature, complexity, and risk of each allegation. The model adds capacity before cases reach AIU through preliminary inquiry and evidence-based disposition, increases AIU's capacity for cases requiring formal investigation, and expands OIA Field Operations' ability to assume higher-risk investigations. It also seeks to leverage AI to improve efficiency and increase case closure rates.

This approach is intended to reduce the number of matters requiring a full AIU investigation while simultaneously increasing the Department's capacity to timely resolve those allegations that do require a formal investigation. The result is a more balanced investigative system in which additional staffing is paired with improved triage, greater utilization of objective evidence, and risk-based distribution of investigative workload.

#### 2. Performance Measurement and Reassessment

CDCR will establish measurable performance indicators for the initial phase, including monthly investigative intake and closure rates, backlog size, case age, cases approaching statutory deadlines, special-condition closure rates, utilization of available objective evidence, and the distribution of cases among investigative components. These measures will provide an empirical basis for determining the effect of the proposed interventions and allow the Department to properly calibrate its staffing needs, including during the May-revise if necessary.

Following implementation and an appropriate period of evaluation, CDCR will reassess investigative staffing requirements using the resulting, better-calibrated operating model rather than assuming that the current referral and workload structure represents the appropriate long-term staffing baseline. This phased approach allows the department to satisfy the immediate need for additional investigative capacity while addressing the systemic issues identified by expert review and avoid the risk of permanently staffing an inefficient, mis-calibrated process.

Staffing needs will be measured and reevaluated over phases with periodic reevaluation based on changes to the investigative and disciplinary process. The Department proposes that this process occur quarterly.

## IV. Implementation Plan

CDCR plans to prepare and submit a Budget Change Proposal for the staffing plan discussed above. All new position authority and spending require budgetary approval. For these requests, if approved, funding would be allocated as part of the FY27/28 budget beginning July 1, 2027.

Current unfilled positions are presently within various stages of recruitment. On average, positions take an estimated 2 months to recruit with an additional 4-6 months for background (6-8 months total). Training for positions takes an additional 3-4 weeks.

/ / /

/ / /

/ / /

# DRAFT CST SCREENING & ROUTING TOOL ATTACHED

**CENTRALIZED SCREENING TEAM**
**SCREENING & ROUTING TOOL**

**QUICK GUIDE**

1. Do I understand the allegation well enough to decide whether it could be on the Allegation Decision Index (ADI) (what/how/why)?

2. Do I have enough information to manage the claim and identify duplicate or related claims (who/when/where)?

| ADI Screening | Action |
|---|---|
| No staff behavior described. | Obtain description of what staff did or said. |
| Uses only labels, conclusions, or buzz words. | Clarify the underlying behavior. |
| Insufficient information to determine whether the allegation, if true, could constitute misconduct on the ADI. | Obtain additional information necessary to understand the allegation. |
| Sufficient information to determine whether the allegation, if true, could constitute misconduct on the ADI. | Proceed with ADI determination. |
| **Pre-Routing Information** | **Action** |
| Staff involved, date, time, or location are unknown. | Attempt to obtain information necessary to identify duplicate or related claims before routing. |
| Sufficient identifying information has been obtained or could not be found. | Route the claim. |

**FACE VALUE SCREENING**

PURPOSE:

"'Staff Misconduct' refers to behavior that results in a violation of law, regulation, policy, or procedure, or actions contrary to an ethical or professional standard." Cal. Code Regs., Tit. 15, § 3486(b)(7).

Face value screening is the initial review of a complaint based on staff behavior alleged by the complainant. The purpose of screening is not to determine whether misconduct occurred, whether an allegation can be proven, or whether the complainant's asserted reason, motive, or

intent is correct. Rather, the purpose is to determine whether the allegation, if true, could constitute staff misconduct identified on the ADI.

SCREENING:

When conducting face value screening, staff should identify: (1) the alleged staff behavior, including actions, omissions, statements, or decisions; and (2) any asserted reason, motive, or intent for that behavior. For screening purposes, the alleged behavior and any asserted reason, motive, or intent for that behavior must be assumed true. Then, staff should determine whether those allegations could constitute staff misconduct identified on the ADI.

Labels, conclusions, or "buzzwords" alone are insufficient to identify the nature of an allegation. However, a complainant's belief regarding the reason, motive, or intent for alleged staff behavior may be considered as part of the allegation when it is connected to specific alleged behavior.

For example, "Officer Smith retaliated against me" is a conclusion because it does not identify the behavior at issue. In contrast, "Officer Smith retaliated against me by issuing me a false write-up after I filed a grievance against him" identifies specific alleged behavior and the complainant's asserted reason for that behavior.

Identifying the alleged behavior is necessary because the same label, conclusion, or buzzword may be applied to behavior that could constitute staff misconduct or to behavior that would not constitute staff misconduct. Without knowing the behavior at issue, staff cannot determine whether the allegation, if true, corresponds to a category of misconduct on the ADI. The goal is not to evaluate the validity or veracity of the complaint, but to understand what behavior is alleged to have occurred.

If the alleged adverse action is staff conduct that is required by policy, it is not staff misconduct and not on the ADI unless there is an allegation of discrimination based on a claim that staff violated that policy to benefit other incarcerated people. Additionally, objections to policies or policy decisions are also not allegations of staff misconduct and not on the ADI.

Not every event described in a complaint is an allegation of misconduct. Some events are included only to provide context for the action that the complainant is challenging. When a complaint describes multiple events or actions, staff should identify the conduct the complainant is alleging was improper, recognizing that allegations may include background or contextual information that explains the circumstances leading to the complaint without constituting the conduct at issue. The inclusion of an event in a complaint does not, by itself, mean the complainant is alleging misconduct regarding that event.

For example, a complainant states that staff used force, that they were subsequently treated by medical staff, and complains that the medical treatment was inadequate and requests further medical care. If the complainant challenges only the adequacy of the medical treatment, but does not allege that the force was improper, the prior use-of-force event *may* be included only to provide context, but is not itself the subject of the complaint.

CLARIFICATION:

Staff should attempt to clarify an allegation when it is unclear, ambiguous, incomplete, or insufficiently specific to identify the behavior being alleged. If it is unclear whether the complainant is challenging a particular action or merely describing it as background, staff should also seek clarification before classifying the allegation.

Clarification shall not be sought to prove or disprove an allegation, assess credibility, or determine whether misconduct occurred. Once the alleged behavior and any asserted reason, motive, or intent are identified, staff must determine whether the allegation, if true, could constitute staff misconduct identified on the ADI.

Staff may obtain clarification via a clarifying interview of the claimant when necessary. Staff may also consult with their supervisors and subject matter experts when appropriate.

For purposes of determining that an allegation is on the ADI, staff may rely on available records to clarify a complaint. However, if the records do not clearly establish that the allegation is on the ADI, a clarifying interview must be conducted before concluding that the allegation is not on the ADI. Although records may suggest that the alleged misconduct did not occur, staff must not weigh evidence or assess credibility at the screening stage. For purposes of determining whether an allegation is on the ADI, the allegations in the complaint must be accepted as true.

If, after reasonable clarification efforts, including a clarifying interview, no identifiable staff behavior can be obtained, the complaint does not meet the threshold for an allegation of staff misconduct on the ADI.

EXAMPLES:

1. USE OF FORCE

**Criteria:** (1) staff (2) used physical force (including use of chemical agents and restraints) (3) against an incarcerated person; or (4) engaged in the misuse, non-use, careless handling, or inappropriate display of duty weapons.

**On the ADI:**

These allegations identify specific staff actions involving physical force or misconduct involving a duty weapon. Assuming the allegations are true, the described behavior could constitute a use-of-force allegation on the ADI.

- "While being escorted from Facility B, an officer slammed me into the wall while I was handcuffed behind my back."
- "Multiple staff sprayed me with pepper spray in my cell after I was already prone and restrained."

- Staff tightened my handcuffs after I complained, causing lacerations and bleeding."
- "During a cell extraction, two officers punched me while I was on the ground and not fighting back."
- "Officers used excessive force on me by striking me in the head with a baton."
- "The Control Booth Officer removed his rifle and pointed it at me because he said I was being too loud."

**Requires Clarification:**

These allegations describe a conclusion or characterization of events but do not identify the underlying staff behavior. Clarification is needed to determine whether the allegation corresponds to the use of physical force by staff.

- "They used excessive force on me."
- "The force was unnecessary."
- "They assaulted me."
- "They roughed me up."
- "I was treated badly during an escort."

**Not on the ADI:**

These allegations characterize the behavior as excessive or unnecessary force, but the alleged behavior does not involve the use of physical force or misconduct involving a duty weapon and, even if true, would not constitute a use-of-force allegation on the ADI.

- "Staff used excessive force on me by repeatedly shining a flashlight into my cell when I failed to respond."
- "The force was unnecessary because staff woke me up by banging on my door."
- "Staff assaulted me by playing bad music in my housing unit."
- "Staff used unnecessary force by placing me in leg irons after the incident when I was already in waist chains."

2. STAFF SEXUAL MISCONDUCT

**Criteria:** (1) staff engaged in (2) sexual (3) misconduct (including violence) or harassment (4) against an incarcerated person.

**On the ADI:**

These allegations identify staff sexual misconduct or harassment against an incarcerated person that, if true, could constitute staff sexual misconduct on the ADI.

- "Staff massaged my genitals during a clothed search."
- "An officer told me to expose my genitals and laughed."
- "The officer offered me better housing in exchange for sexual favors."
- "An officer made repeated comments about my breasts."

**Requires Clarification:**

These allegations describe a conclusion, perception, or characterization of events but do not identify the specific staff behavior. Clarification is needed to determine whether the alleged behavior is sexual misconduct or harassment by staff.

- "They sexually harassed me."
- "I was made to feel uncomfortable during a pat down search."
- "He acted inappropriately toward me."
- "They crossed the line during a search."
- "I feel like I was violated."

**Not on the ADI:**

The below allegations characterize the behavior as sexual misconduct or harassment, but the alleged behavior is not sexual in nature and, if true, would not constitute staff sexual misconduct or harassment on the ADI.

- "Staff sexually harassed me by confiscating my pornographic magazines."
- "Staff sexually harasses inmates by following the unclothed body search policy."
- "Staff sexually harassed me by randomly performing a clothed body search without probable cause."
- "Staff sexually assaulted me by swiping my waistband twice during a clothed body search when going to yard."

3. DISHONESTY

**Criteria:** (1) staff (2)(a) destroyed, fabricated, falsified, altered, or planted (b) evidence; or (3)(a) included materially false information (b) in an official report or record; or (4)(a) made materially false or intentionally misleading statements (b) to a supervisor. Information is "material" if it could affect or influence a decision, determination, investigation, disciplinary action, or other official action.

**On the ADI:**

These allegations identify specific behavior, such as the fabrication, falsification, alteration, or planting of evidence, or inclusion of materially false information in an official report or record that, if true, could constitute dishonesty on the ADI.

- "An officer authored an RVR that I refused a direct order to submit to handcuffs. I complied with the officer's direct order; however, I was found guilty."
- "A counselor added false information in my file to give me an "R" suffix"
- "I told committee I couldn't transfer due to safety concerns, but they lied saying I had no safety concerns and agreed with the committee's decision."
- "During a random search of my cell, I observed an officer put a controlled substance in between my photo albums and claimed I was in possession of contraband."

**Requires Clarification:**

These allegations assert that information is false but do not identify the specific statement, record, evidence, or conduct at issue. Clarification is needed to determine whether the alleged behavior, if true, could constitute dishonesty on the ADI.

- "Staff lied in my report."
- "The report is false."
- "Staff made things up about me."
- "The paperwork is wrong."
- "They put false information in my file."

**Not on the ADI:**

These allegations dispute the accuracy or validity of information, but do not identify the fabrication, falsification, alteration, or planting of evidence, or inclusion of materially false information in an official report or record. Even if true, the alleged conduct would not constitute dishonesty on the ADI.

- "Staff lied in my report. The incident was at 1:31 PM, not 1:30 PM."
- "The paperwork is wrong because staff cited my corporate identity rather than my natural person."
- "They put false information in my file because my name appears in all capital letters."

4. DISCRIMINATION & HARASSMENT

**Criteria:** (1) staff (2)(a) took an adverse action or (b) engaged in harassing or discriminatory conduct against (3) a person in a protected class (4) believed to be because of their membership in that protected class.

There is no requirement that the person allege any facts supporting their belief that the discriminatory/harassing conduct was because of his/her membership in a protected class. For example, "Officer Smith discriminated against me by not allowing me to go to yard because of my ethnicity" is sufficient to establish criteria (4)—no additional factual support is required. A clarifying interview to determine why the person believes the conduct was because of his/her membership in a protected class is also not required. Determining the nexus between the protected class and the differentiated treatment is not the role of CST.

If an apparent discrimination claim does not mention a protected class, a clarifying interview is warranted.

**On the ADI:**

These allegations identify adverse, harassing, or discriminatory behavior directed at an incarcerated person in a protected class. If true, the alleged conduct could constitute discrimination or harassment on the ADI.

- "An officer denied me a job and told me, 'They don't give jobs to people of my race."
- "A couple times the other week, a housing officer called me (described) racial slurs."
- "An officer mocked me by making a funny voice and gestures meant to disparage my disability."

**Requires Clarification:**

These allegations identify a belief that staff acted unfairly, discriminatorily, or harassingly, but do not provide enough information to determine whether the complainant is alleging discrimination or harassment on the ADI

- "Staff discriminated against me by not giving me my breakfast."
- "My doctor discriminated against me for being transgender."

- "Staff is racist."
- "I am being treated unfairly."
- "They don't like people like me."
- "Staff harasses me all the time."

**Not on the ADI:**

These allegations characterize the behavior as discrimination or harassment, but, even if true, they do not identify adverse behavior based on membership in a protected class that would qualify as discrimination or harassment under the ADI.

- "Staff is racist because they gave me a rules violation report just because I exposed myself to a female nurse."
- "They don't like people like me because of my criminal history."
- "Staff harasses me all the time by enforcing institutional rules."

5. RETALIATION

**Criteria:** (1) staff (2) took an adverse action against the claimant (3) that the claimant perceived occurred because the person engaged in protected conduct, including reporting staff misconduct, filing a grievance or appeal, participating in a lawsuit, or requesting a disability accommodation.

If a complaint alleges retaliation and includes both an adverse action and protected conduct, that is sufficient to meet criteria (2) and (3) without a clarifying interview. If a retaliation claim does not mention protected conduct or provide information about the nature of the adverse action, a clarifying interview is warranted.

**On the ADI:**

These allegations identify specific adverse behavior by staff and an asserted connection between that behavior and the complainant's engagement in protected activity. If true, the alleged conduct could constitute retaliation on the ADI.

- "After I filed a grievance, a Sergeant moved me and said it was because I complained."
- "An officer wrote me up right after I filed a complaint against him. He said it was because I'm a snitch."
- "An officer took my job because I testified in an investigation."
- "I was placed in RHU after I requested a lower bunk accommodation for my disability. Staff said, 'I've got a lower bunk for you' and smiled."

- “My PCP denied me pain medication and physical therapy and said that it’s due to me filing 602’s."

**Requires Clarification:**

Clarification is needed to determine the alleged adverse staff behavior, the protected conduct, or whether the complainant believes the adverse behavior occurred because of the protected conduct.

- “Staff is retaliating against me.”
- “They are messing with me because I file grievances.”
- “I am being targeted.”
- “Staff keeps harassing me after my complaint.”
- “This happened because I spoke up.”

**Not on the ADI:**

These allegations include staff behavior and a perceived reason for that behavior, but, even if true, do not allege adverse action or involve protected conduct that would qualify as retaliation on the ADI.

- “Staff is retaliating against me by placing me in RHU because I assaulted my cellmate.”
- “They are messing with me because I file grievances by denying me release from prison even though I have repeatedly informed them that I am a free and sovereign person who is not subject to the institution’s jurisdiction.”
- “Staff keeps harassing me after my complaint about being unable to watch my favorite show by continuing to deny my requests to watch it.”

6. CODE OF SILENCE

**Criteria:** (1) Staff (2)(a) coordinated to prohibit reporting of misconduct (b) to prohibit reporting of misconduct; (3)(a) did not report misconduct (b) on the ADI; (4)(a) intimidated, dissuaded, or threatened (b) a witness; (5)(a) prevented or interfered with (b) reporting misconduct; or (6)(a) did not have their BWC on (b) during an interaction that is the subject of a staff misconduct complaint other than BWC non-compliance.

**On the ADI:**

These allegations identify specific staff behavior and an asserted connection to concealing, discouraging, interfering with, or failing to report staff misconduct, or to the use of a BWC

during an interaction that is the subject of a staff misconduct complaint. If true, the alleged conduct could constitute a code of silence violation on the ADI.

- "The officer saw the other officer hit me but refused to report it."
- "An officer told me that if I wrote them up, no one would report what happened in the dayroom when another officer threatened to have me beat up by other incarcerated persons."
- "The officer turned off their BWC during the incident where they watched me be beaten by staff."
- "During meal distribution, an officer approached my cell door and whispered (described) racial slurs while covering their BWC."
- "A nurse did not document my injuries in the incident report to cover up the broken arm I suffered at the hands of custody."

**Requires Clarification:**

Clarification is needed to determine the alleged staff behavior, the underlying misconduct at issue (if any), or whether the complainant alleges conduct intended to conceal, discourage, interfere with, or avoid reporting of staff misconduct.

- "Staff are covering for each other."
- "No one will report what happened."
- "They protect their own."
- "Everyone is in on it."
- "The control officer doesn't activate their BWC regularly and uses profane language towards us on the PA system."

**Not on the ADI:**

These allegations identify staff behavior but do not involve concealing, discouraging, interfering with, or failing to report staff misconduct, nor do they involve BWC use during an interaction that is the subject of a staff misconduct complaint. Even if true, the alleged conduct would not constitute a code of silence violation on the ADI.

- "They protect their own. Specifically, staff will protect each other during riots and assaults on staff."
- "Everyone is in on it because staff all coordinated to put my housing unit on lockdown just because of one inmate fight."

- "The control officer doesn't activate their BWC regularly. Separately, the control booth officer uses profane language towards us on the PA system."

7. OTHER MISCONDUCT

**Criteria:** (1)(a) staff (b) violated a law, court order, regulation, policy, or training (c) in a way that endangered an incarcerated person or resulted in significant injury or death of an incarcerated person.

(2)(a) Staff (b) intimidated or threatened (c) an incarcerated person (d) with a sanction or action that, under the circumstances, violates a law, court order, regulation, policy, or training.

(3)(a) Staff (b) were overfamiliar with an incarcerated person.

(4)(a) Staff (b) used their position to solicit gratuities or favors (c) from an incarcerated person.

(5)(a) Staff (b) brought contraband for (c) an incarcerated person.

(6)(a) Staff (a) created an opportunity or motive for (b) an incarcerated/supervised person (c) to harm an incarcerated person.

(7)(a) Staff (b) failed to intervene to stop misconduct (c) that is listed on the ADI.

(8)(a) Staff (a) accessed confidential information (b) that endangered an incarcerated person.

**On the ADI:**

These allegations identify staff behavior that, if true, could constitute endangerment, threats, overfamiliarity, solicitation of favors or gratuities, introduction of contraband, failure to intervene, misuse of confidential information, or another form of misconduct identified in this category.

- "I was told by my celly that the Psych Tech took money to bring in contraband for inmate Jones."
- "Officer ignored my calls for man down/suicide, and no one ever responded."
- "Staff watched inmate Jones assault me and did nothing to stop the assault."
- "Inmate Jones told me the officer shared my pedophile conviction with other inmates, and now I fear for my life."
- "For the past two weeks, a nurse on 3rd watch talks to me about her marriage troubles every day at the pill line."
- "My doctor cleared me to go back to my cell even though I told her, 'I am going to kill myself.'"

- "Officer didn't do anything to call mental health when I told him, 'I am going to swallow a razor.'"
- "No one put a seatbelt on me during transport to the hospital, and I fell to the floor and hit my head."
- "CO in my unit told other inmates I am HIV positive, and now several inmates are taunting me and wanting to attack me for being positive."
- "The RN at B clinic has a crush on me and wanted to be my secret GF."
- "All staff threaten me for reporting their abuses to ADA inmates."

**Requires Clarification:**

These allegations describe a belief that staff acted improperly, but do not provide enough information to determine whether the alleged behavior meets the criteria for this category. Clarification is needed to identify the staff behavior and its connection to the applicable criteria.

- "Staff are corrupt."
- "Something illegal is going on."
- "Staff are abusing their power."
- "They are doing favors for inmates."
- "Staff acted unprofessionally."
- "I am suicidal and they didn't do anything for me."

**Not on the ADI:**

These allegations identify staff behavior and characterize it as improper, but the alleged behavior, even if true, does not meet the criteria for this category and would not constitute misconduct on the ADI under this category.

- "The doctors and nurses violated my HIPAA rights."
- "Officer Doe intimidated and threatened me, saying he would write me up if I continued to refuse orders to return to my assigned housing."
- "Officer Doe failed to intervene to stop Officer Johnson from performing his random cell searches."

**PREPARING CLAIMS FOR ROUTING**

Face value screening focuses on the what, how, and why of an allegation to determine whether, if true, it could constitute staff misconduct on the ADI. Separately, before routing a claim, staff should also attempt to identify the who, when, and where of the allegation, including the staff involved and the date, time, and location of the alleged misconduct. This information is used to identify duplicate and related claims and may be obtained through a review of available records, including grievances, rule violation reports, and chronos, or as part of a clarifying interview.

These are separate processes. Information gathered to identify the who, when, and where of an allegation does not affect the face value screening analysis. Although records may suggest that the alleged misconduct did not occur, staff must not weigh evidence or assess credibility at the screening stage. For purposes of determining whether an allegation is on the ADI, the allegations in the complaint must be accepted as true. Allegations on the ADI must be routed in accordance with policy—even if clarifying efforts fail to identify staff, the date, time, or location of the alleged incident.

Examples of claims on the ADI that require clarification before routing:

These allegations constitute misconduct on the ADI, but do not identify the who, when, and where of the alleged misconduct. Staff should attempt to find this information before routing the claim, including by reviewing relevant records. However, if the information cannot be found, the claim should still be routed in accordance with policy.

- "While being escorted, he slammed me into the wall while I was handcuffed behind my back."
- They authored an RVR that I refused a direct order to submit to handcuffs. I complied with the order; however, they found me guilty."
- "A couple times, staff called me (described) racial slurs."
- "Staff offered me better housing in exchange for sexual favors."
- "Staff wrote me up right after I filed a complaint against them and said it was because I'm a snitch."
- "One officer saw another officer hit me but refused to report it."
- "Officers ignored my calls for man down/suicide, and no one ever responded."

# EXHIBIT D

*Armstrong v. Brown, et al.*

U.S. District Court, Northern District of California,
Case No. C 94-2307 CW

# California Department of Corrections and Rehabilitation's County Jail plan for addressing *Armstrong* class members housed in County Jails, as ordered by the Federal District Court on April 11, 2012.

The CDCR also does not intend for this document to provide any legal advice to Counties or their staff and reserves the right to make changes to this plan, based on future legislative actions or legal clarifications.

## INTRODUCTION

This plan results from a finding by the Federal Court that state parolees and state inmates are under the jurisdiction of California Department of Corrections (CDCR) when housed in a County Jail and therefore are entitled to the same reasonable accommodations that CDCR provides within its institutions and facilities.

By complying with the Court's order of April 11, 2012, and developing this plan to track, and provide parolees and inmates with a grievance process, the CDCR does not concede or assent that it has control over the County Jails. County Jails are operated under the authority of the County Sheriffs.

## DAILY JAIL LIST -

The CDCR will be responsible for sending an electronic message to the County's designee or legal counsel where a CDCR parolee has been newly booked.

CDCR will send notifications to impacted counties via a batch process to be disseminated daily at the same time each day, seven days a week.

The electronic notification will include, at minimum, for each Armstrong parolee:

a. Full name.
b. CDC number.
c. The CDCR Disability Placement Program (DPP) code and definition of the DPP Code.
d. Any housing accommodations as stated in DECS.
e. Any programming accommodations as stated in DECS.
f. Health Care Appliances.
g. Last release date from prison.

The CDCR automated process will allow for counties to reply via email. This will also allow for CDCR to become aware of electronic messages that are returned undeliverable.

## PAROLE HOLDS IN COUNTY JAILS

As part of the Notice of Rights (NOR) process:

1. Current operating procedures for the NOR will remain in place. Parole/Notice Agents shall check Disability and Effective Communication System (DECS), review field file and source documents and determine if any reasonable accommodations are needed. All information will be documented in Section I on the Notice and Request for Assistance at Parole Proceeding BPH form 1073.

2. The parole/notice agent will ask the parolee to self-identify any disability needs related to housing and programming and will document the information in the "Other" field in Section II of the BPH 1073.

3. Within three business days, while informing the parolee of his/her Notice of Rights/Notice of Charges, the parole/notice agent shall provide a parolee identified as an Armstrong class member with a Reasonable Modification or Accommodation Request CDCR form 1824 and explain to the parolee that they may use that form as a grievance process if they are a person with a disability and are not receiving a housing or programming accommodation that they need in the County Jail.

   The parolee will also be provided a self-addressed/postage paid envelope (Business Reply Mail) to be used for sending a completed grievance form to the respective Regional ADA Unit.

   Parolees will be informed of and encouraged to use the local facility's grievance process in addition to CDCR's grievance process.

4. DAPO staff shall assist parolees in completing a CDCR form 1824 when the parolee is unable to complete the form on his/her own due to a disability. The parole/notice agent will forward the completed grievance form to their Regional ADA Unit within one business day of receipt.

5. DAPO staff shall inform County Jail staff about a need for an accommodation or possible medical or mental health examination, no later than four business days after a parolee's date of arrival at the county jail. Any notification given to county jail staff shall be documented on the Notice and Request for Assistance at Parole Proceeding BPH form 1073 and recorded in the DECS.

GRIEVANCES and their COLLECTION (CDC Form 1824)

Upon receipt of a CDCR 1824 grievance form, the notice/parole agent shall send the CDCR form 1824 to the Regional ADA Parole Unit within one business day.

The Regional ADA Parole Administrator shall ensure the grievance is entered into the DAPO tracking system and assigned to an ADA Unit staff member for a response. If the Administrator identifies the stated issue on the CDCR 1824 qualifies as an emergency, he/she shall ensure a response is completed within 5 calendar days. If the Administrator deems the CDCR 1824 is a non-emergency then he/she shall ensure a response is completed within 15 calendar days.

The Regional ADA Parole Administrator will ensure the grievance is forwarded as soon as possible and no later than three business days after receipt to the respective County's designee or legal counsel for subsequent notification to the County Jail housing the subject parolee.

1. For Armstrong class members who are scheduled to go "out to court" for more than three business days, the institutional Case Records staff will include a Request for Reasonable Modification or Accommodation Request CDCR form 1824 post card with the OTC packet at the prison facility where they are housed prior to be transferred out to court. The institution's Recieving and Release staff will give the post card to the inmate at the time of departure from the facility.

   The post card will be self-addressed/postage paid, with the return address for DAPO HQ – Parole Litigation Compliance Unit (PLCU) in Sacramento, CA.

The PLCU will verify the location of the inmate and notify the respective Regional ADA Unit, who will deploy a parole/notice agent to the jail to provide the inmate with necessary forms within three business days of receipt of the post card.

2. The parole/notice agent shall provide an inmate identified as an Armstrong class member with a Reasonable Modification or Accommodation Request CDCR Form 1824 and explain to the inmate that they may use that form as a grievance process if they are a person with a disability and are not receiving a housing or programming accommodation that they need in the County Jail.

3. DAPO staff shall assist inmates in completing a CDCR form 1824 when the inmate is unable to complete the form on his/her own due to a disability. The parole/notice agent will forward the completed grievance form to their Regional ADA Unit within one business day of receipt.

   The inmate will also be provided a self-addressed/postage paid envelope (Business Reply Mail) to be used for sending a completed grievance form to the respective Regional ADA Unit.

   Parolees will be informed of and encouraged to use the local facility's grievance process in addition to CDCR's grievance process.

4. DAPO staff shall inform County Jail staff about a need for an accommodation or possible medical or mental health examination, no later than four business days after the date of arrival at the county jail. Any notification given to county jail staff shall be documented.

5. The Division of Adult Institutions (DAI), Americans with Disabilities Act (ADA) Associate Warden (AW) will notify the Regional ADA Unit of the Armstrong class member's name, number, county where inmate will be housed, and date of departure within three business days of departure from the CDCR institution.

6. The DAI ADA AW will be responsible for notifying the County's legal counsel (or designee) of the inmate's out-to-court status and ADA information that impacts the housing and programming of the inmate, within three business days of departure from the CDCR institution. A copy of the notice sent to the County legal counsel (or designee) will then be forwarded to the Office of Legal Affairs, Class Actions Team– Attention: Armstrong Counsel, at CDCR Headquarters in Sacramento, and to the Plaintiff's counsel simultaneously.

CDCR form 1824's collected at the County Jail shall be sent to the Regional ADA Parole Unit for processing in accordance with this plan.

EMERGENCY APPEALS

If any CDCR staff person becomes aware, whether through a hearing, notice service, or otherwise, that an Armstrong class member being housed in a County Jail has an urgent or emergent situation (i.e., if it alleges a condition which is a threat to the parolee's health or safety, or is necessary for participation or effective communication in a parole revocation proceeding) that person shall immediately notify the Regional ADA Parole Administrator, as well as the County's designee or Legal Counsel using contact information provided by the County's Legal Counsel.

The Regional ADA Parole Administrator shall respond to such a grievance within five calendar days of receipt and make their best efforts to ensure that necessary and reasonable accommodations are provided on an interim basis, and shall document their efforts on the CDCR 1824 form.

PARAGRAPH 5 RESPONSES

If plaintiff's counsel raises concern regarding individual class members, those letters are to be sent simultaneously to the Office of Legal Affairs, Class Actions Team– Attention: Armstrong Counsel, at CDCR Headquarters in Sacramento, and to the respective county Legal Counsel.

With the assistance of the Regional ADA Parole Administrator, non-urgent issues will be addressed within 15 business days and urgent issues will be addressed within five business days.

## PATTERNS OF ALLEGED MISCONDUCT OR DENIAL OF ADA ACCOMODATIONS

Each Regional ADA Parole Administrator shall review all CDCR 1824 grievances and determine if there is a pattern of denials of disability accommodations such as improper housing and/or denial of assistive devices to class members at a particular county jail facility.

If a pattern is discovered, the Regional ADA Parole Administrator must write to the County's Legal Counsel (or designee), within five days of discovery and provide the evidence alleged. The letter must be copied to plaintiff's counsel, care of the Office of Legal Affairs, Class Actions Team – Attention: Armstrong Counsel, at CDCR Headquarters in Sacramento.

The Regional ADA Parole Administrator shall assign one of their Parole Agent II, Supervisors to investigate the alleged deficiencies at the specific county jail. Such agent of CDCR shall audit and/or investigate the situation at the County Jail, to the extent possible, and determine what steps, if any, can be taken to remedy the situation. A written report shall be provided to the Office of Legal Affairs, Class Actions Team – Attention: Armstrong Counsel, at CDCR Headquarter in Sacramento.

## ACCOUNTABILITY

Failure by CDCR staff to comply with any portion of this plan may result in employee referrals for accountability to a Supervisor and/or the Office of Internal Affairs for investigation. Parole Region and Institution employee accountability logs shall be used and maintained consistent with prior memorandums for documentation of employee accountability.

## CDCR ADDRESSES

**Office of Legal Affairs, Class Actions Team**
– Attention: Armstrong Counsel
1515 S Street, Rm 314S
Sacramento, CA 95811

**DAPO HQ – Litigation Compliance Unit**
1515 S Street, Rm 212N
Sacramento, Ca 95811

**Region 1**
**Regional ADA Unit**
9825 Goethe Road, Ste 200
Sacramento, CA 95827-2572

**Region 2**
**Regional ADA Unit**
1515 Clay Street, 10th Floor
Oakland, CA 94612-1499

**Region 3**
**Regional ADA Unit**
320 W. 4th Street, Suite 1000
Los Angeles, CA 90013-2489

**Region 4**
**Regional ADA Unit**
21015 Pathfinder Road, Suite 200
Diamond Bar, CA 91765-4002